THOMSON REUTERS
WESTLAW EDGE ○

FTX    History    Folders    My links    Community    Notifications          Sign out

All content    | Enter terms, citations, databases, questions, |    All State & Federal          Search Tips

## Garrison v. Bankman-Fried et al

1:22CV23753    (Approx. 21 pages)

Document    Filings (1)    Related Opinions/Dockets (0)    Timeline (1)

| Go to |                                              Request Multiple PDFs

TO ORDER COPIES OF ANY DOCUMENTS LISTED BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 02/10/2023**

Today's Date: 2/10/2023

Source: U.S. District Court, Southern District of Florida (Miami)

| | |
|---|---|
| **Court:** | U.S. District Court, Southern District of Florida (Miami) |
| **Case Title:** | Garrison v. Bankman-Fried et al |
| **Case:** | 1:22-CV-23753 |
| **Judge:** | Jud      Copy with Reference (Standard) |
| **Date Filed:** | 11/1   Copy without Reference |
| **Case Status:** | JB, REF_DISCOV |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 1:22CV23753 |
| **Referred To:** | Magistrate Judge Jacqueline Becerra |
| **Jury Demand:** | Plaintiff |
| **Nature of Suit:** | Torts: Other Fraud (370) |
| **Jurisdiction:** | Diversity |
| **Cause:** | 28 USC 1332 - Diversity: Securities Fraud |

## PARTICIPANT INFORMATION                                    Expand All

**Edwin Garrison**

1

Gregg Podalsky

Skyler Lindeen

Alexander Chernyavsky

Gary Gallant

David Nicol

Sunil Kavuri

Sam Bankman-Fried

Thomas Brady

Gisele Bundchen

Stephen Curry

Golden State Warriors LLC

Shaquille O'Neal

Udonis Haslem

David Ortiz

William Trevor Lawrence

Shohei Ohtani

Naomi Osaka

Lawrence Gene David

1

| Kevin O'Leary |
| --- |

| Caroline Ellison |
| --- |

| Sam Trabucco |
| --- |

| Gary Wang |
| --- |

| Nishad Singh |
| --- |

| Dan Friedberg |
| --- |

## CALENDAR INFORMATION

View Calendar Information

## DOCKET PROCEEDINGS (51)

| Entry #: | Date: | Description: | |
| --- | --- | --- | --- |
| 51 | 02/10/2023 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Motion for Elizabeth A. Greenman to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. 36 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 36 is GRANTED. Elizabeth A. Greenman may appear pro hac vice in this matter on behalf of Defendants Thomas Brady and Gisele Bündchen. The Clerk of Court shall provide electronic notification of all electronic filings to elizabeth.greenman@lw.com. Signed by Judge K. Michael Moore on 2/10/2023. (rfr) (Entered: 02/10/2023) | Send Runner to Court |
| 50 | 02/10/2023 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Motion for Andrew B. Brettler to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically | Send Runner to Court |

1

|  |  | Receive Notices of Electronic Filing. [35] . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion [35] is GRANTED. Andrew B. Brettler may appear pro hac vice in this matter on behalf of Defendant Kevin OLeary. The Clerk of Court shall provide electronic notification of all electronic filings to abrettler@berkbrettler.com. Signed by Judge K. Michael Moore on 2/10/2023. (rfr) (Entered: 02/10/2023) |  |
|---|---|---|---|
| 49 | 02/10/2023 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Motion for Coordinated Briefing Schedule for Responses to the Amended Complaint. [48] . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion [48] is GRANTED. Any served Defendant shall respond to the Amended Complaint on or before April 14, 2023. Signed by Judge K. Michael Moore on 2/10/2023. (rfr) (Entered: 02/10/2023) | Send Runner to Court |
| 48 | 02/10/2023 | MOTION for Extension of Time --Defendants' Motion for Coordinated Briefing Schedule for Responses to the Amended Complaint re [16] Amended Complaint/Amended Notice of Removal,, by Thomas Brady, Kevin O'Leary, David Ortiz. Responses due by 2/24/2023 (Carver, Christopher) (Entered: 02/10/2023) | View<br><br>Add to request |
| 47 | 02/08/2023 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Notice of Filing Letter (Notice) [29] . Therein, Plaintiffs include a letter from David Boies to the Court. Id. The Local Rules of the Southern District of Florida provides that, Unless invited or directed by the presiding Judge, attorneys and any party represented by an attorney shall not: (a) address or present to the Court in the form of a letter or the like any application requesting relief in any form, citing authorities, or presenting arguments; or (b) furnish the Court with copies of correspondence between or among counsel, or any party represented by an attorney, except when necessary as an exhibit when seeking relief from the Court. Local Rule 5.1(c) above governs the provision of courtesy copies to a Judge. S.D. Fla. L.R. 7.7.Accordingly, UPON CONSIDERATION of the Notice, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Notice [22] is STRICKEN. Signed by Judge K. Michael Moore on 2/8/2023. (rfr) (Entered: 02/08/2023) | Send Runner to Court |

1

| 46 | 02/08/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Sam Bankman-Fried waiver sent on 2/2/2023, response/answer due 4/3/2023. (Moskowitz, Adam) (Entered: 02/08/2023) | View / Add to request |
| 45 | 02/03/2023 | Notice of Pending, Refiled, Related or Similar Actions by Thomas Brady, Kevin O'Leary, David Ortiz (Carver, Christopher) (Entered: 02/03/2023) | View / Add to request |
| 44 | 02/02/2023 | NOTICE of Attorney Appearance by Tyler Evan Ulrich on behalf of Alexander Chernyavsky, Gary Gallant, Edwin Garrison, Sunil Kavuri, Skyler Lindeen, David Nicol, Gregg Podalsky. Attorney Tyler Evan Ulrich added to party Alexander Chernyavsky (pty:conpla), Attorney Tyler Evan Ulrich added to party Gary Gallant (pty:conpla), Attorney Tyler Evan Ulrich added to party Edwin Garrison(pty:pla), Attorney Tyler Evan Ulrich added to party Sunil Kavuri(pty:conpla), Attorney Tyler Evan Ulrich added to party Skyler Lindeen (pty:conpla), Attorney Tyler Evan Ulrich added to party David Nicol (pty:conpla), Attorney Tyler Evan Ulrich added to party Gregg Podalsky (pty:conpla). (Ulrich, Tyler) (Entered: 02/02/2023) | View / Add to request |
| 43 | 01/31/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Kevin O'Leary waiver sent on 1/4/2023, response/answer due 3/6/2023. (Moskowitz, Adam) (Entered: 01/31/2023) | View / Add to request |
| 42 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Andrew B. Clubok. Filing Fee $ 200.00 Receipt # AFLSDC-16283248 by Thomas Brady, Gisele Bundchen. Responses due by 2/14/2023 (Attachments: # 1 Exhibit Certification, # 2 Text of Proposed Order Proposed Order)(Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |
| 41 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jessica Stebbins Bina. Filing Fee $ 200.00 Receipt # AFLSDC-16283224 by Thomas Brady, Gisele Bundchen. Responses due by 2/14/2023 (Attachments: # 1 Exhibit Certification, # 2 Text of Proposed Order Proposed Order) (Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |

1

| | | | |
|---|---|---|---|
| 40 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michele D. Johnson. Filing Fee $ 200.00 Receipt # AFLSDC-16282651 by Thomas Brady, Gisele Bundchen. Responses due by 2/14/2023 (Attachments: # 1 Exhibit Certification, # 2 Text of Proposed Order Proposed Order)(Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |
| 39 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Brittany M.J. Record. Filing Fee $ 200.00 Receipt # AFLSDC-16282613 by Thomas Brady, Gisele Bundchen. Responses due by 2/14/2023 (Attachments: # 1 Exhibit Certification, # 2 Text of Proposed Order Proposed Order) (Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |
| 38 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Susan E. Engel. Filing Fee $ 200.00 Receipt # FLSDC-16282395 by Tom Brady, Gisele Bundchen, Thomas Brady. Responses due by 2/14/2023 (Attachments: # 1 Exhibit Certification, # 2 Text of Proposed Order Proposed Order)Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM(Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |
| 37 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Marvin Putnam. Filing Fee $ 200.00 Receipt # FLSDC-16282263 by Tom Brady, Gisele Bundchen, Thomas Brady. Responses due by 2/14/2023 (Attachments: # 1 Exhibit Certification, # 2 Text of Proposed Order Proposed Order)Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM(Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |
| 36 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Elizabeth A. Greenman. Filing Fee $ 200.00 Receipt # FLSDC-16282114 by Tom Brady, Gisele Bundchen, Thomas Brady. Responses due by 2/14/2023 Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM(Martinez, Roberto) (Entered: 01/31/2023) | View / Add to request |
| 35 | 01/31/2023 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Andrew B. Brettler. Filing Fee $ 200.00 Receipt # AFLSDC-16281490 by Kevin O'Leary. Responses due by 2/14/2023 | View / Add to request |

1

| | | | |
|---|---|---|---|
| | | (Attachments: # 1 Certification of Andrew B. Brettler, # 2 Text of Proposed Order)(Neiman, Jeffrey) (Entered: 01/31/2023) | |
| 34 | 01/31/2023 | NOTICE of Attorney Appearance by Brandon Scott Floch on behalf of Kevin O'Leary. Attorney Brandon Scott Floch added to party Kevin O'Leary(pty:dft). (Floch, Brandon) (Entered: 01/31/2023) | View / Add to request |
| 33 | 01/31/2023 | NOTICE of Attorney Appearance by Jeffrey Eldridge Marcus on behalf of Kevin O'Leary. Attorney Jeffrey Eldridge Marcus added to party Kevin O'Leary(pty:dft). (Marcus, Jeffrey) (Entered: 01/31/2023) | View / Add to request |
| 32 | 01/31/2023 | NOTICE of Attorney Appearance by Jeffrey Adam Neiman on behalf of Kevin O'Leary. Attorney Jeffrey Adam Neiman added to party Kevin O'Leary(pty:dft). (Neiman, Jeffrey) (Entered: 01/31/2023) | View / Add to request |
| 31 | 01/31/2023 | NOTICE of Attorney Appearance by Michael Anthony Pineiro on behalf of Kevin O'Leary. Attorney Michael Anthony Pineiro added to party Kevin O'Leary(pty:dft). (Pineiro, Michael) (Entered: 01/31/2023) | View / Add to request |
| 30 | 01/30/2023 | NOTICE of Change of Address, Email or Law Firm Name by Katherine Ann Johnson (Johnson, Katherine) (Entered: 01/30/2023) | View / Add to request |
| 29 | 01/30/2023 | "STRICKEN" NOTICE by Alexander Chernyavsky, Gary Gallant, Edwin Garrison, Sunil Kavuri, Skyler Lindeen, David Nicol, Gregg Podalsky Letter from David Boies to Judge K. Michael Moore. Attorney Stephen N. Zack added to party Sunil Kavuri(pty:conpla). (Attachments: # 1 Letter from David Boies to Judge K. Michael Moore) (Zack, Stephen) Modified on 2/9/2023 (ls). (per DE # 47) (Entered: 01/30/2023) | View / Add to request |
| 28 | 01/26/2023 | Clerk's Notice to Filer re 25 Notice of Attorney Appearance,. Attorney Did Not Associate Themselves ; ERROR - Filing attorney neglected to associate themselves to the case. The Clerk has added the attorney to the case. It is not necessary to refile this document future filings must comply with the CM/ECF Administrative Procedures and Local Rules by filing a Notice of Attorney Appearance and linking themselves to the case. (ls) (Entered: 01/26/2023) | Send Runner to Court |
| 27 | 01/25/2023 | NOTICE of Attorney Appearance by Zachary Andrew Lipshultz on behalf of Tom Brady, Gisele Bundchen, Thomas Brady. Attorney Zachary Andrew Lipshultz added to party Tom Brady(pty:dft), Attorney Zachary Andrew Lipshultz added to party Gisele Bundchen(pty:dft), Attorney Zachary Andrew Lipshultz added to party Thomas Brady(pty:dft), Attorney | View / Add to request |

1

| | | | |
|---|---|---|---|
| | | Zachary Andrew Lipshultz added to party Gisele Bundchen(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Lipshultz, Zachary) (Entered: 01/25/2023) | |
| 26 | 01/25/2023 | NOTICE of Attorney Appearance by Stephanie Anne Casey on behalf of Tom Brady, Gisele Bundchen, Thomas Brady. Attorney Stephanie Anne Casey added to party Tom Brady(pty:dft), Attorney Stephanie Anne Casey added to party Gisele Bundchen(pty:dft), Attorney Stephanie Anne Casey added to party Thomas Brady(pty:dft), Attorney Stephanie Anne Casey added to party Gisele Bundchen(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Casey, Stephanie) (Entered: 01/25/2023) | View / Add to request |
| 25 | 01/25/2023 | NOTICE of Attorney Appearance by Roberto Martinez on behalf of Tom Brady, Gisele Bundchen. Attorney Roberto Martinez added to party Tom Brady(pty:dft), Attorney Roberto Martinez added to party Gisele Bundchen(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Martinez, Roberto) (Entered: 01/25/2023) | View / Add to request |
| 24 | 01/25/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. David Ortiz waiver sent on 1/11/2023, response/answer due 3/13/2023. (Moskowitz, Adam) (Entered: 01/25/2023) | View / Add to request |
| 23 | 01/24/2023 | NOTICE of Attorney Appearance by Katherine Ann Johnson on behalf of David Ortiz. Attorney Katherine Ann Johnson added to party David Ortiz(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Johnson, Katherine) (Entered: 01/24/2023) | View / Add to request |
| 22 | 01/24/2023 | NOTICE of Attorney Appearance by Jason Samuel Oletsky on behalf of David Ortiz. Attorney Jason Samuel Oletsky added to party David Ortiz(pty:dft). (Oletsky, Jason) (Entered: 01/24/2023) | View / Add to request |
| 21 | 01/24/2023 | NOTICE of Attorney Appearance by Christopher Stephen Carver on behalf of David Ortiz. Attorney Christopher Stephen Carver added to party David Ortiz(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Carver, Christopher) (Entered: 01/24/2023) | View / Add to request |
| 20 | 01/17/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Gisele Bundchen | View / Add to request |

| | | | |
|---|---|---|---|
| | | waiver sent on 12/27/2022, response/answer due 2/27/2023. (Moskowitz, Adam) (Entered: 01/17/2023) | |
| 19 | 01/17/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Thomas Brady waiver sent on 12/27/2022, response/answer due 2/27/2023. (Moskowitz, Adam) (Entered: 01/17/2023) | View / Add to request |
| 18 | 01/17/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Lawrence Gene David waiver sent on 12/27/2022, response/answer due 2/27/2023. (Moskowitz, Adam) (Entered: 01/17/2023) | View / Add to request |
| 17 | 01/06/2023 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Golden State Warriors LLC waiver sent on 1/4/2023, response/answer due 3/6/2023. (Moskowitz, Adam) (Entered: 01/06/2023) | View / Add to request |
| 16 | 12/16/2022 | AMENDED COMPLAINT AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL against Sam Bankman-Fried, Thomas Brady, Gisele Bundchen, Stephen Curry, Lawrence Gene David, Caroline Ellison, Dan Friedberg, Golden State Warriors LLC, Udonis Haslem, William Trevor Lawrence, Kevin O'Leary, Shaquille O'Neal, Shohei Ohtani, David Ortiz, Naomi Osaka, Nishad Singh, Sam Trabucco, Gary Wang, filed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. (Attachments: # 1 Exhibit A)(Moskowitz, Adam) (Entered: 12/16/2022) | View / Add to request |
| 15 | 12/09/2022 | Summons Issued as to Sam Bankman-Fried. (ls) (Entered: 12/09/2022) | View / Add to request |
| 14 | 12/08/2022 | NOTICE of Voluntary Dismissal PLAINTIFFS NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE by Edwin Garrison (Moskowitz, Adam) (Entered: 12/08/2022) | View / Add to request |
| 13 | 12/08/2022 | NOTICE of Filing Proposed Summons(es) by Edwin Garrison (Attachments: # 1 Summon(s)) (Moskowitz, Adam) (Entered: 12/08/2022) | View / Add to request |
| 12 | 12/05/2022 | Summons Issued as to Thomas Brady, Gisele Bundchen, Stephen Curry, Lawrence Gene David, Golden State Warriors LLC, Udonis Haslem, William Trevor Lawrence, Kevin O'Leary, Shaquille O'Neal, Shohei Ohtani, David Ortiz, Naomi Osaka. (ls) (Entered: 12/05/2022) | View / Add to request |

1

| 11 | 12/02/2022 | NOTICE of Filing Proposed Summons(es) by Edwin Garrison re 1 Complaint filed by Edwin Garrison (Attachments: # 1 Summon(s), # 2 Summon(s), # 3 Summon(s), # 4 Summon(s), # 5 Summon(s), # 6 Summon(s), # 7 Summon(s), # 8 Summon(s), # 9 Summon(s), # 10 Summon(s), # 11 Summon(s), # 12 Summon(s)) (Moskowitz, Adam) (Entered: 12/02/2022) | View  Add to request |
|---|---|---|---|
| 10 | 11/28/2022 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Motion for Alexander Boies to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. 8 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 8 is GRANTED. Alexander Boies may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to aboies@bsfllp.com. Signed by Judge K. Michael Moore on 11/28/2022. (rfr) (Entered: 11/28/2022) | Send Runner to Court |
| 9 | 11/28/2022 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Motion for David Boies to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. 7 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 7 is GRANTED. David Boies may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to dboies@bsfllp.com. Signed by Judge K. Michael Moore on 11/28/2022. (rfr) (Entered: 11/28/2022) | Send Runner to Court |
| 8 | 11/23/2022 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Alexander Boies. Filing Fee $ 200.00 Receipt # AFLSDC-16123609 by Edwin Garrison. Responses due by 12/7/2022 (Attachments: # 1 Text of Proposed Order)(Moskowitz, Adam) (Entered: 11/23/2022) | View  Add to request |
| 7 | 11/23/2022 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David Boies. Filing Fee $ 200.00 Receipt # AFLSDC-16123593 by Edwin Garrison. Responses due by 12/7/2022 (Attachments: # 1 Text of Proposed Order)(Moskowitz, Adam) (Entered: 11/23/2022) | View  Add to request |

1

| 6 | 11/16/2022 | PAPERLESS ORDER REFERRING PRETRIAL DISCOVERY MATTERS TO MAGISTRATE JUDGE JACQUELINE BECERRA. PURSUANT to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, the above-captioned Cause is referred to United States Magistrate Judge Jacqueline Becerra to take all necessary and proper action as required by law with respect to any and all pretrial discovery matters. Any motion affecting deadlines set by the Court's Scheduling Order is excluded from this referral, unless specifically referred by separate Order. It is FURTHER ORDERED that the parties shall comply with Magistrate Judge Jacqueline Becerra's discovery procedures. Signed by Judge K. Michael Moore on 11/16/2022. (rfr) (Entered: 11/16/2022) | Send Runner to Court |
| 5 | 11/16/2022 | PAPERLESS PRETRIAL ORDER. This order has been entered upon the filing of the complaint. Plaintiff's counsel is hereby ORDERED to forward to all defendants, upon receipt of a responsive pleading, a copy of this Order. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference no later than twenty (20) days after the filing of the first responsive pleading by the last responding defendant, or within sixty (60) days after the filing of the complaint, whichever occurs first. However, if all defendants have not been served by the expiration of this deadline, Plaintiff shall move for an enlargement of time to hold the scheduling conference, not to exceed 90 days from the filing of the Complaint. Within ten (10) days of the scheduling conference, counsel shall file a joint scheduling report. Failure of counsel to file a joint scheduling report within the deadlines set forth above may result in dismissal, default, and the imposition of other sanctions including attorney's fees and costs. The parties should note that the time period for filing a joint scheduling report is not tolled by the filing of any other pleading, such as an amended complaint or Rule 12 motion. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) - The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer or may offer if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (a) Documents include computations of the nature and extent of | Send Runner to Court |

1

any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (b) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses - The parties shall exchange the name, address and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) - The parties shall discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I. The parties are hereby on notice that this Court requires all filings to be formatted in 12 point Times New Roman font and double spaced, including any footnotes, with one inch margins on all sides. Failure to follow these formatting guidelines may result in the filing being stricken, any opposing filing being granted by default, and the imposition of other sanctions, including attorney's fees and costs. Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position. If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with ANY of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. The parties shall seek extensions of time in a timely fashion. "A motion for extension of time is not self-executing.... Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." Compere v. Nusret Miami, LLC, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted). Pursuant to Administrative Order 2016-70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three (3) days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits

1

| | | | |
|---|---|---|---|
| | | admitted into evidence, including photographs of non-documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016-70 unless directed otherwise by the Court. Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty-four (24) hours. Signed by Judge K. Michael Moore on 11/16/2022. (rfr) (Entered: 11/16/2022) | |
| 4 | 11/16/2022 | Bar Letter re: Admissions sent to attorney David Boies and Alex Boies, mailing date November 16, 2022, (pt) (Entered: 11/16/2022) | View<br>Add to request |
| 3 | 11/16/2022 | ORDER OF RECUSAL. Magistrate Judge Lauren F. Louis recused. Magistrate Judge Jacqueline Becerra added. Signed by Magistrate Judge Lauren Fleischer Louis on 11/16/2022. See attached document for full details. (vjk) (Main Document 3 replaced on 11/16/2022) (vjk). Modified pdf on 11/16/2022 (vjk). (Entered: 11/16/2022) | View<br>Add to request |
| 2 | 11/15/2022 | Clerks Notice of Judge Assignment to Judge K. Michael Moore. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lauren F. Louis is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (aao) (Entered: 11/16/2022) | Send Runner to Court |
| 1 | 11/15/2022 | COMPLAINT CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-16103423, filed by Edwin Garrison. (Attachments: # 1 Civil Cover Sheet)(Moskowitz, Adam) (Entered: 11/15/2022) | View<br>Add to request |

TO ORDER COPIES OF ANY DOCUMENTS LISTED ABOVE, CALL WESTLAW COURTEXPRESS 1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Contact us   •   Live chat   •   Training and support   •   Improve Westlaw Edge/Report an error   •   Transfer My Data   •   Pricing guide   •   Sign out

1-800-REF-ATTY (1-800-733-2889)



1

Westlaw Edge. © 2023 Thomson Reuters        Accessibility    •    Privacy    •    Supplier terms                                    *Thomson Reuters is not providing professional advice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:22-cv-23753-KMM

**EDWIN GARRISON**, *et al.,* on behalf of
themselves and all others similarly situated,

                *Plaintiffs,*

*v.*

**SAM BANKMAN-FRIED**, *et al.*,

                *Defendants.*

                                          /

**AMENDED CLASS ACTION
COMPLAINT**

**JURY DEMAND**

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs file this Consolidated Complaint (the only Class Action in the Country), on behalf of themselves, and all other similarly situated US and non-US FTX consumers, against Defendants, who all promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities, identical FTX yield-bearing accounts ("YBAs").

## INTRODUCTION

1.    Everyone now agrees the FTX Disaster is the largest financial fraud in US history. The former FTX CEO is in jail and the new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe. FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that <u>any of the victims</u> will be able to see <u>any recovery</u> from those proceedings. This Federal Consolidated Action may be the only avenue for any of the victims to recover any of their damages. This action is specifically brought against persons and celebrities who were specifically

warned by the SEC back in 2017 (and in many FTC Guidelines), that if these FTX YBA's are found to be "securities," those persons may be liable under state and federal regulations for: (1) promoting an unregistered security, or (2) failing to properly disclose their payments and compensation. Those specific claims have a strict liability standard with no *caveat emptor* defense.

2.      The question of whether the sale of every YBA is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[1]

> In the SEC's Report of Investigation concerning The DAO,[2] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

3.      The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this

---

[1]      https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed December 16, 2022).

[2] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 16, 2022)

exact same type of interest-bearing account, finding that exchanges such as BlockFi,[3] Voyager,[4] and Celsius[5] all offered these same accounts as unregistered securities.

    4.    A second narrow issue that is common to the entire Proposed Class, whose focus is solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC's long established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

    5.    We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. In other words, the YBA was portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Entities.

---

[3] https://www.sec.gov/news/press-release/2022-26 (accessed December 16, 2022).

[4]    https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed December 16, 2022).

[5]
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed December 16, 2022).

6.      Literally overnight, Plaintiffs' assets held in their YBAs on the Deceptive FTX

Platform were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a

Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as

explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the
> Chief Restructuring Officer or Chief Executive Officer in several of the largest
> corporate failures in history. I have supervised situations involving allegations of
> criminal activity and malfeasance (Enron). I have supervised situations involving
> novel financial structures (Enron and Residential Capital) and cross-border asset
> recovery and maximization (Nortel and Overseas Shipholding). Nearly every
> situation in which I have been involved has been characterized by defects of some
> sort in internal controls, regulatory compliance, human resources and systems
> integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls
> and such a **complete absence of trustworthy financial information** as occurred
> here. From compromised systems integrity and faulty regulatory oversight abroad,
> to the concentration of control in the hands of a very small group of inexperienced,
> **unsophisticated** and **potentially compromised** individuals, **this situation is**
> **_unprecedented_**.

*See* In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17,

2022) (emphasis added).

7.      The Cryptocurrency National Disaster is growing by the billions almost every day.

More crypto companies are filing new federal bankruptcy petitions each day, all running for

protection from the billions of dollars of losses they directly caused to thousands of investors here

in Florida and across the globe. This is by far the largest securities national disaster, greatly

surpassing the Madoff Ponzi Scheme, and could very likely become a complex international

litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts

across the globe. Unless a workable, coordinated, and organized structure is established now, at

the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto

fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

8.    The Deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## **FACTUAL BACKGROUND**

9.    Undersigned Counsel have been investigated and litigating these specific issues for over a year before this Court. On December 24, 2021, counsel for Plaintiffs and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, plaintiffs also alleged that

Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiffs and Voyager class members, all sustained losses in excess of $5 billion.

10.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

11.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)     on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[6]

12.     On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

13.     On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

14.     Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

15.     Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled

---

[6]     https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed December 16, 2022).

customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the appearance of liquidity.

16.     Part of the scheme employed by the FTX Entities involved utilizing some of the biggest names in sports and entertainment to raise funds and drive global consumers to invest in the YBAs, which were offered and sold largely from the FTX Entities' domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

17.     Importantly, although Defendants disclosed their partnerships with the FTX Entities, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[7] Moreover, none of these Defendants performed any due diligence prior to marketing these FTX products to the public.

18.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech,

---

[7]     https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed December 16, 2022).

Inc., for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[8]

19.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[9] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [10]

20.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the globe through the television and internet render them liable to Plaintiff and class members for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

21.     This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiffs and the Class and to force Defendants to make them whole.

## PARTIES

22.     **Plaintiffs** are all residents of US and/or a foreign government, and all purchased FTX YBAs.

---

[8]          https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed December 16, 2022).

[9]          https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed December 16, 2022).

[10] https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed December 16, 2022).

23.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendants are liable.

24.     **Plaintiff Gregg Podalsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Podalsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendants are liable.

25.     **Plaintiff Skyler Lindeen** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Lindeen did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those

misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendants are liable.

26.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Chernyavsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

27.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Kavuri did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendants are liable.

28.     **Plaintiff Gary Gallant** is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gallant did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed

in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendants are liable.

29.    **Plaintiff David Nicol** is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Nicol did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendants are liable.

30.    **<u>FTX Brand Ambassador Defendants</u>** are all persons and/or companies, that: (1) agreed to serve as "Brand Ambassadors" for FTX, (2) all admittedly advertised and promoted the sale of the FTX YBAs and (3) none of them disclosed, in any of their marketing campaigns and/or advertisements, that they were paid hundreds of millions of dollars by FTX and profited from the sale of FTX YBAs, in clear violation of SEC, FTC and various federal and state regulations.

31.    **Defendant Thomas Brady**, NFL quarterback currently playing for the Tampa Bay Buccaneers, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

32.    **Defendant Gisele Bundchen,** one of the world's highest-paid models and a brand ambassador for FTX, is a citizen and resident of Miami-Dade County, Florida.

33.    **Defendant Kevin O'Leary,** "Mr. Wonderful," a businessman, television personality appearing regularly on *Shark Tank*, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

34.    **Defendant Udonis Haslem**, an American professional basketball player for the Miami Heat of the NBA and brand ambassador of FTX, is a citizen and resident of Miami-Dade County, Florida.

35.    **Defendant David Ortiz,** former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

36.    **Defendant Stephen Curry,** professional basketball player for the Golden State Warriors of the NBA and brand ambassador for FTX, is a citizen and resident of the State of California.

37.    **Defendant Golden State Warriors** LLC is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the court at the Chase Center, and is a corporation operating and existing under the laws of the State of California.

38.    **Defendant Shaquille O'Neal,** former professional NBA basketball star, sports analyst, entrepreneur, and FTX brand ambassador, is a citizen and resident of Collin County, Texas.

39.    **Defendant William Trevor Lawrence,** the quarterback for the Jacksonville Jaguars of the NFL and a brand ambassador for FTX, is a citizen and resident of the state of Mississippi.

40. **Defendant Shohei Ohtani,** a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

41. **Defendant Naomi Osaka**, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

42. **Defendant Lawrence Gene David,** an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

43. **<u>FTX Insider Defendants</u>** are all persons that controlled, assisted and worked at FTX that helped promote, and sell the FTX YBAs but are not personally involved in the FTX restructuring process.

44. **Defendant Caroline Ellison** is the former CEO of Alameda Research, LLC, a trading firm launched by Defendant Sam Bankman-Fried. She oversaw many of the risky bets Alameda took with regard to FTX customers' crypto tokens. Defendant Ellison is a resident of Hong Kong.

45. **Defendant Sam Trabucco,** the former Co-CEO of Alameda Research, LLC, is a citizen and resident of the State of California.

46. **Defendant Gary (Zixiao) Wang**, co-founder of Alameda Research and FTX, upon information and belief is currently residing in the Bahamas.

47. **Defendant Nishad Singh,** the former Director of Engineering of FTX, upon information and belief is currently residing in the Bahamas.

48. **Defendant Dan Friedberg,** the former Chief Compliance Officer of FTX, is a citizen and resident of Seattle, Washington.

## JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

50.     This Court has personal jurisdiction against Defendants because they conduct substantial and not isolated business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. Further, Defendants have engaged in a conspiracy in which some of the co-conspirators—including some who are Defendants in this action—committed overt acts in furtherance of the conspiracy in the State of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

51.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

52.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

## FACTUAL ALLEGATIONS

**A.     Background on FTX and its Key Players.**

53.     Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

54.     Attached as **Exhibit A** is the Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade Blockchain Investigation Agency, which is incorporated into this complaint in its entirety by reference, and additionally as cited.

55.     As Sibenik explains, in many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. Ex. A ¶ 10.

56.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Ex. A ¶ 11. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets. *Id.*

57.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. Ex. A ¶ 12. This credit can be regarded as a liability of the exchange to its customer. *Id.*

58.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

      a)  Trade it for another cryptocurrency

      b)  Trade it for fiat currency

      c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances. Ex. A ¶ 13.

59.    The exchange accounts should very much be regarded as being custodial in nature. Ex. A ¶ 14. This means that the customer does not *control* access to the assets 'in' their account. *Id.* The customer needs to make a request to the exchange to be able to access and send those balances. *Id.* The exchange then debits the user account and sends the assets. *Id.* Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange. *Id.*

60.    One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so. Ex. A ¶ 15.

61.    For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. Ex. A ¶ 16. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms),*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

> you may withdraw your Digital Assets by sending them to a different
> blockchain address controlled by you or a third party."[11]

*Id.*

62.     While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX. Ex A ¶ 17. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. *Id.* However, it should also be noted that the digital assets aren't technically 'in' the account at all. *Id.* At a technical level, an exchange account cannot hold or store cryptocurrency. *Id.* The account stores a record of a liability or an IOU to the exchange's customer. *Id.* When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. *Id.* Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true. *Id.*

63.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds. Ex. A ¶ 18.

---

[11]     https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf
(accessed December 16, 2022).

64.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report. Ex. A ¶ 19.

65.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account. Ex. A ¶ 20.

66.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Ex. A ¶ 21. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

67.     Exchanges on the other hand, are not subject to capital control requirements. Ex. A ¶ 22. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public. *Id.*

68.     Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. Ex. A ¶ 23. And exchanges have no requirement to have any type of insurance equivalent to

FDIC insurance. *Id.* While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted. *Id.*

69.     Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets. Ex. A ¶ 24.

70.     The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. Ex. A ¶ 25. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. *Id.* 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money. *Id.*

71.     This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[12] often in spectacular fashion. Ex. A ¶ 26. The most common reasons for an exchange's failure include:

        a)  The exchange borrowing against customer assets (either to fund business
            operations or lending them out in an effort to generate a profit) leading to
            insolvency.
        b)  The exchange trading or leveraging customer assets in an effort to generate a
            profit, leading to insolvency.

---

[12] https://www.cryptowisser.com/exchange-graveyard/ (accessed December 16, 2022).

    c) A hack or theft by an external actor

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

*Id.*

72. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back. Ex. A ¶ 27.

73. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. Ex. A ¶ 28. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. *Id.* Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. *Id.* However, what an exchange says, and what they actually do are two different things entirely. *Id.* It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.* FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they say it. *Id.*

74. This is not to suggest that exchanges cannot be a much safer place to store assets. Ex. A ¶ 29. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[13] specifically, those investors will be made whole or almost whole due to sensical

---

[13] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan. *Id.*

### Defendant Sam Bankman-Fried

75.     The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

76.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda Research, in November 2017,[14] after stints in the charity world and at trading firm Jane Street.[15] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

### Defendants Caroline Ellison and Sam Trabucco

77.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda Research. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

---

[14]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed December 16, 2022).

[15]          https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

78.     In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and fiercely traded crypto.

79.     After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda Research along with Sam Trabucco, who served as CEO.

80.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to put distance between the exchange and trading shop he founded. As co-CEO, Trabucco helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, he said Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[16]

81.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

---

[16]     https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed December 16, 2022).

82.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[17]

83.     The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[18]

### Defendant Gary Wang

84.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

85.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[19]

86.     Before co-founding Alameda Research (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[20] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

87.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of

---

[17] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed December 16, 2022).
[18]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed December 16, 2022).
[19] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 16, 2022)
[20] https://ftxfuturefund.org/about/ (accessed December 16, 2022).

arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

88.　It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[21]

89.　Nishad Singh, the head of engineering at FTX, said Wang was a "really good mentor" who offered suggestions and advice to push things out on short timescales.

90.　In the aftermath of FTX's collapse, and the subsequent $400 million hack, questions are circulating around who could possibly have abused client funds. Wang is a prominent suspect, as one of the few people with "root access" to the exchange's code base, according to The Block.[22]

91.　Wang is also one of the board members of FTX Future Fund – the charity guided by "effective altruism" that aims to "use reason and evidence to do the most good possible for the most people."

92.　Wang, one of the 10 roommates in Bankman-Fried' luxury penthouse in the Bahamas, is reportedly among the four people cited by Caroline Ellison who knew about the decision to send customer funds to Alameda, according to people who spoke to the Wall Street Journal.[23]

---

[21]　https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed December 16, 2022).
[22]　https://www.theblock.co/post/186476/who-is-billionaire-ftx-co-founder-gary-wang-and-why-is-he-still-committing-code (accessed December 16, 2022).
[23]　https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).

93.     A few Wang photos are circulating on the internet, though little else is known about the mysterious co-founder who preferred to stay in the shadows as SBF chased the limelight. In a now infamous picture on FTX's website, CTO Wang is seen with his back facing the camera as he focuses on the monitors in front of him.

94.     At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[24]

95.     Wang is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Singh.[25]

### Defendant Nishad Singh

96.     Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

97.     Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

---

[24]
https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed December 16, 2022).
[25] https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 16, 2022).

98.   He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[26]

99.   Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[27]

100.   "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

101.   Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

102.   In the podcast, Singh said he was also attracted to the company's cultural commitment to effective altruism,[28] a movement that "aims to find the best ways to help others," which he discovered in college.

103.   Singh is a board member of FTX Future Fund, a part of the FTX Foundation, a philanthropic collective funded principally by Bankman-Fried and other senior FTX executives.

---

[26]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).

[27]   https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed December 16, 2022).

[28]   https://www.coindesk.com/layer2/2022/11/11/how-sam-bankman-frieds-effective-altruism-blew-up-ftx/ (accessed December 16, 2022).

104.    "It was pretty clear that everybody working [at Alameda] was highly motivated, was sort of effective altruism-aligned, which mattered a lot to me and was really [a] bright spot. I could learn a lot from them," Singh said in the podcast.

105.    After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

106.    "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[29] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

107.    Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[30] A similar relationship may be in place at FTX's core properties.[31]

108.    Singh is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Wang.[32]

**Dan Friedberg**

109.    Daniel S. Friedberg was the chief compliance officer at FTX, the person who oversaw FTX's compliance initiatives before it imploded. He joined the firm in March 2020, and

---

[29] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 16, 2022).
[30]    https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed December 16, 2022).
[31]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).
[32]    https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 16, 2022).

was instrumental in perpetuating its nefarious activities, in part by helping to cover up any indications that the FTX scheme was unraveling.

110.    Although Friedberg was supposed to be the adult in the room overseeing the operations of the FTX empire, he did so thousands of miles away, remotely, from Seattle, Washington. As FTX's chief regulatory officer, Friedberg was tasked with monitoring customer protection practices, ensuring product offerings complied with existing rules and overseeing internal audits and reviews. He did none of this.

111.    Friedberg has also been tied to an online poker scandal in 2008, where Ultimate Bet's founder Russ Hamilton was accused of installing a "God mode" on his gambling platform that only certain players had access to – resulting in an estimated $50 million in misappropriated funds.

112.    In a surreptitiously recorded file, Friedberg reportedly advised Hamilton to claim he was a victim of the Ultimate Bets "God mode" scam, and push blame on an unnamed consultant to the company who exploited the site's servers. The audio recordings were published in 2013 under uncertain circumstances and have not been independently verified by CoinDesk.

113.    "I did take this money and I'm not trying to make it right, Dan, so we gotta get that out of the way right away, real quick," Hamilton allegedly said in the audio recording.[33] Hamilton also founded the World Champion online poker platform.

114.    Veteran short seller Marc Cohodes, one of the few to publicly question the rapid rise of FTX before its fall in a September interview with trading-focused webcast Hedgeye,[34] had

---

[33] http://craakker.blogspot.com/2013/05/pokers-watergate-moment.html (accessed December 16, 2022).
[34]     https://app.hedgeye.com/insights/122943-marc-cohodes-ftx-is-dirty-rotten-to-the-core-hedgeye-investing-s?with_category=17-insights (accessed December 16, 2022).

noted the potential conflicts of hiring someone connected to a cheating scandal to oversee compliance at the $32 billion FTX exchange.

115.    Similarly here, Dan Friedberg in his role as Chief Compliance Officer oversaw both FTX and Alameda, which had its own "god mode," i.e., Alameda was secretly exempted from FTX's auto-liquidation protocols.

116.    Friedberg's penchant for duplicity to make legal problems vanish for his corporate paymasters didn't end with UB's demise. NBC News recently reported on a 2020 incident involving SBF's promotion of the Ethereum-based Cover Protocol and the unfortunate experience of one Dave Mastrianni, an investor who was prevented from cashing out his $400,000 in paper winnings due to "insufficient liquidity" on FTX before the COVER token cratered.[35]

117.    When Mastrianni contacted FTX to accuse SBF of having a "pump and dump" role in the debacle, Friedberg called back with an offer. How would Mastrianni, a graphic artist, like a job creating NFTs for FTX? Friedberg offered Mastrianni an 'adviser' contract that would pay him one BTC for 30 days' work, but it also required Mastrianni to absolve FTX, Alameda, and its affiliates of any responsibility for Mastrianni's COVER losses.

118.    Mastrianni eventually agreed, but while he did receive that one BTC, FTX never accepted any of his artwork. Friedberg later emailed to inform him that the payment "was primarily for your release of all claims" and, with that goal accomplished, FTX had no more reason to maintain this subterfuge.

119.    In August, the Federal Deposit Insurance Corporation (FDIC) sent a letter to Friedberg and then-FTX US CEO Brett Harrison to "cease and desist" using marketing language

---

[35]     https://www.nbcnews.com/news/epic-fall-sam-bankman-fried-was-hailed-crypto-genius-clients-saw-smoke-rcna56583 (accessed December 16, 2022).

that could have been erroneously interpreted as saying that exchange users accounts were ensured by the federal banking regulator. Harrison subsequently deleted the tweet.

120.    Before joining FTX, Friedberg was a partner at Fenwick & West LLP, where he led the law firm's cryptocurrency division, according to a now-deprecated LinkedIn page. He received a JD and MBA degree from the University of Wisconsin-Madison.

**B.      The Rise and Fall of FTX.**

121.    The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[36]

122.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 ***billion dollars***.

123.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

124.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[37]

---

[36]      https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed December 16, 2022).

[37]      https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

125.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[38]

126.    Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[39]

127.    After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[40] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[41]

---

[38]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

[39]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 16, 2022).

[40]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 16, 2022).

[41]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 16, 2022).

128.    The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[42] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[43] On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[44]

129.    Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[45]



---

[42]    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 16, 2022).

[43]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed December 16, 2022).

[44]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 16, 2022).

[45]    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*









*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*















130. According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent

more than *half* of its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans outstanding*.[46]

## C.    The SEC's Consistent Approach to Cryptocurrency.

### Overview

131.    Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

132.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities

---

[46]    https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[47]

133.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> "We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

134.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[48] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[49] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

135.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products

---

[47]https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed December 16, 2022).
[48] https://supreme.justia.com/cases/federal/us/328/293/ (accessed December 16, 2022).
[49] Id.

and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[50]

136.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[51] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[52] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[53]

137.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[54]

---

[50] ia_virtualcurrencies.pdf (sec.gov) (accessed December 16, 2022).
[51] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed December 16, 2022).
[52] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 16, 2022).
[53] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed December 16, 2022).
[54] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

138. In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[55] multiple speeches,[56] Congressional testimony,[57] and several official SEC statements[58] and proclamations.[59] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[60] warning that their failure to register with the SEC may violate U.S. securities laws.[61] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[62]

139. On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[63] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[64] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO

---

[55] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed December 16, 2022).
[56] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed December 16, 2022).
[57] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed December 16, 2022).
[58] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed December 16, 2022).
[59] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed December 16, 2022).
[60] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed December 16, 2022).
[61] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed December 16, 2022).
[62] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed December 16, 2022).
[63] SEC.gov | Kennedy and Crypto (accessed December 16, 2022).
[64] Id.

Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[65]

140.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[66]

141.     What follows are summaries of five cases that will help inform this litigation.

**SEC v. KIK**

142.     In Kik[67], the SEC's complaint[68], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[69]

143.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

---

[65] Id.

[66] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed December 16, 2022).

[67] https://www.sec.gov/news/press-release/2020-262 (accessed December 16, 2022).

[68] https://www.sec.gov/news/press-release/2019-87 (accessed December 16, 2022).

[69]     https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed December 16, 2022).

**SEC v. Telegram**

144.    In Telegram,[70] the SEC filed a complaint[71] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

145.    Telegram argued[72] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

146.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[73] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

147.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the

---

[70] https://www.sec.gov/news/press-release/2020-146 (accessed December 16, 2022).
[71] https://www.sec.gov/news/press-release/2019-212 (accessed December 16, 2022).
[72]    https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed December 16, 2022).
[73] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed December 16, 2022).

sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

**SEC v. BlockFi**

148.     In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [74] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

149.     BlockFi argued for "increased regulatory clarity" but lost. [75]

150.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

**SEC Wells Notice to Coinbase**

151.     In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)." [76] According to Coinbase, its lawyers

---

[74] https://lnkd.in/d-Xy45ec (accessed December 16, 2022).
[75] https://blockfi.com/pioneering-regulatory-clarity (accessed December 16, 2022).
[76] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed December 16, 2022).

reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells* Notice*, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

152.    According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[77]

153.    The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

154.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

155.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

---

[77] *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

156.     Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

157.     The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

158.     Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors (especially disgruntled ones) would certainly expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

159.    Given the clear facts of this case, Coinbase decided to cancel the Lend program.[78]

**D.      FTX's offer and sale of YBAs, which are unregistered securities.**

160.    Beginning in 2019, the FTX Entities began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

161.    The details of the Earn program are still listed on the FTX website,[79] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[80]

162.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[81]

163.    On the same webpage, the company also states:

The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[82]

164.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

---

[78] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed December 16, 2022).
[79] FTX App Earn – FTX Exchange (accessed December 16, 2022).
[80] 1175310142280000000134.pdf (stretto.com) (accessed December 16, 2022).
[81] FTX App Earn – FTX Exchange (accessed December 16, 2022).
[82] *Id.*

165.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[83] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[84]

166.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[85] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers

---

[83] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.
[84] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed December 16, 2022).
[85] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed December 16, 2022).

staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[86]

167.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

168.    As Mr. Sibenik explains, applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

> From a securities perspective, the Howey Test defines an investment contract as:
> a. An investment of money
>    i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining

---

[86] Id.

aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

b. In a common enterprise

   i. FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c. With the expectation of profit

   i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[87]

d. To be derived from the efforts of others

   i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

   ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies. The primary strategy that FTX

---

[87] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed December 16, 2022).

portrayed to investors was 'staking' as I discuss in the following paragraphs.

Ex. A, ¶ 43.

169.    The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[88] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[89]

**FTT Token**

170.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[90] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the

---

[88] FTX App Earn – FTX Exchange (accessed December 16, 2022).
[89] https://www.sec.gov/news/press-release/2022-26 (accessed December 16, 2022).
[90] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed December 16, 2022).

exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[91]

171.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[92] Exchange tokens like FTT also functionally resemble the XRP token, which the SEC alleges is an investment contract due to Ripple's control over the XRP token.[93]

172.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

173.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Entities offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to

---

[91]    See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed December 16, 2022).
[92]    https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed December 16, 2022).
[93]    https://www.sec.gov/news/press-release/2020-338 (accessed December 16, 2022).

fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

174.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

>> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

>> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[94] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet

---

[94] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.
>
> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a

hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.
>
> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required

by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

175.     Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the platform. Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks. When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account. Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

176.     According to the first day declaration by John Ray, how FTX kept its crypto is a mystery:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the

absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[95]

177.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[96] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[97] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[98]

178.    To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX

---

[95] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed December 16, 2022).
[96] *Id.*
[97] *Id.*
[98] *Id.*

had a bank account.[99] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than \$5 billion in those Alameda accounts."[100] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[101]

179.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[102] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[103] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[104] It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the

---

[99]     https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed December 16, 2022).

[100] FTX customers deposited more than \$5 billion in those Alameda accounts.

[101] *Id.*

[102] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed December 16, 2022).

[103]     https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed December 16, 2022).

[104] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed December 16, 2022).

form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

180.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[105] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

181.    After the CoinDesk report came out on November 2, the CEO of FTX's rival exchange Binance, Changpeng Zhao, tweeted that Binance was planning to sell off its holdings of FTT. This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

---

[105]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 16, 2022).

182.    While we are still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of information that are relevant to this litigation.

183.    First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have actually resulted in a cryptocurrency transaction. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms (Alameda's balance sheet in John Ray's first day declaration list venture capital assets).

184.    Second, when customers withdrew cryptoassets from FTX in the past, FTX was likely meeting these withdrawals by selling FTT. However, as the price of FTT fell in the wake of Zhao's tweet, it became increasingly expensive for FTX to convert FTT into other cryptoassets that matched customers' expectations of their portfolio holding – especially as so many FTX customers were seeking to pull their cryptoassets out of the exchange at the same time. Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (i.e., commodities) the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. Another way to think of it is that FTX and all its affiliated entities were essentially economically akin to a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. Given these facts, it appears that any person who used FTX was engaged in a securities transaction of some kind, knowingly or unknowingly.

185.    Thus, as will be illustrated below, the FTX Brand Ambassadors' promotion of "FTX" was necessarily the promotion of unregistered securities.

**E. The Defendants Aggressively Marketed the FTX Platform**

186.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[106] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[107]

187.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and

---

[106]         https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed December 16, 2022).
[107] https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/UlbrichtCriminalComplaint.pdf (accessed December 16, 2022).

drug trafficking."[108] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[109] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[110] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[111]

188. Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[112] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The

---

[108] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed December 16, 2022).

[109] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed December 16, 2022), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed December 16, 2022), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed December 16, 2022).

[110] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed December 16, 2022).

[111] Id.

[112] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed December 16, 2022).

report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[113]

189.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[114] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[115] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto

---

[113] [Ban Cryptocurrency to Fight Ransomware - WSJ](accessed December 16, 2022).
[114] [Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice](accessed December 16, 2022).
[115] Id.

to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[116] The median individual loss was a staggering $2,600.

190.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[117]

191.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Entities through the bankruptcy proceedings.[118]

192.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not

---

[116] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed December 16, 2022).
[117] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed December 16, 2022).
[118] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

invested although they have heard at least a little about cryptocurrency.[119] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

193.    These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by O'Leary, Brady, and Curry, below). These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

194.    FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

195.    As Mr. Sibenik explains, FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' Ex. A ¶ 44–49:

> In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims
>
> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*
>
> Kevin O'Leary, another FTX brand ambassador stated:
>
> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

---

[119] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mrb O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[120]"*

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

196.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[121] In addition, CME Group CEO Terry Duffy allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial

---

[120]         https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/
[121] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed December 16, 2022).

conversation with Mr. Fried.[122] Finally, after FTX's implosion, the FT reported that FTX held

talks with Taylor Swift to sponsor the singer's tour for more than $100 million.[123] While the article

does not detail the reasons why Swift declined the FTX offer, it does include the following quote

from a person close to the negotiations:

> "Taylor would not, and did not, agree to an endorsement deal. The discussion was
> around a potential tour sponsorship that did not happen."[124]

197.    Based upon the information that has been released by FTX's new CEO John Ray

as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20

minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In

his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and
> such a complete absence of trustworthy financial information as occurred here.
> From compromised systems integrity and faulty regulatory oversight abroad, to the
> concentration of control in the hands of a very small group of inexperienced,
> unsophisticated and potentially compromised individuals, this situation is
> unprecedented."[125]

198.    Mr. Ray's pleading contains a number of troubling findings, among them: 1.) FTX

did not have centralized control of its cash, 2.) FTX had no dedicated human resources department,

which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX

Entities, 3.) A lack of disbursement controls that resulted in employees submitting payment

requests via on-line chat and these requests being approved by managers responding with

---

[122]     https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed December 16, 2022).

[123] FTX held talks with Taylor Swift over $100mn sponsorship deal | Financial Times (accessed December 16, 2022).

[124] Id.

[125]

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C
_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-
documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQ
JwnmP5fFftiyYkNjSG (accessed December 16, 2022).

personalized emojis, 4.) Corporate funds were used to purchase homes and personal items for employees, and 5.) A lack of books and records and the absence of lasting records of decision-making.

199.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic. Of course, the same can be said for prominent venture capital (VC) firms that invested in FTX. But these investors are in the business of taking risk and VC firms have an incentive to conduct limited due diligence lest they become known as unfriendly to founders and get locked out of future deals. The same "founder friendly" dynamics played a role in lapse due diligence at WeWork and Theranos.

200.    Furthermore, customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales. Thus, celebrities have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

201.    In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

202.    In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

203.    FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[126]

204.    In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

**i.    Defendants Tom Brady and Gisele Bundchen**



---

[126]         https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed December 16, 2022).

205.    The star quarterback and the businesswoman and model, then a couple, became FTX ambassadors last year. They also took equity stakes in FTX Trading Ltd.

206.    Mr. Brady and Ms. Bündchen also joined the company's $20-million ad campaign in 2021. They filmed a commercial called "FTX. You In?" showing them telling acquaintances to join the FTX platform. The ad can be viewed here: https://www.youtube.com/watch?v=uymLJoKFlW8

207.    In a second commercial, Brady is shown executing a trade on the FTX platform on his cellular phone. Brady explains, "I mean trading crypto. FTX is the safest and easiest way to buy and sell crypto. It's the best way to get in the game."

208.    In a third commercial, FTX is again depicted using the FTX platform on his cellular phone while walking off a football field. A man asks, "FTX, that's the crytpo app right?" Brady responded, "Now its for all kinds of investing. It's better. And I like better."

209.    None of these three commercials disclose the fact that Mr. Brady was a paid brand ambassador for FTX or that he owned equity in FTX Trading Ltd.

210.    The commercials may be viewed here: https://www.youtube.com/watch?v=_aCGMyrFn-8. The shorter version of the first commercial which aired during the Superbowl may is available here: https://www.youtube.com/watch?v=4p4z2wsjhmM.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

ii.     **Defendant Kevin O'Leary**



211.    "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the YBAs.

212.    "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary *recently deleted the tweet*.

213.    He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[127]

214.    And *very* recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers. If there's ever a place I could be

---

[127] https://ftxcharityhackathon.com/ (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great

people but he gets the job in compliance which is why he's working so hard to get regulation."[128]



215.   He went on to state that "[t]here are a lot of signs right now that point to things

looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If

you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll

soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in

the comments!"[129]

### iii.   Defendant Udonis Haslem





[128]   *See*   https://www.youtube.com/watch?v=iwD_zWgyUz8   beginning   at   17:32   (accessed
December 16, 2022)

[129]   *Id.*

216.    Udonis Haslem, the Captain of the Miami HEAT and Miami legend, became an FTX global ambassador. Much like Brady and Bunchden, Haslem starred in FTX's "You In, Miami?" ad campaign that launched at the start of the 2021 - 2022 Miami HEAT season.

217.    In    the    ad,    which    be    viewed    here: https://www.youtube.com/watch?v=83FDP53yPa8, Haslem states "FTX has arrived in 305. So I just got one question: Are you in, Miami?" Others respond "If he's in, I'm in." Haslem concludes "Our city. Our team. FTX. You in, Miami?"

### iv.    Defendant David Ortiz



218.    Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series. In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow

sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto

exchange of MLB.

      **v.**    **Defendant Steph Curry**



    219.    Defendant Stephen Curry had his own nationwide ad campaign pushing the

Deceptive FTX Platform, known as the "#notanexpert" campaign.[130] Throughout the ad, Curry

repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement that "I'm

not an expert, ***and I don't need to be.*** With FTX I have everything I need to buy, sell, and trade

crypto ***safely.***"[131]

    220.    The purpose of Curry being an ambassador is to expand the reach of the crypto firm

and "tout the viability of cryptocurrency to new audiences around the world," FTX said in a press

---

[130] https://www.youtube.com/watch?v=gsy2N-XI04o (accessed December 16, 2022).
[131] *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

release.[132] In other words, to drive adoption of the Deceptive FTX Platform and to facilitate the sales of unregistered YBAs to unsuspecting and unwitting retail consumers.

221.    "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in the statement, highlighting that "first-time," inexperienced users were the intended targets of the campaign.[133]

### vi.    Defendant Golden State Warriors



Official Crypto Platform and NFT Marketplace
of the **Golden State Warriors**

222.    The Golden State Warriors and FTX officially launched their partnership in 2022 with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise dropped NFTs on FTX.us beginning in early 2022. The partnership between the Warriors and FTX marked the first international rights

---

[132]    https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed December 16, 2022).
[133] *Id.*

partner for the Warriors, meaning the GSW and FTX had a visible market presence, inclusive of logo and likeness, internationally.

223.    The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.[134]

### vii.    Defendant Shaquille O'Neal



---

[134] https://www.instagram.com/p/CYiBaq8JLx7/ (accessed December 16, 2022).

224.    Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, also became an FTX ambassador, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[135]

### viii.    Defendant Trevor Lawrence



225.    Defendant William Trevor Lawrence, the first pick in the 2021 NFL draft and now quarterback for the Jacksonville Jaguars of the NFL, became a brand ambassador for FTX in exchange for unspecified cryptocurrency payments, which sponsorship was announced in April

---

[135] https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed December 16, 2022).

2021.[136] The stated purpose of the sponsorship was because "Trevor is someone people can have a personal and human connection with for [FTX] and to the crypto space."[137]

### ix. Defendant Shohei Ohtani



226.     The FTX Entities entered into a long-term partnership with global icon and history-making MLB Superstar Shohei Ohtani. In addition to being an FTX global ambassador, Mr. Ohtani received all of his compensation in equity and cryptocurrencies.[138] In exchange for those

---

[136] https://twitter.com/ftx_app/status/1386667859393253376 (accessed December 16, 2022).

[137] https://www.forbes.com/sites/chriscason/2021/04/26/trevor-lawrence-makes-first-investment-move-with-first-of-its-kind-partnership-with-blockfolio/?sh=7190ee6f47ef (accessed December 16, 2022).

[138] https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

unspecified payments, Mr. Ohtani served as a spokesperson for FTX to increase awareness of the Deceptive FTX Platform and to drive adoption of and investments in the unregistered YBA securities on a global scale through a variety of initiatives. [139]

### x.   Defendant Naomi Osaka



227.     Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time Grand Slam singles champion, became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[140] Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open. [141] In exchange for an equity stake in FTX and payments in unspecified amounts of cryptocurrency, Osaka directed and produced content in association with the FTX Entities designed to promote the offer and sale of the unregistered YBA securities, hoping "she will reach a global audience."[142]

---

[139] *Id.*
[140]    https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed December 16, 2022).
[141] *Id.*
[142] *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

228.    Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her **1.1 million followers**, which can be viewed here: https://youtu.be/pkuf8avR50k. It shows the tennis star competing in a comic strip — and over dramatic music, she says: "They thought they made the rules for us. They thought they could control us. They were wrong."

229.    The video then cuts to a boardroom full of marketing executives talking about the ad in a tongue-in-cheek way — and discussing other ideas… including Osaka heading to the moon. An idea to have a QR code bouncing around the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being "boring."

230.    They settle on letting Osaka speaking for herself — and play a mock-up of the tennis ace giving an interview to a news channel where she says: "I'm Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency accessible is a goal that FTX and I are striving towards." The ad ends with the tagline: "Naomi is in. You in?"

### xi.    Defendant Larry David



231.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Entities called "Don't Miss Out on Crypto,"

which aired during the 2022 Super Bowl, making FTX one of the most retweeted brands during the Super Bowl, and winning the "Most Comical" honorific from *USA Today*'s Ad Meter.[143]

232.     The ad—the only Super Bowl commercial David ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "Don't be like Larry." The ad can be viewed here: https://youtu.be/BH5-rSxilxo

## CLASS ACTION ALLEGATIONS

233.     As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.     Class Definitions**

234.     Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass (collectively, "the Classes"):

> **(1) Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

> **(2) Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

---

[143]     https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed December 16, 2022).

  **(3)** **<u>Florida Subclass</u>:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

  235. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of FTX YBAs to Plaintiffs and the Class Members (in which Defendants each substantially participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell an FTX YBA stems from a transactional occurrence that emanated from the State of Florida.

**B. Numerosity**

  236. The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

C. **Commonality/Predominance**

237.     This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

 (a) whether the YBAs were unregistered securities under federal or Florida law;

 (b) whether Defendants' participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.

 (c) the type and measure of damages suffered by Plaintiffs and the Class.

 (a) whether Defendants' practices violate the FDUTPA;

 (b) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

 (c) whether Plaintiffs and Class members are entitled to injunctive relief;

 (d) whether Plaintiffs and Class members are entitled to declaratory relief; and

 (e) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

D. **Typicality**

238.     Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's YBAs because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

E.      **Adequacy of Representation**

239.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

F.      **Requirements of Fed. R. Civ. P. 23(b)(3)**

240.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform.

241.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

242.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

G.      **Superiority**

243.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H.  Requirements of Fed. R. Civ. P. 23(b)(2)

244.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

245.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.      Requirements of Fed. R. Civ. P. 23(c)(4)**

246.    As it is clear that one of the predominant issues regarding Defendants' liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

247.    As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Class.**

248.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## COUNT ONE

**Violations of the Florida Statute Section 517.07,
The Florida Securities and Investor Protection Act
(Plaintiffs Individually and on behalf of the Classes)**

249.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–248 above, as if fully set forth herein.

250.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

251.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

252.    The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

253.    The YBAs sold and offered for sale to Plaintiff and Class members were not:

a.    exempt from registration under Fla. Stat. § 517.051;

b.    a federal covered security;

c.    registered with the Office of Financial Regulations (OFR); or

d.    sold in a transaction exempt under Fla. Stat. § 517.061.

254.    The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

255.    Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

256.     The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,
§ 501.201, Florida Statutes, *et seq.*
(Plaintiffs Individually and on behalf of the Classes)**

257.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–248 above, as if fully set forth herein.

258.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

259.     Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

260.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

261.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

262.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

263.    Plaintiffs and consumers in the Classes have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

264.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

265.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

266.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT THREE

**Civil Conspiracy**
**(Plaintiffs Individually and on behalf of the Classes)**

267. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–248 above, as if fully set forth herein.

268. The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

269. The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs and/or use the Deceptive FTX Platform.

270. Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

271. Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

272. Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

## COUNT FOUR

### Declaratory Judgment
### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)
### (Plaintiffs Individually and on behalf of the Classes)

273.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–248 as if fully set forth herein.

274.     This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq*.

275.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

276.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

277.     Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

278.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

279.     Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

280.    Plaintiff and the Class seek an order declaring that the YBAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.    Certifying the Class as requested herein;

b.    Awarding actual, direct and compensatory damages;

c.    Awarding restitution and disgorgement of revenues if warranted;

d.    Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.    Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.    Awarding statutory and multiple damages, as appropriate;

g.    Awarding attorneys' fees and costs; and

h.    Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

Dated: December 16, 2022                     Respectfully submitted,

                                    **By: */s/ Adam Moskowitz*_____**
                                    Adam M. Moskowitz
                                    Florida Bar No. 984280
                                    adam@moskowitz-law.com
                                    Joseph M. Kaye
                                    Florida Bar No. 117520
                                    joseph@moskowitz-law.com
                                    **THE MOSKOWITZ LAW FIRM, PLLC**
                                    2 Alhambra Plaza, Suite 601
                                    Coral Gables, FL 33134
                                    Telephone: (305) 740-1423


                                    **By: */s/ David Boies***
                                    David Boies
                                    (*Pro Hac Vice*)
                                    Alex Boies
                                    (*Pro Hac Vice*)
                                    **BOIES SCHILLER FLEXNER LLP**
                                    333 Main Street
                                    Armonk, NY 10504
                                    Phone: (914) 749–8200
                                    dboies@bsfllp.com


                                    **By: */s/ Stephen Neal Zack***
                                    Stephen Neal Zack
                                    Florida Bar No. 145215
                                    **BOIES SCHILLER FLEXNER LLP**
                                    100 SE 2nd St., Suite 2800
                                    Miami, FL 33131
                                    Office: 305-539-8400
                                    szack@bsfllp.com
                                    uungaro@bsfllp.com


                                    *Co-Counsel for Plaintiff and the Class*

# Exhibit A



# CipherBlade

## Blockchain Investigation Agency

# PRELIMINARY EXPERT REPORT

| | |
|---:|:---|
| **Matter:** | FTX Exchange |
| **Written By:** | Paul Sibenik |
| **Date:** | 12.16.2022 |

# Introduction

1. In accordance with instructions from Moskowitz Law Firm, PLLC, I have been instructed to prepare a preliminary expert report surrounding FTX Exchange,

2. More specifically, I have been asked to provide a preliminary opinion on FTX 'Earn' accounts, FTT Token, and FTX Exchange in general, as well as the risks that could affect consumers inherent in them. I have furthermore been asked to provide a technical opinion assessing if or how FTX Earn accounts meet the Howey Test.

3. I am the Lead Case Manager at CipherBlade, a leading blockchain forensics and cybercrime investigative firm which consults with blockchain projects, numerous police, law enforcement and regulatory agencies around the world, including the US FBI and US Secret Service, cryptocurrency exchanges, and other organizations. Other CipherBlade staff and I have experience in some of the most high-profile cryptocurrency investigations to date in relation to a wide range of niches including but not limited to cases involving hacking, theft, SIM-Swapping, ransomware, different types of frauds and scams (e.g., involving ICOs, NFTs, investment fraud, Ponzi Schemes), 'rugpulls,' embezzlement, as well as civil matters such as divorce cases and bankruptcy cases. I am recognized as one of the few experts in blockchain forensics and cryptocurrency cybercrime investigation. This work regularly requires the analysis of cryptocurrency transactions, wallets and addresses, alongside gathering and analyzing other data sources.

4. I regularly use blockchain forensics software to assist me in blockchain investigations. My usage of blockchain forensics software in this matter, has, thus far been extremely minimal. However, I expect blockchain forensics to play a more important role in this matter as this case develops and disclosures are obtained. For reference, however, I primarily utilize Chainalysis Reactor, which is the leading blockchain forensics software available and is utilized by various law enforcement agencies around the world, including the FBI, USSS, DHS, and DEA in the United States. Chainalysis Reactor helps professionals to better understand the flow of funds on assets on supported blockchains. It helps to aggregate and manage large amounts of transaction data and addresses to make the data more parsable. It helps professionals like me to better understand which addresses are under the control of the same individuals or entities, and for addresses that are under the control of a service or exchange, it is often able to identify the name of that service or exchange. Furthermore, Chainalysis Reactor also provides Open-Source Intelligence (OSINT) on various cryptocurrency addresses, which can help investigators understand what those addresses may be

associated with or can provide additional context in situations. I have a Chainalysis Reactor Certification (CRC), which is a certification offered by Chainalysis to certify knowledge and understanding of their Reactor forensics tool. I also have the Chainalysis Investigation Specialist Certification (CISC), an additional certification by Chainalysis designed specifically for the most advanced Reactor users, which dives deep into advanced investigative techniques and obfuscation approaches sometimes used by individuals trying to launder ill-gotten cryptocurrency. I furthermore have the Chainalysis Ethereum Investigations Certification (CEIC), a certification program focused on Ethereum, as well as other EVM (Ethereum virtual machine)-compatible cryptocurrencies.

5. Additionally, a large portion of my work involves consulting with blockchain companies in various capacities pertaining to preventative measures they can or should take to reduce risks and mitigate the amount of cybercrime that their company is exposed to. This involves consulting on security practices, including those pertaining to cryptocurrency storage and management. This also involves consulting on matters of compliance so as to significantly mitigate the likelihood and/or frequency of ill-gotten funds being laundered through their service and reduce the amount of various types of fraud, including investment scams, romance scams, impersonation scams, and money muling.

6. A copy of my CV is attached in Appendix A.

7. This is a preliminary report and is subject to change. I reserve the right to amend the views expressed in this report should or when additional information be uncovered or presented to me.

8. Prior to accepting instructions to act in this matter, I made reasonable inquiries to identify any actual or potential conflicts of interest in connection with the parties concerned. No matters arose.

## A Primer on Cryptocurrency Exchanges

9. Before delving into the issues at hand, I think it's first pertinent to provide some background information on what cryptocurrency exchanges are, what purpose they serve, and how they operate, in relation to the matter at hand.

10. In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry.

11. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

12. The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability or IOU of the exchange to its customer.

13. If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

   a) Trade it for another cryptocurrency

   b) Trade it for fiat currency

   c) Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

   d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

14. The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

15. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

16. For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

3

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."[1]*

17. While FTX violated their own terms of service, it's would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

18. With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

19. While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report.

20. The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

---

[1] https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf

21. Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent.

22. Exchanges on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

23. Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

24. Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

25. The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

26. This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[2] often in spectacular fashion. The most common reasons for an exchange's failure include:

    a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

    b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

    c) A hack or theft by an external actor

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

27. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

28. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they make such claims.

29. This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[3] specifically, those investors will be made whole or almost whole due to sensical regulations that were put in place in light of the lessons learned from the

---

[2] https://www.cryptowisser.com/exchange-graveyard/

[3] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

failures of Mt. Gox and Coincheck exchanges in Japan.

## FTX Earn Program

30. The FTX Earn program was a yield-bearing account that FTX customers were offered.[4] It was also offered on FTX.us for US persons.[5] The FTX website describes it as follows:

> *"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."*

31. The yield that customers were offered is also outlined on the same page – 8% APY (Annual percentage yield) for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

| Assets supported | Amount | Rate |
|---|---|---|
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000, up to $100,000 | 5% |

**Example:**

A. I have $10,000 USD in my account. I will earn **8% APY** on my deposit of USD.

B. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of **6.5%** on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example B, you will earn 6.5% on both the DOGE and the BTC. **There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.**

32. FTX's Earn program is very similar to that of Voyager's earn program, and programs offered by Celsius and Blockfi, all of whom have filed for bankruptcy. The differences

---

[4] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn
[5] http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

between these programs are minimal and involve differences in phrasing 'yield' vs
'interest' vs 'rewards,' the APY offered, the frequency of payout, and the assets that
were supported.

33. The FTX website does not describe how, exactly, FTX will generate the applicable
yield, and does not indicate what risk factors may be apparent that could result in the
inability to pay such yield.

34. The website does suggest term 'staking' however as a means of generating yield when
they indicate that:

> "*By opting in and participating in staking your supported assets in your FTX
> accoun*t"

35. This naturally gives the impression that their assets would be used for 'staking'
without being 100% clear about it.

36. The word 'staking' in the context of cryptocurrency is understood to have a technical
meaning. 'Staking' is associated with a consensus mechanism known as 'Proof of
Stake'(PoS) and relatedly, 'Delegated Proof of Stake,'(dPos) which *some*
cryptocurrencies utilize, but many don't (such as Bitcoin for example, which uses
'Proof of Work' as a consensus mechanism).

37. Staking has a similar purpose for cryptocurrencies that utilize PoS and dPoS as what
'miners' are offered from cryptocurrencies that utilize Proof of Work. Individuals
involved in staking are responsible for verifying transactions and they used their
staked assets (instead of sunk costs associated with expenditure of electricity and
equipment) as a way of guaranteeing the transactions they verify and add onto a
blockchain are valid. If they try to add an invalid transaction, staked assets are
typically burned as punishment, which creates a disincentive to act dishonestly or
maliciously. In exchange for staking, users are awarded compensation accordingly in
the form of newly issued cryptocurrency.

38. FTX is not itself a cryptocurrency operating on a PoS model; FTX was an exchange.
One cannot 'stake' assets on an exchange. One can lend them to an exchange though,
and theoretically, that exchange could then stake select cryptocurrency assets on
behalf of the user (for cryptocurrencies that have Proof of Stake).

39. While there is disagreement over whether or not 'staking' is itself a security, the issue
is that FTX did often not 'stake' customer assets, and indeed in many cases *could not*
stake customer assets since not all cryptocurrencies utilize Proof of Stake. Yet the
FTX website clearly suggests that 'all assets' in the account are subject to applicable

8

yield, including fiat assets (such as USD), which obviously don't even have a staking mechanism if FTX wanted to utilize it.

40. Rather than 'staking,' it appears that a primary thing FTX was doing was lending customer assets out, even from applicable that weren't part of the 'Earn' program, most notably to Alameda.[6] There are allegations that Alameda received loans from FTX interest-free.[7] Sam Bankman-Fried was a primary equity holder of both companies. FTX choosing to lend out assets, whether for free or otherwise, has nothing to do with actual staking of cryptocurrency.

41. The 'staking,' described on the FTX is purposely misleading, and not a representation of what was being offered. Users were not given the ability to 'stake' on FTX. They were given the ability to lend to FTX, and FTX would in turn invest and re-lend those assets out to questionable entities, on questionable terms, and such loans were not appropriately collateralized.

42. That being said, as it appears that even for users that did not subscribe to the Earn program, FTX leveraged and loaned out customer assets anyway to a large degree. It furthermore appears that while there were separate legal entities behind ftx.com and ftx.us, the two entities may not have been operated all that differently from one another, with Sam Bankman-Fried a primary equity holder of each, and just how independent the two entities were from each other is very much a matter of concern.

43. From a securities perspective, the Howey Test defines an investment contract as:

    a. An investment of money

        i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

---

[6] https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf
[7] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html

b. In a common enterprise
    i. FTX customer assets are almost always consolidated in wallets operated a controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c. With the expectation of profit
    i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[8]

d. To be derived from the efforts of others
    i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.
    ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that

---

[8] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn

10

would employ such strategies. The primary strategy that FTX portrayed to investors was 'staking' as I discuss in the following paragraphs.

## Importance and Role of Brand Ambassadors

44. FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims

*"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

45. Kevin O'Leary, another FTX brand ambassador stated:

*"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

46. Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

47. Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

48. Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but*

11

> *we also relied on another investment theme that I felt drove a lot of interest in FTX[9]"*

49. Mr. O'Leary is also a strategic investor in what is allegedly Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

## FTX and Representations of Safety and Risks

50. The yield that users could receive as part of the FTX Earn program, as previously mentioned was 8% APY for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

51. This type of yield structure makes no logical sense from a profitability standpoint. Why would a financial institution offer a lender a *lower* yield when they loaned more, and no yield at all beyond a certain threshold? As a business, should they want to pay out lower yields to a smaller number of people than higher yields to a larger number of people?

52. In my opinion, the reasons that FTX had this yield structure was so that they could mitigate their legal risks to customers. Simply put, a customer who loses $4,000 due to FTX's misappropriation of funds is very unlikely pursue action against the exchange, such as litigation. A customer who loses $4 million is much more likely to.

53. FTX did have a legal disclaimer associated with their Earn program, shown below:

---

[9] https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

## Legal Disclaimers and Terms of Service

Services are provided by FTX for its customers.

**APY refers to projected yield by staking. This yield is not interest and is not guaranteed, and changes based upon terms of applicable staking programs. FTX transmits value from your account to staking program and ensures that the value is properly transmitted to and from the program. Your customer balance is not a bank account, and is not insured.**

Only customers of FTX may be eligible to participate in the yield program. If a customer is eligible and opts into the program, then their assets will be used to generate a fixed yield for the user.

While FTX does not anticipate any problems, it does not guarantee the future or present yield payments in the case of malfunction, although it would not intend to claw back previously received yield. FTX *does* back the principal generating the yield with its own funds and equity. Nevertheless, users should exercise appropriate caution when deciding whether to enable yield for their accounts.

54. FTX again refers to staking numerous times, suggesting this was what they were primarily doing with customer assets, which wasn't true, and indeed wasn't even technically possible for a large portion of the assets that customers deposited.

55. FTX indicated that for customers who opt-in to the Earn program, FTX would take their assets to generate a fixed yield for the user, presumably via 'staking.'

56. The legal disclaimer, and certainly the brand ambassadors grossly misrepresented the level of risk associated with its Earn program. While FTX does indicate that it's 'not a bank account, and is not insured' and that 'users should exercise appropriate caution when deciding whether to enable yield for their accounts,' this hardly seems like a sufficient disclaimer and disclosure that would accurately represent the real level of risk. It certainly does not reveal that funds will be lent to affiliated entities to perform highly questionable and risky trading strategies, the lender will collateral FTT tokens with FTX for safety.

57. The FTX Earn program was clearly represented as being 'opt-in' and not 'opt-out.' However, in a declaration from Joseph Rotunda, the Director of Enforcement at the Texas State Security Board, he describes how he, as a US citizen, went to the FTX website, downloaded the FTX Trading App. He funded his account with $50, and "the default settings were automatically configured to enable earning of yield."[10] clearly notes that the earn program he was auto-enrolled in was associated with FTX US, not FTX Trading.

58. Thus, FTX's assertion that the FTX.US yield program were strictly opt-in was not true. It's certainly possible that when some US persons registered for FTX, the Earn program might have been opt-in in some cases but based on the series of events

---

[10] https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf

described by Mr. Rotunda, it's clear at the very least that a considerable portion of US persons that registered would have been auto-enrolled in the yield program. This would make it such that those users that were auto-enrolled (and who did not opt-out) appear to have engaged in an unregistered securities transaction as soon as any money was deposited to their account, whether fiat or cryptocurrency.

59. This means it appears that brand ambassadors were promoting a company and application that at least in some cases auto-enrolled US persons in the FTX Earn program which would reasonably be considered a security in my opinion, and which was also being lauded as 'safe' and 'compliant.'

## The FTT Token and Alameda

60. The FTT Token was an instrumental part of FTX's demise. FTT Tokens were created and issued by FTX, and FTT provides various benefits to its holders on FTX Exchange. The benefits include, most notably, trading fee discounts, but also ancillary benefits such as early access to token sales on the exchange.

61. It is not uncommon for many of the larger cryptocurrency exchanges to build in contrived 'utility' (such as trading discounts) for tokens that they themselves create because it can be financially lucrative for the exchange, since as the issuer they would typically retain a sizable portion of the tokens, and could elect to sell those tokens at some point, when the price is advantageous.

62. Similar to equity, the financial success of an exchange's token (FTT) is tied to the financial success and popularity of the exchange. This is because as the exchanges gains new customers, more and more customers will naturally want to buy FTT, either so they can have a discount on trading fees, or because they think the price will increase (possibly a result of new customers and demand for FTT). However, the holders of FTT have no legal rights voting rights that they would have with an equity investment.

63. Thus, as the number of customers that exchange has increases, as is often the case in a 'bull market,' the price of FTT could generally be expected to increase in value. However, in a bear market, when there is less demand and interest, and fewer new users signing up, there is naturally a lower demand for FTT that would generally cause the price to decline.

64. It is apparent that FTX (and FTX.us) effectively gave Alameda research an unlimited credit line, and Alameda could then effectively use FTX customer assets in extremely high-risk trading activity and strategies, and loans that ultimately left Alameda in extremely poor financial condition.

14

65. Alameda research allegedly largely provided FTT tokens (which were presumably issued or given to them by FTX) as collateral to FTX in order to obtain the loans from FTX. However, FTT tokens are highly volatile and ultimately subject to investor confidence in FTX itself. When that confidence and interest in FTX began to wane, the price of FTT started to collapse, and with that, the collateral that was designed to cover Alameda's bad debts.

66. FTX now has a bunch of comparatively worthless FTT on their balance sheet, and the price of that obviously won't recover measurably. Given what FTX's misappropriation of customer assets (both in and outside of the Earn program), investors were essentially invested in FTT tokens in large part even if they didn't know it or buy any directly themselves.

## Verifiable FTX Falsehoods

67. It's evident that the FTX group was grossly mismanaged and misappropriated customer funds. It is still the early stages of finding out about all the misconduct. Much of the misconduct that has been revealed thus far and will be revealed in the coming months would not necessarily have been immediately known to brand ambassadors. This begs the question as to what are the falsehoods that were or should have been apparent to FTX brand ambassadors when partnering with FTX initially, well before their collapse?

68. The first, as we've already discussed is the claims regarding staking. Cryptocurrencies like Bitcoin and Dogecoin, which FTX offers, cannot be staked. And fiat currency (which FTX also offered yield on) also cannot be staked. Yet, FTX offers yield for them on the Earn Program. The fact that FTX would not technically be able to stake applicable cryptocurrency assets on behalf of customers as they have said and pay back yield in the same currency / cryptocurrency, was always a giant red flag that was demonstrably false, and which should have been recognized by anyone promoting FTX.

69. The second verifiably false claim by FTX that would have been evident publicly well before their downfall relates to FTX's claim that only the user has control of digital assets in their account:

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*

15

As mentioned previously, FTX exchange accounts are custodial in nature. This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. Whether or not such requests are processed are dependent on the willingness, ability and approval of the exchange. It is very much the exchange that *controls* the assets, not their customer.

70. An additional claim in this quote that could also be argued is verifiably false is the assertion that digital assets are held 'in' the account at all (even if the exchange wasn't misappropriating funds). On a technical level, an exchange account cannot hold or store cryptocurrency. However, exchange accounts can store a record of liability for that cryptocurrency, that an exchange may have to its customer. However, because this concept of 'storage' can be difficult for people to understand, it's somewhat common, at least for newcomers and those less educated with cryptocurrency to discern that a balance held on a cryptocurrency exchange account is equivalent to those assets being 'stored' on the exchange. What a customer(s) balance is versus what an exchange actually stores in its own custody on behalf of the user should not be assumed to be the same thing; there is no regulation or assurance guaranteeing or requiring that. Only an exchange's terms of service, which might contain such language, might guarantee that, but even if it does, such terms may not be adhered to (which was the case here).

71. A third major red flag should have been readily apparent is the non-sensical yield structure for customer accounts, which in my opinion was designed in such a way so as to onboard users. As previously mentioned, this was most likely doing to limit legal risks that FTX could incur, since investors who lost smaller amounts of money are much less likely to pursue action than investors that lost considerable amounts of money.

72. A fourth falsehood should have been apparent in Sam Bankman-Fried's testimony to the US House of Representatives Financial Services committee when he stated:

> *"There is complete transparency about the positions that are held. There is a robust, consistent risk framework applied"*

No, there is not "complete transparency" and the positions that FTXs holds and held. While most cryptocurrency operate on public blockchains, the entities that own specific wallets, who controls specific accounts, and loans that are made by an exchange are not publicly available simply because such blockchains are public, and such information was not disclosed by FTX. And based on John Ray's affidavit,

FTX's records are so poor it's likely that large swaths of this information won't ever be known.

73. A fifth area of contention that could be said to be demonstrably false (depending on semantics) or at least misleading would be with respect to the FTX Earn program is the use of the term 'wallet.' FTX's page on the Earn program frequently talks about users' wallets (with FTX).

> *"All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate"*

74. The term 'wallet' is one of the very first terms that cryptocurrency users hear of, which they start to use, but term is frequently misused and misunderstood. The 'wallet' terminology FTX uses perpetuates that misunderstanding.

75. A cryptocurrency wallet is inherently 'self-custodial' meaning that there is no institution holding cryptocurrency on behalf of the user, nor does the user need to seed any permission to have nor hold funds in such a wallet. Only the person who created the wallet has ability to access the wallet (unless the credentials to the wallet were to be breached or otherwise accessed by another party). A cryptocurrency wallet is an auxiliary device or medium that holds or stores private key(s) needed to access or spend cryptocurrency balances that have been allocated to address(es) that are part of the wallet.

76. The mere use of 'wallet' in this context is itself a misnomer, and very misleading, because a user *cannot* have a 'FTX wallet' of theirs. There is no such thing. A user can have wallet(s), and a FTX account, or both, but there is no such thing as an 'FTX Wallet' belonging to the user. FTX Exchange did have and control many different wallets, but for any given customer, FTX Exchange did not hold funds in a unique wallet only for that customer; that's simply not how exchanges work.

77. These are just the obvious falsehood and red flags that would be apparent on the surface. If brand ambassadors obtained information or knowledge about the inner workings of FTX, it's very likely that they would have encountered additional red flags.

**// ENDS**

Paul Sibenik

Lead Case Manager

CipherBlade

_____