THOMSON REUTERS
WESTLAW EDGE ○

FTX    History    Folders    My links    Community    Notifications      Sign out

All content     Enter terms, citations, databases, questions,     All State & Federal     Search Tips

## Lam v. Bankman-Fried

3:22CV07336   (Approx. 8 pages)

Document     Filings (0)     Related Opinions/Dockets (0)     Timeline (1)

Go to                  Request Multiple PDFs

TO ORDER COPIES OF ANY DOCUMENTS LISTED BELOW, CALL WESTLAW COURTEXPRESS 1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 02/10/2023**

Today's Date: 2/10/2023

Source: U.S. District Court, Northern District of California (San Francisco)

| | |
|---|---|
| **Court:** | U.S. District Court, Northern District of California (San Francisco) |
| **Case Title:** | Lam v. Bankman-Fried |
| **Case:** | 3:22-CV-07336 |
| **Judge:** | Judge Jacqueline Scott Corley |
| **Date Filed:** | 11/20/2022 |
| **Case Status:** | ADRMOP, RELATE |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 3:22CV07336 |
| **Jury Demand:** | Plaintiff |
| **Demand:** | $5,000,000 |
| **Nature of Suit:** | Torts: Other Fraud (370) |
| **Jurisdiction:** | Diversity |
| **Cause:** | 28 USC 1332 Diversity-Fraud |

## PARTICIPANT INFORMATION      Expand All

**Elliott Lam**

1

Julie Papadakis

Russell Hawkins

Michael Elliott Jessup

Stephen T Pierce

Julie Chon Papadakis

Sam Bankman-Fried

Caroline Ellison

Golden State Warriors, LLC

## CALENDAR INFORMATION

View Calendar Information

## DOCKET PROCEEDINGS (22)

| Entry #: | Date: | Description: | |
|---|---|---|---|
| 20 | 02/03/2023 | CERTIFICATE OF SERVICE by Julie Papadakis re 19 MOTION to Consolidate Cases MOTION to Appoint Counsel (Logan, Todd) (Filed on 2/3/2023) (Entered: 02/03/2023) | View / Add to request |
| 19 | 02/02/2023 | MOTION to Consolidate Cases , MOTION to Appoint Counsel filed by Michael Elliott Jessup, Elliott Lam, Stephen T Pierce, Julie Papadakis, Russell Hawkins. Motion Hearing set for 3/9/2023 10:00 AM before Judge Jacqueline Scott Corley. Responses due by 2/16/2023. Replies due by 2/23/2023. (Attachments: # 1 Declaration of William M. Audet, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 | View / Add to request |

1

2/10/23, 10:03 AM                                                    Westlaw Edge

| | | | |
|---|---|---|---|
| | | Exhibit 6, # 8 Exhibit 7, # 9 Proposed Order)(King, Laurence) (Filed on 2/2/2023) (Entered: 02/02/2023) | |
| 18 | 01/10/2023 | ORDER by Judge Jacqueline Scott Corley granting (17) Administrative Motion to Relate in case 3:22-cv-07336-JSC. 23-cv-0024 is related to this action. (ahm, COURT STAFF) (Filed on 1/10/2023) (Entered: 01/10/2023) | View / Add to request |
| 17 | 01/04/2023 | ADMINISTRATIVE MOTION To Relate pursuant to Local Rule 3-12 & 7-11 filed by Julie Chon Papadakis. Responses due by 1/9/2023. (Attachments: # 1 Declaration of Laurence D. King in Support of Administrative Motion to Consider Whether Cases Should be Related Pursuant to Civil Local Rules 3-12 and 7-11, # 2 Exhibit 1 to the Declaration of Laurence D. King, # 3 Exhibit 2 to the Declaration of Laurence D. King, # 4 Exhibit 3 to the Declaration of Laurence D. King, # 5 Exhibit 4 to the Declaration of Laurence D. King, # 6 Exhibit 5 to the Declaration of Laurence D. King, # 7 Proposed Order, # 8 Certificate/Proof of Service)(King, Laurence) (Filed on 1/4/2023) (Entered: 01/04/2023) | View / Add to request |
| 16 | 12/19/2022 | CLERK'S NOTICE CONTINUING INITIAL CASE MANAGEMENT CONFERENCE. Please take notice that the case management conference set for March 2, 2023 is continued to April 6, 2023 at 1:30 p.m. before Judge Jacqueline Scott Corley via a Zoom webinar. Joint Case Management Statement is due by 3/30/2023. Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.u scourts.gov/jsc Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than noon 4/5/2023. General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ahm, COURT STAFF) (Filed on 12/19/2022) (Entered: 12/19/2022) | Send Runner to Court |
| 15 | 12/19/2022 | ORDER RELATING CASE. Signed by Judge Jacqueline Scott Corley on 12/19/2022. (22-cv-7444, 22-cv-7620, and 22-cv-7666 are related to this action.) (ahm, COURT STAFF) (Filed | View / Add to request |

1

2/10/23, 10:03 AM                                      westlaw.com

| | | | |
|---|---|---|---|
| | | on 12/19/2022) Modified on 12/19/2022 (ahm, COURT STAFF). (Entered: 12/19/2022) | |
| 14 | 12/16/2022 | OPPOSITION/RESPONSE (re 9 ADMINISTRATIVE MOTION To Consider Whether Cases Should Be Related ) filed byStephen T Pierce. (Hoda, Marshal) (Filed on 12/16/2022) (Entered: 12/16/2022) | View / Add to request |
| 13 | 12/16/2022 | Summons Issued as to Sam Bankman-Fried, Caroline Ellison, Golden State Warriors, LLC. (far, COURT STAFF) (Filed on 12/16/2022) (Entered: 12/16/2022) | View / Add to request |
| 12 | 12/15/2022 | Proposed Summons. (Audet, William) (Filed on 12/15/2022) (Entered: 12/15/2022) | View / Add to request |
| | 12/15/2022 | Electronic filing error . ONLY ONE SUMMONS TO BE ISSUED PER CASE, USE AN ATTACHMENT TO SUMMONS IF NEEDED TO LIST ADDITIONAL DEFENDANTS INFORMATION [err201]This filing will not be p rocessed by the clerks office.Please re-file in its entirety. Re: 10 Proposed Summons filed by Elliott Lam (far, COURT STAFF) (Filed on 12/15/2022) (Entered: 12/15/2022) | Send Runner to Court |
| 11 | 12/14/2022 | OPPOSITION/RESPONSE (re 9 ADMINISTRATIVE MOTION To Consider Whether Cases Should Be Related ) filed byMichael Elliott Jessup. (Logan, Todd) (Filed on 12/14/2022) (Entered: 12/14/2022) | View / Add to request |
| 10 | 12/13/2022 | Proposed Summons. (Audet, William) (Filed on 12/13/2022) (Entered: 12/13/2022) | View / Add to request |
| 9 | 12/12/2022 | ADMINISTRATIVE MOTION To Consider Whether Cases Should Be Related filed by Elliott Lam. Responses due by 12/16/2022. (Attachments: # 1 Declaration Of Kurt D. Kessler In Support Of Administrative L.R. 7-11 Motion To Consider Whether Cases Should Be Related, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Order, # 7 Certificate/Proof of Service)(Audet, William) (Filed on 12/12/2022) (Entered: 12/12/2022) | View / Add to request |
| 8 | 11/28/2022 | CLERK'S NOTICE RESCHEDULING INITIAL CASE MANAGEMENT CONFERENCE. Joint Case Management Statement due by 2/23/2023. Initial Case Management Conference reset for 3/2/2023 at 1:30 p.m. before Judge Jacqueline Scott Corley via a Zoom webinar. Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc Court Appearances: Ad | View / Add to request |

1

| | | | |
|---|---|---|---|
| | | vanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than noon on 3/1/2023. General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/. (ahm, COURT STAFF) (Filed on 11/28/2022) (Entered: 11/28/2022) | |
| 7 | 11/25/2022 | ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Jacqueline Scott Corley for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to case. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.Signed by The Clerk on 11/25/2022. (Attachments: # 1 Notice of Eligibility for Video Recording)(jrs, COURT STAFF) (Filed on 11/25/2022) (Entered: 11/25/2022) | View<br><br>Add to request |
| 6 | 11/23/2022 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (This is a text-only entry generated by the court. There is no document associated with this entry.) (ig, COURT STAFF) (Filed on 11/23/2022) (Entered: 11/23/2022) | Send Runner to Court |
| 5 | 11/22/2022 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Elliott Lam.. (Audet, William) (Filed on 11/22/2022) (Entered: 11/22/2022) | View<br><br>Add to request |
| 4 | 11/21/2022 | Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 2/22/2023. Initial Case Management Conference set for 3/1/2023 01:30 PM in Oakland, Courtroom 4, 3rd Floor. (far, COURT STAFF) (Filed on 11/21/2022) (Entered: 11/21/2022) | View<br><br>Add to request |
| 3 | 11/21/2022 | Case assigned to Magistrate Judge Donna M. Ryu. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit E-Filing A New Civil Case at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at | Send Runner to Court |

1

| | | | |
|---|---|---|---|
| | | www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 12/5/2022. (ark, COURT STAFF) (Filed on 11/21/2022) (Entered: 11/21/2022) | |
| 2 | 11/21/2022 | FEE PAID (Filing fee$402,receipt number ACANDC-17744783). (Audet, William) (Filed on 11/21/2022) Modified on 11/21/2022 (far, COURT STAFF). (Entered: 11/21/2022) | Send Runner to Court |
| 1 | 11/21/2022 | COMPLAINT Class Action Complaint against all Defendants. Filed by Elliott Lam (Attachments: # 1 Civil Cover Sheet) (Audet, William) (Filed on 11/21/2022) Modified on 11/21/2022 (far, COURT STAFF). (Entered: 11/21/2022) | View <br><br> Add to request |
| | 11/21/2022 | Electronic filing error . Filing fee not paid. Please pay the filing fee through Pay.gov by clicking on Civil > Other Documents > New Case Filing Fee in CM/ECF. [err701] Re:[ 1] Complaint filed by Elliot Liam, Golden State Warriors (ark, COURT STAFF) (Filed on 11/21/2022) (Entered: 11/21/2022) | Send Runner to Court |

TO ORDER COPIES OF ANY DOCUMENTS LISTED ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Contact us  •  Live chat  •  Training and support  •  Improve Westlaw Edge/Report an error  •  Transfer My Data
•  Pricing guide  •  Sign out

1-800-REF-ATTY (1-800-733-2889)



Westlaw Edge. © 2023 Thomson Reuters    Accessibility  •  Privacy  •  Supplier terms          *Thomson Reuters is not providing professional advice*

1

https://1.next.westlaw.com/Docket/i0ad6159d000001863bd9dad47287bca9/View/Updated.html?docguid=I53CBAD8C69B011ED8CE1BBC550B8C66...    6/6

William M. Audet (CA SBN 117456)
Ling Y. Kuang (CA SBN 296873)
Kurt D. Kessler (CA SBN 327334)
  waudet@audetlaw.com
  lkuang@audetlaw.com
  kkessler@audetlaw.com
AUDET & PARTNERS, LLP
  711 Van Ness Avenue, Suite 500
  San Francisco, CA 94102-3275
  Telephone:   (415) 568-2555
  Facsimile:    (415) 568-2556

Robert L. Lieff (CA SBN 037568)
  rlieff@lieff.com
  P.O. Drawer A
  Rutherford, California 94573

Edward LEHMAN (IL SBN 6194489)*
  elehman@lehmanlaw.com
Jacob BLACKLOCK (TX SBN 24079835)*
  jblacklock@lehmanlaw.com
LEHMAN, LEE & XU LLC (Saipan #25977-001-1)
  c/o LEHMAN, LEE & XU
  Suite 3313, Tower One, Times Square
  1 Matheson Street, Causeway Bay, Hong Kong
  Telephone:   (852) 3588-2127
  Facsimile:    (852) 3588-2088

*Counsel for Plaintiff Elliott Lam, individually
and on behalf of all others similarly situated*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ELLIOTT LAM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SAM BANKMAN-FRIED, CAROLINE ELLISON, and GOLDEN STATE WARRIORS, LLC, <br><br> Defendants. | Case No: <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMAND** |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF ACTION ........................................................................................................ 2

PARTIES ............................................................................................................................ 5

JURISDICTION & VENUE ................................................................................................. 5

FACTUAL ALLEGATIONS ................................................................................................ 6

    I.   THE RISE OF FTX ............................................................................................ 6

    II.  THE FALL OF FTX ........................................................................................... 8

    III. ALAMEDA RESEARCH AND THE QUESTIONABLE ROLE IT HAD IN FTX'S COLLAPSE ................. 9

    IV. YIELD-BEARING ACCOUNTS (YBAS) AND VIOLATIONS OF LAW ............ 11

    V.  LEVERAGING INTERNATIONAL REACH OF GOLDEN STATE WARRIORS TO MARKET FTX'S

    PLATFORM AND SERVICES ................................................................................ 12

CLASS ALLEGATIONS ................................................................................................... 13

    I.   CLASS DEFINITION(S) ................................................................................... 13

    II.  REQUIREMENTS OF RULE 23(A) MET ........................................................ 14

        A.    Numerosity ................................................................................. 14

        B.    Commonality and Predominance ............................................... 15

        C.    Typicality .................................................................................... 15

        D.    Adequacy .................................................................................... 15

        E.    Superiority .................................................................................. 16

    III. REQUIREMENTS OF RULE 23(B)(3) MET .................................................... 16

    IV. REQUIREMENTS OF RULE 23(B)(2) MET .................................................... 17

    V.  REQUIREMENTS OF RULE 23(C)(4) MET .................................................... 17

CAUSES OF ACTION ...................................................................................................... 18

PRAYER FOR RELIEF ..................................................................................................... 23

JURY TRIAL DEMAND .................................................................................................... 23

ELLIOTT LAM, by and through undersigned counsel, brings this action on behalf of himself and on behalf of all others similarly situated ("Plaintiff" and the "Class") against SAM BANKMAN-FRIED, CAROLINE ELLISON, and GOLDEN STATE WARRIORS, LLC, (together, "Defendants"). Plaintiff make the following allegations based on personal knowledge of the facts pertaining to themselves and on information and belief upon investigation that is reasonable as to all other matters. Plaintiff alleges as follows:

**NATURE OF ACTION**

1.     An "unprecedented" situation has occurred involving fraud and deceit at a scale rarely seen – causing billions of dollars in value and financial equity to ostensibly disappear overnight.

2.     FTX Trading LTD d/b/a FTX's ("FTX") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), was collectively valued at over $32 billion at one recent point and was known for offering and selling unregistered securities in the form of yield-bearing accounts ("YBAs") to residents of the United States and other countries around the world.

3.     The FTX Entities imploded in early November when they filed for bankruptcy in the aftermath of a seemingly massive and nearly unprecedented liquidity crisis. The FTX Entities, and its billionaire co-founder and Defendant herein, Sam Bankman-Fried, are reportedly now under investigation by the US Department of Justice and the Securities and Exchange Commission for severely mismanaging billions of dollars in client funds. When FTX's troubles drew more and more headlines and customers started taking out funds, the FTX Entities halted withdrawals, and the companies and related entities filed for bankruptcy days later.

4.     As a result of this crisis, CEO Bankman-Fried resigned on Nov. 11, and was replaced by John Ray III ("Ray"), who previously oversaw the Enron bankruptcy. On Nov. 17, Ray submitted a filing with the United States Bankruptcy Court, District of Delaware, stating:

> "Never in my career [over 40 years of legal and restructuring experience] have I seen such a **complete failure of corporate controls** and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the

CLASS ACTION COMPLAINT

hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, **this situation is unprecedented**."

*In re: FTX TRADING LTD., et al.*, No. 22-11068-JTD, Dkt. #24 at ¶ 5 (Bankr. D. Del., Nov. 17, 2022) (emphasis added).

5. Ray also published a sprawling, overly complicated organizational chart of FTX's financial and investment empire, offering a glimpse of the maze-like web of legal entities Bankman-Fried had created to run his empire. *In re: FTX TRADING LTD., et al.*, No. 22-11068-JTD, Dkt. #24 at Ex. B (Bankr. D. Del., Nov. 17, 2022) ("Preliminary Corporate Structure Chart").

6. Nick Mancini, director of research for the crypto data firm Trade the Chain has described the complex structure as likely intentional and created to aid Defendant Bankman-Fried's misconduct within his companies: "It's clear Sam [Bankman-Fried] designed the organizational structure to be intentionally convoluted in order to keep various employees and companies in the dark about what was happening outside of their specific walled garden within the greater structure. Reports of fraud, lack of accounting, and special privileges between subsidiaries are examples of reasons that you would create such an intentionally confusing structure."[1]

7. In addition to using convoluted organizational structures to hide its malfeasance, reports have started to emerge about how Bankman Fried enabled the secret transfer of $10 billion from FTX Entities to Alameda Research LLC, Bankman-Fried's venture-capital and trading firm affiliate of FTX, and that at least $1 billion of those funds have disappeared.[2]

8. Separately, according to paperwork filed by Ray with the U.S. Bankruptcy Court for the District of Delaware, Alameda Research had $4.1 billion in related-party loans. Among those were $1 billion to Defendant Bankman-Fried.

9. The scale of this Ponzi-scheme-like fraud was matched only by the scale of the publicity campaign employed by Bankman-Fried and the FTX Entities to conjure up an illusion of financial and corporate success. Flush with money from unwitting investors and seeking to further

---

[1] https://www.yahoo.com/now/ftx-bankruptcy-filing-reveals-remarkably-193200722.html (last accessed: Nov. 20, 2022)

[2] https://www.reuters.com/markets/currencies/exclusive-least-1-billion-client-funds-missing-failed-crypto-firm-ftx-sources-2022-11-12/ (last accessed: Nov. 20, 2022)

1    increase their customer reach, Bankman-Fried and the FTX Entities began signing branding deals

2    with sports institutions and advertising on television prolifically to entice new customers.

3        10.    FTX Entities bought the naming rights for the National Basketball Association

4    ("NBA") franchise Miami Heat's stadium, signing a 19-year deal with the team and Miami-Dade

5    County, Florida, for $135 million. The Mercedes-AMG Petronas Formula 1 team named FTX its

6    cryptocurrency exchange partner. And a professional e-sports team, TSM, agreed to be paid $210

7    million from FTX over 10 years to change its name to TSM FTX. The FTX Entities continued to

8    spend lavishly over the last couple years on nonfungible token ("NFTs") and crypto partnerships

9    with teams including the Golden State Warriors and the Washington Capitals. Major League

10   Baseball ("MLB") and the FTX Entities announced what they were calling a long-term, global

11   partnership deal that came with swag: the umpires would wear patches with the logo of FTX.US.

12   Other sponsorships included the title sponsorships of the first season of MLB Home Run Derby X,

13   and the title sponsorship of the tournaments FTX Road to Miami and FTX Crypto Cup as part of

14   the Champions Chess Tour 2022. In August 2021, it was announced FTX secured naming rights to

15   UC Berkeley's California Memorial Stadium in a $17.5 million deal. In addition to the naming

16   rights, FTX will receive on-field branding and branding on athletics press backdrops, along with

17   social integration, likely exposing a substantial number of foreign students to FTX Entities' trading

18   platform, offers of YBAs, and other services. FTX also ran Super Bowl ads to gain U.S. and

19   international exposure for new customers.

20       11.    FTX Entities' publicity and commercial campaign also involved the personal

21   endorsements of internationally-known celebrity, entertainment, and sports figures through FTX's

22   own celebrity brand ambassadors. These 'brand ambassadors,' used their social media reach and

23   personal brands to induce unsophisticated investors and consumers into a relationship with the FTX

24   Entities.

25       12.    As a result of the willful misconduct alleged above, and in more detail below,

26   Plaintiff brings this action on behalf of himself and the Class seeking to recover damages,

27

28

CLASS ACTION COMPLAINT

declaratory and/or injunctive relief stemming from fraudulent and deceitful conduct of Defendants and their promotion and marketing of FTX Entities' trading platform and their YBAs.

## PARTIES

13.     Plaintiff Elliott Lam is a citizen of Canada and resident of Hong Kong, China. He is a natural person over the age of 21. Plaintiff Lam purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amounts to earn interest on his holdings. Plaintiff Lam did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the FTX Entities and their related trading platforms as detailed in this complaint, and executed trades in reliance on those misrepresentations and omissions. As a result, Plaintiff Lam has sustained damages approximated at $750,000.00 for which Defendants are liable.

14.     Defendant Sam Bankman-Fried, founder and former CEO of FTX, is a citizen and resident of the Bahamas.

15.     Defendant Caroline Ellison is the CEO of Alameda Research, LLC, a trading firm launched by Defendant Sam Bankman-Fried. She oversaw many of the risky bets Alameda took with regard to FTX customers' crypto tokens. Defendant Ellison is a resident of Hong Kong.

16.     Defendant Golden State Warriors LLC is a professional basketball team in the NBA that partnered with FTX in 2022, unveiling an FTX logo on the court at its home arena, Chase Center, and is a corporation operating and existing under the laws of the State of California and headquartered in San Francisco, California.

## JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

18.      This Court has personal jurisdiction against Defendants because at least one Defendant conducts business in California, and/or have otherwise intentionally availed themselves of the State of California's consumer market through the promotion, marketing, and sale of FTX's

YBAs in California, which constitutes committing a tortious act within the state of California. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in California. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from those who reside in this District.

20.    Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) as there is no single district in which all Defendants reside; because a substantial part of the events or omissions giving rise to the claims at issue occurred outside of the United States in the Bahamas, the home of Sam Bankman-Fried and FTX; and because Defendants entered into transactions and/or received substantial profits from those who reside in this District. As established, this district has personal jurisdiction over Defendants, rendering venue here appropriate. Further, Sam Defendants Bankman-Fried and FTX contracted with additional Defendant Golden State Warriors, who is headquartered and conduct business in this district.

21.    All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### I.    THE RISE OF FTX

22.    In May 2019, former Wall Street trader Defendant Sam Bankman-Fried and ex-Google employee Zixiao "Gary" Wang founded 'FTX,' the owner and operator of the FTX.COM cryptocurrency exchange.

23.    In little more than two years, by July 2021, the darling startup has reached an astronomical valuation of $18 billion due to raising $900 million during a funding round that included financial support from Wall Street titans like SoftBank Group Corp, venture capital firm

Sequoia Capital, private equity giant Thoma Bravo, Daniel Loeb's Third Point, the Paul Tudor Jones family, British hedge fund manager Alan Howard, and 50-plus additional investors. The company reportedly had at the time more than 1 million users and averaged about $10 billion in trading volume per day, with revenue surging more than tenfold in the past year.

24.     In a mere 3 months, by October 2021, the value of FTX had soared again to $25 billion. This funding round saw an infusion of $420 million from reputable investor institutions and firms like Ontario Teachers' Pension Plan Board, Temasek, Tiger Global and more than 60 other investors.

25.     In January 2022, FTX's smaller related entity, FTX.US, was valued at $8 billion stemming from a $400 million first-round funding from reputable investors like Softbank Group Corp, and Singapore's Temasek Holdings. Combined, the FTX Entities' value exceeded $32 billion.

26.     Flush with cash, the FTX Entities and related companies, continued and even expanded its significant marketing and promotional efforts, as detailed below, to entice consumers from around the world to adopt, use, or otherwise learn about its services and the crypto-industry.

27.     The FTX Entities primary product was a platform service provider that served as a mobile application for cryptocurrency investment and allowed users to place cryptocurrency trade orders on behalf of users like Plaintiff and Class and to use interest bearing or yield-bearing accounts (YBA). The trading platform sought to be both user-friendly for first time investors but also with enough robust features for professional traders.

28.     At its peak, the FTX.com exchange was extremely successful, and in 2022, around $15 billion in assets were traded daily on the platform, which represented 10% of global volume for crypto trading. This made FTX one of the largest crypto-trading companies in the world. The FTX team had grown to over 300 individuals from all over the globe. Although the FTX Entities' primary international headquarters is in the Bahamas, it maintained a US base of operations in Miami, Florida that significantly affected all parts of the United States, including California.

29.     FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection in November 2022, customers had entrusted a purported $10 to $50 billion dollars to the platform.

30.     Defendant Bankman-Fried got rich off FTX (and an intertwined company called Alameda Research, LLC), with the two companies providing him income of more than $1 billion in 2020 alone.

31.     Before the house-of-cards empire collapsed, Defendant Bankman-Fried reached a net worth of $26 billion. Bankman-Fried unabashedly used his wealth to become a major political donor and force, secured celebrity endorsements like Defendant Golden State Warriors named herein, and spent lavish sums of money on not just promotional materials for his companies but for his personal use as well.

**II.     THE FALL OF FTX**

32.     In the fall of 2022, trouble began for Defendants Bankman-Fried and FTX. On August 19, 2022, a U.S. bank regulator ordered the FTX platform to halt "false and misleading" information about whether funds at the company were insured by the government (they were not).

33.     On November 2, 2022, popular crypto news publication CoinDesk released a devasting report, with leaked financial documents, showcasing that Bankman-Fried's other company, Alameda Research, was heavily dependent on FTX's native token, FTT.

34.     CEO Changpeng "CZ" Zhao, who oversaw a competitor to FTX in Binance, in learning about the substantial amount that Alameda Research depended on FTT, decided to quickly and politely liquidate holdings of FTT worth more than $500 million. Given CZ's prominence in the crypto-trading sphere, other consumers quickly followed.

35.     FTX saw a staggering $6 billion in withdrawals over 3 days; FTX struggled to fulfill these withdrawals given their speed and volume. As a result of FTX's situation, the related native coin FTT plummeted nearly a third in value.

36.     On November 8, 2022, Defendant Bankman-Fried announced that Binance would come to the rescue and become a white-knight by bailing the company out. However, one day later,

on November 9, 2022, Binance announced it was withdrawing from the deal citing "due diligence" concerns and additional reports about mismanagement and mishandling of funds within the FTX Entities. FTT plunged even faster and even deeper.

37. On November 11th, unable to obtain a bailout from Binance or others, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO and in a social media posting, publicly acknowledged that he had messed up.

### III. ALAMEDA RESEARCH AND THE QUESTIONABLE ROLE IT HAD IN FTX'S COLLAPSE

38. According to recent reports, another explanation contributing to the precarious situation the FTX Entities and their trading platform was facing stems from mismanagement of funds. Earlier this year, Bankman-Fried secretly transferred at least $4 billion in customer funds from FTX to Alameda to apparently cover for Alameda after it faced a series of losses. The FTX entities lent as much as $8 billion, of which more than half belong to customers, to Alameda with more than $10 billion in loans still outstanding. Alameda Research has a checkered and conflicting history with Defendant Bankman-Fried.

39. Alameda Research, LLC ("Alameda Research") is a quantitative trading firm that was founded in November of 2017 by Defendant Bankman-Fried. Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

40. At the time, Defendant Bankman-Fried started moving up to $25 million a day in arbitrage trades (using two or more markets to capitalize on the difference of price on the stock or commodity in different markets) to take advantage of the higher price of Bitcoin in Japan compared to the price in the U.S. The Company earned about $20 million from that arbitrage opportunity.[3]

41. By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda Research. Defendant Ellison described the recruitment as follows: "This was very much

---

[3] Parloff, Roger. *Portrait of a 29-year-old billionaire: Can Sam Bankman-Fried make his risky crypto business work?* https://finance.yahoo.com/news/ftx-ceo-sam-bankman-fried-profile-085444366.html (Yahoo! Finance, August 12, 2021)

A&P AUDET & PARTNERS LLP

1    like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an

2    interview regarding her initial impressions of Alameda.

3        42.    In late 2018, the headquarters of Alameda Research was relocated to Hong Kong.

4    The team at Alameda Research included Defendant Bankman-Fried's close friends (and later co-

5    founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison and Sam Trabucco

6    were also part of the group and upon moving to Hong Kong the group lived like college students

7    and fiercely traded crypto.

8        43.    After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began

9    taking more responsibility at Alameda Research along with Sam Trabucco, who served as CEO.

10   Defendant Ellison rose swiftly at Alameda Research, becoming co-CEO of Alameda alongside Sam

11   Trabucco in the summer of 2021.

12       44.    As of August 2021, Bankman-Fried owned approximately 90% of Alameda

13   Research.

14       45.    Between early 2021 and March 2022, Alameda Research amassed crypto tokens

15   ahead of FTX announcing that it would list them, totaling about $60 million worth of tokens in the

16   Ethereum blockchain.[4]

17       46.    In and around April 2022, Sam Trabucco stepped down as co-CEO of Alameda

18   Research, months before he publicly announced his departure in August, according to a former

19   Alameda employee.[5]

20       47.    In May and June of 2022, Alameda Research suffered significant losses. Anonymous

21   sources cited by the Wall Street Journal indicated that those losses led to FTX loaning Alameda

22   Research more than half of its customer funds. When Sam Bankman-Fried stated publicly that he

23   made a poor judgment call, the anonymous sources cited by the Wall Street Journal indicated that it

24

25   [4] Ostroff, Caitlin. *Alameda Amassed Crypto Tokens Ahead of FTX Listings, Public Data Shows.*
     https://www.wsj.com/livecoverage/stock-market-news-today-11-14-2022/card/alameda-amassed-
26   crypto-tokens-ahead-of-ftx-listings-public-data-shows-z6KFN051ToEpFohTXA89 (Wall Street
     Journal, November 14, 2022)
27   [5] Jeans, David, et al. 'Queen Caroline': The 'Fake Charity Nerd Girl' Behind The FTX Collapse.
28   https://www.forbes.com/sites/davidjeans/2022/11/18/queen-caroline-the-risk-loving-29-year-old-
     embroiled-in-the-ftx-collapse (Forbes Digital Assets, November 18, 2022).

A&P ᴬᵁᴰᴱᵀ & ᴾᴬᴿᵀᴺᴱᴿˢ

was a decision to loan funds from FTX to Alameda Research that he was referencing. This conduct was explicitly forbidden by the terms of service of FTX.[6] Some estimates are that Bankman-Fried secretly transferred at least $4 billion in customer funds from FTX to Alameda to apparently cover for Alameda after it faced a series of losses. The FTX Entities lent apparently billions to a company that Defendant Bankman-Fried also owned in the past year. This misconduct and mismanagement raises significant ethical, legal, and conflicts of interest problems for Defendants.

## IV.   YIELD-BEARING ACCOUNTS (YBAS) AND VIOLATIONS OF LAW

48.     Other violations of law stem from FTX's use of YBAs. Early on in its inception, the FTX Entities offered interest-bearing cryptocurrency accounts to public investors called yield-bearing accounts (YBAs). Plaintiff and the Class invested in FTX's YBAs.

49.     The YBAs were "securities" as defined by the United States securities laws. The FTX Entities offered variable interest rewards on crypto assets held in the YBAs, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

50.     In October 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States."

51.     Mr. Rotunda's declaration supported the notion that (i) users appear able to download the FTX trading app even when they reside in the United States; (ii) default settings were automatically configured to enable the earning of yield; (iii) FTX may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or

---

[6] Salmon, Brady, *FTX's terms-of-service forbid trading with customer funds.* https://www.axios.com/2022/11/12/ftx-terms-service-trading-customer-funds (Axios, November 13, 2022)

otherwise likely to deceive the public; and (iv) potentially violating securities laws in various jurisdictions.

**V.     LEVERAGING INTERNATIONAL REACH OF GOLDEN STATE WARRIORS TO MARKET FTX'S PLATFORM AND SERVICES**

52.     Defendant Sam Bankman-Fried, along with his company FTX, needed to continue growing the userbase for its crypto-trading platform and enlisted, at great expense, some of the marquee influencers and talents in the sports, entertainment, and celebrity arenas. These A-list celebrities have not only been brand ambassadors for FTX, but some have also invested or sought equity as part of his or her compensation. Most of these influencers conducted marketing and promotional campaigns for Bankman-Fried and FTX and also further raised awareness and encouraged the adoption of the FTX platform in social media, interviews, or other direct engagement channels. As a result of their concerted actions, adoption, use, and money being spent on the platform rose.

53.     Defendant Bankman-Fried and FTX, in conjunction with the use of A-list celebrities to promote FTX's platform and products, also sought a stratospheric rise in publicity and consumer awareness by spending, again lavishly, on partnerships with sports and entertainment entities like the Golden State Warriors or slapping their name on an entire NBA arena for the storied Miami Heat franchise.

54.     These actions had one goal: outcompeting competitor trading platforms and getting consumers to use the FTX platform technology instead. As then-FTX.US President Brett Harrison explains, using A-list celebrities and mass branding campaigns would "familiarize consumers with its technology, customer service and offerings" and with FTX brand. The company "need[ed]" to attract new consumers to continue funneling them (and the money they put into the FTX system) as part of an elaborate scheme to prompt up the businesses.

55.     Defendants continued to drive unwitting investors and consumers into a Ponzi-like-scheme, substantially assisting in the sale of the YBAs, which are unregistered securities. The A-list celebrity brand ambassadors, including a Defendant herein, made representations, solicitations, or other forms of promotions.

CLASS ACTION COMPLAINT

56.     One of the FTX Entities' most prominent promotions and marketing efforts involved the NBA franchise Golden State Warriors ("GSW"). FTX and GSW launched a partnership in 2022 and with it unveiled the FTX logo on the main court at the Chase Center, the GSW's new $1.4 billion arena. FTX served as GSW's Official Cryptocurrency Platform and NFT Marketplace, and to further promote FTX to its avid fanbase, the GSW dropped NFTs on FTX.US beginning in early 2022.

57.     The NBA is one of the most prolific professional sports leagues in the world and the GSW, with recent championships in 2015, 2017, 2018 and as recently as 2022 gave the franchise, its arena, and its partnership with FTX unprecedented reach internationally. The partnership between the GSW and FTX marked the first international rights partner for the GSW, meaning the GSW and FTX had a visible market presence, inclusive of logo and likeness, internationally for all of its millions of fans. The partnership deal also included the GSW's G League affiliate team (Santa Cruz Warriors), the Golden Guardians and Warriors Gaming Squad (affiliated e-sports teams), in-arena signage at Chase Center, and virtual floor signage at GSW games. Millions of consumers, in the United States and most importantly internationally, were exposed to FTX's branding, marketing materials, and services.

## CLASS ALLEGATIONS

58.     As alleged herein, Plaintiff brings this lawsuit on behalf of themselves and all others similarly situated (the "Class"), pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4).

**I.      CLASS DEFINITION(S)**

59.     Plaintiff seeks to represent the following *Transnational Class*: "All persons or entities outside the United States who, within the applicable time period limitations, purchased or enrolled in yield-bearing accounts ("YBAs") offered by FTX Trading LTD d/b/a FTX's ("FTX") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities") and/or otherwise invested in one or more FTX Entities."

60.     The following persons or entities are further excluded from the Class: (i) judicial officers and associated court staff presiding over this case; (ii) past and present officers, directors,

A&P | AUDET & PARTNERS LLP

affiliates, representatives, agents and employees to the Defendants, including Defendants themselves, or any of its direct or indirect subsidiaries; (iii) any immediate family members of the above two groups; and (iv) all those otherwise in the Class who timely and properly exclude themselves therefrom in such manner as the Court may direct.

61. Any notices to the Class(es) directed by the Court shall comply with all provisions of Rule 23 and applicable court rulings regarding notice(s). Class members may be notified of the pendency, certification and/or other important steps in this action under Fed. R. Civ. P. 23, as appropriate, through a Court-approved combination of direct and indirect methods, including print, broadcast, social media, posting, and other physical and electronic means. All Class members should be identifiable and reachable based on corporate records in the possession, custody and control of Defendants and once made available, Plaintiff anticipates ease of publishing, mailing and emailing notice at minimum.

62. Plaintiff reserves the right to modify or amend the definition of the proposed *Transnational Class*, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiff seeks certification of the *Transnational Class* in part because a significant portion of the offers of FTX YBAs to Plaintiff and the Class members (in which Defendants each substantially participated) were made by FTX to persons and entities outside the United States.

## II. REQUIREMENTS OF RULE 23(A) MET

### A. Numerosity

63. The Class is comprised of thousands, if not millions, of consumers internationally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers internationally have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number and nature of class members is currently unknown to Plaintiff but readily identifiable through discovery and review of FTX's corporate records.

**B. Commonality and Predominance**

64.     Common questions of law and fact predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

      a. whether the YBAs were unregistered securities under federal or applicable law;

      b. whether Defendants' participation and/or actions related to FTX's offerings and sales of YBAs violate the provisions of the Securities Act and under federal or applicable law;

      c. what the type and measure of damages suffered by Plaintiff and the Classes may be;

      d. whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

      e. whether Plaintiff and Class members are entitled to injunctive and/or declaratory relief;

      f. whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**C. Typicality**

65.     Plaintiff's claims are typical of the claims of the members of the Class because all members were injured through the uniform misconduct described above, namely that Plaintiff and the Class were offered and/or sold FTX's YBAs as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiff is advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiff.

**D. Adequacy**

66.     Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests

to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### E.  Superiority

67.  A class action is superior to individual actions for the proposed Class, and also superior to actions outside the United States, in part due to the following factors:

a.  Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside across the globe;

b.  There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

c.  The interests of justice will be well served by resolving the common disputes of potential Class members efficiently in one forum;

d.  Extraterritorial litigation will unlikely provide the any, let alone the requested relief for the proposed Class herein but by contrast, litigation of common questions as a class action in a single, unitary proceeding will materially advance the disposition of the litigation and is consistent with the purposes and goals of class actions;

e.  Individual suits would not be cost effective or economically maintainable as individual actions; and

f.  The action is manageable as a class action.

### III.  REQUIREMENTS OF RULE 23(B)(3) MET

68.  The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Class. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct by Defendants in marketing, offering, and/or selling the YBAs, which are unregistered securities.

69.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

70.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the instant action, common questions will be held to predominate over individual questions.

## IV.     REQUIREMENTS OF RULE 23(B)(2) MET

71.     Alternatively, Plaintiff will seek certification under 23(b)(2) for injunctive and/or declaratory relief for the Class. Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

72.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Entities' trading platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## V.     REQUIREMENTS OF RULE 23(C)(4) MET

73.     One of the predominant issues regarding Defendants' liability is whether the YBAs FTX offered and/or sold are unregistered securities in violation of federal and/or applicable law, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this or other issues would materially advance the disposition of the litigation as a whole.

74.     Another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Entities' trading platform, and utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this or other issues would materially advance the disposition of the litigation as a whole.

CLASS ACTION COMPLAINT

## CAUSES OF ACTION

## COUNT I

### Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.
### (Individually and on Behalf of the Class)

75. Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

76. The Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

77. Defendants unfair and deceptive practices described herein are likely to mislead – and clearly have misled – consumers acting reasonably in the circumstances into purchasing YBAs and transacting with FTX.

78. Unlawful: Defendants have advertised the Products using false and/or misleading claims, such that Defendant's actions as alleged herein violate at least the following laws:

• The False Advertising Law, California Business & Professions Code § 17500, *et seq.*

79. Fraudulent: A practice is "fraudulent" if members of the general public were or are likely to be deceived. Defendants' statements regarding the legality, nature and viability of YBAs are deceptive to the public. Further, Defendant Bankman-Fried and FTX's operation of FTX and Ponzi-scheme type behavior is further fraudulent and deceptive to the public related to the viability and nature of FTX.

80. Unfair: The UCL gives courts maximum discretion to address improper business practices that are "unfair" Defendants' collective conduct with respect to the marketing and sale of YBAs is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to transact with FTX and purchase YBAs and the utility of their conduct, if any, does not remotely outweigh the gravity of the harm to its victims. Plaintiff and the Class would not have transacted with FTX and purchased YBAs had they known that the statements were misrepresentations and deliberately deceiving.

81.     Defendant Bankman-Fried and FTX's conduct with respect to the operation of FTX is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, can reasonably avoid.

82.     The harm suffered by Plaintiff and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to YBAs and the operation of FTX, as described herein.

83.     In accordance with California Business & Professions Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. On behalf of the Class, Plaintiff also seeks an order for the restitution of all monies from the sales of YBAs, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

## **COUNT II**
**Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.**
**(Individually and on Behalf of the Class)**

84.     Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

85.     California's False Advertising Law ("FAL") prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

86.     As set forth herein, Defendants made statements regarding YBAs and FTX that were untrue or misleading. They publicly represented that FTX and YBAs were a viable and safe way to invest in crypto, a statement designed to deceive consumers into investing with FTX.

87.     Defendants' claims that YBAs and FTX were viable and safe for investing in crypto are untrue due to the house of cards nature of FTX's business and movement of funds, as evidenced by the immense collapse in fall 2022.

88.     Defendants knew, or reasonably should have known, that all these claims relating to the viability and safety of YBA and FTX were untrue or misleading. Defendants failed to adequately inform Plaintiff and the Class of the true nature of YBAs and FTX.

– 19 –

89.     When the true nature of FTX and YBAs became publicly known in the fall of 2022, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by Defendants and FTX's business practices.

90.     Plaintiff and members of the Class are entitled to injunctive and equitable relief, and restitution in the amount of moneys spent on YBAs.

## COUNT III
### Fraudulent Concealment
### (Individually and on Behalf of the Class)

91.     Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

92.     Defendants omitted an existing fact about FTX and YBAs when it failed to disclose information regarding the true nature of FTX and YBAs.

93.     The omission is material because Plaintiff and the Class would not have transacted with FTX had they known true nature of FTX and YBAs

94.     Defendants marketed and sold to Plaintiff and the Class despite having knowledge of the true nature of FTX and YBAs.

95.     Defendants intended that consumers and purchasers would rely on Defendants' statements regarding the safety and nature of FTX and YBAs to bolster sales.

96.     Plaintiff and the Class were not aware of the true nature and safety of YBAs and FTX's platform and could not reasonably have discovered those true characteristics.

97.     Plaintiff and the Class relied on Defendants' statements in that they paid any amount of money for YBAs, which they would not have done had they known the true risky and Ponzi scheme nature of the products.

98.     Plaintiff and the Class had the right to rely on Defendants' statements and omissions that created the false impression that FTX and YBAs were safe and reliable investment accounts based on reasonable purchaser expectations that the exchange would remain solvent.

CLASS ACTION COMPLAINT

99.     Defendants had an affirmative duty to disclose the true nature of FTX and YBAs to potential purchasers and investors because they were in a superior position to know the true nature of FTX and YBAs.

100.    Defendants fraudulently concealed the nature of FTX and YBAs, causing damages to Plaintiff and the class.

## COUNT IV
### Civil Conspiracy
### (Individually and on Behalf of the Class)

101.    Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

102.    Defendants made innumerable misrepresentations and omissions to Plaintiff and Class Members regarding the nature and safety of FTX and YBAs in order to induce confidence in the platform and convince consumers to invest in what was a patently misleading and deceptive scheme, thus deceiving consumers and potential customers that their investments in FTX were safe.

103.    FTX and Defendant Sam Bankman-Fried entered into at least one agreement with the other Defendants for the express purpose of making misrepresentations or omissions in order to induce and convince Plaintiff and consumers to invest in YBAs and put their money in FTX.

104.    Defendants engaged in concerted unlawful acts, particularly in the form of misrepresentations and omissions made to Plaintiff and the Class for the purposes of inducing them to invest with FTX and in YBAs.

105.    The conspiracy substantially aided the wrongdoing conducted by FTX and Defendant Sam Bankman-Fried. Additionally, the non-FTX Defendant had knowledge of the fraud and wrongdoing by FTX as a result of their experience and relationship with FTX, and thus knew or should have known that the representations they made were deceitful and fraudulent.

106.    This conspiracy caused damages to Plaintiff and the Class in the amount of the money they invested in FTX that was lost as a result of the insolvency.

**COUNT V**
**Declaratory Judgment, Cal. Code Civ. Proc. § 1060**
**(Individually and on Behalf of the Class)**

107.   Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

108.   This Count is asserted against all Defendants under Cal. Code Civ. Proc. § 1060.

109.   There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained or ascertainable state of facts and a present controversy as to that state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

110.   Plaintiff and the Class have an obvious and significant interest in the outcome of this lawsuit.

111.   Plaintiff and the Class purchased YBAs and invested with FTX, based in part oon justifiable reliance on Defendants' statements and misrepresentations regarding the nature of YBAs and the FTX platform.

112.   If Plaintiff and the Class knew the true facts surrounding YBAs and FTX, including but not limited to that YBAs are unregistered securities, Plaintiff and the Class would not have purchased YBAs or invested with FTX in the first place.

113.   Thus, there is a justiciable controversy over whether the YBAs were sold illegally and whether the Defendants illegally solicited their purchase from Plaintiff and the Class.

114.   Plaintiff and the Class thus seek an order declaring that the YBAs were unregistered securities and needed to be registered with the SEC and state regulatory authorities, that FTX did not work as represented, and that Defendants were paid to misrepresent FTX and YBAs to the nation at large.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment on behalf of themselves and the Class(es):

    a.  Certifying the proposed Class(es) as requested herein;

    b.  Awarding actual, direct and compensatory damages;

    c.  Awarding restitution and disgorgement of revenues if warranted;

    d.  Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing any unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.  Awarding statutory and multiple damages, as appropriate;

    g.  Awarding attorneys' fees and expenses; and

    h.  Providing any such further relief as the Court deems just and proper

**JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial as to all claims so triable.

Dated:  November 20, 2022

                           Respectfully submitted,

                By:    *s/ William Audet*

                      William M. Audet (CA SBN 117456)
                      Ling Y. Kuang (CA SBN 296873)
                      Kurt D. Kessler (CA SBN 327334)
                        waudet@audetlaw.com
                        lkuang@audetlaw.com
                        kkessler@audetlaw.com
                      AUDET & PARTNERS, LLP
                        711 Van Ness Avenue, Suite 500
                        San Francisco, CA 94102-3275
                        Telephone:    (415) 568-2555
                        Facsimile:     (415) 568-2556

                      Robert L. Lieff (CA SBN 037568)
                        rlieff@lieff.com
                        P.O. Drawer A

– 23 –

A&P AUDET & PARTNERS LLP

Rutherford, California 94573

Edward LEHMAN (IL SBN 6194489)*
    elehman@lehmanlaw.com
Jacob BLACKLOCK (TX SBN 24079835)*
    jblacklock@lehmanlaw.com
LEHMAN, LEE & XU LLC (Saipan #25977-001-1)
    c/o LEHMAN, LEE & XU
    Suite 3313, Tower One, Times Square
    1 Matheson Street, Causeway Bay, Hong Kong
Telephone:    (852) 3588-2127
Facsimile:    (852) 3588-2088

*Pro hac vice forthcoming

*Counsel for Plaintiff Elliott Lam, individually
and on behalf of all others similarly situated*

– 24 –

CLASS ACTION COMPLAINT