TO ORDER COPIES OF ANY DOCUMENTS LISTED
BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

## This docket is current through 01/30/2023

Today's Date: 2/10/2023
Source: U.S. District Court, Southern District of California (San Diego)

| | |
|---|---|
| **Court:** | U.S. District Court, Southern District of California (San Diego) |
| **Case Title:** | Gonzalez v. Silvergate Bank et al |
| **Case:** | 3:22-CV-01981 |
| **Judge:** | Judge Roger T. Benitez |
| **Date Filed:** | 12/14/2022 |

## SYNOPSIS INFORMATION

| | |
|---|---|
| **Allegations:** | Class action. Defendants failed to adequately monitor and stop the fraudulent activities of FTX/Alameda, and Defendants' acts and omissions directly in furtherance of this scheme, carried out through defendant accounts, were the cause of the investment losses of Plaintiff and class members. |
| **Damages:** | $5,000,000.00 in damages, class action certification, restitution, interest, fees and costs. |
| **COMPLAINT (MANUALLY RETRIEVED)** | Original Image of this Document (PDF) |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 3:22CV01981 |
| **Referred To:** | Magistrate Judge William V. Gallo |
| **Jury Demand:** | Plaintiff |
| **Nature of Suit:** | Torts: Other Fraud (370) |
| **Key Nature of Suit:** | Torts/Negligence; Personal Property; Other Fraud (430.77.05) |
| **Key Nature of Suit:** | Class Action (115) |
| **Jurisdiction:** | Diversity |
| **Cause:** | 28 USC 1332fd Diversity-Breach of Fiduciary Duty |

## PARTICIPANT INFORMATION

### Joewy Gonzalez

| | |
|---|---|
| **Party Description:** | on behalf of all others similarly situated |
| **Type:** | Plaintiff |
| **Attorney:** | Adam E. Polk |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Girard Sharp LLP |
| **Attorney Address:** | 601 California Street |
| | Suite 1400 |
| | San Francisco, CA 94108 |
| **Attorney Phone:** | 415-981-4800 |
| **Email Address:** | apolk@girardsharp.com |
| **Attorney:** | Daniel C. Girard |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Girard Sharp LLP |
| **Attorney Address:** | 601 California Street |
| | Suite 1400 |

| | |
|---|---|
| | San Francisco, CA 94108 |
| **Attorney Phone:** | 415-981-4800 |
| **Attorney Fax:** | 415-981-4846 |
| **Email Address:** | dgirard@girardsharp.com |
| **Attorney:** | Jason S Hartley |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Hartley LLP |
| **Attorney Address:** | 101 West Broadway |
| | Suite 820 |
| | San Diego, CA 92101 |
| **Attorney Phone:** | 619-400-5822 |
| **Attorney Fax:** | 619-400-5832 |
| **Email Address:** | hartley@hartleyllp.com |
| **Attorney:** | Jason M. Lindner |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Stueve Siegel Hanson LLP |
| **Attorney Address:** | 550 West C Street |
| | Suite 610 |
| | San Diego, CA 92101 |
| **Attorney Phone:** | 619-400-5822 |
| **Attorney Fax:** | 619-400-5832 |
| **Email Address:** | lindner@stuevesiegel.com (Inactive) |
| **Attorney:** | Makenna Cox |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Suite 1400 |
| | 601 California Street |
| | Suite 1400 |
| | San Francisco, CA 94108 |
| **Attorney Phone:** | 415-981-4800 |
| **Email Address:** | mcox@girardsharp.com |

## Silvergate Bank

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | John Michael Landry |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter & Hampton |
| **Attorney Address:** | 333 South Hope Street |
| | 43rd Floor |
| | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-620-1780 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | jlandry@sheppardmullin.com |
| **Attorney:** | Madalyn Annabel Macarr |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter & Hampton |
| **Attorney Address:** | 333 S. Hope Street |
| | 43rd Floor |
| | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-620-1780 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | mmacarr@sheppardmullin.com |
| **Attorney:** | Polly Towill |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter and Hampton LLP |
| **Attorney Address:** | 333 South Hope Street |

|  | 43rd Floor |
|---|---|
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-617-5480 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | ptowill@sheppardmullin.com |

## Silvergate Capital Corporation

| **Type:** | Defendant |
|---|---|
| **Attorney:** | John Michael Landry |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter & Hampton |
| **Attorney Address:** | 333 South Hope Street |
|  | 43rd Floor |
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-620-1780 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | jlandry@sheppardmullin.com |
| **Attorney:** | Madalyn Annabel Macarr |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter & Hampton |
| **Attorney Address:** | 333 S. Hope Street |
|  | 43rd Floor |
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-620-1780 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | mmacarr@sheppardmullin.com |
| **Attorney:** | Polly Towill |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter and Hampton LLP |
| **Attorney Address:** | 333 South Hope Street |
|  | 43rd Floor |
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-617-5480 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | ptowill@sheppardmullin.com |

## Alan J. Lane

| **Type:** | Defendant |
|---|---|
| **Attorney:** | John Michael Landry |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter & Hampton |
| **Attorney Address:** | 333 South Hope Street |
|  | 43rd Floor |
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-620-1780 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | jlandry@sheppardmullin.com |
| **Attorney:** | Madalyn Annabel Macarr |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter & Hampton |
| **Attorney Address:** | 333 S. Hope Street |

|  |  |
|---|---|
|  | 43rd Floor |
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-620-1780 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | mmacarr@sheppardmullin.com |
| **Attorney:** | Polly Towill |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Sheppard Mullin Richter and Hampton LLP |
| **Attorney Address:** | 333 South Hope Street |
|  | 43rd Floor |
|  | Los Angeles, CA 90071 |
| **Attorney Phone:** | 213-617-5480 |
| **Attorney Fax:** | 213-620-1398 |
| **Email Address:** | ptowill@sheppardmullin.com |

**CALENDAR INFORMATION**

View Calendar Information

**DOCKET PROCEEDINGS (11)**

| Entry #: | Date: | Description: | | |
|---|---|---|---|---|
| 11 | 12/27/2022 | ORDER Granting Joint Motion For Extension Of Time To Respond To Complaint [ECF No. 8 ]. Signed by Judge Roger T. Benitez on 12/27/2022. (ddf) (Entered: 12/27/2022) | View | Add to request |
| 10 | 12/21/2022 | NOTICE OF RELATED CASE(S) by Joewy Gonzalez of case(s) 3:22-cv-01901-L-AGS . (Girard, Daniel) (ddf). (Entered: 12/21/2022) | View | Add to request |
| 9 | 12/21/2022 | NOTICE of Party With Financial Interest by Alan J. Lane, Silvergate Bank, Silvergate Capital Corporation re 8 Joint MOTION for Extension of Time to File Response/Reply as to 1 Complaint, /Joint Motion to Extend Defendants' Deadline to Respond to the Class Action Complaint /Defendant Silvergate Capital Corporation's Notice of Parties With Financial Interest Per Civil Local Rule 40.2 and Rule 7.1 of the Federal Rules of Civil Procedure. No Parties With Financial Interest. (Towill, Polly) (ddf). (Entered: 12/21/2022) | View | Add to request |
| 8 | 12/21/2022 | Joint MOTION for Extension of Time to File Response/ Reply as to 1 Complaint, /Joint Motion to Extend Defendants' Deadline to Respond to the Class Action Complaint by Alan J. Lane, Silvergate Bank, Silvergate Capital Corporation. (Towill, Polly) (ddf). (Entered: 12/21/2022) | View | Add to request |

| 7 | 12/21/2022 | NOTICE OF WITHDRAWAL OF DOCUMENT by Silvergate Capital Corporation, Silvergate Bank, Alan J. Lane /Withdrawal of Documents Filed as Docket Numbers 6, 6-1 and 6-2. (Macarr, Madalyn) (ddf). (Entered: 12/21/2022) | View | Add to request |

| 6 | 12/20/2022 | Joint MOTION for Extension of Time to File Response/ Reply as to 1 Complaint, /Joint Motion to Extend Defendants' Deadline to Respond to the Class Action Complaint by Alan J. Lane, Silvergate Bank, Silvergate Capital Corporation. (Attachments: # 1 [Proposed] Order Granting Joint Motion to Extend Defendants' Deadline to Respond to the Class Action Complaint, # 2 Notice Defendant Silvergate Capital Corporation's Notice of Parties With Financial Interest Per Civil Local Rule 40.2 and Rule 7.1 of the Federal Rules of Civil Procedure)(Macarr, Madalyn) QC Mailer re Document contains wrong signature (ddf). (Entered: 12/20/2022) | View | Add to request |

| 5 | 12/20/2022 | NOTICE of Appearance of Madalyn A. Macarr by Madalyn Annabel Macarr on behalf of Alan J. Lane, Silvergate Bank, Silvergate Capital Corporation (Macarr, Madalyn)Attorney Madalyn Annabel Macarr added to party Alan J. Lane(pty:dft), Attorney Madalyn Annabel Macarr added to party Silvergate Bank(pty:dft), Attorney Madalyn Annabel Macarr added to party Silvergate Capital Corporation(pty:dft) (ddf). (Entered: 12/20/2022) | View | Add to request |

| 4 | 12/20/2022 | NOTICE of Appearance of John Landry by John Michael Landry on behalf of Alan J. Lane, Silvergate Bank, Silvergate Capital Corporation (Landry, John)Attorney John Michael Landry added to party Alan J. Lane(pty:dft), Attorney John Michael Landry added to party Silvergate Bank(pty:dft), Attorney John Michael Landry added to party Silvergate Capital | View | Add to request |

| | | | | |
|---|---|---|---|---|
| | | Corporation(pty:dft) (ddf). (Entered: 12/20/2022) | | |
| 3 | 12/20/2022 | NOTICE of Appearance of Polly Towill by Polly Towill on behalf of Alan J. Lane, Silvergate Bank, Silvergate Capital Corporation (Towill, Polly)Attorney Polly Towill added to party Alan J. Lane(pty:dft), Attorney Polly Towill added to party Silvergate Bank(pty:dft), Attorney Polly Towill added to party Silvergate Capital Corporation(pty:dft)(ddf). (Entered: 12/20/2022) | View | Add to request |
| 2 | 12/14/2022 | Summons Issued. Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1. (mjw) (jrd) (Entered: 12/14/2022) | View | Add to request |
| 1 | 12/14/2022 | COMPLAINT With Jury Demand Against Silvergate Bank, Silvergate Capital Corporation, Alan J. Lane (Filing fee $402.00 receipt number ACASDC-17423842.), filed by Joewy Gonzalez. (Attachments: # 1 Civil Cover Sheet) The new case number is 3:22-cv-1981-BEN-WVG. Judge Roger T. Benitez and Magistrate Judge William V. Gallo are assigned to the case. (Girard, Daniel C.) (mjw)(jrd) (Entered: 12/14/2022) | View | Add to request |

TO ORDER COPIES OF ANY DOCUMENTS LISTED
ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Daniel C. Girard (SBN 114826)
Adam E. Polk (SBN 237000)
Makenna Cox (SBN 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
apolk@girardsharp.com
mcox@girardsharp.com

Jason S. Hartley (SBN 192514)
Jason M. Lindner (SBN 211451)
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOEWY GONZALEZ, on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SILVERGATE BANK, SILVERGATE CAPITAL CORPORATION, and ALAN J. LANE, <br><br> Defendants. | Case No. **'22CV1981 BEN WVG** <br><br> **CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Joewy Gonzalez, on behalf of himself and all others similarly situated, brings this action against Defendants Silvergate Bank, Silvergate Capital Corporation, and Alan J. Lane, and alleges as follows.

## INTRODUCTION

1.      Plaintiff invested his savings in cryptocurrency, digital assets purportedly secured by anti-counterfeiting cryptography. Plaintiff entrusted his investments to FTX, a cryptocurrency exchange founded by Samuel Bankman-Fried. FTX promised investors that they could store assets securely as they gained in value, cash them out, or trade them for other assets or financial products. With FTX's recent collapse, Plaintiff and other FTX investors are unable to recover their investments and face years of uncertainty and catastrophic losses.

2.      Bankman-Fried not only ran FTX's exchange and affiliated companies but also co-founded Alameda Research LLC, a cryptocurrency trading firm. Unlike FTX, which purported to allow investors to store, trade, or cash out their "tokens" and other crypto assets, Alameda executed cryptocurrency trades on its own behalf, including on the FTX platform. Unbeknownst to Plaintiff and the other investors, Alameda and FTX operated as a single criminal enterprise under the control of Bankman-Fried. The new CEO of FTX, who took over after the company declared bankruptcy in November 2022, stated: "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Deposits, both in fiat currency (*i.e.*, U.S. dollars) and in cryptocurrency, which FTX undertook to store for trading or potential investment, were diverted to and commingled with Alameda's assets. Alameda used FTX investor funds for a variety of unauthorized purposes, including proprietary, speculative trading on other digital-asset exchanges, funding risky crypto investments, operations, marketing, political contributions, luxury real estate purchases, and funding hundreds of millions of dollars in loans to Bankman-Fried and other FTX executives.

CLASS ACTION COMPLAINT

3. Silvergate, a publicly traded and federally regulated bank catering to cryptocurrency customers, maintained both FTX and Alameda accounts. It directly aided and abetted FTX's fraud and breaches of fiduciary duty via first-hand participation in the commingling of funds, improper transfers, and lending out of customer money. Silvergate processed billions in transfers from FTX's client account at Silvergate to the Alameda accounts. Silvergate also accepted deposits from FTX investors—intended to be stored, traded, or cashed out—that at Bankman-Fried's direction were wired straight to Alameda bank accounts and misused. Bankman-Fried explained that he "forgot" about the improper transfers until the company imploded, telling a reporter "it looks like people wired $8b to Alameda and 'oh god we basically forgot about the stub account that corresponded to that so it was never delivered to FTX.'"

4. Silvergate is liable for its role in furthering FTX's investment fraud and breaches of fiduciary duty and is obligated under common law to make Plaintiff and the other investors whole.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the proposed plaintiff class is a citizen of a State different from a Defendant.

6. The Court has personal jurisdiction over Defendants based on their substantial, continuous and systematic contacts with the State and because Defendants have purposely availed themselves of the benefits and privileges of conducting business activities within the State.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants Silvergate Bank and Silvergate Capital are headquartered in this District and a substantial part of the events or omissions giving rise to the claims occurred in the District.

CLASS ACTION COMPLAINT

## PARTIES

### A.    Plaintiff

8.     Plaintiff Joewy Gonzalez is a citizen and resident of Revere, Massachusetts. Starting in November 2021, Plaintiff placed funds in an FTX account in anticipation of executing cryptocurrency trades, engaging in investment activity. After FTX announced its bankruptcy, Plaintiff attempted to withdraw the cryptocurrency in his FTX account but was unable to do so.

### B.    Defendants

9.     Defendant Silvergate Bank is a California corporation with its principal place of business in La Jolla, California.

10.     Chartered by the State of California, Silvergate Bank is overseen by the Federal Reserve Bank of San Francisco; its deposits are guaranteed by the Federal Deposit Insurance Corporation.

11.     Silvergate Bank primarily serves the cryptocurrency industry—its customers include cryptocurrency exchanges, institutional investors, and stablecoin issuers, such as Coinbase, Bitstamp, Crypto.com, Kraken, and Gemini.

12.     Defendant Silvergate Capital Corporation is a Maryland corporation with its principal place of business in La Jolla, California and the parent of Silvergate Bank (together, "Silvergate").

13.     Defendant Alan J. Lane is President and Chief Executive Officer of Silvergate Capital, Chief Executive Officer of Silvergate Bank and a member of Silvergate Capital's board of directors. He resides in Temecula, California.

## OVERVIEW OF RELEVANT BANKING REGULATIONS

14.     Silvergate is obligated to comply with the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* ("BSA"), including regulations broadening its anti-money laundering provisions. The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council (FFIEC Manual) summarizes the

applicable anti-money laundering compliance program requirements, expectations for risks and risk management, industry sound practices, and examination procedures.

15.     Silvergate must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2); 12 C.F.R. § 21.21. Silvergate must maintain a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, furnishing a means for the bank to notice unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to know the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage. Federal guidelines thus require that Silvergate take reasonable steps to "determine the identity of all nominal and beneficial owners of the private banking account" and "determine the source(s) of funds deposited into the private banking account and the purpose and expected use of the account; and . . . review the activity of the account to ensure that the activity is consistent with the information obtained about the source of funds, the stated purpose and the expected use of the account, as needed to guard against money laundering, and to report any suspicious activity."

16.     Customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, the anti-money laundering guidelines direct federally regulated banks like Silvergate to gather additional information about the customer and its accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

17.     Moreover, Silvergate and its personnel must be able to identify and take appropriate action once on notice of any of a series of money laundering "red flags" set forth in the FFIEC Manual. Among these are: (1) funds transfers sent in large, round

dollar amounts; (2) funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations; (3) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (4) repetitive or unusual funds transfer activity; (5) funds transfers sent or received from the same person to or from different accounts; (6) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (7) transactions inconsistent with the account holder's business; (8) customer use of a personal account for business purposes; (9) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (10) multiple high-value payments or transfers between shell companies without a legitimate business purpose.

18. In addition, federal law requires Silvergate to conduct "enhanced" due diligence when establishing or maintaining a correspondent account for a financial institution that operates under an offshore license (as FTX did) or is incorporated in a jurisdiction known for failing to cooperate with international anti-money laundering principles (as FTX was, having incorporated in the Bahamas).

19. The FFIEC Manual also identifies "lending activities" and "nondeposit account services," including for nondeposit investment products, as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency. Therefore, when investment trading or lending services are being run through the bank, the FFIEC Manual requires heightened due diligence including determining the purpose of the account, ascertaining the source and funding of the capital, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining adequate explanations for account activities.

CLASS ACTION COMPLAINT

## **STATEMENT OF FACTS**

**A.    The Cryptocurrency Industry**

20.    Cryptocurrency is a form of digital currency that first came to prominence in 2008, when an author under the pseudonym Satoshi Nakamoto published the whitepaper *Bitcoin: A Peer-to-Peer Electronic Cash System*. Nakamoto defined cryptocurrency as "an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party"—*i.e.*, a bank.

21.    Cryptocurrency relies on a long list of public addresses, each bearing a unique label consisting of numbers and letters, corresponding to a specific amount of cryptocurrency. The address acts as a public key. The owner of the cryptocurrency holds a private key, which serves as a password to access the account, and allows people to send each other the cryptocurrency.

22.    Cryptocurrency ownership is tracked on a public ledger. In the case of Bitcoin, for example, thousands of people who use Bitcoin maintain the ledger. When Bitcoin is sold, the transaction is broadcast to the entire network. Bitcoin miners (computers on the network) compile the transactions as they arrive into a group called a "block." Once that block becomes official, the block is considered mined. New blocks will then refer to the blocks preceding them, forming a blockchain—the formal record of what transactions the network has agreed upon, and in what order.

23.    The process of confirming a block is time- and resource-intensive, and involves the miner repeatedly attempting to generate a small enough number by running an algorithm. If the number is small enough—a setting determined by the Bitcoin software—then the miner has mined a block. If not, the process starts over with a different input. The calculations are so intensive that miners require special hardware, and often are run on large farms of computers that are always on.

CLASS ACTION COMPLAINT

24.     Cryptocurrency has rapidly gained value over the past decade while experiencing high volatility. When Nakamoto's paper was first published, one Bitcoin—the original cryptocurrency—was worth zero dollars. In November 2021, one Bitcoin was worth more than $67,000. As of the date of this complaint, one Bitcoin is worth over $17,000.

25.     Several new forms of cryptocurrency have proliferated since the advent of Bitcoin, many of which have been even more volatile than Bitcoin. FTT, the FTX token, was worth over $77 in September 2021. Now it is worth around $1.40.

26.     Today, the primary way people buy the different types of cryptocurrency is through cryptocurrency exchanges. These are companies, like FTX, Coinbase, Kraken, and others, that accept regular currency in exchange for cryptocurrency. In other words, you wire an exchange an amount of money, and the exchange gives you title to a corresponding amount of cryptocurrency.

## B.     The FTX Exchange

27.     The FTX group of companies was founded in 2019 and began as an exchange or marketplace for the trading of cryptocurrency assets. Until declaring bankruptcy, the FTX companies operated a multi-billion-dollar mobile application cryptocurrency investment service that offered trading in various options, futures, swaps, and other digital commodity derivative products. FTX also offered various services related to cryptocurrency trading. For example:

- FTX maintained a spot market on which FTX customers could trade cryptocurrency with other FTX customers in exchange for money or other cryptocurrency;

- FTX maintained spot-margin trading services, which enabled FTX customers to borrow against collateral in their FTX accounts and trade or lend cryptocurrency in their accounts to other FTX customers for purposes of executing trades; and

CLASS ACTION COMPLAINT

- FTX maintained an over-the-counter service that allowed investors to request quotes for spot cryptocurrency assets and to carry out trades.

28. Customers were able to access the FTX platform through the FTX website, FTX.com, as well as through its popular mobile app. The stated objective of FTX was to build a digital-asset trading platform and exchange to promote a better user experience, customer protection, and innovative financial products.

29. FTX grew rapidly after its founding in 2019. As of 2021, FTX stated that it held approximately $15 billion in assets across its platforms.

30. As it raised money from investors, Bankman-Fried, his agents and affiliates continuously highlighted to the public the safe nature of the platform and its products. FTX touted automated risk mitigation procedures, including a program that calculated a customer's margin level every 30 seconds and automatically liquidated assets if collateral fell below a certain threshold. Bankman-Fried stated repeatedly that FTX and its customers were protected from others' losses due to this auto-liquidation program.

31. Bankman-Fried represented that FTX offered "complete transparency about the positions that are held [and] a robust, consistent, risk framework."

32. Similarly, FTX's terms of service assured investors they owned and controlled assets they placed on the exchange. Those terms stated unequivocally that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading." The terms further provided that "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading" and that "You control the Digital Assets held in your account. At any time, subject to outages, downtime, and other applicable policies . . . you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."

33. FTX also solicited investments that were purportedly loans to be used on the FTX.com exchange to purchase crypto assets that would generate promised returns.

CLASS ACTION COMPLAINT

Investors purchased FTT tokens (FTX's proprietary token) on the understanding that FTX, using part of its profits, would buy back the tokens at various times.

34.     FTT tokens and other FTX digital assets were not registered with any U.S. jurisdiction or regulatory authority. Unconstrained by U.S. securities law, FTX marketed vaguely described crypto investments as delivering "HIGH RETURNS WITH NO RISK":

---

## Investment offerings

**PACKAGES**

We offer one investment product:

**15% annualized fixed rate loans** (no lockup)

We can accept both fiat and crypto and can pay interest denominated in either. We can take on another $200m in capital and still achieve returns that beat traditional and crypto markets.

For investors with specific risk profiles, we are happy to discuss custom packages. For investments of $50m or more, we are willing to discuss higher rates of return.

**HIGH RETURNS WITH NO RISK**

These loans have **no downside** – we guarantee full payment the principal and interest, enforceable under US law and established by all parties' legal counsel. We are extremely confident we will be pay this amount. In the unlikely case where we lose more than 2% over a month we will give all investors the opportunity to recall their funds and we will still guarantee full repayment.

---

35.     Relatedly, in furtherance of its rapid fundraising, FTX deployed an aggressive, celebrity-fueled marketing campaign, which included well-known sports and entertainment figures such as Tom Brady, Gisele Bundchen, Shaquille O'Neal, Steph Curry, and others. FTX also obtained the naming rights to the Miami Heat's venue, and formalized a partnership with the Golden State Warriors.

### C.     Alameda

36.     Bankman-Fried founded Alameda Research, LLC ("Alameda")—a quantitative trading firm specializing in cryptocurrency assets—in 2017, before founding FTX. Alameda initially focused mostly on high frequency arbitrage trading through which the company sought to exploit price differences for the same or similar assets

CLASS ACTION COMPLAINT

across various digital-asset platforms. Later, Alameda undertook other strategies, such as market making, pooling cryptocurrency assets in exchange for interest, volatility trading, and eventually, taking large equity stakes in various digital-asset companies.

37. According to Alameda, within a year of its founding, it had "become the largest liquidity provider and market maker in the [digital] asset space," and traded "$600 million to 1 billion a day" which it said was "roughly 5% of global volume in digital asset trading."

38. Bankman-Fried operated as the majority owner of Alameda at all relevant times, and was the CEO of Alameda until fall 2021. Even after that, Bankman-Fried continued to control Alameda, remaining a signatory on its bank accounts and maintaining decision-making authority over all of its trading, investment, and financial decisions.

### D. Bankman-Fried Used Alameda to Misappropriate FTX Investor Funds

39. Throughout the period in which FTX was raising investor funds, Bankman-Fried made repeated public statements assuring investors that their FTX assets were safe, tweeting, for example: "Backstopping customer assets should always be primary. Everything else is secondary"; and, "As always, our users' funds and safety comes first. We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

40. Likewise, Bankman-Fried, individually, and through his agents and employees, made a point of publicly maintaining that there were circuit breakers in place to ensure the separation of Alameda and FTX, and to protect against Alameda's preferential treatment on the FTX platform. Bankman-Fried's public statements regarding this purported FTX/Alameda separation include:

- To the *Wall Street Journal*: "There are no parties that have privileged access";

- To *Bloomberg*: "Alameda is a wholly separate entity" and "We're at arm's length and don't get any different treatment from other market-makers."

41. In like vein, during an August 2022 media appearance, Alameda's CEO described a purported firewall between FTX and Alameda:

> They're both owned by Sam, obviously. So ultimately, sort of aligned incentives in that way. We keep them quite separate in terms of day-to-day operations. We definitely have a Chinese wall in terms of information sharing to ensure that no one in Alameda would get customer information from FTX or anything like that, or any sort of special treatment from FTX. They really take that pretty seriously.

42. Even after the FTX bankruptcy, Bankman-Fried claimed to *The New York Times* that "Alameda is not, like, a company that I monitor day-to-day." He similarly claimed to *New York Magazine* that Alameda is "not a company I run. It's not a company I have run for the last couple years."

43. In truth, far from "walling off" Alameda from FTX, following its collapse FTX represented to the Bankruptcy Court at the first-day hearing that Bankman-Fried ran this global multibillion-dollar business as a "personal fiefdom." FTX and Alameda also shared office space, first in Berkeley, California and later in Hong Kong and the Bahamas, as well as sharing key personnel, hardware, technology, and intellectual property. In addition, Bankman-Fried and other senior executives at FTX and Alameda had widespread access to each other's systems and accounts.

44. Since FTX's bankruptcy filing, it has come to light that, from the outset of FTX's operations in 2019, customers deposited billions of dollars, which they thought were going to fund their trading activities, into Silvergate bank accounts that actually were controlled by Alameda.

45. Alameda commingled the FTX funds with its other assets, and in turn used them to finance its trading operations and other Bankman-Fried ventures, including payments to celebrity pitchmen and purchases of luxury real estate.

CLASS ACTION COMPLAINT

46.     Among other investments, Alameda used FTX customer funds to prop up the value of FTX's own cryptocurrency, the FTT token, which grants holders a discount on trading fees on the FTX exchange. A large percentage of Alameda's balance sheet was held in FTT tokens.

47.     FTX also granted Alameda several unique exceptions that allowed Bankman-Fried to carry out his scheme:

- Alameda was exempted from FTX's auto-liquidation feature, meaning it was permitted to maintain a negative balance in its account with no collateral. It was the only account afforded that treatment.

- Bankman-Fried directed FTX to increase Alameda's negative balance cap, effectively providing it with an uncapped line of credit, through which it could use other FTX customer funds for its own trading activities. No other FTX account was granted a similar line of credit.

48.     The scheme began to unravel when Alameda became unable to pay debt incurred through billions of dollars in loans that Bankman-Fried caused Alameda to borrow from third-party cryptocurrency lenders to fund his investments and for personal use. Specifically, when the cryptocurrency market began to decline precipitously in 2022, several of these lenders demanded repayment from Alameda, and because Alameda had no assets to pay them back, Bankman-Fried caused Alameda to draw on its FTX credit line, resulting in Alameda owing billions of dollars to FTX.

### E.     The FTX Scheme Collapses

49.     The FTX scheme ended in November 2022 when the scale of the fraud became apparent to the market. The chain of events leading to FTX's swift collapse was set in motion on November 2nd, when CoinDesk, a crypto news website, published an article stating that based on its review of an Alameda balance sheet it had obtained, Alameda held a large position in FTT and other FTX tokens.

50. On November 6th, Changpeng "CZ" Zhao, the CEO of Binance, a cryptocurrency trading platform, liquidated $530 million of FTT. Other customers then raced to pull out: over the course of 72 hours investors sought to withdraw an estimated $6 billion from FTX, placing the company under severe financial pressure.

51. After declining by 32%, the price of FTT briefly rallied on November 8th when Bankman-Fried announced that Binance would acquire FTX. But the next day, Binance announced it would not proceed with the transaction, citing its due diligence findings and reports of mishandled customer funds by FTX. The price of FTT plummeted.

52. On November 11th, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO. The bankruptcy filing includes all 130 companies under the FTX umbrella, as well as the trading firm Alameda.

53. John J. Ray, who oversaw Enron following its accounting scandal in 2007, became CEO. After reviewing FTX's books and records, Ray declared that "never in my career have I seen such an utter failure of corporate controls at every level of an organization, from the lack of financial statements to a complete failure of any internal controls or governance whatsoever."

54. Ray stated that FTX "failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money" and that the "[c]ash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners around the world." Ray noted "[t]he ability of Alameda, the crypto hedge fund within the FTX Group, to borrow funds held at FTX.com to be utilized for its own trading or investments without any effective limits."

55. Further, Ray stated "we know" that "customer assets from FTX.com were commingled with assets from the Alameda trading platform," that Alameda "used client

funds to engage in margin trading which exposed customer funds to massive losses," and that "loans and other payments were made to insiders in excess of $1 billion."

56. On November 10th, in the midst of FTX's collapse, Bankman-Fried admitted to culpability in a series of Twitter exchanges with reporters and investors:



57. In the same series of tweets, Bankman-Fried blamed "a poor internal labeling of bank-related accounts." When asked how FTX customer deposits ended up in Alameda's accounts, Bankman responded that his exchange platform did not originally have a bank account, so customers were directed to wire money to *Alameda's* account with Silvergate in exchange for the commodity assets on FTX.

58. According to Bankman-Fried, executives at the company "forgot" about this irregular depositing arrangement right up until the company imploded: "[I]t looks like people wired $8b to Alameda and 'oh god we basically forgot about the stub account that corresponded to that and so it was never delivered to FTX.'"

59. Similarly, in a recent interview, Bankman-Fried sought to downplay his conduct as an error or oversight:

There was a F*** up, I was incorrect on Alameda's balances on FTX by a fairly large number, an embarrassingly large one and it was because of a, like, very poorly labeled accounting thing, which was a historical artifact of a time before FTX had bank accounts and the result of that was basically there was a time back yonder when people would wire money to Alameda and then actually credited on

FTX. This . . . got screwed up and that was like a pretty big miss and that meant Alameda was substantially more levered than I thought it was.

60.     Bankman-Fried also told an investor that more than $10 billion in loans remains outstanding.

61.     By the 21st tweet in the November 10th series, Bankman-Fried was offering disclaimers:



**F.     The Fallout**

62.     On December 12th, Bankman-Fried was arrested in the Bahamas on the basis of an indictment filed by the U.S. attorney's office for the Southern District of New York. The criminal charges against Bankman-Fried include wire fraud, securities fraud, money laundering, and conspiracy to commit wire fraud and securities fraud.

63.     On December 13th, the Securities and Exchange Commission filed a civil action against Bankman-Fried for securities fraud in the Southern District of New York, alleging in part:

- "[F]rom the start, Bankman-Fried improperly diverted customer assets to his privately-held crypto hedge fund . . . and then used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations" and "sank billions of dollars of customer funds into speculative venture investments."

CLASS ACTION COMPLAINT

- "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw down from a virtually limitless 'line of credit' at FTX, which was funded by FTX customer assets."

- "The FTX funds transferred to Alameda were used not only for Alameda's proprietary trading, but also to fund loans to FTX executives, including Bankman-Fried himself, and to fund personal real estate purchases. Between March 2020 and September 2022, Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338 billion, including two instances in which Bankman-Fried was both the borrower in his individual capacity and the lender in his capacity as CEO of Alameda."

- "Bankman-Fried also used commingled funds from Alameda to make large political donations and to purchase tens of millions of dollars in Bahamian real estate for himself, his parents, and other FTX executives."

- "[O]n or about July 22, 2022, Bankman-Fried loaned himself $136 million."

64. Also on December 13th, the Commodity Futures Trading Commission filed a complaint against Bankman-Fried, FTX, and Alameda containing similar allegations concerning the scheme.

65. The same day, John J. Ray (who, as noted, serves as FTX's CEO in bankruptcy) testified to the House Financial Services Committee that, despite the relatively new cryptocurrency markets involved, FTX committed "really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose. Not sophisticated at all—sophisticated, perhaps, in the way they were able to sort of hide it from people, frankly, right in front of their eyes."

CLASS ACTION COMPLAINT

### G.    Silvergate's Complicity in the FTX Scheme

66.    Following FTX's collapse, significant questions about Silvergate's role in the failed FTX crypto enterprise have been raised both on Wall Street and in Congress.

67.    On November 15th, Marcus Aurelius Value, an investment research firm, tweeted that "[r]ecently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affidavit from investigation into crypto crime ring linked to smugglers/drug traffickers."

68.    On November 17th, the investment newsletter *The Bear Cave* released a report entitled "The Great Crypto Collapse" that discussed in part Silvergate's involvement in crypto markets. The report notes an "alarming" August 2022 forfeiture application for probable cause filed in Broward County, Florida that asserts Silvergate's link to a money laundering operation. According to that court filing, portions of which the report reproduces, "Records produced by Silvergate Bank found: (i) During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms into accounts held at different US banks. (ii) The accounts were receiving funds in the same pattern as those . . . used to facilitate the laundering of illicit funds."

69.    On December 1st, *The Bear Cave* issued a further report raising additional concerns about Silvergate's role in illegal transfers related to crypto currency. That report highlights a July 2021 plea agreement filed in the Middle District of Florida stating that the convicted defendant, Joel Greenberg, wired "$200,000 from the account of the Tax Collector's Office at Florida Capital Bank to Silvergate Bank" in order to buy cryptocurrency for himself. "Greenberg quickly spent the $200,000 in multiple purchases of cryptocurrency," the plea agreement states. "Greenberg engaged in more than 40 transactions over the course of about four days" and then withdrew almost all of the cryptocurrency from the Silvergate account.

CLASS ACTION COMPLAINT

70.     On December 5th, investment bank Morgan Stanley downgraded Silvergate's investment rating, explaining that Silvergate's ability to make money may be impaired by the continued stress in crypto markets caused by FTX's bankruptcy.

71.     Silvergate also faces Congressional inquiries. A December 5th letter signed by Sens. Elizabeth Warren (D-MA) and John Kennedy (R-LA) and by Rep. Roger W. Marshall (R-KS) posed a series of questions to Defendant Alan Lane regarding Silvergate's relationship with the FTX complex, after noting the direct funds transfers from FTX's client account at Silvergate to the accounts of Alameda and other entities under Bankman-Fried's control. Silvergate's "involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor . . . suspicious financial activity," the letter states. In expressing concern over Silvergate's "role in facilitating the improper transfer of FTX customer funds to Alameda," the letter notes that "Silvergate's failure to take adequate notice of this scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program."

72.     A subsequent December 7th letter to Federal Reserve Chair Jerome Powell from Senators Warren and Tina Smith (D-MN) highlights an $11.5 million investment that Alameda made in Moonstone Bank, an amount "more than double the bank's worth at the time." The investment could be seen as a move by FTX to gain access to the bank without owning a U.S. banking license. A former president of the Independent Community Bankers of America is quoted in the letter as saying that "[t]he fact that an offshore hedge fund that was basically a crypto firm was buying a stake in a tiny bank for multiples of its stated book value should have raised massive red flags."

### 1.     Background on Silvergate Bank

73.     Founded in 1988 as an industrial loan company, Silvergate, a member of the Federal Reserve, was once a small, community bank with three branches in Southern California. Its stock publicly trades on the New York Stock Exchange under the symbol

SI. Silvergate historically provided traditional financial services including commercial banking, business lending, commercial and residential real estate lending and mortgage warehouse lending, funded primarily by interest-bearing deposits and borrowing.

74.　In 2013 Silvergate shifted its focus to digital currency. By 2018 "the majority" of Silvergate's funding came from "non interest bearing deposits associated with clients in the digital currency industry." With its initial public offering, Silvergate touted itself as the "leading provider of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry."

75.　Further committing to its shift in business plan, in mid-2019, Silvergate sold its small business lending division "to increase its focus on its digital currency initiative and its specialty lending competencies." It also sold off two of its retail banking branches to focus more on crypto currencies. CEO and Defendant Alan Lane said Silvergate was "all in" on crypto.

76.　As part of this digital currency initiative, in the first quarter of 2018, Silvergate introduced the "Silvergate Exchange Network" or "SEN"—a "proprietary, virtually instantaneous payment network for participants in the digital currency industry." The SEN allows cryptocurrency investors and crypto exchanges who bank at Silvergate to transfer money instantly, 24/7, which contrasts with wire transfers or ACH transactions outside the bank, which can take hours or days to complete.

77.　The SEN's capabilities make Silvergate attractive to crypto investors and exchanges as a de facto clearinghouse. Crypto exchanges and crypto investors who bank at Silvergate can instantly transfer money around the clock among each other's accounts.

78.　Silvergate, as one of the few banks enabling customers to move U.S. dollars onto crypto exchanges, fueled by its instantaneous SEN platform, became "the go-to bank for the cryptocurrency industry," according to its website.

CLASS ACTION COMPLAINT

### 2. Silvergate's Mutual Interests and Alignment with FTX/Alameda

79. FTX/Alameda was one of Silvergate's most important customers, and their business operations and interests were tightly entwined. Silvergate profited from deposits by digital-asset customers, which grew exponentially as FTX's own business expanded. Out of Silvergate's approximately 1,500 customers, FTX alone accounted for approximately 10% of Silvergate's deposits.

80. Until its collapse, Silvergate's website even showed an endorsement from Bankman-Fraud stating that "[l]ife as a crypto firm can be divided up into before Silvergate and after Silvergate—it's hard to overstate how much it revolutionized banking for blockchain companies."

81. Silvergate had a strong incentive to keep its knowledge of the irregularities of the FTX/Alameda scheme to itself. Silvergate earned increased profits in conjunction with the accelerating use by customers of the FTX exchange platform and app. Silvergate earned income from transaction fees as well as from investing capital derived from its FTX accounts.

82. Silvergate held its initial public offering on November 7, 2019. Before it went public and retained FTX as a client in 2019, Silvergate had an annual net income of $7.6 million. By 2021 its net annual income had increased to $75.5 million. Silvergate's business and profits grew in tandem with those of FTX and Alameda.

83. After closing at $12.50 per share on the day of its IPO, the price of Silvergate stock skyrocketed to $219.75 per share as of November 15, 2021. By December 9, 2022, following FTX's collapse, Silvergate shares had dropped back down to $21.43.

84. In a public letter issued December 5, 2022, Lane acknowledged "the apparent misuse of customer assets and other lapses of judgment by FTX and Alameda Research."

### 3. Silvergate's Knowledge and Participation in the FTX Fraud

85. Silvergate's actions and inaction were integral to Bankman-Fried's enterprise. Numerous accounts held by his companies—including FTX Ltd., FTX US, and Alameda—were held at Silvergate Bank. Bankman-Fraud's fraud and the financial details concerning his FTX/Alameda companies occurred in plain sight of Silvergate.

86. As discussed above, federal law required Silvergate and Lane to monitor FTX/Alameda for anomalous or suspicious behavior, and upon discovering signs of fraud, money laundering or other mismanagement or malfeasance, to stop doing business with FTX/Alameda and report the red flags.[1]

87. Silvergate's duty of due diligence in relation to FTX/Alameda was especially strong because Silvergate advertised Bankman-Fried on its website.

88. Lane acknowledged these duties, stating that, "For each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds. Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage."

89. Among other facts that triggered enhanced due diligence obligations, Defendants knew that cryptocurrency trading has repeatedly presented an opportunity for fraud. They therefore should have applied heightened scrutiny to the related-party transactions, speculation in novel, risky crypto assets and other atypical FTX/Alameda activities and processes occurring in Silvergate's accounts.

90. Defendants breached their know-your-customer and anti-money laundering duties with respect to FTX/Alameda. They either failed to establish and maintain an adequate due diligence program or failed to properly execute such a program.

---

[1] Plaintiff's claims are not predicated on whether Silvergate filed or failed to file a Suspicious Activity Report pursuant to the Bank Secrecy Act.

CLASS ACTION COMPLAINT

91.    Because red flags from the FTX scheme abounded, even ordinary due diligence—not limited to the enhanced scrutiny required—would have revealed suspicious account activities.

92.    As noted above, the FFIEC Manual describes certain "red flags" that indicate possible money laundering or other misconduct, for which banks must monitor. Included in the FFIEC Manual's list are the following "red flags," all of which were present in the transactions and activity in the FTX/Alameda accounts held at Silvergate:

- "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."
- "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."
- "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."
- "Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers."
- "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."
- "A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity."
- "Customer uses a personal account for business purposes."
- "Unusual use of trust funds in business transactions or other financial activity."

93.    Those are not the only red flags relevant to FTX/Alameda's operations and transactions. Despite widespread advertising in the United States, FTX never made any attempt to comply with U.S. securities laws, raising immediate questions about FTX's

civil and criminal exposure and attendant risks to Silvergate. Neither FTT nor any other FTX crypto asset was ever registered with any U.S. jurisdiction or regulatory authority.

94.     Nor did FTX/Alameda ever have financial statements audited or show Silvergate any audited financial statements. That omission, standing alone, was extremely suspicious and should have been reported to law enforcement.

95.     Moreover, Silvergate accepted several billion dollars from FTX customers, intended to be lodged or traded on the FTX crypto exchange, for deposit into an account held by a separate entity, Bankman-Fried's hedge fund Alameda. This massive commingling of funds was carried out via transactions that Silvergate's internal monitoring systems should have brought to the attention of the bank's compliance and risk management personnel.

96.     It also was apparent to Defendants that numerous wires sent to Bankman-Fried's Alameda trading account actually were earmarked for deposit to FTX for trading on its exchange. It is highly unusual for a hedge fund to receive the high volume of relatively small deposits, from a large number of distinct individuals, that Alameda received through its account at Silvergate. The bank nonetheless permitted what were clearly incoming investor funds, denominated in miscellaneous amounts, to be deposited with Bankman-Fried's own hedge fund and commingled with Alameda's assets.

97.     Further, the increasing and uncapped loan "margin" that FTX extended to Alameda, through their respective Silvergate accounts, relied on impermissible related-party transactions that the bank repeatedly knew about and processed.

98.     In still another suspect related-party transaction, Bankman-Fried made Alameda a "licensor" to FTX such that FTX paid approximately $400 million in investor funds to Alameda, through their Silvergate accounts, purportedly for technology that would be used to optimize the FTX.com exchange platform and app.

99.     Defendants' failures to adequately monitor and stop the fraudulent activities of FTX/Alameda, and Defendants' acts and omissions directly in furtherance of this

scheme, carried out through Silvergate bank accounts, were the cause of the investment losses of Plaintiff and class members.

## AGENTS AND CO-CONSPIRATORS

100.   At all relevant times, each of Silvergate, Bankman-Fried and Lane was a principal, agent, joint venturer, partner or affiliate of Silvergate, Bankman-Fried and Lane. In doing the acts alleged herein, Silvergate, Bankman-Fried and Lane acted within the course and scope of that principal, agent, joint venture, partnership or affiliate relationship. Silvergate, Bankman-Fried and Lane had mutual knowledge of each other's wrongdoing; ratified, approved, joined in, acquiesced, or authorized the wrongful acts of Silvergate, Bankman-Fried and Lane; and retained the benefits of those wrongful acts.

101.   At all relevant times, each of Silvergate, Bankman-Fried and Lane was a co-conspirator of Silvergate, Bankman-Fried and Lane. Silvergate and Lane aided and abetted, encouraged and substantially assisted Bankman-Fried in jointly perpetrating a fraudulent scheme upon Plaintiff and the investor class. In taking action, as alleged herein, to aid, abet, encourage and substantially assist the commissions of the wrongful acts, omissions and other misconduct set forth herein, Defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially aid the accomplishment of their illegal design.

## TOLLING OF THE STATUTES OF LIMITATIONS

102.   Defendants Silvergate and Lane fraudulently concealed from Plaintiff and the other investors the true nature of the FTX investment enterprise. Though aware of the illegal FTX/Alameda scheme and its injurious effects, Defendants did not take any action to stop or report it, but instead continued accepting the deposits and executing the transfer and lending transactions upon which the scheme relied.

103.   Silvergate and Lane were aware that FTX investors like Plaintiff did not know about the FTX/Alameda investment fraud. Silvergate and Lane had superior and

exclusive knowledge of that fraud. Despite reasonable diligence on their part, Plaintiff was kept ignorant by these Defendants of the factual bases for these claims for relief.

104.    Plaintiff did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Defendants' violations or the harm caused thereby until FTX's implosion in early November 2022. Plaintiff learned of the relevant actions and violations of FTX/Alameda, Silvergate and Lane through media coverage and FTX's bankruptcy filing.

105.    Because Plaintiff and the other class members could not have reasonably discovered the facts constituting Silvergate's and Lane's violations until November 2022, all applicable statutes of limitation were tolled until then.

## CLASS ACTION ALLEGATIONS

106.    Plaintiff sues on his own behalf and on behalf of all other persons similarly situated under Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who, as of November 11, 2022, had legal title to any fiat or cryptocurrency deposited or invested with FTX, including from the FTX.com, FTX US and FTX international platforms.

107.    Excluded from the class are Silvergate's employees, affiliates, legal representatives, predecessors, successors or assigns; any entity in which Silvergate has a controlling interest or which has a controlling interest in Silvergate; the immediate family members of Alan Lane; and the judicial officers to whom this litigation is assigned as well as their staff and immediate family members.

108.    <u>Numerosity</u>. The class members are too numerous to be practicably joined. The class members are identifiable from information and records in the possession, custody, or control of Silvergate. Notice of this action can be readily provided to all members of the class.

CLASS ACTION COMPLAINT

109. <u>Typicality</u>. Plaintiff's claims are typical of the claims of other members of the class. Plaintiff and each class member invested in the FTX investments at issue and was subject to the wrongful conduct alleged in this complaint.

110. <u>Adequacy of Representation</u>. Plaintiff is a member of the class and will fairly and adequately represent and protect its interests. Plaintiff has no interests contrary to or in conflict with the interests of the other class members.

111. Plaintiff's counsel are competent and experienced in class action and investment fraud litigation and will pursue this action vigorously.

112. <u>Commonality and Predominance</u>. Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. Among the questions common to the class are:

     a.    Whether Bankman-Fried committed fraud or breached duties to Plaintiff and members of the class;

     b.    Whether Silvergate aided and abetted, joined and/or participated in Bankman-Fried's fraud or breach of duties;

     c.    Whether Silvergate knowingly carried out transactions in furtherance of the FTX investment scheme despite atypical banking activity and other red flags indicating that Bankman-Fried, through FTX/Alameda and his other operations, was committing investor fraud, breaching fiduciary duties, and misusing investor funds;

     d.    Whether Silvergate was unjustly enriched in consequence of its wrongful conduct; and

     e.    Whether, in view of their investment losses, Plaintiff and the class are entitled to damages or restitution.

113. <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although many class members paid thousands to dollars to deposit or invest assets with FTX, the cost of this litigation will be high. The factual issues are complex and detailed, extend over several years and

CLASS ACTION COMPLAINT

relate to many transactions. Absent a class action, most class members would find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy. Class treatment will conserve resources, avoid inconsistent rulings, and promote efficiency and economy of adjudication in a single court.

## CLAIMS FOR RELIEF

### COUNT 1

**Aiding and Abetting Fraud**

**(Against Silvergate and Lane)**

114. Plaintiff incorporates all of the foregoing allegations by reference.

115. Bankman-Fried made fraudulent misrepresentations and omissions to the investing public about the nature of the FTX investments and how investor money would be applied. Plaintiff and class members relied to their detriment on these misrepresentations and omissions when depositing or investing assets with FTX.

116. Defendants knew of and substantially aided this fraud. Silvergate accepted billions of dollars of irregular deposits and approved the related-party transfers, atypical lending and funds commingling that marked Bankman-Fried's fraudulent scheme. In connection with providing such material assistance, Defendants were aware of their essential role in the scheme and knowingly acted in furtherance of it. Defendants also substantially benefited from their participation in this scheme.

117. As a direct and proximate result of Defendants' aiding and abetting of fraud, Plaintiff and class members have been damaged in an amount to be determined at trial

### COUNT 2

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against Silvergate and Lane)**

118. Plaintiff incorporates all of the foregoing allegations by reference.

119. At all relevant times, Bankman-Fried was the controlling owner and/or CEO of the FTX companies. By reason of his controlling position, actions and direct and

indirect representations to Plaintiff and class members, and because they deposited funds into Bankman-Fried's control with the understanding that he would act in accordance with his promises in regard to the use of such funds, Bankman-Fried owed investors the fiduciary duties of loyalty and care and to deal honestly and in good faith. Nevertheless, Bankman-Fried breached fiduciary duties he owed to Plaintiff and class members.

120.    Through their knowledge of FTX/Alameda's business model and banking activity, Defendants knew that Bankman-Fried owed fiduciary duties to investors, such as Plaintiff. Defendants substantially assisted Bankman-Fried's breaches of fiduciary duty while knowing he was breaching those duties. Bankman-Fried's breaches of duty were enabled by and would not have been possible but for Defendants' relevant actions and inaction.

121.    As a direct and proximate result of Defendants' aiding and abetting of breach of fiduciary duty, Plaintiff and class members have been damaged in an amount to be determined at trial.

### COUNT 3

### Unjust Enrichment

### (Against Silvergate)

122.    Plaintiff incorporates all of the foregoing allegations by reference.

123.    Plaintiff lacks an adequate remedy at law.

124.    Plaintiff and the other class members conferred benefits on Silvergate by depositing funds into and using the FTX exchange platforms.

125.    Silvergate acquired ill-gotten gain, including in the form of revenues, derived from Plaintiff's and the other class members' funding and use of the FTX exchange platforms.

126.    Silvergate condoned and furthered the wrongful conduct from which it benefited. Its retention of these sums is therefore inequitable.

127.    Silvergate's wrongful gain should be restored to Plaintiff and the class.

CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment:

A.     Certifying this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), appointing Plaintiff as class representative and his attorneys as class counsel under Federal Rule of Civil Procedure 23(g), and requiring Defendants to pay the costs of Notice to the class;

B.     Awarding damages or restitution, including pre-judgment interest, upon each Count in an amount to be determined at trial;

C.     Awarding reasonable attorneys' fees and costs of litigation; and

D.     Granting such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff seeks a jury trial of any Counts for which a trial by jury is permitted by law.

Respectfully submitted,

Dated: December 14, 2022

By:   /s/ *Daniel C. Girard*
Daniel C. Girard
Adam E. Polk
Makenna Cox
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
dgirard@girardsharp.com
apolk@girardsharp.com
mcox@girardsharp.com

Jason S. Hartley
Jason M. Lindner
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822

29

CLASS ACTION COMPLAINT

hartley@hartleyllp.com
lindner@hartleyllp.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOEWY GONZALEZ, on behalf of all others similarly situated

**DEFENDANTS**

SILVERGATE BANK, SILVERGATE CAPITAL CORPORATION, and ALAN J. LANE

**(b)** County of Residence of First Listed Plaintiff   Suffolk County, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Girard Sharp LLP - 601 California St., Ste. 1400
San Francisco, CA 94108 Tel: 415.981.4800

Attorneys *(If Known)*

'22CV1981 BEN WVG

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(d)(2) (the Class Action Fairness Act)

Brief description of cause:
Aiding and Abetting Fraud; Aiding and Abetting Breach of Fiduciary Duty; Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*   JUDGE   M. James Lorenz   DOCKET NUMBER   3:22-cv-01901

DATE   Dec 14, 2022

SIGNATURE OF ATTORNEY OF RECORD   /s/ Daniel C. Girard

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE