**Query     Reports     Utilities     Help     Log Out**

ADRMOP

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00669-AGT

Magleby et al v. Silvergate Bank et al
Assigned to: Magistrate Judge Alex G. Tse
Demand: $5,000,000
Cause: 28:1332 Diversity-Fraud

Date Filed: 02/14/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Matson Magleby**
*on behalf of all others similarly situated*

represented by **Daniel C. Girard**
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
415-981-4800
Fax: 415-981-4846
Email: dgirard@girardsharp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam E. Polk**
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
Fax: (415) 981-4846
Email: apolk@girardsharp.com
*ATTORNEY TO BE NOTICED*

**Jason Scott Hartley**
Hartley LLP
101 W. Broadway
Suite 820
San Diego, CA 92101
(619) 400-5822
Fax: (619) 400-5832
Email: hartley@hartleyllp.com
*ATTORNEY TO BE NOTICED*

**Jason Michael Lindner**
Hartley LLP
101 W. Broadway
Suite 820

San Diego, CA 92101
619-400-5822
Fax: 619-400-5832
Email: lindner@hartleyllp.com
*ATTORNEY TO BE NOTICED*

**Tom Lane Watts**
Girard Sharp LLP
601 California Street. Suite 1400
San Francisco, CA 94108
United Sta
(415) 981-4800
Email: tomw@girardsharp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Golam Sakline** | represented by | **Daniel C. Girard** |
| *on behalf of all others similarly situated* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Adam E. Polk**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Scott Hartley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Michael Lindner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tom Lane Watts**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Silvergate Bank**
*California Corporation*

**Defendant**

**Silvergate Capital Corporation**
*Maryland Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2023 | 1 | COMPLAINT against Silvergate Bank, Silvergate Capital Corporation ( Filing fee $ 402, receipt number ACANDC-17989907.). Filed byMatson Magleby, Golam Sakline. (Attachments: # 1 Civil Cover Sheet)(Girard, Daniel) (Filed on 2/14/2023) (Entered: 02/14/2023) |
| 02/14/2023 | 2 | Proposed Summons. (Girard, Daniel) (Filed on 2/14/2023) (Entered: 02/14/2023) |
| 02/14/2023 | 3 | Certificate of Interested Entities by Matson Magleby, Golam Sakline (Girard, Daniel) (Filed on 2/14/2023) (Entered: 02/14/2023) |
| 02/15/2023 | 4 | Case assigned to Magistrate Judge Sallie Kim.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 3/1/2023. (mbc, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/15/2023 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 5/15/2023. Initial Case Management Conference set for 5/22/2023 01:30 PM. (mcl, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023)** |
| 02/15/2023 | 6 | Summons Issued as to Silvergate Bank, Silvergate Capital Corporation. (mcl, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/22/2023 | 7 | **ORDER OF RECUSAL. Signed by Magistrate Judge Sallie Kim on 2/22/2023. (mkl, COURT STAFF) (Filed on 2/22/2023) (Entered: 02/22/2023)** |
| 02/23/2023 | 8 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Magistrate Judge Alex G. Tse for all further proceedings. Magistrate Judge Sallie Kim no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 2/23/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(ark, COURT STAFF) (Filed on 2/23/2023) (Entered: 02/23/2023)** |
| 02/23/2023 | 9 | CLERKS NOTICE SETTING INITIAL CASE MANAGEMENT AND ZOOM NOTICE.<br><br>Initial Case Management Conference set for 5/26/2023 02:00 PM in San Francisco before Magistrate Judge Alex Tse - Videoconference Only. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/agt |

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

Case Management Statement due by 5/19/2023. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (klh, COURT STAFF) (Filed on 2/23/2023) (Entered: 02/23/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/01/2023 18:04:50 | | | |
| **PACER Login:** | GirardSharp0108 | **Client Code:** | 713 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-00669-AGT |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

Daniel C. Girard (SBN 114826)
Adam E. Polk (SBN 237000)
Tom Watts (SBN 308853)
Makenna Cox (SBN 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
apolk@girardsharp.com
tomw@girardsharp.com
mcox@girardsharp.com

Jason S. Hartley (SBN 192514)
Jason M. Lindner (SBN 211451)
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATSON MAGLEBY and GOLAM SAKLINE, on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>       v.<br><br>SILVERGATE BANK and SILVERGATE CAPITAL CORPORATION<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Matson Magleby and Golam Sakline, on behalf of themselves and all others similarly situated, bring this action against Defendants Silvergate Bank and Silvergate Capital Corporation (collectively, "Silvergate"), and allege as follows.

## INTRODUCTION

1.      Plaintiffs invested their savings in cryptocurrency, digital assets purportedly secured by anti-counterfeiting cryptography. Plaintiffs entrusted their investments to FTX, a cryptocurrency exchange founded by Samuel Bankman-Fried. FTX promised investors that they could store assets securely as they gained in value, cash them out, or trade them for other assets or financial products. In November 2022, FTX declared bankruptcy amid reports that it had transferred FTX customer funds to a separate company also owned by Bankman-Fried, which had suffered massive losses and was unable to repay the funds. With FTX's recent collapse, Plaintiffs and other FTX investors are unable to recover their investments and face years of uncertainty and catastrophic losses. This case concerns Silvergate's knowing aiding and abetting of the misconduct that caused Plaintiffs' losses.

2.      Bankman-Fried not only ran FTX's exchange and affiliated companies but also co-founded Alameda Research LLC, a cryptocurrency trading firm. Alameda was a separate company from FTX with no affiliation other than co-ownership, and it had a separate business model. Unlike FTX, which purported to allow investors to store, trade, or cash out their "tokens" and other crypto assets, Alameda executed cryptocurrency trades on its own behalf, including on the FTX platform. But unbeknownst to Plaintiffs and the other investors, Alameda and FTX diverted FTX customer funds to Alameda accounts. Billions of dollars of deposits, both in fiat currency (*e.g.*, U.S. dollars) and in cryptocurrency, which FTX undertook to store for trading or potential investment, were diverted to and commingled with Alameda's assets. Alameda used FTX investor funds for a variety of unauthorized purposes, including proprietary, speculative trading on other digital-asset exchanges, funding risky crypto investments, operations, marketing, political contributions, luxury real estate purchases, and funding hundreds of millions of dollars in loans to Bankman-Fried and other FTX executives. Some of the funds also simply went missing. The new CEO of FTX, who took over after the company declared

CLASS ACTION COMPLAINT

bankruptcy in November 2022, stated: "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."

3.  Silvergate, a publicly traded and federally regulated bank catering to cryptocurrency customers, maintained both FTX and Alameda accounts. It directly aided and abetted FTX's fraud and breaches of fiduciary duty via first-hand participation in the commingling of funds, improper transfers, and lending out of customer money. Silvergate processed billions in transfers from FTX's client account at Silvergate to the Alameda accounts. Silvergate also accepted deposits from FTX investors— intended to be stored, traded, or cashed out—that at Bankman-Fried's direction were wired straight to Alameda bank accounts and misused. Bankman-Fried explained that he "forgot" about the improper transfers until the company imploded, telling a reporter "it looks like people wired $8b to Alameda and 'oh god we basically forgot about the stub account that corresponded to that so it was never delivered to FTX.'"

4.  Silvergate is liable for its role in furthering FTX's investment fraud and breaches of fiduciary duty and is obligated under common law to make Plaintiffs and the other investors whole.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the proposed plaintiff class is a citizen of a State different from a Defendant.

6.  The Court has personal jurisdiction over Defendants based on their substantial, continuous, and systematic contacts with the State and because Defendants have purposely availed themselves of the benefits and privileges of conducting business activities within the State. In particular, Defendants are headquartered in California, and Defendant Silvergate Bank is a California-chartered bank.

7.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District. For example, as discussed below, FTX and Alameda were headquartered in this District until 2019, when they moved

CLASS ACTION COMPLAINT

internationally. Based on the timing described in Bankman-Fried's public statements, the decision to misappropriate FTX customer funds into Alameda accounts was made in this District. Bankman-Fried and other witnesses are located in this District.

## PARTIES

### A. Plaintiffs

8.    Plaintiff Matson Magleby is a citizen and resident of Utah. He committed funds to FTX in anticipation of executing cryptocurrency trades. When he did so, he wired his money into a Silvergate bank account. After FTX announced its bankruptcy, Mr. Magleby attempted to withdraw the cryptocurrency in his FTX account but was unable to do so.

9.    Plaintiff Golam Sakline is a citizen of the United Kingdom of Great Britain and Northern Ireland and resides in the United Arab Emirates. He committed funds to FTX in anticipation of executing cryptocurrency trades. When he did so, he wired his money into a Silvergate bank account. After FTX announced its bankruptcy, Mr. Sakline attempted to withdraw the cryptocurrency in his FTX account but was unable to do so.

### B. Defendants

10.    Defendant Silvergate Bank is a California corporation with its principal place of business in La Jolla, California.

11.    Chartered by the State of California, Silvergate Bank is overseen by the Federal Reserve Bank of San Francisco; its deposits are guaranteed by the Federal Deposit Insurance Corporation.

12.    Silvergate Bank primarily serves the cryptocurrency industry—its customers include cryptocurrency exchanges, institutional investors, and stablecoin issuers, such as Coinbase, Bitstamp, Crypto.com, Kraken, and Gemini.

13.    Defendant Silvergate Capital Corporation is a Maryland corporation with its principal place of business in La Jolla, California, and is the parent of Silvergate Bank.

CLASS ACTION COMPLAINT

## OVERVIEW OF RELEVANT BANKING REGULATIONS

14. Silvergate is obligated to comply with the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* ("BSA"), including regulations broadening its anti-money laundering provisions. Silvergate has obligations under the BSA as both a "bank" and a "money transmitter."[1]

15. The BSA and its implementing regulations require a bank like Silvergate to develop, implement, and maintain an effective Anti-Money Laundering (AML) program that is reasonably designed to prevent the bank from being used to facilitate money laundering and the financing of terrorist activities. See 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1020.210(a).

16. The AML program must include:

> a due diligence program that includes appropriate, specific, risk-based, and, where necessary, enhanced policies, procedure and controls that are reasonably designed to enable the covered financial institution[2] to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account[3] established, maintained, administered, or managed . . . for a foreign financial institution.

31 C.F.R. § 1010.610(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This includes: (a) assessing the money laundering risk presented by any foreign financial institution correspondent account (which includes Alameda and FTX accounts, *see* 31 C.F.R. § 510.309) based on its business and the markets it serves, anticipated activity, nature and duration of its relationship with the bank, the regulatory regime of the country in which it is located, and information known or available to the bank about its anti-money

---

[1] Plaintiffs' claims are not based on whether Silvergate filed or failed to file a Suspicious Activity Report pursuant to the Bank Secrecy Act.

[2] "Covered financial institution means: (1) For purposes of § 1010.610 and 1010.620: (i) A bank required to have an anti-money laundering compliance program under the regulations implementing 31 U.S.C. 5318(h), 12 U.S.C. 1818(s), or 12 U.S.C. 1786(q)(1)[.]" 31 C.F.R. § 1010.605(e).

[3] "The term correspondent account means: (i) For purposes of § 1010.610(a), (d), and (e), an account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution; and (ii) For purposes of §§ 1010.610(b) and (c), 1010.630 and 1010.670, an account established for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign bank." 31 C.F.R. § 1010.605(c)(1).

CLASS ACTION COMPLAINT

laundering record; and (b) applying risk-based procedures and controls designed to detect money laundering activity, including through a periodic review of account activity sufficient to determine its consistency with expected activity.

17.     Additionally, Silvergate must "maintain a due diligence program that includes policies, procedures, and controls that are reasonably designed to detect and report any known or suspected money laundering or suspicious activity conducted through or involving any private banking account that i[t] established, maintained, administered, or managed," *see* 31 C.F.R. § 1010.620(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This program must be:

> designed to ensure, at a minimum, that [Silvergate] takes reasonable steps to: (1) Ascertain the identity of all nominal and beneficial owners of a private banking account . . . (3) Ascertain the source(s) of funds deposited into a private banking account and the purpose and expected use of the account; and (4) Review the activity of the account to ensure that it is consistent with the information obtained about the client's source of funds, and with the stated purpose and expected use of the account, as needed to guard against money laundering, and to report, in accordance with applicable law and regulation, any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account.

*Id.* § 1010.620(b).

18.     Silvergate's AML program must also include:

> at a minimum: (i) A system of internal controls to assure ongoing compliance; (ii) Independent testing for compliance to be conducted by bank personnel or by an outside party; (iii) Designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance; (iv) Training for appropriate personnel; and (v) Appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to: (A) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and (B) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information" including "information regarding the beneficial owners of legal entity customers[.]

31 C.F.R. § 1020.210(a)(3).[4]

---

[4] "Legal entity customer means a corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account." 31 C.F.R. § 1010.230(e).

19.     Through its operation of the Silvergate Exchange Network, or SEN, which allows for Silvergate customers to transfer currency to one another in real time 24 hours a day, 7 days a week, and 365 days a year, Silvergate also operates as a "money transmitter" as defined by the BSA and its implementing regulations. *See* 31 C.F.R. § 1010.100(ff). As such, Silvergate is required to comply with BSA regulations applicable to money transmitters. *See generally* 31 C.F.R. § 1022 ("Rules for Money Services Businesses").

20.     In addition to developing, implementing, and maintaining an effective anti-money laundering program, similar to its obligation as a bank, applicable regulations require Silvergate to: (a) integrate its compliance procedures into any automated data processing systems it uses (such as SEN); (b) designate a person to assure day-to-day compliance with the program and relevant regulations; and (c) provide for an independent review of the program. *See* 31 C.F.R. § 1022.210(d).

21.     The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council (FFIEC Manual) summarizes the applicable anti-money laundering compliance program requirements, expectations for risks and risk management, industry sound practices, and examination procedures.

22.     Silvergate must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2); 12 C.F.R. § 21.21. Silvergate must maintain a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, furnishing a means for the bank to notice unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to know the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage. Federal guidelines thus require that Silvergate take reasonable steps to "determine the identity of all nominal and beneficial owners of the private banking account" and "determine the source(s) of funds deposited into the private banking account and the purpose and expected use of the account; and . . . review the activity of the account to ensure that the activity is consistent with the information obtained about the

6

CLASS ACTION COMPLAINT

source of funds, the stated purpose and the expected use of the account, as needed to guard against money laundering, and to report any suspicious activity."

23.     Customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, the anti-money laundering guidelines direct federally regulated banks like Silvergate to gather additional information about the customer and its accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

24.     Moreover, Silvergate and its personnel must be able to identify and take appropriate action once on notice of any of a series of money laundering "red flags" set forth in the FFIEC Manual. Among these are: (1) funds transfers sent in large, round dollar amounts; (2) funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations; (3) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (4) repetitive or unusual funds transfer activity; (5) funds transfers sent or received from the same person to or from different accounts; (6) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (7) transactions inconsistent with the account holder's business; (8) customer use of a personal account for business purposes; (9) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (10) multiple high-value payments or transfers between shell companies without a legitimate business purpose.

25.     In addition, federal law requires Silvergate to conduct "enhanced" due diligence when establishing or maintaining a correspondent account for a financial institution that operates under an offshore license (as FTX did) or is incorporated in a jurisdiction known for failing to cooperate with international anti-money laundering principles (as FTX was, having incorporated in the Bahamas).

26.     The FFIEC Manual also identifies "lending activities" and "nondeposit account services," including for nondeposit investment products, as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and

CLASS ACTION COMPLAINT

involve high volumes of currency. Therefore, when investment trading or lending services are being run through the bank, the FFIEC Manual requires heightened due diligence including determining the purpose of the account, ascertaining the source and funding of the capital, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining adequate explanations for account activities.

## STATEMENT OF FACTS

### A.     The Cryptocurrency Industry

27.     Cryptocurrency is a form of digital currency that first came to prominence in 2008, when an author under the pseudonym Satoshi Nakamoto published the whitepaper *Bitcoin: A Peer-to-Peer Electronic Cash System*. Nakamoto defined cryptocurrency as "an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party"—*i.e.*, a bank.

28.     Cryptocurrency relies on a long list of public addresses, each bearing a unique label consisting of numbers and letters, corresponding to a specific amount of cryptocurrency. The address acts as a public key. The owner of the cryptocurrency holds a private key, which serves as a password to access the account, and allows people to send each other the cryptocurrency.

29.     Cryptocurrency ownership is tracked on a public ledger. In the case of Bitcoin, for example, thousands of people who use Bitcoin maintain the ledger. When Bitcoin is sold, the transaction is broadcast to the entire network. Bitcoin miners (computers on the network) compile the transactions as they arrive into a group called a "block." Once that block becomes official, the block is considered mined. New blocks will then refer to the blocks preceding them, forming a blockchain—the formal record of what transactions the network has agreed upon, and in what order.

30.     The process of confirming a block is time- and resource-intensive, and involves the miner repeatedly attempting to generate a small enough number by running an algorithm. If the number is small enough—a setting determined by the Bitcoin software—then the miner has mined a block. If not, the process starts over with a different input. The calculations are so intensive that miners require special hardware, and often are run on large farms of computers that are always on.

CLASS ACTION COMPLAINT

31. In addition to coins and tokens, another important part of the cryptocurrency ecosystem are "stablecoins."—specific types of coins purportedly designed to remain stable in value. Stablecoins purportedly achieve stability by being pegged to some underlying store of value. For example, a stablecoin issuer might place $1 billion in a bank account, and then issue one billion $1 stablecoins effectively underwritten by the fiat asset. Many stablecoins are pegged to fiat currency (and several are pegged 1-to-1 to U.S. dollars specifically), but others are backed by portfolios of currencies, commercial paper, and other financial assets. Stablecoins are frequently traded digital assets because they function as intermediaries both between fiat and crypto and between crypto pairs for which there may not be much liquidity.

32. Cryptocurrencies (both coins and tokens) must be stored in digital "wallets." These are applications that store the passkeys (i.e., private codes) used by owners to engage in cryptocurrency transactions. Digital wallets also provide the interface that lets owners access and transfer their digital assets.

33. Cryptocurrency has rapidly gained value over the past decade while experiencing high volatility. When Nakamoto's paper was first published, one Bitcoin—the original cryptocurrency—was worth zero dollars. In November 2021, one Bitcoin was worth more than $67,000. As of the date of this complaint, one Bitcoin is worth over $17,000.

34. Several new forms of cryptocurrency have proliferated since the advent of Bitcoin, many of which have been even more volatile than Bitcoin. FTT, the FTX token, was worth over $77 in September 2021. Now it is worth around $1.40.

35. Today, the primary way people buy the different types of cryptocurrency is through cryptocurrency exchanges. These are companies, like FTX, Coinbase, Kraken, and others, that accept regular currency in exchange for cryptocurrency. In other words, you wire an exchange an amount of money, and the exchange gives you title to a corresponding amount of cryptocurrency.

**B.** **Silvergate Bank**

36. Silvergate was founded in 1988 as a small industrial loan company with three branches in Southern California. Since its founding, Silvergate has provided traditional financial services.

CLASS ACTION COMPLAINT

37.     But in the 2010s, Silvergate increasingly began to focus on cryptocurrency, an area that most other banks avoided due to its risks. In the first quarter of 2018, Silvergate introduced the "Silvergate Exchange Network" or "SEN"—a "proprietary, virtually instantaneous payment network for participants in the digital currency industry." Due in large part to the SEN platform, Silvergate became "the go-to bank for the cryptocurrency industry," according to its website.

38.     In a June 2022 interview, Lane explained that around 2018, Silvergate "really focused on this new digital asset called Bitcoin and some of the companies that were being formed at the time to provide services to this budding Bitcoin space." He said that "many of them were struggling to find and maintain bank accounts," and "[s]o the first thing we did . . . is we were just a bank willing to talk to these new companies."

39.     In a separate interview, Lane explained that Silvergate's entrance into cryptocurrency was catalyzed by the need to grow deposits in order to fund its lending activities. He explained that he saw an opportunity in the cryptocurrency space. According to Lane, cryptocurrency industry participants were in need of banking services because "they were getting kicked out of their banks" due to "the perception of risk," including "the whole concern of anti-money laundering, BSA . . . ."

40.     Silvergate rapidly became a cryptocurrency-focused bank. According to an analyst report issued shortly before Silvergate went public, by 2018, "[t]he majority of Silvergate's funding [came] from non-interest bearing deposits associated with clients in the digital currency industry." In information that Silvergate released with its initial public offering, Silvergate wrote that it was the "leading provider of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry."

41.     On November 15, 2018, Silvergate entered into an agreement to sell its small business lending division and retail branch located in San Marcos, California, to another bank. In a securities filing, Silvergate stated that this transaction enabled Silvergate "to increase its focus on its digital currency initiative and its specialty lending competencies." Lane said Silvergate was "all in" on crypto.

42.     In November 2019, Silvergate went public. Silvergate's New York Stock Exchange ticker symbol is "SI." In its Registration Statement, Silvergate described itself as "the leading provider

of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry," and it claimed to have "a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

43. The Registration Statement included the following graphic:



44. By 2022, Silvergate had over 1,600 crypto clients, including Coinbase, Paxos, Circle, Kraken, Bitstamp, Gemini, and Crypto.com.

45. According to Silvergate, "These market participants generally hold either or both of two distinct types of funds: (i) those funds that market participants use for digital currency investment activities, which [Silvergate] refer[s] to as investor funds, and (ii) those funds that market participants use for business operations, which [Silvergate] refers to as operating funds."

C.    The Silvergate Exchange Network

46. According to Silvergate's public filings with the SEC: "Instrumental to [its] leadership position and growth strategy is the Silvergate Exchange Network, or SEN, [Silvergate's] proprietary, virtually instantaneous payment network for participants in the digital currency industry . . . ."

47. Silvergate introduced the SEN in 2017 "in response to unmet demand for U.S. dollar deposit accounts for many [digital asset] market participants." It allows the bank's participating customers to send money instantaneously to other SEN participants at any time.

48. The SEN only transfers fiat currency such as U.S. dollars or euros. Traditional cash transfers between bank accounts, such as bank wires and ACH transfers—take hours or days to

complete and typically close during traditional banking hours. In contrast, cryptocurrency transfers can happen nearly instantly and at any time, even outside banking hours. So a transaction involving both cryptocurrency and fiat currency—such as a purchase of a Bitcoin using U.S. dollars—may be slowed down by an inability to transfer the fiat currency quickly.

49. The SEN was designed to reduce industry friction and thereby, among other things, help mitigate exposure to digital currency pricing fluctuations.

50. Silvergate's Registration Statement described use of the SEN as of September 30, 2018, as follows:

|  | Digital Currency Exchanges | Institutional Investors | Other Customers |
|---|---|---|---|
| **Overview** | Exchanges through which digital currencies are bought and sold; includes over-the-counter, or OTC, trading desks | Hedge funds, venture capital funds, private equity funds, family offices and traditional asset managers, which are investing in digital currencies as an asset class | Companies developing new protocols, platforms and applications; mining operations; and providers of other services |
| **Typical Uses** | • SEN to facilitate fiat transfers [1]<br>• API to attribute fiat transfers [2]<br>• Cash management<br>• Deposit accounts to hold investor funds and operating funds | • SEN to transfer fiat to digital currency exchanges and traditional bank accounts [1]<br>• Cash management<br>• Deposit accounts to hold investor funds | • SEN to facilitate fiat transfers [1]<br>• Cash management<br>• Deposit accounts to hold operating funds |
| **Noteworthy metrics** | Silvergate's customers include the 5 largest U.S. domiciled digital currency exchanges [3] | Silvergate's customers have transferred approximately $9 billion in fiat quarterly since January 1, 2018 [4] | Silvergate's customers have raised over $1 billion through private placements |
| **Number of Customers** | 35 | 339 | 109 |
| **Total Deposits** | $792.9 million | $572.7 million | $227.5 million |
| **Select Customers** | | | |

(1) SEN transfers are funds transfers within the Bank's deposit system from one SEN participant to another SEN participant.
(2) This refers to the attribution of funds received by a SEN API user within its own platform on a programmatic basis without manual human interaction, based on the user's integration of the Bank's API into the user's own systems.
(3) Based on data reflecting U.S. dollar 30 day trading volume as of October 1, 2018 from coinmarketcap.com.

51. SEN clients can transfer fiat currency from one SEN account to another either via Silvergate's online banking system, or via its proprietary, cloud-based Application Programming Interface, or API.[5] Though money is transferred from one SEN account to another through a traditional

---

[5] An API is a set of definitions and protocols for building and integrating application software that lets a product or service communicate with other products and services without having to know how those other products or services are implemented. Essentially, an API is a communication tool between software applications.

CLASS ACTION COMPLAINT

intrabank funds transfer enabled through Silvergate's online banking data processing system,[6] SEN facilitates the transfer by using its API to instantly notify one accountholder when another has sent funds. Because both parties to the transaction must be SEN members and Silvergate bank account holders, the API is effectively making a notational entry in Silvergate's internal ledger then notifying the parties of that entry and thereby acting as a trusted intermediary.

52.    As Silvergate explained in its Registration Statement, "digital currency exchanges that integrate our API into their technology infrastructure can attribute incoming client funds, at scale, without human involvement and in virtually real-time, typically within a matter of seconds."

53.    In addition, one of the challenges in cryptocurrency is exchanging fiat currency, such as U.S. dollars, for cryptocurrency—a process called "on-ramping." The SEN facilitates on-ramping. In a June 2022 interview, Lane explained:

> And so if, if somebody wants to purchase USDC from Circle, what they would do is they would send dollars into Circle's bank account at Silvergate, and when those dollars hit the bank account, then at that moment there is an API call from Silvergate to Circle that says, we just received X amount of dollars from this customer, and at that point Circle knows we have the dollars in our possession, so they turn around and they mint the USDC token and send it to the wallet address of that institution that is looking to purchase the USDC.
>
> And then the same thing happens in reverse. So, um, if someone wants to redeem their USDC and go back to U.S. dollars, they send the USDC to the wallet at Circle. Circle at that point, once they have possession of the USDC, they then send an instruction to us via API and we then in turn will send a dollar back to that prior USDC token holder.

**D.    The Growth in Silvergate's SEN Use, Deposits, and Revenue**

54.    The SEN grew rapidly after its launch in 2018.

55.    From the fourth quarter of 2018 to the fourth quarter of 2019, volume on the SEN increased 150% to 14,400 transactions, representing $9.6 billion. And as shown below, annual SEN transactions grew from $32.7 billion in 2019 to a $787.4 billion, a growth of more than 2,700% in two years.

---

[6] Silvergate's Registration Statement says that SEN "is simply the means by which internal account transfer transaction instructions are passed to the Bank's core banking system through which they are executed."

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8

 

9   56.   Silvergate's revenue from fees charged for those transactions increased as well, as
10  shown below.

11
12
13



14
15
16
17
18

19  57.   According a securities filing by Silvergate: "The SEN is a central element of the
20  operations of our digital currency related customers, which enables us to grow with our existing
21  customers and to attract new customers who can benefit from our innovative solutions and services."
22  Silvergate's growth is illustrated below.

23
24
25
26
27
28

CLASS ACTION COMPLAINT



58. Silvergate's growth in digital currency customers served Mr. Lane's goal of growing its deposits. Deposits from Silvergate's cryptocurrency clients are non-interest-bearing, allowing Silvergate to deploy the full amount of those deposits in making other investments. As Silvergate explained in its Registration Statement, this provides it "a distinctive advantage over most traditional financial institutions" in that it "allows [Silvergate] to generate revenue from a conservative portfolio of investments in cash, short term securities and certain types of loans . . . ."

59. Silvergate's focus on crypto clients drove "the Bank's funding costs to among the lowest in the U.S. banking industry," which "allowed [Silvergate] to generate attractive returns on lower risk assets through increased investments in interest earning deposits in other banks and securities, as well as funding limited loan growth."

60. In its Registration Statement, Silvergate illustrated its growth in noninterest bearing deposits as follows:



61.     By the end of September 2022, Silvergate's crypto-derived, noninterest bearing deposits were 90% of the bank's overall deposit base, amounting to $11.9 billion. And of that, FTX alone constituted nearly 10% of the $11.9 billion in deposits, or about $1.2 billion. As a result, Silvergate's profits grew even when traffic on SEN slowed in 2022.

62.     And because SEN continually attracted new clients and deposits, Silvergate's overall revenue also grew, resulting in increasingly greater profits as operating costs stabilized, as illustrated below.



### E. The FTX Exchange

63. The FTX group of companies was founded in 2019 and began as an exchange or marketplace for the trading of cryptocurrency assets. Until declaring bankruptcy, the FTX companies operated a multi-billion-dollar mobile application cryptocurrency investment service that offered trading in various options, futures, swaps, and other digital commodity derivative products. FTX also offered various services related to cryptocurrency trading. For example:

- FTX maintained a spot market on which FTX customers could trade cryptocurrency with other FTX customers in exchange for money or other cryptocurrency;

- FTX maintained spot-margin trading services, which enabled FTX customers to borrow against collateral in their FTX accounts and trade or lend cryptocurrency in their accounts to other FTX customers for purposes of executing trades; and

- FTX maintained an over-the-counter service that allowed investors to request quotes for spot cryptocurrency assets and to carry out trades.

- FTX served as a platform for the purchase and sale of crypto futures contracts.

64. Customers were able to access the FTX platform through the FTX website, FTX.com, as well as through its popular mobile app. The stated objective of FTX was to build a digital-asset trading platform and exchange to promote a better user experience, customer protection, and innovative financial products.

65. Regarding deposits of fiat currency, FTX's Terms of Service provided that "the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods," and "Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money ("E-Money"), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account." However, this "E-MONEY IS NOT LEGAL TENDER." Nevertheless, "You may redeem all or part of any E-Money held in your Account at any time . . . . Unless agreed otherwise, funds will be transferred to the bank account you have registered with us."

CLASS ACTION COMPLAINT

66. Signing up for FTX was simple. FTX did not require its users to validate their identities by providing official identification documents. In fact, as shown in the below screenshot of FTX's website in or around late 2019, to sign up, an FTX user was not required to provide even the most basic identifying information, such as name, date of birth, address, or other identifiers.



67. As a result, users were able to create and fund FTX accounts with nothing more than an email address. This meant accounts on FTX could easily be opened anonymously, including by customers in the United States.

68. FTX grew rapidly after its founding in 2019. As of 2021, FTX stated that it held approximately $15 billion in assets across its platforms.

69. As it raised money from investors, Bankman-Fried, his agents and affiliates continuously highlighted to the public the safe nature of the platform and its products. FTX touted automated risk mitigation procedures, including a program that calculated a customer's margin level every 30 seconds and automatically liquidated assets if collateral fell below a certain threshold. Bankman-Fried stated repeatedly that FTX and its customers were protected from others' losses due to this auto-liquidation program.

70. Bankman-Fried represented that FTX offered "complete transparency about the positions that are held [and] a robust, consistent, risk framework."

CLASS ACTION COMPLAINT

71.     Similarly, FTX's terms of service assured investors they owned and controlled assets they placed on the exchange. Those terms stated unequivocally that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading." The terms further provided that "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading" and that "You control the Digital Assets held in your account. At any time, subject to outages, downtime, and other applicable policies . . . you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."

72.     FTX also solicited investments that were purportedly loans to be used on the FTX.com exchange to purchase crypto assets that would generate promised returns. Investors purchased FTT tokens (FTX's proprietary token) on the understanding that FTX, using part of its profits, would buy back the tokens at various times.

73.     FTT tokens and other FTX digital assets were not registered with any U.S. jurisdiction or regulatory authority. Unconstrained by U.S. securities law, FTX marketed vaguely described crypto investments as delivering "HIGH RETURNS WITH NO RISK":

**Investment offerings**

**PACKAGES**

We offer one investment product:

**15% annualized fixed rate loans** (no lockup)

We can accept both fiat and crypto and can pay interest denominated in either. We can take on another $200m in capital and still achieve returns that beat traditional and crypto markets.

For investors with specific risk profiles, we are happy to discuss custom packages. For investments of $50m or more, we are willing to discuss higher rates of return.

**HIGH RETURNS WITH NO RISK**

These loans have **no downside** – we guarantee full payment the principal and interest, enforceable under US law and established by all parties' legal counsel. We are extremely confident we will be pay this amount. In the unlikely case where we lose more than 2% over a month we will give all investors the opportunity to recall their funds and we will still guarantee full repayment.

74.     Relatedly, in furtherance of its rapid fundraising, FTX deployed an aggressive, celebrity-fueled marketing campaign, which included well-known sports and entertainment figures such as Tom

Brady, Gisele Bundchen, Shaquille O'Neal, Steph Curry, and others. FTX also obtained the naming rights to the Miami Heat's venue and formalized a partnership with the Golden State Warriors.

**F.      Alameda**

75.      Bankman-Fried founded Alameda Research, LLC ("Alameda")—a quantitative trading firm specializing in cryptocurrency assets—in 2017, before founding FTX. Alameda was headquartered at 2000 Center Street, Suite 400, in Berkeley, California, and was named after Alameda County.

76.      Alameda initially focused mostly on high frequency arbitrage trading through which the company sought to exploit price differences for the same or similar assets across various digital-asset platforms. Later, Alameda undertook other strategies, such as market making, pooling cryptocurrency assets in exchange for interest, volatility trading, and eventually, taking large equity stakes in various digital-asset companies.

77.      According to Alameda, within a year of its founding, it had "become the largest liquidity provider and market maker in the [digital] asset space," and traded "$600 million to 1 billion a day" which it said was "roughly 5% of global volume in digital asset trading."

78.      Bankman-Fried operated as the majority owner of Alameda at all relevant times, and was the CEO of Alameda until fall 2021. Even after that, Bankman-Fried continued to control Alameda, remaining a signatory on its bank accounts and maintaining decision-making authority over all of its trading, investment, and financial decisions.

**G.      Bankman-Fried Used Alameda to Misappropriate FTX Investor Funds**

79.      Throughout the period in which FTX was raising investor funds, Bankman-Fried made repeated public statements assuring investors that their FTX assets were safe, tweeting, for example: "Backstopping customer assets should always be primary. Everything else is secondary"; and "As always, our users' funds and safety comes first. We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

80.      Likewise, Bankman-Fried, individually, and through his agents and employees, made a point of publicly maintaining that there were circuit breakers in place to ensure the separation of

CLASS ACTION COMPLAINT

Alameda and FTX, and to protect against Alameda's preferential treatment on the FTX platform. Bankman-Fried's public statements regarding this purported FTX/Alameda separation include:

- To the *Wall Street Journal*: "There are no parties that have privileged access";
- To *Bloomberg*: "Alameda is a wholly separate entity" and "We're at arm's length and don't get any different treatment from other market-makers."

81. In like vein, during an August 2022 media appearance, Alameda's CEO described a purported firewall between FTX and Alameda:

> They're both owned by Sam, obviously. So ultimately, sort of aligned incentives in that way. We keep them quite separate in terms of day-to-day operations. We definitely have a Chinese wall in terms of information sharing to ensure that no one in Alameda would get customer information from FTX or anything like that, or any sort of special treatment from FTX. They really take that pretty seriously.

82. Even after the FTX bankruptcy, Bankman-Fried claimed to *The New York Times* that "Alameda is not, like, a company that I monitor day-to-day." He similarly claimed to *New York Magazine* that Alameda is "not a company I run. It's not a company I have run for the last couple years."

83. In truth, far from "walling off" Alameda from FTX, following its collapse FTX represented to the Bankruptcy Court at the first-day hearing that Bankman-Fried ran this global multibillion-dollar business as a "personal fiefdom." FTX and Alameda also shared office space, first in Berkeley, California and later in Hong Kong and the Bahamas, as well as sharing key personnel, hardware, technology, and intellectual property. In addition, Bankman-Fried and other senior executives at FTX and Alameda had widespread access to each other's systems and accounts.

84. Bankman-Fried used the lack of separation between FTX and Alameda to misappropriate FTX customer funds. From FTX's inception in May 2019, through the time FTX collapsed and entered bankruptcy on November 11, 2022, Bankman-Fried and his associates improperly diverted FTX customer assets to Alameda, which used the funds to: (1) invest directly in cryptocurrencies; (2) extend billions of dollars in "loans" to Bankman-Fried and other insiders (which

in turn paid for political donations and funded lavish lifestyles); and (3) acquire crypto businesses, some of which were failing.

85. One of the primary ways in which Bankman-Fried and his associates carried out their scheme was by directing FTX customers to wire or otherwise deposit fiat currency into Silvergate bank accounts held and controlled by Alameda. Silvergate had actual knowledge of and carried out these improper actions.

86. When FTX launched, it did not have the requisite bank accounts to accept and hold customer funds, in part because cryptocurrency exchanges are subject to more stringent due diligence requirements than are other industry participants, like hedge funds. As a result, and at Bankman-Fried and FTX's direction, from the start of FTX's operations in around May 2019 and continuing into 2022, FTX customers deposited fiat currency—billions of dollars' worth—into bank accounts that were controlled by Alameda.

87. To facilitate the misappropriation of FTX funds into Alameda accounts, on December 17, 2019, Bankman-Fried formed and registered Alameda Research Ltd., as British Virgin Islands (BVI) limited corporation, with a corporate address in Tortola, BVI ("Alameda Ltd."). Shortly thereafter, Alameda Ltd. opened at least three bank accounts with Silvergate Bank. Although Alameda Ltd. was a BVI company purportedly headquartered in Tortola, it operated as an alter ego of Alameda's, and was operated by the same persons, including Bankman-Fried, out of Alameda's Berkeley, California offices.

88. Once funds intended for customers' FTX accounts were deposited into Alameda bank accounts, FTX personnel monitoring the Alameda bank accounts would manually credit the depositing customer's FTX account on the FTX internal ledger system using the NONLEGAL TENDER that FTX invented for this purpose, its so-called "E-Money." The purpose of E-Money was for FTX to avoid the transfer of actual value from Alameda's accounts to its own.

89. The E-money credits on customers' FTX accounts were notational only. While customers accessing their FTX accounts would be able to observe on the exchange's website or mobile app that their funds had been posted to their FTX accounts—and believed they were then effectively

CLASS ACTION COMPLAINT

segregated for their benefit per the Terms of Service—the funds in fact remained in Alameda's accounts.

90. At Alameda's direction, Silvergate commingled the FTX funds with its other assets, allowing Alamenda in turn to use them to finance its trading operations and other Bankman-Fried ventures, including payments to celebrity pitchmen and purchases of luxury real estate.

91. Among other investments, Alameda used FTX customer funds to prop up the value of FTX's own cryptocurrency, the FTT token, which grants holders a discount on trading fees on the FTX exchange. A large percentage of Alameda's balance sheet was held in FTT tokens.

92. FTX also granted Alameda several unique exceptions that allowed Bankman-Fried to carry out his scheme:

- Alameda was exempted from FTX's auto-liquidation feature, meaning it was permitted to maintain a negative balance in its account with no collateral. It was the only account afforded that treatment.

- Bankman-Fried directed FTX to increase Alameda's negative balance cap, effectively providing it with an uncapped line of credit, through which it could use other FTX customer funds for its own trading activities. No other FTX account was granted a similar line of credit.

93. The scheme began to unravel when Alameda became unable to pay debt incurred through billions of dollars in loans that Bankman-Fried caused Alameda to borrow from third-party cryptocurrency lenders to fund his investments and for personal use. Specifically, when the cryptocurrency market began to decline precipitously in 2022, several of these lenders demanded repayment from Alameda, and because Alameda had no assets to pay them back, Bankman-Fried caused Alameda to draw on its FTX credit line, resulting in Alameda owing billions of dollars to FTX.

**H. The FTX Scheme Collapses**

94. The FTX scheme ended in November 2022 when the scale of the fraud became apparent to the market. The chain of events leading to FTX's swift collapse was set in motion on November 2,

CLASS ACTION COMPLAINT

2022, when CoinDesk, a crypto news website, published an article stating that based on its review of an Alameda balance sheet it had obtained, Alameda held a large position in FTT and other FTX tokens.

95.     In response, on November 6, 2022, Caroline Ellison, then CEO of Alameda, tweeted:

A few notes on the balance sheet info that has been circulating recently:

- that specific balance sheet is for a subset of our corporate entities, we have > $10b of assets that aren't reflected there

- the balance sheet breaks out a few of our biggest long positions; we obviously have hedges that aren't listed

- given the tightening in the crypto credit space this year we've returned most of our loans by now

96.     The same day, on November 6, 2022, Changpeng "CZ" Zhao, the CEO of Binance, a cryptocurrency trading platform, liquidated $530 million of FTT. Other customers then raced to pull out: over the course of 72 hours investors sought to withdraw an estimated $6 billion from FTX, placing the company under severe financial pressure.

97.     Seeking to reassure the market, Ellison tweeted at CZ: "@cz_binance if you're looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!" This offer was misleading: Alameda did not have sufficient funds to purchase Binance's entire stake in FTT at a price of $22 per token without further borrowing.

98.     On or about November 7, 2022, Bankman-Fried tweeted: "FTX is fine. Assets are fine . . . FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be . . . ." This tweet was false. FTX was insolvent, and client assets had been misappropriated to fund Alameda's speculative investments. Withdrawals would be stopped repeatedly over the next few days. Bankman-Fried deleted this tweet within two days.

99.     On November 8, 2022, FTX paused all customer withdrawals. In response, the price of FTT decreased approximately 80%. Since much of Alameda's collateral for its loans from FTX was in the form of FTT, this decrease in the value of FTT left the loans undercollateralized. At the same time,

since Alameda's speculative investments had been going bad for months, Alameda was unable to repay the loans. FTX's loans to Alameda became unrecoverable.

100.    The same day, on November 8, 2022, Bankman-Fried announced that Binance would acquire FTX, and the price of FTT briefly rallied. But the next day, November 9, 2022, Binance announced it would not proceed with the transaction, citing its due diligence findings and reports of mishandled customer funds by FTX. The price of FTT plummeted again.

101.    Bankman-Fried later admitted in a Substack post that by November 8, 2022, Alameda and one of the larger FTX entities were "clearly insolvent." In a draft of testimony to Congress that was never delivered, Bankman-Fried wrote that "[s]tarting on November 8th, I was put under extreme pressure to file for Chapter 11."

102.    On November 10, 2022, the Securities Commission of The Bahamas froze the assets of FTX's international arm FTX Digital Markets. FTX halted all trading and withdrawals.

103.    On November 11, 2022, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO. The bankruptcy filing includes all 130 companies under the FTX umbrella, as well as the trading firm Alameda.

104.    John J. Ray, who oversaw Enron following its accounting scandal in 2007, became CEO. After reviewing FTX's books and records, Ray declared that "never in my career have I seen such an utter failure of corporate controls at every level of an organization, from the lack of financial statements to a complete failure of any internal controls or governance whatsoever."

105.    Ray stated that FTX "failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money" and that the "[c]ash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners around the world." Ray noted "[t]he ability of Alameda, the crypto hedge fund within the FTX Group, to borrow funds held at FTX.com to be utilized for its own trading or investments without any effective limits."

106.    Further, Ray stated "we know" that "customer assets from FTX.com were commingled with assets from the Alameda trading platform," that Alameda "used client funds to engage in margin

trading which exposed customer funds to massive losses," and that "loans and other payments were made to insiders in excess of $1 billion."

107.     On November 10th, in the midst of FTX's collapse, Bankman-Fried admitted to culpability in a series of Twitter exchanges with reporters and investors:



108.     In the same series of tweets, Bankman-Fried blamed "a poor internal labeling of bank-related accounts." When asked how FTX customer deposits ended up in Alameda's accounts, Bankman responded that his exchange platform did not originally have a bank account, so customers were directed to wire money to *Alameda's* account with Silvergate in exchange for the commodity assets on FTX.

109.     According to Bankman-Fried, executives at the company "forgot" about this irregular depositing arrangement right up until the company imploded: "[I]t looks like people wired $8b to Alameda and 'oh god we basically forgot about the stub account that corresponded to that and so it was never delivered to FTX.'"

110.     Similarly, in a recent interview, Bankman-Fried sought to downplay his conduct as an error or oversight:

> There was a F*** up, I was incorrect on Alameda's balances on FTX by a fairly large number,
> an embarrassingly large one and it was because of a, like, very poorly labeled accounting thing,
> which was a historical artifact of a time before FTX had bank accounts and the result of that
> was basically there was a time back yonder when people would wire money to Alameda and

then actually credited on FTX. This . . . got screwed up and that was like a pretty big miss and that meant Alameda was substantially more levered than I thought it was.

111. Bankman-Fried also told an investor that more than $10 billion in loans remains outstanding.

112. By the 21st tweet in the November 10th series, Bankman-Fried was offering disclaimers:



## I. The Fallout

113. On December 12th, Bankman-Fried was arrested in the Bahamas on the basis of an indictment filed by the U.S. Attorney's Office for the Southern District of New York. The criminal charges against Bankman-Fried include wire fraud, securities fraud, money laundering, and conspiracy to commit wire fraud and securities fraud.

114. On December 13th, the Securities and Exchange Commission filed a civil action against Bankman-Fried for securities fraud in the Southern District of New York, alleging in part:

- "[F]rom the start, Bankman-Fried improperly diverted customer assets to his privately-held crypto hedge fund . . . and then used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations" and "sank billions of dollars of customer funds into speculative venture investments."

- "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw down from a virtually limitless 'line of credit' at FTX, which was funded by FTX customer assets."

CLASS ACTION COMPLAINT

- "The FTX funds transferred to Alameda were used not only for Alameda's proprietary trading, but also to fund loans to FTX executives, including Bankman-Fried himself, and to fund personal real estate purchases. Between March 2020 and September 2022, Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338 billion, including two instances in which Bankman-Fried was both the borrower in his individual capacity and the lender in his capacity as CEO of Alameda."

- "Bankman-Fried also used commingled funds from Alameda to make large political donations and to purchase tens of millions of dollars in Bahamian real estate for himself, his parents, and other FTX executives."

- "[O]n or about July 22, 2022, Bankman-Fried loaned himself $136 million."

115. Also on December 13th, the Commodity Futures Trading Commission filed a complaint against Bankman-Fried, FTX, and Alameda containing similar allegations concerning the scheme.

116. The same day, John J. Ray (who, as noted, serves as FTX's CEO in bankruptcy) testified to the House Financial Services Committee that, despite the relatively new cryptocurrency markets involved, FTX committed "really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose. Not sophisticated at all—sophisticated, perhaps, in the way they were able to sort of hide it from people, frankly, right in front of their eyes."

117. On December 14, 2022, Bahamian authorities revealed in court filings that on November 9, 2022, Ryan Salame, then the CEO of FTX Digital Markets, told the Securities Commission of the Bahamas that FTX was sending customer funds to Alameda and that only three people had the access required to conduct these transfers: Bankman-Fried; Gary Wang, FTX's former Chief Technology Officer and co-founder of Alameda and FTX; and Nishad Singh, FTX's former Director of Engineering.

118. On December 19, 2022, the U.S. Attorney's Office for the Southern District of New York filed sealed criminal charges against Ellison and Wang. The charges against each included conspiracy to commit wire fraud on customers, wire fraud on customers, conspiracy to commit

CLASS ACTION COMPLAINT

commodities fraud, and conspiracy to commit securities fraud. Both pleaded guilty to all charges and agreed to cooperate with investigators. On December 22, 2022, the charges were unsealed.

119. On December 21, 2022, the SEC and CFTC filed complaints and stipulated judgments against Ellison and Wang. As part of their stipulations with the SEC and CFTC, Ellison and Wang admitted the truth of the SEC's and CFTC's allegations. The SEC alleged:

- "From at least May 2019 through November 2022, Defendants, together with Samuel Bankman-Fried ("Bankman-Fried") and others, engaged in a scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), the crypto asset trading platform of which Bankman-Fried and Wang were co-founders, at the same time that they were also defrauding the platform's customers. FTX raised more than $1.8 billion from investors, including U.S. investors, who bought an equity stake in FTX believing that FTX had appropriate controls and risk management measures. Unbeknownst to those investors (and to FTX's trading customers), Bankman-Fried was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire."

- "Bankman-Fried and Wang improperly diverted customer assets to Alameda Research LLC and its subsidiaries ("Alameda"), the crypto asset hedge fund that they had founded and co-owned and that Ellison ran. Wang created and participated in the creation of the software code that allowed Alameda to divert FTX customer funds. Ellison, in turn, used the misappropriated FTX customer funds for Alameda's trading activity. And Bankman-Fried used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations."

- "From the inception of FTX, Defendants and Bankman-Fried diverted FTX customer funds to Alameda, and continued to do so until FTX's collapse in November 2022."

- "Defendants and Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to

draw down from a virtually limitless "line of credit" at FTX, which was funded by FTX customer assets."

- "Bankman-Fried then used Alameda as his personal piggy bank to buy luxury condominiums, support political campaigns, and make private investments, among other uses. Ellison used these funds for Alameda's operations, including speculative trading strategies and servicing Alameda's debt to third-party lenders. Defendants knew that none of this was disclosed to FTX equity investors or to the platform's trading customers."

- "From its inception, FTX had poor controls and fundamentally deficient risk management procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Alameda, FTX, and executives, including Bankman-Fried, Wang, and Singh. This reality was a sharp contrast to the image of FTX that Bankman-Fried consistently portrayed to the public and to investors—a mature company that managed funds and risk in a conservative, rigorous manner."

120.   The CFTC alleged:

- "When FTX customer assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX customer accounts with the corresponding amount of fiat currency on FTX internal ledger system. Customers accessing their FTX accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX accounts, even though the fiat deposits actually remained in Alameda-controlled bank accounts."

- "The use of customer assets by Alameda was not authorized by FTX customers, and FTX customers were not made aware that their assets were being used by Alameda. To the contrary, FTX's Terms of Service expressly prohibited such use of customer assets."

- "On the morning of November 9 at approximately 10 AM ET, . . . Ellison held an "all-hands" meeting with Alameda staff. In that meeting, Ellison acknowledged that earlier

CLASS ACTION COMPLAINT

that year, she, Bankman-Fried and other individuals had decided to use FTX customer

assets to pay Alameda's debts, and that Wang and another FTX executive were aware of

this. . . . In response to an employee question, Ellison also acknowledged that her

November 6 tweet to the Binance CEO offering to buy his FTT holdings at $22 per

token was "kind of a misleading thing to tweet" and expressed remorse. Shortly after

this meeting, most of Alameda's staff resigned."

121.    Collectively, the guilty pleas and consent judgments show that FTX employees

committed crimes in furtherance of an unlawful scheme to defraud investors, who lost billions of

dollars.

122.    Investigations are ongoing, and further details about the scheme are expected to be

revealed.

**J.    Silvergate's Complicity in the FTX Scheme**

123.    Following FTX's collapse, significant questions about Silvergate's role in the failed

FTX crypto enterprise have been raised both on Wall Street and in Congress.

124.    On November 15th, 2022, Marcus Aurelius Value, an investment research firm, tweeted

that "[r]ecently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto

bank accounts to South American money launderers. Affidavit from investigation into crypto crime

ring linked to smugglers/drug traffickers."

125.    On November 17th, 2022, the investment newsletter *The Bear Cave* released a report

entitled "The Great Crypto Collapse" that discussed in part Silvergate's involvement in crypto markets.

The report notes an "alarming" August 2022 forfeiture application for probable cause filed in Broward

County, Florida that asserts Silvergate's link to a money laundering operation. According to that court

filing, portions of which the report reproduces, "Records produced by Silvergate Bank found: (i)

During the period of September 2021 to June 2022 ten companies had transferred a total of over $425

million dollars off these cryptocurrency trading platforms into accounts held at different US banks. (ii)

The accounts were receiving funds in the same pattern as those . . . used to facilitate the laundering of

illicit funds."

126.    On December 1st, 2022, *The Bear Cave* issued a further report raising additional concerns about Silvergate's role in illegal transfers related to crypto currency. That report highlights a July 2021 plea agreement filed in the Middle District of Florida stating that the convicted defendant, Joel Greenberg, wired "$200,000 from the account of the Tax Collector's Office at Florida Capital Bank to Silvergate Bank" in order to buy cryptocurrency for himself. "Greenberg quickly spent the $200,000 in multiple purchases of cryptocurrency," the plea agreement states. "Greenberg engaged in more than 40 transactions over the course of about four days" and then withdrew almost all of the cryptocurrency from the Silvergate account.

127.    On December 5th, 2022, investment bank Morgan Stanley downgraded Silvergate's investment rating, explaining that Silvergate's ability to make money may be impaired by the continued stress in crypto markets caused by FTX's bankruptcy.

128.    Silvergate also faces Congressional inquiries. A December 5th letter signed by Sens. Elizabeth Warren (D-MA) and John Kennedy (R-LA) and by Rep. Roger W. Marshall (R-KS) posed a series of questions to Alan Lane regarding Silvergate's relationship with the FTX complex, after noting the direct funds transfers from FTX's client account at Silvergate to the accounts of Alameda and other entities under Bankman-Fried's control. Silvergate's "involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor . . . suspicious financial activity," the letter states. In expressing concern over Silvergate's "role in facilitating the improper transfer of FTX customer funds to Alameda," the letter notes that "Silvergate's failure to take adequate notice of this scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program."

129.    A subsequent December 7th letter to Federal Reserve Chair Jerome Powell from Senators Warren and Tina Smith (D-MN) highlights an $11.5 million investment that Alameda made in Moonstone Bank, an amount "more than double the bank's worth at the time." The investment could be seen as a move by FTX to gain access to the bank without owning a U.S. banking license. A former president of the Independent Community Bankers of America is quoted in the letter as saying that

1  "[t]he fact that an offshore hedge fund that was basically a crypto firm was buying a stake in a tiny

2  bank for multiples of its stated book value should have raised massive red flags."

3       130.    Silvergate CEO Alan Lane responded to the Congressional letter on December 19, 2022.

4  He wrote that "Silvergate is fully committed to complying with its Bank Secrecy Act (BSA) and Anti-

5  Money Laundering (AML) obligations. Mr. Lane confirmed that Silvergate "conducted significant due

6  diligence on FTX and its related entities, including Alameda research . . . ."

7       131.    In the same letter, Mr. Lane refused to answer several questions focused on its

8  knowledge of the FTX fraud on confidentiality grounds, including:

- "Why did your bank's BSA compliance program fail to identify [that FTX was directing its customers to wire money to Alameda's account] as a reportable concern?";

- "Did your bank's BSA compliance program fail to identify [the movement of funds to Alameda accounts or between Alameda accounts and FTX or FTX-affiliate accounts] as suspicious?"

- "[P]lease provide the results of all [independent audits of Silvergate's BSA/AML compliance program."; and

- "Did Silvergate have any communications with representatives from Alameda, FTX, or FTX-affiliated entities regarding concerns about the transfer of funds into Silvergate?"

18       132.    Senators Warren, Kennedy, and Marshall responded on January 30, 2023, and expressed

19  disappointment by Mr. Lane's "evasive and incomplete response to our December 5, 2022 letter

20  regarding Silvergate Bank's role in the improper transfer of FTX customer funds to cryptocurrency

21  hedge fund Alameda Research." The Senators rejected Mr. Lane's reference to confidentiality, stating

22  that "the public need and deserve the information necessary to understand Silvergate's role in FTX's

23  fraudulent collapse . . . ." The Senators then requested complete answers to their questions by February

24  13, 2013. No response is currently publicly available.

25       133.    In separate seizures on January 11 and 19, 2023, the U.S. government seized about $100

26  million from Silvergate Bank accounts held in the name of FTX Digital Markets.

CLASS ACTION COMPLAINT

### 1.  Silvergate's Mutual Interests and Alignment with FTX/Alameda

134.  FTX/Alameda was one of Silvergate's most important customers, and their business operations and interests were tightly entwined. Silvergate profited from deposits by digital-asset customers, which grew exponentially as FTX's own business expanded. Out of Silvergate's approximately 1,500 customers, FTX alone accounted for approximately 10% of Silvergate's deposits.

135.  Until its collapse, Silvergate's website even showed an endorsement from Bankman-Fried stating that "[l]ife as a crypto firm can be divided up into before Silvergate and after Silvergate— it's hard to overstate how much it revolutionized banking for blockchain companies."

136.  Silvergate had a strong incentive to continue accepting FTX/Alameda customer deposits and executing transfers and taking other actions in furtherance of the FTX/Alameda scheme. Silvergate earned increased profits in conjunction with the accelerating use by customers of the FTX exchange platform and app. Silvergate earned income from transaction fees as well as from investing capital derived from its FTX accounts.

137.  Silvergate held its initial public offering on November 7, 2019. Before it went public and retained FTX as a client in 2019, Silvergate had an annual net income of $7.6 million. By 2021 its net annual income had increased to $75.5 million. Silvergate's business and profits grew in tandem with those of FTX and Alameda.

138.  After closing at $12.50 per share on the day of its IPO, the price of Silvergate stock skyrocketed to $219.75 per share as of November 15, 2021. By December 9, 2022, following FTX's collapse, Silvergate shares had dropped back down to $21.43.

139.  In a public letter issued December 5, 2022, Lane acknowledged "the apparent misuse of customer assets and other lapses of judgment by FTX and Alameda Research."  The misuse of customer assets could not have occurred without the active participation of Silvergate.

### 2.  Silvergate's Knowledge and Participation in the FTX Fraud

140.  Silvergate's actions and inaction were integral to Bankman-Fried's enterprise. Numerous accounts held by his companies—including FTX Ltd., FTX US, and Alameda—were held at

CLASS ACTION COMPLAINT

Silvergate Bank. Bankman-Fraud's fraud and the financial details concerning his FTX/Alameda companies occurred in plain sight of Silvergate.

141. Silvergate's duty of due diligence in relation to FTX/Alameda was especially strong because Silvergate advertised Bankman-Fried on its website.

142. Lane acknowledged these duties, stating that, "For each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds. Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage."

143. Mr. Lane also specifically acknowledged and also in a December 5, 2022 public filing titled "Public Letter from Silvergate Capital Corporation Chief Executive Officer Alan Lane" that: "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above."

144. Similarly, in his December 19, 2022 response to the congressional letter, Mr. Lane affirmed that "Silvergate has instituted and consistently updates and improves, a robust compliance and risk management program that spans the life cycle of each client." Mr. Lane, moreover, confirmed that "we determine the beneficial owner, the source of funds, and the purpose and expected use of funds for each and every account we open." He also confirmed that the bank "monitors transaction activity for every account and identifies activity outside of the expected usage."

145. Lane's letter further represented that "Silvergate conducted significant due diligence on FTX and its related entities, including Alameda Research, both during the onboarding process and through ongoing monitoring."

146. In addition to developing, implementing, and maintaining an effective anti-money laundering program, similar to its obligation as a bank, see 31 C.F.R. §§ 1022.210(a) &According to Silvergate's public filings with the Securities and Exchange Commission, the company "invested heavily in [its] risk management and compliance infrastructure," and "attracted a talented, dedicated compliance team with substantial experience in regulated financial institutions, including developing,

CLASS ACTION COMPLAINT

implementing and monitoring systems to detect and prevent financial crimes." This team "developed a strong risk management and compliance framework that leverages technology for onboarding and monitoring market participants." These "proprietary compliance procedures, developed over five years of serving the digital currency industry," were "designed to enable [Silvergate] to prudently and efficiently establish deposit accounts for market participants."

147.    More specifically, Silvergate "comprehensively investigates the customers it proposes to onboard according to the level it deems necessary and appropriate, based on whether the customer is an 'administrator,' an 'exchanger' or a 'user' of virtual currencies" as "defined in March 2013 guidance by the U.S. Treasury Department . . . ."

148.    According to Silvergate, "at a minimum," its "due diligence and onboarding processes include . . . detailed reviews of each customer's ownership, management team, business activities and geographies in which they operate."

149.    Moreover, "[f]or customers such as exchanges which pose a higher degree of risk or have a higher degree of regulatory obligations, [Silvergate's] processes are more extensive and incorporate reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

150.    As a result of enhanced due diligence procedures performed while onboarding Alameda, FTX, and related entities, and performing ongoing monitoring over those entities, Silvergate obtained extensive information relating to the ownership and business of each Alameda- or FTX-related entity. Silvergate periodically required Alameda, FTX, and related entities to update this information.

151.    As noted above, the FFIEC Manual describes certain "red flags" that indicate possible money laundering or other misconduct, for which banks must monitor. Included in the FFIEC Manual's list are the following "red flags," all of which were present in the transactions and activity in the FTX/Alameda accounts held at Silvergate:

CLASS ACTION COMPLAINT

- "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."
- "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."
- "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."
- "Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers."
- "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."
- "A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity."
- "Customer uses a personal account for business purposes."
- "Unusual use of trust funds in business transactions or other financial activity."

152. Those are not the only red flags relevant to FTX/Alameda's operations and transactions. Neither FTT nor any other FTX crypto asset was ever registered with any U.S. jurisdiction or regulatory authority.

153. Nor did FTX/Alameda ever have financial statements audited or show Silvergate any audited financial statements.

154. Moreover, Silvergate accepted several billion dollars from FTX customers, intended to be lodged or traded on the FTX crypto exchange, for deposit into an account held by a separate entity, Bankman-Fried's hedge fund Alameda. This massive commingling of funds was carried out via transactions that Silvergate's internal monitoring systems should have brought to the attention of the bank's compliance and risk management personnel.

155. It also was apparent to Defendants that numerous wires sent to Bankman-Fried's Alameda trading account actually were earmarked for deposit to FTX for trading on its exchange. It is highly unusual for a hedge fund to receive the high volume of relatively small deposits, from a large

CLASS ACTION COMPLAINT

number of distinct individuals, that Alameda received through its account at Silvergate. The bank

nonetheless permitted what were clearly incoming investor funds, denominated in miscellaneous

amounts, to be deposited with Bankman-Fried's own hedge fund and commingled with Alameda's

assets.

156. Further, the increasing and uncapped loan "margin" that FTX extended to Alameda,

through their respective Silvergate accounts, relied on impermissible related-party transactions that the

bank repeatedly knew about and processed.

157. In still another suspect related-party transaction, Bankman-Fried made Alameda a

"licensor" to FTX such that FTX paid approximately $400 million in investor funds to Alameda,

through their Silvergate accounts, purportedly for technology that would be used to optimize the

FTX.com exchange platform and app.

158. Defendants' decision to accept customer deposits and execute transfers at the direction

of FTX/Alameda, and Defendants' other acts and omissions directly in furtherance of the scheme

described herein, carried out through Silvergate bank accounts, and other means and facilities, were the

cause of the investment losses of Plaintiffs and class members.

## **TOLLING OF THE STATUTES OF LIMITATIONS**

159. Silvergate fraudulently concealed from Plaintiffs and the other investors the true nature

of the FTX investment enterprise. Though aware of the illegal FTX/Alameda scheme and its injurious

effects, Defendants did not take any action to stop or report it, but instead continued accepting the

deposits and executing the transfer and lending transactions upon which the scheme relied.

160. Silvergate was aware that FTX investors like Plaintiffs did not know about the

FTX/Alameda investment fraud. Silvergate had superior and exclusive knowledge of that fraud.

Despite reasonable diligence on their part, Plaintiffs were kept ignorant by these Defendants of the

factual bases for these claims for relief.

161. Plaintiffs did not discover, and exercising reasonable diligence could not have

discovered, the facts establishing Defendants' violations or the harm caused thereby until FTX's

CLASS ACTION COMPLAINT

implosion in early November 2022. Plaintiffs learned of the relevant actions and violations of FTX/Alameda and Silvergate through media coverage and FTX's bankruptcy filing.

162. Because Plaintiffs and the other class members could not have reasonably discovered the facts constituting Silvergate's violations until November 2022, all applicable statutes of limitation were tolled until then.

## CLASS ACTION ALLEGATIONS

163. Plaintiffs sue on their own behalf and on behalf of all other persons similarly situated under Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who, as of November 11, 2022, had legal title to any fiat or cryptocurrency deposited or invested with FTX, including from the FTX.com, FTX US and FTX international platforms.

164. Excluded from the class are Silvergate's employees, affiliates, legal representatives, predecessors, successors or assigns; any entity in which Silvergate has a controlling interest or which has a controlling interest in Silvergate; and the judicial officers to whom this litigation is assigned as well as their staff and immediate family members.

165. Numerosity. The class members are too numerous to be practicably joined. The class members are identifiable from information and records in the possession, custody, or control of Silvergate. Notice of this action can be readily provided to all members of the class.

166. Typicality. Plaintiffs' claims are typical of the claims of other members of the class. Plaintiffs and each class member invested in the FTX investments at issue and was subject to the wrongful conduct alleged in this complaint.

167. Adequacy of Representation. Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of the other class members.

168. Plaintiffs' counsel are competent and experienced in class action and investment fraud litigation and will pursue this action vigorously.

39

CLASS ACTION COMPLAINT

169. <u>Commonality and Predominance</u>. Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. Among the questions common to the class are:

a. Whether FTX and Bankman-Fried committed fraud or breached duties to Plaintiffs and members of the class;

b. Whether Silvergate aided and abetted, joined and/or participated in FTX's or Bankman-Fried's fraud or breach of duties;

c. Whether Silvergate knowingly carried out transactions in furtherance of the FTX investment scheme despite atypical banking activity and other red flags indicating that Bankman-Fried, through FTX/Alameda and his other operations, was committing investor fraud, breaching fiduciary duties, and misusing investor funds;

d. Whether Silvergate was unjustly enriched in consequence of its wrongful conduct; and

e. Whether, in view of their investment losses, Plaintiffs and the class are entitled to damages or restitution.

170. <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although many class members paid thousands to dollars to deposit or invest assets with FTX, the cost of this litigation will be high. The factual issues are complex and detailed, extend over several years and relate to many transactions. Absent a class action, most class members would find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy. Class treatment will conserve resources, avoid inconsistent rulings, and promote efficiency and economy of adjudication in a single court.

## CLAIMS FOR RELIEF

## COUNT 1

### Aiding and Abetting Fraud

171. Plaintiffs incorporate all of the foregoing allegations by reference.

172.     Bankman-Fried, FTX, and Alameda made fraudulent misrepresentations and omissions to the investing public about the nature of the FTX investments and how investor money would be applied. Plaintiffs and class members relied to their detriment on these misrepresentations and omissions when depositing or investing assets with FTX.

173.     Defendants knew of and substantially aided this fraud. Silvergate accepted billions of dollars of irregular deposits and approved the related-party transfers, atypical lending and funds commingling that marked the fraudulent scheme. In connection with providing such material assistance, Defendants were aware of their essential role in the scheme and knowingly acted in furtherance of it. Defendants also substantially benefited from their participation in this scheme.

174.     As a direct and proximate result of Defendants' aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial

## COUNT 2

### Aiding and Abetting Breach of Fiduciary Duty

175.     Plaintiffs incorporate all of the foregoing allegations by reference.

176.     At all relevant times, Bankman-Fried was the controlling owner and/or CEO of the FTX companies. By reason of his controlling position, actions and direct and indirect representations to Plaintiffs and class members, and because they deposited funds into Bankman-Fried's, FTX's, or Alameda's control with the understanding that they would act in accordance with their promises in regard to the use of such funds, Bankman-Fried, FTX, and Alameda owed investors the fiduciary duties of loyalty and care and to deal honestly and in good faith. Nevertheless, Bankman-Fried, FTX, and Alameda breached fiduciary duties he owed to Plaintiffs and class members by commingling and misappropriating customers' funds. As a direct and proximate result of the Alameda and FTX's fraud, Plaintiffs and other Class Members have been damaged.

177.     Through their knowledge of FTX/Alameda's business model and banking activity, Defendants knew that Bankman-Fried, FTX, and Alameda owed fiduciary duties to investors, such as Plaintiffs. Defendants substantially assisted these breaches of fiduciary duty by, among other things, executing transfers, accepting deposits, and allowing continued use of the SEN even while knowing

those duties were being breached. The breaches of duty were enabled by and would not have been possible but for Defendants' relevant actions and inaction.

178. As a direct and proximate result of Defendants' aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

### COUNT 3

### Unjust Enrichment

179. Plaintiffs incorporate all of the foregoing allegations by reference.

180. Plaintiffs lack an adequate remedy at law.

181. Plaintiffs and the other class members conferred benefits on Silvergate by depositing funds into and using the FTX exchange platforms.

182. Silvergate acquired ill-gotten gain, including in the form of revenues, derived from Plaintiffs' and the other class members' funding and use of the FTX exchange platforms.

183. Silvergate condoned and furthered the wrongful conduct from which it benefited. Its retention of these sums is therefore inequitable.

184. Silvergate's wrongful gain should be restored to Plaintiffs and the class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A. Certifying this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), appointing Plaintiffs as class representatives and their attorneys as class counsel under Federal Rule of Civil Procedure 23(g), and requiring Defendants to pay the costs of Notice to the class;

B. Awarding damages or restitution, including pre-judgment interest, upon each Count in an amount to be determined at trial;

C. Awarding reasonable attorneys' fees and costs of litigation; and

D. Granting such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs seek a jury trial of any Counts for which a trial by jury is permitted by law.

CLASS ACTION COMPLAINT

Respectfully submitted,

Dated: February 14, 2023

By:   /s/ *Daniel C. Girard*
Daniel C. Girard
Adam E. Polk
Tom Watts
Makenna Cox
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
dgirard@girardsharp.com
apolk@girardsharp.com
tomw@girardsharp.com
mcox@girardsharp.com

Jason S. Hartley
Jason M. Lindner
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT