# EXHIBIT A

## *Keane v. Silvergate Bank*

## Docket Sheet and Civil Complaint

## 4:23-cv-00670-JD

ADRMOP

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00670-JD

Keane v. Silvergate Bank et al
Assigned to: Judge James Donato
Cause: 28:1332 Diversity-Fraud

Date Filed: 02/14/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

### Plaintiff

**Nicole Keane**
*on behalf of herself, all others similarly
situated, and the general public*

represented by **Jack Fitzgerald**
Fitzgerald Joseph, LLP
2341 Jefferson Street, Suite 200
San Diego, CA 92110
(619) 215-1741
Email: jack@fitzgeraldjoseph.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Emhardt**
Fitzgerald Joseph LLP
2341 Jefferson Street, Suite 200
San Diego, CA 92110
(619) 215-1741
Email: caroline@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

**James M. Davis**
Blood Hurst & O'Reardon, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
619-338-1100
Fax: 619-338-1101
Email: jdavis@bholaw.com
*ATTORNEY TO BE NOTICED*

**Melanie Rae Persinger**
Fitzgerald Joseph, LLP
2341 Jefferson Street, Suite 200
San Diego, CA 92110
(619) 215-1741
Email: melanie@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

**Paul K. Joseph**
Fitzgerald Joseph LLP
2341 Jefferson Street, Suite 200
San Diego, CA 92110
(619) 215-1741
Email: paul@fitzgeraldjoseph.com

*ATTORNEY TO BE NOTICED*

**Thomas Joseph O'Reardon , II**
Blood Hurst & O'Reardon, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
(619) 338-1100
Fax: (619) 338-1101
Email: toreardon@bholaw.com
*ATTORNEY TO BE NOTICED*

**Timothy G. Blood**
Blood Hurst & O'Reardon, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
(619) 338-1100
Fax: (619) 338-1101
Email: tblood@bholaw.com
*ATTORNEY TO BE NOTICED*

**Trevor Matthew Flynn**
Fitzgerald Joseph, LLP
2341 Jefferson Street, Suite 200
San Diego, CA 92110
(619) 215-1741
Email: trevor@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Silvergate Bank**                    represented by  **Polly Towill**
Sheppard, Mullin, Richter & Hampton LLP
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071
213-620-1780
Fax: 213-620-1398
Email: ptowill@sheppardmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Silvergate Capital Corporation**     represented by  **Polly Towill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2023 | 1 | CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL against Silvergate Bank, Silvergate Capital Corporation, (Filing Fee: $402.00, receipt number ACANDC-17990003). Filed by Nicole Keane. (Attachments: #(1) Civil Cover Sheet)(Fitzgerald, |

| | | |
|---|---|---|
| | | Jack) (Filed on 2/14/2023) Modified on 2/15/2023 (tn, COURT STAFF). (Entered: 02/14/2023) |
| 02/15/2023 | | Electronic filing error. Please resubmit Civil Cover Sheet. Use October 2020 Form which can be downloaded from https://cand.uscourts.gov/. No judge assignment will be made until the document is e-filed. Submit your document using Civil Events > Other Filings > Other Documents > Civil Cover Sheet Re: 1 Complaint filed by Nicole Keane (mbc, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/15/2023 | 2 | Civil Cover Sheet by Nicole Keane *(corrected)*. (Fitzgerald, Jack) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/15/2023 | 3 | Proposed Summons. (Flynn, Trevor) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/15/2023 | 4 | Proposed Summons. (Flynn, Trevor) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/15/2023 | 5 | Case assigned to Magistrate Judge Kandis A. Westmore. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 3/1/2023. (ark, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/15/2023 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: Joint Case Management Statement due by 5/9/2023. Initial Case Management Conference set for 5/16/2023 at 1:30 PM in Oakland - To be determined. (tn, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023)** |
| 02/15/2023 | 7 | Summons Issued as to Silvergate Bank, Silvergate Capital Corporation. (tn, COURT STAFF) (Filed on 2/15/2023) (Entered: 02/15/2023) |
| 02/16/2023 | 8 | NOTICE OF ERRATA re 1 Complaint by Nicole Keane. (Fitzgerald, Jack) (Filed on 2/16/2023) (Entered: 02/16/2023) |
| 02/16/2023 | 9 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Nicole Keane.. (Flynn, Trevor) (Filed on 2/16/2023) (Entered: 02/16/2023) |
| 02/16/2023 | 10 | NOTICE by Nicole Keane *Notice of Lodgment* (Attachments: # 1 Exhibit Administrative Motion to Consider Whether Cases Should be Related, # 2 Exhibit Declaration of Daniel Girard, # 3 Exhibit Declaration of Timothy Blood, # 4 Exhibit Declaration of Michael Reiser, # 5 Exhibit [Proposed] Order Granting Administrative Motion to Consider Whether Cases Should be Related)(Blood, Timothy) (Filed on 2/16/2023) (Entered: 02/16/2023) |
| 02/17/2023 | 11 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. |

| | | |
|---|---|---|
| | | *This is a text only docket entry; there is no document associated with this notice.* (wft, COURT STAFF) (Filed on 2/17/2023) (Entered: 02/17/2023) |
| 02/21/2023 | 12 | **Case Reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Judge James Donato for all further proceedings. Magistrate Judge Kandis A. Westmore no longer assigned to the case. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.Signed by The Clerk on 02/21/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(jrs, COURT STAFF) (Filed on 2/21/2023) (Entered: 02/21/2023)** |
| 02/22/2023 | 13 | **CASE MANAGEMENT SCHEDULING ORDER: Initial Case Management Conference set for 5/18/2023 10:00 AM in San Francisco, Courtroom 11, 19th Floor. Case Management Statement due by 5/11/2023.. Signed by Judge James Donato on 2/22/2023. (lrc, COURT STAFF) (Filed on 2/22/2023) (Entered: 02/22/2023)** |
| 03/03/2023 | 14 | NOTICE by Silvergate Bank, Silvergate Capital Corporation *OF LODGING OF OPPOSITION TO ADMINISTRATIVE L.R. 7-11 MOTION TO CONSIDER WHETHER THE SILVERGATE ACTIONS SHOULD BE RELATED* (Attachments: # 1 Exhibit Lam v. Bankman-Fried, 27 Opposition To Admin L.R. 7-11 Motion To Consider Whether The Silvergate Actions Should Be Related)(Towill, Polly) (Filed on 3/3/2023) (Entered: 03/03/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/03/2023 11:03:49 | | | |
| **PACER Login:** | TimotBloodQy | **Client Code:** | 25922-01 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-00670-JD |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, CA 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD (SBN 149343)
*tblood@bholaw.com*
THOMAS J. O'REARDON II (SBN 247952)
*toreardon@bholaw.com*
JAMES M. DAVIS (SBN 301636)
*jdavis@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE KEANE, on behalf of herself, all others similarly situated, and the general public,<br><br>        Plaintiff,<br><br>                    v.<br><br>SILVERGATE BANK, and SILVERGATE CAPITAL CORPORATION,<br><br>        Defendants. | Case No. 23-cv-670<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

THE PARTIES ......................................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 2

INTRADISTRICT ASSIGNMENT ........................................................................................ 2

FACTS ..................................................................................................................................... 2

    I.      CRYPTOCURRENCY AND BLOCKCHAIN ................................................. 2

    II.     SILVERGATE'S DIGITAL ASSET BUSINESS ............................................. 5

         A.     Silvergate's Formation and Early Entrance into Cryptocurrency ............................. 5

         B.     The Silvergate Exchange Network ......................................... 7

         C.     The Growth in Silvergate's SEN Use, Deposits, and Revenue ................................... 9

    III.    THE FTX FRAUD AND COLLAPSE ........................................................... 12

         A.     FTX ........................................................................... 12

         B.     Alameda ..................................................................... 16

         C.     Bankman-Fried Uses Alameda to Misappropriate Customer Funds ......................... 18

         D.     The FTX Scheme Collapses.................................................. 20

         E.     The Fallout ................................................................... 22

    IV.    SILVERGATE HAD ACTUAL KNOWLEDGE OF AND SUBSTANTIALLY ASSISTED THE FTX FRAUD ......................................................... 24

         A.     Silvergate Had Actual Knowledge of the Fraud ................................... 25

             1.     By Virtue of Carrying Out its Due Diligence and Ongoing Monitoring Obligations.................................................. 25

             2.     By Virtue of Operating the Silvergate Exchange Network ........................... 39

i

3. By Virtue of its Cryptocurrency Expertise and Close Connection to the Industry ............................................................................... 40

4. By Virtue of Numerous Red Flags.......................................................... 41

    a. The Cryptocurrency Industry ............................................... 42

    b. FTX's Avoidance of U.S. Regulation.................................... 43

    c. The Involvement of Daniel Friedberg in FTX and Alameda.............. 43

B. Silvergate Facilitated the Fraud by Continuing to Provide Banking Services to Alameda and FTX After Observing Fraudulent Transfers of FTX Customer Monies Through Alameda's Accounts ............................. 44

V. SILVERGATE'S ACTIONS AFTER THE FTX COLLAPSE............................ 47

TOLLING ALLEGATIONS ............................................................................... 48

CLASS ACTION ALLEGATIONS ..................................................................... 49

CAUSES OF ACTION ...................................................................................... 50

PRAYER FOR RELIEF ..................................................................................... 54

JURY DEMAND ............................................................................................... 54

Plaintiff NICOLE KEANE, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby brings this action against Defendants SILVERGATE BANK and SILVERGATE CAPITAL CORPORATION, and alleges the following upon her knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1. Because of the risks attendant to its lack of regulation and ease of use for fraud and crime, most banks have steered clear of any involvement in cryptocurrency industry. But Silvergate Bank gambled that getting deeply involved in this burgeoning industry would pay off big. Today, Silvergate is known as one of the most "crypto-friendly" banks in the U.S., in part because it offers a bespoke payments product, called the Silvergate Exchange Network (SEN), to facilitate its cryptocurrency clients' conversion of fiat currencies to digital assets and vice versa (what is known as "on-ramping" and "off-ramping" in crypto).

2. This case concerns Silvergate's conduct regarding the now-infamous cryptocurrency trading exchange, FTX, which spectacularly imploded in early November 2022, entering into Chapter 11 bankruptcy as the result of rampant fraud and corporate malfeasance that has seemingly left over a million creditors with losses in the billions of dollars.

3. Silvergate had actual knowledge of and substantially assisted the fraud by permitting FTX to divert its customer's funds to Alameda Research, a cryptocurrency hedge fund that was a wholly-separate entity but commonly owned by FTX's owner, Sam Bankman-Fried. Plaintiff brings this action to recover compensation for the damages she and others sustained as a result of Silvergate's malfeasance.

## THE PARTIES

4. Plaintiff Nicole Keane is a citizen of Alaska and resides in Oregon. She placed funds in an FTX account in anticipation of executing cryptocurrency trades. To do so, she wired her money into a Silvergate bank account. After FTX announced its bankruptcy, Ms. Keane attempted to withdraw the cryptocurrency in her FTX account but was unable to do so.

5. Defendant Silvergate Bank is a California chartered commercial bank with its principal place of business in La Jolla, California. It is a wholly-owned subsidiary of Silvergate Capital Corporation.

6. Defendant Silvergate Capital Corporation is a Maryland company with its principal office located in Baltimore County, Maryland. It is a federally-registered bank holding company and the parent of

*Keane v. Silvergate Bank et al.*, No. 23-cv-670
CLASS ACTION COMPLAINT

Silvergate Bank. Silvergate Capital Corporation's assets consist primarily of its investment in Silvergate Bank and its primary activities are conducted through the Bank.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from one or more Defendants. In addition, more than two-thirds of the members of the class reside in states other than the state in which Defendants are citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

8.     The Court has personal jurisdiction over Defendants pursuant to Cal. Code Civ. P. § 410.10, as a result of their substantial, continuous, and systematic contacts with the State, and because Defendants have purposely availed themselves of the benefits and privileges of conducting business activities within the State.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants reside (*i.e.*, are subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

10.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to either the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claim occurred in Alameda County.

## FACTS

### I.     CRYPTOCURRENCY AND BLOCKCHAIN

11.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Cryptocurrency is the common name given to a set of unique digital assets that exist and can be transferred on peer-to-peer networks, called blockchains, using cryptography, rather than requiring facilitation from a financial institution.

12.     These networks can be decentralized (spread across a network of internet-connected computers that no one person or group controls), or centralized (controlled by some party). Unlike

government-issued fiat currency, cryptocurrencies exist purely as digital entries to an online database, often known as a public or distributed ledger. Peer-to-peer transactions are placed in "blocks" for verification, and once the transactions are verified as legitimate, the blocks are recorded in the public ledger, or blockchain, that is unique to a particular cryptocurrency. Because the ledgers are spread across a network of computers that record all transactions, entries on public ledgers are time-stamped and immutable, meaning that, in theory, all cryptocurrency transactions are traceable. When a transaction is verified, it is given a unique alphanumeric identifier, called a "hash."

13.     The native cryptocurrency on an individual blockchain is called a "coin." But there is also another type of common blockchain-based digital asset called a "token." Although often used interchangeably, coins and tokens are different concepts in cryptocurrency, with unique characteristics. Coins operate on an independent blockchain specifically created to launch and record transactions for that coin. Because it requires building a blockchain, creating and launching a coin is difficult and labor intensive. Coins are intended to function as digital money with purchasing power and are designed to have the attributes of more traditional currency: scarcity, durability, and inherent value. By contrast, tokens operate on top of existing blockchains and require less expertise or expense to launch. In this regard, tokens can be created by an issuer "out of thin air." Moreover, tokens can be created by an issuer for a variety of reasons to represent a variety of assets or services.

14.     New coins are "minted," or issued, by "mining," which involves "miners" solving complex math problems to validate transactions and earn with freshly minted coins. The process uses sophisticated hardware to compute extremely complex math problems. The first computer to find the solution to the problems receives the next block of coins and the process begins again. This verification process is known as "proof of work." Tokens, by contrast, are created and distributed at the issuers' discretion and are thus much easier to create and acquire.

15.     In addition to coins and tokens, another important part of the cryptocurrency ecosystem are "stablecoins."—specific types of coins purportedly designed to remain stable in value. Stablecoins purportedly achieve stability by being pegged to some underlying store of value. For example, a stablecoin issuer might place $1 billion in a bank account, then issue one billion $1 stablecoins effectively underwritten by the fiat asset. Many stablecoins are pegged to fiat currency (and several are pegged 1-to-1 to U.S. dollars

specifically), but others are backed by portfolios of currencies, commercial paper, and other financial assets. Stablecoins are the most-traded digital assets because they function as intermediaries between both fiat and crypto, and between crypto pairs for which there may not be much liquidity.

16. Cryptocurrencies (both coins or tokens) must be stored in digital "wallets." These are applications that store the passkeys (*i.e.*, private codes) used by owners to engage in cryptocurrency transactions. Digital wallets also provide the interface that lets owners access and transfer their digital assets. There are three types of digital wallets. A "hardware wallet" is the most secure because the cryptocurrency owner is in possession of a hardware device that is disconnected from the blockchain but can be plugged into a computer via USB or via Bluetooth on a mobile device to access the blockchain of choice. A "software wallet" is similarly disconnected, except the wallet that can be plugged in to access the blockchain is kept in software rather than hardware. A "custodial wallet" is one owned by a customer, but held by a third party, such as a cryptocurrency exchange, which controls the passkeys. When wallets are connected to the internet, they are said to be "hot," and "cold" when not connected. Cold wallets are more secure, while hot wallets are more useable.

17. Cryptocurrencies can also be destroyed. When a cryptocurrency community decides it wants or needs to destroy units of a specific coin or token, they use a process called "burning" to effectively take the assets out of circulation, reducing the total supply of that asset. To execute a cryptocurrency burn, users send their crypto to an "eater address," or a burn wallet, which is a digital wallet that only receives tokens, but cannot send them. Those coins are thus effectively locked up and taken out of circulation. That transaction, confirmed on the blockchain ledger, makes the burn permanent and irrevocable.

18. Cryptocurrency has rapidly gained value over the past decade while experiencing high volatility. In 2008, when cryptocurrency was created, one Bitcoin—the original cryptocurrency—was worth zero dollars. In November 2021, one Bitcoin was worth more than $67,000. As of the date of this complaint, one Bitcoin is worth approximately $22,500.

19. Several new forms of cryptocurrency have proliferated since the advent of Bitcoin, many of which have been even more volatile than Bitcoin. FTT, the FTX token, was worth over $77 in September 2021. Now it is worth around $1.60.

20.     Today, the primary way people buy the different types of cryptocurrency is through cryptocurrency exchanges. These are companies, like FTX, Coinbase, Kraken, and others, that accept regular currency in exchange for cryptocurrency. In other words, you wire an exchange an amount of money, and the exchange gives you title to a corresponding amount of cryptocurrency.

## II.     SILVERGATE'S DIGITAL ASSET BUSINESS

### A.     Silvergate's Formation and Early Entrance into Cryptocurrency

21.     Silvergate Bank was incorporated in 1987 and commenced business in 1988 under the California Financial Code as an industrial bank. In February 2009, the Bank converted its charter to a California commercial bank, which gave it the added authority to accept demand deposits. Silvergate Capital Corporation concurrently became a registered bank holding company under the federal Bank Holding Company Act. In December 2012, Silvergate became a member of the Federal Reserve System.

22.     In 2013, under CEO Alan Lane's leadership and at his behest, Silvergate began providing banking services to the emerging digital asset industry. In an interview, Lane explained that around that time, Silvergate "really focused on this new digital asset called Bitcoin and some of the companies that were being formed at the time to provide services to this budding Bitcoin space." He noted that "many of them were struggling to find and maintain bank accounts," and "[s]o the first thing we did . . . is we were just a bank willing to talk to these new companies."

23.     In a separate interview, Lane explained that Silvergate's entrance into cryptocurrency was catalyzed by the need to grow deposits in order to fund its lending activities. He explained that he saw an opportunity in the cryptocurrency space. According to Lane, cryptocurrency industry participants were in need of banking services because "they were getting kicked out of their banks" due to "the perception of risk," including "the whole concern of anti-money laundering, BSA . . . ."

24.     Silvergate went public in November 2019 and is traded on the New York Stock exchange under the ticker symbol "SI." It held itself out in its Registration Statement as "the leading provider of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry," and claimed to have "a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

25.     The Registration Statement provided the following graphic regarding "The Formation of Our Digital Currency Initiative."

26.     According to Silvergate, it "began exploring the digital currency industry in 2013 based on market dynamics" that it "believed were highly attractive," namely that: (1) it was a "Significant and Growing Industry" that "presented a revolutionary model for executing financial transactions"; (2) the industry had "Infrastructure Needs," because "In order to become widely adopted, digital currency would need to rely on many traditional elements of financial services, including those services that support funds transfers, customer account controls and other security measures; and (3) there was "Regulatory Complexity as a Barrier to Entry" such that "Providing infrastructure solutions and services to the digital currency industry would require specialized compliance capabilities and a management team with a deep understanding of both the digital currency and the financial services industries." Moreover, its customer base had "grown rapidly, as many customers proactively approach us due to our reputation as the leading provider of innovative financial infrastructure solutions and services to participants in the digital currency industry, which includes our unique technology solutions."

27.     Silvergate's digital asset industry customers come from both inside and outside the United States and include cryptocurrency exchanges, institutional investors, stablecoin issuers, and other crypto companies such as those developing new protocols or platforms, engaged in mining operations, or providing other services to the crypto industry.

28.     According to Silvergate, "These market participants generally hold either or both of two distinct types of funds: (i) those funds that market participants use for digital currency investment activities,

which [Silvergate] refer[s] to as investor funds, and (ii) those funds that market participants use for business operations, which [Silvergate] refers to as operating funds."

29.     Prior to FTX's collapse in November 2022, Silvergate had over 1,600 crypto clients. Some of its notable customers included Coinbase, Paxos, Circle, Kraken, Bitstamp, Gemini, and Crypto.com.

**B.     The Silvergate Exchange Network**

30.     According to Silvergate's public filings with the SEC, "Instrumental to [its] leadership position and growth strategy is the Silvergate Exchange Network, or SEN, [Silvergate's] proprietary, virtually instantaneous payment network for participants in the digital currency industry . . . ."

31.     Silvergate introduced the SEN in 2017 "in response to unmet demand for U.S. dollar deposit accounts for many [digital asset] market participants." It allows the bank's participating customers to send money instantaneously to other SEN participants at any time. Such round-the-clock availability is important in the cryptocurrency industry, which is inconvenienced by the traditional banking system's limited availability.

32.     The ability to execute transactions in virtually real-time is valuable to the digital asset industry because cryptocurrency trading occurs constantly on a global scale, with no regulated market hours. By enhancing transaction execution speed compared to the traditional banking system—where bank wires and ACH transfers may take hours or days to complete—SEN was designed to reduce industry friction and thereby help mitigate exposure to digital currency pricing fluctuations.

33.     The SEN only transfers fiat U.S. dollars, is only available to commercial customers, and is not enabled for customers who are individual investors. SEN participants can move U.S. dollars 24 hours per day, 7 days per week, 365 days per year between their Silvergate bank accounts and other SEN participants' Silvergate bank accounts. Thus, in effect, the SEN is a two-sided network that connects digital asset exchanges with institutional clients, like crypto hedge funds, and other participants in the crypto industry.

34.     Silvergate's Registration Statement provided the following chart regarding various different market participants' use of the SEN as of September 30, 2018, showing typical uses.

| | Digital Currency Exchanges | Institutional Investors | Other Customers |
|---|---|---|---|
| **Overview** | Exchanges through which digital currencies are bought and sold; includes over-the-counter, or OTC, trading desks | Hedge funds, venture capital funds, private equity funds, family offices and traditional asset managers, which are investing in digital currencies as an asset class | Companies developing new protocols, platforms and applications; mining operations; and providers of other services |
| **Typical Uses** | • SEN to facilitate fiat transfers [1]<br>• API to attribute fiat transfers [2]<br>• Cash management<br>• Deposit accounts to hold investor funds and operating funds | • SEN to transfer fiat to digital currency exchanges and traditional bank accounts [1]<br>• Cash management<br>• Deposit accounts to hold investor funds | • SEN to facilitate fiat transfers [1]<br>• Cash management<br>• Deposit accounts to hold operating funds |
| **Noteworthy metrics** | Silvergate's customers include the 5 largest U.S. domiciled digital currency exchanges [3] | Silvergate's customers have transferred approximately $9 billion in fiat quarterly since January 1, 2018 [4] | Silvergate's customers have raised over $1 billion through private placements |
| **Number of Customers** | 35 | 339 | 109 |
| **Total Deposits** | $792.9 million | $572.7 million | $227.5 million |
| **Select Customers** | | | |

(1) SEN transfers are funds transfers within the Bank's deposit system from one SEN participant to another SEN participant.
(2) This refers to the attribution of funds received by a SEN API user within its own platform on a programmatic basis without manual human interaction, based on the user's integration of the Bank's API into the user's own systems.
(3) Based on data reflecting U.S. dollar 30 day trading volume as of October 1, 2018 from coinmarketcap.com.

35. The SEN thus serves two functions for Silvergate's customers. First, it facilitates anytime, near-instantaneous fiat transfers between Silvergate bank accounts held by different members of the SEN for which a counterparty relationship has been established. Second, it facilitates the on-ramping and off-ramping of fiat into crypto and vice versa.

36. The first function, transferring fiat from one SEN account to another, can be performed either via Silvergate's online banking system, or via its proprietary, cloud-based Application Programming Interface, or API.[1] Though money is transferred from one SEN account to another through a traditional intrabank funds transfer enabled through Silvergate's online banking data processing system,[2] SEN facilitates the transfer by using its API to instantly notify one accountholder when another has sent funds. Because both parties to the transaction must necessarily be SEN members and Silvergate bank account holders, the API is effectively making a notational entry in Silvergate's internal ledger then notifying the parties of that entry and thereby acting as a trusted intermediary. The process is automated and available

---

[1] An API is a set of definitions and protocols for building and integrating application software that lets a product or service communicate with other products and services without having to know how those other products or services are implemented. Essentially, an API is a communication tool between software applications.

[2] Silvergate's Registration Statement that SEN "is simply the means by which internal account transfer transaction instructions are passed to the Bank's core banking system through which they are executed."

24/7. Thus, as Silvergate explained in its Registration Statement, "digital currency exchanges that integrate our API into their technology infrastructure can attribute incoming client funds, at scale, without human involvement and in virtually real-time, typically within a matter of seconds."

37.     SEN facilitates the on-ramping and off-ramping of fiat into crypto and vice versa by using API calls to the accounts of stablecoin-issuer SEN customers, directing them to mint or burn stablecoins. As Defendant Alan J. Lane once explained:

> And so if, if somebody wants to purchase USDC from Circle, what they would do is they would send dollars into Circle's bank account at Silvergate, and when those dollars hit the bank account, then at that moment there is an API call from Silvergate to Circle that says, we just received X amount of dollars from this customer, and at that point Circle knows we have the dollars in our possession, so they turn around and they mint the USDC token and send it to the wallet address of that institution that is looking to purchase the USDC.

> And then the same thing happens in reverse. So, um, if someone wants to redeem their USDC and go back to U.S. dollars, they send the USDC to the wallet at Circle. Circle at that point, once they have possession of the USDC, they then send an instruction to us via API and we then in turn will send a dollar back to that prior USDC token holder.

38.     Whether made via Silvergate's online banking system or API, three steps are required to create, authorize, and approve a SEN transfer. First, the sender is authorized as an SEN participant. Second, the receiver is validated as an SEN participant. Third, the transfer amount is confirmed to be available in the originating (sender's) account. SEN transfers are push only and settle virtually instantly if all three conditions are met. No other transfer-of-value type transactions may be made on the SEN.

## C.     The Growth in Silvergate's SEN Use, Deposits, and Revenue

39.     The SEN was developed and tested in 2017 with a limited number of Silvergate customers, and was subsequently made available to all of the bank's digital asset related clients in early 2018. Thereafter, use of the SEN grew exponentially.

40.     From the fourth quarter of 2018 to the fourth quarter of 2019, volume on the SEN increased 150% to 14,400 transactions, representing $9.6 billion. And as shown below, annual SEN transactions grew from $32.7 billion in 2019 to a $787.4 billion, a growth of more than 2,700% in two years.





41.     Because Silvergate charges fees for its client's use of the SEN, its revenue from those transactions increased proportionally, generating tens of millions of dollars for the bank as shown below.



42.     Moreover, according to Silvergate, the SEN has "enable[d] [it] to grow with [its] existing customers and to attract new customers who can benefit from [its] innovative solutions and services." This growth is illustrated in the graphic below.



43.     Silvergate's growth in digital currency customers served CEO Lane's goal of growing the bank's deposits. Significantly, deposits from its cryptocurrency clients are *non-interest-bearing*, allowing

10

Silvergate to deploy the full amount of those deposits in making other investments. As Silvergate explained in its Registration Statement, this provides it "a distinctive advantage over most traditional financial institutions" in that it "allows [Silvergate] to generate revenue from a conservative portfolio of investments in cash, short term securities and certain types of loans . . . ."

44.    Moreover, Silvergate's focus on crypto clients drove "the Bank's funding costs to among the lowest in the U.S. banking industry," which "allowed [Silvergate] to generate attractive returns on lower risk assets through increased investments in interest earning deposits in other banks and securities, as well as funding limited loan growth."

45.    Silvergate's growth in noninterest bearing deposits is illustrated in the below graphic included in its Registration Statement.



46.    By the end of September 2022, Silvergate's crypto-derived, noninterest bearing deposits were 90% of the bank's overall deposit base, amounting to $11.9 billion. And of that, FTX alone constituted nearly 10% of the $11.9 billion in deposits, or about $1.2 billion. As a result, Silvergate's profits grew even when traffic on SEN slowed in 2022.

47.    And because SEN continually attracted new clients and deposits, Silvergate's overall revenue also grew, resulting in increasingly greater profits as operating costs stabilized, as illustrated below.

*Keane v. Silvergate Bank et al.*, No. 23-cv-670
CLASS ACTION COMPLAINT

Expanding profitability while making investments in strategic growth initiatives

## III. THE FTX FRAUD AND COLLAPSE

48. Until recently, FTX was one of the largest cryptocurrency exchanges in the world. Its spectacular implosion in early November 2022 has been widely publicized. A number of persons involved in the fraud have been indicted or pleaded guilty to wire fraud, money laundering, and other financial crimes.

49. At the heart of the FTX fraud was the misappropriation of customer deposits intended for FTX into bank accounts controlled by Alameda Research, a cryptocurrency hedge fund sharing common ownership with FTX, where they were embezzled. During the relevant period, Alameda and FTX were headquartered or operated from 2000 Center Street, Suite 400, in Berkeley, California, and numerous related entities shared that address (the "Center Street Address").

50. At the helm of the scheme was Sam Bankman-Fried, the co-founder and majority owner of both Alameda and FTX. From FTX's inception in May 2019, through the time FTX collapsed and entered bankruptcy on November 11, 2022, Bankman-Fried and his associates improperly diverted customer assets to Alameda, which used the funds to make bad bets on cryptocurrencies, to give billions in "loans" to Bankman-Fried and other insiders to fund lavish lifestyles, and to acquire failing crypto businesses in bad deals, hoping to prop up the industry. As alleged more fully below, one of the primary ways in which Bankman-Fried and his associates accomplished this was by directing FTX customers to wire fiat currency into bank accounts held at Silvergate Bank and controlled by Alameda.

### A. FTX

51. Bankman-Fried was the ultimate decisionmaker at FTX from its inception until he resigned on November 11, 2022. He maintained tight control over the operation, delegating little to others. As a result,

he was highly-involved in its operations, for example, sometimes personally answering even minor support requests from users.

15.    The FTX group of companies was founded in 2019 and began as an exchange or marketplace for the trading of cryptocurrency assets. Until declaring bankruptcy, the FTX companies operated a multi-billion-dollar mobile application cryptocurrency investment service that offered trading in various options, futures, swaps, and other digital commodity derivative products. FTX also offered various services related to cryptocurrency trading. For example:

- FTX maintained a spot market on which FTX customers could trade cryptocurrency with other FTX customers in exchange for money or other cryptocurrency;

- FTX maintained spot-margin trading services, which enabled FTX customers to borrow against collateral in their FTX accounts and trade or lend cryptocurrency in their accounts to other FTX customers for purposes of executing trades;

- FTX maintained an over-the-counter service that allowed investors to request quotes for spot cryptocurrency assets and to carry out trades; and

- FTX served as a platform for the purchase and sale of crypto futures contracts.

52.    Regarding deposits of fiat currency, FTX's Terms of Service provided that "the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods," and "Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account." However, this "E-MONEY IS NOT LEGAL TENDER." Nevertheless, "You may redeem all or part of any E-Money held in your Account at any time . . . . Unless agreed otherwise, funds will be transferred to the bank account you have registered with us."

53.    Customers were able to access the FTX platform through the FTX website, FTX.com, as well as through its popular mobile app. The stated objective of FTX was to build a digital-asset trading platform and exchange to promote a better user experience, customer protection, and innovative financial products.

54.    Signing up for FTX was simple. FTX did not require its users to validate their identities by providing official identification documents. In fact, as shown in the below screenshot of FTX's website in or

around late 2019, to sign up, an FTX user was not required to provide even the most basic identifying information, such as name, date of birth, address, or other identifiers.



55.     As a result, users were able to create and fund FTX accounts with nothing more than an email address. This meant accounts on FTX could easily be opened anonymously, including by customers in the United States.

56.     FTX grew rapidly after its founding in 2019. As of 2021, FTX stated that it held approximately $15 billion in assets across its platforms.

57.     As it raised money from investors, Bankman-Fried, his agents and affiliates continuously highlighted to the public the safe nature of the platform and its products. FTX touted automated risk mitigation procedures, including a program that calculated a customer's margin level every 30 seconds and automatically liquidated assets if collateral fell below a certain threshold. Bankman-Fried stated repeatedly that FTX and its customers were protected from others' losses due to this auto-liquidation program.

58.     Bankman-Fried represented that FTX offered "complete transparency about the positions that are held [and] a robust, consistent, risk framework."

59.     Similarly, FTX's terms of service assured investors they owned and controlled assets they placed on the exchange. Those terms stated unequivocally:

14

All Digital Assets are held in your Account on the following basis:

(A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

60.    FTX also posted on its website a document titled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," in which it represented that FTX "segregates customer assets from its own assets across our platforms," and maintains "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

61.    An August 2021 policy document of FDM, the operational entity of FTX, further stated:

FDM has a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds. This includes customer assets that may be held by third party service providers. **FDM will ensure that**:

    • Customer assets (both fiat and virtual assets) are segregated from its own assets;

    • Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable;

    • All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors; and

    • All third-party providers are aware that customer assets are held in trust.

Regarding customer fiat assets, FDM will maintain customer accounts with a regulated credit, e-money or payment institution that is acceptable to the Securities Commission of The Bahamas (SCB). Customer accounts will be designated as such, and the monies contained therein will be appropriately ring-fenced and protected from claims against FDM.

Customer monies will be appropriately ring-fenced to protect from:

    • The unlikely event FDM becomes insolvent;

    • The use of customer monies being used to benefit others; and

15

• FDM using customer monies to finance its own operations. Written notice will be provided to the relevant regulated credit, e-money, or payment institution to clarify that the assets contained are held by us on trust for our customers and they are not entitled to combine the account any other account, or to exercise any right of set-off or counterclaim against the money in those accounts, in respect of any debt owed by us.

62.     FTX also solicited investments that were purportedly loans to be used on the FTX.com exchange to purchase crypto assets that would generate promised returns. Investors purchased FTT tokens (FTX's proprietary token) on the understanding that FTX, using part of its profits, would buy back the tokens at various times.

63.     FTT tokens and other FTX digital assets were not registered with any U.S. jurisdiction or regulatory authority. Unconstrained by U.S. securities law, FTX marketed vaguely described crypto investments as delivering "HIGH RETURNS WITH NO RISK":

## Investment offerings

**PACKAGES**

We offer one investment product:

**15% annualized fixed rate loans** (no lockup)

We can accept both fiat and crypto and can pay interest denominated in either. We can take on another $200m in capital and still achieve returns that beat traditional and crypto markets.

For investors with specific risk profiles, we are happy to discuss custom packages. For investments of $50m or more, we are willing to discuss higher rates of return.

**HIGH RETURNS WITH NO RISK**

These loans have **no downside** – we guarantee full payment the principal and interest, enforceable under US law and established by all parties' legal counsel. We are extremely confident we will be pay this amount. In the unlikely case where we lose more than 2% over a month we will give all investors the opportunity to recall their funds and we will still guarantee full repayment.

**B.     Alameda**

64.     Bankman-Fried co-founded Alameda Research, LLC ("Alameda")—a quantitative trading firm specializing in cryptocurrency assets—in 2017, before founding FTX. His co-founder was Zixiao "Gary" Wang. Alameda initially focused mostly on high frequency arbitrage trading through which the company sought to exploit price differences for the same or similar assets across various digital-asset platforms. Later, Alameda undertook other strategies, such as market making, pooling cryptocurrency assets

in exchange for interest, volatility trading, and eventually, taking large equity stakes in various digital-asset companies.

65. According to Alameda, within a year of its founding, it had "become the largest liquidity provider and market maker in the [digital] asset space," and traded "$600 million to 1 billion a day" which it said was "roughly 5% of global volume in digital asset trading."

66. Bankman-Fried operated as the majority owner of Alameda at all relevant times, and was the CEO of Alameda until fall 2021, at which point he stepped down as CEO, and appointed Caroline Ellison (a former Alameda Trader) and Sam Trabucco (a college classmate) as co-CEOs. Even after that, Bankman-Fried continued to control Alameda, remaining a signatory on its bank accounts and maintaining decision-making authority over all its trading, investment, and financial decisions.

67. Throughout the period in which FTX was raising investor funds, Bankman-Fried made repeated public statements assuring investors that their FTX assets were safe, tweeting, for example: "Backstopping customer assets should always be primary. Everything else is secondary"; and, "As always, our users' funds and safety comes first. We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

68. Likewise, Bankman-Fried, individually, and through his agents and employees, made a point of publicly maintaining that there were circuit breakers in place to ensure the separation of Alameda and FTX, and to protect against Alameda's preferential treatment on the FTX platform. Bankman-Fried's public statements regarding this purported FTX/Alameda separation include:

69. According to Alameda, within a year of its founding, it had "become the largest liquidity provider and market maker in the [digital] asset space," and traded "$600 million to 1 billion a day" which it said was "roughly 5% of global volume in digital asset trading."

70. Bankman-Fried operated as the majority owner of Alameda at all relevant times, and was the CEO of Alameda until fall 2021, at which point he stepped down as CEO, and appointed Caroline Ellison (a former Alameda Trader) and Sam Trabucco (a college classmate of Bankman-Fried's) as co-CEOs. Even after that, Bankman-Fried continued to control Alameda, remaining a signatory on its bank accounts and maintaining decision-making authority over all of its trading, investment, and financial decisions.

71. Throughout the period in which FTX was raising investor funds, Bankman-Fried made repeated public statements assuring investors that their FTX assets were safe, tweeting, for example: "Backstopping customer assets should always be primary. Everything else is secondary"; and, "As always, our users' funds and safety comes first. We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

72. Likewise, Bankman-Fried, individually, and through his agents and employees, made a point of publicly maintaining that there were circuit breakers in place to ensure the separation of Alameda and FTX, and to protect against Alameda's preferential treatment on the FTX platform. Bankman-Fried's public statements regarding this purported FTX/Alameda separation include:

- To the *Wall Street Journal*: "There are no parties that have privileged access";

- To *Bloomberg*: "Alameda is a wholly separate entity" and "We're at arm's length and don't get any different treatment from other market-makers."

73. In like vein, during an August 2022 media appearance, Alameda's CEO described a purported firewall between FTX and Alameda:

They're both owned by Sam, obviously. So ultimately, sort of aligned incentives in that way. We keep them quite separate in terms of day-to-day operations. We definitely have a Chinese wall in terms of information sharing to ensure that no one in Alameda would get customer information from FTX or anything like that, or any sort of special treatment from FTX. They really take that pretty seriously.

74. Even after the FTX bankruptcy, Bankman-Fried claimed to *The New York Times* that "Alameda is not, like, a company that I monitor day-to-day." He similarly claimed to *New York Magazine* that Alameda is "not a company I run. It's not a company I have run for the last couple years."

**C.  Bankman-Fried Uses Alameda to Misappropriate Customer Funds**

75. Far from "walling off" Alameda from FTX, following its collapse, FTX represented to the Bankruptcy Court at the first-day hearing that bankman-Fried ran FTX as a "personal fiefdom." FTX and Alameda shared office space, first in Berkeley, California, and later in Hong Kong and The Bahamas. They also shared key personnel, hardware, technology, and intellectual property. Bankman-Fried and other senior executives at FTX and Alameda, moreover, had widespread access to each other's systems and accounts.

76. Bankman-Fried used the lack of separation between FTX and Alameda to misappropriate FTX customer funds. One of the primary ways in which Bankman-Fried and his associates carried out their scheme

was by directing FTX customers to wire or otherwise deposit fiat currency into Silvergate bank accounts held and controlled by Alameda. Silvergate had actual knowledge of and carried out these improper actions. As a result, and at Bankman-Fried and FTX's direction, from the start of FTX's operations in around May 2019 and continuing into 2022, FTX customers deposited fiat currency—billions of dollars' worth—into bank accounts that were controlled by Alameda.

77.     Once funds intended for customers' FTX accounts were deposited into Alameda bank accounts, FTX personnel monitoring the Alameda bank accounts would manually credit the depositing customer's FTX account on the FTX internal ledger system using the NONLEGAL TENDER that FTX invented for this purpose, its so-called "E-Money." The purpose of E-Money was for FTX to avoid the transfer of actual value from Alameda's accounts to its own.

78.     The E-money credits on customers' FTX accounts were notational only. While customers accessing their FTX accounts would be able to observe on the exchange's website or mobile app that their funds had been posted to their FTX accounts—and believed they were then effectively segregated for their benefit per the Terms of Service—the funds in fact remained in Alameda's accounts.

79.     Alameda then commingled the FTX funds with its other assets (without designating the accounts as being "for the benefit of" FTX customers or otherwise segregated), and in turn used them to finance its trading operations and other Bankman-Fried ventures, including purchases of luxury real estate.

80.     Among other investments, Alameda used FTX customer funds to prop up the value of FTX's own cryptocurrency, the FTT token, which grants holders a discount on trading fees on the FTX exchange. A large percentage of Alameda's balance sheet was held in FTT tokens.

81.     FTX also granted Alameda several unique exceptions that allowed Bankman-Fried to carry out his scheme For example, Alameda was exempted from FTX's auto-liquidation feature, meaning it was permitted to maintain a negative balance in its account with no collateral. It was the only account afforded that treatment. Bankman-Fried also directed FTX to increase Alameda's negative balance cap, effectively providing it with an uncapped line of credit, through which it could use other FTX customer funds for its own trading activities. No other FTX account was granted a similar line of credit.

82.     The scheme began to unravel when Alameda became unable to pay debt incurred through billions of dollars in loans that Bankman-Fried caused Alameda to borrow from third-party cryptocurrency

lenders to fund his investments and for personal use. Specifically, when the cryptocurrency market began to decline precipitously in 2022, several of these lenders demanded repayment from Alameda, and because Alameda had no assets to pay them back, Bankman-Fried caused Alameda to draw on its FTX credit line, resulting in Alameda owing billions of dollars to FTX.

**D.    The FTX Scheme Collapses**

83.    The FTX scheme ended in November 2022 when the scale of the fraud became apparent to the market. The chain of events leading to FTX's swift collapse was set in motion on November 2nd, when CoinDesk, a crypto news website, published an article stating that based on its review of an Alameda balance sheet it had obtained, Alameda held a large position in FTT and other FTX tokens.

84.    On November 6th, Changpeng "CZ" Zhao, the CEO of Binance, a cryptocurrency trading platform, liquidated $530 million of FTT. Other customers then raced to pull out: over the course of 72 hours investors sought to withdraw an estimated $6 billion from FTX, placing the company under severe financial pressure.

85.    After declining by 32%, the price of FTT briefly rallied on November 8th when Bankman-Fried announced that Binance would acquire FTX. But the next day, Binance announced it would not proceed with the transaction, citing its due diligence findings and reports of mishandled customer funds by FTX. The price of FTT plummeted.

86.    On November 11th, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO. The bankruptcy filing includes FTX, Alameda, and 132 additional interrelated companies.

87.    John J. Ray III, who oversaw Enron following its accounting scandal in 2007, became CEO. After reviewing FTX's books and records, Ray declared, "never in my career have I seen such an utter failure of corporate controls at every level of an organization, from the lack of financial statements to a complete failure of any internal controls or governance whatsoever."

88.    Ray stated that FTX "failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money" and that the "[c]ash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners around the world."

89.     Ray noted "[t]he ability of Alameda, the crypto hedge fund within the FTX Group, to borrow funds held at FTX.com to be utilized for its own trading or investments without any effective limits."

90.     Ray further stated "we know" that "customer assets from FTX.com were commingled with assets from the Alameda trading platform," that Alameda "used client funds to engage in margin trading which exposed customer funds to massive losses," and that "loans and other payments were made to insiders in excess of $1 billion."

91.     On November 10th, in the midst of FTX's collapse, Bankman-Fried admitted to culpability in a series of Twitter exchanges with reporters and investors:



92.     Similarly, on November 15, 2022, Bankman-Fried had a Twitter conversation with Vox writer Kelsey Piper, which she published the next day.[3] In the conversation, Bankman-Fried admitted FTX was using Alameda's bank accounts to receive customer deposits, which Alameda then misappropriated.

93.     According to Bankman-Fried, executives at the company "forgot" about this irregular depositing arrangement right up until the company imploded: "[I]t looks like people wired $8b to Alameda and 'oh god we basically forgot about the stub account that corresponded to that and so it was never delivered to FTX.'"

94.     Similarly, in a recent interview, Bankman-Fried sought to downplay his conduct as an error or oversight:

> There was a F*** up, I was incorrect on Alameda's balances on FTX by a fairly large number, an embarrassingly large one and it was because of a, like, very poorly labeled accounting thing, which was a historical artifact of a time before FTX had bank accounts and the result of that was basically there was a time back yonder when people would wire money to Alameda and then actually credited on FTX. This . . . got screwed up and that was like a pretty big miss and that meant Alameda was substantially more levered than I thought it was.

---

[3] Kelsey Piper, "Sam Bankman-Fried tries to explain himself: The fallen crypto CEO on what went wrong, why he did what he did, and what lies he told along the way," Vox (Nov. 16, 2022), *at* https://www.vox.com/future-perfect/23462333/sam-bankman-fried-ftx-cryptocurrency-effective-altruism-crypto-bahamas-philanthropy.

95. Bankman-Fried also told an investor that more than $10 billion in loans remains outstanding.

**E.    The Fallout**

96. On December 12th, Bankman-Fried was arrested in The Bahamas on the basis of an indictment filed by the U.S. attorney's office for the Southern District of New York. The criminal charges against Bankman-Fried include wire fraud, securities fraud, money laundering, and conspiracy to commit wire fraud and securities fraud.

97. On or around December 13, 2022, Bankman-Fried was indicted on eight felony counts, for which he faces up to 115 years in prison. The charges include counts for wire fraud on customers and lenders and related conspiracy charges; conspiracy to commit securities and commodities fraud; conspiracy to commit money laundering; and conspiracy to violate U.S. campaign finance laws. The criminal case is styled *United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 22-CR-673 (S.D.N.Y.).

98. On December 13th, the Securities and Exchange Commission filed a civil action against Bankman-Fried, *SEC v. Samuel Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.), for securities fraud in the Southern District of New York, alleging in part:

- "[F]rom the start, Bankman-Fried improperly diverted customer assets to his privately-held crypto hedge fund . . . and then used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations" and "sank billions of dollars of customer funds into speculative venture investments."

- "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw down from a virtually limitless 'line of credit' at FTX, which was funded by FTX customer assets."

- "The FTX funds transferred to Alameda were used not only for Alameda's proprietary trading, but also to fund loans to FTX executives, including Bankman-Fried himself, and to fund personal real estate purchases. Between March 2020 and September 2022, Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338 billion, including two instances in which Bankman-Fried was both the borrower in his individual capacity and the lender in his capacity as CEO of Alameda."

- "Bankman-Fried also used commingled funds from Alameda to make large political donations and to purchase tens of millions of dollars in Bahamian real estate for himself, his parents, and other FTX executives."

- "[O]n or about July 22, 2022, Bankman-Fried loaned himself $136 million."

99. Also on December 13th, the Commodity Futures Trading Commission filed a complaint against Bankman-Fried, FTX, and Alameda containing similar allegations concerning the scheme. The case is styled *CFTC v. Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, & Alameda Research LLC*, No. 22-cv-10503 (S.D.N.Y.). The CFTC alleged in part:

- When FTX customer assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX customer accounts with the corresponding amount of fiat currency on FTX internal ledger system. Customers accessing their FTX accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX accounts, even though the fiat deposits actually remained in Alameda-controlled bank accounts."

- "The use of customer assets by Alameda was not authorized by FTX customers, and FTX customers were not made aware that their assets were being used by Alameda. To the contrary, FTX's Terms of Service expressly prohibited such use of customer assets."

- "On the morning of November 9 at approximately 10 AM ET, . . . Ellison held an "all-hands" meeting with Alameda staff. In that meeting, Ellison acknowledged that earlier that year, she, Bankman-Fried and other individuals had decided to use FTX customer assets to pay Alameda's debts, and that Wang and another FTX executive were aware of this. . . . In response to an employee question, Ellison also acknowledged that her November 6 tweet to the Binance CEO offering to buy his FTT holdings at $22 per token was "kind of a misleading thing to tweet" and expressed remorse. Shortly after this meeting, most of Alameda's staff resigned."

100. The same day, FTX's CEO, Mr. Ray testified to the House Financial Services Committee that, despite the relatively new cryptocurrency markets involved, FTX committed "really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose. Not sophisticated at all—sophisticated, perhaps, in the way they were able to sort of hide it from people, frankly, right in front of their eyes."

101.    On or around December 14, 2022, Ellison agreed to plead guilty to seven felonies that carry a combined maximum 110 years' imprisonment. The charges include counts for conspiracy relating to wire fraud on customers and lenders, securities and commodities fraud, and money laundering.

102.    Also on December 14th, Wang agreed to plead guilty to four felonies that carry a combined maximum 50 years' imprisonment. The charges include counts for conspiracy relating to wire fraud on customers and lenders, and securities and commodities fraud.

103.    On December 21, 2022, the SEC and CFTC filed complaints and stipulated judgments against Ellison and Wang by virtue of their roles in defrauding FTX investors, styled *SEC v. Caroline Ellison & Zixiao "Gary" Wang*, No. 22-cv-10794 (S.D.N.Y.) and *Commodity Futures Trading Commission v. Samuel Bankman-Fried, FTX Trading Ltd D/B/A Ftx.Com, Alameda Research LLC, Caroline Ellison and Zixiao "Gary" Wang*, No. 22-cv-10503 (S.D.N.Y.).

104.    As part of their stipulations with the SEC and CFTC, Ellison and Wang admitted the truth of the SEC's and CFTC's allegations.

105.    Collectively, the guilty pleas and consent judgments show that FTX employees committed crimes in furtherance of an unlawful scheme to defraud investors, who lost billions of dollars.

## IV.    SILVERGATE HAD ACTUAL KNOWLEDGE OF AND SUBSTANTIALLY ASSISTED THE FTX FRAUD

106.    As alleged more fully below, from around the time the fraud began in mid-2019, Silvergate had actual knowledge of the FTX fraud, which it acquired through, among other things by (i) directly observing and processing suspicious funds transfers through SEN, and through other Alameda and FTX accounts at Silvergate Bank, (ii) performing enhanced due diligence on Alameda and FTX, first during their onboarding and then during ongoing monitoring, and (iii) performing enhanced blockchain analysis. In addition, Silvergate's closeness to and expertise regarding the cryptocurrency industry, and the numerous red flags present, further confirm Silvergate's actual knowledge.

107.    Further, Silvergate substantially assisted the FTX fraud by publicly promoting FTX; by failing to close, suspend, or otherwise limit any Alameda and FTX accounts, despite knowing that the accounts were being used in violation of FTX's Terms of Service and its fiduciary duties to its customers; and by accepting additional customer deposits into Alameda accounts after learning of the fraud.

**A.    Silvergate Had Actual Knowledge of the Fraud**

**1.    By Virtue of Carrying Out its Due Diligence and Ongoing Monitoring Obligations**

108.    The primary purpose of the U.S. system of banking supervision is to ensure the safety and soundness of banks in order to protect depositors, the Federal Deposit Insurance Corporation (FDIC) deposit fund, and the financial system generally.

109.    As a California state-chartered bank, Silvergate Bank is subject to both federal and state laws and regulations.

110.    The Currency and Foreign Transactions Reporting Act of 1970—which is commonly referred to as the Bank Secrecy Act ("BSA")[4]—was passed to, among other things, "prevent the laundering of money and the financing of terrorism"; "facilitate the tracking of money that has been sourced through criminal activity or intended to promote criminal or terrorist activity"; and to "protect the financial system of the United States from criminal abuse." *See* 31 U.S.C. § 5311.

111.    Silvergate has obligations under the BSA as both a "bank" and a "money transmitter." *See generally* 31 C.F.R. § 1020 ("Rules for Banks"); *id.* § 1022 ("Rules for Money Services Businesses").

112.    The BSA and its implementing regulations require a bank like Silvergate to develop, implement, and maintain an effective Anti-Money Laundering (AML) program that is reasonably designed to prevent the bank from being used to facilitate money laundering and the financing of terrorist activities. *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1020.210(a). This includes several things.

113.    First, Silvergate must have:

establish[ed] a due diligence program that includes appropriate, specific, risk-based, and, where necessary, enhanced policies, procedure and controls that are reasonably designed to enable the covered financial institution[5] to detect and report, on an ongoing basis, any known

---

[4] Pub. L No. 91-508, § 202, 84 Stat. 1114 (enacted Oct. 26, 1970) (codified as amended at 31 U.S.C. §§ 5311-5314, 5316-5366 and 12 U.S.C. §§ 1829b, 1951-1959); *see* Pub. L. No. 102-550, the "Annunzio-Wylie Anti-Money Laundering Act" (enacted 1992); Pub. L. No. 107-56, the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (USA PATRIOT Act) (enacted Oct. 26, 2001) & Pub. L. No. 116-283, §§ 6001-6511, the "Anti-Money Laundering Act of 2020" (AMLA) (enacted Jan. 1, 2021). Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

[5] "Covered financial institution means: (1) For purposes of § 1010.610 and 1010.620: (i) A bank required to have an anti-money laundering compliance program under the regulations implementing 31 U.S.C. 5318(h), 12 U.S.C. 1818(s), or 12 U.S.C. 1786(q)(1)[.]" 31 C.F.R. § 1010.605(e).

1      or suspected money laundering activity conducted through or involving any correspondent account[6] established, maintained, administered, or managed . . . for a foreign financial institution.

31 C.F.R. § 1010.610(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This includes: (a) assessing the money laundering risk presented by any foreign financial institution correspondent account (which includes Alameda and FTX accounts, *see* 31 C.F.R. § 510.309) based on its business and the markets it serves, anticipated activity, nature and duration of its relationship with the bank, the regulatory regime of the country in which it is located, and information known or available to the bank about its anti-money laundering record; and (b) applying risk-based procedures and controls designed to detect money laundering activity, including through a periodic review of account activity sufficient to determine its consistency with expected activity.

114. Second, Silvergate must have "maintain[ed] a due diligence program that includes policies, procedures, and controls that are reasonably designed to detect and report any known or suspected money laundering or suspicious activity conducted through or involving any private banking account that i[t] established, maintained, administered, or managed," *see* 31 C.F.R. § 1010.620(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This program must have been:

> designed to ensure, at a minimum, that [Silvergate] takes reasonable steps to: (1) Ascertain the identity of all nominal and beneficial owners of a private banking account; (2) Ascertain whether any person identified under paragraph (b)(1) . . . is a senior foreign political figure; (3) Ascertain the source(s) of funds deposited into a private banking account and the purpose and expected use of the account; and (4) Review the activity of the account to ensure that it is consistent with the information obtained about the client's source of funds, and with the stated purpose and expected use of the account, as needed to guard against money laundering, and to report, in accordance with applicable law and regulation, any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account.

*Id.* § 1010.620(b).

---

6 "The term correspondent account means: (i) For purposes of § 1010.610(a), (d), and (e), an account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution; and (ii) For purposes of §§ 1010.610(b) and (c), 1010.630 and 1010.670, an account established for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign bank." 31 C.F.R. § 1010.605(c)(1).

115.    Third, Silvergate's AML program must have included:

at a minimum: (i) A system of internal controls to assure ongoing compliance; (ii) Independent testing for compliance to be conducted by bank personnel or by an outside party; (iii) Designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance; (iv) Training for appropriate personnel; and (v) Appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to: (A) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and (B) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information" including "information regarding the beneficial owners of legal entity customers[.]

31 C.F.R. § 1020.210(a)(3).[7]

116.    Including by virtue of its offering SEN to its customers, Silvergate is also a "money services business," and specifically a "money transmitter," as defined by the BSA and its implementing regulations. *See* 31 C.F.R. § 1010.100(ff).

117.    Accordingly, in addition to developing, implementing, and maintaining an effective anti-money laundering program, similar to its obligation as a bank, *see* 31 C.F.R. §§ 1022.210(a) & 1022.600, applicable money transmitter regulations require Silvergate to: (a) integrate its compliance procedures into any automated data processing systems it uses (such as SEN); (b) designate a person to assure day-to-day compliance with the program and relevant regulations; and (c) provide for an independent review of the program. *See* 31 C.F.R. § 1022.210(d).

118.    The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council (the "FFIEC Manual") summarizes the applicable anti-money laundering compliance program requirements, expectations for risks and risk management, industry sound practices, and examination procedures.

119.    Silvergate must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2); 12 C.F.R. § 21.21. Silvergate must maintain a customer due diligence program to assist in predicting the types of transactions, dollar volume,

---

[7] "Legal entity customer means a corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account." 31 C.F.R. § 1010.230(e).

and transaction volume each customer is likely to conduct, furnishing a means for the bank to notice unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to know the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage. Federal guidelines thus require that Silvergate take reasonable steps to "determine the identity of all nominal and beneficial owners of the private banking account" and "determine the source(s) of funds deposited into the private banking account and the purpose and expected use of the account; and . . . review the activity of the account to ensure that the activity is consistent with the information obtained about the source of funds, the stated purpose and the expected use of the account, as needed to guard against money laundering, and to report any suspicious activity."

120.    Customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, the anti-money laundering guidelines direct federally regulated banks like Silvergate to gather additional information about the customer and its accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

121.    Moreover, Silvergate and its personnel must be able to identify and take appropriate action once on notice of any of a series of money laundering "red flags" set forth in the FFIEC Manual. Among these are: (1) funds transfers sent in large, round dollar amounts; (2) funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations; (3) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (4) repetitive or unusual funds transfer activity; (5) funds transfers sent or received from the same person to or from different accounts; (6) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (7) transactions inconsistent with the account holder's business; (8) customer use of a personal account for business purposes; (9) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (10) multiple high-value payments or transfers between shell companies without a legitimate business purpose.

122.    In addition, federal law requires Silvergate to conduct "enhanced" due diligence when establishing or maintaining a correspondent account for a financial institution that operates under an offshore

license (as FTX did) or is incorporated in a jurisdiction known for failing to cooperate with international anti-money laundering principles (as FTX was, having incorporated in The Bahamas).

123.    The FFIEC Manual also identifies "lending activities" and "nondeposit account services," including for nondeposit investment products, as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency. Therefore, when investment trading or lending services are being run through the bank, the FFIEC Manual requires heightened due diligence including determining the purpose of the account, ascertaining the source and funding of the capital, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining adequate explanations for account activities.

16.    Included in the FFIEC Manual's list are the following "red flags," all of which were present in the transactions and activity in the FTX/Alameda accounts held at Silvergate:

- "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

- "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

- "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

- "Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers."

- "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

- "A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity."

- "Customer uses a personal account for business purposes."

- "Unusual use of trust funds in business transactions or other financial activity."

124.    While the regulations governing Silvergate are detailed, they can be distilled into a number of specific things Silvergate was required to do (or questions Silvergate was required to ask and receive satisfactory answers to) vis-à-vis Alameda and FTX. During onboarding and as part of its ongoing enhanced

due diligence requirements—relevant to possible money laundering and other financial crimes— Silvergate was required to:

      a.    Identify and verify the identities of the beneficial owners and top managers of the Alameda and FTX entities, and update that information regularly.

      b.    Establish the purpose of each Alameda and FTX account with the bank, the source of the deposits into each account, and the intended use of those deposits by Alameda and FTX.

      c.    Ask for and analyze:

          i.    Alameda and FTX's financial statements (audited and unaudited);

          ii.    A description of Alameda and FTX's business models (and analyze the risks of those models);

          iii.    Organization charts for the conglomerate or other information allowing Silvergate to identify all Alameda and FTX corporate affiliates, and to identify whether Alameda and FTX each had an accounting department, a comptroller's department for cash management, an internal audit function, a compliance function, etc.;

          iv.    Any complaints or regulatory orders against Alameda or FTX and information regarding any other pending investigations;

          v.    A description or copies of any investor or customer complaints against Alameda and FTX, including lawsuits filed in court or complaints filed directly with the companies or with regulators;

          vi.    A list of each Alameda and FTX entity's board of directors and a list of the date of every board meeting, as well as board minutes;

          vii.    A description of Alameda and FTX's cash management procedures;

          viii.    A copy of Alameda and FTX's written KYC/AML procedures; and

          ix.    Alameda and FTX's written user agreements or terms of service.

      d.    Search the web and available commercial and government databases for negative information on Alameda, FTX, their shareholders, their officers, and their employees. This includes press accounts, social media, litigation filings, government enforcement orders available online, and anything Silvergate could have discovered through a Google search.

e.     For the risk analysis of Alameda and FTX, (i) research and analyze the risks of the industries they were in and their lines of business, then ask for a description of their internal controls to manage their risks, a description of their internal and external audit procedures to audit those internal controls, and the findings of those audits; and (ii) do a high-level overview of the strength of the regulatory oversight of their activities in relevant jurisdictions.

f.     Analyze all transactions through Alameda and FTX accounts at the Bank and identify suspicious transactions, which involves automated transaction analysis, the adoption of triggers setting off automated alerts to bank employees, a comprehensive internal process for employees to analyze red flags and formulate an appropriate response, and an internal audit system to make sure this all works.

125.   Further, Silvergate's Customer Identification Program (CIP) must identify when it should close an account after detecting suspicious activity or after attempts to verify a customer's identity have failed.

126.   According to Silvergate's 2018 Registration Statement, it "invested heavily in [its] risk management and compliance infrastructure," and "attracted a talented, dedicated compliance team with substantial experience in regulated financial institutions, including developing, implementing and monitoring systems to detect and prevent financial crimes." This team "developed a strong risk management and compliance framework that leverages technology for onboarding and monitoring market participants." These "proprietary compliance procedures, developed over five years of serving the digital currency industry," were "designed to enable [Silvergate] to prudently and efficiently establish deposit accounts for market participants."

127.   According to Silvergate, its "onboarding process . . . includes extensive regulatory compliance diligence," and Silvergate claims it is "highly selective in [its] customer onboarding process to ensure the integrity of the [SEN] platform."

128.   More specifically, Silvergate claims it "comprehensively investigates the customers it proposes to onboard according to the level it deems necessary and appropriate, based on whether the customer is an 'administrator,' an 'exchanger' or a 'user' of virtual currencies" as "defined in March 2013 guidance by the U.S. Treasury Department . . . ."

129. According to Silvergate, "at a minimum," its "due diligence and onboarding processes include . . . detailed reviews of each customer's ownership, management team, business activities and geographies in which they operate."

130. Moreover, "For customers such as exchanges which pose a higher degree of risk or have a higher degree of regulatory obligations, [Silvergate's] processes are more extensive and incorporate reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

131. Silvergate has repeatedly represented, including in documents publicly-filed with the SEC and United States Senate, that it complied with its due diligence obligations during the relevant time period, both generally and specifically with respect to Alameda and FTX.

132. In a December 5, 2022 public filing tilted "Public Letter from Silvergate Capital Corporation Chief Executive Officer Alan Lane," for example, Silvergate represented:

**We take risk management and compliance extremely seriously.**

Silvergate operates in accordance with the Bank Secrecy Act and the USA PATRIOT Act. For each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds.

Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage. When we identify certain kinds of activity, we are required to file suspicious activity reports, and we do so routinely. We have a track record of closing accounts that are used for purposes outside of the expected use.

This is no small undertaking. We have invested, and will continue to invest, in systems and procedures to help ensure we are conducting effective customer due diligence and monitoring. We have dedicated a substantial number of Silvergate employees to this effort. And, as our customers can attest, the onboarding process can take weeks as a result of the time we spend gathering and reviewing information and documentation from prospective customers. After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags.

By performing our risk management procedures and fulfilling our regulatory obligations, Silvergate plays a key role in helping law enforcement identify bad actors. We take this responsibility seriously.

**We conducted extensive due diligence on FTX and Alameda Research.**

*Keane v. Silvergate Bank et al.*, No. 23-cv-670
CLASS ACTION COMPLAINT

Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above.

133.     In a December 19, 2022 response to a letter of inquiry from several U.S. Senators, CEO Lane wrote on behalf of Silvergate:

Silvergate has instituted, and consistently updates and improves, a robust compliance and risk management program that spans the life cycle of each client. A significant number of Silvergate's employees are dedicated to these efforts, and we take our responsibilities very seriously.

We welcome the opportunity to share more about our risk management policies and procedures with you, both generally and as it relates to FTX and Alameda. In compliance with the Bank Secrecy Act and the USA PATRIOT Act, we determine the beneficial owner, the source of funds, and the purpose and expected use of funds for each and every account we open. Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage. When we identify certain kinds of activity, we are required to confidentially file suspicious activity reports, and we do so routinely. We have a track record of closing accounts that are used for purposes outside of their expected use.

134.     Lane's letter further represented that "Silvergate conducted significant due diligence on FTX and its related entities, including Alameda Research, both during the onboarding process and through ongoing monitoring."

135.     Silvergate engaged in enhanced due diligence processes and procedures when onboarding Alameda, FTX, and related entities, and performed ongoing monitoring over those entities. . As part of its onboarding enhanced due diligence, Silvergate obtained or determined extensive information relating to the ownership and business of each Alameda- or FTX-related entity. Silvergate periodically required Alameda, FTX, and related entities to update this information.

136.     More specifically, as part of its onboarding due diligence, including through documents such as a Business Account Application, a Certificate of Beneficial Ownership, and a Fund Risk Review Questionnaire, Silvergate obtained or determined at least the following information relating to each Alameda- or FTX-related entity:

a.      Legal name, any d/b/a, date of formation, location of formation, entity type, Certificate of Incorporation, and Memorandum of Articles of Association.

b.      U.S. or foreign tax ID.

c.      Physical street address, mailing address, website, email address, and phone number.

d.      Whether the business operates out of a home.

e.      Whether the business is a non-profit organization.

f.      Whether the business's principal office is within the U.S.

g.      Whether the business is registered to do business in California.

h.      The business's beneficial owners,[8] including their name, date of birth, address, legal identification number (such as SSN), copy of legal identification such as driver's license or passport, and percent of ownership.

i.      A "Controlling Individual" for the business, meaning "one (1) individual with significant responsibility for managing the legal entity," such as "An executive officer or senior manager," or "Any other individual who regularly performs similar functions."

j.      A register of the business's directors, officers, and members.

k.      Number of employees.

l.      A classification of the business as one or more of the following:

      i.      Fund – investing in digital assets.

      ii.      Venture Fund – investing in digital assets and/or entities.

      iii.      Software Developer.

      iv.      Digital Currency Mining.

      v.      Market Maker, including identifying "all that apply" among the following: "Buying and selling digital currency with own capital," "Proprietary Trading Firm," and Over-the-Counter Trading Firm.

      vi.      Digital Currency Exchange.

      vii.      Other (Virtual Currency), please describe.

      viii.      Other (Non-Virtual Currency), please describe.

---

[8] This applies to "each individual or entity . . . who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns or controls 25 percent or more of the equity interest of the legal entity . . . including their ownership or control percentage." Moreover, "If the Beneficial Owner is identified as another legal entity, a separate certification is required for each legal entity that owns 25% or more of the legal entity customer . . . ."

m.     A description of the "Nature of the Business" including "products/services offered."

n.     Areas of Operation – Domestic and International.

o.     Whether the business is a money services business and, if so, its FinCEN MSB Registration Number.

p.     Whether the business maintains state money transmitter licenses.

q.     Whether the business is registered with the U.S. Securities Exchange Commission and, if so, the type of registration and details.

r.     Whether the business is registered with the U.S. Commodity Futures Trading Commission and, if so, the type of registration and details.

s.     Any licensing or registration requirements applicable to the business not already identified.

t.     Whether the business provides any of the following services for a fee or as a courtesy: (i) Cash, (ii) Checks, (iii) Exchange Currency, (iv) Sell money Orders, (v) Travelers Checks, (vi) Stored Value Cards (Prepaid Access, Gift Cards, reloadable cards), (vii) Payment Processing, (viii) Wire Money, (ix) ATM Operations, (x) Lottery Sales, or (xi) Selling or Redeeming virtual currencies for customers.

u.     Whether an ATM is located on the premises and, if so, whether it provides fiat or virtual currency (and, if fiat, the identity of the cash provider for the ATM).

v.     Whether the business has any related entities including parent entities.

w.     An organizational chart showing relationships between all related entities, including the name, location, and business type of every related entity.

x.     Whether the Silvergate account will be used for Operating, Market Making, or Other.

y.     The Source of Funds for the account.

z.     The account's expected average balance.

aa.     The account's expected initial deposit balance.

bb.     The foreign jurisdictions from and to which the business expects to receive and send wires.

*Keane v. Silvergate Bank et al.*, No. 23-cv-670
CLASS ACTION COMPLAINT

cc.    A description of what funds flow activity can be expected, with an explanation of the types of transactions that will likely occur.

dd.    Anticipated monthly transaction activity, broken down into:

    i.    Cash

    ii.    Domestic Wires

    iii.    Foreign Wires

    iv.    ACH

    v.    Internal Silvergate Transfers

    vi.    Checks

    vii.    Merchant Account Activity

    viii.    Debit Card Activity

    ix.    Other

ee.    The following information regarding each of the business's principals and officers:

    i.    Name, Social Security or Tax ID number (including Foreign Tax ID as applicable).

    ii.    A copy of official identification, typically a passport or driver's license.

    iii.    Home street address, date of birth, country of citizenship, main telephone number, work telephone number, home telephone number, cell number,  job title, and email address.

    iv.    Whether the person or any family members are involved in a foreign government.

    v.    Whether the person is a "close associate" of a senior foreign political figure.

    vi.    Whether the person or any family member is involved in a local (city or county), State or Federal government position.

ff.    For funds (like Alameda):

    i.    The fund name, investment manager name, fund administrator name, auditor name, law firm name, and BSA/Compliance Officer name.

ii.     Whether the fund is located in the U.S. and, if not, all other countries or jurisdictions where the fund is located or has operations.

iii.    Whether the fund or fund manager is operating under any state or federal public regulatory enforcement actions pertaining to its BSA/AML compliance, including FinCEN enforcement actions and, if so, date issued, name of issuing agency, and type of action.

iv.    Whether the fund or affiliated organization is operating under an offshore banking license and, if so, the location and supporting documentation.

v.     A description of the fund's SEC and CFTC licensing registration requirements, including an explanation as necessary.

vi.    Whether the fund allows "in-kind" contributions.

vii.   A description of the fund's target investors and methods for soliciting investors.

viii.  Whether the funds investments are primarily accepted from domestic or international jurisdictions and, if a large portion are international, a list of all countries or jurisdictions from which the fund derives a significant portion of its investors.

ix.    The fund's projected assets under management (AUM) for the next 12 months (with selections of $1M - $25M, $25M – $50M, $50M - $100M, $100M - $150M, and $150M+).

137.   As a result of carrying out its enhanced due diligence obligations, including during onboarding and ongoing monitoring, Silvergate knew at least the following facts, from which it had actual knowledge of the fraud:

a.     There was no real separation between Alameda and FTX. Silvergate knew the fine details of both entities' corporate formations, beneficial owners, management, operations, and organizational structure. It knew both entities were majority owned by Bankman-Fried. It knew they shared office space, corporate officers, and personnel. It knew Bankman-Fried was a signatory on and had access to both entities' bank accounts, even after he nominally stepped down as CEO in October 2021.

b. <u>Alameda played a vital role in the operation of FTX</u>. Silvergate knew and understood Alameda's business as a trader and market maker on various cryptocurrency exchanges, including FTX. Accordingly, Silvergate knew Bankman-Fried was seriously conflicted because he owned controlling shares of both Alameda and FTX's equity.

c. <u>Alameda and FTX were involved in risky business models</u>. Silvergate knew Alameda and FTX were engaged in risky businesses that needed to be closely monitored. Not only did Silvergate know the cryptocurrency market was risky as a whole because of its lack of regulation and ease of use for fraud and crime, but it knew Alameda and FTX were involved in offering and trading risky financial products, such as highly-leveraged margin trades, derivatives, and futures. It knew the companies operated and headquartered in lightly-regulated, offshore jurisdictions. And it knew Alameda held large positions in FTT and other illiquid tokens and understood this presented a conflict of interest and risk to the businesses.

d. <u>Alameda and FTX lacked adequate corporate formalities</u>. Silvergate knew that Alameda, FTX, and its related entities lacked boards of directors and never had board meetings. Silvergate also knew that Alameda and several of the Alameda- or FTX-related shell entities lacked audited financial statements.

e. <u>Alameda and FTX lacked appropriate personnel and procedures</u>. Silvergate knew Alameda and FTX's KYC and AML procedures were inadequate and not followed. It knew that neither Alameda nor FTX had adequate personnel in risk management functions. And it knew FTX lacked adequate policies and procedures securing customer assets under custody.

f. <u>Bankman-Fried and FTX were directing customers to deposit funds intended for FTX into Alameda-controlled accounts</u>. Silvergate knew that the source of funds in Alameda's account was, at least in part, FTX customer deposits, and knew that FTX was directing this, including via wiring instructions on its website. It knew that the intended use of these funds was for deposit onto the FTX trading platform.

g. <u>FTX Terms of Service imposed a fiduciary duty on FTX to segregate customer funds</u>. Silvergate was aware that FTX and its operational entity, FDM, and FTX US, had fiduciary duties to FTX's customers, including pursuant to FTX's Terms of Service and FTX US's User Agreement, to

ensure that the customers' funds were segregated and held in trust for the customer. Silvergate was aware that customer funds were not considered the property of FTX or FDM.

h. FTX was using "E-Money" to misappropriate customer funds. From a review of FTX's Terms of Service, Silvergate knew FTX was using "E-Money," a nonlegal tender, to credit customers' FTX accounts. Because it also knew that those customers were being directed to deposit their funds to Alameda, Silvergate knew that neither the funds, nor custody of anything of value representing the funds (such as stablecoins or signets), was actually subsequently transferred to FTX. And because customer funds were not being segregated and held in trust in Alameda's account, where they were instead commingled with the assets of Alameda and other FTX customers, Silvergate knew Alameda and FTX were misappropriating customer funds being deposited into Alameda's Silvergate bank accounts.

i. Alameda and FTX operated through shell entities. Silvergate understood the overall corporate structure of Alameda and FTX, including their numerous affiliates and subsidiaries, several of which Silvergate banked. Silvergate knew these entities, like Alameda BVI, North Dimension, and FTX Ventures were wholly-owned by either Alameda or FTX, and thus primarily owned by Bankman-Fried.

j. The source of Alameda and FTX's venture capital was FTX customer funds. Silvergate knew that the source of funds in the account of FTX Ventures was, at least in part, FTX customer deposits.

## 2. By Virtue of Operating the Silvergate Exchange Network

138. The SEN is built on Silvergate's central bank ledger. As Silvergate stated in its Registration Statement, "Transaction instructions are passed to the core banking system via the SEN, are executed on the core banking system, and are subsequently monitored through the Bank's automated BSA systems." Accordingly, transfers between entities participating in and using SEN are captured in perpetuity in Silvergate's private records. This means that by virtue of controlling and operating the SEN, Silvergate had a particularly clear view into what was going on in the accounts of SEN participants.

139.    Silvergate's observing and processing the transfer of funds on the SEN gave it insight into both what was and what was *not* happening with SEN members' accounts. As a result, Silvergate knew at least the following facts, from which it had actual knowledge of the FTX fraud:

a.    Money going into Alameda's SEN account consisted of funds deposited by FTX customers for trading on FTX.

b.    Alameda did not transfer those customer funds to FTX (or anyone) for custodial safekeeping or otherwise.

c.    Alameda did not provide FTX with like-value reimbursement for these deposits, such as stablecoins.

d.    Alameda did not segregate the customer funds into FBO accounts or otherwise.

e.    Alameda drew those funds itself, by transferring them into other accounts it held at Silvergate Bank and elsewhere.

140.    In sum, by virtue of operating the SEN, Silvergate directly observed the improper commingling and misappropriation of customer funds because it processed transfers of those funds from Alameda's SEN account to accounts other than FTX exchange accounts.

**3.    By Virtue of its Cryptocurrency Expertise and Close Connection to the Industry**

141.    Silvergate has been referred to as "the first bank of Crypto." According to its Registration Statement, Silvergate is "one of only a small group of institutions that currently open deposit accounts and provide ongoing services in a manner that is designed to be regulatory compliant for digital currency market participants."

142.    Having been involved in the cryptocurrency industry for a decade, and at the forefront of baking the industry, Silvergate has developed a close connection and expertise about the industry. The following graphic, for example, illustrates Silvergate's comprehensive crypto business as of September 30, 2021.

143.    In its 2018 Registration Statement, Silvergate stated that its "first-mover advantage and expertise in the industry" has attracted hundreds of digital currency customers, including "the digital currency industry's most notable participants."

144.    Moreover, Silvergate said that its "customer network also enables [it] to receive feedback on challenges that the industry currently faces and anticipates facing in the future," and that "[t]hrough active dialogue with our customers, [it] stay[s] at the forefront of industry trends, identif[ies] opportunities early and create[s] solutions to address challenges."

145.    As a result, separate and apart from its due diligence actions, Silvergate was well aware of the close ties between Alameda and FTX, for example, their shared office space and personnel. Silvergate also understood the companies' respective businesses and their roles in the cryptocurrency trading market. Silvergate was likewise aware of Bankman-Fried's dominant role in both businesses' activities. And Silvergate was aware Alameda and FTX went on a venture capital spending spree during the crypto winter, buying up failing or struggling crypto businesses in what were obviously bad deals for Alameda and FTX. As Silvergate knows, according to the FFIEC Manual, these types of venture investment transactions typify the "integration" phase of money laundering, creating the appearance of legality.

146.    In addition, Silvergate was aware of FTX's Terms of Service from onboarding and ongoing due diligence and was aware the Terms prohibited U.S. customers from using the FTX international platform. Moreover, based on ongoing online review, Silvergate was or should have been aware that, contrary to this prohibition, FTX did not actually exclude U.S. customers from using the FTX International Platform. Silvergate likewise knew or should have known by at least October 2022 that FTX even facilitated use of the platform by U.S. customers by offering a mobile app, purchased from Blockfolio LLC and rebranded by FTX, that did not block U.S. users' access, as described by the Director of Enforcement of the Texas State Securities Board filed in a declaration filed in *In re: Voyager Digital Holdings, Inc.*, No. 22-10943-MEW (S.D.N.Y. Bankr.), Dkt. No. 536.

### 4.    By Virtue of Numerous Red Flags

147.    The FFIEC required Silvergate to monitor high-risk customers such as FTX and Alameda for red flags of suspicious activity. Throughout the relevant period, there was a wide variety of information available to Silvergate that served to act as red flags of the fraudulent activity. Between 2018 and 2022, other entities observed some or all of these red flags and refused to do business with FTX as a result.[9]

---

[9] For example, in 2018, crypto venture firm Dragonfly Capital was considering investing in FTX. After doing due diligence, it concluded that Bankman-Fried's "risk-taking was catastrophic," and "saw red flags – too

### a.     The Cryptocurrency Industry

148.    The cryptocurrency industry is relatively nascent, with the first cryptocurrency, Bitcoin, having been invented just 14 years ago, in 2008. As a result of its lack of regulation and ease of use, including across borders, the industry has proven to be a haven for financial crimes, like money laundering.

149.    As recently as February 2022, for example, Fitch Ratings reported on the launching of a consortium of U.S. banks and fintechs wanting to use stablecoin for payment transfers and other digital assets. According to Fitch, "Lack of legislation or clear regulatory guidance has made U.S. banks cautious to enter the digital asset space," with policymakers "increasingly voic[ing] concerns around money laundering/terrorism financing and know-your-customer (KYC) issues, as well as price volatility of cryptocurrencies."[10]

150.    Silvergate understands the risk in serving the industry. In its November 2018 Registration Statement it stated, "We are one of the only financial services providers in the United States catering our target customer base. These market participants have been underserved by the legacy financial services community due to a lack of vision and regulatory complexity associated with the digital currency industry . . . ." Silvergate claimed it was "able to overcome" these challenges "because of the in-depth industry knowledge and strategic foresight of [its] management team and [its] robust risk management and regulatory compliance framework."

151.    Moreover, as an early participant in the cryptocurrency industry—and a provider of essential technology and banking services to the industry—Silvergate has been aware of the numerous high-profile frauds that have plagued the industry over the years.

---

much risk" to invest. Moreover, some potential investors who conducted due diligence in 2018 and 2019 concluded Bankman-Fried "hid serious things and took incredible risks with other peoples' money," and that Alameda was "hemorrhaging money to pay for FTX." In May 2022, FTX offered $485,000 to MITRE to research bioweapon security. Ultimately, however, MITRE declined to finalize the gift citing concerns over unnamed red flags. Finally, in July 2022, an FTX subsidiary called FTX Future Fund offered the nonprofit, Our World in Data, a $7.5 million grant to track changes in living standards, the global impact of Covid-19 and other relevant trends. After conducting due diligence, the nonprofit declined.

[10] Fitch Wire, "US Bank Stablecoin Consortiums Signal Growth of digital Asset Demand" (Feb. 9, 2022), *at* https://www.fitchratings.com/research/banks/us-bank-stablecoin-consortiums-signal-growth-of-digital-asset-demand-09-02-2022.

### b. FTX's Avoidance of U.S. Regulation

152. In late 2018 and in 2019, Bankman-Fried moved FTX to Hong Kong for friendlier cryptocurrency regulations, and then to The Bahamas in 2021, so that it could offer risky trading options that were not legal in the United States.

153. That Alameda and FTX relocated in this manner was a red flag. Not only did FTX do so to avoid U.S. regulation and oversight—the same reason it purported to exclude U.S. customers—but in 2000, the Organization for Economic Co-operation and Development placed The Bahamas on a blacklist for tax havens, and in 2020, the European Union placed the Bahamas on a blacklist of high-risk countries for money laundering and terrorist financing.

### c. The Involvement of Daniel Friedberg in FTX and Alameda

154. According to FTX's present CEO, Mr. Ray, FTX, Alameda, FTX, and its associated entities were run by a "group of inexperienced, unsophisticated, and potentially compromised individuals[.]"

155. One person exercising a substantial amount of control and discretion on behalf of Alameda and FTX was Daniel Friedberg, a Seattle-based lawyer who acted as FTX's Chief Regulatory Officer and General Counsel, and as Alameda's Legal Counsel.

156. As FTX's Chief Regulatory Officer, Friedberg was responsible for monitoring customer protection practices, ensuring product offerings complied with existing rules, and overseeing internal audits and reviews, among other things. Friedberg, however, is notorious for his role in an online poker cheating scandal involving the theft of millions of dollars.

157. In 1999, Friedberg became involved in online gambling, acting as a corporate agent for companies set up by professional poker players, including Phil Hellmuth and Annie Duke. In 2006, Hellmuth, Duke, and Russ Hamilton, the 1994 World Series of Poker champion, were employed by Excapsa Software, an online gaming software company in Toronto where Friedberg was an executive. Excapsa and its three units in Malta managed a poker network and licensed online gaming software applications.

158. Among its sites was Ultimate Bet. In 2008, some high-stakes players on Ultimate Bet accused others of being able to see their cards and profiting on bets using that knowledge. It later emerged that tweaks to Ultimate Bet's software—known internally as God Mode—had allowed some players to see others' hands. An estimated $40 million was stolen using this cheat. Investigations traced the cheat to Excapsa. The

Kahnawake Gaming Commission of Canada, which oversaw Ultimate Bet, conducted an audit and "found clear and convincing evidence to support the conclusion that between the approximate dates of May 2004 to January 2008, Russell Hamilton, an individual associated with Ultimate bet's affiliate program, was the main person responsible for and benefitting from the multiple cheating incidents."[11]

159.    In 2013, Travis Makar, a computer expert and executive assistant to Hamilton, released audio recordings from 2008 in which Hamilton and some Ultimate Bet associates met to discuss how to deal with the cheating scandal. In it, Friedberg suggests the group claim a consultant "took advantage of a server flaw by hacking into the client, unable to identify exactly when," and said that "If we can get [the refund amount] down to $5 [million], I'd be happy."[12] That recording was made public and widely circulated online.[13]

160.    Given Friedberg's well-known and indisputable connection to a multi-million-dollar fraud, his involvement in providing legal advice—particularly to *both* Alameda and FTX—was a red flag of the fraud.

**B.    Silvergate Facilitated the Fraud by Continuing to Provide Banking Services to Alameda and FTX After Observing Fraudulent Transfers of FTX Customer Monies Through Alameda's Accounts**

161.    In a November 8, 2021 interview titled "Roundtable: Banking in the Digital Age with Alan Lane," Silvergate CEO Lane stated that Silvergate was "all in" on crypto, and that 98% or 99% of Silvergate's deposits were related to crypto by that time. In discussing Silvergate's customers, Lane stated that Silvergate was "in the background . . . helping our customers, our institutional, our business customers, scale their businesses . . . ."

---

[11] Kahnawake Gaming Commission, "Kahnawake Gaming Commission Imposes Sanctions on Ultimate Bet with Regard to Cheating Incidents" (Sept. 29, 2008), *at* http://www.gamingcommission.ca/news/pr09282008a.pdf.

[12] Recording available at https://youtu.be/XrnmyWu1vS0; *see also* Brett Collison, "Audio Tapes Expose Ultimate Bet Cheating Scandal; Phil Hellmuth Responds," PokerNews.com (May 13, 2013), *at* https://www.pokernews.com/news/2013/05/audio-tapes-expose-ultimate-bet-cheating-scandal-14986.htm.

[13] Recording available at https://youtu.be/XrnmyWu1vS0; *see also* Brett Collison, "Audio Tapes Expose Ultimate Bet Cheating Scandal; Phil Hellmuth Responds," PokerNews.com (May 13, 2013), *at* https://www.pokernews.com/news/2013/05/audio-tapes-expose-ultimate-bet-cheating-scandal-14986.htm.

162. Silvergate and FTX had a close relationship, and FTX was a crucial client of Silvergate's. As of June 2022, Silvergate had approximately 1,500 institutional clients, with a total of approximately $12 billion on deposit. Yet, despite constituting just a few accounts at Silvergate, FTX's deposits made up a full 10% of Silvergate's total deposits, making FTX one of Silvergate's most important customers.

163. In testament to this relationship—though it has been removed since FTX's bankruptcy—the following endorsement appeared on Silvergate's website:

> "Life as a crypto firm can be divided up into before Silvergate and after Silvergate — it's hard to overstate how much it revolutionized banking for blockchain companies."
>
> — Sam Bankman-Fried
> FOUNDER AND CEO, FTX AND ALAMEDA RESEARCH

Notably, in quoting him and using his endorsement to market its own business, Silvergate identified Bankman-Fried as the "Founder and CEO" of *both* FTX and Alameda Research.

164. By featuring Bankman-Fried, Alameda, and FTX in this highly-public manner, Silvergate bolstered their legitimacy.

165. During the relevant time period, Silvergate bank held multiple accounts for FTX- and Alameda-related entities.

166. First, Silvergate Bank held at least eight accounts for Alameda Research and related entities, including Alameda Ltd.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |
| Ledger Holdings Inc. | Signature Bank | 8106 |
| Ledger Prime LLC | Signature Bank | 5385 |
| Ledger Prime LLC | Signature Bank | 5377 |
| Paper Bird Inc | Signature Bank | 8701 |
| West Realm Shires Inc. | Signature Bank | 7436 |
| West Realm Shires Inc. | Signature Bank | 2804 |
| West Realm Shires Services Inc. | Signature Bank | 3976 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| FTX Lend Inc. | Signature Bank | 7651 |
| Crypto Bahamas LLC | Signature Bank | 5171 |
| Good Luck Games, LLC | Signature Bank | 7432 |
| Goodman Investments Ltd. | Signature Bank | 2903 |
| West Realm Shires Financial Services Inc. | Signature Bank | 9812 |
| Alameda Research LLC | Signet | 5489 |
| Ledger Holdings Inc | Silicon Valley Bank | 7808 |
| Alameda Research KK | Silvergate Bank | 3433 |
| Alameda Research KK | Silvergate Bank | 4621 |
| Alameda Research LLC | Silvergate Bank | 5587 |
| Alameda Research LLC | Silvergate Bank | 6056 |
| Alameda Research LLC | Silvergate Bank | 6080 |
| Alameda Research Ltd | Silvergate Bank | 4456 |
| Alameda Research Ltd | Silvergate Bank | 4464 |
| Alameda Research Ltd | Silvergate Bank | 4605 |
| FTX Europe AG | Silvergate Bank | 4439 |

45

167. Second, Silvergate Bank held at least two accounts for North Dimension Inc., as shown below.

| Ledger Prime LLC | Silvergate Bank | 1223 |
| Ledger Prime LLC | Silvergate Bank | 3145 |
| North Dimension Inc | Silvergate Bank | 8738 |
| North Dimension Inc | Silvergate Bank | 8746 |
| West Realm Shires Services Inc. | Silvergate Bank | 8589 |

Among 36 banks identified in the FTX bankruptcy filing as holding FTX-related accounts, Silvergate is the only bank holding accounts for North Dimension. This is one of the entities Alameda used to collect and commingle FTX customer funds.

168. During the relevant time period of May 2019 to November 2022, FTX directed certain customers to deposit funds for trading on FTX.com into these Alameda- or North Dimension-controlled accounts at Silvergate Bank. FTX customers did not know their funds were being sent to Alameda and retained by Alameda, rather than transferred to FTX. Meanwhile, Silvergate knew that customer funds were intended for FTX, and knew those funds were being deposited by some FTX customers into Alameda- and North Dimension-controlled accounts.

169. Third, Silvergate Bank held an account for FTX Ventures Ltd. Among the 36 banks identified in the FTX bankruptcy filing as holding FTX-related accounts, Silvergate is one of only two banks that held accounts for FTX Ventures Ltd.

| Debtor | Bank Name | Last Four Digits of Account No. |
| --- | --- | --- |
| West Realm Shires Services Inc. | Silvergate Bank | 1239 |
| West Realm Shires Services Inc. | Silvergate Bank | 8597 |
| West Realm Shires Services Inc. | Silvergate Bank | 8605 |
| FTX Ventures Ltd | Silvergate Bank | 3181 |
| FTX TURKEY TEKNOLOJİ VE TİCARET | Siraat Banksai | 5007 |

170. Finally, Silvergate held at least four accounts for FTX Digital Markets with the following account numbers:

• 0000005090042549

• 0000005090042556

• 0000005090042564

• 0000005091010037

171. Through transfers to these Silvergate Bank accounts, Alameda was able to use customer funds to pay off third-party lenders in 2022; to extend "loans" to Bankman-Fried, Wang, and other FTX insiders;

46

1  and to fund its venture spending spree. Silvergate observed and processed the transfer of funds through these

2  accounts.

3      172.    Moreover, through these Silvergate Bank accounts, FTX transferred customer funds to

4  Alameda for various illicit purposes including undisclosed venture investments, real estate purchases,

5  political donations, and personal "loans" to insiders.

6      173.    Silvergate continued to bank Alameda, FTX, and related shell corporations and entities even

7  after learning of their misappropriation of FTX customer funds, breach of fiduciary duties, and other

8  wrongdoing.

9      174.    Despite knowing of the fraud carried out through Alameda, FTX, and related entities, at no

10  point prior to FTX's bankruptcy did Silvergate cease doing business with Alameda, FTX, or Bankman-Fried,

11  nor did it suspend, close, or otherwise limit Alameda, FTX, and related entities' bank accounts.

12      175.    Rather, seeing skyrocketing deposits, revenues, and profits from Alameda and FTX's

13  dominating performance in the crypto marketplace, Silvergate continued to take more deposits from FTX's

14  customers into Alameda-controlled accounts despite knowing of Alameda and FTX's wrongful conduct.

15      176.    Silvergate had a strong incentive to keep its knowledge of the irregularities of the

16  FTX/Alameda scheme to itself. Silvergate earned increased profits in conjunction with the accelerating use

17  by customers of the FTX exchange platform and app. Silvergate earned income from transaction fees as well

18  as from investing capital derived from its FTX accounts.

19  **V.    SILVERGATE'S ACTIONS AFTER THE FTX COLLAPSE**

20      177.    Silvergate has come under significant public scrutiny for its role in FTX's collapse and faces

21  Congressional inquiries. A December 5th letter signed by Sens. Elizabeth Warren (D-MA) and John Kennedy

22  (R-LA) and by Rep. Roger W. Marshall (R-KS) posed a series of questions to Silvergate CEO Alan Lane

23  regarding the bank's relationship with the FTX complex, after noting the direct funds transfers from FTX's

24  client account at Silvergate to the accounts of Alameda and other entities under Bankman-Fried's control.

25  Silvergate's "involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an

26  egregious failure of your bank's responsibility to monitor . . . suspicious financial activity," the letter states.

27      178.    In response, Lane refused on confidentiality grounds to answer several questions focused on

28  Silvergate's knowledge of the FTX fraud, including:

a.     "Why did your bank's BSA compliance program fail to identify [that FTX was directing its customers to wire money to Alameda's account] as a reportable concern?";

b.     "Did your bank's BSA compliance program fail to identify [the movement of funds to Alameda accounts or between Alameda accounts and FTX or FTX-affiliate accounts] as suspicious?"

c.     "[P]lease provide the results of all [independent audits of Silvergate's BSA/AML compliance program."; and

d.     "Did Silvergate have any communications with representatives from Alameda, FTX, or FTX-affiliated entities regarding concerns about the transfer of funds into Silvergate?"

e.     Senators Warren, Kennedy, and Marshall responded on January 30, 2023, and expressed disappointment by Lane's "evasive and incomplete response to our December 5, 2022 letter regarding Silvergate Bank's role in the improper transfer of FTX customer funds to cryptocurrency hedge fund Alameda Research." The Senators rejected Lane's reference to confidentiality, stating that "the public need and deserve the information necessary to understand Silvergate's role in FTX's fraudulent collapse . . . ."

179.    Since FTX's collapse, Silvergate has tried to distance itself from the wrongdoing and taken steps to rectify its shortcomings

180.    On November 7, 2022, shortly before FTX filed for bankruptcy, Silvergate appointed a new Chief Risk Officer, replacing Tyler J. Pearson, who was CEO Lane's son-in-law.

181.    Silvergate has since also terminated its Chief AML and Sanction Officer, Michelle Sabins.

182.    Silvergate has since also terminated Jason Breiner who, since October 2018 has been Silvergate's Vice President and Director of Finance and Accounting; since October 2019, also its Vice President of Correspondent Banking and Senior Relationship Manager; and since 2022 also its Director of Trading. Brenier is also CEO Lane's son-in-law.

183.    Silvergate has since also terminated numerous other persons involved in its KYC/AML, risk, and SEN service departments.

## TOLLING ALLEGATIONS

184.    Silvergate fraudulently concealed from Plaintiff and the other investors the true nature of the FTX investment enterprise. Though aware of the illegal FTX/Alameda scheme and its injurious effects,

Defendants did not take any action to stop or report it, but instead continued accepting the deposits and executing the transfer and lending transactions upon which the scheme relied.

185. Silvergate was aware that FTX investors like Plaintiff did not know about the FTX/Alameda investment fraud. Silvergate had superior and exclusive knowledge of that fraud. Despite reasonable diligence on her part, Plaintiff was kept ignorant by these Defendants of the factual bases for these claims for relief.

186. Plaintiff did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Defendants' violations or the harm caused thereby until FTX's implosion in early November 2022. Plaintiff learned of the relevant actions and violations of FTX/Alameda, and Silvergate through media coverage and FTX's bankruptcy filing.

187. Because Plaintiff and the other class members could not have reasonably discovered the facts constituting Silvergate's violations until November 2022, all applicable statutes of limitation were tolled until then.

## CLASS ACTION ALLEGATIONS

188. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons who, as of November 11, 2022, had legal title to any fiat or cryptocurrency unable to be withdrawn from FTX, including both the FTX US and FTX international platforms (the "Class").

189. Plaintiff nevertheless reserves the right to divide into subclasses, expand, narrow, more precisely define, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

190. The members in the proposed class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

191. Questions of law and fact common to Plaintiff and the class (Fed. R. Civ. P. 23(a)(2) include, without limitation:

> a. Whether Silvergate had actual knowledge of Alameda and FTX's fraud;
>
> b. Whether Silvergate substantially assisted in Alameda and FTX's fraud;

c.     Whether, during the relevant period, Silvergate violated any law or regulation with respect to the detection and prevention of money laundering, fraud, and other crime;

d.     The proper equitable and injunctive relief;

e.     The proper amount of compensatory damages;

f.     The proper amount of restitution or disgorgement; and

g.     The proper amount of reasonable litigation expenses and attorneys' fees.

192.    Plaintiff's claims are typical of class members' claims in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct. Fed. R. Civ. P. 23(a)(3).

193.    Plaintiff will fairly and adequately represent and protect the interests of the class, has no interests incompatible with the interests of the class, and have retained counsel competent and experienced in class action litigation.

194.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is small such that, absent representative litigation, it would be infeasible for class members to redress the wrongs done to them.

195.    Questions of law and fact common to the class predominate over any questions affecting only individual class members.

196.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(b)(4).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

197.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

198.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200.

**Unlawful**

199.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the Bank Secrecy Act, and its implementing regulations.

200.    Plaintiff reserves the right to allege other violations of law which constitute other unlawful business acts or practices.

**Unfair**

201.    Defendants' conduct was unfair because it was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, did not outweigh the gravity of the harm to its consumers.

202.    Defendants' conduct was also unfair because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the BSA, and specifically the public policy rationales that underpin federal and state law KYC and AML obligations.

203.    Defendants' conduct was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. For example, FTX consumers directed to deposit funds into an account in the name of Alameda Research or North Dimension may reasonably not have noticed the discrepancy or may have assumed there was some lawful connection between the entities (such as a doing-business-as relationship), and reasonably relied on Silvergate, as the holder of those accounts, to safeguard their deposits from fraud.

204.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

**Fraudulent**

205.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants alleged herein were fraudulent because they induced Plaintiff and other Class Members to fund and use the fraudulent FTX exchange platforms under false pretenses.

                    *                    *                    *

206.    Defendants profited from, and Plaintiff and other Class Members suffered injury in fact and lost money or property as a result of Defendants' unlawful, unfair, and fraudulent conduct. Accordingly,

Plaintiff seeks an Order for the restitution of all monies that were inequitably acquired by Defendants pursuant to the UCL.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraud

207. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

208. Bankman Fried, Alameda and FTX's conduct detailed herein constituted a fraud upon Plaintiff and other Class Members. More specifically, Bankman-Fried, FTX and Alameda made fraudulent misrepresentations and omissions to Plaintiff and other Class Members about the nature of their FTX investments and how investor money would be applied and maintained. Plaintiff and other Class Members relied to their detriment on these misrepresentations and omissions when depositing or investing assets with FTX. As a direct and proximate result of the fraud, Plaintiff and other Class Members have been damaged.

209. Silvergate knew the conduct detailed herein constituted a fraud upon Plaintiff and other Class Members.

210. Silvergate gave substantial assistance or encouragement to Bankman-Fried, Alameda, FTX, and related persons and entities in defrauding Plaintiff and other Class Members. Specifically, Silvergate accepted billions of dollars of irregular deposits and approved or facilitated the related-party transactions, atypical lending, and the commingling and misappropriation of customer funds that marked FTX and Alameda's fraudulent scheme.

211. Defendants also substantially benefited from their participation in this scheme.

212. As a direct and proximate result of Silvergate's aiding and abetting the fraud, Plaintiff and other Class Members have been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Aiding & Abetting Breach of Fiduciary Duty

213. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

214. Alameda and FTX breached fiduciary duties owed to Plaintiff and other Class Members. Specifically, because Plaintiff and other Class Members deposited funds into Alameda and FTX's control

with the understanding that those entities would act in accordance with their promises in regard to the use of such funds, including under FTX's Terms of Service and FDM's policy, Alameda and FTX owed investors the fiduciary duties of loyalty and care and to deal honestly and in good faith. As detailed herein, Alameda and FTX breached those fiduciary duties by stealing customers' funds. As a direct and proximate result of the Alameda and FTX's fraud, Plaintiff and other Class Members have been damaged.

215. At all relevant times, Bankman-Fried was the controlling owner and/or CEO of the FTX companies. By reason of his controlling position, actions and direct and indirect representations to Plaintiff and class members, and because they deposited funds into Bankman-Fried's control with the understanding that he would act in accordance with his promises in regard to the use of such funds, Bankman-Fried owed investors the fiduciary duties of loyalty and care and to deal honestly and in good faith. Nevertheless, Bankman-Fried breached fiduciary duties he owed to Plaintiff and class members.

216. Silvergate had actual knowledge that Alameda, FTX, and related persons and entities breached fiduciary duties they owed to Plaintiff and other Class Members. Specifically, Silvergate knew that funds being deposited into Alameda's accounts were not being used consistently with the businesses' purposes and were not being held separately in trust for FTX customers, nor segregated or otherwise separated.

217. Silvergate provided substantial assistance or encouragement to Alameda, FTX, and related persons' and entities' breaches of their fiduciary duties to Plaintiff and other Class Members. Specifically, Silvergate accepted and permitted the commingling of billions of dollars of FTX customer funds it knew Alameda and FTX had a fiduciary duty to separate and hold in trust for those customers.

218. As a direct and proximate result of Silvergate's aiding and abetting of breach of fiduciary duty, Plaintiff and other Class Members have been damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### Unjust Enrichment

219. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

220. Plaintiff lacks an adequate remedy at law.

221.    Plaintiff and other Class Members conferred benefits on Silvergate by depositing funds into Silvergate Bank.

222.    Silvergate acquired ill-gotten gain, including in the form of revenues, from Plaintiff's and other Class Members' deposits intended for use on the FTX exchange.

223.    Silvergate condoned and furthered the wrongful conduct from which it benefitted. Retention of those moneys under these circumstances is unjust and inequitable because Silvergate's actions and omissions caused injuries to Plaintiff and other Class Members, since they would not have deposited and lost their funds if the true facts had been known and if Silvergate had not engaged in the malfeasance alleged.

224.    Because Silvergate's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Silvergate has been unjustly enriched in an amount to be determined at trial, and its wrongful gain should be restored to Plaintiff and the Class.

## **PRAYER FOR RELIEF**

225.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, pray for judgment against Defendants Silvergate Bank and Silvergate Capital Corporation as to each and every cause of action, and the following remedies:

a.    An Order certifying this as a class action, appointing Plaintiff and her counsel to represent the Class;

b.    And Order requiring Defendants to pay the costs of class notice;

c.    An Order requiring Defendants to pay all statutory, compensatory, and punitive damages permitted under the causes of action alleged herein;

d.    An Order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising;

e.    Pre- and post-judgment interest;

f.    Costs, expenses, and reasonable attorneys' fees; and

g.    Any other and further relief the Court deems necessary, just, or proper.

## **JURY DEMAND**

226.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 14, 2023                    /s/ Jack Fitzgerald

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD
*tblood@bholaw.com*
THOMAS J. O'REARDON
*toreardon@bholaw.com*
JAMES M. DAVIS
*jdavis@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

***Counsel for Plaintiff***