Query   Reports   Utilities   Help   What's New   Log Out

ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00993-ALC

Statistica Capital Ltd. et al v. Signature Bank
Assigned to: Judge Andrew L. Carter, Jr
Cause: 28:1453 Class Action Fairness Act

Date Filed: 02/06/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Statistica Capital Ltd.**
*on behalf of themselves and all others*
*similarly situatd and the general public*

represented by   **Caroline Emhardt**
2341 Jefferson St
Ste 200
San Diego, CA 92110
619-215-1741
Email: caroline@fitzgeraldjoseph.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Davis**
Blood Hurst & O'Reardon
501 W Broadway
Ste 1490
San Diego, CA 92101
619-338-1100
Email: jdavis@bholaw.com
*ATTORNEY TO BE NOTICED*

**Melanie Rae Persinger**
Fitzgerald Joseph LLP
2341 Jefferson St.
Suite 200
San Diego, CA 92110
619-215-1741
Email: melanie@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

**Paul K Joseph**
Fitzgerald Joseph LLP
2341 Jefferson Street
Ste 200
92110
San Diego, CA 92110
619-215-1741
Email: paul@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

**Thomas J. O'Reardon , II**
Blood Hurst & O'reardon, LLP
600 B Street, Suite 1550
San Diego, CA 92101
(619)-338-1100
Fax: (619)-338-1101
Email: toreardon@bholaw.com
*ATTORNEY TO BE NOTICED*

**Timothy Gordon Blood**
Blood Hurst & O'Reardon LLP
600 B Street Suite 1550
San Diego, CA 92101
619-338-1100
Fax: 619-338-1101
Email: tblood@bholaw.com
*ATTORNEY TO BE NOTICED*

**Trevor Flynn**
Fitzgerald Joseph, LLP
2341 Jefferson Street
Ste 200
San Diego, CA 92110
619-215-1741
Email: trevor@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

**John Joseph Fitzgerald , IV**
Fitzgerald Joseph LLP
2341 Jefferson Street, Suite 200
San Diego, CA 92110
619-215-1741
Fax: 619-331-2943
Email: jack@fitzgeraldjoseph.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Statistica Ltd.**
*on behalf of themselves and all others
similarly situatd and the general public*

represented by **Caroline Emhardt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melanie Rae Persinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul K Joseph**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas J. O'Reardon , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Gordon Blood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Trevor Flynn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Joseph Fitzgerald , IV**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Signature Bank**                    represented by **Elizabeth M. Sacksteder**
Paul Weiss (NY)
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax: 212-757-3990
Email: esacksteder@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**H. Christopher Boehning**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3061
Fax: 212-757-3990
Email: cboehning@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Sombat Carey**
Paul Weiss (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3566
Fax: (212)-492-0566
Email: jcarey@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| | | |
|---|---|---|
| 02/06/2023 | 1 | COMPLAINT against Signature Bank. (Filing Fee $ 402.00, Receipt Number ANYSDC-27303924)Document filed by Statistica Capital Ltd., Statistica Ltd...(Fitzgerald, John) (Entered: 02/06/2023) |
| 02/06/2023 | 2 | CIVIL COVER SHEET filed..(Fitzgerald, John) (Entered: 02/06/2023) |
| 02/06/2023 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Statistica Capital Ltd., Statistica Ltd...(Fitzgerald, John) (Entered: 02/06/2023) |
| 02/06/2023 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Signature Bank, re: 1 Complaint. Document filed by Statistica Capital Ltd., Statistica Ltd...(Fitzgerald, John) (Entered: 02/06/2023) |
| 02/07/2023 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney John Joseph Fitzgerald, IV. The party information for the following party/parties has been modified: Statistica Capital Ltd., Statistica Ltd.. The information for the party/parties has been modified for the following reason/reasons: party text was omitted. (sj) (Entered: 02/07/2023)** |
| 02/07/2023 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney John Joseph Fitzgerald, IV. The following case opening statistical information was erroneously selected/entered: Citizenship Defendant code 1 (Citizen of This State). The following correction(s) have been made to your case entry: the Citizenship Defendant code has been modified to 4 (Incorporated/Principal Place of Business-This State). (sj) (Entered: 02/07/2023)** |
| 02/07/2023 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Andrew L. Carter, Jr. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(sj) (Entered: 02/07/2023) |
| 02/07/2023 | | Magistrate Judge Valerie Figueredo is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (sj) (Entered: 02/07/2023) |
| 02/07/2023 | | Case Designated ECF. (sj) (Entered: 02/07/2023) |
| 02/07/2023 | 5 | ELECTRONIC SUMMONS ISSUED as to Signature Bank. (sj) (Entered: 02/07/2023) |
| 02/27/2023 | 6 | SUMMONS RETURNED EXECUTED. Signature Bank served on 2/13/2023, answer due 3/6/2023. Service was accepted by Marisol Murphy, Administrative Assistant. Document filed by Statistica Capital Ltd.; Statistica Ltd...(Fitzgerald, John) (Entered: 02/27/2023) |
| 02/27/2023 | 7 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Melanie Persinger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27396520. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # 1 Affidavit of Melanie Persinger in Support of Motion to Appear Pro Hac Vice, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Granting Motion to Appear Pro Hac Vice).(Persinger, Melanie) Modified on 2/28/2023 (sgz). (Entered: 02/27/2023) |

| | | |
|---|---|---|
| 02/28/2023 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. <u>7</u> MOTION for Melanie Persinger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27396520. Motion and supporting papers to be reviewed by Clerk's Office staff. The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California 415-865-7000. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (sgz)** (Entered: 02/28/2023) |
| 02/28/2023 | <u>8</u> | MOTION for Timothy G. Blood to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27403774. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # <u>1</u> Affidavit of Timothy G. Blood, # <u>2</u> Exhibit Certificate of Good Standing, # <u>3</u> Text of Proposed Order (Proposed) Order Granting Motion to Appear Pro Hac Vice).(Blood, Timothy) (Entered: 02/28/2023) |
| 03/01/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>8</u> MOTION for Timothy G. Blood to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27403774. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sac)** (Entered: 03/01/2023) |
| 03/01/2023 | <u>9</u> | MOTION for Thomas J. O'Reardon to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27408540. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # <u>1</u> Affidavit of Thomas J. O'Reardon, # <u>2</u> Exhibit Certificate of Good Standing, # <u>3</u> Text of Proposed Order (Proposed) Order Granting Motion to Appear Pro Hac Vice).(O'Reardon, Thomas) (Entered: 03/01/2023) |
| 03/01/2023 | <u>10</u> | MOTION for James M. Davis to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27408860. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # <u>1</u> Affidavit of James M. Davis, # <u>2</u> Exhibit Certificate of Good Standing, # <u>3</u> Text of Proposed Order (Proposed) Order Granting Motion to Appear Pro Hac Vice).(Davis, James) (Entered: 03/01/2023) |
| 03/02/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>9</u> MOTION for Thomas J. O'Reardon to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27408540. Motion and supporting papers to be reviewed by Clerk's Office staff., <u>10</u> MOTION for James M. Davis to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27408860. Motion and supporting papers to be reviewed by Clerk's Office staff. The document has been reviewed and there are no deficiencies. (sac)** (Entered: 03/02/2023) |
| 03/02/2023 | <u>11</u> | ORDER FOR ADMISSION PRO HAC VICE granting <u>8</u> Motion to Appear Pro Hac Vice. The motion of Timothy G. Blood, for admission to practice Pro Hac Vice in the above captioned action is granted. As further set forth by this Order. SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 3/2/2023) (tg) (Entered: 03/02/2023) |
| 03/03/2023 | <u>12</u> | ORDER granting <u>9</u> Motion for Thomas J. O'Reardon to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 3/3/2023) (ate) (Entered: 03/03/2023) |
| 03/06/2023 | <u>13</u> | MOTION for Caroline S. Emhardt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27428025. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # <u>1</u> Affidavit Affidavit in Support of Motion, # <u>2</u> Exhibit Certificate of Good Standing, # <u>3</u> |

| | | |
|---|---|---|
| | | Text of Proposed Order Proposed Order for Admission Pro Hac Vice).(Emhardt, Caroline) (Entered: 03/06/2023) |
| 03/06/2023 | 14 | MOTION for Melanie Persinger to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # 1 Affidavit of Melanie Persinger in Support of Motion to Appear Pro Hac Vice, # 2 Exhibit - Certificate of Good Standing, # 3 Text of Proposed Order Granting Motion to Appear Pro Hac Vice).(Persinger, Melanie) Modified on 3/7/2023 (aea). (Entered: 03/06/2023) |
| 03/06/2023 | 15 | MOTION for Paul K. Joseph to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27428518. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # 1 Affidavit of Paul K. Joseph, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order).(Joseph, Paul) (Entered: 03/06/2023) |
| 03/06/2023 | 16 | NOTICE OF APPEARANCE by Jessica Sombat Carey on behalf of Signature Bank.. (Carey, Jessica) (Entered: 03/06/2023) |
| 03/06/2023 | 17 | NOTICE OF APPEARANCE by H. Christopher Boehning on behalf of Signature Bank.. (Boehning, H.) (Entered: 03/06/2023) |
| 03/06/2023 | 18 | NOTICE OF APPEARANCE by Elizabeth M. Sacksteder on behalf of Signature Bank.. (Sacksteder, Elizabeth) (Entered: 03/06/2023) |
| 03/06/2023 | 19 | **FILING ERROR -- DEFICIENT DOCKET ENTRY - MISSING DIVERSITY INFORMATION -** RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Signature Bank..(Sacksteder, Elizabeth) Modified on 3/8/2023 (lb). (Entered: 03/06/2023) |
| 03/06/2023 | 20 | MOTION for Trevor M. Flynn to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27429409. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Statistica Capital Ltd., Statistica Ltd.. (Attachments: # 1 Affidavit of Trevor M. Flynn, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order).(Flynn, Trevor) (Entered: 03/06/2023) |
| 03/06/2023 | 21 | LETTER MOTION for Conference *(Pre-Motion Conference)* addressed to Judge Andrew L. Carter, Jr. from Elizabeth Sacksteder dated March 6, 2023. Document filed by Signature Bank..(Sacksteder, Elizabeth) (Entered: 03/06/2023) |
| 03/07/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 13 MOTION for Caroline S. Emhardt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27428025. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea) (Entered: 03/07/2023)** |
| 03/07/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 14 MOTION for Melanie Persinger to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea) (Entered: 03/07/2023)** |
| 03/07/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 15 MOTION for Paul K. Joseph to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27428518. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea) (Entered: 03/07/2023)** |
| 03/07/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Trevor M. Flynn to Appear Pro Hac Vice . Filing fee $ 200.00,** |

| | | |
|---|---|---|
| | | receipt number ANYSDC-27429409. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea) (Entered: 03/07/2023) |
| 03/08/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Notice to Attorney Elizabeth M. Sacksteder to RE-FILE Document No. 19 Rule 7.1 Corporate Disclosure Statement,. The filing is deficient for the following reason(s): the jurisdiction of this action is based on diversity - the party/intervenor did not name and identify the citizenship of every individual or entity whose citizenship is attributed to that party or intervenor. Re-file the document using the event type Rule 7.1 Corporate Disclosure Statement found under the event list Other Documents - select the correct filer/filers - attach the correct signed PDF - when prompted with the message "Are there any corporate parents or other affiliates?", select the Yes radio button - enter the corporate parent/other affiliate, click the Search button - select the correct corporate parent/other affiliate name from the search results list or if no person found, create a new corporate parent/other affiliate - select the party to whom the corporate parent/other affiliate should be linked - add corporate parent/other affiliate names one at a time - name and identify the citizenship of every individual or entity whose citizenship is attributed to that party or intervenor. Please use the revised form found here NYSD form page** (lb) (Entered: 03/08/2023) |
| 03/08/2023 | 22 | LETTER RESPONSE to Motion addressed to Judge Andrew L. Carter, Jr. from Jack Fitzgerald dated March 8, 2023 re: 21 LETTER MOTION for Conference *(Pre-Motion Conference)* addressed to Judge Andrew L. Carter, Jr. from Elizabeth Sacksteder dated March 6, 2023. . Document filed by Statistica Capital Ltd., Statistica Ltd...(Fitzgerald, John) (Entered: 03/08/2023) |
| 03/09/2023 | 23 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Signature Bank..(Sacksteder, Elizabeth) (Entered: 03/09/2023) |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATISTICA CAPITAL LTD. and STATISTICA LTD., on behalf of themselves, all others similarly situated, and the general public,<br><br>    Plaintiffs,<br><br>          v.<br><br>SIGNATURE BANK,<br><br>    Defendant. | Case No.: 1:23-CV-993<br><br>CLASS ACTION<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs STATISTICA CAPITAL LTD. and STATISTICA LTD., on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendant SIGNATURE BANK (at times "Signature" or the "Bank"), and allege the following upon their knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## **INTRODUCTION**

1.    Plaintiffs bring this action because Signature Bank had actual knowledge of and substantially facilitated the now-infamous FTX fraud. In particular, Signature knew of and permitted the commingling of FTX customer funds within its proprietary, blockchain-based payments network, Signet.

2.    Plaintiffs themselves advised Signature on multiple occasions that their funds were intended for FTX; Signature nevertheless allowed their funds to be transferred via Signet and by wire into Alameda-controlled accounts.

3.    Plaintiffs bring this action to recover compensation for the damages they and other similarly-situated entities suffered as a result of Signature's malfeasance.

## THE PARTIES

4.      Plaintiff Statistica Capital Ltd. is a British Virgin Islands limited company and is licensed as an Approved Manager by the Financial Services Commission of the British Virgin Islands.

5.      Plaintiff Statistica Ltd. is a British Virgin Islands limited company. Prior to a recent name change and during the relevant time period, the entity was called Statistica Fund Ltd.

6.      Defendant Signature Bank is a New York chartered commercial bank with its principal executive offices at 565 Fifth Avenue, New York, New York, 10017. Signature Bank's stock is publicly-traded on the NASDAQ Global Select Market under the ticker "SBNY."

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one member of the class is a citizen of a state different from Defendant. In addition, more than two-thirds of the class members reside in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

8.      The Court has personal jurisdiction over Defendant because Defendant has purposely availed itself of the benefits and privileges of conducting business activities within the State.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides (*i.e.*, is subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

## I.      CRYPTOCURRENCY AND BLOCKCHAIN

10.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Cryptocurrency is the common name given to a set of unique digital assets that exist and can be transferred on peer-to-peer networks, called blockchains, using cryptography, rather than requiring facilitation from a financial institution.

11.     These networks can be decentralized (spread across a network of internet-connected computers that no one person or group controls), or centralized (controlled by some party). Unlike

government-issued fiat currency, cryptocurrencies exist purely as digital entries to an online database, often known as a public or distributed ledger. Peer-to-peer transactions are placed in "blocks" for verification, and once verified as legitimate, the blocks are recorded in a public ledger, or blockchain, that is unique to a particular cryptocurrency. When a transaction is verified, it is given a unique alphanumeric identifier, called a "hash." Because ledgers are spread across a network of computers that record all transactions, entries on public ledgers are time-stamped and immutable, meaning that all cryptocurrency transactions are traceable.

12.     The native cryptocurrency on an individual blockchain is called a "coin," but there is another type of common blockchain-based digital asset called a "token." Coins and tokens have unique characteristics. Coins operate on an independent blockchain specifically created to launch and record transactions for that coin. Because it requires building a blockchain, creating and launching a coin is difficult and labor intensive. Coins are intended to function as digital money with purchasing power and are designed to have the attributes of more traditional currency: scarcity, durability, and inherent value. By contrast, tokens operate on top of existing blockchains and require less expertise or expense to launch. In this regard, tokens can be created by an issuer "out of thin air." Moreover, tokens can be created by an issuer for a variety of reasons, to represent a variety of assets or services.

13.     New coins are "minted," or issued, by "mining," which involves "miners" solving complex math problems to validate transactions and be rewarded with freshly minted coins. The process uses sophisticated hardware to compute extremely complex math problems. The first computer to find the solution to the problems receives the next block of coins and the process begins again. This verification process is known as "proof of work." Tokens, by contrast, are created and distributed at the issuers' discretion and are thus much easier to create and acquire (although their creation is still called minting).

14.     Cryptocurrencies can also be destroyed through a process called "burning" to effectively take the assets out of circulation permanently. To execute a cryptocurrency burn, crypto destined to be destroyed is sent to an "eater address," or a burn wallet, which is a digital wallet that only receives tokens, but cannot send them. Those coins are thus effectively locked up and taken out of circulation. That transaction, confirmed on the blockchain ledger, makes the burn permanent and irrevocable.

15.     There is a particular type of coin called a "stablecoin." Stablecoins' putative purpose is to remain stable in value by being pegged to some underlying store of value. For (a simplified) example, a stablecoin issuer might place $1 billion in a bank account, then issue one billion $1 stablecoins effectively underwritten by the fiat asset. Many stablecoins are pegged to fiat (and several pegged 1-to-1 to U.S. dollars specifically), but others are backed by portfolios of currencies, commercial paper, and other financial assets. Stablecoins are the most-traded digital assets because they function as intermediaries between both fiat and crypto, and between crypto pairs for which there may not be much liquidity.

16.     Cryptocurrencies (both coins and tokens) must be stored in digital "wallets." These are applications that store the passkeys (*i.e.*, private codes) used by owners to engage in cryptocurrency transactions. Digital wallets also provide the interface that lets owners access and transfer their digital assets.

## II.     SIGNATURE'S DIGITAL ASSET BUSINESS

### A.     Signature's Formation and Entrance into the Cryptocurrency Industry

17.     Signature Bank was incorporated as a New York State-chartered bank in September 2000; commenced operations in May 2001; and went public in March 2004. It is a full-service commercial bank with 40 private client offices throughout New York, California, Connecticut, North Carolina, and Nevada. Signature takes a single-point-of-contact approach to its business, wherein the Bank's network of private client banking teams serves the needs of privately-owned businesses.

18.     As one of only a handful of institutions providing banking services to the cryptocurrency industry, Signature is well known as one of the most crypto-friendly banks in the United States. Signature began its foray into the industry in April 2018, with the hiring of a five-person Digital Asset Banking team. By 2020, the group had grown to 12 employees. Today, Signature has relationships with many institutional participants that make up the digital asset ecosystem, including exchanges, custodians, digital miners, institutional traders, and more.

### B.     Signet

19.     In December 2018, the New York Department of Financial Services ("NY DFS") authorized—and on January 1, 2019, Signature launched—a proprietary blockchain-based payment solution

called Signet (or sometimes SigNET), to allow for real-time payments 24/7/365. Signature's 2018 Annual

Report described Signet as follows:

> The Signet Platform, which leverages blockchain technology, allows Signature Bank's commercial clients to make payments in U.S. dollars, 24 hours a day, seven days a week, 365 days a year. Transactions made on the Signet Platform settle in real time, are safe and secure, and incur no transaction fees. Signature Bank is the First FDIC-insured bank to launch a blockchain-based digital payments platform. Typically, in the case of real-time payments, funds are transferred between two different institutions. With Signet, funds are transferred in real time between commercial clients of Signature Bank, eliminating any dependence on a third party.

20.     The below image is taken from a 2020 marketing brochure for Signet.



21.     Signet was designed to let Signature Bank clients move money in 30 seconds or less, 24 hours

per day, 7 days per week. By contrast, traditional payments using the Swift interbank platform (*i.e.*, wires)

or the Automated Clearing House (*i.e.*, ACH transfers) can take as long as three days and are generally

unavailable during the weekend and outside of business hours.

22.     Signet works through an asset tokenization and redemption process, comprised of minting

and burning tokens, powered by a permissioned version of the Ethereum blockchain. This process converts

U.S. dollars into "signet" tokens, which are one-for-one digital representations of the dollars. Signet tokens

are compliant with Ethereum's ERC-20 standard, but unlike other ERC-20-compliant tokens, Signature's digitized dollars were designed to work only on the bank's proprietary Signet platform, and not to interoperate with other exchanges or services. This tokenization process is automated, but Signature has support staff available 24/7 for credential resets and other technical support issues.

23.     In a June 2021 interview, Signature Chairman Scott A. Shay explained that, while signets are similar to stablecoins, they have some advantages:

> What makes Signet a little different is that it is a digital representation of a dollar. In stablecoin, you have a piece of a pool of money. Right? The money is in whatever it's in, at banks. . . . They have a pool of money and you have 1.00001% of that money. That's what stablecoin represents.

> What we have is a tad different, in that it's actually a digital representation of this very dollar that I'm putting in the bank. It's actually a dollar in an FDIC bank account, it's not necessarily insured, it's only insured obviously up to the $250,000. But it's actually a deposit at a bank, as opposed to a piece of a pool.

> I'm not saying that one's better than the other, but they are different. What we've tokenized, if you will, is that actual dollar you put into Signature Bank. And that also has some attraction for people. That's their dollar, as opposed to a share in a greater pool.

24.     Shay further stated, "The other thing that makes it far superior to stablecoin is you don't have to wait for delays. You don't have to worry about the fact that miners or someone is taking a little piece. If I send you a $1,000, you get a $1,000. There's nobody taking a cut."

25.     NY DFS's authorization of Signet was limited to institutional clients and included required conditions to ensure the Bank maintained robust policies and procedures to address risks and ensure compliance with New York's strong standards and regulations regarding anti-money laundering, anti-fraud, and consumer protection measures. As a result, when Signet was launched, to use the platform, both parties to a transaction had to be Signature Bank clients holding a minimum of $250,000, and each must have passed the bank's know-your-customer (KYC) and anti-money laundering (AML) compliance procedures.

26.     As of August 2020, Signature had about 650 clients within its digital asset ecosystem, including, cryptocurrency exchanges, over-the-counter brokers, hedge funds, and market makers. By the end

of 2021, that had increased to 1,000 clients, with at least 740 of them on Signet. As of January 2023, Signature had 1,410 active digital asset clients transacting $275.5 billion on Signet in the fourth quarter of 2022.

27.     Signet was and is accessible to those clients in three ways: (i) through Signature's website, (ii) through a client's treasury management system using an API,[1] and (iii) through a third party, such as the Fireblocks digital assets platform.

**C.      The Growth in Signet Use and in Signature's Deposits and Revenue**

28.     Signature does not charge its clients fees for their use of Signet. Rather, Signature recoups its cost of Signet by using the service to attract new customers, grow its client and deposit base, and expand the banking services it supplies to its Signet users. In fact, one of Signature's core business principles is its focus on deposits. Signature's Chief Executive Officer, Joseph DePaolo, once told ABA Banking Journal, "Everyone thinks of banking as lending. I think of banking as bringing in deposits."

29.     As a result of Signet's launch, Signature saw significant increases in deposits, which, as shown below, grew 263% in just two years, from $40.4 billion in 2019, to $106.1 billion in 2021. During a January 2021 earnings call, CEO DePaolo stated that "our Digital Banking team grew over $8 billion in deposits" in the previous quarter, such that "We have clearly distinguished ourselves as the predominant bank in the digital space."

---

[1] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software. APIs let a product or service communicate with other products and services without having to know how they are implemented. In its 2021 Annual Report, Signature stated:

> Our Application Program Interface (API) connectivity offered through the Signet platform enables clients and developers to directly integrate Signet's instantaneous blockchain payments features within their systems and workflows to access full transactional capabilities. The API integration affords Signet clients the ability to increase their level of financial controls, operational efficiencies and access to capital. It also offers greater efficiency, speed and security when integrating the Bank's digital payments platform directly into their products and services. Our API advancements have been revolutionary for Signet users, and Signet continues to attract an increasing number of clients, deposits and ecosystems. With the implementation of the API, we have seen rapid adoption of Signet by our digital clients.



30. In fact, 2021 was a marquee year for Signature Bank. Transactions on Signet grew from $17.5 billion in the first quarter of 2020 to $213.7 billion in the last quarter of 2021, a growth of more than 1,200% in two years. Total digital asset transaction volume reached $579.4 billion in 2021. According to Signature, its digital asset client base grew more than 55% in 2021, helping to increase Signet's transfer volume by more than 400%. Moreover, new user adoption of Signet resulted in more than $7 billion in growth, while year-over-year deposit balances grew more than 200%. By the end of 2021, the volume of deposits from Signature's digital asset customers had reached $28.73 billion, representing more than 27% of the bank's deposits. As a result, 2021 represented for Signature a year of record revenue growth, record net income, and record asset growth.





31.     In particular, non-interest-bearing deposits grew dramatically, which Signature has largely attributed to the success of Signet. In fact, this is an area where Signature saw exponential growth, as demonstrated in the chart below, drawn from data in Signature's public filings.



32.     Cryptocurrency exchanges are particularly valuable clients to Signature, as they represent hubs of the cryptocurrency industry and bring in significant non-interest bearing deposits. Illustrating this, despite that there are relatively few exchanges relative to other participants in the digital asset industry, by the end of 2021, Signature had $3.4 billion in deposits from blockchain technology and digital mining companies, $4.5 billion from over-the-counter (OTC) desks and institutional traders, $6.9 billion from stablecoin issuers, and $14 billion from exchanges.

## III.    THE FTX FRAUD AND COLLAPSE

33.     Until recently, FTX was one of the largest cryptocurrency exchanges in the world. Its spectacular implosion in early November 2022 has been widely publicized, and several individuals involved have been indicted for or agreed to plead guilty to wire fraud, money laundering, and other financial crimes.

34.     At the heart of the FTX fraud was the misappropriation of customer deposits intended for the FTX cryptocurrency exchange into bank accounts controlled by Alameda Research LLC ("Alameda"), a cryptocurrency hedge fund sharing common ownership with FTX, where the customer deposits were then embezzled.

35.     At the helm of the scheme was Samuel Bankman-Fried, the co-founder and majority owner of both Alameda and FTX. From FTX's inception in May 2019, through the time FTX collapsed and entered bankruptcy on November 11, 2022, Bankman-Fried and his associates improperly diverted customer assets to Alameda, which used the funds to make bad bets on cryptocurrencies; to give billions in "loans" to Bankman-Fried and other insiders to fund political donations and lavish lifestyles; and to acquire failing crypto businesses in bad deals, hoping to prop up the crypto industry.

36.     As alleged more fully below, one of the primary ways in which Bankman-Fried and his associates accomplished this was by directing FTX customers to wire or otherwise deposit fiat currency into bank accounts held and controlled by Alameda. Signature knew about and facilitated these improper actions.

A.     **In October 2017, Bankman-Fried and Wang Form Alameda Research as a Cryptocurrency Hedge Fund**

37.     After graduating from MIT, Bankman-Fried worked for the global trading firm, Jane Street, where he learned a trading strategy called arbitrage, which seeks to exploit price gaps in markets.

38.     By 2017, the cryptocurrency industry was booming, and there were several private digital asset exchanges. Bankman-Fried—who had by then quit his job at Jane Street—noticed that Bitcoin was selling for substantially more money in Japan than in the U.S. and thought he could exploit the 10% price gap. As a 25-year-old, in October 2017, Bankman-Fried and then 24-year-old, Zixiao "Gary" Wang thus co-founded Alameda as a quantitative trading firm specializing in digital assets, sometimes known as a crypto hedge fund.

39.     Alameda was headquartered at 2000 Center Street, Suite 400, in Berkeley, California (the "Center Street Address"), which is in Alameda county, the namesake of the company. Bankman-Fried chose the name Alameda specifically to avoid attention.

40.     At first, Bankman-Fried, who was Alameda's CEO, was responsible for trading operations while Wang handled engineering and programming functions. Until Alameda declared bankruptcy on November 11, 2022, Bankman-Fried and Wang were the sole equity owners, with 90% and 10% of the ownership, respectively.

41.     Alameda maintained one or more bank accounts at Signature Bank and had a Signet account.

42.     Initially, Alameda was focused on leveraging Japan's Bitcoin premium. At the peak of this strategy, it was sending $15 million between the two countries daily, generating $1.5 million in daily profits. That gap lasted for only a few weeks, but its exploitation earned Alameda about $20 million.

43.     As crypto rapidly expanded in popularity and began attracting professional investors, arbitrage opportunities became less lucrative or disappeared. Partly in response to the declining arbitrage opportunities, and partly as a way to reinvest Alameda's profits, in late 2018, Bankman-Fried and his associates decided to launch a cryptocurrency exchange, and Alameda began shifting its focus from arbitrage to market making.

**B.      In May 2019, Bankman-Fried and Wang Form the Cryptocurrency Exchange, FTX**

44.     By the start of 2019, Bankman-Fried, Wang, and a third man named Nishad Singh were working to build their own cryptocurrency exchange. After four months of coding, they ultimately co-founded FTX Trading Ltd., an Antigua and Barbuda limited corporation which, through a child company called FTX Digital Markets Ltd. ("FDM") did business as FTX.com, sometimes referred to as the FTX International platform.

45.     FTX.com launched in May 2019 as a global crypto asset trading platform, although persons in some countries, including the United States, were prohibited from using the platform. Later, in August 2020, Bankman-Fried formed FTX US as an exchange platform available to U.S. customers.

46.     FTX initially shared offices in Berkeley and personnel with Alameda, and represented itself to be a San Francisco company, as shown in screenshots below from mid- to late 2019, including FTX's Facebook page.



FTX Raises $8M in Funding

Aug 11, 2019 finsmes.com

FTX, a San Francisco, CA-based cryptocurrency derivatives exchange ... The exchange also issued its native utility token, FTT, which provide holders with a number of unique benefits, such as ⅓ revenue buy and burn, lower trading fees, OTC rebates ...





47.     For some time after FTX was formed, Bankman-Fried's Twitter profile identified him as the CEO of both FTX and Alameda.



48.     For some time after FTX was formed, Bankman-Fried tweeted about and promoted it from his @SBF_Alameda account, for example, the below July 24, 2019 and September 14, 2019 tweets.





49. Similarly, as shown below, FTX's twitter profile stated that it was a "Crypto Derivatives Exchange by Alameda Research."



50. Alameda's website likewise made clear this connection. As shown below, the header of Alameda's website included a prominent link to FTX. Moreover, a button "Trade with Us" located on the website linked to FTX's website.



51. In June 2019, FTX published a white paper to help attract potential investors. On the first page, under the header, "Track Record of Proven Success," it stated:

> FTX is backed by Alameda Research, a ~$100million AUM quantitative cryptocurrency trading firm. Within a year, Alameda Research became the largest liquidity provider and market maker in the space. Alameda trades $600 million to 1 billion a day, accounts for roughly 5% of global volume and is ranked 2nd on the BitMEX leaderboard.

52. Since at least 2020, FTX maintained bank accounts at Signature and was a Signet user.

53. Bankman-Fried was the ultimate decisionmaker at FTX from its inception until he resigned on November 11, 2022, and maintained tight control over the operation, delegating little to others. As a result,

he was highly-involved in its operations, for example, sometimes personally answering even minor support requests from users.

54.     FTX offered its customers a number of services, including:

    a.    The *spot market*, a trading platform through which customers could trade crypto assets with other FTX customers in exchange for fiat currency or other crypto assets.

    b.    *Spot margin trading services*, allowing FTX customers to trade using assets they did not have (*i.e.*, to trade on margin) by posting collateral in their FTX accounts and borrowing crypto assets through the spot market on the FTX platform. FTX also allowed customers to lend their crypto assets to other FTX customers who would then use those crypto assets to spot trade.

    c.    An *OTC desk*, or off-platform portal that enabled customers to connect and request quotes for spot crypto assets, and to conduct trades.

    d.    *Futures trading*, for the purchase and sale of crypto futures contracts.

55.     A screenshot of the FTX web-based platform appears below.



56. Nevertheless, some of FTX's services were available through an API, which institutional investors often used.

57. Trading on the platform was largely accomplished through an internal FTX order book that matched buyers with sellers.

58. Signing up for FTX was simple. FTX did not require its users to validate their identities by providing official identification documents. In fact, as shown in the below screenshot of FTX's website in around late 2019, to sign up, an FTX user was not required to provide even the most basic identifying information, such as name, date of birth, address, or other identifiers.



59.     As a result, users were able to create and fund FTX accounts with nothing more than an email address. This meant accounts on FTX could easily be opened anonymously, including by customers in the United States.[2] Moreover, users were able to make unlimited deposits and trades with up to 100x leverage, though they could only withdraw $1,000. While this rule was designed to combat money laundering, it did not prevent users from laundering unlimited funds from one account to another to bypass the $1,000 limit.

60.     Furthermore, to double the withdrawal limit to $2,000, a user needed only to complete FTX's "tier 1" KYC requirements, which, as shown in the below screenshot from an FTX document, were minimal: just an email, name, and country of residence.

FTX has three different tiers of KYC requirements. Please see below for a summary of the levels:

| Tier | Requirements | Withdrawal Limits |
|---|---|---|
| 0 | Email | $1000 USD lifetime |
| 1 | Email<br>Name<br>Country of residence and region/province | $2000 USD Daily |

61.     FTX did not verify the information provided by users who completed its tier 1 KYC process, which meant U.S. consumers could easily register, and any user could easily register multiple accounts.

62.     In effect, FTX had virtually no AML or KYC processes or policies in place, or the existing policies lacked any meaningful enforcement.

63.     FTX's services were rendered pursuant to Terms of Service ("Terms") that were publicly-available on FTX's website, FTX.com.[3] The Terms provided that, "In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account."

---

[2] IP address-based restrictions are easily circumvented using a Virtual Private Network (VPN). Moreover, FTX introduced a mobile app in 2020 that did not restrict U.S. customers' use. Accordingly, approximately 2% of the traffic on FTX was from U.S. customers who were purportedly prohibited from using the platform.

[3] *See* FTX Terms of Service (May 13, 2022), attached hereto as <u>Exhibit 1</u>, and incorporated by reference into this Complaint.

64. Regarding fiat, the Terms of Service provided that "the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods," and "Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account." However, this "E-MONEY IS NOT LEGAL TENDER." Nevertheless, "You may redeem all or part of any E-Money held in your Account at any time . . . . Unless agreed otherwise, funds will be transferred to the bank account you have registered with us."

65. The Terms further provided that:

All Digital Assets are held in your Account on the following basis:

(A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading . . . .

(B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)    You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

66. FTX also posted on its website a document titled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," in which it represented that FTX "segregates customer assets from its own assets across our platforms," and maintains "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

67. An August 2021 policy document of FDM, the operational entity of FTX, further stated:

FDM has a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds. This includes customer assets that may be held by third party service providers. **FDM will ensure that**:

• Customer assets (both fiat and virtual assets) are segregated from its own assets;

• Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable;

• All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors; and

• All third-party providers are aware that customer assets are held in trust.

Regarding customer fiat assets, FDM will maintain customer accounts with a regulated credit, e-money or payment institution that is acceptable to the Securities Commission of The Bahamas (SCB). Customer accounts will be designated as such, and the monies contained therein will be appropriately ring-fenced and protected from claims against FDM.

Customer monies will be appropriately ring-fenced to protect from:

• The unlikely event FDM becomes insolvent;

• The use of customer monies being used to benefit others; and

• FDM using customer monies to finance its own operations. Written notice will be provided to the relevant regulated credit, e-money, or payment institution to clarify that the assets contained are held by us on trust for our customers and they are not entitled to combine the account any other account, or to exercise any right of set-off or counterclaim against the money in those accounts, in respect of any debt owed by us.

**C.     From FTX's Inception, FTX Diverts to Alameda and Commingles FTX Customer Funds**

68.     When FTX launched, it did not have the requisite bank accounts to accept and hold customer funds, in part because cryptocurrency exchanges are subject to more stringent due diligence requirements than are other industry participants, like hedge funds. As a result, and at Bankman-Fried and FTX's direction, from the start of FTX's operations in around May 2019 and continuing into 2022, FTX customers deposited fiat currency—billions of dollars' worth—into bank accounts that were controlled by Alameda. Wiring instructions to facilitate these transfers were publicly-available on FTX's website.

69.     Once funds intended for customers' FTX accounts were deposited into Alameda bank accounts, FTX personnel monitoring the Alameda bank accounts would manually credit the depositing customer's FTX account on the FTX internal ledger system using the NONLEGAL TENDER that FTX invented for this purpose, its so-called "E-Money." Because Signature is the largest holder of reserves for the world's largest stablecoin, Circle's USDC, which is integrated into Signet—and because stablecoins like USDC or Tether's USDT provide the same function but have actual value—the obvious purpose of E-Money was for FTX to avoid the transfer of value from Alameda's accounts to its own.




70.     Indeed, these E-money credits on customers' FTX accounts were notional only. While customers accessing their FTX accounts would be able to observe on the exchange's website or mobile app that their funds had been posted to their FTX accounts—and believed they were then effectively segregated for their benefit per the Terms of Service—the funds in fact remained in Alameda's accounts.

71.     These customer funds received by Alameda were not placed into accounts designated as being "for the benefit of" (FBO) FTX customers, or otherwise segregated.

**D.      In August 2020, Bankman-Fried Forms North Dimension to Further Facilitate the Diversion of FTX Customer Funds to Alameda**

72.     In August 2020, Bankman-Fried formed a new Delaware entity called North Dimension Inc. as a wholly-owned subsidiary of Alameda Research LLC. Like Alameda, its registered address was the Center Street Address in Berkeley, California. Bankman-Fried formed the entity in an effort to hide the fact that customers were being directed to send funds to an account controlled by Alameda.

73.     Bankman-Fried opened two bank accounts for North Dimension at Silvergate Bank, in La Jolla, California. Then he and FTX, including in wiring instructions posted on the FTX.com website, began directing FTX customers to deposit funds intended for FTX into those North Dimension accounts. Bankman-Fried eventually created a fake website for North Dimension, which purported to sell electronics, but was not functional. As shown in the screenshot below, Alameda's Center Street Address was provided as North Dimension's contact information.



## E.    The Good Times

74.    Over time, Alameda expanded its activities into a number of new digital asset business models, like yield farming—pooling crypto assets in exchange for interest or other rewards—and volatility trading. It also offered OTC trading services.

75.    From its inception, FTX relied on Alameda resources, funds, and personnel to carry out a number of core functions for the trading platform, including creating liquid submarkets for all of the products it offered, maintaining an appropriate balance of various digital assets on the exchange, and supporting FTX's peer-to-peer margin lending program.

76.    In particular, from the launch of FTX, Alameda operated as a primary market maker on the exchange. In that capacity, it acted as an always-willing buyer and seller of digital assets in order to provide sufficient liquidity and ensure an available trading counterparty to FTX customers. Over time, FTX acquired other market makers, but Alameda always remained a high-volume market maker on the platform.

77.    Assisted in part by Alameda's market making, FTX grew quickly, becoming the world's second-largest crypto exchange in just a couple short years. By June 2019, shortly after its launch, the daily

volume of futures trading on FTX often exceeded $100 million. By 2020, an average of $1 billion was being traded on FTX daily. By 2021, FTX held about $15 billion in assets on its platforms and accounted for about $16 billion of transaction volume per day—about 10% of the global digital asset volume. That year, FTX made $350 million in profit, and Alameda $1 billion, with a staff of just 30.

78.    During this time, FTX and Alameda failed to observe corporate formalities, including by failing to segregate funds, operations, resources, and personnel, and by failing to properly document intercompany transfers of funds and other assets.

79.    Moreover, the entities regularly shared office space—first in Berkeley, California, then later in Hong Kong and The Bahamas—as well as systems, technology, hardware, accounts, intellectual property, communication channels, and other resources.

80.    As FTX grew, in October 2021, Bankman-Fried stepped down as CEO of Alameda, appointing as co-CEOs of Alameda then 27-year-old Caroline Ellison, who had joined Alameda as a trader in March 2018, and 28-year-old Sam Trabucco, who had graduated from MIT with Bankman-Fried and joined Alameda in 2019.

81.    Even after stepping down, however, Bankman-Fried continued to maintain control over Alameda. For example, he retained full access to Alameda's records and databases, remained a signatory on Alameda's bank accounts, and remained an authorized trader for Alameda with certain merchants. Bankman-Fried also maintained direct decision-making authority over all of Alameda's major trading, investment, and financial decisions, exercising this authority by participating in in-person and mobile chat communications with senior personnel at Alameda, including Ellison. Moreover, while Ellison was responsible for Alameda's day-to-day operations and for making trading decisions, she frequently consulted Bankman-Fried, particularly about strategic issues and significant trades.

82.    During this time, Alameda used customer funds intended for FTX to fund its trading operations and Bankman-Fried's other ventures, such as real estate purchases and political donations. Ellison was aware of and complicit in this scheme.

83.    Alameda's multi-billion-dollar liability was reflected in an internal account in the FTX database not tied to Alameda, but instead labeled "fiat@ftx.com." Characterizing the amount of customer

funds sent to Alameda as an internal FTX account had the effect of concealing Alameda's liability in FTX's internal systems. In balance sheets Ellison provided to its lenders, Alameda tracked this liability as a "loan," but did not specify that it was from FTX and combined it with other loans to help conceal its origin. Alameda was not required to pay interest on this "loan."

84.    In addition to receiving cash deposits directly from FTX customers, Alameda benefitted from numerous special privileges Bankman-Fried and Wang gave it on the FTX platform. This included being permitted to carry a negative balance in its FTX account untethered from any collateral requirements; an unofficial, $65 billion "line of credit"; exemption from FTX's auto liquidation feature; and executing timing privileges that gave Alameda a substantial advantage in high-frequency trading.

85.    These special privileges, afforded only to Alameda—which were programmed into FTX's software by Wang at Bankman-Fried's direction, and with Ellison's knowledge—permitted Alameda to draw on FTX customer assets to a virtually unlimited extent for its own uses. And because its own FTX trading account was able to maintain a negative balance of billions of dollars, unbacked by sufficient collateral, Alameda was able to and did divert billions of dollars in FTX customer assets.

### F.    The Crypto Winter

86.    As part of its expanding business, in around 2020 Alameda began making and managing large debt and equity investments in various companies in the digital asset industry. In 2021, Bankman-Fried directed Ellison to secure for Alameda large loans from digital asset lending platforms, so that Alameda could rapidly increase the size and variety of its digital asset industry investments. These loans were used to fund venture investments, and for Bankman-Fried's personal use. Some of the loans, however, permitted the lenders to demand repayment at any time.

87.    By early 2022, Alameda had invested several billion dollars in directional, unhedged, illiquid, and long-term investments. To fund these activities, it had relied on billions of dollars of these loans, traditional bank lines of credit, and its unlimited borrowing abilities on FTX, including its access to customer funds.

88.    Alameda funded these activities in part through an account held at Signature Bank in the name of Maclaurin Investments Ltd. ("Maclaurin"). Maclaurin was organized and is headquartered in the

Seychelles. It is 100% owned by Alameda Research Ltd., a British Virgin Islands limited corporation ("Alameda BVI"), which itself is 100% owned by Alameda.

89. In early 2022, prices of Bitcoin and other cryptocurrencies began dropping precipitously in what is now known as the "crypto winter." Whereas Bitcoin had reached an all-time high just over $67,000 per coin on November 9, 2011, by June 2022, it had dropped to below $20,000 per coin.

90. Particularly devastating was the collapse in May 2022 of the algorithmic stablecoin terraUSD (UST), and its companion token, LUNA, which sent shockwaves through the industry, greatly exacerbating the falling prices.

91. As crypto prices were dropping precipitously, Bankman-Fried, through various Alameda and FTX-related entities, entered into a series of transactions with struggling members of the cryptocurrency industry, providing credit to or taking over numerous failing firms.

92. At the same time, in May 2022, several lenders demanded repayment from Alameda, whose assets were similarly plummeting in value. Because it did not have sufficient assets to cover these obligations, Bankman-Fried directed Alameda, via Ellison, to draw on its "line of credit" from FTX, which was funded by its spot market customers. As a result, billions of dollars of customer funds were diverted to Alameda and used to repay its third-party loan obligations.

93. Even after this—and despite Alameda having no realistic prospects of raising capital to pay off its "line of credit"—in the summer of 2022, Bankman-Fried continued to direct Alameda, via Ellison, to draw on the "line of credit," diverting hundreds of millions of dollars more to make "loans" to Bankman-Fried and other FTX insiders, and to fund additional venture investments.

94. Between March 2020 and September 2022, Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338 billion. In two instances, Bankman-Fried was both the borrower in his individual capacity, and lender in his capacity as CEO of Alameda. Singh and Wang also

borrowed $554 million and $224.7 million, respectively, by executing promissory notes with Alameda in 2021 and 2022.[4] These loans were poorly documented.

95.     Between 2020 and 2022, Alameda, FTX, and Bankman-Fried made at least 117 venture investments. The below graphic illustrates Alameda Research's venture portfolio as of November 28, 2021.



96.     In March and September 2022, using diverted customer funds, FTX made two $100 million venture investments through a British Virgin Islands entity called FTX Ventures Ltd., which had a bank account at Signature Bank.

97.     Because their venture activities in 2022 were largely undertaken in hopes of propping up an industry in turmoil, Alameda and FTX's deals were hastily made without adequate due diligence, and on poor terms. Bankman-Fried knowingly entered into these bad deals because he believed that, to dig Alameda out of its hole, it was necessary to lift up the entire industry. For example, just days before Voyager Digital

---

[4] The funds borrowed under these notes in Wang's name were not intended for his use but were instead used by Bankman-Fried for other purposes, including additional venture investments. Nevertheless, Wang used approximately $200,000 for his own purposes.

declared bankruptcy, and before it could tap the full loan, Alameda agreed to extend a $485 million line of credit to the company. At the time, Alameda owed money to Voyager and was one of its biggest shareholders.

98.     Between March 2020 and November 2022, Bankman-Fried and FTX also made $93 million in political donations and purchased approximately $253 million worth of real estate in The Bahamas.



### G.     The November 2022 Collapse

99.     The collateral Alameda had on deposit with FTX included a large position in illiquid digital assets, most notably in the "FTT" token, the native crypto asset of FTX. This compounded the risk to FTX's customers because FTX valued this Alameda collateral at trading prices. But because FTX and Alameda owned the majority of the FTT tokens that FTX had minted, and only a small portion were in circulation, the collateral was not worth the value assigned: the market for the tokens was illiquid and if Alameda or FTX had tried to sell Alameda's holdings, their price—and the value of Alameda's collateral on FTX—would have cratered.

100.     On November 2, 2022, crypto publication CoinDesk released a report finding that, even though FTX and Alameda were ostensibly separate, Alameda's balance sheet was mostly comprised of FTT. It appeared that, following massive losses Alameda had sustained in the second quarter of 2022, FTX was

lending Alameda money against these illusory assets. The report thus called FTX's liquidity into serious question.

101. Shortly after these revelations, FTX's primary competitor, the cryptocurrency exchange Binance, announced it was liquidating $530 million worth of FTT tokens. Customers raced to withdraw funds from FTX, with an estimated $6 billion withdrawn over the course of 72 hours, as the value of its FTT token plunged 32% in the same timeframe.

102. On Tuesday, November 8, 2022, FTX made a surprise announcement that Binance would buy FTX, effectively bailing it out. The following day, however, Binance announced it was walking away from the tentative deal after performing due diligence and finding that customer funds had been mishandled. The price of FTT plunged on this news.



103. The following morning, November 9, 2022, Ellison held an "all-hands" meeting with Alameda's staff. She stated that, earlier that year, in response to an accounting or bookkeeping problem, she, Bankman-Fried, and Wang had decided to use FTX customer funds for Alameda; that FTX had always allowed Alameda to borrow customer funds; and that FTX did not require collateral from Alameda, though in practice the collateral was Alameda's FTT.

104. The following morning, November 10, 2022, Reuters reported that, after Alameda sustained $500 million in losses in May and June 2022, Bankman-Fried had transferred at least $4 billion from FTX to Alameda without telling anyone, "fearing the news would leak," and "lent more than half of its $16 billion

in customer funds to Alameda in total, with Bankman-Fried telling an investor . . . that Alameda owes FTX about $10 billion."

### H. The Fallout

105.    On Friday, November 11, 2022, Bankman-Fried resigned as FTX's CEO, appointing John J. Ray III as his replacement. FTX then filed for Chapter 11 bankruptcy. Alameda and 132 other related companies also moved for bankruptcy and joint administration.

106.    On December 13, 2022, the United States Securities and Exchange Commission (SEC) filed a civil complaint against Bankman-Fried for his violation of the Securities Act and Exchange Act by virtue of his role in defrauding FTX investors, styled *SEC v. Samuel Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.).

107.    On December 13, 2022, the United States Commodities Futures Trading Commission (CFTC) filed a civil complaint against Bankman-Fried, FTX, and Alameda, for their violations of the Commodity Exchange Act, styled *CFTC v. Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, & Alameda Research LLC*, No. 22-cv-10503 (S.D.N.Y.).

108.    On or around December 13, 2022, Bankman-Fried was indicted on eight felony counts, for which he faces up to 115 years in prison. The charges include counts for wire fraud on customers and lenders and related conspiracy charges; conspiracy to commit securities and commodities fraud; conspiracy to commit money laundering; and conspiracy to violate U.S. campaign finance laws. *See United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 22-CR-673 (S.D.N.Y.).

109.    On or around December 14, 2022, Ellison agreed to plead guilty to seven felonies that carry a combined maximum 110 years' imprisonment. The charges include counts for conspiracy relating to wire fraud on customers and lenders, securities and commodities fraud, and money laundering.

110.    On or around December 14, 2022, Wang agreed to plead guilty to four felonies that carry a combined maximum 50 years' imprisonment. The charges include counts for conspiracy relating to wire fraud on customers and lenders, and securities and commodities fraud.

111.    On December 21, 2022, the SEC filed a civil complaint against Ellison and Wang for their violations of the Securities Act and Exchange Act by virtue of their roles in defrauding FTX investors, styled *SEC v. Caroline Ellison & Zixiao "Gary" Wang*, No. 22-cv-10794 (S.D.N.Y.).

## IV.    SIGNATURE HAD ACTUAL KNOWLEDGE OF AND SUBSTANTIALLY FACILITATED THE FTX FRAUD

112.    As alleged more fully below, from at least June 2020, Signature had actual knowledge of the FTX fraud, which it acquired through, among other things by (i) directly observing and processing suspicious funds transfers through Signet—including transfers Plaintiffs expressly told Signature were for FTX, which Signature allowed to be transferred to Alameda anyway—and through other Alameda and FTX accounts at Signature Bank, (ii) performing enhanced due diligence on Alameda and FTX, first during their onboarding and then during ongoing monitoring, and (iii) performing enhanced blockchain analysis. In addition, Signature's closeness to and expertise regarding the cryptocurrency industry, and the numerous red flags present, further confirm Signature's actual knowledge.

113.    Further, Signature substantially facilitated the FTX fraud by publicly promoting FTX; by failing to close, suspend, or otherwise limit any Alameda and FTX accounts, despite knowing that the accounts were being used in violation of FTX's Terms of Service and its fiduciary duties to its customers; and by accepting additional customer deposits into Alameda accounts after learning of the fraud.

### A.    Signature Had Actual Knowledge of the Fraud

#### 1.    By Virtue of Carrying Out its Due Diligence and Ongoing Monitoring Obligations

114.    The primary purpose of the U.S. system of banking supervision is to ensure the safety and soundness of banks in order to protect depositors, the Federal Deposit Insurance Corporation (FDIC) deposit fund, and the financial system generally.

115.    The Currency and Foreign Transactions Reporting Act of 1970—commonly referred to as the Bank Secrecy Act ("BSA")[5]—was passed to, among other things, "prevent the laundering of money and the

---

[5] Pub. L No. 91-508, § 202, 84 Stat. 1114 (enacted Oct. 26, 1970) (codified as amended at 31 U.S.C. §§ 5311-5314, 5316-5366 and 12 U.S.C. §§ 1829b, 1951-1959); *see* Pub. L. No. 107-56, the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (USA PATRIOT Act) (enacted Oct. 26, 2001) & Pub. L. No. 116-283, §§ 6001-6511, the "Anti-Money Laundering Act of 2020" (AMLA) (enacted Jan. 1, 2021). Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

financing of terrorism," "facilitate the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "protect the financial system of the United States from criminal abuse." *See* 31 U.S.C. § 5311.

116. Signature has obligations under the BSA as both a "bank" and a "money transmitter."

117. First, Signature is a "domestic financial institution," and specifically a "Bank," as defined by the BSA and its implementing regulations.[6] As such, Signature is required to comply with BSA regulations applicable to banks. *See generally* 31 C.F.R. § 1020 ("Rules for Banks").

118. The BSA and its implementing regulations require a bank like Signature to develop, implement, and maintain an effective AML program that is reasonably designed to prevent the bank from being used to facilitate money laundering and the financing of terrorist activities. *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1020.210(a). This includes several things.

119. First, Signature must have:

> establish[ed] a due diligence program that includes appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures and controls that are reasonably designed to enable the covered financial institution[7] to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account[8] established, maintained, administered, or managed . . . for a foreign financial institution.

31 C.F.R. § 1010.610(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This includes: (a) assessing the money laundering risk

---

[6] *See* 31 U.S.C. § 5312(a)(2) & (b)(1) (defining "financial institution" and "domestic financial institution"); 31 C.F.R. §§ 1010.100(d) (defining "bank") & 1010.100(t) (defining "Financial Institution").

[7] "Covered financial institution means: (1) For purposes of § 1010.610 and 1010.620: (i) A bank required to have an anti-money laundering compliance program under the regulations implementing 31 U.S.C. 5318(h), 12 U.S.C. 1818(s), or 12 U.S.C. 1786(q)(1)[.]" 31 C.F.R. § 1010.605(e).

[8] "The term correspondent account means: (i) For purposes of § 1010.610(a), (d), and (e), an account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution; and (ii) For purposes of §§ 1010.610(b) and (c), 1010.630 and 1010.670, an account established for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of, the foreign bank, or to handle other financial transactions related to such foreign bank." 31 C.F.R. § 1010.605(c)(1).

presented by any foreign financial institution correspondent account (which includes Alameda and FTX accounts, *see* 31 C.F.R. § 510.309) based on its business and the markets it serves, anticipated activity, nature and duration of its relationship with the bank, the regulatory regime of the country in which it is located, and information known or available to the bank about its anti-money laundering record; and (b) applying risk-based procedures and controls designed to detect money laundering activity, including through a periodic review of account activity sufficient to determine its consistency with expected activity.

120. Second, Signature must have "maintain[ed] a due diligence program that includes policies, procedures, and controls that are reasonably designed to detect and report any known or suspected money laundering or suspicious activity conducted through or involving any private banking account that i[t] established, maintained, administered, or managed," *see* 31 C.F.R. § 1010.620(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This program must have been:

> designed to ensure, at a minimum, that [Signature] takes reasonable steps to: (1) Ascertain the identity of all nominal and beneficial owners of a private banking account; (2) Ascertain whether any person identified under paragraph (b)(1) . . . is a senior foreign political figure; (3) Ascertain the source(s) of funds deposited into a private banking account and the purpose and expected use of the account; and (4) Review the activity of the account to ensure that it is consistent with the information obtained about the client's source of funds, and with the stated purpose and expected use of the account, as needed to guard against money laundering, and to report, in accordance with applicable law and regulation, any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account.

*Id.* § 1010.620(b).

121. Third, Signature's AML program must have included:

> at a minimum: (i) A system of internal controls to assure ongoing compliance; (ii) Independent testing for compliance to be conducted by bank personnel or by an outside party; (iii) Designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance; (iv) Training for appropriate personnel; and (v) Appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to: (A) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and (B) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information" including "information regarding the beneficial owners of legal entity customers[.]

31 C.F.R. § 1020.210(a)(3).[9]

122. Including by virtue of its offering Signet to its customers, Signature is also a "money services business," and specifically a "money transmitter," as defined by the BSA and its implementing regulations.[10] As such, Signature is required to comply with BSA regulations applicable to money transmitters. *See generally* 31 C.F.R. § 1022 ("Rules for Money Services Businesses").

123. In addition to developing, implementing, and maintaining an effective anti-money laundering program, similar to its obligation as a bank, *see* 31 C.F.R. §§ 1022.210(a) & 1022.600, applicable regulations required Signature to: (a) integrate its compliance procedures into any automated data processing systems it uses (such as Signet); (b) designate a person to assure day-to-day compliance with the program and relevant regulations; and (c) provide for an independent review of the program. *See* 31 C.F.R. § 1022.210(d).

---

[9] "Legal entity customer means a corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account." 31 C.F.R. § 1010.230(e).

[10] *See* 31 C.F.R. § 1010.100(ff) (Defining "money services business" as "a person wherever located doing business . . . in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(6) of this section."); *id.* § 1010.100(ff)(5)(i) (Defining "money transmitter" as:

> (A) A person that provides money transmission services. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or (B) Any other person engaged in the transfer of funds.).

The section includes a number of exceptions, *see id.* § 1010.100(ff)(5)(ii), but none apply to Signature. *See also* U.S. Dep't of Treasury, Fin. Crimes Enforcement Network, FIN-2014-R002, "Application of FinCEN's Regulations to Virtual Currency Software Development and Certain Investment Activity," at 2-3 (Jan. 30, 2014) (Explaining that the guidance provided in FIN-2013-G001, titled "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies" (Mar. 18, 2013), "makes clear that an administrator or exchanger of convertible virtual currencies that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency in exchange for currency of legal tender or another convertible virtual currency for any reason . . . is a money transmitter under FinCEN's regulations, unless a limitation or exemption from the definition applies to the person" pursuant to 31 C.F.R. § 1010.100(ff)(5)(ii)).

124.     In addition, as a New York state-chartered commercial bank, Signature is subject to both New York's Banking Law ("BL") and Financial Services Law ("FSL"). NY DFS implements and enforces these laws.[11] Under these laws, DFS is empowered to, *inter alia*, "ensure the safe and sound conduct of [banking] business[es] . . . and protect the public interest and interest of depositors, creditors, shareholders and stockholders"[12]; and to "ensure the continued solvency, soundness, and prudent conduct of the providers of financial products and services," "encourage high standards of honesty, transparency, fair business practices and public responsibility," and "promote the reduction and elimination of fraud, criminal abuse and unethical conduct by, and with respect to, financial services institutions and their customers."[13]

125.     Applicable regulations appear in titles 3 (Banking) and 23 (Financial Services) of the New York Codes, Rules, and Regulations ("NYCRR"). Signature falls within the definition of—and is subject to regulations covering—both Banks,[14] and Virtual Currency Businesses.[15] These laws generally require Signature to comply with the Federal AML regulations.

126.     NY DFS's approval of Signet was based on stringent requirements including to: (i) implement, monitor and update effective risk-based controls and appropriate BSA/AML and OFAC[16] controls to prevent money laundering or terrorist financing; (ii) Implement, monitor and update effective

---

[11] *See* BL Ch. 2, Art. 2 § 10; FSL § 102.

[12] BL Ch. 2, Art. 2 § 10.

[13] FSL § 201(b).

[14] *See* 3 NYCRR §§ 2.1 & 2.11.

[15] *See* 23 NYCRR §§ 200.1 *et seq.* Virtual Currency Business Activity means the conduct of any one of the following types of activities involving New York or a New York Resident: (1) receiving Virtual Currency for Transmission or Transmitting Virtual Currency; (2) storing, holding, or maintaining custody or control of Virtual Currency on behalf of others; (3) buying and selling Virtual Currency as a customer business; (4) performing Exchange Services as a customer business; or (5) controlling, administering, or issuing a Virtual Currency. *See* 23 NYCRR § 200.2(q). The "signet" tokens used on Signature's Signet system are virtual currencies because they are a "type of digital unit that is used as a medium of exchange or a form of digitally stored value." *See id.* § 200.2(p) (Further providing that "Virtual Currency shall be broadly construed to include digital units of exchange that (i) have a centralized repository or administrator; (ii) are decentralized and have no centralized repository or administrator; or (iii) may be created or obtained by computing or manufacturing effort.").

[16] Office of Foreign Assets Control, a financial intelligence and enforcement agency of the U.S. Treasury Department.

risk-based controls to prevent and respond to any potential or actual wrongful use of virtual currency, including but not limited to its use in illegal activity, market manipulation, or other similar misconduct as required by NY DFS's February 7, 2018, "Guidance on Prevention of Market Manipulation and Other Wrongful Activity";[17] (iii) Comply with NY DFS's transaction monitoring and cybersecurity regulations; and (iv) Maintain policies and procedures for consumer protection and to promptly address and resolve customer complaints. Thus, to the extent it would not already have been considered one, the NY DFS authorization effectively made Signature a Virtual Currency Business ("VC Entities") subject to the regulations promulgated under 23 NYCRR Part 200.

127.    NY DFS's Guidance on Wrongful Activity "emphasizes that: 1) VC Entities are required to implement measures designed to effectively detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing; and 2) market manipulation is a form of wrongdoing about which VC Entities must be especially vigilant, given that such manipulation presents serious risks both to consumers and to the safety and soundness of financial services institutions."

128.    The specific regulations governing Signature as a Virtual Currency Business are even more detailed. First, Signature is required to keep detailed records of all transactions, including amount, date, precise time, payment instructions, fees, names, account numbers, and physical addresses of parties to the transaction. Signature is also required to keep a general ledger and other records. *See* 23 NYCRR § 200.12(a).

129.    Second, Signature is required to "consider legal, compliance, financial, and reputational risks associated with [its] activities, services, customers, counterparties, and geographic location and . . . establish, maintain, and enforce an anti-money laundering program based thereon," with "additional assessments on an annual basis, or more frequently as risks change, and . . . modif[ications to] its anti-money laundering program as appropriate to reflect any such changes." 23 NYCRR § 200.15(b).

130.    Third, Signature is required to "maintain, as part of its anti-money laundering program, a customer identification program" that includes four components: (i) identification and verification of account holders; (ii) enhanced due diligence for accounts involving foreign entities; (iii) prohibition on accounts with

---

[17] *Available at* https://www.dfs.ny.gov/system/files/documents/2020/03/il180207.pdf.

foreign shell entities; and (iv) identification required for large transactions." *See id.* § 200.15(h). More specifically:

a. *Identification and verification of account holders*. When opening an account for, or establishing a service relationship with, a customer, Signature must, at a minimum, verify the customer's identity, to the extent reasonable and practicable, maintain records of the information used to verify such identity, including name, physical address, and other identifying information, and check customers against the Specially Designated Nationals list maintained by the Office of Foreign Asset Control (OFAC), a part of the U.S. Treasury Department. Enhanced due diligence may be required based on additional factors, such as for high-risk customers, high-volume accounts, or accounts on which a suspicious activity report has been filed. *See id.* § 200.15(h)(1).

b. *Enhanced due diligence for accounts involving foreign entities*. If maintaining accounts for non-U.S. Persons, Signature must establish enhanced due diligence policies, procedures, and controls to detect money laundering, including assessing the risk presented by such accounts based on the nature of the foreign business, the type and purpose of the activity, and the anti-money laundering and supervisory regime of the foreign jurisdiction. *See id.* § 200.15(h)(2).

c. *Prohibition on accounts with foreign shell entities*. Signature is prohibited from maintaining relationships of any type in connection with its Virtual Currency Business Activity with entities that do not have a physical presence in any country. *See id.* § 200.15(h)(3).

d. *Identification required for large transactions*. Signature must require verification of the identity of any accountholder initiating a transaction with a value greater than $3,000. *See id.* § 200.15(h)(4).

131. While the regulations governing Signature are detailed, they can be distilled into a number of specific things Signature was required to do (or questions Signature was required to ask and receive satisfactory answers to) vis-à-vis Alameda and FTX. During onboarding and as part of its ongoing enhanced due diligence requirements—relevant to possible money laundering and other financial crimes—Signature was required to:

a.      Identify and verify the identities of the beneficial owners and top managers of the Alameda and FTX entities, and update that information regularly.

b.      Establish the purpose of each Alameda and FTX account with the bank, the source of the deposits into each account, and the intended use of those deposits by Alameda and FTX.

c.      Ask for and analyze:

i.      Alameda and FTX's financial statements (audited and unaudited);

ii.     A description of Alameda and FTX's business models (and analyze the risks of those models);

iii.    Organization charts for the conglomerate or other information allowing Signature to identify all Alameda and FTX corporate affiliates, and to identify whether Alameda and FTX each had an accounting department, a comptroller's department for cash management, an internal audit function, a compliance function, etc.;

iv.     Any complaints or regulatory orders against Alameda or FTX and information regarding any other pending investigations;

v.      A description or copies of any investor or customer complaints against Alameda and FTX, including lawsuits filed in court or complaints filed directly with the companies or with regulators;

vi.     A list of each Alameda and FTX entity's board of directors and a list of the date of every board meeting, as well as board minutes;

vii.    A description of Alameda and FTX's cash management procedures;

viii.   A copy of Alameda and FTX's written KYC/AML procedures; and

ix.     Alameda and FTX's written user agreements or terms of service.

d.      Search the web and available commercial and government databases for negative information on Alameda, FTX, their shareholders, their officers, and their employees. This includes press accounts, social media, litigation filings, government enforcement orders available online, and anything Signature could have discovered through a Google search.

e.      For the risk analysis of Alameda and FTX, (i) research and analyze the risks of the industries they were in and their lines of business, then ask for a description of their internal controls to manage their risks, a description of their internal and external audit procedures to audit those internal controls, and the findings of those audits; and (ii) do a high-level overview of the strength of the regulatory oversight of their activities in relevant jurisdictions.

f.      Analyze all transactions through Alameda and FTX accounts at the Bank and identify suspicious transactions, which involves automated transaction analysis, the adoption of triggers setting off automated alerts to bank employees, a comprehensive internal process for employees to analyze red flags and formulate an appropriate response, and an internal audit system to make sure this all works.

132.    Further, Signature's Customer Identification Program (CIP) must identify when it should close an account after detecting suspicious activity or after attempts to verify a customer's identity have failed.

133.    Signature is, of course, well aware of its due diligence obligations. In a July 2018 earnings call—just as Signature's digital asset business was beginning—CEO DePaolo stated:

I do want to say, one of the things in digital technology, we have turned down billions of deposits, believe it or not, that we could have brought on to the institution because of, as they call them, bad actors, that have digital currencies. And you have to watch out from a due-diligence standpoint of bringing on the wrong clients.

134.    In June 2021, Signature's Chairman, Scott A. Shay, described the Bank's due diligence process for onboarding clients to Signet as a "walled garden":

We built what we call, what I like to call, a "walled garden." If you pass through this walled garden and you're a miner, you're an exchange, you're a custodian, you're essentially any of many, many types of participants, [over-the-counter desks], whatever; but if you get through our vetting process . . . we have a strenuous KYC / AML process because we are an American onshore bank. But if you get through that, you're going to get into this walled community, this gated community. You get access to Signet and Signet is a blockchain-enabled tool that you can use with other people who are part of this community and they've been vetted too.

135.    Shay further stated that Signature "take[s] a minority of the accounts that apply to us because we go through a vetting process that is substantial so to get into the gated community does require you to

have certain financial wherewithal and to be a solid citizen."

136.    Shay further stated:

We take a minority of accounts that apply to us because we do go through a vetting process that is substantial. To get into the gated community does require you to have certain financial wherewithal and to be a solid citizen. We don't just open up an account for anyone who wants to open an account. That's important and that's a differentiator. Frankly, that makes people who are transacting within Signet feel more comfortable because they have gone through a US bank vetting process. That's got its upsides and it's got its downsides. We are who we are, we're a US bank, and we're going to uphold the standards.

137.    In an October 2022 earnings call, CEO DePaolo stated, "In digital, we turn down more clients or potential clients than we bring on clients, because of all the due diligence that we do because we want to deal with the best of the best."

138.    In a July 2021 interview, Signature Senior Vice President and Director of Signature's Digital Asset Group, Joseph Siebert stated, "So as we expand our team and the digital asset banking sector, we're growing pretty rapidly. We're adding components and layers to it now. So we have a risk component broken out of six individuals. We're probably going to expand that even further." Siebert further noted, "it's a heavy lift on a manual side there's a lot we look at, from beneficial ownership, to counterparty risk, to jurisdictions, neighboring jurisdictions, negative news."

139.    In a January 2023 earnings call, Signature Senior Vice President and Chief Operating Officer, Eric Howell, stated, "we're a highly regulated banking institution and we follow strict BSA, KYC, AML policies and procedures. You know, in this space, in particular, we have had to do diligence monitoring."

140.    Signature engaged in enhanced due diligence processes and procedures when onboarding Alameda, FTX, and related entities, and performed ongoing monitoring over those entities. As part of its onboarding enhanced due diligence, Signature obtained or determined at least the following information relating to each Alameda- or FTX-related entity:

a.      Its name, date of formation, formation location, headquarter address, mailing address, and website.

b.      A breakdown of beneficial ownership (including the identification of anyone owning more than 10%), and an Organizational Chart.

c.       Employer Identification Number (EIN), if in the US.

d.       Primary contact person, including cell number and email address.

e.       Authorized account signers, their corporate titles, and the signing authority given (i.e., individual, any 2, etc.)

f.       Business type and description.

g.       Source of referral to Signature Bank.

h.       Jurisdictions in which entity will conduct business or service clients.

i.       Whether the entity is required to be regulated or licensed in its jurisdiction and, if so, the details of any such regulation or licensure.

j.       A copy of the entity's written KYC & AML policies.

k.       A description of the background of the entity's owners, including a resume and specific source of wealth for each owner.

l.       A source of funding (*i.e.*, bank account).

m.       The entity's expected average monthly deposit balance.

n.       A copy of the entity's past bank statements.

o.       A specific purpose or description for how the entity will use the account.

p.       The major counterparties the entity is expected to transact with at Signature.

q.       Whether the entity serves institutional clients, retail clients, or both.

141.       Signature periodically required Alameda, FTX, and related entities to update this information, and in any event, at least annually.

142.       As part of their onboarding, Alameda, FTX and their related entities also provided Signature with the following documents.

| Authorized Signers and Owners Over 10% | |
|---|---|
| 1 | Personal Short Form |
| **Business filing documentation** | |
| **For US Entity (or equivalent for International)** | |
| 2.2 | Articles of Formation/Business Certificate |

| 2.3 | Executed Operating Agreement (If Applicable) |
|-----|----------------------------------------------|
| 2.4 | Proof of Address (company headquarters) |
| 2.5 | W8 BEN E (Foreign entities only) |
| **Additional Documents** | |
| 4.1 | Pitch Deck/Marketing Materials |
| 4.2 | Org Chart |
| 4.3 | KYC/CIP Policy |
| 4.4 | AML/BSA Policy |
| 4.5 | PPM/Offering Agreement (if applicable) |

143.     The "Personal Short Form" noted above required any person with 10% or more beneficial ownership to provide their Full Name, a Copy of Passport or Driver's License, Citizenship, Home Address, Proof of Address (utility bill, cable bill, credit card statement, lease agreement, tax return), Social Security Number (US Citizens only), Date of Birth, Cell Phone, Email Address, and their Employment / Source of Wealth.

144.     Alameda, FTX, and its related entities also had to give Signature a document providing User Credentials for online banking access, identifying those persons who had access to the entity's accounts, and their authority to view the account, make internal transfers, input wires, approve wires, pay bills, or have all-account access.

145.     As part of their onboarding process, Alameda, FTX, and its related entities also answered—and then annually updated—an "Industry Specific Questionnaire." The instructions stated:

> Thank you for taking this time to fill out our Industry Specific Client Questionnaire. **Please select from the Business Type drop down box what services apply to your specific business.** Please then put your answers in the "Answers" column. "Blank" is currently the default setting. If you are in the digital asset exchange business, please select "Exchange." If the exchange also offers OTC services, please also select "OTC." If you are also doing a fund raise through an ICO or something similar, please also select "Digital Asset Fundraising."
>
> **<u>NOTE</u>: If you are an existing client filling this out for an annual update, please select the appropriate Business Type for "<u>Existing Client Update</u>." For example, if you are an existing Mining type client, select "<u>Existing Client Updates - Mining</u>." If you handle multiple industries, please select all applicable.**

146. Both Alameda and FTX offered OTC services. As a result, both answered the following "Over-The-Counter (OTC) Trading" questions during onboarding, and subsequently updated their answers annually, which were arranged into broader question "types," underlined below:

    r.    <u>Regulatory Questions</u>:

        i.    Does the company offer its services to US users?

        ii.    If so, is the company registered with FinCEN?

        iii.    Does the company offer services to New York based client? [sic]

        iv.    If so, do they have a Bitlicense?

        v.    If you are not servicing US clients, what jurisdictions do you offer services to?

        vi.    Do those jurisdiction require a license?

        vii.    If so, have you registered (please provide a copy of license or registration).

        viii.    Does the company offer any financial products aside from spot trading of digital assets (such as contracts-for-differences, margin trading, derivatives, etc.)?

        ix.    What regulatory frameworks, licenses and exemptions apply?

    s.    <u>AML and KYC Questions</u>

        i.    Please provide a copy of your AML/KYC program.

        ii.    How does the company monitor VPNs?

        iii.    Do you screen and log IP addresses of users?

        iv.    Please explain how the company monitors digital asset transactions? (For example, do they engage a service like ChainAlyis [sic] or Elliptic?)

        v.    How many transaction 'hops' do you analyze and explain how this methodology was arrived at.

        vi.    Do they do any enhanced monitoring of clients purchasing anonymity coins? If so, please explain.

        vii.    If there are any business types that the company will not do business with (prohibited businesses), please list those business types here.

viii.    Does the company have any clients involved in the following industries and if so please provide the names of those users: (1) Adult Entertainment; (b) Casinos; (c) Online Gambling/Gaming; (d) Marijuana Businesses; (e) Weapons Manufacturing/Distribution; (f) Pharmaceuticals; (g) Foreign Governments and Officials; (h) Not-For-Profits/Charitable Organizations.

ix.    How many employees are engaged in implementing the company's AML/KYC program?

x.    How does the company combat synthetic ID fraud? Can they provide an example of this?

t.    <u>Trading Questions</u>

i.    What tokens/coins do you trade? Does client also offers [sic] anonymous or privacy coins/tokens like Monero (XMR), Zcash (ZEC), Komodo (KMD) and/or cannabis related coins like PotCoin (POT) or HempCoin (THC)? Does client also offers [sic] stablecoins like USDT/Tether, TrueUSD, USDCoin, Gemini Dollar, etc.?

ii.    Does client has [sic] a Coin Risk Assessment (CRA) Policies and Procedures? If yes, please provide a copy of client's CRA Policies and Procedures.

iii.    How does the company mitigate or investigate the risk of wash trading, market manipulation an [sic] front running? If possible, please provide your procedures regarding how these investigations are handled.

iv.    Are trading fees publicly listed? If not, would we be able to get a transaction fee schedule? Are there any clients trading outside this trading schedule or with rebates or research or similar arrangements?

v.    If fees are paid to the company in digital assets, where does the company go to liquidate this fee revenue into fiat?

vi.    If the company has an insider trading policy, please provide it. If they do not have one, please explain why.

vii.　How are clients able to fund their accounts? List all fiat methods (wire, credit card, cash). In terms of fiat deposit, do they allow third party deposits? What digital assets can clients fund their wallets with? What steps are taken to determine that the incoming digital assets belong to the account holder?

viii.　Does the company purchase digital assets from other exchanges/issuers to hold as an inventory to trade against users of the platform? If so, from what exchanges/issuers/OTC desks do they purchase from? [sic]

ix.　Do they act in a principal or agent capacity?

u.　<u>Custody Questions</u>

i.　How does the company handle custody (do they do it themselves or outsource it to a third party)?

ii.　If they are doing it themselves, can the company go in more detail about their security protocols for securing assets under custody?

iii.　If the company accepts privacy tokens to custody (like Monero or Zcash), what steps does the company take to get comfortable with those transactions/users?

v.　<u>Basic Company Information</u>

i.　Where is the company's headquarters?

ii.　Does the company have any subsidiaries? If so, what are their names and describe in detail the purpose of each subsidiary. If necessary, please provide an organizational chart.

iii.　Where are the company's servers located?

iv.　What percent of your client base is retail vs. institutional?

v.　Would any retail activity be interacting with the Signature Bank account?

vi.　Please provide a detailed understanding of what the Signature Bank account will be used for and name major credit and debiting counterparties/companies. Does the company anticipate using any transaction methods outside of international/domestic wires or ACH (such as physical cash, Remote Deposit Capture (RDC), third party checks)? If yes,

please specify which. Please specify the countries that anticipated counterparties are located in. Please indicate the anticipated USD amount of incoming and outgoing for international wires. Please provide a thorough explanation of the purpose of the outgoing wires. Please indicate the anticipated USD amount of incoming and outgoing for ACH. Please provide a thorough explanation of the purpose of the outgoing ACH.

vii.     Do you use the services of any payment processors? If so, please provide the names of these and explain if we should anticipate seeing funds to and from these payment processors interacting with the Signature Bank account.

viii.     What percentage of your client base is US based vs. international?

ix.     What professionals (law firms, audit firms, accountants, investment bankers, promoters, etc.), in addition to those listed in the PPM, SAFT of Offering materials, have been involved and what role have they served?

x.     What litigation or regulatory actions are pending or threatened?

xi.     What is the cybersecurity history of the prospect – have any wallet thefts, cybersecurity breaches or other theft/fraud allegations occurred?

xii.     What are the privacy policies and compliance with privacy regulations such as GDPR?

xiii.     What is the tax analysis related to the transfers, the raise and the prospect, and are there any tax related actions pending or threatened?

xiv.     What financial institutions have in the past been used or are currently being used?

xv.     What conflicts among founders or information about the background of the principals, the token or currency or other matters that might be in the past, currently or in the future cause there to be negative press that a reasonable investor or financial institution would want to be made aware of when making a decision about doing business with the prospect?

xvi.     What material information or misstatement if any should be disclosed to us that has not been disclosed under prior questions?

w.      Other

i.      Please provide any wallet addresses the company uses for hot and cold wallets. Also indicate if the wallet is being held by the client or at an exchange. Does the client control the private keys to these wallets or does another third party (such as an exchange, custodian, etc.)[?]

ii.      Please describe your wallet infrastructure (how wallets are created, abandoned, etc.)[.]

iii.      What Travel Rule related regulations are you subject to in your jurisdiction of incorporation and geographic service footprint? If you do not believe yourself to be subject to Travel Rule related regulations, please explain why.

iv.      Please provide a brief outline of your systems utilized to remain in compliance with the Travel Rule. How will the company pass on sender and beneficiary information to the receiving institution? How will the company know that they [sic] payment they are making is to another financial institution? If you do not have systems in place to comply with Travel Rule regulations, can you provide us with a timeline of when you will have those systems in place? If you do not plan to implement systems to comply with Travel rule regulations, can you explain why?

147.      FTX was also an exchange. As a result, it answered as part of its onboarding, and subsequently updated annually its answer to all of the above questions, as well as the following additional "Exchange" only questions:

a.      Regulatory Questions

i.      Is it a cryptocurrency exchange aggregator?

b.      Trading Questions

i.      Are wallets offered custodial or non-custodial?

ii.      Can users create multiple accounts?

45

     c.    <u>OTC Questions</u>

        iii.    Does the company offer OTC services? If so, do they act in a principal or agent capacity?

     d.    <u>Other Questions</u>

        i.    Is the client a centralized or decentralized exchange?

        ii.    Does the client in the future plans [sic] to launch an Initial Exchange Offering (IEO) on its exchange platform? If yes, does the IEO covers [sic] in our client's AML policies and procedures? What type of token(s) are allowed to be offered (utility, security, stablecoin) in this IEO platform? Does our client requires [sic] this company conducting an IEO to have an AML/KYC Program?

        iii.    Does client has [sic] Cybersecurity and Disaster Recovery/Business Continuity Plan (DR/BCP) policies and procedures to address hacking, ransomware, DDoS or similar related cybercrimes? If yes, please provide a copy of client's DR/BCP policies and procedures. Who is responsible in managing our client's Cybersecurity and DR/BCP? Please provide a short summary of this person's role and qualifications. Have all the firm's personnel been trained in their role in the DR/BCP process? If yes, how does the training process work and how often is the training is [sic] conducted? Are all DR/BCP/plans tested and kept up-to-date on a regular basis? Is the organization regularly backing up their information systems onsite and offsite in light of their DR/BCP plans?

        iv.    Does client has [sic] an emergency insurance fund (similar to Binance Secure Asset Fund "SAFU") that will cover/reimburse the lost funds and returned [sic] back those funds to its customers? If yes, please provide a brief description of how this emergency insurance fund works?

148.    Alameda, FTX and related entities also completed, as part of their onboarding, a Funds Transfer Application and a Signet Platform Application. Each required the entity to designate authorized representatives, who were required to provide wet signatures.

149.    As a result of carrying out its enhanced due diligence obligations, including during onboarding and ongoing monitoring, Signature knew at least the following facts, from which it had actual knowledge of the fraud:

a.    <u>There was no real separation between Alameda and FTX</u>. Signature knew the fine details of both entities' corporate formations, beneficial owners, management, operations, and organizational structure. It knew both entities were majority owned by Bankman-Fried. It knew they shared office space, corporate officers, and personnel. It knew Bankman-Fried was a signatory on and had access to both entities' bank accounts, even after he nominally stepped down as CEO in October 2021.

b.    <u>Alameda played a vital role in the operation of FTX</u>. Signature knew and understood Alameda's business as a trader and market maker on various cryptocurrency exchanges, including FTX. Accordingly, Signature knew Bankman-Fried was seriously conflicted because he owned controlling shares of both Alameda and FTX's equity.

c.    <u>Alameda and FTX were involved in risky business models</u>. Signature knew Alameda and FTX were engaged in risky businesses that needed to be closely monitored. Not only did Signature know the cryptocurrency market was risky as a whole because of its lack of regulation and ease of use for fraud and crime, but it knew Alameda and FTX were involved in offering and trading risky financial products, such as highly-leveraged margin trades, derivatives, and futures. It knew the companies operated and headquartered in lightly-regulated, offshore jurisdictions. And it knew Alameda held large positions in FTT and other illiquid tokens and understood this presented a conflict of interest and risk to the businesses.

d.    <u>Alameda and FTX lacked adequate corporate formalities</u>. Signature knew that Alameda, FTX, and its related entities lacked boards of directors and never had board meetings. Signature also knew that Alameda and several of the Alameda- or FTX-related shell entities lacked audited financial statements.

e.    <u>Alameda and FTX lacked appropriate personnel and procedures</u>. Signature knew Alameda and FTX's KYC and AML procedures were inadequate and not followed. It knew that

neither Alameda nor FTX had adequate personnel in risk management functions. And it knew FTX lacked adequate policies and procedures securing customer assets under custody.

     f.     <u>Bankman-Fried and FTX were directing customers to deposit funds intended for FTX into Alameda-controlled accounts</u>. Signature knew that the source of funds in Alameda's account was, at least in part, FTX customer deposits, and knew that FTX was directing this, including via wiring instructions on its website. It knew that the intended use of these funds was for deposit onto the FTX trading platform.

     g.     <u>FTX Terms of Service imposed a fiduciary duty on FTX to segregate customer funds</u>. Signature was aware that FTX and its operational entity, FDM, had a fiduciary duty to FTX's customers, including pursuant to FTX's Terms of Service, to ensure that the customers' funds were segregated and held in trust for the customer. Signature was aware that customer funds were not considered the property of FTX or FDM.

     h.     <u>FTX was using "E-Money" to misappropriate customer funds</u>. From a review of FTX's Terms of Service, Signature knew FTX was using "E-Money," a nonlegal tender, to credit customers' FTX accounts. Because it also knew that those customers were being directed to deposit their funds to Alameda, Signature knew that neither the funds, nor custody of anything of value representing the funds (such as stablecoins or signets), was actually subsequently transferred to FTX. And because customer funds were not being segregated and held in trust in Alameda's account, where they were instead commingled with the assets of Alameda and other FTX customers, Signature knew Alameda and FTX were misappropriating customer funds being deposited into Alameda's Signature bank account.

     i.     <u>Alameda and FTX operated through shell entities</u>. Signature understood the overall corporate structure of Alameda and FTX, including their numerous affiliates and subsidiaries, several of which Signature banked. Signature knew these entities, like Alameda BVI, Maclaurin, and FTX Ventures were wholly-owned by either Alameda or FTX, and thus primarily owned by Bankman-Fried. And while Signature did not bank North Dimension, it was aware of the entity, its relationship

48

to Alameda, and its purpose to accept on behalf of Alameda customer funds that those customers had intended for deposit onto FTX.

j.    The source of Alameda and FTX's venture capital was FTX customer funds. Signature knew that the source of funds in the accounts of Maclaurin and FTX Ventures was, at least in part, FTX customer deposits.

150.    As part of its ongoing enhanced due diligence, Signature also knew that a November 2019 federal lawsuit against Alameda and FTX accused them of market manipulation and other financial crimes in an action styled *Bitcoin Manipulation Abatement LLC v. FTX Trading Ltd. et al.*, No. 19-cv-7245 (N.D. Cal.). In light of this, Signature knew of the alleged criminal activity by Alameda and FTX, including money laundering in the form of transfers of proceeds from illegal activities. According to the lawsuit, the criminal activities, conducted through Alameda and FTX, included:

a.    Operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a);

b.    Money laundering in violation of 18 U.S.C. § 1956(a);

c.    Engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a);

d.    Wire fraud in violation of 18 U.S.C. § 1343;

e.    Interstate transportation of stolen property in violation of 18 U.S.C. § 2314;

f.    Perpetrating a manipulative, fraudulent and deceptive scheme to manipulate the prices of certain cryptocurrency derivatives;

g.    Organizing "FTX Trading LTD [a]s a sham shell entity with nominee officers, directors and shareholders used by Defendants . . . to hide the true ownership and control of defendant FTX from the public and the U.S. authorities";

h.    Processing $30 million of illegal money transfers each day, while "FTX turnover was over $100 million per day," so that "in addition to [the] $30 million per day turnover for Defendant Alameda," the defendants "illegally transmitted over $130 million per day without the required state

money transmitter license and the required registration with FinCEN in violation of 18 U.S.C. § 1960(a)"; and

     i.    Facilitating and continuing to facilitate the transfer of funds involved in cryptocurrency market manipulation and money laundering.

151.    As part of its enhanced due diligence on FTX, Signature learned of its involvement in a 2020 scam called the SushiSwap rug pull. SushiSwap was a decentralized exchange built on the Ethereum blockchain, used to exchange between different cryptocurrencies using a connected wallet. SushiSwap's anonymous creator, known as Chef Nomi, removed a significant number of SUSHI tokens from the liquidity pool,[18] worth about $13 million at the time, and cashed out. The community accused Chef Nomi of scamming them, which Chef Nomi denied. Chef Nomi then transferred control of SushiSwap over to Bankman-Fried, returned the money, and was apologetic in his Tweets, in language reminiscent of Bankman-Fried's post-FTX-collapse apologies (stating "I f*cked up.").

152.    As part of its ongoing enhanced due diligence, Signature learned of the substantial public scrutiny and concern in the media about the relationship between Alameda and FTX. In an August 2, 2021 article, for example, one journalist reported "Crypto market participants suggest that Hong-Kong based trading brokerage Alameda Research and its trading partner, crypto exchange FTX, are using insider information to trade digital assets . . . ."[19] And a September 2022 *Bloomberg* article noted that, "As [Alameda's] influence spreads, so have concerns over potential conflicts of interest—particularly its relationship with FTX, the world's second-largest cryptocurrency exchange," and quoted a market participant as saying that "FTX and Alameda 'have been able to benefit from a regulatory gap that has allowed them to trade and profit from cryptocurrencies without having to follow the same rules as traditional financial institutions[.]'"[20]

---

[18] A liquidity pool is a collection of assets used to facilitate trading on a decentralized exchange.

[19] Dana Sanchez, "The Most Influential Trader in Crypto, Sam Trabucco, Works With FTX Exchange: Some See Manipulation," The Moguldom Nation (Aug. 2, 2021), *at* https://moguldom.com/365562/the-most-influential-trader-in-crypto-sam-trabucco-works-with-ftx-exchange-some-see-manipulation.

[20] Anne Massa, Anna Irrera, and Hannah Miller, "Crypto Quant Shop With Ties to FTX Powers Bankman-Fried's Empire: Alameda Research is a little-scrutinized power player in virtual currencies. As its influence

153.    Signature also learned of disturbing statements made by Bankman-Fried. In an August 6, 2021

interview with Bloomberg's Matt Levine, for example, Bankman-Fried explained how a token like FTT can

be used to perpetrate a fraud:

> You start with a company that builds a box and in practice this box, they probably dress it up
> to look like a life-changing, you know, world-altering protocol that's gonna replace all the big
> banks in 38 days or whatever. Maybe for now actually ignore what it does or pretend it does
> literally nothing. It's just a box. So what this protocol is, it's called "Protocol X," it's a box,
> and you take a token.
>
> . . . So you've got this box and it's kind of dumb, but like what's the end game, right? This box
> is worth zero obviously. . . . But on the other hand, if everyone kind of now thinks that this box
> token is worth about a billion dollar market cap, that's what people are pricing it at and sort of
> has that market cap. Everyone's gonna mark to market. In fact, you can even finance this,
> right? You put X token in a borrow lending protocol and borrow dollars with it. If you think
> it's worth like less than two thirds of that, you could even just like put some in there, take the
> dollars out. Never, you know, give the dollars back. You just get liquidated eventually. And it
> is sort of like real monetizable stuff in some senses.[21]

154.    Similarly, during an April 2022 Bloomberg podcast, Bankman-Fried described FTX's yield

farming in a manner that others equated to a Ponzi scheme, which Bankman-Friend agreed was "a pretty

reasonable response."[22] News and social media picked up on the Ponzi scheme analogy, including in articles

published by BeInCrypto and CoinGeek, in a column published on UnHerd, and on YouTube.

## 2.    By Virtue of Receiving Express Instructions from Clients Like Plaintiffs

155.    At various times, Signature's digital asset clients provided Signature with information from

which it learned of the fraud. Plaintiffs' experience is instructive.

156.    Plaintiff Statistica Capital is a trading firm that both invests its own money and manages the

money of Statistica Fund. During the relevant time period, Statistica Capital maintained a bank account at

_____

grows, so do concerns over a potential market advantage," Bloomberg (Sept. 14, 2022), *at* https://www.bloomberg.com/news/articles/2022-09-14/trading-firm-alameda-research-powers-ftx-ceo-sam-bankman-fried-s-crypto-empire.

[21] "Transcript: Sam Bankman-Fried and Matt Levine on Crypto Market Structure," Bloomberg (Aug. 6, 2021), *at* https://www.bloomberg.com/news/articles/2021-08-06/transcript-sam-bankman-fried-and-matt-levine-on-crypto-market-structure.

[22] Tracy Alloway and Joe Weisenthal, "Sam Bankman-Friend Described Yield Farming and Left Matt Levine Stunned," Bloomberg (April 25, 2022), *at* https://www.bloomberg.com/news/articles/2022-04-25/sam-bankman-fried-described-yield-farming-and-left-matt-levine-stunned.

Signature Bank and was a participant on Signet. Throughout 2022, Statistica Capital used Signet to deposit funds into what it believed was its FTX account, transacting a total of over $1.8 million during that time.

157.    On October 13, 2022, Statistica Capital used Signet to deposit $300,000 into what it believed was its FTX account, which credit was reflected in its FTX account shortly after its deposit. Rather than actually transfer custody of those funds to FTX, though, the credit was notational only, and Statistica Capital's deposit in fact remained in the possession, custody, and control of Alameda. Statistica Capital subsequently transferred this money to the FTX account of its majority owner as a dividend.

158.    During the relevant time period, Plaintiff Statistica Ltd., known then as Statistica Fund Ltd., held the money of several accredited investors and was managed by Statistica Capital. During the relevant time period, Statistica Fund maintained a bank account at Signature Bank. In 2021, Statistica Fund applied to participate in Signet and provided to Signature a Due Diligence Overview form in which, in a section titled "Account Activity," Statistica Fund stated that the "Major counterparties [it] expected to transact with at Signature" were "**FTX OTC**, Tether, mostly[.]"

159.    In onboarding with Signature, Statistica Capital in 2020, and Statistica Fund in 2021, communicated with Signature representatives including Sarmen Saryan. Signature asked Statistica Capital multiple rounds of clarifying questions about its business before permitting it onto Signet.

160.    When managing Statistica Fund moneys, Statistica Capital relied on a third-party fund administrator, NAV Consulting, to initiate wires, which Statistica Fund disclosed to Signature.

161.    Beginning in August 2021 and continuing into 2022, Statistica Fund—at the direction of Statistica Capital, and facilitated by NAV Consulting—initiated with Signature at least six wire transfers totaling $24,675,000, from its Signature Bank account to an account for North Dimension Inc. at Silvergate Bank in La Jolla, California, which was in fact controlled by Alameda, as alleged herein. The wires varied in amount between $500,000 and $9,000,000. FTX's website had instructed FTX customers to wire funds intended for trading on the FTX platform to this North Dimension Inc. account. When Statistica Fund initiated the wire transfers, it did not know that Alameda controlled the North Dimension bank account.

162.    Meanwhile, Signature knew these large wires were intend by Statistica Fund to be deposited with FTX for trading on the FTX platform. Signature also knew that North Dimension was an Alameda-

controlled entity and that it had no legitimate business purpose, instead only existing to collect FTX customer funds for Alameda. Signature facilitated these wire transfers anyway.

163.    More specifically, when Statistica Fund asked NAV Consulting to initiate the first wire on August 31, 2021, it advised NAV Consulting that the wire was being made to "transfer these [funds] to Statistica Fund's FTX account," and stated, "here are the FTX wiring details," providing the North Dimension wiring information that FTX had posted on its website.

164.    In March 2022, a Senior Client Associate Officer in Signature's Digital Asset Banking group, Nicole Santiago, sent an email to Statistica Fund advising it that its "account is currently under review by our Analyst Team," which was "asking for clarity on the below items." The email identified a $9 million "Wire Out" to "North Dimension," and a $3 million "Wire Out" to "FTX Digital Markets Ltd." The email asked Statistica Fund to "provide the purpose of the wires listed above." In response, Statistica Fund advised Signature:

> When we receive new subscriptions from Statistica Fund Ltd investors, we send them to the fund's FTX account, to then be able to use these funds for trading. Both these transactions are transfers to the fund's FTX account. The beneficiary details changed because FTX relocated their HQ between those two transactions.[23]

Santigo stated that she would "notify compliance" and "should they have any additional questions I will circle back here." Santigo never subsequently followed up. Signature did nothing to reverse the $9 million wire to North Dimension or otherwise recover the Statistica Fund's funds it knew were misappropriated. Signature did not even advise Statistica Fund of the misappropriation.

165.    A short while later, Statistica Fund advised Santiago that it "would like to start using Signet for the transfers between our Statistica Fund Ltd. Bank account and Statistica Fund's FTX account," and asked for her help "to set this up[.]" Santigo provided Statistica Fund some forms and instructed it to fill out and submit them to Signature, which it did. Signature processed these forms even though Statistica Fund told Signature it was seeking to use Signet to fund its FTX account, which Signature knew was impossible since FTX did not have an active account on Signet.

---

[23] This last sentence was Statistica Fund's best understanding, or assumption at the time, but was incorrect.

### 3.   By Virtue of Operating Signet

166.   Signet is built on a centralized blockchain controlled by Signature, itself build on the decentralized Ethereum blockchain, one of the most established and used blockchains in existence. Accordingly, any dollar transfers between entities participating in and using Signet are captured in perpetuity in both Signature's private records, and to some extent on the Ethereum public ledger. Signet was also built specifically to comply with U.S. and N.Y. banking regulations. Thus, as Chairman Shay stated about Signet in a June 2021 interview, "It's just like the blockchain," and "we're standing behind ***and watching*** the digital representation of the dollar."

167.   As shown in the below excerpt from Signature's "Guide to Using the Signet Platform," "Comprehensive details of every Signet<sup>TM</sup> transaction (Deposit, Send, Receive, Redeem) are always available within [a Bank client's] Transaction History and may be exported in .CSV format," and "provided via email immediately . . . ." Of course, Signature itself also necessarily maintains all such transaction details.



168.     Indeed, as a Virtual Currency Business under New York law, Signature was required to maintain records of virtual currency transactions, including of signets (*i.e.*, Signature's proprietary Ethereum-based token). Specifically, Signature was required to:

> maintain the following information for all Virtual Currency transactions involving the payment, receipt, exchange, conversion, purchase, sale, transfer, or transmission of Virtual Currency:
>
> i)   the identity and physical addresses of the party or parties to the transaction that are customers or accountholders of the Licensee and, to the extent practicable, any other parties to the transaction;
>
> ii)  the amount or value of the transaction, including in what denomination purchased, sold, or transferred;
>
> iii) the method of payment;
>
> iv)  the date or dates on which the transaction was initiated and completed; and
>
> v)   a description of the transaction.

*See* 23 NYCRR § 200.15(e)(1).

169.     Signature was also required to maintain reports on certain virtual currency transactions exceeding an aggregate daily value of $10,000 if not otherwise required under federal law. *See id.* § 200.15(e)(2).

170.     More generally, Signature was required to "monitor for transactions that might signify money laundering, tax evasion, or other illegal or criminal activity," and to "review[] on an ongoing basis" "[c]ontinuing suspicious activity . . . ." *See id.* § 200.15(e)(3).[24]

171.     By virtue of controlling and operating Signet, and in carrying out its regulatory obligations to track virtual currency transactions, Signature had a unique and particularly clear view into what was going on in the accounts of Signet participants, including Alameda and Plaintiffs.

172.     As Chairman Shay stated in his June 2021 interview:

**Q:** Do you ever lose sleep that there might be a Mt. Gox there somewhere like in that pool of customers, in that pool of clients, that if something goes wrong, the regulators will come after

---

[24] The applicable regulations also prohibit Signature from "structur[ing] transactions, or assist[ing] in the structuring of transactions, to evade reporting requirements," and from "engag[ing] in, facilitat[ing], or knowingly allow[ing] the transfer or transmission of Virtual Currency when such action will obfuscate or conceal the identity of an individual customer or counterparty." *See id.* §§ 200.15(f)-(g).

you and say, "Okay, we got to do an audit of this whole thing." Do you lose sleep over that at all?

**Shay:** Well, here's the thing. We're not touching the crypto itself and we're not custodian for the crypto. We're facilitating the payments. And if the regulators ever wanted to see where all the payments were coming, we're a US-regulated bank, so they could always see as they could anywhere, what's happening.

173.    Signature's observing and processing the transfer of funds on Signet gave it insight into both what was and what was *not* happening with Signet members' accounts. As a result, Signature knew at least the following facts, from which it had actual knowledge of the FTX fraud:

a.    Money going into Alameda's Signet account consisted of funds deposited by FTX customers for trading on FTX.

b.    Alameda did not transfer those customer funds to FTX (or anyone) for custodial safekeeping or otherwise.

c.    Alameda did not provide FTX with like-value reimbursement for these deposits, such as stablecoins.

d.    Alameda did not segregate the customer funds into FBO accounts or otherwise.

e.    Alameda drew those funds itself, by transferring them into other accounts it held at Silvergate Bank and elsewhere.

174.    In sum, by virtue of operating Signet, Signature directly observed the improper commingling and misappropriation of customer funds because it processed transfers of those funds from Alameda's Signet account to accounts other than FTX exchange accounts.

**4.    By Virtue of Performing Enhanced Blockchain Analysis**

175.    Since at least July 2021, Signature has employed software tools called Chainalysis and Cyber Trace, which analyze and report on blockchain transactions.

176.    While blockchains are public and offer a permanent digital record, the data available is limited, and typically comprised of strings that are difficult to understand standing alone (such as transaction hashes and wallet addresses). Tools like Chainalysis and Cyber Trace apply algorithms and extensive databases to make this blockchain information useable.

177.    As shown in the slide below from a Chainalysis presentation, the tool helped Signature visualize and understand what was occurring on various blockchains.



178.    Chainalysis' "Know Your Transaction" product includes a dashboard providing a host of data about any given transaction or customer. First, the "home page" of the dashboard provides analytics raking the risk of users.



179.    Next, the product includes a "Users" dashboard that provides more granular data.







180.     Chainalysis includes a second tool, called Reactor, that allows a user to further visualize the blockchain data to understand the history of transactions. Sample screenshots appear below.





181.    These tools were capable of monitoring major blockchains, like Bitcoin and Ethereum, several major stablecoins, and numerous other digital assets, which increased over time. With the tools, Signature could learn the history of any blockchain transaction, including the source and fate of funds, the history of wallets involved, including their ties to illicit activity and, in some cases, the identity of their owners.

182.    During the Relevant Time Period, Signature also used the services of an Australian company called Cyber Trace. The company describes itself as "dedicated to developing innovative solutions for countering cyber enabled investment fraud through Artificial Technology, Big Data, and Analytical Algorithms," with a "specific area of expertise" in "the development of cryptocurrency Anti Money Laundering (AML) technologies."[25]

183.    In a July 2021 interview, Signature Digital Asset Business Group Manager Siebert, when asked about the cryptocurrency landscape, said:

> So we're excited. We continue to push forward, look at our regulators, the landscape we have in front of us, and follow the plan that we've set forth, which is extensive due diligence, guard rails around certain jurisdictions and funds flow, and making sure we understand Bitcoin's movement on the blockchain. You know, are these coins that are being traded touching dark markets, are they clean coins, you know. So using tools like Chainalysis and Cyber Trace has been helpful for the bank as well.

---

[25] *See* "Who are we?" *at* https://technologies.cybertrace.com.au.

184. Seibert further stated that, "as a publicly traded bank audited by . . . New York Department of Financial Services and the FDIC—we get two different bodies looking at us—and so what we try to do is collaborate with both and share information and be open and transparent. So, with that comes a lot of, you know, transactional flow that we analyze."

185. Because Signature used Chainalysis and Cyber Trace, it had a full view of the origin and destination of customer funds deposited into Alameda's accounts. Signature thus knew that customer funds were never actually being transferred to FTX, but rather being drawn by Alameda directly.

### 5. By Virtue of its Cryptocurrency Expertise and Close Connection to the Industry

186. Signature is well-known as one of the most crypto-friendly banks in the world because it has been one of the few in the U.S. willing to bank digital asset industry members during the last several years. It began this effort by hiring in 2018 a private banking team already experienced in the digital asset industry. Having been involved in the industry for approximately five years, and having personnel with even more industry experience, Signature has developed a close connection to and expertise about the industry.

187. In July 2018 quarterly earnings call, when asked about Signature's hiring a team with "backgrounds in blockchain," CEO DePaolo said,

> This opportunity is significant if you're dealing with the right clients. And we hired a team, which is in the digital space, and they've been there for a number of years and have a knowledge base in that industry to know who and who not to deal with.

188. As a result, separate and apart from its due diligence actions, Signature was well aware of the close ties between Alameda and FTX, for example, their shared office space and personnel. Signature also understood the companies' respective businesses and their roles in the cryptocurrency trading market. Signature was likewise aware of Bankman-Fried's dominant role in both businesses' activities. And Signature was aware Alameda and FTX went on a venture capital spending spree during the crypto winter, buying up failing or struggling crypto businesses in what were obviously bad deals for Alameda and FTX. As Signature knows, these types of venture investment transactions typify the "integration" phase of money laundering, creating the appearance of legality.[26]

---

[26] Federal Financial Institutions Examination Council (FFIEC), Bank Secrecy Act/Anti-Money Laundering Examination Manual (2014) at 8.

189.    In addition, Signature was aware of FTX's Terms of Service from onboarding and ongoing due diligence and was aware the Terms prohibited U.S. customers from using the FTX international platform. Moreover, based on ongoing online review, Signature was or should have been aware that, contrary to this prohibition, FTX did not actually exclude U.S. customers from using the FTX International Platform. Signature likewise knew or should have known by at least October 2022 that FTX even facilitated use of the platform by U.S. customers by offering a mobile app, purchased from Blockfolio LLC and rebranded by FTX, that did not block U.S. users' access, as described by the Director of Enforcement of the Texas State Securities Board filed in a declaration filed in *In re: Voyager Digital Holdings, Inc.*, No. 22-10943-MEW (S.D.N.Y. Bankr.), Dkt. No. 536.

### 6.    By Virtue of Numerous Red Flags

190.    The Federal Financial Institutions Examination Council required Signature to monitor high-risk customers such as FTX and Alameda for red flags of suspicious activity.[27]

191.    Throughout the relevant period, there was a wide variety of information available to Signature that served to act as red flags of the fraudulent activity. Between 2018 and 2022, other entities observed some or all of these red flags and refused to do business with FTX as a result.[28]

### a.    The Cryptocurrency Industry

192.    The cryptocurrency industry is relatively nascent, with the first cryptocurrency, Bitcoin, having been invented just 14 years ago, in 2008. As a result of its lack of regulation and ease of use, including across borders, the industry has proven to be a haven for financial crimes, like money laundering.

---

[27] *Id.*, Appendix F.

[28] For example, in 2018, crypto venture firm Dragonfly Capital was considering investing in FTX. After doing due diligence, it concluded that Bankman-Fried's "risk-taking was catastrophic," and "saw red flags – too much risk" to invest. Moreover, some potential investors who conducted due diligence in 2018 and 2019 concluded Bankman-Fried "hid serious things and took incredible risks with other peoples' money," and that Alameda was "hemorrhaging money to pay for FTX." In May 2022, FTX offered $485,000 to MITRE to research bioweapon security. Ultimately, however, MITRE declined to finalize the gift citing concerns over unnamed red flags. Finally, in July 2022, an FTX subsidiary called FTX Future Fund offered the nonprofit, Our World in Data, a $7.5 million grant to track changes in living standards, the global impact of Covid-19 and other relevant trends. After conducting due diligence, the nonprofit declined.

193.    As recently as February 2022, for example, Fitch Ratings reported on the launching of a consortium of U.S. banks and fintechs wanting to use stablecoin for payment transfers and other digital assets. According to Fitch, "Lack of legislation or clear regulatory guidance has made U.S. banks cautious to enter the digital asset space," with policymakers "increasingly voic[ing] concerns around money laundering/terrorism financing and know-your-customer (KYC) issues, as well as price volatility of cryptocurrencies."[29]

194.    Signature is well aware of the industry's propensity to attract bad actors. In its 2021 10K, Signature wrote of the risks associated with its "expansion into the marketplace for digital asset transactions and deposits":

> [T]he digital asset industry is somewhat nascent and the use of digital assets in financial transactions is an emerging practice. Certain characteristics of digital asset transactions, such as the speed with which such transactions can be conducted, the ability to transact without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, and the anonymous nature of the transactions can make digital assets vulnerable to fraud, money laundering, tax evasion and cybersecurity risks. At present, digital assets and digital asset service providers are not subject to extensive regulation.

195.    Moreover, as a relatively early participant in the cryptocurrency industry—and a provider of essential technology and banking services to the industry—Signature has been aware of the numerous high-profile frauds that have plagued the industry over the years.[30]

196.    In a June 2021 interview, Chairman Shay stated, "If we just looked at what other banks were doing, we wouldn't be accepting crypto customers, crypto clients." Moreover, he recognized the "opportunities and threats" of cryptocurrency:

> I think listeners need to understand the spectrum when I say opportunities and threats. I don't think people mostly get the space, that they're all on the same wavelength. So, at the one hand, you can have a cryptocurrency where nobody knows who the recipients are, what the wallets are, anything. And there's anonymity. Bitcoin gives you some of that, gives you a good chunk of that. And the good news is, I can do business with you and it's nobody else's business what we're doing. And that's fine. The problem is, of course, you could be making a transfer because

---

[29] Fitch Wire, "US Bank Stablecoin Consortiums Signal Growth of digital Asset Demand" (Feb. 9, 2022), *at* https://www.fitchratings.com/research/banks/us-bank-stablecoin-consortiums-signal-growth-of-digital-asset-demand-09-02-2022.

[30] Some examples include Mt. Gox, Onecoin, Bitconnect, Thodex, Bitclub Network, Quadriga, and Plexcoin.

you're involved in human trafficking, drug selling, arms. Pick the bad thing and you could be doing that and there's nobody to be able to tell that that transfer has taken place because of anonymity.

### b. FTX's Avoidance of U.S. Regulation

197.    In late 2018 and in 2019, Bankman-Fried moved FTX to Hong Kong for friendlier cryptocurrency regulations, and then to The Bahamas in 2021, so that it could offer risky trading options that were not legal in the United States.

198.    That Alameda and FTX relocated in this manner was a red flag. Not only did FTX do so to avoid U.S. regulation and oversight—the same reason it purported to exclude U.S. customers—but in 2000, the Organization for Economic Co-operation and Development placed The Bahamas on a blacklist for tax havens, and in 2020, the European Union placed the Bahamas on a blacklist of high-risk countries for money laundering and terrorist financing.

### c. The Involvement of Daniel Friedberg in FTX and Alameda

199.    According to FTX's present CEO, John J. Ray III, FTX, Alameda, FTX, and its associated entities were run by a "group of inexperienced, unsophisticated, and potentially compromised individuals[.]"[31]

200.    One person exercising a substantial amount of control and discretion on behalf of Alameda and FTX was Daniel Friedberg, a Seattle-based lawyer who acted as FTX's Chief Regulatory Officer and General Counsel, and as Alameda's Legal Counsel.

201.    As FTX's Chief Regulatory Officer, Friedberg was responsible for monitoring customer protection practices, ensuring product offerings complied with existing rules, and overseeing internal audits and reviews, among other things. Friedberg, however, is notorious for his role in an online poker cheating scandal involving the theft of millions of dollars.

202.    In 1999, Friedberg became involved in online gambling, acting as a corporate agent for companies set up by professional poker players, including Phil Hellmuth and Annie Duke. In 2006, Hellmuth, Duke, and Russ Hamilton, the 1994 World Series of Poker champion, were employed by Excapsa Software,

---

[31] *In re FTX Trading Ltd. Bankr.*, No. 22-11-68-JTD (D. Del.), Dkt. No. 24, Declaration of John J. Ray III ("Ray Decl.") ¶ 5.

an online gaming software company in Toronto where Friedberg was an executive. Excapsa and its three units in Malta managed a poker network and licensed online gaming software applications.

203. Among its sites was Ultimate Bet. In 2008, some high-stakes players on Ultimate Bet accused others of being able to see their cards and profiting on bets using that knowledge. It later emerged that tweaks to Ultimate Bet's software—known internally as God Mode—had allowed some players to see others' hands. An estimated $40 million was stolen using this cheat. Investigations traced the cheat to Excapsa. The Kahnawake Gaming Commission of Canada, which oversaw Ultimate Bet, conducted an audit and "found clear and convincing evidence to support the conclusion that between the approximate dates of May 2004 to January 2008, Russell Hamilton, an individual associated with Ultimate bet's affiliate program, was the main person responsible for and benefitting from the multiple cheating incidents."[32]

204. In 2013, Travis Makar, a computer expert and executive assistant to Hamilton, released audio recordings from 2008 in which Hamilton and some Ultimate Bet associates met to discuss how to deal with the cheating scandal. In it, Friedberg suggests the group claim a consultant "took advantage of a server flaw by hacking into the client, unable to identify exactly when," and said that "If we can get [the refund amount] down to $5 [million], I'd be happy."[33] That recording was made public and widely circulated online.[34]

205. Given Friedberg's well-known and indisputable connection to a multi-million-dollar fraud, his involvement in providing legal advice—particularly to *both* Alameda and FTX—was a red flag of the fraud.

---

[32] Kahnawake Gaming Commission, "Kahnawake Gaming Commission Imposes Sanctions on Ultimate Bet with Regard to Cheating Incidents" (Sept. 29, 2008), *at* http://www.gamingcommission.ca/news/pr09282008a.pdf.

[33] Recording available at https://youtu.be/XrnmyWu1vS0; *see also* Brett Collison, "Audio Tapes Expose Ultimate Bet Cheating Scandal; Phil Hellmuth Responds," PokerNews.com (May 13, 2013), *at* https://www.pokernews.com/news/2013/05/audio-tapes-expose-ultimate-bet-cheating-scandal-14986.htm.

[34] Recording available at https://youtu.be/XrnmyWu1vS0; *see also* Brett Collison, "Audio Tapes Expose Ultimate Bet Cheating Scandal; Phil Hellmuth Responds," PokerNews.com (May 13, 2013), *at* https://www.pokernews.com/news/2013/05/audio-tapes-expose-ultimate-bet-cheating-scandal-14986.htm.

**B.** **Signature Facilitated the Fraud by Continuing to Provide Banking Services to Alameda and FTX After Observing Fraudulent Transfers of FTX Customer Monies Through Alameda's Accounts**

206. Signature's private team business model is highly client-centric. In a June 2021 interview, Chairman Shay explained:

> [W]e always were focused on *what does the client want?* The clients want two things: they want sleep at night safety. . . . Second is just figuring out how can we help the client make more money? . . . [W]e're less interested in what other banks are doing than what our clients are thinking. I mean, honestly, when I get up in the morning and when my head hits the pillow at night, I'm not really thinking as much about what our competitors are doing as much as how can we make our clients make more money? And if we can do that, how can we make them happier? How can we make them make more money? Or help them make more money?

207. Shay further explained that "we don't use the term customers at the bank. Because we want to treat everybody like a client, someone as a counterparty that we can help make better, and work with, and partner with." And Shay said, "We think about how we can help our clients all the time[.]"

208. CEO DePaolo, echoed these comments during an April 2022 earnings call, saying about Signet, "what we do, we basically listen to the client. In this industry, we listen to the client very closely, and they kind of dictate what we should do next."

209. The team servicing Signature's cryptocurrency clients is its Digital Asset Banking Group, as shown in the below excerpt from a 2020 Signature marketing brochure.



SIGNATURE BANK'S DIGITAL ASSET BANKING GROUP

Joseph Seibert
*Senior Vice President, Group Director, Digital Asset Banking*
646.949.4022 | JSeibert@SignatureNY.com
1400 Broadway, 26th Floor, New York, NY 10018

David D'Amico, *Group Director - Vice President*      Sarmen Saryan, *Group Director - Vice President*
646.949.4024 | DDamico@SignatureNY.com          646.949.4023 | SSaryan@SignatureNY.com

Melissa Rivera, *Senior Client Associate*          Theo Been, *Senior Client Associate*
646.949.4099 | MRivera@SignatureNY.com          646.949.4026 | TBeen@SignatureNY.com

Nicole Santiago, *Senior Client Associate*          Bridget Palacios, *Client Associate*
646.949.4095 | NSantiago@SignatureNY.com        646.949.4025 | BPalacios@SignatureNY.com

Fahima Begum, *Client Associate*
646.949.4054 | FBegum@SignatureNY.com

Signet™ is a brand of Signature Bank®, a New York State-chartered bank and Member FDIC.
565 Fifth Avenue, New York, NY 10017 | SignatureNY.com
With over $50 billion in assets, Signature Bank is a full-service commercial bank built upon strong financials and exceptional client service,
provided by experienced financial professionals. Signet is just one of many robust products and services offered by Signature Bank.

210.    In a June 2021 interview, when asked how Signature reconciled the anonymity of cryptocurrency with regulatory KYC requirements, Chairman Shay, stated:

The first thing is having the right folks interact with the clients, because to a great degree, your marketing is your underwriting, you want to be dealing with the right people. If you have the right people, if your colleagues are the right people and they have the right values, then they will do the pre-screening of who are the folks we can rely on. We wouldn't have gotten going if we couldn't have brought on Joe Seibert, who leads that area for us in terms of client contact, Sarmen Saryan, and David D'Amico. They really form the bedrock of folks that we could work with, and we brought them onboard. We ended up turning down many more clients than we bring up.

211.    Shay further stated:

As of the end of last year, we had $10 billion in deposits related to that. In the first quarter, we announced that had grown another $4.4 billion. But the thing is, those deposits have velocity among themselves because they're being used to settle. That gives people a lot of comfort. And that's what's allowed us to really grow because they get the safety and security of a bank, they get Joe Seibert, Sarmen Saryan, and David D'Amico, and the rest of team to call.

212.    In a July 2021 interview, Seibert stated about Signet, "what's great is there's more institutions joining the network every day. Even though we're cautious with who we onboard, we still want to help the ecosystem. You know, the exchanges need certain, you know, counterparties on there for liquidity and settlement 24/7."

213.    FTX was a long-time user of Signature banking services and an important client to Signature. As CEO DePaolo explained during a September 2022 earnings call:

The exchanges are our biggest deposits. And that doesn't include the clients that are coming on board that want to deal with those exchanges. So what happens is, we get a benefit of the exchange joining us and then all the clients following them to Signet. And so, we certainly don't want to charge a fee for the exchanges because they're actually bringing us business by moving on to the platform.

214.    Evincing FTX's early use of Signet, in a June 28, 2020 tweet thread, Sam Bankman-Fried wrote, that "SigNET was terrible until relatively recently," and "I suspect ta [*sic*] lot of this is a holdover from when it took 1 day to move money from signet to Signature (!!!)"



215. A few months later, in November 2020, Bankman-Fried tweeted that "fiat rails are a *total* mess[,] but also really important," and that "FTX is building slowly but carefully: we have ~10 of them," but "we only roll out ones if we trust them," and "It's taking a lot of time." In response to a question about the 10 fiat rails, Bankman-Fried identified Signature's "SigNET," among others.



216. Subsequently, in October 2021, FTX made an "official" announcement about the integration of Signet into FTX, as shown in the tweet below.



217. This, however, was false, and Signature knew it. As Signature's COO Howell, explained during a January 2023 earnings call, "we had announced that we're integrating FTX, but we were not integrated yet with FTX. So, we didn't have client-related transactions of FTX happening on our platform."

218. Despite Bankman-Fried's public lies about FTX's Signet presence and participation, Signature relied on his endorsement to market Signet. In an April 12, 2022 press release, Signature quoted Bankman-Fried as follows:

> FTX.US, a U.S-regulated cryptocurrency exchange, is among those benefitting from Signet. FTX CEO and Founder Sam Bankman-Fried commented on the Bank's new Fedwire transfer feature: "Partnering with Signature Bank, an established financial institution and fintech pioneer, will allow us to continue to grow our business by leveraging all the advantages and key aspects of Signet. The implementation of an API-enabled, blockchain-based digital payments platform to initiate blockchain transactions and Fedwire transactions via Signet is just the latest move toward revolutionizing the payments industry through the power of blockchain technology."[35]

219. And Signature praised Bankman-Fried on social media.

---

[35] Press Release, "Signature Bank Adds Fedwire Feature to Its Signet Digital Payments Platform, Allowing Instant Transfers Through Its Application Programming Interface" (April 12, 2022), *available at* https://investor.signatureny.com/pme/press-releases/news-details/2022/Signature-Bank-Adds-Fedwire-Feature-to-Its-Signet-Digital-Payments-Platform-Allowing-Instant-Transfers-Through-Its-Application-Programming-Interface/default.aspx.



*Pictured L to R: Sarmen Saryan, Bankman-Fried, and Joseph Siebert*

220.    By featuring Bankman-Fried and FTX in this highly-public manner, Signature bolstered their legitimacy.

221.    During the relevant time period, Signature held multiple accounts for FTX- and Alameda-related entities.

222.    First, Signature held at least two accounts for Alameda, which was organized in Delaware and originally headquartered in Berkeley, California. The account ending in -5489 was specifically a Signet account.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |
| Ledger Holdings Inc. | Signature Bank | 8106 |
| Ledger Prime LLC | Signature Bank | 5385 |
| Ledger Prime LLC | Signature Bank | 5377 |
| Paper Bird Inc | Signature Bank | 8701 |
| West Realm Shires Inc. | Signature Bank | 7436 |
| West Realm Shires Services Inc. | Signature Bank | 2804 |
| West Realm Shires Services Inc. | Signature Bank | 3976 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| FTX Lend Inc. | Signature Bank | 7651 |
| Crypto Bahamas LLC | Signature Bank | 5171 |
| Good Luck Games, LLC | Signature Bank | 7432 |
| Goodman Investments Ltd. | Signature Bank | 2903 |
| West Realm Shires Financial Services Inc. | Signature Bank | 9812 |
| Alameda Research LLC | Signet | 5489 |
| Ledger Holdings Inc. | Silicon Valley Bank | 7808 |

223. During the Relevant Time Period of May 2019 to November 2022, FTX directed certain high-worth commercial clients, including Plaintiff Statistica Capital, to deposit funds for trading on FTX.com through Signature Bank's Signet platform. There was, however, no Signet account for any FTX entity.

224. In fact, FTX customers were actually being directed to deposit their funds into a Signet account opened and controlled by Alameda. FTX customers did not know that Alameda owned and controlled that Signate account. Meanwhile, Signature knew that customer funds, including Statistica's, were intended for FTX, and knew those funds were being deposited by some of its Signet customers into an Alameda-controlled Signet account.

225. Second, Signature Bank held two accounts for FTX Trading Ltd., a company organized in Antigua and headquartered in The Bahamas, that was the parent company of FTX Digital Markets Ltd., which did business as FTX.com, *i.e.*, the FTX International platform.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |

226.    Third, Signature Bank held an account for FTX Ventures Ltd., as shown below.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |

Among 36 banks identified in the FTX bankruptcy as holding Alameda- and FTX-related accounts, only two held accounts for this entity: Signature and its primary competitor, Silvergate Bank.

227.    Fourth, Signature held an account for Maclaurin Investments Ltd., which is organized and headquartered in the Seychelles.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |

Among 36 banks identified in the FTX bankruptcy as holding Alameda- and FTX-related accounts, Signature is the only bank that held an account for Maclaurin.

228.    Through transfers to these Signature Bank accounts, Alameda was able to use customer funds to pay off third-party lenders in 2022; to extend "loans" to Bankman-Fried, Wang, and other FTX insiders;

and to fund its venture spending spree. Signature observed and processed the transfer of funds through these accounts.

229.    Moreover, through these Signature Bank accounts, FTX transferred customer funds to Alameda for various illicit purposes including undisclosed venture investments, real estate purchases, political donations, and personal "loans" to insiders.

230.    Signature continued to bank Alameda, FTX, and related shell corporations and entities even after learning of their misappropriation of FTX customer funds, breach of fiduciary duties, and other wrongdoing.

231.    Despite knowing of the fraud carried out through Alameda, FTX, and related entities, at no point prior to FTX's bankruptcy did Signature cease doing business with Alameda, FTX, or Bankman-Fried, nor did it suspend, close, or otherwise limit Alameda, FTX, and related entities' bank accounts.

232.    Rather, seeing skyrocketing deposits, revenues, and profits from Alameda and FTX's dominating performance in the crypto marketplace, Signature continued to take more deposits from FTX's institutional customers and transfer them into Alameda-controlled accounts despite knowing of Alameda and FTX's wrongful conduct.

## V.    SIGNATURE'S ACTIONS AFTER THE FTX COLLAPSE

233.    In a November 15, 2022 press release, Signature said its "deposit relationship with FTX and their related companies is less than 0.1 percent of the Bank's overall deposits as of November 14, 2022," and noted that it had reported "102.8 billion in deposits as of September 30, 2022." Thus, Signature has admitted that at least approximately $100 million of deposits in its possession shortly after FTX entered bankruptcy relate to "FTX and their related companies" (though it is unclear whether that includes Alameda).

234.    During a December 6, 2022 Financial Services Conference hosted by Goldman Sachs, CEO DePaolo explained that, after "looking at our [digital asset] businesses" and "the deposits from those businesses," Signature "do[es]n't want to be beholden to any one industry or any one individual client," so that it decided to "limit the amount of deposits not only on a global basis but on an individual client basis."

235.    Asked about the state of Signature's deposits, DePaolo said at the Goldman Sachs event:

Right now, we're at $7.3 billion, but of that, $6.1 billion is crypto, and that's purposeful because we actually had higher balances a few weeks ago when FTX happened. But right now, we're going to have probably somewhere between $8 billion and $12 billion, and most of that crypto, that will be going away.

236. During the conference, COO Howell, explained Signature's abrupt policy change in the wake of FTX's collapse:

So as Joe said, given the issues that we've seen in the cryptocurrency space as of late in particular, it's really given us an opportunity as [to] what we're doing there. We're going to have—we're really focused on our concentration levels in deposits. We're going to lower them to at least under 20%, most likely down to under 15% and keep them there as a dollar level as we grow the rest of our institution.

We're going to put in at least—no 1 client can have more than 2% in deposits. We're going to, over time, look to lower that as well. So we're looking to get more granular in the space, and we're looking to basically limit it to about—definitely no more than 20%. We're looking at really bringing it down to under 15%. We're probably pretty close there.

What does that mean? That means we're going to exit about $8 billion to $10 billion worth of deposits in that space, which we can easily cover through cash and borrowings. So it's going to be a little bit more expensive in the short term. But as we replace those deposits—lower those borrowings with lower core deposits, it will ultimately be a far better use of capital than what we've seen today.

237. Howell was asked whether this should be read as Signature's exit from the digital space. Howell responded, "we're going to be involved but we're going to be involved in a much more thoughtful manner moving forward."

238. To replace these reduced deposits, Signature has taken approximately $10 billion in advances from the Federal Home Loan Bank of New York.

239. During a January 2023 earnings call, CEO DePaolo was asked whether Signature would lend digital asset deposits out since "the original appeal of these deposits was it would be a lower-cost funding option," but that "is not necessarily proving to be the case." DePaolo responded, "in the short term, we clearly don't have any evidence or any past history that gives us a comfort level that we should do something long term with those deposits. So, we're going to keep them short for now."

240. Asked about Signature's commitment to the cryptocurrency industry, DePaolo said:

Having this FTX situation clearly put a lack of confidence in that ecosystem. Now, what we need to do is to get regulation, get competence back in the system, and we can go from there. . . . You know, every major bank—maybe not every major bank, but many major banks are in

the space, maybe more internationally than domestically, but they're all there. And what really shook the confidence of the markets was, as I said, FTX, almost Bernie Madoff-like. And that when Bernie Madoff happened, that shook the markets—it shook the markets. Again—I'll say it again: We need regulations. So, we need the regulators and Congress to get on the same page.

241.    During the call, DePaolo claimed that Signature's extensive KYC and AML procedures had simply failed in the case of Bankman-Fried, Alameda, and FTX, saying "With the FTX, it wasn't a matter of BSA/AML. Everyone thought that he was legitimate and he ended up being very Madoff-like. So, I don't think anyone could say that they knew that and we catch it." [sic] DePaolo later reiterated, "FTX is not BSA/AML. It was a Bernie Madoff-like situation that no one really thought that Sam was a bad asset."

## VI.    SIGNATURE'S ACTIONS ARE PART OF A PATTERN OF CONDUCT FACILITATING MONEY LAUNDERING, PONZI SCHEMES, AND OTHER FRAUD

242.    Over the years, Signature has been implicated in a number of money laundering and Ponzi schemes, and generally appears ready, willing, and able to bank persons and entities who use cryptocurrencies to carry out their schemes and crimes.

### A.    Signature Allegedly Facilitated William Landberg's West End Ponzi Scheme

243.    In 2015, a group of investors sued Signature Bank in both New York and Broward County, Florida, alleging fraud, breach of fiduciary duty and conspiracy in connection with a Ponzi scheme run by William Landberg—who pleaded guilty to securities fraud in 2011—through his alter egos, West End Financial Advisors LLC and West End Capital Management. *See Rizack et al. v. Signature Bank, N.A. et al.*, No. CACE-15-000367 (Cir. Ct., Broward Cty. Fla.) (filed Jan. 9, 2015).

244.    The Complaint alleged that "Signature had knowledge of Landberg's scheme from at least April 2008 when Signature first allowed funds to be transferred [from an interest reserve account] with full knowledge that the transfer was impermissible," and not only failed to stop the Ponzi scheme, but continued it, "actively taking more of Plaintiffs' money into the bank after having knowledge of the wrongful and illegal actions taken by Landberg." In an allegation particularly relevant here, the Complaint claimed that despite "the limited partnerships that purportedly pursued different investment strategies and had different

investors, Landberg unlawfully managed and controlled, de facto, each of the entities on a day-to-day basis, indiscriminately using employees of one entity to perform functions for various entities."

245.    The cases were eventually dismissed on statute of limitations and personal jurisdiction grounds. But during discovery, the plaintiffs uncovered a number of documents showing Signature's disregard of its duty to prevent money laundering.

246.    For example, the plaintiffs uncovered numerous email communications in which Signature followed Landberg's instructions to "scrub" money by transferring various amounts between dozens of business and personal accounts; lent Landberg money against its internal policies, in exchange for higher lending fees; and generally bent over backward to help Landberg perpetuate his fraud.

---

From: Forie, James
Sent: Wednesday, June 04, 2008 2:12 PM
To: 'William Landberg'
Subject: RE:

The use of the word "consider" is troublesome?

---

From: William Landberg [mailto:wlandberg@westendfinancial.com]
Sent: Wednesday, June 04, 2008 2:03 PM
To: Forie, James
Subject:

Jim

FYI I was just informed that the Met Life funds were received by Sun Life.

We should be in receipt of the funds tomorrow. After I 'scrub' the funds I will consider paying down the loan!

B

William Landberg

Chairman

West End Financial Advisors LLC

70 East 55th St, 17th floor

New York, NY 10022

212.277.7620

212.588.8902 (f)

This message is intended only for the personal and confidential use of the designated recipient(s) named above. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of West End Financial Advisors.

**From:** Forie, James
**Sent:** Thursday, June 05, 2008 12:06 PM
**To:** 'William Landberg'
**Subject:** RE: Baum

Nothing as of 12:00.

---

**From:** William Landberg [mailto:wlandberg@westendfinancial.com]
**Sent:** Thursday, June 05, 2008 11:24 AM
**To:** Forie, James
**Subject:** FW: Baum

Looks like we should have money wired into the diversified account today.
Will scrub it and get it into the west merc account so you can debit.
b

William Landberg
Chairman
West End Financial Advisors LLC
70 East 55th St, 17th floor
New York, NY 10022
212.277.7620
212.588.8902 (f)

This message is intended only for the personal and confidential use of the designated recipient(s) named above. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of West End Financial Advisors.

**From:** "Forie, James" <Forie, James>

**To:** "Efstratiou, Chris" <Efstratiou, Chris>

**Bcc:** "cefstratiou@signatureny.com" <cefstratiou@signatureny.com>

**Subject:** FW: Wire

**Date:** 2008-06-04 15:17:32 -0400

**Importance:** Normal

---

FYI

-----Original Message-----
From: William Landberg [mailto:wlandberg@westendfinancial.com]
Sent: Wednesday, June 04, 2008 3:11 PM
To: Forie, James
Cc: kkramer@westendfinancial.com; Steven Gould; Janis Barsuk
Subject: RE: Wire

It will probably be wired into west end diversified, the insurance
dedicated fund.
We have to move it around and get it scrubbed and into west mercury so
you can then debit the account.
B

William Landberg
Chairman
West End Financial Advisors LLC
70 East 55th St, 17th floor
New York, NY 10022
212.277.7620
212.588.8902 (f)

247.    In one email, Landberg's primary Signature Bank contact, Chris Efstratiou, acknowledges that Landberg is "kiting" (covering a bad check from one bank account to another), notes a $100M[36] wire callback, and states that he "changed the date on [a] wire just in case . . . ."

---

**From:** "Efstratiou, Chris" <Efstratiou, Chris>
**To:** "Sherman, Arnie" <Sherman, Arnie>
**Bcc:** "asherman@signatureny.com" <asherman@signatureny.com>
**Subject:** FW: Earns Notification 10-09-08
**Date:** 2008-10-09 13:35:08 -0400
**Importance:** Normal
**Attachments:** EARNS_NOTIFICATION_10-09-08.xls

---

Because of the holiday Bill was not around for that $100M wire callback. However, I have a feeling we won't be doing it because that Congressional Bank bounced a check he deposited into the same account. Can you say "kiting"?

Anyway, I changed the date on the wire just in case you still need to do it, but chances are not.

---

**From:** Cruz, Silvia
**Sent:** Thursday, October 09, 2008 10:24 AM
**To:** Private Client Group - Myszko (111); Private Client Group - Vessecchia (153); Private Client Group - Kasulka (161); Private Client Group - Daperis (163); Private Client Group - Sirlin (181); Private Client Group - Eliades (221); Private Client Group - Broder (222); Private Client Group - Monaco (421); Private Client Group - Larsen (422); Private Client Group - Meyerson (423); Private Client Group - Liggio (521); Private Client Group - McLaughlin (721); Private Client Group - Stern (722); Private Client Group - Podolec (821); Private Client Group - Danon (921)
**Cc:** Manzi, Patrick; Sowell-Jenkins, Margie; Cheng, Arline; Sampson, Faye; Bynum, Wendy; Mercado, Amelia; Williams, Kaaren; Francis, Sandra; Ashton, Dorothy
**Subject:** Earns Notification 10-09-08

Hello All,

Please see attached file.

---

248.    In a particularly striking communication, years before he was caught, a Signature banker calls out Landberg's request for a complicated, multi-entity transaction as a "Madoff Ponzi." Signature nevertheless continued to service him and West End for years afterwards.

[continued]

---

[36] Signature uses "M" for thousands (milli) and "MM" for millions (milli milli).

**From:** "Forie, James" <Forie, James>

**To:** "Liggio, Charlie" <Liggio, Charlie>

**Bcc:** "jforie@signatureny.com" <jforie@signatureny.com>

**Subject:** RE:

**Date:** 2009-01-22 09:51:27 -0500

**Importance:** Normal

---

Madoff Ponzi

---

**From:** Liggio, Charlie
**Sent:** Thursday, January 22, 2009 9:47 AM
**To:** Forie, James
**Subject:** FW:

I TOLD YOU !!!! If the fee is O.K. I bet he get's it. Charlie

---

**From:** William Landberg [mailto:wlandberg@westendfinancial.com]
**Sent:** Thursday, January 22, 2009 9:42 AM
**To:** Merlo, Michael
**Cc:** Liggio, Charlie; DePaolo, Joseph
**Subject:**

Mike

Here is transaction we discussed earlier today

West End Short Term is lending BDG, an approved borrower per West LB, $5,880,000 or 70% of the appraised value of 2 parcels of land.

Funds for the loan to BDG are made up of two advances
80% of the $5,880,000 or $4,700,000 is advanced by West LB pursuant to tightly constructed loan agreement.
20% of the $5,880,000 or $1,176,000 is advanced by West End Mercury fund

Proceeds of the loan to BDG are as follows
$4,000,000 to pay down Century Bank
 1,880,000 is going to be used as follow

  $200,000 closing costs
$1,200,000 investment in West End Mercury
$480,000 working capital to BDG

In order to close, I need to forward $5,880,000 to the escrow agent. I get $4,700,000 from West LB. It is usual and customary for all real estate closings to be handled with certified funds. Of course we could use regular checks but it is neater to do it all with certified funds.

My request to you is to either advance West Mercury $1,200,000 or me $1,200,000 and I will advance it to Mercury. Upon receipt of the proceeds BDG will direct at the closing the $1,200,000 to West End Mercury which will be used to pay down your advance or if you advance to me, to return to me and then return to SBNY.

Its clean and neat and is done every day.

Would appreciate the accomodation of $1,200,000 for 2 hours. You dont have to fund until I receive the $4,700,000 from West LB---yes they send it to me first. I then add additional funds and wire to the escrow agent. No closing, no disbursements and the funds are returned back to me.

CONFIDENTIAL

SB056160

249. Notably, CEO DePaolo, is a participant in many of these emails, including the one above, and another, replicated below, in which Landberg asks and he agrees to have a "John Dean" meeting.[37]

**From:** DePaolo, Joseph
**Sent:** Friday, June 06, 2008 10:14 AM
**To:** 'William Landberg'
**Subject:** RE:

Bill,

I just to Mike Merlo and Morey Danon…….. They will call you shortly (within 10 minutes)……..…..

THANK YOU very much – it is much appreciated !

Joe

---

**From:** William Landberg [mailto:wlandberg@westendfinancial.com]
**Sent:** Friday, June 06, 2008 9:05 AM
**To:** DePaolo, Joseph
**Subject:**

Joe
I would like to spend 15 minutes with you in the very near term.
Sort of a John Dean meeting.
B

William Landberg
Chairman
West End Financial Advisors LLC
70 East 55th St. 17th floor
New York, NY 10022
212.277.7620
212.588.8902 (f)

This message is intended only for the personal and confidential use of the designated recipient(s) named above. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of West End Financial Advisors.

CONFIDENTIAL SB047795

---

[37] John Dean was White House Counsel for President Richard Nixon and was arrested for his role in the Watergate scandal.

**B.      Signature Allegedly Facilitated the ChinaCast Fraud**

250.    In December 2019, Chinese online education provider ChinaCast Education Corp. filed a lawsuit against Signature and two other banks, accusing them of letting the company's former CEO embezzle $35 million through accounts at the banks. ChinaCast alleged the banks ignored warning signs of money laundering and failed to stop transfers of money to a fictitious investment holding company in the British Virgin Islands with no legitimate business purpose. The parties apparently settled the matter.

**C.      Signature has Partnered with Bittrex, an Admitted Money Launderer**

251.    Between March 2014 and December 2018, for example, cryptocurrency exchange Bittrex violated sanctions and anti-money laundering laws at least 116,421 times, permitting persons located in the sanctioned jurisdictions of the Crimea region of the Ukraine, Cuba, Iran, Sudan, and Syria to use its platform to engage in approximately $263 million of cryptocurrency transactions.[38] In a Consent Order with the Financial Crimes Enforcement Network (FinCEN), Bittrex admitted to, among other things:

252.    Despite these dangerous and illegal practices, Signature partnered with Bittrex in May 2018. Since the practices were allowed to continue for at least several months after the partnership, Signature likely failed to perform adequate due diligence.

**D.      Signature Banked Binance Despite Publicly-Available Evidence of its Misapplication of Customer Funds**

253.    Binance is one of the largest cryptocurrency exchanges in the world, but has come under a great deal of scrutiny. In particular, Binance has been accused of allowing Iranian cryptocurrency traders to dodge U.S. economic sanctions.

254.    Binance lists Signet as a method for onboarding funds. However, the entity that receives funds sent to Binance via Signet is actually called Key Vision Development Limited ("KVDL").

255.    In December 2020, around the time Binance signed up with Signature's primary digital asset industry competitor, Silvergate Bank, a shell company was registered in Seychelles under the name Key

---

[38] *See* Dep't of Treasury, "Treasury Announces Two Enforcement Actions for over $24M and $29M Against Virtual Currency Exchange Bittrex, Inc," *at* https://home.treasury.gov/news/press-releases/jy1006.

Vision Development Limited. In addition, over time, Binance customers who experienced withdrawal issues reported receiving reports from their banks that the funds were returned to the sender, KVDL.

256.    Among increasing concerns about the legitimacy of its business, in May 2021, Silvergate terminated Binance as a client. Binance then transferred its business to Signature. KVDL was later stricken off the Seychelles register in September 2021, but on October 5, 2022, a Key Division Development Limited LLC was registered by unknown parties in Wyoming.

257.    On January 22, 2023, Signature announced that it was instituting a $100,000 minimum transaction amount for SWIFT transfers to Binance but—despite its awareness of allegations that Binance allows crypto traders to evade U.S. sanctions and its use of a shell company—continues to bank the company and allow it to use Signet.

## PLAINTIFFS' INJURY

258.    Plaintiffs' experience with Signature Bank is detailed in paragraphs 156 to 165, above.

259.    Since Alameda, FTX, and related entities entered bankruptcy on November 11, 2022, Statistica Capital and its majority owner have been unable to recoup $300,000 intended for FTX but actually sent or diverted to Alameda via Signet.

260.    Since Alameda, FTX, and related entities entered bankruptcy on November 11, 2022, Statistica Ltd. (formerly Statistica Fund) has been unable to recoup approximately $1.7 million of the funds it sent by wire, intended for deposit to FTX, from its Signature account to an account for North Dimension Inc. controlled by Alameda.

## CLASS ACTION ALLEGATIONS

261.    Pursuant to Fed. R. Civ. P. 23, Plaintiffs seek to represent a class of all persons who, at any time between May 2019 and November 2022 obtained banking services from Signature Bank, were in possession of fiat or digital currency on FTX as of November 11, 2022, and have been unable to recover any portion of that currency.

262.    Plaintiffs nevertheless reserve the right to divide into subclasses, expand, narrow, more precisely define, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

263.    The members in the proposed class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

264.    Questions of law and fact common to Plaintiffs and the class (Fed. R. Civ. P. 23(a)(2)) include, without limitation:

      a.    Whether Alameda or FTX, including individuals associated with those entities and related entities, defrauded Plaintiffs and other Class Members;

      b.    Whether Alameda or FTX owed Plaintiffs and other Class Members fiduciary duties;

      c.    Whether Alameda or FTX violated their fiduciary duties to Plaintiffs and other Class Members;

      d.    Whether Signature knew of the fraud carried out by Alameda, FTX, and related entities and persons;

      e.    Whether Signature knew of Alameda and FTX's breaches of fiduciary duty;

      f.    Whether Signature substantially facilitated the fraud;

      g.    Whether Signature substantially facilitated the breach of fiduciary duty;

      h.    Whether Defendant was unjustly enriched;

      i.    The proper equitable and injunctive relief;

      j.    The proper amount of restitution or disgorgement;

      k.    The proper amount of compensatory and punitive damages; and

      l.    The proper amount of reasonable litigation expenses and attorneys' fees.

265.    Plaintiffs' claims are typical of class members' claims in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct. Fed. R. Civ. P. 23(a)(3).

266.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation.

267.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

268.    Questions of law and fact common to the class predominate over any questions affecting only individual Class Members.

269.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(b)(4).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Aiding and Abetting Fraud

270.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

271.    Alameda and FTX's conduct detailed herein constituted a fraud upon Plaintiffs and other Class Members. More specifically, FTX and Alameda made fraudulent misrepresentations and omissions to Plaintiffs and other Class Members about the nature of their FTX investments and how investor money would be applied and maintained. Plaintiffs and other Class Members relied to their detriment on these misrepresentations and omissions when depositing or investing assets with FTX. As a direct and proximate result of the fraud, Plaintiffs and other Class Members have been damaged.

272.    Signature knew the conduct detailed herein constituted a fraud upon Plaintiffs and other Class Members.

273.    Signature gave substantial assistance or encouragement to Alameda, FTX, and related persons and entities in defrauding Plaintiffs and other Class Members. Specifically, Signature accepted billions of dollars of irregular deposits and approved or facilitated the related-party transactions, atypical lending, and the commingling and misappropriation of customer funds that marked FTX and Alameda's fraudulent scheme.

274.    As a direct and proximate result of Signature's aiding and abetting the fraud, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

275.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

276.    Alameda and FTX breached fiduciary duties owed to Plaintiffs and other Class Members. Specifically, because Plaintiffs and other Class Members deposited funds into Alameda and FTX's control with the understanding that those entities would act in accordance with their promises in regard to the use of such funds, including under FTX's Terms of Service and FDM's policy, Alameda and FTX owed investors the fiduciary duties of loyalty and care and to deal honestly and in good faith. As detailed herein, Alameda and FTX breached those fiduciary duties by stealing customers' funds. As a direct and proximate result of the Individual Defendant's fraud, Plaintiffs and other Class Members have been damaged.

277.    Signature had actual knowledge that Alameda, FTX, and related persons and entities breached fiduciary duties they owed to Plaintiffs and other Class Members. Specifically, Signature knew that funds being deposited into Alameda's accounts were not being used consistently with the businesses' purposes and were not being held separately in trust for FTX customers, nor segregated or otherwise separated.

278.    Signature provided substantial assistance or encouragement to Alameda, FTX, and related persons' and entities' breaches of their fiduciary duties to Plaintiffs and other Class Members. Specifically, Signature accepted and permitted the commingling of billions of dollars of FTX customer funds it knew Alameda and FTX had a fiduciary duty to separate and hold in trust for those customers.

279.    As a direct and proximate result of Signature's aiding and abetting of breach of fiduciary duty, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

280.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

281.    Plaintiffs lack an adequate remedy at law.

282.     Plaintiffs and other Class Members conferred benefits on Defendant by depositing funds into Signature Bank and by using Signet.

283.     Defendant acquired ill-gotten gain, including in the form of revenues, from Plaintiffs' and other Class Members' deposits intended for use on the FTX exchange.

284.     Defendant condoned and furthered the wrongful conduct from which it benefitted. Retention of those moneys under these circumstances is unjust and inequitable because Defendant's actions and omissions caused injuries to Plaintiffs and other Class Members, since they would not have deposited and lost their funds had the true facts been known and had Defendant not engaged in the malfeasance.

285.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial, and its wrongful gain should be restored to Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

286.     Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Signature as to each and every cause of action, and the following remedies:

a.     An Order certifying this as a class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Signature to pay the costs of class notice;

b.     An Order requiring Signature to pay all statutory, compensatory, and punitive damages permitted under the causes of action alleged herein;

c.     An Order requiring Signature to restore, disgorge, or otherwise return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

d.     Pre- and post-judgment interest;

e.     Costs, expenses, and reasonable attorneys' fees; and

f.     Any other and further relief the Court deems necessary, just, or proper.

## **JURY DEMAND**

287. Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: February 6, 2023

_____

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, CA 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD (*phv application forthcoming*)
*tblood@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

***Counsel for Plaintiffs***