BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| In Re: FTX Cryptocurrency Exchange Litigation | MDL No. 3076 |
|---|---|

**STATISTICA CAPITAL LTD. & STATISTICA LTD.'S INTERESTED PARTY RESPONSE OPPOSING TRANSFER**

Pursuant to JMPL Rule 6.2(e), Statistica Capital Ltd. and Statistica Ltd. (together "Statistica"), plaintiffs in a lawsuit styled *Statistica Capital Ltd. et al. v. Signature Bank*, No. 23-00993-ALC (S.D.N.Y.) ["*Statistica Capital*"], submit the following interested party response opposing transfer under 28 U.S.C. § 1407, both generally, and as to *Statistica Capital* specifically, even if the other cases are centralized. If an MDL motion is granted and *Statistica Capital* is subject to a transfer order, however, Statistica believes centralization in the Northern District of California, before the Honorable Jacquelin Scott Corley—before whom the majority of the actions are now pending—is most appropriate.

**I.      INTRODUCTION**

The motion to transfer seeks to centralize a handful of cases against disparate defendants simply because each action involves, as a predicate for its claims, the now-infamous FTX fraud. That underlying fraud, however, is neither particularly complicated, nor particularly disputed, setting it apart from many other aiding and abetting cases with multiple defendants. FTX's present CEO, John J. Ray III, for example, has explained that the fraud was little more than a case of "old fashioned embezzlement." And a wide variety of information has already come out of the bankruptcy demonstrating the means and mode of the fraud. *See*, *e.g.*, Decl. of Jack Fitzgerald ("Fitzgerald Decl.") ¶¶ 2-3 & Exs. 1-2. Presumably, more information about the behavior of FTX, its co-founder, Samuel Bankman-Fried, his conspiring associates, and his hedge fund, Alameda

Research, will emerge from the bankruptcy proceedings and criminal prosecutions. It will likely be that information, rather than discovery taken directly from Bankman-Fried, FTX, or Alameda, that will evince the underlying fraud.

Beyond that, the legal and factual issues among different types of defendants are so disparate, and the evidence relating to each defendant's role in the action is so individualized, that centralization is unlikely to realize substantial efficiencies: whether Gisele Bundchen is liable to people who lost money in the FTX fraud because she promoted the exchange, for example, depends on wholly-different questions of fact and law than whether FTX's auditors are liable for certifying FTX as financially sound after auditing the company—which in turn present very different legal and factual issues regarding whether banks doing business with FTX and Alameda are liable for allowing the commingling and theft of FTX customer funds. There is no need to coordinate such different cases, and little to no benefit from it.

To the extent coordination is useful, however, it is already happening in the Northern District of California, where 10 of the 15 actions being considered for transfer are already pending, 8 of them before Judge Corley.[1] And dispersion of the litigation is minimal. Beyond the N.D. Cal. Cases, there are just four cases pending in Florida—which do not bear much resemblance to those in California—and Statistica's action pending in the Southern District of New York, which is unique. No other jurisdictions are involved.

---

[1] These are: *Lam*, *Pierce*, *Hawkins*, *Jessup*, *Papadakis*, *Rabbitte*, *Bhatia*, *Magleby*, *Keane*, and *Girschovich* (the "N.D. Cal. Cases"). *Bhatia*, *Magleby*, *Keane*, however, are against Silvergate Bank, which recently announced plans to liquidate and wind down its business, such that these cases should probably not weigh heavily in the Panel's consideration of the need for centralization.

## II.     BACKGROUND

Statistica Capital Ltd. is a British Virgin Islands limited company licensed as an Approved Manager by the Financial Services Commission of the British Virgin Islands. *Statistica Capital* Compl. ("Compl.") ¶ 4. Statistica Ltd. is a BVI limited company that, during the relevant period, was called Statistica Fund Ltd. *Id.* ¶ 5. Statistica Capital is a trading firm that both invests its own money and managed the money of Statistica Fund during the relevant time period. On February 6, 2023—after significant investigation, evidence-gathering, and expert consultation in the weeks following the FTX collapse—Statistica sued Signature Bank, alleging it aided and abetted FTX's embezzlement of its money, and the money of other institutional, commercial customers who did business with the bank.

Signature is a New York commercial bank well known as one of the most "crypto-friendly" banks in the United States because it offers a bespoke banking product called Signet, which allows participants to convert fiat money to cryptocurrency and to transfer money to other participants over the network at any time. *See id.* ¶¶ 17-22. Signet was limited, however, to the bank's institutional clients, like Statistica, who held a minimum of $250,000 and passed know-your-customer and anti-money-laundering procedures. *See id.* ¶ 25.

Both Statistica and Alameda were Signature Bank account holders and members of Signet. Believing it was depositing money for trading onto the FTX exchange, Statistica sent millions of dollars to Alameda using Signet—and millions more by wire from its Signature bank account to an account in the name of North Dimension, which was wholly-owned by Alameda and controlled by Sam Bankman-Fried—believing the money was being deposited for its trading on the FTX exchange. *See id.* ¶¶ 156-57, 161. Statistica had even expressly advised Signature that its money

was intended for FTX. *Id.* ¶¶ 158-60, 162-65. Thus, Statistica has a powerful, direct case for Signature Bank's actual knowledge.

## III.     THE MOTION FOR CENTRALIZATION SHOULD BE DENIED

### A.    Centralization is Inappropriate Because the Suits Involve Disparate Defendants and Divergent Theories of Liability

While several actions being considered for transfer name FTX-insider individuals like Bankman-Fried, Caroline Ellison, Gary Wang, Nishad Singh, Sam Trabucco, and Daniel Friedberg as defendants, their legal and financial troubles and the pending criminal and bankruptcy proceedings mean they are likely judgment proof. Accordingly, the real import of the pending litigation is whether certain *outsiders* are potentially liable to those who lost money in the FTX fraud. But while each case seeks to hold some third-party defendant responsible for assisting in the fraud, that is where the material similarities in the cases end.

The corporate defendants in the 13 pending actions can be broken into the following groups: promoters, investors, auditors, and bankers.[2] Accordingly, while "the actions share some basic questions of fact" because the FTX fraud underlies each of them, "significant localized intervening causation issues are expected to be at play . . . ." *See In re: Yellow Brass Plumbing Component Prods. Liab. Litig.*, 844 F. Sup. 2d 1377, 1379 (J.P.M.L. 2012) ["*Yellow Brass*"].

Although each group of defendants allegedly had some involvement in the FTX fraud, the case theories against them vary widely. *Garrison*, *Norris*, and *Podalsky*, for example, bring cases against FTX promoters including Tom Brady, Gisele Bundchen, Kevin O'Leary, David Ortiz, Stephen Curry, Shaquille O'Neal, and the Golden State Warriors, among others. Their actions focus on whether FTX yield-bearing accounts ("YBAs") "are found to be 'securities,'" in which

---

[2] The last-filed case, *O'Keefe*, also names law firm Fenwick & West LLP among its 20 defendants. To assist the Panel, a table showing all relevant cases in order of filing, and their class definitions and causes of action, is attached to the Fitzgerald Declaration as Exhibit 3.

case they assert FTX celebrity and sport promotors "may be liable under state and federal regulations for: (1) promoting an unregistered security, or (2) failing to properly disclose their payments and compensation." *See Garrison* Complaint ¶ 1. Accordingly, each case except *Norris*[3] is brought on behalf of persons who "purchased or enrolled in a YBA" with FTX. *See Garrison* Complaint ¶ 234; *Podalsky* Complaint ¶ 145. Each seeks declaratory judgment that these YBAs are securities. *See Garrison* Complaint ¶¶ 273-80; *Norris* Complaint ¶¶ 94-101; *Podalsky* Complaint ¶¶ 184-91. And then each alleges violations of Florida's Securities and Investor Protection Act and Deceptive and Unlawful Trade Practices Act for the promoters' alleged behavior in selling these unregistered securities. *See Garrison* Complaint ¶¶ 249-66; *Norris* Complaint ¶¶ 70-87; *Podalsky* Complaint ¶¶ 160-77. Finally, each contains a civil conspiracy count alleging the promoters made material omissions and misrepresentations about the YBAs. *See Garrison* Complaint ¶¶ 267-72; *Norris* Complaint ¶¶ 88-93; *Podalsky* Complaint ¶ 178-83.

By contrast, *Pierce*, *Hawkins*, *Papadakis*, and *O'Keefe* assert claims against FTX auditing firms, Armanino, LLP and Prager Metis CPAS, LLC. According to *Pierce*, "Armanino and Prager Metis personnel knew or should have known that their work would be used to entice third parties to entrust FTX Group with their assets," and that "[b]y agreeing to prepare and certify the audit reports at the behest of the FTX Group . . . conspire[d] with the FTX Group in its conduct of a RICO enterprise." *Pierce* Complaint ¶¶ 101, 106; *see also id.* ¶¶ 130-34 (asserting a single count against the auditor defendants for RICO Conspiracy). In sum, *Pierce* alleges that the "individual Defendants . . . directed and controlled a RICO enterprise through a pattern of racketeering

---

[3] *Norris* is not even pleaded as a class action, but instead is brought only on behalf of six individual plaintiffs. *See Norris* Complaint ¶ 36; *see generally id.* (no indication of class action on cover sheet, no definition of class in complaint, damages only sought for individual plaintiffs, etc.).

activity," and that "Armanino and Prager Metis facilitated this scheme by agreeing to provide and providing auditing and consulting services to FTX Group." *Id.* ¶ 132.

*Hawkins* similarly alleges Armanino and Prager Metis "issued certified reports which purportedly found the FTX Entities to be in good financial health" and "published statements in support of Bankman-Fried and the FTX Entities in 2021 and 2022, respectively." *Hawkins* Complaint ¶ 5. According to *Hawkins*, "[t]he Auditor Defendants' validation of the FTX Entities through their certified reports and other public statements was crucial to the FTX Entities' continued growth, as it offered assurance to customers . . . that any assets deposited with FTX were in responsible hands." *Id.* ¶ 37. *Hawkins* asserts a single claim against these entities for Civil Conspiracy, alleging they "had knowledge of the fraud and wrongdoing by the FTX Entities as a result of their experience and relationship with the FTX Entities, and thus knew or should have known that the representations they made were deceitful and fraudulent." *Id.* ¶ 84.

*Papadakis* asserts similar facts and claims, and adds allegations that "Armanino and Prager both failed at complying with the standard for auditor independence." *Papadakis* Complaint ¶ 62; *see generally id.* ¶¶ 19-21, 54-80. It asserts claims against them for Aiding and Abetting Fraud and Breach of Fiduciary Duty, Aiding and Abetting violation of California's Unfair Competition Law, and Civil Conspiracy. *see id.* ¶¶ 180-81, 188, 192, 202. *O'Keefe* is similar. *See O'Keefe* Complaint ¶ 173 ("Preger [sic] Metis and Armanino audited, and then signed off on, FTX Trading's and FTX US's 2020 and 2021 financial statements," which "provided FTX with a necessary veneer of stability and safety and helped to conceal SBF's fraud."); *see also id.* ¶¶ 174-79 (factual allegations); *id.* ¶¶ 195-97 (civil conspiracy claim[4]); *id.* ¶¶ 200-201 (aiding and abetting fraud

---

[4] Although these paragraphs are asserted against Fenwick & West, that appears to be a copy-and-paste error given that the prior section is titled "Defendant Accounting Firms," whereas the law firm is featured in a prior section titled "Fenwick & West."

claim); ¶¶ 206-207 (aiding and abetting breach of fiduciary duty claim); *id.* ¶¶ 211-12 (aiding and abetting conversion claim).

Patently, whether FTX's auditors participated in a racketeering enterprise or conspiracy by knowingly issuing false audit reports involves completely different questions of fact and law than whether Tom Brady's "participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law," *see Garrison* Complaint ¶ 237(b).

The cases against the banks are also quite different. Unlike celebrity promoters or even audit firms, banks are highly regulated under the Bank Secrecy Act and state law, and also have strong protections and privileges for providing routine services. Nevertheless, banking was integral to FTX's business and fraud.

In *Statistica Capital*, Statistica alleges Signature Bank "had actual knowledge of the FTX fraud, which it acquired through . . . (i) directly observing and processing suspicious funds transfers through Signet . . . (ii) performing enhanced due diligence on Alameda and FTX, first during their onboarding and then during ongoing monitoring, and (iii) performing enhanced blockchain analysis." Compl. ¶ 112. Statistica alleges Signature "substantially facilitated the FTX fraud by publicly promoting FTX; by failing to close, suspend, or otherwise limit any Alameda and FTX accounts, despite knowing that the accounts were being used in violation of FTX's Terms of Service and its fiduciary duties to its customers; and by accepting additional customer deposits into Alameda accounts after learning of the fraud." *Id.* ¶ 113.

For its Aiding and Abetting Fraud claim, then, Statistica alleges "Signature accepted billions of dollars of irregular deposits and approved or facilitated the related-party transactions, atypical lending, and the commingling and misappropriation of customer funds that marked FTX and Alameda's fraudulent scheme." *Id.* ¶ 273; *see also id.* ¶ 278 (Aiding and Abetting Breach of

Fiduciary Duty claim alleging "Signature accepted and permitted the commingling of billions of dollars of FTX customer funds it knew Alameda and FTX had a fiduciary duty to separate and hold in trust for those customers.").

Whether such a highly-regulated bank knowingly allowed the commingling of funds within its accounts is a very different question than whether auditors knowingly signed off on false financial statements, which is a very different question than whether Larry David's participation in a Superbowl commercial was an illegal offering of unregistered securities. While all have some commonality because of the FTX connection, the cases are very disparate. And while each set of cases brings claims labeled things like "civil conspiracy," the alleged conspiracy is always between the unique defendant and FTX—there is no allegation of inter-defendant cooperation, for example, no allegation auditors and bankers were conspiring with each other, along with FTX.

Even within the defendant groups, the inquiries may be highly individualized. In the banking group, for example, two banks—Signature and Silvergate—offered bespoke products for converting fiat currency to cryptocurrency (called Signet and the Silvergate Exchange Network, or SEN), which are central to the cases against them. *See* Compl. ¶ 1 ("Signature knew of and permitted the commingling of FTX customer funds within its proprietary, blockchain-based payments network, Signet."); *id.* ¶¶ 19-32, 166-74 (allegations regarding Signet's role); *Keane* Complaint ¶ 106 ("[F]rom around the time the fraud began in mid-2019, Silvergate had actual knowledge of the FTX fraud, which it acquired through, among other things . . . directly observing and processing suspicious funds transfers through SEN, and through other Alameda and FTX accounts at Silvergate Bank . . . ."); *id.* ¶¶ 30-47, 138-40 (further allegations regarding SEN's role). But even while these products have the same purpose, they function completely differently. *See* Compl. ¶ 22 (describing Signet's asset tokenization and redemption process); *Keane*

Complaint ¶ 36 (describing SEN's process of making notational entries to the bank's internal general ledger). Thus, the inquiry with respect to each bank is different. The remaining banks in the meanwhile—Deltec, Moonstone, and an associated individual, Jean Chalopin—are alleged to have misbehaved in a completely different manner, "primarily assisting SBF in trafficking Class Member funds across the U.S. border." *See O'Keefe* Complaint ¶ 102.

Finally, the investors are alleged to have "pumped billions of dollars into FTX," with FTX having "returned the favor," *see id.* at 39 (header emphasis omitted); *see also id.* ¶¶ 111-61 (full allegations regarding venture capital fund defendants), while law firm Fenwick & West is alleged to have "helped set up the shadowy entities through which SBF operated his fraud . . . ." *Id.* ¶ 162.

Because each of these non-FTX parties and groups of parties is alleged to have assisted the FTX fraud in its own unique way, "the various complaints raise factual issues predominantly unique to each [third-party's] relationship with [FTX], notwithstanding" that there may be some "similarity of [ ] legal issues." *See In re Fotomat Franchisee Litig.*, 394 F. Supp. 798, 799 (J.P.M.L. 1975) (denying motion to transfer). The unique relationships between each third party defendant and FTX also mean that "[d]iscovery directed toward each [defendant] will be unique whether or not" the actions are transferred. *See id.* Thus, "even assuming that some common factual nexus exists among these actions . . . the overall convenience of the parties and witnesses and the just and efficient conduct of the litigation will not necessarily be enhanced by a Section 1407 transfer." *See id*.

**B.     Centralization is Unnecessary Because it Would Bring Competitors Together**

The Panel is "typically hesitant to centralize litigation against multiple, competing defendants . . . ." *Yellow Brass*, 844 F. Supp. 2d at 1378. This is sensible, because joining competitors in an MDL could increase the risk of collusive or anticompetitive behavior (either in cooperation or against one another). But that is the ask of movants here, since there are numerous

competitors within the groups of defendants. For example, Armanino and Prager Metis are competing auditors; Silvergate and Signature are competing commercial banks; and Sequoia Capital and Tiger Global are competing venture capital firms.

### C. Centralization is Unnecessary Given the Minimal Number of Actions and Already-Occurring Coordination

Where "only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate." *In re SLB Enter. Rico Litig.*, 412 F. Supp. 3d 1350, 1352 (J.P.M.L. 2019) (citation omitted). The Panel should find that burden unsatisfied here where only a few district courts are presiding over relevant cases, so that there is a minimal "set[] of pretrial proceedings to coordinate . . . ." *See id.* at 1351-52 (denying motion to transfer notwithstanding that "[t]he actions unquestionably involve[d] nearly identical factual allegations that affiliated toy companies . . . are engaged in a common scheme to evade court judgments" because there were only "six actions . . . pending in two districts").

Of the 15 pending cases being considered for centralization, 10 are already in the Northern District of California, and 8 already before Judge Corley. Counsel for Statistica is also counsel for Plaintiff in *Keane*, pending before Judge Corley, and has, on multiple occasions starting last December, discussed coordination and cooperation with counsel for the other N.D. Cal. Cases. Fitzgerald Decl. ¶ 6. Where prudent, Statistica is prepared to continue cooperating and coordinating with the plaintiffs in other cases involving FTX, and their counsel.

The Panel has noted that "voluntary coordination and cooperation among the parties . . . and the involved judges is a preferable alternative to centralization." *In re: Uponor, Inc. F1960 Plumbing Fittings Prod. Liab. Litig.*, 895 F. Supp. 2d 1346, 1349 (J.P.M.L. 2012) (denying motion to transfer); *see also Yellow Brass*, 844 F. Supp. 2d at 1379 (same). That is the case here.

## IV. IF TRANSFER IS ORDERED, *STATISTICA CAPITAL* SHOULD BE EXCLUDED

If the Panel grants the motion for centralization, it should nevertheless find *Statistica Capital* is so differently-situated that it should be excluded.[5]

Between 2021 and 2023, Signature had between 1,000 and 1,410 digital asset clients, about 70% percentage of which were also Signet members. *See* Compl. ¶ 26. Unlike the very broad class definitions in the other 12 lawsuits—which encompass everyone in the world affected by the FTX collapse—Statistica has limited its lawsuit to persons who "obtained banking services from Signature Bank," *see* Compl. ¶ 261, which is necessarily limited to commercial, institutional investors like Statistica and other crypto hedge funds. Given the small number of Signature's digital asset customers and Signet members, this class is likely to be smaller than 1,000 in number.

Given this small class, it is unsurprising that out of approximately 25 plaintiffs named in the 13 pending suits, Statistica is the only institutional plaintiff; all others appear to be retail consumers who used the FTX exchange. This includes the only other plaintiff who filed a case against Signature, Connor O'Keefe; in that late-filed lawsuit, however, Signature is just one of 20 named defendants, even though it never did business with Mr. O'Keefe because Signature did not accept retail business. Moreover, unlike Silvergate Bank, Signature seemingly did not even accept retail deposits into institutional accounts. So all of the commingling that happened at Signature Bank happened with institutional money—like Statistica's—not retail money.

Given its position, Statistica was able to plead its case in far more detail, and with far more evidence than the retail cases. *See*, *e.g.*, Compl. ¶¶ 140-49 (the specific information Signature learned about Alameda and FTX during onboarding); *id.* ¶¶ 156-65 (Signature's direct experience

---

[5] Statistica filed a Notice of Potential Tag-Along Action out of an abundance of caution given Rule 6.2(d), but the proponents of the MDL notably did not tag *Statistica Capital* as related, presumably because they observe the same distinction and also believe the case should be left alone to be litigated where it is, in the Southern District of New York.

advising Signature of information demonstrating Alameda and FTX's commingling of funds). And the litigation is moving along, with Signature already having sought the district court's permission to file a motion to dismiss. *See Signature Capital* Dkt. Nos. 21 & 22. Moreover, unlike most other cases proposed for transfer, *Signature Capital* does not name as defendants or assert claims against any FTX insiders, like Bankman-Fried, Ellison, Wang, Singh, or Trabucco.

As a commercial, institutional investor and Signature business bank account holder, Statistica is also subject to a contract titled "Business Bank Account Agreements and Disclosures" ("Agreement"), which purports to impose several changes to the normal litigation procedures under the Federal Rules: a requirement for venue in New York County (the reason Statistica filed in S.D.N.Y.); a different statute of limitations and burden of proof than would otherwise apply; and a waiver of a jury trial. *See* Fitzgerald Decl. Ex. 4, Agreement at 10-11. These provisions both allow for and require very different litigation strategy, making coordination of the case with those governed by the usual rules of Federal Procedure likely to be unwieldy or at least inefficient. For example, without a jury to worry about, *Daubert* motions are not that important and the parties might reasonably wish to save time and resources by skipping them; but their progress might be held up by an MDL in which law and motion practices relating to expert testimony takes up a great deal of time. Similarly, with the promise of a bench trial, Statistica and Signature need not spend their time on jury consultants and focus groups.

Because the case and position of the parties is so different in *Statistica Capital* than the other 12 cases proposed to be transferred, if the Panel grants the motion, it should nevertheless deny the motion as to *Statistica Capital*. *See In re Pennsylvania Life Co. Secs. Litig.*, 389 F. Supp. 981, 983-84 (J.P.M.L. 1975) (Holding that "[w]ith the exception of the Benyas action, we find that all actions involve common questions of fact and that their transfer to the Central District of

California for coordinated or consolidated pretrial proceedings" is appropriate, and explaining that the Benyas action "is a private contract dispute involving operative facts distinct from the other actions," that "the documents relied upon by plaintiffs in Benyas to prove their claims are different from those relied upon by the plaintiffs in the remainder of the litigation," and that because the Benyas action "raises only limited questions of fact common to the other actions," it should "remain in the Eastern District of Michigan."); *In re Government Auto Fleet Sales*, 328 F. Supp. 218, 218 n.1, 220 (J.P.M.L. 1971) (Order "that the actions listed on the attached Schedule A (with the exception of the Merit Motors Co. Case) are hereby transferred," and explaining that:

> All parties agree that the Merit Motors Case (a case brought by an automobile dealer opposed to discounts to commercial fleet purchasers) should not be included with the actions brought by states and other government entities urging the governmental fleet discounts should be reinstated. Although there may be some overlapping discovery, we do not believe that the inclusion of this case would promote the just and efficient conduct of this litigation and it will not be included in this transfer order).

**V.    IF TRANSFER IS ORDERED, CENTRALIZATION SHOULD OCCUR IN THE NORTHERN DISTRICT OF CALIFORNIA**

If the Panel grants the motion for centralization, the MDL should be assigned to Judge Corley, of the Northern District of California, before whom the majority of the relevant actions are already pending. Judge Corley has experience as a District Judge presiding over *In re Qualcomm Antitrust Litigation*, MDL No. 2773 (N.D. Cal.) ["*In re Qualcomm*"], and as a Magistrate Judge, also served as a discovery referee in multiple complex cases, including other MDL proceedings, such as *In re Juul Labs, Inc. Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2913 (N.D. Cal.), and *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, MDL No. 2843 (N.D. Cal.), as well as the complex opioid litigation, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-CV-07591 (N.D. Cal.).

Transfer to Judge Corley would also be less judicially burdensome than transfer to the movants' suggested Southern District of Florida jurists. Judge Corley's pending MDL Proceeding (*In re Qualcomm*) was consolidated in 2017, a year before Judge Moore's, *see In re Liquid Toppings Dispensing Sys. ('447) Pat. Litig.*, 291 F. Supp. 3d 1378 (J.P.M.L. 2018) ["*Liquid Toppings Patent Litigation*"], and four years before Judge Altonaga's, *see In re Jan. 2021 Short Squeeze Trading Litig.*, No. MDL 2989, 2021 WL 1258399 (J.P.M.L. Apr. 2, 2021) ["*Short Squeeze Litigation*"]. Further, in contrast to the *Short Squeeze Litigation*, which is in its infancy and includes 58 cases of the initial 63 consolidated, and the *Liquid Toppings Patent Litigation*, which has thus far resolved none of its consolidated actions,[6] in *In re Qualcomm*, one action has already proceeded through a bench trial and appeal, and the remaining claims have been narrowed to only an exclusive dealing theory and a derivative unfair competition claim. *See In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at *1 (N.D. Cal. Jan. 6, 2023) (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020); *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021)).

Given that 10 out of 15 cases are already pending in the Northern District of California, with 8 already before Judge Corley, and given her considerable experience and best ability to take on a new MDL, if the Panel is inclined to consolidate the actions, it should do so before Judge Corley.

## VI. CONCLUSION

The cases before the panel are few in number and venue, involve disparate groups of competing defendants, and advance significantly different case theories that depend on wholly

---

[6] *See* MDL Statistics Report – Distribution of Pending MDL Dockets by District, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-February-16-2023.pdf.

different issues of law and fact. Because centralization is unnecessary and inappropriate, the Panel should deny the motion.

If the Panel grants the motion, it should limit centralization to the consumer-oriented cases and except from the transfer order *Statistica Capital*, a case brought on behalf of a small, specialized putative class that differs greatly from the other very broad cases and classes.

To the extent the Panel grants the motion and includes *Statistica Capital*, it should centralize the matters in the Northern District of California, before Judge Jacqueline S. Corley.

Dated: March 10, 2023                                   Respectfully Submitted,

/s/ Jack Fitzgerald

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD
*tblood@bholaw.com*
THOMAS J. O'REARDON
*toreardon@bholaw.com*
JAMES M. DAVIS
*jdavis@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

***Counsel for Statistica Capital Ltd. & Statistica Ltd.***