**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In Re: FTX Cryptocurrency Exchange Litigation** | **MDL No. 3076** |

**DECLARATION OF JACK FITZGERALD IN SUPPORT OF
STATISTICA CAPTIAL LTD. & STATISTICA LTD.'S
INTERESTED PARTY RESPONSE**

I, Jack Fitzgerald, declare as follows:

1.       I am a member in good standing of the State Bars of California and New York; and of the United States District Courts for the Northern, Central and Southern Districts of California, the Southern and Eastern Districts of New York, and the Western District of Wisconsin; and of the United States Courts of Appeal for the Second, Eighth, and Ninth Circuits. I make this declaration based on my own personal knowledge, in support of Statistica Capital Ltd. and Statistica Ltd.'s (together, "Statistica") Interested Party Response Opposing Centralization.

2.       Attached hereto as Exhibit 1 is a document filed in *In re: FTX Trading Ltd. et al.*, No. 22-br-11068-JTD (D. Del. Bankr.) ["*FTX*"], the FTX bankruptcy proceeding, comprising a presentation titled "Maximizing FTX Recoveries," dated January 17, 2023 ("January Presentation"). The document provides a great deal of information and evidence regarding the FTX fraud, especially in pages 16-20 of the January Presentation.

3.       Attached hereto as Exhibit 2 is a document filed in *FTX* comprising a presentation titled "Preliminary Analysis of Shortfalls at FTX.COM and FTX.US," dated March 2, 2023 ("March Presentation"). The document similarly provides a great deal of information and evidence regarding the FTX fraud.

4.      These are just two examples of the types of information emerging from the FTX bankruptcy proceedings.

5.      Attached hereto as <u>Exhibit 3</u> is a table of all the cases presently before the Panel, organized by filing date and showing the parties, court and case number, currently-assigned judge, class definition, and causes of action for each case.

6.      Starting in December 2022, counsel for Statistica—who are also counsel for plaintiff in *Keane v. Silvergate Bank et al.*, No. 23-cv-670 (N.D. Cal.), pending before the Honorable Jacqueline Scott Corley—have engaged in several conversations with counsel for other cases pending in the Northern District of California, to discuss cooperation. Based on these conversations, we are confident that the various plaintiffs' counsel can organize themselves informally. Moreover, in our representation of Statistica against Signature bank, we are prepared to cooperate and coordinate with plaintiffs' counsel if and as necessary and prudent.

7.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of Signature Bank's Business Bank Account Agreements and Disclosures. As a commercial customer of Signature Bank's and business bank account holder, Statistica was subject to this agreement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 10th day of March 2023 in San Diego, California.

By:   <u>  /s/ Jack Fitzgerald  </u>
              Jack Fitzgerald

# Exhibit 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## NOTICE OF PRESENTATION TO THE OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS

**PLEASE TAKE NOTICE** that, on November 11, 2022 and November 14, 2022, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on December 15, 2022, the Office of the United States Trustee (the "U.S. Trustee") filed the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 231], and on December 20, 2022, the U.S. Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [D.I. 261], forming the Official Committee of Unsecured Creditors (the "Committee").

**PLEASE TAKE FURTHER NOTICE** that, on January 17, 2022, the Debtors provided a presentation (the "Presentation") to the Committee, a copy of which is attached hereto as **Exhibit A**.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**PLEASE TAKE FURTHER NOTICE** that copies of the Presentation and other pleadings filed in the above-captioned Chapter 11 Cases may be obtained free of charge from the website maintained by the Debtors' noticing and claims agent at https://cases.ra.kroll.com/FTX. You may also obtain copies from the Court's website at www.deb.uscourts.gov for a fee.

| | |
|---|---|
| Dated: January 17, 2023<br>Wilmington, Delaware | **LANDIS RATH & COBB LLP**<br><br>*/s/ Matthew R. Pierce*<br>Adam G. Landis (No. 3407)<br>Kimberly A. Brown (No. 5138)<br>Matthew R. Pierce (No. 5946)<br>919 Market Street, Suite 1800<br>Wilmington, Delaware 19801<br>Telephone: (302) 467-4400<br>Facsimile: (302) 467-4450<br>E-mail: landis@lrclaw.com<br>　　　brown@lrclaw.com<br>　　　pierce@lrclaw.com<br><br>-and-<br><br>**SULLIVAN & CROMWELL LLP**<br>Andrew G. Dietderich (admitted *pro hac vice*)<br>James L. Bromley (admitted *pro hac vice*)<br>Brian D. Glueckstein (admitted *pro hac vice*)<br>Alexa J. Kranzley (admitted *pro hac vice*)<br>125 Broad Street<br>New York, NY 10004<br>Telephone: (212) 558-4000<br>Facsimile: (212) 558-3588<br>E-mail: dietdericha@sullcrom.com<br>　　　bromleyj@sullcrom.com<br>　　　gluecksteinb@sullcrom.com<br>　　　kranzleya@sullcrom.com<br><br>*Proposed Counsel for the Debtors*<br>*and Debtors-in-Possession* |

# EXHIBIT A

# Maximizing FTX Recoveries

January 17, 2023                                              **Preliminary / Subject to Material Change**

## Management & Committee Meeting

ALVAREZ & MARSAL | SULLIVAN & CROMWELL LLP | 

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Disclaimer

**Limitations of Report**

This report and the information contained herein (the "Report") has been prepared solely for use by FTX Trading Ltd. (d.b.a. FTX.com), and approximately 101 additional affiliated companies (together, the "Company") based on instructions given by the Company to Sullivan & Cromwell ("S&C"), Alvarez & Marsal North America, LLC ("A&M") and Perella Weinberg Partners ("PWP" and together with S&C and A&M, the "Debtors' Advisors").

The limiting conditions, assumptions and disclaimers set forth herein are an integral part of this Report, must be reviewed in conjunction herewith, and may not be modified or distributed separately.

The preliminary Information included herein reflects and/or is based upon financial and other information provided to the Debtors' Advisors  by the Company, including management, staff, contract staff and other advisors of the Company, as well as other sources.  The Debtors' Advisors have relied upon, and assumed, without independent verification, the accuracy and completeness of such information, and make no representation or warranty as to the accuracy or completeness of, and otherwise assumes no liability with respect to, the Report or upon which the Report is based. The Debtors' Advisors are not responsible to any party, in any way, for any analysis contained in this Report or for the future financial or operational performance of any recipient or any affiliated company.

In the event this Report contains or involves prospective financial or forward-looking information, this information was prepared by the Company's management and our work did not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the American Institute of Certified Public Accountants, and the Debtors' Advisors express no assurance of any kind on such information.  Further, the work involved did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist.  Accordingly, the Debtors' Advisors cannot and do not express an opinion or any other form of assurance on, and assumed no responsibility for, the accuracy or correctness of the historical information or the completeness and achievability of the projected financial data, information and assessments upon which the Report is presented.

Further, any references to estimated ranges of collateral values or cash flow recoveries included in this Report are preliminary in nature, subject to material change and not valuations of any kind.  Rather, estimates have been necessary to include herein, and are based upon the limited financial information as provided or made available by the Company, available market information and various assumptions and are provided for informational purposes only.  References to values of any cryptocurrencies or other digital assets are approximate and subject to material change. It is expected that there will be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  Accordingly, no representation or warranty is made as to, and the Debtors' Advisors take no responsibility for, the achievability of any estimated recovery results described in this Report. Accordingly, the Debtors' Advisors are not responsible to any party, in any way, for the future financial or operational performance of any recipient of the Report or any affiliated company.

Further, this Report will be subject to further work, revisions and other factors which means that this version may be substantially different from any final report or advice issued.

The Report does not constitute a recommendation as to what action, if any, any person should take with respect to any claims and/or securities, nor does the Report constitute a recommendation regarding the accounting, tax, financial, legal or regulatory aspects of any proposed or possible outcome of the Company's restructuring.

# Disclaimer (cont'd)

**No Third Party Reliance**

This preliminary Report and any related informational updates are provided only in connection with the purpose of a public case update in respect of which the services are being provided. In no event, regardless of whether consent has been provided, shall the Debtors' Advisors assume any responsibility, liability or duty of care to any claimholder, person or entity other than the Company ("Third Party") to which any this preliminary information is disclosed or otherwise made available. This Report does not necessarily take account of those matters or issues which might be of relevance to any Third Parties and any Third Party is responsible for conducting its own investigation with respect to the Report and any related transactions or activities. The Debtors' Advisors make no representations or warranties, express or implied, to any Third Party on which any such party may rely with respect to the Information, including without limitation, as to accuracy or completeness, the inclusion or omission of any facts or information, or as to its suitability, sufficiency or appropriateness for the purposes of any such party.

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary
report and should be read in conjunction therewith*

# Executive Summary

**FTX Debtors have made important progress in efforts to maximize recoveries for customers and other stakeholders**

**FTX Debtors have identified approximately $5.5 billion of liquid assets to date comprising:**

- $1.7 billion of cash
- $3.5 billion of liquid cryptocurrency and FTT tokens
- $0.3 billion of liquid securities

**Investigation has confirmed shortfalls at both International and U.S. Exchanges**

- FTX Debtors have identified only $1.6 billion of digital assets associated with FTX.com as of the Petition Time
- FTX Debtors have identified only $181 million of digital assets associated with FTX US as of the Petition Time
- FTX Debtors have uncovered the mechanics behind how Alameda Research had the ability to borrow without collateral effectively unlimited amounts from customers and how a small group of individuals had the ability remove digital assets from the exchange without being recorded on the exchange ledger

**FTX Debtors are continuing the effort to maximize recovery through:**

- Exploring potential sale of four regulated or licensed subsidiaries
- Exploring potential monetization of over 300 prepetition investments with book value of approximately $4.6 billion
- Exploring potential reorganization opportunities for FTX exchanges
- Marketing real estate in the Bahamas in a joint process with the Joint Provisional Liquidators
- Investigating all historical transactions conducted by prepetition management

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Potential Sources of Recovery



**RECOVERY TO CREDITORS**

PRELIMINARY / SUBJECT TO MATERIAL CHANGE
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Liquid Assets



**Cash** — $1.7 Billion

**Crypto Assets** — $3.5 Billion

**Securities** — $0.3 Billion

**Venture Investments**

**Approximately $5.5 billion of liquid assets identified to date**



Equity Investments + Debt Investments + Subsidiary Businesses + Primary Exchanges

Real Estate + Exchange Avoidance Actions + Other Avoidance Actions + Causes of Action

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Confirmed Cash

            

**$1.7 billion of Debtor & non-Debtor cash confirmed to date**

| USD in Millions | WRS Silo | Alameda Silo | Ventures Silo | Dotcom Silo | Total |
|---|---|---|---|---|---|
| Unrestricted Cash | $234.6 | $825.2 | $8.8 | $138.0 | $1,206.6 |
| Custodial Cash | 29.4 | 28.7 | - | 131.3 | 189.4 |
| Other Restricted Cash | 1.3 | 1.2 | - | 4.0 | 6.4 |
| **Total Debtor Cash** | **265.3** | **855.1** | **8.8** | **273.2** | **1,402.4** |
| Non-Debtor Cash | 162.8 | - | - | 164.1 | 326.8 |
| **Total Cash** | **$428.1** | **$855.1** | **$8.8** | **$437.3** | **$1,729.2** |



**Includes $128.4 million of primarily restricted cash at LedgerX**



**Includes $153.2 million of primarily custodial or other restricted cash at FTX Digital Markets**

7

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Located Crypto Assets

            

| Cash | Crypto Assets | Securities | Venture Investments | Equity Investments | Debt Investments | Subsidiary Businesses | Primary Exchanges | Real Estate | Exchange Avoidance Actions | Other Avoidance Actions | Causes of Action |

**$3.5 billion[1] of Debtor cryptocurrency assets located at Petition Date pricing[2]**

USD in Millions

 **Hot Wallet** — $1,761

 **BitGo Cold Storage** — $1,144

 **Held in Bahamas** — $426

 **FTX JP** — $140[3]

 **Hacked Crypto** — $415

Notes:
1. $3.5 billion of identified crypto assets excludes $415mm of hacked crypto.
2. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book at that time.
3. ~$140mm of crypto held at FTX Japan is segregated in cold wallets 1:1 for Japan customers, some of which may be available to the Debtors.

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Located Crypto Asset Tracing by Silo



**Crypto tracing achieved by analyzing database of 14mm addresses & 3rd party exchanges**[1,2,3]



**Notes:**
1. Crypto tracing by silo is based on preliminary on-chain tracing back to dedicated FTX.COM/US deposit and sweep addresses, and Alameda addresses. Crypto held on 3rd party exchanges, staked Solana, and other Alameda crypto are classified as Alameda. In instances where tracing has not been completed, a preliminary allocation was used. Furthermore, Chainalysis and TRM Labs are also involved in tracing exercises to assist with refining these amounts.
2. Excludes ~$140mm of crypto held at FTX Japan is segregated in cold wallets 1:1 for Japan customers, some of which may be available to the Debtors.
3. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book at that time.

9

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Top Located Tokens, incl. Alameda

            

### $3.3 billion¹ located at FTX US, FTX.com, and Alameda Research²

**USD in Millions**

  

**Includes crypto held at 3rd party exchanges**

The Debtors currently have limited visibility into the token composition of crypto balances at certain 3rd party exchanges. Once obtained, information provided by these exchanges is likely to increase the balances of certain tokens listed here.



| SOL | FTT | BTC | ETH | APT | DOGE | MATIC | BIT | TON | XRP | Stablecoins | Mixed |
|-----|-----|-----|-----|-----|------|-------|-----|-----|-----|-------------|-------|
| $685 | $529 | $268 | $90 | $67 | $42 | $39 | $35 | $31 | $29 | $245 | $1,271 |

**Notes:**
1. Excludes ~$140mm of crypto held at FTX Japan is segregated in cold wallets 1:1 for Japan customers, some of which may be available to the Debtors.
2. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book at that time.

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
***The limiting conditions are integral to this preliminary report and should be read in conjunction therewith***

# Illiquid Crypto Assets

Cash | Crypto Assets | Securities | Venture Investments | Equity Investments | Debt Investments | Subsidiary Businesses | Primary Exchanges | Real Estate | Exchange Avoidance Actions | Other Avoidance Actions | Causes of Action

## Illiquid tokens[1,2] are not included in located crypto value estimates as of Petition Date

**USD in Millions**

| No. | Logo | Token | Quantity | Petition Date Spot Price | USD Equivalent at Spot Price |
|---|---|---|---|---|---|
| 1 | | SRM | 9,919,593,204 | $0.200 | $1,987 |
| 2 | | SOLETH | 479,331 | $1,169.800 | $561 |
| 3 | | MAPS | 9,870,251,766 | $0.053 | $521 |
| 4 | | SOLBTC | 14,077 | $16,857.672 | $237 |
| 5 | | OXY | 9,969,097,181 | $0.019 | $188 |
| 6 | | MEDIA | 8,354,518 | $6.000 | $50 |
| 7 | | BEAR | 190,134,415,155 | $0.000 | $46 |
| 8 | | FIDA | 277,871,751 | $0.111 | $31 |
| 9 | | BRZ | 138,942,485 | $0.171 | $24 |
| 10 | | ALM | 2,433,093,847 | $0.006 | $15 |
| 11 | | TRUMPLOSE | 13,999,994 | $0.974 | $14 |
| 12 | | GT | 3,165,320 | $3.734 | $12 |
| 13 | | LUNA (Wormhole) | 6,951,539 | $1.690 | $12 |
| 14 | | LIKE | 18,180,467 | $0.500 | $9 |
| 15 | | HXRO | 104,378,582 | $0.082 | $9 |
| 16 | | MSOL | 333,019 | $21.375 | $7 |
| 17 | | JSOL | 364,860 | $16.800 | $6 |
| 18 | | XSUSHI | 3,399,998 | $1.660 | $6 |
| 19 | | ALEPH | 57,657,313 | $0.092 | $5 |
| 20 | | JET | 62,283,609 | $0.075 | $5 |

The **listed top 20 tokens compose 98%** of the illiquid value while the remaining ~200 tokens make up the rest

**Notes:**
1. Illiquid tokens reflect certain tokens whereby the market cap and volume is low, or where FTX holds a significant portion of the coins in circulation, whereby attempts to liquidate would significantly affect their market value.
2. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book around that time.

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary
report and should be read in conjunction therewith*

# Brokerage Assets



### $268 million[1] in securities held in Alameda brokerage account



**GRAYSCALE**
**$45 Million**
**Grayscale Ethereum Trust ETF**
*2.0% of Total Shares*

**Bitwise**
**$21 Million**
**Bitwise 10 Crypto Index Fund**
*14.4% of Total Shares*

**GRAYSCALE**
**$4 Million Across**
**Ethereum Classic ETF**
**Litecoin Trust ETF**
**Digital Large Cap ETF**

**GRAYSCALE**
**$197 Million**
**Grayscale Bitcoin Trust ETF**
*3.2% of Total Shares*

**BlackRock**
**<$0.1 Million**
**BlackRock Equity**

17%   8%   2%   74%

**All values as of the Petition Date**

Note:
1.   Totals may not reconcile due to rounding.

12

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Venture Investments



**~$4.6 billion book value investments across 300+ prepetition transactions**

**Select assets including:**

## Equity / Debt Investments

   
    
    
     

## Fund Investments

    
  

## Token

    
   

**Recoverable value likely to be materially lower than acquisition value**

PRELIMINARY / SUBJECT TO MATERIAL CHANGE
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Exploring Potential Sale of Four Licensed Subsidiaries

           

**Four wholly owned subsidiaries covered by Bid Procedures Order entered January 12, 2023**

| |  LedgerX | Embed |  FTX EU |  FTX JP |
|---|---|---|---|---|
| **Description** | Operational US Crypto Derivatives Exchange | US-Based Clearing Broker | Diversified Derivatives & Crypto Operations | Japan & Singapore Exchange |
| **Primary Licensing** | CFTC Regulated | SEC registered Broker-Dealer & member of FINRA | Licensed in Cyprus (currently suspended) | Registered in Japan; operated under temporary exemption in Singapore (license pending) |

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Exploring Exchange Reorganization

           

**Joint task force assessing reorganization opportunities for FTX exchanges**

    

15

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Real Estate in The Bahamas with a Cost Basis of $253M

            

Cash | Crypto Assets | Securities | Venture Investments | Equity Investments | Debt Investments | Subsidiary Businesses | Primary Exchanges | Real Estate | Exchange Avoidance Actions | Other Avoidance Actions | Causes of Action

## 36 Bahamas properties to be marketed in a joint process with the JPLs

**A** $166.1 Million
15 Properties


Orchid Penthouse & Units


Honeycomb – Condo Units


Tetris – Condo Units


Charles – Condo Unit


Cube – Condo Unit


Gemini – Condo Unit


Coral – Condo Unit

**Albany Marina Residences**

**B** $12.9 Million
1 Property


The Conch Shack

**C** $28.8 Million
3 Properties


Veridian Corporate Centre

**D** $5.9 Million
5 properties


ONE Cable Beach

**+** $39.4 million across 12 additional properties


Nassau

The Bahamas

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Sample Historical Transactions Under Review



**The Debtors are reviewing all historical transactions conducted by prepetition management**

Select examples of historical transactions under review:



**Loans to Insiders**
Over $2B of loans to insiders between Q1 2020 and Q4 2021

**BINANCE**
$2.1B payment from FTX to repurchase Series A shares

**BlockFi**
Robinhood shares allegedly pledged for outstanding Alameda Loans

**Modulo Capital**
Approximately $400 million invested

**Political Donations**
$93 million of donations between March 2020 and November 2022

**VOYAGER**
$446 million of transfers in the preference period

**Hundreds of M&A and other transactions under review**

17

PRELIMINARY / SUBJECT TO MATERIAL CHANGE
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# The $65 Billion Backdoor



## Alameda Research had the ability to borrow without collateral up to $65B from customers



PRELIMINARY / SUBJECT TO MATERIAL CHANGE
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

Case 22-11068-JTD Doc 50751-1 Filed 03/17/23 Page 25 of 110

# Margin Requirements & Auto Liquidation[1] – FTX.com

            

## Alameda Research and small group of individuals had ability to remove assets from exchange

| | Account Setting Code | Implications | Number of Accounts |
|---|---|---|---|
| **Customers** | `'borrow' = 0` | User **cannot** have a negative balance on the exchange. Once an account balance is negative up to an amount equal to posted collateral, net of fees, all positions are auto-liquidated. | **7 Million** |
| **Market Makers** | `'borrow' > 0` | User **can** have a negative balance up to a specified credit limit. Primarily used for market makers to receive lending from FTX. | Credit Limit: Greater than $0 — 4,000; $1 Million to $150 Million — 41; $65 Billion — 1 |

### God Mode

**"On Ledger"** where entries are recorded in AWS

`'can_withdraw_below_borrow' = true`

User can **withdraw** assets (cash or crypto) from the exchange while having a net negative balance.[2]



Alameda Research

| | |
|---|---|
| $65 Billion | 1 |

**"Off AWS Ledger"** by moving funds through a direct on-chain transaction



User can **move** assets (crypto) by accessing the private keys to initiate a direct on-chain transaction.[3]

**Small group of individuals**

| | |
|---|---|
| All Crypto | 1 |

Notes:
1. The exchange code assessment above was based on a review of the FTX codebase and conversations with post-petition FTX employees. For the FTX US platform, preliminary analysis shows that 3 accounts had "borrow > zero", notably Alameda for $150mm. The FTX US platform had the same "off ledger" issue, and preliminary analysis shows that it had a similar "on ledger" issue that is under review.
2. The FTX codebase reflects that an "allow_negative" function may also enable this ability, however it only applies to 10 internal FTX/Alameda trading accounts.
3. Certain users had permissions in the AWS environment to access private keys. Investigation is underway to determine whether any off-ledger misuse of such access occurred.

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# AWS Environment





**Certain individuals could withdraw assets without record on the exchange ledger[1]**

**Typical Flow of Funds Scenario**

**①** Customers Deposit Funds into Specific Addresses

**②** FTX Aggregated Customer Deposits by Moving Funds to Sweep Addresses

**③** Customer Withdrawals Initiated Movement of Funds from Sweep Addresses to Recipient

**Note:**
1.   Investigation is underway to determine whether any off-ledger misuse of this ability to withdraw assets occurred.

20

# Exhibit 2

# **<u>EXHIBIT A</u>**

# Preliminary Analysis of Shortfalls at FTX.COM and FTX.US

March 2, 2023                                    Preliminary / Subject to Material Change

## Materials for Official Committee and Other Stakeholders

SUBJECT TO MATERIAL CHANGE

# General Disclaimer

The limiting conditions, qualifications, assumptions and disclaimers set forth herein are an integral part of this Presentation, must be reviewed in conjunction herewith, and may not be modified or distributed separately.

**Limitations of Presentation**

This presentation and the information contained herein (the "Presentation") has been prepared at the direction of FTX Trading Ltd. (d.b.a. FTX.com) and approximately 100 additional affiliated companies (together, the "Company") for its own business purposes with the assistance of Alvarez & Marsal North America, LLC ("A&M"). The information herein reflects and/or is based upon financial and other information provided to A&M by the Company, including management, staff, contract staff and other advisors of the Company, as well as other sources.  A&M has relied upon, and assumed, without independent verification, the accuracy and completeness of such information, and make no representation or warranty as to the accuracy or completeness of, and otherwise assumes no liability with respect to, the Presentation or the information upon which the Presentation is based.

In the event this Presentation contains or involves prospective financial or forward-looking information, this information was prepared by the Company's management and does not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the American Institute of Certified Public Accountants, and A&M expresses no assurance of any kind on such information.  Further, the work to prepare the Presentation did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist.  In addition, any references to estimated value or recoveries included in this Presentation are preliminary in nature, provided for informational purposes only, subject to material change and not valuations of any kind. It is expected that there will be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and these differences may be material. Accordingly, A&M cannot and does not express an opinion or any other form of assurance on, and assumed no responsibility for, the accuracy or correctness of the historical information, the accuracy of any valuation or estimate, or the completeness and achievability of any of the projected financial data, information and assessments upon which the Presentation is based on.

The subject matter of this Presentation will be subject to further work, revisions and other factors which means that this version may be substantially different from any final report or advice issued.

The Presentation does not constitute a recommendation as to what action, if any, any person should take with respect to any claims and/or securities, nor does the Presentation constitute a recommendation regarding the accounting, tax, financial, legal or regulatory aspects of any proposed or possible outcome of the Company's restructuring.

**No Third Party Reliance**

This Presentation and any related informational updates are provided only in connection with the purpose of a public case update in respect of which the services are being provided. In no event, regardless of whether consent has been provided, shall A&M or any other advisor to or representative of the Company assume any responsibility, liability or duty of care to any claimholder, person or entity other than the Company ("Third Party") to which any of this preliminary information is disclosed or otherwise made available. This Presentation does not necessarily take account of those matters or issues which might be of relevance to any Third Parties and any Third Party is responsible for conducting its own investigation with respect to the Presentation and any related transactions or activities.   A&M makes no representation or warranty, express or implied, to any Third Party on which any such party may rely with respect to the Information, including without limitation, as to accuracy or completeness, the inclusion or omission of any facts or information, or as to its suitability, sufficiency or appropriateness for the purposes of any such party.

2

# Nature and Limitations of Presentation

1. On January 17, 2023, the FTX Debtors presented preliminary information to the Official Committee of Creditors on the FTX Debtors' consolidated assets, recovery efforts and other matters. The presentation was made public on the same day and is available at https://restructuring.ra.kroll.com/FTX/

2. This second presentation of preliminary information, part of what the FTX Debtors anticipate will be a series, shows digital assets and fiat associated with the exchanges at commencement (the "Petition Time") of the chapter 11 case for FTX Trading Ltd., the owner and operator of FTX.COM ("FTX Trading"), and West Realm Shires Financial Services, Inc., the owner and operator of FTX.US ("WRSFS"), excluding digital assets and/or fiat associated with the Japan, Cyprus and Singapore exchanges, and with Alameda or other FTX Debtors.

3. The FTX Debtors' analysis is ongoing, and complicated by the incomplete nature of the books and records maintained by pre-petition management. As a result, the information in this presentation is <u>preliminary</u> and <u>subject to material change</u> as new, additional or conflicting information is identified, and it should not be relied upon <u>for any purpose</u>.  The FTX Debtors are disclosing this presentation at this time because they determined that the need for transparency, and to ensure that all stakeholders have roughly contemporaneous access to the preliminary information as it develops, outweighs the interest in delaying disclosure until the relevant information is no longer reasonably subject to change.

4. **In particular, it is not possible to calculate or predict customer recoveries based on the preliminary information in this presentation.  Among other reasons:**

   – **The presentation does not attempt to adjust for commingling of assets or insider access to assets, which may be the subject of future, material adjustments.**

   – **Actual recoveries will depend on many facts and factors, including (a) the extent of other assets and liabilities of FTX Trading and WRSFS, (b) the nature of intercompany payables and receivables, (c) claims and causes of action, (d) the resolution of numerous legal issues, (e) recoveries from the liquidation, sale or reorganization of over a hundred companies comprising the FTX group globally, and (f) fluctuations in the value of assets.**

# Timeline of Work to Determine Exchange Shortfalls



**Chapter 11 Filing**
November 11, 2022

**Cyber Attack**

**Rapidly Secured FTX Computing Environment**

**Rapidly Secured Assets to Cold Storage**

**Customer Balance Review Started**
December 6, 2022

**Initial Analysis Completed**
*Significant Balance Issues Identified*
December 29, 2022

**Developed Script & Reconciled Exchange Data**
FTX data team, engineers and advisors utilized script & exchange data reconciliation to produce preliminary customer balances

**Performed Preliminary Asset Tracing**
Performed on-chain asset tracing to originating exchange addresses for all identified assets and unauthorized transfers

✷ TRM

**Preliminary Customer Balances Published**
Today

**Data Complexity:**

| | | |
|---|---|---|
| **120 Billion** Rows of User Transaction Data | **Incomplete Leveraged Tokens & Derivatives Data** | **Compromised FTX Computer Environment** |
| **14 Million** Wallet Addresses | **Challenges in Identifying Related Party Balances** | **Abnormal Internal User Accounts** |

4

SUBJECT TO MATERIAL CHANGE

# Hurdles in Determining Preliminary Balances

**Access to key data was limited while the FTX Debtors' computing environment was secured in the aftermath of the cyber attack, and remains subject to certain restrictions necessary for security purposes.**



**Preliminary Customer Balances Published**
Today

**1** Calculate balances as of the precise **Petition Time**

**2** Validate pricing and treatment of **futures and derivatives** contracts

**3** Recalculate **leverage token** pricing & valuation

**4** Determine appropriateness of **source of pricing**

**5** Lack of recordkeeping & documentation resulting in challenges in **locating crypto assets**

**6** Review of **certain accounts and tokens** to understand activity and determine inclusion / exclusion in balance

**7** On-chain crypto **tracing across dozens of blockchains** conducted to validate source wallets by exchange

SUBJECT TO MATERIAL CHANGE

# Assumptions and Notes on Analysis

1. Tokens have been broken down into two categories:

   a) "Category A Assets" are tokens with (i) a market capitalization of at least $15M and (ii) an average daily trading volume of at least $1M during the past 30 days, in each case measured at February 2, 2023.

   b) "Category B Assets" are tokens that do not satisfy the test for Category A Assets or which are largely held and/or controlled by the estate.

2. Digital assets and/or fiat associated with the Japan, Cyprus and Singapore exchanges, and with Alameda or other FTX Debtors, are excluded.

3. All pricing is as of the Petition Time based on preliminary information from CoinMarketCap ("Petition Time Pricing"). Petition Time Pricing may not reflect the actual market value of positions, especially for Category B Assets, or the valuation to be used by the FTX Debtors for other purposes.

4. Certain tokens carried at fixed values are excluded entirely because they do not have an active trading market (FTX Equity, West Realm Equity, etc.).

5. To simplify the presentation, certain internal accounts are excluded from the analysis and related party and third party accounts have been netted where considered appropriate based on current information.

6. As previously noted, the information set forth in this presentation is preliminary and subject to material change as new, additional or conflicting information is identified.  As a result, the information should not be relied upon for any purpose including, but not limited to, estimating recoveries in the FTX Debtors' Chapter 11 cases.

6

SUBJECT TO MATERIAL CHANGE

# Preliminary Takeaways

**1** The FTX Debtors have identified and inventoried substantially all wallets associated with the FTX.COM and FTX.US exchanges. Both exchanges generally held digital assets in sweep wallets which were not segregated for individual customers.

**2** FTX's pre-petition management used the FTX.COM and FTX.US sweep wallets to store, borrow and lend digital assets for the proprietary account of the FTX Debtors and a large number of related parties, including employees, suppliers, vendors and business partners, as well as exchange customers.

**3** There is a massive shortfall at the FTX.COM exchange at the Petition Time, defined as the difference between digital asset claims on the ledger of FTX.COM and digital assets available to satisfy those claims. The shortfall is especially pronounced for Category A Assets. Only a small amount of cash, stablecoin, BTC, ETH and other Category A Assets remain in wallets preliminarily sourced to the FTX.COM exchange.

**4** The shortfall is smaller at FTX.US, but still significant. In addition to FTX.US customers, other FTX Debtors and related parties maintained a $128 million (net) receivable position from FTX.US at the Petition Time. Accordingly, creditors of other FTX Debtors, including FTX.COM customers, may have an indirect interest in assets at the FTX.US exchange.

**5** Prior to the FTX Debtors obtaining custody of digital assets from pre-petition management, unauthorized transfers removed an additional $293 million from wallets preliminarily sourced to the FTX.COM exchange and $139 million from wallets preliminarily sourced to the FTX.US exchange.



SUBJECT TO MATERIAL CHANGE

# Petition Time Balances



**USD Millions at Petition Time Pricing**
*Excludes Japan, Singapore and Cyprus Local Exchanges*

**Related party payables and receivables include $9.3B of net borrowing by Alameda from FTX.com**



**Notes:**

1. Related Parties include founder accounts (Sam Bankman-Fried, Gary Wang, and Nishad Singh), Alameda Research accounts, FTX.com affiliate and FTX US affiliate accounts. Employee accounts are included in customer liabilities. Creditors in other silos may have an indirect interest in Related Party Payables.
2. Customer balances may include unidentified founder, related party or disqualified accounts.
3. Includes [restricted] cash of $19M and $93M in FDM accounts as of 12/16/2022. *Excludes* FTT and SRM in custody of the Securities Commission of The Bahamas.
4. Balances combine and net subaccount payables and are subject to continuing review.
5. Several fiat withdrawals were initiated but in a pending status in the AWS system due to exchange shutdown procedures; fiat withdrawal tracing on-going to review successful withdrawals (est. impact up to $200M liability decrease).

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances by Token



**USD Millions at Petition Time Pricing**

## Comparison of customer liabilities and assets for top located tokens, cash, and stablecoins by category

| Token | Customer Payables | Located Assets | Customer Receivables | Total Assets | (Deficit) / Surplus[1] |
|---|---|---|---|---|---|
| **Category A** | | | | | |
| Cash / Stablecoin | $ 6,991 | $ 270 | $ 310 | $ 580 | $ (6,411) |
| BTC | 1,591 | 1 | 5 | 6 | (1,585) |
| ETH | 922 | 9 | 42 | 52 | (870) |
| SOL | 118 | 2 | 7 | 9 | (109) |
| XRP | 93 | 12 | 3 | 14 | (79) |
| BNB | 68 | 5 | 2 | 7 | (61) |
| MATIC | 65 | 45 | 1 | 46 | (19) |
| TRX | 62 | 18 | 2 | 20 | (43) |
| All Other | 635 | 334 | 11 | 345 | (290) |
| **Total Category A** | **10,544** | **694** | **383** | **1,078** | **(9,466)** |
| **Category B** | | | | | |
| FTT | 441 | 130 | 0 | 130 | (312) |
| MAPS | 96 | 1,004 | - | 1,004 | 909 |
| SRM | 56 | 157 | 1 | 158 | 102 |
| FIDA | 4 | 59 | 0 | 59 | 55 |
| MEDIA | 0 | 38 | - | 38 | 38 |
| All Other | 93 | 72 | 1 | 73 | (19) |
| **Total Category B** | **690** | **1,461** | **2** | **1,462** | **773** |
| **Total** | **$ 11,233** | **$ 2,155** | **$ 385** | **$ 2,540** | **$ (8,693)** |

**Notes:**
1. (Deficit) / Surplus excludes $293M of unauthorized transfers preliminarily sourced to the FTX.COM exchange.

10

SUBJECT TO MATERIAL CHANGE

# Related Party Detail



**USD Millions at Petition Time Pricing**

| Related Party Balances[1] | | | | | | |
|---|---|---|---|---|---|---|
| **Payables** | | | **Receivables** | | | |
| # | Related Party | Total | # | Related Party | | Total |
| 1 | Alameda Research LLC | $  3,535 | 1 | Alameda Research LLC | $ | 12,842 |
| 2 | Cottonwood Grove LTD | 483 | 2 | Maclaurin Investments LTD (fka Alameda Ventures LTD) | | 149 |
| 3 | Maclaurin Investments LTD (fka Alameda Ventures LTD) | 309 | 3 | Founder Accounts | | 53 |
| 4 | FTX Europe AG | 100 | 4 | Cottonwood Grove LTD | | 52 |
| 5 | SNG Investments | 83 | 5 | Paper Bird Inc. | | 21 |
| 6 | Founder Accounts | 16 | | All Other[2] | | 130 |
| 7 | FTX Turkey | 12 | | **Total Related Party Receivables** | $ | **13,246** |
| 8 | Paper Bird Inc. | 0 | | | | |
| | All Other[2] | 310 | | | | |
| | **Total Related Party Payables** | $  **4,847** | | | | |

Notes:
1.   Balances include netting of sub account payables and receivables into the main account; largest impact is to info@alameda-research.com which has both a payable and receivable balance on different sub-accounts for $73B of FTT.
2.   "All Other" may include payables and receivables that have yet to be reclassified to legal entities listed above.

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances – Category A Only



**USD Millions at Petition Time Pricing**
*Excludes Japan, Singapore and Cyprus Local Exchanges*

**Related party payables and receivables include $9.2B of net borrowing by Alameda from FTX.com**



**Notes:**
1. Related Parties include founder accounts (Sam Bankman-Fried, Gary Wang, and Nishad Singh), Alameda Research accounts, FTX.com affiliate and FTX US affiliate accounts. Employee accounts are included in customer liabilities. Creditors in other silos may have an indirect interest in Related Party Payables.
2. Customer balances may include unidentified founder, related party or disqualified accounts.
3. Includes [restricted] cash of $19M and $93M in FDM accounts as of 12/16/2022. *Excludes* FTT and SRM in custody of the Securities Commission of The Bahamas.
4. Balances combine and net subaccount payables and are subject to continuing review.
5. Several fiat withdrawals were initiated but in a pending status in the AWS system due to exchange shutdown procedures; fiat withdrawal tracing on-going to review successful withdrawals (est. impact up to $200M liability decrease).

12



SUBJECT TO MATERIAL CHANGE

# Petition Time Balances



**USD Millions at Petition Time Pricing**



**Notes:**
1. Related Parties include founder accounts (Sam Bankman-Fried, Gary Wang, and Nishad Singh), Alameda Research accounts, FTX.com affiliate and FTX US affiliate accounts. Employee accounts are included in customer liabilities. Creditors in other silos may have an indirect interest in Related Party Payables.
2. A portion of the deficit may be related to the de-pegging of Sollet tokens from their underlying digital assets.
3. Customer balances may include unidentified founder, related party or disqualified accounts.
4. Located Assets includes [restricted] cash of $24M where property interests are still being reviewed.
5. Balances combine and net subaccount payables and are subject to continuing review.

14

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances by Token



**USD Millions at Petition Time Pricing**

## Comparison of customer liabilities and assets for top located tokens, cash, and stablecoins by category

| Token | Customer Payables | Located Assets | Customer Receivables | Total Assets | (Deficit) / Surplus[1] |
|---|---|---|---|---|---|
| **Category A** | | | | | |
| Cash / Stablecoin | $        181 | $         88 | $       28 | $       116 | $       (65) |
| BTC | 66 | 64 | 0 | 64 | (2) |
| ETH | 38 | 7 | 0 | 7 | (31) |
| SOL | 19 | - | 0 | 0 | (19) |
| DOGE | 9 | 15 | 0 | 15 | 6 |
| MATIC | 4 | 0 | 0 | 0 | (4) |
| LINK | 4 | 0 | 0 | 0 | (4) |
| SHIB | 3 | 0 | 0 | 0 | (3) |
| TRX | 2 | 6 | - | 6 | 4 |
| UNI | 1 | 0 | 0 | 0 | (1) |
| ALGO | 1 | 2 | 0 | 2 | 2 |
| PAXG | 1 | - | 0 | 0 | (1) |
| ETHW | 1 | 2 | 0 | 2 | 1 |
| WBTC | 0 | 0 | 0 | 0 | (0) |
| WETH | - | 1 | - | 1 | 1 |
| All Other | 6 | 5 | 0 | 5 | (0) |
| **Total Category A** | **335** | **190** | **28** | **219** | **(116)** |
| **Category B** | | | | | |
| All Other | 0 | 0 | - | 0 | (0) |
| **Total Category B** | **0** | **0** | **-** | **0** | **(0)** |
| **Total** | $       **335** | $       **191** | $       **28** | $       **219** | $       **(116)** |

Notes:
1.   (Deficit) / Surplus excludes $139M of unauthorized transfers preliminarily sourced to the FTX.US exchange .

15

SUBJECT TO MATERIAL CHANGE

# Related Party Detail

**USD Millions at Petition Time Pricing**



| Related Party Balances[1] | | | | | | |
|---|---|---|---|---|---|---|
| **Payables** | | | | **Receivables** | | |
| # | Related Party | Total | | # | Related Party | Total |
| 1 | Alameda Research LLC | $ 262 | | 1 | Alameda Research LLC | $ 155 |
| 2 | Paper Bird Inc. | 19 | | | All Other[2] | 0 |
| 3 | Maclaurin Investments LTD (fka Alameda Ventures LTD) | 0 | | | **Total Related Party Receivables** | **$ 155** |
| 4 | Founder Accounts | 0 | | | | |
| 5 | FTX Digital Markets LTD | 0 | | | | |
| 6 | Blockfolio, Inc. | 0 | | | | |
| | All Other[2] | 1 | | | | |
| | **Total Related Party Payables** | **$ 283** | | | | |

**Notes:**
1. Balances include netting of sub account payables and receivables into the main account.
2. "All Other" may include payables and receivables that have yet to be reclassified to legal entities listed above.

16

# Appendix
**Daily Deposits and Withdrawals Activity**
**90 Days Prior to Petition Date**



SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals
## 90 Day Activity: August 14, 2022 to November 11, 2022



**USD Millions at Petition Time Pricing**



**Notes:**
1. The sharp rise in deposits in the days immediately prior to the petition date include in large part deposits from Alameda

18

SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals Activity
## November 1, 2022 Through Petition Date

**FTX.com**

**USD Millions at Petition Time Pricing**

### Consolidated

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|------|----------|-------------|-----|----------------|
| 11/1/2022 | $1,959 | ($2,419) | ($461) | ($461) |
| 11/2/2022 | 1,341 | (1,507) | (166) | (627) |
| 11/3/2022 | 1,157 | (1,547) | (390) | (1,017) |
| 11/4/2022 | 1,632 | (1,444) | 189 | (828) |
| 11/5/2022 | 525 | (739) | (213) | (1,042) |
| 11/6/2022 | 1,752 | (3,306) | (1,554) | (2,596) |
| 11/7/2022 | 3,507 | (4,659) | (1,152) | (3,748) |
| 11/8/2022 | 1,004 | (983) | 21 | (3,728) |
| 11/9/2022 | 25 | (3) | 21 | (3,706) |
| 11/10/2022 | 16 | (38) | (22) | (3,728) |
| 11/11/2022 | 20 | (64) | (44) | (3,773) |
| **Total** | **$12,937** | **($16,710)** | **($3,773)** | **N/A** |

### Customers

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|------|----------|-------------|-----|----------------|
| 11/1/2022 | $1,091 | ($1,489) | ($398) | ($398) |
| 11/2/2022 | 923 | (1,090) | (167) | (566) |
| 11/3/2022 | 939 | (1,459) | (519) | (1,085) |
| 11/4/2022 | 1,068 | (1,204) | (136) | (1,221) |
| 11/5/2022 | 446 | (626) | (181) | (1,402) |
| 11/6/2022 | 425 | (2,273) | (1,848) | (3,250) |
| 11/7/2022 | 929 | (4,235) | (3,306) | (6,556) |
| 11/8/2022 | 414 | (824) | (410) | (6,965) |
| 11/9/2022 | 20 | (3) | 17 | (6,948) |
| 11/10/2022 | 14 | (35) | (21) | (6,969) |
| 11/11/2022 | 20 | (64) | (44) | (7,014) |
| **Subtotal** | **$6,289** | **($13,303)** | **($7,014)** | **N/A** |

### Alameda & Other Related Parties

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|------|----------|-------------|-----|----------------|
| 11/1/2022 | $868 | ($930) | ($62) | ($62) |
| 11/2/2022 | 417 | (417) | 1 | (62) |
| 11/3/2022 | 218 | (88) | 129 | 68 |
| 11/4/2022 | 565 | (240) | 325 | 393 |
| 11/5/2022 | 80 | (112) | (33) | 360 |
| 11/6/2022 | 1,327 | (1,033) | 294 | 654 |
| 11/7/2022 | 2,578 | (424) | 2,154 | 2,808 |
| 11/8/2022 | 589 | (159) | 430 | 3,238 |
| 11/9/2022 | 4 | (0) | 4 | 3,242 |
| 11/10/2022 | 2 | (3) | (1) | 3,241 |
| 11/11/2022 | 0 | (0) | 0 | 3,241 |
| **Subtotal** | **$6,648** | **($3,407)** | **$3,241** | **N/A** |





Deposits    Withdrawals

**Notes:**
1. The sharp rise in deposits in the days immediately prior to the petition date include in large part deposits from Alameda

19

# Appendix
## Daily Deposits and Withdrawals Activity
## 90 Days Prior to Petition Date



SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals
## 90 Day Activity: August 14, 2022 to November 11, 2022



**USD Millions at Petition Time Pricing**





SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals Activity
## November 1, 2022 Through Petition Date



**USD Millions at Petition Time Pricing**

## Consolidated

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|------|----------|-------------|-----|----------------|
| 11/1/2022 | $159 | ($197) | ($38) | ($38) |
| 11/2/2022 | 133 | (152) | (20) | (58) |
| 11/3/2022 | 96 | (97) | (1) | (58) |
| 11/4/2022 | 204 | (190) | 14 | (44) |
| 11/5/2022 | 86 | (78) | 8 | (37) |
| 11/6/2022 | 181 | (471) | (290) | (326) |
| 11/7/2022 | 309 | (573) | (264) | (590) |
| 11/8/2022 | 354 | (752) | (398) | (988) |
| 11/9/2022 | 253 | (583) | (330) | (1,319) |
| 11/10/2022 | 114 | (264) | (150) | (1,468) |
| 11/11/2022 | 19 | (78) | (59) | (1,528) |
| **Total** | **$1,908** | **($3,436)** | **($1,528)** | **N/A** |

## Customers

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|------|----------|-------------|-----|----------------|
| 11/1/2022 | $84 | ($100) | ($16) | ($16) |
| 11/2/2022 | 105 | (111) | (6) | (22) |
| 11/3/2022 | 72 | (81) | (10) | (32) |
| 11/4/2022 | 116 | (122) | (6) | (38) |
| 11/5/2022 | 86 | (78) | 8 | (30) |
| 11/6/2022 | 38 | (159) | (121) | (151) |
| 11/7/2022 | 144 | (336) | (192) | (343) |
| 11/8/2022 | 86 | (622) | (536) | (879) |
| 11/9/2022 | 60 | (417) | (357) | (1,236) |
| 11/10/2022 | 78 | (197) | (119) | (1,355) |
| 11/11/2022 | 19 | (78) | (59) | (1,415) |
| **Subtotal** | **$887** | **($2,301)** | **($1,415)** | **N/A** |

## Alameda & Other Related Parties

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|------|----------|-------------|-----|----------------|
| 11/1/2022 | $75 | ($97) | ($22) | ($22) |
| 11/2/2022 | 28 | (41) | (14) | (35) |
| 11/3/2022 | 25 | (16) | 9 | (26) |
| 11/4/2022 | 88 | (69) | 20 | (7) |
| 11/5/2022 | 0 | (0) | 0 | (7) |
| 11/6/2022 | 143 | (311) | (168) | (175) |
| 11/7/2022 | 166 | (238) | (72) | (247) |
| 11/8/2022 | 269 | (131) | 138 | (109) |
| 11/9/2022 | 192 | (166) | 27 | (82) |
| 11/10/2022 | 36 | (67) | (31) | (113) |
| 11/11/2022 | 0 | (0) | (0) | (113) |
| **Subtotal** | **$1,021** | **($1,134)** | **($113)** | **N/A** |





22

# Appendix

**Assets Bridge from Previous Press Release**
***"January 17, 2023 – Maximizing FTX Recoveries: Management & Committee Meeting Presentation"***

SUBJECT TO MATERIAL CHANGE

# Assets Bridge from Previous Press Release (1/17/23)

**USD Millions at Petition Time Pricing**

| | Crypto | Cash | Securities | Total |
|---|---|---|---|---|
| **Liquid Assets as of Jan 17th (Category A and FTT)** | **$3,472** | **$1,729** | **$268** | **$5,469** |
| (A) Newly Located Crypto | 384 | – | – | 384 |
| (B) Pricing Source Adj. | 214 | – | – | 214 |
| All Other Adj. | 9 | 32 | – | 41 |
| **Liquid Assets as of March 1st (Category A and FTT)** | **$4,078** | **$1,762** | **$268** | **$6,107** |

| Bridge: Liquid Assets to Located Assets (FTX.COM/US) [1] |
|---|

| | |
|---|---|
| **Liquid Assets as of March 1st (Category A and FTT)** | **$4,078** |
| (C) Excl. Alameda Crypto | (2,442) |
| Excl. Japan and Singapore | (220) |
| Inclusion of Category B Tokens (excl. FTT / SRM in Bahamas) | 793 |
| (D) Restricted and FDM FBO Cash | 136 |
| **Located Assets - FTX.US and FTX.COM (Exchange Shortfall Presentation)** | **$2,346** |
| *Located Assets - FTX.US* | *$191* |
| *Located Assets - FTX.COM* | *$2,155* |

| Select Commentary |
|---|

(A) **Newly located crypto consists of:**
- $202M of crypto held at Alameda
- $125M of stablecoins
- $57M of crypto held at subsidiaries

(B) **Change in pricing source from AWS environment (reflective of FTX order book) to CoinMarketCap**

(C) **Exchange shortfall excludes Alameda assets; Alameda crypto primarily consists of:**
- $956M of Solana and Aptos
- $820M at 3rd party exchanges
- $185M of stablecoins in cold storage
- $169M of BTC in cold storage

(D) **Located assets in the Exchange Shortfall Presentation include Restricted and FDM FBO cash only**

**Notes:**
1. "Liquid assets" as defined for purposes of the prior January 17 presentation included Category A Assets and FTT, and this Asset Bridge Slide includes information to reconcile the January 17 information with the new method of categorization that excludes FTT from Category A Assets.

24

# Exhibit 3

| Date Filed | Plaintiffs | Defendants | Court | Case No. | Judge | Class Definition | Causes of Action |
|---|---|---|---|---|---|---|---|
| 11/15/2022 | Edwin Garrison et al. | • Tom Brady<br>• Gisele Bundchen<br>• Kevin O'Leary<br>• Udonis Haslem<br>• David Ortiz<br>• Stephen Curry<br>• Golden State Warriors<br>• Shaquille O'Neal<br>• William Trevor Lawrence<br>• Shohei Ohtani<br>• Naomi Osaka<br>• Sam Bankman-Fried<br>• Caroline Ellison<br>• Sam Trabucco<br>• Gary Wang<br>• Nishad Singh<br>• Dan Friedberg | S.D. Fla. | 22-23753 | K. Michael Moore | • (1) Global Class: All persons and entities residing outside of the U.S. who, within the applicable limitations period, purchased or enrolled in a YBA;<br>• (2) Nationwide Class: All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA;<br>• (3) Florida Subclass: All persons or entities in the state of Florida who, within the applicable limitations period, purchase or enrolled in a YBA. | • Violation of Florida Securities & Investor Protection Act<br>• Violations of FDUTPA<br>• Civil Conspiracy<br>• Declaratory Judgment |
| 11/21/2022 | Elliot Lam | • Sam Bankman-Fried<br>• Caroline Ellison<br>• Golden State Warriors | N.D. Cal. | 22-7336 | Jacqueline S. Corley | • All persons or entities outside the United States who, within the applicable time period limitations, purchased or enrolled in yield-bearing accounts ("YBAs") offered by FTX . . . and/or otherwise invested in one or more FTX Entities." | • California UCL<br>• California FAL<br>• Fraudulent Concealment<br>• Civil Conspiracy<br>• Declaratory Judgment |
| 11/23/2022 | Stephen Pierce | • Armanino, LLP<br>• Prager Metis CPAS, LLC<br>• Sam Bankman-Fried<br>• Caroline Ellison<br>• Gary Wang<br>• Nishad Singh | N.D. Cal. | 22-7444 | Jacqueline S. Corley | All persons who, during the Class Period, entrusted fiat and/or digital currency to FTX US and were damages thereby. | • RICO Enterprise<br>• RICO Conspiracy |

| Date Filed | Plaintiffs | Defendants | Court | Case No. | Judge | Class Definition | Causes of Action |
|---|---|---|---|---|---|---|---|
| 12/2/2022 | Russell Hawkins | • Armanino, LLP<br>• Prager Metis CPAS, LLC<br>• Sam Bankman-Fried<br>• Caroline Ellison<br>• Gary Wang<br>• Nishad Singh | N.D. Cal. | 22-7620 | Jacqueline S. Corley | All those who have been unable to withdraw funds deposited into YBAs with the FTX Entities; and were damaged upon the revelation of the alleged corrective disclosures. | • California UCL<br>• California FAL<br>• Fraudulent Concealment<br>• Civil Conspiracy<br>• Declaratory Judgment |
| 12/5/2022 | Michael Jessup et al. | • Sam Bankman-Fried<br>• Caroline Ellison<br>• Nishad Singh<br>• San Trabucco<br>• Gary Wang | N.D. Cal. | 22-7666 | Jacqueline S. Corley | All persons in the United States who had bitcoins, other cryptocurrency, assets or money stored with FTX on November 10, 2022. | • Fraud<br>• Unjust Enrichment<br>• Conversion |
| 12/5/2022 (removed 2/3/2023) | Michael Norris et al. | • Tom Brady<br>• Kevin O'Leary<br>• David Ortiz | S.D. Fla. | 22-20439 | Cecilia M. Altonaga | No class (Compl. ¶ 36) | • Violation of Florida Securities & Investor Protection Act<br>• Violations of FDUTPA<br>• Civil Conspiracy<br>• Declaratory Judgment |

| Date Filed | Plaintiffs | Defendants | Court | Case No. | Judge | Class Definition | Causes of Action |
|---|---|---|---|---|---|---|---|
| 12/7/2022 | Gregg Podalsky et al. | • Tom Brady<br>• Gisele Bundchen<br>• Kevin O'Leary<br>• Udonis Haslem<br>• David Ortiz<br>• Stephen Curry<br>• Golden State Warriors<br>• Shaquille O'Neal<br>• William Trevor Lawrence<br>• Shohei Ohtani<br>• Naomi Osaka<br>• Sam Bankman-Fried<br>• Caroline Ellison<br>• Sam Trabucco<br>• Gray Wang<br>• Nishad Singh<br>• Dan Friedberg | S.D. Fla. | 22-cv-23983 | K. Michael Moore | • (1) Global Class: All persons and entities residing outside of the U.S. who, within the applicable limitations period, purchased or enrolled in a YBA;<br>• (2) Nationwide Class: All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA;<br>• (3) Florida Subclass: All persons or entities in the state of Florida who, within the applicable limitations period, purchase or enrolled in a YBA. | • Violation of Florida Securities & Investor Protection Act<br>• Violations of FDUTPA<br>• Civil Conspiracy<br>• Declaratory Judgment |
| 1/3/2023 | Julie Papadakis | • Armanino, LLP<br>• Prager Metis CPAS, LLC<br>• Sam Bankman-Fried<br>• Caroline Ellison<br>• Gary Wang<br>• Nishad Singh | N.D. Cal. | 23-24 | Jacquelin S. Corley | All persons other than Defendants that have deposited funds and/or assets in accounts ("Accounts") with FTX . . . and who have been unable to access or withdraw the deposited funds and/or assets in the Accounts. | • California UCL<br>• California FAL<br>• Fraudulent Concealment<br>• Negligent Misrepresentations<br>• Intentional Misrepresentation<br>• Fraud<br>• Breach of Fiduciary Duty<br>• Aiding and Abetting Fraud<br>• Aiding and Abetting Breach of Fiduciary Duty<br>• Civil Conspiracy<br>• Conversion<br>• Unjust Enrichment<br>• Declaratory Judgment |

| Date Filed | Plaintiffs | Defendants | Court | Case No. | Judge | Class Definition | Causes of Action |
|---|---|---|---|---|---|---|---|
| 2/6/2023 | Statistica Capital Ltd. et al. | Signature Bank | S.D.N.Y. | 23-993 | Andrew L. Carter | All persons who, at any time between May 2019 and November 2022 obtained banking services from Signature Bank, were in possession of fiat or digital currency on FTX and have been unable to recover any portion of that currency. | • Aiding and Abetting Fraud<br>• Aiding and Abetting Breach of Fiduciary Duty<br>• Unjust Enrichment |
| 2/14/2023 | Patrick J. Rabbitte | • Sequoia Capital Operations, LLC<br>• Thoma Bravo, LP<br>• Paradigm Operations LP | N.D. Cal. | 23-655 | William J. Alsup | All persons and entities that purchased, deposited, and/or transacted in fiat currency or digital assets in accounts with the FTX Entities during the Class Period and who were damaged thereby. | • California UCL<br>• California FAL<br>• California Corp. Code § 25504.1<br>• Negligent Misrepresentation<br>• Intentional Misrepresentation<br>• Fraudulent Inducement<br>• Civil Conspiracy<br>• Aiding and Abetting<br>• Declaratory Judgment |
| 2/14/2023 | Soham Bhatia | • Silvergate Bank<br>• Silvergate Capital Corporation<br>• Alan J. Lane | N.D. Cal. | 23-667 | Jacqueline S. Corley | [All persons] who, as of November 11, 2022, held legal title to any fiat or cryptocurrency deposited or invested through an FTX platform. | • Aiding and Abetting Fraud<br>• Aiding and Abetting Breach of Fiduciary Duty<br>• Unjust Enrichment |

| Date Filed | Plaintiffs | Defendants | Court | Case No. | Judge | Class Definition | Causes of Action |
|---|---|---|---|---|---|---|---|
| 2/14/2023 | Matson Magleby et al. | • Silvergate Bank<br>• Silvergate Capital Corporation | N.D. Cal. | 23-669 | Jacqueline S. Corley | All persons who, as of November 11, 2022, had legal title to any fiat or cryptocurrency deposited or invested with FTX, including from the FTX.com, FTX US and FTX international platforms. | • Aiding and Abetting Fraud<br>• Aiding and Abetting Breach of Fiduciary Duty<br>• Unjust Enrichment |
| 2/14/2023 | Nicole Keane | • Silvergate Capital Corporation | N.D. Cal. | 23-670 | Jacqueline S. Corley | All persons who, as of November 11, 2022, had legal title to any fiat or cryptocurrency unable to be withdrawn from FTX, including both he FTX US and FTX international platforms. | • California UCL<br>• Aiding and Abetting Fraud<br>• Aiding and Abetting Breach of Fiduciary Duty<br>• Unjust Enrichment |
| 2/22/2023 | Connor O'Keefe | • Sequoia Capital Operations, LLC<br>• Silvergate Bank<br>• Signature Bank<br>• Deltec Bank & Trust Co. Ltd.<br>• Farmington State Bank<br>• Jean Chalopin<br>• Thoma Bravo L.P.<br>• Toggle Section<br>• Paradigm Operations LP.<br>• Temasek Holdings (Private) Limited<br>• Softbank Vision Fund (AIV M2) L.P.<br>• Ribbit Capital, L.P. | S.D. Fla. | 23-20700 | Jose E. Martinez | All natural persons and entities who purchased, deposited and/or transacted Class Member funds in accounts on the FTX platform any time after May 1, 2019 through FTX's collapse on November 11, 2022, the date on which it filed for bankruptcy, and have been harmed by Defendants' conduct alleged herein. | • Civil Conspiracy<br>• Aiding and Abetting Fraud<br>• Aiding and Abetting Breach of Fiduciary Duty<br>• Aiding and Abetting Conversion |

| Date Filed | Plaintiffs | Defendants | Court | Case No. | Judge | Class Definition | Causes of Action |
|---|---|---|---|---|---|---|---|
| | | • Altimeter Capital Management, LP<br><br>• Multicoin Capital Management LLC<br><br>• Tiger Global Management, LLC<br><br>• Sino Global Capital Limited<br><br>• Fenwick & West LLP<br><br>• Prager Metis CPAs, LLC<br><br>• Armanino, LLP<br><br>• Softbank Group Corp. | | | | | |
| 3/2/2023 | Mark Girshovich | • Sequoia Capital Operations, LLC<br><br>• Thoma Bravo, LP<br><br>• Paradigm Operations LP | N.D. Cal. | 23-945 | Joseph C. Spero | All persons and entities that purchased, deposited, and/or transacted in fiat currency or digital assets in accounts with the FTX Entities during the Class Period and who were damaged thereby. | • California UCL<br><br>• California FAL<br><br>• California Corp. Code § 25504.1<br><br>• Negligent Misrepresentation<br><br>• Intentional Misrepresentation<br><br>• Fraudulent Inducement<br><br>• Civil Conspiracy<br><br>• Aiding and Abetting<br><br>• Declaratory Judgment |

# Exhibit 4



SIGNATURE BANK®

# Business Bank Account
## Agreements and Disclosures

**EFFECTIVE DATE: DECEMBER 27, 2019**

*ADDENDUM DATE: JULY 1, 2020*

## INTRODUCTION

Welcome.................................................................................................................................... 2

Contacts................................................................................................................................... 2

## SIGNATURE BANK - Business Bank Account Agreements and Disclosures

Business Bank Deposit Account Terms and Conditions.................................................................. 3

Monogram Money Market Funds Program Customer Agreement for Business............................ 22

ATM Card and Debit Card for Business Agreement..................................................................... 31

Funds Availability Disclosure (Reg CC)...................................................................................... 35

Funds Transfer Agreement......................................................................................................... 38

## ADDENDUM TO THE BUSINESS BANK ACCOUNT AGREEMENTS AND DISCLOSURES

---

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT**

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

---

Effective Date: December 27, 2019

700800-1219

SIGNATURE BANK

*Business Account Agreements & Disclosures*

## WELCOME

Thank you for opening an account at Signature. This booklet contains important information about your bank deposit accounts and your non-deposit accounts at Signature Bank. Please read it carefully, and retain it for future reference. By opening an account at Signature Bank, you agree to the terms contained herein.

## CONTACTS

Clients and non-clients alike are always welcome to visit any of our locations for assistance, **or simply call 1-866-sigline with any questions you may have.**

TTY# 212-292-0137
Signature Internet Banking: 1-866-sigline
Signature Mobile Banking: 1-866-sigline

Written Correspondence:
565 Fifth Avenue 8th Floor New York, NY 10017
Attn: Denise Raucci

**www.signatureny.com**

2

SIGNATURE BANK

▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

*Business Bank Deposit Account Terms and Conditions*

All Clients of the Bank who open or renew a Business Bank Deposit Account at the Bank agree to the following:

# I. BANK DEPOSIT ACCOUNT DETAILS

## 1. DEFINITIONS

**A. Account:** An account that is either an FDIC insured Bank Deposit Account offered by the Bank or a non-FDIC insured Non-deposit Investment Account also offered by the Bank.

**B. ACH:** An Automated Clearing House

**C. Agreement:** Business Bank Deposit Account Terms and Conditions.

**D. ATM:** An Automated Teller Machine.

**E. ATM Card:** The card issued to you by the Bank, which you can use at ATMs located at the Bank's Financial Centers or at other locations that are owned or leased by the Bank and ATMs and POS Payment Terminals that accepts such card and that are part of the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International networks to access those Accounts of yours that can be accessed by such card and have been designated for such access.

**F. Available Balance:** Funds in your Bank Deposit Account other than a Certificate of Deposit ("CD") that you may withdraw. Funds deposited to your Bank Deposit Account other than a CD become available for withdrawal in accordance with the Bank's Funds Availability Disclosure found in this Business Account Agreements and Disclosures booklet.

**G. Average Available Monthly Balance:** The amount determined by adding together the Available Balances on deposit in your Bank Deposit Account at the end of each day in the Statement Cycle Period and dividing the sum by the number of days in the Statement Cycle Period.

**H. Bank:** Signature Bank.

**I. Bank Deposit Account:** An Account that is an FDIC insured bank deposit, which for Business Clients includes Signature Flat Fee Business Checking, Signature NOW for Business, Signature NOW for Municipalities, Monogram Business Checking, Monogram Insured Money Market for Business, Escrow Account and Certificate of Deposit ("CD").

**J. Bank Holiday:** January 1, the third Monday in January, the third Monday in February, the last Monday in May, July 4, the first Monday in September, the second Monday in October, November 11, the fourth Thursday in November, or December 25. If January 1, July 4, November 11, or December 25 fall on a Sunday, the next Monday is not a Business Day.

**K. Business:** Corporation, partnership, sole proprietorship, unincorporated association, trust, estate or other business entity.

**L. Business Day:** Any day other than a Saturday, Sunday or a Bank Holiday.

**M. Certificate of Deposit ("CD"):** A Bank Deposit Account in which funds must remain on deposit for a specific time period and on which the Bank agrees to pay interest at a specific interest rate during that time period.

**N. Check:** When used in this Agreement the term Check includes checks, Substitute Checks, Remotely Created Checks, money orders, drafts and other instruments or items payable in United States money.

**O. Client, you, your:** The corporation, partnership, sole proprietorship, unincorporated association, trust, estate or other business entity which has a Bank Deposit Account at the Bank.

**P. Company ID:** A system generated number used to identify your Internet Banking profile.

**Q. Current Balance:** The total funds in your Bank Deposit Account including those funds that have not become available for withdrawal in accordance with the Bank's Funds Availability Disclosure found in this Business Account Agreements and Disclosures booklet.

**R. Debit Card:** The card issued to you by the Bank, which you can use at ATMs located at the Bank's Financial Centers or at other locations that are owned or leased by the Bank and ATMs and POS Payment Terminals that are part of the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International networks to access those Accounts of yours that can be accessed by such card at such terminal and have been designated for such access.

**S. Deferred Exchange:** The exchange of like–kind property that qualifies as a tax free exchange under Internal Revenue Code (IRC) section 1031 and the Internal Revenue Service (IRS) Regulations promulgated thereto.

**T. Deferred Exchange Funds:** The funds held by a Qualified Intermediary in relation to a Deferred Exchange.

**U. Escrow Account:** A Bank Deposit Account that is any of the following: a) the Master Account and related Sub-accounts established by an Escrow Agent to hold funds of one or more Escrowees; b) an Interest on Lawyer Account ("IOLA Account"), c) an Interest on Lawyer Trust Account ("IOLTA Account"), d) Interest on Trust Account ("IOTA"), e) a Standalone Escrow Account or f) a Monogram Escrow Account.

**V. Escrow Agent:** Each Attorney, Law Firm, Qualified Intermediary, individual, sole proprietor, corporation, partnership, limited liability company or other entity opening an Escrow Account.

**W. Escrowee:** Each person or entity for whom or which an Escrow Agent is holding funds deposited into an Escrow Account.

**X. Exchange Agreement:** A Deferred Exchange agreement between an Escrow Agent who is a Qualified Intermediary and an Escrowee.

**Y. Exchange Rate:** The rate stated in U.S. Dollars for each Foreign Currency at which the Bank agrees to convert Foreign Currency to U.S. currency and U.S. currency to a Foreign Currency.

3

Z.   **Financial Center:** An office of the Bank at which you can open Bank Deposit Accounts and conduct Bank Deposit Account transactions and other Bank business.

AA.  **Foreign Check:** Checks that are payable in any currency, including U.S. Dollars, that is drawn on a bank or branch of a bank located outside of the United States.

BB.  **Foreign Currency:** Any currency other than U.S. Dollars.

CC.  **Foreign Draft:** A check drawn on a bank other than the Bank that is payable in a Foreign Currency.

DD.  **Funds Transfer:** A wire or other electronic transfer of funds which is subject to the Bank's Funds Transfer Agreement.

EE.  **IOLA Account:** A Bank Deposit Account maintained by an Escrow Agent who is either an attorney licensed to practice law in New York or a law firm doing business in New York that holds funds of Escrowees where the interest earned on the account is paid to the New York State IOLA Fund by the Bank.

FF.  **IOLTA Account:** A Bank Deposit Account maintained by an Escrow Agent who is either an attorney licensed to practice law in Connecticut or California or a law firm doing business in Connecticut or California that holds funds of Escrowees where the interest earned on the account is paid to the Connecticut Bar Foundation or the State Bar of California, respectively.

GG.  **IOTA Account:** A Bank Deposit Account maintained by an Escrow Agent doing business in CT who receives loan proceeds from a mortgage lender pursuant to CT General Statute 51-81c(c).

HH.  **Master Account:** The Escrow Account, maintained at the Bank by the Escrow Agent, and which is used by the Escrow Agent to manage the funds of one or more Sub-accounts.

II.  **Master Sub-account:** The portion of the funds in the Master Account of a Monogram Escrow Account that is unallocated or awaiting disbursement.

JJ.  **Money Order:** A Money order is a negotiable instrument purchased to make a payment to a third party. Money Orders are drawn on and payable through Signature Bank.

KK.  **Monogram Escrow Account:** The Escrow Account offered by the Bank that allows the Escrow Agent to manage the Master Sub-account and Sub-accounts from Monogram Escrow Express.

LL.  **Monogram Escrow Express:** The Bank's internet based cash management platform used by Escrow Agents to manage their Master Sub-Accounts and Sub-accounts.

MM.  **Non-deposit Investment Account:** An Account that is an investment, is not FDIC insured, is not a bank deposit, is not guaranteed by a bank and which may lose value. The Non-deposit Investment Account offered by Signature Bank is the Monogram Money Market Funds Program Account. Additional non-deposit investment accounts include securities, annuities and insurance products that are offered by Signature Securities Group Corporation.

NN.  **Official Check:** An official check is a negotiable instrument purchased to make a payment to a third party. Official checks are drawn on and payable through Signature Bank.

OO.  **Password:** The combination of letters, numbers, and special characters that has been assigned to, or selected by, the System User that is required together with the System User's User ID or Username and Company ID to access Monogram Escrow Express via Signature Internet Banking.

PP.  **Payment Order:** Funds Transfer instructions received from a sender to a receiving bank to pay, or cause another bank to pay, a specific amount of money to a designated beneficiary and subject to the Bank's Funds Transfer Agreement. As a sender, this means Funds Transfer instructions received from you by the Bank to pay, or cause another bank to pay, a specific amount of money from your Account to a designated beneficiary. As a beneficiary, this means Funds Transfer instructions received by the Bank from a sender to pay a specific amount of money to your Account.

QQ.  **POS Payment Terminal or Point of Sale Payment Terminal:** A payment terminal at which an ATM Card or Debit Card can be used to access an Account designated for such access.

RR.  **Qualified Intermediary:** A person or entity that has entered into an Exchange Agreement with a taxpayer to hold Deferred Exchange Funds pursuant to an Exchange Agreement.

SS.  **Remotely Created Check:** A check drawn on an Account other than a CD that has been created by a merchant or other payee at the Client's request or with the Client's authorization or approval, whether directly or indirectly, and generally containing the information normally found on a check, such as the Client's name, the account number, the Bank's name and the Bank's routing number, but instead of containing the Client's handwritten signature containing either the Client's printed or typed name or a statement that the Client has authorized the check.

TT.  **Signature Internet Banking:** A service provided by the Bank which permits you to perform a number of banking functions on Accounts linked to the service through the use of a personal computer.

UU.  **Signature Securities Group Corporation:** A non-bank subsidiary of Signature Bank, broker-dealer, member FINRA and an insurance agency that offers non-FDIC insured Non-deposit Investment Accounts.

VV.  **Standalone Escrow Account:** The Bank Deposit Account maintained by the Escrow Agent holding funds of one Escrowee and which does not have Sub-accounts.

WW.  **Statement:** The record of Account balance and activity that is provided to you at the end of each Statement Cycle Period for your Accounts other than Certificates of Deposit ("CD").

XX.  **Statement Cycle Period:** The monthly period set at the Bank's discretion to begin or end on the same calendar day, Business Day or day of a particular week each month, except that the initial and final Statement Cycle Periods may begin or end on a different day. The Bank may decide to change the beginning or ending day of a Statement Cycle Period for all Accounts or for a group of Accounts. Any Statement Cycle Periods resulting from such a change in such beginning or ending day and the initial and final Statement Cycle Periods may be longer or shorter than a monthly period.

YY.  **Sub-account:** An account at the Bank in which funds held in escrow for an Escrowee have been deposited,

4

transferred or allocated by the Escrow Agent. At the request of the Escrow Agent, the sub-account may or may not earn interest.

**ZZ.** **Substitute Check:** A paper copy of an original check that federal law permits to replace the original check, which is similar in size to the original with a slightly reduced image of the front and back of the original check, and can be used in the same way as the original check.

**AAA.** **System User:** Person designated by the Escrow Agent on the Bank's Set-Up Application form for the Monogram Escrow Account to use Monogram Escrow Express.

**BBB.** **User ID or Username:** The name assigned to or selected by the System User that is used with the System User's Password and Company ID to access Monogram Escrow Express via Signature Internet Banking.

**CCC.** **Web Browser:** The version of the commercially available web browsers that have been approved by the Bank that the Escrow Agent must have on its computer in order to access Monogram Escrow Express.

## 2. CHECKING AND SAVINGS SUB-ACCOUNTS:

The Signature Flat Fee Business Checking, Signature NOW for Business, Signature NOW for Municipalities, Monogram Business Checking Account, Monogram Escrow Account, and Master Account consist of a checking sub-account and a savings sub-account. The Bank will periodically transfer funds between these two sub-accounts. The sixth transfer from the savings sub-account to the checking sub-account during a calendar month will include all of the funds in the savings sub-account until the end of that month. If your Account is an account on which interest is paid, your interest calculation will remain the same. Otherwise, the savings sub-account will not earn any interest. The savings sub-account will be governed by the rules governing our Monogram Insured Money Market for Business accounts. The existence of these sub-accounts will not affect your available balance, the interest you may earn, FDIC insurance protection, or your monthly statement.

## 3. MINIMUM BALANCES, SERVICE CHARGES AND FEES:

Accounts are subject to the minimum balance requirements and to the minimum opening balance requirements set forth in the Bank's Business Accounts Fee Schedule, in effect at the Bank at the time the Account is opened and as may be amended from time to time. The Bank may deduct charges and fees from your Account without further authorization on your part. The most recently revised schedule of service charges is available at all of the Bank's Financial Centers.

If the Account is an IOLA Account, IOLTA Account, or IOTA Account, then the services charges and fees (other than the cost of the initial checkbook order) are the responsibility of the Escrow Agent maintaining the IOLA Account, IOLTA Account, or IOTA Account and can be paid in cash, by check drawn by the Escrow Agent on the Escrow Agent's business account, or as a debit authorized by the Escrow Agent on the Escrow Agent's business account at the Bank. The Bank will deduct the cost of the initial checkbook order from the interest earned on the IOLA Account, IOLTA Account, or IOTA Account. The interest less permissible fees is paid to the relevant state program and will not be debited from the principal of the IOLA Account, IOLTA Account or IOTA Account for any other fees or service charges related to such account.

## 4. STATEMENTS:

Except for Certificate of Deposit ("CD"), once a Statement Cycle Period, the Bank will send you, at your address appearing on the Bank's records, a Statement of the Bank Deposit Account balance and activity since the last Statement that will be accompanied by any Checks drawn on the Account that have been paid during that Statement Cycle Period if Checks can be written on the Account and if that Account provides for the return of such Checks. These Checks accompanying the Statement may be originals, copies or optical images of the original Checks or Substitute Checks. You will exercise reasonable care and promptness in examining such Statement and Checks to discover any errors or irregularity including, but not limited to, any forged, unauthorized or improperly made signatures on, or any alteration of, a Check or unauthorized or erroneous ACH debits. You will notify the Bank promptly in writing of any errors or irregularities, and in no event more than fourteen (14) calendar days after the time that such Statement and Checks, or copies or optical images of such Checks, were first made available to you.

## 5. SIGNATURE LINE:

For information call the Signature Line toll free at 1-866-sigline. You can find the Bank's current Client Care Services hours on our website at SignatureNY.com by clicking "About Us" and then selecting "Contact Us".

## 6. TRANSFERS BETWEEN ACCOUNTS AND INQUIRIES:

You can request transfers between your Accounts at the Bank by telephone, fax and email subject to the approval of the Bank, which approvals shall be at its sole discretion, or through internet banking services or mobile banking services, provided you have agreed to the Bank's Internet Banking Agreement or Mobile Banking Services End User Agreement, as applicable. You agree that the Bank's records of such transfers are binding, and agree to assume all risks in connection with such transfers. Those risks include, but are not limited to, (i) requests made by a person representing himself or herself to be you or an individual you have authorized to act for you, (ii) delays or errors as a result of a misunderstanding of any instructions and (iii) the malfunction of any equipment. The risks do not include those risks resulting directly from the Bank's willfulness, recklessness or gross negligence. The Bank reserves the right to refuse such a request for the transfer of funds. You authorize the Bank to respond to inquiries about your Accounts from you and any person you have authorized to act for you and believed by the Bank to be you or that individual.

## 7. DEPOSITED OR CASHED CHECKS:

The Bank is authorized to accept for your Account(s) all Checks from third parties which are payable to you. You agree that the Bank shall not be responsible for any delay in giving your Account credit for any deposit you make, for the acts of any agent of yours or person or persons who you have authorized to act on your behalf with respect to Accounts

at the Bank or for any other act that the Bank thinks is appropriate provided the Bank has acted in good faith. Checks may not be deposited to a CD during the term of the CD.

A. <u>Verifying Deposits</u>: All Checks and other deposits will be accepted subject to verification by the Bank. This verification will not occur at the time the Bank accepts the deposit from you, but will occur at a later time. Any receipt given to you by the Bank at the time you make your deposit is not a verification of the amount of the deposit or the checks included in the deposit. If the amounts stated on your deposit form do not conform to the amounts of each of the Checks and currency accompanying that deposit form, then the Bank will correct the deposit made to your Account and send you a notice of such correction. The Bank is not responsible for any Checks listed on the deposit form that are missing when the Bank verifies the amount of the deposit.

B. <u>Multiple Endorsements</u>: You agree that if you want to deposit or cash a Check which is not made payable to you, but which has been endorsed by the payee of the Check, the Bank may refuse to accept that Check if the Bank is unable to verify to its satisfaction that the payee's endorsement and all other endorsements on the Check are genuine.

C. <u>Funds Availability:</u> Funds deposited in your Accounts in the form of a Check or other instrument will normally be available for withdrawal in accordance with the Bank's Funds Availability Disclosure in this Business Account Agreements and Disclosures booklet unless the deposit is made to a CD.

D. <u>Encoding:</u> If the Bank accepts from you Checks for deposit into or to be cashed against your Account which you or your agent have encoded with MICR or other encoding, the Bank may rely upon the accuracy and completeness of such encoding in processing the items for collection or payment. You shall be solely responsible for any encoding in processing the Checks for collection or payment. You shall be solely responsible for any encoding errors or defects including, without limitation, amount errors and shall indemnify and hold the Bank harmless from and against any and all claims, demands, damages, liabilities, losses and expenses (including attorney's fees) resulting, directly or indirectly, from such encoding.

E. <u>Collection of Checks:</u> All Checks deposited in your Accounts, or cashed for you, are received by the Bank as agent for you and are subject to collection. The Bank shall not be responsible for any loss due to the failure to demand payment of amounts due on Checks you deposit, which is called presentment, or because of the late presentment of any Check. The Bank chooses the method of obtaining final payment of Checks and other instruments and may use other banks or agents in the process. The Bank will use due diligence in the selection of collection agents and correspondent banks (hereinafter collectively called the "Correspondents") but will not be liable for the insolvency, neglect, misconduct, mistake or default of any such Correspondents or for loss or destruction of a Check or other instrument in transit or in the possession of others. The Bank or any Correspondent may waive presentment, notice and protest on all Checks for which credit or value is given in whole or in part or which are received for deposit or collection and may send any Check, directly or indirectly, to any bank, including the drawee or payor, or to any nonbank payer. You authorize the Bank to renew or to extend the time with respect to the collection of any sums due on said Checks, and you agree that any such renewals, extension of time or other modification of such collection shall be deemed to have been granted or made with a full and express reservation by the Bank of any of its rights that it has against you. The Bank is not responsible for any act or failure to act that is reasonable under the circumstances or that it is taken or omitted pursuant to this Agreement.

F. <u>Uncollected and Returned Checks</u>: Any Check not finally collected may be charged back to any of your accounts at the bank whether such Check was cashed or deposited. If a Check that you have deposited to or cashed against your Bank Deposit Account is returned and claimed to have a forged signature or forged endorsement or is materially altered, then the Bank may charge any of your Accounts for the amount of such Check.

G. <u>No Protest:</u> If any Check that you deposit into or cash against your Account is returned unpaid by the bank that it is drawn upon, you agree that you will not require the Bank to obtain a protest, which is an official certification that a Check has been dishonored.

## 8. ACH CREDITS:

If the Account receives funds through the ACH (Automated Clearing House), then any credit given by the Bank to the Account for such funds will be provisional until the Bank receives final settlement through a Federal Reserve Bank or has otherwise received payment as provided under Section 4A-403(a) of New York's Uniform Commercial Code. Notice to the Client of such ACH credits will be provided on the Client's Statement. If the Bank does not receive final settlement or payment of an ACH credit, then the Bank is entitled to recover from the Account or the Client the amount of the provisional credit and the person or entity making that ACH payment ("ACH Originator") will not be considered to have paid that amount to the Client.

## 9. INCOMING WIRES:

If funds are wired into an Account, the Client agrees that the Bank's Funds Transfer Agreement will apply and also agrees that notification of the receipt of such wire may be made by including such wire as a credit reflected in the periodic statement for the Client's account indicated in the wire instructions, as well as by a separate notice sent by mail or electronically to Client no later than the Business Day following the Business Day the wire has been received by the Bank. The Client recognizes that from time to time the Bank may charge its accounts for amounts credited thereto, whether provisionally or not, including by way of illustration and not by way of limitation, charges made as a result of the cancellation or amendment of a Payment Order or the failure of a wire system to settle as anticipated. The Bank may rely solely on identifying account numbers of the beneficiary, beneficiary bank or intermediary bank in the Payment Order, rather than names. The Bank has no duty to detect any inconsistencies between the name and the account number in any Payment Order.

**10. WITHDRAWALS FROM ACCOUNT:**

Withdrawals from Accounts can be made (i) by Check provided the Account is a checking, NOW or money market account, (ii) at an ATM (iii) by use of a Debit Card provided that an ATM or Debit Card has been issued for the Account, (iv) as an ACH debit, (v) as a bill payment or transfer initiated through the Bank's internet banking service or mobile banking services provided you have agreed to the Bank's Internet Banking Agreement or Mobile Banking End User Agreement as applicable, and the Account is eligible for such product, (vi) by transfer to another of your Accounts via telephone, fax or e-mail-provided that the Account is eligible for such transfers and the Bank consents to such transfer or internet banking services or mobile banking services, provided you have agreed to the Bank's Internet Banking Agreement or Mobile End User Agreement, as applicable, (vii) as a wire provided you agree to the Bank's Funds Transfer Agreement, (viii) as a withdrawal in the form of cash or an official check processed by the teller.

**11. PAYING WITHDRAWALS:**

If the withdrawal is by Check, then your Bank Deposit Account will be debited on the day the Check is presented to the Bank or at such earlier time as notification is received by the Bank by electronic or other means that the Check has been deposited or received for collection by another financial institution. If multiple Checks, wires, ATM or Debit Card transactions, ACH debits and/or transfers are presented to the Bank for payment or requested on a day when there is an insufficient Available Balance in the Account to pay all of them, then the Bank will generally process your Transactions in the following posting order:

**First**: We add deposits and credits to your Bank Deposit Account received before the applicable cut-off times referenced in the Business Bank Account Agreements and Disclosures.

**Second**: We subtract debits by category in the following order: wires, ATM and Debit Card transactions, teller transactions, transfers, internet banking and mobile banking bill payments and ACH, Checks (other than checks converted by the payee to ACH debits), recurring transfers. Within each category, we process the transactions in the order of lowest to highest amount in order to minimize the number of payments for which there may be insufficient or uncollected funds.

**12. OVERDRAFT AND INSUFFICIENT FUNDS:**

The Bank at its sole discretion may choose to pay or return any item presented, if your Available Balance is less than the amount of the item. You will be charged a fee, as set forth in the Bank's Business Accounts Fee Schedule, whether the Bank pays or returns the item.  Once the Bank determines that your Bank Deposit Account's Available Balance is not sufficient to pay the transaction, then the transaction might not be paid and you will be charged a returned item fee even if prior to the deadline for the Bank to take action on such transaction the Available Balance has increased. If the Bank decides to pay the transaction, known as an overdraft, you will be charged an overdraft fee if the transaction being paid is a Check, wire, ACH debit or transfer. Additional provisions apply to overdrafts in Signature Flat Fee Business Checking and Monogram Business Checking accounts, please refer to Overdraft Billing section. You can avoid fees for overdrafts and/or returned items by ensuring your Account has a sufficient Available Balance to cover all of your transactions. Your account may be overdrawn if the Bank pays an item and your Available Balance has an insufficient amount to cover the item. Any overdrawn account balance along with applicable fees must be repaid immediately. We review your balances daily on each Business Day to determine if any item presented that would cause an overdraft should be paid or returned. Any past payment of overdraft is no guarantee of future payments. If your account is overdrawn, we will use any deposits made to your Account to pay the overdraft and any fees you may owe, associated with the overdraft.

**13. OUTGOING WIRES:**

If you wire funds from your Account, then such wires will be subject to the Bank's Funds Transfer Agreement, which you agree to when requesting such wire.

**14. ACH AND OTHER ELECTRONIC DEBITS:**

Some businesses may advise us that they have obtained your authorization to debit your Account electronically through an automated clearing house ("ACH") or another system for amounts you owe to them or to convert your checks that you give them into an ACH debit or other form of electronic debit. You agree that the Bank may charge your Account for such electronic debits.

**15. BANK'S RIGHT TO REFUSE PAYMENT:**

The Bank may refuse to pay checks drawn upon an Account or refuse any other withdrawal request from any Account in cases such as, but not limited to, the following:

**A.** If the withdrawal would consist of funds that are not yet available for withdrawal under the Bank's Funds Availability Disclosure.

**B.** If the Bank has been ordered by a court or other legal process such as, a levy, execution or restraining notice not to permit the withdrawal.

**C.** If the Bank is aware of any dispute relating to the Account, unless a court has ordered the Bank to permit the withdrawal.

**D.** If the Bank has some suspicion of fraud or irregularity.

**E.** If someone, who the Bank believes, in its sole discretion, is authorized to act for you, directs the Bank not to make payment.

**F.** If the signature(s) on the Check or other withdrawal request does not compare favorably with the specimen signature(s) on the records of the Bank for the Account.

**G.** If the Check or withdrawal request has not been presented with any or all of the required signatures.

**H.** If an equipment problem at the Bank prevents determining the available funds.

    **I.** If the Account is a Signature NOW for Business Account, Signature NOW for Municipalities or a Monogram Insured Money Market for Business and the Bank has exercised its right to require up to 7 days notice of an intended withdrawal from that Account as stated in this Agreement.

    **J.** If the Account is a Certificate of Deposit ("CD") and the withdrawal includes principal and is not being made at maturity or within an applicable grace period.

    **K.** If any document (such as Checks or withdrawal request forms supplied by the Bank) or identification the Bank or the law requires in connection with the withdrawal has not been presented to the Bank.

**16. LOST OR STOLEN CHECKS:**

If any of the checks you use to withdraw funds from the Account are lost or stolen, you agree to notify the Bank immediately.

**17. PURCHASING CHECKS FROM UNAUTHORIZED VENDORS:**

If you purchase checks to use to withdraw funds from your Account from a company other than a vendor authorized by the Bank, then unless the Bank has approved those checks in advance, the Bank may assess an additional charge for processing those checks and/or refuse to pay those checks because the Bank's, or its agent's, equipment may not be able to read or process them properly. You will be solely responsible for any costs and losses resulting from using checks, other than those purchased from authorized vendors, to withdraw from your Account or the Bank refusing to pay such checks.

**18. CHECK NOTATIONS:**

Notations are any legends, instructions, restrictions or language such as, but not limited to, "not valid after 60 days" or "not valid over $1,000". If you add Notations to any Checks that are used to withdraw from your Account or have Notations printed on such Checks, you agree that such Notations are not intended to be conditions on the payment or negotiation of the Check. You agree that the Bank may disregard these Notations and agree that the Bank will not be responsible for any losses, claims, damages, or expenses that may result from doing so or from your placing these Notations or any other statements on any Checks that are used to withdraw from the Account.

**19. POSTDATED CHECKS:**

Postdating a Check does not guarantee that payment of the check will be delayed until after the date of the Check. The Bank reserves the right to pay any Check at the time when it is presented for payment, regardless of the date appearing on the Check. You agree that you shall have no claim against the Bank if the Bank pays a Check prior to the date of the Check. If the postdated Check is returned because there were insufficient or uncollected funds in your Bank Deposit Account, you will be charged the Bank's standard fee for a Check drawn on insufficient or uncollected funds.

**20. CHECKS WITH STALE DATES:**

The Bank has the right, but shall not be required, to pay a stale dated Check, which is a Check that has been presented for payment more than 6 months after the date of the Check. To make sure that a stale dated Check will not be paid by the Bank, you must place a Stop Payment Order on it.

**21. STOP PAYMENT ORDER:**

You may request that payment be stopped on any Check that you have written provided the Check has not been paid before the Bank has had a reasonable period of time to act on the stop payment request. You may make the request in person at a Financial Center by signing a stop payment order on the Bank's form, through the Bank's web site if you have enrolled in the Bank's internet banking service or you may make the request by calling the Signature Line toll free at 1-866-sigline. You must provide your Account number, the number and date of your Check, the name of the payee and the amount of the Check. If any of this information is not stated or is stated incorrectly, the Bank shall not be liable if it fails to honor the stop payment request or stops payment on the wrong Check. A stop payment order is valid for the life of the Account. The Bank's acceptance of your stop payment request does not mean that the Check has not been paid. For example, that Check could have been paid prior to the request or that Check might be paid during the time it takes the Bank to process your request. The Bank may assess a service charge for the written or oral stop payment order you make or deliver to the Bank. You further understand that the Bank cannot control how the payee of a Check that you have written (or the payee's bank or agent) presents such Check for payment and you agree that the Bank shall not be liable for failing to stop the payment of such Check if it has been presented in a manner that does not include the Check number and the account number of the Account on which the Check was drawn.

**22. NOTICE OF ERRORS, FORGERIES, ALTERATIONS-TIME LIMITS:**

You must notify the Bank in writing within fourteen (14) calendar days from the date such Account Statement is mailed or made available to you, of any claimed errors in such Statement and with respect to any cancelled Check accompanying the Statement, or any image or copy of a cancelled Check that accompanies such Statement. Such errors include, but are not limited to, claims that your signature was forged, a Check was drawn without your authority, that a Check was altered in any way, or that the amount of a Check was raised. You must notify the Bank in writing within six (6) months from the date any such cancelled Check or any image or copy of such cancelled Check is mailed or made available to you that any endorsement was forged, improper, made without the authority of the person who should have endorsed it, or was missing. If you fail to give such notice, the Account Statement shall be considered to be correct for all purposes and the Bank shall not be liable for any payments made and charged to the Account. You agree that you will not bring or cause to be brought any legal proceeding or action against the Bank to seek to recover any payment of any check or other instrument upon which any signature or endorsement has been forged or was improper or which was drawn, made, accepted or endorsed without your authority or the authority of the endorser, or which was altered in any way or on which the amount was raised, or from which any endorsement was missing unless you shall have given the Bank the written notice provided above and you start or cause to be started such legal proceeding or

8

action within one (1) year from the date such statements and cancelled checks, including images or copies of cancelled Checks, mailed or made available to you, or within one and one-half (1 1/2) years in the case of any unauthorized endorsement. You agree that the Bank shall be deemed to have acted in good faith and used ordinary care and shall not be liable to you for any forgery of your signature or any alteration if the forgery of your signature or the alteration is not readily apparent and recognizable to an ordinary bank teller.

**23. UNLAWFUL INTERNET GAMBLING:**
Federal banking regulations prohibit any person or business entity engaged in the business of betting or wagering from knowingly accepting any payment in connection with the participation of another person or business entity in unlawful Internet gambling (a "restricted transaction"). You acknowledge and agree that you are prohibited from processing a restricted transaction through your Account or other banking relationship with the Bank. Your participation, or attempted participation, in any restricted transaction through your Account or other banking relationship with the Bank may result in the termination of your banking relationship with the Bank and/or the closing of your Account. The Bank reserves the right to decline any transaction that the Bank believes is a restricted transaction.

**24. FDIC INSURANCE:**
The Bank is the member of the FDIC; therefore, your Bank Deposit Accounts and your funds in the Escrow Account associated with the Monogram Money Market Funds Program Account at the Bank are added together and insured by the FDIC up to the maximum permitted by FDIC regulations. Your Non-deposit Investment Accounts, such as the Monogram Money Market Funds Program Account, are not insured or guaranteed by the FDIC.

**25. BLOCKED OR RESTRAINED ACCOUNTS:**
You agree that if your Account is restrained or blocked by legal process, court order or government action, then the Bank may remove the funds being restrained from the Account and place those funds in a control account for your benefit until the Account or those funds are no longer restrained or blocked. While those funds are in the control account, you agree that the funds will not earn any interest **unless required by law**.

**26. INACTIVE AND DORMANT ACCOUNTS:**
A Bank Deposit Account becomes inactive if it has not had any customer-generated activity for a period of 24 consecutive months. A Bank Deposit Account becomes dormant if it has had no customer generated activity for an additional six consecutive months, that is, a total of 30 consecutive months. If the Bank Deposit Account is a CD, then this period begins on the original maturity date of the CD or any later maturity date that you had authorized. Customer generated activity is defined as:
**A.** A deposit or withdrawal transaction, or
**B.** The bank receiving a signed document indicating that you, as someone who is entitled to the funds, are aware of the existence of the Account.
When a Bank Deposit Account is in inactive or dormant status, the Bank will reinstate it to active status when the Bank receives a signed, written acknowledgement of the account from you or someone legally able to act on your behalf.

**27. ABANDONED ACCOUNTS, OFFICIAL CHECKS AND MONEY ORDERS:**
Each state has laws that govern when accounts are considered inactive or unclaimed ("Abandoned Period"), and when the Bank is required to send a customer's funds to the state. The Bank encourages you to make sure your accounts remain active so you receive regular statements, have the full use of your accounts, and avoid the potential of having your funds transferred to the state as unclaimed property. Generally, if none of the customer-generated activity listed above for an Account has occurred during the Abandoned Period, then the Bank Deposit Account may be deemed abandoned and the Bank may close the Bank Deposit Account and, if required, turn the funds over ("escheat") to the appropriate state abandoned property administrator. If the Bank Deposit Account is a CD, then this period begins on the original maturity date of the CD. Additionally, if you have purchased an Official Check or Money Order and the Official Check or Money Order has not been presented for payment during the Abandoned Period, then the Official Check or Money Order may be deemed abandoned and the Bank may, if required, escheat to the appropriate state abandoned property administrator. The Bank will send you a letter in advance if your funds may be transferred to the state as unclaimed property. The Bank may impose a reasonable charge, which shall not be refundable, on an abandoned property to recover the cost related to, or incurred as a result of, the payment or delivery of abandoned property to the state. These charges may include the cost of certified mail, and a pro-rated share of advertising costs.
Note: Dormancy periods for determining actual escheatment requirements vary by the abandoned property laws of the individual states, and by type of property. The Bank is required to base the period for escheatment on the state of the client's last known address on the Bank's records, and that state's corresponding dormancy period.

**28. LIENS AND SET-OFF:**
You give the Bank a continuing lien on any Account or other personal property of yours that is in the possession of either the Bank or any of the Bank's affiliates, including but not limited to bank deposits and securities. This lien shall be in the amount of any and all liabilities and obligations you may owe to the Bank or any of the Bank's affiliates whether such liabilities and obligations exist now or are incurred in the future. You agree that the Bank and its affiliates may set-off against your Accounts and may sell your personal property which is not an Account, by public or private sale at its discretion, and use the funds in such Account or the proceeds of such sale to satisfy such liabilities or obligations whether or not such liability or obligation is then in default or is subject to a contingency. The Bank will not assert, claim or exercise any right of setoff against any Bank Deposit Account receiving direct deposit of Social Security benefits or disability, Supplemental Security Income, Veterans Administration benefits, or other types of benefit payments subject to government reclamation ("Benefit Payments") unless the Benefit Payment is deposited after you are no longer eligible to receive such Benefit Payments, then the Bank may set-off against your Account to recover any Benefit Payments the Bank is obligated to return to the payor because of your ineligibility.

## 29. BANK'S RIGHT TO INDEMNIFICATION:

If the Bank believes in its sole discretion that any instruction from you, which the Bank agrees to accept, might expose it to claims, suits, losses, expenses, liabilities or damages, whether directly or indirectly, the Bank may require indemnification from you satisfactory to the Bank before following such instructions.

## 30. NO IMPLIED WAIVER:

Bank's failure to enforce any of its rights under this Agreement shall not be deemed a waiver of (i) those rights not enforced; (ii) any of its rights; (iii) any specific default; (iv) any default by you in the performance of any of your obligations under this Agreement; or (v) Bank's right to insist upon or to enforce performance by you of your obligations under this Agreement. None of Bank's rights under this Agreement can be affected or waived orally or by any prior act, acquiescence, practice, course of action, course of dealing or previous action or failure to act. No waiver shall be effective unless made in writing and signed by Bank's authorized officer having full knowledge of all facts, and then **only to the extent set forth in the writing.**

## 31. LIMITATION OF BANK'S LIABILITY:

You agree that in any litigation in which you and Bank are adverse parties as to any claim allegedly arising or resulting from, or in any way related to, Bank's performance or non-performance of this Agreement your sole right to any relief shall be limited to breach of contract. You specifically waive any and all claims, however denominated, whether based on or arising from statute or tort and specifically waive the right to recover from Bank on any claim of negligence, gross negligence, willful misconduct, failure to act in good faith and/or deal fairly with you, bad faith, breach of implied covenant or duty to act in good faith or deal fairly with you, breach of fiduciary duty, commercial unreasonableness, loss of business, loss of business opportunity or advantage. You further agree that, in no event, shall you claim or shall Bank be liable for special, punitive, indirect or consequential damages, whether economic or non-economic, loss of profits, loss of business or other financial loss, lost savings, lost benefits, even if Bank has acted in bad faith and even if Bank has been advised of the possibility of or could have foreseen such damages or the possibility of such damages, and your attorney's fees and expenses of litigation (including the fees and expenses of your experts, consultants or any other person, whether or not they testify), even if you would otherwise be entitled to recover such attorneys fees or litigation expenses under any applicable statute or rule, and any other legal cost, disbursement or other expense, however denominated. Notwithstanding the above, should the Bank be liable for a loss of interest, such interest shall be at the rate of interest paid by the Bank on the Account related to the loss and shall be limited to a maximum of 30 days. This limitation of liability will not apply where prohibited by the laws governing your account.

## 32. PRESUMPTION OF BANK ACTING WITH REASONABLE CARE:

You agree that Bank's performance in accordance with this Agreement or in accordance with Standard Banking Practice of banks relating to accounts and transactions covered by this Agreement shall be conclusively presumed and deemed to have been in compliance with Bank's duty to act with reasonable care, it being clearly understood that this Agreement sets forth the standards of and by which Bank's compliance with any duty of reasonable care shall be measured. This presumption will not apply where prohibited by the laws governing your account.

## 33. DISPUTE RESOLUTION:

If you have a dispute with the Bank, the Bank hopes to resolve it promptly. Please discuss it with your PCG at the Bank. If the Bank is not able to resolve the dispute, then you and the Bank agree that the dispute will be resolved as provided below.

### A.  FOR ACCOUNTS OPENED IN STATES OTHER THAN CALIFORNIA:

### (i) LAWSUITS:

You agree to commence any action or proceeding against Bank relating to this Agreement regarding performance or non-performance, ONLY in a court of competent subject matter jurisdiction (State or Federal) located within the State of New York and the County of New York, which shall be the exclusive venue and forum for all litigations between you and the Bank regarding or in any way relating to this Agreement.

In any action commenced by Bank against you to enforce or protect Banks' rights hereunder, you (i) waive any objection you may now or hereafter have to the venue of such proceeding, including that the venue or the court is inconvenient or improper; (ii) agree that service of process may be effected upon you, and be deemed valid and sufficient, by mailing of a copy of the summons and complaint by first class mail to your address contained in Bank's records, whether or not, at the time of mailing, (a) such address is your current address; (b) Bank knew or should have known of a current or better or other address for you; and (c) whether or not such mailing actually is received by you. Service of process shall be deemed complete ten days after filing with the court of proof of such mailing, which may be made by affidavit, attesting to the mailing or depositing in an official depository under the care or custody of the U.S. Postal Service; and agree that nothing set forth herein shall affect Bank's right to effect service of process in any other manner authorized by law. In any action, litigation, proceeding to enforce a judgment, restraining order or other legal process or other legal proceeding related to an Account or an agreement in which you and/or the Bank are parties, whether commenced by you, the Bank or any other person or entity, and provided the Bank is not held at fault under a final determination in such proceeding, the Bank shall be entitled to recover from you its attorneys fees, costs and expenses (including those allocated to the Bank's internal Legal Department) and expert's and consultant's fees (whether or not they testify) and expenses **but you waive, and shall not have, any such reciprocal right against Bank.** Any action commenced by Bank against you shall be timely if commenced within the applicable period of limitations provided by law. In any lawsuit or other legal proceeding in which you and the Bank are in different positions, you agree that you will not claim that the Bank waited too long to make its claim

or state its position and you agree not to make any claim against the Bank in the same legal proceeding if your claim does not involve the original claim in that legal proceeding.

**(ii) LIMITATION ON YOUR TIME TO SUE:**
You must commence any legal action or proceeding against Bank with respect to any Account or this Agreement within the one year of the date of the occurrence of the event that is the subject matter of the action or proceeding but in no event beyond the time period set forth in any law or agreement applicable to such event.

**(iii) JURY TRIAL WAIVER; OTHER WAIVERS:**
YOU AGREE THAT IN ANY LITIGATION RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT, IN WHICH BANK AND YOU SHALL BE ADVERSE PARTIES, THE ACTION AS BETWEEN YOU AND THE BANK SHALL BE TRIED BY THE COURT WITHOUT A JURY. **YOU SPECIFICALLY AGREE AND CONSENT THAT TRIAL BY JURY IS WAIVED AS TO EACH AND EVERY ISSUE WHICH MAY OR MIGHT BE TRIABLE AS OF RIGHT TO A JURY ACCORDING TO THE CONSTITUTION OR THE LAWS OF THE STATE OF NEW YORK.** In addition, you agree to waive the right to interpose against Bank any defense based upon lack of personal jurisdiction, inconvenience of forum, the statute of limitations, laches, waiver, estoppel, and any setoff, cross-claim or counterclaim, however denominated, whether related or unrelated to this Agreement or to any related agreement.

**(iv) BURDEN OF PROOF AND DUTY TO MITIGATE:**
In any litigation in which you and Bank are adverse parties, and you seek a recovery from Bank, you shall have and agree to bear the burden of proving your claim to relief and alleged actual and direct damages by clear and convincing proof and not merely a preponderance of proof. You agree to make all reasonable efforts, and will cooperate in good faith with Bank, to avoid or mitigate your alleged damages or loss.

**(v) ATTORNEY'S FEES, LOSSES & EXPENSES:**
You agree to pay all losses, costs, disbursements and expenses (including, without limitation, fees and expenses of attorneys, including those fees, costs and expenses allocated to the Bank's internal Legal Department, consultants and expert witnesses) incurred by the Bank relating to your Account as a result of (i) your failure to comply with this Agreement, (ii) a dispute among the owners, beneficiaries, heirs or others claiming an interest to all or part of this Account, (iii) any third party claim, notice or legal action whether or not such claim is legally enforceable, (iv) any governmental or administrative investigation, (v) any action taken by the Bank to resolve or comply with such dispute, claim or investigation or to protect the Bank's interest or (vi) any litigation, action, proceeding to enforce a judgment, restraining order or other legal process or other legal proceeding relating to an Account or to an agreement in which you and/or the Bank are parties, whether brought by you, the Bank or any other person or entity, unless the final determination of such proceeding holds the Bank at fault.

**B. FOR ACCOUNTS OPENED IN CALIFORNIA:**
If you aren't able to resolve the dispute and you opened your account in a California branch, you agree that either the Bank or you can initiate arbitration in accordance with the provisions in this Section 33.B. These provisions constitute the Arbitration Agreement between you and the Bank. **ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. YOU AND THE BANK AGREE TO WAIVE THE RIGHT TO A JURY TRIAL OR A TRIAL BEFORE A JUDGE IN COURT.**

**(i) AGREEMENT TO ARBITRATE:**
Either you or the Bank may choose, with the other's consent, to arbitrate all Disputes. A "Dispute" is any unresolved disagreement between you and the Bank, including any disagreements about the meaning, scope, or enforceability of this Arbitration Agreement. The only exception to this Arbitration Agreement are Disputes filed by the Bank or you in small claims court, so long as the Dispute remains in that court and is pursued on an individual basis.

**(ii) NO CLASS ACTION OR JOINDER OF PARTIES:**
**You and the Bank agree that no class or any other type of representative action can be pursued in arbitration or in court if either you or the Bank chooses to arbitrate a Dispute. Unless both you and the Bank agree, Disputes by or against others may not be joined, consolidated, or otherwise brought together in the same arbitration.** If any part of this section is found to be unenforceable, the entire Arbitration Agreement will be unenforceable.

**(iii) ARBITRATION PROCEDURE:**
You and the Bank agree to the following procedures for arbitration of any Disputes:
- The party filing arbitration can choose one of the following arbitration administrators and follow its rules and procedures for the arbitration: the American Arbitration Administration ("AAA") pursuant to the AAA Commercial Arbitration Rules or JAMS pursuant to the Comprehensive Arbitration Rules & Procedures. You can obtain a copy of the AAA Commercial Arbitration Rules at www.adr.org or 1-800-778-7879. You can obtain a copy of the JAMS Comprehensive Arbitration Rules at www.jamsadr.com or 1-800-352-5267.
- The arbitration will be decided by a single, neutral arbitrator who is a retired judge selected in accordance with the rules of the arbitration administrator.
- The arbitrator will take reasonable steps to protect your and the Bank's confidential information.
- The arbitrator will decide the dispute in accordance with the terms of our agreements and applicable substantive law, including evidentiary privileges and statutes of limitations. The arbitrator can award damages or other relief available under applicable law.

- At your or the Bank's request, the arbitrator will provide a statement of reasons for his or her decision in writing.
- If there are any differences between the arbitration administrators' rules and this Arbitration Agreement, this Arbitration Agreement governs.
- If the arbitrator awards $0 for the party that filed the arbitration, awards more than $100,000 against the party that did not file the arbitration, or awards injunctive relief, a party may request a new arbitration before a three-arbitrator panel in accordance with the arbitration administrator's rules. This request must be filed with the arbitration administrator in writing within 15 days of notice of the award. In this case, each reference to the arbitrator in this Agreement will mean the three-arbitrator panel.
- The arbitrator's award will be final and binding, subject to judicial review only to the extent allowed under the Federal Arbitration Act.  A party may seek to have a final and binding award entered as a judgment in any court having jurisdiction.

### (iv) ARBITRATION FEES AND COSTS:

The applicable arbitration rules and procedures determine who pays the arbitration fees, unless limited by applicable law.  Each party will pay its own costs and attorney, expert, and witness fees.  The arbitrator may require either party to pay the costs and fees of the other party, including the fees of the arbitrator, to the extent permitted under applicable law.

### (v) RIGHT TO RESORT TO PROVISIONAL REMEDIES PRESERVED:

You or the Bank can exercise rights or remedies to exercise self-help remedies, such as the right of setoff or the right to restrain funds in any account, or to obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court having jurisdiction.

## 34. GOVERNING LAW:

You agree that the Account and this Agreement will be governed by the laws and regulations of the State of New York, including, but not limited to, the Uniform Commercial Code, except to the extent that federal laws and regulations apply. In addition, the rules and regulations of any clearing house of which the Bank is a member shall apply. Other than as specified in paragraph 33(B)(ii), if any part of this Agreement shall not be valid under any law or regulation, it shall not affect any other part.

## 35. RECORDING:

The Bank, at its sole discretion, may but shall not be required to make recordings and retain such recordings of any telephone conversations, not limited to cell phone, landline, and cordless telephone conversations, between you and the Bank. You authorize the Bank to record and monitor such telephone conversations and agree that any such recordings that have been made and retained by the Bank shall be admissible in a court of law. The Bank may use such recording for reasonable business purposes, including quality control and authentication purposes. The Bank may not remind you that the Bank may record or monitor telephone conversations at the outset of a call unless required by law to do so. You authorize and consent in advance to these telephone conversation recordings.

## 36. LOANS:

An Account shall not be used to secure any loans made to you unless the Bank, in its sole discretion, gives its written consent.

## 37. TRANSFERABILITY:

The Account is not transferable or assignable, unless approved by the Bank, in its sole discretion and entered on the Bank's records.

## 38. EXCHANGE OF INFORMATION:

To the extent permitted by law and provided in the Bank's privacy notice, a copy of which has been given to you and is available at all Financial Centers, you authorize affiliates of the Bank to exchange information about you and all of your Accounts and all of any other accounts you have. You also authorize the Bank to disclose documentation and/or information about you or your Accounts in connection with Account transactions and in any other circumstances the Bank or its affiliates deem necessary or appropriate.

## 39. TERMINATION OF ACCOUNT:

The Bank may at any time terminate an Account by mailing you a notice of termination to your address of record. Any checks drawn on such Account that has been presented to the Bank subsequent to such termination will be returned unpaid. If at any time the Account has a zero balance, then the Bank may automatically terminate the Account. At the time of the termination of an Account, or within a reasonable time thereafter, the Bank may, at your risk, mail to you at your address of record a check for the balance, if any, of such terminated Account.

## 40. NOTICES:

You agree that any notice you send to the Bank will only be effective if you send it to the Financial Center or department of the Bank conducting the transaction or transactions under this Agreement. Any notice to you shall be sufficient if the Bank sends it to you at your last known address appearing on the Bank's records.

## 41. AMENDMENTS:

The Bank reserves the right to amend this agreement at any time. Copies of the changes will be available to you at the Bank's financial centers.

## 42. MERGER; NON-RELIANCE:

This Agreement sets forth the entire agreement and understanding of you and the Bank. All prior or contemporaneous

promises, agreements and understandings, whether oral or written, are deemed to be merged into and included in this Agreement, and neither party is relying on any promise, agreement or understanding not set forth in this Agreement. You warrant that you have read or have had sufficient opportunity to have read this Agreement and to have consulted with counsel and/or experts of your own selection prior to opening an Account pursuant this Agreement. You specifically acknowledge that you are not relying on any advice, suggestion or guidance which Bank may have provided to you which, in any event, shall not be deemed legal advice or any advice, and shall not oblige the Bank or put the Bank at any risk whatsoever therefor. Bank also shall have no liability or responsibility for refusing to make any suggestion or provide any guidance which you request but which Bank declines to provide.

## 43. CONSTRUCTION - PARAGRAPH HEADINGS:
Paragraph headings are descriptive only and are not intended to, nor shall they have, substantive affect. The wording of each paragraph shall be binding and conclusive of the intent and agreement of the parties.

## 44. GRAMMAR:
Use of the singular includes the plural and use of the plural includes the singular.

## 45. CONTINUANCE OF OBLIGATIONS:
Your obligations under this Agreement shall continue after the termination of this Agreement and/or your Accounts at the Bank and shall bind you and your administrators, successors, legal representatives and assigns. All rights, benefits, and privileges which Bank has or may have or come to have under this Agreement shall be and are extended to, conferred upon, and may be enforced by, the Bank's successors and assigns.

## 46. NO THIRD-PARTY BENEFITS:
This Agreement confers no right or benefit upon any person other than you and Bank and your and the Bank's legal successors and permitted assigns.

## 47. FORCE MAJEURE:
Notwithstanding any other provision of this Agreement, the Bank shall not be liable for any failure to perform, inability to perform or delay in performing any obligation under this Agreement if such failure, inability or delay is due to or caused by legal or governmental constraint, interruption of transmission or communication facilities, unavailability of communication channels that may affect your access to the Internet or any equipment or device you use to access the Internet, equipment failure, act of God, war, civil disorder, terrorist acts, strikes, other industrial disturbances, fire, explosions, unusually severe weather conditions, emergency conditions or other events or circumstances that are beyond the Bank's reasonable control.

## 48. REFERRAL TO THIRD PARTY SERVICE PROVIDERS:
The Bank may refer you to a third party service provider(s) to comply with your request for a specific product and/or service. The Bank may disclose to the third party service provider(s) information as is necessary to offer a specific product and/or a service as permissible by law. None of your information will be provided to the third party service provider(s) unless the third party service provider agrees to keep such information confidential and solely to use such information in order to provide a specific product and/or service. The Bank shall not be liable for any errors or negligence of any third party service provider(s) or for the party service providers' failure to provide the product or service.

# II. ADDITIONAL PROVISIONS FOR SIGNATURE FLAT FEE BUSINESS CHECKING AND MONOGRAM BUSINESS CHECKING

## 1. OVERDRAFT BILLING:
When a Check drawn on or Funds Transfer initiated from your Signature Flat Fee Business Checking account or your Monogram Business Checking account is presented to Bank for payment and there is insufficient or unavailable funds in such Bank Deposit Account, you authorize the Bank to advance funds to you in the amount by which the Check or Payment Order exceeds the Available Balance in such Bank Deposit Account. Such advance is referred to as an Overdraft. The Bank does not encourage this practice, is under no obligation to pay these Checks or Payment Orders, and, in certain instances, may be prohibited by applicable governmental rules and regulations from paying Overdrafts. Therefore, the Bank may, in any or all instances, return such Check unpaid or reject the Payment Order. In those instances where Bank, in its sole discretion, agrees to advance funds to pay such Check or Payment Order, you agree that Bank may charge and you agree to pay interest on the amount of the Overdraft until sufficient funds in the Bank Deposit Account become available to cover the payment of the Check or Payment Order. You also agree that the Bank may charge and you agree to pay certain service charges and/or fees ("Overdraft Fees") incurred in accordance with the Bank's Business Accounts Fee Schedule. The Overdraft and Overdraft Fees are referred to collectively as the "Overdraft Sum". Interest will be charged on the amount of the Overdraft Sum (meaning interest will be charged on both the Overdraft and Overdraft Fees) at a fluctuating rate per annum equal to a certain percentage per annum above the Reference Rate (as defined below), which rate will change, without notice to you, from time to time with each change in the Reference Rate. "Reference Rate" means the rate established by the Bank, from time to time, at its principal office as its reference-lending rate for U.S. commercial loans. The Bank may make loans above, at or below the Reference Rate. You may call your Account Officer for the current interest rate that applies to the Overdraft Sum. The rate will be stated on your Bank Deposit Account Statement. The Bank may establish a new Reference Rate and/or increase the percentage added to the Reference Rate, from time to time, without notice to you. The interest rate charged on the Overdraft Sum shall never

exceed the maximum rate permitted by law. The Bank will also continue to charge interest at the Reference Rate after the Bank demands payment of the Overdraft Sum, before and after any default. All deposits and credits, when available, will be used to first pay accrued interest, then Overdraft Fees and finally Overdrafts before being added to your Bank Deposit Account as a positive balance. The Bank reserves the right to decide whether or not to pay a Check or Payment Order when the amount of the Check or Payment Order exceeds the Available Balance. If the Bank pays one or several Checks or Payment Orders, the Bank is not establishing a course of conduct and it shall not mean that the Bank will pay other similar Checks or Payment Orders in the future. The Bank reserves the right, at any time, to modify these terms, terminate these policies and/or demand payment of all Overdrafts and other amounts due to Bank from you.

## III. ADDITIONAL PROVISIONS FOR SIGNATURE NOW FOR BUSINESS and SIGNATURE NOW FOR MUNICIPALITIES

### 1. AVAILABILITY:
The Signature NOW for Business account is available only to Sole Proprietors, Not-for-Profit Organization and Estates. The Signature NOW for Municipalities is available only to Municipalities.

### 2. VARIABLE INTEREST:
The Signature NOW for Business and Signature NOW for Municipalities accounts will earn interest on the Current Balance in the Account less the amount of any Checks deposited into the Account that day at an interest rate which is set by the Bank, in its sole discretion, and which rate is subject to change daily. Interest will begin to accrue for non-cash deposits, based on the availability as outlined in Funds Availability Disclosure in this Business Bank Account Agreements and Disclosures booklet. The Bank will not use any index, schedule or formula to set, fix or calculate this interest rate. You will be advised of the interest rate and annual percentage yield at account opening and the current interest rate and annual percentage yield will be available at any Financial Center of the Bank. The Bank uses the daily balance method to calculate the interest. This method applies a daily periodic rate to the Current Balance in the Account after deducting the amount of any Checks deposited into the Account that day. Interest will accrue and be compounded daily and will be credited to the Account at the end of the Statement Cycle Period. Interest is available for withdrawal on the first Business Day of the next Statement Cycle Period. If the Account is closed prior to the end of a Statement Cycle Period, the accrued interest will be credited to the Account prior to closing.

### 3. WITHDRAWALS:
As required by federal law, the Bank reserves the right to require you to give it notice in writing of an intended withdrawal at least seven days before you withdraw money from a Signature NOW for Business account or Signature NOW for Municipalities account.

## IV. ADDITIONAL PROVISIONS FOR MONOGRAM INSURED MONEY MARKET FOR BUSINESS

### 1. VARIABLE INTEREST:
The Monogram Insured Money Market for Business will earn interest each day on the Current Balance in the Account less the amount of any Checks deposited into the Account that day, which interest shall be at interest rates which are set by the Bank, in its sole discretion, and which rates are subject to change daily. Interest will begin to accrue for non-cash deposits, based on the availability as outlined in Funds Availability Disclosure in this Business Bank Account Agreements and Disclosures booklet. The Bank will not use any index, schedule or formula to set, fix or calculate these rates. You will be advised of the interest rates and annual percentage yields for the Monogram Insured Money Market for Business at the time you open the Account. The current interest rates and annual percentage yields for the Monogram Insured Money Market for Business will be available at any Financial Center of the Bank. The Bank uses the daily balance method to calculate the interest on the Account. This method applies a daily periodic rate each day to the Current Balance in the Account after deducting the amount of any checks deposited into the Account that day. Interest will accrue daily, be compounded daily and credited to the Account at the end of the Statement Cycle Period. Interest is available for withdrawal on the first Business Day of the next Statement Cycle Period. If the Account is closed prior to the end of the Statement Cycle Period, the amount of the accrued interest will be credited to the Account prior to closing.

### 2. LIMITATIONS ON WITHDRAWALS:
You understand that your Monogram Insured Money Market for Business will be charged for all Checks drawn on that Account on the day those Checks are delivered to the Bank or at such earlier time as the Bank receives notification by electronic means or otherwise that the Checks have been deposited for collection in another financial institution. Federal regulations restrict the number of preauthorized and automatic withdrawals, Checks, Debit Card payments to third parties, and withdrawals by telephone, fax, email, internet banking services and mobile banking services that you can have from the Monogram Insured Money Market for Business during a Statement Cycle Period. During each Statement Cycle Period, you are allowed up to six (6) such withdrawals, payments and transfers from the Account. If during a Statement Cycle Period more than six such withdrawals, payments and transfers from the Account are made or paid, then you have exceeded the limits permitted under federal regulations and the Bank may charge you a fee and may be required to close your Monogram Insured Money Market for Business or convert it to an account type which is not subject to withdrawal limitations. There is no limit on the number of withdrawals that are made payable directly to you provided such withdrawals are made on a Monogram Insured Money Market for Business withdrawal ticket provided by the Bank and are sent by mail, or messenger to, or made in person at, any Financial Center of the Bank. If you have a Debit Card or ATM Card and have designated your Monogram Insured Money Market for Business for

access to such Debit Card or ATM Card, then you can make an unlimited number of withdrawals from this Account at any ATM (but not at a POS) which accepts such Debit Card or ATM Card and make an unlimited number of transfers at an ATM from this Monogram Insured Money Market for Business to another Account of yours at the Bank which has been linked to this Account provided such transfer is permitted at that ATM. As required by federal law, the Bank reserves the right to require you to give it notice in writing of an intended withdrawal from this Account at least seven days before you withdraw money from this Account.

# V. ADDITIONAL PROVISIONS FOR ALL ESCROW ACCOUNTS

**1. INTEREST:**
The IOLA Account, IOLTA Account, IOTA Account, Standalone Escrow Account and Sub-accounts will earn interest on the Current Balance in the account less the amount of any Checks deposited into the account that day, at interest rates which are set by the Bank, in its sole discretion, and which rates are subject to change daily. Interest will begin to accrue for non-cash deposits, based on the availability as outlined in Funds Availability Disclosure in this Business Bank Account Agreements and Disclosures booklet. The Bank will not use any index, schedule or formula to set, fix or calculate these rates. The Escrow Agent will be advised of the interest rates and annual percentage yields at the time the Account is opened. The current interest rates and annual percentage yields for the IOLA Account, IOLTA Account, IOTA Account, Standalone Escrow Account and Sub-account will be available at the Bank's Financial Center where the Account is maintained. The Bank uses the daily balance method to calculate the interest on the Sub-account. This method applies a daily periodic rate to the Current Balance in the Account after deducting the amount of any checks deposited into the Account that day. Interest will be compounded daily and credited to the Sub-account at the end of each Statement Cycle Period. No interest will be paid on the Master Account. The Escrow Agent may request that the Sub-account or Standalone Escrow Account not earn interest. The Bank will honor such requests.

**2. TAXPAYER IDENTIFICATION NUMBERS AND REPORTING OF INTEREST EARNED:**
The Escrow Agent will provide the Bank with the Taxpayer Identification Number (TIN) for the Escrow Agent at the time the Escrow Account is established and for each Escrowee at the time a Sub-account is opened. These TINs will be provided by furnishing the Bank with an IRS form W-9 signed by the Escrow Agent, with respect to the Escrow Agent's TIN, and by each Escrowee, with respect to that Escrowee's TIN or the appropriate form W-8 if the Escrowee is not a U.S. person as defined by IRS regulations. Interest earned in each Sub-account will be reported to the IRS using the name and the above TIN number (if the Escrowee is a U.S. Person) in accordance with IRS regulations, and a copy of such report will be sent to the Escrowee or Escrow Agent as requested by the Escrow Agent. If the Escrow Agent is a Qualified Intermediary, then as requested by the Qualified Intermediary each Sub-account will earn interest at both the Escrowee interest rate and the Qualified Intermediary interest rate. The Qualified Intermediary agrees that Interest earned at the Escrowee interest rate shall be reported to the IRS by the Bank as being earned by the Escrowee and that interest earned at the Qualified Intermediary interest rate shall be reported to the IRS as being earned by the Qualified Intermediary. The Escrow Agent assumes any and all liability and obligations imposed, now or hereafter, by the Internal Revenue Code, other applicable tax law, the IRS and/or other applicable taxing authorities with respect to any interest earned on each Subaccount and how that interest is reported to the IRS and indemnifies and holds the Bank harmless from any liability for, or obligation as a result of, any taxes, assessments, additions for late payment, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank in connection with the reporting to the IRS of interest earned on each Subaccount, the amount of such interest being reported or the payee of such interest, including, but not limited to, costs and expenses (such as reasonable legal fees and expenses), interest and penalties.

**3. DEPOSITS:**
The Escrow Agent may make a deposit to an Escrow Account each day that the Bank is open for business except for Sub-accounts that are part of a Monogram Escrow Account. For Monogram Escrow Accounts, all deposits must be made to the Master Account and then allocated by the Escrow Agent using Monogram Escrow Express to a Sub-account that has been established for that Escrowee. The Escrow Agent agrees only to deposit funds that have been given to the Escrow Agent by or on behalf of the Escrowee to hold in escrow for the benefit of that Escrowee, and to use Escrowee funds only as authorized by the Escrowee. If the Escrow Agent is a Qualified Intermediary, the Escrow Agent represents and warrants to the Bank that the deposited funds have been received by the Qualified Intermediary in accordance with the Exchange Agreement. The Bank is authorized to accept for deposit to an Escrow Account all remittances of funds or other property from third parties which are payable to an Escrowee or endorsed by that Escrowee. The Escrow Agent agrees that the Bank shall not be responsible for any delay in giving a Sub-account credit for any deposit the Escrow Agent makes, for the acts of any agent of the Escrow Agent or person or persons who the Escrow Agent has authorized to act on the Escrow Agent's behalf with respect to the Master Sub-account and the Sub-accounts at the Bank, or for any other act that the Bank thinks is appropriate provided the Bank has acted in good faith.

**4. WITHDRAWALS:**
Withdrawals from an Escrow Account may only be made if sufficient funds are available in the Escrow Account. For the Monogram Escrow Account withdrawals from the Sub-account may only be made by an account closeout performed by a System User or by a transfer to the Master Account by a Partial Transfer User, and such funds will become available for use in the Master Account the following Business Day. Withdrawals from IOLA Accounts, IOLTA Accounts, IOTA Account, Master Accounts and Standalone Escrow Accounts that are Monogram Business Checking accounts are not limited to transfers and may be made in any other permissible fashion. All Sub-accounts and Standalone Escrow Accounts that are Monogram Business or Personal Insured Money Markets will be limited to a maximum of six (6)

withdrawals per statement cycle Period for each Sub-account. As required by federal law, the Bank reserves the right to require the Escrow Agent to give it notice in writing of an intended withdrawal from an IOLA Account, IOLTA Account, IOTA Account, or a Standalone Escrow Account that is a Monogram Business or Personal Insured Money Market, or a Sub-account that earns interest of at least seven (7) days before the Escrow Agent withdraws money from that account.

**5. ATTORNEY ESCROW ACCOUNT, IOLA ACCOUNT, AND IOLTA ACCOUNT REPORTING AND FEES:**

If the Escrow Agent is an attorney or law firm with an Escrow Account at the Bank and any check drawn on the Escrow Account is not paid by the Bank because of insufficient available funds or because of any other reason required by applicable rules, then the Bank shall, without notice to the Escrow Agent, report such dishonor to the organization or committee having the responsibility for disciplining lawyers in accordance with their rules and provide the organization and/or committee additional information concerning the Escrow Account. The Escrow Agent consents to the above, releases the Bank from any liability and agrees to indemnify the Bank against any and all claims that a client of the Escrow Agent or anyone else may have as a result of such notification and the providing of such information to the organization and/or committee. The monthly maintenance fee, where applicable is deducted only from interest on the account and not from the principal of an IOLA Account/IOLTA Account.

**6. ESCROW AGENT'S WARRANTIES AND ASSUMPTION OF LIABILITY:**

The Escrow Agent represents and warrants to the Bank that it has the authority to deposit and withdraw funds on behalf of each Escrowee to and from the Escrow Account and assumes all responsibility and liability for ensuring that each Escrowee's funds in the Escrow Account are only transferred to an Account or Sub-account in the name of that Escrowee or disbursed for the benefit of or on behalf of that Escrowee.

**7. INDEMNIFICATION OF BANK:**

In addition to any indemnification of the Bank contained elsewhere in this Agreement, the Escrow Agent agrees to indemnify, defend and hold harmless the Bank and its agents from, and against, any and all claims, actions, lawsuits and other proceedings, and liabilities, losses, costs, damages, penalties and expenses of any kind and nature which are incurred or sustained by the Bank as a result of (i) the Escrow Agent depositing funds into the Escrow Account (ii) allocating Escrowee funds between the Sub-accounts and Master Sub-account or withdrawing those Escrowee funds from the Master Account, (iii) the Bank paying and reporting interest earned on the Sub-account or Standalone Escrow Account in the manner requested by the Escrow Agent, and reporting that interest to the IRS as interest earned in the calendar year in which the interest was credited to that Account, (iv) any Escrowee's property exchange failing to qualify for favorable tax treatment under U.S. federal or state tax law as a Deferred Exchange, (v) the Escrow Agent failing to obtain a W-8, W-9 or substitute W-9 signed by the Escrowee, an incorrect or improperly signed W-8, W-9 or substitute W-9 or the Bank paying and reporting interest earned on the Standalone Escrow Account or Sub-accounts or (vi) the Escrow Agent or any System User failing to comply with this Agreement.

## VI. ADDITIONAL PROVISIONS FOR MONOGRAM ESCROW ACCOUNTS

**1. DETAILS:**

The Monogram Escrow Account allows the Escrow Agent to manage the Master Sub-account and Sub-accounts through Monogram Escrow Express. Monogram Escrow Express enables the Escrow Agent to create and maintain Sub-accounts as well as move funds between the Master Sub-account and the Sub-accounts. Monogram Escrow Express is accessed by the System Users via Signature Internet Banking by using a Web Browser on Escrow Agent's personal computer, or the computer of whomever the Escrow Agent authorized to have access to Monogram Escrow Express. The Web Browser must meet the specifications outlined in the Signature Bank Business Account Internet Banking Terms and Conditions. After accessing Monogram Escrow Express, the System User will enter the Escrowee's information to set up a Sub-account. Once a Sub-account has been established, the Sub-account can be funded by allocating funds from the Master Sub-account to the Sub-account via Monogram Escrow Express. The balance of the Master Sub-account and the balance of each Sub-account will only be reflected on Monogram Escrow Express, and these balances will be aggregated together and reported as the balance of the Master Account. The Escrow Agent must provide the Bank all forms required for establishing a Sub-account, properly completed and signed. The Bank will not permit the allocation of funds to the Sub-account if appropriate documentation is not received at the Bank. Additionally, the Bank may close the Sub-account without notice if documentation is not provided. When disbursements are required, the Escrow Agent agrees to move the appropriate funds from the Sub- account to the Master Account, by either partial transfer of the funds in that Sub-account, if permitted, or by the closure of the Sub-account, so that those funds can be disbursed by the Escrow Agent on behalf of the Escrowee. In either case, the funds will become available for use in the Master Account the following Business Day.

**2. E-STATEMENT:**

Escrow Agent shall receive periodic account statements in connection with the Monogram Escrow Account via electronic means. Escrow Agent understands and agrees that if Escrow Agent enters into a Master Product Application, each System User is authorized by Escrow Agent to access Monogram Escrow Express through Signature Internet Banking and Escrow Agent consents to receiving Statements electronically by accessing Monogram Escrow Express through Signature Internet Banking and Escrow Agent authorizes the Bank to suppress hard copy Statements via postal mail service. Escrow Agent understands and agrees that the Bank will post the Statement to Monogram Escrow Express on the first day of the following month. In the event of a delay, notification to the Escrow Agent will be made either via posted notice to Monogram Escrow Express or via an e-mail to the System Users. Further, Escrow Agent has the option to view, print and download monthly statements on Monogram Escrow Express at any time for the past 24

morning. Escrow Agent understands and agrees that Escrow Agent will not receive hard copies of the Statements via postal mail service if Escrow Agent utilizes Monogram Escrow Express. However, should there be a requirement for hard copies of the Statements via postal mail service, Escrow Agent may contact the Bank. Escrow Agent shall review the Statement, regardless of whether received by hard copy or electronic means, in a timely manner and shall notify the Bank promptly in writing of any errors or irregularities, and in no event more than fourteen (14) calendar days after the time that the Statement was first made available to Escrow Agent.

## 3. SYSTEM USERS:

The Escrow Agent shall designate the System Users in the Bank's form called the Master Product Application. The System Users can be the Escrow Agent's authorized signers or those persons who have been designated by the Escrow Agent. Through the System Users the Escrow Agent agrees to properly maintain the Master Sub-account and Sub-accounts on Monogram Escrow Express in accordance with the Agreement. The Escrow Agent further agrees that the Bank (and any interested third party) may rely upon the authority given to each System User until such time that the Escrow Agent has removed the System User, the Escrow Agent has provided the Bank written notice of such removal on the Bank's form for such purpose and the Bank has had a reasonable opportunity to act upon such notice. The Escrow Agent agrees that it is the responsibility of the Escrow Agent to immediately notify the Bank of any changes in the authority of a System User. The Escrow Agent also agrees that it is solely responsible for the transactions made and instructions given by each System User and that the Bank may rely and act on those transactions and instructions without the Bank being liable to the Escrow Agent or any Escrowee. The Escrow Agent further agrees that each System User will access and use Monogram Escrow Express only in accordance with this Agreement and the Signature Bank Business Account Internet Banking Terms & Conditions and the authority given to them by the Escrow Agent. Each time a System User accesses, views, or conducts an allocation or transfer on a Master Sub-account or Sub-account, the Escrow Agent represents and warrants to the Bank that such action is authorized by the Escrow Agent. If the Bank receives conflicting instructions or believes that the security of Monogram Escrow Express or that of the Bank may be at risk as a result of an action or failure to act by a System User, the Bank may at its sole discretion terminate that System User authority, or not permit the appointment of a System User, without prior notice to that System User or the Escrow Agent. If the Bank determines that the Escrow Agent or a System User has violated or failed to comply with any provision of this Agreement, the Escrow Agent's access to Monogram Escrow Express will be terminated.

## 4. SECURITY PROCEDURES:

Monogram Escrow Express cannot be accessed by the System User until the System User receives user credentials for Signature Internet Banking from the Bank. Signature Internet Banking will allow the System User to access Monogram Escrow Express via Single Sign-on with a Company ID, User ID or Username and Password. The System User will be required to change the Password upon signing in for the first time to Signature Internet Banking and periodically thereafter and may change the Password at any other time. The Escrow Agent agrees to instruct the System User to memorize its Company ID, User ID or Username and Password and not keep any notation of the Company ID, User ID or Username and Password on or with the Escrow Agent's computers or where it can be accessed by anyone not authorized to use or know the System User's Company ID, User ID or Username and Password. The System User's Company ID, User ID or Username and Password assures that only the System User or someone to whom the System User has given the Company ID, User ID or Username and Password can use Monogram Escrow Express. The Escrow Agent agrees that the System User will not give the Company ID, User ID or Username and Password to anyone not authorized by the Escrow Agent to Monogram Escrow Express and Escrow Agent agrees that it will call the Bank immediately if any System User's Company ID, User ID or Username and Password has been lost or stolen or needs to be changed because someone previously given a Company ID, User ID or Username and Password no longer is entitled to access Monogram Escrow Express or for any other reason the System User's Company ID, User ID or Username or Password needs to be changed or deactivated. Escrow Agent agrees that use by the System User of the Company ID, User ID or Username and Password is an acceptable security device and shall be deemed to be commercially reasonable in light of Escrow Agent's particular needs and circumstances. Escrow Agent further acknowledges and agrees that the Company ID, User ID or Username and Password is a security device to detect an unauthorized use of Monogram Escrow Express and not a security device to detect an error made by a System User when using Monogram Escrow Express. If a transfer or disbursement has been made from a Master Sub-account or any Sub-account, in whatever form, as a result of the use of System User's Company ID, User ID or Username and Password with Monogram Escrow Express through Signature Internet Banking, then that transfer or disbursement shall be deemed by the Bank to have been requested and authorized by the Escrow Agent. The confidentiality of the System User's Company ID, User ID or Username and Password shall be safeguarded by the System User. The Escrow Agent agrees to immediately notify the Bank of any breach of this confidentiality requirement. The Bank may revoke the System User's access to Monogram Escrow Express at any time without prior notice to the Escrow Agent if the Bank deems it necessary to maintain the security of Monogram Escrow Express. The Escrow Agent agrees that any action taken by the Bank beyond the security procedures referred to in this section of the Agreement in an attempt to detect or prevent an unauthorized transfer or disbursement from a Master Sub-account or a Sub-account, shall not be deemed to be a part of the security procedures regardless of how often such action may be taken by the Bank. The Escrow Agent and System User agrees to be bound by the Signature Bank Business Account Internet Banking Terms and Conditions.

## 5. ESCROW AGENT'S OBLIGATIONS AND LIABILITY:

Escrow Agent agrees that in using Monogram Escrow Express it:

**A.** will comply, and cause all System Users to comply, with this Agreement and the Signature Bank Business Account Internet Banking Terms and Conditions and with all procedures and requirements of Bank and its agent relating to

Monogram Escrow Express,

**B.** will maintain and keep current on those computers that will use Monogram Escrow Express sufficient protection so that such use will not result in the transmission of any virus, worm, Trojan horse or any other harmful computer program or message to the Bank, its agent or their agents;

**C.** will not reverse engineer, decode, decompile, attempt to tamper with or evade or discover the method of operations or defeat any security device designed to protect the integrity of Monogram Escrow Express;

**D.** will be solely and absolutely liable for all transactions, including interest allocations, made through Monogram Escrow Express by use of a System User's User ID or Username and Password;

**E.** assumes all risk associated with the unauthorized use of a System User's User ID or Username and Password;

**F.** will take whatever steps are required by the Bank or its agent to properly implement and test the connectivity of Signature Internet Banking and Monogram Escrow Express on those computers of the Escrow Agent (or of someone that the Escrow Agent permits to access Monogram Escrow Express) that will access Monogram Escrow Express and to ensure that the proxy server or firewall system used by such computers does not prevent access by those computers to Monogram Escrow Express; and

**G.** understands the Bank will not be liable for any loss or damages due or related to the Bank providing the Monogram Escrow Account through the internet.

### 6. UNAUTHORIZED ACCESS TO OR USE OF THE SERVICE:

The Escrow Agent agrees to IMMEDIATELY call the Bank at 1-646-822-1700 Monday through Friday, 8:00 a.m. to 5:00 p.m. Eastern Time and to report that it believes any of the following has occurred or will occur:

**A.** the computer system for Monogram Escrow Express has been accessed or copied without authorization,

**B.** Monogram Escrow Express has been used without authorization, or

**C.** Transactions have been made by an unauthorized person

Escrow Agent acknowledges and agrees that all systems (including any improvements, enhancements, modifications, variations or derivative works thereof) used by the Escrow Agent in providing Monogram Escrow Express is owned or licensed by the Bank or its agents and constitutes the sole and exclusive property of Bank or its agent or such third parties, as applicable. To the extent that such ownership does not vest by operation of law, Escrow Agent hereby irrevocably transfers and assigns to Bank, its agent or such third parties, in perpetuity, all worldwide right, title and interest in any such systems and software, including the patent rights, copyrights, trade secrets and other proprietary rights embodied therein.

## VII. ADDITIONAL PROVISIONS FOR CERTIFICATES OF DEPOSIT ("CD")

### 1. TERM AND INTEREST RATE:

The term, maturity date, interest rate and annual percentage yield of the Certificate of Deposit ("CD") will be provided to you when the CD is opened on the CD receipt. This interest rate will not change until the maturity date of the CD. The Bank uses the daily balance method to calculate the interest on the CD. This method applies a daily periodic rate to the balance in the CD each day. Interest is compounded daily. The annual percentage yield assumes that the interest will remain on deposit until maturity. A withdrawal will reduce earnings. When a CD is being automatically renewed, then the interest rate for the renewed CD will be the interest rate offered by the Bank on the renewal date of the CD for CDs of the same type and maturity period for which the CD is being renewed. You can call the toll free Signature Line at 1-866-sigline.on the renewal date of your CD to obtain the interest rate and annual percentage yield that the Bank will pay for CDs of the type and term of your CD.

### 2. MINIMUM BALANCE:

The minimum balance requirement to open or renew a CD at the Bank is five thousand dollars ($5,000).

### 3. CD DEPOSIT RECEIPT:

When opening or renewing a CD at the Bank you will not receive a certificate or passbook. You will be given a CD receipt that acknowledges the opening or renewal of a CD. The CD receipt will state the title of the CD, opening date, maturity day, CD opening balance, interest rate and annual percentage yield.

### 4. CREDITING OF INTEREST:

The interest will be earned from the day the CD is opened and will be credited at maturity if the term is 7 days and monthly and at maturity for all other terms. Interest will be reported to the IRS for the calendar year in which the interest is credited in accordance with IRS regulations.

### 5. WITHDRAWALS:

If withdrawal of principal is made prior to maturity (known as an "Early Withdrawal"), a penalty as set forth in the section entitled EARLY WITHDRAWAL PENALTY shall be imposed with respect to the amount withdrawn and the Bank may require several days to process the request. If your CD was automatically renewed and has a term other than a 7-day term, then you may withdraw principal without penalty at any time between the maturity date of the CD and ten calendar days after the maturity date. However, no interest will be paid after the maturity date on amounts so withdrawn. If your CD has a 7-day term, then you can only withdraw the principal without penalty on the date the CD matures. In no event will the Bank permit a withdrawal prior to maturity if the funds are not available for withdrawal under the Bank's Funds Availability Disclosure found in this Business Account Agreements and Disclosures Booklet. All early withdrawals are subject to the Bank's policy at the time the withdrawal is made. This policy may change at any time without notice.

## 6. EARLY WITHDRAWAL PENALTY:

If you make a withdrawal of principal prior to the maturity of the CD you will be charged a penalty. This penalty will be calculated by applying interest at the nominal (simple) interest rate being paid on the CD to the principal amount withdrawn for the number of penalty days as shown on the chart below for the CD's maturity period. The penalty days are based on the CD's maturity period, not on the length of time the funds withdrawn have remained on deposit. The amount of the penalty will be deducted from the principal on deposit in the CD if it exceeds the interest credited to and not withdrawn from the CD.

| Maturity Period | Number of Days for Penalty Calculation |
|---|---|
| Seven Days | Seven |
| 1 year (365 days or 366 days in a leap year) or less | Thirty |
| Greater than 1 year and less than 3 years | Ninety |
| 3 years or more and less than 5 years | One Hundred Eighty |
| 5 years or more | Three Hundred Sixty Five |

## 7. WITHDRAWAL OF INTEREST:

Interest earned may not be withdrawn until credited. Interest that has been credited to the CD during the current maturity period is not subject to the Early Withdrawal Penalty if it is withdrawn. However, if the CD is renewed, all interest credited to the CD in the prior maturity period that has not been withdrawn becomes principal and will be subject to the Early Withdrawal Penalty unless withdrawn on the maturity date if the term is 7 days and withdrawn within ten (10) days after the CD is automatically renewed for all other terms.

## 8. GRACE PERIOD:

CDs with a term of 7 days do not have a grace period and CDs with any other term have a grace period of ten calendar days from the date the CD is automatically renewed in which you can close your CD or transfer your CD to another account without being subject to the Bank's Early Withdrawal Penalty. However, no interest will be earned during this grace period if the CD is not renewed.

## 9. ADDITIONAL DEPOSITS:

Additional Deposits may not be made to a CD except on the day the CD is renewed.

## 10. AUTOMATIC RENEWAL:

The CD shall be renewed automatically into a CD of the same type and term as the existing CD unless by the maturity date you provide the Bank with written instructions requesting a different disposition of your CD. If the Bank does not offer a CD of the same type with the same term, then the CD will be automatically renewed as a CD of the same type with a term equal to the nearest longer or nearest shorter term, at the discretion of the Bank. The renewed CD shall earn interest at the rate then in effect at the Bank for CDs of the same type and term. The Bank may, in its sole discretion, refuse to permit the CD to be automatically renewed on the maturity date in which event the Bank will provide you with written notice at least by the date the CD is renewed or thirty (30) days prior to the maturity date, whichever is later.

# VIII. ADDITIONAL PROVISIONS FOR REPRESENTATIVE PAYEE ACCOUNT

## 1. REPRESENTATIVE PAYEE ACCOUNT:

If you open an Account as a "representative payee" for someone who receives Social Security benefit or disability, or a legal custodian, spouse payee, or other custodian for someone who receives Veterans Administration benefit or other types of benefit payments subject to government reclamation, you agree not to permit any deposits in the Account other than the designated payments. The Bank is not required to determine whether you deposit other funds or whether any withdrawals or transfers from the Account are for the support of the person for whose benefit the funds are paid. This person is called the beneficiary. If the beneficiary dies, you must promptly notify the Bank and stop all further deposits to and withdrawals from the Account.

# IX. ADDITIONAL PROVISIONS FOR FOREIGN CHECKS AND FOREIGN CURRENCY

## 1. CURRENCY EXCHANGE RATES:

A. We may receive transactions related to an Account or your relationship with us for which we determine in our sole discretion that it is appropriate to convert the transaction from one currency to another currency. As an example, we may receive a wire denominated in a Foreign Currency and convert the Foreign Currency to U.S. Dollars for credit to your Account. When we decide to convert a transaction, we may determine in our sole discretion the currency Exchange Rate and then assign that currency Exchange Rate to your transaction without notice to you. You agree to pay the Bank for all fees and charges applicable to such conversion. You agree to this procedure and accept our determination of the currency Exchange Rate.

B. If we assign an Exchange Rate to your Foreign Currency transaction, that Exchange Rate will be determined by us in our sole discretion based upon such factors as we determine relevant, including without limitation, market conditions, exchange rates charged by other parties, market risk, credit risk and other market, economic and business factors. Different fees may apply to domestic and foreign items.

C. The Exchange Rate fluctuates, you acknowledge and accept all risks that may result from such fluctuations. You acknowledge that the Exchange Rates for retail and commercial transactions, and for transactions effected after regular business hours and on weekends, are different from the rates for large inter-bank transactions effected during the business day as may be reported in The Wall Street Journal or elsewhere. The rates offered by other dealers, or shown at other sources (including online sources) may be different from the Bank's Exchange Rates. The Exchange Rate you are offered by the Bank may be less competitive then the rate paid by the Bank to acquire the underlying currency.

D. You acknowledge that any and all liability for our Exchange Rates is disclaimed, including without limitation direct, indirect or consequential loss, and any liability if our Exchange Rates are different from rates offered or reported by third parties, or offered by us at a different time, at a different locations, for a different transaction amount, for a different tier of the Client or involving a different payment media (including by not limited to bank-notes, checks, wire transfers, etc.).

## 2. DEPOSIT OF CASH IN FOREIGN CURRENCY:

If you seek to deposit cash that is in a Foreign Currency, then you must deliver the Foreign Currency to the Bank. By delivering Foreign Currency to the Bank, you certify that you are in rightful possession of such currency and have the legal right to sell and transfer such currency. The Bank will arrange to sell the Foreign Currency for U.S. Dollars at the Exchange Rate in effect on the date of such sale, and the Bank will credit the Account in U.S. Dollars with the proceeds of such sale and debit the Account for the Bank's fees and charges.

## 3. PURCHASE OF CASH IN FOREIGN CURRENCY:

If you seek to purchase cash in a Foreign Currency, then the Bank will purchase that Foreign Currency from a third party vendor on behalf of and as agent for you and shall deduct from the Account the amount that will be needed to purchase the Foreign Currency, plus the Bank's fee and charges. The Foreign Currency purchased will be either (i) held by the Bank at the Financial Center either where the Account is maintained or selected by you for pick-up by you, or (ii) delivered to you in accordance with your instructions.

## 4. INCOMING FOREIGN CURRENCY WIRES:

If funds are wired to your Account by others and those funds are in a Foreign Currency, the Bank will convert the Foreign Currency to U.S. Dollars at the current Exchange Rate. If the Bank makes funds available to you in anticipation of the Bank's receipt, in the currency of the Payment Order, of final payment of a Payment Order for which the Client is the beneficiary, then you agree that all such funds made available prior to receipt of final payment (i) constitute loans or advances by the Bank and not acceptance of a Payment Order, and (ii) shall be repayable upon demand to the Bank if the expected funds in the currency of the Payment Order are not actually received or finally settled.

## 5. YOU MAY NOT WRITE FOREIGN CURRENCY CHECKS:

You may not write checks or give other withdrawal orders on your Account in a Foreign Currency. If we receive such a check or order, we may refuse to accept or process it without any liability to you.

## 6. PURCHASE OF FOREIGN DRAFTS:

To request that the Bank order a Foreign Draft, you must complete an application stating the Foreign Currency, the amount, the payee, payee's address and whether to mail the Foreign Draft to the payee or hold the Foreign Draft for pick-up by Client. If the application is approved, the Bank will debit the Account (i) for the amount, in U.S. Dollars based upon the Exchange Rate, of the Foreign Draft issued and (ii) for the amount of the Bank's fee. If there is insufficient available funds in the Account in U.S. Dollars that the Bank estimates will be needed to purchase the Foreign Currency (which may include an amount to cover any increase in the Exchange Rate from the date the amount is deducted until the date the Foreign Currency is purchased, plus the Bank's fee), then the Bank may, in its sole discretion, cancel such order or reduce the amount of the Foreign Draft.

## 7. PROCESSING AND COLLECTING FOREIGN CHECKS:

A. You should be cautious about accepting Foreign Checks because Foreign Checks are not subject to United States laws or regulations. The Bank's Funds Availability Disclosure does not apply to Foreign Checks and the funds represented by such Foreign Checks will not be made available to you until those funds have been collected, which will be much later than a check drawn on a U.S. bank payable in U.S. Dollars. Additionally, a Foreign Check may be returned unpaid much later (sometimes many months later) than checks or other items that are drawn on banks located in the United States. If a Foreign Check is returned to us unpaid or there is some other problem with the Foreign Check, you are responsible for the item and you may incur a loss.

B. The Bank will charge your Account for all fees and charges assessed by the Bank and by the banks and other entities involved in the collection of such Foreign Check.

C. We may refuse to accept a Foreign Check for deposit or collection. If we accept a Foreign Check for deposit or collection, it will be accepted on a collection basis and you will bear all the risks relating to or arising from the collection process and the fluctuation in currency Exchange Rates during such collection process.

D. If we accept a Foreign Check for deposit or collection, we may decide not to credit the value of the Foreign Check to your Account until we receive the proceeds in cleared funds from the paying bank. However, if we do credit your Account, the credit is provisional and we may reverse the credit at any time and you will bear all the risks of such

reversal. If we provisionally credit your Account and a fluctuation in the Exchange Rate at the time of completion of the collection process results the Bank receiving a greater amount than was provisionally credited to you, the Bank has no obligation to credit the Account with the additional amount the bank received.

E. If we accept an item for deposit which we later determine to be a Foreign Check, we may decide that the item needs to be sent for collection. If so, we may reverse any credit given for the item and mail the Foreign Check to you at the address we have for your Account statement. You may ask us to send the item for collection.

F. When we send a Foreign Check for collection, you understand that the Foreign Check is sent solely for you and at your risk and that we are not liable for any event in the collection process which is beyond our control. As examples, we are not liable for a default by any bank or agent involved in the collection process or for the loss of the foreign item in transit. We may send the foreign item through a correspondent bank or directly to the paying bank. We may deduct our fees and the fees and charges assessed by the paying bank and any agents involved in the collection process from any amount collected or from your account.

G. If you request, we will try to determine the status of a collection. You agree to pay all fees and charges related to such a request. We may refuse your request if less than 30 business days have passed since we first processed the collection.

H. If a foreign item is returned to us unpaid for any reason at any time or is initially paid but then subsequently returned unpaid, we may charge your account for the foreign items and mail the foreign item to you at the address we have for your account statement. Even though the item is returned unpaid, we may charge you for our collection fees and for fees and charges assess by the paying bank and any agents involved in the collection process.

I. When we credit your account for a foreign item, we use our applicable currency Exchange Rate on the day we credit the item to determine the amount of the credit. When we reverse a credit for a foreign item, we use our applicable currency Exchange Rate on the day we reverse the credit to determine the amount of the debit. Exchange Rates are volatile and the Exchange Rate on the day that we credit your Account is likely to be different than the Exchange Rate on the day that we debit your Account. You understand and agree that this may result in a currency exchange loss to you.

## 8. FOREIGN EXCHANGE LIMITS:

We reserve the right to limit the number and amount of Foreign Currency transactions or positions that you may enter into or maintain. We reserve the right, in our sole discretion, to refuse to accept any order related to opening or increasing your Foreign Currency exposure with us.

## 9. DELAYS AND FAILURES:

Except as required under applicable law, we shall have no responsibility, and you assume any liability related to, delays in processing or failure to process a Foreign Currency transaction caused by

- screening procedures by us or by third parties, or requests for additional information from any governmental unit or regulatory agency or third party,
- insufficient wire or payment instructions in our or a third parties' sole discretion,
- delays in the transmission of orders due to disruption, failure or malfunction of communications facilities or power or the Bank's or third party services and systems, and

in each case, we shall not be liable for claims, losses, damages, costs or expenses, including attorney's fees, to any person or entity arising from the foregoing, or Force Majeure, other than as a direct result of our gross negligence. You agree to reimburse us for any fees and costs related to such delays or failures, including the cost of unwinding any hedge we may have entered into related to your Foreign Currency transaction that was delayed or failed.

SIGNATURE BANK

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

*Monogram Money Market Funds Program Customer Agreement for Business*

All Monogram Money Market Funds Program customers of the Bank, by signing an application for the Monogram Money Market Funds Program, or by purchasing or redeeming shares in one or more of the money market mutual funds made available through the Monogram Money Market Funds Program, agree to the following:

**1. DEFINITIONS:**

   **A. Agreement:** The Monogram Money Market Funds Program Customer Agreement.

   **B. Application:** The Business Client Profile and Application and related forms on which the Monogram Money Market Funds Program has been selected.

   **C. ATM:** An Automated Teller Machine.

   **D. ATM Card:** The card issued to you by the Bank, which you can use at ATMs located at the Bank's Financial Centers or at other locations that are owned or leased by the Bank and ATMs that are part of the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International networks, that you have designated and the Bank in its sole discretion permits you to use to access your Program Account.

   **E. Average Daily Value of Fund Shares:** The average value of Fund shares held by you during the Statement Period which is determined by multiplying for each day in the Statement Period the N.A.V. for that day by the number of Fund shares owned by you that day, adding those amounts together and dividing the sum by the number of days in the Statement Period.

   **F. Bank:** Signature Bank.

   **G. Bank Holiday**: January 1, the third Monday in January, the third Monday in February, the last Monday in May, July 4, the first Monday in September, the second Monday in October, November 11, the fourth Thursday in November, or December 25. If January 1, July 4, November 11, or December 25 fall on a Sunday, the next Monday is not a Business Day.

   **H. Business Day:** Any day other than a Saturday, Sunday or Bank Holiday.

   **I. Check:** The checks given to you by the Bank that you can use to withdraw from your Program Account.

   **J. Debit Card:** The card issued to you by the Bank, which you can use at ATMs located at the Bank's Financial Centers or at other locations that are owned or leased by the Bank and ATMs that are part of the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International networks, that you have designated and the Bank in its sole discretion permits you to use to access your Program Account.

   **K. Distributor:** Fidelity Distributors Corporation with respect to the Fidelity Funds and Goldman Sachs & Co. with respect to the Goldman Sachs Funds.

   **L. Dividends:** The total dividends and distributions paid in respect of Fund shares held by the Bank as your agent in your Program Account.

   **M. Escrow Account:** An escrow account established by the Bank to hold your funds pending the purchase of Fund shares for you as your agent.

   **N. Fidelity Funds:** Those funds stated in the Monogram Money Funds Program Details on the Business Accounts Fee Schedule for which the Distributor is Fidelity Distributors Corporation.

   **O. Financial Center:** An office of the Bank at which you can open a Program Account and conduct Program Account transactions and other Bank business.

   **P. Fund:** One or more of the money market mutual funds listed in the Monogram Money Market Funds Program Details on the Business Accounts Fee Schedule, which you have designated on the Application.

   **Q. Goldman Sachs Funds:** Those funds stated in the Monogram Money Market Funds Program Details on the Business Accounts Fee Schedule for which the Distributor is Goldman Sachs & Co.

   **R. Net Asset Value per Share or N.A.V.:** The amount computed by dividing the value of the Fund's net assets (i.e. the value of the Fund's assets less the Fund's liabilities) by the total number of shares outstanding.

   **S. Program Account:** The special deposit or safekeeping account that you have established at the Bank to hold the Fund shares that you purchase in the Monogram Money Market Funds Program.

   **T. Statement Period:** The monthly period ending on the last calendar day of each month.

   **U. Transfer Agent:** Fidelity Investments Institutional Operations Company with respect to the Fidelity Funds and Goldman Sachs & Co. with respect to the Goldman Sachs Funds.

   **V. You and Your:** Each individual or entity such as a sole proprietorship, partnership, corporation, or association named on the Application and each person duly authorized to act for such individual or entity.

**2. ACKNOWLEDGMENTS:**

   **You understand that the Fund shares in the Program Account:**

   • **Are not FDIC insured or guaranteed.**
   • **Are not deposits or other obligations of any bank or guaranteed by any bank.**
   • **Are subject to investment risks, including possible loss of principal amount invested.**

   **You have received and examined carefully the prospectus of the Fund(s). You understand that the Distributor of Fund shares provides the prospectus, and that the Bank has forwarded the prospectus to you as a service. You understand that the Bank is not affiliated with the Distributor, Manager, Investment Adviser or the Transfer Agent of the Funds. You understand that Fidelity Distributors Corporation is the Distributor for**

the Fidelity Funds, Fidelity Management & Research Company (FMR) is the Manager of the Fidelity Funds,
Fidelity Investments Institutional Operations Company is the Transfer Agent for the Fidelity Funds, Fidelity
Investments Money Management, Inc. is the sub-adviser for the Fidelity Funds. You understand that Goldman
Sachs & Co. is the Distributor and Transfer Agent for the Goldman Sachs Funds, and Goldman Sachs Asset
Management, a unit of the Investment Management Division of Goldman Sachs & Co., is the Investment
Adviser for the Goldman Sachs Funds.

Funds shares are not guaranteed or insured by the U.S. Government, Federal Deposit Insurance Corporation,
or any other agency. Yield fluctuates and is not guaranteed. There is no assurance that the Funds will maintain
a steady $1.00 per share price in the future. Not all of the Funds available in the Program offer tax-exempt
dividends. Before investing, please consult your tax advisor concerning the taxability of dividends earned on
these Funds.

You further understand that the funds maintained on your behalf in the Escrow Account pending purchase of
Fund shares for you:

- Are FDIC insured up to the maximum extent permitted by the applicable law.
- Is a deposit or other obligation of Bank.

## 3. ELIGIBILITY:

The Monogram Money Market Funds Program is available only to Bank clients purchasing or otherwise utilizing
another non-securities Bank product or service, such as a Bank checking or other deposit account (other than the
Escrow Account) or Bank loan product. By signing an Application for the Monogram Money Market Funds Program
or by purchasing or redeeming shares in one or more of the money market mutual funds made available through the
Monogram Money Market Funds Program, you represent and warrant to the Bank that you also purchase or otherwise
utilize another non-securities Bank product or service.

## 4. APPOINTMENT AS AGENT:

You appoint the Bank as your agent to effect transactions for you with the Fund, including purchases and redemptions
of Fund shares, and to hold Fund shares purchased for you, as your agent, in your Program Account. You authorize
the Bank to receive and maintain on your behalf in the Escrow Account those funds received from you for the purchase
of Fund shares, pending purchase of Fund shares for you. You authorize the Bank at the close of business on each
Business Day (i) to use any funds maintained on your behalf in the Escrow Account to purchase on your behalf Fund
shares and (ii) to the extent that the Bank has received your instruction to sell (redeem) Fund shares on that Business
Day, to sell a sufficient amount of Funds shares held in your Program Account to honor that instruction and to distribute
the proceeds of such sale as prescribed in this Agreement. You understand that you will be the beneficial owner of Fund
shares held for you in your Program Account. You understand that the Bank may establish minimums, maximums,
limitations, restrictions and charges with respect to Fund share purchases and redemptions that are affected for you
that may be in addition to or different from those stated in the Fund prospectus. You understand that certain Fund
services provided in the Fund prospectus might not be available to you. The Bank will forward to you copies of annual
and semiannual reports, proxy solicitation materials and other materials normally received by programs of the Fund,
provided the Bank has received such materials from the Fund. You relieve the Bank of all liability if you do not receive
any materials the Bank forwards to you. You understand that: (i) you will be able to purchase or redeem shares in the
Fund through the Bank only in accordance with this Agreement, (ii) Dividends will be automatically reinvested by the
Bank on your behalf in Fund Shares (iii) no stock certificates evidencing your interest in the Fund will be issued to you,
and you will not be able to transfer or pledge shares of the Fund to any other person or entity. The Bank's duty of care
to you shall be a duty of ordinary care only. The Bank shall act in good faith with respect to the funds maintained on
your behalf in the Escrow Account, your Program Account and you. You agree to hold the Bank harmless from any
liability or loss and to indemnify the Bank against any claim and related expense, including but not limited to attorney's
fees and legal costs, and the receipt or maintenance of your funds in the Escrow Account arising from the purchase
or redemption or sale of Fund shares for you or from any instructions you may give the Bank under this Agreement.

## 5. MINIMUM AMOUNT OF FUND SHARES HELD IN PROGRAM ACCOUNT:

You understand that in order to purchase Fund shares pursuant to this Agreement, you must have on deposit a
sufficient amount to make the minimum initial purchase of shares of the Fund you have chosen as stated in the Account
Specific Fees & Minimums section on the Business Accounts Fee Schedule, if such minimum is stated in that section.
If at any time the value of your shares in the Fund is less than the minimum amount as stated in the Account Specific
Fees & Minimums section on the Business Accounts Fee Schedule, then the Bank may charge you a service charge
provided in Section 20 of this Agreement or terminate the Program Account for that Fund in accordance with Section
16 of this Agreement.

## 6. PURCHASE OF SHARES:

You can purchase Fund shares by: (a) delivering to the Bank cash or a check made payable to the Bank, or to you and
endorsed by you and made payable to the Bank, together with instruction to purchase Fund shares, or (b) transferring
money to the Bank from another account of yours at the Bank (i) with your ATM Card or Debit Card if the Bank in its
sole discretion permits you to access such account with an ATM Card or Debit Card, or (ii) by telephone instruction
to the Bank in accordance with this Section, or (iii) by a transfer initiated through the Bank's internet banking service
or mobile banking service, (c) using your Bank ATM Card or Debit Card to place in the Bank's ATM cash or a check
made payable to the Bank or to you and endorsed by you and made payable to the Bank together with instructions
to purchase Fund shares, if the Bank in its sole discretion permits you to utilize the ATM Card or Debit Card for this

purposes, or (v) transferring money to the Bank from an account of yours at a depository institution other than the Bank. The funds you provide to the Bank for the purchase of Fund shares will be maintained on your behalf in the Escrow Account. You may not deposit funds directly into the Program Account. After the close of business on each Business Day, the cash balance maintained on your behalf in the Escrow Account will be used to purchase Fund shares. Under the Prospectus the Distributor has reserved the right to place limitations, both maximums and minimums, on the number of shares that may be purchased. If the Bank is unable to purchase shares on your behalf as a result of limitations placed by the Distributor or for any other reason, the funds you provided to the Bank for the purchase of Fund shares will remain in the Escrow Account until the purchase of Fund shares can be made or such funds are returned to you.

**7. REDEMPTION OF SHARES:**

You can instruct the Bank to sell (redeem) your Fund shares by (a) telephone transfer from your Program Account to another account of yours at the Bank that can be accessed by such telephone transfers, (b) a transfer initiated through the Bank's internet banking service or mobile banking service, (c) using your Bank ATM Card or Debit Card at an ATM to make a withdrawal from your Program Account if the Bank in its sole discretion permits you to access your Program Account with an ATM Card or Debit Card and such card has been designated for access to your Program Account, (d) using a Check, (e) using a Program Account redemption form at any Bank Financial Center, or (f) transfer from your Program Account to an account of yours at a depository institution other than the Bank. Fund shares purchased with the proceeds of checks (see Section 6 above) may only be redeemed if the proceeds of such checks would have become available under the Bank's Funds Availability Disclosure found in this Business Bank Account Agreements and Disclosure booklet. Without limiting any rights the Bank may have under law or hereunder, Bank reserves the right to place a hold on the proceeds of checks (or funds arising from sale of Fund shares purchased with such proceeds) for the reasons permitted in the Bank's Funds Availability Disclosure. The number of Fund shares redeemed by the Bank will be equal to the amount of the redemption request divided by the public offering price of the Fund shares. On the day that you make a redemption request, the Bank will advance to you an amount equal to the proceeds of the redemption which amount will either be given to you in the form of cash or a check drawn on the Bank, or be credited to your account at the Bank or a depository institution other than the Bank that you designate. On the date the Bank receives the proceeds of such redemption, the amount of the redemption will be used to repay the Bank the amount previously advanced by the Bank to you or your account at the Bank or other depository institution. To protect the Bank with respect to such negative balance and if any account which you maintain with the Bank incurs an overdraft for any reason or if any other indebtedness owed to the Bank or an affiliate of the Bank is past due, then the Bank is authorized and directed to redeem a sufficient number of Fund shares to reimburse itself or its affiliate for such negative balance, overdraft or indebtedness. The Bank may collect any compensation, fees, charges or expenses due to the Bank in accordance with the terms of this Agreement by automatically, and without notice to you, redeeming a sufficient number of Fund shares held by the Bank on your behalf to pay such fees or charges.

**8. ATM CARDS AND DEBIT CARDS:**

You can request the Bank to issue an ATM Card to you, if permitted by the Bank in its sole discretion, to be used to purchase Fund shares or to access your Program Account at ATMs. If you already have an ATM Card or Debit Card and the Bank in its sole discretion permits you to do so, then you can request the Bank to enable your ATM Card or Debit Card to be used to purchase Fund shares or to access your Program Account at ATMs. Once your ATM Card or Debit Card has been enabled by the Bank to purchase Fund shares or access your Program Account, your ATM Card or Debit Card is then subject to the Bank's agreement for such ATM Card or Debit Card and you can use your ATM Card or Debit Card to purchase Fund shares or to access your Program Account at ATMs as prescribed in Section 6 and Section 7 of this Agreement.

**9. CHECK PRIVILEGES:**

The Bank will provide you with Checks for your Program Account that you can use to make payments to third parties and to affect redemption of your Fund shares. You agree that you will not draw any Check in an amount greater than the value of the Fund shares in your Program Account on which the Check was drawn. In the event that the Bank receives for payment a Check drawn by you in an amount greater than such value, you understand that the Bank may determine not to pay the Check and to return it unpaid.

**10. ADVANCES:**

You understand that in order to facilitate your redemption of Fund shares in your Program Account, as a service to you, the Bank may in its sole and absolute discretion advance funds to you prior to redeeming or selling your Fund shares to cover Checks drawn on or withdrawals or transfers made from your Program Account. You pledge to the Bank, and grant to the Bank a security interest in your Program Account at any time, as well as the proceeds of the sale of such Fund shares, in connection with and to the extent of any such advances to you, whether the funds advanced to you are paid to you or paid to third parties pursuant to your Checks or other instructions. You understand that upon advancing funds to you the Bank will hold a sufficient number of your Fund shares to secure the advance in full until the Bank extinguishes the advance by redeeming your Fund shares. You grant to the Bank the right to take Fund shares in your Program Account as a set off against funds advanced to you under this Agreement, including any overdraft in your Program Account. This Agreement constitutes a security agreement under the New York Uniform Commercial Code.

**11. DIVIDENDS AND DISTRIBUTIONS:**

In accordance with the Fund prospectus, your Fund shares will earn Dividends from the day the shares are purchased until the day prior to the date those shares are redeemed by the Bank on your behalf. You understand that in accordance with the Fund prospectus, all Dividends earned by and distributions made with respect to your shares in the Fund will be paid monthly. These Dividends will be automatically reinvested in additional Fund shares for you and

added to your Program Account. If all your Fund shares are redeemed at any time during the month, then Dividends earned but not yet paid at the time of redemption will usually be paid on the last day of the month in which they were redeemed, and the Dividends will be deposited into your Program Account. If Dividends paid by the Fund are taxable as income by the federal, state or local government, then you understand that these Dividends will have to be declared as income. The Bank will report to you the Dividends for each Fund for each calendar year after the end of that year.

## 12. TELEPHONE INSTRUCTIONS:

You agree that the Bank may respond to telephone requests or instructions about funds maintained on your behalf in the Escrow Account or your Program Account from any person representing himself or herself to be you where the Bank reasonably believes the request or instructions to be made by you. You may transfer money to the Escrow Account or from your Program Account by telephone requests or instructions to the Bank using only the telephone number provided by the Bank for this purpose. You authorize and consent in advance for the Bank, at its sole discretion, to record these telephone requests or instructions in any manner received, not limited to cell phone, landline, or cordless telephone conversations. The Bank may not remind you that the Bank may record or monitor telephone conversations at the outset of a call unless required by law to do so. You understand that the Bank will employ reasonable procedures, such as requiring a form of personal identification, to confirm that telephone requests or instructions are genuine. You agree that the Bank will not be liable for honoring any telephone requests or telephone instructions to transfer funds to or from the Escrow Account or purchase or redeem Fund shares from the Program Account that the Bank receives from any person the Bank reasonably believes to be you. Should there be an unauthorized purchase or sale of Fund shares, then the Bank shall, after receiving notice from you of such unauthorized purchase or sale and as soon as practicable, repurchase such Fund shares redeemed or sell such Fund shares purchased to the extent that you have not already directed the Bank to repurchase or sell those Fund shares. You agree that the Bank's records of such telephone transfers are binding on you and that the Bank reserves the right to refuse any telephone request or instruction to purchase or redeem Fund shares.

## 13. PERIODIC STATEMENTS:

You have the right under the rules of the federal agencies to receive without additional charge a confirmation of each transaction in your Program Account. The federal agencies authorize the use of different arrangements with your consent. You consent to the Bank providing you with a periodic statement, in lieu of a confirmation of each transaction, for your Program Account. You will receive a periodic statement each Statement Period that will cover your Program Account. Each Statement Period the Bank will send you a periodic statement showing for the Statement Period among other information: the number and value of Fund shares in your Program Account on the first day and on the last day of the Statement Period, all fees, and for each transaction - the number of Fund shares involved, the price, whether the transaction was the payment or reinvestment of a dividend or other distribution. Purchase transactions are referred to on the periodic statement as "Purchases and Other Credits" and sales transactions are referred to on the periodic statement as "Redemptions and Other Debits". The transaction dates shown on the periodic statement are: a) for the purchase of Fund shares, the date the Bank receives funds from you for the purchase of Fund shares which purchase typically occurs the following Business Day and, b) for the redemption of Fund shares, the date we advance the funds to you for the redemption of Fund shares which redemption typically occurs the following Business Day. You understand that within fourteen calendar (14) days of receiving a periodic statement you must notify the Bank in writing of any error in the periodic statement and that, if you do not, the periodic statement shall be considered correct for all purposes.

## 14. PROXIES:

You understand that the Bank will not vote any shares of the Fund that the Bank holds for you as your agent, except in accordance with your timely written instructions. The Bank will cause to be sent to you by mail all Fund proxy solicitation material and proxies that the Bank receives from the Fund. You are expected to return them promptly as instructed as to how the Fund shares held on your behalf should be voted. You relieve the Bank of any liability if proxies are mailed to you but do not reach you, your written instructions are mailed by you but not received back for processing, or your written instructions are unable to be complied with because there is an insufficient period of time after receipt to vote.

## 15. FDIC INSURANCE; EFFECT OF BANK FAILURE:

The Escrow Account is an FDIC insured deposit account at the Bank and the Program Account is not an FDIC insured account. **Since funds maintained in the Escrow Account on your behalf are not used to purchase Fund shares typically until the Business Day after those funds are deposited to the Escrow Account (see Section 6), any funds maintained in the Escrow Account on your behalf at the time the Bank failed will remain in the Escrow Account and be insured by the FDIC in accordance with FDIC's regulations.** In the event of a Bank failure, you would have the right to the Fund shares held in the Program Account as owner of those Fund shares. Since Fund shares will not be redeemed typically until the Business Day following the receipt by the Bank of your instruction to redeem the Fund shares (see Section 7), Fund shares will remain in the Program Account as your asset until their redemption. However, in advancing the money to cover debits from your Program Account the Bank retains a security interest in Fund shares necessary to cover such advance (See Section 10).

## 16. TERMINATION/REDEMPTION UPON TERMINATION:

You may terminate your Program Account by withdrawing from your Program Account an amount equal to the value of all of your Fund shares in the Program Account. If you terminate your Program Account while there are funds maintained in the Escrow Account on your behalf, the Bank will use those funds to purchase Fund shares and deposit them into your Program Account. If you terminate your Program Account before all of your earned Dividends have been paid by the Fund, then when those Dividends are paid, the Bank will deposit them into your Program Account. If you want to make additional purchases of Fund shares after you terminate your Program Account, then except as otherwise

expressly provided in this Section you must submit a new Application to the Bank. The Bank may, at its discretion, terminate your Program Account at any time. Said termination shall become effective three (3) Business Days after the Bank has mailed to you a notice of termination addressed to you at your address as indicated on the Bank's records. Immediately upon termination, the Bank is authorized to redeem all of your Fund shares in your Program Account and forward to you a check for the proceeds of such redemption. If the Bank terminates your Program Account while there are funds maintained in the Escrow Account on your behalf, the Bank will either will use those funds to purchase Fund shares and deposit them into your Program Account or return those funds to you in the same or a different check for the proceeds of the redemption of your Fund shares in your Program Account. If the Bank terminates your Program Account before all of your earned Dividends have been paid by the Fund, then when those Dividends are paid, the Bank will either deposit them into your Program Account or forward you a check for those paid Dividends. Any check to be forwarded to you pursuant to this Section will be sent to you by ordinary first class mail to your address as indicated on the Bank's records.

**17. AMENDMENTS - NOTICES:**
The Bank may amend this Agreement in any respect at any time by mailing to you at your address appearing on the Bank's records a written notice of such amendment at least ten (10) calendar days prior to the effective date of said amendment (or such other period mandated by applicable law). Any notices required or permitted to be given to you under this Agreement shall be deemed given when mailed to your address appearing on the Bank's records.

**18. ASSIGNMENTS AND TRANSFERS:**
You agree not to assign, transfer or pledge any right, title or interest you have in this Agreement, in funds maintained on your behalf in the Escrow Account, in your Program Account, or in any of your Fund shares without the Bank's prior written consent. The Bank may disregard any assignment, transfer or pledge which you have made without the Bank's prior written consent. The Bank may assign this Agreement, without your consent, to its broker-dealer affiliate, Signature Securities Group Corporation, or to any other entity. You will be notified of any assignment by the Bank.

**19. INTERRUPTION OF BUSINESS:**
The Bank shall have no responsibility to you for any delay or failure to perform any obligation under this Agreement arising out of the delay or failure of the Fund or any third party to perform its obligation or arising out of any interruption of the Bank's, the Fund's or any third party's business due to acts of God, act of governmental authority, acts of public enemy or war, riots, fires, floods, civil commotions, insurrections, labor difficulties (including strikes and other work stoppages and slowdowns), severe or adverse weather conditions or other causes beyond the Bank's control.

**20. BANK'S COMPENSATION, FEES AND CHARGES:**
You understand that the Bank may be entitled to receive compensation (including but not limited to any Fund "asset-based sales charge" and/or "service fee" calculated as provided for in the FINRA Rules of Fair Practice and paid under a plan adopted pursuant to Rule 12b-1 under the Investment Company Act of 1940, as amended) as a shareholder servicing agent as more fully described in the Fund prospectus. You also agree to pay the Bank the fees and charges set forth in the Account Specific Fees & Minimums section on the Business Accounts Fee Schedule.

**21. EXCHANGE OF INFORMATION:**
To the extent permitted by law you authorize the Bank and any of the Bank's affiliates to exchange information about you, any funds maintained in the Escrow Account on your behalf, your Program Accounts and any other account you have. You also authorize the Bank to disclose documentation and/or information about you, any funds maintained in the Escrow Account on your behalf, or your Program Account in connection with the Escrow Account or Program Account transactions or in any other circumstances the Bank deems necessary or appropriate.

**22. LIMITATION OF BANK'S LIABILITY:**
You agree that in any litigation in which you and Bank are adverse parties as to any claim allegedly arising or resulting from, or in any way related to, Bank's performance or non-performance of this Agreement your sole right to any relief shall be limited to breach of contract. You specifically waive any and all claims, however denominated, whether based on or arising from statute or tort and specifically waive the right to recover from Bank on any claim of negligence, gross negligence, willful misconduct, failure to act in good faith and/or deal fairly with you, bad faith, breach of implied covenant or duty to act in good faith or deal fairly with you, breach of fiduciary duty, commercial unreasonableness, loss of business, loss of business opportunity or advantage. You further agree that, in no event, shall you claim or shall Bank be liable for special, punitive, indirect or consequential damages, whether economic or non-economic, loss of profits, loss of business or other financial loss, lost savings, lost benefits, even if Bank has acted in bad faith and even if Bank has been advised of the possibility of or could have foreseen such damages or the possibility of such damages, and your attorney's fees and expenses of litigation (including the fees and expenses of your experts, consultants or any other person, whether or not they testify), even if you would otherwise be entitled to recover such attorneys fees or litigation expenses under any applicable statute or rule, and any other legal cost, disbursement or other expense, however denominated.

**23. LIEN AND SET OFF:**
You give the Bank and its affiliates a continuing lien on any funds maintained in the Escrow Account on your behalf, any Fund shares in your Program Account or other accounts or personal property of yours which is in the possession of either the Bank or any of the Bank's affiliates, including but not limited to bank deposits and securities. This lien shall be in the amount of any and all liabilities and obligations you may owe to the Bank or any of the Bank's affiliates whether such liabilities and obligations exist now or are incurred in the future. You agree that the Bank and its affiliates may sell your Fund shares and your other personal property held by the Bank or any of the Bank's affiliates by public or private

sale, at its discretion, and set-off against your funds maintained in the Escrow Account or your behalf, bank accounts or other accounts at the Bank or any of the Bank's affiliates and use the proceeds of such sale and the money in such accounts to satisfy your liabilities or obligations to the Bank and the Bank's affiliates whether or not such a liability or obligation is then in default or is subject to a contingency.

**24. LIMITATION ON YOUR TIME TO SUE:**

You must commence any legal action or proceeding against Bank with respect to any Account or this Agreement within one year of the date of the occurrence of the event that is the subject matter of the action or proceeding but in no event beyond the time period set forth in any law or agreement applicable to such event.

**25. DISPUTE RESOLUTION:**

If you have a dispute with the Bank, the Bank hopes to resolve it promptly. Please discuss it with your PCG at the Bank. If the Bank is not able to resolve the dispute, then you and the Bank agree that the dispute will be resolved as provided below.

### A. FOR ACCOUNTS OPENED IN STATES OTHER THAN CALIFORNIA:

**(i) LAWSUITS:**

You agree to commence any action or proceeding against Bank relating to this Agreement regarding performance or non-performance, **ONLY** in a court of competent subject matter jurisdiction (State or Federal) located within the State of New York and the County of New York, which shall be the exclusive venue and forum for all litigations between you and the Bank regarding or in any way relating to this Agreement. In any action commenced by Bank against you to enforce or protect Banks' rights hereunder, you (1) waive any objection you may now or hereafter have to the venue of such proceeding, including that the venue or the court is inconvenient or improper; (2) agree that service of process may  be effected upon you, and be deemed valid and sufficient, by mailing of a copy of the summons and complaint by first class mail to your address contained in Bank's records, whether or not, at the time of mailing, (i) such address is your current address; (ii) Bank knew or should have known of a current or better or other address for you; and (iii) whether or not such mailing actually is received by you. Service of process shall be deemed complete ten days after filing with the court of proof of such mailing, which may be made by affidavit, attesting to the mailing or depositing in an official depository under the care or custody of the U.S. Postal Service; and agree that nothing set forth herein shall affect Bank's right to effect service of process in any other manner authorized by law. In any such action, litigation, proceeding to enforce a judgment, restraining order or other legal process or other legal proceeding relating to the Program Accounts, your funds in the Escrow Account or an agreement in which the Bank and/or you are parties, whether commenced by you, the Bank or any other person or entity, and provided the Bank is not held at fault under a final determination in such proceeding, the Bank shall be entitled to recover from you its attorneys fees, costs and expenses (including those allocated to the Bank's internal Legal Department) and expert's and consultant's fees (whether or not they testify) and expenses **but you waive, and shall not have, any such reciprocal right against Bank**. Any action commenced by Bank against you shall be timely if commenced within the applicable period of limitations provided by law. In any lawsuit or other legal proceeding in which you and the Bank are in different positions, you agree that you will not claim that the Bank waited too long to make its claim or state its position and you agree not to make any claim against the Bank in the same legal proceeding if your claim does not involve the original claim in that legal proceeding.

**(ii) ATTORNEY FEES, LOSSES & EXPENSES:**

You agree to pay all losses, costs, claims, damages and expenses (including, without limitation, fees and expenses of attorneys, including those fees, costs and expenses allocated to the Bank's Legal Department, consultants and expert witnesses) incurred by the Bank relating to your Fund shares in the Program Account or to this Agreement as a result of (a) your failure to comply with the Agreement, (b) a dispute among the owners, beneficiaries, heirs or others claiming an interest to all or part of your Fund shares or your funds in the Escrow Account, (c) any third party claim, notice or legal action whether or not such claim is legally enforceable, (d) any governmental or administrative investigations, (e) any action taken by the Bank to resolve or comply with such dispute, claim or investigation or to otherwise protect the Bank's interest or (f) any litigation, action, proceeding to enforce a judgment, restraining order or other legal process or other legal proceeding relating to your Fund shares, your funds in the Escrow Account, this Agreement or any other agreement in which you and/or the Bank are parties, whether brought by you, the Bank or any other person or entity, unless the final determination of such the Bank at fault.

**(iii) JURY TRIAL WAIVER; OTHER WAIVERS:**

YOU AGREE THAT IN ANY LITIGATION RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT, IN WHICH BANK AND YOU SHALL BE ADVERSE PARTIES, THE ACTION AS BETWEEN YOU AND THE BANK SHALL BE TRIED BY THE COURT WITHOUT A JURY. **YOU SPECIFICALLY AGREE AND CONSENT THAT TRIAL BY JURY IS WAIVED AS TO EACH AND EVERY ISSUE WHICH MAY OR MIGHT BE TRIABLE AS OF RIGHT TO A JURY ACCORDING TO THE CONSTITUTION OR THE LAWS OF THE STATE OF NEW YORK.** In addition, you agree to waive the right to interpose against Bank any defense based upon lack of personal jurisdiction, inconvenience of forum, the statute of limitations, laches, waiver, estoppel, and any setoff, cross-claim or counterclaim, however denominated, whether related or unrelated to this Agreement or to any related agreement.

**(iv) BURDEN OF PROOF AND DUTY TO MITIGATE:**

In any litigation in which you and Bank are adverse parties, and you seek a recovery from Bank, you shall have and agree to bear the burden of proving your claim to relief and alleged actual and direct damages by clear and convincing proof and not merely a preponderance of proof. You agree to make all reasonable efforts, and will cooperate in good faith with Bank, to avoid or mitigate your alleged damages or loss.

## B. FOR ACCOUNTS OPENED IN CALIFORNIA:

If you aren't able to resolve the dispute and you opened your account in a California branch, you agree that either the Bank or you can initiate arbitration in accordance with the provisions in this Section 25.B. These provisions constitute the Arbitration Agreement between you and the Bank. **ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. YOU AND THE BANK AGREE TO WAIVE THE RIGHT TO A JURY TRIAL OR A TRIAL BEFORE A JUDGE IN COURT.**

### (i) AGREEMENT TO ARBITRATE:

Either you or the Bank may choose, with the other's consent, to arbitrate all Disputes. A "Dispute" is any unresolved disagreement between you and the Bank, including any disagreements about the meaning, scope, or enforceability of this Arbitration Agreement. The only exception to this Arbitration Agreement are Disputes filed by the Bank or you in small claims court, so long as the Dispute remains in that court and is pursued on an individual basis.

### (ii) NO CLASS ACTION OR JOINDER OF PARTIES:

**You and the Bank agree that no class or any other type of representative action can be pursued in arbitration or in court if either you or the Bank chooses to arbitrate a Dispute. Unless both you and the Bank agree, Disputes by or against others may not be joined, consolidated, or otherwise brought together in the same arbitration**. If any part of this section is found to be unenforceable, the entire Arbitration Agreement will be unenforceable.

### (iii) ARBITRATION PROCEDURE:

You and the Bank agree to the following procedures for arbitration of any Disputes:

- The party filing arbitration can choose one of the following arbitration administrators and follow its rules and procedures for the arbitration: the American Arbitration Administration ("AAA") pursuant to the AAA Commercial Arbitration Rules or JAMS pursuant to the Comprehensive Arbitration Rules & Procedures. You can obtain a copy of the AAA Commercial Arbitration Rules at www.adr.org or 1-800-778-7879. You can obtain a copy of the JAMS Comprehensive Arbitration Rules at www.jamsadr.com or 1-800-352-5267.
- The arbitration will be decided by a single, neutral arbitrator who is a retired judge selected in accordance with the rules of the arbitration administrator.
- The arbitrator will take reasonable steps to protect your and the Bank's confidential information.
- The arbitrator will decide the dispute in accordance with the terms of our agreements and applicable substantive law, including evidentiary privileges and statutes of limitations. The arbitrator can award damages or other relief available under applicable law.
- At your or the Bank's request, the arbitrator will provide a statement of reasons for his or her decision in writing.
- If there are any differences between the arbitration administrators' rules and this Arbitration Agreement, this Arbitration Agreement governs.
- If the arbitrator awards $0 for the party that filed the arbitration, awards more than $100,000 against the party that did not file the arbitration, or awards injunctive relief, a party may request a new arbitration before a three-arbitrator panel in accordance with the arbitration administrator's rules. This request must be filed with the arbitration administrator in writing within 15 days of notice of the award. In this case, each reference to the arbitrator in this Agreement will mean the three-arbitrator panel.
- The arbitrator's award will be final and binding, subject to judicial review only to the extent allowed under the Federal Arbitration Act. A party may seek to have a final and binding award entered as a judgment in any court having jurisdiction.

### (iv) ARBITRATION FEES AND COSTS:

The applicable arbitration rules and procedures determine who pays the arbitration fees, unless limited by applicable law. Each party will pay its own costs and attorney, expert, and witness fees. The arbitrator may require either party to pay the costs and fees of the other party, including the fees of the arbitrator, to the extent permitted under applicable law.

### (v) RIGHT TO RESORT TO PROVISIONAL REMEDIES PRESERVED:

You or the Bank can exercise rights or remedies to exercise self-help remedies, such as the right of setoff or the right to restrain funds in any account, or to obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court having jurisdiction

## 26. BLOCKED OR RESTRAINED ACCOUNT:

You agree that if your Program Account is restrained or blocked by legal process, court order or government action, then the Bank may redeem the Funds shares in the Program Account being restrained or blocked and place the proceeds of such redemption in a control account for your benefit until the Program Account, those Fund shares and the proceeds of those Fund shares are no longer restrained or blocked. While the proceeds of the Fund shares are in

the control account, you agree that the Fund shares will not earn any Dividends and the proceeds of the Fund shares will not earn and any interest or dividends.

**27. BANK'S RIGHTS:**

You agree that the Bank shall not be responsible as a result of any delay or failure to purchase or redeem Fund shares on your behalf, provided the Bank has acted in good faith. You agree that the Bank shall be deemed to have acted in good faith and used ordinary care and shall not be liable to you for any forgery of your signature or any alteration if the forgery of your signature or the alteration is not readily apparent and recognizable to an ordinary bank employee. Nothing the Bank does or delays in doing will amount to a waiver of any of its rights unless it so states in a signed writing. The failure of the Bank to demand its rights on any one occasion will not be a waiver of any of those rights on any other occasion.

**28. BANK'S RIGHT TO INDEMNIFICATION:**

If the Bank believes in its sole discretion that any instruction from you, which the Bank agrees to accept, might expose it to claims, suits, losses, expenses, liabilities or damages, whether directly or indirectly, the Bank may require indemnification from you satisfactory to the Bank before following such instructions.

**29. PRESUMPTION OF BANK ACTING WITH REASONABLE CARE:**

You agree that Bank's performance in accordance with this Agreement or in accordance with Standard Banking Practice of banks relating to accounts and transactions covered by this Agreement shall be conclusively presumed and deemed to have been in compliance with Bank's duty to act with reasonable care, it being clearly understood that this Agreement sets forth the standards of and by which Bank's compliance with any duty of reasonable care shall be measured. This presumption will not apply where prohibited by the laws governing your account.

**30. NO IMPLIED WAIVER:**

Bank's failure to enforce any of its rights under this Agreement shall not be deemed a waiver of (1) those rights not enforced; (2) any of its rights; (3) any specific default; (4) any default by you in the performance of any of your obligations under this Agreement; or (5) Bank's right to insist upon or to enforce performance by you of your obligations under this Agreement. None of Bank's rights under this Agreement can be affected or waived orally or by any prior act, acquiescence, practice, course of action, course of dealing or previous action or failure to act. No waiver shall be effective unless made in writing and signed by Bank's authorized officer having full knowledge of all facts, and then only to the extent set forth in the writing.

**31. ABANDONED PROGRAM ACCOUNTS:**

Each state has laws that govern when accounts are considered inactive or unclaimed ("Abandoned Period"), and when the Bank is required to send a customer's funds to the state. A Program Account is deemed abandoned if it has not had any customer generated activity for the Abandoned Period. Customer-generated activity is defined as: a purchase or redemption of Fund shares, or the Bank receiving a signed document indicating that you are, or the person the Bank determines is entitled to the shares in the Program Account is, aware of the existence of the Program Account. If a Program Account is deemed abandoned, then the Bank may close the Program Account and, if required, turn the Fund shares in the Program Account over ("escheat") to the appropriate state abandoned property administrator. Additionally, if in redeeming your fund shares you have purchased an Official Check or Money Order and the Official Check or Money Order has not been presented for payment for during the Abandoned Period, then the Official Check or Money order may be deemed abandoned and the Bank may, if required, escheat to the appropriate state abandoned property administrator. The Bank encourages you to make sure your accounts remain active so you receive regular statements, have the full use of your accounts, and avoid the potential of having your funds transferred to the state as unclaimed property. The Bank will send you a letter in advance if your funds may be transferred to the state as unclaimed property. The Bank may impose a reasonable charge, which shall not be refundable, on an abandoned property to recover the cost related to, or incurred as a result of, the payment or delivery of abandoned property to the state. These charges may include the cost of certified mail, and a pro-rated share of advertising costs. Note: Dormancy periods for determining actual escheatment requirements vary by the abandoned property laws of the individual states, and by type of property. The Bank is required to base the period for escheatment on the state of the client's last known address on the Bank's records, and that state's corresponding dormancy period.

**32. OBLIGATION OF OTHERS:**

Your obligations under this Agreement will also be binding on your heirs, executors, legal representatives, successors and assigns.

**33. SEVERABILITY:**

Except as set forth in paragraph 25.B(ii), if any provision in this Agreement proves to be unlawful, it shall not affect the enforceability of any other provision.

**34. GOVERNING LAW:**

This Agreement is to be governed by, and interpreted in accordance with, the laws and regulations of the State of New York, except where federal laws and regulations apply. You agree that the checks used to purchase Fund shares and the Checks provided by the Bank for you to use to redeem Fund shares will be governed by applicable federal and state laws and regulations, including, but not limited to, the Uniform Commercial Code ("UCC") and Federal Reserve Board regulations, and by the rules and regulation of any clearinghouse used to clear those checks. Other than as specified in paragraph 25(B)(ii), if any part of this Agreement shall not be valid under any law or regulation, it shall not affect any other part.

**35. OTHER AGREEMENTS.**
The Escrow Account and Program Account are also subject to the applicable terms of the Business Bank Deposit Account Terms and Conditions that apply to the Signature Flat Fee Business Checking. In addition, you agree that the Escrow Account associated with your Program Account, including the deposit of funds to the Escrow Account and the subsequent use of those funds to purchase Fund shares for your Program Account, shall be subject to the Bank's terms and conditions governing the Escrow Account as may be provided to you from time to time. Furthermore, with respect to the processing of check and other deposits to the Escrow Account, the Escrow Account shall be considered a "Bank Deposit Account" under the Business Bank Deposit Account Terms and Conditions for the sole purpose of establishing the Bank's rights with respect to the processing of such deposits to the Escrow Account. The Program Account also shall be considered a "Bank Deposit Account" under the Business Bank Deposit Account Terms and Conditions for the sole purpose of defining the rights of the Bank with respect to the processing of Checks written to instruct the Bank to sell Fund shares from your Program Account**.**

SIGNATURE BANK

▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

*ATM Card & Debit Card for Businesses Agreement*

Each corporation, partnership, sole proprietorship, unincorporated association, trust, estate or other business entity that applies for, or requests a Signature Bank Debit Card or ATM Card and/or uses a Signature Bank Debit Card or ATM Card agrees to the provisions of this ATM Card and Debit Card for Businesses Agreement.

**1. DEFINITION:**

- **A. Agreement:** This ATM Card and Debit Card for Businesses Agreement.
- **B. ATM:** An Automated Teller Machine.
- **C. ATM Card:** The card issued to you by the Bank that you can use to access (i) your Deposit Accounts, Credit Line and/or Monogram Money Market Funds Program Accounts at a Bank ATM or an ATM in the ATM Network and (ii) your Primary Checking Account at POS Payment Terminals where ATM Cards are accepted and includes any card that the Bank issues to replace the ATM Card.
- **D. ATM Network or Network:** The ATMs that are part of the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International networks.
- **E. Bank, We, Us and Our:** Signature Bank.
- **F. Bank ATMs:** ATMs located at the Bank's Financial Centers or at other locations that are owned or leased by the Bank.
- **G. Bank Holiday**: January 1, the third Monday in January, the third Monday in February, the last Monday in May, July 4, the first Monday in September, the second Monday in October, November 11, the fourth Thursday in November, or December 25. If January 1, July 4, November 11, or December 25 fall on a Sunday, the next Monday is not a Business Day.
- **H. Business Day:** Any day other than a Saturday, Sunday or a Bank Holiday.
- **I. Credit Lines:** Any credit line you have, or in the future have, at the Bank that has been designated as a credit line that can be accessed by your ATM Card or Debit Card.
- **J. Debit Card:** Card issued to you by the Bank that you can use to access (i) your Deposit Accounts, Credit Lines and/or Monogram Money Market Funds Program Accounts at a Bank ATM, (ii) your Primary Checking Account, Primary Savings Account and/or Primary Credit Line at an ATM in the ATM Network, and (iii) your Primary Checking Account at a POS Payment Terminal.
- **K. Deposit Account(s):** Any deposit account(s) you have, or in the future have, at the Bank that can be accessed by your Debit Card or ATM Card.
- **L. Monogram Money Market Funds Program Account:** Non-FDIC insured investment account that you have established at the Bank to hold shares of those money market mutual funds that are available through the Bank's Monogram Money Market Funds Program, which account holds shares purchased by the Bank for you as your agent and which account has been designated by you for access by your ATM Card or Debit.
- **M. PIN:** Personal identification number, is a numeric password that has been or will be issued to you, for the purpose of authenticating you as the owner of an ATM Card or Debit Card and includes any personal identification number that replaces your PIN.
- **N. POS Payment Terminal or Point of Sale Payment Terminal:** A payment terminal in the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International Networks that accepts your Debit Card or ATM Card to purchase goods or services from merchants by automatically deducting the amount of such purchase from your Primary Checking Account.
- **O. Primary Checking Account:** Deposit Account that is a checking account, NOW account or Monogram Managed Account which you have designated for access by your ATM Card or Debit Card at an ATM in the ATM Network or by your Debit Card at a POS Payment Terminal.
- **P. Primary Credit Line:** Credit Line that you designate as your Credit Line that can be accessed at an ATM in the ATM Network.
- **Q. Primary Savings Account:** (i) the Deposit Account that is a savings or Monogram Insured Money Market Account or (ii) the Monogram Money Market Funds Program Account that you have designated as the Savings Account and (iii) that can be accessed by your Debit Card at a POS Payment Terminal or ATM Card at an ATM in the ATM Network.
- **R. You and Your:** The corporation, partnership, sole proprietorship, unincorporated association, trust, estate or other business entity that applies for, accepts, or uses a Debit Card or ATM Card.

**2. ACCOUNT ACCESS AND TRANSACTION LIMITS:**

- **A. Account Access**

    You may use your ATM Card or Debit Card to access those Deposit Accounts, Credit Lines or Monogram Money Market Funds Program Accounts which you have designated on your ATM Card or Debit Card application for the following transactions up to the limits in the section entitled "Transaction Limitations":

    (i) At ATMs in the ATM Network you may make (a) withdrawals from your Primary Checking Account, your Primary Savings Account or Primary Credit Line, (b) inquiries as to Deposit Account balances or available balance on your Primary Credit Line, (c) transfers between your Primary Checking Account and your Primary Savings Account or from your Primary Credit Line to either your Primary Savings Account or your Primary Checking Account and (d) redeem your mutual funds shares held by the Bank on your behalf in your Monogram Money Market Funds Program

Account in your Monogram Money Market Funds Program Account or your Primary Savings Account. Some of these services may not be available at all of the ATMs in the ATM Network.

(ii) At Bank ATMs you may make (a) withdrawals from Deposit Accounts or Credit Lines, (b) inquiries as to Deposit Account balances or available balances on Credit Lines, (c) transfers between Deposit Accounts or between Credit Lines and Deposit Accounts, (d) deposits to Deposit Accounts or payments on a Credit Line by placing checks, cash (bills only, no coin), or both in a deposit envelope, (e) redeem your mutual fund shares held by the Bank on your behalf in your Monogram Money Market Funds Program Account and (f) request the Bank to purchase mutual fund shares on your behalf to be held in your Monogram Money Market Funds Program Account by placing check, cash (bills only, no coin) or both in a deposit envelope.

(iii) At any POS Payment Terminal you may use your ATM Card or Debit Card to pay for goods or services and charge such purchase to, or to withdraw cash from, your Primary Checking Account.

(iv) At any merchant that accepts cards in the NYCE and Pulse Regional Networks and the Cirrus®, Maestro® and Plus National and International Networks you may use your Debit Card to pay for goods and services sold by the merchant and charge such purchase to your Primary Checking Account provided an authorization receipt is signed.

**B.** Transaction Limitations

Withdrawals at an ATM or a POS Payment Terminal or purchases at a POS Payment Terminal may not exceed $1,000 each Day. If you request the Bank to permit a larger transaction limitation and the Bank agrees to increase this limitation, then you agree that notwithstanding any other provision in this Agreement the Bank will not be liable for any ATM, POS or other transaction using, or purporting to use, your ATM or Debit Card, even if that transaction was not authorized by you. A Day is defined as the period of time from approximately 6:00 p.m. Eastern Time from one calendar day to approximately 6:00 p.m. Eastern Time of the following calendar day. Deposits and payments made before 3:00 p.m. Eastern Time (or before 4:30 p.m. Pacific Time if deposits and payments are made at the San Francisco Financial Center) on any Business Day will be credited to your Deposit Account, Monogram Managed Account, Monogram Money Market Funds Program Account or Credit Line as of that Business Day. Deposits and payments made after 3:00 p.m. Eastern Time on a Business Day or on a day that is not a Business Day will be credited as of the next Business Day. All deposits, payments and purchases are subject to our proof and verification. Any difference between the amount of your deposit, payment, redemption or purchase and the amount stated on your deposit slip will be handled in accordance with standard Bank procedures. If your Deposit Account is a Monogram Insured Money Market Account or Monogram Money Market Funds Program Account, you are limited to a total of six preauthorized and automatic withdrawals, checks, Debit Card payments to third parties, and withdrawals by telephone, fax, email, internet banking services and mobile banking services you can have each month. If you exceed this limit your ATM Card or Debit Card transaction above this limit may not be executed.

**3. ATM SAFETY TIPS:**

- Activity of an ATM facility may be recorded by a surveillance camera or cameras.
- You should close the entry door completely upon entering and exiting an ATM facility, if applicable.
- You should not permit any unknown persons to enter an ATM facility after regular banking hours.
- You should place withdrawn cash securely upon your person before existing an ATM facility.
- NYS Department of Financial Services if the ATM facility is located in the state of New York, and/or the nearest available public telephone should be used to call the police if emergency assistance is needed.
- If you drive up to an ATM, keep your car doors locked and an eye on your surroundings.
- you're alone, leave the area.
- Do not stop to count the money or expose it for others to see.
- Remember, do not leave your card at the ATM, do not leave any documents at a night deposit facility.
- If you lose your Debit Card or if it is stolen, promptly notify us, you should consult the other disclosures you have received about electronic fund transfers or ATM/Debit Card agreements for additional information about what to do if your card is lost or stolen.
- Allow a comfortable distance between you and the person using the ATM.

**4. SECURITY PROCEDURES AND LIABILITY:**

YOUR ATM CARD OR DEBIT CARD CANNOT BE USED AT ANY BANK ATM OR ANY ATM IN THE ATM NETWORK AND YOUR DEBIT CARD CAN NOT BE USED AT ANY POS PAYMENT TERMINAL UNTIL YOU RECEIVE A PIN AND YOU ACTIVATE YOUR ATM CARD OR DEBIT CARD. Your PIN authenticates you at the ATM and acts as your signature at a POS Payment Terminal when used for a debit transaction. The use of a PIN known only to you is the security procedure used by the Bank to verify that the ATM Card or Debit Card transaction has been properly authorized. You agree that the use of a PIN is a commercially reasonable security procedure for the ATM Card and Debit Card when used by you at an ATM and/or POS Payment Terminal for a debit transaction. For your protection, you should memorize your PIN and not keep any notation of your PIN on or with your ATM Card or Debit Card. Your ATM Card or Debit Card is for your business use only. You agree to keep your ATM Card and Debit Card in a safe and secure place and not to give your ATM Card, Debit Card or PIN to anyone not authorized by you to use it or allow your ATM Card, Debit Card or PIN to get into the possession of anyone not authorized to use it. You agree to require anyone

you authorized to use the ATM Card or Debit Card to follow these same procedures with respect to the ATM Card, Debit Card and PIN. You agree that you will be solely responsible for any amount withdrawn or transferred from your Deposit Accounts, Credit Lines or Monogram Money Market Funds Program Accounts by anyone using, or purporting to use, your ATM Card, Debit Card or PIN. **If you request a Debit Card, then you agree and acknowledge that the Debit Card can be used without a PIN at a POS Payment Terminal through the selection of credit transaction and signing an authorization slip. You understand that when a Debit Card is used at a POS Payment Terminal in this manner, the Bank has no way of verifying whether the signer of the authorization slip has been authorized by you to use the Debit Card. You understand and agree that it will be your sole responsibility to ensure that the Debit Card is only used by someone authorized by you to use it, that you will be liable for all transactions in which a Debit Card was used at a POS Payment Terminal through the selection of credit transaction and signing an authorization slip and that you will not claim that any such use was unauthorized even if the signer of the authorization slip is not an authorized signer on the Debit Card or on the account at the Bank that has been accessed by the Debit Card or is not otherwise authorized by you. If assuming this risk and liability is not acceptable to you, then you agree to request that the Bank issue you an ATM Card instead of a Debit Card.**

**5. LOST OR STOLEN ATM CARD OR DEBIT CARD:**

Call us AT ONCE if you believe your ATM Card, Debit Card or PIN has been lost or stolen or is in the possession of someone not authorized to have or use it. You could lose all the money in your Deposit Account and Monogram Money Market Funds Program Accounts plus an amount equal to your maximum Credit Lines if you don't immediately report such loss, theft or unauthorized possession or if we do not have sufficient time to block your ATM Card or Debit Card once you do report it as being lost, stolen or in someone's possession without authorization and to prevent the unauthorized use of your ATM Card or Debit Card. If your Deposit Account, Credit Line or Monogram Money Market Funds Program Account statement shows transactions that you did not make, tell us at once in order to prevent future unauthorized transactions and in no event later than 14 days after the statement was mailed or made available to you.

**6. ADDRESS AND TELEPHONE NUMBER FOR LOST OR STOLEN CARD OR UNAUTHORIZED TRANSFERS:**

If you believe that someone has transferred or may transfer money from your Deposit Account(s), Monogram Managed Account(s), Monogram Money Market Funds Program Account(s) and/or Credit Line(s) without your permission, call toll free: 1-866-sigline. To report a lost or stolen Card call toll free 1-866-sigline, select Option 6 or speak to a Client Services representative at any time. You may also write the Bank at:

<div align="center">

Signature Bank
565 Fifth Avenue, 8th Floor
New York, New York 10017
Attention: Bank Operations

</div>

**7. CHARGES & FEES:**

The fees for ATM Cards and Debit Cards are stated in the Bank's Business Accounts Fee Schedule. There is no charge by the Bank for using your ATM Card or Debit Card at an ATM or POS Payment Terminal, except for a currency conversion fee when you use an ATM or POS Payment Terminal in a foreign country to obtain foreign currency or make a purchase. In addition, the provider of the ATM or POS Payment Terminal might charge you a fee. The Bank also has minimum balance requirements and charges that apply to the Deposit Accounts, Monogram Money Market Funds Program Accounts and Credit Lines whether or not a Debit Card or ATM Card can access those accounts.

**8. DOCUMENTATION OF TRANSACTIONS:**

**A.** ATM & POS Transactions

You can get a receipt at the time you make any transaction at a Bank ATM, an ATM in the ATM Network or a POS Payment Terminal. If there is a conflict between the receipt and the Bank's records, the Bank's records shall be deemed to be correct.

**B.** Periodic Statement

You will get a monthly statement for each Deposit Account, Monogram Money Market Funds Program Account and Credit Line that can be assessed by your ATM Card or Debit Card and that statement will show your ATM Card and Debit Card transactions for the period covered by the statement.

**9. DELAYED OR INCOMPLETE ATM CARD OR DEBIT CARD TRANSACTIONS:**

If an ATM Card or Debit Card transaction you attempt to make is not made or completed or was delayed, we will not be liable to you except for direct losses to you that were directly and solely the result of our gross negligence. In no event will the Bank be liable for the following:

- If the transaction would exceed the available credit on your Credit Line, the available funds in your Deposit Account or Monogram Funds Program Account or the limits stated in this Agreement.
- If the ATM where you were making an ATM withdrawal does not have enough cash.
- If the ATM, ATM Network, or POS Payment Terminal is not working properly.
- If circumstances beyond our control (such as fire or flood) prevent the transaction.
- There may be other instances where we will not be liable that are stated in the Deposit Accounts, Credit Lines and Monogram Money Market Funds Program Accounts agreements between you and the Bank.

**10. ERRORS OR QUESTIONS ABOUT YOUR ATM CARD OR DEBIT CARD TRANSACTIONS:**

Call the telephone number on your account statement or 1-866-sigline as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt. You may also write to us at the Bank at: Signature Bank, Bank Operations, 565 Fifth Avenue, 8th Floor, New York, New York 10017. We must hear from you no later than 14 days after we sent or made available the FIRST statement on which the problem or error appeared. Tell us your name and account number (if any); describe the error or transaction you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and tell us the dollar amount of the suspected error or questioned transaction. If you tell us orally, we may require that you send us your complaint or question in writing. If you are reporting an error, we will investigate and when we complete our investigation we will correct any error that we determine has been made.

**11. OTHER RULES:**

ATM Card and Debit Card transactions will also be subject to the Bank's agreements for each Deposit Account, Credit Line and Monogram Money Market Funds Program Account to or from which such a transaction can be made.

**12. AMENDMENTS:**

The Bank may change this Agreement at any time by posting a notice of such change in its Financial Centers or sending you or making available to you a notice of such change.

**13. CANCELLATION:**

The Bank may cancel or revoke your ATM Card, Debit Card and/or PIN or all or part of this Agreement without prior notice to you. You agree to immediately return the ATM Card or Debit Card to the Bank if that card is cancelled.

**14. WAIVER:**

The Bank shall not be deemed to have lost any of its rights because they have not been exercised.

**15. INVALIDITY OF ANY PROVISION:**

If any provision stated in this Agreement or in any applicable Deposit Account, Monogram Money Market Funds Program Account or Credit Line agreement is held to be unenforceable, the remaining provisions shall remain in effect.

**16. APPLICABLE LAW:**

This Agreement shall be governed by the laws of the State of New York and applicable federal laws.

**17. LIMITATION OF BANK'S LIABILITY:**

You agree that the Bank shall be liable only for damages which are the direct result of the Bank's gross negligence or willful misconduct. In no event shall the Bank be liable for special, punitive, indirect or consequential damages, nor shall any action or inaction on the part of the Bank constitute a waiver by it of any cause of action or defense to recovery under any applicable law of mistake or restitution.

SIGNATURE BANK

▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

*Funds Availability Disclosure*

This Disclosure Statement provides information, which you should use to determine when funds deposited in your Signature Bank deposit accounts will be available for withdrawal. While Signature Bank's policy is to make funds available in an expeditious manner, it takes time before we are able to collect funds from your deposit and there are certain delays before deposited funds are available to you. The period of time varies with, among other things, the type of deposit and the location of the bank on which a check deposited into your account is drawn. During the delay you may not withdraw the funds in cash and we will not use the funds to pay checks that you have written. Refer to the Business Bank Deposit Account Terms and Conditions section of this Business Bank Account Agreements and Disclosures for defined terms.

**1. DETERMINING THE AVAILABILITY OF A DEPOSIT:**

The length of the delay is counted in business days from the day of your deposit. Every day is a business day except Saturdays, Sundays and the following holidays: January 1, the third Monday in January, the third Monday in February, the last Monday in May, July 4, the first Monday in September, the second Monday in October, November 11, the fourth Thursday in November, and December 25. If January 1, July 4, November 11, or December 25 fall on a Sunday, the next Monday is not a business day. If you make a deposit before 4:00 p.m. Eastern Time (or before 4:30 p.m. Pacific Time if deposits and payments are made at the San Francisco Financial Center) on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 4:00 p.m. Eastern Time (or after 4:30 p.m. Pacific Time if deposits and payments are made at the San Francisco Financial Center), or on a day that is not a business day, we will consider that the deposit was made on the next business day we are open. Funds mailed to Signature Bank are considered deposited on the business day they are received by Signature Bank. Funds deposited to a night depository, lock box or similar facility (other than Signature ATMs) are considered deposited on the day on which the deposit is removed from such facility and is available for processing by Signature Bank.

Signature ATMs: If you make a deposit to a Signature ATM before 3:00 p.m. Eastern Time on a Business Day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 3:00 p.m. Eastern Time, or on a day that is not a Business Day, we will consider that the deposit was made on the next Business Day we are open.

Please note that a check you deposit may be returned unpaid after we have made the funds available to you. If this happens, the amount of the returned check will be deducted from your account balance, and there will be a service charge.

**2. SAME-DAY AVAILABILITY:**

Funds from the following deposits are available on the day of your deposit:

(i) Cash made in person to one of our employees.

(ii) Wire transfers.

(iii) Electronic Direct Deposits, such as social security benefits and payroll payments.

**3. NEXT-DAY AVAILABILITY:**

Funds from the following deposits are available on the first Business Day after the day of your deposit provided the deposit is made to an account of the payee:

(i) U.S. Treasury checks.

(ii) Checks drawn on Signature Bank.*

(iii) Federal Reserve Bank checks, Federal Home Loan Bank checks, postal money orders, and travelers checks.

(iv) State and local government checks deposited in a Signature Bank Financial Center located in the state that issued the check using a special deposit slip available upon request at Signature Bank's Financial Centers.**

(v) Cashier's, certified, and teller's checks using a special deposit slip available upon request at Signature Bank's Financial Centers. **

\* Checks drawn on Signature Bank are not required to be deposited into an account of the payee for next-day availability.

\*\*Special deposit slips may be used to deposit these checks by mail or at non-staffed facilities, such as Signature Bank's ATM's.

**4. OTHER CHECK DEPOSITS:**

The following chart will show you when funds from these checks will be available.

| When funds are available | When funds are available if a deposit is made on a Monday (assuming no Bank Holidays) |
|---|---|
| $200 on the first Business Day after the day of your deposit. | Tuesday |
| An additional $400 for cash withdrawal at 7:30 a.m. local time (of the Financial Center in which the deposit was made) on the second Business Day after the day of your deposit. | Wednesday |
| Funds to pay checks you have written to others on the second Business Day after the day of your deposit. | Wednesday |
| Remaining funds on the third Business Day after the day of your deposit. | Thursday |

**5. CASH-WITHDRAWAL LIMITATION:**

The first $200 from a deposit of checks will be available on the first Business Day after the day of your deposit for a cash withdrawal or to pay checks you have written to others. All of the remaining funds will be available on the second Business Day after the day of your deposit to pay checks you have written to others.

An additional $400 of the deposit may be withdrawn in cash at 7:30 a.m. Eastern Time on the second Business Day after the day of your deposit. All of the remaining funds will be available for cash withdrawal on the third Business Day after the day of your deposit.

For example, if you deposit a check of $700 on a Monday, $200 of the deposit is available on Tuesday to pay checks to others and to withdraw in cash. The rest is available to pay checks on Wednesday. At 7:30 a.m. Eastern Time on Wednesday, you may withdraw another $400 of the deposit in cash and you may withdraw the rest in cash on Thursday.

**6. LONGER DELAYS MAY APPLY:**

Funds you deposit by check may be delayed for a longer period under the following circumstances:

(i) We believe a check you deposit will not be paid.
(ii) You deposit checks totaling more than $25,000 on any one day (Other than checks subject to Next-Day Availability).
(iii) There is an emergency, such as failure of communications or computer equipment.
(iv) You redeposit a check that has been returned unpaid.
(v) You have overdrawn your account repeatedly in the last six months.

If on any one Business Day you deposit checks (other than checks subject to Next-Day Availability) totaling more than $25,000, then the first $25,000 of such checks will be available to you according to our general policy as stated in this Funds Availability Disclosure. The amount of such checks in excess of $25,000 will be available to you one Business Day later than stated in our general policy. For example, with respect to such checks that represent deposits over $25,000 made on a Business Day, the funds will become available to pay checks in 3 Business Days and for cash withdrawals in 4 Business Days.

We will notify you if we delay your ability to withdraw funds for any of the reasons stated above (other than the reason stated in the preceding paragraph), and we will tell you when the funds will be available. They will generally be available no later than the sixth Business Day after the day of your deposit.

**7. HOLDS ON OTHER FUNDS (CHECK CASHING):**

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

**8. HOLD ON OTHER FUNDS (OTHER ACCOUNT):**

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

**9. SPECIAL RULES FOR NEW ACCOUNTS:**

If you are a new customer, the following special rules will apply during the first 30 days your account is open.

Funds from deposits of cash, wire transfers and electronic direct deposits will be available on the day of your deposit. The first $5,000 of a day's total deposits of Federal Reserve Bank checks, Federal Home Loan Bank checks, postal money orders, cashier's, certified, teller's, travelers, and state and local government checks deposited in a Signature Bank Financial Center located in the state that issued the check will be available on the first Business Day after the day

of your deposit. You must use a special deposit slip to obtain the availability described in this paragraph for cashier's checks, certified checks, teller's checks, state and local government checks deposited in a Signature Bank Financial Center located in the state that issued the check. The excess over $5,000 of these checks will be available on the fifth Business Day after the day of your deposit. Funds from deposits of other checks will be available on the sixth Business Day after the day of your deposit

SIGNATURE BANK

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

*Funds Transfer Agreement*

Each client of Signature Bank (the "Bank") by requesting or instructing that the Bank transfer funds from or to an account at the Bank by wire or other electronic means ("Funds Transfer") or making or receiving a Funds Transfer agrees to this Funds Transfer Agreement ("Agreement") between the Bank and such client (the "Client") which describes the terms and conditions upon which the Bank agrees to make Funds Transfers. "Other Agreements" means all of those agreements in effect from time to time between the Bank and the Client governing the Client's use of any electronic communication system of the Bank, each software license or sublicense agreement, master control agreement or use agreement pursuant to which the Bank or any other person has licensed or permitted the Client to use any electronic communication system of the Bank and any software in connection therewith.

**1. AUTHORITY TO TRANSFER FUNDS:**

The Bank is authorized to honor, execute and charge the Client's account(s) which have been designated by the Client in the Funds Transfer Application ("Application") and accepted by the Bank ("Authorized Account") in and according to Funds Transfer instructions ("Payment Order") by the Client to the Bank to pay, or cause another bank to pay, a specific amount of money to a designated beneficiary. Payment Orders may only be made from the Private Client Group at the Bank maintaining the Client's account ("PCG") unless special arrangements involving foreign currencies have been made by the Client with the Client's account officer. If the Bank determines to act upon the Client's Payment Order, it shall do so at such time as it, in its sole discretion, shall determine.

**2. INITIATING PAYMENT ORDERS:**

**A.** The Client may provide the Bank with Payment Orders in person or by telephone, fax, messenger or e-mail to the PCG at the Bank maintaining the Client's accounts ("Offline Access"), by using the Bank's internet banking service or foreign exchange quotes data and trading portals ("FX Portal"), and with the Bank's internet banking service ("Online Access"), or by using certain third-party messaging services, as may be permitted by the Bank ("Third Party Messaging Services"). The PCG will provide to the Client the PCG's fax and/or telephone numbers and/or e-mail addresses to be used for Offline Access upon accepting the Client's Application. Should the Client send a Payment Order to the Bank in any manner other than Online Access or Offline Access, then such Payment Order may not be acted upon, may be acted upon after a delay or may contain incorrect information. The Bank will have no liability with respect to such consequences and the Client shall assume all responsibility and liability for such consequences, including without limitation for Payment Orders that contain incomplete information or information that is not delivered in a timely manner or is held for screening purposes, all in the sole discretion of the Bank.

**B.** The Bank is not required to act upon any instruction or notice received from the Client or any other person, including without limitation any instruction as to the time or means of, or Funds Transfer system to be used in executing or paying a Payment Order or, except, as otherwise expressly provided in this Agreement, to provide any notice or advice to the Client or any third person.

**C.** The Bank may rely upon the information provided in the Payment Order to make such payment and any errors in that information, including the misidentification of the beneficiary(ies) and/or the beneficiary bank, incorrect or inconsistent account names and numbers and misspellings, are the Client's sole responsibility. The Client expressly understands and accepts the increased risk that an unintended person or entity may obtain payment or the benefit of a completed Payment Order to the extent the Client incompletely or inaccurately identifies the Beneficiary, the Beneficiary's bank, the Beneficiary's account number, or identifies more than one Beneficiary or more than one account number. The Bank shall have no liability for any errors, negligence, suspension of activity, actions, omissions or defaults of any correspondent, agent, sub-agent or communication data or trading system, including without limitation the FX Portal. In addition, the Bank shall have no liability for (i) any failure to accurately identify the beneficiary or the beneficiary's account number, or any mispayment of any Payment Order, (ii) any errors, mutilations, delay, misdelivery or failure or delivery in the transmission of any Payment Order or (iii) any suspension of any means of communication, data or trading service or system or for any imposition of any censorship, exchange control or other restriction.

**D.** In executing any Payment Order for the Client the Bank may make use of correspondents, agents, subagents and funds transfer and communication, data or trading service or systems that the Bank, in its good faith judgment, deems sufficient for such purpose. All correspondents, agents, subagents and funds transfer and communication, data or trading service or systems selected or used by the Bank in effecting the Client's Payment Order(s) shall conclusively be deemed to be solely as agents of the Client.

**E.** If a Client's Payment Order is not received by the Bank on a Business Day when the Bank is open for Funds Transfer activity on or before the cutoff time for Payment Orders of 4:00 p.m. Eastern Time (or such other time related to a Payment Order initiated by Client and denominated in foreign currency ("Foreign Currency Payment Order"), as may be set from time to time by the Bank or as may be applicable to that foreign currency), then the Payment Order might not be processed by the Bank until the next Business Day when the Bank is open for Funds Transfer activity. A Business Day is defined as any day other than a Saturday, Sunday or Bank Holiday, which is January 1, the third Monday in January, the third Monday in February, the last Monday in May, July 4, the first Monday in September, the second Monday in October, November 11, the fourth Thursday in November, or December 25. If January 1, July 4, November 11, or December 25 fall on a Sunday, the next Monday is a not a Business Day.

**F.** To reduce the risk of duplicative Payment Orders, the Client agrees not to send a written confirmation of a Payment Order made by telephone or internet banking unless the Bank specifically requests such a confirmation. The Client agrees that the Bank shall not be responsible for any duplicate Payment Orders should an unrequested written confirmation be submitted to the Bank. The Client agrees to indemnify the Bank for any loss, liability, expense or damage caused by such unrequested written confirmation, including, without limitation, attorney's fees and litigation expenses. Any such unintended duplicate Payment Order shall be at the sole risk, cost and expense of the Client.

**G.** The Bank may, but is not required to, record electronically and retain all telephone conversations, not limited to cell phone, landline, and cordless telephone conversations, between the Bank and the Client regarding Payment Orders. The Client authorizes the Bank to record and monitor such telephone conversations and agrees that such recordings may be admitted as evidence in any litigation, arbitration or other proceeding or hearing. Should there be a discrepancy between any Payment Order submitted via telephonic Offline Access, whether or not it is recorded, and a written confirmation, or if the recording is ambiguous or not understandable, then the Bank's understanding of the Payment Order submitted via telephonic Offline Access will be controlling. The Bank may not remind you that the Bank may record or monitor telephone conversations at the outset of a call unless required by law to do so. You authorize and consent in advance to these telephone conversation recordings.

**H.** The Bank shall have no duty or obligation of inquiry or verification of, and it may act in complete reliance on, any Payment Order initiated or purportedly initiated by the Client via Online Access, including via the FX Portal, Offline Access or access via Third Party Messaging Services, which the Bank believes in good faith to have been given, sent, made, or was authorized to have been given, sent, or made by or on behalf of the Client, or an Authorized Representative, whether or not in fact given, sent, made or authorized by the Client or an Authorized Representative, provided such Payment Order is in accordance with the Security Procedures applicable to Client's Payment Orders.

**I.** The Client may provide the Bank with a standing wire instruction in a form prescribed by the Bank to initiate repetitive Payment Orders from an Authorized Account ("Standing Instruction"). The beneficiary, beneficiary's financial institution, amount and accounts to be debited and credited shall remain constant, as specified in the Standing Instruction, and shall not change for each Payment Order initiated pursuant to the Standing Instruction. The Client may request a change to a Standing Instruction at a time and in a manner that permits the Bank a reasonable opportunity to act upon such a request prior to the Bank's acceptance of a subsequent Payment Order. If the Bank does not have a reasonable opportunity to change the Standing Instruction prior to the Bank's acceptance of a subsequent Payment Order, the Payment Order initiated pursuant to the Standing Instruction shall be deemed a Payment Order authorized by the Client. The Client acknowledges that the Bank using a Security Procedure as described in Section 6 of this Funds Transfer Agreement is a commercially reasonable security procedure given the nature of Payment Orders initiated pursuant to the Standing Instruction.

## 3. FOREIGN CURRENCY PAYMENT ORDERS:

The Client may initiate Payment Orders denominated in foreign currencies ("Foreign Currency Payment Orders") through the foreign exchange quoting and trading systems offered by the Bank, including the FX Portal, to the extent the Client has been granted access to such systems. Any risk related to fluctuation in the applicable exchange rate for a Foreign Currency Payment Order is borne by the Client. The Client acknowledges and agrees that exchange rates for Foreign Currency Payment Orders may differ from rates offered by other dealers or rates reported in sources such as the Wall Street Journal or other sources. The Bank accepts no liability if the rate assigned to a Foreign Currency Payment Order differs from the rates offered or reported by third parties at a different location, or a different day, at a different time, for a different amount or using a different payment method. If a Foreign Currency Payment Order is returned to the Bank, the Client shall also bear the risk of converting the amount returned back to U.S. Dollars. The Bank may rely upon all information provided in the Foreign Currency Payment Order, and the Client is solely responsible for any errors or inaccuracies in the Foreign Currency Payment Order, including the misidentification of the beneficiary(ies) and/or the beneficiary bank, incorrect or inconsistent account names and numbers and misspellings, or incorrect identification of the foreign currency or the country of destination for payment. The Client is solely responsible for any duplicate Foreign Currency Payment Order initiated through the foreign exchange quoting and trading systems offered by the Bank, including the FX Portal, or through communications with the PCG or any other person at the Bank.

## 4. OUTGOING WIRES SENT TO AN ACCOUNT DENOMINATED IN FOREIGN CURRENCY:

When you send a wire denominated in U.S. Dollars to an account denominated in a foreign currency, an intermediary bank or the receiving bank may convert your wire into the applicable foreign currency and the Bank may receive compensation in connection with any such conversion. When this occurs, the intermediary bank or the receiving bank determines in their discretion the currency exchange rate. We are not responsible for the exchange rate set by an intermediary bank or the receiving bank.

## 5. REIMBURSEMENT FOR PAYMENT ORDERS:

The Client shall pay the Bank the amount of each of the Client's Payment Order(s) executed or paid by the Bank pursuant to this Agreement on the date of such execution or payment, as applicable, or at such time and on such date, as the Bank in its discretion shall determine. The Bank may, without prior notice or demand, obtain payment of any such amount by charging an Authorized Account, or any other account of the Client for or in respect of the Client's Payment Orders. The Client shall reimburse the Bank on demand for any overdrafts in any of its accounts arising by operation of this Agreement. Notification to the Client of the execution of the Client's Payment Orders will appear on the statement that was issued for the Authorized Account that was debited for the Payment Order for the statement cycle during which the Payment Order was made.

**6. SECURITY PROCEDURES:**

A. The Bank offers the security procedures described in this Agreement ("Security Procedures"), as may be updated from time-to-time, to the Client for purposes of authenticating any communication initiating, verifying, amending or canceling a Payment Order. The Security Procedures are not used to detect an error in the transmission or the content of the payment order. Any communication that complies with the agreed upon Security Procedure shall be conclusively deemed to have been authorized by the Client.

B. Online Security Procedures. The Bank provides the Client with a Security Procedure by which the Client may initiate or verify Payment Orders via Online Access, which may include a User ID or Username, password, or authentication token, other access credentials provided by the Bank ("Access Credentials"), as well as other hardware and software security measures or systems controls as may be specified by or provided by the Bank from time to time ("Online Security Procedures").

C. Authorized Representatives. The Client will designate Authorized Representative, as defined in Section 33 of this Agreement, to initiate and verify Payment Orders. The Client will designate the number of Authorized Representatives required to verify each Payment Order in the resolution/banking agreement. The Bank strongly recommends that the Client require that two (2) Authorized Representatives verify each Payment Order submitted via Online Access, and that neither Authorized Representative that verifies a Payment Order is the same Authorized Representative who has initiated such Payment Order in order to minimize the likelihood of fraudulent initiation of Payment Orders.

D. Safeguarding Access Credentials. The Client agrees that it will require each Authorized Representative to safeguard the confidentiality of any Access Credentials provided by the Bank, protect them from being copied, lost or stolen, not disclose them to anyone else or permit anyone else to use or have access to them. The Client agrees to notify the Bank immediately of any unauthorized disclosure of Access Credentials.

E. Offline Security Procedures. Each of the Client's Payment Orders communicated to the Bank via fax or messenger must contain the signature of an Authorized Representative. The Bank may verify the authenticity of any Payment Order communicated to the Bank via Offline Access, by a call-back to an Authorized Representative that is authorized by the Client to verify fund transfers ("Call-Back Procedure").

F. Security Procedures Offered by Third Party Messaging Services. Each of the Client's Payment Orders that are authenticated by a Third Party Messaging Service selected by the Client and issued to the Bank in the name of the Client shall be deemed to be verified by an Authorized Representative of the Client.

G. Payment Alerts and Payment Activity Thresholds. The Bank may offer the Client the ability to receive alerts and notifications of payment activity ("Payment Alerts"). The Bank also may offer the Client the ability to limit or restrict account activity by setting a transaction value threshold ("Payment Activity Threshold"). If the Client utilizes a Payment Activity Threshold, the Bank is authorized to honor, execute and accept any Payment Order in a manner consistent with the agreed upon Security Procedures or otherwise using the Client's Access Credentials, that does not violate such a Payment Activity Threshold. The Bank may seek to authenticate further, including by use of the Call-Back Procedure, any Payment Order that, based on a Payment Activity Threshold or otherwise in the Bank's judgment, appears anomalous or presents indicia of fraud. Payment Alerts and Payment Activity Thresholds are part of the Security Procedures that the Bank offers to the Client.

H. Commercial Reasonableness. The Client agrees that the Security Procedures described herein are commercially reasonable for the size, type and frequency of Payment Orders the Client normally expects to issue. The Client agrees not to make a claim against the Bank that a Payment Order is unauthorized or inaccurate if that Payment Order has been verified by the Bank in accordance with these Security Procedures. If the Client deviates from the Security Procedures offered or recommended by the Bank, including but not limited to the procedures described in this Section 6, the Client has refused a commercially reasonable security procedures offered and recommended by the Bank and the Client expressly agrees to be bound by any Payment Order issued in the Client's name whether or not the Payment Order is authorized by the Client. The Client agrees that failure of the Bank to use or comply with any Security Procedure provided in this Agreement shall not excuse the Client from its obligation to reimburse the Bank the amount of the Payment Order sent, or authorized, by the Client or for which the Client is otherwise liable. The Bank may from time to time modify or add to its security procedures and shall give the Client written or other appropriate notice thereof.

**7. INSUFFICIENT FUNDS:**

If at the time of processing a Payment Order the available funds in the Authorized Account plus any available credit for the payment of the Payment Order is not sufficient to reimburse the Bank for the Payment Order, then the Bank has the right to (i) reject the Payment Order, (ii) create an overdraft in the Authorized Account to the extent of the deficiency or (iii) transfer funds from any other Client account at the Bank into the Authorized Account to cover such deficiency.

**8. BENEFICIARY BANK/INTERMEDIARY BANK:**

The beneficiary bank must be identified accurately in the Client's Payment Order and must be a member of the Federal Reserve System, CHIPS, SWIFT or be a correspondent bank of such a member. Client agrees to be bound by the rules of any system through which the Funds Transfer is made. The beneficiary bank may credit an account based solely on the account number provided by Client. If a Payment Order does not designate the beneficiary bank, the Bank will not attempt to identify the bank at which the beneficiary maintains an account and will seek further instructions from the Client prior to acting on the Payment Order. If the Payment Order does not, where appropriate, designate an intermediary bank, the Bank will select an intermediary bank and the Client agrees that the Bank shall have no liability with respect to such selection.

**9. REJECTION OF PAYMENT ORDER:**

The Bank reserves the right to reject any of the Client's Payment Orders:

(i) If there is insufficient available funds in the Authorized Account;

(ii) If the Payment Order is incomplete or unclear;

(iii) If the Payment Order is not received in a manner permitted under this Agreement, including by misuse or unauthorized use of Access Credentials;

(iv) If the Bank is unable to confirm the Payment Order;

(v) If the Payment Order violates any Payment Activity Threshold or any limits set by the Bank in its sole discretion related to Foreign Currency Payment Orders;

(vi) If the Bank is unable to authenticate a Payment Order that, in the Bank's judgment, appears anomalous or presents indicia of fraud; or

(vii) If for any other reason the Bank is unable to process the Payment Order.

The Bank will attempt to notify the Client of any rejected Payment Order either in the same manner as the Payment Order was sent to the Bank by the Client or in the manner provided in this Agreement for Notices, but shall not be liable for any delay or failure in providing such notice or executing any Payment Order. THE BANK SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSS SUSTAINED BY THE CLIENT FOR THE BANK'S REJECTION OF A PAYMENT ORDER. THE BANK SHALL BE ENTITLED TO REIMBURSEMENT BY THE CLIENT FOR FEES, COSTS AND EXPENSES INCURRED BY THE BANK RELATED TO ANY CANCELLED OR FAILED FOREIGN EXCHANGE PAYMENT ORDER.

**10. CANCELLATION/AMENDMENTS OF PAYMENT ORDER:**

The Client may send a cancellation or amendment request to a Payment Order that has not already been executed by the Bank, provided the Bank receives the Client's request in a time, manner and circumstances that gives the Bank a reasonable opportunity to act upon such request. The Bank has no obligation to accept such a cancellation or amendment request, but if in its sole discretion it determines to do so, it may condition its action upon (i) compliance with applicable Security Procedures and (ii) receipt of an indemnity and bond or security acceptable to the Bank. Any cancellation or amendment request of a Client's Payment Order by the Bank shall relieve the Bank of any obligation to act on the original Payment Order. If the Client's Payment Order was already executed, then the Payment Order can only be cancelled or amended if the beneficiary bank agrees to such request. If the Bank accepts the Client's request to cancel or amend a Payment Order, the Bank will not be liable for any losses for the failure of the beneficiary bank to cancel or amend the Client's Payment Order. If the Client's Payment Order was made in a foreign currency, any refund will be in U.S. Dollars computed at the Exchange Rate on the day of the refund.

**11. DELAY/NON-EXECUTION OF PAYMENT ORDER:**

While the Bank intends to handle the Client's Payment Orders as expeditiously as possible, the Bank will not be responsible for any delays, non-executions or misexecutions due to circumstances beyond the Bank's reasonable control. This includes, without limitation, any inaccuracy, interruption, delay in transmission or the failure in means of transmission, whether caused by fire or other catastrophe; mechanical, computer or electrical failures; an act of God or other circumstances beyond the Bank's control. In addition, the Bank shall not be responsible for any losses or for failure or delays in acting if such action would have resulted in the Bank's having exceeded any limitation upon its intraday net funds position established pursuant to present or future Federal Reserve guidelines or in the Bank otherwise violating any provision of any present or future risk control program of the Federal Reserve or any rule or regulation of any other governmental authority. The obligation, if any, of the Bank with respect to any Client Payment Order, or the return of funds to the Client, shall be suspended while any of the above described situations exist.

**12. RETURN OF PAYMENT ORDER:**

If any Client Payment Order is returned to the Bank after its execution, the Bank shall use reasonable efforts to notify the Client promptly. The Bank shall not be liable for any delay or failure to provide such notice. The Bank may credit an Authorized Account in any amount to which the Client may be entitled by reason of return of the Client's Payment Order executed by the Bank or the amendment or cancellation of a Payment Order. The Client recognizes that from time to time the Bank may charge its accounts for amounts credited thereto, whether provisionally or not, including by way of illustration and not by way of limitation, charges made as a result of the cancellation or amendment of a Payment Order or the failure of a funds transfer system to settle as anticipated.

**13. FUNDS TRANSFERS TO CLIENT:**

If the Client is the beneficiary of a Payment Order, the Client agrees that notification of the receipt of such Funds Transfer may be made by including such Funds Transfer as a credit reflected in the periodic statement for the Client's account indicated in the Payment Order, as well as by a separate notice sent to the Client by mail or electronically no later than the Business Day following the Business Day of the Bank's receipt of such Funds Transfer. If the Bank makes funds available to the Client in anticipation of the Bank's receipt of final payment of a Payment Order for which the Client is the beneficiary, then the Client agrees that all such funds made available prior to receipt of final payment (i) constitute loans or advances by the Bank and not acceptance of a Payment Order, and (ii) shall be repayable upon demand to the Bank if the expected funds are not actually received or finally settled. The Client recognizes that from time to time the Bank may charge its accounts for amounts credited thereto, whether provisionally or not, including by way of illustration and not by way of limitation, charges made as a result of the cancellation or amendment of a Payment Order or the failure of a Funds Transfer system to settle as anticipated. The Bank may rely solely on identifying account numbers of the beneficiary, beneficiary bank or intermediary bank in the Payment Order, rather than names. The Bank has no duty to detect any inconsistencies between the name and the account number in any Payment Order.

**14. FEES:**

The Bank may charge, and the Client shall pay to the Bank promptly, the Bank's usual and customary fees as set by the Bank from time to time for services provided under this Agreement. The Bank's fees will be set forth in its fee schedule and updated from time to time. In addition, the Client shall pay any fees imposed by an intermediary bank, beneficiary bank, funds transfer system or regulation having the force of law for processing the Payment Order. The Bank is authorized to collect such fees by making appropriate charges to the Authorized Account, or if necessary, to other Client accounts.

**15. NON-VALUE MESSAGES:**

At your request, the Bank may process messages, including through SWIFT or another messaging service, on your behalf that are not Payment Orders or other value transfers ("non-value messages"). Such non-value messages include, but are not limited to, MT199, MT799, MT999 and any additional or successor MT messages for transmission by the Bank that SWIFT might adopt and implement in the future. Non-value messages may be subject to form and format requirements, security procedures, timing requirements, and fee schedules. This Agreement does not impose any obligation on the Bank or the recipient of a non-value message to respond to or take action based on a non- value message or the information contained therein. The Bank shall not be liable for damages caused by (i) the Bank or any recipient's failure to take action in connection with a non-value message; or (ii) any receiving bank's failure to accept or properly authenticate a non-value message. The Bank's liability for damages caused by the Bank's failure to exercise ordinary care or act in good faith in processing a non-value message shall not exceed the amount of any fee paid to the Bank for the non-value message.

**16. NOTICES:**

Except as otherwise provided in this Agreement, any notice given under this Agreement shall be provided to the other party as follows: If to the Client at the Client's address as provided on the Bank's records, and if to the Bank to the attention of the Group Director of the PCG at the Bank's Financial Center where the Client's accounts are maintained or at any other address as a party shall advise the other party in writing in accordance with this section.

**17. INFORMATION REQUESTS:**

Upon request, the Client will provide the Bank with any transaction information necessary for the Bank to handle inquiries and tracing, or otherwise to comply with applicable laws and regulations relating to the Client's Payment Orders including, but not limited to, U.S. Dollar amounts, account(s) affected, dates and names of beneficiaries and third parties involved in the transfer.

**18. BANK LIABILITY:**

The Bank shall be responsible only for performing the services expressly provided for in this Agreement. Within a reasonable time not exceeding 30 days of the Bank sending the Client a statement or a notice of a Payment Order or Funds Transfer, such notice having been provided electronically as agreed by the Client or by mail, the Client shall notify the Bank in writing of any discrepancies, unauthorized transactions or other errors with respect to such statement, Payment Order or Funds Transfer. The Client agrees that such written notification shall be a condition precedent in any litigation in which the Client and the Bank are adverse parties as to any claim allegedly arising or resulting from, or in any way related to, the Bank's performance or non-performance of this Agreement, or alleged breach of any obligation of the Bank arising under Article 4-A of the UCC (as defined in this Agreement), and that the Client's sole right to any relief shall be limited to breach of contract. The Client specifically waives any and all claims, however denominated, whether based on or arising from statute or tort. The Client specifically waives the right to recover from the Bank on any claim of negligence, gross negligence, willful misconduct, failure to act in good faith and/or deal fairly with the Client, bad faith, breach of implied covenant or duty to act in good faith or deal fairly with the Client, breach of fiduciary duty, commercial unreasonableness, loss of business, or loss of business opportunity or advantage. Further, the Client agrees that, in no event, shall the Client claim, or shall the Bank be liable for, special, punitive, indirect or consequential damages, whether economic or non-economic, loss of profits, loss of business or other financial loss, lost savings, lost benefits, even if the Bank has acted in bad faith and even if the Bank has been advised of the possibility of or could have foreseen such damages or the possibility of such damages. In addition, the Bank shall not be liable for the Client's attorney's fees and expenses of litigation (including the fees and expenses of the Client's experts, consultants or any other person, whether or not they testify), even if the Client would otherwise be entitled to recover such attorneys fees or litigation expenses under any statute or rule or the UCC (as defined in this Agreement), and any other legal cost, disbursement or other expense, however denominated. In no event shall any action or inaction on the part of the Bank constitute a waiver by it of any cause of action or defense to recovery under any applicable law of mistake or restitution. The Bank shall not be liable to the Client for interest on any amount to be refunded or paid to the Client with respect to an unauthorized, erroneous or any other Payment Order if the Client fails to exercise ordinary care in determining that a Payment Order is unauthorized or erroneous or fails to notify the Bank of the facts thereof within a reasonable time, which shall not exceed 30 days, after the earlier of the Client receiving notice from the Bank of the acceptance of the Payment Order or the Client's Account was debited in the amount of the Payment Order or the Bank sending the Client the account statement containing such Payment Order. If the Bank is liable to the Client for interest on such refunded amount, then the Client agrees that the amount of such interest shall not exceed thirty (30) days interest. As set forth in Paragraph 2(D) above, to the full extent permitted by law, all correspondents, agents, subagents and communication, data or trading services or systems used by the Bank for the Client's Payment Order shall be deemed to be agents of the Client.

**19. CLIENT'S RESPONSIBILITY; ASSUMPTION OF RISK:**

In consideration of the agreement by the Bank to act upon a Funds Transfer request or instruction from the Client

pursuant to this Agreement, the Client agrees, to the fullest extent permitted by applicable law, to indemnify and hold the Bank, its directors, officers, employees and agents harmless from and against any loss, liability, expense or damage, including without limitation, attorney's fees and expenses of litigation, resulting from any claim of any third party relating to any of the Client's Payment Orders, non-value messages, or any other services provided for in this Agreement. Any losses resulting from the Client's Payment Order specifying an incorrect account number, or any inaccuracy in a non-value message, are the Client's sole responsibility and are not the responsibility of the Bank. Notwithstanding any contrary or other provision of any statute or rule, the Client agrees to assume all risks of action or omission to act of any Intermediary Bank, Paying Bank, or any other entity, whether or not selected by the Bank, in connection with any Payment Order or non-value message, or any other person or entity in connection with any Payment Order or non-value message. This indemnification will survive the termination of this Agreement by either party and/or for any reason.

## 20. WHEN CLIENT IS A BANK:

If the Client is a bank (as defined in Uniform Commercial Code Article 4A) and under applicable law the Client is not deemed the originator of the Funds Transfer to which a Payment Order relates, the Client agrees to indemnify and hold the Bank harmless for any loss or liability owed to such originator to the extent that such loss or liability would not have been incurred by the Bank if the Client had been the originator.

## 21. NO IMPLIED WAIVER:

The Bank's failure to enforce any of its rights under this Agreement on any one occasion shall not be deemed a waiver of (i) those rights not enforced; (ii) any of its rights; (iii) any specific default; (iv) any default of the Client in the performance of any of its obligations under this Agreement; or (v) the Bank's right to insist upon or to enforce performance by the Client of its obligations under this Agreement. None of the Bank's rights under this Agreement can be affected or waived orally or by any prior act, acquiescence, practice, course of action, course of dealing or previous action or failure to act. No waiver shall be effective unless made in writing and signed by the Bank's authorized officer having full knowledge of all facts, and then only to the extent set forth in the writing.

## 22. TERMINATION:

This Agreement shall remain in full force and effect until either party shall be given written notice of its termination. Notwithstanding any notice of termination, this Agreement shall remain effective in respect of any transaction occurring, and liability arising, prior to such termination.

## 23. GOVERNING LAW:

This Agreement shall be governed and interpreted according to federal law and the laws of the State of New York, including without, limitation Article 4A of the New York Uniform Commercial Code ("UCC"), and without regard to the conflict of laws provisions of the laws of the State of New York. In addition, the rules and regulations, including applicable choice of law provisions, of any funds transfer system of which the Bank is a member, and commercial bank practices applicable to funds transfers, shall apply.

## 24. ENTIRE AGREEMENT:

This Agreement includes the exhibits to this Agreement and all of the terms, provisions and conditions of the account agreement for the Accounts, cash management agreement and all other agreements (including the Other Agreements) between the Bank and the Client, except that if there is any conflict between this Agreement and any provisions of those agreements, then the provisions of this Agreement shall govern as to Payment Orders with respect to such conflict. This Agreement constitutes the complete and exclusive expression of the terms of the Agreement between the parties, supersedes all prior or contemporaneous proposals, understandings, representations, conditions, warranties, covenants, and all other communications between the parties relating to the subject matter of this Agreement. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be merged into and included in this Agreement, and neither party is relying on any promise, agreement or understanding not set forth in this Agreement. The parties further agree that this Agreement may not in any way be explained or supplemented by a prior or existing course of dealing between the parties or by any other prior performance between the parties pursuant to this Agreement or otherwise. The Client specifically acknowledges that it is not relying on advice, suggestions or guidance which the Bank may provide to the Client which, in any event, shall not be deemed legal advice or any advice, and shall not oblige the Bank or put it at any risk whatsoever therefor. The Bank also shall have no liability or responsibility for refusing to make any suggestion or provide any guidance which the Client requests but which the Bank declines to provide.

## 25. AMENDMENTS:

Except for the Authorized Accounts and Authorized Representatives, any part of this Agreement may be amended from time to time by the Bank. Any such amendments shall become effective upon the Bank's sending of written notice of such amendment to the Client in accordance with paragraph 16 above.

## 26. ASSIGNMENTS:

No right or obligation under this Agreement may be assigned by the Client without the prior written consent of the Bank. Subject to the foregoing limitation, this Agreement shall be binding upon, and inure to the benefit of the Client and the Bank and their respective legal successors and permitted assigns.

## 27. SEVERABILITY:

Except as set forth in paragraph 28.B(ii), if any term or provision of this Agreement is declared invalid, illegal or unenforceable by any court of competent jurisdiction, the validity, legality or enforceability of the remaining provisions of this Agreement shall in no way be affected or impaired thereby.

28. **JUDICIAL PROCEEDINGS:**

A. **FOR ACCOUNTS OPENED IN STATES OTHER THAN CALIFORNIA:** The Client agrees to commence any action or proceeding against the Bank relating to this Agreement regarding performance or non-performance, ONLY in a court of competent subject matter jurisdiction (State or Federal) located within the State of New York and the County of New York. The Client agrees that this venue and forum shall be exclusive, irrespective of any statute or rule and irrespective of any conflict of law rule of New York. The Client must commence any legal action or proceeding against the Bank with respect to any alleged improper, erroneous, duplicate or unauthorized Funds Transfer or Payment Order within one year of the date the Client received Notice from the Bank of the transfer but in no event beyond the period of repose set forth in Art 4A-505 of the UCC in effect in New York on the date of the transfer in question. In any action commenced by the Bank against the Client to enforce or protect the Banks' rights hereunder, the Client waives any objection it may now or hereafter have to the venue of such proceeding, including that the venue or the court is inconvenient or improper. In any such action, the Bank shall be entitled to recover its attorneys fees, costs and expenses (including those allocated to the Bank's internal Legal Department) and expert's and consultant's fees (whether or not they testify) and expenses but the Client waives, and shall not have, any such reciprocal right against the Bank. Any action commenced by the Bank against the Client shall be timely if commenced within the applicable period of limitations provided by law. In respect of any legal proceeding related in any way to this Agreement, the Client consents to submit to the non-exclusive personal jurisdiction of any court of competent jurisdiction (State or Federal) located within the State of New York and the County of New York. THE CLIENT AGREES THAT IN ANY LITIGATION RELATING TO THIS AGREEMENT OR ANY RELATED CASH MANAGEMENT AGREEMENT, IN WHICH THE BANK AND THE CLIENT SHALL BE ADVERSE PARTIES, THE ACTION AS BETWEEN THE BANK AND THE CLIENT SHALL BE TRIED BY THE COURT WITHOUT A JURY. THE CLIENT SPECIFICALLY AGREES AND CONSENTS THAT TRIAL BY JURY IS WAIVED AS TO EACH AND EVERY ISSUE WHICH MAY OR MIGHT BE TRIABLE AS OF RIGHT TO A JURY ACCORDING TO THE CONSTITUTION OR THE LAWS OF THE STATE OF NEW YORK. In addition, the Client agrees to waive the right to interpose against the Bank any defense based upon lack of personal jurisdiction, inconvenience of forum, the statute of limitations, laches, waiver, estoppel, and any setoff, cross-claim or counterclaim, however denominated, whether related or unrelated to this Agreement or to any related Cash Management Agreement.

B. **FOR ACCOUNTS OPENED IN CALIFORNIA:** If you aren't able to resolve the dispute and you opened your account in a California branch, you agree that either the Bank or you can initiate arbitration in accordance with the provisions in this Section 28.B. These provisions constitute the Arbitration Agreement between you and the Bank. **ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. YOU AND THE BANK AGREE TO WAIVE THE RIGHT TO A JURY TRIAL OR A TRIAL BEFORE A JUDGE IN COURT.**

   (i) **AGREEMENT TO ARBITRATE:**
   Either you or the Bank may choose, with the other's consent, to arbitrate all Disputes. A "Dispute" is any unresolved disagreement between you and the Bank, including any disagreements about the meaning, scope, or enforceability of this Arbitration Agreement. The only exception to this Arbitration Agreement are Disputes filed by the Bank or you in small claims court, so long as the Dispute remains in that court and is pursued on an individual basis.

   (ii) **NO CLASS ACTION OR JOINDER OF PARTIES:**
   **You and the Bank agree that no class or any other type of representative action can be pursued in arbitration or in court if either you or the Bank chooses to arbitrate a Dispute. Unless both you and the Bank agree, Disputes by or against others may not be joined, consolidated, or otherwise brought together in the same arbitration.** If any part of this section is found to be unenforceable, the entire Arbitration Agreement will be unenforceable.

   (iii) **ARBITRATION PROCEDURE:**
   You and the Bank agree to the following procedures for arbitration of any Disputes:
   - The party filing arbitration can choose one of the following arbitration administrators and follow its rules and procedures for the arbitration: the American Arbitration Administration ("AAA") pursuant to the AAA Commercial Arbitration Rules or JAMS pursuant to the Comprehensive Arbitration Rules & Procedures. You can obtain a copy of the AAA Commercial Arbitration Rules at www.adr.org or 1-800-778-7879. You can obtain a copy of the JAMS Comprehensive Arbitration Rules at www.jamsadr.com or 1-800-352-5267.
   - The arbitration will be decided by a single, neutral arbitrator who is a retired judge selected in accordance with the rules of the arbitration administrator.
   - The arbitrator will take reasonable steps to protect your and the Bank's confidential information.
   - The arbitrator will decide the dispute in accordance with the terms of our agreements and applicable substantive law, including evidentiary privileges and statutes of limitations. The arbitrator can award damages or other relief available under applicable law.
   - At your or the Bank's request, the arbitrator will provide a statement of reasons for his or her decision in writing.
   - If there are any differences between the arbitration administrators' rules and this Arbitration Agreement, this Arbitration Agreement governs.
   - If the arbitrator awards $0 for the party that filed the arbitration, awards more than $100,000 against the party that did not file the arbitration, or awards injunctive relief, a party may request a new arbitration before a three-arbitrator panel in accordance with the arbitration administrator's rules. This request must

be filed with the arbitration administrator in writing within 30 days of notice of the award. In this case, each reference to the arbitrator in this Agreement will mean the three-arbitrator panel.

- The arbitrator's award will be final and binding, subject to judicial review only to the extent allowed under the Federal Arbitration Act. A party may seek to have a final and binding award entered as a judgment in any court having jurisdiction.

**(iv) ARBITRATION FEES AND COSTS:**

The applicable arbitration rules and procedures determine who pays the arbitration fees, unless limited by applicable law. Each party will pay its own costs and attorney, expert, and witness fees. The arbitrator may require either party to pay the costs and fees of the other party, including the fees of the arbitrator, to the extent permitted under applicable law

**(v) RIGHT TO RESORT TO PROVISIONAL REMEDIES PRESERVED:**

You or the Bank can exercise rights or remedies to exercise self-help remedies, such as the right of setoff or the right to restrain funds in any account, or to obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court having jurisdiction.

## 29. CONSTRUCTION - PARAGRAPH HEADINGS:

Paragraph headings are descriptive only and are not intended to, nor shall they have, substantive affect. The wording of each paragraph shall be binding and conclusive of the intent and agreement of the parties.

## 30. GRAMMAR:

Use of the singular includes the plural and use of the plural includes the singular.

## 31. CONTINUANCE OF OBLIGATIONS:

The obligations of the Client arising under this Agreement and any related Cash Management Agreement shall continue after the termination of any such agreement and shall bind the Clients administrators, successors, legal representatives and assigns. All rights, benefits, and privileges which the Bank has or may have or come to have under this Agreement shall be and are extended to, conferred upon, and may be enforced by, the Bank's successors and assigns.

## 32. NO THIRD-PARTY BENEFITS:

This Agreement confers no right or benefit upon any person other than the parties specifically identified as the Client and the Bank and their legal successors and permitted assigns. The Bank shall not be liable to any third party or for any act or omission of the Client or any third party.

## 33. AUTHORIZED REPRESENTATIVES:

The Client agrees to name in the Application the individuals that are authorized by the Client to initiate or verify Payment Orders made by fax, telephone, messenger or e-mail and those individuals authorized to initiate or approve Payment Orders using the internet banking service ("Authorized Representatives"). The Bank will act on the Payment Order that are initiated and verified or approved by Authorized Representatives until and unless such time as the Bank is notified in writing of any change with respect to Authorized Representatives and the Bank has had a reasonable opportunity to act on such change notice. Verifications of the individuals named in the Application until and unless such time as the Bank is notified in writing of any change in the above individuals authorized to initiate, approve or verify Payment Orders and the Bank has had a reasonable opportunity to act on such change notice.

## 34. AUTHORIZED ACCOUNTS:

The Client will designate in the Application those accounts that are Authorized Accounts to debit for Funds Transfers.

## 35. CHANGES TO AUTHORIZED REPRESENTATIVES OR AUTHORIZED ACCOUNTS:

The Client may change the Authorized Account(s) or the Authorized Representatives from time to time by giving the Bank written notice thereof certified by an authorized signer of the Client (other than the Authorized Representative) whose signature is verified in accordance with procedures established by the Bank. Any such notice purporting to be certified by an authorized signer of the Client and whose signature is so verified shall be deemed to have been certified by such authorized signer and to have been executed on behalf of, and shall be binding upon, the Client. No such notice shall become operative before the Bank acknowledges it in writing. The Bank shall have a reasonable time to update its records and acknowledge any such notice received. The Bank shall be fully protected in relying upon the most recent designation of Authorized Accounts and the authority of the Client's Authorized Representatives in the Bank's possession until such time as the Client gives the Bank notice of any change and the Bank has had a reasonable opportunity to act with respect thereto.

 SIGNATURE BANK®

**Business Bank Account**
Agreements and Disclosures

Effective Date: **December 27, 2019**                    700800-1219

# ADDENDUM TO THE BUSINESS BANK ACCOUNT
# AGREEMENTS AND DISCLOSURES

Effective Date: July 1, 2020

## 1) The FUNDS AVAILABILITY DISCLOSURE is deleted in its entirety and revised as follows:

### SIGNATURE BANK

*Funds Availability Disclosures*

This Disclosure Statement provides information, which you should use to determine when funds deposited in your Signature Bank deposit accounts will be available for withdrawal. While Signature Bank's policy is to make funds available in an expeditious manner, it takes time before we are able to collect funds from your deposit and there are certain delays before deposited funds are available to you. The period of time varies with, among other things, the type of deposit and the location of the bank on which a check deposited into your account is drawn. During the delay you may not withdraw the funds in cash and we will not use the funds to pay checks that you have written. Refer to the Personal Bank Deposit Account Terms and Conditions section of this Personal Bank Account Agreements and Disclosures for defined terms.

1. **DETERMINING THE AVAILABILITY OF A DEPOSIT:**

   The length of the delay is counted in business days from the day of your deposit. Every day is a business day except Saturdays, Sundays and the following holidays: January 1, the third Monday in January, the third Monday in February, the last Monday in May, July 4, the first Monday in September, the second Monday in October, November 11, the fourth Thursday in November, and December 25. If January 1, July 4, November 11, or December 25 fall on a Sunday, the next Monday is not a business day. If you make a deposit before 4:00 p.m. Eastern Time (or before 4:30 p.m. Pacific Time if deposits are made at Signature Bank's California Financial Centers) on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 4:00 p.m Eastern Time, (or after 4:30 p.m. Pacific Time if deposits are made at Signature Bank's California Financial Center) or on a day that is not a business day, we will consider that the deposit was made on the next business day we are open. Funds mailed to Signature Bank are considered deposited on the business day they are received by Signature Bank. Funds deposited to a night depository, lock box or similar facility (other than Signature ATMs) are considered deposited on the day on which the deposit is removed from such facility and is available for processing by Signature Bank

   Signature ATMs: If you make a deposit to a Signature ATM before 3:00 p.m. Eastern Time on a Business Day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 3:00 p.m. Eastern Time, or on a day that is not a Business Day, we will consider that the deposit was made on the next Business Day we are open.

   Please note that a check you deposit may be returned unpaid after we have made the funds available to you. If this happens, the amount of the returned check will be deducted from your account balance, and there will be a service charge.

2. **SAME-DAY AVAILABILITY:**

   Funds from the following deposits are available on the day of your deposit:

   (i)   Cash made in person to one of our employees.
   (ii)  Wire transfers.
   (iii) Electronic Direct Deposits, such as social security benefits and payroll payments.

3. **NEXT-DAY AVAILABILITY:**

   Funds from the following deposits are available on the first Business Day after the day of your deposit provided the deposit is made to an account of the payee:

   (i)   U.S. Treasury checks.
   (ii)  Checks drawn on Signature Bank.*
   (iii) Federal Reserve Bank checks, Federal Home Loan Bank checks, postal Money Orders, and travelers checks.
   (iv)  State and local government checks deposited in a Signature Bank Financial Center located in the state that issued the check using a special deposit slip available upon request at Signature Bank's Financial Centers.**
   (v)   Cashier's, certified, and teller's checks using a special deposit slip available upon request at Signature Bank's Financial Centers.**

* Checks drawn on Signature Bank are not required to be deposited into an account of the payee for next-day availability.

\*\*Special deposit slips may be used to deposit these checks by mail or at non-staffed facilities, such as Signature Bank's ATM's.

## 4. OTHER CHECK DEPOSITS:

The following chart will show you when funds from these checks will be available.

| When funds are available | When funds are available if a deposit is made on a Monday (assuming no Bank Holidays) |
|---|---|
| $225 on the first Business Day after the day of your deposit. | Tuesday |
| An additional $450 for cash withdrawal at 7:30 a.m. local time (of the Financial Center in which the deposit was made) on the second Business Day after the day of your deposit. | Wednesday |
| Funds to pay checks you have written to others on the second Business Day after the day of your deposit. | Wednesday |
| Remaining funds on the third Business Day after the day of your deposit. | Thursday |

## 5. CASH-WITHDRAWAL LIMITATION:

The first $225 from a deposit of checks will be available on the first Business Day after the day of your deposit for a cash withdrawal or to pay checks you have written to others. All of the remaining funds will be available on the second Business Day after the day of your deposit to pay checks you have written to others.

An additional $450 of the deposit may be withdrawn in cash at 7:30 a.m. Eastern Time on the second Business Day after the day of your deposit. All of the remaining funds will be available for cash withdrawal on the third Business Day after the day of your deposit.

For example, if you deposit a check of $700 on a Monday, $225 of the deposit is available on Tuesday to pay checks to others and to withdraw in cash. The rest is available to pay checks on Wednesday. At 7:30 a.m. Eastern Time on Wednesday, you may withdraw another $450 of the deposit in cash and you may withdraw the rest in cash on Thursday.

## 6. LONGER DELAYS MAY APPLY:

Funds you deposit by check may be delayed for a longer period under the following circumstances:

(i)     We believe a check you deposit will not be paid.
(ii)    You deposit checks totaling more than $25,000 on any one day (Other than checks subject to Next-Day Availability).
(iii)   There is an emergency, such as failure of communications or computer equipment.
(iv)   You redeposit a check that has been returned unpaid.
(v)    You have overdrawn your account repeatedly in the last six months.

If on any one Business Day you deposit checks (other than checks subject to Next-Day Availability) totaling more than $25,000, then the first $25,000 of such checks will be available to you according to our general policy as stated in this Funds Availability Disclosure. The amount of such checks in excess of $25,000 will be available to you one Business Day later than stated in our general policy. For example, with respect to such checks that represent deposits over $25,000 made on a Business Day, the funds will become available to pay checks in 3 Business Days and for cash withdrawals in 4 Business Days.

We will notify you if we delay your ability to withdraw funds for any of the reasons stated above (other than the reason stated in the preceding paragraph), and we will tell you when the funds will be available. They will generally be available no later than the sixth Business Day after the day of your deposit.

## 7. HOLDS ON OTHER FUNDS (CHECK CASHING):

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

8. **HOLD ON OTHER FUNDS (OTHER ACCOUNT):**

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

9. **SPECIAL RULES FOR NEW ACCOUNTS:**

If you are a new customer, the following special rules will apply during the first 30 days your account is open.

Funds from the deposit of cash, wire transfers and electronic direct deposits will be available on the day of your deposit. The first $5,525 of a day's total deposits of Federal Reserve Bank checks, Federal Home Loan Bank checks, postal Money Orders, cashier's, certified, teller's, travelers, and state and local government checks deposited in a Signature Bank Financial Center located in the state that issued the check will be available on the first Business Day after the day of your deposit. You must use a special deposit slip to obtain the availability described in this paragraph for cashier's checks, certified checks, teller's checks, state and local government checks deposited in a Signature Bank Financial Center located in the state that issued the check. The excess over $5,525 of these checks will be available on the fifth Business Day after the day of your deposit. Funds from deposits of other checks will be available on the sixth Business Day after the day of your deposit.

## 2) The ATM CARD & DEBIT CARD FOR BUSINESSES AGREEMENT section 2(B) is deleted in its entirety and revised as follows:

2. **ACCOUNT ACCESS AND TRANSACTION LIMITS:**

B. Transaction Limitations

Withdrawals at an ATM or a POS Payment Terminal or purchases at a POS Payment Terminal may not exceed $1,000 each Day. If you request the Bank to permit a larger transaction limitation and the Bank agrees to increase this limitation, then you agree that notwithstanding any other provision in this Agreement the Bank will not be liable for any ATM, POS or other transaction using, or purporting to use, your ATM or Debit Card, even if that transaction was not authorized by you. A Day is defined as the period of time from approximately 6:00 p.m. Eastern Time from one calendar day to approximately 6:00 p.m. Eastern Time of the following calendar day. Deposits and payments made before 3:00 p.m. Eastern Time (or before 4:30 p.m. Pacific Time if deposits and payments are made at a California Financial Center) on any Business Day will be credited to your Deposit Account, Monogram Managed Account, Monogram Money Market Funds Program Account or Credit Line as of that Business Day. Deposits and payments made after 3:00 p.m. Eastern Time on a Business Day or on a day that is not a Business Day will be credited as of the next Business Day. All deposits, payments and purchases are subject to our proof and verification. Any difference between the amount of your deposit, payment, redemption or purchase and the amount stated on your deposit slip will be handled in accordance with standard Bank procedures. If your Deposit Account is a Monogram Insured Money Market Account or Monogram Money Market Funds Program Account, you are limited to a total of six preauthorized and automatic withdrawals, checks, Debit Card payments to third parties, and withdrawals by telephone, fax, email, internet banking services and mobile banking services you can have each month. If you exceed this limit your ATM Card or Debit Card transaction above this limit may not be executed.