<table>
<tr><td colspan="2" align="center"><strong>BEFORE THE UNITED STATES<br>JUDICIAL PANEL ON MULTIDISTRICT LITIGATION</strong></td></tr>
<tr><td><strong>IN RE: FTX CRYPTOCURRENCY<br>EXCHANGE COLLAPSE LITIGATION</strong><br><br>This document relates to:<br><em>O'Keefe v. Sequoia Capital Operations, LLC,<br>et al.</em>, Case No. 1:23-cv-20700 (S.D. Fla.)</td><td><strong>MDL DOCKET NO. 3076</strong></td></tr>
</table>

---

**PLAINTIFF CONNOR O'KEEFE'S RESPONSE IN OPPOSITION TO PETITIONERS'
MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407**

---

To date, Plaintiff Connor O'Keefe, of *O'Keefe v. Sequoia Capital Operations, LLC, et al.*
(S.D. Fl. Case No. 1:23-cv-20700), has filed the most comprehensive lawsuit arising from the
collapse of the FTX fraudulent scheme, on behalf of himself and all others similarly situated
("Class Members"). Plaintiff O'Keefe's claims differ starkly—in both substance and scope—from
the claims tagged for centralization by this Panel under 28 U.S.C. § 1407, and Plaintiff O'Keefe
opposes centralization for the reasons herein.

**I.    INTRODUCTION**

Plaintiff O'Keefe has asserted claims against professional service providers ("Professional
Service Providers" or "*O'Keefe* Defendants"), including venture capital firms, banks, accounting
firms and a law firm—many, titans in their industries—who, after conducting thorough diligence
on FTX's purported business model and actual operations, substantially assisted the FTX fraud,
despite knowing that Sam Bankman-Fried ("SBF"), FTX's former CEO, was misappropriating

Class Member funds. Petitioners,[1] on the other hand, have filed suits against celebrities, such as Tom Brady, Gisele Bundchen, Shaquille O'Neal, Larry David and other so-called "Brand Ambassadors" who, lacking any industry experience or expertise, filmed one-off commercials and other advertisements for FTX.

Plaintiff O'Keefe's and Petitioners' suits[2] do not share any overlapping parties. Plaintiff O'Keefe names 19 defendants, none of Petitioners named in their complaints, and Petitioners name 18 defendants, none of whom Plaintiff O'Keefe named.[3] Moreover, Plaintiff O'Keefe is pursuing different theories of liability than are Petitioners, and Plaintiff O'Keefe has filed suit on behalf of a class that does not overlap with the classes asserted by Petitioners. Accordingly, Plaintiff O'Keefe's case shares no predominating common factual issues with Petitioners' cases, and no efficiency would be gained from their centralization. Plaintiff opposes Petitioners' motion to transfer for these reasons.

Because his case is unique, Plaintiff O'Keefe has retained specialized counsel with specific subject matter expertise and premier experts singularly focused on pursuing his claims against Professional Service Providers in a manner both expeditious and efficient. Undersigned Counsel have successfully litigated similar third-party aider/abettor claims on behalf of victims of Ponzi

---

[1] As used herein, "Petitioners" refers to Edwin Garrison, Gregg Podalsky, Skyler Lindeen, Alexander Chernyavsky, Sunil Kavuri, Gary Gallant, and David Nicol.

[2] Petitioners have filed no fewer than three separate putative class action lawsuits alleging the same claims against overlapping subsets of the same defendants. *Compare Garrison, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23753-KMM (S.D. Fla.), *Podalsky, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23983-KMM (S.D. Fla.), and *Kavuri, et al. v. Bankman-Fried*, No. 1:22-cv-23817-DPG (S.D. Fla.) (voluntarily dismissed Dec. 9, 2022). Petitioners Garrison, Podalsky, Lindeen, Chernyavsky, Gallant, and Nicol are plaintiffs in two of the suits, *Garrison* and *Podalsky*, while Petitioner Kavuri is a plaintiff in all three suits, *Garrison, Podalsky*, and *Kavuri*.

[3] Plaintiff O'Keefe acknowledges that some of the cases tagged by Petitioners name Silvergate Bank, Signature Bank, Preger Metis CPAs, LLC and Armanino, LLP as defendants. However, none of those cases was filed in the Southern District of Florida, as was Plaintiff O'Keefe's, and none of those cases assert the same claims that Plaintiff O'Keefe is asserting.

schemes and other complex financial frauds. Most recently, Undersigned Counsel served as co-lead counsel in *Rotstain v. Trustmark National Bank, et. al.*, (S.D. Tex. Case No. 4:22-cv-00800) one of the last cases pending in the MDL arising from R. Allen Stanford's $8 billion fraud, the second-largest Ponzi scheme on record. Undersigned Counsel represented the Official Stanford Investor Committee, along with several individual investors, in claims that several banks, including some of the largest international banks in the world, knowingly assisted Mr. Stanford's fraud. In total, Undersigned Counsel helped to secure $1.6 billion in settlement proceeds from the *Rotstain* defendants, after litigating the case for more than 12 years. Both Mr. Stanford's fraud, and the ways in which the *Rotstain* defendants knowingly assisted the fraud, bear striking similarities to the fraud perpetuated by SBF through FTX, and the assistance provided by the Professional Service Providers named in Plaintiff O'Keefe's suit. Already, Plaintiff O'Keefe has retained two of the primary experts from the Stanford litigation—James Spindler, professor of corporate and securities law at the University of Texas School of Law and the University of Texas McCombs School of Business and an expert in capital markets and their evolution to include cryptocurrency; and Pat McElroy, Jr., a former bank examiner, bank executive, and consultant and an expert in the banking industry and regulations—to provide expert consultation and testimony in his case. Undersigned Counsel holds an extensive track record successfully litigating cases on behalf of investors and other victims of complex financial frauds, as well as resolving fraud-based and securities claims as a court-appointed receiver or in conjunction with Securities and Exchange Commission receiverships.

Complementing this subject matter expertise, Undersigned Counsel have extensive procedural knowhow in litigating complex cases in record speed, including as liaison and lead trial counsel in two of the largest MDLs to date. Judge Eldon E. Fallon appointed Undersigned Counsel

as Liaison Counsel to lead *In re Chinese-Manufactured Drywall Products Liability Litigation* (MDL 09-MD-2047) ("*In re Chinese Drywall*"), arising from allegedly defective Chinese-manufactured building material. Shortly thereafter, Judge Carl J. Barbier appointed Undersigned Counsel as Liaison Counsel to lead *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico* (MDL 10-M-2179) ("*In re Deepwater Horizon*"), arising from the BP oil spill in the Gulf of Mexico in 2009. Each of *In re Chinese Drywall* and *In Re Deepwater Horizon* involved dozens of defendants and thousands of plaintiffs, and each resulted in settlements totaling billions of dollars. Notably, Undersigned Counsel tried the first bellwether trial in *In re Chinese Drywall* less than a year after the MDL commenced and negotiated a global billion dollar settlement within two and half years of commencement. In *In Re Deepwater Horizon,* Undersigned Counsel served as co-lead trial counsel in what was billed as the largest civil trial in MDL history, if not the nation's history, and successfully resolved claims involving private litigants, the United States of America, and five states.

As the imminent liquidation of Silvergate Bank,[4] a defendant in Plaintiff O'Keefe's case, makes clear, time is of the essence for Plaintiff O'Keefe's claims, as other Professional Service Providers could apply for bankruptcy at any time. In light of this exigency, Plaintiff O'Keefe would suffer prejudice if caught in a protracted MDL proceeding against Brand Ambassadors, none of whom are defendants in Plaintiff O'Keefe's case. Delay prejudicial to Plaintiff O'Keefe is inevitable, were the Panel to centralize the cases, as Plaintiff O'Keefe loses time to Petitioners' discovery into FTX's engagement of each Brand Ambassador and what each Brand Ambassador

---

[4] *See* Press Release, Silvergate Capital Corporation, Silvergate Capital Corporation Announces Intent to Wind Down Operations and Voluntarily Liquidate Silvergate Bank (Mar. 8, 2023), https://ir.silvergate.com/news/news-details/2023/Silvergate-Capital-Corporation-Announces-Intent-to-Wind-Down-Operations-and-Voluntarily-Liquidate-Silvergate-Bank/default.aspx.

knew as a result of that engagement, as well as the dozens of motions to dismiss and motions for summary judgment that these celebrity endorsers will mount on issues having nothing to with Plaintiff O'Keefe's claims, while the assets of the *O'Keefe* Defendants steadily deplete.

In short, Plaintiff O'Keefe's suit is distinctive among those tagged in the instant proceeding, and Plaintiff O'Keefe's claims differ materially from those Petitioners assert. Undersigned Counsel has the experience and the demonstrated expertise to lead the litigation of Plaintiff O'Keefe's case expeditiously by focusing on the extant claims and parties outside of an MDL proceeding. Accordingly, and for the reasons contained in this pleading, Plaintiff O'Keefe hereby responds to the motion for transfer filed by Petitioners as follows:

1. Plaintiff O'Keefe opposes the transfer of his case pursuant to 28 U.S.C. § 1407. Centralization does not satisfy the requirements of Section 1407, and Plaintiff O'Keefe respectfully requests that the Panel deny Petitioners' motion.

2. Were the Panel to centralize the cases tagged in this proceeding, Plaintiff O'Keefe respectfully requests that the Panel transfer the cases to a learned judge in the Southern District of Florida or, alternatively, the Northern District of California.

## II.    FACTUAL BACKGROUND

In his 82-page complaint, Plaintiff O'Keefe alleges that the following professional service providers knowingly assisted the FTX fraud in violation of Florida common law.

- **Venture capitalists**: Sequoia Capital Operations, LLC; Thoma Bravo L.P.; Paradigm Operations LP; Temasek Holdings (Private) Limited; Softbank Vision Fund (AIV M2) L.P.; Softbank Group Corp.; Ribbit Capital, L.P.; Sino Global Capital Limited; Multicoin Capital Management LLC; Altimeter Capital Management, LP; and Tiger Global Management, LLC ("Defendant VCs").

- **Banks**: Silvergate Bank, Signature Bank, Moonstone Bank, Deltec Bank and Trust Company, and its chairman, Jean Chalopin ("Bank Defendants").

- **Law firm**: Fenwick & West LLP.

- **Accounting firms**: Preger Metis CPAs, LLC and Armanino, LLP ("Defendant Accounting Firms").

Plaintiff O'Keefe asserts that the *O'Keefe* Defendants learned of the FTX fraud through diligence required by law and/or industry standards, as well as through their direct ties to SBF, former CEO of FTX and mastermind of the fraudulent scheme. Despite this knowledge, the *O'Keefe* Defendants provided necessary assistance in furtherance of the scheme.

Each *O'Keefe* Defendant benefited from the steady, and increasing, flow of customer funds into FTX accounts and helped to perpetuate the FTX fraud in service of those benefits. Specifically, Defendant Banks, where FTX held multiple accounts, benefited from billion-dollar increases in their low-cost deposit bases derived from FTX customer funds; Defendant VCs, who invested more than $2 billion in FTX, benefited from the astronomical valuation that increasing deposits generated for FTX, upon which the value of Defendant VCs' stakes in the company correspondingly grew; Defendant Fenwick & West and Defendant Accounting Firms, meanwhile, benefited from the high dollar fees they could continue to extract for services to FTX, paid for with Class Member funds and proceeds.

With shared objectives and complementary motives, Plaintiff O'Keefe alleges that the *O'Keefe* Defendants provided knowing assistance to and/or conspired with FTX to perpetuate the fraud, and each committed critical overt acts in furtherance of it:

- Defendant VCs wielded their power, influence, and deep pockets to launch FTX's house of cards to its multi-billion dollar scale. Defendant VCs invested nearly $2 billion in FTX, and SBF returned the favor in kind, investing millions of dollars in Defendant VCs. This was more than a simple quid pro quo, and Defendant VCs were more than passive investors. Indeed, Defendant VCs provided critical groundwork for the FTX fraud, including serving on FTX's advisory board and providing other support, and promoting FTX despite knowing that SBF was misappropriating Class Member funds. More specifically, Defendant VCs promoted FTX, not in one-off, 30-second commercials like those filmed by Brand Ambassadors, who have no experience in the industry, but by lending expert credibility to SBF and by making repeated public statements valorizing FTX and publishing glowing profiles of SBF, proclaiming, for example, that "the FTX competitive advantage" is SBF's

"[e]thical behavior" and Class Members should "trust [their] money with SBF, hands-down."

- Defendant Banks provided a suite of non-routine, high risk banking services to FTX, when traditional financial institutions would not, including accepting and/or transferring Class Members' funds into accounts that Defendant Banks knew were held by entities that SBF separately owned; developing proprietary blockchain software and other infrastructure necessary to SBF's looting of Class Members' funds; and helping to fence Class Member funds across the U.S. border.

- Defendant Fenwick & West set up a network of shadowy front organizations, which SBF used to conceal his siphoning of Class Member funds into entities that he separately owned. Fenwick & West also guided FTX's skirting of regulatory oversight, structuring acquisitions to obtain necessary licenses while circumventing regulatory scrutiny, advising on FTX's regulatory dodge, more generally, and supplying personnel to execute on that strategy directly from its own pool of lawyers.

- Defendant Accounting Firms performed sham audits of FTX's primary entities, certifying that FTX had sound financials and sufficient controls in place, despite knowing full well that neither was true. These audits lent to FTX a necessary veneer of legitimacy and security, which in turn helped to conceal the fraud, and SBF leveraged these endorsements in hawking FTX to the public.

The *O'Keefe* Defendants took these actions only after conducting exhaustive diligence on FTX, as standard in the industry and required by regulation, law, or legal duty. Plaintiff O'Keefe alleges that, from their diligence, the *O'Keefe* Defendants learned of FTX's misconduct, but rendered assistance anyway, without which SBF could not have perpetuated the fraud. Plaintiff O'Keefe, on behalf of himself and Class Members, seeks damages for the *O'Keefe* Defendants' participation in furtherance of SBF's fraud.

## III.  ARGUMENT

### A.  Centralization does not satisfy the requirements of Section 1407, and Petitioners' motion should be denied.

This Panel may centralize cases for consolidated or coordinated pre-trial proceedings only if three statutory requirements are satisfied: (1) common questions of fact must predominate

among the cases; (2) transfer must serve the convenience of the parties and witnesses; and (3) centralization must "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The party seeking centralization bears the burden of proving each statutory element, *In re Acthar Gel Antitrust Litig.*, 543 F. Supp. 3d 1375, 1376 (J.P.M.L. 2021), and "centralization under Section 1407 should be the last solution after considered review of all other options." *In re Baby Food Mktg., Sales Practices and Products Liab. Litig.*, 544 F. Supp. 3d 1375, 1377 (J.P.M.L. 2021). Transfer of Plaintiff O'Keefe's case does not satisfy these statutory requirements, and the Panel should deny Petitioners' request for centralization of the cases tagged in this proceeding.

Ordinarily, the requirements of Section 1407 are satisfied, and centralization appropriate, where multiple suits challenge the same wrongful conduct by no more than a few common defendants; for example, in cases alleging products liability or toxic torts, where coordination can avoid duplicative discovery and contradictory evidentiary rulings. That is not the case here. Petitioners have alleged that more than a dozen celebrity Brand Ambassadors (1) materially assisted FTX's sale of unregistered securities in filming advertisements for FTX; (2) engaged in unfair or deceptive trade practices in recording those advertisements; and/or (3) conspired with FTX to "drive customers to invest in what was ultimately a Ponzi scheme."[5] In contrast, Plaintiff O'Keefe has alleged that nearly 20 Professional Service Providers (1) substantially assisted FTX's misappropriation of Class Member funds, despite a general awareness that FTX was engaging in misconduct; and/or (2) conspired to commit acts in furtherance of FTX's misappropriation of Class Member funds. Each case therefore turns on (1) what each individual defendant <u>knew or should have known</u> about the FTX fraud; and (2) what each individual defendant <u>did</u> despite that knowledge. Those are the factual issues that predominate Petitioners' and Plaintiff O'Keefe's

---

[5] *See, e.g.*, *Garrison, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23753-KMM (S.D. Fla.), ECF No. 16, at 94.

claims. These predominating factual issues are necessarily defendant specific; therefore, Petitioners' cases and Plaintiff O'Keefe's case do not share them, and no efficiency in discovery, motion practice, or other pre-trial proceedings will result from centralization of these cases.

### 1.   *Petitioners' cases and Plaintiff O'Keefe's case do not share predominate issues of fact.*

Noted above, the essence of each claim that Petitioners and Plaintiff O'Keefe assert is that the defendants named in their respective cases assisted the FTX fraud with knowledge or general awareness of FTX's misconduct. Because there is no identity between the dozen-plus Brand Ambassadors (*i.e.*, the Petitioners' defendants) and the dozen-plus Professional Service Providers (*i.e.*, the *O'Keefe* Defendants), there is no overlap as to the central factual inquiries into (1) each defendant's knowledge or awareness of FTX's misconduct; and (2) the assistance each defendant provided in furtherance of that misconduct. The ways in which each defendant acquired their knowledge or awareness, the extent of that knowledge or awareness, and the specific actions each defendant took in furtherance of the FTX fraud will vary from defendant to defendant. *Cf. In re Baby Food Mktg., Sales Practices and Products Liab. Litig*, 544 F. Supp. 3d at 1376-77 (finding centralization unwarranted where "[a]ll plaintiffs allege that defendants knowingly sold baby food products containing heavy metals and did not disclose that in their marketing. It is not disputed, though, that each defendant manufactures, markets, and distributes its own baby food products subject to different [processes and procedures]. The claims against each defendant thus are likely to rise or fall on facts specific to that defendant [and m]uch of the discovery and pretrial practice will be defendant specific."). Because defendant specific issues of fact predominate Petitioners' and Plaintiff O'Keefe's claims, centralization is not warranted under Section 1407. *Id.; see also In re Suppl. Nutrition Assistance Program Litig.*, --- F. Supp. 3d ----, 2022 WL 3134129 (J.P.M.L. Aug. 2, 2022) (finding centralization unwarranted where "factual questions are largely [defendant

specific]" and "[t]here are no efficiencies to be gained from centralization of discovery on these [defendant]-specific issues.").

To be sure, none of the common issues Petitioners offer satisfies Section 1407. At the threshold, several of the issues Petitioners advance are not factual at all; they are instead legal questions, which are inapposite under Section 1407. *In re Suppl. Nutrition Assistance Program Litig.*, 2022 WL 3134129 ("Common legal questions are insufficient to satisfy Section 1407's requirement of common factual questions."). Specifically, those legal issues include:

- "whether all of the Yield-Bearing Accounts ("YBAs"), native cryptocurrency token, or other assets offered or sold by [FTX] were unregistered securities;"

- "whether [Brand Ambassadors'] participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and analogous Florida state securities law;"

- "whether [Brand Ambassadors'] practices violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and/or analogous and applicable state consumer protection statutes;" and

- "whether Plaintiffs and Class Members are entitled to consequential damages, punitive damages, Florida statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of [Brand Ambassadors'] conduct."[6]

Petitioners also suggest that issues regarding damages are common between their cases and Plaintiff O'Keefe's.[7] But the majority of Petitioners' claims are statutory, arising under FDUTPA, the Securities Act, or Florida blue sky law—not common law—and the statutes giving rise to those claims govern damages that Petitioners may recover.[8] Plaintiff O'Keefe has not asserted any

---

[6] *See* Motion at 3-4.

[7] *See* Motion at 3 (asserting that common questions of fact include "the type and measure of damages suffered by Plaintiffs and the Classes" and "whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss.").

[8] *See, e.g.*, *Rodriguez v. Recovery Performance, LLC*, 28 So. 3d 178, 180 (3d DCA 2010) ("[U]nder FDUTPA, the term 'actual damages' does not include special or consequential damages."); Fla.

statutory claims and, as such, issues of statutory damages are not present in his case. These issues of damages, to the extent they are indeed factual issues, are not common among Petitioners' and Plaintiff O'Keefe's claims, and these issues do not support centralization of the cases under Section 1407. *See In re Am. Home Prod. Corp "Released Value" Claims Litig.*, 448 F. Supp. 276 (J.P.M.L. 1978) ("On the basis of the record before us, the predominant, and perhaps only, common aspect in these actions is the legal question of what measure of damages is applicable. The factual issues presented are primarily, if not entirely, unique questions pertaining to the numerous distinct shipments involved in each action. Thus, since these actions involve a common question of law and share few, if any, questions of fact, transfer under Section 1407 is inappropriate.").

In addition to the above, Petitioners offer only the following proposed common issue: "whether the FTX entities operated a Ponzi scheme from their domestic headquarters in Miami." But resolution of this issue is irrelevant to Plaintiff O'Keefe's case. To prevail on his claims, Plaintiff O'Keefe need prove only that each *O'Keefe* Defendant had "a general awareness that its role was part of [FTX's] <u>overall improper activity</u>," not that the *O'Keefe* Defendants knew FTX was operating a full-blown Ponzi scheme.[9] Likewise, other of Plaintiff O'Keefe's claims require he prove only that each *O'Keefe* Defendant agreed "to do <u>an unlawful act</u> or to do <u>a lawful act by unlawful means</u>" in assistance to the fraud, not that the defendants agreed to participate in a full-blown Ponzi scheme.[10] Not only is the issue of whether FTX was perpetuating a Ponzi scheme absent from Plaintiff O'Keefe's claims, and therefore not shared with Petitioners' claims, but centralizing Plaintiff O'Keefe's case with Petitioners' in this way would impermissibly heighten

---

Stat. Ann. § 517.211 (West) (setting forth calculation for statutory damages under the Florida Securities and Investor Protection Act).

[9] *Gilison v. Flagler Bank*, 303 So. 999, 1003 (Fla. 4th DCA 2020) (emphasis added).

[10] *Id.* at 1004 (emphasis added).

the burden of proof for Plaintiff O'Keefe's claims. Even so, assuming its relevance, the question as to whether the FTX fraud amounted to a full-blown Ponzi scheme is secondary, if not wholly tangential, to the primary questions of (1) whether each defendant developed knowledge or awareness of FTX's misconduct (*i.e.*, the defendant's scienter), and (2) what action, or inaction, each defendant took despite that knowledge or awareness (*i.e.*, the defendant's conduct). The question whether FTX perpetuated a Ponzi scheme thus provides insufficient grounds for centralization under Section 1407. *See, e.g.*, *In re Kohl's Tel. Consumer Prot. Act (TCPA) Litig.*, 220 F. Supp. 3d 1363, 1364 (J.P.M.L. 2016) (finding centralization unwarranted where "issues, while common, appear to be relatively straightforward, and discovery is unlikely to be unusually burdensome or time-consuming [in contrast to] the amount of individualized discovery.").

Because the factual issues at the heart of both Petitioners' and Plaintiff O'Keefe's claims—namely, (1) each defendant's state of mind; and (2) the assistance each defendant provided to FTX—are highly defendant specific, there are no common questions of fact that predominate each of Petitioners' and Plaintiff O'Keefe's cases. Petitioners offer common issues that are either legal, and carry no weight under Section 1407, or are neither dispositive in Plaintiff O'Keefe's case nor predominate Plaintiff O'Keefe's claims. As such, Petitioners fail to meet Section 1407's initial criterion, and the Panel should deny their motion to centralize these cases.

### 2. *Centralization would not promote the just and efficient conduct of the cases.*

For Plaintiff O'Keefe, time is of the essence. As noted, Silvergate Bank, a defendant in Plaintiff O'Keefe's case, announced its liquidation just days ago. Given the faltering state of the crypto industry, other bankruptcies may soon follow. Under these conditions, where parties "are on the brink of bankruptcy," efficiency "is best obtained outside the MDL context." *In re Cincinnati Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 492 F. Supp. 3d 1347, 1350

(J.P.M.L. 2020).

At any rate, it is unclear what, if any, efficiency would be gained from centralization of Plaintiff O'Keefe's case with Petitioners' cases. For reasons stated above, discovery is largely defendant specific and, because there is no identity among the *O'Keefe* Defendants and the Brand Ambassadors, there will be little to no overlap in the discovery taken in each case. *See In re Family Dollar Stores, Inc., Access for Individuals with Disabilities Litig.*, 466 F. Supp. 3d 1383, 1384 (finding centralization unwarranted where "[a] significant amount of discovery appears almost certain to be case-specific."). Moreover, Plaintiff O'Keefe is pursuing different legal theories of liability and has filed suit on behalf of a class that does not overlap with the classes asserted by Petitioners. Accordingly, the risk of inconsistent rulings on class certification or other competing motions is absent here. In any event, "to the extent there is any possibility of duplicative discovery or inconsistent pretrial rulings, voluntary cooperation and coordination among the parties and the involved courts is a preferable alternative to centralization." *In re Trans Union, LLC, Balance After Bankr. Discharge Fair Credit Reporting Act Litig.*, No. MDL 3058, 2023 WL 1811838, at *2 (J.P.M.L. Feb. 6, 2023); *see also In re Live Face on Web, LLC, Copyright Litig.*, 148 F. Supp. 3d 1373, 1374 (J.P.M.L. 2015) (noting that "alternatives to centralization—such as employing a shared expert and coordinating common depositions—can minimize any overlap in pretrial proceedings").

Because time is of the essence, and because little to no efficiency would be gained from centralization of the cases tagged in this proceeding, transfer of the *O'Keefe* matter is unwarranted, and the Panel should deny Petitioners' motion.

**B.**     **Were the Panel to centralize the cases tagged in this proceeding, it should transfer the MDL to a learned judge of the Southern District of Florida or the Northern District of California.**

If the Panel determines that the issues listed in Petitioners' motion for transfer warrant centralization in an MDL, then the MDL should proceed in the U.S. District Court for the Southern District of Florida. In this respect, undersigned counsel concurs in Petitioners' motion to transfer.

Petitioners list seven factual issues that they assert are common among the tagged proceedings. *See* Motion, at 3-4. As discussed above, many of these issues are not factual issues or are not common among the proceedings and are, at a minimum, entirely irrelevant to *O'Keefe* matter. Indeed, only one issue arising from the underlying fraud is both factual and not particular to any plaintiff or defendant in the tagged actions, such that it may be considered common— namely, "whether the FTX Entities operated a Ponzi scheme from their domestic headquarters in Miami." *See id.* If the Panel considers that such issue justifies centralization in an MDL, then the Southern District of Florida is the logical locus for the MDL because FTX US was headquartered in Miami, Florida. It follows that the evidence related to the common issue is likely to be concentrated in the Southern District of Florida. To maximize efficiency—one of the primary goals of centralization—in what will be an atypical, multidefendant MDL, then, the MDL should proceed in the Southern District of Florida.

Additionally, a jurist with expertise in Florida law would be preferable for any FTX MDL. First, as discussed above, the *O'Keefe* matter is the most comprehensive lawsuit filed to date arising out of the FTX fraud. Each of its claims arises under Florida law. Second, given that FTX was headquartered in Miami, Florida, it is safe to say even prior to discovery that much of FTX's and SBF's unlawful or tortious conduct occurred in Florida. Undoubtedly, the State of Florida has an overwhelming interest in the outcome of FTX-related litigation. Thus, its laws are likely to be at issue in any FTX MDL, and it would be preferable to have a judge steeped in Florida law

14

applying Florida law. It cannot seriously be disputed that the judges of the Southern District of Florida are expert in Florida law.

The judges of the Southern District of Florida would be ideal for any FTX MDL for the additional reason that they are well equipped to adjudicate what will certainly be voluminous and complicated cases arising from such a large-scale fraud. Indeed, Undersigned Counsel would prefer to proceed with the *O'Keefe* matter before the judges to whom it was assigned: District Judge Jose E. Martinez and Magistrate Judge Jacqueline Becerra. Both possess a mastery of Florida law and are highly regarded for their legal acumen and efficiency, and combined they have more than twenty-four years of experience on the federal bench. Undersigned Counsel argues in favor of other judges only in the case of transfer into an MDL and only because other circumstances render these judges particularly well suited to oversee an FTX MDL.

Such other judges include, in a minimum, Chief Judge Cecilia Altonaga, Judge Roy K. Altman, and Judge K. Michael Moore, all of whom have the skills and experience to oversee the tagged cases and others like them. Judge Altonaga has served as a district judge in the Southern District of Florida since 2003, and she was made Chief Judge in 2021. Before joining the federal bench, she served as a judge in Florida state court for seven years. As a result, she is especially familiar with Florida state law.

Moreover, Chief Judge Altonaga is no stranger to MDLs or alleged financial frauds. In April 2021, cases arising from trade restrictions that online retail trading entity Robinhood imposed on certain stocks during an eight-day period in late January and early February 2021 were centralized before Chief Judge Altonaga in an MDL. *See In re January 2021 Short Squeeze Trading Litig.*, S.D. Fla. Case No. 1:21-md-02989. She quickly organized the MDL into four tranches, allowed sufficient time for master complaints to be filed in the four tranches as well as

related motions to dismiss, dismissed the tranches lacking meritorious claims, and set the remaining (securities) claims for trial in August 2024. Her well-reasoned orders reflect a mastery of complex securities issues, which will only strengthen as she continues to usher the securities tranche toward trial. To be sure, the efficiency with which she organized and marshalled the claims in the Robinhood cases is emblematic of the best of MDLs. The foregoing also means that Judge Altonaga's preexisting MDL need not preclude another: the Robinhood MDL involves a discrete set of facts stretching over a mere eight days and Judge Altonaga has already substantially whittled down the cases.

Judge Roy K. Altman also has the clout to take on an FTX-related MDL. Judge Altman's experience before joining the federal bench in 2019 focused on MDLs, class actions, and other complex cases. Although he has served only four years as a federal district judge, he has already been charged with one MDL, which is now administratively closed: *In re: ERMI LLC ('289) Patent Litigation*.

Like Chief Judge Altonaga, Judge Altman has proved himself capable of adjudicating complex matters. For example, Judge Altman is currently overseeing another cryptocurrency putative class action matter: *Robertson, et al. v. Mark Cuban, et al.*, S.D. Fla. Case No. 22-cv-22538. In *Robertson*, the plaintiffs allege that brand ambassadors for cryptocurrency platform Voyager violated certain Florida state securities and deceptive trade practices laws. Trial of the matter is set for February 2024. Petitioners' *Garrison* matter is nearly identical in form and substance to *Robertson*, with overlapping claims and at least one overlapping plaintiff. Certainly, Judge Altman's experience with *Robertson* would make him a logical choice for any FTX-related MDL.

Judge Moore also has relevant experience making him an appropriate choice for an FTX MDL. Petitioners' putative class action matters arising from the FTX fraud that are currently pending in the Southern District of Florida have already been consolidated before Judge Moore: *Garrison, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23753-KMM and *Podalsky, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23983-KMM. Petitioners filed lawsuits on behalf of six individual FTX investors (rather than as a putative class action) in Florida state court, which the defendants removed to the Southern District of Florida. Those actions were consolidated and are now pending before Judge Moore as well, *Norris, et al. v. Thomas Brady, et al.*, No. 1:23-cv-20439. Judge Moore has been a district judge for more than thirty years, and he served as Chief Judge in the Southern District of Florida immediately prior to Judge Altonaga. He is more than qualified to take on any FTX-related MDL.

Alternatively, Plaintiff O'Keefe appreciates that many of the cases tagged in this proceeding are pending in the Northern District of California and have been consolidated before Judge Jacqueline S. Corley. Judge Corley has extensive experience managing centralized proceedings, including in her tenure as a United States Magistrate Judge, during which she presided over *In re Volkswagen "Clean Diesel" Mktg., Sales Practices and Products Liab. Litig.*, comprised of more than 1,600 lawsuits, including class actions, arising from Volkswagen's installation of diesel emissions-defeating software in their cars. Additionally, many of the Professional Service Providers made defendants in Plaintiff O'Keefe's case are headquartered in California, and centralization in the Northern District would provide a convenient forum for Plaintiff O'Keefe to conduct discovery relating to those California-based defendants.

Although Undersigned Counsel does not believe the *O'Keefe* matter shares sufficient issues with Petitioners' matters to warrant centralization in an MDL, if the Panel disagrees, it should

centralize broadly related cases and assign any MDL arising from the FTX fraud in the Southern District of Florida or the Northern District of California before any one of the learned judges referenced above.

**CONCLUSION**

For reasons herein, Petitioners have failed to satisfy Section 1407's requirements. No common issues of fact predominate the cases and no efficiency would be gained from their centralization. To the contrary, transfer of the *O'Keefe* matter would result only in prejudice to Plaintiff O'Keefe, for whom time is of the essence in light of the liquidations and bankruptcies already announced, or possibly to come, by the *O'Keefe* Defendants and in the crypto industry. Centralization is accordingly unwarranted, and Plaintiff O'Keefe respectfully requests that the Panel deny Petitioners' motion to transfer the cases tagged in this proceeding.

Were the Panel to centralize these cases, however, Plaintiff O'Keefe respectfully requests that the Panel transfer the MDL to the Southern District of Florida or, in the alternative, the Northern District of California, and assign the matter to one of the learned judges referenced herein.

Dated: March 10, 2023                                Respectfully submitted,

<div style="margin-left:40%">

*/s/ Kerry J. Miller*
James R. Swanson
Kerry J. Miller
Benjamin D. Reichard
C. Hogan Paschal
Monica L. Bergeron
FISHMAN HAYGOOD, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA  70170
Telephone:     504.586.5252
Facsimile:      504.586.5250
jswanson@fishmanhaygood.com

</div>

kmiller@fishmanhaygood.com
breichard@fishmanhaygood.com
hpaschal@fishmanhaygood.com
mbergeron@fishmanhaygood.com

Timothy A. Kolaya
Jorge A. Perez Santiago
Amy M. Bowers
STUMPHAUZER KOLAYA NADLER &
SLOMAN, PLLC
2 South Biscayne Boulevard, Suite 1600
Miami, FL 33131
(305) 614-1404 (telephone)
tkolaya@sknlaw.com
jperezsantiago@sknlaw.com
abowers@sfslaw.com

*Counsel to Plaintiff,*
*Connor O'Keefe and the Putative Class*