# EXHIBIT A

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23−cv−02475−SK

Imbert v. Bankman−Fried et al                          Date Filed: 05/19/2023
Assigned to: Magistrate Judge Sallie Kim             Jury Demand: Plaintiff
Demand: $500,000,000                                  Nature of Suit: 370 Other Fraud
Cause: 28:1332 Diversity−Fraud                        Jurisdiction: Diversity

**Plaintiff**

**Kenny Imbert**                           represented by  **William M. Audet**
                                                          Audet & Partners, LLP
                                                          711 Van Ness Avenue
                                                          Suite 500
                                                          San Francisco, CA 94102−3229
                                                          415−568−2555
                                                          Fax: 415.568−2556
                                                          Email: waudet@audetlaw.com
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Samuel Bankman−Fried**

**Defendant**

**Zixiao "Gary" Wang**

**Defendant**

**Nishad Singh**

**Defendant**

**Caroline Ellison**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/19/2023 | 1 | COMPLAINT *CLASS ACTION COMPLAINT* against Samuel Bankman−Fried, Caroline Ellison, Nishad Singh, Zixiao "Gary" Wang ( Filing fee $ 402, receipt number ACANDC−18286185.). Filed byKenny Imbert. (Attachments: # 1 Civil Cover Sheet)(Audet, William) (Filed on 5/19/2023) (Entered: 05/19/2023) |
| 05/22/2023 | 2 | Case assigned to Magistrate Judge Sallie Kim.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E−Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 6/5/2023. (mbc, COURT STAFF) (Filed on 5/22/2023) (Entered: 05/22/2023) |

WILLIAM M. AUDET (CA SBN 117456)
LING (DAVID) KUANG (CA SBN 296873)
KURT D. KESSLER (CA SBN 327334)
  waudet@audetlaw.com
  lkuang@audetlaw.com
  kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
  711 Van Ness Avenue, Suite 500
  San Francisco, CA 94102-3275
  Telephone:  (415) 568-2555
  Facsimile:  (415) 568-2556

*Counsel for Plaintiff Imbert, individually, and*
*on behalf of all others similarly situated*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| KENNY IMBERT, individually, and on behalf of all others similarly situated, | Case No: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| SAMUEL BANKMAN-FRIED, ZIXIAO "GARY" WANG, NISHAD SINGH and CAROLINE ELLISON. | **JURY TRIAL DEMAND** |
| Defendants. | |

# TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................. 1

PARTIES ................................................................................................................... 7

JURISDICTION & VENUE ......................................................................................... 10

ADDITIONAL FACTUAL ALLEGATIONS ..................................................................... 10

    I.   THE RISE OF FTX ............................................................................................. 10

    II.  THE FALL OF FTX ............................................................................................ 13

    III. ALAMEDA RESEARCH AND THE CENTRAL ROLE IT HAD PERPETUATING THE FRAUD ............... 14

    V.  THE INTERNATIONAL MARKETING OF FTX'S PLATFORM AND SERVICES ..................... 21

    VI. CRIMINAL AND REGULATORY PROCEEDINGS ................................................... 22

CLASS ALLEGATIONS ............................................................................................. 26

    I.   CLASS DEFINITION(S) ...................................................................................... 26

    II.  REQUIREMENTS OF RULE 23(A) MET ............................................................... 27

        A.   Numerosity ....................................................................................... 27

        B.   Commonality and Predominance ..................................................... 27

        C.   Typicality ......................................................................................... 28

        D.   Adequacy ......................................................................................... 28

        E.   Superiority ....................................................................................... 28

    III. REQUIREMENTS OF RULE 23(B)(3) MET .......................................................... 29

    IV. REQUIREMENTS OF RULE 23(B)(2) MET .......................................................... 29

    V.  REQUIREMENTS OF RULE 23(C)(4) MET .......................................................... 29

CAUSES OF ACTION ................................................................................................ 30

PRAYER FOR RELIEF ............................................................................................... 34

JURY TRIAL DEMAND ............................................................................................. 34

KENNY IMBERT, by and through undersigned counsel, bring this action individually and on behalf of all others similarly situated ("Plaintiffs" and "Class") against SAMUEL BANKMAN-FRIED, ZIXIAO "GARY" WANG, NISHAD SINGH ("Founder Defendants"), and CAROLINE ELLISON ("Alameda Defendant") (collectively, "Defendants"). Plaintiffs make the following allegations based on personal knowledge of facts pertaining to themselves and on information and belief upon investigation that is reasonable as to all other matters. Plaintiffs allege as follows:

## NATURE OF ACTION

1.      A small collection of individuals, running a crypto company and a trading firm, perpetuated a fraudulent and deceitful scheme at a scale rarely seen – defrauding consumers out of untold sums of money and leading to billions of dollars in fiat currency and financial equity to essentially vanish into thin air while a well-known company that had seemingly made it its mission to present itself as the face of the crypto industry imploded seemingly overnight.

2.      The primary individuals perpetuating this scheme – Defendants Bankman-Fried, Gary Wang, Nishad Singh, and Caroline Ellison – have been collectively charged with dozens of criminal offenses as a result of their clearly unlawful conduct. Three of them have already pled guilty to their charges, displaying their underlying blame for the events that have occurred as a result of their fraud and deceit. All three that pled guilty have issued statements, either personally or through their counsel, indicating their acknowledgement of their misdeeds. Defendant Ellison even went so far to say "I am truly sorry for what I did … I knew that it was wrong." Defendant Singh said that "I knew my conduct was wrong." These statements indicate that the Defendants took the actions they did knowingly and willingly, displaying the mental state to embark on an unprecedented fraudulent and deceitful scheme that involved the disappearing of billions in customer funds. The Defendants unabashedly knew what they were doing was clearly wrong and against the law, and the customers and those that entrusted the Defendants with their money by placing it into FTX have paid the price of the misdeeds of the Defendants.

3.      The only defendant to not plead guilty, Defendant Bankman-Fried, is currently on house arrest as his case is prosecuted following his not guilty plea, but as a result of their plea deals, Defendants Wang, Singh, and Ellison can be compelled to testify against Bankman-Fried. As the

founder of FTX, it is clear he was not ignorant to the activities to his partners and subordinates and likely maintained a key position in the regime of fraud and deceit that pervaded throughout FTX and Alameda Research to the effect of billions of dollars.

4. FTX Trading LTD d/b/a FTX's ("FTX") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), were collectively valued at over $32 billion at one point. The rapid rise in valuation of these FTX Entities ($32 billion in little more than 2 years) was eclipsed only by an even faster collapse in less than 2 weeks in November 2022.



Source.[1]

5. FTX and related companies imploded in November 2022 in the aftermath of a seemingly massive and nearly unprecedented liquidity crisis that was the result of their and the Defendants' intense mismanagement and embezzlement of client and investor funds. When FTX's troubles drew more and more headlines and customers started taking out their funds, the FTX Entities halted withdrawals due to a lack of liquidity to actually honor those withdrawals. The resulting financial collapse has resulted in multiple investigations into the FTX Entities, and its billionaire co-

---

[1] Kate Clark, et al., *FTX Venture Investors Fear Total Wipeout in Binance Rescue Deal*, THE INFORMATION, (Nov. 8, 2022, 2:47 PM), https://www.theinformation.com/articles/ftx-venture-investors-fear-total-wipeout-in-binance-rescue-deal

founder and Defendant herein, Samuel Bankman-Fried ("SBF"), by the U.S. Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), the Securities and Exchange Commission ("SEC"), as well as numerous foreign governmental agencies, including in the Bahamas where FTX and affiliated entities were based, for the mishandling of billions of dollars in client and investor funds.[2] As the effects of the crisis became clear, CEO and Defendant Bankman-Fried resigned on November 10, 2022 at approximately 4:30 a.m. ET.[3]

6.     John Ray III ("Ray"), who previously oversaw the Enron bankruptcy and liquidation, was installed as the new CEO and the FTX Entities and affiliated corporations/entities quickly filed for Chapter 11 reorganization bankruptcy on November 11, 2022. *See In re: FTX TRADING LTD., et al.*, No. 22-11068-JTD (Bankr. D. Del.).[4]

---

[2] On December 13, 2022, the United States Attorney for the Southern District of New York, the United States Attorney General, and the Assistant Director in Charge of the New York Field Office of the FBI, announced the unsealing of an Indictment charging Defendant Bankman-Fried with conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the Federal Election Commission and commit campaign finance violations. *See* Press Release for the UNITED STATES DEPARTMENT OF JUSTICE, (Dec. 13, 2022), https://www.justice.gov/usao-sdny/pr/united-states-attorney-announces-charges-against-ftx-founder-samuel-bankman-fried

[3] Steven Ehrlich, *Exclusive Transcript: The Full Testimony Bankman-Fried Planned To Give To Congress*, FORBES DIGITAL ASSETS, (Dec. 13, 2022, 1:54 AM EST), https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress/

[4] On November 15, a separate but related Chapter 15 bankruptcy petition was filed by FTX Digital Markets Ltd., ("FDM") a Bahamas-based entity within Defendant Bankman-Fried's global digital asset empire. *See In the Matter of FTX Digital Markets Ltd. and Brian C. Simms*, No. 22-11516-mew (Bankr. S.D.N.Y.) (hereafter "Chapter 15 Proceedings"). Given the global scope of all the FTX related entities and their significant international assets and customers, the Chapter 15 filing by FDM allows it to potentially shield assets and to block creditors who may want tie assets up in the United States. Significantly, FDM made the consequential assertion that the Chapter 11 proceedings may be improper and "there is a serious question regarding the validity of those Chapter 11 filings, principally because they occurred after the Bahamas Securities Commission had placed [FDM] into bankruptcy proceedings [there]." *See In re: FTX TRADING LTD., et al.*, No. 22-11068-JTD, Dkt. #44-1 ("Tr. of November 17, 2022 Status Conference in Chapter 15 Proceedings") at 11:2-5 (Bankr. D. Del., Nov. 18, 2022). While the Chapter 15 Proceedings have now been transferred from New York to the District of Delaware, the Bahamian liquidators for FDM continue to argue that FTX assets do not belong in the Chapter 11 proceedings. *See id.*, Dkt. #213 (Bankr. D. Del., Dec. 12, 2022) (FDM asserting that FTX Property Holdings, Ltd., which holds nearly $300M in real property in the Bahamas, was improperly included in the Chapter 11 proceedings).

7.      On November 17, Ray submitted a filing with the United States Bankruptcy Court, District of Delaware, stating:

> "Never in my career [over 40 years of legal and restructuring experience] have I seen such a **complete failure of corporate controls** and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, **this situation is unprecedented**."

*In re: FTX TRADING LTD., et al.*, No. 22-11068-JTD, Dkt. #24 at ¶ 5 (Bankr. D. Del., Nov. 17, 2022) (emphasis added).

8.      Ray also published a sprawling, overly complicated organizational chart of FTX's financial and investment empire, offering a glimpse of the maze-like web of legal entities Bankman-Fried had created to run his empire. *In re: FTX TRADING LTD., et al.*, No. 22-11068-JTD, Dkt. #24 at Ex. B (Bankr. D. Del., Nov. 17, 2022) ("Preliminary Corporate Structure Chart").

9.      Nick Mancini, director of research for the crypto data firm Trade the Chain has described the complex structure as likely intentional and created to aid Defendant Bankman-Fried's misconduct within his companies: "It's clear Sam [Bankman-Fried] designed the organizational structure to be intentionally convoluted in order to keep various employees and companies in the dark about what was happening outside of their specific walled garden within the greater structure. Reports of fraud, lack of accounting, and special privileges between subsidiaries are examples of reasons that you would create such an intentionally confusing structure."[5]

10.      In addition to using convoluted organizational structures to hide its malfeasance, reports have emerged about how Bankman Fried enabled the secret transfer of $10 billion from FTX Entities to Alameda Research LLC, Bankman-Fried's venture-capital and trading firm affiliate of FTX, and that at least $1 billion of those funds have disappeared.[6]

11.      To further an embezzlement scheme or otherwise inappropriately allocate funds

---

[5] Scott Nover, et al., *The scrollable, annotated, incredibly complex org chart of FTX and Sam Bankman-Fried's fallen empire*, QUARTZ, (Nov. 17, 2022), https://qz.com/ftx-bankruptcy-filing-reveals-a-remarkably-convoluted-c-1849797496

[6] Angus Berwick, *Exclusive: At least $1 billion of client funds missing at failed crypto firm FTX*, REUTERS, (Nov. 13, 2022, 2:00 PM PT), https://www.reuters.com/markets/currencies/exclusive-least-1-billion-client-funds-missing-failed-crypto-firm-ftx-sources-2022-11-12/

provided by FTX Entities' investors and clients, a significant portion of funds was improperly commingled between the FTX Entities and a separate but related trading firm Alameda Research, LLC ("Alameda").[7] After commingling funds, a large portion was thereafter redistributed, or "loaned" out to FTX executives and some of the Defendants herein. Out of a whopping $4.1 billion in related-party 'loans' provided by Alameda, Defendant Bankman-Fried received $1 billion, Defendant Singh received $543 to $554 million, and Defendant Gary Wang received $224.7 million, among others. *See In re: FTX TRADING LTD.*, No. 22-11068-JTD, Dkt. #24 at 9 (Bankr. D. Del., Nov. 17, 2022); *see also*, *SEC v. Bankman-Fried*, No. 22-cv-10501, Dkt. #1 at 20 (S.D.N.Y., Dec. 13, 2022).

12. The scale of this Ponzi-scheme-like fraud was matched only by the scale of the methodical publicity campaign, to conjure up an illusion of financial stability and corporate success, ultimately employed by the Defendants and the FTX Entities and directed at unwitting members of the public, their clients, and investors. To perpetuate their fraud, Defendants and the FTX Entities adopted two primary strategies: (1) demonstrate *bona fide* financial credentials by purportedly having transparent accounting practices and reputable third-party audits of said accounting statements; and (2) promote its services and products vicariously through celebrity/institutional endorsements and social media outreach.

13. The first part of Defendants' strategy to establish the false veneer of financial stability and success required FTX Entities to engage and work with third-party accounting firms to audit and vet the companies' corporate finances so that the general public, its clients, and investors, would be reassured about their financial state.

14. The second core part of Defendants' strategy to promote FTX Entities' fraudulent and deceptive services and products would involve Defendant Bankman-Fried the FTX Entities signing

---

[7] Alameda Research, LLC ("Alameda") was co-founded by Defendant Bankman-Fried in late 2017 and acted as a quantitative trading firm focused on cryptocurrency arbitrage. A November 17, 2022 filing with the U.S. Bankruptcy Court for the District of Delaware, indicates that Alameda, and related companies in its silo, is "owned 90% by [Defendant] Bankman-Fried and 10% by [Defendant Gary] Wang." *See In re: FTX TRADING LTD.*, No. 22-11068-JTD, Dkt. #24 at 23 (Bankr. D. Del., Nov. 17, 2022).

a tsunami of branding deals with sports institutions that had established worldwide reach and prolific advertising on television to entice new customers around the world.

15. Flush with money from unwitting investors and clients, Defendants began an unprecedented marketing campaign to gain public legitimacy.

16. In August 2021, it was announced FTX secured naming rights to University of California, Berkeley's California Memorial Stadium in a $17.5 million deal. In addition to the naming rights, FTX will receive on-field branding and branding on athletics press backdrops, along with social integration, exposing a substantial number of foreign students or would-be students to FTX Entities' trading platform, offers, and other services. The FTX Entities continued to spend lavishly over the last couple years on nonfungible token ("NFTs") and crypto partnerships with sports teams, including internationally-popular National Basketball Association ("NBA") franchises Golden State Warriors in San Francisco, California and Miami Heat in Miami, Florida. Major League Baseball ("MLB") and the FTX Entities announced, as they called it, a long-term global partnership deal that came with swag: the umpires would wear patches with the logo of FTX.US. Other sponsorships included the title sponsorships of the first season of MLB Home Run Derby X, and the title sponsorship of the tournaments FTX Road to Miami and FTX Crypto Cup as part of the Champions Chess Tour 2022. FTX also ran Super Bowl ads to gain international exposure for new customers. FTX Entities further bought the naming rights for the NBA franchise Miami Heat's stadium, signing a 19-year deal with the team for $135 million. The Mercedes-AMG Petronas Formula 1 team, headquartered in the United Kingdom, named FTX its cryptocurrency exchange partner. And a professional e-sports team with worldwide popularity, Team SoloMid or TSM, agreed to be paid $210 million from FTX over 10 years to change its name to TSM FTX.

17. FTX Entities' publicity and commercial campaign blitz also involved the personal endorsements of internationally-known celebrity, entertainment, and sports figures through FTX's own celebrity brand ambassadors. These 'brand ambassadors,' used their social media clout and personal brands to induce unsophisticated investors and consumers into a relationship with the FTX Entities.

18. As a result of the willful misconduct alleged above, and in more detail below, Plaintiffs bring this action on behalf of themselves and the Class seeking to recover damages, declaratory and/or injunctive relief stemming from fraudulent and deceitful conduct of Defendants and their promotion and marketing of FTX Entities' trading platform.

**PARTIES**

- **Plaintiff**

19. Plaintiff Kenny Imbert is a citizen of the Bahamas. He is a natural person over the age of 21. Plaintiff Imbert deposited money with the FTX Entities because he relied upon FTX Entities' statements that its platforms were a safe and secure investing options to residents all over the world. Plaintiff Imbert funded the account with sufficient amounts to earn interest on his holdings. He did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the FTX Entities and their related trading platforms as detailed in this complaint and executed trades in reliance upon those misrepresentations and omissions. As a result, Plaintiff Imbert has sustained damages for which Defendants are liable.

- **Founder Defendants**

20. Defendant SAMUEL BANKMAN-FRIED, often referred to publicly as "SBF," is a resident of the Bahamas. SBF is the co-founder and former CEO of FTX. SBF maintained majority/controlling ownership stakes in numerous FTX-related companies, which has been identified in the U.S. Bankruptcy Court, District of Delaware as four groupings or 'silos' of businesses: the WRS Silo (including FTX.US, LedgerX and other businesses), the Alameda Silo (including Alameda Research, LLC and subsidiaries), the Ventures Silo (including Clifton Bay Investments companies and FTX Ventures Ltd.), and the Dotcom Silo (including FTX.com and similar exchanges in non-U.S. jurisdictions). Defendant Bankman-Fried owned 52.99%, 90%, 67% and 75% of each of these respective silos. The Founder Defendants and other Defendants were aware of the source code change by Defendant Singh, detailed below, which effectively led to the theft of billions of FTX Entities' client and investor funds. Defendant Bankman-Fried is currently under house arrest in Palo Alto, California, awaiting trial in the Southern District of New York.

21.     Defendant ZIXIAO "GARY" WANG is a resident of the Bahamas. Gary Wang is a co-founder of Alameda Research, LLC (or "Alameda") and a co-founder of the FTX-related cryptocurrency exchanges, with Defendants Bankman-Fried and Singh. He served as the Chief Technology Officer for FTX-related entities and was a member of Defendant Bankman-Fried's inner circle. Defendant Gary Wang owned 16.93%, 10%, and 23% stakes in the WRS, Alameda, and Ventures Silos, respectively. The Defendants were aware of the source code change, detailed below, which effectively led to the theft of billions of FTX Entities' client and investor funds. Defendant Wang has pled guilty to numerous charges in the Southern District of New York.

22.     Defendant NISHAD SINGH is a resident of the Bahamas. Singh is a co-founder of the FTX-related cryptocurrency exchanges, with Defendants Bankman-Fried and Gary Wang. He served as the Chief Engineering Officer for FTX-related entities and was a member of Defendant Bankman-Fried's inner circle. Defendant Singh owned 7.83% and 10% stakes in the WRS and Ventures Silos, respectively. Defendant Singh has been identified as the individual that secretly modified the FTX exchange platform's software source code so as to exempt Alameda Research, LLC ("Alameda") from having to automatically sell off assets if it was losing too much borrowed money.[8] The SEC's lawsuit against Defendant Bankman-Fried reference this same phenomenon and describe it as "privileges permitt[ing] Alameda to draw on FTX customer assets to a virtually unlimited extent for its own uses" and "was continually raised to the point where it grew to tens of billions of dollars and effectively became limitless." *SEC v. Bankman-Fried*, No. 22-cv-10501, Dkt. #1 at 12-13 (S.D.N.Y., Dec. 13, 2022). Defendant Singh further made clear that the embezzlement of client funds through Alameda must be protected and notes within the source code indicate he wrote "[b]e extra careful not to liquidate [Alameda positions]," and in August 2020 further coded and notated that "Alameda would be liquidating, prevented" and "not to liquidate the PMM [the Primary Market Mover, which was Alameda]."[9] The Defendants were aware of the source code change by Defendant Singh which

---

[8] Angus Berwick, et al. *Exclusive: How a secret software change allowed FTX to use client money*, REUTERS, (Dec. 13, 2022, 6:18 PM PT), https://www.reuters.com/technology/how-secret-software-change-allowed-ftx-use-client-money-2022-12-13/

[9] Angus Berwick, et al. *Exclusive: How a secret software change allowed FTX to use client money*, REUTERS, (Dec. 13, 2022, 6:18 PM PT), https://www.reuters.com/technology/how-secret-software-change-allowed-ftx-use-client-money-2022-12-13/

effectively led to the theft of billions of FTX Entities' client and investor funds. Defendant Singh has met with prosecutors in the Southern District of New York in proffer sessions in an effort to negotiate a plea deal for the crimes he has been charged with. Defendant Singh eventually pled guilty to the numerous counts he was charged with.

- **Alameda Defendant**

23.     In late 2017, Founder Defendants Bankman-Fried and Gary Wang co-founded Alameda Research, LLC ("Alameda") in downtown Berkeley, California and named after the namesake state county in which it was located. The company served as a quantitative trading firm with a focus on cryptocurrency assets. Alameda would prove to be Defendant Bankman-Fried's launch pad into the crypto currency big leagues. Alameda had initial success exploiting crypto arbitrage opportunities and would hire two deputies approximately a year later to help run the company: Defendant Caroline Ellison and Sam Trabucco. Defendant Ellison and Sam Trabucco were previously known to Defendant Bankman-Fried: Defendant Ellison had previously worked with Defendant Bankman-Fried at Jane Street (another quantitative trading firm), and Trabucco was a Susquehanna International Group bond trader (another quantitative trading firm) prior to coming to Alameda and was a friend from the same alma mater, MIT, as Defendant Bankman-Fried. Under the control of Defendant Bankman-Fried, then-CEO of Alameda, and Defendants Ellison and Sam Trabucco, his deputies, Alameda evolved into a behemoth network of trading, yield farming, startup investments and market making in the cryptocurrency sphere and was reported to have booked $1 billion in profits in 2020 according to Forbes.[10] In October 2021, while still maintaining a controlling stake in Alameda, Defendant Bankman-Fried resigned as CEO of Alameda and appointed Defendant Ellison and Sam Trabucco as co-CEOs.

24.     Defendant CAROLINE ELLISON is a resident of the Bahamas. She is the CEO of Alameda Research, LLC, a trading firm launched by Defendant Sam Bankman-Fried in late 2017.

---

[10] Danny Nelson, *Sam Bankman-Fried Hands Control of Crypto Trading Firm Alameda to Two Deputies*, COINDESK, (Oct 12, 2021, 6:33 AM PT), https://www.coindesk.com/business/2021/10/12/sam-bankman-fried-hands-control-of-crypto-trading-firm-alameda-to-two-deputies/

She oversaw many of the risky bets Alameda took with regard to FTX customers' assets. Defendant Ellison has pled guilty to numerous charges in the Southern District of New York.

## JURISDICTION & VENUE

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

26.    This Court has personal jurisdiction against Defendants because at least one Defendant conducts business in California, and/or have otherwise intentionally availed themselves of the State of California's consumer market through the promotion, marketing, and sale of FTX products in California, which constitutes committing a tortious act within the state of California. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in California. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

27.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from those who reside in this District.

28.    Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) as there is no single district in which all Defendants reside; because a substantial part of the events or omissions giving rise to the claims at issue occurred outside of the United States in the Bahamas, the then home of Sam Bankman-Fried and FTX; and because Defendants entered into transactions and/or received substantial profits from those who reside in this District. As established, this district has personal jurisdiction over Defendants, rendering venue here appropriate.

29.    All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## ADDITIONAL FACTUAL ALLEGATIONS

### I.    THE RISE OF FTX

30.     In May 2019, former Wall Street trader Defendant Sam Bankman-Fried and ex-Google employee Zixiao "Gary" Wang founded 'FTX,' the owner and operator of the FTX.COM cryptocurrency exchange. Bankman-Fried developed the exchange to support all the major cryptocurrencies out there, as well as leveraged tokens, in addition to being able to facilitate trading. Within two years of its inception, the FTX cryptocurrency exchange grew into one of the most successful and outwardly-reputable names in the blockchain and cryptocurrency industry. In 2021, FTX US grew from a mere ten-thousand users to over 1.2 million. As of January 2022, the FTX Entities were collectively valued at over $32 billion. As of August 2022, their websites were being visited by over 10.8 million users a month.

31.     The FTX mission was to build a crypto exchange with consumer protections as well as a superior experience for users.

32.     In little more than two years, by July 2021, the darling startup has reached an astronomical valuation of $18 billion due to raising $900 million during a funding round that included financial support from Wall Street titans like SoftBank Group Corp, venture capital firm Sequoia Capital, private equity giant Thoma Bravo, Daniel Loeb's Third Point, the Paul Tudor Jones family, British hedge fund manager Alan Howard, and 50-plus additional investors. The company reportedly had at the time more than 1 million users and averaged about $10 billion in trading volume per day, with revenue surging more than tenfold in the past year.

33.     In a mere 3 months, by October 2021, the value of FTX had soared again to $25 billion. This funding round saw an infusion of $420 million from reputable investor institutions and firms like Ontario Teachers' Pension Plan Board, Temasek, Tiger Global and more than 60 other investors.

34.     In January 2022, FTX's smaller related entity, FTX.US, was valued at $8 billion stemming from a $400 million first-round funding from reputable investors like Softbank Group Corp, and Singapore's Temasek Holdings. Combined, the FTX Entities' value exceeded $32 billion.

35.     Flush with cash, the FTX Entities and related companies, continued and even expanded its significant marketing and promotional efforts, as detailed below, to entice consumers from around the world to adopt, use, or otherwise learn about its services and the crypto-industry.

36. Bankman-Fried even held himself out as a liaison between the two worlds of crypto and politics, testifying in front of the House Financial Services Committee in December 2021, making sure to hype FTX as a consumer friendly and safe investment platform. He said that "FTX has designed and offered a platform with a market structure that is risk reducing."[11]

37. The FTX Entities primary product was a platform service provider that served as a mobile application for cryptocurrency investment and allowed users to place cryptocurrency trade orders on behalf of users like Plaintiffs and the Class. The trading platform sought to be both user-friendly for first time investors but also with enough robust features for professional traders.

38. At its peak, the FTX.com exchange was extremely successful, and in 2022, around $15 billion in assets were traded daily on the platform, which represented 10% of global volume for crypto trading. This made FTX one of the largest crypto-trading companies in the world. The FTX team had grown to over 300 individuals from all over the globe. Although the FTX Entities' primary international headquarters is in the Bahamas, it maintained a US base of operations in Miami, Florida that significantly affected all parts of the United States, including California.

39. FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection in November 2022, customers had entrusted a purported $10 to $50 billion dollars to the platform.

40. Defendant Bankman-Fried got rich off FTX (and an intertwined company called Alameda Research, LLC), with the two companies providing him income of more than $1 billion in 2020 alone.

41. Bankman-Fried gave control of Alameda to Defendant Ellison and Sam Trabucco, who only had a few years of trading experience.

42. Trabucco specifically is a gambler and applied his so-called "gambler's instincts" to crypto trading via Alameda. He often bragged that he had been banned from multiple cousins for counting cards while playing blackjack, emblematic of the high-risk investing style of Alameda.

---

[11] Sam Bankman-Fried, *Digital Assets and the Future of Finance: Understanding the Challenges and Benefits of Financial Innovation in the United States*, *before the H. Comm. on Fin. Servs.*, 117th Cong. (2021) (Testimony of Sam Bankman-Fried Co-Founder and CEO of FTX), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-bankman-frieds-20211208.pdf

43. Trabucco stepped down from Alameda in August 2022, right before the hammer fell on the company.

44. Before the house-of-cards empire collapsed, Defendant Bankman-Fried reached a net worth of $26 billion. Bankman-Fried unabashedly used his wealth to become a major political donor and force, secured celebrity endorsements and spent lavish sums of money on not just promotional materials for his companies but for his personal use as well.

## II.    THE FALL OF FTX

45. In 2022, the cryptocurrency market dropped precipitously: Bitcoin cratered to under $15,000, while TerraLUNA went to near zero. Alameda's portfolio soon followed suit. Alameda, in turn, began to aggressively increase the share of FTT in its portfolio in order to artificially prop up its price amidst the cryptocurrency crash, so as to avoid default on its FTT-collateralized loans.

46. In the fall of 2022, trouble began for Defendant Bankman-Fried and FTX. On August 19, 2022, a U.S. bank regulator ordered the FTX platform to halt "false and misleading" information about whether funds at the company were insured by the government (they were not).

47. On November 2, 2022, popular crypto news publication CoinDesk released a devasting report, with leaked financial documents, showcasing that Bankman-Fried's other company, Alameda Research, was heavily dependent on FTX's native token, FTT.

48. CEO Changpeng "CZ" Zhao, who oversaw a competitor to FTX in Binance, in learning about the substantial amount that Alameda Research depended on FTT, decided to quickly and politely liquidate holdings of FTT worth more than $500 million. Given CZ's prominence in the crypto-trading sphere, other consumers quickly followed.

49. The Binance liquidation cratered the price of FTT and wiped out the value of Alameda's portfolio almost overnight. As the FTX Entities had funneled most of their customer funds to Alameda, this triggered a massive liquidity crisis.[12] When these events began to make headlines and panicked customers started taking out their money, the FTX Entities halted withdrawals.

---

[12] Kate Clark, et al., *FTX Venture Investors Fear Total Wipeout in Binance Rescue Deal*, THE INFORMATION, (Nov. 8, 2022, 2:47 PM), https://www.theinformation.com/articles/ftx-venture-investors-fear-total-wipeout-in-binance-rescue-deal

50.     FTX saw a staggering $6 billion in withdrawals over 3 days; FTX struggled to fulfill these withdrawals given their speed and volume. As a result of FTX's situation, the related native coin FTT plummeted nearly a third in value.

51.     On November 8, 2022, Defendant Bankman-Fried announced that Binance would come to the rescue and become a white-knight by bailing the company out. However, one day later, on November 9, 2022, Binance announced it was withdrawing from the deal citing "due diligence" concerns and additional reports about mismanagement and mishandling of funds within the FTX Entities. FTT plunged even faster and even deeper.

52.     On November 10, 2022, the Securities Commission of the Bahamas suspended the business license of FTX Digital and froze its assets, the same day filing a petition for an order that FTX Digital be wound up.

53.     That same day, a hearing took place in the Bahamas, with the court ordering that FTX Digital be placed into provisional liquidation and appointing Brian C. Simms as a liquidator over FTX Digital.

54.     On November 11th, unable to obtain a bailout from Binance or others, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO and in a social media posting, publicly acknowledged that he had messed up.

### III.     ALAMEDA RESEARCH AND THE CENTRAL ROLE IT HAD PERPETUATING THE FRAUD

55.     According to recent reports, another explanation contributing to the precarious situation the FTX Entities and their trading platform was facing stems from mismanagement of funds. Earlier this year, Bankman-Fried secretly transferred at least $4 billion in customer funds from FTX to Alameda to apparently cover for Alameda after it faced a series of losses. The FTX entities lent as much as $8 billion, of which more than half belong to customers, to Alameda with more than $10 billion in loans still outstanding. Alameda Research has a checkered and conflicting history with Defendant Bankman-Fried.

56.     The strategy employed by Defendants to perpetuate this scheme involved not only customized software code that gave Alameda unique privileges (*see* prior allegations above) but also the creation of additional native-token cryptocurrency FTT (*i.e.*, virtually mint money out of thin air)

and provided to Alameda so as to balance the financials. Nansen's blockchain analysis highlights the scheme as follows:



Source.[13]

57.     Alameda Research, LLC ("Alameda Research") is a quantitative trading firm that was founded in November of 2017 by Defendant Bankman-Fried. Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

---

[13] Yong Li Khoo, et al., *Blockchain Analysis: The Collapse of Alameda and FTX*, NANSEN, (Nov. 17, 2022), https://www.nansen.ai/research/blockchain-analysis-the-collapse-of-alameda-and-ftx

58.    In 2017, Bankman-Fried launched Alameda as an investment vehicle to manage a portfolio of highly volatile cryptocurrency assets. Bankman-Fried personally acted as CEO of Alameda until October 2021, when he recruited Defendant Ellison and Sam Trabucco to replace him. Bankman-Fried continued to hold a 90% interest in Alameda, with the remaining 10% held by Defendant Wang.

59.    At the time, Defendant Bankman-Fried started moving up to $25 million a day in arbitrage trades (using two or more markets to capitalize on the difference of price on the stock or commodity in different markets) to take advantage of the higher price of Bitcoin in Japan compared to the price in the U.S. The Company earned about $20 million from that arbitrage opportunity.[14]

60.    By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda Research. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

61.    In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Defendant Nishad Singh and Defendant Gary Wang. Defendant Caroline Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and fiercely traded crypto.

62.    After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda Research along with Sam Trabucco, who served as CEO. Defendant Ellison rose swiftly at Alameda Research, becoming co-CEO of Alameda alongside Sam Trabucco in the summer of 2021.

63.    In or around 2021, Bankman-Fried directed Ellison and Trabuccco to take out multi-billion-dollar loans from third-party cryptocurrency firms to enable both more aggressive and speculative investment, as well as even larger misappropriation of funds by the Defendants. These loans were collateralized by FTT, a proprietary digital asset created by the FTX Entities.

---

[14] Roger Parloff, *Portrait of a 29-year-old billionaire: Can Sam Bankman-Fried make his risky crypto business work?*, YAHOO! FINANCE, (Aug. 12, 2021), https://finance.yahoo.com/news/ftx-ceo-sam-bankman-fried-profile-085444366.html

64.    As of August 2021, Bankman-Fried owned approximately 90% of Alameda Research.

65.    Between early 2021 and March 2022, Alameda Research amassed crypto tokens ahead of FTX announcing that it would list them, totaling about $60 million worth of tokens in the Ethereum blockchain.[15]

66.    In and around April 2022, Sam Trabucco stepped down as co-CEO of Alameda Research, months before he publicly announced his departure in August, according to a former Alameda employee.[16]

67.    In May and June of 2022, Alameda Research suffered significant losses. Anonymous sources cited by the Wall Street Journal indicated that those losses led to FTX loaning Alameda Research more than half of its customer funds. When Sam Bankman-Fried stated publicly that he made a poor judgment call, the anonymous sources cited by the Wall Street Journal indicated that it was a decision to loan funds from FTX to Alameda Research that he was referencing. This conduct was explicitly forbidden by the terms of service of FTX.[17] Alameda CEO Defendant Ellison has claimed that senior FTX officials, including the Founder Defendants, knew that FTX had lent its customers' money to Alameda to help it meet its liabilities.[18] Some estimates are that Bankman-Fried secretly transferred at least $4 billion in customer funds from FTX to Alameda to apparently cover for Alameda after it faced a series of losses. The FTX Entities lent apparently billions to a company that Defendant Bankman-Fried also owned in the past year. This misconduct and mismanagement raise significant ethical, legal, and conflicts of interest problems for Defendants.

---

[15] Caitlin Ostroff, *Alameda Amassed Crypto Tokens Ahead of FTX Listings, Public Data Shows*, THE WALL STREET JOURNAL, (Nov. 14, 2022, 12:30 PM ET), https://www.wsj.com/livecoverage/stock-market-news-today-11-14-2022/card/alameda-amassed-crypto-tokens-ahead-of-ftx-listings-public-data-shows-z6KFN051ToEpFohTXA89

[16] David Jeans, et al., *Meet Caroline Ellison, The 'Fake Charity Nerd Girl' Behind The FTX Collapse*, FORBES DIGITAL ASSETS, (Nov. 18, 2022, 6:30 AM ET), https://www.forbes.com/sites/davidjeans/2022/11/18/queen-caroline-the-risk-loving-29-year-old-embroiled-in-the-ftx-collapse/

[17] Brady Dale and Felix Salmon, *FTX's terms-of-service forbid trading with customer funds*, AXIOS, (Nov. 13, 2022), https://www.axios.com/2022/11/12/ftx-terms-service-trading-customer-funds

[18] Dave Michaels, et al., *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, THE WALL STREET JOURNAL, (Nov. 12, 2022, 2:42 PM ET), https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238

---

## IV.  POST-COLLAPSE FTX ACTIVITY AND BANKRUPTCY REVELATIONS

68.     In a statement on March 15, 2023, FTX stated that it made transfers of about $2.2 billion to company founder Sam Bankman-Fried through related entities, the company's new management said.[19]

69.     More than $3.2 billion was transferred through payments and loans to company founders and key employees.[20]

70.     These payments were made chiefly from Alameda Research hedge fund (Defendant Caroline Ellison was CEO of Alameda Research), FTX states that it made these disclosures by filing schedules and statements of financial affairs with the bankruptcy court.[21]

71.     FTX also stated that the transfers did not include over $240 million spent to purchase luxury property in the Bahamas, political and charitable donations made directly by the FTX debtors, and substantial transfers to non-debtor units in the Bahamas and other jurisdictions.[22]

72.     Prosecutors have charged Defendant Bankman-Fried, with stealing billions of dollars in FTX customer funds to plug losses at Alameda Research, and making tens of millions of dollars in illegal political donations to buy influence in Washington, D.C.[23]

73.     A report filed by a group of debtors, led by John Ray II, current CEO and Chirf Restructuring Officer in the Delaware Bankruptcy Case (Case 22-11068-JTD Doc 1242-1) revealed accusations against the company including executives who joked about losing track of millions, a culture that cracked down on anyone who flagged potential problems, and a total disregard for normal accounting principles[24][25]. (Case 22-11068-JTD Doc 1242-1)

74.     The report alleged that FTX was completely controlled by a small group of executives,

---

[19] Deshmukh, Shubhendu, *FTX transferred $2.2 bln to Bankman-Fried via related entities, new managers say,* Reuters. https://www.reuters.com/technology/ftx-transferred-22-bln-bankman-fried-via-related-entities-new-managers-say-2023-03-16/ (last accessed May 19. 2023)

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] (In Re FTX Trading et. al. (Delaware Bankruptcy Court) Case 22-11068-JTD Doc 1242-1)

[25] Mazza, Kyle, *FTX execs 'joked internally' about losing track of millions in assets, misused customer funds, and 'stifled dissent,' new debtors' report says* Fortune Magazine https://fortune.com/2023/04/10/ftx-execs-sbf-joked-losing-track-millions-new-debtor-report/ (last accessed 5/19/2023)

controlled by cofounder and former CEO Sam Bankman-Fried (SBF), who failed to institute reasonable accounting and security practices, putting the firm's "crypto assets and funds at risk from the outset." [26][27]. (Case 22-11068-JTD Doc 1242-1)

75.     The report was candid: "While the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed." [28]

76.     Defendant Sam Bankman-Fried and his top execs, including cofounder Defendant Gary Wang and Defendant Alameda Research CEO Caroline Ellison, "stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown,"[29]

77.     FTX states that the assets available for stakeholder recovery have risen from Jan by $100 million, up to $6.2 billion at petition date value. At current prices, the assets have increased to $7.3 Billion, a $1.9 Billion increase from FTX's Jan Update to the court. (Tr. Page 7)[30]  Debtors are still gaining new information daily and will submit additional findings in due course.

78.     On May, 17, 2023, FTX's new leadership team filed a series of lawsuits to recover $240 million in connection with the cryptocurrency exchange's acquisition of stock trading platform Embed, which closed just weeks before FTX filed for bankruptcy.[31]

79.     The plaintiffs in all three suits include Alameda Research and West Realm Shires (WRS) Inc.[32]

---

[26] (In Re FTX Trading et. al. (Delaware Bankruptcy Court) Case 22-11068-JTD Doc 1242-1)
[27] Mazza, Kyle, *FTX execs 'joked internally' about losing track of millions in assets, misused customer funds, and 'stifled dissent,' new debtors' report says* Fortune Magazine https://fortune.com/2023/04/10/ftx-execs-sbf-joked-losing-track-millions-new-debtor-report/ (last accessed 5/19/2023)
[28] (In Re FTX Trading et. al. (Delaware Bankruptcy Court) Case 22-11068-JTD Doc 1242-1)
[29] *Id.*
[30] Transcript of Hearing. In Re FTX Trading et. al. (Delaware Bankruptcy Court) Case 22-11068-JTD Hearing Held On Wednesday, April 12, 2023.
[31] Dumas, Breck. *FTX sues Sam Bankman-Fried, others in effort to recover $240M from Embed acquisition*, Fox News. https://www.msn.com/en-us/money/companies/ftx-sues-sam-bankman-fried-others-in-effort-to-recover-240m-from-embed-acquisition/ar-AA1bnC5w (last accessed May 19, 2023)
[32] *Id.*

80.    The FTX debtors sued founders Sam Bankman-Fried, Nishad Singh and Zixiao "Gary" Wang, Embed founder Michael Giles and Embed shareholders, claiming FTX can claw back the funds under bankruptcy law and that the funds for the acquisition came from Alameda and were misappropriated.[33]

81.    WRS had purchased Embed with the aim of building its empire by providing FTX.US customers the ability to trade stocks on its platform in addition to crypto assets.[34]

82.    But the complaints allege FTX executives conducted little to no due diligence before acquiring the stock platform and rushed to complete the six-month transaction ahead of the crypto exchange's collapse.

83.    The complaint against Giles cites to internal communications from Embed employees that acknowledge that the then-president of FTX.US had discovered "many bugs" in the system ahead of the deal closing and that Giles admitted the platform was "experiencing multiple issues per day." Another Embed employee replied to Giles, "Deep down, it's why I want to accelerate the signing of the DA [definitive agreement with WRS] … more issues are inevitable."[35]

84.    FTX recently tried to sell Embed, but the highest bidder was Giles, who offered only $1 million.[36]

85.    The plaintiffs state in the complaint that the auction "leaves no doubt" that the $220 million FTX spent to acquire Embed was "wildly inflated relative to the company's fair value, which Giles well knew,". The complaint calls Embed's software "essentially worthless."[37]

86.    Embed's own insiders were surprised that FTX paid so much for the company after little more than a meeting with Giles, describing FTX's approach to due diligence with a cowboy emoji in internal messages.[38]

87.    As part of the purchase, FTX also paid Embed employees $70 million in retention bonuses. Most of that went to Giles, who later worried how to explain his $55 million bonus to other

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*

Embed shareholders, according to the lawsuits.[39] FTX is seeking to recover $236.8 million from Giles and Embed insiders, as well as $6.9 million from Embed minority shareholders.[40]

### V.     THE INTERNATIONAL MARKETING OF FTX'S PLATFORM AND SERVICES

88.     Defendant Sam Bankman-Fried, along with his company FTX, needed to continue growing the userbase for its crypto-trading platform and enlisted, at great expense, some of the marquee influencers and talents in the sports, entertainment, and celebrity arenas. These A-list celebrities have not only been brand ambassadors for FTX, but some have also invested or sought equity as part of his or her compensation. Most of these influencers conducted marketing and promotional campaigns for Bankman-Fried and FTX and also further raised awareness and encouraged the adoption of the FTX platform in social media, interviews, or other direct engagement channels. As a result of their concerted actions, adoption, use, and money being spent on the platform rose.

89.     Defendant Bankman-Fried and FTX, in conjunction with the use of A-list celebrities to promote FTX's platform and products, also sought a stratospheric rise in publicity and consumer awareness by spending, again lavishly, on partnerships with sports and entertainment entities like the Golden State Warriors or slapping their name on an entire NBA arena for the storied Miami Heat franchise.

90.     These actions had one goal: outcompeting competitor trading platforms and getting consumers to use the FTX platform technology instead. As then-FTX.US President Brett Harrison explains, using A-list celebrities and mass branding campaigns would "familiarize consumers with its technology, customer service and offerings" and with FTX brand. The company "need[ed]" to attract new consumers to continue funneling them (and the money they put into the FTX system) as part of an elaborate scheme to prompt up the businesses.

91.     One of the FTX Entities' most prominent promotions and marketing efforts involved the NBA franchise Golden State Warriors ("GSW"). FTX and GSW launched a partnership in 2022 and with it unveiled the FTX logo on the main court at the Chase Center, the GSW's new $1.4 billion

---

[39] *Id.*
[40] *Id.*

arena. FTX served as GSW's Official Cryptocurrency Platform and NFT Marketplace, and to further promote FTX to its avid fanbase, the GSW dropped NFTs on FTX.US beginning in early 2022.

## VI.    CRIMINAL AND REGULATORY PROCEEDINGS

92.    Defendant Bankman-Fried was arrested in the Bahamas on December 12, 2022, after US Prosecutors filed charges against him in the Southern District of New York.

93.    Defendant Bankman-Fried was charged with two counts of wire fraud conspiracy, two counts of wire fraud, and one count of conspiracy to commit money laundering, each of which carries a maximum sentence of 20 years.  He is also charged with conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to defraud the United States and commit campaign finance violations, each of which carries a maximum sentence of five years.[41]

94.    Defendant Bankman-Fried was subsequently extradited from The Bahamas to the United States, and is currently under house-arrest at his parents' house in Stanford, California.

95.    The Securities and Exchange Commission ("SEC") filed a complaint in the Southern District of New York on December 13, 2022, alleging that "[f]rom at least May 2019 through November 2022, Bankman-Fried engaged in a scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), the crypto asset trading platform of which he was CEO and co-founder, at the same time that he was also defrauding the platform's customers. Bankman-Fried raised more than $1.8 billion from investors, including U.S. investors, who bought an equity stake in FTX believing that FTX had appropriate controls and risk management measures. Unbeknownst to those investors (and to FTX's trading customers), Bankman-Fried was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire."[42]

96.    Defendant Bankman-Fried faces a complaint by the Commodity Futures Trading Commission ("CTFC") in the Southern District of New York, filed on December 13, 2022.

---

[41] **United States Attorney Announces Charges Against FTX Founder Samuel Bankman-Fried,** https://www.justice.gov/usao-sdny/pr/united-states-attorney-announces-charges-against-ftx-founder-samuel-bankman-fried (last accessed Feb. 7, 2023).
[42] *S.E.C. v. Bankman-Fried*, Case No. 1:22-cv-10501, Dkt. 1 (S.D.N.Y.).

97.    "Digital commodity asset markets continue to present risks for investors due to the lack of basic protections," said CFTC Chairman Rostin Behnam. "The CFTC continues to be fully committed to using all available enforcement tools and authorities to protect investors and root out those who seek to profit through fraud and misappropriation."[43]

98.    The U.S. Attorney for the Southern District of New York asked for a stay of SEC and CTFC proceedings against Bankman-Fried, pending the result of the criminal trial in October 2023.

99.    Caroline Ellison pled guilty to federal charges in December 2022 ,which was accepted by the United States on December 18, 2022.

100.    Her first count was for conspiracy to commit wire fraud on customers of FTX – which carried a maximum term of imprisonment of 20 years.

101.    Her second count was for wire fraud on customers of FTX, and aiding abetting the same – which carried a maximum term of imprisonment of 20 years.

102.    Her third count was for conspiracy to commit wire fraud on lends of Alameda Research – which carried a maximum term of imprisonment of 20 years.

103.    Her fourth count was for wire fraud on lenders of Alameda Research, and aiding and abetting the same – which carried a maximum term of imprisonment of 20 years.

104.    Her fifth count was for conspiracy to commit commodities fraud – which carried a maximum term of imprisonment of five years.

105.    Her sixth count was for conspiracy to commit securities fraud with respect to FTX equity investors – which carried a maximum term of imprisonment of five years.

106.    Her seventh count was for conspiracy to commit money laundering – which carried a maximum term of imprisonment of 20 years.

107.    The total maximum sentence of incarceration for the seven counts she pled guilty to is 110 years' imprisonment.

108.    The terms of the plea agreement additionally said that Defendant Ellison would make restitution.

---

[43] CFTC Charges Sam Bankman-Fried, FTX Trading and Alameda with Fraud and Material Misrepresentations, https://www.cftc.gov/PressRoom/PressReleases/8638-22 (last accessed Feb. 7, 2023).

109.     While making the plea, Defendant Ellison stated that "I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies…. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols." She went on to say that "I am truly sorry for what I did … I knew that it was wrong."[44]

110.     Defendant Gary Wang pled guilty to federal charges in December 2022, which was accepted by the United States on December 18, 2022.

111.     His first count was for conspiracy to commit wire fraud on customers of FTX – which carried a maximum term of imprisonment of 20 years.

112.     His second count was for wire fraud on customers of FTX, and aiding abetting the same – which carried a maximum term of imprisonment of 20 years.

113.     His third count was for conspiracy to commit commodities fraud – which carried a maximum term of imprisonment of five years.

114.     His fourth count was for conspiracy to commit securities fraud – which carried a maximum term of imprisonment of five years.

115.     His total maximum sentence of incarceration for the four counts he pled guilty to is 50 years' imprisonment.

116.     The terms of the plea agreement additionally said that Defendant Wang would make restitution.

117.     Wang's attorney stated that "Gary has accepted responsibility for his actions and takes seriously his obligations as a cooperating witness."[45]

---

[44] Former Alameda CEO confirms firm borrowed billions from FTX customer deposits as part of plea deal, https://cointelegraph.com/news/former-alameda-ceo-confirms-firm-borrowed-billions-from-ftx-customer-deposits-as-part-of-plea-deal (last accessed May 13, 2023).

[45] Caroline Ellison, former Alameda chief, and Gary Wang, FTX cofounder, each pleaded guilty to multiple charges and are cooperating with feds, https://www.cnn.com/2022/12/21/business/ftx-alameda-research-cooperating/index.html (last accessed May 13, 2023).

118. Defendant Singh entered a guilty plea in February 2023, which the United States accepted on February 26, 2023.

119. His first count was for conspiracy to commit wire fraud on customers of FTX – which carried a maximum term of imprisonment of 20 years.

120. His second count was for wire fraud on customers of FTX, and aiding and abetting the same – which carried a maximum term of imprisonment of 20 years.

121. His third count was for conspiracy to commit wire fraud on lenders of Alameda Research – which carried a maximum term of imprisonment of 20 years.

122. His fourth count was for wire fraud on lenders of Alameda Research, and aiding and abetting the same – which carried a maximum term of imprisonment of 20 years.

123. His fifth count was for conspiracy to commit commodities fraud – which carried a maximum term of imprisonment of five years.

124. His sixth count was for conspiracy to commit securities fraud with respect to FTX equity investors – which carried a maximum term of imprisonment of five years.

125. His seventh count was for conspiracy to commit money laundering – which carried a maximum term of imprisonment of 20 years.

126. His total maximum sentence for the counts he pled guilty to equals 110 years' imprisonment.

127. The terms of the plea agreement additionally said that Defendant Singh would make restitution.

128. In a hearing, Defendant Singh stated that he was "unbelievably sorry for my role in this and the harm it caused" and that "I took actions to make it appear that FTX's revenues were higher than they were and provided that information to auditors…I knew my conduct was wrong." [46]

129. However, Defendant Singh additionally faced charges from the Securities and Exchange Commission, who have charged him with fraud in the offer or sale of securities and fraud in connection with the purchase or sale of securities, in connection with his activities related to FTX

---

[46] Sam Bankman-Fried increasingly isolated as another associate takes a plea deal, https://www.latimes.com/business/technology/story/2023-02-28/sam-bankman-fried-increasingly-isolated-as-another-associate-takes-a-plea-deal (last accessed May 19, 2023).

1  and Alameda Research. *SEC v. Singh*, No. 1:23-cv-01691, Dkt. 1 (S.D.N.Y). Judgment was entered

2  in this matter on March 3, 2023. *Id.* Dkt. 7.

3  **CLASS ALLEGATIONS**

4  130. As alleged herein, Plaintiffs bring this lawsuit on behalf of themselves and all others

5  similarly situated (the "Class"), pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4).

6  **I. CLASS DEFINITION(S)**

7  131. Plaintiffs seek to represent the following *Transnational Class*: "All persons or entities

8  outside the United States who, within the applicable time period limitations, deposited fiat or digital

9  currency assets with FTX Trading LTD d/b/a FTX's ("FTX"), West Realm Shires Services Inc. d/b/a

10 FTX US's ("FTX US"), or a related entity (collectively, the "FTX Entities") or enrolled in products

11 offered by the FTX Entities.

12 132. The following persons or entities are further excluded from the Class: (i) judicial

13 officers and associated court staff presiding over this case; (ii) past and present officers, directors,

14 affiliates, representatives, agents and employees to the Defendants, including Defendants themselves,

15 or any of its direct or indirect subsidiaries; (iii) any immediate family members of the above two

16 groups; and (iv) all those otherwise in the Class who timely and properly exclude themselves

17 therefrom in such manner as the Court may direct.

18 133. Any notices to the Class(es) directed by the Court shall comply with all provisions of

19 Rule 23 and applicable court rulings regarding notice(s). Class members may be notified of the

20 pendency, certification and/or other important steps in this action under Fed. R. Civ. P. 23, as

21 appropriate, through a Court-approved combination of direct and indirect methods, including print,

22 broadcast, social media, posting, and other physical and electronic means. All Class members should

23 be identifiable and reachable based on corporate records in the possession, custody and control of

24 Defendants and once made available, Plaintiffs anticipate ease of publishing, mailing and emailing

25 notice at minimum.

26 134. Plaintiffs reserve the right to modify or amend the definition of the proposed

27 *Transnational Class*, or to include additional classes or subclasses, before or after the Court

28 determines whether such certification is appropriate as discovery progresses. Plaintiffs seek

certification of the *Transnational Class* in part because a significant portion of the offers of FTX products to Plaintiffs and the Class members (in which Defendants each substantially participated) were made by FTX to persons and entities outside the United States.

## II.    REQUIREMENTS OF RULE 23(A) MET

### A. Numerosity

135.    The Class is comprised of thousands, if not millions, of consumers internationally, to whom FTX offered and/or sold products. Moreover, thousands, if not millions, of consumers internationally have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number and nature of class members is currently unknown to Plaintiffs but readily identifiable through discovery and review of FTX's corporate records.

### B. Commonality and Predominance

136.    Common questions of law and fact predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

    a.   whether the products were unregistered securities under federal or applicable law;

    b.   whether Defendants' participation and/or actions related to FTX's offerings and sales of products violate the provisions of the Securities Act and under federal or applicable law;

    c.   what the type and measure of damages suffered by Plaintiffs and the Classes may be;

    d.   whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

    e.   whether Plaintiffs and Class members are entitled to injunctive and/or declaratory relief;

    f.   whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

### C. Typicality

137.    Plaintiff's claims are typical of the claims of the members of the Class because all members were injured through the uniform misconduct described above, namely that Plaintiffs and the Class were offered and/or sold FTX's products as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiff.

### D. Adequacy

138.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### E. Superiority

139.    A class action is superior to individual actions for the proposed Class, and also superior to actions outside the United States, in part due to the following factors:

    a.  Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside across the globe;

    b.  There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

    c.  The interests of justice will be well served by resolving the common disputes of potential Class members efficiently in one forum;

    d.  Extraterritorial litigation will unlikely provide the any, let alone the requested relief for the proposed Class herein but by contrast, litigation of common questions as a class action in a single, unitary proceeding will materially advance the disposition of the litigation and is consistent with the purposes and goals of class actions;

e.  Individual suits would not be cost effective or economically maintainable as individual actions; and

f.  The action is manageable as a class action.

### III.  REQUIREMENTS OF RULE 23(B)(3) MET

140.  The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Class. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants in marketing, offering, and/or selling the products, which are unregistered securities.

141.  Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

142.  As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the instant action, common questions will be held to predominate over individual questions.

### IV.  REQUIREMENTS OF RULE 23(B)(2) MET

143.  Alternatively, Plaintiffs will seek certification under 23(b)(2) for injunctive and/or declaratory relief for the Class. Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the products, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

144.  Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Entities' trading platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### V.  REQUIREMENTS OF RULE 23(C)(4) MET

145.  One of the predominant issues regarding Defendants' liability is whether the products FTX offered and/or sold are unregistered securities in violation of federal and/or applicable law,

utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this or other issues would materially advance the disposition of the litigation as a whole.

146. Another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Entities' trading platform, and utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this or other issues would materially advance the disposition of the litigation as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(Individually and on Behalf of the Class)**

147. Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

148. The Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

149. Defendants unfair and deceptive practices described herein are likely to mislead – and clearly have misled – consumers acting reasonably in the circumstances into purchasing products and transacting with FTX.

150. Unlawful: Defendants have advertised the Products using false and/or misleading claims, such that Defendant's actions as alleged herein violate at least the following laws:

- The False Advertising Law, California Business & Professions Code § 17500, *et seq*.

151. Fraudulent: A practice is "fraudulent" if members of the general public were or are likely to be deceived. Defendants' statements regarding the legality, nature and viability of products are deceptive to the public. Further, Defendant Bankman-Fried and FTX's operation of FTX and Ponzi-scheme type behavior is further fraudulent and deceptive to the public related to the viability and nature of FTX.

152. Unfair: The UCL gives courts maximum discretion to address improper business practices that are "unfair" Defendants' collective conduct with respect to the marketing and sale of the FTX entities is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or

substantially injurious to consumers in inducing them to transact with FTX, and the utility of their conduct, if any, does not remotely outweigh the gravity of the harm to its victims. Plaintiffs and the Class would not have transacted with FTX had they known that the statements were misrepresentations and deliberately deceiving. This conduct caused substantial consumer injury, not outweighed by benefits to consumers or competition, and unavoidable through reasonable diligence by consumers.

153.    Defendant Bankman-Fried and FTX's conduct with respect to the operation of FTX is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, can reasonably avoid.

154.    The harm suffered by Plaintiffs and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to products and the operation of FTX, as described herein.

155.    In accordance with California Business & Professions Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. On behalf of the Class, Plaintiffs also seek an order for the restitution of all monies from the sales of products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

## COUNT II
**Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*
(Individually and on Behalf of the Class)**

156.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

157.    California's False Advertising Law ("FAL") prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

158.    As set forth herein, Defendants made statements regarding FTX products that were untrue or misleading. They publicly represented that FTX and its products were a viable and safe way to invest in crypto, a statement designed to deceive consumers into investing with FTX.

159.  Defendants' claims that products of FTX were viable and safe for investing in crypto are untrue due to the house of cards nature of FTX's business and movement of funds, as evidenced by the immense collapse in fall 2022.

160.  Defendants knew, or reasonably should have known, that all these claims relating to the viability and safety of FTX were untrue or misleading. Defendants failed to adequately inform Plaintiffs and the Class of the true nature of FTX.

161.  When the true nature of FTX became publicly known in the fall of 2022, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by Defendants and FTX's business practices.

162.  Plaintiffs and members of the Class are entitled to injunctive and equitable relief, and restitution in the amount of money spent on FTX products.

**COUNT III**
**Fraudulent Concealment**
**(Individually and on Behalf of the Class)**

163.  Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

164.  Defendants omitted an existing fact about FTX when it failed to disclose information regarding the true nature of FTX.

165.  The omission is material because Plaintiffs and the Class would not have transacted with FTX had they known true nature of FTX.

166.  Defendants marketed and sold to Plaintiffs and the Class despite having knowledge of the true nature of FTX.

167.  Defendants intended that consumers and purchasers would rely on Defendants' statements regarding the safety and nature of FTX to bolster sales.

168.  Plaintiffs and the Class were not aware of the true nature and safety of FTX products and FTX's platform and could not reasonably have discovered those true characteristics.

169.  Plaintiffs and the Class relied on Defendants' statements in that they paid any amount

of money to FTX, which they would not have done had they known the true risky and Ponzi scheme nature of the products provided.

170. Plaintiffs and the Class had the right to rely on Defendants' statements and omissions that created the false impression that FTX and its products involved safe and reliable investment accounts based on reasonable purchaser expectations that the exchange would remain solvent.

171. Defendants had an affirmative duty to disclose the true nature of FTX to potential purchasers and investors because they were in a superior position to know the true nature of FTX.

172. Defendants fraudulently concealed the nature of FTX, causing damages to Plaintiffs and the class.

## COUNT IV
### Civil Conspiracy
### (Individually and on Behalf of the Class)

173. Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

174. Defendants made innumerable misrepresentations and omissions to Plaintiffs and Class Members regarding the nature and safety of FTX Entities in order to induce confidence in the platform and convince consumers to invest in what was a patently misleading and deceptive scheme, thus deceiving consumers and potential customers that their investments in the FTX Entities were safe.

175. The FTX Entities and Defendants entered into at least one agreement for the express purpose of making misrepresentations or omissions in order to induce and convince Plaintiffs and consumers to invest in FTX products and put their money in FTX.

176. Defendants engaged in concerted unlawful acts, particularly in the form of misrepresentations and omissions made to Plaintiffs and the Class for the purposes of inducing them to invest with FTX.

177. The conspiracy substantially aided the wrongdoing conducted by FTX and Defendant Sam Bankman-Fried.

178. This conspiracy caused damages to Plaintiffs and the Class in the amount of the money they invested in FTX that was lost as a result of the insolvency.

1

2                          **PRAYER FOR RELIEF**

3       WHEREFORE, Plaintiffs pray for a judgment on behalf of themselves and the Class(es):

4           a.   Certifying the proposed Class(es) as requested herein;

5           b.   Awarding actual, direct and compensatory damages;

6           c.   Awarding restitution and disgorgement of revenues if warranted;

7           d.   Awarding declaratory relief as permitted by law or equity, including declaring the

8                Defendants' practices as set forth herein to be unlawful;

9           e.   Awarding injunctive relief as permitted by law or equity, including enjoining the

10               Defendants from continuing any unlawful practices as set forth herein, and directing

11               the Defendants to identify, with Court supervision, victims of their conduct and pay

12               them all money they are required to pay;

13          f.   Awarding statutory and multiple damages, as appropriate;

14          g.   Awarding attorneys' fees and expenses; and

15          h.   Providing any such further relief as the Court deems just and proper

16

17                          **JURY TRIAL DEMAND**

18       Plaintiffs hereby demand a jury trial as to all claims so triable.

19

20   Dated:  May 19, 2023                    Respectfully submitted,

21                                      By:  */s/ William Audet*

22                                           WILLIAM M. AUDET (CA SBN 117456)
23                                           LING (DAVID) KUANG (CA SBN 296873)
                                             KURT D. KESSLER (CA SBN 327334)
24                                           waudet@audetlaw.com
                                             lkuang@audetlaw.com
25                                           kkessler@audetlaw.com
                                             **AUDET & PARTNERS, LLP**
26                                           711 Van Ness Avenue, Suite 500
                                             San Francisco, CA 94102-3275
27                                           Telephone:    (415) 568-2555
                                             Facsimile:    (415) 568-2556
28
                                             *Counsel for Plaintiff Imbert, individually, and on*
                                             *behalf of all others similarly situated*