# U.S. District Court
# Eastern District of Michigan (Detroit)
# CIVIL DOCKET FOR CASE #: 2:23-cv-11764-LJM-KGA

| | |
|---|---|
| Garrison et al v. Singh | Date Filed: 07/21/2023 |
| Assigned to: District Judge Laurie J. Michelson | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Kimberly G. Altman | Nature of Suit: 190 Contract: Other |
| Cause: 28:1332 Diversity-Other Contract | Jurisdiction: Diversity |

**Plaintiff**

**Edwin Garrison**     represented by     **Sharon S. Almonrode**
The Miller Law Firm, P.C.
950 West University Drive
Suite 300
Rochester, MI 48307
248-841-2200
Fax: 248-652-2852
Email: ssa@millerlawpc.com
*ATTORNEY TO BE NOTICED*

**E. Powell Miller**
The Miller Law Firm
950 W. University Drive
Suite 300
Rochester, MI 48307
248-841-2200
Email: epm@millerlawpc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gregg Podalsky**     represented by     **Sharon S. Almonrode**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Powell Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Skyler Lindeen**     represented by     **Sharon S. Almonrode**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Powell Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alexander Chernyavsky**                          represented by  **Sharon S. Almonrode**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **E. Powell Miller**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sunil Kavuri**                                   represented by  **Sharon S. Almonrode**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **E. Powell Miller**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gary Gallant**                                   represented by  **Sharon S. Almonrode**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **E. Powell Miller**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Nicol**                                    represented by  **Sharon S. Almonrode**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **E. Powell Miller**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jaspreet Singh**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2023 | 1 | COMPLAINT filed by All Plaintiffs against Jaspreet Singh with Jury Demand. Plaintiff requests summons issued. Receipt No: AMIEDC-9427023 - Fee: $ 402. County of 1st Plaintiff: Out of State - County Where Action Arose: Out of State - County of 1st Defendant: Wayne. [Previously dismissed case: No] [Possible companion case(s): United States District Court for the Southern District of Florida, 1:23-md-03076-KMM, Judge K. Michael Moore] (Attachments: # 1 Exhibit A - In re: FTX Cryptocurrency Exchange Collapse Litigation, MDL No. 3076, ECF No. 138 (J.P.M.L June 5, 2023), # 2 Exhibit B - Expert Report of Paul Sibenik (December 16, 2022)) (Miller, E.) (Entered: 07/21/2023) |
| 07/21/2023 | 2 | ATTORNEY APPEARANCE: Sharon S. Almonrode appearing on behalf of All Plaintiffs |

(Almonrode, Sharon) (Entered: 07/21/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/21/2023 17:08:07 | | | |
| **PACER Login:** | AdamMoskoadam | **Client Code:** | FTX |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-11764-LJM-KGA |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **EDWIN GARRISON**, *et al.,* on behalf of themselves and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| *Plaintiffs,* | **JURY TRIAL DEMANDED** |
| v. | **CASE NO.:**_____ |
| **JASPREET SINGH,** | |
| *Defendant.* | |

_____/

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs file this Complaint on behalf of themselves, and all other similarly situated

US and non-US FTX consumers, against Defendant, Jaspreet Singh, an "Influencer" who

promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX

Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively,

the "FTX Entities"), offer and sale of unregistered securities.[1]

---

[1] The Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade, dated December 16, 2022) is incorporated herein by reference and attached hereto as **Exhibit B**. This report was filed last year in the first class action in the country against various FTX Defendants, including Sam Bankman-Fried, other FTX insiders, and Celebrity Brand Ambassadors, which cases were consolidated and are all pending before The Honorable K. Michael Moore. *Garrison, et al. v. Bankman-Fried, et al.*, No. 1:22-cv-23753-KMM (S.D. Fla.).

## <u>INTRODUCTION</u>

1.       This Action is a Related Action to the multidistrict litigation *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla.) (the "FTX MDL"), pending in the United States District Court for the Southern District of Florida before the Honorable K. Michael Moore (the "Transferee Court"). A copy of the Transfer order issued by the United States Judicial Panel on Multidistrict Litigation (the "Panel") in *In re: FTX Cryptocurrency Exchange Collapse Litigation*, MDL No. 3076, ECF No. 138 (J.P.M.L June 5, 2023), is attached as **Exhibit A**. A Notice of Potential Tag-Along Action is being concurrently filed before the Panel in accordance with Rule 7.1(a) of the Panel's Rules of Procedure. This Related Action, which was originally filed in the Southern District of Florida, *Garrison v. Paffrath*, Case No. 1:23-cv-21023, is being filed again before this Court in this District in order to address the arguments Defendant Brian Jung raised regarding whether the Transferee Court has jurisdiction over him for these claims. The substantive allegations in both actions are the same, and will be amended in a consolidated amended class action complaint currently due to be filed August 7, 2023, once transferred to the Transferee Court and consolidated into the FTX MDL.

2.       The FTX disaster is the largest financial fraud in US history. The former FTX CEO, Sam Bankman-Fried ("<u>SBF</u>"), is facing numerous criminal charges and

the new CEO—who helped wind down Enron—concluded that this fraud was worse than Enron. Billions of dollars have been stolen from investors across the globe.

3. FTX was a centralized cryptocurrency platform which specialized in derivatives and leveraged products. It filed for bankruptcy protection in November 2022 and will be involved in federal bankruptcy proceedings for many years. There is no guarantee that any of the victims will be able to see any recovery from those proceedings.

4. This action may be one of the only avenues for any of the victims to recover any of their damages. Plaintiffs bring this action against YouTube and social media financial influencers and promoters who shared financial advice and actively promoted FTX and its yield-bearing-accounts ("YBAs") to their millions of followers. Though FTX paid Defendant handsomely to push its brand and encourage their followers to invest, the Defendant did not disclose the nature and scope of his sponsorships and/or endorsement deals, payments and compensation, nor conduct adequate (if any) due diligence.

5. With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "Influencers" has been created. Evidence has now been uncovered that reveals Influencers played a major role in the FTX disaster and in fact, FTX could not have arisen to such great heights without the massive impact of these Influencers, who hyped the Deceptive FTX Platform for undisclosed

payments ranging from tens of thousands of dollars to multimillion dollar bribes.[2] Indeed, the most searched companies on the internet today are cryptocurrency brands. According to the NBA 2021–2022 Marketing & Partnerships Annual Report by SponsorUnited, the cryptocurrency industry had a higher search volume during that year than the entire Alcohol & Beverages industry.

6.      It is paramount to understand that the Florida state law claims asserted in this action **do not require "reliance" or "deceit."** The law merely requires the named Plaintiffs (and eventually the certified class) to have suffered damages as a result of: (a) purchasing an "unregistered security," and (b) that was promoted by Defendant for his financial benefit and/or the financial benefit of FTX.

7.      The reality is that anyone around the world with a computer can now be a promoter. Many of these paid FTX Influencers have since asked for forgiveness, because many of these Influencers rely mainly on their alleged independence and impartiality in attracting people to join their fanbase.[3] This Action is brought to hold liable those Influencers who specifically violated the law under these acts and will serve as precedent to warn and guide Influencers in the future.

---

[2] For example, the company Coinbound touts that: We help crypto brands go viral using Web3's top influencers. An influencer marketing agency built for crypto. https://coinbound.io/influencers/ (accessed July 21, 2023).

[3] https://www.businessinsider.com/influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11 (accessed July 21, 2023).

8.     State and federal regulators have been required to quickly modify and adjust to all of the changing sources of promoters and marketers. Starting with sponsors on radio, then television and motion pictures and today, to the wild west of the internet, the number of companies that specialize in promoting on social media have sky-rocketed. According to studies, those aged 18 to 34 are more likely to build an interest in an investment specifically from social media, instead of traditional news websites.[4]

9.     Both the Eleventh and Ninth Circuits have already recently entered opinions that specifically social media posts and mass communications (in the cryptocurrency context) made through the internet, exactly like the ones at issue in these claims, are sufficient to state a claim for soliciting the sale of unregistered securities. *Pino v. Cardone Capital, LLC*, 55 F.4th 1253 (9th Cir. 2022); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022), *cert. denied sub nom. Arcaro v. Parks*, 214 L. Ed. 2d 235 (2022).

10.     Numerous state courts have also interpreted their own state securities laws, such as the Florida Securities and Investor Protection Act ("FSIPA"), to go even further and provide broader protection for investors from aiding and abetting the sale of unregistered securities, such as these YBAs, because the FSIPA, "as its

---

[4]         https://www.theguardian.com/money/2021/aug/22/as-finfluencers-spread-through-social-media-beware-the-pitfalls (accessed July 21, 2023).

title makes clear, [was designed] to protect the public from fraudulent and deceptive practices in the sale and marketing of securities." *Mehl v. Office of Financial Regulation*, 859 So.2d 1260, 1264–65 (Fla. 1st DCA 2003) (quoting *Arthur Young & Co. v. Mariner Corp.*, 630 So.2d 1199, 1203 (Fla. 4th DCA 1994).

11.     Literally overnight, Plaintiffs lost their assets held in their YBAs on FTX's trading platform as FTX imploded and filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. In the months following FTX's filing, its founders, including SBF, were charged with numerous counts of fraud and money laundering (among other things) and as of the date of this filing at least three of SBF's cohorts pled guilty to conspiracy and other criminal charges relating to FTX's scheme to defraud its investors.

12.     FTX's fraudulent scheme was designed to take advantage of investors from across the globe, including specifically in Michigan, who sought out what was represented to be a safe platform to make their investments in the burgeoning cryptocurrency industry. The scheme resulted in FTX investors collectively sustaining billions of dollars in damages.

## PARTIES

13.     **Plaintiffs** are all residents of the United States and/or a foreign government, and all purchased FTX YBAs.

14. **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendant is liable.

15. **Plaintiff Gregg Podalsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Podalsky did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendant is liable.

16. **Plaintiff Skyler Lindeen** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen

purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Lindeen did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendant is liable.

17.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Chernyavsky did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendant is liable.

18.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings.

Plaintiff Kavuri did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendant is liable.

19.     **Plaintiff Gary Gallant** is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gallant did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendant is liable.

20.     **Plaintiff David Nicol** is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Nicol did so after being exposed to some or all of Defendant's misrepresentations and omissions regarding the FTX Platform as detailed in this

complaint, and/or executed trades on the FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendant is liable.

21.     Defendant, **Jaspreet Singh**, a YouTube star with over 1.4 million subscribers to his YouTube channel, "Minority Mindset," was paid to endorse FTX, and is a citizen and resident of Detroit, Michigan.

22.     Defendant is a digital creator who provides investor information and advice on an array of topics, including cryptocurrency generally and FTX on his YouTube channel. YouTube is the second largest search engine, which generates content that is accessible across the globe.

23.     Defendant (1) admittedly endorsed and promoted the sale of the FTX YBAs and (2) did not disclose, in any of his YouTube and other social media posts, that he was paid hundreds of thousands and/or millions of dollars by FTX and profited from the sale of FTX YBAs, in clear violation of SEC, FTC and various federal and state regulations.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28                                                                              U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00

(one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than Defendant.

25.    This Court has general personal jurisdiction over Defendant Jaspreet Singh in the state of Michigan because he is a domiciled in this state, and is engaged in substantial and not isolated activity within this state, rendering Defendant Singh subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. Upon transfer of this Related Action to the Transferee Court for consolidation into the FTX MDL, the Transferee Court will have personal jurisdiction over Defendant Jung because in enacting the multidistrict litigation statute, 28 U.S.C. § 1407, Congress "authroiz[ed] the federal courts to exercise nationwide personal jurisdiction … and [t]ransfers under Section 1407 are simply encumbered by considerations of in personam jurisdiction…" *In re Agent Orange Prod. Liab. Litig. MDL No 381*, 818 F.2d 145, 163 (2d Cir. 1987). The Transferee Court further independently has personal jurisdiction over Defendant because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendant regularly conducted business in Florida and/or engaged in continuous and systematic activities within Florida, and committed tortious acts in the state of Florida, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

26.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant Jaspreet Singh resides in this District. Venue is also proper in the Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1407, because the Panel ordered in its Transfer Order that all Related Actions be transferred to the Transferee Court and consolidated into the FTX MDL for pretrial purposes. Venue is further proper in the Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1391 because the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within this District

27.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### I.  Background on Cryptocurrency Litigation Relating to the Promotion of YBAs

28.     Back in 2017, the SEC warned that if YBAs are found to be "securities," persons who promote them may be liable under state and federal regulations for: (1) promoting an unregistered security, or (2) failing to properly disclose their payments and compensation. Those specific claims have a strict liability standard with no *caveat emptor* defense.

29.     The question of whether the sale of FTX YBAs constitutes the sale of "unregistered securities" under the Statutes has practically been answered in the

12

affirmative through various regulatory statements, guidance, and actions issued by

the U.S. Securities and Exchange Commission and other regulatory entities. For

example, on November 1, 2017, in the "SEC Statement Urging Caution Around

Celebrity Backed ICOs,"[5]

> In the SEC's Report of Investigation concerning The
> DAO,[6] the Commission warned that virtual tokens or coins
> sold in ICOs may be securities, and those who offer and
> sell securities in the United States must comply with the
> federal securities laws. Any celebrity or other individual
> who promotes a virtual token or coin that is a security must
> disclose the nature, scope, and amount of compensation
> received in exchange for the promotion. A failure to
> disclose this information is a violation of the anti-touting
> provisions of the federal securities laws. **Persons making
> these endorsements may also be liable** for potential
> violations of the anti-fraud provisions of the federal
> securities laws, **for participating in an unregistered
> offer and sale of securities**, and for acting as unregistered
> brokers. The SEC will continue to focus on these types of
> promotions to protect investors and to ensure compliance
> with the securities laws.

30.    The SEC and state securities regulators over the past five years have

already found liable numerous celebrities, cryptocurrency brokers and exchanges

just like FTX for offering this exact same type of interest-bearing account, finding

---

[5]https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed July 21, 2023) (emphasis added).

[6]    https://www.sec.gov/litigation/investreport/34-81207.pdf    (accessed   July   21, 2023).

that exchanges such as BlockFi,[7] Voyager,[8] and Celsius[9] all offered these same accounts as unregistered securities.

31.  A second narrow issue that is common to the entire Proposed Class, whose focus is solely objective, is whether this Defendant violated Florida's consumer laws by failing to abide by the FTC's long-established rules and regulations regarding the requirements that must be met in connection with celebrity endorsements, including of items such as cryptocurrency.

32.  In particular, Plaintiffs' claims arise from their purchase of and investment in FTX's YBAs, which, FTX marketed through Defendant, as a type of savings account that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. That is the narrative that Defendant pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, the

---

[7] https://www.sec.gov/news/press-release/2022-26 (accessed July 21, 2023).

[8]                                  *See,*                                  *e.g.*,
https://www.nj.gov/oag/newsreleases22/Voyager%20Summary%20Order.pdf     (
accessed March 13, 2023); https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-order-22-004-s-voyager.pdf (accessed March 13, 2023)

[9]   https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf    (accessed March 13, 2023).

Defendant is liable for Plaintiffs' losses, jointly and severally and to the same extent as if he himself were the FTX Entities.

33.    Literally overnight, Plaintiffs' assets held in their YBAs on the FTX Platform were unavailable to them as FTX imploded and filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

*See In re: FTX Trading Ltd, et al*., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

34.    The losses associated with malfeasance in the cryptocurrency sector are growing by the billions almost every day. More crypto companies are filing new

federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Michigan and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff ponzi scheme.

35. The deceptive and failed FTX platform emanated from Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous cryptocurrency conventions. FTX' fraudulent plan was put into effect from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where the Miami Heat—who are 3-time NBA Champions—play.

## II. Background on FTX

36. Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service

(the "FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

37. In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange, the exchange has dominion and control over those assets.

38. The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer. One major factor that affects the exchange's ability to process such requests is whether they have the assets and/or capital necessary to do so. For any non-yield-bearing account, liquidity should not be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, on a 1:1 basis.

39. FTX's terms of service guaranteed that title to the digital assets in customer accounts remained with the customer and that customers controlled the digital assets in their accounts. FTX violated its own terms of service.

40. While FTX violated its own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin even if

there was hypothetically no wrongdoing on the part of FTX because FTX exchange accounts are custodial in nature. This means that the customer does not *control* access to the assets "in" their account. Rather, the customer needs to make a request to the exchange to be able to access and send those balances, which then debits the user account and sends the assets. Whether or not such requests are processed is dependent on the willingness, ability, and approval of the exchange.

41.    With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers' principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

42.    While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

43.    The main functional differences between banks and cryptocurrency exchanges is that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

44.     Banks are regulated with regards to the type of assets that they can invest customer assets in, subject to regular financial audits, and have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), ensuring that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

45.     In contrast, exchanges like FTX are not subject to the same capital control requirements as banks. While almost all exchanges will indicate that they "securely" store all customer assets 1:1 in "cold storage," there is no regulatory requirement in most jurisdictions (including the U.S.) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or the public.

46.     Other than by an exchange's own terms of service – which FTX violated – exchanges are not prevented from investing customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. Nor are there any requirements for exchanges to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance'

is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

47.　　Due to the risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

48.　　Indeed, there is an extensive track record of the cryptocurrency exchanges that have shut down and ultimately failed,[10] often in spectacular fashion. The most common reasons for an exchange's failure include:

    a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

    b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

    c) A hack or theft by an external actor

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

*Id.*

---

[10] https://www.cryptowisser.com/exchange-graveyard/ (accessed July 21, 2023).

49.     When exchanges do shut down, it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back. That is because investors' cryptocurrency belongs to the exchange if they elect to store it "on" the exchange, and if the exchange reneges or is unable to fulfill its liability to the investor, the investor as the beneficial owner of the cryptocurrency has effectively lost its money.

## III.  The Rise and Fall of FTX and Alameda

50.     FTX launched in May 2019 and rapidly became a leading cryptocurrency exchange. FTX was led by SBF as its founder and Chief Executive Officer.

51.     Prior to founding FTX, the Silicon Valley-born, MIT-educated SBF launched his quantitative crypto trading firm, Alameda Research, in November 2017,[11] after stints in the charity world and at trading firm Jane Street.[12] Quantitative

---

[11]   https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed July 21, 2023).

[12]   https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed July 21, 2023).

trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

52.     By 2018, Bankman-Fried had persuaded Caroline Ellison to join him at Alameda Research. In an interview for Forbes magazine regarding her initial impressions of Alameda, Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'"

53.     In late 2018, Alameda Research relocated its headquarters to Hong Kong. The team at Alameda Research included SBF's close friends (and later co-founders of FTX) Nishad Singh and Gary Wang. Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and actively traded crypto.

54.     Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

55.     The FTX.com exchange was extremely successful since its launch. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX team grew to over 300 globally. Although the FTX Entities' primary international

headquarters was in the Bahamas, its domestic US base of operations was in Miami, Florida.[13]

56.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

57.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities and social medial influencers like Defendant in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[14]

58.    Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.

59.    Even though they are two separate businesses, the division between FTX and Alameda breaks down in a key place: on Alameda's balance sheet, which was full of the FTT token issued by the FTX exchange that grants holders a discount

---

[13]https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed July 21, 2023).

[14]https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed July 21, 2023).

on trading fees on its marketplace. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX was able to create unlimited amounts of FTT. Thus, in essence, Bankman-Fried's trading giant Alameda rested on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto.

60. Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Alameda also engaged in margin trading, essentially borrowing money to execute risky trading strategies, which trades in turn were secured by the assets Alameda had borrowed from FTX customers' accounts. That leverage made Alameda's trades (and thus FTX customers' funds) highly vulnerable to adverse market movements. [15]

61. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022, Alameda borrowed from FTX some

---

[15]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/    (accessed July 21, 2023).

of its customers' assets.[16] Some have suggested that the loans were made for free.[17]

62.     Having borrowed those customer assets, Alameda could then use them as cheap collateral for margined trades with other parties.[18] Indeed, obtaining collateral from other sources would have been much more expensive.

63.     In an Alameda balance sheet leaked in early November 2022, FTT tokens were listed as Alameda's largest asset holdings. Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[19] Alameda had few assets that had

---

[16]     https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed July 21, 2023).

[17]https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed July 21, 2023).

[18] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed July 21, 2023).

[19]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/     (accessed July 21, 2023).

not been created out of thin air by FTX or FTX-related entities, and when falling crypto prices reduced the value of FTT, Alameda struggled to pay off its lenders.[20]

64.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[21]

65.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[22] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, 2022, that Binance would buy FTX, effectively bailing it out.[23]

66.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer

---

[20]     https://www.nytimes.com/2022/11/30/business/dealbook/ftx-almeda-research-sam-bankman-fried.html#:~:text=Alameda%20served%20as%20the%20token's,to%20facilitate%20its%20trading%20activities. (accessed July 21, 2023)

[21]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed July 21, 2023.

[22]https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed July 21, 2023).

[23]https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed July 21, 2023).

funds and the possibility of a federal investigation.[24] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[25] On November 11, 2022, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[26]

67.   This chain of events was entirely foreseeable to those who were aware of FTX's relationship with Alameda, and their respective dependence on the purported value of FTT. Indeed, as discussed above, their respective reliance on FTT as a mechanism to prop them up and to purportedly offer protection (which was in effect illusory) to FTX customers' whose assets had been lent to Alameda was a risk that was obvious to insiders, but otherwise undisclosed to the market and FTX's customers. The very risk of which Alameda, FTX, and its insiders were aware, accordingly, swiftly came to bear, and FTX's customers were the victims.

68.   Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[27]

---

[24] https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed July 21, 2023).

[25]   https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed July 21, 2023).

[26] https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed July 21, 2023).

[27]   https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed July 21, 2023).





SBF ✓ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin. I thought it was way lower.

💬 251      🔁 749      ♡ 3,407      ⬆️



SBF ✓ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours. We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241      🔁 907      ♡ 3,823      ⬆️



SBF ✓ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough. I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116      🔁 278      ♡ 2,882      ⬆️





SBF ✓ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102        ⟲ 274        ♡ 3,007        ⬆



SBF ✓ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well. *I*, ultimately, should have been on top of everything.

I clearly failed in that. I'm sorry.

💬 180        ⟲ 423        ♡ 4,122        ⬆



SBF ✓ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129        ⟲ 235        ♡ 2,502        ⬆









SBF ✔ @SBF_FTX · Nov 10
18) But all of that isn't what matters right now--what matters right now is
trying to do right by customers.  That's it.

💬 144          ↻ 158          ♡ 1,970          ⬆️

SBF ✔ @SBF_FTX · Nov 10
19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that
accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406          ↻ 760          ♡ 2,776          ⬆️

SBF ✔ @SBF_FTX · Nov 10
20) At some point I might have more to say about a particular sparring
partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

💬 1,532          ↻ 3,303          ♡ 8,047          ⬆️

SBF ✔ @SBF_FTX · Nov 10
21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN
ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE
NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M
NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908          ↻ 1,055          ♡ 3,463          ⬆️



69.  According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the FTX Platform is that earlier this year, Bankman-Fried secretly transferred **at least $4 billion** in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than **half** of its **$16 billion** in **customer funds** to Alameda in total, with more than **$10 billion in loans outstanding**.[28]

## IV.  FTX Insiders Plead Guilty to Numerous Criminal Charges Relating to FTX's Fraudulent Scheme

70.  On January 3, 2023, SBF pled not guilty to eight criminal charges during a court hearing at the U.S. District Court for the Southern District in *USA v. Bankman-Fried*, 1:22-cr-00673-LAK-1. On February 23, 2023, a Superseding Indictment was unsealed, which added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.*, Doc. 80. SBF faces over 100 years in prison in connection

---

[28]  https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed July 21, 2023).

with charges predicated on his lying to investors and stealing billions of dollars in customers' money. His trial is set to commence in October 2023.

71. In December 2022, Ellison and Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. In entering her guilty plea, Ellison told a federal judge in Manhattan:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I

agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[29]

---

[29] https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (last accessed July 21, 2023)

72.     In entering his guilty plea, Wang similarly told the federal judge in Manhattan:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

73.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried, apologized for his role in FTX's scheme, and admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[30]

## V. The SEC's Consistent Approach to Cryptocurrency

### A. Overview

---

[30]     https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed July 21, 2023).

74.     The SEC's stance on cryptocurrency has been clear and consistent from the beginning. The Securities and Exchange Acts are intentionally drafted to apply to a broad range of securities. As such, the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

75.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to

encompass virtually any instrument that might be sold as an investment." (emphasis added)[31]

76.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

77.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[32] That decision resulted in the *Howey* Test, which is used to determine the

---

[31]https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed July 21, 2023).

[32] https://supreme.justia.com/cases/federal/us/328/293/ (accessed July 21, 2023).

presence of an investment contract. The *Howey* Test provides that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[33] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

78.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[34]

79.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[35] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH")

---

[33] *Id.*

[34] ia_virtualcurrencies.pdf (sec.gov) (accessed July 21, 2023).

[35] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed July 21, 2023).

over a one-month period in 2016.[36] The SEC applied the *Howey* Test to the DAO

tokens and concluded they were securities under the Securities Act of 1933

("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

While The DAO, and DAO tokens, were no longer operational at the time due to a

high-profile hack that resulted in the theft of most DAO tokens, the Commission

chose to release the report so as "to advise those who would use a Decentralized

Autonomous Organization ("DAO Entity"), or other distributed ledger or

blockchain-enabled means for capital raising, to take appropriate steps to ensure

compliance with the U.S. federal securities laws."[37]

80.    In 2019, the SEC released a "Framework for 'Investment Contract'

Analysis of Digital Assets" which provided additional details on when a digital asset

has the characteristics of an investment contract and "whether offers and sales of a

digital asset are securities transactions."[38]

---

[36]  https://www.sec.gov/litigation/investreport/34-81207.pdf  (accessed July 21, 2023).

[37]  Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed July 21, 2023).

[38]  SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed July 21, 2023).

81.     In addition, the SEC has publicized its position on cryptocurrency in countless enforcement  actions,[39]  multiple speeches,[40] Congressional  testimony,[41] and several official SEC statements[42] and proclamations.[43] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[44] warning that their failure to register with the SEC may violate U.S. securities laws.[45] In one interview, Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[46]

---

[39] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed July 21, 2023).

[40]        https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed July 21, 2023).

[41]   https://www.sec.gov/news/testimony/gensler-2021-05-26   (accessed July 21, 2023).

[42]        https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11(accessed July 21, 2023).

[43]https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed July 21, 2023).

[44]        https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec(accessed July 21, 2023).

[45]https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed July 21, 2023).

[46]        https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec(accessed July 21, 2023).

82.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[47] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[48] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[49]

83.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[50]

84.     What follows are summaries of five cases that will help inform this litigation.

**B.  SEC v. KIK**

---

[47] SEC.gov | Kennedy and Crypto (accessed July 21, 2023).

[48] *Id.*

[49] *Id.*

[50] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed July 21, 2023).

85.   In Kik[51], the SEC's complaint[52], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[53]

86.   The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

### C. SEC v. Telegram

87.   In Telegram,[54] the SEC filed a complaint[55] on October 11, 2019, alleging that the company had raised capital to finance its business by selling

---

[51] https://www.sec.gov/news/press-release/2020-262 (accessed July 21, 2023).

[52] https://www.sec.gov/news/press-release/2019-87 (accessed July 21, 2023).

[53] https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed July 21, 2023).

[54] https://www.sec.gov/news/press-release/2020-146 (accessed July 21, 2023).

[55] https://www.sec.gov/news/press-release/2019-212 (accessed July 21, 2023).

approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

88.     Telegram argued[56] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

89.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[57] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

90.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from

---

[56] https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed July 21, 2023).

[57] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed July 21, 2023).

violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### D. SEC v. BlockFi

91.     In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [58] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

92.     BlockFi argued for "increased regulatory clarity" but lost.[59]

93.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced

---

[58] https://lnkd.in/d-Xy45ec (accessed July 21, 2023).

[59] https://blockfi.com/pioneering-regulatory-clarity (accessed July 21, 2023).

that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### E. SEC Wells Notice to Coinbase

94.     In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[60] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells* Notice, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

95.     According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[61]

96.     The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the

---

[60] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed July 21, 2023).

[61] *Id.*

question of whether a product is a "note" and hence a security (applying the so-called "Family Resemblance Test").

97.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

98.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper-type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

99.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing

a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and 7) a note evidencing loans by commercial banks for current operations.

100.   The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

101.   Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

102.   Given the clear facts of the case, Coinbase decided to cancel the Lend program.[62]

## VI.  FTX's offer and sale of YBAs, which are unregistered securities.

103.   Beginning in 2019, the FTX Entities began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

104.   The details of the Earn program were listed on the FTX website.[63] Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets.[64]

105.   On the same webpage, the company also states:

> The **first $10,000** USD value in your deposit wallets will earn **8%** APY.  Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[65]

---

[62] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed July 21, 2023).

[63] FTX App Earn – FTX Exchange (accessed July 21, 2023).

[64] FTX App Earn – FTX Exchange (accessed July 21, 2023).

[65] *Id.*

106.   Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

107.   Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[66] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[67]

---

[66] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

[67] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed July 21, 2023).

108.   Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[68] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[69]

109.   Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY.

---

[68] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed July 21, 2023).

[69] *Id.*

110.   From a securities perspective, the *Howey* Test defines an investment contract if it is (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

111.   <u>Plaintiffs here invested money.</u> Plaintiffs' investment of assets, even if such investments were in the form of cryptocurrencies, satisfy the "investment of money" prong for an investment contract.

112.   <u>Plaintiffs here invested in a common enterprise.</u> FTX promoted and paid for advertisements which touted earning up to 8% "yield" on any fiat or crypto held in a YBA, along with representations that customers are eligible to earn the "yield," on an hourly basis, simply by passively keeping the funds in the YBA. FTX also made the same YBAs available to all FTX customers, and all assets held in the account, whether crypto or fiat, earned the same rate of interest. Once investors logged into their YBAs, the earn capability was automatically enabled, and they passively earned yield. FTX has admitted that these earn "[s]ervices are provided by FTX for its customers," that FTX "transmits value from your [YBA]" and those "assets will be used to generate a fixed yield for the user." FTX's Terms of Service further make clear that investor funds are pooled together and used for lending and investment activities that would generate the yield, i.e., "Your balances in your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses

or accounts, as applicable." The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

113. <u>Plaintiffs here invested with the expectation of profit from the efforts of others</u>. FTX customers clearly had an expectation of profit, as they were guaranteed to earn up to 8% "yield" for any fiat or crypto held in a YBA. FTX represented that customers are eligible to earn the "yield," which is rewarded hourly simply by passively keeping the funds in the YBA. Moreover, Plaintiffs expected that they would earn these yield profits primarily, if not solely, from FTX's efforts in managing the assets invested into the YBAs, and not through their own efforts. Indeed, the assets were not actually "in" Plaintiffs' YBAs at all and were instead pooled with all other FTX customer assets, as explained in the FTX's Terms of Service, i.e., "Your balances in your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable." The yield was generated entirely through FTX's efforts from either staking assets from the pooled account or otherwise lending assets, most notably to Alameda., FTX freely admits that the yield was earned entirely through FTX's efforts, as they admit that the Earn

"Services are provided by FTX for its customers," that FTX "transmits value from your [YBA]" and those "assets will be used to generate a fixed yield for the user.[70]

114.  In addition, the FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user. The work that 'others' (namely FTX) would need to do would include, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies. The primary strategy that FTX portrayed to investors was "staking," as discussed herein.

115.  The FTX Earn program was a note under *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second,

---

[70] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed July 21, 2023).

Earn was offered and sold to a broad segment of the general public. Third, FTX

promoted Earn as an investment; on their website, FTX notes that Earn users will

receive "yield earnings" on their "investment portfolio."[71] Fourth, no alternative

regulatory scheme or other risk reducing factors exist with respect to Earn. Note that

the above analysis mirrors that provided by the SEC in their BlockFi order.[72]

116. On October 14, 2022, Director of Enforcement of the Texas State

Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy

proceedings pending in connection with the collapse of the Voyager Digital

cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-

10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he

explained how the YBAs are in fact "an offering of unregistered securities in the

form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his

declaration, the pertinent portions of which are reproduced in full for ease of

reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX
> as described herein. As more fully explained throughout this
> declaration, I am aware that FTX Trading, along with West Realm
> Shires Services Inc. dba FTX US ("FTX US"), may be offering
> unregistered securities in the form of yield-bearing accounts to
> residents of the United States. These products appear similar to the
> yield-bearing depository accounts offered by Voyager Digital LTD

---

[71] FTX App Earn – FTX Exchange (accessed July 21, 2023).

[72] https://www.sec.gov/news/press-release/2022-26 (accessed July 21, 2023).

et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[73] (the

---

[73] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a

"FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by

---

cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application was developed by Blockfolio.

"Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and**

59

**Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

**FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil. FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be

violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## VII. FTT Token

117.   The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[74] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[75]

118.   FTT meets the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test

---

[74] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed July 21, 2023).

[75] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed July 21, 2023).

is met. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[76] Exchange tokens like FTT also functionally resemble the XRP token, which the SEC alleges is an investment contract due to Ripple's control over the XRP token.[77]

## VIII. The FTX Platform

119.    Another avenue through which FTX users were exposed to a securities transaction was through the basic structure of the platform. Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks. When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which

---

[76] https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed July 21, 2023).

[77] https://www.sec.gov/news/press-release/2020-338 (accessed July 21, 2023).

is governed by the terms and conditions of the account. Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

120. FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments.

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

> The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable

to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[78]

121.  In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[79] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[80] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[81]

---

[78]  042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed July 21, 2023).

[79] *Id.*

[80] *Id.*

[81] *Id.*

122.　To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[82] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[83] The WSJ acknowledged that these funds "could have been recorded in two places— both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[84]

123.　The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some

---

[82]　https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed July 21, 2023).

[83] FTX customers deposited more than $5 billion in those Alameda accounts.

[84] *Id.*

of its customer assets that it did control to Alameda.[85] Presumably, the exchange

benefitted from the interest paid by Alameda for the loaned cryptoassets – although

some have suggested that the loans were made for free.[86] Alameda could then use

the customer assets as cheap collateral for margined trades with other parties

(obtaining collateral from other sources would have been much more expensive).[87]

It appears that Alameda did post collateral to secure the loans of customer crypto

assets that it received, but that collateral took the form of FTT tokens. FTT tokens

were the so-called "native token" of the FTX exchange: FTX created FTT and issued

it to both institutional and retail investors without registering with any regulator or

undergoing any audit or other external due diligence. FTX could create unlimited

amounts of FTT if it wished.

124.   In short, there appear to have been two sets of leveraged transactions

involved. First, Alameda borrowed assets from FTX's customers, providing FTT

tokens as collateral for those loans. Second, Alameda engaged in margin trading,

essentially borrowing money to execute risky trading strategies: these trades were

---

[85]         https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations
(accessed July 21, 2023).

[86]https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-
ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed July 21,
2023).

[87] For a more general discussion of the conflicts of interest inherent in these
relationships,   see   https://www.coppolacomment.com/2022/11/the-ftx-alameda-
nexus.html (accessed July 21, 2023).

secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[88] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

125.   After the CoinDesk report came out on November 2, 2022, the CEO of FTX's rival exchange Binance, Changpeng Zhao, tweeted that Binance was planning to sell off its holdings of FTT. This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

126.   While we are still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of information that are relevant to this litigation.

---

[88] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/   (accessed July 21, 2023).

127.   First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have actually resulted in a cryptocurrency transaction. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms (Alameda's balance sheet in John Ray's first day declaration list venture capital assets).

128.   Second, when customers withdrew cryptoassets from FTX in the past, FTX was likely meeting these withdrawals by selling FTT. However, as the price of FTT fell in the wake of Zhao's tweet, it became increasingly expensive for FTX to convert FTT into other cryptoassets that matched customers' expectations of their portfolio holding – especially as so many FTX customers were seeking to pull their crypto assets out of the exchange at the same time. Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (i.e., commodities) the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. Another way to think of it is that FTX and all its affiliated entities were essentially economically akin to a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. Given these facts, it appears that any person

who used FTX was engaged in a securities transaction of some kind, knowingly or unknowingly.

129. Thus, as will be illustrated below, the FTX Brand Ambassadors' promotion of "FTX" was necessarily the promotion of unregistered securities.

## IX. Defendant Aggressively Marketed the FTX Platform

130. From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with crime, frauds and scams."[89] Everyday consumers have also fallen victim to various cryptocurrency-related scams.[90]

131. There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest.

132. All the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use

---

[89]https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed July 21, 2023). Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed July 21, 2023)' Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed July 21, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed July 21, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed July 21, 2023).

[90] *See* Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed July 21, 2023); Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed July 21, 2023).

cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[91] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

133.   Crypto firms like FTX turned to celebrity and social media endorsers to position itself as the "safe" option among cryptocurrency exchanges. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency, which were proven untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

134.   FTX's paid endorser program was clearly designed to use the positive reputation associated with specific YouTube and other social network influencers to convince consumers that FTX was a safe place to buy and sell cryptocurrency. As Mr. Sibenik explains, FTX's brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' Ex. B ¶ 44–49.

135.   FTX not only deployed such well-known celebrities such as Stephen Curry, Kevin O'Leary as brand ambassadors, *id.*, but it also engaged in aggressive

---

[91]  46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center (last accessed July 21, 2023).

global digital marketing, particularly through influencer "crypto marketing" on YouTube and other social networks.

136.  "Crypto marketing" is the execution of marketing and advertising efforts with the goal of raising awareness, acquiring users, or driving growth for a cryptocurrency or blockchain-related product. Popular crypto marketing strategies include influencer marketing, community growth, social media management, and grassroots digital marketing, and tout great results and valuable case studies, specifically with promoting cryptocurrency.[92]

137.  Social media "influencers" are individuals who have amassed a large following on platforms such as Instagram, YouTube, and TikTok, and use their influence to promote products, services, and ideas. Social media influencers are characterized by a huge number of highly loyal and engaged social media followers, who share a rapport with their fans and are perceived as everyday people who are experts in their niches.

138.  Unlike mainstream celebrities, influencers don't shroud their lives in an air of mystery and present themselves as real-life consumers who share authentic and valuable information with their followers.[93] They create content that resonates

---

[92] Ultimate Cryptocurrency Marketing Strategy Guide for 2022 | Coinbound (last accessed July 21, 2023).

[93] The Rise of Influencer Marketing: All You Need to Know | Shane Barker (last accessed July 21, 2023).

with their followers, often by sharing their personal experiences, lifestyle choices, and preferences. By doing so, they establish a sense of authenticity and relatability with their audience, which can be incredibly compelling.

139. Influencer marketing thus involves collaborating with a social media influencer to increase brand visibility and strengthen a brand's reputation. When executed correctly, it helps win more customers from target audiences and earn more revenue. What differentiates influencer marketing from other types of celebrity marketing is that it is perceived as more authentic and trustworthy, because, owing to an influencer's rapport with their fans, their recommendations aren't dismissed as fake and sponsored endorsements. *Id.* Instead, their followers often swear by the recommendations made by their favorite influencer. *Id.* Because their audience trusts them, they are more likely to take their recommendations, which can lead to increased sales for the products they promote.

140. While influencer digital marketing is more expensive than other types of paid media, studies done on the subject show that the majority of marketing teams have found the return of investment ("ROI") on influencer marketing to be higher than that of other forms of online growth tactics.[94] According to a recent study, influencer marketing delivers an ROI of $6.5 for every $1 spent. This is far

---

[94] Everything You Need to Know About Crypto Influencer Marketing (coinbound.io) (last accessed July 21, 2023).

higher than the ROI of other forms of digital marketing.[95] Digital content creators also can more precisely target their marketing efforts by using highly sophisticated analytic tools such as Google Analytics to measure their site's traffic, where its coming from, and who is visiting their sites.[96]

141.  As such, digital marketing through social media is extremely effective at influencing consumer decisions. According to a survey from the National Association of Professional Financial Advisors (NAPFA), more than one-quarter of Gen Zers learn about finance from social media. The survey results also show that more than one-third (39%) of Americans under 65 receive their financial advice from social media.[97] When it comes to where they are getting financial advice, YouTube is one the most popular platforms for Gen Z (63%) and Millenials (71%) to discuss financial planning and investment in cryptocurrency.[98] More than 60% of the

---

[95] *Id*; [The Rise of Influencer Marketing: All You Need to Know | Shane Barker](#) (last accessed July 21, 2023).

[96] [Ultimate Cryptocurrency Marketing Strategy Guide for 2022 | Coinbound](#) (last accessed July 21, 2023).

[97] [https://www.napfa.org/social-media-survey](https://www.napfa.org/social-media-survey) (last accessed July 21, 2023).
;                                                                [http://s3.napfa.cql-aws.com.s3.amazonaws.com/files/Consumer/NAPFA%20Fall%202021%20Full%20Report.pdf](http://s3.napfa.cql-aws.com.s3.amazonaws.com/files/Consumer/NAPFA%20Fall%202021%20Full%20Report.pdf)

[98]  [https://www.thebalancemoney.com/8-personal-finance-influencers-you-should-know-6544780](https://www.thebalancemoney.com/8-personal-finance-influencers-you-should-know-6544780) (last accessed July 21, 2023).

respondents who received their information online say they have acted on that advice.[99]

142.  YouTube, which allows for long-form video content which can exist in perpetuity, is one of the most effective social media channels for targeting cryptocurrency audiences and has found its way into the daily routine of millions of cryptocurrency enthusiasts worldwide.[100]

143.  Many of the most famous finance and money social media influencers collaborated with FTX, working under the umbrella of Creators Agency, a talent management firm for digital creators. Creators Agency touts its expansive reach, claiming to have reached "millions," including 2.94B+ YouTube views and 27M+ YouTube Subscribers. Though not all Creative Agency clients endorsed FTX, many of the talent it manages netted hundreds of thousands, if not millions of dollars from signed contracts procured and/or facilitated by the agency.

144.  Endorsements by Defendant are even more dangerous, because of his broad public reach. People are more likely to watch YouTube than network television. Micro-celebrities and social media influencers thus can have outsized

---

; https://www.napfa.org/social-media-survey (last accessed July 21, 2023).

[99] *Id.*

[100] Everything You Need to Know About Crypto Influencer Marketing (coinbound.io) (last accessed July 21, 2023).

influence on their audience, particularly those that espouse financial advice. FTX capitalized on this dynamic, and sponsored several of those content creators, particularly on YouTube.

145.   Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[101] In addition, CME Group CEO Terry Duffy allegedly told SBF that he was "an absolute fraud" upon having an initial conversation with him.[102] Finally, after FTX's implosion, the Financial Times reported that FTX held talks with Taylor Swift to sponsor the singer's tour for more than $100 million.[103] While the article does not detail the reasons why Swift declined the FTX offer, it does include the following quote from a person close to the negotiations:

> Taylor would not, and did not, agree to an endorsement deal. The discussion was around a potential tour sponsorship that did not happen.[104]

---

[101] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed July 21, 2023).

[102]     https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed July 21, 2023).

[103] FTX held talks with Taylor Swift over $100mn sponsorship deal | Financial Times (accessed July 21, 2023).

[104] Id.

146.   Based upon the information that has been released by FTX's new CEO, John Ray, as part of the company's bankruptcy filings, anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.[105]

147.   Mr. Ray's pleading contains a number of troubling findings, among them: 1) FTX did not have centralized control of its cash, 2) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Entities, 3) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4) Corporate funds were used to purchase homes and personal items for employees,

---

[105]https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYkNjSG (accessed July 21, 2023).

and 5) A lack of books and records and the absence of lasting records of decision-making.

148.   It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

149.   Instead, tens of thousands of customers relied on the testimonials of paid endorsers such as Defendant who knew why he was being compensated. Indeed, the whole point behind paying influencers to endorse a product is to increase sales. Thus, influencers have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

150.   In addition to the conduct of SBF, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX and/or been paid to serve as brand ambassadors for the company. Several of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

151.   In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

152. FTX's explanation for using social media influencers -- micro-celebrities in their own right -- and stars like Tom Brady and supermodel Gisele Bunchden was no secret: "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[106]

153. In other words, the FTX Entities needed influencers like Defendant to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities.

## CLASS ACTION ALLEGATIONS

154. As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### I. Class Definitions

155. Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass (collectively, the "Classes"):

---

[106] https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed July 21, 2023).

      (1) **<u>Global Class</u>:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

      (2) **<u>Nationwide Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

      (3) **<u>Florida Subclass</u>:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes are Defendant, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

156.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of FTX YBAs to Plaintiffs and the Class Members (in which Defendant substantially participated) were made by FTX from its principal place of business in Miami, Florida, through its interactive website and mobile app which were accessible to Florida residents and

were actually used to effect commercial transactions with customers in Florida, thus the sales of FTX YBAs stem from a transactional occurrence that emanated from the State of Florida.

## II.  Numerosity

157.   The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

## III.  Commonality/Predominance

158.   This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the YBAs were unregistered securities under federal or Florida law;

(b) whether Defendants' participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.

(c) the type and measure of damages suffered by Plaintiffs and the Class.

(a) whether Defendant's practices violate the FDUTPA;

(b) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(c) whether Plaintiffs and Class members are entitled to injunctive relief;

(d) whether Plaintiffs and Class members are entitled to declaratory relief; and

(e) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendant's conduct.

## IV. Typicality

159. Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's YBAs because of Defendant's actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

## V. Adequacy of Representation

160.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## VI. Requirements of Fed. R. Civ. P. 23(b)(3)

161.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendant (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform.

162.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

163.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### A. Superiority

164.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## VII.   Requirements of Fed. R. Civ. P. 23(b)(2)

165.   Defendant has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

166.   Defendant has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## VIII.   Requirements of Fed. R. Civ. P. 23(c)(4)

167.   As it is clear that one of the predominant issues regarding Defendant's liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

168.   As it is clear that another predominant issue regarding Defendant's liability is whether he has violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding

the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## IX. Nature of Notice to the Proposed Class.

169.   The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**COUNT ONE**
**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Individually and on behalf of the Classes)**

170.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–169 above, as if fully set forth herein.

171.   Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

172.   Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally

participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

173.   The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

174.   The YBAs sold and offered for sale to Plaintiff and Class members were not:

    a.   exempt from registration under Fla. Stat. § 517.051;

    b.   a federal covered security;

    c.   registered with the Office of Financial Regulations (OFR); or

    d.   sold in a transaction exempt under Fla. Stat. § 517.061.

175.   The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

176.   Defendant is an agent of the FTX Entities pursuant to Fla. Stat. § 517.211.

177.   The FTX Entities, with Defendant's material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendant violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO
### For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq.* (Plaintiffs Individually and on behalf of the Classes)

178.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–169 above, as if fully set forth herein.

179.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

180.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

181.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

182.    Defendant's unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead – and have materially misled – consumers acting reasonably in the circumstances.

183.   Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

184.   Plaintiffs and consumers in the Classes have been aggrieved by Defendant's unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the FTX Platform and in the amount of their lost investments.

185.   The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendant, as more fully described herein.

186.   Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

187.   Defendant still utilizes many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendant's unfair and deceptive scheme.

## COUNT THREE
## Civil Conspiracy
## (Plaintiffs Individually and on behalf of the Classes)

188.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–169 above, as if fully set forth herein.

189.   The FTX Entities and Defendant made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers with the false impression that any cryptocurrency assets held on the FTX Platform were safe and were not being invested in unregistered securities.

190.   The FTX Entities entered into one or more agreements with Defendant with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs and/or use the FTX Platform.

191.   Defendant engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

192.   Defendant's conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendant had knowledge of such fraud and/or wrongdoing, because of his experience and relationship with the

FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

193. Defendant's conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## COUNT FOUR
## Declaratory Judgment
### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq*.)
### (Plaintiffs Individually and on behalf of the Classes)

194. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–169 as if fully set forth herein.

195. This Count is asserted against Defendant under Florida Statutes §§ 86.011, *et seq*.

196. There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

197. Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

198.    Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on Defendant's misrepresentations and omissions regarding the FTX Platform as further described hereinabove.

199.    If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the FTX Platform does not work as represented, and Defendant was paid exorbitant sums of money to peddle FTX to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

200.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether Defendant illegally solicited their purchases from Plaintiff and the Class.

201.    Plaintiff and the Class seek an order declaring that the YBAs were securities that the FTX Platform did not work as represented, and Defendant was paid exorbitant sums of money to peddle FTX to the nation.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.    Certifying the Class as requested herein;

    b.    Awarding actual, direct and compensatory damages;

    c.    Awarding restitution and disgorgement of revenues if warranted;

d.      Awarding declaratory relief as permitted by law or equity, including

declaring Defendant's practices as set forth herein to be unlawful;

e.      Awarding injunctive relief as permitted by law or equity, including

enjoining Defendant from continuing those unlawful practices as set

forth herein, and directing Defendant to identify, with Court

supervision, victims of his conduct and pay them all money he is

required to pay;

f.      Awarding statutory and multiple damages, as appropriate;

g.      Awarding attorneys' fees and costs; and

h.      Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.


Dated: July 21, 2023          Respectfully submitted,

                              */s/ E. Powell Miller*
                              E. Powell Miller (P39487)
                              Sharon S. Almonrode (P33938)
                              **THE MILLER LAW FIRM, P.C.**
                              950 West University Dr, Ste 300
                              Rochester, MI 48307
                              Telephone: (248) 841-2200
                              epm@millerlawpc.com
                              ssa@millerlawpc.com

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
(*Pro Hac Vice Motion Forthcoming*)
Joseph M. Kaye
(*Pro Hac Vice Motion Forthcoming*)
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
service@moskowitz-law.com

By: */s/ David Boies*
David Boies
(*Pro Hac Vice Motion Forthcoming*)
Alex Boies
(*Pro Hac Vice Motion Forthcoming*)
Brooke Alexander
(*Pro Hac Vice Motion Forthcoming*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
914-749-8200
dboies@bsfllp.com
aboies@bsfllp.com
balexander@bsfllp.com

***Co-Counsel for Plaintiffs and the Class***

# Exhibit A

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: FTX CRYPTOCURRENCY EXCHANGE**
**COLLAPSE LITIGATION**                                     MDL No. 3076

## TRANSFER ORDER

**Before the Panel:**[*]  This litigation arises out of the collapse of the FTX cryptocurrency exchange in November 2022 and the subsequent bankruptcy of FTX Trading Ltd. and its U.S. affiliate FTX US (together, FTX).  Plaintiffs are FTX customers and investors seeking to recover their losses.  Defendants are individuals and entities that allegedly facilitated FTX's wrongful conduct.  This litigation currently consists of eight actions pending in two districts, as listed on Schedule A.  Since the filing of the motion, the Panel has been notified of eleven related actions in the Northern District of California, Southern District of Florida, District of New Jersey, and Southern District of New York.[1]  Plaintiffs in the consolidated *Garrison* and *Podalsky* actions move under 28 U.S.C. § 1407 to centralize this litigation in the Southern District of Florida.

Responding plaintiffs' positions on centralization vary.  Plaintiffs in three actions support centralization in the Southern District of Florida, and plaintiff in one action supports centralization in the Northern District of California.  Plaintiffs in eleven actions oppose centralization or request exclusion of their actions from any MDL. In particular, plaintiffs in two potential tag-along actions (*Rabbitte* and *Gershovich*) which bring claims solely against investment firms Sequoia Capital Operations, LLC, Paradigm Operations LP, and Thoma Bravo, LP, request exclusion of their actions.  Plaintiff in a potential tag-along action against Signature Bank (*Statistica Capital*) requests exclusion of that action.  And plaintiffs in two potential tag-along actions request exclusion of the *Bhatia, Magleby,* and *Keane* actions against the Silvergate Bank defendants.[2] Most of the opposing plaintiffs propose the Northern District of California if the actions are centralized over their objections.  Opposing plaintiff in one action (*O'Keefe*) proposes the Southern District of Florida.

---

[*] One or more Panel members who could be members of the putative classes in this litigation have renounced their participation in the classes and have participated in this decision.

[1] These and any other related actions are potential tag-along actions.  *See* Panel Rules 1.1(h), 7.1 and 7.2.

[2] The Silvergate Bank defendants are Silvergate Bank, Silvergate Capital Corp., and Alan J. Lane.

Responding defendants' positions on centralization also vary considerably.[3]  Sequoia, Paradigm, and Thoma Bravo support centralization and have no preference on the transferee district.  Prager Metis and Armanino support centralization in the Southern District of Florida.  The Celebrity Defendants oppose centralization.[4]  The Silvergate Bank defendants oppose inclusion of any claims against them, and the FDIC opposes inclusion of the *Statistica Capital* action against Signature Bank.

In opposition to centralization, the various plaintiffs and defendants primarily argue that the actions lack sufficient common questions of fact and informal coordination provides a practicable alternative.  We find these arguments unpersuasive.  The actions undoubtedly involve several non-overlapping defendants and raise defendant-specific issues.  But they all rest on the same core set of facts concerning the alleged fraud that led to FTX's collapse and, in particular, revolve around the conduct of FTX's Samuel Bankman-Fried, the relationship with another Bankman-Fried company known as Alameda Research, and Alameda's Caroline Ellison.  Indeed, Bankman-Fried and Ellison are defendants in seven of the eight actions on the motion, and are central figures in all of the related actions before the Panel.  Moreover, all actions on the motion allege that there was a conspiracy between Bankman-Fried and other alleged FTX insiders to make misrepresentations to consumers and investors to induce them to invest in FTX products and use the FTX exchange.  This common factual core warrants centralization despite the involvement of a number of different defendants.  *See, e.g., In re January 2021 Short Squeeze Trading Litig.*, MDL No. 2989, 2021 WL 1258399 (J.P.M.L. 2021) (centralizing actions "nam[ing] more than forty brokers, funds, and clearinghouses as defendants" where all actions involved common conduct concerning the Robinhood trading platform).  Transfer under Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core.  *See In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390-91 & n.5 (J.P.M.L. 2014).

We further find that informal coordination is not an adequate alternative to centralization.  Although the actions in the Northern District of California are in the process of being organized into three tracks, there are still seven distinct groups of non-overlapping plaintiffs' counsel pursuing claims in this litigation, including potential tag-along actions, on behalf of putative global and nationwide classes.  Additionally, dozens of defendants are involved, with little overlap in their counsel.  The large number of plaintiffs' and defense counsel will pose serious obstacles to informal coordination.  Inefficiencies also will arise from having to coordinate these unusually complex actions involving novel cryptocurrency issues with the related criminal case in the Southern District of New York and the bankruptcy case in the District of Delaware.  Moreover, informal coordination does not address the possibility of inconsistent rulings on *Daubert* and class certification issues.

---

[3] The responding defendants are Prager Metis CPAs, LLC; Armanino LLP; Sequoia Capital Operations, LLC; Paradigm Operations LP; Thoma Bravo, LP; the Silvergate Bank defendants; and seven "Celebrity Defendants" – the Golden State Warriors, Thomas Brady, Gisele Bündchen, Lawrence David, Kevin O'Leary, David Ortiz, and William Trevor Lawrence.  Additionally, the Federal Deposit Insurance Corporation responded as receiver for Signature Bank.

[4] The Golden State Warriors alternatively request the Northern District of California.

Although the Signature Bank and Silvergate Bank defendants are named only in the potential tag-along actions – not in the actions on the motion – we received extensive briefing and oral argument on whether the MDL should include them. Both plaintiffs and defendants in those actions oppose their inclusion in an MDL because Signature Bank was closed in March 2023 and is in FDIC receivership, and Silvergate Bank is in voluntary liquidation. Additionally, at oral argument, movants conceded that centralization of these claims is not warranted given the closure-related issues unique to those entities.[5] Based on this record, we do not intend to include the claims against Signature Bank and the Silvergate Bank defendants.[6]

On the basis of the papers filed and the hearing session held, we find that the actions on Schedule A involve common questions of fact, and centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions present common questions of fact concerning the collapse of the FTX cryptocurrency exchange in November 2022, which allegedly was caused by the conduct of FTX former principals Sam Bankman-Fried, Zixiao "Gary" Wang, and Nishad Singh, and financial improprieties with Alameda Research. All actions allege that FTX executives fraudulently withheld or misrepresented information with respect to customer assets on the FTX platform and that the professional services firms and celebrity promoters who worked with FTX were complicit in or otherwise bear responsibility for the alleged fraud – for example, by concealing FTX's financial problems or promoting FTX products with knowledge or willful blindness of the alleged fraud. The common factual questions include: (1) whether FTX executives and their representatives misled customers about FTX's practices for safeguarding customer funds; (2) whether FTX executives and their representatives misrepresented the financial condition of the FTX entities; (3) whether FTX and Alameda executives embezzled customer assets; (4) the existence and scope of a conspiracy; and (5) the nature of FTX products, such as Yield-Bearing Accounts and FTT tokens. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification and *Daubert* motions; and conserve the resources of the parties, their counsel and the judiciary.

The Southern District of Florida is an appropriate transferee district for this litigation. A significant part of FTX's conduct allegedly emanated from this district, where it had its U.S. headquarters before filing for bankruptcy. This district also provides an easily accessible location for this nationwide litigation. Judge K. Michael Moore, who presides over the actions on the motion in this district, is an experienced transferee judge, and we are confident he will steer this matter on a prudent and expeditious course.

---

[5] For example, plaintiffs in *Statistica Capital v. Signature Bank* are subject to an exhaustion of administrative remedies requirement under the Financial Institutions Reform, Recovery and Enforcement Act because of the FDIC receivership, and that action thus has been stayed.

[6] We intend to transfer the actions against Sequoia, Paradigm, and Thoma Bravo through the conditional transfer order process, based on the common factual core discussed above. *See* Panel Rule 7.1(b). Those actions do not present the same efficiency concerns as the actions involving banks in closure-related proceedings.

-4-

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Southern District of Florida are transferred to the Southern District of Florida and, with the consent of that court, assigned to the Honorable K. Michael Moore for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_____
Karen K. Caldwell
Chair

Nathaniel M. Gorton        Matthew F. Kennelly
David C. Norton            Roger T. Benitez
Dale A. Kimball            Madeline Cox Arleo

**IN RE: FTX CRYPTOCURRENCY EXCHANGE
COLLAPSE LITIGATION**
                                                                    MDL No. 3076

## SCHEDULE A

<u>Northern District of California</u>

LAM v. BANKMAN-FRIED, C.A. No. 3:22−07336
PIERCE v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07444
HAWKINS v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07620
JESSUP v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07666
PAPADAKIS v. BANKMAN-FRIED, ET AL., C.A. No. 3:23−00024

<u>Southern District of Florida</u>

GARRISON v. BANKMAN-FRIED, ET AL., C.A. No. 1:22−23753
PODALSKY, ET AL. v. BANKMAN-FRIED, ET AL., C.A. No. 1:22−23983
NORRIS, ET AL. v. BRADY, ET AL., C.A. No. 1:23−20439

# Exhibit B



**CipherBlade**

Blockchain Investigation Agency

# PRELIMINARY EXPERT REPORT

---

**Matter:** FTX Exchange

**Written By:** Paul Sibenik

**Date:** 12.16.2022

# Introduction

1. In accordance with instructions from Moskowitz Law Firm, PLLC, I have been instructed to prepare a preliminary expert report surrounding FTX Exchange,

2. More specifically, I have been asked to provide a preliminary opinion on FTX 'Earn' accounts, FTT Token, and FTX Exchange in general, as well as the risks that could affect consumers inherent in them. I have furthermore been asked to provide a technical opinion assessing if or how FTX Earn accounts meet the Howey Test.

3. I am the Lead Case Manager at CipherBlade, a leading blockchain forensics and cybercrime investigative firm which consults with blockchain projects, numerous police, law enforcement and regulatory agencies around the world, including the US FBI and US Secret Service, cryptocurrency exchanges, and other organizations. Other CipherBlade staff and I have experience in some of the most high-profile cryptocurrency investigations to date in relation to a wide range of niches including but not limited to cases involving hacking, theft, SIM-Swapping, ransomware, different types of frauds and scams (e.g., involving ICOs, NFTs, investment fraud, Ponzi Schemes), 'rugpulls,' embezzlement, as well as civil matters such as divorce cases and bankruptcy cases. I am recognized as one of the few experts in blockchain forensics and cryptocurrency cybercrime investigation. This work regularly requires the analysis of cryptocurrency transactions, wallets and addresses, alongside gathering and analyzing other data sources.

4. I regularly use blockchain forensics software to assist me in blockchain investigations. My usage of blockchain forensics software in this matter, has, thus far been extremely minimal. However, I expect blockchain forensics to play a more important role in this matter as this case develops and disclosures are obtained. For reference, however, I primarily utilize Chainalysis Reactor, which is the leading blockchain forensics software available and is utilized by various law enforcement agencies around the world, including the FBI, USSS, DHS, and DEA in the United States. Chainalysis Reactor helps professionals to better understand the flow of funds on assets on supported blockchains. It helps to aggregate and manage large amounts of transaction data and addresses to make the data more parsable. It helps professionals like me to better understand which addresses are under the control of the same individuals or entities, and for addresses that are under the control of a service or exchange, it is often able to identify the name of that service or exchange. Furthermore, Chainalysis Reactor also provides Open-Source Intelligence (OSINT) on various cryptocurrency addresses, which can help investigators understand what those addresses may be

associated with or can provide additional context in situations. I have a Chainalysis Reactor Certification (CRC), which is a certification offered by Chainalysis to certify knowledge and understanding of their Reactor forensics tool. I also have the Chainalysis Investigation Specialist Certification (CISC), an additional certification by Chainalysis designed specifically for the most advanced Reactor users, which dives deep into advanced investigative techniques and obfuscation approaches sometimes used by individuals trying to launder ill-gotten cryptocurrency. I furthermore have the Chainalysis Ethereum Investigations Certification (CEIC), a certification program focused on Ethereum, as well as other EVM (Ethereum virtual machine)-compatible cryptocurrencies.

5. Additionally, a large portion of my work involves consulting with blockchain companies in various capacities pertaining to preventative measures they can or should take to reduce risks and mitigate the amount of cybercrime that their company is exposed to. This involves consulting on security practices, including those pertaining to cryptocurrency storage and management. This also involves consulting on matters of compliance so as to significantly mitigate the likelihood and/or frequency of ill-gotten funds being laundered through their service and reduce the amount of various types of fraud, including investment scams, romance scams, impersonation scams, and money muling.

6. A copy of my CV is attached in Appendix A.

7. This is a preliminary report and is subject to change. I reserve the right to amend the views expressed in this report should or when additional information be uncovered or presented to me.

8. Prior to accepting instructions to act in this matter, I made reasonable inquiries to identify any actual or potential conflicts of interest in connection with the parties concerned. No matters arose.

## A Primer on Cryptocurrency Exchanges

9. Before delving into the issues at hand, I think it's first pertinent to provide some background information on what cryptocurrency exchanges are, what purpose they serve, and how they operate, in relation to the matter at hand.

10. In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry.

11. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

2

12. The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability or IOU of the exchange to its customer.

13. If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

    a) Trade it for another cryptocurrency

    b) Trade it for fiat currency

    c) Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

14. The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

15. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

16. For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

3

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*[1]

17. While FTX violated their own terms of service, it's would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

18. With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

19. While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report.

20. The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

---

[1] https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf

21. Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent.

22. Exchanges on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

23. Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

24. Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

25. The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

26. This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[2] often in spectacular fashion. The most common reasons for an exchange's failure include:

    a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

    b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

    c) A hack or theft by an external actor

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

27. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

28. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they make such claims.

29. This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[3] specifically, those investors will be made whole or almost whole due to sensical regulations that were put in place in light of the lessons learned from the

---

[2] https://www.cryptowisser.com/exchange-graveyard/

[3] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

failures of Mt. Gox and Coincheck exchanges in Japan.

## FTX Earn Program

30. The FTX Earn program was a yield-bearing account that FTX customers were offered.[4] It was also offered on FTX.us for US persons.[5] The FTX website describes it as follows:

> *"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."*

31. The yield that customers were offered is also outlined on the same page – 8% APY (Annual percentage yield) for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

| Assets supported | Amount | Rate |
|---|---|---|
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000, up to $100,000 | 5% |

**Example:**

A. I have $10,000 USD in my account. I will earn **8% APY** on my deposit of USD.

B. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of **6.5%** on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example B, you will earn 6.5% on both the DOGE and the BTC. **There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.**

32. FTX's Earn program is very similar to that of Voyager's earn program, and programs offered by Celsius and Blockfi, all of whom have filed for bankruptcy. The differences

---

[4] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn
[5] http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

between these programs are minimal and involve differences in phrasing 'yield' vs 'interest' vs 'rewards,' the APY offered, the frequency of payout, and the assets that were supported.

33. The FTX website does not describe how, exactly, FTX will generate the applicable yield, and does not indicate what risk factors may be apparent that could result in the inability to pay such yield.

34. The website does suggest term 'staking' however as a means of generating yield when they indicate that:

> "*By opting in and participating in staking your supported assets in your FTX account*"

35. This naturally gives the impression that their assets would be used for 'staking' without being 100% clear about it.

36. The word 'staking' in the context of cryptocurrency is understood to have a technical meaning. 'Staking' is associated with a consensus mechanism known as 'Proof of Stake'(PoS) and relatedly, 'Delegated Proof of Stake,'(dPos) which *some* cryptocurrencies utilize, but many don't (such as Bitcoin for example, which uses 'Proof of Work' as a consensus mechanism).

37. Staking has a similar purpose for cryptocurrencies that utilize PoS and dPoS as what 'miners' are offered from cryptocurrencies that utilize Proof of Work. Individuals involved in staking are responsible for verifying transactions and they used their staked assets (instead of sunk costs associated with expenditure of electricity and equipment) as a way of guaranteeing the transactions they verify and add onto a blockchain are valid. If they try to add an invalid transaction, staked assets are typically burned as punishment, which creates a disincentive to act dishonestly or maliciously. In exchange for staking, users are awarded compensation accordingly in the form of newly issued cryptocurrency.

38. FTX is not itself a cryptocurrency operating on a PoS model; FTX was an exchange. One cannot 'stake' assets on an exchange. One can lend them to an exchange though, and theoretically, that exchange could then stake select cryptocurrency assets on behalf of the user (for cryptocurrencies that have Proof of Stake).

39. While there is disagreement over whether or not 'staking' is itself a security, the issue is that FTX did often not 'stake' customer assets, and indeed in many cases *could not* stake customer assets since not all cryptocurrencies utilize Proof of Stake. Yet the FTX website clearly suggests that 'all assets' in the account are subject to applicable

8

yield, including fiat assets (such as USD), which obviously don't even have a staking mechanism if FTX wanted to utilize it.

40. Rather than 'staking,' it appears that a primary thing FTX was doing was lending customer assets out, even from applicable that weren't part of the 'Earn' program, most notably to Alameda.[6] There are allegations that Alameda received loans from FTX interest-free.[7] Sam Bankman-Fried was a primary equity holder of both companies. FTX choosing to lend out assets, whether for free or otherwise, has nothing to do with actual staking of cryptocurrency.

41. The 'staking,' described on the FTX is purposely misleading, and not a representation of what was being offered. Users were not given the ability to 'stake' on FTX. They were given the ability to lend to FTX, and FTX would in turn invest and re-lend those assets out to questionable entities, on questionable terms, and such loans were not appropriately collateralized.

42. That being said, as it appears that even for users that did not subscribe to the Earn program, FTX leveraged and loaned out customer assets anyway to a large degree. It furthermore appears that while there were separate legal entities behind ftx.com and ftx.us, the two entities may not have been operated all that differently from one another, with Sam Bankman-Fried a primary equity holder of each, and just how independent the two entities were from each other is very much a matter of concern.

43. From a securities perspective, the Howey Test defines an investment contract as:

    a. An investment of money

        i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

---

[6] https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf

[7] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html

b. In a common enterprise

    i. FTX customer assets are almost always consolidated in wallets operated a controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c. With the expectation of profit

    i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[8]

d. To be derived from the efforts of others

    i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

    ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that

---

[8] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn

would employ such strategies. The primary strategy that FTX portrayed to investors was 'staking' as I discuss in the following paragraphs.

## Importance and Role of Brand Ambassadors

44. FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims

> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

45. Kevin O'Leary, another FTX brand ambassador stated:

> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

46. Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

47. Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

48. Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

> *"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but*

11

*we also relied on another investment theme that I felt drove a lot of interest in FTX[9]"*

49. Mr. O'Leary is also a strategic investor in what is allegedly Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

## FTX and Representations of Safety and Risks

50. The yield that users could receive as part of the FTX Earn program, as previously mentioned was 8% APY for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

51. This type of yield structure makes no logical sense from a profitability standpoint. Why would a financial institution offer a lender a *lower* yield when they loaned more, and no yield at all beyond a certain threshold? As a business, should they want to pay out lower yields to a smaller number of people than higher yields to a larger number of people?

52. In my opinion, the reasons that FTX had this yield structure was so that they could mitigate their legal risks to customers. Simply put, a customer who loses $4,000 due to FTX's misappropriation of funds is very unlikely pursue action against the exchange, such as litigation. A customer who loses $4 million is much more likely to.

53. FTX did have a legal disclaimer associated with their Earn program, shown below:

---

[9] https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

12

**Legal Disclaimers and Terms of Service**

Services are provided by FTX for its customers.

**APY refers to projected yield by staking. This yield is not interest and is not guaranteed, and changes based upon terms of applicable staking programs. FTX transmits value from your account to staking program and ensures that the value is properly transmitted to and from the program. Your customer balance is not a bank account, and is not insured.**

Only customers of FTX may be eligible to participate in the yield program.  If a customer is eligible and opts into the program, then their assets will be used to generate a fixed yield for the user.

While FTX does not anticipate any problems, it does not guarantee the future or present yield payments in the case of malfunction, although it would not intend to claw back previously received yield.  FTX *does* back the principal generating the yield with its own funds and equity.  Nevertheless, users should exercise appropriate caution when deciding whether to enable yield for their accounts.

54. FTX again refers to staking numerous times, suggesting this was what they were primarily doing with customer assets, which wasn't true, and indeed wasn't even technically possible for a large portion of the assets that customers deposited.

55. FTX indicated that for customers who opt-in to the Earn program, FTX would take their assets to generate a fixed yield for the user, presumably via 'staking.'

56. The legal disclaimer, and certainly the brand ambassadors grossly misrepresented the level of risk associated with its Earn program. While FTX does indicate that it's 'not a bank account, and is not insured' and that 'users should exercise appropriate caution when deciding whether to enable yield for their accounts,' this hardly seems like a sufficient disclaimer and disclosure that would accurately represent the real level of risk. It certainly does not reveal that funds will be lent to affiliated entities to perform highly questionable and risky trading strategies, the lender will collateral FTT tokens with FTX for safety.

57. The FTX Earn program was clearly represented as being 'opt-in' and not 'opt-out.' However, in a declaration from Joseph Rotunda, the Director of Enforcement at the Texas State Security Board, he describes how he, as a US citizen, went to the FTX website, downloaded the FTX Trading App. He funded his account with $50, and "the default settings were automatically configured to enable earning of yield."[10] clearly notes that the earn program he was auto-enrolled in was associated with FTX US, not FTX Trading.

58. Thus, FTX's assertion that the FTX.US yield program were strictly opt-in was not true. It's certainly possible that when some US persons registered for FTX, the Earn program might have been opt-in in some cases but based on the series of events

---

[10] https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf

described by Mr. Rotunda, it's clear at the very least that a considerable portion of US persons that registered would have been auto-enrolled in the yield program. This would make it such that those users that were auto-enrolled (and who did not opt-out) appear to have engaged in an unregistered securities transaction as soon as any money was deposited to their account, whether fiat or cryptocurrency.

59. This means it appears that brand ambassadors were promoting a company and application that at least in some cases auto-enrolled US persons in the FTX Earn program which would reasonably be considered a security in my opinion, and which was also being lauded as 'safe' and 'compliant.'

## The FTT Token and Alameda

60. The FTT Token was an instrumental part of FTX's demise. FTT Tokens were created and issued by FTX, and FTT provides various benefits to its holders on FTX Exchange. The benefits include, most notably, trading fee discounts, but also ancillary benefits such as early access to token sales on the exchange.

61. It is not uncommon for many of the larger cryptocurrency exchanges to build in contrived 'utility' (such as trading discounts) for tokens that they themselves create because it can be financially lucrative for the exchange, since as the issuer they would typically retain a sizable portion of the tokens, and could elect to sell those tokens at some point, when the price is advantageous.

62. Similar to equity, the financial success of an exchange's token (FTT) is tied to the financial success and popularity of the exchange. This is because as the exchanges gains new customers, more and more customers will naturally want to buy FTT, either so they can have a discount on trading fees, or because they think the price will increase (possibly a result of new customers and demand for FTT). However, the holders of FTT have no legal rights voting rights that they would have with an equity investment.

63. Thus, as the number of customers that exchange has increases, as is often the case in a 'bull market,' the price of FTT could generally be expected to increase in value. However, in a bear market, when there is less demand and interest, and fewer new users signing up, there is naturally a lower demand for FTT that would generally cause the price to decline.

64. It is apparent that FTX (and FTX.us) effectively gave Alameda research an unlimited credit line, and Alameda could then effectively use FTX customer assets in extremely high-risk trading activity and strategies, and loans that ultimately left Alameda in extremely poor financial condition.

14

65. Alameda research allegedly largely provided FTT tokens (which were presumably issued or given to them by FTX) as collateral to FTX in order to obtain the loans from FTX. However, FTT tokens are highly volatile and ultimately subject to investor confidence in FTX itself. When that confidence and interest in FTX began to wane, the price of FTT started to collapse, and with that, the collateral that was designed to cover Alameda's bad debts.

66. FTX now has a bunch of comparatively worthless FTT on their balance sheet, and the price of that obviously won't recover measurably. Given what FTX's misappropriation of customer assets (both in and outside of the Earn program), investors were essentially invested in FTT tokens in large part even if they didn't know it or buy any directly themselves.

## Verifiable FTX Falsehoods

67. It's evident that the FTX group was grossly mismanaged and misappropriated customer funds. It is still the early stages of finding out about all the misconduct. Much of the misconduct that has been revealed thus far and will be revealed in the coming months would not necessarily have been immediately known to brand ambassadors. This begs the question as to what are the falsehoods that were or should have been apparent to FTX brand ambassadors when partnering with FTX initially, well before their collapse?

68. The first, as we've already discussed is the claims regarding staking. Cryptocurrencies like Bitcoin and Dogecoin, which FTX offers, cannot be staked. And fiat currency (which FTX also offered yield on) also cannot be staked. Yet, FTX offers yield for them on the Earn Program. The fact that FTX would not technically be able to stake applicable cryptocurrency assets on behalf of customers as they have said and pay back yield in the same currency / cryptocurrency, was always a giant red flag that was demonstrably false, and which should have been recognized by anyone promoting FTX.

69. The second verifiably false claim by FTX that would have been evident publicly well before their downfall relates to FTX's claim that only the user has control of digital assets in their account:

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*

15

As mentioned previously, FTX exchange accounts are custodial in nature. This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. Whether or not such requests are processed are dependent on the willingness, ability and approval of the exchange. It is very much the exchange that *controls* the assets, not their customer.

70. An additional claim in this quote that could also be argued is verifiably false is the assertion that digital assets are held 'in' the account at all (even if the exchange wasn't misappropriating funds). On a technical level, an exchange account cannot hold or store cryptocurrency. However, exchange accounts can store a record of liability for that cryptocurrency, that an exchange may have to its customer. However, because this concept of 'storage' can be difficult for people to understand, it's somewhat common, at least for newcomers and those less educated with cryptocurrency to discern that a balance held on a cryptocurrency exchange account is equivalent to those assets being 'stored' on the exchange. What a customer(s) balance is versus what an exchange actually stores in its own custody on behalf of the user should not be assumed to be the same thing; there is no regulation or assurance guaranteeing or requiring that. Only an exchange's terms of service, which might contain such language, might guarantee that, but even if it does, such terms may not be adhered to (which was the case here).

71. A third major red flag should have been readily apparent is the non-sensical yield structure for customer accounts, which in my opinion was designed in such a way so as to onboard users. As previously mentioned, this was most likely doing to limit legal risks that FTX could incur, since investors who lost smaller amounts of money are much less likely to pursue action than investors that lost considerable amounts of money.

72. A fourth falsehood should have been apparent in Sam Bankman-Fried's testimony to the US House of Representatives Financial Services committee when he stated:

> *"There is complete transparency about the positions that are held. There is a robust, consistent risk framework applied"*

No, there is not "complete transparency" and the positions that FTXs holds and held. While most cryptocurrency operate on public blockchains, the entities that own specific wallets, who controls specific accounts, and loans that are made by an exchange are not publicly available simply because such blockchains are public, and such information was not disclosed by FTX. And based on John Ray's affidavit,

FTX's records are so poor it's likely that large swaths of this information won't ever be known.

73. A fifth area of contention that could be said to be demonstrably false (depending on semantics) or at least misleading would be with respect to the FTX Earn program is the use of the term 'wallet.' FTX's page on the Earn program frequently talks about users' wallets (with FTX).

> *"All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate"*

74. The term 'wallet' is one of the very first terms that cryptocurrency users hear of, which they start to use, but term is frequently misused and misunderstood. The 'wallet' terminology FTX uses perpetuates that misunderstanding.

75. A cryptocurrency wallet is inherently 'self-custodial' meaning that there is no institution holding cryptocurrency on behalf of the user, nor does the user need to seed any permission to have nor hold funds in such a wallet. Only the person who created the wallet has ability to access the wallet (unless the credentials to the wallet were to be breached or otherwise accessed by another party). A cryptocurrency wallet is an auxiliary device or medium that holds or stores private key(s) needed to access or spend cryptocurrency balances that have been allocated to address(es) that are part of the wallet.

76. The mere use of 'wallet' in this context is itself a misnomer, and very misleading, because a user *cannot* have a 'FTX wallet' of theirs. There is no such thing. A user can have wallet(s), and a FTX account, or both, but there is no such thing as an 'FTX Wallet' belonging to the user. FTX Exchange did have and control many different wallets, but for any given customer, FTX Exchange did not hold funds in a unique wallet only for that customer; that's simply not how exchanges work.

77. These are just the obvious falsehood and red flags that would be apparent on the surface. If brand ambassadors obtained information or knowledge about the inner workings of FTX, it's very likely that they would have encountered additional red flags.

17

**// ENDS**

Paul Sibenik

Lead Case Manager

CipherBlade

_____