# U.S. District Court [LIVE]
## Western District of Texas (Austin)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00838-DII

O'Keefe v. Multicoin Capital Management, LLC
Assigned to: Judge Docket II - Austin
Case in other court:  FLSD Miami Division, 1:23-md-03076-KMM
Cause: 28:1332 Diversity-Fraud

Date Filed: 07/21/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Connor O'Keefe**
*on behalf of himself and all others similarly situated*

represented by **Ryan D. Ellis**
The Lanier Law Firm, P.C.
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
713-659-5200
Fax: 713-659-2204
Email: ryan.ellis@lanierlawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Multicoin Capital Management, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2023 | 1 | COMPLAINT ( Filing fee $ 402 receipt number ATXWDC-17686310), filed by Connor O'Keefe. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(Ellis, Ryan) (Entered: 07/21/2023) |
| 07/21/2023 | 2 | REQUEST FOR ISSUANCE OF SUMMONS by Connor O'Keefe. (Ellis, Ryan) (Entered: 07/21/2023) |
| 07/21/2023 | | Case assigned to Judge Docket II - Austin. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (jv2) (Entered: 07/24/2023) |
| 07/21/2023 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Lane (jv2) (Entered: 07/24/2023) |
| 07/21/2023 | | DEMAND for Trial by Jury by Connor O'Keefe. (jv2) (Entered: 07/24/2023) |
| 07/24/2023 | 3 | Summons Issued as to Multicoin Capital Management, LLC. (jv2) (Entered: 07/24/2023) |
| 07/24/2023 | 4 | Pro Hac Vice Letter directed to Alex J. Brown. (jv2) (Entered: 07/24/2023) |

7/24/23, 4:04 PM   Unlimited CM/ECF LIVE - U.S. District Court:txwd

## PACER Service Center

### Transaction Receipt

| | | | |
|---|---|---|---|
| 07/24/2023 14:57:38 | | | |
| **PACER Login:** | AdamMoskoadam | **Client Code:** | FTX |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00838-DII |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated, | ) ) ) | Case Number 23-cv-838 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | **CLASS ACTION** |
|  | ) |  |
| MULTICOIN CAPITAL MANAGEMENT, LLC, | ) ) | |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.      This Action is a Related Action to the multidistrict litigation *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla.) (the "FTX MDL"), pending in the United States District Court for the Southern District of Florida before the Honorable K. Michael Moore (the "Transferee Court"). A copy of the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation (the "Panel") in *In re: FTX Cryptocurrency Exchange Collapse Litigation*, MDL No. 3076, ECF No. 138 (J.P.M.L. June 5, 2023), is attached as **Exhibit A**. A Notice of Potential Tag-Along Action is being concurrently filed before the Panel in accordance with Rule 7.1(a) of the Panel's Rules of Procedure. This Related Action, which was originally filed in the Southern District of Florida, *O'Keeffe v. Sequoia Capital Operations, LLC, et al.*, No. 1:23-cv-20700 (S.D. Fla.) is being filed again before this Court in this District in order to address the arguments Defendant Multicoin Capital Management, LLC ("Multicoin") raised regarding whether the Transferee Court has jurisdiction over them for these claims. The substantive allegations in both actions are the same and will be amended in a consolidated amended class action complaint currently due to be filed August 7, 2023, once transferred to the Transferee Court and consolidated into the FTX MDL.

2.      On November 11, 2022, the world learned what Defendant had long known. Sam Bankman-Fried ("SBF") was a fraud.



1

> everyone goes around pretending that perception reflects reality

> it doesn't

> some of this decade's greatest heroes will never be known, and some of its most beloved people are basically shams

Yesterday, 9:48 PM

3.  Through his cryptocurrency exchange, FTX, SBF preyed on naïve, young investors, persuading them to deposit hard-earned monies into accounts on the exchange, promising them the funds would be safe and garner returns other financial institutions could not provide.

4.  Both were lies. SBF was in fact running a Ponzi scheme, whereby he took in FTX customer funds, transferred those funds to entities he separately owned, and then spent the money on things of unmatched luxury, including a Formula One team, beachfront property in The Bahamas, expensive cars, and private jets. SBF swindled more than $8 billion from FTX customers in this way.

5.  Though FTX customers could not see that SBF was misappropriating their deposits on vice, vanity, and speculative personal investments, Defendant had full view. Through diligence on FTX and close ties with SBF, Defendant learned that FTX was operated as SBF's personal piggy bank, that as quickly as FTX customer funds flowed into FTX, they flowed back out to other entities SBF separately owned or controlled, and that FTX lacked the most basic internal controls, such that the enterprise was in fact a house of cards. But Defendant did not care. It, too, had money to make in the scheme, and its interests aligned with SBF's.

6.  SBF's fraud relied on two objectives: first, to keep FTX customer funds flowing into accounts on the exchange; second, to keep the fraud concealed from the public eye. Defendant

2

shared these objectives, as it benefited from the steady, and increasing, flow of customer funds into FTX accounts. Various banks, where FTX held multiple accounts, benefited billion-dollar increases in their low-cost deposit bases derived from FTX customer funds. Defendant, a venture capitalist and investment firm, benefited from the astronomical valuation that increasing deposits generated for FTX, upon which the value of Defendant's stakes in the company astronomically grew. Fenwick & West and other accounting firms, meanwhile, benefited from the premium fees they could continue to extract for services to FTX, paid for with FTX customer proceeds.

7.    With shared objectives and complementary motives, Defendant conspired with FTX to perpetuate the fraud, and each committed critical overt acts in furtherance of it. Defendant wielded its power, influence, and deep pockets to launch FTX's house of cards to its multi-billion dollar scale. Defendant invested in FTX, and SBF returned the favor in kind, investing millions of dollars in Defendant. This was more than a simple quid pro quo, and Defendant was more than passive investors. Indeed, Defendant provided critical groundwork for the FTX fraud, including serving on FTX's advisory board and providing other support, and promoting FTX despite knowing that SBF was misappropriating Class Member funds, by making public statements valorizing FTX and publishing glowing profiles of SBF, proclaiming, for example, that "the FTX competitive advantage" is SBF's "[e]thical behavior" and Class Members should "trust [their] money with SBF, hands-down."

8.    SBF could not have perpetuated the fraud without this assistance from Defendant. Plaintiff O'Keefe, on behalf of himself and all others similarly situated ("Class Members"), seeks damages for Defendant's knowing and substantial assistance in furtherance of SBF's fraud.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

3

because this is a class action for a sum exceeding $5,000,000.00 and diversity of citizenship exists between at least one Class Member and the Defendant.

10.     This Court has general personal jurisdiction over Defendant Multicoin because Defendant Multicoin's principal place of business is in this District, rendering Defendant Multicoin subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. Upon transfer of this Related Action to the Transferee Court for consolidation into the FTX MDL, the Transferee Court will have personal jurisdiction over Defendant Multicoin because in enacting the multidistrict litigation statute, 28 U.S.C. § 1407, Congress "authoriz[ed] the federal courts to exercise nationwide personal jurisdiction….and "[t]ransfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction…." *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987). The Transferee Court further independently has personal jurisdiction over Defendant because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendant regularly conducted business in Texas and/or engaged in continuous and systematic activities within Texas, and committed tortious acts in the state of Texas, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendant Multicoin resides in this District. Venue is also proper in the Western District of Texas before the Transferee Court pursuant to 28. U.S.C. § 1407, because the Panel ordered in its Transfer Order that all Related Actions be transferred to the Transferee Court and consolidated into the FTX MDL for pretrial purposes. Venue is further proper in the Western District of Texas before the Transferee Court pursuant to 28 U.S.C. § 1391 because the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within this District.

## PARTIES

12.     Plaintiff Connor O'Keefe ("Plaintiff O'Keefe") is a resident of the State of Mississippi. Plaintiff O'Keefe held funds in both U.S. dollars and cryptocurrencies in a yield-bearing account ("YBA," further defined herein) and/or other account on the FTX platform. On November 18, 2021, Plaintiff O'Keefe deposited these funds by direct transfer of US dollars from his bank account to an account he understood to be held by FTX. As further detailed herein, FTX promised that his assets would be secure and would return yields of 5% to 8%. Later, Plaintiff O'Keefe transferred cryptocurrencies into his FTX account from an account he held at Coinbase Global, another cryptocurrency exchange. Plaintiff O'Keefe believed that he had made safe investments. To be sure, he regularly monitored his investments, as well as the media surrounding FTX. Because of the overt acts taken by Defendant and described herein, Plaintiff O'Keefe was misled to believe that the assets placed in his FTX account were safe, that FTX was a legitimate operation, and that its founder, SBF, was a trustworthy entrepreneur. Plaintiff O'Keefe never fully liquidated the funds in his FTX account. Plaintiff O'Keefe's funds are now frozen in his FTX account, and he has been unable to withdraw those funds since the FTX fraud collapsed.

13.     Defendant Multicoin Capital Management LLC ("Multicoin") is a "thesis-driven" investment firm specializing in cryptocurrencies, with $600 million in assets under management. Multicoin is based in Austin, Texas.

## FACTUAL ALLEGATIONS

### A.  The Rise of FTX

14.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX Trading Ltd. ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US ("FTX US"), which, along with various subsidiaries, affiliates and related entities (collectively, "FTX"),

operated the FTX platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

15.     FTX based its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

16.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

17.     FTX lured Class Members to make such deposits with promises of 8% annual percent yield on assets equivalent up to $10,000 USD and 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law.

18.     By structuring the rates of returns in this way, FTX targeted nascent investors—*i.e.*, those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

19.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by

6

FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

20.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX *does* back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

21.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

22.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (*i.e.*, without any intermediary

to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

23.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

24.     More generally, in television commercials, through interviews, on Twitter, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured

by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

25.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

26.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds. Defendant dutifully piled on in laundering SBF's reputation to conceal the fraud.

27.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion *per day* and its valuation topped $32 billion within three years of its founding.

28.     Defendant knew that FTX's public representations were false, including by way of the omissions set forth in Paragraphs 42 below, and that FTX made a number of material omissions

in soliciting Class Members' deposits, further detailed below. But Defendant remained silent and, worse, fueled SBF's fraud.

**B.  The Mechanics of SBF's Fraudulent Scheme**

29.    The FTX fraud was straightforward and, though concealed from Class Members, the fraud was readily apparent to those, like Defendant, with visibility into FTX's operations.

30.    With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into YBAs on the FTX exchange.

31.    Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX, including accounts at the few banks willing to service FTX.

32.    From those omnibus account, at SBF's direction, those banks transferred Class Member funds to and among his separately owned entities, through which SBF enriched himself, his friends, and his family members, with uncapped spending on illicit drugs, political donations, naming rights to sports arenas, concert sponsorships, luxury cars, private jets, and real estate across the globe.

33.    Frequently, SBF routed his fraudulent scheme through Alameda Research LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to

control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

34.     Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

35.     Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

36.     SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned using banks, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [*i.e.*, SBF] is also the primary shareholder of several related entities which do business with the company." Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive."

37.     More often, SBF looted Class Member funds directly, without the cover of sham

11

related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts at Silvergate held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

38.     SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison,

Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

39. SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described in Paragraph 22, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's— and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a *de facto* limitless line of credit, which Alameda used to invest $8 billion in risky startups and esoteric cryptocurrencies—highly illiquid investments purchased on credit from FTX, funded with Class Member assets.

40. SBF also misappropriated Class Member funds to inflate the balance sheets of Alameda, which were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX and/or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using Class Member funds and to the benefit of Alameda, SBF manipulated the value of FTT by implementing

13

a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third of FTX's revenue. By artificially increasing the value of FTT in this way, SBF increased the value of collateral available to Alameda, with which SBF was able to borrow billions of dollars from third party lenders in furtherance of his fraudulent scheme.

41.     Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

42.     At no time did FTX, or the Defendant, disclose the foregoing to Class Members, including that:

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

FTX and Defendant had a common interest in concealing these facts. Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange, SBF's fraud would not have succeeded, and neither SBF nor the Defendant would have stood to profit as handsomely as they expected. Defendant therefore worked to conceal the fraud, all the while inciting it with critical infrastructure, unique services, and dressings of legitimacy and security. For some time, Defendant succeeded. But, in late 2022, the fraud finally collapsed, and Defendant's misconduct was finally revealed.

## C. The Fraud's Collapse

43.     Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

44.     Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end

of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully solicit any further investments in FTX. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

45. On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its FTT reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

46. Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds.

47. Two days later, Binance offered to rescue FTX from flatlining. On November 8, 2022, Binance announced a non-binding deal to acquire the company. But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds—issues of which Defendant was aware, but helped conceal in furtherance of the fraud.

48. Facing an insurmountable liquidity crisis, on November 11, 2022, FTX filed for Chapter 11 bankruptcy protection, and SBF resigned. The bankruptcy court appointed John J. Ray

III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as CEO. Mr.

Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and

other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never

"seen such a complete failure of corporate controls and such a complete absence of trustworthy

financial information as occurred here." Moreover, Mr. Ray uncovered that:

> ***First***, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

> ***Second***, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

> ***Third***, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

> ***Fourth***, loans and other payments were made to insiders in excess of $1 billion.

> ***Fifth***, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

49. Defendant knew of FTX's deficient internal controls and its misappropriation of

Class Member funds, often by way of Alameda and "loans" to insiders, as well as Alameda's

margin trading and other risk-taking activity on the FTX platform long before Mr. Ray. Indeed,

Defendant facilitated these very failures, but affirmatively concealed them from the public for their

own financial gain.

50. The losses sustained by SBF's victims are staggering. FTX stole more than $8

billion in Class Member funds, the bulk of which has now vanished. Many Class Members came

of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent

their lives working long hours for low wages, often across multiple jobs or in the gig economy.

Unlike the Defendant, these Class Members do not have money to burn. They are not "crypto-

bros." They are financially vulnerable, and SBF, with the help of his co-conspiring Defendant, exploited their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

### D. Defendant's Roles in the Fraud

51.     The FTX fraud was a towering house of cards, and one that SBF could not have built on his own. SBF needed Defendant's assistance to achieve fraud of this scale. Defendant happily enlisted, agreeing, at least impliedly, to undertake certain overt acts in furtherance of SBF's scheme, including by providing state-of-the-art infrastructure, capital injections, and necessary cover for the fraud.

52.     Defendant is a large VC and wields enormous influence in spurring the development of emerging industries, like crypto, and persuading others to invest in the portfolio companies that they advise and nurture. From these positions of power, Defendant provided critical funding for SBF's fraudulent scheme, pumping billions into FTX's coffers, without which SBF could not have launched the venture. These were not passive investments; Defendant assistance went much further than underwriting FTX's launch. Defendant also supplied FTX with hands-on support, partnership, guidance, infrastructure, networks, endorsements, promotion, publicity, cover and other assistance vital to the fraud. Defendant worked closely with FTX in providing these services and, in turn, driving up FTX's valuation, all by way of SBF's fraudulent scheme and expanding SBF's reach to victims.

    *a. **Defendant pumped billions of dollars into FTX, and FTX returned the favor.***

53.     On July 20, 2021, Defendant, along with other VCs, including Paradigm, Sequoia, Thoma Bravo, Temesek, SoftBank, Ribbit Capital, Altimeter, and Sino Global, put up $1 billion

in Series B funding for FTX Trading. SBF remarked that through this round of fundraising, "we've formed a hugely valuable set of partners" in these VCs. SBF explained after the Series B funding closed that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand."

54.     Shortly thereafter, on October 21, 2021, certain VCs, including Temasek, Sequoia, Tiger Global, and Ribbit Capital, among others, put up $420.69 million in FTX Trading's Series B-1 funding. In the press release announcing the fundraising, SBF repeated a common refrain, underscoring FTX's safety:

> We are focused on establishing FTX as a trustworthy and innovative exchange by regularly engaging regulators around the world, and constantly seeking opportunities to enhance our offerings to digital asset investors. For this round, we capitalized on those strides and were able to partner with investors that prioritize positioning FTX as the world's most transparent and compliance cryptocurrency exchange.

55.     FTX reportedly referred to the Series B-1 fundraising as a "meme-round," referencing the allusions to oral sex and marijuana embedded within the amount raised. This was one of many juvenile references made by FTX regarding core components of its business model. For example, FTX advertised to investors that one of the products unique to the exchange was its "Shitcoin Index Futures," a "funny named" futures product built on "shit" cryptocurrencies.

56.     Though FTX Trading claimed that the Series B-1 funding would help it "make strategic investments designed to grow the business and expand [its] regulatory coverage," in October 2021, during the height of its Series B-1 fundraising, FTX instead diverted $300 million—equivalent to nearly 75% of the Series B-1 funding—to SBF in exchange for shares he owned in the company. Pay days of this kind are unusual and indicative that something is amiss. As industry experts explain:

> Generally, venture investors frown on large sales of stock by founders before a company goes public, in part because they dislike the idea of a founder who put little or no money into a business getting rich before investors can cash out. . . . It shows the company's founder thinks there's a better place to invest. . . . Anytime you see a founder selling shares in a secondary offering, you have to really ask them pretty tough questions.

To be sure, not only was SBF's cash out "large by startup-world standards," it also directly contradicted FTX Trading's purported use for the funds. Moreover, it was money that could have—and should have—been paid to satisfy the claims of SBF's victims.

57.     Unphased by SBF's $300 million payday, other VCs put up more money. On January 31, 2022, FTX Trading announced that it had raised $400 million in Series C Funding from investors, many of whom had participated in its Series B and B-1 rounds of fundraising, including Temasek, Paradigm, SoftBank, and Tiger Global, "demonstrating [their] belief in the Company's vision and their continued support of FTX's explosive growth."

58.     Just days earlier, on January 26, 2022, FTX US closed on its $400 million Series A fundraising, securing yet more money from certain Defendant and other VCs, including Paradigm, Temasek, and SoftBank. In publicizing the deal, Brett Harrison, President of FTX US, affirmed FTX's commitment to regulatory compliance, stating that "[w]e're excited to continue working cooperatively with [lawmakers and regulators], and feel confident that FTX US will emerge as the leading US-regulated crypto spot and derivatives exchange."

59.     In announcing each round of funding, Defendant and other VCs publicly endorsed FTX and its founder. After fundraising closed, VCs continued to valorize SBF and promote FTX to the public. For example, in a profile spanning 20 pages and published on its website until recently, Sequoia boasted "the possibility that FTX could join—or even eclipse—the big four of American banking (JPMorgan Chase, Bank of America, Wells Fargo and Citibank)."

60.     In total, Defendant and other VCs put up a combined $2 billion to expand FTX's

reach to SBF's victims. SBF returned the favor in kind, investing in his VC-backers as they had in him: entities "controlled by SBF have committed more than $200 million to Sequoia-related funds" and millions more to Paradigm, Altimeter, Defendant Multicoin and Sino Global. Upon information and belief, some or all of these investments were paid for with, or collateralized by, Class Member funds.

61.     In garnering investments into their own funds, VCs worked closely with SBF. For example, in 2021, Sino Global partnered with FTX as a co-general partner and "anchor" investor in building Sino Global's $200 million Liquid Value I fund. SEC filings reveal that Alameda, too, invested in the Liquid Value I fund. Sino Global's managing partner Matthew Graham and SBF worked hand-in-hand to pitch the fund, as the following slide from the investor deck demonstrates:



The short biography of SBF in the lower right-hand corner of the slide further illustrates what all VCs knew. SBF owned both FTX and Alameda Research. Thoma Bravo certainly knew this—Orlando Bravo, Thoma Bravo's founder and managing partner, tweeted on July 20, 2021, that he was "[s]o proud" to be backing both "SBF_Alameda" and the "FTX_Official" team:



**b.** ***Defendant gained awareness of SBF's fraud in the course of investing in, advising, and promoting FTX.***

62. Defendant had knowledge of FTX's misconduct, because, prior to investing, each VC undertook a diligence process to evaluate FTX's offerings and understand its business model and operations. Defendant was obligated to conduct this diligence, as a fiduciary to its investors. Diligence of this kind occurs in multiple stages, and industry standards require a review of the target's financial statements and projections, identification of the target's basic corporate governance structures and internal controls, an understanding of the target's business model (as confirmed by the target's financial statements), and an evaluation of the founders' track records and relevant experience. Venture capital firms conduct diligence for a living, and Defendant is among the largest and foremost of those firms. Firms of such stature undertake state-of-the-art diligence on the investments they make, and Defendant conducted the same top-notch, rigorous

22

diligence on FTX.

63.     Defendant Multicoin, for its part, is a "thesis-driven investment firm" and co-founder Kyle Samani reports that, before Multicoin invests in startups like FTX, he and his team are "obviously, doing due diligence" in accordance with industry standards. Mr. Samani has elaborated that, 'when evaluating a potential investment," Multicoin's diligence is driven by "a few major criteria:"  (1) "Founder/market fit," including an understanding of the "founder's background that makes them uniquely suited to solve the problem at hand;" (2) "Market size," including "[i]f the idea works as intended, how big can it get;" (3) "Defensibility," which requires understanding the "business/protocol" in order to make "it difficult for [competitors] to catch up;" "Crypto," *i.e.*, the "unique crypto angle to the investment;"  and (4) "Team," which requires understanding whether "the founders have the background and skillset to pull this off." Upon information and belief, Multicoin conducted diligence of the same rigor on FTX and, as a member of FTX's advisory board, Mr. Samani continued to monitor FTX's activity after investing in the fraudulent venture.

64.     From employing in-depth diligence standard in the industry, Defendant knew that SBF was misappropriating Class Member funds, contrary to FTX's public representations and by way of the omissions set forth in Paragraph 42. In particular, Defendant could see that (1) FTX was closely interconnected with Alameda, though SBF separately owned each entity, and SBF engaged in self-dealing by way of FTX and Alameda; (2) FTX granted Alameda exemptions and other special treatment that allowed Alameda to engage in margin trading and other risky activity on the FTX platform, exposing Class Members to Alameda's risk of loss; (3) FTX's projections were unsubstantiated and its financial statements, nothing more than "homespun excel files;" and (4) FTX lacked critical internal controls, such as separate accounts for Class Member funds, an

23

independent board of directors, or even a chief financial officer.

65.     The entanglement of FTX and Alameda, for example, was apparent through investor presentations—now available to the public for the first time, but available to Defendant years ago—in which "some of the same assets appeared simultaneously on the balance sheets of FTX and of [SBF's] trading firm, Alameda Research[,] despite claims by FTX that Alameda operated independently." Specifically, for example, "each time FTX was seeking to raise funding, [SBF] sent a spreadsheet to potential investors displaying items like revenue, profit and losses, daily users, and expenses for FTX," and these spreadsheets showed overlap between FTX and Alameda. Other investor materials note that "FTX is a spinout of Alameda Research" and that one of the risk factors presented by FTX was its relationship with Alameda, and specifically that FTX and Alameda would engage in self-dealing by "[t]rading on their own exchange," elaborating that:

> An exchange needs a market maker to get it off the ground and Alameda will be the initial market [maker] for FTX itself. The team intends to bring on more market makers over time however this is a major risk. We have talked to other quantitative hedge funds who are hesitant to trade on FTX for this reason"

66.     The intertwining of FTX and Alameda was certainly apparent to other investors conducting diligence on the companies. Alex Pack, a venture capitalist focused on cryptocurrency investments, reports that in December 2018, he considered investing in Alameda and, after a month-long due diligence period, discovered that "Alameda and FTX were tied at the hip," and that SBF planned to use Mr. Pack's investment in Alameda to fund the operations of FTX. For those reasons, Mr. Pack declined to invest in SBF's enterprise.

67.     In addition to revealing the overlap between Alameda and FTX, the pitchbooks that FTX used to solicit funds from Defendant reportedly featured projections that FTX could not substantiate with viable assumptions or calculations. For example, in financials that FTX provided to investors, FTX's projected revenue figures for fiscal years 2021 and 2022 did not reconcile with

projected volumes or fees. More generally, these financials were not of the caliber expected of a $32 billion multinational corporation and instead, where "homespun Excel files," which were "very unorganized," at times "inaccurate" and "confusing." In piecing FTX together after the fraud's collapse, Mr. Ray quickly discovered that FTX used Quickbooks for its financials, which he found obviously incongruous: "[A] multi-billion-dollar company using Quickbooks. Nothing against Quickbooks, very nice tool, just not for a multi-billion-dollar company."

68. Defendant could see, *years* before Mr. Ray could see (and was able to uncover in a matter of days), that the information presented in FTX's financial statements presented "substantial concerns;" that FTX lacked fundamental internal controls, including a chief financial officer or a board of independent directors; that FTX did not segregate Class Member funds from operations; and that control of FTX was concentrated in the hands of unsophisticated twenty-somethings who played League of Legends throughout meetings at which billions of dollars in venture capital were at stake. None of this material information was disclosed to Class Members, and SBF's fraud relied on Defendant's assistance in keeping the fraud in motion, and these critical omissions concealed.

### c. Defendant provided critical assistance in furtherance of the FTX fraud, despite knowing that SBF was misappropriating Class Member funds.

69. Still, Defendant jumped at the opportunity to pour millions into FTX's repositories, without which FTX could not have gotten off the ground, much less enjoyed such expansive reach. Reportedly, FTX raised:

- $278 million from Paradigm;

- $275 million from Temasek.

- $210 million from Sequoia;

- $100 million from Softbank Group;

- $38 million from Tiger Global;

- An amount in the "mid-seven figures" from Sino Global; and

- More than $25 million from Defendant Multicoin.

70.    This funding was critical to FTX's growth. FTX needed money, and it needed

money from Defendant, specifically, for reasons laid bare by Sequoia in its profile of SBF:

> FTX did need money, after all. **And it needed that money from credible sources
> so it could continue to distinguish itself from the bottom-feeders who came to
> crypto to fleece the suckers**.

Without the credibility and influence attached to the enormous sums of money that Defendant and

other VCs put into FTX, SBF could never have crafted the veneer of legitimacy, trustworthiness,

and safety critical to FTX's meteoric growth.

71.    To that end, each VC and the Defendant vociferously, and repeatedly, promoted the

legitimacy of FTX and endorsed SBF's integrity and character. Defendant Multicoin admits that

it "strongly and publicly endorsed [SBF] and FTX," and it did so repeatedly. Defendant Multicoin

"carefully watched" FTX since its founding, and repeatedly lauded FTX and its management in

public statements, including managing partner Kyle Samani's statements following the closing of

FTX Trading's Series B-1 fundraising:

> We have been carefully watching the FTX team over the last two years. They are
> far and away the best executing team in crypto, and have blown away everyone's
> expectations. They have firmly established themselves as the exchange with the
> best overall product offering, and are now leveraging the unique capabilities of
> global crypto rails to build the future of internet native finance. FTX is building the
> future of crypto, and we are incredibly excited to invest.

And, following FTX US's Series A fundraising., Mr. Samani, who served on FTX's advisory

board, reiterated his confidences in SBF and FTX:

> The FTX US team is laying the groundwork to become the dominant trading
> platform in the United States for all things crypto: spot trading, derivatives, and
> NFTs. They are growing market share as customers recognize the power and
> flexibility of the platform, and we expect that to accelerate as the product suite

accelerates.

72.    Defendant and the other VCs' commendations and endorsements were critical to the perpetuation of SBF's fraud. In summarizing FTX's success to *The New York Times*, FTX's president, Brett Harrison, explained: "We're the newcomers to the [cryptocurrency] scene. . . . The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken. . . . We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that." Sequoia, too, recognized FTX's need for reputation laundering, noting in its 20-page profile of SBF that:

> Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation. But FTX had an ambition to change that. It was built to be the exchange traders could count on. **SBF needed to get the word out. He wanted FTX to be known as the respectable face of crypto. This required ad campaigns, sponsorship deals, a charitable wing—and a war chest to pay for it all**. (emphasis added).

73.    Regulators have taken note of VCs' assistance to the FTX fraud in pumping FTX with cash and repeatedly endorsing the exchange and its founder. In a key note address to The Warton School and the University of Pennsylvania Carey Law School on January 18, 2023, Christy Goldsmith Romero, Commissioner of the CFTC, remarked:

> FTX had financial support for its campaign to build trust. Some venture capital firms (and other investors) knowingly funded this trust campaign. . . . **FTX appears to have used Sequoia[, for example,] as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto.**
>
> **It appears that Sequoia at least knew its money would be used in this fashion.** However, there are serious questions and allegations about whether this public-relations "war chest" was funded not only by venture capital money but also customer property. If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

**The multi-dimensional public relations campaign was meant to build the public's trust in FTX.** And I have not discussed all elements of that campaign. There were rumored efforts to influence charities and policy advocacy groups. There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site. All of this appears to be part of a branding campaign designed to make FTX appear trustworthy.

74. In short, FTX told customers that what set it apart was its safety and its trustworthiness. Defendant and other VCs hawked these purported features of the exchange again and again, despite knowing that what they were telling the public about FTX and about SBF was unsubstantiated. "With the help of a marquee investor roster," the rest was history, and [SBF] was able to build FTX into a massively popular exchange . . . and successfully promote himself as one of the most trusted founders in all of crypto."

75. Defendant's vociferous endorsements of FTX paid off. Between the Series B and B-1 fundraising rounds, FTX's user base increased 48%, its average daily trade volume surpassed $14 billion, and its valuation jumped from $18 billion to $25 billion. At the close of the Series C fundraising round, FTX's user base grew another 60% and its valuation ballooned to $32 billion. VCs who put up money in the Series B round therefore saw the value of their stakes in FTX grow by 40% in the three months intervening the Series B and Series B-1 fundraising rounds and nearly 90% in the six months intervening the Series B and Series C rounds.

76. Defendant and the VCs' assistance in furtherance of the fraud did not end with their fundraising for and promotion of FTX. SBF had "two main goals" in fundraising from VCs . In addition to raising necessary capital, SBF also sought to "form[] a lot of partnerships with people who are really excited about and who we think can help grow our business and make a lot of connections for us." Again, Defendant and the VCs pulled through.

77. Defendant extended to FTX a self-professed "hands-on" investment strategy, which involved "partnering" with FTX and offering it guidance, infrastructure and expertise. For

example, Defendant Multicoin "will not invest if [it] cannot add value beyond capital," and boasts a team of 'hands-on investors," who "will do everything in [their] power to maximize the success of [their] portfolio companies. Multicoin professes that what it does "best" is "invest[] with high conviction, in a hands-on way" and that what sets it apart from other VCs is that Multicoin "can dedicate real time and thought to projects as partners at the onset." According to Kyle Samani, who leads Multicoin as its co-founder and managing partner, this means that if a founder "calls you Friday at 9 p.m., you answer the phone. . . . We care about our founders, we work with them during the week and we don't like being passive investors."

78.     Defendant did not deviate from its standard "hands on" approach when partnering with FTX. Indeed, upon information and belief, executives of Sequoia, Paradigm, Defendant Multicoin and Thoma Bravo served on FTX's advisory board, which held meetings at least through March 2022. Other VCs provided direct assistance to SBF's fundraising efforts, with FTX Trading reporting that its $900 million Series B funding was "led by the Company's own ventures team, with help from Paradigm [and] Ribbit Capital."

> d.     *Defendant sought to keep the fraud concealed, and therefore afloat, until FTX could effect an IPO or a private sale.*

79.     In working with SBF to grow the FTX platform to its exponential scale, Defendant obtained knowledge of SBF's misappropriation of Class Member funds, along with FTX's attendant misrepresentations and omissions. But despite this knowledge, Defendant continued to provide infrastructure for and guidance on the company's trajectory, with any eye towards an IPO or private sale, the end game for venture capitalists like Defendant:

> Venture money is not long-term money. The idea is to invest in a company's balance sheet and infrastructure until it reaches a sufficient size and credibility so that it can be sold to a corporation or so that the institutional public-equity markets can step in and provide liquidity. In essence, the venture capitalist buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits with the

29

help of an investment banker.

For Defendant, FTX was no different. In fact, in closing FTX Trading's Series B funding, SBF announced that FTX was "trying to get [itself] in a position where we could go public relatively quickly if we wanted to." Defendant stood to profit enormously from FTX's public or private sale, as long as Defendant could help keep the fraud afloat until FTX went on the selling block.

80.    By January 2022, an IPO or private sale was increasingly imminent. FTX Trading's valuation reached $32 billion—one of the largest valuations in recent history, greater than the market cap of both Nasdaq and Twitter—while FTX US's valuation topped $8 billion.  In announcing the valuations, SBF stated that he and others at FTX "look forward to working alongside our investors [*i.e.*, Defendant] to achieve our mission and continue our tremendous growth throughout 2022 and beyond." These multi-billion dollars valuations arose directly from the fundraising by Defendant; FTX could not have achieved these appraisals without the nearly $2 billion in fundraising from Defendant and the other VCs.

81.    Just two months later, in March 2022, SBF met with David Soloman, CEO of Goldman Sachs, to discuss, among other things, FTX's IPO. With the prospect of an IPO imminent, Defendant could cash out with massive returns on their equity stakes and leave Class Members to bear the losses resulting from SBF's fraud, if they could help keep customer deposits flowing into FTX accounts, and SBF's fraud would be concealed, until just after the sale.

82.    By now, Defendant's interest in keeping SBF's fraud concealed—and, in turn, FTX afloat—had broadened, as Defendant had stakes not only in FTX, but in crypto companies throughout the industry. But by this time, the crypto industry had begun to falter, and SBF's spree to buy up failing crypto companies (so to keep his fraud concealed from Class Members) took off. For as long as Defendant could keep FTX's fraud hidden from public eye, FTX could in turn shore

30

up struggling players in the crypto industry (like it did Blockfi), including those in which Defendant and other VCs had an interest. In the alternative, the collapse of FTX—then the second-largest cryptocurrency exchange on the market—could potentially result in a total crash of the cryptocurrency market. With their eyes on an IPO or private sale, and determined to extricate crypto industry-wide, Defendant and the other investing VCs conspired with FTX to keep Class Member funds flowing in and the fraud hidden.

     *e.*    ***Defendant emerged from the fraud unscathed, while Class Members lost everything.***

83.    Defendant nearly succeeded in cashing out on SBF's fraudulent crypto exchange. However, journalists broke the news of the fraud in early November, and SBF's fraud swiftly imploded. Though many Class Members lost their entire savings to SBF's fraud, Defendant emerged largely unscathed. For example, Defendant Multicoin's co-founder, Kyle Samani, freely acknowledges that "[he doesn't] care about people who [Multicoin is not] invested in," and Multicoin clearly doesn't care that Class Members now bear the losses that wrought by FTX with Multicoin's assistance.

84.    These comments underscore the win/win scenario that Defendant enjoyed at the expense of Class Members, including Plaintiff O'Keefe.  As long as Defendant and its fellow VCs could keep SBF's merry-go-round running until FTX went on the selling block or the volatile crypto market returned to ascendancy, Defendant and the other VCs would go down in history as some of the largest rainmakers in the tech industry. Conversely, as they now admit, if the fraud collapsed before FTX reached a sale, Defendant would suffer only non-material losses, losses which Defendant could in fact harvest for hefty tax deductions. All told, Defendant had nothing to lose in propping up SBF's fraud; they instead had everything to gain. And so Defendant assisted the FTX fraud; they did so knowingly; and they did so at Class Members' expense.

31

## CLASS ACTION ALLEGATIONS

85.     Plaintiff O'Keefe brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as the representative of a Class defined as follows:

> All natural persons and entities who purchased, deposited and/or transacted Class Member funds in accounts on the FTX platform any time after May 1, 2019, through FTX's collapse on November 11, 2022, the date on which it filed for bankruptcy, and have been harmed by Defendant's conduct alleged herein.

86.     **Numerosity and Ascertainability**. Members of the Class are so numerous that joinder is impracticable. Plaintiff O'Keefe does not know the exact size of the Class but believes that there as many as 2.7 million class members in the United States alone. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically. Membership in the class may be ascertained through records held by Class Members, for example, their own bank records, and/or records held by FTX.

87.     **Typicality**. Plaintiff O'Keefe's claims are typical of the claims of the members of the Class. Plaintiff O'Keefe and all members of the Class were damaged by the same wrongful conduct of Defendant.

88.     Plaintiff O'Keefe will fairly and adequately protect and represent the interests of the Class. Plaintiff O'Keefe's interests are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving his own claims, Plaintiff O'Keefe will prove other Class members' claims as well.

89.     **Adequacy of Representation**. Plaintiff O'Keefe is represented by counsel who are experienced and competent in the prosecution of complex securities litigation on behalf of investors, including suits against third party aider/abettors to financial fraud. Plaintiff O'Keefe and his counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff O'Keefe can and will fairly and adequately represent the interests of the Class and

have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

90. **Commonality and Predominance**. There are questions of law and fact common to the Class that predominate over any questions of law or fact affecting the claims of individual Class Members, including, but not limited to:

- Whether FTX's YBA program was a fraudulent enterprise;

- Whether FTX used material misstatements of fact or omissions to induce Class Members to deposit funds into accounts on the FTX exchange.

- Whether FTX and/or SBF breached a fiduciary duty to Class Members.

- Whether FTX and/or SBF converted Class Member funds.

- Whether the Defendant knew about or possessed a general awareness of wrongdoing by FTX and/or SBF;

- Whether Defendant's actions substantially assisted the wrongdoing of FTX and/or SBF;

- Whether Defendant conspired with FTX and/or SBF;

- Whether Defendant took overt acts in furtherance of that conspiracy; and

- Whether the Class has been damaged by the alleged wrongful conduct of Defendant.

91. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable, as Class Members are dispersed across the United States. Moreover, the claims of many Class Members does not exceed the cost of litigating the claims individually, and individual suits would not be cost effective or economically viable as individual actions.

## **CAUSES OF ACTION**

### A. **Count One: Civil Conspiracy**

92.     Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 91 as if fully set forth herein.

93.     There was an express or implied agreement between at least one of SBF and/or other agents of FTX and Defendant Multicoin to deceive Class Members, and to commit the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members property.

94.     Through the course of their due diligence and hands-on partnerships with FTX, and in providing guidance to FTX and its founder, SBF, Defendant acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, Defendant stood to gain financially from FTX's misconduct, and Defendant agreed, at least impliedly, to assist that unlawful conduct.

95.     Defendant agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including (1) propping up SBF's fraud—and expanding its reach—by injecting necessary capital into the scheme; (2) generating for FTX the appearance of legitimate operations, strong financial condition, and other credibility, which permitted the scheme to grow in scale and persist in duration; (3) advising FTX on ways to continue its growth, thereby attracting new victims and thrusting the scheme forward; and (4) concealing the fraud when the cryptocurrency industry began to falter, with the purpose of keeping the fraud afloat until Defendant could cash out in a public or private sale or once the crypto market recovered.

### B. Count Two: Common Law Aiding and Abetting Fraud

96.　　Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 91 as if fully set forth herein.

97.　　FTX, and its founder SBF, defrauded Class Members by, among other things, making the following material omissions in soliciting their deposits:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

98.　　Based on its knowledge of the financial industry, with a focus on serving crypto

clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendant Multicoin acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

99.     Notwithstanding this knowledge, and by reason of the conduct described above, Defendant Multicoin substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

100.     Defendant Multicoin's actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendant Multicoin is jointly and severally liable for aiding and abetting his fraudulent scheme.

## C.  Count Three: Common Law Aiding and Abetting Fiduciary Breach

101.     Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 91 as if fully set forth herein.

102.     FTX took custody of the Class Member funds. As alleged herein, FTX promised Class Members funds were safe in its hands, and that FTX customer funds were "held by FTX for [their] benefit." As a custodian of Class Member funds, and by virtue of the promises FTX made to safeguard their funds, FTX owed a fiduciary duty to Class Members, and FTX was obligated to discharge that duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members.

103.     Rather than safeguarding Class Member funds, FTX misappropriated their funds in breach of the fiduciary duty owed to Class Members. These breaches include, but are not limited to:  (1) transferring funds belonging to Class Members to Alameda and other of SBF's separately

36

owned entities; (2) transferring funds belonging to Class Members to SBF and his co-conspirators; (3) using funds belonging to Class Members to engage in self-dealing, including non-arms' length transactions among SBF's affiliated entities.

104.    Based on its knowledge of the financial industry, with a focus on serving crypto clients, and its understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendant Multicoin acquired knowledge of FTX's fiduciary duty to Class Members and breaches thereof.

105.    Notwithstanding this knowledge, and by reason of the conduct described above, Defendant Multicoin substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

106.    Defendant Multicoin's actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendant Multicoin is jointly and severally liable for participating in the breach of FTX's fiduciary duty.

**D.  Count Four: Aiding and Abetting Conversion**

107.    Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 91 as if fully set forth herein.

108.    The funds deposited by Class Members into YBAs on the FTX exchange were personal property of Class Members. SBF and his co-conspirators wrongfully exercised dominion or control over such property, misappropriating Class Member funds entrusted to FTX.

109.    Based on its knowledge of the financial industry, with a focus on serving crypto clients, and its understanding of FTX's operations obtained through diligence, ongoing monitoring

and/or hands-on partnership, Defendant Multicoin acquired knowledge of FTX's conversion of Class Member funds.

110. Notwithstanding this knowledge, and by reason of the conduct described above, Defendant Multicoin substantially aided, abetted, and/or participated with SBF and his co-conspirators in conversion of funds belonging to Class Members, including by the actions set forth above.

111. Defendant Multicoin's actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendant Multicoin is jointly and severally liable for participating in the breach of FTX's conversion of Class Member funds.

## JURY DEMAND

112. Plaintiff O'Keefe demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of himself and those similarly situated, Plaintiff O'Keefe prays for judgment in its favor and against Defendant Multicoin for compensatory damages, punitive damages, attorney's fees, and for all such other relief as this Court deems fair and just.

Respectfully submitted,

*/s/ Alex J. Brown*
Alex J. Brown (SBN 24026964)
Alex.Brown@lanierlawfirm.com
Ryan D. Ellis (SBN 24087470)
Ryan.Ellis@lanierlawfirm.com
J. Davis LaBarre (SBN 24131442)
(*Motion to Appear Pro Hac Vice* to be Filed)
Davis.LaBarre@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N, Suite 100
Houston, Texas 77064
Tel: (713) 659-5200  Fax: (713) 659-2204

James R. Swanson, La. Bar. No. 18455
*(Motion to Appear Pro Hac Vice to be Filed)*
Kerry J. Miller, La. Bar. No. 24562
*(Motion to Appear Pro Hac Vice to be Filed)*
Benjamin D. Reichard, La. Bar No. 31933
*(Motion to Appear Pro Hac Vice to be Filed)*
C. Hogan Paschal, La. Bar No. 38495
*(Motion to Appear Pro Hac Vice to be Filed)*
Monica Bergeron, La. Bar No. 39124
*(Motion to Appear Pro Hac Vice to be Filed)*
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
breichard@fishmanhaygood.com
hpaschal@fishmanhaygood.com
mbergeron@fishmanhaygood.com

***Counsel to Plaintiff O'Keefe and
the Putative Class***

# Exhibit A

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: FTX CRYPTOCURRENCY EXCHANGE
COLLAPSE LITIGATION**                                    *MDL No. 3076*

### TRANSFER ORDER

**Before the Panel:**[*]  This litigation arises out of the collapse of the FTX cryptocurrency exchange in November 2022 and the subsequent bankruptcy of FTX Trading Ltd. and its U.S. affiliate FTX US (together, FTX).  Plaintiffs are FTX customers and investors seeking to recover their losses.  Defendants are individuals and entities that allegedly facilitated FTX's wrongful conduct.  This litigation currently consists of eight actions pending in two districts, as listed on Schedule A.  Since the filing of the motion, the Panel has been notified of eleven related actions in the Northern District of California, Southern District of Florida, District of New Jersey, and Southern District of New York.[1]  Plaintiffs in the consolidated *Garrison* and *Podalsky* actions move under 28 U.S.C. § 1407 to centralize this litigation in the Southern District of Florida.

Responding plaintiffs' positions on centralization vary.  Plaintiffs in three actions support centralization in the Southern District of Florida, and plaintiff in one action supports centralization in the Northern District of California.  Plaintiffs in eleven actions oppose centralization or request exclusion of their actions from any MDL.  In particular, plaintiffs in two potential tag-along actions (*Rabbitte* and *Gershovich*) which bring claims solely against investment firms Sequoia Capital Operations, LLC, Paradigm Operations LP, and Thoma Bravo, LP, request exclusion of their actions.  Plaintiff in a potential tag-along action against Signature Bank (*Statistica Capital*) requests exclusion of that action.  And plaintiffs in two potential tag-along actions request exclusion of the *Bhatia, Magleby,* and *Keane* actions against the Silvergate Bank defendants.[2]  Most of the opposing plaintiffs propose the Northern District of California if the actions are centralized over their objections.  Opposing plaintiff in one action (*O'Keefe*) proposes the Southern District of Florida.

---

[*] One or more Panel members who could be members of the putative classes in this litigation have renounced their participation in the classes and have participated in this decision.

[1] These and any other related actions are potential tag-along actions.  *See* Panel Rules 1.1(h), 7.1 and 7.2.

[2] The Silvergate Bank defendants are Silvergate Bank, Silvergate Capital Corp., and Alan J. Lane.

Responding defendants' positions on centralization also vary considerably.[3] Sequoia, Paradigm, and Thoma Bravo support centralization and have no preference on the transferee district. Prager Metis and Armanino support centralization in the Southern District of Florida. The Celebrity Defendants oppose centralization.[4] The Silvergate Bank defendants oppose inclusion of any claims against them, and the FDIC opposes inclusion of the *Statistica Capital* action against Signature Bank.

In opposition to centralization, the various plaintiffs and defendants primarily argue that the actions lack sufficient common questions of fact and informal coordination provides a practicable alternative. We find these arguments unpersuasive. The actions undoubtedly involve several non-overlapping defendants and raise defendant-specific issues. But they all rest on the same core set of facts concerning the alleged fraud that led to FTX's collapse and, in particular, revolve around the conduct of FTX's Samuel Bankman-Fried, the relationship with another Bankman-Fried company known as Alameda Research, and Alameda's Caroline Ellison. Indeed, Bankman-Fried and Ellison are defendants in seven of the eight actions on the motion, and are central figures in all of the related actions before the Panel. Moreover, all actions on the motion allege that there was a conspiracy between Bankman-Fried and other alleged FTX insiders to make misrepresentations to consumers and investors to induce them to invest in FTX products and use the FTX exchange. This common factual core warrants centralization despite the involvement of a number of different defendants. *See, e.g., In re January 2021 Short Squeeze Trading Litig.*, MDL No. 2989, 2021 WL 1258399 (J.P.M.L. 2021) (centralizing actions "nam[ing] more than forty brokers, funds, and clearinghouses as defendants" where all actions involved common conduct concerning the Robinhood trading platform). Transfer under Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core. *See In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390-91 & n.5 (J.P.M.L. 2014).

We further find that informal coordination is not an adequate alternative to centralization. Although the actions in the Northern District of California are in the process of being organized into three tracks, there are still seven distinct groups of non-overlapping plaintiffs' counsel pursuing claims in this litigation, including potential tag-along actions, on behalf of putative global and nationwide classes. Additionally, dozens of defendants are involved, with little overlap in their counsel. The large number of plaintiffs' and defense counsel will pose serious obstacles to informal coordination. Inefficiencies also will arise from having to coordinate these unusually complex actions involving novel cryptocurrency issues with the related criminal case in the Southern District of New York and the bankruptcy case in the District of Delaware. Moreover, informal coordination does not address the possibility of inconsistent rulings on *Daubert* and class certification issues.

---

[3] The responding defendants are Prager Metis CPAs, LLC; Armanino LLP; Sequoia Capital Operations, LLC; Paradigm Operations LP; Thoma Bravo, LP; the Silvergate Bank defendants; and seven "Celebrity Defendants" – the Golden State Warriors, Thomas Brady, Gisele Bündchen, Lawrence David, Kevin O'Leary, David Ortiz, and William Trevor Lawrence. Additionally, the Federal Deposit Insurance Corporation responded as receiver for Signature Bank.

[4] The Golden State Warriors alternatively request the Northern District of California.

Although the Signature Bank and Silvergate Bank defendants are named only in the potential tag-along actions – not in the actions on the motion – we received extensive briefing and oral argument on whether the MDL should include them. Both plaintiffs and defendants in those actions oppose their inclusion in an MDL because Signature Bank was closed in March 2023 and is in FDIC receivership, and Silvergate Bank is in voluntary liquidation. Additionally, at oral argument, movants conceded that centralization of these claims is not warranted given the closure-related issues unique to those entities.[5] Based on this record, we do not intend to include the claims against Signature Bank and the Silvergate Bank defendants.[6]

On the basis of the papers filed and the hearing session held, we find that the actions on Schedule A involve common questions of fact, and centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions present common questions of fact concerning the collapse of the FTX cryptocurrency exchange in November 2022, which allegedly was caused by the conduct of FTX former principals Sam Bankman-Fried, Zixiao "Gary" Wang, and Nishad Singh, and financial improprieties with Alameda Research. All actions allege that FTX executives fraudulently withheld or misrepresented information with respect to customer assets on the FTX platform and that the professional services firms and celebrity promoters who worked with FTX were complicit in or otherwise bear responsibility for the alleged fraud – for example, by concealing FTX's financial problems or promoting FTX products with knowledge or willful blindness of the alleged fraud. The common factual questions include: (1) whether FTX executives and their representatives misled customers about FTX's practices for safeguarding customer funds; (2) whether FTX executives and their representatives misrepresented the financial condition of the FTX entities; (3) whether FTX and Alameda executives embezzled customer assets; (4) the existence and scope of a conspiracy; and (5) the nature of FTX products, such as Yield-Bearing Accounts and FTT tokens. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification and *Daubert* motions; and conserve the resources of the parties, their counsel and the judiciary.

The Southern District of Florida is an appropriate transferee district for this litigation. A significant part of FTX's conduct allegedly emanated from this district, where it had its U.S. headquarters before filing for bankruptcy. This district also provides an easily accessible location for this nationwide litigation. Judge K. Michael Moore, who presides over the actions on the motion in this district, is an experienced transferee judge, and we are confident he will steer this matter on a prudent and expeditious course.

---

[5] For example, plaintiffs in *Statistica Capital v. Signature Bank* are subject to an exhaustion of administrative remedies requirement under the Financial Institutions Reform, Recovery and Enforcement Act because of the FDIC receivership, and that action thus has been stayed.

[6] We intend to transfer the actions against Sequoia, Paradigm, and Thoma Bravo through the conditional transfer order process, based on the common factual core discussed above. *See* Panel Rule 7.1(b). Those actions do not present the same efficiency concerns as the actions involving banks in closure-related proceedings.

-4-

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Southern District of Florida are transferred to the Southern District of Florida and, with the consent of that court, assigned to the Honorable K. Michael Moore for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

Karen K. Caldwell
Chair

| | |
|---|---|
| Nathaniel M. Gorton | Matthew F. Kennelly |
| David C. Norton | Roger T. Benitez |
| Dale A. Kimball | Madeline Cox Arleo |

**IN RE: FTX CRYPTOCURRENCY EXCHANGE**
**COLLAPSE LITIGATION**                                    MDL No. 3076

## SCHEDULE A

### Northern District of California

LAM v. BANKMAN-FRIED, C.A. No. 3:22−07336
PIERCE v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07444
HAWKINS v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07620
JESSUP v. BANKMAN-FRIED, ET AL., C.A. No. 3:22−07666
PAPADAKIS v. BANKMAN-FRIED, ET AL., C.A. No. 3:23−00024

### Southern District of Florida

GARRISON v. BANKMAN-FRIED, ET AL., C.A. No. 1:22−23753
PODALSKY, ET AL. v. BANKMAN-FRIED, ET AL., C.A. No. 1:22−23983
NORRIS, ET AL. v. BRADY, ET AL., C.A. No. 1:23−20439