# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-03944-JCS

Cabo et al v. Fenwick & West LLP
Assigned to: Magistrate Judge Joseph C. Spero
Demand: $25,000,000
Cause: 28:1332 Diversity-Fraud

Date Filed: 08/07/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Leandro Cabo**

represented by **William M. Audet**
Audet & Partners, LLP
711 Van Ness Avenue
Suite 500
San Francisco, CA 94102-3229
415-568-2555
Fax: 415.568-2556
Email: waudet@audetlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ryan Henderson**

represented by **William M. Audet**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kyle Rupprecht**

represented by **William M. Audet**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vijeth Shetty**

represented by **William M. Audet**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Warren Winter**

represented by **William M. Audet**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Fenwick & West LLP**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/07/2023 | 1 | COMPLAINT against Fenwick & West LLP ( Filing fee $ 402, receipt number ACANDC-18517717.). Filed byVijeth Shetty, Leandro Cabo, Kyle Rupprecht, Ryan Henderson, |

| | | Warren Winter. (Attachments: # 1 Civil Cover Sheet)(Audet, William) (Filed on 8/7/2023) (Entered: 08/07/2023) |
|---|---|---|
| 08/07/2023 | 2 | Proposed Summons. (Audet, William) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | 3 | Case assigned to Magistrate Judge Joseph C. Spero. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 8/21/2023. (bw, COURT STAFF) (Filed on 8/7/2023) (Entered: 08/07/2023) |

<table>
<tr><td colspan="4"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4">08/07/2023 12:15:56</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>AdamMoskoadam</td><td><strong>Client Code:</strong></td><td>ftx</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>3:23-cv-03944-JCS</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>2</td><td><strong>Cost:</strong></td><td>0.20</td></tr>
</table>

WILLIAM M. AUDET (CA SBN 117456)
LING (DAVID) Y. KUANG (CA SBN 296873)
KURT D. KESSLER (CA SBN 327334)
  waudet@audetlaw.com
  lkuang@audetlaw.com
  kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
  711 Van Ness Avenue, Suite 500
  San Francisco, CA 94102-3275
  Telephone:   (415) 568-2555
  Facsimile:    (415) 568-2556

*Counsel for Plaintiffs, individually, and*
*on behalf of all others similarly situated*

*Additional Counsel on Signature Block

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| LEANDRO CABO, RYAN HENDERSON, KYLE RUPPRECHT, VIJETH SHETTY, and WARREN WINTER, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FENWICK & WEST, LLP.<br><br>Defendant. | **Case No:**<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMAND** |

LEANDRO CABO, RYAN HENDERSON, KYLE RUPPRECHT, VIJETH SHETTY, WARREN WINTER ("Plaintiffs"), by and through undersigned counsel, bring this action individually and on behalf of all others similarly situated, against FENWICK & WEST, LLP ("Defendant" or "Fenwick").[1] Plaintiffs make the following allegations based on personal knowledge of facts pertaining to themselves and on information and belief upon investigation that is reasonable as to all other matters. Plaintiffs allege as follows:

## I. **INTRODUCTION**

1.    The FTX disaster is the largest financial fraud in US history. Samuel Bankman-Fried ("SBF"), FTX Group's[2] founder and former CEO, is on house arrest awaiting his criminal trial scheduled for October of this year. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2.    SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

3.    On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. The deceptive FTX Platform maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the deceptive FTX Platform, the yield-bearing accounts ("YBA"), FTX's native cryptocurrency token ("FTT"), and/or loans to pay

---

[1] At the request of the United States District Court for the Southern District of Florida, in Case Number 23-md-03076-KMM, (the "MDL Court"), Plaintiffs file this class complaint against Fenwick & West LLP, as the "Law Firm" complaint, and intend to immediately seek transfer pursuant to 28 U S.C. § 1407 from this District to the MDL Court as a tag-along action in MDL 3076.

[2] FTX Trading Ltd. and its subsidiaries are referred to herein as "FTX Trading" or "FTX Trading Ltd." West Realm Shires Inc. and its subsidiaries, including West Realm Shires Services, Inc. ("WRS"), are referred to herein as "FTX US." FTX Trading Ltd. and FTX US are collectively referred to as "FTX" or the "FTX entities." FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4.     On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

5.     This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, aiding and abetting fraud, negligence, and breach of fiduciary duties, and violations of the Racketeer Influenced and Corrupt Organizations Act.

6.     Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

7.     FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings. This class action, pending in the Southern District of Florida as a Multi-District Litigation ("MDL"), may be the only avenue for any of the victims to recover any of their damages.

8.     As outlined in the five complaints filed contemporaneously in this MDL, the MDL Defendants[3] directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain. Fenwick was FTX US's principal outside law firm.  Headquartered in Mountain View, California, Fenwick is ideally located

---

[3] "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints filed in the MDL Court: Samuel Bankman-Fried, Caroline Ellison, Gary Wang, Nishad Singh, Prager Metis CPAs, LLC and Armanino LLP, Sequoia Capital Operations, LLC, Thoma Bravo, LP, Paradigm Operations LP, SkyBridge Capital II, LLC, Multicoin Capital Management LLC, Tiger Global Management, LLC, Ribbit Management Company, LLC, Altimeter Capital Management, LP, and K5 Global Advisor, LLC, Sino Global Capital Limited ("Sino Global"), Softbank Group Corp., Temasek Holdings (Private) Limited, Temasek International (USA) LLC, Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg, Creators Agency, LLC, Deltec Bank & Trust Company Ltd., and Farmington State Bank.

in the heart of Silicon Valley, at the center of the technology and cryptocurrency industry, and near to Bankman-Fried and FTX's California operations.

9.     Fenwick touted itself as being "at the forefront Blockchain Revolution." According to Fenwick, clients "across the blockchain ecosystem" relied on Fenwick for "strategic advice" in navigating the "business and regulatory landscape," and to "find creative solutions," through a "flexible, forward-thinking approach." Fenwick prided itself in working with clients "as their partners."

10.     As alleged herein, Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide. When asked by FTX Group executives for counsel, Fenwick lawyers were eager to craft not only creative, but illegal strategies. Fenwick helped set up the shadowy entities through which Bankman-Fried and the FTX Insiders operated a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed. As several members of Congress recently remarked in connection with the FTX collapse, these and other services are "often central to major financial scandals, given [legal counsel's] role in drafting financial agreements, risk management compliance practices, and corporate controls." Fenwick is no different, and the services and strategies it provided to the FTX Group were similarly central to the FTX Group's fraud.

## II.     **PARTIES**

11.     Leandro Cabo is a resident and citizen of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which Defendants are liable.

12.     Ryan Henderson is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX

Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which Defendants are liable.

13. Plaintiff Kyle Rupprecht is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which Defendants are liable.

14. Vijeth Shetty is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which Defendants are liable.

15. Plaintiff Warren Winter is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which Defendants are liable.

16. Defendant Fenwick & West LLP ("Fenwick") is an unincorporated limited liability partnership organized under the law of California with its principal place of business in Mountain View, California and with two other locations in California. Fenwick advertises that it has approximately 150 individual partners, at least 100 of which with residence in California.

17. Fenwick's practice focuses on technology companies, life sciences companies and start-ups. The firm generates more than $700 million in revenue each year.

## III. JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action because pursuant to 28 U.S.C. §§ 1331 and 1367 because this is a civil action arising under the Constitution, laws, or treaties of the United States and because all other claims herein are so related to claims in the action within

such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

19. This Court further has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds sum or value of $5,000,000, exclusive of interest and costs, and in which at least one class member is a citizen of a state different from any defendant and in which at least one class member is a citizen or subject of a foreign state and any defendant is a citizen of a State.

20. This Court has personal jurisdiction over Fenwick pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure § 410.10 because (1) Fenwick is "home" in California subject to the general jurisdiction of its courts at because it is formed under the laws of California, has its principle place of business in California, and because at least one of its partners is an individual citizen and resident of California and (2) because this suit arises out of and relates to Fenwick's contacts in California.

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because (1) the Defendant is a resident of this District and (2) a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV. CONDITIONS PRECEDENT

22. All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## V. FACTUAL ALLEGATIONS

### A. The Rise of FTX

23. In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

24. FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles

for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[4]

25.     All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

26.     FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

27.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

28.     FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds.

29.     By structuring the rates of returns in this way, FTX targeted nascent investors—i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

30.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll

---

[4] *See United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, S5 Cr. 673 (LAK), Dkt. 115, Superseding Indictment at ¶ 2 (March 28, 2023).

cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

31.  FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)." In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."   The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

32.  FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

33.  FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought

permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

34. FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

35. More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users'

names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

36.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

37.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

38.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion *per day* and its valuation topped $32 billion within three years of its founding.

### B.     FTX's Key Players

#### (1)     *Sam Bankman-Fried*

39.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

40.     Prior to that, the Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda, in November 2017,[5] after stints in the charity world and at trading firm Jane Street.[6] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

41.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in *USA v. SBF*, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.,* Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

**(2)     *Caroline Ellison***

42.     By 2018, Bankman-Fried had persuaded Ellison to join him at Alameda. Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

43.     In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team at Alameda included Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

44.     After Bankman-Fried established FTX in 2019, Ellison began taking more responsibility at Alameda.

45.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance

---

[5] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[6] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[7]

46.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

47.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[8]

48.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

**(3)     *Gary Wang***

49.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

50.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[9]

51.     Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the

---

[7] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

[8] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

[9] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

Future Fund's website.[10] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

52.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

53.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[11]

54.     At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[12]

55.     In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

**(4)     *Nishad Singh***

56.     Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

---

[10] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

[11]     https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed May 11, 2023).

[12] https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctws%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

57.     Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

58.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[13]

59.     Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[14]

60.     "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

61.     Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

62.     After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

63.     "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[15] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

---

[13]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[14] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

[15] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

64.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[16] A similar relationship may be in place at FTX's core properties.[17]

65.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

### C.  The Basics of a Cryptocurrency Exchange

66.     In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. There is a big difference, however, in regard to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

67.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

68.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

69.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

    a)  Trade it for another cryptocurrency

    b)  Trade it for fiat currency

    c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

---

[16] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[17] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

1  These things could be done in whole or in part. Ledger entries would (and should) be made internally

2  by the exchange to account for changes in positions and applicable balances.

3         70.    The exchange accounts should very much be regarded as being custodial in nature. This

4  means that the customer does not *control* access to the assets 'in' their account. The customer needs

5  to make a request to the exchange to be able to access and send those balances. The exchange then

6  debits the user account and sends the assets. Whether or not such requests are processed are dependent

7  on the willingness, ability, and approval of the exchange.

8         71.    One major factor the affects the exchange's ability to process such requests is whether

9  or not they have the assets and/or capital necessary to do so.

10         72.    For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should*

11  have enough assets in custody for the benefit of their customers to cover their liabilities to their

12  customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly

13  violated their own terms of service:

14        Title to your Digital Assets shall at all times remain with you and shall not

15        transfer to FTX Trading. As the owner of Digital Assets in your Account, you
         shall bear all risk of loss of such Digital Assets. FTX Trading shall have no

16        liability for fluctuations in the fiat currency value of Digital Assets held in your
         Account."

17        None of the Digital Assets in your Account are the property of, or shall or
         may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital

18        Assets in User's Accounts as belonging to FTX Trading.

19        You control the Digital Assets held in your Account. At any time, subject to
         outages, downtime, and other applicable policies (including the Terms), you

20        may withdraw your Digital Assets by sending them to a different blockchain
         address controlled by you or a third party.[18]

21

22         73.    While FTX violated their own terms of service, it would also have been true that some

23  of these claims would have been demonstrably false to begin with even if there was hypothetically no

24  wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account

25  with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.*

26  This means that the customer does not control access to the assets 'in' their account. The customer

27  needs to make a request to the exchange to be able to access and send those balances. It is very much

28

---

[18] https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

74.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

75.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

76.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

77.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regard to the type of assets in which they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

78.     Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor

is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

79.     Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance.

### D. The Mechanics of the Fraudulent Scheme

80.     The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

81.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

82.     Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

83.     Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

84.     Frequently, SBF routed his fraudulent scheme through Alameda LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led

Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

85.     Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

86.     Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

87.     SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

88.     Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX Insiders effectively looted the company. Even during the crypto boom, the FTX Insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

89.     More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

90.     SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms.

1  Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky

2  bets and to cover Alameda's colossal losses.

3      91.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways.

4  Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that

5  representation, FTX exempted Alameda from the automated "risk engine" described in Paragraphs

6  33-34, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—

7  and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to

8  maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance

9  cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position

10  on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize

11  the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65

12  billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay

13  this line of credit, having spent the money on insider transfers and purported "loans," gifts, and

14  questionable investments.

15      92.    With these exemptions—exemptions offered to no other customers on the exchange—

16  FTX extended Alameda a de facto limitless line of credit.

17      93.    Upon information and belief, SBF also employed Alameda to funnel Class Member

18  funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection,

19  Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those

20  funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda

21  had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

22      94.    The improper relationship between Alameda and FTX was well known to the

23  companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of

24  Alameda, told a federal judge in Manhattan when entering her guilty plea:

25      From approximately March 2018 through November 2022, I worked at Alameda
    Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.

26

27      From 2019 through 2022, I was aware that Alameda was provided access to a
    borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-
    Fried. I understood that FTX executives had implemented special settings on

28      Alameda's FTX.com account that permitted Alameda to maintain negative balances in
    various fiat currencies and crypto currencies. In practical terms, this arrangement

permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.

While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[19]

95.     *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video

call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh)

[19]     https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[20]

96.    Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[21]

97.    FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

98.    FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

---

[20]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

[21]    https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

99.     FTX Insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

100.    At no time did FTX disclose the foregoing to Class Members, including that:

a)  SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

b)  FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

c)  FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

d)  FTX and Alameda were not, in fact, "wholly separate entit[ies]" operating  at "arm's length," and were instead operated as a common enterprise;

e)  SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

f)  SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

g)  SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

h)  Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

i)  With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

j)  FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

k)  FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

101. Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**E. The Fraud's Collapse**

102. The FTX.com exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[22]

103. FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

104. Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

105. At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities, like the named MDL Defendants, in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[23]

106. Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX

---

[22] https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

[23] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

107. Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

108. In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[24] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

109. Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[25]

110. Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and,

---

[24] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[25] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.[26]

111.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[27] In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[28] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

112.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[29]



---

[26]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[27]    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[28]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[29]    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).





SBF ✓ @SBF_FTX · Nov 10

2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly. But of course it's on me that we ended up there in the first place.

💬 218    ↻ 391    ♡ 4,939    ↥



SBF ✓ @SBF_FTX · Nov 10

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH. THERE ARE APPROXIMATIONS HERE.]

💬 259    ↻ 639    ♡ 3,873    ↥



SBF ✓ @SBF_FTX · Nov 10

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals. The liquidity varies widely, from very to very little.

💬 174    ↻ 636    ♡ 3,592    ↥



SBF ✓ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin. I thought it was way lower.

💬 251    ↻ 749    ♡ 3,407    ↥



**SBF** ✓ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours. We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241    🔁 907    ♡ 3,823    ⬆️

---

**SBF** ✓ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough. I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116    🔁 278    ♡ 2,882    ⬆️

---

**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are. Which sucks, and that's on me.

I'm sorry.

💬 155    🔁 357    ♡ 3,122    ⬆️

---



**SBF** ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that. To take responsibility, and do what I can.

💬 162    🔁 357    ♡ 3,715    ⬆️



















SBF ✔ @SBF_FTX · Nov 10

17) All of the stakeholders would have a hard look at FTX governance. I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

💬 137          ⟲ 198          ♡ 1,878          ⬆️



SBF ✔ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

💬 144          ⟲ 158          ♡ 1,970          ⬆️



SBF ✔ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International. FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid. Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406          ⟲ 760          ♡ 2,776          ⬆️



SBF ✔ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses. So for now, all I'll say is:

well played; you won.

💬 1,532          ⟲ 3,303          ♡ 8,047          ⬆️





### F. FTX Files for Bankruptcy

113.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[30]

114.    At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[31]

115.    Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even

---

[30]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

[31]    https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

admitted that "FTX used customer money to help Alameda meet its liabilities."[32] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[33]

116. The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

117. On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

118. The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

119. The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of

---

[32] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

[33] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

corporate controls and such a complete absence of trustworthy financial information as occurred here."

Moreover, Mr. Ray uncovered that:

> **First**, customer assets from FTX.com were commingled with assets from the Alameda trading platform.
>
> **Second**, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.
>
> **Third**, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.
>
> **Fourth**, loans and other payments were made to insiders in excess of $1 billion.
>
> **Fifth**, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

120. On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as Exhibit D (the "First Interim Rpt.").

121. Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

> the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.
>
> Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

> Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

122. After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

123. According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

124. The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

125. The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a)  Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

b)  Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

c)  Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

d)  Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14;

e)  "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

f)  "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15;

g)  the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

h)  "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging,"

including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

i) "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.*, 17;

j) Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k) On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the Deceptive FTX Platform, *Id.*, 18–22; and finally

l) There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets,"

and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

126. Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

### G. Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct

127. From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[34] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the

---

[34] https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

128. Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[35] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[36] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[37] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[38]

129. Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[39] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729

---

[35] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[36] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

[37] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[38] Id.

[39] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[40]

130.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[41] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[42] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze – that's about one out of every four dollars reported lost, more than *any* other payment method."[43] The median individual loss was a staggering $2,600.

131.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

---

[40] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[41] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[42] *Id.*

[43] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

"Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[44]

132.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[45]

133.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[46] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

134.    For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike the MDL Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring MDL Defendants, exploited their

---

[44] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[45] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[46] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

### H. The Role of Fenwick.

#### a. Fenwick Forms a Close Relationship with FTX.

146. From 2017 through FTX's implosion in November 2022, Fenwick's partners and high-level associates served as legal counsel on a myriad of matters for FTX US and FTX Trading Ltd., advising on legal and compliance matters and significant transactions.

147. The relationship between Fenwick and FTX was exceedingly close in large part because Fenwick supplied a pipeline of key personnel to FTX Group, namely attorneys Daniel Friedberg and Can Sun, who went directly from Fenwick to FTX Group entities. Together Friedberg and Sun were key to concealing Bankman-Fried's fraud from public view and worked in conjunction with their former law firm in doing so.

148. Friedberg joined Fenwick in 2014, and from 2017 to 2019, he came to work closely with Bankman-Fried and the FTX Group, providing legal advice in connection with general corporate and tax matters, including the formation of specific subsidiaries. During that time, Joe Bankman, Bankman-Fried's father, urged Bankman-Fried and others to give Friedberg a central role and to keep Friedberg "in the loop . . . so we have one person on top of everything."

149. Friedberg led Fenwick's burgeoning cryptocurrency practice, and while doing so vouched for Bankman-Fried.

150. At the time Friedberg joined Fenwick, it would have been well known to Fenwick that Friedberg had only recently been associated with another fraud arising from a cheating scheme facilitated by the online poker site Ultimate Bet. For years prior, Ultimate Bet allowed certain players to employ "God-mode," which allowed them to see the hands held by their unsuspecting competitors. Victims of the scandal lost an estimated $40 million to the players employing "God-mode" to cheat others. At the time, Friedberg was an executive at the software company that managed Ultimate Bet. Rather than report the scandal to the public, Mr. Friedberg sought to cover it up, suggesting that Ultimate Bet tell the public that an outside consultant "took advantage of a server flaw by hacking into the client," and that Ultimate Bet was "unable to identify exactly when" the hacking occurred. In 2013,

just one year before Friedberg joined Fenwick, news broke of Mr. Friedberg's attempts to suppress the truth about Ultimate Bet.

151. In January 2020, FTX made Friedberg a lucrative offer to leave Fenwick to serve as not only FTX US's Chief Compliance Officer, but also as General Counsel of Alameda. As time passed, Friedberg would also hold other titles at the FTX Group, including Executive Vice President and Chief Regulatory/Compliance Officer of FTX US, General Counsel of Alameda and Chief Regulatory Officer and General Counsel of FTX Trading Ltd. Friedberg also served as the Secretary for the Board of Directors at several FTX Group entities including FTX Digital Markets Ltd., FTX Property Holdings Ltd., and FTX US. Friedberg was also an officer of FTX Digital Markets Ltd., and FTX US, and served on the Risk and Compliance Committee of FTX US's Board of Directors.

152. Friedberg's responsibilities among the many hats he wore at the various FTX entities included managing risk and overseeing all legal needs for the FTX Group. As Friedberg confirmed in a recent sworn declaration, he "oversaw all lawyers—as needed—to efficiently deliver legal services" to the FTX Group organizations. Friedberg was indeed considered one of the key decisionmakers within the FTX Group and was routinely identified as a member of the senior executive team.

153. For its part, Fenwick continued to routinely advise both FTX US and FTX Trading Ltd. as well Alameda on wide-ranging matters and generally assisted Friedberg and Sun in carrying out their work.

**b. Fenwick's Knowledge of & Assistance in FTX's Wrongdoing.**

154. Through the relevant period, 2017 through November 2022, Fenwick, as counsel to the FTX entities, had placed itself in a unique position to gain deep insight into the FTX entities' convoluted organizational structure, abject lack of internal controls, and dubious business practices.

155. The provision of Fenwick's services involved and required due diligence and monitoring, including, for example, reviewing the organizational documents for the FTX entities, including certificates of incorporation or formation, by-laws and other agreements and understanding the purpose of business entities formed (e.g., North Dimension Inc.); reviewing customer contracts and reviewing finance documents including intracompany loans or other related party agreements, guarantees and promissory notes; and investigating FTX and Alameda business practices to defend

against litigation, including in at least one lawsuit alleging illegal racketeering activity.

156.    Importantly, through their work and diligence, Fenwick would have necessarily been aware of the representations FTX US and FTX Trading Ltd. made to their customers and/or regulators. Notably, Fenwick invoices indicate that Fenwick reviewed "FTX terms of service."

157.    In the FTX US terms of service, FTX US represented to customers that:

   a. "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit";

   b. "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and

   c. that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."

158.    Similarly, in the FTX Trading Ltd. terms of service, FTX Trading Ltd. represented to its customers that:

   a. "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading";

   b. "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"; and

   c. "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

159.    In providing services and assistance to the various FTX entities, and from its close ties with its former attorneys in Friedberg and Sun, Fenwick learned that the FTX entities were breaching their fiduciary duties to customers, acting inconsistently with their representations to customers, and even misappropriating customer funds. Not only did Fenwick provide legal assistance despite this knowledge, but it helped to create accounts and entities where and through which misappropriated customer funds were diverted.

160.    For example, in 2020, Fenwick helped to establish and draft the incorporation papers for North Dimension Inc. ("North Dimension") and its sister company, North Wireless Dimension, the fake electronics retailer that Bankman-Fried employed as a front to conceal his wiring of Class Member funds into accounts held by Alameda.

161. On August 25, 2020, Friedberg directed the formation of North Dimension, emailing two of his former Fenwick partners and directing them as follows:

> "We need two new subsidiaries asap: North Wireless Dimension Inc. North Dimension Inc. Both Delaware corporations Owned by Alameda Research LLC Disregarded for tax purposes."

162. Through the formation and management of these entities, and in advising FTX US on its representations to regulators, Fenwick helped obfuscate where FTX US was holding customer money. Specifically, beginning in April 2021, after a bank opened accounts for North Dimension, the aforementioned bank accounts received tens of millions of dollars in customer funds from FTX.com. The funds in these accounts were then commingled with other FTX Group funds, and ultimately were used by the FTX Insiders to back highly speculative and unhedged cryptocurrency trading and fund hundreds of so-called "venture investments," as well as to make purported personal "loans," bonuses, real estate purchases, and charitable and political contributions for the FTX founders.

163. As to the North Dimension entities, Fenwick drafted memoranda and otherwise advised FTX US, often through their former partner Friedberg, regarding FTX US's regulatory obligations, including its obligations under the Federal and State Money Transmission Rules.

164. Fenwick was privy to the nature of reckless treatment of FTX customer funds through their communications with FTX executives and their own services. In January 2021, for example, Friedberg emailed Fenwick attorneys and expressly told them that not only did Alameda hold FTX cash and cryptocurrency (a breach of FTX US's duty to exercise reasonable care with its customer deposits) but that "we" (referring to FTX[47] and Fenwick) needed to come up with any justification for the arrangement. He wrote: "[s]ome FTX cash and crypto is held by Alameda for the benefit of FTX customers. As we wade into the audit, the explanation here is important. We propose a 'cash management' agreement between the affiliates somehow where FTX gets first dibs on Alameda's cash."

165. A later exchange between Friedberg and Fenwick attorneys underscores that Fenwick knew that Friedberg was concerned by the possible release of information revealing that FTX was keeping customer money outside of FTX entities.

---

[47] Friedberg did not specify whether "FTX" was referring to both FTX US and FTX Trading Ltd.

- <u>Friedberg to Fenwick</u>: "What are the public disclosures that will likely be required with respect to the intercompany relationships between Alameda Group and FTX? How detailed?"

- <u>Fenwick to Friedberg</u>: "Yes, we'll need to disclose of [sic] the material terms of all related party transactions . . . This could be very problematic given that this'd [sic] likely draw in all of our intercompanies, including the FTT docs."

166. Recognizing both the issue and Frieberg's facially improper aim on behalf of the FTX entities, Fenwick offered to assist by proposing to Friedberg that an "Intercompany Treasury Management and Loan Agreement" be entered into - under which Alameda would perform "treasury management functions" for FTX. Fenwick attorneys would go on to draft intercompany agreements for the FTX entities and Alameda to allocate costs and manage the flow of cash among these entities.

167. Fenwick also provided legal and commercial advice on a number of FTX's business transactions, including FTX Trading Ltd.'s Series B and B-1 capital raises However, the firm has since deleted all announcements regarding these deals, along with the vast majority of other materials linking the firm to FTX.

168. One transaction of particular note was FTX US's October 2021 acquisition of LedgerX LLC, rebranded as FTX US Derivatives ("LedgerX"), for which Fenwick provided legal and commercial counsel. LedgerX was a digital currency futures and options exchange regulated by the CFTC, which had granted licenses to LedgerX to operate as a Designated Contract Market ("DCM"), a Swap Execution Facility ("SEF"), and a Derivatives Clearing Organization ("DCO"). These licenses provided access to the U.S. commodities derivatives markets as a regulated exchange, and, with its acquisition of LedgerX, FTX acquired that access in one fell swoop. With the help of Fenwick, FTX was able to leverage these three licenses in subsequent applications to the CFTC and other regulators.

169. Zach Dexter, whom FTX installed as CEO of LedgerX once the transaction was finalized, touted the acquisition as one that would enhance both FTX's regulatory compliance and the safety of the FTX exchange. Mr. Dexter asserted that these were top priorities for the company in announcing the acquisition:

> As the regulatory environment in the crypto ecosystem continues to evolve, we look forward to acting as a resource and an example of how the protections afforded by proper regulatory oversight and licensing can boost consumer confidence and facilitate safe and reliable exchange platforms. The most important facet of this acquisition of LedgerX is that it allows us to do that. FTX US Derivatives will

continue to strive to be a part of the regulation conversation and ensure that the operational standards required by the CFTC are maintained.

At other times, Bankman-Fried explained that FTX pursued acquisitions like LedgerX, which were purportedly driven by regulatory and compliance considerations, because what matters most "is transparency and protection against fraud."

170.    Contrary to these representations, Bankman-Fried later admitted to journalists that FTX's public commitment to regulatory compliance was "just PR," to which he added:

fuck regulators

they make everything worse

171.    These admissions highlight the FTX entities' true reasons for acquiring necessary licenses by way of acquisition like LedgerX. Rather than obtain these licenses through application to the licensing agencies, where the FTX entities would face "uncomfortable questions" from regulators, the FTX entities instead purchased other companies that already held the licenses it needed. This allowed the FTX entities to circumvent the scrutiny of regulators like the CFTC, while fostering "the cleanest brand in crypto" and concealing the fraud that pervaded through their organization. This strategy had the added benefit of providing Bankman-Fried access to meetings and other avenues for lobbying the same regulators he privately denigrated, not to push for heightened customer protections or regulatory oversight, as he claimed publicly, but to lobby for more lenient regulations in the crypto space. In this manner, Fenwick helped to design the FTX entities licensing by acquisition strategy in furtherance of Bankman-Fried's fraud.

172.    Fenwick assisted FTX's regulatory dodge more broadly as well. In a filing with the CFTC, FTX US disclosed that "FTX US monitors both Federal and State level development with its outside legal counsel, Fenwick & West LLP. FTX US has worked closely with Fenwick & West LLP on the development of its BSA program, as well as documentation and compliance assessments."

Fenwick helped FTX US to develop "compliance" procedures designed to skirt FTX's regulatory obligations and/or conceal its noncompliance therewith.

173.    In aiding the FTX entities with their wrongdoing, Fenwick was motivated by the substantial fees it would enjoy in return for the services it rendered to the FTX entities at the behest of Bankman-Fried, Friedberg and others at FTX,,in bolstering its reputation as a law firm on the cutting edge of cryptocurrency issues and holding itself out as the premier cryptocurrency firm.

174.    Notably, the many issues plaguing the FTX entities were so obvious that, when a new CEO was appointed to take over the FTX entities on November 11, 2022, it only took six days for him to conclude that the failures were greater than anything he had encountered in his 40-year career packed with legal and restructuring experience.

175.    Specifically, on November 17, 2022, John J. Ray III, the new CEO, declared, in a declaration in support of Chapter 11 petitions, that:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

## VI.    CLASS ACTION ALLEGATIONS

176.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.  Class Definitions

177.    Plaintiffs Rupprecht and Winter seek to represent the following International Class and Plaintiffs Cabo, Henderson, and Shetty seek to represent the following Nationwide Class:

**(1) International Class:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

**(2) <u>Nationwide Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

Excluded from the Classes are the MDL Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

178.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which MDL Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

### B. Numerosity

179.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

### C. Commonality/Predominance

180.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities committed fraud, negligence, and/or breached fiduciary duties;

(b) whether the Defendant agreed with FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities to deceive FTX customers and/or commit fraud;

(c) whether the Defendant had the requisite degree of knowledge of FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities' fraud and/or negligent acts;

(d) whether Defendant aided in the FTX Group entities' substantial interference with Plaintiffs' and Class Members' property in a manner in inconsistent with their property rights, by misappropriating or comingling those funds;

(e) the type and measure of damages suffered by Plaintiffs and the Class.

(f) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(g) whether Plaintiffs and Class members are entitled to injunctive relief;

(h) whether Plaintiffs and Class members are entitled to declaratory relief; and

(i) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendant's conduct.

### D. Typicality

181. Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's Deceptive FTX Platform, that MDL Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX insiders, and/or FTX, or that Defendant agreed with Bankman-Fried, the FTX insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

### E. Adequacy of Representation

182. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs

intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## F. Requirements of Fed. R. Civ. P. 23(b)(3)

183. The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendant (1) in marketing, offering, and/or selling the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, (3) in aiding and abetting fraud, breach of fiduciary duty and/or conversion by Bankman-Fried, FTX and the FTX insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

184. The common course of conduct by MDL Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the Deceptive FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

185. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

186. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G. Superiority

187. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H. Requirements of Fed. R. Civ. P. 23(b)(2)

188.   The MDL Defendants has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

189.   The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I. Requirements of Fed. R. Civ. P. 23(c)(4)

190.   As it is clear that one of the predominant issues regarding MDL Defendants' liability is whether the Deceptive FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

191. As it is clear that another predominant issue regarding MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J. Nature of Notice to the Proposed Class.

192. The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## VII.   CAUSES OF ACTION

### COUNT 1

### Civil Conspiracy

193. Plaintiffs hereby incorporate the allegations in all preceding paragraphs as if fully set forth herein.

194. There was an express or implied agreement between, on the one hand, FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities and, on the other hand, Fenwick, to deceive Class Members, and to commit the wrongful conduct described herein, namely FTX Group's fraud and conversion of Class Members' property.

195. Through the course of its due diligence, long and close relationship with, and representation of FTX US and FTX Trading Ltd., Fenwick knew of FTX US and FTX Trading Ltd.'s omissions, untruthful and fraudulent conduct, and misappropriation of Class Members' funds. Despite this knowledge, Fenwick stood to gain financially from the FTX Group's misconduct and so agreed, at least impliedly, to assist that unlawful conduct for its own gain.

196. Fenwick agreed with its co-conspirator(s) to commit the overt acts alleged herein, each in furtherance of fraud and conversion of Class Members' property, including (1) forming shell entities, including North Dimension and North Wireless Dimension, through which FTX Group

siphoned misappropriated Class Members' funds; (2) structuring acquisitions and other transactions by which FTX US expanded its product offerings—and, by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses to operate in desired markets; and (3) generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

197.    These acts were made in concert and pursuant to an agreement between Fenwick and its co-conspirator(s).

198.    But for the overt acts taken by Fenwick and their co-conspirator(s), the conspiracy would not have been able to carry out the FTX fraud to commingle and/or misappropriate customer funds. Plaintiffs and Class Members have suffered particularized harms from the foregoing conspiracy to commit fraud and conversion.

199.    As a result of this civil conspiracy, Plaintiffs and the Class suffered damages, including the loss of their ability to retrieve their fiat currency or digital assets as a result of the insolvency of FTX US and FTX Trading Ltd. Thus, Fenwick's actions, in combination with the actions of Friedberg, Bankman-Fried, and his co-conspirators, are a proximate cause of actual damages to Class Members. And a result of this conduct, Fenwick is jointly and severally liable for these damages.

## COUNT 2

### Common Law Aiding and Abetting Fraud

200.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

201.    FTX US and FTX Trading Ltd. assured customers that they were holding their deposits in their accounts for the customers' benefit and that they would not convert their funds improperly.

202.    For example, FTX US represented to customers (i) that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit"; (ii) that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and (iii) that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."

203.    Similarly, FTX Trading Ltd. represented to its customers that, with respect to assets in their account, (i) "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading"; (ii) "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"; and (iii) "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

204.    FTX Trading Ltd. and FTX US intended that customers rely on these representations and, indeed, gave customers assurances that their assets were safe was critical in inducing customers to trust the entities with their assets.

205.    The customers of FTX Trading Ltd. and FTX US relied on these representations in entrusting their assets with those entities.

206.    It was reasonable for the customers to rely on these representations as, from all appearances, FTX Trading Ltd. and FTX US were responsible corporate entities whose principals had sought the counsel of large sophisticated law firms like Fenwick for operational and compliance related counsel.

207.    At the time FTX Trading Ltd. and FTX US made these representations, they knew the representations were false. Specifically, at the time of these representations:

   a)  FTX Trading Ltd. and FTX US were not holding Class Member funds strictly for their benefit, instead commingling those funds in FTX Group's omnibus accounts and treating those funds as FTX Group's own;

   b)  Bankman-Fried was siphoning and otherwise misappropriating Class Member funds to his friends and family members or for his own personal use;

   c)  FTX US and Alameda were not, in fact, "wholly separate entit[ies]" operating at "arm's length," and were instead operated as a common enterprise;

   d)  Friedberg directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

   e)  Bankman-Fried routinely transferred Class Member funds out of accounts held by the FTX entities to those held by Alameda, under the guise of "related party transactions" and "loans";

   f)  Bankman-Fried was using Class Member funds to underwrite his speculative personal investments at Alameda;

g) With the foregoing exemption, Alameda engaged in margin trading on the FTX trading platforms, exposing Class Members to the risks of Alameda's losses;

h) FTX Group used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

i) The FTX entities did not have in place fundamental internal controls, including an independent board of director or a CFO.

208. The customers' reliance on FTX US and FTX Trading Ltd.'s representations was a substantial factor in causing their harm. Specifically, based on the assurances from those entities, customers allowed those entities to hold their assets. Had they known the truth, they would have never entrusted the entities with their assets.

209. Fenwick aided and abetted the fraud of FTX Trading Ltd. and FTX US.

210. Through its representation of the FTX entities, Fenwick acquired knowledge of FTX Trading Ltd. and FTX US's misrepresentations and omissions to customers, untruthful conduct, and misappropriation of Class Members' funds. In spite of this knowledge, Fenwick stood to gain financially from FTX Group's misconduct and substantially assisted and encouraged the FTX Group's misconduct.

211. Fenwick substantially assisted and encouraged FTX Trading Ltd. and FTX US's fraud, including by (1) forming shell entities, including North Dimension and North Wireless Dimension, through which FTX Group siphoned Class Members funds; (2) structuring acquisitions and other transactions by which FTX US expanded its product offerings—and, by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses; and (3) generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

212. Fenwick knew that FTX Trading Ltd. and FTX US had omitted certain material facts, including, inter alia, regarding the above transactions involving North Dimension and LedgerX and the safety and viability of their entities to induce confidence in their platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Bankman-Fried and his co-conspirators' stakes in FTX. These omissions were material, as they would

have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX. In fact, Class Members reasonably relied on one or more of these representations as a substantial factor influencing their decision to do business with FTX, including by accepting these statements without an independent inquiry into their veracity.

213. Notwithstanding Fenwick's knowledge, and by reason of the conduct described above, Fenwick substantially assisted and encouraged FTX Trading Ltd. and FTX US in a fraudulent scheme against Class Members, including by the actions set forth above, which were committed within the scope of Fenwick's employment and in furtherance of the firm's business.

214. Thus, Fenwick's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they cannot retrieve their fiat currency or digital assets. Fenwick is thus jointly and severally liable for aiding and abetting this fraudulent scheme.

## COUNT 3

### Aiding and Abetting Negligence, FTX US

215. Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

216. FTX US owed a duty to its customers to act with reasonable care in its transactions with them, including as a result of its representations to customers that (i) "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit"; (ii) "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and (iii) "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." Given these representations, FTX US acted akin to a trustee with respect to its customers.

217. FTX US also had a special relationship with its customers because of, among other things: (i) the fact that any transactions involving customer cryptocurrency or dollars would (and did) uniquely affect customers; (ii) the foreseeability of harm that would result from comingling and misappropriation of customer funds; (iii) the serious harm suffered by customers based on FTX US's actions, including the loss of the customers' cryptocurrency or dollars; (iv) the fact that FTX US's treating of customer assets as its own would—and ultimately did—harm customers; (v) the blame that

could—and should—be assigned to FTX US for its misrepresentations to customers; and (vi) the policy of preventing future harm that would be served by punishing a company that acts like a trustee over customer assets from treating those assets as its own.

218.  FTX US breached its duty of reasonable care to its customers by, among other things:

a)  Commingling Class Member funds in the FTX Group's omnibus accounts and treating those funds as if they were its own;

b)  Allowing Bankman-Fried to siphon Class Member funds to his friends and family members for his own personal use;

c)  Operating with Alameda as a common enterprise;

d)  Directing that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

e)  Allowing Bankman-Fried to routinely transfer Class Member funds out of FTX US accounts held by FTX US to those held by Alameda, under the guise of "related party transactions" and "loans";

f)  Allowing Bankman-Fried to use Class Member funds to underwrite his speculative personal investments at Alameda;

g)  Using Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

h)  Failing to have in place fundamental internal controls, including an independent board of director or a CFO.

219.  Through its representation of FTX US,  Fenwick acquired knowledge of FTX US's negligence, comprised of FTX US's omissions, untruthful conduct, and misappropriation of Class Members' funds.

220.  Notwithstanding Fenwick's knowledge, Fenwick substantially assisted and encouraged FTX Trading Ltd.'s negligence, including by, among other things, forming shell entities, including North Dimension and North Wireless Dimension, through which FTX US and FTX US siphoned Class Members funds.

221.  Fenwick's actions were committed within the scope of the Fenwick's employment with FTX and in furtherance of the firm's business.

222. Thus, Fenwick's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they cannot retrieve the fiat currency or digital assets they entrusted to FTX. Fenwick is thus jointly and severally liable for aiding and abetting this negligence.

### COUNT 4

### Aiding and Abetting Negligence, FTX Trading, Ltd.

223. Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

224. FTX Trading, Ltd. owed a duty to its customers to act with reasonable care in its transactions with them, including as a result of its representations to customers that, with respect to assets in their account, (i) "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading"; (ii) "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"; and (iii) "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading." Given these representations, FTX Trading, Ltd. acted akin to a trustee with respect to its customers.

225. FTX Trading, Ltd. also had a special relationship with its customers because of, among other things: (i) the fact that any transactions involving customer cryptocurrency or dollars would (and did) uniquely affect customers; (ii) the foreseeability of harm that would result from comingling and misappropriation of customer funds; (iii) the serious harm suffered by customers based on FTX Trading, Ltd.'s actions, including the loss of the customers' cryptocurrency or dollars; (iv) the fact that FTX Trading Ltd. treating of customer assets as its own would—and ultimately did—harm customers; (v) the blame that could—and should—be assigned to FTX Trading, Ltd. for its misrepresentations to customers; and (vi) the policy of preventing future harm that would be served by punishing a company that acts like a trustee over customer assets from treating those assets as its own.

226. FTX Trading Ltd. breached its duty of reasonable care to its customers by, among other things:

     a) Commingling Class Member funds in the FTX Group's omnibus accounts and treating those funds as if they were its own;

b) Allowing Bankman-Fried to siphon Class Member funds to his friends and family members for his own personal use;

c) Operating with Alameda as a common enterprise;

d) Directing that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

e) Allowing Bankman-Fried to routinely transfer Class Member funds out of FTX Trading Ltd. accounts held by FTX Trading Ltd. to those held by Alameda, under the guise of "related party transactions" and "loans";

f) Allowing Bankman-Fried to use Class Member funds to underwrite his speculative personal investments at Alameda;

g) Using Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

h) Failing to have in place fundamental internal controls, including an independent board of director or a CFO.

227. Through its representation of FTX Trading Ltd., Fenwick acquired knowledge of FTX Trading Ltd.'s negligence, comprised of FTD Trading Ltd.'s omissions, untruthful conduct, and misappropriation of Class Members' funds.

228. Notwithstanding Fenwick's knowledge, Fenwick substantially assisted and encouraged FTX Trading Ltd.'s negligence, including by, among other things, forming shell entities, including North Dimension and North Wireless Dimension, through which FTX US and FTX US siphoned Class Members funds.

229. Fenwick's actions were committed within the scope of the Fenwick's employment with FTX and in furtherance of the firm's business.

230. Thus, Fenwick's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they cannot retrieve their fiat currency or digital assets. Fenwick is thus jointly and severally liable for aiding and abetting this negligence.

## COUNT 5

### Common Law Aiding and Abetting Fiduciary Breach, FTX US

231. Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

232. FTX US took custody of the Class Member funds. As alleged herein, FTX US represented to customers that (i) "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit"; (ii) "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and (iii) "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."

233. As a custodian of Class Member funds, and by virtue of the representations FTX US made to customers, FTX US owed fiduciary duties to Class Members, including duties of care and loyalty, and were obligated to discharge those duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members. Given FTX US's representations to its customers, FTX US acted akin to a trustee with respect to its customers.

234. Rather than safeguarding Plaintiffs and Class Member funds, FTX US misappropriated their funds in breach of the fiduciary duty owed to Plaintiffs and Class Members and otherwise failed to safeguard their assets. These breaches include, but are not limited to:

a) Participating in and enabling a fraudulent scheme to commingle customer and corporate funds, including through the North Dimension entities;

b) Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and/or did not intent to repay;

c) Abusing or allowing abuse of positions by FTX US officers and Bankman-Fried for their personal gain and to the detriment of the FTX US;

d) Failing to implement or cause to be implemented corporate controls that would have prevented the wrongdoing alleged herein;

e) Failing to investigate credible allegations of fraudulent and illegal conduct brought to its attention and to remediate any issues identified by such investigation.

235. Based on Fenwick's knowledge of the applicable regulatory and legal framework, financial industry, focus on serving crypto clients, and its representation of FTX Trading Ltd., Fenwick acquired knowledge of FTX US's fiduciary duties to Class Members and breaches thereof.

236. Notwithstanding Fenwick's knowledge, Fenwick substantially assisted and encouraged FTX US's breach of fiduciary duties, including by, among other things, forming shell entities, including North Dimension and North Wireless Dimension, through which FTX US and FTX US siphoned Class Members funds.

237. Fenwick's actions were committed within the scope of the Fenwick's employment with FTX and in furtherance of the firm's business.

238. Thus, Fenwick's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they cannot retrieve their fiat currency or digital assets. Fenwick is thus jointly and severally liable for aiding and abetting this breach of fiduciary duties.

## COUNT 6

### Common Law Aiding and Abetting Fiduciary Breach, FTX Trading Ltd.

239. Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

240. FTX US took custody of the Class Member funds. As alleged herein, FTX US represented to customers that (i) "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit"; (ii) "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and (iii) "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."

241. As a custodian of Class Member funds, and by virtue of the representations FTX Trading Ltd. made to customers, FTX Trading Ltd. owed fiduciary duties to Class Members, including duties of care and loyalty, and were obligated to discharge those duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members. Given FTX Trading Ltd.'s representations to its customers, FTX Trading Ltd. acted akin to a trustee with respect to its customers.

242. Rather than safeguarding Plaintiffs and Class Member funds, FTX Trading Ltd. misappropriated their funds in breach of the fiduciary duty owed to Plaintiffs and Class Members and otherwise failed to safeguard their assets. These breaches include, but are not limited to:

    a) Participating in and enabling a fraudulent scheme to commingle customer and corporate funds, including through the North Dimension entities;

    b) Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and/or did not intend to repay;

    c) Abusing or allowing abuse of positions by FTX Trading Ltd. officers and Bankman-Fried for their personal gain and to the detriment of the FTX Trading Ltd.;

    d) Failing to implement or cause to be implemented corporate controls that would have prevented the wrongdoing alleged herein;

    e) Actively contributing to a lack of corporate controls that would have prevented the wrongdoing alleged herein; and

    f) Failing to investigate credible allegations of fraudulent and illegal conduct brought to its attention and to remediate any issues identified by such investigation.

243. Based on Fenwick's knowledge of the applicable regulatory and legal framework, financial industry, focus on serving crypto clients, and its representation of FTX Trading Ltd., Fenwick acquired knowledge of FTX Trading Ltd.'s fiduciary duties to Class Members and breaches thereof.

244. Notwithstanding Fenwick's knowledge, Fenwick substantially assisted and encouraged FTX Trading Ltd.'s breach of fiduciary duties, including by, among other things, forming shell entities, including North Dimension and North Wireless Dimension, through which FTX Trading Ltd. siphoned Class Members funds.

245. Fenwick's actions were committed within the scope of the Fenwick's employment with FTX and in furtherance of the firm's business.

246. Thus, Fenwick's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they cannot retrieve their fiat currency or digital assets. Fenwick is thus jointly and severally liable for aiding and abetting this breach of fiduciary duties.

**COUNT 7**

**Aiding and Abetting Conversion**

247.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

248.    The funds deposited by Class Members into accounts with FTX US and FTX Trading Ltd. were personal property of Plaintiffs and Class Members.

249.    FTX US, FTX Trading, Ltd., Bankman-Fried, Friedberg, and other FTX officers and employees substantially interfered with Plaintiffs' and Class Members' property in a manner inconsistent with their property rights, by taking possession of their funds entrusted to FTX US and FTX Trading Ltd. and misappropriating or comingling those funds without the consent of Plaintiffs and Class Members.

250.    Based on Fenwick's knowledge of the applicable regulatory and legal framework, financial industry, focus on serving crypto clients, and its representation of FTX US and FTX Trading Ltd., Fenwick's attorneys acquired knowledge that such conversion was occurring.

251.    Notwithstanding Fenwick's knowledge, and by reason of the conduct described above, Fenwick substantially assisted and encouraged the conversion of customer funds, including by the actions set forth above, which were committed within the scope of the Fenwick's employment and in furtherance of the firm's business.

252.    Thus, Fenwick's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they cannot retrieve their fiat currency or digital assets. Fenwick is thus jointly and severally liable for aiding and abetting this conversion.

**COUNT 8**

**Federal R.I.C.O., 18 U.S.C. § 1962(d)**

253.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

254.    At all relevant times, and as described below, Fenwick agreed and conspired with Bankman-Fried, Friedberg, FTX Group entities, and others to violate 18 U.S.C. § 1962(c)

255. Bankman-Fried directed and controlled a RICO enterprise through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities, and others aspects of illegal activity alleged below, to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

256. The RICO enterprise, the activities of which affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included Bankman-Fried, Ellison, Friedberg, the FTX Group, and other unnamed co-conspirators. Their association was structured by contracts and agreements between and among them.

257. The RICO enterprise shared a common purpose, which was to (i) convince and assuage potential and existing customers to entrust FTX US and FTX Trading Ltd. with their assets, (ii) conceal their misappropriate of customers' funds and conflict-of-interest activities, and (iii) make their ill-gotten gains available for the co-conspirators personal use in interstate and foreign commerce.

258. The RICO enterprise had a continuity of structure and personnel, and operated as an ascertainable, separate structure. Bankman-Fried was at all times the leader, assisted by Ellison, Wang, Singh, and Friedberg, who reported to Bankman-Fried as co-owners and/or as part of his inner circle. Fenwick attorneys served as the primary legal services providers for the RICO enterprise, assisting in structuring of the enterprise operations.

259. Together these co-conspirators agreed to and did conduct and participate in the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding depositors and customers of FTX US and FTX Trading Ltd. Specifically, they committed multiple related acts of racketeering activity as follows:

a) Bankman-Fried committed multiple acts of wire fraud under 18 U.S.C. § 1343. Specifically, Bankman-Fried devised and perpetrated a scheme to defraud customers and potential customers of FTX cryptocurrency exchanges for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promise and transmitted or caused to be transmitted by means of wire, radio, or television communication in intrastate or foreign commerce various writings, signals, pictures, and sounds for the purpose of executing their scheme;

b) Bankman-Fried committed multiple violations of 18 U.S.C. § 1952, prohibiting intrastate state or foreign travel in aid of racketeering enterprise. Specifically, Bankman-Fried traveled in interstate or foreign commerce with intent to distribute the proceeds of his unlawful activity and otherwise promote, manage, establish, carry on,

and facilitate the promotion, management establishing and carrying out of his unlawful acidity. This unlawful activity for purposes of this violation includes money laundering in violation of 18 U.S.C. § 1956 and indictable violations of U.S. Code, Chapter 31, Subchapter II, prohibition false reporting of monetary transactions.

c) Bankman-Fried committed numerous acts of money laundering in violation of 18 U.S.C. § 1956. Specifically, Bankman-Fried with the knowledge that the property involved in financial transactions as to which he and/or the FTX entities were parties represented proceeds of unlawful activity, did in fact conduct and attempt to conduct financial transactions that involved the proceeds of that unlawful activity and were intended to promote the carrying on of that unlawful activity.

d) Bankman-Fried engaged in numerous transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957. Specifically, Bankman-Fried repeatedly deposited funds derived from their unlawful RICO enterprise by and through financial institutions in the United States and abroad, and thereby affected interstate and foreign commerce.

e) Bankman-Fried and Ellison operated an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960. Specifically, Bankman-Fried, Ellison, and Friedberg operated Alameda as a money-transmitting business by directing wire transfers to that entity and proceeding to distribute those funds at their discretion. Alameda is not a licensed money transmitting business in any jurisdiction and its activities involved the transportation of funds that were intended to be used to promote or support unlawful activity.

f) Bankman-Fried and Ellison engaged in access device fraud in violation of 18 U.S.C. § 1029(a). Specifically, Bankman-Fried and Ellison knowingly and with intent to defraud trafficked in and/or used one or more unauthorized access devices during any one year period and by such conduct obtained anything of value during the period.

260. As a part of and in furtherance of the above violations and coordinated scheme to defraud, Bankman-Fried, FTX US, and FTX Trading Ltd. made numerous material omissions to the Plaintiffs and Class Members with the intent to defraud and deceive the Plaintiffs and Class members, as alleged above.

261. Additionally, Bankman-Fried used and invested the income received through the pattern of racketeering activity to operate the RICO enterprise, the FTX Group operations, and to enrich himself and his friends, including Ellison, which caused the Plaintiffs and Class Members to suffer damages. This income further allowed Bankman-Fried and his inner-circle to perpetuate the operation of the enterprise and to continue to defraud the Plaintiffs and the Class members.

262. These related criminal acts had the same or similar purpose, results, participants, victims and methods of commission, and are otherwise related, which are not isolated events, such that they constituted a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

263. For its part, Fenwick facilitated the scheme to defraud and RICO enterprise by agreeing to provide and providing legal services to FTX US and FTX Trading Ltd., including through advice and counsel to Friedberg, an officer of both FTX entities. Fenwick did so knowingly, or recklessly, or with willful blindness to the nature of the RICO enterprise, but within the scope of the Fenwick's employment and in furtherance of the firm's business. In fact, in exchange for Fenwick's counsel in these matters, FTX paid Fenwick significant fees.

264. Fenwick had the specific intent to participate in the overall RICO enterprise, which is evidenced by its words and conduct in providing substantial assistance in facilitating the misappropriation of customer funds and the concealment of that misappropriation. Further, Fenwick reasonably calculated this assistance to shield the comingling and misappropriation of customer funds and to generally obfuscate the scheme to defraud Plaintiffs and members of the Class.

265. Fenwick agreed, at least impliedly, with Friedberg and/or one or more of his co-conspirators to commit overt acts in furtherance of these activities, including (1) forming shell entities, including North Dimension and North Wireless Dimension, through which FTX US and FTX Trading Ltd. siphoned Class Members funds; (2) structuring acquisitions and other transactions by which FTX US expanded its product offerings—and, by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses; and (3) generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

266. Notwithstanding Fenwick's knowledge, and by reason of the conduct described above, Fenwick participated with the FTX Group entities, Friedberg, and Bankman-Fried in a fraudulent scheme against Class Members, including by the actions set forth above, which were committed within the scope of the Fenwick's employment with FTX and in furtherance of the firm's business.

267.   In this manner, the Fenwick formed an illegal agreement to violate the substantive provisions of the RICO statute set forth above, and thus are jointly and severally liable for the acts of their co-conspirators, including Bankman-Fried and Friedberg.

268.   By reason, and as a result thereof, Fenwick's conduct and participating in the racketeering activity described herein has caused Plaintiffs and the Class Members to directly incur significant damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.   Certifying the Class as requested herein;

b.   Awarding actual, direct and compensatory damages;

c.   Awarding restitution and disgorgement of revenues;

d.   Awarding declaratory relief as permitted by law or equity, including declaring the Defendant's practices as set forth herein to be unlawful;

e.   Awarding injunctive relief as permitted by law or equity, including enjoining the Defendant from continuing those unlawful practices as set forth herein, and directing the Defendant to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.   Awarding statutory and multiple damages, as appropriate;

g.   Awarding attorneys' fees and costs; and

h.   Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, hereby demand a jury trial as to all claims so triable.

Dated: August 7, 2023

Respectfully submitted,

By: */s/ William Audet*

WILLIAM M. AUDET (CA SBN 117456)
LING (DAVID) Y. KUANG (CA SBN 296873)
KURT D. KESSLER (CA SBN 327334)
  waudet@audetlaw.com
  lkuang@audetlaw.com
  kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
  711 Van Ness Avenue, Suite 500
  San Francisco, CA 94102-3275
  Telephone: (415) 568-2555
  Facsimile: (415) 568-2556

*Counsel for Plaintiffs, individually, and
on behalf of all others similarly situated*

RACHEL W. FURST (FL SBN 45155)
FRANCISCO R. MADERAL (FL SBN 41481)
JOHN R. BYRNE (FL SBN 126294)
  rachel@maderalbyrne.com
  frank@maderalbyrne.com
  john@maderalbyrne.com
**MADERAL BYRNE & FURST PLLC**
  2800 Ponce De Leon Boulevard, Suite 1100
  Coral Gables, FL 33134-6933
  Telephone: (305) 520-5690
  Facsimile: (305) 520-5698

*Plaintiffs' Counsel in MDL No. 3076*

DAVID BOIES (NY REG NO. 2296333)
ALEXANDER BOIES (NY REG NO. 5418579)
BROOKE ALEXANDER (NY REG NO. 4678900)
  dboies@bsfllp.com
  aboies@bsfllp.com
  balexander@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
  333 Main Street
  Armonk, NY 10504
  Telephone: (914) 749-8200

ADAM M. MOSKOWITZ (FL SBN 984280)
JOSEPH M. KAYE (FL SBN 117520)
  adam@moskowitz-law.com
  joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
  3250 Mary Street, Suite 202
  Coconut Grove, FL 33133
  Telephone: (305) 740-1423

*Plaintiffs' Co-Lead Counsel for MDL No. 3076*

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1 U.S. Government Plaintiff

2 U.S. Government Defendant

3 Federal Question
*(U.S. Government Not a Party)*

4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | | 710 Fair Labor Standards Act | 820 Copyrights | 430 Banks and Banking |
| | 340 Marine | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | **PERSONAL PROPERTY** | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 370 Other Fraud | | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit |
| 153 Recovery of Overpayment | 360 Other Personal Injury | 371 Truth in Lending | 790 Other Labor Litigation | | 485 Telephone Consumer Protection Act |
| of Veteran's Benefits | 362 Personal Injury -Medical Malpractice | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 490 Cable/Sat TV |
| 160 Stockholders' Suits | | 385 Property Damage Product Liability | | 861 HIA (1395ff) | 850 Securities/Commodities/ Exchange |
| 190 Other Contract | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **IMMIGRATION** | 862 Black Lung (923) | 890 Other Statutory Actions |
| 195 Contract Product Liability | 440 Other Civil Rights | **HABEAS CORPUS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 196 Franchise | 441 Voting | 463 Alien Detainee | 465 Other Immigration Actions | 864 SSID Title XVI | 895 Environmental Matters |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | 865 RSI (405(g)) | 895 Freedom of Information Act |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | **FEDERAL TAX SUITS** | 896 Arbitration |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 870 Taxes (U.S. Plaintiff or Defendant) | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | 871 IRS–Third Party 26 USC § 7609 | |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

1 Original Proceeding

2 Removed from State Court

3 Remanded from Appellate Court

4 Reinstated or Reopened

5 Transferred from Another District *(specify)*

6 Multidistrict Litigation–Transfer

8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** Yes No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only) **SAN FRANCISCO/OAKLAND** **SAN JOSE** **EUREKA-MCKINLEYVILLE**

DATE

SIGNATURE OF ATTORNEY OF RECORD

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a)　**Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

　b)　**County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

　c)　**Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.　**Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

　(1)　<u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

　(2)　<u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

　(3)　<u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

　(4)　<u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.　**Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.　**Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.　**Origin.** Place an "X" in one of the six boxes.

　(1)　<u>Original Proceedings</u>. Cases originating in the United States district courts.

　(2)　<u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

　(3)　<u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

　(4)　<u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

　(5)　<u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

　(6)　<u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

　(8)　<u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

　<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.　**Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. <u>Brief Description</u>: Unauthorized reception of cable service.

VII.　**Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

　<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

　<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.　**Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX.　**Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.