# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:23-cv-22949-XXXX

Rabbitte et al v. SkyBridge Capital II, LLC et al
Assigned to:
Cause: 28:1332 Diversity

Date Filed: 08/07/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Patrick Rabbitte**

represented by **Stuart Andrew Davidson**
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard
Suite 720
Boca Raton, FL 33432
561-750-3000
Fax: 561-750-3364
Email: sdavidson@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mark Girshovich**

represented by **Stuart Andrew Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brandon Orr**

represented by **Stuart Andrew Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leandro Cabo**

represented by **Stuart Andrew Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ryan Henderson**

represented by **Stuart Andrew Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Livieratos**

represented by **Stuart Andrew Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alexander Chernyavsky**

represented by **Stuart Andrew Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| Gregg Podalsky | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Vijeth Shetty | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Chukwudozie Ezeokoli | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Michael Norris | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Edwin Garrison | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Shengyun Huang | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Julie Papadakis | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Vitor Vozza | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Kyle Rupprecht | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Warren Winter | represented by | **Stuart Andrew Davidson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| Sunil Kavuri | represented by | **Stuart Andrew Davidson**<br>(See above for address) |

ATTORNEY TO BE NOTICED

V.

**Defendant**

**SkyBridge Capital II, LLC**

**Defendant**

**Sequoia Capital Operations, LLC**

**Defendant**

**Thoma Bravo, LP**

**Defendant**

**Paradigm Operations LP**

**Defendant**

**Multicoin Capital Management LLC**

**Defendant**

**Tiger Global Management, LLC**

**Defendant**

**Ribbit Management Company, LLC**

**Defendant**

**Altimeter Capital Management, LP**

**Defendant**

**K5 Global Advisor, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/07/2023 | 1 | COMPLAINT against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-16822594, filed by Michael Norris, Alexander Chernyavsky, Warren Winter, Mark Girshovich, Patrick Rabbitte, Sunil Kavuri, Kyle Rupprecht, Shengyun Huang, Michael Livieratos, Brandon Orr, Vijeth Shetty, Edwin Garrison, Vitor Vozza, Julie Papadakis, Gregg Podalsky, Leandro Cabo, Chukwudozie Ezeokoli, Ryan Henderson. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s) Altimeter Capital Management, LP, # 3 Summon(s) K5 Global Advisor, LLC, # 4 Summon(s) Multicoin Capital Management LLC, # 5 Summon(s) Paradigm Operations LP, # 6 Summon(s) Ribbit Management Company, LLC, # 7 Summon(s) Sequoia Capital Operations, LLC, # 8 Summon(s) SkyBridge Capital II, LLC, # 9 Summon(s) Thoma Bravo, LP, # 10 Summon(s) Tiger Global Management, LLC) (Davidson, Stuart) (Entered: 08/07/2023) |

**PACER Service Center**

**Transaction Receipt**

08/07/2023 15:41:19

| PACER Login: | AdamMoskoadam | Client Code: | ftx |
| Description: | Docket Report | Search Criteria: | 1:23-cv-22949-XXXX |
| Billable Pages: | 4 | Cost: | 0.40 |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

COMPLAINT AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................3

THE PARTIES....................................................................................................................6

JURISDICTION AND VENUE ........................................................................................14

FACTUAL ALLEGATIONS ............................................................................................15

    A.    The Rise of FTX ....................................................................................15

    B.    FTX's Key Players...................................................................................20

        1.    Defendant SBF..............................................................................20

        2.    Defendant Caroline Ellison..........................................................21

        3.    Defendant Gary Wang ..................................................................23

        4.    Defendant Nishad Singh ...............................................................24

    C.    The Basics of a Cryptocurrency Exchange...........................................26

    D.    The Mechanics of the Fraudulent Scheme...........................................30

    E.    The Fraud's Collapse .............................................................................38

    F.    FTX Files for Bankruptcy......................................................................48

    G.    The Crypto Sector Is a Hotbed for Illicit Activity and Fraudulent Conduct .........55

    H.    The SEC's Approach to Cryptocurrency ...............................................60

        1.    Overview.......................................................................................60

            a.    *SEC v. Kik* .......................................................................65

            b.    *SEC v. Telegram* .............................................................65

            c.    *SEC v. BlockFi*................................................................67

            d.    *SEC Wells Notice to Coinbase* .......................................67

            e.    *SEC v. Binance*...............................................................70

            f.    *SEC v. Coinbase*.............................................................70

- i -

**Page**

I. FTX's Offer and Sale of YBAs, Which Are Unregistered Securities ..................71

J. FTX's Offer and Sale of FTT Tokens, Which Are Unregistered Securities .........80

K. Using the FTX Platform Itself Necessarily Required Transacting in Unregistered Securities ........................................................................................81

L. FTX Aggressively and Deceptively Marketed Its Platform ...............................85

M. The MDL Defendants' Roles in the Fraud ........................................................95

N. Specific Allegations Concerning the Domestic VC Defendants .......................108

  1. The Domestic VC Defendants' Role in the Rise of FTX .......................108

  2. Due Diligence Conducted by the Domestic VC Defendants .................112

  3. The Regulatory Actions Following the Fall of FTX..............................114

  4. History of Sequoia ...............................................................................116

  5. Sequoia Promotes FTX and SBF ........................................................118

  6. History of Thoma Bravo .......................................................................135

  7. Thoma Bravo Promotes FTX and SBF.................................................136

  8. History of Paradigm..............................................................................145

  9. Paradigm Promotes FTX and SBF........................................................146

  10. History of SkyBridge ............................................................................151

  11. SkyBridge Promotes FTX and SBF......................................................154

  12. History of Multicoin Capital .................................................................171

  13. Multicoin Capital Promotes FTX and SBF...........................................172

  14. History of Tiger Global..........................................................................179

  15. Tiger Global Promotes FTX and SBF ..................................................180

  16. History of Ribbit Capital.......................................................................182

4896-1753-3557.v1

**Page**

17. Ribbit Capital Promotes FTX and SBF ................................. 184

18. History of Altimeter ................................................................ 192

19. Altimeter Promotes FTX and SBF ......................................... 193

20. History of K5 Global ............................................................. 196

21. SBF's Drive to Obtain Celebrity Connections and Political Influence ................................................................................ 197

22. Mr. Kives, Mr. Baum, and K5 Global Received Pecuniary Gain from their Relationship with SBF .......................................... 199

23. The Close Relationship of Messrs. Kives, Baum, and SBF, and of K5 Global and FTX ............................................................... 201

O. Domestic VC Defendants' Fraudulent Scheme and Deceptive Course of Conduct ............................................................................................. 203

P. The Truth Emerges ............................................................................. 205

Q. Sequoia's Additional False and Misleading Statements to Cover Up Its Knowledge of the Fraudulent Conduct by FTX .................................. 213

R. SkyBridge's Additional False and Misleading Statements to Cover Up Its Knowledge of the Fraudulent Conduct by FTX .................................. 216

S. Multicoin Capital's Additional False and Misleading Statements to Cover Up Its Knowledge of the Fraudulent Conduct by FTX ......................... 221

T. The First Interim Bankruptcy Report ................................................. 223

U. The Second Interim Bankruptcy Report ............................................. 229

V. Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global's Financial Gain from Commingled Assets ............................. 232

W. Domestic VC Defendants Sought to Keep the Fraud Concealed, and Therefore Afloat, Until FTX Could Conduct an IPO or a Private Sale .............. 238

X. Domestic VC Defendants Emerged from the Fraud Relatively Unscathed, While Class Members Lost Everything ............................................. 239

**Page**

CLASS ACTION ALLEGATIONS ........................................................................240

    A.    Class Definitions ....................................................................241

    B.    Numerosity ..............................................................................242

    C.    Commonality/Predominance ...................................................242

    D.    Typicality ...............................................................................243

    E.    Adequacy of Representation ...................................................244

    F.    Requirements of Fed. R. Civ. P. 23(b)(3) ...............................244

    G.    Superiority ..............................................................................245

    H.    Requirements of Fed. R. Civ. P. 23(b)(2) ...............................246

    I.    Requirements of Fed. R. Civ. P. 23(c)(4) ...............................246

    J.    Nature of Notice to the Proposed Class. .................................247

COUNT I ............................................................................................................247

COUNT II ...........................................................................................................249

COUNT III ..........................................................................................................250

COUNT IV ..........................................................................................................252

COUNT V ...........................................................................................................255

COUNT VI ..........................................................................................................257

COUNT VII .........................................................................................................259

COUNT VIII .......................................................................................................261

COUNT IX ..........................................................................................................263

COUNT X ...........................................................................................................265

COUNT XI ..........................................................................................................267

COUNT XII ........................................................................................................269

4896-1753-3557.v1

**Page**

COUNT XIII ...........................................................................................................................270

PRAYER FOR RELIEF ..........................................................................................................272

DEMAND FOR JURY TRIAL ...............................................................................................273

Plaintiffs Patrick Rabbitte, Mark Girshovich, Brandon Orr, Leandro Cabo, Ryan Henderson, Michael Livieratos, Alexander Chernyavsky, Gregg Podalsky, Vijeth Shetty, Chukwudozie Ezeokoli, Michael Norris, Edwin Garrison, Shengyun Huang, Julie Papadakis, Vitor Vozza, Kyle Rupprecht, Warren Winter, and Sunil Kavuri ("Plaintiffs"), on behalf of themselves and all others similarly situated, sue MDL Defendants for their respective actions, as outlined herein, which contributed to the collapse of the FTX Group, including, but not limited to: (1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud; and (2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

Plaintiffs use the following defined terms throughout:

1. "Auditor Defendants" collectively refers to Prager Metis CPAs, LLC ("Prager Metis") and Armanino LLP ("Armanino").

2. "Bank Defendants" collectively refers to Defendants Deltec Bank & Trust Company Ltd. ("Deltec"), Farmington State Bank d/b/a Moonstone Bank ("Moonstone"), and Jean Chalopin ("Chalopin").

3. "Classes" and "Class Members" refers to the classes and class members as set forth in the Class Action Allegations below.

4. "Domestic VC Defendants" collectively refers to Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"),

- 1 -

SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger Global"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global").

5.  "FTX Insider Defendants" refers to Samuel Bankman-Fried ("SBF"), Caroline Ellison ("Ellison"), Gary Wang ("Wang"), and Nishad Singh ("Singh").

6.  "Law Firm Defendant" refers to Defendant Fenwick & West LLP ("Fenwick").

7.  "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints.

8.  "Multinational Domestic VC Defendants" collectively refers to Defendants Sino Global Capital Limited ("Sino Global"), Softbank Group Corp. ("Softbank Group"), and Temasek Holdings (Private) Limited ("Temasek Holdings") together with its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek").

9.  "Promoter and Digital Creator Defendants" or "Brand Ambassador Defendants" collectively refers to Thomas Brady ("Brady"), Gisele Bündchen ("Bündchen"), Kevin O'Leary ("O'Leary"), Udonis Haslem, David Ortiz, Stephen Curry ("Curry"), Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani ("Ohtani"), Noami Osaka ("Osaka"), Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg and Creators Agency, LLC.

10.  FTX Trading LTD and its subsidiaries d/b/a FTX ("FTX Trading") and West Realm Shires Inc. and its subsidiaries ("WRS"), are together referred to herein as "FTX."  WRS includes,

- 2 -

without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US ("FTX US"). FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

## INTRODUCTION

1.      The FTX disaster is the largest financial fraud in U.S. history. Defendant Sam Bankman-Fried ("SBF"), FTX Group's founder and former Chief Executive Officer ("CEO"), is on house arrest awaiting his criminal trial scheduled for October of this year. FTX Group's new CEO – who helped wind down Enron – concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2.      SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

3.      On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. The FTX Platform[1] maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs,

---

[1]    "FTX Platform" refers to the various platforms FTX created for investors to access crypto and related markets. It provided an easy way for investors to access an otherwise tech-heavy dominant world of cryptocurrencies, as *The New York Times* described it: "FTX serves as a portal to the crypto world. With the click of a button, a curious investor can turn dollars into Bitcoin, Dogecoin or Ether. It's as simple as buying paper towels from Target." In addition to YBAs and FTT, the FTX Platform offered a range of trading products to cryptocurrency investors, including derivatives, options, volatility products, coins, tokens and leveraged tokens.

FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4.     On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group.  Rather than heed the myriad warnings from the U.S. Securities and Exchange Commission ("SEC") dating as far back as 2017, the FTX Group chose instead to skirt U.S. regulation through deception.

5.     This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, the California Unfair Competition Law ("UCL"), the California False Advertising Law, the California Corporations Code, the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUPTA"), the Florida Securities and Investor Protection Act, and various common law causes of action as detailed herein.

6.     As outlined herein, MDL Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar fraud for their own financial and professional gain.

7.     Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

8.     FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings.  The

class action, pending in the Southern District of Florida as a Multi-District Litigation, may be the only avenue for any of the victims to recover any of their damages.

9. FTX's campaign to build public and investor trust relied on significant financial and public support from the Domestic VC Defendants. As alleged herein, the Domestic VC Defendants poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the FTX Platform. The Domestic VC Defendants knew that their investments in FTX would be used to promote the FTX Platform as credible and trustworthy. The Domestic VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX. They also vouched for the safety and stability of the FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

10. Importantly, FTX told customers that their assets belonged solely to the customer and would not be transferred to FTX. Yet, what is now known, is that the FTX Group was, among other things, engaged in comingling and embezzling billions of dollars of customer assets. Each Domestic VC Defendant claimed it conducted proper due diligence on the FTX Group prior to investing (and throughout FTX's existence), and many Domestic VC Defendants took positions on FTX's Advisory Board with others formalizing partnerships and engaging in cross partnerships.

11. Accordingly, each Domestic VC Defendant knew or was reckless in not knowing that SBF's entire crypto empire was a sham. Each had ample access to information from their own due diligence process that was not publicly known, including from due diligence in connection with the FTX Group's investments of hundreds of millions of dollars into the Domestic VC Defendants' own

funds or partnerships. Although the Domestic VC Defendants benefited directly from the improper use of customer assets and would have reaped massive windfalls if the fraud was not discovered, Plaintiffs' assets remain missing or unable to be accessed. In short, the largest financial fraud in U.S. history would not have occurred without the Domestic VC Defendants. As alleged in detail herein, this class action seeks to recover the value of such customer assets and other applicable damages from the Domestic VC Defendants who participated in or directly enabled the FTX Group and SBF's fraud.

## THE PARTIES

12.     Plaintiff Patrick Rabbitte ("Rabbitte") is a citizen and resident of Panama City, Panama. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rabbitte purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the Domestic MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rabbitte has sustained damages for which Domestic MDL Defendants are liable.

13.     Plaintiff Mark Girshovich ("Girshovich") is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Girshovich purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the Domestic MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Girshovich has sustained damages for which Domestic MDL Defendants are liable.

14.     Plaintiff Brandon Orr ("Orr") is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title

to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the Domestic MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which Domestic MDL Defendants are liable.

15. Plaintiff Leandro Cabo ("Cabo") is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which MDL Defendants are liable.

16. Plaintiff Ryan Henderson ("Henderson") is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which MDL Defendants are liable.

17. Plaintiff Michael Livieratos ("Livieratos") is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which MDL Defendants are liable.

18. Plaintiff Alexander Chernyavsky ("Chernyavsky") is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff

Chernyavsky purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which MDL Defendants are liable.

19. Plaintiff Gregg Podalsky ("Podalsky") is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which MDL Defendants are liable.

20. Plaintiff Vijeth Shetty ("Shetty") is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which MDL Defendants are liable.

21. Plaintiff Chukwudozie Ezeokoli ("Ezeokoli") is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which MDL Defendants are liable.

- 8 -

22.     Plaintiff Michael Norris ("Norris") is a citizen and resident of the State of New Jersey.  He is a natural person over the age of 21 and is otherwise *sui juris*.  Plaintiff Norris purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which MDL Defendants are liable.

23.     Plaintiff Edwin Garrison ("Garrison") is a citizen and resident of the State of Oklahoma.  He is a natural person over the age of 21 and is otherwise *sui juris*.  Plaintiff Garrison purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which MDL Defendants are liable.

24.     Plaintiff Shengyun Huang ("Huang") is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*.  Plaintiff Huang purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which MDL Defendants are liable.

25.     Plaintiff Julie Papadakis ("Papadakis") is a citizen and resident of the State of Virginia.  She is a natural person over the age of 21 and is otherwise *sui juris*.  Plaintiff Papadakis purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the

specific allegations set forth herein, Plaintiff Papadakis has sustained damages for which MDL Defendants are liable.

26.    Plaintiff Vitor Vozza ("Vozza") is a citizen and resident of the Federal Republic of Brazil.  He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which MDL Defendants are liable.

27.    Plaintiff Kyle Rupprecht ("Rupprecht") is a citizen and resident of the Dominion of Canada.  He is a natural person over the age of 21 and is otherwise *sui juris*.  Plaintiff Rupprecht purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which MDL Defendants are liable.

28.    Plaintiff Warren Winter ("Winter") is a citizen and resident of the Federal Republic of Germany.  He is a natural person over the age of 21 and is otherwise *sui juris*.  Plaintiff Winter purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform.  As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which MDL Defendants are liable.

29.    Plaintiff Sunil Kavuri ("Kavuri") is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland.  He is a natural person over the age of 21 and is otherwise *sui*

*juris*. Plaintiff Kavuri purchased or held legal title to and/or a beneficial interest in any fiat or crypto currency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which MDL Defendants are liable.

30.     Defendant Sequoia Capital Operations, LLC ("Sequoia") is a venture capital firm. The firm is headquartered in Menlo Park, California, and specializes in seed stage, early stage, and growth stage investments in private companies across technology sectors. As of December 31, 2022, Sequoia's total assets under management were approximately $53 billion. Sequoia was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

31.     Defendant Thoma Bravo, LP ("Thoma Bravo") is a private equity firm. The firm is headquartered in Chicago, with primary offices in Miami and San Francisco, and describes itself as one of the largest software investors in the world with over $121 billion in assets under management as of December 31, 2022. Thoma Bravo was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

32.     Defendant Paradigm Operations LP ("Paradigm") is a venture capital firm. The firm is headquartered in San Francisco, California, and invests in the cryptocurrency, financial services, information technology, media, telecommunication, SaaS, and web3 sectors. Paradigm was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world. As of December 31, 2022, Paradigm had over $8.7 billion in assets under management.

33.    Defendant SkyBridge Capital II, LLC ("SkyBridge") is an alternative asset manager with its principal office in New York City. SkyBridge is authorized to and does conduct business in the State of Florida with offices in Palm Beach Gardens, Florida. SkyBridge is principally owned by its founder, Anthony "The Mooch" Scaramucci ("Scaramucci"), who briefly served as the White House Director of Communications from July 21 to July 31, 2017. As of December 31, 2022, SkyBridge had approximately $2 billion in assets under management.

34.    Defendant Multicoin Capital Management LLC ("Multicoin Capital") is a venture capital company based in Austin, Texas that invests in cryptocurrencies, tokens, and blockchain companies. The company was founded in 2017 and its first fund was extremely successful, which Multicoin Capital advertised in 2021 as having a soaring 20,287% increase since its inception. As of December 31, 2022, Multicoin Capital had approximately $1.4 billion in assets under management.

35.    Defendant Tiger Global Management, LLC ("Tiger Global") is an investment firm headquartered in New York City. Tiger Global is authorized to and does conduct business in the State of Florida with offices in West Palm Beach, Florida. Over the past decade Tiger Global has grown to be a prolific venture capital investor specializing in the tech sector. As of December 31, 2022, Tiger Global had $51 billion in assets under management.

36.    Defendant Ribbit Management Company, LLC ("Ribbit Capital") is a venture capital firm. The firm is headquartered in Palo Alto, California, and "[f]ocused on the intersection of financial services and technology." Ribbit Capital is a leader in global investments in fintech. In 2021, Ribbit Capital had some of the highest-profile IPOs, including Coinbase, Nubank, and Robinhood. As of December 31, 2022, Ribbit Capital had approximately $11.9 billion in assets under management.

- 12 -

37.     Defendant Altimeter Capital Management, LP ("Altimeter") is an investment management firm based in Menlo Park, San Francisco, and Boston.  Altimeter states that it is "a leading technology-focused investment firm built by founders for founders."  As of December 31, 2022, Altimeter had approximately $8.5 billion in assets under management.

38.     Defendant K5 Global Advisor, LLC ("K5 Global") is a limited liability company incorporated in Delaware on March 17, 2021.  K5 Global is registered to do business in California and Florida and provides notice filings of its Adviser Public Disclosures that it files with the Securities Exchange Commission to the state securities authorities in California and Florida.  K5 Global maintains a principal address in Miami Beach, Florida, and maintains its business' mailing address in San Francisco, California.  K5 Global describes itself as "an investment and incubation firm with an extensive portfolio of notable investments, including SpaceX, Airbnb, and Relativity Space, as well as successful incubated companies, including Kendall Jenner's 818 Tequila and Jake Arnold's The Expert.  K5 works closely with leading institutions, revolutionizing technologists, Fortune 500 leaders, celebrities, and world luminaries as limited partners."  As of December 31, 2022, K5 Global had over $3 billion in assets under management.

39.     Each of the Domestic VC Defendants is liable for making deceptive and/or misleading statements, willfully participating in acts that damaged Class Members in violation of the law, and/or aiding and abetting violations of law as described herein.  In committing the wrongful acts alleged herein, each of the Domestic VC Defendants willfully participated in acts and transactions and/or aided and abetted in their commission, and promoted the purported trustworthiness, favorable risk profile, and financial stability of FTX, thereby deceiving and injuring the investing public.

## JURISDICTION AND VENUE

40.     The claims asserted herein arise under and pursuant to the UCL, the California False Advertising Law, the California Corporations Code, FDUTPA, Florida's Securities and Investor Protection Act, as well various common law causes of action.

41.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(d)(2), as this is a class action where at least one of the members of each class is a citizen of a state different from at least one of the Domestic VC Defendants and also where at least one of the Class Members is a foreign citizen, and the matter in controversy exceeds the sum or value of $5,000,000.

42.     This Court has personal jurisdiction over Domestic VC Defendants because each of the Domestic VC Defendants maintain primary offices in this District, conduct substantial business in this District, and/or otherwise intentionally availed themselves of the State of Florida's consumer market through the promotion, marketing, or conspiring in or aiding and abetting the sale of products and services offered by FTX in and from this District.  Accordingly, Domestic VC Defendants committed tortious acts within the State of Florida and within this District.  Domestic VC Defendants' purposeful availment renders the exercise of jurisdiction by this Court over Domestic VC Defendants permissible under traditional notions of fair play and substantial justice.

43.     Venue is proper in this judicial district under 28 U.S.C. §1391(b), because: (i) one or more Domestic VC Defendants reside in this District; and (ii) a substantial part of the events or omissions giving rise to the claims occurred in this District.  FTX had its domestic operations in Miami, Florida, where FTX US was also headquartered.  Domestic VC Defendant SkyBridge maintains an office in Palm Beach Gardens, Florida, and is subject to notice filings to the State of

- 14 -

Florida by the SEC because it conducts business within Florida or has clients within Florida. Domestic VC Defendants prepared many of the deceptive statements complained of herein in substantial part in Florida, the statements relate in substantial part to Domestic VC Defendants' Florida operations, the statements were used to induce the investment and/or deposit of funds (including cryptocurrency) into FTX by Florida residents, and the statements were disseminated in Florida and to Class Members who reside in Florida.

44.     In connection with the acts alleged in this complaint, Domestic VC Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, and interstate telephone and/or wire communications.

## FACTUAL ALLEGATIONS

### A.     The Rise of FTX

45.     In May 2019, SBF and his co-founders, Mr. Wang and Mr. Singh, launched FTX, which, along with various subsidiaries, affiliates, and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

46.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection.  In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle . . . FTX segregate[s] customer assets from its own assets across our platforms."  SBF spent millions on advertisements to portray FTX as the

"safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[2]

47.     All the while, however, FTX was doing none of these things.  Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise.  Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds.  Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

48.     FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

49.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open YBAs and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

50.     FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly

---

[2]     *See* Superseding Indictment, ¶2, *United States of America v. Samuel Bankman-Fried a/k/a "SBF,"* No. S5 Cr. 673 (LAK) (S.D.N.Y. Mar. 28, 2023) ECF 115.

upon a Class Member's deposit of funds.  At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

51.     By structuring the rates of returns in this way, FTX targeted nascent investors – *i.e.*, those under the age of 30 and/or new to trading, both inexperienced and unsophisticated – by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

52.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard.  In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit"; that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US."; and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."  FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

53.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity."  In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."  The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."  SBF further promised, on

Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

54.    FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market.  For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves."  Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

55.    FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform.  For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets.  FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (*i.e.*, without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio.  The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book.  Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop.  Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

56.    FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by

other users.  For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days."  The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions.  There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be *segregated*, and that is a difference with traditional models.  It provides an extra guarantee of the assets backing these positions.

(Emphasis added.)

57.    At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] *segregated* accounts for margin for the customers' positions, which also provides a capital backstop . . . ."  (Emphasis added.)

58.    More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first."  In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC") – including in a tweet by FTX US President Brett Harrison ("Harrison") that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insureds . . . accounts" – until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

- 19 -

59.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise.  SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people."  In touting his commitment to the movement, SBF explained on YouTube and to journalists that, "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

60.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties.  And he got those things – with Class Member funds.  SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

61.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world – at its peak, the exchange's trading volumes reached approximately $21 billion *per day* and its valuation topped $32 billion within three years of its founding.

**B.      FTX's Key Players**

**1.      Defendant SBF**

62.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets.  FTX was established by SBF, Wang, and Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative

products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

63. Prior to that, the Silicon Valley-born, MIT-educated SBF, launched his quantitative crypto trading firm, Alameda, in November 2017,[3] after stints in the charity world and at trading firm Jane Street.[4] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

64. On January 3, 2023, SBF pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in *United States of America v. SBF*, No. 1:22-cr-00673-LAK-1 (S.D. Cal.). On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.*, ECF 80. With his trial scheduled for October 2023, SBF faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

## 2. Defendant Caroline Ellison

65. By 2018, Defendant SBF had persuaded Defendant Ellison to join him at Alameda. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ms. Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

---

[3] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[4] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

66.     In late 2018, the headquarters of Alameda was relocated to Hong Kong.  The team at Alameda included Defendant SBF's close friends (and later co-founders for FTX) Mr. Singh and Mr. Wang.  Defendant Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

67.     After Defendant SBF established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda.

68.     In October 2021, Ms. Ellison was appointed as co-CEO of Alameda with Sam Trabucco ("Trabucco") after SBF resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded.  As co-CEO, Ms. Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift.  For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi).  Ms. Ellison became sole CEO in August 2022, following Mr. Trabucco's sudden and unexpected departure from the firm, when he shifted his role from co-CEO to adviser of the company.[5]

69.     Leading up to the collapse of FTX, Ms. Ellison lived with nine other FTX or Alameda colleagues in SBF's $30 million penthouse in the Bahamas.  She reportedly paid SBF rent, and was occasionally in a romantic relationship with him.  In 2021, Ms. Ellison tweeted about recreational stimulant use.  Upon information and belief, Ms. Ellison left the Bahamas and moved back to Hong Kong.

---

[5]     https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

70.     "Young people tend to be too risk averse," Ms. Ellison said in a more recent Alameda podcast episode.[6]

71.     In December 2022, Ms. Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### 3.     Defendant Gary Wang

72.     Mr. Wang is not like his co-founder SBF, who loves fame and putting himself at the center of public attention.  In fact, there's little public information about Mr. Wang, who has been described as a shady but critical player in the rise and fall of FTX.

73.     Mr. Wang met SBF at a math camp in high school.  Later, they became college roommates at the Massachusetts Institute of Technology ("MIT"), where Mr. Wang got degrees in mathematics and computer science, and SBF received a bachelor's in physics.[7]

74.     Before co-founding Alameda (and later FTX), Mr. Wang worked at Google.  He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[8]  When SBF left the Jane Street Hedge Fund to start Alameda in 2017, Mr. Wang left the tech giant.

75.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office.  The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

---

[6]     https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

[7]     https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

[8]     https://ftxfuturefund.org/about/ (accessed May 11, 2023).

76.     It's there that Mr. Wang and SBF funneled funds from Alameda to build its bespoke derivatives exchange.  SBF told *Insider* that he is not a good coder: "I don't code.  I'm trash.  I have not written any of FTX's code base.  That's all a lot of other really impressive people at FTX.  That's not me at all."[9]

77.     At the age of 28, Mr. Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April.  SBF sent his congratulations to Mr. Wang in public, tweeting that "I couldn't be prouder" when the list came out.[10]

78.     In December 2022, Mr. Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### 4.     Defendant Nishad Singh

79.     Mr. Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California apartment.  He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

80.     Mr. Singh is and was a close confidant of SBF, having shared multiple apartments with the FTX founder over the years, including most recently a ten-person luxury penthouse in Nassau, Bahamas.

---

[9]     https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed May 11, 2023).

[10]    https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

81.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[11]

82.     Although Mr. Singh's LinkedIn profile is down and his Twitter account is locked, the University of California at Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[12]

83.     "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook.  "At some point, it became obvious that was kind of stupid . . . so I took some time off and really gave my 100% working at Alameda," Mr. Singh said.

84.     Mr. Singh visited Alameda in the first month of its existence, where he witnessed SBF execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available."  Feeling inspired, he took a job.

85.     After spending one and a half years as a core Alameda engineer, Mr. Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision."  He has provided code to a number of SBF-related projects, including the decentralized exchange Serum on Solana.

86.     "Nishad was one of my brother's best friends in high school.  He's shown the fastest and most sustained professional growth I've ever witnessed," SBF wrote in a company blog.[13]  Mr.

---

[11]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[12]   https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

[13]   https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

Singh also assisted Mr. Wang in building most of FTX's "technological infrastructure" and managed the development team.

87.     Although pitched as a community-run and- organized exchange, people familiar with the matter told *CoinDesk* the true power over Serum rested with FTX Group, which then held the program's access keys.[14]  A similar relationship may be in place at FTX's core properties.[15]

88.     On February 28, 2023, Mr. Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering.  He agreed to cooperate with prosecutors' investigation into SBF and apologized for his role in FTX's scheme.

### C.      The Basics of a Cryptocurrency Exchange

89.     In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry.  There is a big difference, however, in regards to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

90.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers.  Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

91.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received.  This credit can be regarded as a liability of the exchange to its customer.

---

[14]    https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[15]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

92.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

      (a)     trade it for another cryptocurrency;

      (b)     trade it for fiat currency;

      (c)     leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer); or

      (d)     withdraw it (withdrawal could be done prior to or after a trade or conversion). These things could be done in whole or in part.  Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

93.     The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets "in" their account.  The customer needs to make a request to the exchange to be able to access and send those balances.  The exchange then debits the user account and sends the assets.  Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

94.     One major factor that affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

95.     For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis.  FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.  As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets.  FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

- 27 -

None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.[16]

96.    While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase, for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets "in" their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically "in" the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency – they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets "on" their account, even though it's not technically true.

97.    With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan, or invest them in some way, and hopefully receive enough

---

[16]   https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

- 28 -

assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

98. While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

99. The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

100. Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regard to the type of assets in which they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

101. Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they "securely" store all customer assets 1:1 in "cold storage," there is no regulatory requirement in most jurisdictions (including the U.S.) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

102. Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of

- 29 -

risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance.

> ### D. The Mechanics of the Fraudulent Scheme

103. The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

104. With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

105. Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

106. Under the cloak of this wide-ranging con game, FTX insiders, including SBF, facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

107. Frequently, SBF routed his fraudulent scheme through Alameda, a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before

launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

108.    Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

109.    Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

110.    SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties"; and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [*i.e.*, SBF] is also the primary shareholder of several related entities which do business with the company."

111.    Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan'

- 31 -

to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

112.    More often, SBF looted Class Member funds directly, without the cover of sham-related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Cell Phone
Ipad 11 "ich
$899.00 Was $410.00
★★★★☆  ( 10 Reviews )

- 32 -

113.    Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF.  SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

114.    SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time.  Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices.  Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns.  Alameda's entrée into yield farming was not without internal controversy – in early 2021, Ms. Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail.  Ms. Ellison was correct to observe that Alameda's bets had grown dodgier.  At the time, Mr. Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts."  As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

115.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways.  Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system.  Compounding FTX's – and, though they did not know it, Class Members' – exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over

- 33 -

time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange, Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

116. With these exemptions – exemptions offered to no other customers on the exchange – FTX extended Alameda a *de facto* limitless line of credit.

117. Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

118. The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ms. Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular

currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.

While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[17]

---

[17] https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

4896-1753-3557.v1

119.    *The Wall Street Journal* recently reported that Ms. Ellison told Alameda staffers in a video call that she was one of four people (along with SBF, Mr. Wang, and Mr. Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[18]

120.    Similarly, Mr. Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[19]

121.    FTX co-founder Mr. Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would give Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

122.    FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users.

---

[18]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

[19]    https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

123. FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

124. At no time did FTX disclose the foregoing to Class Members, including that:

(a) SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

(b) FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

(c) FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

(d) FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

(e) SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

(f) SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

(g) SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

(h)    Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

(i)    With the foregoing exemption, Alameda engaged in margin trading on the FTX Platform, exposing Class Members to the risk of Alameda's loss;

(j)    FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

(k)    FTX did not have in place fundamental internal controls, including an independent board of director or a Chief Financial Officer ("CFO").

125.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded.  In late 2022, the fraud finally collapsed, and the misconduct was revealed.

E.    **The Fraud's Collapse**

126.    The FTX.com exchange was extremely successful since its launch in May 2019.  In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading.  The FTX Group's team grew to over 300 employees globally.  Although the FTX Group's primary international headquarters is in the Bahamas, its domestic U.S. base of operations is located in Miami, Florida.[20]

127.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency.  By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 ***billion dollars***.

---

[20]    https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

128.    SBF got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to *Bloomberg*.

129.    At his peak, SBF was worth $26 billion.  At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[21]

130.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud.  For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender.  At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda.  If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token.  FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

131.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened.  By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running.  He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations.  Without this influx of capital,

---

[21]   https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

4896-1753-3557.v1

FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

132.    In early November 2022, crypto publication *CoinDesk* released a bombshell report that called into question just how stable SBF's empire really was.[22]  On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time.  FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

133.    Prior to the collapse of the FTX Group, SBF's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries.  But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows SBF's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto.  The situation adds to evidence that the ties between FTX and Alameda are unusually close.[23]

134.    Days later, on November 6, 2022, Changpeng ("CZ") Zhao ("Zhao" or "CZ"), CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash

---

[22]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[23]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with SBF's surprise announcement on Tuesday, November 8, 2022 that Binance would buy FTX, effectively bailing it out.[24]

135.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[25] In truth, there were always too many issues – issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further – SBF saw 94% of his net worth wiped out in a single day.[26] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

136.    SBF issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[27]

---

[24]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[25]    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[26]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[27]    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).



SBF ✓ @SBF_FTX · Nov 10

1) I'm sorry.  That's the biggest thing.

I fucked up, and should have done better.

💬 11K   🔁 21.4K   ♡ 59.3K   ⬆️



SBF ✓ @SBF_FTX · Nov 10

2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly.  But of course it's on me that we ended up there in the first place.

💬 218   🔁 391   ♡ 4,939   ⬆️



SBF ✓ @SBF_FTX · Nov 10

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH.  THERE ARE APPROXIMATIONS HERE.]

💬 259   🔁 639   ♡ 3,873   ⬆️



SBF ✓ @SBF_FTX · Nov 10

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals.  The liquidity varies widely, from very to very little.

💬 174   🔁 636   ♡ 3,592   ⬆️

- 42 -







4896-1753-3557.v1



SBF ✓ @SBF_FTX · Nov 10

8) And so we are where we are. Which sucks, and that's on me.

I'm sorry.

💬 155    🔁 357    ♡ 3,122    ⬆️



SBF ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that. But I'm going to try. And give anything I have to if that will make it work.

💬 164    🔁 394    ♡ 3,377    ⬆️



SBF ✓ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87    🔁 234    ♡ 2,625    ⬆️



SBF ✓ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102    🔁 274    ♡ 3,007    ⬆️

4896-1753-3557.v1







4896-1753-3557.v1







4896-1753-3557.v1







4896-1753-3557.v1



### F. FTX Files for Bankruptcy

137.  On November 11, 2022, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and SBF resigned as CEO.[28]

138.  At or around the same time as SBF's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[29]

139.  Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to SBF's November 10, 2022 litany of tweets), Alameda CEO Ms. Ellison said that she, SBF, and two other FTX executives, Mr. Singh and Mr. Wang, were aware of the decision to send customer funds directly to Alameda.  Ms. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[30]  Ms. Ellison

---

[28]  https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

[29]  https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

[30]  https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

4896-1753-3557.v1

elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to

commit wire fraud, securities fraud, and money laundering, among other conspiracies.[31]

140.     CNBC reported that FTX's biggest customer was Alameda, which, instead of holding

money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as

collateral, then trading it.  When the price of the FTT nosedived 75% in a day, making the collateral

insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises.

141.     On December 13, 2022, the SEC filed a civil action against SBF for securities fraud

in the United States District Court for the Southern District of New York.  *SEC v. SBF*, No. 1:22-cv-

10501, (S.D.N.Y. Dec. 13, 2022), ECF 1.  In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded
> repayment on billions of dollars of loans.  Despite the fact that Alameda had, by this
> point, already taken billions of Bankman-Fried of FTX customer assets, it was unable
> to satisfy its loan obligations.  Bankman-Fried directed FTX to divert billions more
> in customer assets to Alameda to ensure that Alameda maintained its lending
> relationships, and that money could continue to flow in from lenders and other
> investors.

*Id.*, ¶4

> Through the summer of 2022, he directed hundreds of millions more in FTX
> customer funds to Alameda, which he then used for additional venture investments
> and for "loans" to himself and other FTX executives.

142.     The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in

essentially two ways: (1) by directing FTX customers to deposit fiat currency (*e.g.*, U.S. Dollars)

into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually

limitless "line of credit" at FTX, which was funded by FTX customer accounts."  *Id.*, ¶32.

---

[31]     *Id.*

143.    The bankruptcy court appointed John J. Ray III ("Ray"), a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO.  Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."  Moreover, Mr. Ray uncovered that:

*First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

*Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

*Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

*Fourth*, loans and other payments were made to insiders in excess of $1 billion.

*Fifth*, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

144.    On April 9, 2023, Mr. Ray filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges.  *See In re: FTX Trading Ltd.*, No. 1:22-bk-11068-JTD, (Bankr. Dist. Del. Apr. 9, 2023) ECF 1242-1, attached as Exhibit D (the "First Interim Rpt.").

145.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

[T]he Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity.  Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a

- 50 -

business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate.  Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets.  This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value.  This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework.  These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown.  In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt. at 2-3.

146.    After summarizing the history of the three main FTX Group entities, the current

efforts to retain advisors to assist in investigating the FTX Group's available financial records and

interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures

that led to its eventual collapse, including (a) lack of management and governance controls; (b) lack

of financial and accounting controls; and (c) lack of digital asset management, information security

and cybersecurity controls.  *Id.* at 11-37.

147.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management,

governance, and organizational structure," and the "management and governance of the FTX Group

was largely limited to Bankman-Fried, Singh, and Wang.  Among them, Bankman-Fried was viewed as having the final voice in all significant decisions."  *Id.* at 11.  The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent."  *Id.*

148.    The FTX Group also "lacked an appropriate organizational structure.  Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried."  *Id.* at 8.  The FTX Group did not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were."  *Id.* at 8-9.

149.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

(a)    Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.* at 11;

(b)    Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

(c)    Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of ***any*** kind, 35 used QuickBooks in

conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.* at 12-13;

      (d)     Recordkeeping was so poor that SBF described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable.  I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history."  We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.* at 14.

      (e)     "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly."  *Id.* at 14-15.

      (f)     "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely."  *Id.* at 15;

      (g)     The FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail."  *Id.* at 15;

      (h)     "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely

challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*

      (i)    "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures – some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.* at 17.

      (j)    Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to SBF, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred. *Id.*

      (k)    On both FTX International and U.S. exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's

account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX Platform. *Id.* at 18-22; and finally

(l) There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data – all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.* at 22-37.

150. Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.* at 39.

## G. The Crypto Sector Is a Hotbed for Illicit Activity and Fraudulent Conduct

151. From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's ("DoJ") report from September 2022 titled:

"The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets." The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by the DoJ[32] dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces . . ." and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the Federal Bureau of Investigation ("FBI") in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

152.	Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office ("GAO") issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[33] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S.

---

[32]	https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

[33]	Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

economic and financial sanctions.[34]  According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[35]  North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen.  "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, U.S. deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain. . . . up to a third of their funds for their missile program."[36]

153.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments.  In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[37]  The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million."  The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities.  As evidence, they cite data from blockchain

---

[34]  Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review (accessed May 11, 2023).

[35]  How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[36]  *Id.*

[37]  HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[38]

154. Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau ("CFPB") published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[39] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[40] In June 2022, the Federal Trade Commission ("FTC") issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in

---

[38] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[39] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[40] *Id.*

crypto to scams . . . – that's about one out of every four dollars reported lost, more than ***any*** other payment method."[41]  The median individual loss was a staggering $2,600.

155.  Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams.  While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize.[42]

156.  There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest.  One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014.  Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen.  Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[43]

157.  All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency.  According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested

---

[41]  Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze (accessed May 11, 2023).

[42]  Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[43]  What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ.

although they have heard at least a little about cryptocurrency.[44]  For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

158.    For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud.  The losses sustained by SBF's victims are staggering.  FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished.  Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy.  Unlike MDL Defendants, these Class Members do not have money to burn.  They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring MDL Defendants, exploited their vulnerability for tremendous financial gain.  Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

## H.    The SEC's Approach to Cryptocurrency

### 1.    Overview

159.    Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning.  Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided.  This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78c(a)(10), include not only

---

[44]   46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center.

conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

160. Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). ***In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits***, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.

(Emphasis added)[45]

161. Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

---

[45] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

162.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* decision, which the Supreme Court adopted over 75 years ago.[46] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[47] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

163.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[48]

164.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[49] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12

---

[46]   https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[47]   *Id.*

[48]   ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[49]   Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

million Ether ("ETH") over a one-month period in 2016.[50]  The SEC applied the *Howey* Test to the

DAO tokens and concluded they were securities under the Securities Act and the Exchange Act.

While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack

that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to

advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other

distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure

compliance with the U.S. federal securities laws."[51]

165.    In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of

Digital Assets" which provided additional details on when a digital asset has the characteristics of an

investment contract and "whether offers and sales of a digital asset are securities transactions."[52]

166.    In addition, the SEC has publicized its position on cryptocurrency in countless

enforcement actions,[53] multiple speeches,[54] Congressional testimony,[55] and several official SEC

statements[56] and proclamations.[57]  Current SEC Chairman, Gary Gensler ("Gensler"), has spoken

---

[50]  https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[51]  Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

[52]  SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

[53]  SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[54]  https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[55]  https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

[56]  https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[57]  https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

frequently about the perils and illegality of crypto lending platforms and decentralized finance,[58] warning that their failure to register with the SEC may violate U.S. securities laws.[59] In one interview, Mr. Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[60]

167. On September 8, 2022, Mr. Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[61] Mr. Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[62] Mr. Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[63]

168. The judicial record supports Mr. Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[64]

169. What follows are summaries of five cases that will help inform this litigation.

---

[58] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[59] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed May 11, 2023).

[60] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[61] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

[62] *Id.*

[63] *Id.*

[64] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

### a. *SEC v. Kik*

170.    In *Kik*,[65] the SEC's complaint,[66] filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws.  Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[67]

171.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements.  The court further found that Kik's private and public token sales were a single integrated offering.

### b. *SEC v. Telegram*

172.    In *Telegram*,[68] the SEC filed a complaint[69] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide.  The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

---

[65]    https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[66]    https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[67]    https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

[68]    https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[69]    https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

173.    Telegram argued[70] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

174.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[71] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

175.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933.  The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams.  It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000.  For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

---

[70]   https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

[71]   SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

4896-1753-3557.v1

c. **SEC v. BlockFi**

176.    In *BlockFi Lending LLC*, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi[72] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

177.    BlockFi argued for "increased regulatory clarity" but lost.[73]

178.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

d. **SEC Wells Notice to Coinbase**

179.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[74] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells Notice,* informing Coinbase of their intention to seek approval from the SEC

---

[72]    https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

[73]    https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

[74]    The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed May 11, 2023).

4896-1753-3557.v1

Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

180. According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[75]

181. The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

182. Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

183. Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

---

[75]  *Id.*

184.     Per the "family resemblance test," a presumption that a note is a security can only be
rebutted if the note bears a resemblance to one of the enumerated categories on a judicially
developed list of exceptions, as follows: (a) a note delivered in consumer financing; (b) a note
secured by a mortgage on a home; (c) a short-term note secured by a lien on a small business or
some of its assets; (d) a note evidencing a character loan to a bank customer; (e) a short-term note
secured by an assignment of accounts receivable; (f) a note which simply formalizes an open-
account debt incurred in the ordinary course of business (such as a trade payable for office supplies);
and (g) a note evidencing loans by commercial banks for current operations.

185.     The "family resemblance" analysis requires:

(a)     A consideration of the motivation of the seller and buyer (*e.g.*, is the seller
looking for investment and the buyer looking for profit?);

(b)     The plan of distribution of the note (*e.g.*, is the product being marketed as an
investment?);

(c)     The expectation of the creditor/investor (*e.g.*, would the investing public
reasonably expect the application of the securities laws to the product); and

(d)     The presence of an alternative regulation (*e.g.*, will the product be registered
as a banking product and the offered registered as a bank?).

186.     Applying the family resemblance test to Lend reveals the presence of a note.  First,
Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking
for a profitable investment and Coinbase is looking for investors.  Second, Coinbase marketed the
Lend program as an investment.  Third, investors would expect that securities regulation applies.

Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

187.   Given the clear facts of the case, Coinbase decided to cancel the Lend program.[76]

### e.   *SEC v. Binance*

188.   In *Binance*, the SEC filed a complaint[77] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Mr. Zhao.  The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities.  The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets.  The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

### f.   *SEC v. Coinbase*

189.   In *Coinbase*, the SEC filed a complaint[78] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global.  The SEC alleges that the Coinbase entities have violated multiple securities laws, including making

---

[76]   https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats (accessed June 27, 2023).

[77]   https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.

[78]   https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.

billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal ("Grewal"), Director of the SEC's Division of Enforcement.[79]

I.      **FTX's Offer and Sale of YBAs, Which Are Unregistered Securities**

190.    Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program.  Plaintiffs and other similarly situated individuals invested in FTX's YBAs.

191.    The details of the Earn program are still listed on the FTX website,[80] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[81]

192.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets.[82]

On the same webpage, the company also states:

---

[79]   https://www.sec.gov/news/press-release/2023-102.

[80]   FTX App Earn – FTX Exchange (accessed May 11, 2023).

[81]   1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

[82]   FTX App Earn – FTX Exchange (accessed May 11, 2023).

The *first $10,000* USD value in your deposit wallets will earn *8%* APY. Amounts held *above $10,000 up to $100,000* USD in value (subject to market fluctuations) will earn *5%* APY.[83]

193.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

194.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[84]  Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange.  While the exact mechanism will vary from project to project, in general, users will put their token on the line (*i.e.*, "stake") for a chance to add a new block onto the blockchain in exchange for a reward.  Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain.  The network chooses validators based on the size of their stake and the length of time they've held it.  Thus, the most invested participants are rewarded.  If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[85]

195.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate.  In other words, some argue that staking programs are different from lending programs because user assets are not actually being

---

[83]    *Id.*

[84]    For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

[85]    The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed May 11, 2023).

Case 1:23-cv-00449-DXN 3D7ocument Entre4 on FLSD 0800/dcket 08/07/2026 of 395 Page 79 of 281

"lent" out to third parties. But in September 2022, Chair Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[86] According to Mr. Gensler, "From the coin's perspective . . . that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." *The Wall Street Journal* noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar – with some changes of labeling – to lending."[87]

196.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A, ¶¶36-42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.*, ¶39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

197.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX

---

[86]    Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

[87]    *Id.*

are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

From a securities perspective, the *Howey* Test defines an investment contract as:

(a)     An investment of money

    i.     Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

(b)     In a common enterprise

    i.     FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

(c)     With the expectation of profit

    i.     FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[88]

(d)     To be derived from the efforts of others

---

[88]   https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed May 11, 2023).

4896-1753-3557.v1

i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

198. The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[89] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[90]

199. FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (a) the purchaser makes an investment of money or exchanges another item of value, (b) in a common enterprise, and (c) with the reasonable expectation of profits to be derived from the efforts of others.

---

[89] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[90] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

4896-1753-3557.v1

200.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

201.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[91] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account

---

[91] FTX acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application developed by Blockfolio.

4896-1753-3557.v1

will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

*FTX* does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the *United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea*. FTX also does not onboard corporate accounts located in or a resident of *Antigua or Barbuda*. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

*FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda*. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.

(Emphasis in original.)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts prior to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure

- 79 -

requirements.  Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US.  FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering).  The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website.  The FTX Trading App also indicated the Earn program is provided by FTX US.  As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda
By: Joseph Jason Rotunda

**J.    FTX's Offer and Sale of FTT Tokens, Which Are Unregistered Securities**

202.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test.  FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange.  According to crypto news site *CoinDesk*, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[92]  Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media

---

[92]   https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

posts, and other announcements.  Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer.  As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase.  Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[93]

203.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will.  And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated.  It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency.  In fact, Binance CEO Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[94]

**K.    Using the FTX Platform Itself Necessarily Required Transacting in Unregistered Securities**

204.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the FTX Platform.

205.    Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

206.    When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain.  Rather, the exchange simply maintains its own

---

[93]    *See* FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

[94]    https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

207.     Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

208.     According to the first day declaration by Mr. Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

> The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos.

The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[95]

209.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[96] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[97] Mr. Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[98]

210.    To further complicate matters, recent statements given by SBF to *The Wall Street Journal* suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[99] This money was intended to fund customers' accounts at FTX. SBF claims some customers continued to

---

[95]    042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

[96]    *Id.*

[97]    *Id.*

[98]    *Id.*

[99]    https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed May 11, 2023).

- 83 -

4896-1753-3557.v1

use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[100] *The WSJ* acknowledged that these funds "could have been recorded in two places – both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[101]

211.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse.  After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[102]  Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[103]  Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[104]

212.    It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the form of FTT tokens.  FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional

---

[100]  FTX customers deposited more than $5 billion in those Alameda accounts.

[101]  *Id.*

[102]  https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations  (accessed  May  11, 2023).

[103]  https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

[104]  For a more general discussion of the conflicts of interest inherent in these relationships, *see* https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

and retail investors without registering with any regulator or undergoing any audit or other external due diligence.  FTX could create unlimited amounts of FTT if it wished.

213.    In short, there appear to have been two sets of leveraged transactions involved.  First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans.  Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts.  Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements.  In an Alameda balance sheet linked to *CoinDesk* in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX).  Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which SBF was an early investor) and SRM tokens (issued by the Serum exchange that SBF co-founded).[105]  Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

## L.    FTX Aggressively and Deceptively Marketed Its Platform

214.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams.  For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[106]  The report was issued pursuant to the March 9, 2022 Executive Order on

---

[105]  https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

[106]  https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces . . ." and the department classified digital asset crime into three categories: (1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[107]

215.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, GAO issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[108] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[109] According to the United Nations, "money raised by North Korea's criminal cyber operations are

---

[107] https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/Ulbricht CriminalComplaint.pdf (accessed May 11, 2023).

[108] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[109] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023); Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023); This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review (accessed May 11, 2023).

helping to fund the country's illicit ballistic missile and nuclear programs."[110]  North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen.  "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, U.S. deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain . . . up to a third of their funds for their missile program."[111]

216.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments.  In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[112]  The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million."  The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities.  As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020.  The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money

---

[110]  How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[111]  *Id.*

[112]  HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[113]

217. Everyday consumers have also fallen victim to various cryptocurrency-related scams. The CFPB published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[114] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[115] In June 2022, the FTC issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams . . . – that's about one out of every four dollars reported lost, more than *any* other payment method."[116] The median individual loss was a staggering $2,600.

218. Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds,

---

[113] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[114] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[115] *Id.*

[116] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze (accessed May 11, 2023).

- 88 -

thefts, and scams.  While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize.[117]

219.     There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest.  One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014.  Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen.  Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[118]

220.     All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency.  According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[119]  For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

221.     These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers.  The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by Messrs. O'Leary, Brady, and Curry, below).  These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

---

[117]  Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[118]  What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ.

[119]  46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center.

222. FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

223. FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being "safe" and "compliant."

224. In Mr. Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims:

> With FTX, I have everything I need to buy, sell, and trade crypto safely.

225. Mr. O'Leary, another FTX brand ambassador stated:

> To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements.

226. Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

227. Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

228.     Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

> I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX.[120]

229.     Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, "WonderFi." The name is derived from Mr. O'Leary's nickname, "Mr. Wonderful." Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

230.     Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or SBF's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[121] In addition, CME Group CEO Terry Duffy allegedly told SBF that he was "an absolute fraud" upon having an initial conversation with SBF.[122]

231.     Based upon the information that has been released by FTX's new CEO Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

---

[120]  https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

[121]  https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed May 11, 2023).

[122]  https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed May 11, 2023).

Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.[123]

232.    Mr. Ray's pleading contains a number of troubling findings, among them: (a) FTX did not have centralized control of its cash; (b) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group; (c) a lack of disbursement controls that resulted in employees submitting payment requests via online chat and these requests being approved by managers responding with personalized emojis; (d) corporate funds were used to purchase homes and personal items for employees; and (e) a lack of books and records and the absence of lasting records of decision-making.

233.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

234.    Furthermore, many customers were opting to use FTX because of who their investors were and many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

---

[123]  https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKE wiokr3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3 .amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYk NjSG (accessed May 11, 2023).

235. Thus, celebrities like the Promoter and Digital Creator Defendants have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

236. In addition to the conduct of Defendant SBF, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

237. In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

238. FTX's explanation for using stars like Mr. Brady, Ms. Bündchen, and the other Promoter and Digital Creator Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[124]

239. In other words, the FTX Group needed celebrities like the Promoter and Digital Creator Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of unregistered securities, including the YBAs. Below are

---

[124] https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed May 11, 2023).

4896-1753-3557.v1

representative statements and advertisements the Promoter and Digital Creator Defendants made to drive the offers and/or sales of the YBAs, which Plaintiffs and Class Members will supplement as the case progresses and discovery unfolds.

240. The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and Class Members.

241. On or around September 10, 2021, FTX tweeted out a list of its promoters who were part of the "You In?" campaign, asking its audience whether they are "in" as well.



**M.     The MDL Defendants' Roles in the Fraud**

242.    Each group of MDL Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

4896-1753-3557.v1

243.    The individual role of each MDL Defendant is outlined below, and more fully expounded upon within the individual chapter of the complaint in which they are named.

244.    SBF stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called Alameda Research.  He did so with the help of three key people, Ms. Ellison, Mr. Wang, and Mr. Singh, who were part of SBF's inner circle.  Many of them were friends going back years before the creation of FTX.  Together, they were the brain trust of FTX and the architects of the FTX fraud, and are referred to herein as the "FTX Insider Defendants."

245.    The public accounting firms of Prager Metis and Armanino (the "Auditor Defendants"), were the auditors of FTX Trading and FTX US, respectively.  In those roles, and in violation of the professional standards to which they were subject, Prager Metis and Armanino issued reports in which they opined, respectively, that the financial statements of FTX Trading and FTX US for the years ending 2020 and 2021 were presented in accordance with generally accepted accounting principles (or "GAAP") and that they had performed audits of such financial statements in accordance with generally accepted auditing standards (or "GAAS").  Reports such as the type issued here by the Auditor Defendants are generally referred to as "clean" audit reports.  Given the virtual absence of accounting and financial systems and controls, corporate governance structures, and other controls at FTX – things that were so glaring and obvious that Mr. Ray discovered them within just days of being appointed as FTX's CEO in connection with the FTX bankruptcy – the Auditor Defendants never should have issued, and in fact were prohibited by the professional standards to which they were subject, their clean audit reports.  Nor should they have allowed, as they did, FTX and SBF to tout that FTX had passed financial statement audits.  Finally, in further

- 96 -

violation of the professional rules and standards to which they were subject, the Auditor Defendants issued statements of support on the internet and social media of FTX and SBF. The Auditor Defendants played a significant role in the FTX fiasco in that their actions gave legitimacy and credibility to FTX and SBF, which FTX and SBF used to curry favor with customers and investors and give them the sense that FTX could be entrusted with their money.

246.     FTX's campaign to build public and investor trust relied on significant financial and public support from Domestic DV Defendants Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global") (collectively, the "Domestic VC Defendants") poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the FTX Platform. The Domestic VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX. They also vouched for the safety and stability of the FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

247.     Defendants Temasek Holdings (Private) Limited ("Temasek Holdings") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at nearly $300 billion. Temasek Holdings operates in the United States primarily through its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek

Holdings, "Temasek"). After undertaking an extensive, eight-month-long due diligence process involving, *e.g.*, FTX's business model, applicable regulations, audited financials, and corporate governance, Temasek invested $275 million in FTX. Temasek "continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters" even post investment, advising FTX with regard to "upgrad[ing] regulatory and legal functions" and to "strengthen [its] leadership." Temasek was in a particularly good position to offer such advice; upon information and belief, its executive, Antony Lewis, served on FTX's advisory board, which held meetings at least through March 2022.

248. Defendant Softbank Group Corp. ("Softbank Group") is a Japanese multinational investment company venture capital fund formed as a Delaware limited partnership by Defendant Softbank Group Corp. ("Softbank Group" and, together with Softbank, "Softbank Defendants"), a Japanese holding company. Softbank Group invested in FTX through its Softbank Vision Fund, which is managed by Defendants SoftBank Investment Advisers (UK) Limited ("Softbank Investment Advisers") and Softbank Global Advisers Limited ("Softbank Global Advisers"), and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Vision Fund is one of the largest technology funds in the world, totaling approximately $56 billion, with its U.S. base in Silicon Valley, California. Softbank Group has a worldwide reputation for being a "unicorn company . . . whisperer," and startups such as FTX fortunate enough to count it among its investors gain "a major credibility building moment." SoftBank Group employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. Upon

information and belief, SoftBank Group continued to enjoy unique influence over and insight into FTX following its investment through its executives – CEO Rajeev Misra and Partner Tom Cheung – who served on FTX's advisory board, which held meetings at least through March 2022. It sought to pave the way for FTX to expand into the derivatives clearinghouse arena by lobbying the CFTC to grant FTX the necessary licenses with claims that FTX's proposal would reduce risks to the consumer.

249.     Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in Hong Kong with hundreds of millions in assets under management. Sino Global "supported the FTX vision" "[f]rom the very beginning" and "worked with [FTX] to make it a reality," including by investing an undisclosed amount in the "mid-seven figures" in FTX. In conjunction with its investment, Sino Global – in the words of its managing partner Matthew Graham ("Graham") – did "a hell of a lot of due diligence" and eventually embarked on a "deep relationship" with FTX. Sino Global's reputation, due diligence representations, ultimate investment, and ongoing relationship lent an air of legitimacy to FTX, as Mr. Graham recognized following one round of funding: "Today, SBF is no longer merely a titan of crypto. He's now a titan of business . . . ." As FTX's value skyrocketed, Sino Global stood to make an enormous return on its investment, but it benefitted from its ties to FTX in more direct ways: Sino Global accepted a $60 million investment from Alameda and yet another investment of an undisclosed amount from SBF, each of which, upon information and belief, having been comprised of Class Member funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid Value I fund, Sino Global's first ever outside venture fund. Together, Temasek, Softbank, and Sino Global are referred to as the "Multinational Domestic VC Defendants."

- 99 -

250.    Defendant Fenwick was FTX's principal outside law firm.  Headquartered in Mountain View, California, Fenwick was ideally located in the heart of Silicon Valley, near to FTX's California operations.  Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide.  When asked by FTX Group executives for counsel, Fenwick lawyers were eager to craft not only creative, but illegal strategies.  Fenwick helped set up the shadowy entities through which SBF and the FTX Insiders operated a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed.  In this manner, Fenwick conspired with and aided and abetted the fraud, conversion, negligence, and respective breaches of fiduciary duties of the FTX entities.

251.    Bank Defendants Deltec, Moonstone, and Mr. Chalopin primarily assisted SBF in trafficking Class Member funds across the U.S. border.  Defendant Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX and, upon information and belief, served as a primary vehicle through which SBF routed Class Member funds offshore, beyond the reach of U.S. regulators and law enforcement.  Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

252.    Promoters are Defendants who agreed to serve as brand ambassadors, advertised and promoted the sale of the FTX Platform, YBAs, and/or FTT, and failed to disclose in any of their marketing campaigns or advertisements that they were paid millions of dollars by FTX.  All in clear violation of SEC, FTC, and various federal and state regulations.

4896-1753-3557.v1

253.     Digital Creators are YouTube and social media financial influencers who promoted FTX as financial advice and promoted the sale of the FTX Platform, YBAs, and/or FTT, to their millions of followers.  They include the following individuals and entities:

254.     On or about spring 2021, Mr. Brady and Ms. Bündchen partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement.  Those services included, but were not limited to, posting on social media, making personal appearances, and appearing in television and print advertising.  Mr. Brady and Ms. Bündchen also took equity stakes in FTX Trading Ltd.  Ms. Bündchen was given the title of Environmental and Social Initiatives Head at FTX.  Mr. Brady and Ms. Bündchen made numerous statements across platforms to induce individuals to invest in the FTX Platform, YBAs, and/or FTT.

255.     On August 10, 2021, FTX (U.S. and International) announced that it entered a "long-term relationship with entrepreneur, venture capitalist, and Shark Tank investor, Mr. O'Leary."  It further explained that "Mr. O'Leary will be taking an equity stake in both FTX Trading Ltd. & West Realm Shires Services Inc. along with being paid in crypto to serve as an ambassador and spokesperson for FTX."[125]  The overarching objective of the partnership was for Mr. O'Leary, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

256.     On or about June 2021, Udonis Haslem partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement.  Those services included posting on social media, appearing in a commercial, and participating in promotional events.

---

[125] https://www.prnewswire.com/news-releases/ftx-and-kevin-oleary-announce-long-term-investment-and-spokesperson-relationship-301352189.html (accessed May 9, 2023).

257. On or about October 2021, David Ortiz partnered with FTX as a brand ambassador, which included promoting the platform and releasing collections of NFTs through the FTX app.

258. On or about September 7, 2021, FTX partnered with Mr. Curry as a brand ambassador, through his company SC30 Inc., to provide FTX with spokesperson and marketing services. Those services included but were not limited to posting on social media, creating an exclusive NFT collection, and appearing in commercial advertising. The overarching objective of the partnership was for Mr. Curry, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.



259.     On or around December 14, 2021, the Warriors and FTX announced a first-of-its-kind cryptocurrency partnership in professional sports, with the unveiling of the FTX logo on the court at the Chase Center.  As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise announced it would drop NFTs on FTX.US, beginning in early 2022.  The partnership

between the Warriors and FTX was the first international rights partner for the team, granting both

the Warriors and FTX a visible market presence, inclusive of logo and likeness, internationally.[126]

260.    On or about June 1, 2022, Defendant Shaquille O'Neal, former professional NBA

basketball star, sports analyst, and entrepreneur, unveiled his partnership with FTX, stating in a

video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make

crypto accessible for everyone.  I'm all in.  Are you?"[127]



261.    On or about April 2021, William Trevor Lawrence partnered with FTX – through one

of FTX's investment apps Blockfolio – as a brand ambassador, which included posting on social

media and appearing in promotional and marketing materials.

---

[126]  https://www.nba.com/warriors/warriors-ftx-partnership-20211214

[127]  https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD
9vCndYg (accessed May 11, 2023).

- 104 -



262.     On or about November 2021, Mr. Ohtani partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement.  Those services included appearing in a commercial and as a spokesperson for the brand.  Mr. Ohtani signed on as a long-term global ambassador with both FTX US and FTX International.[128]

---

[128] https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed May 11, 2023).



263.    Defendant Osaka became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[129] Ms. Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open. [130] Ms. Osaka and FTX launched a commercial designed to bring cryptocurrency and investing in the FTX Platform, including YBAs, to the masses.

---

[129] https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed May 11, 2023).

[130] *Id.*

- 106 -



264.   For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David ("David"), created and starred in an ad for the FTX Group called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl.  Mr. David and his long-time collaborator "were completely in lockstep with" FTX's idea of using the contrarian comic's well-known wit and persona to advertise the emerging crypto exchange app and reach a wide-pool of potential users.  Indeed, embracing Mr. David's constructed antagonism for cryptocurrency was part of FTX's broader, manipulative marketing strategy.  According to SBF, FTX wanted to "meet people where they are – and that means embracing skepticism."

4896-1753-3557.v1

265.    On June 3, 2021, for $210 million paid equally on an annual basis over the course of 10 years, TSM (e-sports) announced that it was changing its name to TSM FTX.[131]  This was, at the time, the one of the largest sports deals in existence, made with the most valuable e-sports company in the United States, in the middle of the COVID-19 Pandemic and on the heels of FTX's FTX Arena deal.[132]  In short, the deal caused FTX Group's popularity to skyrocket, helping to catapult it to the forefront of the nascent crypto exchange industry.  As part of its deal with FTX, TSM announced that "TSM FTX will distribute cryptocurrency to each of its players and employees" and would purchase "$1 million worth of FTT, FTX's native token" and distribute cryptocurrency to its players and employees.[133]  At that time, the price per FTT hovered as just under $35 – by November 16, 2022, it dropped to under $2.[134]

### N.    Specific Allegations Concerning the Domestic VC Defendants

#### 1.    The Domestic VC Defendants' Role in the Rise of FTX

266.    During the relevant period, FTX experienced a meteoric rise in success due in no small part to an aggressive promotional campaign bankrolled and supported by Domestic VC Defendants Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, Altimeter, and K5 Global.  The money received from the Domestic VC Defendants' capital injections were used to promote and advertise FTX to the public.  For example, in a blog post titled

---

[131]  https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (accessed May 11, 2023)

[132]  *Id.*; *see also*  https://www.forbes.com/sites/christinasettimi/2020/12/05/the-most-valuable-esports-companies-2020/ (accessed May 11, 2023).

[133]  https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (last accessed May 11, 2023)

[134]  https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (last accessed May 11, 2023)

"End of Year 2021," FTX summarized highlights from its promotional and marketing campaigns legitimizing its brand to the public. FTX said that it raised over $1.4 billion in its Series B and B-1 financing in 2021 from "notable investors" and "illustrious partners" like Sequoia, Paradigm, and Tiger Global. It further stated how "FTX moved assertively into consumer marketing and advertising . . . , driven mainly by [its] sports and athlete partnerships." The same blog post went on to state that "[i]n 2021 FTX became the first crypto company to land the naming rights to a stadium, the first to sign a deal with a Big 4 sports league, and first to pay for a collegiate partnership entirely in crypto." FTX continued to highlight its campaigns with Mercedes F1, Major League Baseball, and the Miami Heat (naming the FTX Arena), along with its partnership with the University of California at Berkley (to name their sports facility FTX Field at California Memorial Stadium).

267.    In the same blogpost, FTX boasted that *Ad Age*, the largest publication in the ad trade field, named FTX one of the Top 10 Marketers of the Year, stating that it was a recognition "of the billions of impressions that our campaigns and partnerships garnered." FTX secured "brand ambassadors" comprised of athletes and celebrities, and released a series of internet and television advertisements and marketing campaigns to promote these partnerships. FTX further announced that heading into 2022, it was expanding the marketing and advertising teams, and would "kick off our 2022 campaigns with a Super Bowl ad, part of the first class of crypto companies to ever advertise in the big game."

268.    A key component of these promotional efforts was the legitimacy lent by the Domestic VC Defendants as recognized and respected venture capital and private equity firms. The Domestic VC Defendants not only invested in FTX knowing that these funds would be spent on the promotional activities described above, which were all false and misleading, they also directly

boasted and celebrated the purported safety, trustworthiness, and favorable risk profile of the FTX Platforms.

269.    Additionally, the Domestic VC Defendants' contacts and capital assisted FTX in proliferating an image of itself as being at the forefront of investor protection.  In 2021, FTX released a press release with "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," claiming "the protection of investors and the public as a top priority."  The Domestic VC Defendants were heavily involved in lobbying efforts to shape the regulatory narrative and conveying to customers that FTX was a legitimate exchange.

270.    With the Domestic VC Defendants' support, FTX filed an application with the CFTC to become a derivatives clearing organization, without the use of a registered futures commission merchant, through its recently purchased company LedgerX LLC ("LedgerX") (based in Miami, Florida).  As more specifically alleged below, the Domestic VC Defendants promoted this application and other regulatory lip service as supposed proof of FTX's legitimacy and transparency.

271.    Prior to FTX's $900 million Series B funding in July 2021, SBF told the *Financial Times* on July 4, 2021: "The biggest thing is not the funds themselves," he said, "[t]he biggest thing is the partnerships."  The Domestic VC Defendants' representatives, Mr. Alfred Lin ("Lin") for Sequoia, Mr. Robert (Tre) Sayle ("Sayle") for Thoma Bravo, Mr. Matt Huang ("Huang") for Paradigm, Mr. Kyle Samani ("Samani") for Multicoin Capital, Nick Shalek ("Shalek") for Ribbit Capital, and Michael Kives ("Kives") and Bryan Baum ("Baum") for K5 Global all sat on FTX's Advisory Board and had unique inside information and access into FTX, holding regularly scheduled virtual meetings with PowerPoint presentations at each virtual meeting.  Except for K5 Global, their participation in FTX's business was memorialized in a contract titled "Letter Agreement Re: FTX

Advisory Board" dated August 24, 2021, with Sequoia's being titled "Advisory Board Letter" and dated the same. These Advisory Board members specifically discussed issues including the CFTC's potential request to increase FTX's default insurance fund in connection with its application to clear derivatives in the U.S., FTX's correspondence with the SEC, and various other executive-level board issues until at least September 2022.

272. As intended, the Domestic VC Defendants' participation in the Company and supportive promotional efforts resulted in a rapid increase in FTX's valuation. By July 2021, FTX Trading had attained a valuation of $18 billion after securing funding from major financial players in the crypto space, such as multinational conglomerate Binance, the Domestic VC Defendants, and others. By October 2021, after securing another series of investments, FTX Trading had reached a valuation of $25 billion, representing a sizable and speedy return on the Domestic VC Defendants' initial investments.

273. FTX Trading soon became one of the largest crypto-trading companies in the world, with nearly $15 billion in assets being traded on its platforms daily. By January 2022, when the Domestic VC Defendants invested in FTX, FTX US attained a valuation of $8 billion after securing its own institutional funding. Combined, FTX had attained a valuation exceeding $32 billion in only three years – achieved predominantly through the Domestic VC Defendants' relentless efforts to promote the FTX exchange as reliable and trustworthy so as to increase the returns on their respective investments.

274. The Domestic VC Defendants also had investments alongside the FTX Group, or with FTX affiliated products, such as FTX's own FTT, Solana Lab Inc.'s ("Solana") token SOL, and Serum's SRM token for its exchange software built on SOL. As set forth below, by promoting SBF

- 111 -

and FTX, the Domestic VC Defendants benefited from the increase in their advantageous positions in investments affiliated with FTX and SBF.

275.     After the Domestic VC Defendants' investments in January 2022, cryptocurrencies entered into a period of prolonged pricing declines, which has become known as the "Crypto Winter."  In May 2022, a series of highly publicized cryptocurrency collapses occurred, including Luna and Terra USD, which had the effect of wiping out Three Arrows Capital (then Voyager Digital), followed by Celsius Network, which collapsed in July 2022.  Despite the turmoil and investors' worries about the stability of players in the crypto markets, the Domestic VC Defendants continued to promote FTX as stable and fostered the narrative that SBF was the "savior" of crypto.

### 2.     Due Diligence Conducted by the Domestic VC Defendants

276.     Venture capital and private equity firms routinely conduct due diligence before making investments into companies.  As one global law firm, with a National Tier 1 ranking by *U.S. News* in venture capital law, states:

> Venture capital investors typically complete a due diligence review process before finalizing an investment.  Investors perform due diligence to confirm information previously provided by the company's management and assess the strengths, weaknesses and risks of the company's business and plans.  The process, which involves reviewing and gathering information and documents about the company and investment opportunity, includes both ***business diligence*** and ***legal diligence***.

277.     Another National Tier 1 law firm has published a sample due diligence request list of "what VCs will look for before they'll close your financing."  In addition to formation and structural type documents, the list includes requiring documents concerning the operations of the target company, such as information concerning directors, officers, employees, and transactions, loans, or other arrangements with them.  "Debt Financing" documents are also requested, such as all "debt instruments and credit agreements" and "[a]ny guarantees of third party obligations," and the

"[m]ost recent audited financial statements" or "[a]ny other agreements material to the business of the Company, or outside the ordinary course of business."

278.     The Domestic VC Defendants claimed to have done due diligence on the FTX entities, but even a cursory due diligence review would have raised serious doubts about the business practices and legitimacy of FTX and Alameda.  For example, a November 15, 2022 article published by *Insider*, describes how SBF pitched investing in FTX to CEO and founder of venture capital company Social Capital, Chamath Palihapitiya ("Palihapitiya"), during the same investment round that each of the Domestic VC Defendants invested.  "After a Zoom meeting with Bankman-Fried, Palihapitiya said [SBF] didn't 'make much sense,' so his team at Social Capital worked on a two-page deck of recommendations for next steps for FTX if the investment talks were to proceed." Social Capital made three recommendations to FTX: (a) form a board; (b) create a dual-class stock; and (c) provide investors with "'some reps and warranties around affiliated transactions and related party transactions.'"  Mr. Palihapitiya explained that after making these recommendations "'[t]he person that worked there called us back and literally, I'm not kidding you, said, "go fuck yourself."'"

279.     In addition to showing the misappropriated customer funds, basic due diligence would have shown that FTX's balance sheets were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost.  FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX or Alameda.  As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion.  Using customer funds and for the benefit of Alameda, SBF and his cohorts

manipulated the value of FTT by implementing a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third of FTX's revenue.

### 3. The Regulatory Actions Following the Fall of FTX

280. On December 13, 2022, after the FTX Group and SBF's fraud was revealed and FTX Group had filed for bankruptcy, CFTC Chair Rostin Benham lambasted the fact that "FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds," after the CFTC filed its own complaint related to the collapse of FTX, stating in pertinent part as follows:

> *FTX held itself out as "the safest and easiest way to buy and sell crypto" and represented that customers' assets, including both fiat and digital assets including bitcoin and ether, were held in "custody" by FTX and segregated from FTX's own assets. To the contrary, FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds.* Alameda, Bankman-Fried, and others also appropriated customer funds for their own operations and activities, including luxury real estate purchases, political contributions, and high-risk, illiquid digital asset industry investments. The complaint further alleges that, at Bankman-Fried's direction, FTX employees created features in the FTX code that favored Alameda and allowed it to execute transactions even when it did not have sufficient funds available, including an "allow negative flag" and effectively limitless line of credit that allowed Alameda to withdraw billions of dollars in customer assets from FTX. These features were not disclosed to the public.

281. That same day, SEC Chair Gensler called FTX "'a house of cards'" built "'on a foundation of deception'" following the filing of a related SEC complaint, stating in pertinent part as follows:

> *We allege that Sam Bankman-Fried built a house of cards on a foundation of deception while telling investors that it was one of the safest buildings in crypto*. . . . The alleged fraud committed by Mr. Bankman-Fried is a clarion call to crypto platforms that they need to come into compliance with our laws. Compliance protects both those who invest on and those who invest in crypto platforms with time-tested safeguards, such as properly protecting customer funds and separating conflicting lines of business.

- 114 -

282. Also on December 13, 2022, SEC's Director of Enforcement Mr. Grewal described how FTX's true operations were diametrically opposed to the marketing pitches made to FTX customers (which mirrored the statements made by Domestic VC Defendants), stating in pertinent part as follows:

> FTX operated behind a veneer of legitimacy Mr. Bankman-Fried created by, among other things, touting its best- in-class controls, including a proprietary "risk engine," and FTX's adherence to specific investor-protection principles and detailed terms of service. But as we allege in our complaint, ***that veneer wasn't just thin, it was fraudulent*** . . . .

283. As more fully set forth below, despite glaring red flags, and fraud that any proper due diligence process would have revealed, the Domestic VC Defendants each invested in and publicly promoted FTX. Before deploying millions of dollars to legitimatize SBF's empire, the Domestic VC Defendants had the opportunity to, and indeed claimed they had, conducted the proper due diligence that showed or would have shown upon reasonable inquiry that customer assets were being comingled, massive "loans" were being given between FTX and Alameda, balance sheets were loaded with FTT and other affiliated tokens which value was manipulated, there was a complete lack of internal controls, and that outright fraud was occurring. Instead, abusing their stature and reputation, the Domestic VC Defendants promoted FTX and SBF to unsuspecting investors who went on to transact and deposit fiat currency or digital assets in accounts with FTX believing that if the Domestic VC Defendants are endorsing FTX it must be safe. But the Domestic VC Defendants actually or constructively knew, or were reckless in not knowing, that SBF's empire was a complete and utter sham.

### 4. History of Sequoia

284. Sequoia is a venture capital firm headquartered in the heart of Silicon Valley. Sequoia was founded by Don Valentine in 1972 and were early investors in then-nascent computer technology companies like Atari and Apple. The company has "long been seen as the gold standard in the venture capital industry for its high investment bar."

285. Sequoia earns lucrative investment management fees by pooling capital from its investors, which it then generally invests in pre-IPO companies with a focus on the technology sector. Sequoia captures the appreciation of its investments between the time of the funding rounds and the time that the company goes public via an IPO. Because Sequoia invests early in the life cycle of a company, there is tremendous potential to return many times its initial investment – potential that most average investors do not have.

286. Investing decisions are made by Sequoia's general partners (called simply "partners" by Sequoia), while limited partners only have a stake in the profits of the Sequoia-managed funds they invest in. Sequoia claims that when it comes to the companies they invest in, they are "***actively engaged partners who roll up [their] sleeves and dedicate decades of collective company-building experience to help founders achieve their potential***."

287. Sequoia is one of the largest venture capital firms in the world with over $85 billion in assets under management in 2022. Sequoia is highly respected among investors with several of its partners being named to *Forbes*' 2022 "The Midas List," which is a list of "The World's Best Venture Capital Investors."[135] Mr. Lin, the Sequoia partner who led the firm's investments into

---

[135] Sequoia and Mr. Lin also appeared on Valuer's 2021 list of "100 Top Venture Capitalists in the USA." https://www.valuer.ai/blog/100-top-venture-capitalists-in-the-usa. In 2017, Mr. Lin was fourth on *The New York Times*' "Top 20 Venture Capitalists Worldwide" list. https://www.nytimes

FTX, came in at seventh out of the 100 venture capitalists named to The Midas List. In 2021, he was first.

288. Mr. Lin has an impressive management track record even outside Sequoia, having been COO and CFO of online footwear retailer Zappos. Mr. Lin helped lead Zappos to Amazon.com's $1.2 billion acquisition of the shoe retailer in 2009. After Zappos, Mr. Lin joined the Sequoia team as a partner in 2010. Mr. Lin has been involved in several highly profitable investments for Sequoia, such as its investments in Airbnb, Uber, DoorDash, and Instacart, among others. In fact, Mr. Lin is so well respected in the industry that *Forbes* published a piece naming him "The World's Best Venture Capitalist." The *Forbes* article detailed how Sequoia banked more than $21 billion in a two-day period – thanks to the successful IPOs of Sequoia's investments in DoorDash and Airbnb led by Mr. Lin. Another *Forbes* article titled "The 30 Most Influential People in Tech" summarized his accomplishments as "[e]verything he touches turns to gold." Put simply, Mr. Lin's success at Sequoia is well known to the investing public, and, when Mr. Lin speaks, investors tend to listen to what he has to say.

289. Mr. Lin's partner and co-lead on Sequoia's FTX investments was Michelle Bailhe ("Bailhe"). Following Ms. Bailhe's graduation from Brown, she spent time at McKinsey & Co., Google, and private equity firm Hellman & Friedman before being brought on as one of the youngest partners in Sequoia's history. Ms. Bailhe is heavily involved in Sequoia's crypto and blockchain-related investments and she often appears on television, including *CNBC* and *Bloomberg*, as well as various podcasts to discuss the industry. Ms. Bailhe heavily promoted Sequoia's FTX investments,

---

.com/interactive/2017/03/27/technology/Top-20-Venture-Capitalists.html. In 2021, *dealroom.co* named Sequoia the second-most prominent venture capital firm in the world. https://dealroom.co/blog/vc-investor-prominence-rank-2021.

hosting interviews with SBF, facilitating the publication of articles touting FTX, and making several television and podcast appearances to promote the Company. For Ms. Bailhe, Sequoia's investment in FTX provided an opportunity to mark her name right next to Mr. Lin's, as the visionary who helped bring FTX to market.

### 5. Sequoia Promotes FTX and SBF

290. On July 20, 2021, Sequoia participated for the first time in a funding round for FTX. This Series B funding round raised $900 million for FTX Trading, valuing the two-year-old Company at $18 billion. At the time, the funding round was the largest private crypto funding deal ever. Sequoia acquired 2,289,340 of FTX Trading's common stock and 4,769,173 preferred shares.

291. SBF explained after the round that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand." SBF further touted the fundraising round on Twitter tagging Sequoia, Paradigm, Ribbit Capital, and Thoma Bravo among others:



292. Mr. Lin, who also served on FTX's Advisory Board, lent his name to a July 20, 2021 FTX promotional press release, describing the funding round as the "Largest Raise in Crypto

4896-1753-3557.v1

Exchange History." The release, which also featured Domestic VC Defendants Paradigm and Thoma Bravo, contained the following quote from Mr. Lin:

> **FTX is the high-quality, global crypto exchange the world needs**, and it has the potential to become the leading financial exchange for all types of assets. **Sam is the perfect founder to build this business, and the team's execution is extraordinary**. We are honored to be their partners.

293. At the time of FTX Trading's Series B funding round, FTX Trading had over one million users and was averaging over $10 billion of daily trading volume. Following the close of the funding round, crypto traders and investors heeded Mr. Lin's advice and flocked to FTX as a safe haven for what they believed to be high-quality, safe crypto trading.

294. Sequoia promoted FTX on its website, and advertised that FTX "has become one of the world's most respected cryptocurrency exchanges." It had links to FTX's website, the founders who it had "partnered" with Sequoia, and press of SBF.



4896-1753-3557.v1

295.     On July 21, 2021, Sequoia entered into a "Letter Agreement Re: Management Rights: Common Interest Agreement with FTX Trading."   A Management Rights Agreement is an agreement between a venture capital investor and a company that contractually guarantees the investor with certain "management rights" that allow it to substantially participate in, or substantially influence the conduct of, the management of the company.  Venture capital investors seek formal management rights in order to fall under ERISA's venture capital operating company exemption. *See* 29 C.F.R. §2510.3-101.

296.     On October 18, 2021, Sequoia entered into Investors' Rights Agreements with FTX Trading, which provided further insight into FTX.  An Investors' Rights Agreement is an agreement between a venture capital investor and a company that contractually guarantees the investor certain rights concerning the control of the company, including, but not limited to, voting rights, inspection rights, rights of first refusal, and observer rights.

297.     On October 21, 2021, FTX conducted another fundraising round, the Series B-1 round for FTX Trading.  Because of the amount of capital raised, over $420 million, this round would become known as the "Meme Round."  Sequoia participated again in this round, which valued FTX Trading at just shy of $25 billion – meaning Sequoia's initial investment in the Series B round had appreciated by almost 40% in just three-months.  For context, the S&P 500 Index was up less than 7% during that same period.  Sequoia's promotional efforts had worked.  In just the three months since Sequoia's initial investment, the FTX Trading user base increased 48% and its average daily trade volume increased to more than $14 billion.

298.     Recognizing the success of Sequoia's investment, Mr. Lin and Ms. Bailhe launched a media blitz to further cement FTX's apparent legitimacy.  For example, on October 21, 2021, Mr.

Lin was again quoted by FTX in a Company press release highlighting the close of the most-recent funding round. In the release, Mr. Lin called SBF "*a special founder who is ambitious and daring enough to build the future of crypto by establishing FTX as the global exchange with the best overall product offering and leveraging the world's crypto rails to build the future of finance.*" He concluded that Sequoia was "*thrilled to partner with FTX on their next phase of growth*."

299.    FTX posted on its website an official looking link to a *Financial Times* article saying how FTX's investors were "blue-chip investors":



300.    After the Meme Round, Sequoia invested in FTX US's Series A round that occurred on January 26, 2022. That round raised $400 million for the U.S. entity that was supposedly going to be for U.S. only trades.

301.    All told Sequoia had invested $225 million in capital to FTX and it sought to ensure that this investment continued to appreciate.  Sequoia invested in both FTX US and FTX Trading's common and preferred shares through at least two funds: SCGE Fund, L.P. and Sequoia Capital Global Growth Fund III – Endurance Partners, L.P., for itself and as nominee.  Sequoia acquired at least 35,046,340 shares of common stock and 10,611,157 shares of preferred stock.

302.    On November 20, 2021, Ms. Bailhe appeared on FTX's own "The FTX Podcast." She had the following exchange with FTX employee and podcast host, Tristan Yver, in which she represented that Sequoia's confidence in FTX was based on its substantial due diligence:

> [Yver:]  Did you guys go into FTX because Sam's narrative or because the story that FTX told?
>
> [Bailhe:]  It's so funny because I actually shared before we ever met Sam in an official Sequoia meeting, I had sent this email to all the people on our side that were going to join about like guys like "Don't ask silly questions in the meeting. This is an amazing company.  Please bring your 'A' game. . . .  "Did you guys just invest because Sam is so charismatic?"  *And Alfred [Lin] and I were like "No, we do our homework."  We did our homework way in advance.  We knew FTX was this amazing company and we also knew Sam was an amazing founder*.  In the meeting, I think what we loved about Sam is yes, he is an amazing storyteller which I think is important to create truly legendary companies.

303.    During the same podcast, Ms. Bailhe explained that Sequoia takes an active role in the operations of companies that it invests in, like FTX, stating in pertinent part as follows:

> [Yver:]  So you guys have a lot of communication with these founders that you're backing then?  It's not an off-hand process in which you guys invest and then let them go off to the races?
>
> [Bailhe:]  No, no.  *There is a big active conversation throughout.  I think we take it probably more seriously than any other firm*.  We've been debated actually about whether founders would appreciate that or not.  The founders we work closely with seem to appreciate it a lot and *we try to be really careful*.  Because we're not just passive money.  We want to be really business partners.  Not where it's overbearing and we're in your hair but we are partners with you for a decade or

4896-1753-3557.v1

however long you want, so it's not okay to back a direct competitor that is going after you if you're not okay with that.

304.    On December 17, 2021, Ms. Bailhe authored an article titled "Ask Not Wen Moon – Ask Why Moon" that was published on Sequoia's website.  In the article, Ms. Bailhe put forth her bullish case for crypto going forward and promoted Sequoia's close relationship with FTX and SBF, stating in pertinent part as follows:

> Like all other waves of technology, ***Sequoia's mission is to partner with the most daring founders in crypto and help them build something legendary.  We're proud partners of Sam at FTX***, Jack at Square now Block, Michael at Fireblocks, Uri at Starkware, Elena at Iron Fish, Nader at DeSo, Vlad at Robinhood, and a dozen other seed-stage companies still in stealth.  Because we believe crypto will impact every industry, crypto is a firm-wide focus that includes myself (FTX, Fireblocks), Shaun Maguire (DeSo, ParallelFi, Iron Fish, Faraway, Strips, and more seeds in stealth), Alfred Lin (FTX), Mike Vernal (Starkware), Ravi Gupta (Fireblocks), Roelof Botha (Square now Block), Andrew Reed (Robinhood), Stephanie Zhan (stealth seed, Brud acquired by Dapper Labs) and more.  Sequoia has been investing in crypto since 2017 and backs founders pre-seed and beyond in equity and tokens.

305.    On the same day, Sequoia sent the following tweets from its official Twitter account promoting FTX, including a quote by SBF that FTX did not "do scammy things . . . [e]ven if it is technically legal":

4896-1753-3557.v1



4896-1753-3557.v1



306. On January 31, 2022, FTX Trading completed its Series C fundraising round. Sequoia did not participate. The Series C round valued FTX Trading at nearly $32 billion, marking a nearly 90% appreciation in Sequoia's Series B investment in just over six months. In the three months since the Meme Round, and following Sequoia's widespread promotional efforts, FTX Trading's user base had grown another 60%.

307. Sequoia's investment in FTX was so successful that it opened a first-of-its-kind crypto-focused fund. Ms. Bailhe continued her media blitz to promote the new fund, appearing on *CNBC* and *Bloomberg*. In connection with the campaign, Sequoia penned a blog post on *Medium* where it promoted its relationship with FTX and SBF, which stated in pertinent part as follows:

> ***We have partnered with an ever-growing group of some of the best founders in crypto. From Sam Bankman-Fried at FTX***, Jack Dorsey at Block, Uri Kolodny and Eli Ben-Sasson at StarkWare, and Michael Shaulov at Fireblocks, to Elena Nadolinski at Iron Fish, Yubo Ruan at Parallel, Ming Wu at Strips and more in

stealth, these founders have expanded both our thinking and how we support their unique needs.

308.    On April 6, 2022, Sequoia's Twitter account promoted investments it was making

with FTX:



309.    On April 13, 2022, Ms. Bailhe hosted an interview with SBF for *Startup Grind*, a

conference that bills itself as a "Global Community for Entrepreneurs."  The interview segment was

titled "The Rise of FTX."  Ms. Bailhe portrayed SBF as a brilliant and savvy trader, prudent risk

taker, and visionary founder, stating in pertinent part as follows:

> ***I am thrilled to be here today with a founder that Sequoia is honored to***
> ***back and that is Sam himself.  Sam is the co-founder and CEO of FTX and an***

*exceptional founder and human in so many ways. And so I am excited that you all will get to know the man behind the myth in this session*.

\*      \*      \*

Sam, to many people, you are an enigma. You grew up in Northern California, the son of two Stanford law professors. You graduated from MIT which is sort of an alt thing to do these days. You actually went all four years and got a degree and were a top trader on Wall Street at Jane Street. And somehow you blink and years later you are the CEO of a crypto exchange in the Bahamas. *So, your trajectory is striking and I think a lot of that has to do with how well you calculate risk and upside. So talk about the risk that you've taken in your journey as a founder and how smart risk taking has shaped you and helped get FTX to where it is today*.

\*      \*      \*

*Hopefully, the audience can hear the level of quantitative thinking that shapes your choices*. I want to double click on that. A lot of people who know you really well, Sam, call you a trader's trader. People used to watch you trade like they watch gamers on Twitch. FTX's original motto is by trader, for traders. And I think your background as a trader has always given you a deep connection with your users, whether they are individual or institutional and incredible founder fit. *But what I don't think a lot of people realize is how much it impacts your skill in taking risk*. Is that where you first honed this thinking that you have about risk or was it something else in your life? And how has the trading background that you have shaped you as a founder?

\*      \*      \*

You have done what experts will tell you not to do and *you have been right many times*. So how do you decide when to listen to advice and from whom?

310.    Ms. Bailhe continued by highlighting SBF's purported altruism and the values-centric culture of FTX, stating in pertinent part as follows:

Hearing you talk about the deep sense of accountability that I think you know you had hardened through all these experiences *reminds me of a lot of the culture at FTX and it also reminds me about your subscription to the Effective Altruism movement. So you are earning to give. You plan to give away the majority of what you earn. And you have already started. You have a $100 million FTX future fund to that effect*. How do these values guide you as a founder and how do they also impact the culture at FTX?

\*      \*      \*

- 127 -

*FTX is famously lean because you care a lot about culture and you are one of the companies that spends the most time thinking about each additional person you add to the organization*.  People are always shocked to hear these stats, but I think the exact stats are that you had three developers to your first $100 million in revenue, and seven to your first billion.  And I will never forget when we were at dinner with other great founders and their jaws like hit the floor when you said that.  What drives your strong conviction that leaner teams are better?

311.    Ms. Bailhe also highlighted the astounding growth of FTX, stating in pertinent part as follows:

*What's interesting to me is one of the hallmarks of FTX – both culture and product – is speed*.  And you just move faster than your competition and it shows on tons of dimensions.  How do you set pace as a leader?  Aside from keeping the team lean, hiring the right people.  *How do you set the cadence of work and how do you maintain that as you grow?*

\*          \*          \*

*One of your superpowers is your unbridled ambition.  This past year alone, FTX has launched several new products and I would argue made the transition from a product company to a platform company*.  So you have the international exchange, you have the US exchange, you have US retail app, you have a proposal in front of the CFTC to change the way that derivatives could work in the US for crypto.  And you also have a white label product so that any app that wants to add crypto trading can do that now via an API.  And yet, this is a fraction of what we know you have planned.  Could you talk about your long-term vision for FTX?

\*          \*          \*

I remember in our first meeting when you talked about this vision, you had a way of describing it that I thought was very visceral and fun, which was: *we want to build something so that whatever you want to do with your next dollar, whether its trade crypto or send a dollar to a friend or buy a banana, that you can do it with FTX*.  And it was just a great way to phrase it.

312.    On May 10, 2022, Michael Ortiz, Senior Policy Director at Sequoia Capital, submitted a letter to the CFTC in support of FTX's attempt to become a derivatives clearing organization without the use of registered futures commission merchants.  The proposal would have

- 128 -

FTX clear crypto derivatives on its platform without the use of futures commission merchants, which are typically highly-regulated banks and bank affiliates.

313.     The letter to the CFTC was signed by the "Partners of Sequoia Capital" and leaned heavily on Sequoia's status as a prudent investor, saying:

> Sequoia Capital ("Sequoia") is a nearly 50-year old venture capital firm, known for its investments in companies including 23&Me, Airbnb, Apple, Cisco, DoorDash, Google, Instagram, NVIDIA, Oracle, SpaceX, WhatsApp, YouTube, Zoom, and more. While we are known for our work in technology broadly, we have had decades of experience working with financial technology companies, including Block (formerly Square), Citadel Securities, Kalshi (a CFTC-regulated events platform), Klarna, Nubank, PayPal, Robinhood, Stripe, and more.

314.     It then proceeded to readily endorse and promote SBF and FTX based on its history and insight into their business:

> ***Sequoia Capital has been an investor in FTX International and FTX US since August 2021. Sequoia invested in FTX due to our conviction in Sam Bankman-Fried, co-founder and CEO of FTX, and the FTX team, but also because we saw an opportunity for a new entrant in the derivatives market to change it for the better.*** Given our experience partnering with companies across the financial system for decades, we've seen the value created for businesses and consumers by companies that disrupt the status quo to offer fundamentally better, more efficient services***. We see in FTX the opportunity for a new entrant in the derivatives market to (1) increase competition among incumbent exchanges and banks that will ultimately benefit retail and institutional investors, (2) increase access to investment products for a wider range of investors while ensuring appropriate protections, and (3) improve risk management for investors and regulators by offering 24/7/365 financial markets for a 24/7/365 world***.

315.     Sequoia's letter to the CFTC continues by advocating for FTX saying:

> ***FTX's direct clearing model will create broader, more equitable access to financial products, with investor protections***. . . . FTX's direct, more efficient clearing model affords the prospect of broadening customer access, with attendant beneficial effects on overall market liquidity, price discovery and fairness.

*          *          *

*FTX's margining methodology will improve risk management by offering 24/7/365 markets for a 24/7/365 world*. . . . FTX's margining model accordingly will begin to unwind an undermargined customer position immediately, in a manner that will create real-time market feedback on pricing and valuation from FTX's central limit order book and from FTX's committed liquidity providers. *FTX's model represents a modern, efficient approach to margining cleared positions that is manifestly more compatible with emerging technologies in digital payment and transfer systems, as well as with a global derivatives market*. At a minimum – again, with the goal of promoting healthy competition between models – *the CFTC should encourage a comparison between customer access and experience with margining on the FCM overnight credit model, and the faster, more market-disciplined approach under the FTX model*.

*Sequoia encourages the CFTC to foster innovation, competition and superior customer access by granting the amendment sought by FTX*.

316.     On September 22, 2022, just weeks before the collapse of FTX, Sequoia published a now-deleted glowing profile of SBF and FTX on its website. The self-published piece was titled "Sam Bankman-Fried Has a Savior Complex – And Maybe You Should Too." The piece detailed SBF's supposed adherence to "Effective Altruism" – the idea that one should earn as much as possible for benefit of humankind, as FTX and SBF were purportedly working to do. The piece described SBF in almost superhuman terms, as an investing genius who would first revolutionize crypto trading and then the world. The piece stated in pertinent part as follows:

SBF's purpose in life was set: He was going to get filthy rich, for charity's sake. All the rest was merely execution risk.

\*     \*     \*

SBF's mind had been trained almost from birth to calculate. As a schoolboy the hedonic calculus of utilitarianism has him trying to maximize the utility function (measured in "utils," of course) for abortion. During his teenage gaming years, his mathematical abilities allowed him to sharpen his tactics – and win. And, of course, every trade SBF ever made at Jane [Street] was the subject of a risk/reward calculation.

\*     \*     \*

- 130 -

He had to find a risk-neutral career path – which, if we strip away the trader-jargon, actually means he felt he needed to take on a lot more risk in the hopes of becoming part of the global elite.  The math couldn't be clearer.  Very high risk multiplied by dynastic wealth trumps low risk multiplied by mere rich-guy wealth.  To do the most good for the world, SBF needed to find a path on which he'd be a coin toss away from going totally bust.

*      *      *

At this point, mid-2019, SBF decided to double down again – and scratch his own itch.  He would bet Alameda's multimillion-dollar trading profits on a new venture: a trading exchange called FTX.  **It would combine Coinbase's stolid, regulation-loving approach** with the kinds of derivatives being offered by Binance and others.

*      *      *

'Of the exchanges that we had met and looked at, some of them had regulatory issues, some of them were already public," Bailhe says.  "And then there was Sam.'  **The exchange that SBF had started to build, FTX, was Goldilocks-perfect.  There was no concerted effort to skirt the law, no Zuckerbergian diktat demanding that things be broken**.  And, yet, FTX wasn't waiting to get permission to innovate.  The company had based itself offshore precisely because it aspired to build an advanced risk engine that would support all sorts of hedging strategies.  SBF himself seemed to be bred for the role of crypto exchange founder and CEO.  Not only had he been a top trader at a top firm – and, thus, the ideal customer – but both his parents were lawyers.  '**And, so, he is committed to making the right chess moves for FTX to eventually be able to legally do everything they want to do in the U.S.,' Bailhe says – 'not by asking forgiveness, but by asking permission**.'

. . . Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation.  **But FTX had an ambition to change that. It was built to be the exchange traders could count on.  SBF needed to get the word out.  He wanted FTX to be known as the respectable face of crypto.  This required ad campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it all**.

FTX did **need** the money, after all.  **And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers.  So, in the summer of 2021, when FTX started to raise its Series B from a who's who of Silicon Valley VCs, Bailhe and Lin hit the 'Don't Panic' button.  'Embarrassingly, we had never tried to reach out to Sam, because we figured he didn't need us,' Bailhe admits.  'I thought they were just minting money and had absolutely no need for investors.'  Learning otherwise,**

- 131 -

*they quickly contacted SBF and organized a last-minute Zoom call between him and the partners at Sequoia – at four California time on a hot July Friday afternoon. Bailhe was adamant, putting her reputation with the other partners on the line: 'I'm line, "No, it's worth it. Cancel your afternoon."'*

The Zoom went well for all concerned. SBF looked relaxed as he answered questions, talking, as he usually does, in complete paragraphs about topics of extreme complexity. Ramnik Arora, FTX's head of product and another ex-Facebook engineer, remembers the meeting clearly: 'We're getting all these questions from Sequoia toward the end. *He's absolutely fantastic.*' Arora locks eyes with me, and I am mesmerized. Arora is intense – calling to mind a Bollywood version of Adrian Brody. '*Unbelievably fantastic*,' he says, shaking his head.

Bailhe remembers it the same way: 'We had a great meeting with Sam, but the last question, which I remember Alfred asking, was, "So, everything you're building is great, but what is your long-term vision for FTX?"'

That's when SBF told Sequoia about the so-called super-app: 'I want FTX to be a place where you can do anything you want with your next dollar. You can buy bitcoin. You can send money in whatever currency to any friend anywhere in the world. You can buy a banana. You can do anything you want with your money from inside FTX.'

Suddenly, the chat window on Sequoia's side of the Zoom lights up with partners freaking out.

'*I LOVE THIS FOUNDER,*' typed one partner.

'*I am a 10 out of 10,*' pinged another.

'*YES!!!*' exclaimed a third.

What Sequoia was reacting to was the scale of SBF's vision. It wasn't a story about how we might use fintech in the future, or crypto, or a new kind of bank. It was a vision about the future of money itself – with a total addressable market of every person on the entire planet.

'I sit ten feet from him, and I walked over, thinking, *Oh, shit, that was really good*,' remembers Arora. 'And it turns out that that fucker was playing *League of Legends* through the entire meeting.'

'*We were incredibly impressed," Bailhe says. "It was one of those your-hair-is-blown-back type of meetings*.'

- 132 -

Not only that, Arora says, but *League of Legends* is the kind of multiplayer online battle arena video game where every four minutes or so of tactical maneuvering is punctuated by ten seconds of action known as a gank – gamer slang for 'gang killing' – where you and your team gang up on an enemy. 'There's a fight that happens, basically,' says Arora, who was watching over SBF's shoulder as he answered that final question from Sequoia, 'and I'm like, ***This guy is fucking in a gank***!'

The B round raised a billion dollars. Soon afterward came the 'meme round': $420.69 million from 69 investors.

(Emphasis added and in original.)

317.  The Sequoia article described SBF in transcendent terms, calling him "obviously a genius," "***as good at explaining the principles of macroeconomics as anyone out there in the world today***," a "future trillionaire," and someone who was "not talking about maximizing the total value of FTX," but rather "the total value of the universe." The article similarly described SBF as a "risk-neutral" market player who strove to "be fully rational about maximizing his income on behalf of the poor" and "apply his trading principles across the board."

318.  The article spoke of FTX with similarly effusive praise, stating: "FTX has a remarkable corporate culture . . . that comes right from the top" with a "guilelessness, an openness." The article described FTX's extremely "[e]thical behavior" as its primary "competitive advantage" and informed readers that "the success of FTX seems like a foregone conclusion."

319.  Sequoia's official Twitter account promoted the article on September 22, 2022 and September 30, 2022, stating in pertinent part as follows:





320.    On January 18, 2023, CFTC Commissioner Christy Goldsmith Romero ("Goldsmith

Romero") delivered a speech at The Wharton School and the University of Pennsylvania Carey Law

School titled "Crypto's Crisis of Trust: Lessons Learned from FTX's Collapse."  Ms. Goldsmith

Romero described the central importance of Sequoia's support for FTX in luring customers onto the

FTX Platforms, stating in pertinent part as follows:

- 134 -

*FTX appears to have used Sequoia as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto.*

*It appears that Sequoia at least knew its money would be used in this fashion.* However, there are serious questions and allegations about whether this public-relations 'war chest' was funded not only by venture capital money but also customer property. If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

*The multi-dimensional public relations campaign was meant to build the public's trust in FTX.* And I have not discussed all elements of that campaign. There were rumored efforts to influence charities and policy advocacy groups. There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site. *All of this appears to be part of a branding campaign designed to make FTX appear trustworthy.*

FTX's violation of the trust it built through this campaign deepened the trust deficit for an unregulated crypto industry already badly damaged by the collapse of TerraUSD, Three Arrows Capital, Celsius and Voyager. The crypto industry is left with a crisis of trust.

### 6. History of Thoma Bravo

321. Thoma Bravo is a private equity firm headquartered in Chicago, with primary offices in Miami and San Francisco. The predecessor firm to Thoma Bravo, Golder Thoma & Co. ("Golder Thoma"), was founded in 1980 by Stanley Golder and Carl Thoma. Golder Thoma pioneered the "buy-and-build" investment strategy in which the firm would use primarily debt to take a controlling stake in an existing company (also called a "leveraged buyout" or "LBO"). The firm then works with the acquired company's management to transform into a larger and more profitable business through internal growth and a series of strategic, industry consolidating acquisitions. Through several iterations, Golder Thoma came to be known as Thoma Bravo.

322. Orlando Bravo ("Bravo"), Thoma Bravo's founder and managing partner, was born in Puerto Rico and moved to Florida in his early teens. He attended college at Brown University before earning his law degree from Stanford Law School and his Master of Business Administration degree

from Stanford's Graduate School of Business.  While attending law school at Stanford, one of his professors was SBF's father, Joseph Bankman.

323.     Following graduate school, Mr. Bravo began working on mergers and acquisitions for Morgan Stanley.  After Morgan Stanley, Mr. Bravo joined Thoma Bravo's predecessor firm, Thoma Cressey Equity Partners.  After leading several successful deals, Mr. Bravo eventually became a named partner at the firm, leading it to become in 2008 what is now known as Thoma Bravo.

324.     Mr. Bravo is a well-known, successful private equity professional, being dubbed "Wall Street's best dealmaker" by *Forbes* in 2019, and "private equity's king of Saas" by the *Financial Times* in 2021.  As of September 30, 2022, Thoma Bravo had more than $120 billion in assets under management.

### 7.     Thoma Bravo Promotes FTX and SBF

325.     Thoma Bravo invested for the first time in FTX during the same July 2021 Series B funding round that Sequoia also made its first investment in.  Thoma Bravo invested in FTX's common and preferred shares through at least two funds: Thoma Bravo Growth Fund A, L.P. and Thoma Bravo Growth Fund, L.P. (together "Growth Funds").

326.     Thoma Bravo scrutinized FTX before investing, with partners Mr. Bravo and Mr. Sayle personally conducting diligence on FTX during the fundraising rounds.  Thoma Bravo summarized its investing process in documents filed with the SEC, and describes its approach as one that "stresses the importance of conducting comprehensive due diligence on prospective investments" and "approach[es] every potential transaction committed to a diligent, rigorous, and comprehensive due diligence process."

4896-1753-3557.v1

327.     In Thoma Bravo's investment adviser brochure to the SEC, which is publicly available, the firm stated that it undertakes "formal due diligence on prospective investment opportunities" for the Growth Funds:

### Undertake Due Diligence Process

Thoma Bravo's formal due diligence on prospective investment opportunities is intended to provide Thoma Bravo with an accurate picture of the investment opportunity. Thoma Bravo expects to undertake specific due diligence procedures to evaluate important aspects of a prospective portfolio company. The effort may include interviews with industry competitors, customers, suppliers and former employees and an analysis of relevant issues, risks and opportunities. Thoma Bravo expects to utilize Operating Partners and their expertise, experience and insights in the process. External resources to complement the firm's own internal abilities and expertise also are expected to be utilized, including accounting, legal, insurance and/or information technology experts. In addition to customary analysis of the market opportunity, competitive position and financial performance, Thoma Bravo expects to undertake an evaluation of a company's business model to determine whether pricing and packaging changes can be made to potentially accelerate revenue growth. Thoma Bravo expects to apply its experience with numerous growth companies of the Buyout Funds to understand the growth profiles of potential platform companies.

328.     Once an investment is made, Thoma Bravo also claims to perform the following due diligence to monitor its investments in the Growth Funds:

### Monitor Investments and Work Collaboratively with Management

In most cases upon the closing of an investment, Thoma Bravo expects to work with management, providing guidance based on expertise from decades of investing in Software companies. The investment teams intend to maintain contact with management and attend board meetings and operational reviews. Although a Growth Fund typically will not control a portfolio company, the firm expects to be proactive in shaping potential improvement and to work with management teams to highlight areas of operations that Thoma Bravo believes can be improved to drive higher revenues, including pricing and delivery of Software and support services, salesforce reorganizations, and sales channel structures.

329.     Thoma Bravo also stated that it has a high standard for custody of its own digital assets, discussed "cold wallets" and the steps it takes to protect its own keys:

The General Partner of a Growth Fund will be responsible for arranging for custody of such any Digital Assets held by a Growth Fund, including by storage in one or more "cold wallets" and/or on various Digital Asset exchanges.  In certain instances, an issuer will hold a Growth Fund's Digital Assets following a network launch for a period of time prior to engagement of a third party custodian or implementation of a self-custody solution for such assets.  Digital Asset exchanges may require a General Partner to provide control of applicable private keys when such exchanges are utilized by the relevant Growth Fund.  Thoma Bravo will take such steps as it determines are necessary to maintain access to these keys and to prevent their exposure to hacking, malware and general security threats, but there can be no assurance that such steps will be adequate to protect such keys or a Growth Fund's Digital Assets from such threats or that there will be no failure or penetration of the applicable security systems.

330.    Following the $900 million funding round, Mr. Bravo sounded his praises for SBF

and FTX in a press release issued by FTX, which was also posted on the Thoma Bravo website,

stating in pertinent part as follows:

We have watched with excitement as *Sam and the FTX team have successfully built the most cutting-edge, sophisticated cryptocurrency exchange in the world*.  While this has been an incredible accomplishment in itself, their commitment to making a positive impact on the world through their business is what sets the company apart.  We are thrilled to partner with FTX on their next phase of growth as they create a new ecosystem for crypto.

331.    On July 20, 2021, Mr. Bravo took to Twitter to endorse FTX and SBF:

- 138 -



332.    That same day, Thoma Bravo's official Twitter account also amplified their ongoing support of FTX:



333.    However, at the time, Thoma Bravo failed to disclose that its investment in FTX had arisen from Mr. Bravo's personal relationship with SBF's father.  As the *Financial Times* would later reveal in a November 11, 2022 article: "It was a surprise phone call from an old university professor that launched private equity investor Orlando Bravo into becoming one of the most

prominent and vocal supporters of Sam Bankman-Fried and his crypto trading firm FTX." The article continued in pertinent part as follows:

> The call was from Joseph Bankman, a professor of law and business at Stanford University who had taught Bravo in the late 1990s. At the time, in mid-2021, Bravo's $122bn private equity firm Thoma Bravo was opening an office in Miami, the city where Bankman's son Sam had just paid $135mn for a 19-year naming rights contract with the local NBA team.

> Bankman told Bravo his son was looking for guidance on philanthropic projects in Miami to further his 'effective altruism' mission. Only after they spoke did Bravo learn that Bankman-Fried was also in the process of raising a $900mn Series B funding round at a $18bn valuation, with a who's who of investors including Sequoia Capital, BlackRock and SoftBank. He quickly called Bankman back seeking an introduction and a way into the deal, which was progressing quickly and would be the largest capital raising in crypto exchange history.

> When Bravo and a partner Tre Sayle began due diligence for the funding round, they were taken aback by FTX's numbers. The two-year-old start-up led by a relatively small staff of young traders was on course to earn over $200mn in operating profit for the year, unprecedented margins for an early-stage growth company that would normally be losing money. Bravo was blown away. Thoma Bravo invested more than $125mn in the round in June 2021, becoming one of FTX's largest backers.

334. As a member of FTX's Advisory Board (through Mr. Sayle), Thoma Bravo continued to laud FTX during the relevant period, attempting to lure users to the FTX exchange which, in turn, made Thoma Bravo's stake in FTX more valuable. On November 27, 2021, in response to a tweet warning crypto traders to "[o]nly trade [bitcoin] on a legitimate exchange you trust," Mr. Bravo emphasized the purported trustworthiness of FTX. Mr. Bravo urged his Twitter followers to "[o]nly trade [bitcoin] with [FTX]," stating in pertinent part as follows:



335.    Mr. Bravo continued making media rounds in order to promote SBF and FTX.  For example, on January 4, 2022, Mr. Bravo was quoted in a *MarketWatch* article describing SBF's "incredible" execution and stating: "'He combines being visionary with being a phenomenal operator . . . .  That is rare.'"

336.    On January 18, 2022, leading up to the funding round for FTX US, Thoma Bravo tweeted that it was excited to be backing FTX:



337.    The next week, on January 26, 2022, Thoma Bravo also participated in the funding

round for FTX US.  In total, Thoma Bravo invested at least $125 million in FTX and acquired at

least 19,654,000 shares of common stock and 8,954,773 shares of preferred stock.

338.    On January 28, 2022, Thoma Bravo followed their investment with a glowing tweet

of FTX and SBF, again endorsing him and FTX:



339.    On April 8, 2022, Mr. Bravo appeared on *The Scoop* podcast with financial journalist

Frank Chaparro.  Mr. Bravo heaped praise on SBF and FTX, stating in pertinent part as follows:

[Chaparro:]  What advice do you give to an FTX to really stampede the competition and stand out?

[Bravo:]  Well FTX is already doing that.  FTX doesn't need a lot of advice.  That's the great thing.  ***It is so unusual to find a leader like Sam that combines an incredible strategic mindset with at the same time an exceptional operational and execution rhythm to the business***.  You usually find greatness in one or the other and you have to adjust to the culture of the company and their strengths.  In the case of FTX, you have both plus a pioneer plus a company that has such a big cultural mission that is beyond any individual.  Companies like that you don't just run across very often – even in a decade.

340.    On May 11, 2022, Thoma Bravo submitted a letter advocating for FTX's application to the CFTC to become a registered derivatives clearing organization without the use of registered futures commission merchant.  The letter was submitted via the public comment portal by Managing Director, General Counsel and Chief Administrative Officer at Thoma Bravo, Gerald Nowak.

341.    On June 7, 2022, Mr. Bravo endorsed a tweet by SBF where he claimed that FTX would keep growing even as other businesses cut jobs.  As reflected below, Mr. Bravo responded, "This is exactly right":



342.    On June 23, 2022, Mr. Bravo highlighted the "rigorous operations" of FTX as other crypto firms struggled during a crypto downturn, stating in pertinent part as follows:



343.     On September 21, 2022, Mr. Bravo spoke at the 2022 IPEM conference in Cannes, France.  IPEM is an international conference for professionals in the private equity and venture capital community.  More than 5,000 industry professionals attended the conference.  While speaking at IPEM, Mr. Bravo announced to other professional investors that FTX was going to be "a big winner," and he described SBF as "one of the best entrepreneurs" he had come across in his entire career.

344.     Just three days later, on September 25, 2022, the *Financial Times* published an article chronicling an interview with Mr. Bravo where he singled out FTX and SBF as worthy investment opportunities which stood out from the overall crypto sector, stating in pertinent part as follows:

> "I've gotten to know that world a little bit more, and some of the business practices don't rise to the level of ethics that we're all used to in private equity with your investors and your customers and your community, and that has been a bit disappointing," [Bravo] said.
>
> Bravo, who has said he personally owns bitcoin, criticized the crypto market for what he called a "disturbing" lack of transparency.  But he stressed that he was still bullish about bitcoin and believed the industry was "just young" and ethical problems would "get fixed over time."

                    *          *          *

4896-1753-3557.v1

However, he said, ***the firm would "certainly look at" putting more money into FTX if it held another funding round***. The Bahamas-based crypto company was going to be "a big winner," he said, describing 30-year-old Bankman-Fried as "one of the best entrepreneurs" he had come across.

Bravo's comments came as he and other dealmakers from around the world gathered for the IPEM private equity conference in Cannes and as the economic conditions that propelled a decade-long boom in the industry go into reverse.

345. Just weeks later, on November 11, 2022, FTX filed for bankruptcy. Billions of dollars in depositor funds remain misappropriated. Many lost their life savings because they had done exactly what Mr. Bravo had urged: only trading bitcoin on FTX.

## 8. History of Paradigm

346. Paradigm is a venture capital firm focused "on supporting the crypto/Web3 companies and protocols of tomorrow." The firm was founded in 2018 by ex-Sequoia partner, Matt Huang ("Huang"), and Coinbase founder, Fred Ehrsam ("Ehrsam").

347. After graduating with a degree in mathematics from MIT, Mr. Huang founded Hotspots, Inc. – an analytics company. Hotspots was eventually acquired by Twitter and Mr. Huang joined the Twitter Ads team. Following his time at Twitter, Mr. Huang found success as a venture capitalist at Sequoia, where he gained experience investing in pre-IPO companies. After four years at Sequoia, Mr. Huang partnered with Mr. Ehrsam to found Paradigm – a venture capital firm focused on funding blockchain and web3 companies. In just a few years, Mr. Huang and Mr. Ehrsam grew Paradigm into a venture capital powerhouse with billions of dollars in assets under management. From December 2020 through April 2022, Paradigm grew its assets under management by more than 300%. Mr. Huang has ample experience in successful venture capital raises, having participated as an investor in ByteDance (TikTok's parent company) and Instacart, among others.

348.     Since founding Paradigm, Mr. Huang has gained an immense following and is highly respected in the blockchain/crypto industry.  Currently, Mr. Huang boasts well over 100,000 followers on Twitter and has the attention of tens of thousands within the crypto community.

### 9.     Paradigm Promotes FTX and SBF

349.     Paradigm's first investment in FTX came in the July 20, 2021 Series B funding round.  Instead of relying on investment bankers, Paradigm was one of the firms to organize the funding round and help close the deal.  When the funding was announced in a press release that day, FTX announced that "[t]he investment process was led by the Company's own ventures team, with help from Paradigm [and] Ribbit."

350.     Following the funding round, Mr. Huang described SBF as a visionary founder and emphasized the excellent "execution" of FTX in a press release issued by FTX to promote its platforms, stating in pertinent part as follows:

> *Sam Bankman-Fried is one of those special founders whose vision is both stunningly ambitious and uniquely adapted to the future of crypto.  The team's execution speaks for itself*, with FTX growing to become a top global exchange in two years.  There's a bright future ahead for Sam and FTX, and Paradigm is excited to be a part of it.

351.     On or about November 18, 2021, Mr. Huang and Mr. Ehrsam appeared on the FTX sponsored video podcast, UpOnly TV, to discuss their funds, talent in crypto, and various issues concerning crypto investing.  The episode advertised the FTX Platform, how customers can "trade crypto right there on the FTX app" and its offerings of various FTX products.

352.     After witnessing its initial investment in FTX Trading's Series B funding round quickly appreciate, in November 2021, Paradigm set out to raise $2.5 billion from investors for a crypto-centric venture fund, called "Paradigm One."  Just two months later, on January 21, 2022,

Paradigm entered into a series of Investors' Rights Agreements with FTX Trading, and on January 31, 2022, Paradigm invested in FTX Trading's Series C funding round, which valued FTX Trading at nearly $32 billion.

353. In January 2022, Paradigm also invested in FTX US, signing a series of Investors' Rights Agreements with FTX US dated January 21, 2022, and investing in FTX US on January 26, 2022.

354. On January 26, 2022, Paradigm was quoted in a press release promoting FTX, with Mr. Huang saying:

> *Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX US. The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans*.

355. In total, Paradigm invested in FTX US's common and preferred shares and FTX Trading's preferred shares through at least two funds: Paradigm Green Fortitudo LP and Paradigm One LP fund. Paradigm acquired at least 6,551,000 common shares and 19,689,124 shares of preferred stock. Paradigm's total investment was at least $278 million.

356. In a February 23, 2022 press release, Mr. Huang (a member of FTX's Advisory Board) praised FTX's "great products and regulatory engagement," stating in pertinent part as follows:

> Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX.US. *The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans*.

357. On May 11, 2022, Paradigm wrote to the CFTC in a publicly filed letter, submitted by Justin Slaughter, Policy Director for Paradigm, urging the CFTC to approve FTX's application to

- 147 -

allow it to clear derivatives on the FTX Platform without the use of a registered futures commission

merchant:

> *Paradigm supports a regulated, competitive cryptocurrency market. The FTX US application to offer direct-to-customer margin will benefit consumers by dispersing market power of incumbent exchanges more widely. Further, approval of the FTX US application will reduce the over-reliance on the current gatekeepers to trading markets. For the reasons described below, we respectfully urge the Commission to approve the FTX US application.*

358.     The letter claimed that FTX's model will provide investor protections and help

ordinary retail investors safely access products:

> The FTX US model will also give investors the choice to access markets directly, without relying on a financial institutions. ***Working alongside the CFTC, FTX US has worked to ensure that investor protections normally afforded by FCMs are still present. This will permit ordinary retail investors to safely access products previously available only to the most well-resourced investors or through the use of intermediaries.*** Specifically, protections that have traditionally been provided by exchanges, such as risk disclosure, AML/KYC compliance, and market integrity through rigorous surveillance, will now be provided directly by FTX US' platform when accessed by their users.

359.     The letter went on to urge the CFTC to approve the application because centralizing

roles on the FTX Platform would lower system risks:

> ***With less intermediation of markets, as offered by FTX US, the number of interconnection risks between financial institutions in the overall market ecosystem is minimized.*** This also helps to minimize the "too big to fail" systemic-risk concerns that policymakers have continuously addressed since the 2008 financial crisis. The simplicity of the direct-to-investor market structure also reduces other operational risks compared to other models. ***The FTX US structure presents fewer risks to the platform, to the end investor, and makes it easier for the platform to manage risk overall.***

360.     The letter concluded by urging the CFTC to approve the application as soon as

possible and provided the contact details of Paradigm's point-person:

> ***In summary, we fully support the FTX US request to amend its DCO registration. For the reasons detailed above, we urge the Commission to approve***

***this request as soon as possible***.  If the Commission has any questions or comments, please ***do not hesitate to contact Justin Slaughter*** at justin@paradigm.xyz.

361.    On September 9, 2022, Mr. Huang retweeted a response by SBF to one of Mr. Huang's tweets which stated: "[I]t's really important that the gateways to the financial world take their duty extremely seriously to prevent financial crimes."  By promoting and distributing the tweet, Mr. Huang signaled his agreement that SBF had in fact taken significant measures to prevent financial crimes in the crypto space, as illustrated in the following exchange:



362.    By November 2022, FTX's and Domestic VC Defendants' deceit had come unraveled, costing investors billions of dollars in losses.  Mr. Huang wrote an apologetic tweet to his

followers in which he revealed that Paradigm itself had never used any of FTX's platforms, even as he had encouraged others to do so:



363.    Paradigm advertised on the front page of its website that: "We take a deeply hands-on approach to help projects reach their full potential, from the technical (mechanism design, smart contract security, engineering) to the operational (recruiting, regulatory strategy)."

364.    In Paradigm's investment adviser brochure to the SEC, which is publicly available, the firm stated that its funds "primarily invest in blockchain assets, crypto-related assets, and crypto

and crypto-related companies, projects, and protocols." In the same brochure, Paradigm also details its understanding of the risks associated with crypto assets and specifically highlights the risks of "Crypto Asset Exchanges." Demonstrating its recognition of the need to monitor digital transactions, Paradigm further states "[t]he Funds will take credit risk of an exchange every time it transacts."

365. Paradigm also stated in its brochure to the SEC that it conducts "reasonable and appropriate" due diligence for each investment:

> Before making investments, *the Adviser will conduct due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each investment*. When conducting due diligence, the Adviser may be required to evaluate important and complex business, financial, tax, accounting, and legal issues.

366. Through its due diligence prior and throughout its investments in FTX, including by entering into Investors' Rights Agreements, Paradigm knew or was reckless in not knowing that the FTX Platform was not a safe exchange for investors to deposit and trade assets. Yet, Paradigm promoted and advocated for SBF and FTX in the public causing investors significant damage.

### 10. History of SkyBridge

367. SkyBridge is an alternative investment adviser headquartered in New York City and with a satellite branch in Palm Beach Gardens, Florida. SkyBridge is principally owned by its founder, Mr. Scaramucci. SkyBridge was founded in 2005 by Mr. Scaramucci and Ray Nolte ("Nolte"), former CEO and chief investment officer of the Hedge Fund Management Group at Citigroup Alternative Investments. As of December 31, 2022, SkyBridge managed approximately $2.0 billion in assets, including about $450 million in "digital asset-related investments."

368. Mr. Scaramucci is a financer and well-known TV personality, who briefly served as the White House Director of Communications from July 21 to July 31, 2017 during the Trump

Administration.  After Mr. Scaramucci attended Harvard Law School, he began working at Goldman

Sachs, and went on to sell his first investment company, Oscar Capital Management, to Neuberger

Berman.  Mr. Scaramucci is a "CNBC Contributor" having a television contract with the widely

known business news cable channel and website, and often appears talking authoritatively on crypto

investing.  Mr. Scaramucci has repeatedly stated publicly that he considered SBF a close friend.

369.     During the relevant period, SkyBridge and Mr. Scaramucci made numerous

appearances at conferences, online forums, and podcasts discussing crypto currencies and promoting

FTX.  SkyBridge and Mr. Scaramucci heavily promoted FTX, made introductions for FTX to raise

additional capital, and otherwise enabled FTX's fraud.

370.     SkyBridge hosts a large investment conference known as "SALT," a shortened

version of SkyBridge Alternatives, which occurs biannually across the globe.  SkyBridge advertises

the conference as a "global thought leadership and networking forum encompassing finance,

technology and geopolitics.  SALT's biannual events and technology solutions connect leading asset

managers and entrepreneurs with top asset owners, investment advisors and policy experts."

SkyBridge boasts that it has grown to "over 1,800 thought leaders, public policy officials, business

professionals, investors and money managers from around the world."  FTX has sponsored SALT

conferences in North America, Asia, and the Middle East, and SkyBridge has used this conference to

promote FTX and legitimize its platform to investors.

371.     SALT is a widely covered event, in both the traditional media as well as numerous

online forums and podcasts.  SkyBridge held a special SALT event called "Crypto Bahamas," which

occurred on April 26-29, 2022 in the Bahamian capital, Nassau.  It was sponsored by FTX, which

*CoinDesk* described as "a four-day flex of FTX's expanding empire – with a new era of 'corporate

crypto' firmly on display." Highlights included FTX breaking ground on its $60 million headquarters with speeches from SBF and the prime minister of the Bahamas saying that the Bahamas will be a hub for crypto currencies. It also included the now well-known dinner with SBF appearing on stage with former President Bill Clinton and U.K. former Prime Minister Tony Blair. *Forbes* called Crypto Bahamas a "Royal Flush" and "Crypto's Most Exclusive Gathering."

372.    SBF held the limelight and SkyBridge promoted him throughout the conference. As the *New York Times* reported, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence. Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag."

373.    With FTX flush with cash it received from the Domestic VC Defendants, Crypto Bahamas "was a far cry from the early days of 'shadowy super-coders' hearkening the end of banks." Speaker panels had titles like "Investing in Crypto: How Digital Assets Fit Into Modern Portfolios," "The Boomers Are Coming: How Crypto is Transforming Wall Street," and "From Inspector Gadget to the Future of Banking." Indeed, many news outlets reported on the growing acceptance of crypto on display at Crypto Bahamas. For example, *Yahoo! Finance* reported how the story of Crypto Bahamas was "traditional investors and crypto native firms." And *Forbes* reported how the panels "discussed how digital assets fit into modern investment portfolios and the broader maturation of the asset class." The online tech news website *TechCrunch* quoted Mr. Scaramucci as saying, "[s]omeone joked its like millionaires in suits and billionaires in cargo shorts."

374.    SkyBridge also partnered with FTX to create the SALT Crypto show, and other online shows such as one called Bitcoinreview. Mr. Scaramucci and John Darsie ("Darsie") , a

SkyBridge partner and Head of Business Development, appeared on these shows and discussed crypto issues and investments.

### 11. SkyBridge Promotes FTX and SBF

375. On September 13, 2021, SBF was a standout figure highlighted at SALT New York 2021. SALT New York 2021 was SkyBridge's conference held from September 13-15 at the Javits Center in New York City. SBF was prominently featured in a panel on the first day titled, "How Crypto Changes Everything: The Future Of Finance and Culture." During the panel interview, SBF was led to discuss how FTX was a new platform "with an exciting growing set of products" and how FTX was looking to "introduce [its products] to tens of millions of people in a way which doesn't dilute the brand." SBF explained:

> . . . and you know we could buy tens of millions of Facebook ads – and I don't know maybe we should at some point, we'll hire a team to look into to whether that that is worth doing – but that's not a thing which is going to really make the same sort of impact on people, anyone can sort of you know potentially do that, and instead *what we've really been looking for like who are partners that we're really excited about and are really excited about us, and you know, who can help represent us and who we can really work with in a way to build something kind of stronger and more powerful than what we had*.

376. On October 18, 2021, SkyBridge entered into an Investors' Rights Agreement with FTX Trading. On October 21, 2021, SkyBridge bought 244,196 shares of FTX Trading's common stock and 61,049 shares of FTX Trading's Series B-1 preferred shares in its SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G fund.

377. On November 10, 2021, SkyBridge bought 1,310,000 Class A common stock shares of FTX US for approximately $19.5 million in its SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G fund. Notably, venture capitalist investments in FTX US, the U.S. entity, were not announced until the Series A funding round in January 2022.

378.     On January 20, 2022, SkyBridge issued a press release announcing its partnership with FTX for "a multi-year deal to become the global presenting partner of SALT." The press release stated that "FTX will serve as the presenting sponsor of annual SALT events in North America, Asia and the Middle East, as well as the SALT Crypto Show, a new digital series launching in early 2022." In the press release, Mr. Scaramucci publicly promoted FTX saying, "***Sam and the FTX team are building the most important company in crypto and the financial industry more broadly. We are excited to be part of their journey***." *CoinDesk* reported that "Scaramucci says that FTX approached SALT with the idea to co-host a crypto-themed conference in the Bahamas after FTX's partnership with SALT New York last September was a success for the exchange." As discussed below, SkyBridge partners used SALT and other online shows to publicly promote FTX and also provided a platform for others in the industry to also promote FTX.

379.     On January 25, 2022, SkyBridge invested in FTX again purchasing 265,710 shares of FTX Trading's Series C preferred shares, and 8,533,916 shares of FTX US's Series A preferred shares in its SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G fund.

380.     On March 22, 2022, SkyBridge wrote to the CFTC to advocate for FTX's application to be a derivatives clearing organization, requesting that FTX be allowed to clear margined products for retail participants through the Deceptive FTX's Platform without using registered futures commission merchants. Partner, General Counsel and Chief Compliance Officer of SkyBridge Marie Nobel submitted the letter on the CFTC's public portal and Mr. Scaramucci signed the letter saying that "***SkyBridge strongly supports the grant of the amendment sought by FTX***."

381.    The letter claimed that FTX had created investor protections that were on par with the registered commission merchant model, that were accessible on FTX's platform and FTX provided risk tools encouraging investors to use the exchange:

**The Proposed Model Would Make Markets More Accessible to End Users, While Ensuring Adequate Safeguards Are in Place**

\*        \*        \*

The Proposed Model is designed to ensure that providing investors with direct access to the market does not come at the expense of investor protection.  By working with the Commission, ***FTX has developed a method to provide key, legally required protections directly to investors which are normally afforded by FCMs. These protections include risk disclosures, Anti-Money Laundering and Know Your Customer compliance, and market integrity through rigorous compliance***.

\*        \*        \*

Providing a direct, Commission-regulated, margined digital asset exchange would provide significant benefits over current options.  As noted above, ***the Proposed Model includes protections such as fulsome risk disclosure, more robust anti-money laundering and know your counterparty protections, as well as enhanced surveillance of derivative transactions***.  Importantly, the Proposed Model's nearly continuous margin framework would allow traders to trade on margin without needing trades to be fully collateralized or intermediated by an FCM.  ***Unlike an intermediated model, these protections for market participants would be provided directly by FTX when an investor accesses the platform***.  ***SkyBridge believes the protections afforded to market participants and the direct structure of the exchange would encourage market participants to use FTX's exchange***.

382.    On April 27, 2022, at SkyBridge's Crypto Bahamas event, Mr. Scaramucci stated to the press: "***So you have the most influential person in cryptocurrencies chose this country, so I predict that this country will be the most influential or among the most influential in cryptocurrency***."  He continued, stating that SkyBridge was going to have an office in the Bahamas and Mr. Scaramucci was going to visit each year.  Unknown to investors, however, was that the reason why FTX moved to the Bahamas was to escape Hong Kong Regulators.  The new CEO of

FTX in bankruptcy would tell the bankruptcy court, "when Hong Kong announced plans to regulate crypto exchanges, Bankman-Fried and the other FTX Senior Executives immediately sought to leave the jurisdiction." And that "the FTX Group moved to the Bahamas because, with respect to its regulatory environment, the Bahamas was 'friendly' and 'cutting back on red tape.'" FTX would then secure its Bahamian business license through $1 million in bribes.

383. On May 4, 2022, *CoinDesk* reported on Crypto Bahamas, reporting how it was opened by Mr. Scaramucci, who "cracked several self-deprecating jokes about 'boomers' and urged Wall Streeters to be more open-minded toward new technologies." Mr. Scaramucci also promoted FTX and SBF constantly. For example, the same article quoted him as saying "***Sam's a polymath, an exceptional thinker. . . He knows more about politics than anyone***."

384. On March 14, 2022, *The New York Times* reported on Crypto Bahamas, "a showcase for FTX and a vivid demonstration of [SBF's] growing celebrity and influence." But importantly SkyBridge's Crypto Bahamas gave FTX the stage to induce more investors, as *The New York Times* reported:

> *In an interview at the resort in the Bahamas, Mr. Bankman-Fried insisted that FTX's platform was safe: The company has installed protections for retail investors, he said, and reduced the amount of leverage available to traders. "We are talking regularly with all of our regulators," he said. "It would be pretty weird if the regulators were refusing to talk."*



Mr. Bankman-Fried with Anthony Scaramucci at the conference last month. Erika P. Rodriguez for The New York Times

385. In an April 26, 2022 interview he gave to *CoinDesk* at Crypto Bahamas, Mr. Scaramucci made clear that SkyBridge was supporting FTX to legitimize it to people in traditional finance. When asked how he managed to get former President Bill Clinton to talk at Crypto Bahamas, when his wife Hilary Clinton had in the past spoken not so favorably about crypto currencies, Mr. Scaramucci responded:[136]

> That's the interesting dynamic between SkyBridge and SALT and FTX. FTX represents this new, younger generation of people that see Web3 and see the future. ***And I would sort of like to see ourselves – no pun intended because the name of firm is SkyBridge – as a bridge to people that are in traditional finance***. Or someone like president Clinton's case, who is a policy wonk, a long standing policy

---

[136] As detailed below, Bill Clinton's involvement with FTX was likely facilitated by Defendant K5.

wonk, I want to get them to embrace this. We want them to be intellectually open minded to it.

386. In connection with SALT, SkyBridge continued to promote FTX. In April and May 2022, for example, Crypto Bahama's official Twitter account promoted FTX multiple times and advertised SBF's various on stage talks saying it was making his conversations available on YouTube:





387.     On May 4, 2022, the technology business magazine *The Information* published an interview it had with Mr. Scaramucci.  In the interview Mr. Scaramucci drew an analogy to LaGuardia airport, "built in the 1920s," and Dubai's spectacular airport, claiming that FTX was the new financial system:

> "Now you got this old airport. . . .  You're going to improve it over here.  You improve it over there.  And it's an airport that ends up looking terrible by the time you get to 2020."  LaGuardia, in this metaphor, is the existing financial system – a patchwork affair that's lost whatever curb appeal it once had.  "Then you got Dubai.  They build the airport in 2005, and it is ab-so-lute-ly brand new, and it is spectacular."  Dubai's rectangle, representing the new financial system Scaramucci believes will be built with blockchain, was much bigger and nicer, the way he drew it.
>
> "So these are the Goldman Sachses and the JP Morgans and the Morgan Stanleys," he said, pointing to those schlumpy LaGuardia rectangles.  "This is all the sedimentary activity."  He drew an X across LaGuardia.  "***But now along comes Coinbase and FTX and Binance," he said, pointing his pen at Dubai again.  "They don't have any of the predecessor baggage***."
>
> And that, in the most Pictionary-basic nutshell, is what brought Scaramucci and his Wall Street kin down to the Bahamas: to flying open the gates to a flashy new financial system carrying none of the baggage of the old.



Anthony Scaramucci's artistic interpretation of the current and future financial systems.

388.    In the interview, Mr. Scaramucci capped the analogy off by pointing to FTX's application with the CFTC to become a registered derivatives exchange and saying that FTX could someday buy Goldman Sachs:

- 161 -

Instead of vying against each other, founders and crypto executives were open about their plans to compete with traditional financial services. Brett Harrison, CEO of FTX US, an American crypto exchange founded by Bankman-Fried but not tied directly to FTX, spoke onstage about the company's application with the Commodity Futures Trading Commission to allow people to trade using margin – initially posting only a portion of the full derivative obligation – on FTX US's derivatives exchange. Harrison said its technology is far superior to that of existing crypto derivatives exchanges because it evaluates the risk of every margin account every 30 seconds as opposed to once a day.

Scaramucci thinks we'll see more stuff like that. "***If you told me that FTX someday bought a Goldman Sachs, [that] wouldn't surprise me at all***," he said. ***Given the way the financial world is trending, crypto exchanges are more likely to make acquisitions to get into banking rather than the other way around. "They're more flexible***," said Scaramucci, not needing to draw to make this point. "***They're more neurally plastic***."

389.     On May 6, 2022, Crypto Bahamas' Twitter account promoted the Information's article on Mr. Scaramucci and FTX:



390.     On May 19, 2022, Crypto Bahamas' Twitter account promoted that FTX US was open for stock trading for U.S. users by retweeting SBF and a *Wall Street Journal* article on FTX:

- 162 -



391. On May 19, 2022, Mr. Scaramucci also promoted FTX US's stock offerings by retweeting the same article and saying FTX was going to be the Amazon of financial services:



392. On June 21, 2022, during the Crypto Winter, FTX announced that it was providing a credit line to the lending platform BlockFi Inc. This was after FTX purportedly provided a credit line to Voyager Digital Ltd. the week before. That day *Bloomberg* announced that "[a] wave of liquidation has triggered fear of contagion" and SBF was "providing the lines to try and stem contagions." In that article, *Bloomberg* reported on its interview with Mr. Scaramucci where he touted FTX and SBF, saying "***Sam Bankman-Fried is the new John Pierpont Morgan -- he is bailing out cryptocurrency markets the way the original J.P. Morgan did after the crisis of 1907***." *Bloomberg* also reported that Mr. Scaramucci said that "he'd invested alongside Bankman-Fried in several crypto ventures."

393.     On June 29, 2022, FTX issued a press release announcing that SkyBridge's next Crypto Bahamas was already scheduled saying: "Our inaugural Crypto Bahamas conference was a huge success and brought some of the biggest innovators in the industry to the island to collaborate on the continued collaboration between TradFi, crypto and DeFi.  Everyone at FTX is eager to unveil our plans as we go bigger and better for next year's conference."  In the press release, Mr. Scaramucci promoted FTX saying "We are excited to build on the success of the inaugural Crypto Bahamas and grow the premier institutional digital assets event in the world . . . .  ***FTX is a transformative company and we look forward to continue working with them to foster innovation in web3***."

394.     In the June 29, 2022 press release announcing the "[p]artnership [to] drive further collaboration around investment," Mr. Scaramucci endorsed SBF saying, "***Sam is a visionary who has built incredible businesses that are synergistic with the future of SkyBridge***."  The press release stated:

> The deal is the latest collaboration between SkyBridge and FTX, following the multi-year partnership to sponsor global SALT conferences in North America, Asia and the Middle East, and co-present Crypto Bahamas, the leading institutional digital assets conference that launched in April 2022.  The firms will expand their collaboration on venture and digital asset investing across current and future product offerings.

395.     On August 2, 2022, SkyBridge bought more shares of FTX in its SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G fund, purchasing them from another investor.  SkyBridge invested in at least 61,049 preferred shares and 1,544,196 common shares of FTX in its SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G fund.

396.     On or about August 6, 2022, Mr. Scaramucci went to the Bahamas and made a handshake deal with SBF to sell 30% of SkyBridge to SBF.  *Bloomberg* later reported that

"*Scaramucci has said it wasn't because SkyBridge needed money; rather, he saw Bankman-Fried as a Mark Zuckerberg figure who could expand FTX from crypto into bigger things*. The partnership allowed Bankman-Fried to tap into Scaramucci's connections to politicians, Wall Street and deep-pocketed investors."

397.    On September 9, 2022, SkyBridge and FTX announced their partnership in a press release. FTX Ventures, one of SBF's companies, purchased a 30% interest in SkyBridge, paying $45.9 million into SkyBridge Capital II, LLC using Island Bay Ventures Inc., a Delaware corporation owned and controlled by SBF. FTX now held an interest in the firm that helped provide it with the legitimacy it needed to promote its business. As Mr. Scaramucci would later disclose, SkyBridge bought $10 million worth of FTT as part of its partnership with FTX, and thus would benefit from any increased value of FTT. SkyBridge also invested at least $10 million each in SOL and SRM as part of the deal. SkyBridge used $5 million to pay for upfront costs related to SALT.

398.    SkyBridge heavily promoted FTX becoming a part owner of SkyBridge. For example, on September 9, 2022, Mr. Scaramucci and SBF appeared on CNBC to discuss the deal, with Mr. Scaramucci saying "*what we are doing in asset management matches the vision that Sam has for FTX in terms of its growth. And I think there is a lot of synergies there. There is a lot relationship opportunities, cross generational relationship opportunities that we can share with each other*."

399.    In total, SkyBridge invested at least over $89 million in FTX, across $59 million in FTX equity and $30 million in FTX sponsored tokens. SkyBridge's equity investments in FTX included at least 1,554,196 shares of common stock and 9,213,333 shares of preferred stock. SkyBridge held its positions in SkyBridge Multi-Adviser Hedge Fund Portfolios LLC and

- 166 -

SkyBridge FTX LP, and *Bloomberg* has also reported that SkyBridge's Legion Strategies SkyBridge Ventures funds were also investors in FTX.

400.    In September 2022, FTX was prominently featured again at SALT New York 2022, which occurred from September 12-14, 2022.  On September 12, 2022, Mr. Scaramucci and SBF appeared on stage in the opening session titled "Future Exchange: SBF's Vision for Disrupting Finance."  In a wide-ranging promotion of FTX, Mr. Scaramucci discussed the partnership between SkyBridge and FTX and posed questions about the future of FTX.  Mr. Scaramucci and SBF went on to discuss how hard it was to move money in traditional brokerages and how FTX had solved this:

> [Mr. Scaramucci:]  ***Sam when you think about the next three or four years for the cryptocurrency markets the broader markets and FTX – and I've heard you say this on the air and on podcasts – you see your vision for FTX expands beyond the cryptocurrency universe.  Is that fair to say?  Why don't you elicitate for people here what you're thinking about in terms of the FTX vision***.

> [Bankman-Fried:]  Yeah.  Absolutely.  And I think one of the kind of startling things for us, at least for me was, after having gotten into crypto, and started trading it and then moving to building an exchange, I sort of went back and experienced TradFi [Traditional Finance], from a different lens, from the lens of not sitting behind a company that has spent 20 years and thousands of people and billions of dollars building up infrastructure – I was at Jane Street Capital before I got into crypto – and ***I tried to like open my own brokerage account.  I tried to trade a share of Amazon, trade an S&P 500 future, and send money from my bank account into a brokerage account, to do so, and it was an unbelievable nightmare.  It was so horrific.  I feel almost sort of uncomfortable talking about how it sort of feels like something has to have been illegal about how that happened***.  Of course there wasn't.  It's just the realities of market structure today that it came about somewhat accidentally.  I mean it doesn't work the way that people would build it today, if they were rebuilding market structure.  It is a total mess, and I think what that sort of underscored was I, we, we can do better than that.  And I think that made us super motivated to try and figure out, well how can we start to build out market structure not just in crypto but outside of crypto.  In fact, how can we leverage a lot of what we've been doing with blockchain, try and build out hopefully market structure that works better for everyone across a bunch of different asset classes.

401.    Mr. Scaramucci and SBF then tried to get viewers to believe that traditional finance had unseen risks and the exchanges that FTX was building were safe with only regulators standing in the way:

> [Mr. Scaramucci:] *Sam when you talk about stock trading as an example, I think you once used this example that there's probably six or seven entities that a stock has to pass through before it goes from the buyer to the seller.  But over the blockchain we can probably just have a peer-to-peer transfer.  Is that fair to say?  And if you think that that's possible when do you think that would be possible*?

> [Bankman-Fried:]  I mean, I think it in theory is possible – technologically it is possible.  In fact it's possible today, technologically.  *You know the biggest piece of this is figuring out what the right regulatory structure is for that*.  When you think about "clearing" from the perspective of equities, exactly as you said, there are an enormous number of entities involved in the transfer of a stock – between the very stock clearing firms, the DTCC, the brokers, the PFOF firms, the dark pools, the exchanges, the customers.  *And each one of those is a pain-point, each one of those adds noise, adds complexity, and it adds risk*.

> *And you can look at what happened the day that Meme Stocks went crazy a few years ago, basically all the brokers had to shut down because the settlement risk in the system.  You look at what is the equivalent of that in digital assets, and you just send a blockchain transfer.  And five minutes later, and you know in many blockchains five seconds later, you're done.  Like that has fully settled and you can sort of move on to step two of this*.  And so that's just like an enormous difference, and in theory means that there is huge advantage to using blockchain rails to settle things.  It means that, as you said, stock transactions, seconds later to have fully settled – you don't have two plus two days, you have two plus two seconds.  *You don't have settlement risk hanging over that entire time*.

> So I do think that there are you know huge theoretical advantages to it.  And then what it takes to get from here to there the big build out there is regulatory.  *Like internationally we've built out a lot of the infrastructure for this and a lot of what we've been thinking about is how do you do that in the US context*.

402.    On October 20, 2022, SkyBridge featured defendant Multicoin Capital on its SALT Crypto show, a show sponsored by FTX.  Mr. Darsie, a partner at SkyBridge, posed leading questions to Multicoin Capital founder Tushar Jain ("Jain") promoting FTX, SBF and the FTX Platform:

- 168 -

[Mr. Darsie:] ***What do you think is unique to the culture, unique to the leadership, unique to sort of the machine that's built at FTX, relative to other players in the market place? That's not to degrade other exchanges that have been built but FTX has done it a little bit differently than others – where they have a much leaner team, they sort of iterate and expand, grow new things more quickly, sort of build and then fix them type of mentality. But what are the this that you've observed with that team that first made you excited about investing into Sam and the FTX team, and why you think they will continue to excel in the marketplace***?

[Mr. Jain:] ***It's all culture honestly. I think when it comes to markets, like you know exchanges or other large and obvious markets, strategy is not as important as culture. Because culture really drives how the organization works. I Think culture is the most important attribute there. And culture comes from the top. Culture comes at FTX from Sam. And Sam is truly exceptional human being. You know he's one of the hardest working people I've ever seen. And I think that there not only very ambitious in what they want to accomplish things in the right way – in a scalable way that others will be able to get on board***.

***We know where they're headquartered, for example***. You can't say that about some of the other big crypto exchanges. Well where are they headquartered, right? ***We know they're engaging regulators***. I can't necessarily say that for some of the other crypto exchanges. And then for the ones based in the U.S., they're often just moving too slowly. They're not taking the big ambitious bets. You know, for example, ***FTX has this application out in front of the CFTC to be able to trade Futures, crypto Futures in the U.S. It is the first proposal that uses the risk engines that were developed for crypto trading to bring the Futures Market. It's the first real innovation in the Futures Market infrastructure in decades***.

And so that's the kind of ambition – the big bets that really are driven by that culture of ambition. ***But their doing things the right way, and in a compliant way, and working with the relevant stakeholders and not just ignoring them***.

403.    As the Crypto Winter was already well underway, Mr. Scaramucci then asked about the strength of FTX and their related crypto assets in the long term:

[Mr. Scaramucci:] Don't let him off. Darsie, don't let him off the hook. I gotta throw some predictions questions. . . . Okay. Tushar, five years from now am I ok? ***I am long FTX, FTX is long me, I'm long an asset management company called Multicoin, Solana, Helium, Bitcoin. Am I okay***?

[Mr. Jain:] ***Yes***. I mean, look you have to bet that five years from now the macroeconomic climate will be different . . . .

[Mr. Scaramucci:] [Y]ou're basically telling me I'm okay, is that correct?

- 169 -

[Mr. Jain:] Yes, I think so. Five years is a long time and we're seeing more innovation in this industry now than we've ever seen before, and really the thing to pay attention to is the flow of talent. It's that people who are moving from the financial services industry or from traditional web2 companies coming over to the blockchain industry. No one's going the other direction.

404. In October 2022, as was later reported by numerous news outlets and admitted by Mr. Scaramucci, Mr. Scaramucci went to the Middle East to try and raise $1 billion for FTX. This was not known publicly at the time as FTX's public image fostered by the Domestic VC Defendants was that it held ample cash having raised over $2.2 billion within the prior year and customer assets were fully covered dollar per dollar.

405. On November 9, 2022, prior to FTX's filings for bankruptcy, SkyBridge, FTX Trading, and FTX US, respectively, entered into several agreements titled "Letter Agreement – Release and Unwinding of Certain Relationships" for its SkyBridge Coin Fund LP and SkyBridge GP Holdings, LLC. Showing SkyBridge's incredibly close relationship, Mr. Scaramucci would later reveal that he was in the "war room" on November 8, 2022, when it was becoming clear the extent of FTX's fraud.

406. SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G fund is closed end fund registered under the Investment Company Act of 1940. SkyBridge owed fiduciary duties broader than private funds to their investors and therefore had a stringent set of requirements it would have to adhere to, including conducting proper due diligence over the life of an investment. Indeed, SkyBridge's investment adviser brochure provided to the SEC, which is publicly available, states that it conducts fundamental research and due diligence prior to an investment, which increases depending on the complexity and uniqueness of the asset:

SkyBridge's investment decision-making process generally involves thorough fundamental research regarding a prospective investment. SkyBridge conducts a

- 170 -

reasonable amount of due diligence prior to purchasing or selling any asset, and the amount of diligence generally will increase with the complexity and uniqueness of the asset.

407.    From SkyBridge's intimate relationship and business partnership with FTX, and the due diligence SkyBridge purportedly conducted in connection with both FTX's investments into SkyBridge and SkyBridge's investments into FTX, SkyBridge either knew about and failed to disclose or recklessly failed to detect the risks that were so apparent to other VC funds (*e.g.*, Social Capital), and glaringly uncovered in the FTX Group's bankruptcy.  Instead, SkyBridge tirelessly promoted FTX through both financial funding and issuing promotional statements that would reach investors.  SkyBridge provided FTX with a stage – *e.g.*, through the SALT conferences, television promotion, and online shows – to falsely present the FTX Platform as a safe place for investors to deposit and trade their assets when in fact it was not.

### 12.    History of Multicoin Capital

408.    Multicoin Capital is a venture capital company based in Austin, Texas that invests in cryptocurrencies, tokens, and blockchain companies.  It claims it is a "thesis-driven" investment firm, and its thesis is that "[c]rypto will create the largest one time shift in wealth in the history of the internet."  In 2017, Mr. Jain and Mr. Samani founded Multicoin Capital, but it is backed by Marc Andreessen ("Andreessen") and Fred Wilson ("Wilson"), both famous financers and billionaires.  Mr. Andreessen co-founded Netscape and other well-known companies, and sits on the board of Meta (Facebook's parent).  Mr. Wilson is known for his investments in Twitter, Etsy, Foursquare, and other well-known companies.  As of December 31, 2022, Multicoin Capital had approximately $1.4 billion in assets under management.

409.     On February 9, 2020, Mr. Jain told *Forbes*: "The crypto markets are the least efficient markets I've ever seen in my life, and that means active management has an opportunity to shine." In 2021, Multicoin Capital advertised that its first fund recorded a soaring 20,287% increase since its October 2017 inception.

410.     One of Multicoin Capital's investments was in Solana in July 2019 for which it received Solana tokens, or SOL.  Multicoin Capital led this round for Solana and reportedly received SOL for $0.49.[137]  In June 2021, Multicoin Capital and Alameda participated in a $314 million "private token sale" of additional SOL that was led by Mr. Andreessen's Venture Capital firm, Andreessen Horowitz.  Ultimately, FTX and Alameda invested over $580 million into SOL, and Multicoin Capital has invested and constantly traded in SOL.  In 2020, Multicoin Capital collaborated with FTX to build Serum, a purportedly decentralized crypto exchange, on SOL. Serum has its own token, SRM.

411.     Multicoin Capital's founders often appear on audio and video podcasts, conferences, television and other forms mass media to promote their investments and talk authoritatively about the crypto industry.

### 13.     Multicoin Capital Promotes FTX and SBF

412.     Multicoin Capital invested in FTX's Series B round, buying for approximately $30 million of 953,835 preferred shares in its fund Multicoin Private Fund IV, LP.  The founders of Multicoin Capital are active in creating hype for their investments using podcasts, social media, and other channels of promotion.

---

[137]  The price of SOL in April 2021 was over $40; in October 2021, it was over $200.

413. On July 20, 2021, Mr. Samani stated in a press release announcing Multicoin Capital's investment:

> *We have been carefully watching the FTX team over the last two years. They are far and away the best executing team in crypto, and have blown away everyone's expectations. They have firmly established themselves as the exchange with the best overall product offering, and are now leveraging the unique capabilities of global crypto rails to build the future of internet native finance. FTX is building the future of crypto, and we are incredibly excited to invest.*

414. On January 26, 2022, Multicoin Capital invested in the U.S. arm, FTX US. In total Multicoin Capital invested at least $30 million in FTX consisting of at least 4,094,000 shares in common stock and 6,424,294 shares in preferred stock. In addition, Multicoin Capital invested heavily in tokens related to SBF, including his own FTT, SOL, and SRM.

415. On the same day, January 26, 2022, Mr. Samani promoted FTX in a press release promoting FTX and the FTX Platform by saying that more customers are choosing FTX:

> *The FTX US team is laying the groundwork to become the dominant trading platform in the United States for all things crypto: spot trading, derivatives, and NFTs. They are growing market share as customers recognize the power and flexibility of the platform, and we expect that to accelerate as the product suite accelerates.*

416. Mr. Samani gave *CoinDesk* a similar statement that was published that same day: "The FTX US team is laying the groundwork to become the dominant trading platform in the United States for all things crypto: spot trading, derivatives, and NFTs."

417. Multicoin Capital had an intimate relationship with FTX. For example, speaking of FTX US's President Harrison, Mr. Jain would later say, "[w]e had a good relationship with Brett [Harrison], we still do to this day. Actually, Brett called us after he told Sam he was resigning but before it was made public." Mr. Harrison made the news public on September 27, 2022 via Twitter.

- 173 -

418. On May 4, 2022, *CoinDesk* reported on FTX sponsored Crypto Bahamas and how "Wall Streeters, who have once been among crypto's harshest critics, have been softening their stances towards cryptocurrencies, and in some cases, outright embracing the sector." Mr. Samani promoted the narrative of the event saying, ""[p]eople have been saying for a while, 'Crypto needs to grow up,' *and now, it's grown up!*"

419. On May 11, 2022, Multicoin Capital filed a letter to the CFTC, signed by Mr. Jain and Mr. Samani, via the public portal advocating for FTX's application to the CFTC to become a derivatives clearing organization. The latter stated that Multicoin Capital was knowledgeable about FTX's platform, claiming it was reducing risk, in particular for retail investors, and strongly supported the application:

> *We have deep familiarity with digital asset markets and are knowledgeable about FTX's platform and the clearing model they have proposed to adopt on FTX US. Funds managed by Multicoin have invested in FTX US. Multicoin strongly supports the proposed amendment for the reasons set forth below.*

> \*       \*       \*

> *Parties such as FTX US' sister entity FTX.com (a Bahamian digital asset trading platform) have developed and tested newer market models that adapt to a 24-7-365 reality and a retail-oriented customer base. FTX.com has also innovated with market leading risk engines and margining systems. As a result, trading volumes on overseas markets such as FTX.com have led those of US markets by nearly ten-fold.*

> CFTC approval of the proposed amendment would help increase US market competitiveness by allowing domestic market participants to implement appropriate market structure innovations. Of equal importance, US market dominance will allow US participants and regulators to shape the financial market structure and conduct of the new digital economy.

> \*       \*       \*

> *We believe FTX US's proposal represents responsible innovation that can improve market quality, reduce risk and provide market participants with greater*

*choice*.  We also believe that it will bring leadership in digital asset market innovation back to the US, and allow the CFTC to help shape the ongoing evolution of digital asset derivatives markets.

*        *        *

*The current status quo is not easy for the majority of the investing public. FTX US seeks to make these markets more accessible to both institutional and suitable retail participants*.

FTX US seeks to introduce margined, non-intermediated contracts that will trade 24-7 and utilize risk engines that go to work 2-6 times per minute, every minute.  *These risk engines will improve market and regulator insight into exposure on a real time basis.  More granular analysis and data availability can only have positive impacts on investing and regulatory results*.

The proposed platform will be direct-to-investor, replacing FCM exposure with a system that eliminates mutualization of losses by (i) *continuously measuring risk on an individual investor basis, (ii) developing a guaranty fund measured against the failure of the largest counterparties, and (iii) putting in place alternative liquidity providers to step up in the event of mass liquidations*.

This market structure will introduce diversity into the US commodity interest markets, allowing users to select between traditional, FCM-driven access (which remains an option for market participants on FTX US) and a direct-to-investor access point.  *FTX US market access is not turned off overnight, on weekends, or during bank holidays.  This availability will reduce the potential for market dislocations during down periods*.

*        *        *

FTX US's proposal allows it to utilize innovations in technology and market structure to implement a better, more efficient system for bitcoin and ether derivatives markets.  *Importantly, through technical automation, FTX US proposes to provide an "always watching" risk management system for these two "always open" digital asset markets.  In doing so, it allows US markets to compete with international venues that have enjoyed oversized market share and influence*.

This risk management system will allow (i) *FTX US to have real time insight into the risk for each individual investor*; (ii) the CFTC to have real time insight into the risk present in the system, measured on an individual investor basis; (iii) *FTX US to view risk on an individual level, rather than seeking to measure the credit-worthiness of an FCM's more opaque client registry; and (iv) FTX US to engage in an efficient liquidation system that is not subject to jarring margin calls due to overnight or weekend market activity*.

- 175 -

As a result, *we encourage the CFTC to consider that the technology and new market structures for risk assessment advanced by FTX US iterate upon and improve the current intermediated and disintermediated market structures as they apply to bitcoin and ether markets*.

420.    Multicoin Capital's letter to the CFTC connected FTX US to FTX Trading, saying that FTX US learned lessons from FTX Trading (*i.e.*, FTX.com) and FTX has a proven track record of developing best-in-class risk and trading engines:

While not replicating overseas market developments in their entirety, *the proposed amendment would allow FTX US to bring the lessons of FTX.com and other marketplaces to bear in a way that will improve the availability, form and risk profile of derivative instruments for US retail and institutional investors*.

\*          \*          \*

*FTX US is a sophisticated organization with a proven track record – both internally and with its sister entity, FTX.com – of developing best-in class risk and trading engines*.

421.    In a section titled "The Amendment Will Use New Tools To Improve Risk Management," Multicoin Capital advocated for FTX as the DCO (derivatives clearing organization) to be the sole entity managing all the risk in derivatives clearing, saying:

*The FTX US proposal also seeks to return responsibility for risk management to the body best equipped to do so: the DCO*.  FCMs were an adequate stop gap and will remain an effective tool for many market participants, just as financial advisers are an important tool in the current world of online, zero-commission equity brokerage. FTX US is a sophisticated organization with a proven track record – both internally and with its sister entity, FTX.com – of developing best-in class risk and trading engines.

422.    On October 20, 2022, Mr. Jain was featured on the SALT Crypto show, interviewed by SkyBridge's Mr. Scaramucci, founder and managing partner of SkyBridge, and Mr. Darsie, another SkyBridge partner.  The SALT Crypto Show was sponsored by FTX and Multicoin Capital went on to promote the exchange:

- 176 -

[Mr. Darsie:] What do you think is unique to the culture, unique to the leadership, unique to sort of the machine that's built at FTX, relative to other players in the market place? That's not to degrade other exchanges that have been built but *FTX has done it a little bit differently than others – where they have a much leaner team, they sort of iterate and expand, grow new things more quickly, sort of build and then fix them type of mentality.* But what are the this that you've observed with that team that first made you excited about investing into Sam and the FTX team, and why you think they will continue to excel in the marketplace?

[Mr. Jain:] It's all culture honestly. I think when it comes to markets, like you know exchanges or other large and obvious markets, strategy is not as important as culture. Because culture really drives how the organization works. *I Think culture is the most important attribute there. And culture comes from the top. Culture comes at FTX from Sam. And Sam is truly exceptional human being. You know he's one of the hardest working people I've ever seen. And I think that there not only very ambitious in what they want to accomplish things in the right way – in a scalable way that others will be able to get on board.*

We know where they're headquartered, for example. You can't say that about some of the other big crypto exchanges. Well where are they headquartered, right? We know they're engaging regulators. I can't necessarily say that for some of the other crypto exchanges. And then for the ones based in the U.S., they're often just moving too slowly. They're not taking the big ambitious bets. You know, for example, *FTX has this application out in front of the CFTC to be able to trade Futures, crypto Futures in the U.S. It is the first proposal that uses the risk engines that were developed for crypto trading to bring the Futures Market. It's the first real innovation in the Futures Market infrastructure in decades.*

And so that's the kind of ambition – the big bets that really are driven by that culture of ambition. *But their doing things the right way, and in a compliant way, and working with the relevant stakeholders and not just ignoring them.*

423. As the Crypto Winter was already well underway, Mr. Scaramucci then asked about

the strength of FTX and their related crypto assets in the long term:

[Mr. Scaramucci:] Don't let him off. Darsie, don't let him off the hook. I gotta throw some predictions questions. . . . Okay. Tushar, five years from now am I ok? I am long FTX, FTX is long me, I'm long an asset management company called Multicoin, Solana, Helium, Bitcoin. Am I okay?

[Mr. Jain:] *Yes*. I mean, look you have to bet that five years from now the macroeconomic climate will be different . . . .

[Mr. Scaramucci:] [Y]ou're basically telling me I'm okay, is that correct?

- 177 -

[Mr. Jain:] *Yes*, I think so. Five years is a long time and we're seeing more innovation in this industry now than we've ever seen before, and really the thing to pay attention to is the flow of talent. It's that people who are moving from the financial services industry or from traditional web2 companies coming over to the blockchain industry. No one's going the other direction.

424. Within a little more than a month, FTX would be bankrupt and customer assets frozen.

425. In Multicoin Capital's investment brochure provided to the SEC, which is publicly available, it states that:

> Before making investments, the Adviser will conduct due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each investment. When conducting due diligence, the Adviser may be required to evaluate important and complex business, financial, tax, accounting, and legal issues.

426. Multicoin Capital also states that it monitors its investments, saying:

### Oversight and Monitoring

The Adviser closely monitors the Funds' investments. The Funds' accounts are continuously reviewed on an ad hoc basis and are formally reviewed by Managing Partners as necessary. In addition, on a monthly basis at least one Managing Partner, the CFO, the GC/CCO, and certain employees from the operations and legal teams review client accounts, reviewing factors such as the investment mandate, investment restrictions, investment decisions, position sizes, liquidity, trade allocation, counterparties used, trade errors, redemptions, and certain portfolio risk metrics.

427. Multicoin Capital not only invested millions with FTX, they held its own customers' assets on the FTX exchange. In Multicoin's investment advisor brochure it claims that it is aware of risks with digital currency exchanges and also claims that it purportedly conducted due diligence in connection with their counterparty risk, saying it "***monitors the Trading Platforms and believes they or their affiliates are appropriate trading venues***."

### 14. History of Tiger Global

428. Tiger Global is an investment firm headquartered in New York City. It was founded in 2001 by Charles "Chase" Payson Coleman III ("Coleman"), a mentee of Julian Robertson, the famed hedge fund manager whose protégés are known as "Tiger Cubs." As *The Wall Street Journal* put it, Tiger Global "rode the tech boom like no other investment firm." "Fueling Tiger's rise was a double-barreled business: A stock-picking arm put money mostly into public companies, while its venture-capital funds invested in startups throughout the world." And as the *Intelligencer* explained, Tiger Global "differentiated itself by coming in to later rounds of financing and plugging numbers into its models – arguably bringing more of a Wall Street ethos than a Sand Hill Road one to venture investing." In the beginning of 2021, Mr. Coleman was ranked as the 14th best-performing hedge fund manager of all time.

429. Tiger Global expanded into private company investments under Scott Shleifer ("Shleifer"), formerly from Blackstone Group, the heavyweight private-equity firm. Using Tiger Global's "double-barreled business," Mr. Coleman and Mr. Shleifer "created a symbiotic relationship between its hedge-fund holdings and its venture-capital investments." The venture side of the business would develop private companies, known as unicorns, and "[t]he hedge-fund portion of the strategy came into play as these unicorns went public: Before the IPOs, Tiger Global's hedge fund would also invest in the same unicorns as were backed by its VC funds. In a buoyant market, the stocks typically took off, as fellow Tiger cubs as well as other hedge funds bought into what became a growth-stock bubble. That way, a big winner in the venture-capital portfolio could become a big winner in the hedge-fund portfolio." This was seen as innovative in the venture space with other venture capital firms trying to copy this model.

430.    In order to gain expertise in a sector, instead of hiring and building out teams internally, Tiger Global engages consulting firms to provide expertise, such as McKinsey & Company ("McKinsey") and Bain & Company ("Bain").  As the tech industry news site *Protocol* observed, "Tiger employs an army of Bain consultants.  As a result, Tiger doesn't have to do its homework on the fly; it's done it in advance."  These heavyweight consultants are also made available to its portfolio companies, as the *Information* reported, "Tiger pays for its portfolio companies to access consultants at Bain & Co. who provide advice on things like how to launch a product in a new market, according to several founders of companies Tiger funded."

431.    Mr. Coleman has only ever done one interview for a book called *The Power Law: Venture Capital and the Making of the New Future*.  As the *Intelligencer* put it: "[H]istorically [Tiger Global] has been notoriously secretive.  Its partners do not talk to the media, nor do they speak at industry conferences."  Thus, Tiger Global's even minimal disclosures concerning its investments mattered to investors.

### 15.    Tiger Global Promotes FTX and SBF

432.    On July 21, 2021, Tiger Global invested in the Series B-1 funding round, acquiring 59,141 shares of FTX Trading's preferred stock.  Tiger Global also acquired 236,565 shares of FTX Trading's common stock.  Tiger Global made no announcement.

433.    On October 21, 2021, Tiger Global participated in the Series B-1 round acquiring 59,141 preferred shares.  This time, Tiger Global's name was advertised prominently as one of the investors in a press release with SBF quoted as saying, "I'm incredibly humbled by the support we've gotten.  It's our first large fundraise, but through it we've formed a hugely valuable set of

partners." It was widely reported at this time that FTX was preparing itself to go public, and the Defendant investors, including Tiger Global, added weight to this narrative.

434. On January 26, 2022, Tiger Global invested in the FTX US funding round, acquiring 1,269,000 shares of common stock and 6,564,551 preferred shares. And a few days later, on January 31, 2022, Tiger Global invested in FTX Trading's Series C funding round, acquiring 59,141 shares of preferred stock. After the Series C funding, Tiger Global was again highlighted in a press release disclosing FTX's record valuation of $32 billion. In total, Tiger Global invested at least $38 million in 1,505,565 shares of FTX's common stock and 7,183,869 preferred shares through its Tiger Global PIP 15 LLC fund.

435. Tiger Global purportedly completed a comprehensive diligence on FTX, as it does on all of its investments, using its "Wall street ethos." Indeed, when it comes to diligence, Defendant Tiger Global holds a reputation for "deploy[ing] an army of Wall Street types who have cut their teeth working 100 hours a week for years" and whose "work ethic shines through when they do due diligence." Entrepreneurs who have undergone Tiger Global's diligence report that:

> (a) "It's incredible how thorough they are. . . . They know more than any other investor I've ever met, they sign NDAs, and they came to the first meeting with their own product roadmap, revenue and customer projections . . . ."

> (b) Tiger Global's "analysis of the market segment, advantages/ disadvantages . . . . was very thorough. They are not spraying for sure."

> (c) In conducting diligence, Tiger Global "[a]sks very deep thoughtful questions. . . . no BS."; and

> (d) "Re Tiger – anyone who claims they skip DD [*i.e.*, due diligence] is hugely mistaken. They come prepared – no bullshit – full conviction and ready to do the deal. The partners personally jump on reference calls with clients where required to validate and learn. The Bain thing is true and very useful – yes, they do outsource the administrative part to the [Bain] team [in] India – but once the requirement is

- 181 -

identified and the scope agreed – a local, specialist team is assembled to give all the focused assistance required."

436.     Tiger Global often hires third parties to conduct additional diligence, and in the case of FTX, Tiger Global hired Bain to assist in its due diligence.  Tiger Global pays Bain more than $100 million a year to research private companies.  As one entrepreneur said, "[a]nyone who says Tiger doesn't diligence is deeply mistaken. . . .  They have (multiple) Bain teams on retainer that do DEEP dives into market and competition, including multiple customer and expert calls, full market sizing, product research, and also cut through unit economics.  The deck we got was 50+ pages of detail from Bain that the Tiger team cuts through to present to their senior guys."

437.     On November 21, 2022, *Bloomberg* reported that Bain highlighted specifically to Tiger Global that "Bankman-Fried's oversight of a vast web of FTX-linked entities" was a risk.  But Tiger Global either knowingly or recklessly ignored this warning, instead giving FTX $38 million so that it could promote more and induce more customers to depositing money on the FTX exchanges.

### 16.     History of Ribbit Capital

438.     Ribbit Capital is a venture capital firm based and headquartered in Palo Alto, California.  Ribbit Capital was founded by Meyer "Micky" Malka ("Malka") in 2012 and is best known for its fintech investments.  Ribbit Capital advertises that its mantra is, "It takes money to change money," and as of December 2022 it had more than $11.8 billion in discretionary assets under management.

439.     Mr. Malka has significant experience with exchanges and banking.  In 1998, Mr. Malka developed the online brokerage Patagon.com, Inc., which became Latin America's first comprehensive Internet-based financial services portal and dealer until its acquisition in March 2000 by Banco Santander.  In 2003, he co-founded Banco Lemon, a Brazilian retail bank, which went on

to become one of the largest private microfinance institutions in Brazil, until 2009 when it was acquired by Banco do Brasil, Latin America's largest bank. Mr. Malka co-founded and was co-CEO of Bling Nation Ltd., a mobile payments company, which later evolved into Lemon Inc., a mobile wallet company, which was acquired in 2013.

440.    In September 2018, Mr. Malka told *The Wall Street Journal* that his firm had a "boring" strategy of backing personal finance, lending, insurance, wealth management, as well as cryptocurrency startups. In 2021, Ribbit Capital had some of the highest-profile fintech IPOs, such as crypto company Coinbase, digital financial services platform Nubank, and online brokerage Robinhood, and announced the creation of a new fintech startup with Walmart.

441.    Mr. Malka was an early member of the Bitcoin Foundation board and Ribbit Capital has significant experience with cryptocurrency. The firm was one of the first institutional investors to buy crypto assets, when it invested in bitcoin in 2012, and has also invested in Ethereum and other crypto assets. On October 9, 2020, Mr. Malka stated in an interview with Mr. Jain, managing partner of Multicoin Capital, that every single one of Ribbit Capital's funds invested in crypto assets for the past nine years, and that they have been investing in crypto companies, particularly exchanges.

442.    In the same interview, Mr. Malka explained Ribbit Capitals approach to crypto investments as "trying to understand the mode of this business, and how do we make a multi-year bet where we can see, imagine how it plays out versus trying to gamble and watch what the hot thing is today."

443.    Mr. Malka said that crypto was like the "wild west" and "over the years, decades and centuries, *what has mattered the most is what is the value of the brand that people trust*."

Comparing banks with identical balance sheets, same assets, same liabilities, same net worth, more or less same profitability, Mr. Malka explained that "one bank could be worth three times more than the other, why? Because of the brand. They trust the brand more." He expounded that the current state of defi (decentralized finance) was that:

> [T]he brand value has not been completely built. . . . We're not there in defi. There's no brand. There's no acknowledgement of a brand that wins. ***There's no acknowledgement of a user base that has built enough trust and wow experience to let the consumer or user to say no matter what someone else copies I trust this one***. . . . And I would expect that it would take the entrepreneurs and the teams – going back to the people and humans that we talked to so much about at the beginning – *we will have to start to see them becoming much more a face of trust and brand . . . it's for all of us to figure out, as investors, as historians, as people that play in this space, what will it take for some of this [sic] to be the trusted brand*.

### 17. Ribbit Capital Promotes FTX and SBF

444. On July 20, 2021, Ribbit Capital participated in FTX's Series B funding round that raised $900 million. Like Paradigm, Ribbit Capital was one of the firms that FTX used, instead of relying on investment bankers, to organize the funding round and close the deal. In February 2021, Ribbit Capital had helped Robinhood, an online brokerage, raise more than $1 billion in funding commitments in less than 24 hours.

445. On July 20, 2021, Ribbit Capital's general partner, Mr. Shalek, told the press that:

> *In less than two years, Sam and team have built a unique company and culture centered around staying nimble and putting their customer first. These tenants, along with a product-led approach, have propelled FTX into a top global crypto exchange. However, we don't see it stopping there. As crypto becomes more ubiquitous, FTX has the opportunity to build a next generation financial services brand, spanning exchange, payments, and many other categories to come. The Ribbit team is excited to partner with them on their journey to grow the digital currency ecosystem and change finance*.

446. On July 20, 2021, *Forbes* published an article titled "Bitcoin Alert: Biggest Private Crypto Deal Ever Is Closed," which stated that "[m]any will also wonder whether FTX could be positioning itself for a public debut, a path increasingly favored by crypto startups. In April, Coinbase listed its shares on Nasdaq, thus becoming the first major firm in the industry to do so." The *Forbes* article quoted SBF as saying that going public "is something we're going to be actively thinking about."

447. On a 20VC podcast episode, released on July 26, 2021, Mr. Shalek stated that "arguably we spend too much time on it, but our principle from the beginning is ***we underwrite every deal including follow-on decisions***."

448. On August 24, 2021, Ribbit Capital entered into a "Letter Agreement Re: FTX Advisory Board" through one of its funds, Ribbit Bullfrog II, L.P. And on October 18, 2021, the same fund entered into an Investors' Rights Agreement with FTX Trading.

449. On October 21, 2021, Ribbit Capital invested more into FTX. FTX announced its investments in the Series B and B-1 rounds, and its investments in FTX have been widely reported. Ribbit Capital wrote in a letter to the CFTC that it is an investor in FTX US. Ribbit Capital's fund, Ribbit Capital VII, L.P., is listed as a creditor of FTX, and Ribbit Bullfrog II, L.P. is the entity with the agreement for Mr. Shalek to serve on FTX's Advisory Board.

450. Ribbit Capital managing partner Signal Mandelker ("Mandelker") has appeared at multiple conferences and on numerous podcasts advocating for crypto regulations that are directed by the crypto experts (*e.g.*, FTX and its investors). Ms. Mandelker has stated that she was hired by Ribbit Capital to build out their regulatory expertise for their portfolio companies. As a

spokesperson for Ribbit Capital, a lawyer and former U.S. Treasury official, she leveraged her position, background, and involvement in various industry groups to promote FTX.

451.    On April 28, 2022, for example, Ms. Mandelker participated in a panel discussing "The Future of US Crypto Regulation" at SkyBridge's SALT Crypto Bahamas event.  Crypto Bahamas was a lavish "exclusive gathering of the leading investors and builders in the blockchain, digital assets and web3 space" sponsored by FTX.  The news site, *CoinDesk*, described the event as "a four-day flex of FTX's expanding empire – with a new era of 'corporate crypto' firmly on display."

452.    On stage, Ms. Mandelker advocated for FTX's application to the CFTC to allow it to sell leveraged crypto derivatives and settle their trades directly, without using a registered futures commission merchant, to retail investors, saying that FTX was a transparent company begging to be regulated:

> *I think the most fundamental thing we should be thinking about, from an investor protection perspective, is the following: What are the attributes of this is fundamentally new technology that can help protect investors in fundamentally new ways*.
>
> So right now in Washington the debate is, is it the SEC or the CFTC.  If it's the SEC then you have to register.  Are they going to allow you?  If you're a security, who knows.  Are they going to allow you to register, I don't know.  If they do allow you to register, what do you have to do.  You have to file a massive of paper in Edgar, and for anybody who's been in that world you know that is also a massive amount of money for lawyers.  Is that what we need to do here?  That's really the biggest question from my perspective.  Or should we look at the attributes of the technology that enables in many ways, in a more significant way, one of the fundamental precepts of our securities laws, which is disclosure.  Everything that you file on Edgar it's all about disclosure.
>
> Here you have an ecosystem where everything is open resource and everything is transparent.  And we really need to think about are we even in the right world, the right framework to begin with.  Shouldn't our regulators be focusing, instead of being focused on turf, shouldn't they focus on solutions, solutions that can

- 186 -

help investors, that can give them better access to more products. And also, shouldn't they be taking advantage of this technology, like Chainalysis,[138] Aventis and lots of other things that can help. And become crypto native themselves. It's a big problem in government. Most people in the government are not allowed to touch crypto so they don't even know, so their making these rules and they don't even know what it is. And that's the fundamental piece that we need to change.

My vote is for the agency that is willing to engage, that's willing to do that, that's open minding, that will sit down, meet with industry, allow them to experiment, experiment with them. *FTX has an application pending before the CFTC right now to do really interesting, exciting things that are gonna I think enable greater access to better products. Be open, regulators should be open to those solutions. And whoever's going to be most open and willing to engage and understand the technology and really as said, further U.S. interests by enabling growth through acceptance and guidance that's where my vote will ultimately go*.

\*       \*       \*

I think it can work as long as you have regulators who are open to giving a lot of guidance, and working with industry, *grant applications*, grant charters, *bring people who are . . . you know everyone in crypto who has applied for anything in government is saying "Please regulate us, please supervise us" and regulators need to start to say yes ok we are going to do that. . . . now you have, what I said before, a massive amount of transparency, a fundamental new way of operating* . . . . People talk about elicit activity all the time. The fact is elicit activity is being driven out because of these great tools and engineers are building all kinds of new ways to make sure that the system is safe for more people.

453.    On May 11, 2022, Ribbit Capital submitted a letter to the CFTC advocating for approval of FTX's application. The letter signed by Ms. Mandelker and Jessi Brooks, Chief Compliance Officer & Associate General Counsel at Ribbit Capital, "*Ribbit Capital urge[d] the Commission to grant FTX's request*," boldly proclaimed:

FTX's request exemplifies the type of groundbreaking innovation that, when met with a thoughtful and forward-looking regulatory approach, will

---

[138] Chainalysis is another Ribbit Capital investment that bills itself as a blockchain data platform, which helps government agencies, exchanges, financial institutions, and insurance, and cybersecurity companies with investigations, compliance, and market intelligence. Ms. Mandelker has spoken on podcasts about Chainalysis' KYC and AML capabilities as it relates to cryptocurrencies.

*ultimately provide all Americans access to new financial technologies and, critically, financial opportunities to make their lives better and more prosperous*.

454.    Ribbit Capital's letter to the CFTC stated that FTX was in line with increased transparency, market integrity and lowering the risk in transactions.   It also promulgated the narrative that FTX was the responsible exchange working with regulators:

> Moreover, the Commission's approval of FTX's request would be consistent with the purpose set forth in Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which prioritizes "***increase[d] transparency and promot[ion of] market integrity with regard to***" transactions overseen by the Commission, as well as "***lowering the levels of risk inherent to such transactions***."

> \*        \*        \*

> In many respects, the unprecedented transparency of the blockchain enhances the ability of regulators to oversee transactions and market operations in a way that will ultimately deter and disrupt bad actors. ***The Commission's approval of FTX's request would also encourage other market innovators to pursue opportunities in a compliant and thoughtful way.  Those new entrants would be able to use FTX as a model for how to work collaboratively with the Commission to bring their own innovations to market in a responsible and regulated manner***.

> \*        \*        \*

> FTX's non-intermediated model would begin to shift that paradigm of concentrated influence and empower market participants, while leveraging cutting-edge technology ***to ensure that appropriate margin levels are maintained and markets are safeguarded***.  By overseeing FTX's responsible and regulated transition to clearing of margined futures, the Commission can ensure that the derivatives markets are subject to greater competition.

> \*        \*        \*

> The Commission's approval of ***FTX's proposal would materially improve the United States' image*** as a country that embraces innovation, particularly in blockchain technology.  FTX's proposed model can bring significant digital asset-based derivative trading volume into the United States, and thus into the regulatory framework set forth in the CEA and enforced by the Commission.  The United States has long been viewed as a champion of financial innovation, entrepreneurship, and customer protection, ***and FTX's request provides the Commission the ability to***

- 188 -

*enhance this well-earned global reputation by helping to establish robust and reliable digital asset derivatives markets*.

*    *    *

Consumers are not only eager for innovation and enhanced competition, they are also ready to be empowered through access and choice. *FTX's proposal would do this by providing a safe and more efficient avenue for trading and clearing derivatives to a broader, more diverse category of Americans*.

*    *    *

Under CFTC Rule 38.151, designated contract markets must provide market participants "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." And the rules for DCOs call for "[f]air and open access for participation." *FTX's proposed model can do just this, furthering the purpose of these requirements by offering retail participants and other new entrants the ability to trade and clear margined derivatives products*.

*    *    *

In sum, FTX's non-intermediated model, if implemented with the safeguards FTX proposes and the appropriate level of review, input, and oversight of the Commission, could greatly contribute to the long-term value and sustainability of digital assets and cryptocurrency derivatives markets in particular. *The enhanced liquidity that would likely result from FTX's proposed model can help achieve such important goals*.

455. Ribbit Capital's letter vouched for the integrity of FTX and the protections put in place for its customers. In a section titled "Critical Focus on Market Integrity and Customer Protections," Ribbit Capital wrote:

The Commission should use the tools that Congress provided in the CEA for the specific purposes that Congress intended. More specifically, clearing rules and customer protection provisions should be viewed as separate tools with distinct purposes. Clearing rules aim to ensure that account defaults and liquidations are minimized to avoid systemic risk and adverse impacts on other market participants. Customer protection provisions, on the other hand, are designed to safeguard traders. Accordingly, concerns that the Commission might have with retail participants accessing margined products, including the risk of losses to which retail participants could be exposed, should be addressed through the customer protection rules. By the same token, concerns about the market impact of increased liquidations due to the

- 189 -

participation by retail traders who might be more prone to default, should be addressed through the clearing rules. **On both scores, FTX has gone to significant lengths to ensure participant protections and mitigation of systemic risk to the market**, as delineated in its submissions to the Commission.

**The market-changing innovation and promise of FTX's proposal is reflected in the risk monitoring metrics and risk mitigation tools that it has developed and proposed as part of its non-intermediated model. This is where American innovation meets a resolute commitment to customer protection and market integrity.** As FTX has informed the Commission, under its proposed model, rather than traditional weekly margin calculations, FTX would assess customers' ability to meet margin requirements almost every second, seven days per week, 365 days per year.

FTX's proposed model also includes initial margin and maintenance margin requirements, with margin levels recalculated every thirty seconds as they are marked to market. Under this innovative approach, **FTX constantly monitors customers' collateral positions to determine if they ever fall below the maintenance margin, at which point FTX's system would automatically begin to liquidate those deficient positions.** FTX promises to address the "gap" risk present under the current model that assesses margin levels not on a real-time basis, but, at times, multiple hour or day interludes. The novel automated nature of FTX's model also has the potential to mitigate some of the operational complexities present under the legacy model, thus providing a more streamlined way to manage systemic risk. These real-time market monitoring tools would allow FTX to act immediately on market changes and provide the Commission, retail customers, and the market with far better risk-related information than is currently available.

456. The letter to the CFTC also confirmed that "Ribbit Capital is an investor in FTX US."

457. As a Venture Capital firm, Ribbit Capital pools capital from investors into its funds, and then deploys that capital into portfolio companies, saying that it invests in holding equity and equity-oriented securities of privately held companies with a particular focus on investments in financial services companies that leverage new disruptive business models.

458. Ribbit Capital advertises that its "goal isn't just to write checks. It's to deposit and grow ideas." Ribbit Capital states that its services consist of: (a) investigating, identifying, and evaluating investment opportunities; (b) structuring, negotiating, and making investments on behalf

- 190 -

of its funds; (c) managing and monitoring the performance of such investments; and (d) exiting such investments on behalf of its funds.

459.     Ribbit Capital claims to have "deep expertise as investors and operators within financial services and technology," stating in a filing to the SEC that "[w]e underwrite each investment with a decade-plus investment horizon and aspire to invest in assets that we would be willing to hold indefinitely."  Ribbit Capital reports that its "mission . . . is to change the world of finance by providing capital and guidance to visionary financial services entrepreneurs," and that it "strives to be more than a source of financial capital to entrepreneurs" and "approach[es] entrepreneurs as collaborators, offering data, perspectives, and lessons learned in innovative financial businesses . . . over time."  In doing so, [Ribbit Capital] boasts its ability to "create meaningful, lasting relationships with entrepreneurs," like SBF.

460.     Ribbit Capital maintains that it conducts thorough due diligence prior to investing.  It stated that its investment experience is "[d]eveloping sector-specific theses based on original research, deep industry knowledge, and business diligence."  And in its investment adviser brochure provided to the SEC, which is publicly available, Ribbit Capital says it "conducts due diligence to analyze, among other things, the company's market and growth potential of the market, the management team of the company, unique assets such as brand strength and intellectual property, and potential exit strategies."  And after investments are initially made it "seeks to identify operational enhancements to add value to portfolio companies following the investment."  Ribbit Capital charges its funds for "due diligence expenses (such as market diligence and background checks) with respect to actual or proposed investments."

461.    Despite Ribbit Capital's purported due diligence, entering into Investor Rights' Agreements with FTX, and claims of understanding FTX's business and operating model, the FTX Platform has been shown to be a scheme for FTX to use customer assets and be, in fact, entirely unsafe.  What is now known is that any proper due diligence would have revealed the extent of this massive fraud, but instead, Ribbit Capital provided its capital to FTX and falsely and misleadingly promoted the FTX Platform to unsuspecting investors.

### 18.    History of Altimeter

462.    Altimeter is an investment firm that was formed in 2008 by Brad Gerstner ("Gerstner").  Although started in Boston, Massachusetts, Altimeter now also does business in San Francisco and in Menlo Park, California, where it has an office on storied Sand Hill Road, the metonym for Silicon Valley's venture capitalist.  In a filing with the SEC, Altimeter states that "[t]he firm prides itself on providing scalable capital, re-investing in high conviction companies to support their growth journeys.  Altimeter has helped its private portfolio companies consider strategic options including going public through traditional IPOs and direct listings."

463.    Mr. Gerstner, a former securities lawyer and Harvard Business School graduate, funded now famous travel brands like Kayak Software Corp., Zillow Inc., and HotelTonight Inc., and sat on the board of Orbitz.  More recently his firm led a significant investment into Snowflake, a cloud computing company, which went public in 2020 with an opening price valuing the company at $68 billion, the largest software IPO at the time.

464.    According to a filing with the SEC, "Mr. Gerstner is responsible for Altimeter's investment strategy and has relationships with an extensive network of founders, management teams, investors and advisors."

465.     Mr. Gerstner often appears on audio and video podcasts, conferences, television, and other forms mass media to promote his investments and talk authoritatively about the crypto industry.  He often talks about "venerable early stage firms" like Sequoia and Andreeseen Horowitz, and how he does business with, not against them.

466.     In one video podcast exchange Mr. Gerstner boasted about how he looks for employees who have the ability to come up with grifts in order to make money:

> I ask everybody that we're going to hire, I ask this question: tell me how you've made money?  You know the number of people that went to Harvard Business School and worked at Goldman Sachs who can't answer that question.  They've never had to make fucking money.

> I'll tell you.  You asked me that question, the first answer I'll give you is: in the sixth grade I had my mom drop me off at the gas station and I bought candy, I took it to my locker and I sold candy out of my locker at a 2X markup.  That's how I first made money, right.  ***So I've spent my life figuring out hacks on stuff like this, and if somebody doesn't have that grift, they can't answer that question, that's a disqualifier***.

### 19.     Altimeter Promotes FTX and SBF

467.     Altimeter invested in 305,244 shares of FTX Trading's common stock through its Altimeter Growth Partners Fund V, L.P.

468.     Altimeter also invested in FTX's Series B preferred shares, buying for approximately $30 million 953,835 preferred shares through its Altimeter Growth Partners Fund III, L.P.  Altimeter was prominently named as one of the investors in a press release with SBF, quoted as saying, "I'm incredibly humbled by the support we've gotten.  It's our first large fundraise, but through it we've formed a hugely valuable set of partners."

469.     Mr. Gerstner, CEO of Altimeter, explained that partnering closely with the founders in which Altimeter invests is what, in his view, differentiates the firm from its competitors,

4896-1753-3557.v1

explaining: "Most of the other hedge funds were . . . stock pickers, not founders. So I thought, I can do this in a way that's really more empathetic and more closely aligned with founders, like true venture but could scale all the way into the public markets. . . . we want [founders] to know that we're side by side with them on the important issues they face – recruiting a CFO, building their board, getting the company public, helping them raise capital – and that will be first in line to write the check."

470.    On October 21, 2021, Altimeter invested in the Meme Round, acquiring an additional 76,311 preferred shares through its Altimeter Growth Partners Fund V, L.P.  And on January 26, 2022, again invested into FTX US, with a purchase of 4,094,000 Class A stock each in both funds, the Altimeter Growth Partners Fund III, L.P. and the Altimeter Growth Partners Fund V, L.P.  In total Altimeter acquired at least 8,493,244 shares of common stock and 1,030,146 shares of preferred stock from FTX for at least $30 million.

471.    Altimeter described in SEC filings the diligence it conducts on companies like FTX. Altimeter's stated approach to investing is "[d]eep, fundamental analysis," meaning it looks at its portfolio company's fundamentals, not just momentum.  Altimeter continues by saying that its "investment team spends significant time conducting primary due diligence as part of its fundamental bottoms-up research process," and "Altimeter aspires to be domain experts in the markets and business in which it invests."

472.    On an October 10, 2022 podcast on 20VC, Mr. Gerstner boasted that the due diligence Altimeter conducts in carrying out its investment activities is not going to be easily apparent to the outsiders relying on that due diligence, and confirmed that the risks that Altimeter

perceives are less concerning because Altimeter has obtained the necessary information and closely reviewed it:

> *So unless you've done the work, unless you've built the model, unless you have the conviction, you won't be able to do it. So what the outside world oftentimes perceives as tremendous amount of risk, to the person who's done the work, prepared themselves, right – of course you can't eliminate risk – but often for the protagonist who's actually doing it, it feels much less risky than everybody who's perceiving it from the outside in, right.*

> If somebody was adding, if Sequoia was adding money to Airbnb in the Series B or Series C, a bunch of people on the outside may say oh my god that's so crazy look at the valuation. I can't believe they're doing that deal it's so risky. I'm certain they didn't feel that way.

> . . . *I want to do what matters and that means that when you believe something you actually do something about it. You actually stand with a little conviction behind it if we're not doing that then we're not the firm I want us to be.*

473. On October 10, 2022, Mr. Gerstner discussed how his 13 or 14 analysts all study data to find things that confirm their thinking, and once they are onboard they align with their portfolio companies:

> We have an incredibly flat organization. *We have you know 13 or 14 analysts. We all call ourselves analysts, right. Where we study. That's what we do! We study. We think. We try to find things that are consistent with that thinking.*

> \*   \*   \*

> We prosecute our strategy like SEAL team six. When an entrepreneur – go talk to all the entrepreneurs we've partnered with – it's not like I do a deal and then I throw you into a consulting group who may help you with your HR or may help you with your marketing, right. They get me, they get Janis, they get Pauline, they get this team, right. *We are one team they get all of us and we bust ass for them that is a huge differentiator* . . . this game is about picking the right ideas, making good decisions thinking clearly, having conviction.

474. Despite Altimeter's purported best efforts to study data when carrying out its investment activities, Altimeter aligned itself with SBF, who relied on Altimeter's investments and credibility to promote FTX to investors.

- 195 -

### 20. History of K5 Global

475.    In its filings with the SEC, K5 Global describes itself as owned by Michael Kives and Bryan Baum, through their respective holding companies.  K5 Global operated through a number of affiliated entities, including K5 Global Holdings LLC, K5 Global Technology LLC, MBK Capital LP Series T, K5 Global Growth Co-Invest I GP LLC, K5 Global Growth Fund I GP LLC, K5 Global Ventures LLC, Mount Olympus Capital LP, Mount Olympus Capital LLC, K5 Global Growth Fund II LP, K5 Global Growth Fund II GP LLC, K5X Fund I LP, K5X Fund I LLC, and SGN Albany LLC.

476.    Mr. Kives is the founder and a managing member of Defendant K5 Global.  Mr. Kives graduated from Stanford University in 2003.  From August 2003 to February 2018, he worked at Creative Artists Agency ("CAA") as a talent agent representing high-profile Hollywood actors and other clients.  Mr. Kives left CAA in 2018 to found K5 Global.  Media reports have referred to Mr. Kives as a "super networker."  Guests at Mr. Kives's wedding included a former President, a former Secretary of State, a U.S. Senator, the Mayor of Los Angeles, and a long list of billionaires, CEOs of major corporations, and A-list celebrities.

477.    Mr. Baum is a managing member of Defendant K5 Global.  Mr. Baum graduated from Swarthmore College in 2011.  Although Mr. Baum has described himself as a "co-founder" of K5 Global, he actually joined K5 Global in 2020.

478.    As they built K5 Global, Mr. Kives and Mr. Baum touted their connections, including with the billionaire financier Warren E. Buffett ("Buffett").  According to *The New York Times*, in an interview, Mr. Buffett said Mr. Kives was a "name-dropper" who "might pitch that he has a connection to me, but he doesn't."  Mr. Buffett said he had known Mr. Kives from his time at CAA.

- 196 -

Since then, he said, Mr. Kives has contacted him about a few investment opportunities, which he declined.

### 21. SBF's Drive to Obtain Celebrity Connections and Political Influence

479.     Mr. Kives and SBF first connected via email on November 16, 2021, when Mr. Kives helped introduce SBF to world-renowned musician Sia.  Shortly thereafter, Mr. Kives began inviting SBF to dinner parties with Wall Street titans, Academy Award-winning actors, and NBA stars.  On February 11, 2022, the Friday before the Super Bowl, SBF attended a dinner party at Mr. Kives's house alongside former high-ranking politicians, a centibillionaire CEO, and various other celebrities.  The next day, February 12, 2022, Mr. Kives connected SBF via email to a tech company CEO and his wife, a former U.S. Ambassador to the Bahamas.  Mr. Kives and Mr. Baum were also given positions on FTX's Advisory Board.

480.     *The New York Times* has reported that Mr. Kives and Mr. Baum helped SBF cultivate relationships with actor Orlando Bloom ("Bloom"), singer Katy Perry ("Perry"), and former President Bill Clinton, and offered introductions to a who's who of celebrities and business leaders, from Leonardo DiCaprio ("DiCaprio") to the governor of Saudi Arabia's Public Investment Fund.

481.     *The New York Time*s also reported that two days before the Super Bowl in 2022, SBF attended a party at Mr. Kives's home in Beverly Hills, California, where he spent time with Ms. Perry and Mr. Bloom.  During a karaoke session, Ms. Perry reportedly performed a song that incorporated lyrics about FTX.  The next day, she wrote on Instagram that she was quitting music to become an FTX intern.

482.     At Mr. Kives's Super Bowl party, SBF also met Bobby Kotick ("Kotick"), the chief executive of the video game company Activision Blizzard, a person familiar with the matter said.

Mr. Kives tried to foster the relationship, relaying a dinner invitation from Mr. Kotick to SBF in April 2022, according to messages viewed by *The New York Times*.

483.     On February 13, 2022, SBF attended the Super Bowl as Mr. Kives's guest, along with A-list celebrities.  SBF was captivated by Mr. Kives's star-studded circle of friends, and two days later raved in an internal document that K5 Global was "something of a one-stop shop for relationships that we should utilize."  SBF noted that Mr. Kives and Mr. Baum wanted several things in exchange, including "[m]aybe us to invest in them," and, as described below, such investments quickly followed.[139]

484.     In April 2022, SBF (and Defendant SkyBridge, as alleged *supra*), hosted a four-day crypto conference in the Bahamas.  Mr. Bloom and Ms. Perry joined the event at the Baha Mar resort in Nassau, dining with SBF and other high-profile visitors.  Also in attendance was another public figure whom Mr. Kives had introduced to SBF: Mr. Clinton, who appeared on a panel with the FTX founder.

485.     In June 2022, SBF attended a charity gala at Casa Cipriani in New York.  Mr. DiCaprio was also at the event.  When Mr. Kives found out, he texted the actor, encouraging him to speak with SBF, a person familiar with the matter said.

486.     *The New York Times* also reported on Mr. Baum's contacts who enabled FTX and SBF to perpetuate their unlawful activities.  For example, in 2022, Mr. Baum set up a meeting between SBF and Nelson Peltz ("Peltz"), the billionaire activist investor.  Mr. Peltz was impressed

---

[139]  FTX and SBF's personal, business and financial relationship with K5 Global, Mr. Kives and Mr. Baum are detailed in a bankruptcy adversary proceeding that the estate has filed against Mr. Kives, Bauk, K5 Global and various related corporate entities, and quotes to FTX internal documents currently unavailable to plaintiffs here.  *See* Complaint, *In re FTX Trading Ltd.*, Case No. 22-11068-JTD (Bankr. D. Del. June 22, 2023), ECF 1679 (the "Bankruptcy Adversary Proceeding").

enough with the FTX founder that he invited SBF to the star-studded wedding of his daughter Nicola

and Brooklyn Beckham, the son of David and Victoria Beckham, according to emails obtained by

*The Times*.  (SBF did not attend.)

487.    Months later, Mr. Baum helped SBF and his younger brother schedule a meeting in

Miami with Ron DeSantis, Florida's Governor, according to three people familiar with the matter

and messages viewed by *The Times*.

488.    Then in October, he arranged for SBF to appear with Larry Fink, the chief executive

of the investment firm BlackRock, at a conference in New York.  Later that month, Mr. Kives

offered to connect SBF – who was traveling to the Middle East to raise money – with Yasir al-

Rumayyan, the leader of Saudi Arabia's Public Investment Fund, according to messages obtained by

*The Times*.

489.    Without the connections that Messrs. Kives and Baum made, both individually and

through their operations as K5 Global, FTX and SBF would not have been able to obtain the

endorsement from many of the celebrities that gave credibility to FTX, downplayed its risks, and

gave consumers the assurance that FTX was a legitimate operation.

### 22.    Mr. Kives, Mr. Baum, and K5 Global Received Pecuniary Gain from their Relationship with SBF

490.    SBF was so impressed by Messrs. Kives and Baum and their "infinite connections,"

that SBF and Mr. Kives almost immediately began working on a term sheet for a wide-ranging

"association of Sam Bankman-Fried or a related entity" with K5 Global entities.

491.    The term sheet included highly favorable terms for Mr. Kives and Mr. Baum, and

contemplated total consideration in cash and securities of $575 million in exchange for "interests" in

K5 Global's various funds and special purpose vehicles, consisting of: (a) $300 million in cash;

(b) $250 million in shares of FTX Trading Ltd. and West Realm Shires, Inc. to "vest quarterly over three years"; and (c) $25 million in payments to non-profits "with the details to be worked out later." Significantly, of the $300 million in cash consideration, $250 million was to be divided equally between Mr. Kives and Mr. Baum personally.

492. The term sheet also provided for a transaction through Mount Olympus Capital, LP ("Mount Olympus"), a Delaware limited partnership controlled by Mr. Kives and Mr. Baum that would more than double K5 Global's assets under management in the first year alone. Beginning with a $200 million initial capital contribution "from SBF," Mount Olympus would receive a targeted total annual contribution of $1 billion "for at least the first three years." If the $3 billion were fully invested and earned annual returns of 5% (*i.e.*, $150 million), Mr. Kives and Mr. Baum would each stand to receive $12.5 million per year in carried interest alone.

493. On March 7, 2022, the term sheet was signed, and the next day, on March 8, 2022, Clifton Bay Investments LLC ("Clifton Bay"), a Delaware company 67% owned by SBF with the rest owned by FTX's co-conspirators Mr. Singh and Mr. Wang, transferred to K5 Global Holdings LLC $300 million in cash, that Clifton Bay received from Alameda. Subsequently, $250 million was sent to Mr. Kives and Mr. Baum from K5 Global Holdings LLC, with the remaining $50 million sent to K5 Global Tech LLC, the general partner of four other K5 Global Funds.

494. An additional $400 million in cash from Alameda to Mount Olympus occurred on May 23, 2022 ($200 million), on June 7, 2022 ($100 million), and on September 20, 2022 ($100 million). These funds were then distributed further to K5 Global's funds, K5X Fund I LP and K5 Global Growth Fund II, LP.

495.    From March 8, 2022 to September 20, 2022, FTX, Alameda, SBF, and his co-conspirators transferred $700 million in wires to K5 Global and its affiliates.

### 23.    The Close Relationship of Messrs. Kives, Baum, and SBF, and of K5 Global and FTX

496.    As set forth in the Bankruptcy Adversary Proceeding, having easily secured $700 million in capital through various transactions with SBF, and the prospect of billions more in investments into K5 Global's entities, Mr. Kives and Mr. Baum sought to further ingratiate themselves with SBF by offering advice on potential FTX transactions unrelated to K5 Global, helping SBF arrange high-profile political and celebrity speakers for his conferences, and providing various other services for SBF.  Mr. Baum in particular was a frequent visitor to the Bahamas, to the point that the luxury apartments that SBF purchased in the Bahamas included a room reserved for Mr. Baum.  Mr. Kives's and Mr. Baum's efforts paid off – in a matter of months, they cultivated such a close relationship with SBF that he treated FTX and the K5 Global entities as one and the same.  Mr. Baum and Mr. Kives were even included on FTX's internal messaging Slack channels.

497.    For example, in August 2022, SBF was mediating a dispute between Mr. Baum and an FTX executive who had raised concerns about Mr. Baum's attempt to structure "one of the FTX side projects" such that Mr. Baum would "get[] some equity, rather than it just flowing through FTX."  SBF noted in an internal document that the FTX executive had questioned whether Mr. Baum was acting in FTX's best interest and had suggested that this "reek[ed]" of Mr. Baum "trying to nickel and dime FTX, or scam it a little bit . . . ."

498.    SBF also described his solution to the problem (which he referred to as "collaps[ing] the uncanny valley").  SBF emphasized that:

(a)    "FTX is aligned with Bryan [Baum]," and that "if there are significant artificial up-downs between FTX and K5 as entities, I'm happy to just true it up with cash estimates";

(b)    "SBF is aligned with Bryan and K5, and treats $1 to it as $1 to FTX even though we only own 33%, because whatever, we can always true up cash if needed, but also who cares"; and that

(c)    "There are logistical, PR, regulatory, etc reasons to not just merge K5 100% into FTX but I and Brian will both act how we would if they were merged."

499.    SBF declared that these points "are true, always have been true, and even if not, will be true going forward," and asked Mr. Baum and the FTX executive to confirm in writing whether they agreed.  Mr. Baum responded enthusiastically: "Agree with all – FTX FTW!"[140]

500.    Mr. Kives and Mr. Baum continued to expand their relationship with SBF.  For example, in September 2022, Mr. Friedberg, FTX's former Chief Regulatory Officer, instructed an FTX executive to "send to [Mr. Baum] the stuff FTX Ventures has bought into recently" to ensure that "K5 and our internal ventures team" were "keep[ing] each other informed on what is being invested."  Mr. Friedberg stressed that "this is important as *we view K5 as part of SBF's team*."

501.    Mr. Kives and Mr. Baum also continued to take advantage of opportunities to benefit themselves at the expense of FTX's customers.  For example, in September 2022, an Alameda employee flagged for a senior FTX executive that K5 Global had "racked up over $777k in design expenses" that had been sent to Alameda for payment.  The employee noted that he had been "planning to spot check a couple of the invoices against the contractor agreements," but that the first

---

[140]  FTW is an abbreviation meaning "for the win."

one he looked at "was pretty bizarre," so he "decided to review all of the agreements entered into with K5." He found that K5 Global had "billed, for one contractor, 100 hours of work over the course of three days," and that there were other financial discrepancies and facially implausible charges. The senior FTX executive responded: "Can we file this under the 'Something seems off with the K5 camp?'"

502. Due to the hundreds of millions of dollars that FTX had already invested in K5 Global and that Mr. Kives and Mr. Baum had already received to date and the prospects of receiving more funding, they had an interest in continuing their relationship with FTX and facilitating the promotion and growth of FTX.

503. Having access to insider information, through access and inclusion on internal messaging platforms at FTX and otherwise being considered by SBF as part of FTX, Mr. Baum and Mr. Kives had knowledge of FTX's internal operations, the lack of internal controls, and of the wrongdoing committed by FTX.

504. As a result of Messrs. Kives and Baum's aiding and abetting activities through K5 Global, consumers suffered damages.

### O. Domestic VC Defendants' Fraudulent Scheme and Deceptive Course of Conduct

505. As detailed above, Domestic VC Defendants represented to Plaintiffs and Class Members that they had performed adequate due diligence supporting their substantial FTX investments; that FTX's products and services were safe, trustworthy, and reliable; that SBF was a visionary crypto founder whose sole focus was on the greater good rather than profiting at the expense of others; that FTX was being competently run with extraordinary execution; and that FTX and SBF had strictly complied with all legal and regulatory requirements to safeguard their

customers' assets, which included ensuring that funds deposited by FTX Platform users would be segregated for safekeeping.

506.     Domestic VC Defendants knew, or should have known, that these representations were materially false and misleading when made.  If Domestic VC Defendants performed the due diligence activities that they claimed to have performed with respect to FTX, they would have been apprised through such activities of the wanton fraud and self-dealing and the complete lack of internal controls and competency present at FTX.  Domestic VC Defendants had knowledge that FTX was not operating in the manner that Domestic VC Defendants had represented to consumers and the market as a result of their experience and relationship with FTX, and their statements to the contrary during the relevant period did not have a reasonable factual basis.

507.     Domestic VC Defendants' unfair and deceptive statements described herein are likely to mislead – and clearly have misled – consumers and investors acting reasonably in the circumstances into depositing funds and/or cryptocurrency into FTX.

508.     Domestic VC Defendants' unfair and deceptive statements described herein were likely to have misled – and indeed did mislead – consumers acting reasonably under the circumstances in purchasing, transacting, or depositing fiat current or crypto assets in accounts with FTX during the relevant period.

509.     In addition, Domestic VC Defendants gave hundreds of millions of dollars in funding to FTX knowing, or reckless in not knowing, that those funds would be used to promote FTX to more customers, inducing them to trade and keep their assets with FTX.  Immediately after funds were provided, FTX plowed those funds into expensive advertising campaigns, hiring celebrities, naming stadiums, and conducting many other public promotional activities.  But Domestic VC

Defendants' claimed due diligence, if done as they have stated was done, would have revealed that FTX was not safeguarding, not segregating, not properly accounting for, and simply not protecting customer assets. Domestic VC Defendants also knew, or were reckless in not knowing, that FTX was comingling and misusing assets, yet turned a blind eye, did not warn customers, conspired with FTX, and in fact gave hundreds of millions of dollars more to aid and abet, and materially assist in the fraud.

510.    Domestic VC Defendants' conduct has caused Class Members to suffer billions of dollars in losses, as FTX ultimately collapsed and fell into bankruptcy.

### P.    The Truth Emerges

511.    FTX's rapid growth story began to unravel on November 2, 2022, when an article published by the cryptocurrency publication *CoinDesk* questioned the financial health of Alameda and FTX and revealed that Alameda held billions of dollars' worth of FTT Token, the native FTX token. Specifically, the article, titled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet," stated in pertinent part as follows:

> Billionaire Sam Bankman-Fried's cryptocurrency empire is officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.
>
> But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, according to a private financial document reviewed by CoinDesk. (It is conceivable the document represents just part of Alameda.)
>
> That balance sheet is full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.

- 205 -

The financials make concrete what industry-watchers already suspect: Alameda is big. As of June 30, the company's assets amounted to $14.6 billion. Its single biggest asset: $3.66 billion of 'unlocked FTT.' The third-largest entry on the assets side of the accounting ledger? A $2.16 billion pile of 'FTT collateral.'

There are more FTX tokens among its $8 billion of liabilities: $292 million of "locked FTT." (The liabilities are dominated by $7.4 billion of loans.)

'It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token,' said Cory Klippsten, CEO of investment platform Swan Bitcoin, who is known for his critical views of altcoins, which refer to cryptocurrencies other than bitcoin (BTC).

\* \* \*

Other significant assets on the balance sheet include $3.37 billion of 'crypto held' and large amounts of the Solana blockchain's native token: $292 million of 'unlocked SOL,' $863 million of 'locked SOL' and $41 million of 'SOL collateral.' Bankman-Fried was an early investor in Solana. Other tokens mentioned by name are SRM (the token from the Serum decentralized exchange Bankman-Fried co-founded), MAPS, OXY and FIDA. There is also $134 million of cash and equivalents and a $2 billion 'investment in equity securities.'

Also, token values may be low. In a footnote, Alameda says 'locked tokens conservatively treated at 50% of fair value marked to FTX/USD order book.'

Owners of the FTT token get discounts on FTX trading fees, increased commissions on referrals and earn rewards. The value of FTT is maintained by FTX's rolling program of buying back and burning tokens, a process that eats up a third of the exchange's trading commissions, which will continue until half of all tokens are burned, according to FTX.

512.     Shortly after the *CoinDesk* article was published, FTX suffered massive customer withdrawals, resulting in a liquidity crisis.

513.     On November 6, 2022, Binance, a competing crypto asset trading platform, commented that "[d]ue to recent revelations that have came [sic] to light," Binance would be liquidating its FTT holdings, which had been valued at the time at over $500 million. This

announcement caused a collapse in the price of FTT Tokens and accelerated the pace of customer withdrawals from the FTX Platforms.

514. Then, on November 8, 2022, Binance announced that it had reached a non-binding deal to acquire FTX Trading. However, only one day later, Binance stated that "as a result of [its] corporate due diligence . . . [Binance had] decided that [it would] not pursue the potential acquisition of FTX[]" and that "the issues [were] beyond [Binance's] control or ability to help."

515. Ultimately, by November 8, 2022, SBF had elected to freeze all withdrawals of customer assets. As a result, the price of FTT Tokens declined by 80%, and Alameda's collateral on deposit had a value lower than the amount Alameda had borrowed from FTX. This resulted in FTX having billions of dollars' worth of unrecoverable loans outstanding to Alameda.

516. On November 9, 2022, Sequoia sent the following letter to its limited partners posted on Twitter:

> We are in the business of taking risk. Some investments will surprise to the upside, and some will surprise to the downside. We do not take this responsibility lightly and do extensive research and thorough diligence on every investment we make. ***At the time of our investment in FTX, we ran a rigorous diligence process***. In 2021, the year of our investment, FTX generated approximately $1B in revenue and more than $250M in operating income, as was made public in August 2022.

517. In contrast to Sequoia's claim that it does "extensive research and thorough diligence on every investment we make," *The Wall Street Journal* reported that on a subsequent call with investors, Sequoia apologized and stated that "the firm would improve its due-diligence process on future investments" and "the firm in the future will be in a position to have even early-stage startups' financial statements audited by one of the Big Four accounting firms."

518. Sequoia's November 9, 2022 letter to its limited partners posted on Twitter referencing financials made public in August 2022, was referring to news article based on CNBC's

review of leaked financial documents. These purported financials were curiously leaked shortly after Voyager and Celsius filed for bankruptcy in July, and purportedly showed the strength and stability of FTX.[141] However, in the following days Sequoia's claims of extensive due diligence would be completely undermined by the *Financial Times*' revelations of what FTX's financial statements actually showed – FTX's assets being primarily its own or affiliated tokens, distorted financial records and suspicious transactions.

519. On November 9, 2022, Multicoin Capital also wrote a letter to its limited partners. It stated that "FTX is one of the three exchanges the [Multicoin Master] Fund trades on" and discussed Multicoin Capital's purported ongoing due diligence on FTX, including their financial statements:

> ***We actively monitor and manage counterparty risk with trading partners and vendors. We engage in diligence on all counterparties*** and perform testing before execution of meaningful trades. Specific to exchanges, we seek to limit exchange exposure to assets we reasonably believe may be required for trading. The fund was trading BTC, ETH, SOL, MATIC, and USD on FTX. ***As part of ongoing diligence of FTX, we reviewed FTX's most recent financial statements for Q2, and have been in ongoing discussions with FTX team members in several divisions. Based on information provided and our review, signs of distress were not apparent***.

520. In the same letter Multicoin Capital also admitted its close ties to FTX, showing that it would benefit from continuing to promote FTX and SBF. It admitted that "Solana was generally considered to be within SBF's sphere of influence." In discussing Multicoin's ownership of Serum, the letter admitted that "SRM is a decentralized exchange built on Solana that was built by the FTX team. While SRM is not directly implicated by FTX, the market generally considers the assets to be related to one another."

---

[141] On August 20, 2022, a CNBC article titled "FTX grew revenue 1,000% during the crypto craze, leaked financials show," stated: "The crypto exchange's revenue soared more than 1,000% from $89 million to $1.02 billion in 2021. Its profitability, like many start-ups, depends on how you measure it. Operating income was $272 million, up from $14 million a year earlier. FTX saw net income of $388 million last year, up from just $17 million a year earlier.

521. On November 10, 2022, SBF took to Twitter and issued a series of 22 tweets apologizing to customers and attempting to offer an explanation for the crash.

522. Then, on November 12, 2022, *The Wall Street Journal* published an article titled "Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds," which revealed that FTX customer funds had been used to prop up Alameda. The article stated in pertinent part as follows:

> Alameda Research's chief executive and senior FTX officials knew that FTX had lent its customers' money to Alameda to help it meet its liabilities, according to people familiar with the matter.
>
> Alameda's troubles helped lead to the bankruptcy of FTX, the crypto exchange founded by Sam Bankman-Fried. Alameda is a trading firm also founded and owned by Mr. Bankman-Fried.
>
> Alameda faced a barrage of demands from lenders after crypto hedge fund Three Arrows Capital collapsed in June, creating losses for crypto brokers such as Voyager Digital Ltd., the people said.
>
> In a video meeting with Alameda employees late Wednesday Hong Kong time, Alameda CEO Caroline Ellison said that she, Mr. Bankman-Fried and two other FTX executives, Nishad Singh and Gary Wang, were aware of the decision to send customer funds to Alameda, according to people familiar with the video. Mr. Singh was FTX's director of engineering and a former Facebook employee. Mr. Wang, who previously worked at Google, was the chief technology officer of FTX and co-founded the exchange with Mr. Bankman-Fried.
>
> Ms. Ellison said on the call that FTX used customer money to help Alameda meet its liabilities, the people said.
>
> Alameda had taken out loans to fund illiquid venture investments, the people said.
>
> On Friday, FTX, Alameda, FTX US and other FTX affiliates filed for bankruptcy protection.
>
> Bankruptcy means that it could be a long time before individual investors and others owed their funds are able to potentially recover any of them, if ever.

523.    *The Wall Street Journal* article's revelation that customer assets were being used to cover Alameda's trading losses and repay its outstanding debts demonstrated that FTX had been operating in direct contradiction of FTX's terms of service, which explicitly stated that customer assets would not be transferred to FTX trading.

524.    That same day, on November 12, 2023, the *Financial Times* reported that prior to FTX declaring bankruptcy, SBF began sending to investors a purported FTX Trading balance sheet in hopes of raising funds, which showed $900 million in liquid assets but a staggering $9 billion in liabilities.  The balance sheet ambiguously listed assets and liabilities in a hodgepodge of acronyms and anagrams, such as listing assets and liabilities blithely as "liquid" or "less liquid" and referencing $8 billion in withdrawals described as "hidden, poorly internally labeled 'fiat@' account."

525.    The balance sheet itself was a total sham.  For example, FTX's largest asset prior to the publication of the November 2, 2022 *CoinDesk* article, was FTT's own coin, listed as "Less liquid" and purportedly valued at $5.9 billion.  Similarly, FTX's second largest asset was SRM, a Serum token that ran on Solana's blockchain.[142]  FTX valued SRM at $5.4 billion prior to the *CoinDesk* article's publication, with *Bloomberg* writing on November 14, 2022, that if this were true "[i]n round numbers FTX probably held something like two-thirds of Serum's fully diluted market cap, and roughly 20 *times* its basic market cap."  If FTX could not sell these "assets" at the valuation

---

[142]  As noted below certain Defendants along with FTX and Alameda created Serum and partnered with Solana.  The balance sheet also reported $2.2 billion in Solana's token, SOL, and $800 million in MAPS, a Serum spinoff that was also launched by FTX.  Even after the crashes each of these tokens had after the *CoinDesk* article was published, *Bloomberg* noted "Thursday balance sheet valued the FTT, SRM, SOL and MAPS holdings at a combined $4.3 billion, and that number is still way too high."

it was giving them. As *Bloomberg* explained: "FTX's Serum holdings were vastly larger than the entire circulating supply of Serum. If FTX had attempted to sell them into the market over the course of a week or month or year, it would have swamped the market and crashed the price." The same is true for FTX's valuation of its own coin FTT. In fact, this is exactly what happened when Binance announced it will sell its smaller position in FTT on November 6, 2022.

526.     Shortly after the foregoing disclosures, SBF resigned as CEO of FTX, Alameda, and other SBF entities filed for bankruptcy. In a Delaware bankruptcy court filing, FTX's new CEO Ray stated that he had never seen "such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. . . .    [T]his situation is unprecedented."

527.     On November 18, 2022, *CoinDesk* reported that it had obtained the audited financial statements of FTX Trading and FTX US, and pointed out some glaring red flags that should easily be caught by anyone obtaining these statements. The "first red flag" that *CoinDesk* noticed was that they were commissioned by two different audit firms for 2020 and 2021. Prager Metis had purportedly signed the report for FTX Trading with Armanino doing so for FTX US. "[A]nyone receiving these reports should have seen is that there were two different audit firms producing them. Why hire two different firms rather than one to produce an opinion on consolidated results?" And then further both of these firms had "a poor recent track record with the PCAOB."

528.     *CoinDesk* continued that "[t]he second red flag for any reader of the 2021 audit reports is that neither the Armanino nor the Prager Metis audit reports for 2021 provides an opinion on the FTX US or FTX Trading internal controls over accounting and financial reporting . . . the

FTX bankruptcy filing, confirms what reading the year-end 2021 financial statements should have screamed to any auditor or reader of the reports: There were no controls."

529. *CoinDesk* reported that "[t]he third red flag is, despite a combination of enormous siphoning off of firm assets by related parties and favorable tax planning, neither FTX Trading nor FTX US paid any federal income taxes, although they both appeared to be profitable."

530. Lastly, *CoinDesk* concluded that "[t]he biggest red flag for preparers and readers of the audited financial statements (such as the Domestic VC Defendants) should have been the number of complex, roundtrip and utterly confounding related-party transactions documented in just these two years. The related-party transactions at FTX Trading are so numerous that it is difficult to know where to begin to analyze them." *CoinDesk* went on to list several key issues it noticed, including numerous related-party transactions, the use of FTT on balance sheets, FTT being used as currency for acquisitions, and questionable loans to related parties.

531. Thereafter, on November 30, 2022, SBF granted an interview to *The New York Times* reporter Andrew Ross Sorkin, during which SBF accepted responsibility for FTX and Alameda's failures. Among other statements, SBF acknowledged: "'I was responsible ultimately for doing the right things and I mean, we didn't. Like, we messed up big.'" According to *Forbes*, SBF intended to make a similar *mea culpa* to Congress before he lost his job, planning to state, "I f****d up."

532. On December 12, 2022, SBF was arrested in the Bahamas on the eve of what would have been roughly his fourth time providing testimony to a congressional committee in a one-year period. Accordingly, the scheduled congressional testimony for December 13, 2022 was provided by Mr. Ray, wherein Mr. Ray confirmed a host of adverse facts about what his investigation to date

into FTX had uncovered or confirmed. During his prepared remarks to Congress, Mr. Ray stated, in

pertinent part, the following:

> While many things are unknown at this stage, and many questions remain, we know the following:
>
> **First**, customer assets from FTX.com were commingled with assets from the Alameda trading platform.
>
> **Second**, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.
>
> **Third**, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.
>
> **Fourth**, loans and other payments were made to insiders in excess of $1 billion.
>
> **Fifth**, Alameda's business model as a market maker required deploying funds to various third party exchanges which were inherently unsafe, and further exacerbated by the limited protections offered in certain foreign jurisdictions.

(Emphasis in original.)

533. On January 6, 2023, *Reuters* reported that the SEC was probing certain FTX

investors' due diligence process, and had begun asking for documents relating to these investments

in the Company.

**Q.    Sequoia's Additional False and Misleading Statements to Cover Up
Its Knowledge of the Fraudulent Conduct by FTX**

534. As the extent of FTX and Alameda's fraudulent conduct began to come to light,

Domestic VC Defendants began making public statements to avoid scrutiny, and conceal the extent

of their knowledge and involvement.

535. On November 18, 2022, Doug Leone ("Leone"), general partner of Sequoia spoke at

a venture capital conference called Slush, a "founder-focused" event. In a coordinated interview

with fellow Sequoia partner Luciana Lixandru asking questions, Mr. Leone stated that there wasn't much his firm could do to discover the fraud at FTX, claiming that Sequoia had done careful due diligence:

> *I can tell you we've done careful due diligence* but what you see at the end of a quarter in a due diligence statement doesn't reflect what someone may have done in the middle of the quarter. *We've looked at it, there's nothing much we could have done any differently and we do not want to lose our virginity, our true belief to align ourselves with you and to dream with you*. I think we lose that and we are out of business.

536.    On January 12, 2023, Mr. Lin of Sequoia, sat for an interview with Connie Loizos from the news outlet *StrictlyVC*. When asked what went wrong with "one of the worst investments in the history of venture capital," Mr. Lin tried to minimize Sequoia's involvement saying "[i]f you lop off some zeros, one zero, it would be $15 million out of a $630 million fund. And if you look at it that way, which is how we looked at it from a risk management perspective for Global Growth Fund III, you'd be like, fine, we can take a $15 million loss on a $630 million venture fund, and that's how we kind of looked at it from a risk management standpoint."

537.    Mr. Lin also tried to deny any responsibility claiming Sequoia was misled, but in doing so repeated again that Sequoia actually did do extensive research and diligence:

> [Lin:]  We've reflected on it, we looked at the diligence package again and again on whether . . . what we missed. *We do extensive research and diligence when we make an investment. This was, this happened for this investment as well. And, I think in retrospect, we looked at a bunch of things*, but we were . . . look, you know, sort of, [cough] reflecting on it we believe we were misled for a variety of situations and we'll find out when the court documents and investigations happen a lot more closely.
>
> [Loizos:]  I mean, I guess and also, you know, you are a math whiz. You studied applied mathematics and statistics. Were you given fake numbers? I mean, what did you have to look at?

- 214 -

[Lin:] *We looked at balance sheets. We looked at organizational charts of where the subsidiaries were. We looked at how much Alameda was, a percentage of FTX's volume. We looked at a variety of things*. The company Alameda, we knew was a hedge fund. *We knew that they were trading on FTX*, but it was not on any of FTX's organizational charts. So we thought that they were, when we asked, are these two companies independent? And we were told that they were . . . so.

538. Mr. Lin also made the following false and misleading statements concerning Sequoia's "board" representation in the FTX entities:

[Loizos:] And, you know, *I think another thing that obviously shocked everybody was that there was no board*. And you invested something like $200 million across a couple of funds. In retrospect, was that a responsible decision? Was it ever that you wanted to be on the board and they said, you know, you can't be part of the deal in that case? Or, what was that discussion like?

[Lin:] . . . So in some sense and, yes, should we have asked for more board representation? *We could have*. But at the same time, they didn't think that we deserved to be on the board because we owned less than 1% of the company.

539. Contrary to Mr. Lin's assertions, Sequoia (through Mr. Lin's representation) was a member of FTX's Advisory Board and had ample access to the Company's financials and internal reporting (or lack thereof), including its purported balance sheets and organizational charts. Sequoia also entered into Management Rights and Investors' Rights Agreements with FTX, ensuring a higher level of right to FTX information.

540. After a year, Mr. Lin attempted again to declare Sequoia absolved from any wrongdoing. On June 22, 2023, at the Bloomberg Technology Summit in San Francisco, Mr. Lin was asked what lessons were learned from Sequoia's investment in FTX. But there was no second guessing this time – he spoke nothing about more Advisory Board representations or additional due diligence, much less any commiseration for Sequoia's involvement in the billions of dollars that retail investors lost. Instead, he positioned Sequoia as taking a "calculated risk," unbelievably going on to say that they would have invested in FTX all over again:

- 215 -

We looked at the work that we did 15 different ways. ***We probably would have made the investment again***. The lesson learned there is that we're in the Venture business, and there are gonna be losses, and while it stings to lose 150 million dollars from our Global growth fund, its two to three percent of that fund. . . . ***that is actually the most uncomfortable feeling – where you look at the data, you would have done it again, and yet at the same time you have to be okay with it***.

**R.      SkyBridge's Additional False and Misleading Statements to Cover Up Its Knowledge of the Fraudulent Conduct by FTX**

541.      On November 11, 2022, Mr. Scaramucci appeared on CNBC and admitted that he assisted SBF and FTX in raising money prior to its collapse. It would be reported later that SBF's Ponzi scheme was running out of cash and the venture capital funds decided not to invest more, and so SBF was hopeful that investors in the Middle East would give him money. Mr. Scaramucci acknowledged that he was involved in SBF's attempted fund raising at this time:

I spent a lot of time with [Sam]. We traveled to the Middle East. This was before these revelations were exposed. We were embarking in helping him fund raise. He purchased 30% of my business. We were trying to help him around the world.

542.      In the same CNBC interview, although SkyBridge promoted FTX as being a safe place for retail investors to keep their money, Mr. Scaramucci disclosed that SkyBridge's funds kept no assets with SBF.

543.      On November 15, 2022, Mr. Scaramucci was interviewed by Stacy-Marie Ishmael on stage at the Bloomberg New Economy conference and discussed FTX. Mr. Scaramucci discussed how he facilitated FTX's purchase of LedgerX because LedgerX held licenses that were important in the United States. Mr. Scaramucci also discussed SkyBridge's partnership with FTX, and discussed the partnership with FTX in SALT, and misleadingly claimed that he "did not lose the money because Sam gave me the money," a claim he would repeat on multiple occasions.

544.     Mr. Scaramucci went on to disclose that he used his connections to embark on the effort to raise $1 billion for FTX in the Middle East, including in Abu Dhabi and at the Future Investment Initiative Institute in Riyadh, Saudi Arabia, which occurred on October 25-27, 2022.  Mr. Scaramucci said, "I have been doing this longer than Sam has been alive, and so I have a lot of relationships over there.  And I availed him to a lot of those relationships."

545.     Mr. Scaramucci then proceeded to falsely and misleadingly claim that FTX's problems were a liquidity issue brought on by Binance's CEO, CZ.  However, Mr. Scaramucci would later admit that by the time of this interview he was already aware that FTX was using customer assets and committing fraud:

> I think what happened, frankly, [SBF] said something about the founder of Binance in one or two of those meetings.  [CZ] said, we are in a divorce, "we will not make love" –those were the twitter comments.  ***[CZ] hit [SBF] with $500 million of tokens.  I do not think Sam could keep that [FTT] token at a level that would support all of the infrastructure and leverage he had on his balance sheet.  Weirdly the association with us on the trip to the Middle East tipped the first domino earlier***.

> *     *     *

> The problem with the industry is there is a lot of young people that like antagonizing each other and lighting each other up on twitter.  And you and I were talking in the green room, I had an old boss at Goldman, and he said that "your job is to take your six shooters and point them out to the enemy, don't point that at each other."  And we do that in this industry, and I think it is a shame.  And I think if the industry wants to grow up, we need a lot more collaboration.

> ***I think that there was a red flag, sort of a penalty flag, of Sam going after CZ, but also CZ going after Sam***.  I mean there was a twitter spat between the two of them.  I think it would be better for everybody if we calm things down and row in the boat together in synchronicity as opposed to taking the oars and smacking each other over the head with the oars.

546.     Mr. Scaramucci then discussed that he shrewdly constructed the deal with FTX such that SkyBridge would not get entangled with FTX's bankruptcy.

The good news for me, maybe it's a product of having good lawyers, that piece that Sam owns can't be transferred to anyone without my permission, including in a liquidation event. They can't force the liquidation because I am the majority shareholder of the company. So they cannot force a liquidation. Remember it's a minority position. So I'm hopeful that I will be able to negotiate now with the trustee, the administrator, or with bankruptcy a reasonable price for that equity. And we will buy it back.

547. Mr. Scaramucci emphasized that he was being candid saying the issues with FTX gave him the "opportunity to talk about this very transparently." However, when asked about due diligence, Mr. Scaramucci falsely and misleadingly deflected what he knew or should have known, claiming that he was given audited FTX financial statements, validated by third parties, and it was very hard to detect FTX's fraud. But what is now known is that any reasonable due diligence would have uncovered FTX's massive fraud:

> [Mr. Scaramucci:] *You know there were 25 venture capitalists that invested in Sam's business. A lot of them right now, they don't want to share a stage with anybody but I think they should*.

> [Ishmael:] What is the mistake do you think? Was the mistake investing in him? Was a mistake insufficient due diligence?

> [Mr. Scaramucci:] Well listen, *I talked to a lot of my friends that were involved in the due diligence process. I think it is very hard to protect yourself against that sort of misrepresentation. Let's call it misrepresentation for right now. If you are being shown a balance sheet that may or may not be accurate, if you are being shown income statements that may or may not be accurate that are being validated by third parties, that's pretty rough. That's very hard to see through. If you're running a background check on someone like Sam, you're not going to find anything. He was unblemished, if you will, prior to this incident*.

> *I think it's an issue of certain things are going to fall through the cracks whether you like it or not. Now remember he was giving me the money and so I was looking and I was doing a lot of due diligence on him but clearly, clearly not enough*.

548. On January 16, 2023, Mr. Scaramucci appeared on the podcast Capital Allocators with Ted Seides and discussed SkyBridge's and FTX's relationship. Mr. Scaramucci admitted that

in addition to the number of investors in Bitcoin and regulation, safekeeping of digital assets was of primary importance prior to SkyBridge's investments in cryptocurrencies, and so SkyBridge investigated issues concerning cryptocurrency safekeeping and made the decision to custody those assets with Fidelity. The issue of safekeeping that Mr. Scaramucci identified with cryptocurrencies was completely lacking with FTX, as disclosed in FTX's bankruptcy filings:

> [Mr. Scaramucci:] [In 2019,] [w]e didn't pull the trigger we but I had on my checklist three things number one was Bitcoin in particular reaching escape velocity. . . . ***Number two, could I store it safely. Was there a place I could store it? You had the Mt. Gox hack and the bankruptcy Mt. Gox – that was the first real centralized exchange that went belly up. Was there a safe place I could store it? And I made the decision that Abigail Johnson and Fidelity was a very safe place to store things. There's just a lot of procedures there and extra layers of insurance and cold storage and so I got comfortable that we could put nine figures worth of bitcoin at a place like Fidelity***. And then the third thing was regulation. It's not regulated yet it's still a new frontier you're very early in digital assets.

549.    Mr. Scaramucci also discussed how SkyBridge partnered with FTX to do the SALT conferences, and how they were great events, and "it would have been an even bigger event this year but if Sam himself wasn't a fraud." Mr. Scaramucci admitted that the point of FTX's investment in SkyBridge was to promote FTX, saying:

> So now this is August. [SBF] says, okay well what about entering into a transaction, what sort of transaction are we thinking about. I had proposed 15 percent selling of the company. Oh no, I want to go bigger than that. I don't like doing that. ***I had shook hands with them on the idea that I would come in and help him build those relationships grow his rolodex, if you will – it's an old-fashioned term for Outlook but you know what I'm talking about – and so I said okay, I'm in. He bought 30 percent of the company***. It's in the paper now, so it's okay to talk about it. He paid 45 million for 30 percent of the company. It was an understanding that he had a right over three years to buy 85 percent of the company at some point. We shook hands. We announced that deal at Salt New York in 2022.

550.    Despite Mr. Scaramucci claiming publicly that he did not know there was a fraud and blaming CZ on FTX's demise, this time he admitted that he knew there was a fraud by at least

November 8, 2022, admitting that SkyBridge knew then that SBF was a fraud and using customer

assets in direct violation of FTX's terms of service.  However, as detailed herein, SkyBridge knew or

was reckless in not knowing about the massive fraud much earlier:

> And so you just have to think about the lightning moves here we shook hands in August, we did the transaction in September.  ***In the first part of November, we're discovering that Sam is actually a fraud, and he's actually moving money from customer accounts into his personal trading account, which is obviously a direct violation of its terms of service***.

> I wasn't ready to call it a fraud when it first happened, because I obviously want to give everybody the benefit of the doubt, but now that his senior Executives have pled guilty, I think it's pretty clear that it is a fraud.

> \*     \*     \*

> . . . I went on the internet I booked myself a 6 55 am JetBlue flight and I flew down to the Bahamas on November the 8th.  ***And then that's when I knew there was a real problem because there were executives there that told me what they thought was happening, and they explained to me why they thought that this was happening***.  And I told those executives well you have to tell the authorities you have to be very honest about it.  Sam didn't spend much time with me that day.  I did have the opportunity to speak to his father who was very distraught.

> And when I flew back, Sam had people believing that CZ was going to make this investment of the company, ***but if what the people were saying to me were true then there was no way CZ could make that investment***.  And obviously the very next day CZ reported that he was not going to make the investment, and then [FTX] declared bankruptcy, and then the rest of the saga unfolded and it became very, very clear what [SBF] was doing.

551.    Mr. Scaramucci then pointed the finger at other Domestic VC Defendants who lent

their credibility to FTX, again attempting to distinguish SkyBridge because it received money from

SBF (although other Domestic VC Defendants did as well), when in fact SkyBridge had invested at

least $59 million directly in FTX and $30 million more in their affiliated tokens:

> I guess I was naïve to it because of what we saw.  ***We saw a very pristine data room.  We saw audited financials.  We saw, and again I won't mention the names, but there were 25 other luminary venture capital investors, hedge fund***

*billionaires, all of which were investors in Sam's company – remember he was giving me the money.*

552.    Mr. Scaramucci concluded that after SkyBridge's entanglement with FTX, he does

not see anything different and would take the same approach:

> Weirdly, ***I don't see anything different. We got kicked in the teeth, dusted ourselves off, and now we'll take that same approach*** . . . .  I'm in the process of negotiating with the bankruptcy people the repurchase of the 30 percent stake that Sam bought in the company.  And I think once that's done, I think we can then take a clear-headed view of the different options and the opportunities.  But we know each other a long time I'm like – you're allowed to curse on this project?

> [Mr. Seides:]  Sure. Absolutely.

> [Mr. Scaramucci:]  Yeah, ***I'm like a fucking cockroach, okay.***  If you think I'm going down after the nuclear bomb goes off then you've missed sized me.  I'm a little tough son of a bitch and so ***I will find a way hook or crook to make this work for the firm, make it work for our clients***.

553.    *Bloomberg* January 24, 2023 "I don't shy away from it," Mr. Scaramucci said.  "I

think it's important for people who believe in capitalism and important for people that are risk takers

to understand what happened.  I'm not going to be the person that takes no more risk in the future

because I got burned by Sam."  While SkyBridge might consider its investments, partnership and

public promotion of SBF and FTX a mere "risk," billions of dollars' worth of customer assets remain

missing or entangled in FTX's bankruptcy because of SkyBridge's capital support and false and

misleading statements promoting FTX.

### S.    Multicoin Capital's Additional False and Misleading Statements to Cover Up Its Knowledge of the Fraudulent Conduct by FTX

554.    Despite  constantly  appearing  on  multiple  podcasts  discussing  crypto  and  their

investments, Multicoin Capital did not do any podcasts from November 2022 until April 2023.  On

April 18, 2022, the podcast Empire posted an interview of Mr. Jain and Mr. Samani discussing their

relationship with SBF and close ties with Solana.

- 221 -

555.     With respect to Multicoin's close relationship with Solana and FTX, Mr. Samani explained that Multicoin Capital worked closely with SBF to build Serum, an operating hum on the Solana blockchain.  Mr. Samani disclosed that "[w]e had a good relationship with Sam at the time," after which Multicoin Capital soon invested in the new platform along with FTX.  But Mr. Samani quickly minimized FTX's role in their investments with Solana, chalking the allegations of improper trading and involvement as just capitalism:

> So this kind of narrative of FTX supporting Solana, I just don't understand the claim, both in human capital resources or financial resources.  They were doing stuff that was in their own self-interest but like that's just, ***that's just capitalism***. . . . [b]ut inventively those things go away.  Narratives are narratives, and they favor time as intellectual substance kind of matters over the long term.

556.     On the same podcast Mr. Jain attempted to say there was very little Multicoin Capital could do to identify the fraud, but admitted that basic controls were missing at FTX and how there were basic controls that should have existed, but did not:

> [Mr. Jain:]  This guy talked to several of the most sophisticated investors in the world and got them to invest, including sovereign wealth funds, and you know just like giant asset managers – some of the most storied Venture Capital funds in the world, and they all loved him because he told a really good story, he was hyper aggressive and he was focused on addressing enormous market.
>
> So I think, yeah, I think everyone's perception of him was pretty similar right.  Like this guy was kind of like a superhuman right, ***but what I think was underlying that, that we missed was the complete lack of governance controls that anyone placed on him.  The complete lack of transparency into the internal operations***.  Now look when the CEO of the business goes to the CTO and says "please write this back door into the code such that it doesn't alert the auditors when I move this money," uh, ***there's very little that can be done from an oversight perspective from prevent that from happening, but you can have some processes in place right.  If you're checking to see where the money is.  If there's an up-to-date balance sheet always presented to you***.

**T.** **The First Interim Bankruptcy Report**

557.    On April 9, 2023, Mr. Ray filed with the United States Bankruptcy Court for the

District of Delaware a report he made to the newly appointed independent directors of FTX and

Alameda covering the control failures he had thus far identified ("First Bankruptcy Report").  As

stated plainly in the First Bankruptcy Report:

> Normally, in a bankruptcy involving a business of the size and complexity of
> the FTX Group,[143] particularly a business that handles customer and investor funds,
> there are readily identifiable records, data sources, and processes that can be used to
> identify and safeguard assets of the estate.  ***Not so with the FTX Group***.
>
> Upon assuming control, the Debtors[144] found a ***pervasive lack of records
> and other evidence at the FTX Group of where or how fiat currency and digital
> assets could be found or accessed, and extensive commingling of assets***.  This
> required the Debtors to start from scratch, in many cases, simply to identify the assets
> and liabilities of the estate, much less to protect and recover the assets to maximize
> the estate's value.

558.    The First Bankruptcy Report further details the stunning pervasive control failures

throughout FTX (and Alameda), which are entirely inconsistent with Domestic VC Defendants'

statements promoting FTX as a high-quality, global crypto exchange.

559.    Beginning with the three individuals that controlled FTX and Alameda, SBF, Mr.

Singh, and Mr. Wang had "***no experience*** in risk management or running a business" and board

oversight "was also ***effectively non-existent***."  FTX and Alameda were so disorganized that they ***did***

***not even have any "tracking of intercompany relationships and ownership of particular entities***,"

---

[143]  The First Bankruptcy Report defines "FTX Group" as "FTX Trading Ltd., West Realm Shires
Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned
subsidiaries."

[144]  The term "Debtors" in the First Bankruptcy Report and Second Bankruptcy Report (as defined
below) refers to the FTX debtors and debtors-in-possession that were taken over by a new
independent board that appointed Mr. Ray as new CEO in charge of sorting through the bankruptcy.

and ***did not even have "any comprehensive organizational chart" for its entities or "complete lists of who its employees were***."

560.    The First Bankruptcy Report detailed a complete lack of financial and accounting controls, unsuitable for basic financial transactions, much less the safekeeping of assets or acting as an exchange.  "***The FTX Group did not have personnel who were experienced and knowledgeable enough to account accurately for assets . . . or compile and validate financial reports***.  Key executive functions, including those of Chief Financial Officer, Chief Risk Officer, Global Controller and Chief Internal Auditor, were missing at some or all critical entities.  Nor did the FTX Group have any dedicated financial risk, audit, or treasury departments."  Policies and procedures "did not exist, were incomplete, or were highly generic and not appropriate for a firm handling substantial financial assets."  There were also no "***fundamental financial and accounting controls" and no "internal audit function whatsoever***."

561.    FTX and Alameda did not even have an appropriate accounting system "capable of handling large volumes of data" that "[c]ompanies with operations as large and complex as those of the FTX Group normally employ":

> ***Fifty-six entities within the FTX Group did not produce financial statements of any kind.  Thirty-five FTX Group entities used QuickBooks as their accounting system and relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities.***
>
> . . . because [FTX entities and Alameda] processed large volumes of data ***only manually***, a great deal of transaction detail (*e.g.*, the purpose of a transaction) was either ***populated en masse, or omitted entirely***.  ***Substantial accounts and positions went untracked*** in QuickBooks.  Digital asset transactions were tracked in QuickBooks using the generic entry "investments in cryptocurrency," but ***detailed recordkeeping reflecting what those cryptocurrency investments actually consisted of did not exist*** in QuickBooks, making reconciliation with other data sources extremely challenging or impossible.  ***Approximately 80,000 transactions were***

***simply left as unprocessed*** accounting entries in catch-all QuickBooks accounts titled "Ask My Accountant." Further complicating matters, QuickBooks entries were often made months after transactions occurred, rendering ***impossible real-time financial reporting and risk management***.

562.     In an internal communication, SBF described Alameda as "'hilariously beyond any threshold of any auditor being able to even get partially through an audit,'" adding:

> ***Alameda is unauditable***.  I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "***we are only able to ballpark what its balances are***, let alone something like a comprehensive transaction history."  ***We sometimes find $50m of assets lying around that we lost track of; such is life***.

563.     The FTX entities and Alameda also had extraordinarily inadequate reporting and documentation:

> Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as ***statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly***.  Important treasury reports, such as ***reports on daily liquidity, daily settlement, funding mismatches, concentration risk, and liability profiles, did not exist or were not prepared regularly***.  Copies of key documentation – including ***executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely***.  Thousands of deposit checks were collected from the FTX Group's offices, some stale-dated for months, due to the failure of personnel to deposit checks in the ordinary course; instead, deposit checks collected like junk mail.  As discussed in greater detail below, ***the FTX Group did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories***.  The Debtors have had to construct this historical data from scratch and make sense of the numerous resulting discrepancies, anomalies, and undocumented positions.

564.     In addition, transfers of funds were often approved through Slack, Signal, and Telegram, instant messaging services that would utilize "'disappearing messages.'"  Often expenses and invoices were approved by "'emoji.'"  "These informal, ephemeral messaging systems were

used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all."

565.    The First Bankruptcy Report further stated that "the FTX Group maintained over a thousand accounts on external digital asset trading platforms in jurisdictions around the world, many of which held significant assets at various points in time, [but] it had **no comprehensive, centralized source of information reflecting the purpose of these accounts, or the credentials to access them**."

566.    With respect to intercompany transactions, the First Bankruptcy Report stated the following:

> **The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions**.  Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. **Alameda routinely provided funding for corporate expenditures (e.g., paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors.  Alameda also transferred funds to insiders to fund personal investments**, political contributions, and other expenditures – some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future.

> **Intercompany and insider transfers were often recorded on the QuickBooks general ledgers in a manner that was inconsistent with the apparent purpose of the transfers**.  For example, an Alameda bank account transferred tens of millions of dollars to a personal bank account of Bankman-Fried in 2021 and 2022.  Although the transfers were documented in promissory notes as loans from Alameda to Bankman-Fried, they were recorded on the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency."  The Debtors have identified examples of intercompany transactions that do not balance to each other (*i.e.*, where the amounts "due to" and "due from" do not balance across the relevant entities).  North Dimension, a shell company owned by Alameda, frequently recorded cash transfers to Alameda accounts in the general ledger with the description "interco transfer reflecting bank wire," without otherwise stating the purpose or substance of the transaction.

567.    Alameda was also granted extraordinary trading privileges by FTX, hardcoded in the trading software, to effectively give Alameda a limitless ability to trade and withdraw assets,

virtually regardless of the size of any negative balance (which was set at allowing a $65 billion negative balance).  The First Bankruptcy Report concluded that "*[a]ny number of different controls routinely implemented by financial institutions and exchanges in established financial markets would be expected to have prevented, detected, and escalated these secret privileges* to personnel in control functions with sufficient independence and authority to address the issue."

568.    A fundamental responsibility of any exchange that holds customer assets is to safeguard those assets.  FTX and Alameda did not have basic security controls to protect its crypto assets.  The First Bankruptcy Report concluded that "[e]ach failure was egregious in the context of a business entrusted with customer transactions."  These failures included: keeping "*virtually all crypto assets in hot wallets*," accounts connected to the internet with their private keys vulnerable to cybersecurity threats; *no "system in place to monitor or move to cold wallets crypto assets* in excess of the amount needed to cover two days of trading activity, and they did not use offline, air-gapped, encrypted, and geographically distributed laptops to secure crypto assets;" and they *did not use "unique keys or key fragments to effectuate a transaction*."  "*These controls are widely understood to be crucial for crypto exchanges. . . . [T]here is no question that a crypto exchange should employ multi-signature/MPC controls and cold storage solutions . . . neither the FTX exchanges nor Alameda utilized them to protect crypto assets*."

569.    The First Bankruptcy Report also highlighted multiple examples of FTX and Alameda's inability to safeguard and manage private keys used by account holders to access crypto assets.  For example, keys to over $100 million worth of crypto assets were stored in plain text without any encryption at all.  Another key worth over $600 million was titled with four non-descriptive words with no information about what the key was for or who it belonged to.  Other keys

were simply titled "'use this'" or "'do not use'" with no further context; or back up system, so if keys were lost "the associated crypto assets would likely be permanently lost." There were also instances where billions of dollars of assets were stored on servers where employees could access, copy, or unilaterally transfer those assets without detection.[145]

570.     Mr. Ray concluded in the First Bankruptcy Report that as of April 9, 2023, the new controllers had recovered and placed into cold wallets over $1.4 billion in digital assets and identified an additional $1.7 billion that they are in the process of recovering.

571.     With respect to other security issues concerning basic information technology, the First Bankruptcy Report confirmed that FTX and Alameda did not have "even the most widely accepted controls relating to Identity and Access Management"; did not have "appropriate controls with respect to cloud and infrastructure security – that is, controls to protect its cloud services, networks, servers, and 'user endpoints' such as desktops and laptops"; and "did not implement controls sufficient to protect sensitive data relating to its applications, including its application code, from vulnerabilities and attacks."

572.     As detailed above, the total lack of controls and significant operational deficiencies was blatant to anyone in the position of Domestic VC Defendants – as sophisticated investors and members of FTX's Advisory Board would not have been able to deceive individuals to purchase, deposit, or transact in fiat currency or digital assets on its exchange if it were not for Domestic VC Defendants' public platforms, promotion, and active participation in the wrongful acts described herein.

---

[145]  The First Bankruptcy Report details an equally egregious lack of controls with respect to "wallet nodes," which are software programs that utilize private keys to effectuate transactions on the block chain.

573.    FTX and Alameda remain embroiled in bankruptcy proceedings, where their assets continue to be consumed by a variety of costs.  Billions of dollars' worth of assets have yet to be returned to customers, while each of the Domestic VC Defendants has escaped the collapse of FTX relatively unscathed and continues to operate without any major disruptions to their respective investment portfolios.

### U.    The Second Interim Bankruptcy Report

574.    On June 26, 2023, Mr. Ray filed a second report with the United States Bankruptcy Court for the District of Delaware ("Second Bankruptcy Report"), which concerned the comingling and misuse of customer deposits.  Mr. Ray explains how FTX worked to create an image as a customer-focused leader in crypto currency, but how this was a mirage.  The Second Bankruptcy Report states that, "[t]he FTX Senior Executives did not commingle and misuse customer deposits by accident.  Commingling and misuse occurred at their direction, and by their design."  So far Mr. Ray estimates that "approximately $8.7 billion in customer-deposited assets was misappropriated from the FTX.com exchange."

575.    He points to serious issues that Domestic VC Defendants would have looked into if they completed any due diligence.  For example, "the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to the Bahamas, in a continual effort to enable and avoid detection of their wrongdoing.  In doing so, they showed little of the concern for customers that they publicly professed."

576.    While FTX represented that it protected customer deposits, it did simply did not. Domestic VC Defendants should have known that FTX had regulatory requirements that it was not following.  The Second Bankruptcy Report states:

Apart from common practice, companies in certain industries are subject to regulatory requirements concerning the separation and/or protection of customer assets. *See, e.g.*, 17 C.F.R. § 240.15c3-3(b)(1), (e) (2023) (applicable to broker-dealers); 17 C.F.R. § 275.206(4)-2 (2023) (applicable to investment advisers); 17 C.F.R. § 1.20(a),(e) and (f) (2023) (applicable to futures commission merchants with respect to futures customers); 12 C.F.R. § 9.13(b) (applicable to national banks engaged in fiduciary activities). While depository institutions generally are not required to segregate funds underpinning ordinary customer deposits, they are subject to a host of capital, liquidity and other legal and regulatory requirements that are designed to protect depositors from losses.

577.    In addition, "FTX made multiple statements to U.S. officials, the public and other third parties that it separated and protected exchange customer deposits, and it positioned itself as a vocal advocate of regulation requiring other crypto companies to do the same." While FTX's key principles states that "as a general principle FTX segregates customer assets from its own assets across our platforms," any due diligence would show that FTX's numerous accounts and transactions were comingling customer assets.

578.    "Like many companies in the crypto industry, FTX Trading Ltd. had difficulty establishing banking relationships. U.S. banks, which were essential for conducting U.S. dollar transactions, generally were either unwilling to provide services to crypto businesses, or required applicants to undergo enhanced due diligence and register as a money services business ('MSB'), with associated regulatory requirements that FTX Trading Ltd. sought to avoid." As a result, the Second Bankruptcy Report found that:

> To evade banks' restrictions, at the direction of the FTX Senior Executives, FTX Group funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research Ltd. ("Alameda") and other affiliates, and made misrepresentations to banks about the purpose for which it was using the accounts. At the same time, also at the FTX Senior Executives' direction, the FTX Group used those accounts for many other purposes, commingling and misusing vast sums of customer and corporate funds in the process. Simply put, as a former Alameda employee explained to the Debtors, the FTX Group made no meaningful distinction between customer funds and Alameda funds.

- 230 -

579.     As a former Alameda employee explained, "the FTX Group made no meaningful distinction between customer funds and Alameda funds." FTX's primary accounts for deposits were an FTX Digital Markets Ltd. account, an entity owned by FTX Trading, but the two other primary accounts for customer deposits were an Alameda account and a North Dimension, Inc. account, which was owned by Alameda. Customers were told to deposit fiat currency to these accounts, and FTX would fund withdraws through these accounts. This was an enormous red flag, that customer funds were being directed to SBF's private trading firm/piggybank, Alameda.

580.     Further, FTX's banks were required by local regulation to know the nature of the funds flowing through bank accounts. The Second Bankruptcy report found that "[t]hrough its website, social media, and in statements and submissions to Congress, regulators and other third parties, the FTX Group represented that it maintained a strict separation of customer and corporate funds, including by maintaining customer funds in omnibus bank accounts 'for the benefit of' ('FBO') FTX exchange customers. At all times, with the exception of isolated jurisdictions, the FTX Group's representations in this regard were false."

581.     In order to hide the use of funds externally, the naming of accounts at the banks did not use the widely used "FBO" designation. FTX knew how to separate customer funds properly because in certain jurisdictions, namely Japan, FTX segregated customer deposits. Therefore, the difference should have been obvious.

582.     Perhaps most egregious was a fake account set up on FTX's internal books titled "'our Korean friend's account.'" The fake account was set up to hide **cash liabilities** that FTX did not have. Instead, on FTX's books "[t]he account reflected that their "'Korean friend'" **owed the FTX.com exchange** $8.9 billion."

- 231 -

583.     Equally egregious, was that large wires, such as a millions of dollars in political contributions and donations, millions of dollars in Venture investments, and luxury real estate purchases, at times, coming directly from the primary customer accounts.  The Second Bankruptcy Report traced payments for more than 30 properties, including a $30 million penthouse in the Bahamas, that all came from commingled funds from the primary customer accounts.

584.     While FTX publicly stated in its key principles that "FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX," any due diligence would also show that FTX was not.  The Second Bankruptcy Report found "***no evidence that the FTX Group performed any meaningful reconciliation prior to making this claim on its website and in materials provided to Congress, federal agencies, and other third parties***."

585.     The Second Bankruptcy Report, based on its ongoing analysis and as of June 26, 2023, approximates that customers are owed $8.7 billion, of which $6.4 billion is cash and stable coin that has been misappropriated.

**V.      Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global's Financial Gain from Commingled Assets**

586.     Sequoia, Paradigm, SkyBridge, Multicoin Capital, K5 Global, and Altimeter were direct beneficiaries of the comingling of customer assets between FTX and Alameda.  Recent bankruptcy filings show that Clifton Bay Investments LLC ("Clifton Bay"), a Delaware entity controlled by SBF for the purpose of managing "his" private investments, invested $50 million and committed to invest an additional $50 million in Sequoia Capital Fund, L.P., a fund managed and controlled by Sequoia.  Clifton Bay also invested $10 million in SkyBridge Coin Fund LP; invested $7.5 million in Multicoin Venture Fund II US, L.P. and Multicoin Venture Fund II US, L.P.;

invested $1.5 million in Altimeter Growth Partners Fund VI, L.P. and committed to invest a total of $2.5 million. Clifton Bay also paid $300 million to K5 Global.

587.    Similarly, Maclaurin Investments Ltd. ("Maclaurin"), a Seychelles entity owned by Alameda, invested $20.3 million and committed to invest another $14.7 million in Paradigm One (Cayman) Feeder LP, a fund managed and controlled by Paradigm. Maclaurin also invested $25 million in Sequoia's Capital Heritage Fund (SCHF Cayman, L.P.) and committed to invest another $75 million. And Alameda paid an additional $400 million to Mount Olympus Capital LP, which was then transferred to K5X Fund I LP and K5 Global Growth Fund II LP. The FTX Group of these other Domestic VC Defendants did not publicly reveal FTX Group's investments or stake in these funds.

588.    These Domestic VC Defendants all charge management fees and carried interest for their respective funds. A typical fee structure for these types of funds are "2 and 20," or an annual 2% management fee and 20% of any profits (*i.e.*, carried interest). And management fees are based on the invested amount and the committed amount. Thus under a typical structure these funds were set to collect significant fees on an annual basis: Sequoia at least $4 million; Paradigm at least $700 thousand; SkyBridge at least $200 thousand; Multicoin Capital at least $100 thousand; Altimeter at least $50 thousand; and K5 Global at least $14 million. On top of these guaranteed annual fees, these Domestic VC Defendants would reap 20% of any profits from the funds' investments. These amounts also do not include various pass through expenses and other fees that the funds charge investors periodically, including fees the funds charge for due diligence.

589.    When Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global received these respective investments, they undoubtedly performed some amount of due diligence on

Clifton Bay, Maclaurin, and Alameda as a matter of course. The investment funds that these Domestic VC Defendants manage are "private funds," and are offered to investors pursuant to applicable exemptions from registration under the Securities Act of 1933 and the Securities Act of 1940. In order to qualify for these exemptions, these Domestic VC Defendants would be required to investigate the beneficial owner of each investor as well as whether each investor is an accredited or qualified purchaser (*i.e.*, investors that meets certain financial and sophistication standards). Thus, at minimum, these Domestic VC Defendants would have been required by law to ensure that it verified the beneficial owners and the applicable financial information of Clifton Bay, Maclaurin, and Alameda.

590. In addition, investor commitments are contractual obligations by the investors in each fund and are formularized in subscription agreements. As the SEC explains in its guidance about private funds:

> For example, if you structure your private fund as a limited partnership, a limited partnership agreement, or LPA, will document the fund's key legal terms and mechanics. This may include how the general partner may call for capital commitments, how profits are split between the general partner and the limited partners, any management fees, and the extent to which limited partners may withdraw from the fund.

591. Indeed, in FTX's bankruptcy proceedings, FTX petitioned the bankruptcy court to allow it to assign its Sequoia Capital Fund obligation to a third party. FTX explained to the court:

> Pursuant to the Operative Documents, each limited partner, including Seller, is required to contribute a certain, pre-determined amount of capital (the "Capital Commitment"), which capital is used by the Subject Company's general partner to invest in portfolio companies. Generally, when an investment need or opportunity arises, the Subject Company's general partner will request, pursuant to the terms of the applicable Operative Documents, that the limited partners contribute capital to the partnership in order to finance the investment (a "Capital Call"). When a Capital Call is made, each limited partner is required to remit the requested funds to the general partner of the partnership in an amount not to exceed the applicable Capital

Commitment. Pursuant to the Operative Documents, Seller has a Capital Commitment to the Subject Company of approximately $100,000,000, of which, to date, Seller has contributed approximately $50,000,000.[146]

592. Because each fund then makes investment decisions for deploying the promised capital, which requires a great amount upfront work (*e.g.*, detailed analysis, obtaining loans, company due diligence etc.), and the Domestic VC Defendants begin receiving fees based on the committed capital (*i.e.*, the capital it has not yet received), the Domestic VC Defendants have a strong business interest in knowing the source of the fee payments and committed capital and ensuring receipt of both will be certain. As stated in a comment letter to the Financial Crimes Enforcement Network ("FinCEN") by the Managed Funds Association, an industry group that includes more than 160 member firms that collectively manage over $2 trillion:

> At the outset of the relationship with an investor, the administrator or RIA will conduct initial due diligence on the investor at the time of subscription. Industry practice takes into account whether the investor is sending its funds from an account in the investor's name at a financial institution that is located in a FATF-member jurisdiction and subject to customer identification procedures and AML requirements of that jurisdiction. If the investment funds do not originate from financial institutions located in FATF-member jurisdictions, it is customary for enhanced due diligence to be performed.

> Investors are required to complete subscription documents, which include certain AML-related representations and warranties, including that the investor is not a senior political figure or a foreign shell bank, and that the investment funds are not derived directly or indirectly from illegal activities. The investor is also subject to various screening procedures related to sanctions; negative news; and potential status as a senior foreign political figure. Such screening is also generally conducted on the investor at the time of redemption.

593. Further, Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global had obligations to conduct due diligence on their investors that stems from their own risk

---

[146] FTX also petitioned the bankruptcy court to allow it to assign its Sequoia Heritage Fund obligation.

management and operational relationships with multiple financial institutions that must adhere to certain anti-money laundering ("AML") and know your customer ("KYC") laws and regulations, such as the Bank Secrecy Act, Patriot Act, and Anti-Money Laundering Act. For example, at least Sequoia, SkyBridge, K5 Global, and Paradigm's funds have custody accounts with J.P. Morgan who states that its AML program includes: "Know Your Customer standards including a Customer Identification Program and Customer Due Diligence procedures reasonably designed to identify and verify all customers and, where applicable, beneficial owners, source of funds, and the nature and intended purpose of the business relationship, to the extent warranted by the risk of money laundering or terrorist financing or as required by regulation."[147] Domestic VC Defendants Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global also use other financial institutions, such as Merrill Lynch, First Republic Bank, Plainscapital Bank, and Northern Trust, which have similar legal requirements and compliance programs. Indeed, the Managed Funds Association states "the vast majority of its RIA members have had AML programs in place for a number of years."

594. Because of these various obligations and basic business practices, Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global actually or constructively knew, or were reckless in not knowing, that FTX, Alameda, Clifton Bay, and Maclaurin were comingling customer assets and improperly using FTX customer funds. For example, Clifton Bay's September 30, 2022 balance sheet showed $1,519,326 in total liabilities consisting of $1,519,283 in accounts payable to the related FTX and Alameda entities. On the asset side, Clifton Bay showed $1,520,111 in total

---

[147] J.P. Morgan Chase Bank has also entered into a consent order with the Office of the Comptroller of Currency requiring it to take additional BSA/AML steps. [https://www.occ.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf].

assets, only $785 more than its liabilities. And of its assets, $1,492,856 were investments with only $27,255 classified as other types of assets. In other words, the source of Clifton Bay's investments could only be from FTX and Alameda entities because the only asset entries to offset money owed to these entities are the investments, including Clifton Bay's investment in Domestic VC Defendants' funds.

595. With respect to Maclaurin, Sequoia and Paradigm would have also performed the necessary due diligence on both FTX, as an investment for its funds, and Alameda, the owner of Maclaurin, for the reasons stated above. Moreover, because Maclaurin is also a Seychelles entity, an even higher level of scrutiny would have been given to comply with both AML and KYC. K5 Global as well would have performed due diligence on the source of its $700 million in investments, Alameda. Even a perfunctory review would show the comingling of customer funds and the massive deficiencies as reported in the First and Second Bankruptcy Reports.

596. On January 10, 2023, the *Financial Times* confirmed that one of the investors in the Paradigm One fund was FTX's sister trading company, Alameda, and questioned the "circular" nature of these transactions. The article quoted Charles Whitehead, a professor at Cornell Law School, who described the investments as "'weird . . . it raises your eyebrows.'" What was weird then is now understood. These circular investments allowed Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global to profit from the comingling of customer assets between FTX, Alameda, and SBF's other entities. In the case of Sequoia, for example, *The Information* would later report that "[n]otably, the amount of money that Bankman-Fried's entities committed to Sequoia Capital is nearly the same as the amount that Sequoia Capital invested in FTX." Sequoia, Paradigm, SkyBridge, Multicoin Capital, Altimeter, and K5 Global invested capital

to keep FTX and Alameda afloat, while also being a beneficiary of capital from the customer accounts of these entities.  Similarly, K5 Global, among other things alleged herein, made connections for SBF, while being a beneficiary of capital from customer's accounts.  These Domestic VC Defendants reaped significant management fees, and will share in any profits from these investments by FTX and Alameda.

### W.    Domestic VC Defendants Sought to Keep the Fraud Concealed, and Therefore Afloat, Until FTX Could Conduct an IPO or a Private Sale

597.    In working with SBF to grow the FTX Platform to its exponential scale, Domestic VC Defendants obtained knowledge of SBF's misappropriation of Class Member funds, along with FTX's attendant misrepresentations and omissions.  But despite this knowledge, Domestic VC Defendants continued to provide infrastructure for and guidance on the company's trajectory, with any eye towards an IPO or private sale, the end game for venture capitalists like Domestic VC Defendants:

> Venture money is not long-term money.  The idea is to invest in a company's balance sheet and infrastructure until it reaches a sufficient size and credibility so that it can be sold to a corporation or so that the institutional public-equity markets can step in and provide liquidity.  In essence, the venture capitalist buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits with the help of an investment banker.

598.    By January 2022, an IPO or private sale was increasingly imminent.  FTX Trading's valuation reached $32 billion – one of the largest valuations in recent history, greater than the market cap of both Nasdaq and Twitter – while FTX US's valuation topped $8 billion.  In announcing the valuations, SBF stated that he and others at FTX "look forward to working alongside our investors [*i.e.*, Domestic VC Defendants] to achieve our mission and continue our tremendous growth throughout 2022 and beyond."  These multi-billion dollars valuations arose directly from the

fundraising by Domestic VC Defendants; FTX could not have achieved these appraisals without the nearly $2 billion in fundraising from this venture money.

599.    Just two months later, in March 2022, SBF met with Mr. David Soloman, CEO of Goldman Sachs, to discuss, among other things, FTX's IPO.  With the prospect of an IPO imminent, Domestic VC Defendants could cash out with massive returns on their equity stakes and leave Class Members to bear the losses resulting from SBF's fraud.  But this was all predicated on keeping customer deposits flowing into FTX accounts, and concealing SBF's fraud until just after the sale.

600.    By now, the Domestic VC Defendants' interest in keeping SBF's fraud concealed – and, in turn, FTX afloat – had broadened, as Domestic VC Defendants had stakes not only in FTX, but in crypto companies throughout the industry.  But by this time, the crypto industry had begun to falter, and SBF's spree to buy up failing crypto companies (so to keep his fraud concealed from Class Members) took off.  For as long as Domestic VC Defendants could keep FTX's fraud hidden from public eye, FTX could in turn shore up struggling players in the crypto industry (such as Blockfi), including those in which Domestic VC Defendants also had an interest.  In the alternative, the collapse of FTX – then the second-largest cryptocurrency exchange on the market – could potentially result in a total crash of the cryptocurrency market.  With their eyes on an imminent IPO or private sale, and an off-ramp from their overall crypto industry exposure, Domestic VC Defendants conspired with FTX to keep Class Member funds flowing in while concealing the fact that FTX was engaging in a massive multi-billion dollar fraud.

### X.    Domestic VC Defendants Emerged from the Fraud Relatively Unscathed, While Class Members Lost Everything

601.    Domestic VC Defendants nearly succeeded in cashing out on SBF's fraudulent crypto exchange.  However, journalists broke the news of the fraud in early November, and SBF's

fraudulent Company swiftly imploded.  Though many Class Members lost their entire savings to SBF's fraud, Domestic VC Defendants emerged largely unscathed.  For example:

(a)     As Sequoia partner Mr. Leone put it, "[l]ike having a child, you forget the pain of having that child three months later, a year later."  Indeed, commentators noted, "[f]rom a portfolio standpoint," FTX's collapse "doesn't matter one bit" for Sequoia.

(b)     Multicoin co-founder, Mr. Samani, freely acknowledged that "[he doesn't] care about people who [Multicoin is not] invested in," and Multicoin clearly doesn't care that Class Members now bear the losses that was wrought by FTX with Multicoin's assistance.

602.     These comments underscore the win/win scenario that Domestic VC Defendants enjoyed at the expense of Class Members.  As long as Domestic VC Defendants could keep SBF's scheme concealed until FTX went on the selling block or the volatile crypto market returned to ascendancy, Domestic VC Defendants would significantly benefit as some of the largest rainmakers in the tech industry.  Conversely, as they now admit, if the fraud collapsed before FTX reached a sale, Domestic VC Defendants would suffer only non-material losses, losses which Domestic VC Defendants could in fact harvest for hefty tax deductions.  All told, Domestic VC Defendants had very little to lose in propping up SBF's fraud; and they instead had everything to gain.  And so Domestic VC Defendants aided the FTX fraud, and did so knowingly and at Class Members' expense.

## CLASS ACTION ALLEGATIONS

As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure

### A. Class Definitions

603.    Plaintiffs Rabbitte, Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Class, and Girshovich, Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Nationwide Class:

   (a)    **International Class I**: All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

   (b)    **Nationwide Class I**: All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

604.    Excluded from the Classes are MDL Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

605.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.  Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs, and/or FTT to Plaintiffs and Class Members (in which Domestic VC Defendants each materially assisted, substantially participated, and/or

personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs, and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

### B.     Numerosity

606.     The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs, and/or FTT.  Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period.  Membership in the Classes are thus so numerous that joinder of all members is impracticable.  The precise number of Class Members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

### C.     Commonality/Predominance

607.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether SBF, the FTX Insiders, and/or FTX committed fraud;

(b)     whether Domestic VC Defendants agreed with SBF, the FTX Insiders, and/or FTX to commit fraud;

(c)     whether Domestic VC Defendants had the requisite degree of knowledge of SBF's, the FTX Insiders', and/or FTX's fraud;

(d)     whether the FTX Platform, YBAs, and/or FTT were unregistered securities under federal or Florida, California or other state law;

(e)  whether Domestic VC Defendants' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs, and/or FTT violate the provisions of applicable securities law.

(f)  the type and measure of damages suffered by Plaintiffs and Class Members.

(g)  whether Domestic VC Defendants' practices violate the FDUTPA, the UCL, or other state consumer-protection statutes;

(h)  whether Plaintiffs and Class Members have sustained monetary loss and the proper measure of that loss;

(i)  whether Plaintiffs and Class Members are entitled to injunctive relief;

(j)  whether Plaintiffs and Class Members are entitled to declaratory relief; and

(k)  whether Plaintiffs and Class Members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Domestic VC Defendants' conduct.

## D.  Typicality

608.  Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all Class Members were offered and/or sold FTX's FTX Platform, YBAs, and/or FTT because of Domestic VC Defendants' actions and/or participation in the offering and sale of these unregistered securities, that Domestic VC Defendants aided and abetted the fraud and conversion perpetrated by SBF, the FTX Insiders, and/or FTX, or that Defendants agreed with SBF, the FTX Insiders, and/or FTX to commit fraud.  Plaintiffs are advancing the same claims and legal theories on behalf of

themselves and all such members.  Further, there are no defenses available to any Domestic VC Defendant that are unique to Plaintiffs.

### E.  Adequacy of Representation

609.   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to other Class Members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.  To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.  Requirements of Fed. R. Civ. P. 23(b)(3)

610.   The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the Classes.  All claims by Plaintiffs and the unnamed Class Members are based on the common course of conduct by Domestic VC Defendants (a) in marketing, offering, and/or selling the FTX Platform, YBAs, and/or FTT, which are unregistered securities, (b) in receiving secret undisclosed compensation for their promotion of the FTX Platform, (c) in aiding and abetting fraud and/or conversion by SBF, FTX and the FTX Insiders, and/or (d) in agreeing with SBF, the FTX Insiders, and/or FTX to commit fraud.

611.   The common course of conduct by Domestic VC Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or

- 244 -

their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

612.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

613.     As a result, when determining whether common questions predominate, courts focus on the liability issue, if the liability issue is common to the Classes as it is in the case at bar, common questions will be held to predominate over individual questions.

## G.     Superiority

614.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a)     Joinder of all Class Members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b)     Individual claims by Class Members are impracticable because the costs to pursue individual claims exceed the value of what any one Class Member has at stake.  As a result, individual Class Members have no interest in prosecuting and controlling separate actions;

(c)     There are no known individual Class Members who are interested in individually controlling the prosecution of separate actions;

(d)     The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum;

(e)     Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)     The action is manageable as a class action.

### H. Requirements of Fed. R. Civ. P. 23(b)(2)

615.    Domestic VC Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs, and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the Classes as a whole.

616.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the Classes as a whole.

### I. Requirements of Fed. R. Civ. P. 23(c)(4)

617.    As it is clear that one of the predominant issues regarding Domestic VC Defendants' liability is whether the FTX Platform, YBAs, and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

618.    As it is clear that another predominant issue regarding Domestic VC Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

J.     **Nature of Notice to the Proposed Class.**

619.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX.  The Class Members are readily and objectively identifiable.  Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**COUNT I**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §17200, *et seq.*)**
**(Against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital,**
**Tiger Global, Ribbit Capital, and Altimeter)**

620.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

621.    This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter and is based upon the UCL, which prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.

622.    These Domestic VC Defendants' unfair and deceptive practices described herein were likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

623.    **Unlawful**: During the relevant period, these Domestic VC Defendants advertised and otherwise promoted FTX using false and/or misleading claims, such that these Domestic VC Defendants' actions as alleged herein violate at least the following laws:

(a)    The False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq.*; and

(b)    Cal. Corp. Code §25504.1.

- 247 -

624. **Fraudulent**: A practice is "fraudulent" under the UCL if members of the general public were or are likely to be deceived. As detailed herein, these Domestic VC Defendants' statements regarding, *inter alia*, the safety and viability of FTX and their own due diligence activities were deceptive to the public.

625. **Unfair**: The UCL gives courts maximum discretion to address improper business practices that are "unfair." These Domestic VC Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because these Domestic VC Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX and the utility of these Domestic VC Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims. Plaintiffs and Class Members would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX at the prices paid or at all had they known that the statements were misrepresentations and deceptive.

626. These Domestic VC Defendants' conduct with respect to the promotion of FTX is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers can reasonably avoid.

627. The harm suffered by Plaintiffs and Class Members was directly and proximately caused by the deceptive and unfair practices of these Domestic VC Defendants related to the promotion and marketing of FTX, as described herein.

628. In accordance with Cal. Bus. & Prof. Code §17203, Plaintiffs seek an order enjoining these Domestic VC Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. On behalf of the Classes,

Plaintiffs also seek an order for the restitution of all monies made from these Domestic VC Defendants' investments in or other business dealings with FTX, which were made resulting from acts of fraudulent, unfair, or unlawful competition as detailed herein.

**COUNT II**
**Violation of California's False Advertising Law**
**(Cal. Bus. & Prof. Code §17500, *et seq.*)**
**(Against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital,**
**Tiger Global, Ribbit Capital, and Altimeter)**

629.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

630.     This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter and is based upon California's False Advertising Law, which prohibits any statement in connection with the sale of goods or services "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

631.     As set forth herein, these Domestic VC Defendants made statements regarding FTX and their own due diligence activities that were untrue or misleading.  They publicly represented, *inter alia*, that FTX was a viable and safe way to invest in crypto and that they had vetted these representations through their own due diligence efforts, statements designed to deceive consumers into investing with FTX.

632.     These Domestic VC Defendants' claims that FTX was, *inter alia*, viable and safe for investing in crypto and that they had verified these representations through robust due diligence activities were untrue and manifestly false and misleading for the reasons detailed herein.  For example, when FTX imploded in late 2022, it was revealed that FTX had failed to employ the most

basic safeguards and siphoned billions of dollars' worth of customer assets for their own nefarious purposes during the relevant period.

633. These Domestic VC Defendants knew, or reasonably should have known, that their claims relating to, *inter alia*, the viability and safety of FTX and their own due diligence activities were untrue or misleading. These Domestic VC Defendants failed to adequately inform Plaintiffs and Class Members of the true nature of FTX.

634. When the true nature of FTX became publicly known at the end of the relevant period, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by these Domestic VC Defendants and FTX's business practices.

635. By reason of the above conduct, these Domestic VC Defendants are liable pursuant to Cal. Bus. & Prof. Code §17500.

## COUNT III
### Violation of Cal. Corp. Code §25504.1
### (Against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)

636. Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

637. This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter. Cal. Corp. Code §25504.1 imposes joint and several liability for "[a]ny person who materially assists in any violation of Section 25110 . . . or 25401 . . . with intent to deceive or defraud."

638.     "Materially assisting" in an alleged securities law violation, as defined under California law, may take the form of communicating misrepresentations directly to investors, or otherwise playing a material, facilitating role in the alleged securities law violation.

639.     As alleged herein, these Domestic VC Defendants made material misrepresentations and omissions to Plaintiffs and Class Members regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities with the intent to deceive and/or defraud investors in order to induce them to open accounts and purchase, transact in, and/or deposit securities on the FTX Platforms, including securities such as YBAs that were issued by FTX.

640.     The YBAs constituted unregistered securities sold in violation of Cal. Corp. Code §25110.  FTX, with these Domestic VC Defendants' material assistance, offered and sold the unregistered YBAs to Class Members.

641.     In addition, Cal. Corp. Code §25401 makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."  FTX, together with the material assistance of these Domestic VC Defendants, sold the YBAs by means of materially false and misleading written and oral communications.

642.     As a result of this assistance, these Domestic VC Defendants violated Cal. Corp. Code §25504.1 and Plaintiffs and Class Members sustained damages as described herein.

**COUNT IV**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
**(Florida Statute §501.201,** *et seq***.)**
**(Against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital,**
**Tiger Global, Ribbit Capital, and Altimeter)**

643.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

644.     This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter and is based upon FDUPTA which purpose is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. §501.202(2).

645.     Plaintiffs and Class Members are consumers as defined by Fla. Stat. §501.203.  These Domestic VC Defendants' actions as described herein occurred while engaging in "[t]rade or commerce" as defined by the FDUTPA.  Fla. Stat. §501.203(8).

646.     These Domestic VC Defendants' conduct, as described herein, constitutes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" and is unlawful under the FDUTPA.  Fla. Stat. §501.204(1).

647.     These Domestic VC Defendants' unfair and deceptive practices, as described herein were objectively likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

648. These Domestic VC Defendants violated FDUPTA by engaging in such unfair and deceptive practices, as described herein, which offend public policies, are immoral, unethical, unscrupulous, and injurious to consumers.

649. During the relevant period, these Domestic VC Defendants engaged in unfair and deceptive practices by advertising and otherwise promoting FTX using false and/or misleading claims to attract and lure Plaintiffs and Class Members into paying into the Ponzi scheme that was the FTX Platform.

650. A practice is deceptive or "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." As detailed herein, these Domestic VC Defendants' statements regarding, *inter alia*, the safety, and viability of FTX and their own due diligence activities were deceptive to the public.

651. In interpreting unfair or deceptive acts or practices FDUTPA gives deference to the interpretations of the FTC and the federal courts relating to §5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1), Fla. Stat.§501.204(2). These Domestic VC Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because these Domestic VC Defendants' induced Plaintiffs and consumers to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX which resulted in injuries that: (a) were substantial to the consumers; (b) were not outweighed by benefits to the consumers; and (c) could not have reasonably been avoided by the consumers.

652. Plaintiffs and Class Members would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX at the prices paid or even at all had they known that these Domestic VC Defendants' statements were misrepresentations and deceptive.

653. These Domestic VC Defendants' deceptive promotion and misleading marketing of FTX, as described herein, directly, and proximately caused the harm suffered by Plaintiffs and Class Members.

654. These Domestic VC Defendants utilize many of the deceptive acts and practices described herein. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if these Domestic VC Defendants continue to engage in such deceptive, unfair, and unconscionable practices.

655. As a direct and proximate cause of these Domestic VC Defendants' unfair and deceptive acts, Plaintiffs and Class Members paid into the deceptive FTX Platform and were aggrieved and damaged by these Domestic VC Defendants in the amount of their lost investments.

656. Further to the amounts of their lost investments, Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs pursuant to Fla. Stat. §§501.211(2) and 501.2105.

657. Florida Statute Section 501.211(1) also entitles Plaintiffs and Class Members to obtain both declaratory and injunctive relief.  Fla. Stat. §501.211(1).  As such, Plaintiffs seek an order enjoining these Domestic VC Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and providing declaratory relief requiring these Domestic VC Defendants to commence a corrective advertising campaign.

**COUNT V**
**Violations of The Florida Securities and Investor Protection Act**
**(Florida Statute §517.07, *et seq.*)**
**(Against Sequoia, Thoma Bravo, Paradigm, SkyBridge,**
**Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)**

658.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

659.    This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter.  Fla. Stat. §517.07(1) provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida "unless the security is exempt under §517.051, is sold in a transaction exempt under §517.061, is a federal[ly] covered security, or is registered" pursuant to Fla. Stat. §517.07.

660.    Florida Statute Section §517.211 confers joint and several liability on any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale" and further provides that any such director, officer, partner or agent is "jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

661.    As alleged herein, these Domestic VC Defendants made material misrepresentations and omissions to Plaintiffs and Class Members regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities with the intent to deceive and/or defraud investors in order to induce them to open accounts and purchase, transact in, and/or deposit securities on the FTX Platforms, including securities such as YBAs that were issued by FTX.

662.    Pursuant to Fla. Stat. §517.021(22) the YBAs on the FTX Platform are securities.

663.     As such, the YBAs that these Domestic VC Defendants advertised and promoted for sale to Plaintiffs and consumers constituted unregistered securities sold in violation of Fla. Stat. §517.07(1) as the YBAs were not:

(a)     exempt from registration under Fla. Stat. §517.021(22)(a);

(b)     a federal covered security;

(c)     registered with the Office of Financial Regulations; or

(d)     sold in a transaction exempt under Fla. Stat. §517.061.

664.     FTX, with these Domestic VC Defendants' personal participation and material assistance, offered and sold the unregistered YBAs to Plaintiffs and Class Members.

665.     At all relevant times, these Domestic VC Defendants were directors, officers, partners and/or agents of the FTX entities pursuant to Fla. Stat. §517.211.

666.     At all relevant times, Sequoia, Thoma Bravo, Paradigm, and Multicoin held Advisory Board positions within FTX.

667.     Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter participated and provided FTX with material assistance by making, publishing, issuing, and endorsing materially false and misleading statements and representations in written and oral communications, in its offer and sale of the unregistered YBAs to Plaintiffs and Class Members.

668.     As a result of this assistance, Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter violated Fla. Stat. §517.07, *et seq*. and Plaintiffs and Class Members sustained damages as described herein.

**COUNT VI**
**Negligent Misrepresentation**
**(Against Sequoia, Thoma Bravo, Paradigm, SkyBridge,**
**Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)**

669.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

670.    Plaintiffs bring this Count against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter for negligent misrepresentation.

671.    As detailed herein, these Domestic VC Defendants negligently misrepresented certain material facts and opinions, including, *inter alia*, regarding the safety and viability of FTX and their own due diligence activities in order to induce confidence in the FTX Platforms and convince consumers to commit and trade fiat currency and digital assets on the FTX Platforms, thereby increasing the value of these Domestic VC Defendants' investments in FTX.

672.    As detailed herein, these Domestic VC Defendants' misrepresentations include misrepresentations of opinions as statements of fact.  These Domestic VC Defendants claimed to have special knowledge of the FTX Group, SBF, and FTX operations and platforms; gave opinions, not as a casual expression of belief but in a way that declared the matters to be true; had a relationship of trust and confidence with FTX Platform customers; or because of their close relationships with the FTX Group and SBF, Advisory Board Member, or public representations that they were insiders, partners, Advisory Board Members, experts, well-known venture capital investors, or persons conducting due diligence, had reason to expect that Plaintiffs and Class Members would rely on these Domestic VC Defendants' opinions.

673.    As also detailed herein, these Domestic VC Defendants are also responsible for misrepresentations that were not made directly to Plaintiffs.  These Domestic VC Defendants made

- 257 -

misrepresentations of fact and opinions to investors, Twitter users, conference participants, FTX Platform and product customers, news publications and other media outlets (including podcast and online), and regulators intending or reasonably expecting that such misrepresentations would be repeated or their substance communicated to Plaintiffs and Class Members.

674.    These Domestic VC Defendants made these material misrepresentations of fact and opinion, intending that Plaintiffs and Class Members rely on such misrepresentations, without reasonable grounds for believing that the misrepresented facts and opinions were true.

675.    The representations made by these Domestic VC Defendants in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

676.    Plaintiffs and Class Members relied on misrepresentations of these Domestic VC Defendants.  The Domestic VC Defendants' misrepresentations of fact and opinion substantially influenced Plaintiffs and Class Members who without such misrepresentations would not have, or probably would not have, purchased, deposited, and/or transacted in fiat currency and digital assets with accounts at FTX.  Plaintiffs and Class Members opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX Platforms would be operated in accordance with the representations made by these Domestic VC Defendants.

677.    As a result, Plaintiffs and Class Members were directly and proximately injured by these Domestic VC Defendants' negligence in failing to inform Plaintiffs and Class Members of the true nature of the operations of the FTX Platforms.

678.     As a result of these Domestic VC Defendants' negligent misrepresentations during the relevant period, Plaintiffs and Class Members suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX Platforms as a result of the insolvency of FTX.

**COUNT VII**
**Intentional Misrepresentation**
**(Against Sequoia, Thoma Bravo, Paradigm, SkyBridge,**
**Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)**

679.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

680.     Plaintiffs bring this Count against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter for intentional misrepresentation.

681.     As detailed herein, these Domestic VC Defendants knowingly and/or recklessly misrepresented certain material facts or opinions, including, *inter alia*, regarding the safety and viability of FTX and their own due diligence activities in order to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of these Domestic VC Defendants' investments in FTX.

682.     These Domestic VC Defendants marketed and publicly promoted FTX to Plaintiffs and Class Members despite knowing, or were reckless in not knowing, the true nature of FTX based on their partnerships, inside positions, close relationships and/or due diligence of FTX that were contrary to their public misrepresentations.

683.     As detailed herein, these Domestic VC Defendants' misrepresentations include misrepresentations of opinions as statements of fact. These Domestic VC Defendants claimed to have special knowledge of the FTX Group, SBF, and FTX operations and platforms; gave opinions,

- 259 -

not as a casual expression of belief but in a way that declared the matters to be true; had a relationship of trust and confidence with FTX Platform customers; or because of their close relationships with the FTX Group and SBF, as Advisory Board Members, or public representations that they were insiders, partners, experts, well-known venture capital investors, or persons conducting due diligence, had reason to expect that Plaintiffs and Class Members would rely on these Domestic VC Defendants' opinions.

684.    As also detailed herein, these Domestic VC Defendants are also responsible for misrepresentations that were not made directly to Plaintiffs.  These Domestic VC Defendants made misrepresentations of fact and opinions to investors, Twitter users, conference participants, FTX Platform and product customers, news publications and other media outlets (including podcast and online), and regulators intending or reasonably expecting that such misrepresentations would be repeated or their substance communicated to Plaintiffs and Class Members.

685.    These Domestic VC Defendants made these misrepresentations of fact and opinion, intending that Plaintiffs and Class Members rely on such misrepresentations, with knowledge that their statements were misleading or false, or recklessly without regard for the truth.

686.    The representations made by these Domestic VC Defendants in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

687.    Plaintiffs and Class Members relied on the misrepresentations of these Domestic VC Defendants.  The Domestic VC Defendants' misrepresentations of fact and opinion substantially influenced Plaintiffs and Class Members, who without such misrepresentations would not have, or probably would not have, purchased, deposited, and/or transacted in fiat currency and digital assets

with accounts at FTX. Plaintiffs and Class Members opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX Platforms would be operated in accordance with the representations made by these Domestic VC Defendants.

688.   As a result, Plaintiffs and Class Members were directly and proximately injured by these Domestic VC Defendants' intentional misrepresentations in failing to inform Plaintiffs and Class Members of the true nature of the operations of the FTX Platforms.

689.   As a result of these Domestic VC Defendants' intentional misrepresentations during the relevant period, Plaintiffs and Class Members suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX Platforms as a result of the insolvency of FTX.

## COUNT VIII
### Fraudulent Inducement
### (Against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)

690.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

691.   This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter and is based upon the claim of fraudulent inducement.

692.   As detailed herein, these Domestic VC Defendants materially misrepresented and omitted existing facts about FTX when they failed to disclose information regarding the true nature of FTX and their own due diligence efforts.

- 261 -

693.    The omission is material because Plaintiffs and Class Members would not have transacted or entered into contracts with FTX had they known the true nature of FTX.

694.    These Domestic VC Defendants marketed and publicly promoted FTX to Plaintiffs and Class Members despite knowing, or were reckless in not knowing, the true nature of FTX based on their partnerships, inside positions, close relationships and/or due diligence of FTX that were contrary to their public misrepresentations.

695.    These Domestic VC Defendants intended that consumers and purchasers would rely on these Domestic VC Defendants' statements regarding, *inter alia*, the safety and viability of FTX and their own due diligence activities so as to introduce Plaintiffs and Class Members to purchase, deposit, and/or transact in fiat currency and digital assets with accounts with FTX, increasing the user base for FTX and thereby increase the value of their investments in FTX.

696.    Plaintiffs and Class Members were not aware of the true nature and safety of FTX's platform and could not reasonably have discovered those true characteristics.

697.    Plaintiffs and Class Members justifiably relied on these Domestic VC Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX Platforms.  Plaintiffs and Class Members transacted or entered into contracts with FTX believing that the FTX Platforms would be operated in accordance with the representations made by these Domestic VC Defendants.

698.    As a result of these Domestic VC Defendants' fraudulent inducement of Plaintiffs and Class Members onto the FTX Platforms, Plaintiffs and Class Members suffered damages, including

because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX

Platforms as a result of the insolvency of FTX.

**COUNT IX**
**Civil Conspiracy**
**(Against All Defendants)**

699.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619

above, as if fully set forth herein.

700.     This Count is asserted against Domestic VC Defendants and is based upon the claim

of civil conspiracy under common law.

701.     As alleged herein, FTX and Domestic VC Defendants defrauded Plaintiffs and Class

Members by, among other things, making misrepresentations about FTX's platform, operations,

products, and viability.

702.     As also alleged herein, FTX is liable to Plaintiffs and Class Members for conversion

because, among other things, they comingled customer assets, transferred customer funds to

Alameda, used customer assets for their own use and investments, and in doing so wrongfully

exercised control over Plaintiffs' and Class Members' personal property.

703.     As detailed herein, Domestic VC Defendants were aware that FTX and other venture

capitalists planned to induce Plaintiffs and Class Members to use the FTX Platform.  Domestic VC

Defendants were also aware through their partnerships, relationships and due diligence that FTX,

among other things, comingled customer assets, transferred customer funds to Alameda, and used

customer assets for their own use and investments.

704.     Domestic VC Defendants made misrepresentations and omissions to Plaintiffs and

Class Members regarding, *inter alia*, the viability and safety of FTX and their own due diligence

- 263 -

activities in order to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX. Domestic VC Defendants knew, or were reckless in not knowing, that their representations were false.

705.     Domestic VC Defendants each made agreements to provide, and did provide, significant capital to FTX to fund, *inter alia*, promotions and advertising campaigns, hire and engage regulatory and legal experts, garner regulatory favor and dialog through contributions, build products, and expand into additional jurisdictions in order to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX and FTX related investments. As a result, Domestic VC Defendants provided substantial assistance to FTX in connection with the tortious activities alleged herein.

706.     As detailed herein, Domestic VC Defendants engaged in concerted tortious acts, particularly in the form of misrepresentations and omissions made to Plaintiffs and Class Members for the purposes of inducing them to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX or the amount of FTX's investment in certain Domestic VC Defendants' funds.  These acts were made in concert pursuant to agreements with FTX, SBF, or other Domestic VC Defendants to promote the FTX Platforms.

707.     In addition to benefitting Domestic VC Defendants by increasing the value of their investments in FTX, the conspiracy substantially aided and encouraged the wrongdoing conducted by FTX and SBF.  Domestic VC Defendants further propelled FTX's wrongdoing by knowing, or

were reckless in not knowing, that Domestic VC Defendants' representations to Plaintiffs and Class Members regarding FTX and SBF were deceitful and fraudulent.

708.    As a result of Domestic VC Defendants' civil conspiracy, the Plaintiffs and Class Members suffered damages, because their fiat currency or digital assets currently in accounts with the FTX Platforms cannot be retrieved as a result of FTX's insolvency.

## COUNT X
## Aiding and Abetting Fraud
## (Against All Defendants)

709.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

710.    This Count is asserted against Domestic VC Defendants for aiding and abetting the violations of law undertaken by each other and FTX and their affiliates as alleged herein.

711.    As alleged herein, FTX and Domestic VC Defendants defrauded Plaintiffs and Class Members by, among other things, making misrepresentations about FTX's platform, operations, products, and viability.

712.    Domestic VC Defendants made misrepresentations and omissions to Plaintiffs and Class Members regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX and FTX related investments.   As a result, Domestic VC Defendants provided substantial assistance to FTX in connection with the tortious activities alleged herein.

713.     Domestic VC Defendants also each provided significant capital to FTX to fund, *inter alia*, promotions and advertising campaigns, hire and engage regulatory and legal experts, garner regulatory favor and dialog through contributions, build products, and expand into additional jurisdictions in order to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX and FTX related investments.   As a result, Domestic VC Defendants provided substantial assistance to FTX in connection with the tortious activities alleged herein.

714.     Because of their partnerships, inside positions, close relationships, and/or due diligence of FTX, Domestic VC Defendants knew, or were reckless in not knowing, that the wrongdoing by FTX was contrary to their public misrepresentations.

715.     Given Domestic VC Defendants' industry positions and reputations, Plaintiffs and Class Members reasonably relied upon Domestic VC Defendants' material misrepresentations and omissions when deciding to invest in or commit fiat currency and digital assets to the FTX Platforms to their detriment.

716.     Domestic VC Defendants participated in, substantially assisted, and facilitated FTX's fraudulent misconduct, with knowledge or reckless disregard, that such fraud was cheating investors and consumers.   For example, despite knowing or consciously disregarding SBF's and FTX's misconduct, Domestic VC Defendants still promoted and advertised the FTX Platform, YBAs, and/or FTT, to Plaintiffs and Class Members as described herein, making various misrepresentations and omissions as set forth herein.

717.    As a direct and proximate result of Domestic VC Defendants' aiding and abetting of the violations of law by each other, FTX, and its affiliates as detailed herein, Plaintiffs and the Class Members suffered damages, including the loss of the fiat currency or digital assets currently in accounts with the FTX Platforms as a result of FTX's insolvency.

## COUNT XI
## Aiding and Abetting Conversion
### (Against All Defendants)

718.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

719.    This Count is asserted against Domestic VC Defendants for aiding and abetting the violations of law undertaken by each other and FTX and their affiliates as alleged herein.

720.    As alleged herein, the FTX Group, SBF, Ms. Ellison, and Mr. Wang are liable to Plaintiffs and Class Members for conversion because, among other things, they comingled customer assets, transferred customer funds to Alameda, used customer assets for their own use and investments, and in doing so wrongfully exercised control over Plaintiffs' and Class Members' personal property.

721.    Domestic VC Defendants made misrepresentations and omissions to Plaintiffs and Class Members regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX and FTX related investments.   As a result, Domestic VC Defendants provided substantial assistance to FTX Group, SBF, Ms. Ellison, and Mr. Wang in connection with the tortious activities alleged herein.

- 267 -

722.     Domestic VC Defendants also each provided significant capital to FTX to fund, *inter alia*, promotions and advertising campaigns, hire and engage regulatory and legal experts, garner regulatory favor and dialog through contributions, build products, and expand into additional jurisdictions in order to induce confidence in the FTX Platforms and convince consumers to commit fiat currency and digital assets to the FTX Platforms, thereby increasing the value of Domestic VC Defendants' investments in FTX and FTX related investments.  As a result, Domestic VC Defendants provided substantial assistance to FTX in connection with the tortious activities alleged herein.

723.     Because of their partnerships, inside positions, close relationships, and/or due diligence of FTX, Domestic VC Defendants knew, or were reckless in not knowing, that the wrongdoing by FTX was contrary to their public misrepresentations.

724.     Given Domestic VC Defendants' industry positions and reputations, Plaintiffs and Class Members reasonably relied upon Domestic VC Defendants' material misrepresentations and omissions when deciding to invest in or commit fiat currency and digital assets to the FTX Platforms to their detriment.

725.     Domestic VC Defendants participated in, substantially assisted, and facilitated FTX's fraudulent misconduct, with knowledge or reckless disregard, that such fraud was cheating investors and consumers.  For example, despite knowing or consciously disregarding SBF's and FTX's misconduct, Domestic VC Defendants still promoted and advertised the FTX Platform, YBAs, and/or FTT, to Plaintiffs and Class Members as described herein, making various misrepresentations and omissions as set forth herein.

726.     As a direct and proximate result of Domestic VC Defendants' aiding and abetting of the violations of law by each other, FTX, and its affiliates as detailed herein, Plaintiffs and Class Members suffered damages, including the loss of the fiat currency or digital assets currently in accounts with the FTX Platforms as a result of FTX's insolvency.

## COUNT XII
### Declaratory Judgment
### (28 U.S.C. §2201 and Cal. Civ. Proc. Code §1060)
### (Against Sequoia, Thoma Bravo, Paradigm, SkyBridge,
### Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)

727.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

728.     This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter and is based upon the violations of the UCL and the California False Advertising Law as alleged herein.

729.     There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

730.     Plaintiffs and Class Members have an obvious and significant interest in the outcome of this lawsuit.

731. Plaintiffs and Class Members purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in reliance on these Domestic VC Defendants' false and misleading statements.

732. If Plaintiffs and Class Members knew the true facts surrounding FTX, Plaintiffs and Class Members would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

733. Thus, there is a justiciable controversy over whether these Domestic VC Defendants illegally solicited their purchases, deposits, and other transactions from Plaintiffs and Class Members.

734. Plaintiffs and Class Members seek an order declaring that these Domestic VC Defendants committed the violations of law alleged herein; enjoining these Domestic VC Defendants from continuing such legal violations; ordering that these Domestic VC Defendants engaged in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and their own due diligence activities; and ordering that each of the these Domestic VC Defendants that received financial benefits from their wrongful acts detailed herein provide appropriate and equitable restitution to Plaintiffs and Class Members.

## COUNT XIII
### Declaratory Judgment
### (28 U.S.C. §2201 and Florida Statute §86.011, *et seq.*)
### (Against Sequoia, Thoma Bravo, Paradigm, SkyBridge,
### Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter)

735. Plaintiffs repeat and reallege each and every allegation contained in ¶¶1 through 619 above, as if fully set forth herein.

736.     This Count is asserted against Sequoia, Thoma Bravo, Paradigm, SkyBridge, Multicoin Capital, Tiger Global, Ribbit Capital, and Altimeter under the federal Declaratory Judgment Act, 28 U.S.C. §2201, and Florida's Declaratory Judgment Act, Fla. Stat. §86.011, *et seq.*

737.     There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

738.     Plaintiffs and Class Members have an obvious and significant interest in the outcome of this lawsuit.

739.     Plaintiffs and Class Members purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in justifiable reliance on these Domestic VC Defendants' misrepresentations and omissions as described herein.

740.     If Plaintiffs and Class Members had known the true facts surrounding FTX, including but not limited to the fact that YBAs are unregistered securities and that these Domestic VC Defendants' representations to Plaintiffs and consumers regarding FTX and SBF were false, then Plaintiffs and Class Members would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

741.     Thus, there is a justiciable controversy over whether the YBAs were sold illegally and whether these Domestic VC Defendants illegally solicited the purchases, deposits, and other transactions made by Plaintiffs and Class Members.

742. Plaintiffs and Class Members seek an order declaring that these Domestic VC Defendants committed the violations of law alleged herein; enjoining these Domestic VC Defendants from continuing such legal violations; ordering that these Domestic VC Defendants engaged in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and SBF and their own due diligence activities; and ordering that each of these Domestic VC Defendants that received financial benefits from its wrongful acts as detailed herein provide appropriate and equitable restitution to Plaintiffs and Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment on behalf of themselves and the Classes:

(a)     Certifying the Classes as requested herein;

(b)     Awarding actual, direct and compensatory damages;

(c)     Awarding restitution and disgorgement of revenues;

(d)     Awarding declaratory relief as permitted by law or equity, including declaring the Domestic VC Defendants' practices as set forth herein to be unlawful;

(e)     Awarding injunctive relief as permitted by law or equity, including enjoining the Domestic VC Defendants from continuing those unlawful practices as set forth herein, and directing the Domestic VC Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

(f)     Awarding statutory, multiple damages, and punitive as appropriate, including, but not limited to, under Cal. Civ. Code §3294;

(g)     Awarding reasonable fees, costs and expenses incurred in this action, including expert and attorneys' fees; and

(h)     Awarding pre- and post-judgement interest, including, but not limited to, under Cal. Civ. Code §3287, *et seq*. and Cal. Civ. Proc. Code §680.010, *et seq*.; and

(i)     Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

DATED: August 7, 2023        ROBBINS GELLER RUDMAN & DOWD LLP
                      STUART A. DAVIDSON (FL SBN 0084824)
                      ANNY M. MARTIN (FL SBN 1000491)


                           s/ Stuart A. Davidson
                         STUART A. DAVIDSON

                      225 NE Mizner Boulevard, Suite 720
                      Boca Raton, FL  33432
                      Telephone:  561/750-3000
                      561/750-3364 (fax)
                      sdavidson@rgrdlaw.com
                      amartin@rgrdlaw.com

                      ROBBINS GELLER RUDMAN & DOWD LLP
                      ERIC I. NIEHAUS
                      BRIAN E. COCHRAN
                      PATTON L. JOHNSON
                      KENNETH P. DOLITSKY
                      655 West Broadway, Suite 1900
                      San Diego, CA  92101
                      Telephone:  619/231-1058
                      619/231-7423 (fax)
                      ericn@rgrdlaw.com
                      bcochran@rgrdlaw.com
                      pjohnson@rgrdlaw.com
                      kdolitsky@rgrdlaw.com

4896-1753-3557.v1

ROBBINS GELLER RUDMAN & DOWD LLP
SHAWN A. WILLIAMS
HADIYA K. DESHMUKH
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com

Attorneys for Plaintiffs and Member of Plaintiffs'
Steering Committee

HERMAN JONES LLP
JOHN C. HERMAN
CANDACE SMITH
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6555
404/504-6501 (fax)
jherman@hermanjones.com
csmith@hermanjones.com

Additional Attorneys for Plaintiffs

BOIES SCHILLER FLEXNER LLP
DAVID BOIES (NY REG NO. 2296333)
ALEXANDER BOIES (NY REG 5418579)
BROOKE ALEXANDER (NY REG No. 4678900)
333 Main Street
Armonk, NY 10504
Telephone: 914/749-8200
dboies@bsfllp.com
aboies@bsfllp.com
balexander@bsfllp.com

- 274 -

THE MOSKOWITZ LAW FIRM, PLLC
ADAM M. MOSKOWITZ (FL SBN 984280)
JOSEPH M. KAYE (FL SBN 117520)
3250 Mary Street, Suite 202
Coconut Grove, FL  33133
Telephone:  305/740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

Plaintiffs' Co-Lead Counsel for MDL No. 3076

4896-1753-3557.v1

JS 44 (Rev. 14/21) FLSD Revised 12/02/2022

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
Patrick Rabbitte, et al.

**DEFENDANTS**
SkyBridge Capital II, LLC, et al.

**(b)** County of Residence of First Listed Plaintiff  Panama City, Panama
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720, Boca Raton, FL 33432
Telephone: 561/750-3000

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excl. Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☒ 370 Other Fraud | **LABOR** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Acts | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed *(See VI below)* ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation Transfer ☐ 7 Appeal to District Judge from Magistrate Judgment ☐ 8 Multidistrict Litigation – Direct File ☐ 9 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)** (See instructions): a) Re-filed Case ☐ YES ☒ NO  b) Related Cases ☐ YES ☐ NO

JUDGE:                                          DOCKET NUMBER:

**VII. CAUSE OF ACTION** Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)(2).  Violation of FDUTPA and Blue Sky Law.
LENGTH OF TRIAL via          days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23    DEMAND $              CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE  08/07/2023

SIGNATURE OF ATTORNEY OF RECORD
s/Stuart A. Davidson

FOR OFFICE USE ONLY : RECEIPT #          AMOUNT          IFP          JUDGE          MAG JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**      (a) **Plaintiffs-Defendants**. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys**. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit**. Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**     **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.**    **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.**   **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
         Brief Description: Unauthorized reception of cable service

**VIII.**  **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR,
LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL
LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG
PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI,
MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN
HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE
RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI,
Individually and on Behalf of All Others Similarly Situated,

*Plaintiff(s)*

v.

SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL
OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM
OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT
LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT
MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL
MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC,

*Defendant(s)*

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> ALTIMETER CAPITAL MANAGEMENT, LP
> The Corporation Trust Center
> 1209 Orange Street
> Wilimington, DE  19801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                _____
                                                                        *Server's signature*

                                                          _____
                                                                        *Printed name and title*

                                                          _____
                                                                        *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | ) ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> K5 GLOBAL ADVISOR, LLC
> Cogency Global, Inc.
> 850 New Burton Road
> Suite 201
> Dover, DE  19904

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                         _____
                                                              *Server's signature*

                                                              _____
                                                              *Printed name and title*


                                                              _____
                                                              *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida  ▼

PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR,
LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL
LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG
PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI,
MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN
HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE
RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI,
Individually and on Behalf of All Others Similarly Situated,

*Plaintiff(s)*

v.

SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL
OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM
OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT
LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT
MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL
MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC,

*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> MULTICOIN CAPITAL MANAGEMENT LLC
> 501 West Ave., Apt. 3803
> Austin, TX 78701

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                     _____
                                                        *Server's signature*

                                                _____
                                                        *Printed name and title*

                                                _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida  ▾

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) ) Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | ) ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> PARADIGM OPERATIONS LP
> Cogency Global, Inc.
> 850 New Burton Road
> Suite 201
> Dover, DE  19904

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❏ I served the summons on *(name of individual)* _____ , who is

    designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❏ I returned the summons unexecuted because _____ ; or

    ❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.


Date: _____                          _____
                                                        *Server's signature*

                                               _____
                                                        *Printed name and title*

                                               _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida ▼

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) ) Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | ) ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> RIBBIT MANAGEMENT COMPANY, LLC
> 364 University Ave.
> Palo Alto, CA 94301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____        _____
                                                      *Server's signature*

                                                      _____
                                                      *Printed name and title*


                                                      _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida ▾

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, *Plaintiff(s)* | ) ) ) ) ) ) ) ) |
| v. | ) Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, *Defendant(s)* | ) ) ) ) ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> SEQUOIA CAPITAL OPERATIONS, LLC
> The Corporation Trust Center
> 1209 Orange Street
> Wilimington, DE  19801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida ▼

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) ) Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | ) ) ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> SKYBRIDGE CAPITAL II, LLC
> Corporate Creations Network Inc.
> 3411 Silverside Road Tatnall Building Ste 104
> Wilmington, DE 19810

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                        *Server's signature*

                                                        _____
                                                        *Printed name and title*


                                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| *Plaintiff(s)* | ) |
| v. | )  Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | )<br>)<br>)<br>)<br>)<br>) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> THOMA BRAVO, LP
> CT Corporation
> 28 Liberty Street
> New York, NY 10005

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____                    _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida ▼

| | |
|---|---|
| PATRICK RABBITTE, MARK GIRSHOVICH, BRANDON ORR, LEANDRO CABO ("CABO"), RYAN HENDERSON, MICHAEL LIVIERATOS, ALEXANDER CHERNYAVSKY, GREGG PODALSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, EDWIN GARRISON, SHENGYUN HUANG, JULIE PAPADAKIS, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, AND SUNIL KAVURI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) ) Civil Action No. |
| SKYBRIDGE CAPITAL II, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, PARADIGM OPERATIONS LP, MULTICOIN CAPITAL MANAGEMENT LLC, TIGER GLOBAL MANAGEMENT, LLC, RIBBIT MANAGEMENT COMPANY, LLC, ALTIMETER CAPITAL MANAGEMENT, LP, AND K5 GLOBAL ADVISOR, LLC, | ) ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> TIGER GLOBAL MANAGEMENT, LLC
> Corporation Service Company
> 251 Little Falls Drive
> Wilmington, DE 19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> STUART A. DAVIDSON
> ROBBINS GELLER RUDMAN & DOWD LLP
> 225 NE Mizner Boulevard, Suite 720
> Boca Raton, FL 33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____

                                        _____
                                                *Server's signature*

                                        _____
                                                *Printed name and title*

                                        _____
                                                *Server's address*

Additional information regarding attempted service, etc: