# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:23-cv-24479-KMM

Garrison et al v. Major League Baseball et al
Assigned to: Judge K. Michael Moore
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 11/27/2023
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

## Plaintiff

**Edwin Garrison**
*on behalf of themselves and all others
similarly situated*

represented by **Barbara Cabrera Lewis**
The Moskowitz Law Firm
2 Alhambra Plaza
#601
Miami, FL 33134
305-740-1423
Fax: 786-298-5737
Email: barbara@moskowitz-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
Mark Migdal & Hayden
80 SW 8th St
Suite 1999
Miami, FL 33130
305-374-0440
Email: desiree@markmigdal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
The Moskowitz Law Firm
3250 Mary Street
Ste 202
Miami, FL 33133
305-740-1423
Email: john@moskowitz-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
Mark Migdal and Hayden
80 SW 8 Street
Suite 1999
33130
Miami, FL 33131
305-374-0440
Email: jose@markmigdal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
The Moskowitz Law Firm
The Moskowitz Law Firm
P.O. Box 653409
Miami, FL 33175
305-740-1423
Fax: 786-298-5737
Email: joseph@moskowitz-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
The Moskowitz Law Firm
P.O. Box 653409
Miami, FL 33175
305-740-1423
Fax: 786-298-5737
Email: adam@moskowitz-law.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Brandon Orr**                                    represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Leandro Cabo**                                   represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*

ATTORNEY TO BE NOTICED

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ryan Henderson**                    represented by **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Livieratos**        represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alexander Chernyavsky**     represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Gregg Podalsky**                              represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Vijeth Shetty**                               represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Chukwudozie Ezeokoli　　　　　　represented by　**Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Michael Norris　　　　　　represented by　**Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shengyun Huang**                    represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vitor Vozza**                       represented by   **Barbara Cabrera Lewis**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kyle Rupprecht**                    represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Warren Winter**                    represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sunil Kavuri**                    represented by   **Barbara Cabrera Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Desiree Erin Fernandez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ethan Rodstrom , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jose Manuel Ferrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Major League Baseball**

**Defendant**

**Major League Baseball Enterprises, Inc.**

**Defendant**

**Major League Baseball Properties, Inc.**

**Defendant**

**Major League Baseball Promotion
Corporation**

**Defendant**

**MLB Players, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2023 | 1 | COMPLAINT *CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL* against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-17097502, filed by Shengyun Huang, Gregg Podalsky, Brandon Orr, Edwin Garrison, Kyle Rupprecht, Alexander Chernyavsky, Leandro Cabo, Chukwudozie Ezeokoli, Vitor Vozza, Sunil Kavuri, Warren Winter, Vijeth Shetty, Ryan Henderson, Michael Norris, Michael Livieratos. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet, # 5 Summon(s), # 6 Summon(s), # 7 Summon(s), # 8 Summon(s), # 9 Summon(s))(Moskowitz, Adam) (Entered: 11/27/2023) |
| 11/27/2023 | 2 | MDL 3076 Judge Assignment with Tag-Along Case Receipt from the Southern District of Florida. Judge K. Michael Moore assigned FLSD Case Number **23-cv-24479**. Re: FLSD MDL Case Number 1:23-md-03076-KMM. Clerks Note: JPML notified. (nwn) (Entered: 11/27/2023) |
| 11/27/2023 | 3 | Summons Issued as to MLB Players, Inc., Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Promotion Corporation. (nwn) (Entered: 11/27/2023) |
| 11/27/2023 | 4 | Clerk's Notice to Filer re: Summons(es) will not be issued. Summons(es) NOT issued for the following reasons: duplicate summons uploaded for MAJOR LEAGUE BASEBALL ENTERPRISES, INC., one summons was issued. (nwn) (Entered: 11/27/2023) |
| 11/27/2023 | 5 | NOTICE of Filing Proposed Summons(es) by Leandro Cabo, Alexander Chernyavsky, Chukwudozie Ezeokoli, Edwin Garrison, Ryan Henderson, Shengyun Huang, Sunil Kavuri, Michael Livieratos, Michael Norris, Brandon Orr, Gregg Podalsky, Kyle Rupprecht, Vijeth |

Shetty, Vitor Vozza, Warren Winter re 1 Complaint,, filed by Gregg Podalsky, Warren Winter, Ryan Henderson, Michael Norris, Vitor Vozza, Leandro Cabo, Kyle Rupprecht, Shengyun Huang, Sunil Kavuri, Chukwudozie Ezeokoli, Edwin Garrison, Michael Livieratos, Vijeth Shetty, Alexander Chernyavsky, Brandon Orr (Attachments: # 1 Summon(s)) (Moskowitz, Adam) (Entered: 11/27/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/28/2023 08:54:27 | | | |
| **PACER Login:** | AdamMoskoadam | **Client Code:** | FTX |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-24479-KMM |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO.

**EDWIN GARRISON**, *et al.,* on behalf of
themselves and all others similarly situated,

         *Plaintiffs,*                     **CLASS ACTION COMPLAINT**

*v.*                                      **JURY DEMAND**

**MAJOR LEAGUE BASEBALL**, **MAJOR
LEAGUE BASEBALL ENTERPRISES,
INC. MAJOR LEAGUE BASEBALL
PROPERTIES, INC. MAJOR LEAGUE
BASEBALL PROMOTION
CORPORATION** and **MLB PLAYERS,
INC.**

         *Defendant.*

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 4

PARTIES ........................................................................................................................... 20

JURISDICTION AND VENUE ......................................................................................... 26

FACTUAL ALLEGATIONS .............................................................................................. 28

    A. The Rise of FTX .................................................................................................. 28

    B. FTX's Key Players ............................................................................................. 32

    C. The Basics of a Cryptocurrency Exchange ....................................................... 39

    D. The Mechanics of the Fraudulent Scheme ....................................................... 45

    E. The Fraud's Collapse ......................................................................................... 53

    F. FTX Files for Bankruptcy .................................................................................. 63

    G. Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct ................... 71

    H. The SEC's Approach to Cryptocurrency ............................................................ 76

    I. FTX's offer and sale of YBAs, which are unregistered securities. ..................... 91

    J. FTX's Offer and Sale of FTT Tokens, Which Are Unregistered Securities. ...... 100

    K. Using the FTX Platform Itself Necessarily Required Transacting in Unregistered Securities. 101

    L. FTX Aggressively and Deceptively Marketed its Platform ................................. 106

    M. The Defendants' Roles in the Fraud ................................................................ 111

    N. Material Ties to Florida ..................................................................................... 129

CLASS ACTION ALLEGATIONS ................................................................................... 132

    A. Class Definitions ............................................................................................... 132

    B. Numerosity ....................................................................................................... 133

    C. Commonality/Predominance ............................................................................. 133

    D. Typicality ........................................................................................................... 134

    E. Adequacy of Representation .............................................................................. 135

    F. Requirements of Fed. R. Civ. P. 23(b)(3) .......................................................... 135

    G. Superiority ......................................................................................................... 136

    H. Requirements of Fed. R. Civ. P. 23(b)(2) .......................................................... 137

    I. Requirements of Fed. R. Civ. P. 23(c)(4) ........................................................... 137

J. Nature of Notice to the Proposed Class ............................................................................ 138

CAUSES OF ACTION .............................................................................................................. 138

PRAYER FOR RELIEF ............................................................................................................ 154

Plaintiffs, on behalf of themselves and all others similarly situated, sue Major League Baseball, Major League Baseball Enterprises, Inc., Major league Baseball Properties, Inc., Major League Baseball Promotion, Corp. and MLB Players, Inc. (collectively, "MLB" or the "Defendants") for their respective actions, which contributed to the collapse of FTX Trading LTD d/b/a FTX's ("FTX Trading"), West Realm Shires Services Inc. d/b/a FTX US's ("FTX US"), and Alameda Research, LLC's ("Alameda," and collectively, the "FTX Group" or "FTX"), including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

## <u>INTRODUCTION</u>

1.      The FTX disaster is among the largest financial frauds in history. Sam Bankman-Fried ("SBF"), FTX Group's[1] founder and former CEO, is on house arrest awaiting his sentencing following his conviction for fraud and conspiracy after stealing billions of dollars from FTX customers. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2.      Evidence now reveals that the FTX Group's fraud was only able to reach such heights through the offer and sale of unregistered securities, with the willing help and assistance

---

[1] FTX Trading Ltd. and its subsidiaries are referred to herein as "FTX Trading" or "FTX Trading Ltd." West Realm Shires Inc. and its subsidiaries, including West Realm Shires Services, Inc. ("WRS"), are referred to herein as "FTX US." FTX Trading Ltd. and FTX US are collectively referred to as "FTX" or the "FTX entities." FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

of some of the wealthiest, most powerful and recognized organizations and celebrities across the globe. Every victim who invested in FTX had to open an FTX YBA, which was itself an unregistered security. The U.S. Securities and Exchange Commission ("SEC") concluded that FTX's exchange token FTT was promoted as an investment contract and is also a security.

3.      Crucially, since Undersigned Counsel first filed crypto securities class actions in this District, the binding law in this Circuit, and elsewhere across the country, regarding mass promotion of crypto currency and unregistered securities was recently clarified (and updated for today's technology) so now a promoter like MLB, with a financial incentive for themselves or for the financial benefit of the securities issuer (the FTX Group), can be held liable under securities laws for using the internet and social media for mass solicitations of cryptocurrency. Investors can thus now state a cause of action against promoters like the MLB, who had a financial incentive in the crypto products and exchange, for making mass solicitations for cryptocurrency sales over the internet.

4.      As the COVID-19 pandemic crippled the sports and entertainment sectors, potentially altering them irrevocably, the Defendants faced a pivotal choice crucial to its future viability. The options were stark: (1) emulate the National Football League's cautious approach by steering clear of the volatile and unknown world of cryptocurrency, or (2) go "all in," aggressively endorsing and aligning the prestigious and historic MLB brand with FTX, a move aimed at catapulting them to the forefront of the cryptocurrency arena. This decision, fraught with risk, involved promoting and selling billions of dollars in unregistered and illegal securities to the public, leveraging the global reputation and trust in the MLB brand.

5.      Evidence has already been uncovered illustrating the dire condition of many sports organizations and entertainment businesses due directly to the global Covid pandemic. Between

those dynamics and the rise of the industry, lucrative promotion deals with cryptocurrency-related organizations increased 4000%. Despite market pressures, some organizations, such as the NFL, performed due diligence and decided not to take the risks of partnering with cryptocurrency industry players. Investors have now lost more than $11 billion dollars and some exchanges such as FTX and Voyager have gone bankrupt, so this complaint is one of the victims' only avenues to recoup any of those direct losses from these specific promoters.

6.      Following a series of confidential internal deliberations, MLB opted to embrace the risks associated with FTX and go all in. This decision, however, led to significant legal and financial repercussions—not only is there binding precedent that Defendants' widespread promotion of FTX's unregistered securities render them liable for any and all resulting damages, but as the FTX bankruptcy and criminal proceedings against its executives demonstrate, losses to the victims now exceed $11 billion. This lawsuit seeks to hold MLB liable under the law.

7.      Interestingly, while MLB and many others were quick to jump into the crypto world with both feet when they saw the potential for fast money, the National Football League had the foresight to specifically *bar* its teams from selling sponsorships to cryptocurrency trading firms back in September 2021, because it needed the chance to evaluate the cryptocurrency industry more closely before it could develop and implement its official strategy.[2]

8.      In *Wildes v. BitConnect Int'l PLC,* 25 F.4th 1341 (11th Cir. 2022), the Eleventh Circuit clearly articulated the standard applicable to mass solicitation of unregistered securities, ruling that spokespersons who promoted a crypto Ponzi scheme had engaged in "solicitation" of securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's

---

[2]     https://finance.yahoo.com/news/why-nfl-bans-cryptocurrency-nft-164438729.html   (accessed November 19, 2023).

promoters did not directly target particular purchasers. *Id.* at 1346. In so ruling, the Court observed that the Securities Act does not distinguish between individually targeted sales efforts and broadly disseminated pitches, and noted that in early cases applying the Securities Act of 1933, "people understood solicitation to include communications made through diffuse, publicly available means – at the time, newspaper and radio advertisements." *Id.*

9.       *In Pino v. Cardone Capital, LLC,* 55 F.4th 1253 (9th Cir. 2022), the Ninth Circuit adopted Wildes in its entirety, holding that a real estate management company that promoted real estate investment funds through "mass communications to potential sellers" via nontargeted internet videos posted on social media could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return. *Id.* at 1259–60. The court noted that, to state a cause of action, a plaintiff "need not have alleged that he specifically relied on any of the alleged misstatements identified in the [complaint]." *Id.*

10.      *In De Ford v. Koutoulas,* 6:22-CV-652, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), the court denied a motion to dismiss claims that a spokesperson for "Let's Go Brandon" cryptocurrency (LGBCoin) engaged in the solicitation of unregistered securities. Citing *Wildes*, the court rejected the argument that "mere social media posts cannot make him a seller of securities" and held that the plaintiff had sufficiently alleged a claim for selling unregistered securities by alleging (1) the online promotion of LGBCoin through social media channels, and (2) that the promotions were done to serve the spokesperson's own financial interests. *Id.* at *15.

11.      Most recently, on September 20, 2023, Judge William H. Orrick of the Northern District of California, applying both *Pino* and *Wildes*, denied a motion to dismiss by a promoter who was sued for participating in a similar FTX scheme to sell unregistered securities in the form of cryptocurrency, concluding that the suit alleged that the defendants actively solicited sales of

the crypto assets, and were not just "mere collateral participants." *Houghton v. Leshner*, No. 3:22-cv-07781, 2023 WL 6826814, at *3–5 (N.D. Cal. Sept. 20, 2023). In reaching that conclusion, Judge Orrick reasoned that "[s]olicitation is broadly construed," and a promoter "could be a statutory seller liable for solicitation <u>based on YouTube videos and Instagram posts touting the investments and rates of return</u>." *Id.*, (emphasis added) (citing *Pino*, 55 F.4th at 1256; and then citing *Wildes*, 25 F.4th 1341).

12.     In announcing the crucial, long-term partnership, the MLB's Chief Revenue Officer, Noah Garden, proudly claimed: "This is an ***incredibly exciting announcement*** for everyone in Major League Baseball as we partner with a global leader in the early stages of their ***unbelievable growth***. FTX quickly cultivated itself into a worldwide leader in the ever-evolving cryptocurrency industry and continues to build on its already impressive reputation. Our fans have been early adopters in using new technologies to engage with our game.[3]"

13.     Interestingly, while the MLB and many others were quick to jump into the crypto world with both feet when they saw the potential for fast money, the National Football League had the foresight to specifically *bar* its teams from selling sponsorships to cryptocurrency trading firms back in September 2021, because it needed the chance to evaluate the cryptocurrency industry more closely before it could develop and implement its official strategy.[4]

## **FACTUAL BACKGROUND**

14.     SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

---

[3]      https://protectpublicstrust.org/wp-content/uploads/2022/12/23-00051-FOIA-Records-for-Release.pdf  (accessed Nov. 11, 2023).
[4]      https://finance.yahoo.com/news/why-nfl-bans-cryptocurrency-nft-164438729.html  (accessed November 19, 2023).

15.     On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. FTX's mobile application and/or web-based cryptocurrency investment service that placed cryptocurrency trade orders on behalf of users (the "FTX Platform") maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

16.     On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

17.     This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, fraud, and conversion.

18.     As outlined herein, the Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain.

19.     Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

20.     To be sure, Defendants are responsible for the damages that Class Members have sustained. As further detailed herein, the Defendants were necessary players in pushing the FTX fraud to the unprecedented extent it reached, and all made exorbitant amounts of money in the process of doing so. For instance, the Defendants helped create the false narratives about FTX and used their reputation and brand to give them instant credibility.

21.     FTX is and will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings. This class action may be the only avenue for any of the victims to recover any of their damages.

22.     What's more, FTX would not have been successful in perpetrating this fraudulent scheme on Plaintiffs and Class Members around the globe without key events that took place in and emanated from right here in Miami, Florida, which not only eventually became FTX's official headquarters but was their de facto domestic headquarters for years before FTX's eventual collapse. According to the Declaration of Dan Friedberg, attached as **Exhibit A**, FTX maintained an10fficee in Miami, Florida, since early 2021, long before FTX eventually moved its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, who was based in Miami and originally worked for Blockfolio as Director of Product and Partnership before FTX later acquired Blockfolio in late 2020.[5] *Id.* Dabir eventually became FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

---

[5] *See* Zack Voell, *FTX Exchange's $150M Deal for Mobile-First Blockfolio Is a Retail Trading Play*, Coindesk, https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/ (Sept. 14, 2021, 5:47 AM EDT); *see also Blockfolio*, Crunchbase, https://www.crunchbase.com/organization/blockfolio/people (last visited May 10, 2023).

23.     Mr. Dabir operated from FTX's Miami office, and he was focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA. *Id.*

24.     According to Friedberg, Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

25.     The naming of the "FTX Arena" served as an important centerpiece for FTX's efforts to reach other FTX partnerships with celebrities and other well-known partners. *Id.*, ¶ 23. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*

26.     Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, according to Friedberg, it was the first time that he had ever agreed to serve as a spokesperson for any product. *Id.*, ¶ 24. Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*

27.     Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast *The Joe Pomp Show*, where he was interviewed by Mr. Pompliano for over half an hour

on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as **Exhibit B**.

28.     Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.*

29.     After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3. Dabir explained that a contributing factor to the deal was "the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue," which "opened up the door where we could have that conversation" with Miami-Dade County and the Miami Heat. *Id.*, at 4.

30.     Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

31.     In order to close the FTX Arena deal, according to Mr. Dabir, FTX confidentially disclosed to Miami-Dade County and the Miami Heat FTX's balance sheet—which was comprised almost entirely of customer funds—and he explained to Mr. Pompliano that "there are ways to

structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort." *Id.*

32.     Mr. Dabir explained that there were multiple ways that FTX measured the success of their Brand Ambassador program, with the "obvious one [being] straight up conversion," as in "[h]ow many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easy to track." *Id.*, at 6. But the other method, according to Mr. Dabir, is the "intangible element" of "trust" and "legitimacy" that comes from "building trust and value through brand association," like "I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David." *Id.*

33.     Mr. Dabir also explains how he oversaw and participated in the creation of Larry David's now infamous 2022 Super Bowl ad, and recounting, "when we saw the script, we were like, this script is awesome. And then-then we're like, 'We have to get Larry David, right?' And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?" *Id.*, 7.

34.     Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

35.     Mr. Dabir also went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.,* 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explains that

Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as Curry. *Id.*

36.     The question of whether the promotion of the FTX Platform, the sale of every YBA and/or FTT is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[6]

> In the SEC's Report of Investigation concerning The DAO,[7] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **<u>Persons making these endorsements may also be liable</u>** for potential violations of the anti-fraud provisions of the federal securities laws, **<u>for participating in an unregistered offer and sale of securities</u>**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

37.     The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this

---

[6] *SEC Statement Urging Caution Around Celebrity Backed ICOs*, SEC (Nov. 1, 2017), https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

[7] SEC, Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), https://www.sec.gov/files/litigation/investreport/34-81207.pdf

exact same type of interest-bearing account and native token, finding that exchanges such as BlockFi,[8] Voyager,[9] and Celsius[10] all offered these same products as unregistered securities.

38.     A second narrow issue that is common to the entire Proposed Class, whose focus is also solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC's long-established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

39.     We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in the FTX Platform, FTT, and/or a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held on the FTX Platform or in the YBA. In other words, the FTX Platform and YBAs were portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the FTX Platform and the offer and sale of YBAs and/or FTT, all of which are unregistered securities. For that, Defendants are liable for

---

[8] Press Release, *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product*, SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

[9] Steve Kaaru, *6 US Regulators Crackdown on Voyager Digital over Interest-Bearing Accounts*, CoinGeek (April 1, 2022), https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/.

[10] Celsius Network, LLC (N.J. Bureau of Secs. Sept. 17, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf (cease and desist order)

Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Group.

40.     Literally overnight, Plaintiffs' assets, including FTT,[11] held on the FTX Platform and/or in their YBAs were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Group:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> *Never* in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced,

---

[11] Although the FTX Group purported to maintain a separation between the US and International platform—in large part because it knew its products offered on the international exchange were securities required to be registered with securities regulators—the separation was merely a farce and was easily circumvented (which was something that the FTX Group encouraged) through the use of, for instance, a VPN. *See* https://blockduo.com/ftx-usa/ ("FTX, like other crypto exchanges, uses something called geo-blocking to stop users from restricted countries from using the exchange. They do this by seeing where your IP address is, and if it is from one of the banned countries, they will block you from the site. With the now wide availability of VPNs, this can be bypassed") (accessed May 11, 2023). The use of VPNs to circumvent geo-blocking for cryptocurrency exchanges is a well-known and widely used method encouraged by the exchanges to rake in as many new U.S.-based customers as possible to keep new funds loading onto their platform. *See CFTC v. Changpeng Zhao, et al.,* No. 1:23-cv-01887, ECF No. 1 (N.D. Ill. Mar. 27, 2023) (CFTC enforcement action brought because "Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ('VPNs') to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.").

**unsophisticated** and **potentially compromised** individuals, <u>**this situation is unprecedented**</u>.

*See In re: FTX Trading Ltd, et al.*, No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

41. The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the globe. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

42. The deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S.

presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

43.     Plaintiffs bring this action against Major League Baseball, Major League Baseball Enterprises, Inc., and MLB Players, Inc.  who provided actively promoted FTX and its yield-bearing-accounts ("YBAs") to millions of people. Though FTX paid Defendants handsomely to push its brand, Defendants did not conduct adequate (if any) due diligence. Given Defendants' prominence and vast resources, they knew or should have known about FTX's financial fragility, as well as the concerns about FTX selling unregistered crypto securities.

44.     With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "Influencers" has been created. Influencers played a major role in the FTX disaster and in fact, FTX could not have risen to such great heights without the massive impact of these Influencers, who hyped the FTX Platform for undisclosed payments ranging from tens of thousands of dollars to multimillion-dollar bribes.[12] Indeed, the most searched companies on the internet today are cryptocurrency brands. According to the NBA 2021–2022 Marketing & Partnerships Annual Report by Sponsor United, the cryptocurrency industry had a higher search volume during that year than the entire Alcohol & Beverages industry.

45.     It is paramount to understand that the Florida state law claims asserted in this action **do not require "reliance" or "deceit."** The law merely requires the named Plaintiffs (and eventually the certified class) to have suffered damages as a result of: (a) purchasing an

---

[12] For example, the company Coinbound touts, "We help crypto brands go viral using Web3's top influencers." Coinbound, https://coinbound.io/influencers/ (last visited Nov. 22, 2023).

"unregistered security," and (b) that was promoted by the Defendants for their financial benefit
and/or the financial benefit of FTX.

46.     The reality is that anyone around the world with a computer can now be a promoter.
Many of these paid FTX promoters have since asked for forgiveness, because many of these
Influencers rely mainly on their alleged independence and impartiality in attracting people to join
their fanbase.[13] This Action is brought to hold liable those promoters who specifically violated the
law under these acts and will serve as precedent to warn and guide other promoters in the future.

47.     State and federal regulators have been required to quickly modify and adjust to all
the changing sources of promoters and marketers. Starting with sponsors on radio, then television
and motion pictures and today, to the wild west of the internet, the number of companies that
specialize in promoting on social media have sky-rocketed. According to studies, those aged 18 to
34 are more likely to build an interest in an investment specifically from social media, instead of
traditional news websites.[14]

---

[13] Amanda Perelli, *Finance influencers are apologizing to fans after making money promoting FTX—and some say they'll make changes*, Bus. Insider (Nov. 14, 2022, 9:30 AM EST), https://www.businessinsider.com/influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11.

[14] Shane Kickey, *As 'finfluencers' spread through social media, beware the pitfalls*, The Guardian (Aug. 22, 2021, 4:00 EDT), https://www.theguardian.com/money/2021/aug/22/as-finfluencers-spread-through-social-media-beware-the-pitfalls.

## PARTIES

48.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which the Defendants are liable.

49.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which the Defendants are liable.

50.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which the Defendants are liable.

51.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which the Defendants are liable.

52.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested

through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which the Defendants are liable.

53.    **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which the Defendants are liable.

54.    **Plaintiff Vijeth Shetty** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which the Defendants are liable.

55.    **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which the Defendants are liable.

56.    **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which the Defendants are liable.

57.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which the Defendants are liable.

58.     **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which the Defendants are liable.

59.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which the Defendants are liable.

60.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which the Defendants are liable.

61.     **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or

invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which the Defendants are liable.

62.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which the Defendants are liable.

63.     **Defendant Major League Baseball** is an unincorporated association consisting of 30 member teams, each of which is a separate legal entity. Its headquarters are located at 245 Park Avenue, New York, New York, 10167. Major League Baseball's operations and activities span across the United States, including a significant presence in the State of Florida, where it not only hosts spring training for many of its teams but also regular season games, drawing substantial fan engagement and commercial activity within the state. Major League Baseball operates, conducts and engages in business in Florida including but not limited operations and activities within the state where it not only hosts spring training for many of its teams but also regular season games, contractual relationships with various businesses within the state, relations with two of its members which are based in the state (the Miami Marlins and Tampa Bay Rays) as well as the MLB/FTX deal, which was consummated in Miami, Florida. Major League Baseball (1) admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (2) failed to disclose, in any of its marketing campaigns and/or advertisements, that it was paid substantial sums by FTX and

profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

64. **Defendant Major League Baseball Enterprises, Inc.** is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 245 Park Avenue, New York, New York, 10167. This entity is responsible for the commercial, broadcasting, and media operations of Major League Baseball (MLB), encompassing the management of broadcasting rights, digital media, marketing, sponsorships, and merchandising. Its business activities extend significantly to the State of Florida, where several MLB teams are based and where numerous league events and activities are held, directly implicating Major League Baseball Enterprises, Inc. in commercial operations within the state. Major League Baseball Enterprises, Inc. operates, conducts and engages in business in Florida including but not limited the company's role in negotiating and managing media and marketing agreements within the state, relationships with various businesses within the state as well as the MLB/FTX deal, which was consummated in Miami, Florida. Major League Baseball Enterprises, Inc. (1) admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (2) failed to disclose, in any of its marketing campaigns and/or advertisements, that it was paid substantial sums by FTX and profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

65. **Defendant Major League Baseball Properties, Inc. i**s a corporation organized and existing under the laws of the State of New York, with its principal place of business located in New York, New York. This entity is specifically tasked with the management and oversight of the licensing and merchandising aspects of Major League Baseball, including the rights to team logos, trademarks, and other intellectual properties associated with the league and its teams. Major

24

League Baseball Properties, Inc.'s operations significantly impact the State of Florida, where it engages in licensing and merchandising activities due to the presence of MLB teams and the popularity of the sport in the region. This includes the management of merchandising rights and the distribution of licensed products within Florida, activities that are integral to the commercial identity and revenue streams of MLB. Furthermore, the involvement of Major League Baseball Properties, Inc. in agreements and partnerships within Florida, including those related to the MLB/FTX deal, which was consummated in Miami, Florida, underscores its active and influential role in the state's sports and commercial sectors. Major League Baseball Properties, Inc. (1) admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (2) failed to disclose, in any of its marketing campaigns and/or advertisements, that it was paid substantial sums by FTX and profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

66.     **Defendant Major League Baseball Promotion Corporation** a New York-based corporation, is an integral entity within the structure of MLB. Its primary function is to orchestrate and implement promotional activities for MLB across various platforms. This corporation's influence and operations are evident in the State of Florida, where MLB's presence is marked by team activities, fan bases, and events. In Florida, Major League Baseball Promotion Corporation operates, conducts and engages in business in Florida including but not limited to its role in devising and executing promotional campaigns, fan engagement events, marketing initiatives, negotiating licensing agreements, sponsorships, and endorsements that often involve the use of player images and likenesses in various commercial contexts as well as the MLB/FTX deal. The corporation's involvement in promotional agreements and partnerships, including those related to league sponsorships and collaborations, underscores its active role in shaping the profile of MLB

25

in Florida. Major League Baseball Promotion Corporation (1) admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (2) failed to disclose, in any of its marketing campaigns and/or advertisements, that it was paid substantial sums by FTX and profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

67.     **Defendant MLB Players, Inc.** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business is 12 East 49th Street, 24th Floor, New York, NY 10017. As the business and commercial arm of the Major League Baseball Players Association (MLBPA), this entity is primarily engaged in the management, licensing, and marketing of the collective image and likeness rights of professional Major League Baseball players. Its operations extend to the State of Florida, where numerous MLB teams conduct spring training and regular season games, thereby directly impacting and involving MLB Players, Inc.'s business activities within the state. MLB Players, Inc. operates, conducts and engages in business in Florida including but not limited to its role negotiating licensing agreements, sponsorships, and endorsements that often involve the use of player images and likenesses in various commercial contexts as well as the MLB/FTX deal, which was consummated in Miami, Florida. MLB Players, Inc. (1) admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (2) failed to disclose, in any of its marketing campaigns and/or advertisements, that it was paid substantial sums by FTX and profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

## JURISDICTION AND VENUE

68.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion

dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

69.     This Court has personal jurisdiction against Defendants because they conduct substantial and not isolated business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's Deceptive FTX Platform, YBAs and/or FTT in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. Additionally, the FTX/MLB deal was consummated in Miami, Florida. Further, Defendants have engaged in a conspiracy in which some of the co-conspirators—including some who are Defendants in this action— committed overt acts in furtherance of the conspiracy in the State of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

70.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

71.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

# FACTUAL ALLEGATIONS

## A.    The Rise of FTX

72.    In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

73.    FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[15]

74.    All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

75.    FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami

---

[15] *See* Superseding Indictment ¶ 2, *United States of America v. Samuel Bankman-Fried*, No. S5 Cr. 673 (March 28, 2023), ECF No. 115.

Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

76.    Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

77.    FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

78.    By structuring the rates of returns in this way, FTX targeted nascent investors—i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

79.    Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned

to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

80.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

81.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self-trades in order to manipulate markets, reported statistics, or cause liquidations."

82.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the

liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

83.    FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

84.    More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts

31

in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

85.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . I don't want a yacht."

86.     But in truth, SBF did want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

87.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion per day and its valuation topped $32 billion within three years of its founding.

**B.      FTX's Key Players**

***I.      Sam Bankman-Fried***

88.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established

to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

89.     Prior to that, the Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda, in November 2017,[16] after stints in the charity world and at trading firm Jane Street.[17] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

90.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. Bankman-Fried was convicted by a jury on November 2, 2023, of all seven charges tried in October 2023. He now faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

## II.     *Caroline Ellison*

---

[16] Lakshmi Varanasi, Sarah Jackson, Britney Nguyen & Sindhu Sundar, *The Rise and Fall of FTX's Sam Bankman-Fried, the Onetime Crypto Billionaire Prosecutors Now Want Jailed After They Say He Interfered With Witnesses in His Criminal Case*, Bus. Insider, https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (July 26, 2023, 5:12 PM EDT).

[17] Avery Hartmans, *The Collapse of Crypto Firm FTX and Its Superstar Founder Explained for Those Who Know Nothing About Crypto*, Bus. Insider (Nov. 12, 2022, 6:45 AM EST) https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations=.

91.     By 2018, Bankman-Fried had persuaded Ellison to join him at Alameda. Ellison

described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know

what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions

of Alameda.

92.     In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team

at Alameda included Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh

and Gary Wang. Caroline Ellison was also part of the group and, upon moving to Hong Kong, the

group lived like college students and fiercely traded crypto.

93.     After Bankman-Fried established FTX in 2019, Ellison began taking more

responsibility at Alameda.

94.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco

after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance

between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's

expansion beyond its initial market-neutral, but relatively low-profit business as a market maker

for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread

detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized

finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and

unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the

company.[18]

95.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda

colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF

---

[18] Nelson Wang, *Co-CEO of Crypto Trading Firm Alameda Research Sam Trabucco Steps Down*, CoinDesk        https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (May 11, 2023, 1:43 PM EDT).

rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

96.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[19]

97.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### III.    *Gary Wang*

98.     Unlike his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. There is little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

99.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[20]

100.     Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on

---

[19] FTX Official, *FTX Podcast #36: Defi Summer Crypto Trading Strategy*, Youtube (Jan 22, 2021), https://web.archive.org/web/20221108225900/https://www.youtube.com/watch?v=zfcb9JAgWBs.

[20] *Raising the Bar*, FTX Blog, https://web.archive.org/web/20221109182910/https://blog.ftx.com/blog/raising-the-bar/     (last visited Nov. 9, 2022).

the Future Fund's website.[21] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

101.    The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

102.    It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[22]

103.    At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[23]

104.    In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### IV.    *Nishad Singh*

---

[21] *Who We Are*, FTX Future Fund, https://web.archive.org/web/20221109222441/https://ftxfuturefund.org/about/ (last visited Nov. 9, 2022).

[22] Keri McMahon & Vicky Ge Huang, *Here Are 10 of the Most Surprising Little-known Facts We Learned About the 29-Year-Old Crypto Billionaire Sam Bankman-Fried After Months Speaking to His Closest Friends, Family, and Colleagues*, Bus. Insider (Dec. 28, 2021, 4:00 AM CST), https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5.

[23] Sam Bankman-Fried (@SBF_FTX), Twitter (Apr. 5, 2022, 8:45 AM), https://twitter.com/SBF_FTX/status/1511324242612297738.

105.    Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

106.    Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

107.    He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[24]

108.    Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[25]

109.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

---

[24] Dave Michaels, Elaine Yu & Caitlin Ostroff, *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2:42 PM ET).

[25] FTX Official, *FTX Podcast: Crypto Engineer's Responsibilities*, YouTube (Dec. 23, 2020), https://web.archive.org/web/20221123034805/https://www.youtube.com/watch?app=desktop&v=rl0Rq2cUSIQ.

110.     Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

111.     After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

112.     "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[26] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

113.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[27] A similar relationship may be in place at FTX's core properties.[28]

114.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for

---

[26]*Raising the Bar*, FTX Blog, https://web.archive.org/web/20221109182910/https://blog.ftx.com/blog/raising-the-bar/     (last visited Nov. 9, 2022).

[27]Danny Nelson, *FTX Hack Sparks Revolution at Serum DEX as Solana Devs Plot Alameda's Ouster*, CoinDesk, https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (May 9, 2023, 12:02 AM EDT).

[28] Dave Michaels, Elaine Yu & Caitlin Ostroff, *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2:42 PM ET).

conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

115.    November 12, 2022, *The Wall Street Journal* reported that Bankman-Fried, Ellison, Wang, and Singh were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.

## C.    The Basics of a Cryptocurrency Exchange

116.    In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. There is a big difference, however, in regards to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

117.    More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

118.    The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

119.    If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

    **a)**  Trade it for another cryptocurrency

    **b)**  Trade it for fiat currency

    **c)**  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    **d)**  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

120.     The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

121.     One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

122.     For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."[29]*

---

[29]*FTX Terms of Service* (May 13, 2022),
https://web.archive.org/web/20221108192005/https://help.ftx.com/hc/article_attachments/97196 19779348/FTX_Terms_of_Service.pdf.

123.    While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

124.    With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

125.    While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

126.    The main functional differences between banks and cryptocurrency exchanges are such that exchanges are largely unregulated, and that exchanges (and by extension exchange

accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

127.    Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regard to the type of assets that they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

128.    Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

129.    Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

130. Due to the aforementioned reasons and risks surrounding the lack of regulation, as well as various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

131. The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

132. This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[30] often in spectacular fashion. The most common reasons for an exchange's failure include:

    a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency;

    b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency;

    c) A hack or theft by an external actor;

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange; or

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

---

[30] *See Exchange Graveyard*, Crypto Wisser, https://www.cryptowisser.com/exchange-graveyard/ (last visited Nov. 22, 2023).

133.    When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

134.    Suffice it to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.* FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they say it.

135.    This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[31] specifically, those investors will be made whole or almost whole due to sensible regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan.

---

[31] JP Koning, Opinion, *Japan Was the Safest Place to Be an FTX Customer*, Coindesk, https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/ (Sept. 28, 2023, 10:22 AM EDT).

### D.    The Mechanics of the Fraudulent Scheme

136.    The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

137.    With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

138.    Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

139.    Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

140.    Frequently, SBF routed his fraudulent scheme through Alameda, a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as

CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

141.    Until his scheme collapsed, SBF, along with several of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

142.    Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

143.    SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

144.    Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any

46

reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

145.     More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in

this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

146.    SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

147.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the

exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

148.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit, which Alameda used to invest $8 billion in risky startups and esoteric cryptocurrencies—highly illiquid investments purchased on credit from FTX, funded with Class Member assets. SBF also misappropriated Class Member funds to inflate the balance sheets of Alameda, which were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX and/or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using Class Member funds and to the benefit of Alameda, SBF manipulated the value of FTT by implementing a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third of FTX's revenue. By artificially increasing the value of FTT in this way, SBF increased the value of collateral available to Alameda, with which SBF was able to borrow billions of dollars from third party lenders in furtherance of his fraudulent scheme.

149.    Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of

those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

150. The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.

> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.

> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[32]

151.    *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[33]

152.    Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[34]

153.    FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and

---

[32] Transcript of Guilty Plea at 26–29, *United States v. Ellison*, No. 22-cr-673 (S.D.N.Y. Dec. 19, 2022), https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf.

[33] Dave Michaels, Elaine Yu & Caitlin Ostroff, *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2:42 PM ET).

[34] Jody Godoy & Luc Cohen, FTX's Singh Pleads Guilty As Pressure Mounts on Bankman-Fried, Reuters (Feb. 28, 2023, 4:42 PM EST), https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/.

using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

154.    FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

155.    FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

156.    At no time did FTX disclose the foregoing to Class Members, including that:

I.    SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

II.    FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

III.    FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

IV.    FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

V.       SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

VI.      SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

VII.     SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

VIII.    Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

IX.      With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

X.       FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

XI.      FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

157.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**E.       The Fraud's Collapse**

158.    The FTX.com exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is in Miami, Florida.[35]

---

[35] Cheyenne Ligon, *Crypto Exchange FTX Is Moving Its US Headquarters from Chicago to Miami*, CoinDesk (Sept. 27, 2022, 2:52 PM EDT), https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/.

159.  FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

160.  Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

161.  At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[36]

162.  Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

163.  Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked

---

[36] Avery Hartmans, *The Collapse of Crypto Firm FTX and Its Superstar Founder Explained for Those Who Know Nothing About Crypto*, Bus. Insider (Nov. 12, 2022, 6:45 AM EST), https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations=.

to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

164.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[37] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

165.    Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[38]

---

[37] *Id.*

[38] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Aug. 16, 2023, 5:56 PM EDT), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/.

166.    Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's

largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended

to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token

and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered a demand for $5 billion

in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT

plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday,

November 8, that Binance would buy FTX, effectively bailing it out.[39]

167.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a

critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm

sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings

during due diligence, as well as reports of mishandled customer funds and the possibility of a

federal investigation.[40]  In truth, there were always too many issues—issues with the

interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls,

issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even

further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[41] This triggered

panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

---

[39] *Zahra Tayeb, FTX Was Reportedly Hit with $6 Billion in Withdrawals in Just 72 Hours*, Bus.
Insider:    Markets    Insider    (Nov.    9,    2022,    5:05    AM    EST),
https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-
bankman-fried-binance-2022-11.

[40] Brian Evans, *FTX Faces Federal Probes on Handling of Client Funds as Asset Shortfall Could
Top $6 Billion, Report Says*, Bus. Insider: Markets Insider (Nov. 9, 2022, 1:56 PM EST),
https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-
shortfall-6-billion-2022-11.

[41] Samantha Delouya, *Thirty-Year Old Crypto Tycoon Sam Bankman-Fried Was Worth $16
Billion. 94% of That Was Wiped Out in Just One Day*, Bus. Insider: Markets Insider (Nov. 8, 2022,
8:04 PM EST),  https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-
wealth-wiped-out-2022-11.

168.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the

FTX Group went wrong:[42]



---

[42]    Sam    Bankman-Fried    (@SBF_FTX),    Twitter    (Nov.    10,    2022,    9:13    AM),
https://twitter.com/SBF_FTX/status/1590709189370081280 (last of linked tweets).

















SBF ✔ @SBF_FTX · Nov 10
11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87     ↻ 234     ♡ 2,625     ↥



SBF ✔ @SBF_FTX · Nov 10
12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102     ↻ 274     ♡ 3,007     ↥



SBF ✔ @SBF_FTX · Nov 10
13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

💬 180     ↻ 423     ♡ 4,122     ↥



SBF ✔ @SBF_FTX · Nov 10
14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129     ↻ 235     ♡ 2,502     ↥









SBF ✓ @SBF_FTX · Nov 10     ...
18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

💬 144     🔁 158     ♡ 1,970     ⬆



SBF ✓ @SBF_FTX · Nov 10     ...
19) A few other assorted comments:

This was about FTX International. FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid. Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406     🔁 760     ♡ 2,776     ⬆



SBF ✓ @SBF_FTX · Nov 10     ...
20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses. So for now, all I'll say is:

well played; you won.

💬 1,532     🔁 3,303     ♡ 8,047     ⬆



SBF ✓ @SBF_FTX · Nov 10     ...
21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent. I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908     🔁 1,055     ♡ 3,463     ⬆



## F.    FTX Files for Bankruptcy

169.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[43]

170.    At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[44]

171.    Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its

---

[43] Phil Rosen, *FTX Files for Bankruptcy and Sam Bankman-Fried Steps Down as CEO After Crypto Exchange Fails to Secure Bailout*, Bus. Insider (Nov. 11, 2022), https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11.

[44] Matt Levine, Opinion, *FTX's Balance Sheet Was Bad*, Bloomberg (Nov. 14, 2022, 1:09 PM EST), https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg.

liabilities."[45] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[46]

172.    The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

173.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

174.    The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars)

---

[45] Dave Michaels, Elaine Yu & Caitlin Ostroff, Alameda, *FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2022, 2:42 PM ET).

[46] *Id.*

into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

175. The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

*First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

*Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

*Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

*Fourth*, loans and other payments were made to insiders in excess of $1 billion.

*Fifth*, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

176. On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as **Exhibit C** (the "First Interim Rpt.").

177. Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among

others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

178.    After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

179.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX

Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

180.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

181.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

   **a)**    Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

   **b)**    Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

   **c)**    Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

**d)** Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

Id., 14;

**e)** "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

**f)** "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15;

**g)** the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

**h)** "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

68

i) "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17;

j) Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k) On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt

69

Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX Platform, *Id.,* 18–22; and finally

**l)** There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

182. Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

### G. Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct

183.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto

sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of

cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role

of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to

Digital Assets."[46] The report was issued pursuant to the March 9, 2022 Executive Order on

Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency

released by [47] dating back to 2018, all of which detail the dire harms caused by cryptocurrency.

The Department of Justice notes that "[t]he rise of the Bitcoin network paralleled the development

of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified

digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner

of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit

financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The

September report details several high-profile cases involving the illicit use of cryptocurrency. One

case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut

down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin,

equivalent to roughly $1.2 billion at the time.

184.    Cryptocurrency is increasingly being used by organized crime syndicates and

nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO)

issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and

---

[47] Press Release, *Justice Department Announces Report on Digital Assets and Launches Nationwide Network*, Dep't of Just. (Sept. 16, 2022), https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network.

drug trafficking."[48] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[49] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[50] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[51]

185. Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling

---

[48] *Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022]*, U.S. Gov't Accountability Off., https://www.gao.gov/products/gao-22-105462.

[49] Emily Flitter & David Yaffe-Bellany, *Russia Could Use Cryptocurrency to Blunt the Force of U.S. Sanctions*, N.Y. Times (Feb. 24, 2022), https://www.nytimes.com/2022/02/23/business/russia-sanctions-cryptocurrency.html, Kyle Barr, *Iran Plans to Use Crypto to Pay for Imports to Help Get Around Sanctions*, Gizmodo (Aug. 9, 2022), https://gizmodo.com/iran-crypto-imports-sanctions-1849389297, Mike Orcutt, *This is How North Korea Uses Cutting-Edge Crypto Money Laundering to Steal Millions*, MIT Tech. Rev. (Mar. 5, 2020), https://www.technologyreview.com/2020/03/05/916688/north-korean-hackers-cryptocurrency-money-laundering/.

[50] Christian Davies & Scott Chipolina, Fin. Times, *It's Not Juche if You Have to Steal—How North Korea Became a Mastermind of Crypto Cybercrime*, Ars Technica (Nov. 14, 2022, 11:15 AM), https://arstechnica.com/information-technology/2022/11/how-north-korea-became-a-mastermind-of-crypto-cyber-crime/.

[51] Id.

report on ransomware.[52] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[53]

186. Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[54] According to the September

---

[52] U.S. Senate Comm. on Homeland Sec. & Governmental Affs., *Use of Cryptocurrency in Ransomware Attacks, Available Data, and National Security Concerns* (May 25, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/HSGAC%20Majority%20Cryptocurrency%20Ransomware%20Report.pdf.

[53] Lee Reiners, Opinion, *Ban Cryptocurrency to Fight Ransomware*, Wall St. J. (May 25, 2021, 1:13 PM ET) https://www.wsj.com/articles/ban-cryptocurrency-to-fight-ransomware-11621962831.

[54] Press Release, *Justice Department Announces Report on Digital Assets and Launches Nationwide Network*, Dep't of Just.: Off. of Pub. Affairs (Sept. 16, 2022)

Department of Justice report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[55] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze – that's about one out of every four dollars reported lost, more than *any* other payment method."[56] The median individual loss was a staggering $2,600.

187.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[57]

188.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the

---

https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network.

[55] *Id.*

[56] Emma Fletcher, *Reports Show Scammers Cashing in on Crypto Craze*, FTC (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

[57] U.S. Dep't of the Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* (Sept. 2022), https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf.

time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[58]

189.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[59] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

190.    For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring Defendants, exploited their vulnerability for tremendous financial gain. Now, while SBF rests

---

[58] Becky Yerak, *What to Watch in the FTX Bankruptcy as Details Remain Scarce*, Wall St. J. (Nov. 14, 2022, 8:33 PM ET), https://www.wsj.com/articles/what-to-watch-in-the-ftx-bankruptcy-as-details-remain-scarce-11668475992?page=1.

[59] Michelle Faverio & Navid Massarat, *46% of Americans who have invested in cryptocurrency say it's done worse than expected*, Pew Rsch. Ctr. (Aug. 23, 2022), https://www.pewresearch.org/short-reads/2022/08/23/46-of-americans-who-have-invested-in-cryptocurrency-say-its-done-worse-than-expected/.

comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

## H. The SEC's Approach to Cryptocurrency.

### I. Overview

191. Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

192. Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." *In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,"* and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment."[60]

---

[60] *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (emphasis added) (citations omitted).

193.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> "We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

194.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[61] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[62] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

195.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing

---

[61] *SEC v. Howey Co.*, 328 U.S. 293 (1946).

[62] Id.

in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[63]

196.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[64] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[65] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[66]

---

[63] SEC, Pub. No. 153, *Investor Alert: Ponzi Schemes Using Virtual Currencies* (July 2013), https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.

[64] SEC, *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, Investor.gov (May 7, 2014), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39.

[65] SEC, Release No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017), https://www.sec.gov/files/litigation/investreport/34-81207.pdf.

[66] *Id.* at 1–2.

197.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[67]

198.    In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[68] multiple speeches,[69] Congressional testimony,[70] and several official SEC statements[71] and proclamations.[72] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[73] warning that their failure to register with the SEC may violate U.S. securities laws.[74] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of

---

[67] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Mar. 8, 2023), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[68] *Crypto Assets and Cyber Enforcement Actions*, SEC (Nov. 21, 2023), https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

[69] Gary Gensler, Chair, SEC, *Remarks Before the Aspen Security Forum*, SEC (Aug. 3, 2021), https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03.

[70] Gary Gensler, Chair, SEC, *Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee*, SEC (May 26, 2021), https://www.sec.gov/news/testimony/gensler-2021-05-26.

[71] Jay Clayton, Chairman, SEC, *Statement on Cryptocurrencies and Initial Coin Offerings*, SEC (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[72] Divisions of Enforcement and Trading and Markets, *Statement on Potentially Unlawful Online Platforms for Trading Digital Assets*, SEC (Mar. 7, 2018), https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading.

[73] Michael McSweeney, *Gensler sets SEC sights on DeFi, crypto lending and more in expansive speech on regulation*, The Block (Aug. 3, 2021, 1:08 PM EDT), https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec.

[74] Ben Werschkul, *Crypto Platforms that Don't Register With the SEC Do Business 'Outside the Law': Gensler*, Yahoo! Finance (Mar. 4, 2022), https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html.

whether they're registered or they're operating outside of the law and I'll leave it at that."[75]

199.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[76] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[77] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[78]

200.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[79]

201.    What follows are summaries of seven cases that will help inform this litigation.

---

[75] Michael McSweeney, *Gensler sets SEC sights on DeFi, crypto lending and more in expansive speech on regulation*, The Block (Aug. 3, 2021, 1:08 PM EDT), https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec.

[76] Gary Gensler, Chair, SEC, *Kennedy and Crypto*, SEC (Sept. 8, 2022) https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

[77] *Id.*

[78] *Id.*

[79] *See* Simona Mola, Cornerstone Research, *SEC Cryptocurrency Enforcement: 2021 Update*, https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2021-Update.pdf.

## II. SEC v. KIK

202.    In Kik[80], the SEC's complaint[81], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[82]

203.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

## III. SEC v. Telegram

204.    In Telegram,[83] the SEC filed a complaint[84] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from

---

[80] Press Release, *SEC Obtains Final Judgment Against Kik Interactive For Unregistered Offering*, SEC (Oct. 21, 2020), https://www.sec.gov/news/press-release/2020-262.

[81] Press Release, *SEC Charges Issuer With Conducting $100 Million Unregistered ICO*, SEC (June 4, 2019), https://www.sec.gov/news/press-release/2019-87.

[82] Aziz Abdel-Qader, *SEC Seeks to Block Kik Subpoenas, Refutes "Void for Vagueness" Claim*, Fin. Magnates (Oct. 29, 2019, 22:35 GMT), https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/.

[83] Press Release, *Telegram to Return $1.2 Billion to Investors and Pay $18.5 Million Penalty to Settle SEC Charges*, SEC (June 26, 2020), https://www.sec.gov/news/press-release/2020-146.

[84] Press Release, *SEC Halts Alleged $1.7 Billion Unregistered Digital Token Offering*, SEC (Oct. 11, 2019), https://www.sec.gov/news/press-release/2019-212.

delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

205.    Telegram argued[85] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

206.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[86] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

207.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

---

[85] Rachel McIntosh, *SEC vs. Telegram: Will Gram Tokens Ever Be Distributed?*, Fin. Magnates (Oct. 10, 2019, 7:11 GMT), https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/.

[86] *SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement?*, Greenberg Traurig (Apr. 1, 2020), https://www.gtlaw.com/en/insights/2020/4/sec-v-telegram--a-groundbreaking-decision-in-cryptocurrency-enforcement.

## IV. SEC v. BlockFi

208.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 14, 2022, the SEC charged BlockFi [87] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

209.    BlockFi argued for "increased regulatory clarity" but lost.[88]

210.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### SEC Wells Notice to Coinbase

211.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[89] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a Wells Notice, informing Coinbase of their intention to seek approval from the

---

[87] Press Release, BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product, SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

[88] *A Letter from Our Founders: Pioneering a Path Forward to Regulatory Clarity*, BlockFi (Feb. 14, 2022), https://web.archive.org/web/20221111035031/https://blockfi.com/pioneering-regulatory-clarity.

[89] Paul Grewal, *The SEC Has Told Us It Wants to Sue Us Over Lend. We Don't Know Why.*, Coinbase (Sept. 7, 2021), https://www.coinbase.com/blog/the-sec-has-told-us-it-wants-to-sue-us-over-lend-we-have-no-idea-why.

SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

212.    According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[90]

213.    The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

214.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

215.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

216.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially

---

[90] Id.

developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

217.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

218.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

219.    Given the clear facts of the case, Coinbase decided to cancel the Lend program.[91]

---

[91] *See* Mitchell Clark, *Coinbase Cancels Lend Program Launch After SEC Fight / The Company Says It's Still Looking for "Regulatory Clarity"*, Verge (Sept. 20, 2021, 2:38 PM EDT),

### SEC v. Binance

220.    In Binance, the SEC filed a complaint[92] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Changpeng Zhao. The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

### SEC v. Coinbase

221.    In Coinbase, the SEC filed a complaint[93] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware

---

https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats.

[92] Complaint, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. June 5, 2023), ECF No. 1, https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.

[93] Complaint, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. June 6, 2023), ECF No. 1, https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.

of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[94]

### 222. **SEC v. Terraform Labs Pte. Ltd.**

223. In one of the most recent developments in the crypto space, on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346, 2023 WL 4858299 (S.D.N.Y. July 31, 2023).

224. This is a significant ruling for several reasons.

225. First, it supports the fact that YBAs and FTT are unregistered securities.

226. Second, Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc.*, No. 20 CIV. 10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023), *motion to certify appeal denied*, No. 20 CIV. 10832, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.

227. Third, Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge

---

[94] Press Release, *SEC Charges Coinbase for Operating as an Unregistered Securities Exchange, Broker, and Clearing Agency*, SEC (June 6, 2023), https://www.sec.gov/news/press-release/2023-102.

Rakoff, in a *Financial Times* article, the "[T]he most respected securities authority in the federal judiciary."[95]

228.    The relevant points of comparison in Judge Rakoff's decision to the FTX MDL are his analysis around the Luna token and UST stablecoin, which bear similarities to the FTT token and YBAs, respectively.

229.    With respect to the Luna token, Judge Rakoff found that a common enterprise and expectation of profit existed because Terraform labs used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that that these improvements would increase the value of the Luna tokens. This is similar to the FTT token, which was an exchange token. Given FTT's features, it was clearly designed to go up in value as the FTX platform grew and became more popular with crypto traders. In fact, in their complaint alleging, amongst other things, that FTT is an unregistered security, the SEC states:

> FTX used the pooled proceeds from FTT sales to fund the development, marketing, business operations, and growth of FTX, depending on the success of FTX and its management team in developing, operating, and marketing the trading platform. If demand for trading on the FTX platform increased, demand for the FTT token could increase, such that any price increase in FTT would benefit holders of FTT equally and in direct proportion to their FTT holdings. The large allocation of tokens to FTX incentivized the FTX management team to take steps to attract more users onto the trading platform and, therefore, increase demand for, and increase the trading price of, the FTT token.[96]

The SEC makes a similar allegation with respect to Luna in the Terraform Labs action and Judge Rakoff sides with the SEC. From his decision:

> The SEC's theory for horizontal commonality as to these other coins, however, rests on a different but equally plausible theory. As to the LUNA tokens, for instance, the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from

---

[95]    Todd    Baker,    *Crypto    Got    Rakoff'd,    Fin.    Times*    (Aug.    3,    2023), https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880.

[96]    Complaint ¶ 79, *SEC v. Ellison*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022), ECF No. 1, https://www.sec.gov/files/litigation/complaints/2022/comp-pr2022-234.pdf.

LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves. See Amended Complaint ¶¶ 46-47, 49-51. In other words, by alleging that the defendants "pooled" the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise.[97]

Also, of relevance to the FTX MDL and to this case is Judge Rakoff's conclusion that the algorithmic stablecoin, UST, also met the *Howey* standard for investment contracts. Note that this is the first time the SEC has alleged that a stablecoin is an investment contract, and the SEC's reasons for making this allegation also support the assertion that YBAs are securities.

While UST, like most stablecoins, was supposed to be tied one-for-one to the US dollar, Terraform and Kwon marketed "UST coins as profitable investment opportunities—as opposed to just stable stores of value—in meetings with U.S. investors, investment conferences in major U.S. cities, and on social media platforms."[98]

Then, in 2021, Terraform launched the "Anchor Protocol" which was an "investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated."

Judge Rakoff found that "the fact that most of the UST coins were deposited in the Anchor Protocol independently rendered these tokens investment contracts, indeed investments that were touted as being capable of being able to generate future profits of as much as 20%."[99] Judge Rakoff goes on to say:

In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol—in other words, on a pro-rata basis."[100]

---

[97] *SEC v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346, 2023 WL 4858299, at *13 (S.D.N.Y. July 31, 2023).

[98] *Id.* at *2.

[99] *Id.* at *12.

[100] *Id.* at *13.

This closely resembles the facts surrounding YBAs and Judge Rakoff's finding that UST met the requirements for an investment contract supports the conclusion that YBAs are also unregistered securities.

Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the *Ripple* decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[101]

Judge Rakoff goes on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[102]

While noting that "in theory, the tokens, if taken by themselves, might not qualify as investment contracts," Judge Rakoff evaluated—"as the Supreme Court did in *Howey*—whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."[103]

Judge Rakoff's rejection of the *Ripple* decision's secondary market distinction and fulsome *Howey* analysis support Plaintiffs' assertion that FTT and YBAs are unregistered securities. FTT purchasers, on the FTX Platform or elsewhere, did not necessarily know who the seller was. But, as Judge Rakoff explains, knowledge of the seller's identity is not necessary to prove that purchasers expected profits based on the efforts of FTX, who is the ***issuer*** of these assets, and not simply a platform where the assets traded.

---

[101] *Id.* at *15.

[102] *Id.*

[103] *Id.* at *12.

## I. FTX's offer and sale of YBAs, which are unregistered securities.

230.     Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

231.     The details of the Earn program are still listed on the FTX website,[104] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[105]

232.     Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[106]

233.     On the same webpage, the company also states:

The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[107]

---

[104]    FTX Crypto Derivatives Exchange, FTX App Earn, FTX, https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn.

[105] Supplemental Declaration to the Texas State Securities Board's and the Texas Department of Banking's Limited Objection to the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief, *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (Bankr. S.D.N.Y. Oct. 14, 2022), ECF No. 536, https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf.

[106]    FTX Crypto Derivatives Exchange, *FTX App Earn*, FTX, https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn.

[107] *Id.*

91

234.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

235.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[108] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[109]

236.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might

---

[108] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

[109] *See, e.g.*, *What is Staking?*, Coinbase, https://www.coinbase.com/learn/crypto-basics/what-is-staking (last visited Nov. 22, 2023); Mensholong Lepcha, *Slashing*, Techopedia (Nov. 2, 2023), https://www.techopedia.com/definition/slashing; Blocknative, *A Staker's Guide to Ethereum Slashing & Other Penalties*, Blocknative (Oct. 1, 2022), https://www.blocknative.com/blog/an-ethereum-stakers-guide-to-slashing-other-penalties.

pass" the *Howey* Test.[110] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[111]

237.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

238.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

---

[110] Paul Kiernan & Vicky Ge Huang, Ether's New 'Staking' Model Could Draw SEC Attention, Wall St. J. (Sept. 15, 2022, 6:07 PM ET), https://www.wsj.com/articles/ethers-new-staking-model-could-draw-sec-attention-11663266224.

[111] *Id.*

From a securities perspective, the *Howey* Test defines an investment contract as:

    a.  An investment of money

        i.  Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

    b.  In a common enterprise

        i.  FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

    c.  With the expectation of profit

        i.  FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[112]

    d.  To be derived from the efforts of others

        i.  The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which

---

[112] FTX Crypto Derivatives Exchange, *FTX App Earn*, FTX, https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/1057345824532-FTX-App-Earn.

                                      they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

        ii.    The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

239.    The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[113] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[114]

240.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

---

[113] *Id.*

[114] Press Release, *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product*, SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

241.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

242.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[115] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application

---

[115] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still showed the application as developed by Blockfolio.

tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled How do you calculate APY? Does my balance compound daily? that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers

that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled Location Restrictions published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> FTX does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea. FTX also does not onboard corporate accounts located in or a resident of Antigua or Barbuda. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

> FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

> FTX serves all Japanese residents via FTX Japan.

> (emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material

facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda
By: Joseph Jason Rotunda

**J. FTX's Offer and Sale of FTT Tokens, Which Are Unregistered Securities.**

243.     The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee

100

discounts, rebates and early access to token sales held on the platform . . . ."[116] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[117]

244.    FTT passes the *Howey* Test because the token was controlled by FTX (the company could create or destroy it at will) and because its value was based upon the success of FTX, which was dependant on the "efforts" of others besides the investors. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[118]

### K. Using the FTX Platform Itself Necessarily Required Transacting in Unregistered Securities.

245.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the FTX Platform.

---

[116] Robert Stevens, *What Is an Exchange Token?*, Coindesk (Nov. 9, 2022, 12:19 PM EST) https://www.coindesk.com/learn/what-is-an-exchange-token/.

[117] *See FTX Token FTT*, CoinMarketCap, https://coinmarketcap.com/currencies/ftx-token/ (last accessed Nov. 21, 2023) (showing FTT price history).

[118] Harrison Miller, *Binance Passes on FTX Takeover, Bitcoin Rebounds on CPI Data*, Investor's Business Daily (Nov. 10, 2022), https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/.

246.     Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

247.     When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

248.     Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not), with best practice being for exchanges to hold the majority of cryptocurrency they are holding on behalf of customers in multiple cold wallets. Best practices would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

249.     According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption

of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[119]

250.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[120] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[121] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[122]

---

[119] Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ¶¶ 65–66, *In re FTX Trading LTD*, No. 22-11068, (Bankr. D. Del. Nov. 17, 2022), ECF No. 24, https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf.

[120] *Id.* ¶ 18.

[121] *Id.* ¶ 19.

[122] *Id.* ¶ 38.

251. To further complicate matters, statements given by Sam Bankman-Fried to the Wall Street Journal ("WSJ") last year suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[123] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that "[o]ver time, FTX customers deposited more than $5 billion in those Alameda accounts . . . ."[124] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions"—and that "[s]uch double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[125]

252. The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[126] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned crypto asset—although some have suggested that the loans were made for free.[127] Alameda could then

---

[123] Alexander Osipovich, *FTX Founder Sam Bankman-Fried Says He Can't Account for Billions Sent to Alameda*, Wall St. J. (Dec. 3, 2022, 5:47 PM ET), https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink.

[124] *Id.*

[125] *Id.*

[126] Molly White, *The FTX Collapse: The Latest Revelations (Part Three)*, [citation needed]: The FTX Files (Nov. 18, 2022), https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations.

[127] Paige Tortorelli & Kate Rooney, *Sam Bankman-Fried's Alameda Quietly Used FTX Customer Funds for Trading, Say Sources*, CNBC, https://www.cnbc.com/2022/11/13/sam-bankman-frieds-

use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[128]

253.    It appears that Alameda did post collateral to secure the loans of customer crypto assets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

254.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens. (It is possible that it received these in a kind of bailout from FTX.) Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[129] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

---

alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (Nov. 14, 2022, 8:08 AM EST).

[128] For a more general discussion of the conflicts of interest inherent in these relationships, *see* Frances Coppola, *The FTX-Alameda Nexus*, Coppola Comment (Nov. 10, 2022), https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html.

[129] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk, https://www.coindesk.com/business/2022/11/02/divisions-

## L. FTX Aggressively and Deceptively Marketed its Platform

255.     These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency. These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

256.     FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

257.     FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' For example:

> In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatantly stated when he claims,

> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

> Kevin O'Leary, another FTX brand ambassador, stated,

> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

> Given that FTX continually misappropriated customer assets and didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

---

in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/   (Aug. 16, 2023, 5:56 PM EDT).

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Sharks make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

> *"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[:] Sam Bankman-Fried is an American. His parents are American compliance lawyers. There were no other [large] American exchanges to invest in if you wanted to invest in crypto as an infrastructure play."[130]*

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

258.    Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced,

---

[130] *Kevin O'Leary Says FTX Collapse Makes Him and Other Investors in the Crypto Exchange 'Look Like Idiots'*, Daily Hodl (Dec. 9, 2022), https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/.

unsophisticated and potentially compromised individuals, this situation is unprecedented."[131]

259.    Mr. Ray's pleading contains a number of troubling findings, among them, (1) FTX did not have centralized control of its cash; (2) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group; (3) there was a lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis; (4) corporate funds were used to purchase homes and personal items for employees, and; (5) there was a lack of books and records and an absence of lasting records of decision-making.

260.    It is hard to imagine that anyone who did business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

261.    Furthermore, many customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

262.    Thus, celebrities like Mercedes F1 have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

---

[131] Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ¶¶ 5, In re FTX Trading LTD, No. 22-11068, (Bankr. D. Del. Nov. 17, 2022), ECF No. 24, https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf.

263. In addition to the conduct of Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

264. In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

265. FTX's explanation for using stars like Tom Brady and Gisele Bunchden and sports teams like Merecdes F1 was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken . . . . We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that . . . ."[132]

266. In other words, the FTX Group needed celebrities and well known sports teams like Mercedes F1 to continue funneling investors into the FTX Ponzi scheme and to promote and substantially assist in the sale of unregistered securities, including the YBAs. Below are representative statements and advertisements Mercedes F1 made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

---

[132] Megan Graham, *Tom Brady and Gisele Bündchen to Star in $20 Million Campaign for Crypto Exchange*, Wall St. J. (Sept. 8, 2021, 12:00 PM ET), https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline.

267.     The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, including by all of the defendants in the FTX MDL, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

268. On or around September 10, 2021, FTX tweeted out a list of its promoters who were part of the "You In?" campaign, asking its audience whether they are "in" as well.



**M.** **The Defendants' Roles in the Fraud**

269. Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

### i. <u>The Major League Baseball Defendants</u>



270.    Major League Baseball is a professional baseball organization based in New York, New York. As the oldest major professional sports league in the entire world, the MLB comprises thirty teams: there are twenty-nine teams in the United States and one team in Canada.[133]

### a.    **The MLB Partnered with FTX to Promote Its Platform.**

271.    It is no secret that "[s]ports are perfect vehicles for sponsorships due to their high visibility and diversified global audience. As long as fans keep watching and the checks keep clearing, sports will play an outsized role in the world of marketing."[134] It is, thus, no surprise that FTX formed partnerships with many sports organizations, including the MLB.

272.    On or around June 23, 2021, the MLB and FTX announced a five-year partnership deal, notably boasted as "the first-ever partnership between a professional sports league and a

---

[133] https://www.mlb.com/official-information/about-mlb (accessed Nov. 10, 2023).
[134]                                                        https://www.patreon.com/posts/unlocked-in-play-74573732?utm_medium=clipboard_copy&utm_source=copyLink&utm_campaign=postshare_creator (accessed Nov. 11, 2023).

cryptocurrency exchange."[135] The partnership granted FTX "worldwide marketing rights associated with MLB marks, logos and special events," allowing the deceptive platform to be "promoted during nationally televised games, as well as on MLB.com, MLB Network, MLB.TV and the league's social media platforms."[136]



273.    Reactions to the announcement were positive with many, including CFTC Commissioner Dan Berkowitz, lauding MLB and FTX's partnership.[137]

---

[135] https://www.mlb.com/news/mlb-ftx-cryptocurrency-exchange-partnership (accessed Nov. 10, 2023).
[136] *Id.*
[137]        https://protectpublictrust.org/wp-content/uploads/2022/12/23-00051-FOIA-Records-for-Release.pdf (accessed Nov. 11, 2023).

On October 14, 2021, 3:14 PM EDT dberkovitz@cftc.gov wrote:

Ryne,
Thank you for the update and links.
I was watching the Dodgers v. Giants the other night and saw that FTX is the Official Cryptocurrency Exchange of Major League Baseball (I gather this is not news). I'm not sure why MLB needs to have a cryptocurrency exchange, but glad to see that it has one that supports regulation!
Best,
Dan

Dan M. Berkovitz | Commissioner
U.S. Commodity Futures Trading Commission
Three Lafayette Centre  1155 21st Street, NW    Washington, DC 20581
T  (202) 418-5050 | F  (202) 418-5837
Email: dberkovitz@cftc.gov





274.   To kick off the partnership, the MLB and FTX collaborated to host the "MLB Moon Blasts Pick 'Em" contest, which "offered $50,000 worth of Bitcoin to be deposited into the winner's FTX account."[138] This past season, the MLB hosted a similar contest with FTX, this time doubling the grand prize to $100,000 in crypto.[139]

---

[138]      https://www.sportsbusinessjournal.com/Daily/Issues/2022/11/17/Technology/mlb-ftx-cryptocurrency-sports-partnerships-legal-counsel-bankruptcy.aspx (accessed Nov. 10, 2023).
[139] *Id.*

275.    An important feature of FTX's partnership with the MLB was the addition of FTX's logo on umpire uniforms worn by the officials at every baseball game.[140]

276.    The MLB zealously promoted FTX across the United States, including Florida. FTX branding was promulgated "across nationally televised MLB games, MLB.com, MLB Network, MLB.TV, social media platforms, and, according to the league's press release, 'more high-impact baseball media.'"[141]

277.    FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and promotors was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

278.    Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from our Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with the MLB.

279.    On information and belief, the negotiation and execution of the MLB agreement with FTX involved communications between the MLB and Mr. Dabir in FTX's offices in Miami. On information in belief, the MLB understood the counterparty to the contractual negotiations based its domestic operations in Florida.

      **b.  MLB Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

280.    MLB and FTX launched a partnership designed to bring cryptocurrency and investing in the Deceptive FTX Platform, including YBAs and/or FTT, to the masses of MLB fans across the country and world.

---

[140]        https://www.sportspromedia.com/news/mlb-ftx-cryptocurrency-sponsorship-first/?zephr_sso_ott=A7yKr8 (last accessed Nov. 10, 2023).

[141]        https://www.forbes.com/sites/maurybrown/2022/12/28/mlb-will-drop-ftx-patches-for-umpires-in-2023-but-partnership-dilemma-remains/?sh=f377e4d6ad5b (accessed Nov. 10, 2023).

281.     At the outset of the partnership, Bankman-Fried said, "[i]t's an honor for FTX to be the first cryptocurrency exchange to be associated with the history and tradition of America's national pastime. FTX.COM and FTX.US are excited to enter this first-of-its-kind partnership with Major League Baseball. At FTX, we strive each day to make a positive global impact, and there is no better partner for us to achieve this with [the] MLB and its **international fan base**."[142]

282.     In announcing the partnership between the MLB and FTX, Bankman-Fried Tweeted that "FTX is now the official crypto sponsor of Major League Baseball." Employing the word "official" signals that the deal was legitimate and knowingly and carefully executed to spread the deceptive platform's falsities. Bankman-Fried further stated that FTX and MLB have plans on "collaborating on products and experiences together."



---

[142]     https://paymentexpert.com/2021/06/24/ftx-seals-first-sports-league-sponsorship-tie-up-with-mlb/ (accessed Nov. 10, 2023) (emphasis added).

283. The partnership between the MLB and FTX has been recognized as "one of the crypto exchange's most publicly visible sponsorships to date," with the sole purpose of signaling to the world that FTX was safe for all investors. It is indisputable that through this partnership, the MLB endorsed and encouraged investors throughout the country and world to use the deceptive platform.[143]



284. FTX used its access to "worldwide marketing rights associated with MLB marks, logos and special events" to advertise itself in a number of ways across MLB's platforms, including social media posts and give-away contests, such as the "MLB Moon Blasts Pick 'Em" contest.[144]

---

[143] https://www.coindesk.com/business/2022/11/17/mlb-commissioner-its-a-pretty-good-bet-ftx-patches-wont-be-on-umpires-next-season/ (accessed Nov. 11, 2023)
[144] Id.





285. In addition to the "MLB Moon Blasts Pick 'Em" contest, FTX sponsored the MLB's Home Run Derby X in London in July 2022 and in Mexico in October 2022, both of which were streamed online and are still available to watch on MLB's website.[145]

---

[145] https://www.mlb.com/video/live-ftx-mlb-home-run-derby-x-23571 (accessed Nov. 11, 2023); https://www.mlb.com/video/ftx-mlb-home-run-derby-x-44163 (accessed Nov. 11, 2023).



286. MLB also partnered with FTX to advertise and sell physical merchandise. For example, the MLB released and sold koozies, boasting the partnership between the centerpiece of one of America's favorite pastimes and the most egregious, deceptive platform in United States history.



287.    The partnership also included an agreement between FTX.US and the MLB Players Association that gave FTX rights to use footage of player highlights in its advertising and other content creation.[146]

288.    The centerpiece, and most important feature, of the partnership, however, was the inclusion of FTX.US patches on all MLB umpire uniforms. The FTX.US patches marked the first time in the history of MLB, which dates back to the 1800s, that a sponsor brand has had its logo appear on umpire uniforms.[147]

---

[146]    https://paymentexpert.com/2021/06/24/ftx-seals-first-sports-league-sponsorship-tie-up-with-mlb/ (accessed Nov. 11, 2023).

[147]    https://www.sportsbusinessjournal.com/Daily/Issues/2022/11/17/Technology/mlb-ftx-cryptocurrency-sports-partnerships-legal-counsel-bankruptcy.aspx (accessed Nov. 11, 2023).



289.   Beginning at the 2021 All-Star Game in Denver, and lasting through the 2022 season, these advertisements could be seen not just by fans attending games in stadiums but also globally by viewers of the game broadcasts.







290.    The purpose of the umpire patch was plain: signal to the world that FTX was safe

and trustworthy, making it the "natural choice to be the 'umpires of the crypto industry.'"[148]

| Message | |
| --- | --- |
| **From**: | Sam Bankman-Fried [sam@ftx.us] |
| **Sent**: | 10/14/2021 8:31:50 PM |
| **To**: | Berkovitz, Dan (b)(7)(E)<br>(b)(7)(E) |
| **CC**: | 'Zach Dexter' [zach@ledgerx.com]; 'Mark Wetjen' (b)(6)                    ; 'Brett Harrison' [brett@ftx.us] |
| **Subject**: | [EXTERNAL] Re: FTX policy blog; FTX US closes acquisition of LedgerX (CFTC registered exchange) |

**CAUTION**: This email originated from outside of CFTC. DO NOT click links or open attachments unless you recognize and/or trust the sender. If you believe this is SPAM simply block sender and delete the email. If you suspect this to be a phishing attempt, please use the "Report Phishing" button on your Outlook menu bar.

_____

We are the natural choice to be the 'umpires of the crypto industry'

—
Sam Bankman-Fried

---

148      https://protectpublictrust.org/wp-content/uploads/2022/12/23-00051-FOIA-Records-for-Release.pdf (accessed Nov. 11, 2023).



291.     Hindsight, of course, is 20-20, and since FTX's collapse, many have commented that FTX's umpire patches were a red flag from the start, given the umpire's reputation of corruption.



292.     As the MLB expected and understood when entering its partnership with FTX, the team's promotions would be widely viewed nationwide, including in Florida, where the MLB knew or should have known FTX had its domestic home office. Additionally, the MLB knew that Florida's baseball fans and at-home viewers would watch two MLB teams compete: the Miami Marlins and the Tampa Bay Rays.

293.     On information and belief, the MLB also knew and anticipated that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

294.     Last but not least, the MLB has entered into questionable deals in the past, tending to "mak[e] deals now and ask[] questions later."[149] One such deal was MLB's partnership with Distill Brands International (DBI), where "it might strike some as puzzling that an unknown spirits brand that's seemingly never reached the consumer marketplace has become the **official** vodka of the MLB."[150]

> **c.  The MLB Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

295.     As an international rights partner of FTX, the MLB had a financial incentive to induce Plaintiffs to invest with FTX. The MLB had every incentive to be an effective promoter of

---

[149]                    https://www.patreon.com/posts/unlocked-in-play-74573732?utm_medium=clipboard_copy&utm_source=copyLink&utm_campaign=postshare_creator (accessed Nov. 10, 2023).
[150] https://vinepair.com/articles/major-league-baseball-official-vodka/ (emphasis added) (accessed Nov. 10, 2023).

FTX to continue the partnership relationship and, as expressly stated by the MLB's Chief Revenue Officer Noah Garden, to "allow the league to adopt new technology and engage with fans."[151]

### d. The Promotions Were Deceptive and Unlawful.

296.    The MLB did not disclose that they were being compensated by FTX for promoting the sale of unregistered FTX securities.

### e. The MLB Knew or Should Have Known They Were Soliciting Or Assisting FTX Solicit Investments In Unregistered Securities and/or that they were aiding and abetting FTX Group's Fraud and/or Conversion.

297.    While negotiating with FTX, the MLB was on notice of the potential legal compliance risks associated with the promotion and partnership.

298.    To ensure regulatory compliance, at a minimum, the MLB must have conducted due diligence to understand how FTX was pooling investments in a common enterprise and using those assets to generate the promised returns. Otherwise, it would be impossible to ensure FTX was not selling or offering to sell securities or perpetrating fraud or conversion on its customers. The MLB disregarded their obligations to themselves and their fans and went for the money instead.

### f. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

299.    The partnership between the MLB and FTX included in arena and virtual FTX signage at MLB games, as well as national promotions through the media and social media. On information and belief, the MLB knew and intended these promotions would reach people in Florida and nationwide, including because they were displayed at games among and against Florida MLB teams, which were covered by Florida media.

---

[151]    https://cryptopotato.com/after-the-miami-heat-ftx-partners-with-major-league-baseball-mlb/ (accessed Nov. 10, 2023).

300.     The MLB provided promotional services while hosting MLB games in Florida every year. The broadcasts of these games, with a viewership heavily skewed to Florida, included promotions of FTX.

301.     On or about July 9, 2022, the MLB and FTX held the "FTX MLB Home Run Derby," where FTX's logo was promoted on a widely-visible banner.





FTX MLB Home Run Derby X

July 9, 2022 | 04:41:29

302.    The annual MLB Home Run Derby is often one of the most viewed baseball games of the year. With two MLB teams being based in Florida, fans of Florida teams were likely to tune in to the FTX MLB Home Run Derby. Therefore, the MLB knew and intended to benefit from the attention and viewership of Florida residents whenever they hosted the annual Home Run Derby while partnered with the deceptive platform.

**N.    Material Ties to Florida**

303.    The Defendants operate, conduct and engage in business in Florida including but not limited operations and activities within the state where they not only host spring training for many of the MLB teams but also regular season games, contractual relationships with various businesses within the state, relations with two MLB members which are based in the state (the Miami Marlins and Tampa Bay Rays) as well as the MLB/FTX deal, which was consummated in Miami, Florida.

304.    In addition, according to the Declaration of Dan Friedberg, attached as Exhibit A, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced the move of its Domestic headquarters to Brickell in late 2022. *Id.* ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

305.    Mr. Dabir, from the Miami office, focused on formulating and executing FTX's important celebrity partnerships. *Id.* ¶ 21. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom

Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.* ¶ 23.

306.    It was Mr. Dabir's idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.* ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and acquire the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, which included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

307.    Mr. Dabir deserves much of the credit for the collaboration with Mr. David that resulted in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.* ¶ 24. Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

308.    Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast The Joe Pomp Show, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as Exhibit B.

309.    Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX

Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.* at 2–3.

310.    Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.* at 4.

311.    Mr. Dabir went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.* at 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explained that MDL Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as MDL Defendant Curry. *Id.*

312.    In addition to coordinating the promoter campaigns from Miami, Florida, FTX announced it was moving its official U.S. headquarters from Chicago to Miami in 2022.[152] This move happened before FTX declared bankruptcy.

313.    The promotional campaigns came from the brain trust of FTX in Miami, but many of the promotions also took place in Florida as a cryptocurrency hub.

---

[152] Cheyenne Ligon, *Crypto Exchange FTX Is Moving Its US Headquarters From Chicago to Miami*, Coindesk (May 11, 2023, 2:51 PM EDT), https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/.

## CLASS ACTION ALLEGATIONS

314.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

315.    Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Classes:

> **(1)** **International Class:** All persons or entities residing outside the
> United States who, within the applicable limitations period,
> purchased or held legal title to and/or beneficial interest in any
> fiat or cryptocurrency deposited or invested through an FTX
> Platform, purchased or enrolled in a YBA, or purchased FTT.
>
> **(1)** **Nationwide Class:** All persons or entities in the United States
> who, within the applicable limitations period, purchased or held
> legal title to and/or beneficial interest in any fiat or
> cryptocurrency deposited or invested through an FTX Platform,
> purchased or enrolled in a YBA, or purchased FTT.

Excluded from the Classes are the Defendants and their officers, directors, affiliates, legal representatives, and employees; the MDL Defendants[153] and their officers, directors, affiliates, legal representatives, and employees; the FTX Group and their officers, directors, affiliates, legal

---

[153] The MDL Defendants collectively refers to all Defendants named in the case captioned In Re FTX Cryptocurrency Exchange Collapse Litigation, Case No. 1:23-md-03076-KMM.

representatives, and employees; any governmental entities, any judge, justice, or judicial officers presiding over this matter and members of their immediate family and judicial staff.

316.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.    Numerosity**

317.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

**C.    Commonality/Predominance**

318.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

    (a) whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b) whether the Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c) whether the Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d) whether the FTX Platform, YBAs and/or FTT were unregistered securities under federal, Florida, California, or other law;

(e) whether Defendants' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law;

(f) the type and measure of damages suffered by Plaintiffs and the Class;

(g) whether Defendants' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes;

(h) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(i) whether Plaintiffs and Class members are entitled to injunctive relief;

(j) whether Plaintiffs and Class members are entitled to declaratory relief; and

(k) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.     Typicality**

319.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's FTX Platform, YBAs and/or FTT because

of Defendants' actions and/or participation in the offering and sale of these unregistered securities, that Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

### E.     Adequacy of Representation

320.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.     Requirements of Fed. R. Civ. P. 23(b)(3)

321.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by the Defendants (1) in marketing, offering, and/or selling the FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

322.     The common course of conduct by the Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

323.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

324.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G.     Superiority

325.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H. Requirements of Fed. R. Civ. P. 23(b)(2)

326. The Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

327. The Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I. Requirements of Fed. R. Civ. P. 23(c)(4)

328. As it is clear that one of the predominant issues regarding the Defendants' liability is whether the FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

329. As it is clear that another predominant issue regarding the Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX

Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Class.**

330.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**CAUSES OF ACTION**

**COUNT ONE**

**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Individually and on behalf of the Classes)**

331.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

332.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

333.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

334.    The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs are each a security pursuant to Fla. Stat. § 517.021(22)(a).

138

335.     The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs were

not:

a.     exempt from registration under Fla. Stat. § 517.051;

b.     a federal covered security;

c.     registered with the Office of Financial Regulations (OFR); or

d.     sold in a transaction exempt under Fla. Stat. § 517.061.

336.     The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs.

337.     The Defendants is are agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

338.     The FTX Entities, with the Defendant's material assistance, offered and sold the

unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, the

Defendant violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained

damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,
§ 501.201, Florida Statutes, *et seq.*
(Plaintiffs Individually and on behalf of the Classes)**

339.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above,

as if fully set forth herein.

340.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade

Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA

is to "protect the consuming public . . . from those who engage in unfair methods of competition,

or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

§ 501.202(2), Fla. Stat.

341.     Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

342.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

343.     The Defendants' unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead–and have materially misled–consumers acting reasonably in the circumstances.

344.     The Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

345.     Plaintiffs and consumers in the Classes have been aggrieved by the Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the FTX Platform and in the amount of their lost investments.

346.     The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of the Defendant, as more fully described herein.

347.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees, and costs.

348.     The Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Defendants continue to engage in such deceptive, unfair, and unreasonable

practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to the Defendant's unfair and deceptive scheme.

## COUNT THREE

### Civil Conspiracy
### (Plaintiffs Individually and on behalf of the Classes)

349.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

350.    The FTX Entities and the Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to promote false confidence in and to drive consumers to invest in what was ultimately a Ponzi scheme. This mislead customers and customers with the false impression that any cryptocurrency assets held on the FTX Platform were safe and were not being invested in unregistered securities.

351.    The FTX Entities entered into one or more agreements with each of the Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in the YBAs and/or use the FTX Platform.

352.    The Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

353.    The Defendant's conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, the Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

354.    The DefendantsDefendants conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## COUNT FOUR

**Aiding and Abetting Fraud**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

355.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 as if fully set forth herein.

356.     The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. The Defendants actively joined these efforts by misleading customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

357.     Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

358.     The Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as

described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

359.    The Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

360.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT FIVE

**Aiding and Abetting Conversion**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

361.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 as if fully set forth herein.

362.    The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

363.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

364.    The Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

365.     Notwithstanding this knowledge, and by reason of the conduct described herein, Defendant substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

366.     Defendant's actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. The Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT SIX

### Declaratory Judgment
### (Federal Declaratory Judgment Act)
### (Plaintiffs Individually and on behalf of the Classes)

367.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 as if fully set forth herein.

368.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

369.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

370.     Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendant's misrepresentations and omissions regarding the FTX Platform as further described hereinabove.

371.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the FTX Platform does not work as represented, and the Defendants were paid exorbitant sums of money to peddle FTX to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

372.     Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

373.     Plaintiff and the Class seek an order declaring that the YBAs were securities that the FTX Platform did not work as represented, and the Defendants were paid exorbitant sums of money to peddle FTX to the nation.

## THE CALIFORNIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS

## COUNT SEVEN

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, *et seq.*
(In the alternative, Plaintiff Piano Individually
and on behalf of the California Subclasses)**

374.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

375.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

376.     The Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct, and unlawful

conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

377.    The conduct of the Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

378.    Defendant's conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, the Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT EIGHT

**Violations of the California Securities Law**
**Cal. Corp. Code §§ 25110 *et seq*.**
**(In the alternative, Plaintiff Piano individually**
**and on behalf of the California Subclasses)**

379.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

380.    Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimized investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

381.    The Defendants materially assisted and/or personally participated with the FTX Group in the offering and selling of the FTX Platform, the YBAs and/or FTT Tokens Securities in

146

California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503. [52]

382.    Moreover, CSL section 25210(b) provides: "No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents."

383.    The Defendants breached section 25210(b) by encouraging the FTX Group to offer and sell the FTX Platform, YBAs and/or FTT Tokens Securities despite the fact that such securities were not qualified under the CSL.

384.    Additionally, CSL section 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

385.    The Defendants are accordingly joint and severally liable to Plaintiffs for recessionary damages under section § 25504.1.

386.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section § 25503.

---

[52] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 255030 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the FTX Platform, the YBAs and/or FTT Tokens.

## COUNT NINE

### Aiding and Abetting Fraud
### (In the alternative, Plaintiff Piano Individually
### and on behalf of the California Subclasses)

387.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 as if fully set forth herein.

388.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendant misled customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

389.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

390.    The Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendant still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

391.    The Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme.

392.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendant's aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT TEN

### Aiding and Abetting Conversion
### (In the alternative, Plaintiff Piano Individually
### and on behalf of the California Subclasses)

393.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 as if fully set forth herein.

394.    The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

395.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

396.    The Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

397.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendant substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

398.    Defendant's actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. The Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT ELEVEN

### Civil Conspiracy
### (In the alternative, Plaintiff Piano Individually
### and on behalf of the California Subclasses)

399.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

400.     The FTX Group and Defendant made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the FTX Platform were safe and with material misrepresentations and/or omissions regarding how customer funds would be used. The Defendants knew these statements to be false.

401.     The FTX Group entered into one or more agreements with the Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs, FTT and/or use the FTX Platform. The Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

402.     Defendant engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

403.     Defendant's conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, the Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions

relating to the safety of the FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

404.    Defendant's conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## IN THE ALTERNATIVE, THE OKLAHOMA CLAIMS

### COUNT TWELVE

**Violations of the Oklahoma Consumer Protection Act
Okla. Stat. Ann. tit. 15, § 751 *et seq.*
(In the alternative, Plaintiff Garrison individually
and on behalf of the Oklahoma Subclasses)**

405.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

406.    This cause of action is brought pursuant to the Oklahoma Consumer Protection Act ("OCPA") section 751 *et seq.*

407.    The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in section 752." § 753(20).

408.    Plaintiffs and Class members are persons as defined by section 752(1). The Defendants are engaged in a "consumer transaction" as defined by section 752(2), and as described more fully herein.

409.    The Defendants have violated the OCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

151

410.    Plaintiffs and consumers in the Class have been aggrieved by Defendant's unfair and deceptive practices in the amount of their lost investments.

411.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendant's, as more fully described herein.

412.    Pursuant to section 761.1 of the OCPA, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTEEN

**Violations of the Oklahoma Uniform Securities Act of 1980**
**Okla. Stat. Tit. 71, §§ 1-101 *et seq*.**
**(In the alternative, Plaintiff Garrison individually**
**and on behalf of the Oklahoma Subclasses)**

413.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 above, as if fully set forth herein.

414.    71 Section 1-301 of the Oklahoma Securities Act ("OSA") makes it unlawful to sell a security in Oklahoma unless the security is registered, exempted, or the security is a covered security as defined in the act.

415.    The FTX Platform, YBAs and/or FTT Tokens are each a security pursuant to 71 Okla. Stat. § 1-102(32), as described more fully herein.

416.    As a result of these actions, Defendants violated section 1-102(32) and are liable to Plaintiffs pursuant to section 1-509 for both primary and secondary violations of Oklahoma securities law, as described more fully hereinabove.

## COUNT FOURTEEN

**Aiding and Abetting Fraud**
**(In the alternative, Plaintiff Garrison individually**
**and on behalf of the Oklahoma Subclasses)**

417.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-330 as if fully set forth herein.

418.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendant misled customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

419.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

420.    The Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, the Defendants still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

421.    The Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

422.     Plaintiffs and the Class members suffered damages as a direct and proximate result of each of the Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.     Certifying the Class as requested herein;

b.     Awarding actual, direct and compensatory damages;

c.     Awarding restitution and disgorgement of revenues;

d.     Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.     Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.     Awarding statutory, punitive, and multiple damages, as appropriate;

g.     Awarding attorneys' fees and costs; and

h.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: November 27, 2023                    Respectfully submitted,

**By:** *_/s/ Adam Moskowitz_*                    **By:** *_/s/ Jose M. Ferrer_*
Adam M. Moskowitz                          José M. Ferrer
Florida Bar No. 984280                     Florida Bar No. 173746
Joseph M. Kaye                             Desiree Fernandez
Florida Bar No. 117520                     Florida Bar No. 119518
Barbara C. Lewis                           **MARK MIGDAL & HAYDEN, LLC**
Florida Bar No. 118114                     Brickell City Tower
John E. Rodstrom III                       80 SW 8th Street, Suite 1999
Florida Bar No. 1003112                    Miami, FL 33130
**THE MOSKOWITZ LAW FIRM, PLLC**           jose@markmigdal.com
Continental Plaza                          desiree@markmigdal.com
3250 Mary Street, Suite 202                eservice@markmigdal.com
Miami, FL 33133
Telephone: (305) 740-1423                  *Co-Counsel for Plaintiffs and the Class*
adam@moskowitz-law.com
joseph@moskowitz-law.com
barbara@moskowitz-law.com
john@moskowitz-law.com
service@moskowitz-law.com

*Co-Counsel for Plaintiffs and the Class*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:22-CV-23753-KMM**

EDWIN GARRISON, et al. on behalf of
themselves and all others similarly
situated,

      Plaintiff,

v.

SAM BANKMAN-FRIED, et al.,

      Defendants.

_____/

**<u>DECLARATION OF DAN FRIEDBERG</u>**

I, <u>Dan Friedberg</u>, declare as follows:

    1.    I am a citizen and permanent resident of the United States. I am over 18 and am

competent to make this Declaration.

    2.    I am admitted to practice law in the State of Washington. I served as chief

compliance officer of West Realm Shires Services, Inc. ("FTX.US") and chief regulatory officer

of FTX Trading Ltd. ("FTX International") until I resigned as described below. I have personal

knowledge of the facts stated herein.

    3.    I am providing non-privileged information about aspects of the business of the FTX

Entities and certain celebrities that served as what we called FTX Brand Ambassadors.  As set

forth below, many of these activities occurred in, and/or were emanated, from our FTX offices in

Miami, Florida.

## I.     My Role with FTX International, FTX US, and Alameda Research

4.     I was introduced to Samuel Bankman-Fried ("Sam") by his father who is a prominent tax professor at Stanford. I represented Alameda Research LLC ("Alameda") and then FTX International as outside counsel when I served as Chair of the Fintech group at an outside law firm since about the time that Sam left Jane Street to form his own trading firm.

5.     In early 2020, when Sam decided to form FTX.US, I left my law firm to work full time for him. Ultimately, there were over a dozen lawyers retained, including the General Counsel for FTX.US (Ryne Miller), the General Counsel for FTX International (Can Sun), and the General Counsel for FTX Ventures (Tim Wilson) (Alameda, FTX International and FTX US shall hereafter be referred to as "the Organization").

6.     The goal was for the General Counsels to report directly to Sam where possible in the case of FTX International, the President of FTX.US in the case of FTX.US, and to the CEO of Alameda in the case of FTX Ventures.  I oversaw all lawyers -- as needed -- to efficiently deliver legal services to the Organization.

## II.     Events Leading Up to My Resignation From the Organization

7.     On November 7, 2022, certain FTX personnel including Defendant Sam Bankman-Fried informed certain executives in the Bahamas of the existence of an $8 billion customer deficit with respect to FTX International.

8.     The FTX International general counsel contacted me by zoom to inform me of this shocking development.

9.     Prior to this disclosure, I had no idea of any customer deficit. I believed that the customer assets were fully funded on a 1:1 basis as represented to customers.

10.     I reviewed my ethical obligations and felt that there was substantial risk that I would

be used to further additional fraud in connection with the additional investment efforts if I stayed

on. In addition, I no longer trusted Sam, Gary, or Nishad, and did not think that I could proceed

under such circumstances.

11.     I therefore tendered my resignation the following day.

### III.     Events Leading Up to My Cooperation With Plaintiffs

12.     I was named as a Defendant in this action, in the current operative complaint filed

on December 16, 2022. ECF No. 16.

13.     After I was served with the Complaint, I called Plaintiffs' Counsel on March 3,

2023, to discuss an extension of time to file and serve my Response to the Complaint. I left a

telephone message and was called back by Plaintiffs' Counsel. They asked me if I was represented

in this matter, and I told him that I am a lawyer and that I was proceeding *pro se*.

14.     I told Plaintiffs' Counsel that I did not have any personal knowledge of the issues

that the Organization was facing, until shortly before my resignation.  I also told Plaintiffs' Counsel

that I wanted to cooperate and assist for the benefit of the FTX customers.

15.     I explained to Plaintiffs' Counsel that at that point in time, I had already spent much

money paying for counsel and that I had spent significant time disclosing everything I knew about

these events to various federal officials and parties to the "Bankruptcy Action," pending in the

United States Bankruptcy Court for the District of Delaware and styled *In re: FTX Trading Ltd.,*

*et al.*, No. 22-11068-JTD.

16.     Plaintiffs' Counsel informed me to make sure to not reveal any information that

could be covered by attorney-client privilege and/or any other potentially applicable privilege or

confidentiality protections. I certainly agreed and have not disclosed any such information.

17.     Plaintiffs' Counsel further asked me to make sure that any cooperation I provided to Plaintiffs, and the proposed Class, would not in any manner interfere with, and/or run contrary to any state or federal investigations. I agreed and reaffirmed to them that I had met extensively with federal authorities to assist with their investigation against the perpetrators.

18.     Against this backdrop, I represented to Plaintiffs' Counsel that I was more than willing to help the injured FTX customers, and we agreed that we would explore a possible resolution, whereby I would: (a) provide proof that I did not have significant, non-exempt assets in light of the quantum of damages sought, available to provide monetary relief to Plaintiffs or the Class, in the event they obtained a judgment against me in this Action, and (b) provide non-privileged information and assistance that could benefit the harmed customers in terms of seeking out and obtaining possible recoveries. After reviewing all the applicable facts and evidence, Plaintiff's Counsel confirmed that Plaintiffs and the Class would seek preliminary (and then final) approval by the Court, of a proposed class-wide settlement and resolution of the claims against me.

19.     I have been very careful not to provide Plaintiffs, and the Class, with any information that could ever be considered as covered by the attorney-client privilege and/or any other potentially applicable privilege or protection.

## IV.    FTX's Miami Office and Miami-Based Business Activities

20.     FTX maintained an office in Miami, Florida, since early 2021, long before we eventually moved FTX's Domestic headquarters to Brickell in late 2022.  Since early 2021, our Miami office was run by Mr. Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development. I met with Mr. Dabir often and I am very familiar with him and his activities.

21.     Mr. Dabir, operated from our Miami office, and he was focused on formulating and executing our important FTX celebrity partnerships. Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA.

22.     It is my opinion that Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million.

23.     The naming of the "FTX Arena" served an important centerpiece for our efforts to reach other FTX partnerships with celebrities and other well-known partners. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani.

24.     Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, to my knowledge, it was the first time that he had ever agreed to serve as a spokesperson for any product. Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022.

25.     If called upon to testify, I would testify competently to the facts set out in this

Declaration.  I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Dated: May 7, 2023

_____
**Daniel Friedberg**

# Exhibit B



**Joe:** What's up, everyone? I'm Joe Pompliano, and this is *The Joe Pomp Show*. Today's episode is with Avi Dabir, Vice President of Business Development at FTX. Avi has spent the last few years working on sports partnerships with organizations all around the world. FTX has spent more than $500 million on partnerships with the Miami Heat, Major League Baseball, and Mercedes Formula One team, as well as equity-based partnerships with athletes like Tom Brady, Stephen Curry, Naomi Osaka, and Shohei Otani.

Avi joined us in the studio this week, so my brothers and I had some **[00:00:30]** fun asking him exactly how these deals are negotiated, what it's like working with Tom Brady, how their Super Bowl commercial with Larry David came together, and what might be next for FTX. This was an awesome conversation and I hope you guys enjoy it. But before we get into it, let's quickly run through today's sponsors.

This episode is brought to you by Whoop. Whoop is a 24/7 personalized fitness wearable that's here to help you improve your recovery, sleep, fitness, and health. It's the one tech product that I wear 24/7. Here's how it works. Each day when you get up, **[00:01:00]** Whoop gives you a recovery score based on your sleep, resting heart rate, respiratory rate, and heart rate variability.

Your score lets you know how to approach your day, whether you should push yourself during your workout or activity, or if you should skip the gym and take a rest day. You wear your Whoop on your wrist, bicep, or now within one of their new smart clothing garments called Whoop Body. The band connects with an app on your phone and it automatically measures your heart rate, calories, and activity levels throughout the day.

The band also automatically detects and classifies your workouts, so there's never **[00:01:30]** an issue in forgetting to press go on a run anymore. You can then analyze your activity level in the app. There's also a ton of coaching features within it like Strain Coach, which gives you target workout exertion goals tailored to your body's recovery level for that day. Those goals change over the course of the day depending on how active you've been.

That coaching is where Whoop really shines. Whether you're interested in how CBD or alcohol impacts your sleep and recovery, where you're just wondering how long of a run you should go on. Whoop is there to provide you with personalized data to make sure you're aware of the impact **[00:02:00]** these decisions have on your body. And Whoop is now offering 15% off their new Whoop 4.0 right now with the code Joe at Checkout.

Go to Whoop W-H-O-O-P.com. Enter Joe, J-O-E at Checkout to save 15%. Sleep better, recover faster, train smarter, and now feel healthier with Whoop. Next up is Athletic Brewing. When it comes to non-alcoholic beers, Athletic Brewing change the game. Their beer tastes amazing. **[00:02:30]** And since each can is only 25 calories, 5 carbs, and made with organic grains, I can now enjoy the taste of a great beer without compromising my sleep or performance.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



But here's the best part, Athletic Brewing is now offering my listeners 20% off their first order with code Joe 20. That's J-O-E 2-0. So as you prepare to stock the fridge from Arch Madness, now's the perfect time to buy a refreshing, great-tasting beer without the consequences. Next up is Underdog Fantasy. **[00:03:00]** My friends at Underdog Fantasy have a contest on their app right now that no one else is doing. It's called the Dance and it's open from now until April 16th, right before the NBA playoffs start. With $200,000 in total prizes and $30,000 awarded to first place, now is the time to draft your perfect team for the NBA playoffs. Pick players from teams you think will make the Conference finals and NBA finals and you'll have a shot at winning big money by the time the playoffs wrap up. Just go to underdogfantasy.com or download their app in the app store. Sign up with promo code POMP, P-O-M-P, and **[00:03:30]** Underdog will double your first deposit up to $100. The Dance is only $10 to enter, so download the app, try it out. Take your shot at $30,000 in the Dance on Underdog Fantasy today. All right, let's get into this episode.

**Avinash:** Joe Pompliano runs Pomp Investments. All views of Joe Pompliano and his guests are solely their opinions and do not reflect the opinions of Pomp Investments. You should not treat any opinion by Joe or his guests as a specific inducement to make a particular investment or follow a particular strategy, but only as an expression of his personal opinion. This **[00:04:00]** podcast is for informational purposes only.

**Joe:** We got a special treat today. Avi from FTX has joined us. Avi, how are you?

**Avinash:** Doing well, guys. Thanks for having me here. Nice to meet you, Anthony, Joe, John, right? I got that right?

**Joe:** [crosstalk] Yeah, that was pretty good. [laughs] You're good to go, you're good to go. So what-what is your exact role at FTX?

**Avinash:** So I'm Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well. But the end goal is really just how do we take this great platform we have at FTX and **[00:04:30]** acquire more users and also provide more benefits to-to businesses, whoever that might be.

**Joe:** All right. So the real estate part sounds interesting. So let's-

[laughter]

-let's-let's-let's start with sports maybe first.

**Avinash:** Sure, sure.

**Joe:** So in my mind, you guys have been like the leaders in this category, right? Everyone laughs now. Crypto is all over the sports industry, whether it's leagues, teams, individuals, whatever. But you guys really started this. It started with Miami Heat Arena here, and you've done a bunch of other deals since. What is the thought process originally behind your involvement within sports specifically?

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Avinash:** Yeah, I-I mean, **[00:05:00]** so much of what happens at FTX is just, you know, Sam creates like such an op-- and Brett, the president of our US business, just creates such an open environment for people to just throw out like crazy ideas, right? And-and I think you want that at any company, especially when it's young and it's growing. And, you know, the-the way it-it really started for us is we were on a company all-hands call and a bunch of people were just throwing out ideas and someone threw out the idea of, "Oh, we should do like an arena."

And-and, you know, I had previously worked at the NBA, and so I was-- kind of like raised my hand. I **[00:05:30]** was like, "Okay, cool. Like I can-- I can look into this." This was in January, 2020. And then like, you know, I started looking into it, starting getting some more momentum just internally as well. People are like, "Oh, okay, this is cool. Let's do this." Talking to a handful of teams and cities, right? Because the governments-- local governments are involved as well.

And we kind of identified Miami as like, "Oh, this is really interesting," you know, great market, super like-like multicultural, great team. And this **[00:06:00]** was also around the time where like Crypto Buzz was like growing here in Miami. And then, you know, honestly, three months later things just kind of snowballed. And we had this arena like it happened so fast. Tons of credit to Miami-Dade County and Mayor Cava and her staff like to get comfortable with crypto. Like it wasn't easy. No one had really done crypto deals. So--

**Joel:** So how-- so let's stop there for a second. Like, how does this deal actually work? Miami, the-the Heat deal specifically, right?

**Avinash:** Yeah.

**Joel:** Because I think that the arena, I don't know if it had been like a vacant name sponsor for a couple years, I believe, **[00:06:30]** right?

**Avinash:** Yep.

**Joel:** But like how does this work? How do you approach them? How does it get negotiated? All that type of stuff.

**Avinash:** Yeah. You know- you know your history. So American Airlines I think was a vacant partner for the last two years. Right. And-and--

**Joel:** What does that mean? Vacant partner?

**Avinash:** So-so-so their deal ended and for two years, they technically didn't have a naming rights partner, but they left the signage up, right? Because-

**Joel:** It costs money.

**Avinash:** - **[unintelligible 00:06:49]** costs money to take it all down too, right? So there's--

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Joel:** And they hadn't sold the name yet. [crosstalk]

**Avinash:** They hadn't sold the name. So they didn't have a new partner. And I think this is public, but I think there's the-the county also, there's **[00:07:00]** some stipulation in their agreement with the Heat where they may owe some funds or some services in exchange if there's no naming rights partner, right? So they really wanted to get a new partner. And-and we kind of came in at the right time.

And, you know, you kind of add on the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue. I think kind of opened up the door, right? And that sort of opened up the door where we could have the conversation with-with Mayor Cava and Miami-Dade County as well as **[00:07:30]** the Heat. And then they spent a lot of time getting comfortable with our business.

It required a lot of just financial due diligence, a lot of education, and they took the time to learn. Honestly, that's why I give 'em a ton of credit for that. And to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into this really sort of validated not only just FTX but the cryptocurrency industry in general. And-and things kind of just snowballed from there, right.

**Joe:** And on the due **[00:08:00]** diligence piece, I think, I remember seeing a quote from Sam that was like, you know, they questioned if Crypto was gonna be around in years and if he was gonna be able to pay for these things. And he was like, not to sound completely absurd, but we could pay for it today if we needed to. Is that part of the process? You're like, just look how much money we have on our balance sheet, like it's not a problem.

**Avinash:** I mean- I mean they-they have our financials, right?

**Joel:** Yeah.

**Avinash:** And we did disclose that and share that and confidentially, you know, and there are ways to structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort and the **[00:08:30]** deal is public, right? So anyone can really go and look up what the deal terms are with the county.

**Joel:** And why do you think that they sat for two years without a sponsor?

**Avinash:** That's a good question. You know, sort of all that predates really my involvement and-and really, I don't even know if FTX was really in a position where we could acquire an arena at that point. But I think it could be a multitude of reasons. You know, American Airlines, airline businesses probably took a little bit of a hit during-during COVID. That could be one reason. I'm just purely **[00:09:00]** speculating here. I have no--

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

4



**Joe:** What-what is the, like, once you go ahead and you get the naming rights, what else comes with it? Cause I- I see that there's usually people FTX-related courtside. I see, "I went to the game on Monday night" and all of a sudden, they have like 16 kids basically like run out. They're doing the half-court shot of kids--

**Avinash:** Crypto chaos.

**Joe:** Yeah. Kid hits. It goes wild. I'm like, "What just happened?" And all of a sudden it pops up like $5,000 in crypto. Like, oh, that kid about to go party his face off.

**Participant:** Well, we went to the season opener too, and I think you guys gave, uh, it was like $500 to every person in a specific **[00:09:30]** section if they downloaded the app, right?

**Joe:** Yep.

**Participant:** I'm assuming there's a bunch of apps--

**Joe:** Yes, like how does this work? Or like what are some of the things you guys are doing inside of the state other than just the naming rights?

**Avinash:** Yeah. Uh, great question. So-so there's really- there's really two deals. Like, there's one with the county, which is the naming rights, and then there's a- a marketing partnership with the Heat who help activate the arena space.

**Joe:** Got it. So the Heat are responsible for what happens in the game?

**Avinash:** Related to the Miami Heat? Yes, correct. Yeah, I mean part of it is hospitality, right? Where you entertain gas, you know, we could do giveaways and whatnot for, uh, win a ticket to a Heat game, uh, things of that nature. Every game we have a lucky seat and lucky row where we give away cryptocurrency, uh, for downloading the app to the people in those spaces. And now, we've recently added crypto chaos, which is like, I dunno if you guys are, remember that game, like Knockout. It's kind of a knockout-ish.

**Joe:** Yes. They're playing.

**Avinash:** Yeah. Like everyone was just, he even half shots.

**Joe:** It was- it was chaos.

[laughter]

It's good. $5,000, $5,000, $5,000. [laughs]

**Avinash:** It's so- it's so fun. I mean, it's one of the most, like, I-I love that part of the game, right? Because the whole arena is cheering for these people to-to make this shot. So we've added that element to it. You know, we also have a partnership where we're able to sort of leverage Heat assets and whether that be like in social

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

5



media promotions. We did an NFT drop recently with-with the Miami Heat around the mashup jersey.

So really excited about that. There's a space called the FTX Token Lounge, which we've actually created and turned it into an NFT gallery. It's a way for people to enter into the arena. We just launched that like a week ago. We'd love to have you guys come by at some point. We got LED screens, you know, we got some printouts on the the- on the hallway entering in. But really just trying to meet the fans where they're kind of already at through cryptocurrency, NFTs, and blockchain technology rather than try and like force it on them.

**Joe:** How do you measure success? Like, all right, so you guys go spend this money, it's obviously cool, people see it, you know, on the screens, whatever. Do you guys measure like, "Hey, how much do we get from downloads or volume?" Or is it just like, we think it works and let's figure it out? Like what-what do you do?

**Avinash:** Yeah, I think there's- there's multiple pieces to like how you measure success here. You know, one, like the obvious one is straight-up conversion, right? How many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easily to track. But there's this intangible element that's a little bit harder to- to quantify and right. And that's just generally like when I go have a conversation with-with a real estate **[00:12:00]** developer and they're like, that conversation's just easier because they've seen FTX at the arena.

**Joe:** It's Legitimacy as well.

**Avinash:** Yeah. It's trust. It-it's-it's, you know, legitimacy, same thing when it comes to any of our-our team's business development endeavors, right? If you're a trader that's at an institution and like, oh, cool, like I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David or the MLB umpire patch. Like it's just building trust and value through brand association, but we have **[00:12:30]** to deliver on that trust and value. Like that opens up the door, but you know, we need to help them step through that door and then make sure they have a good time when they're in the room with it.

**Joe:** I'm assuming that's more off of feel than it is actual numbers, right? That's probably pretty difficult to quantify.

**Avinash:** Totally. It-it's, and you know, we see it because, you know, we hear people be like, "Oh, I love your Super Bowl commercial, or, you know, I had a great time at the Heat game, you know, last night, or I can't help but see the FTX on the MLB patch, like every ti-- every **[00:13:00]** pitch." All the staff.

**Joe:** How did the Larry David commercial come together? Like, obviously I have a theory, but I want to hear kind of how you guys came up with that and how that came together.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3


GoTranscript

**Avinash:** Yeah, I mean, so-so there's a really good article written. I-I can't remember the publication. It might be the Times, but I-I don't--

**Joe:** It's probably the best business show.

**Avinash:** Yeah.

[laughter]

That's right. Uh, the best business show. I think-I think they had the best theory on it.

[laughter]

But, you know, we-we have some really good agency partners that are super creative, and we also have some great folks **[00:13:30]** internally on the marketing side. They're just great at like, explaining what FTX wants and what FTX really wants is like, we're trying to just be playful, inviting, and just like, "Hey, like, we're here when you're ready." Like, that is our very much, our approach to sort of doing our marketing and advertising. And Daniel on our marketing team is-is a super key component of our brand messaging. And, you know, another, uh, colleague of mine, Cena--

**Joe:** Both Fantastic.

**Avinash:** Yeah, both-both great guys, super smart **[00:14:00]** and just really get our brand, and, you know, they really spearheaded that and pulling the right people and teams together, you know, and then when we- when we saw the script, we were like, this script is awesome. And then-then we're like, "We have to get Larry David, right?" And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?

**Joe:** Yeah, yeah, yeah.

**Avinash:** And-and just small sort of teaser, Sam's dad is-is also in that commercial. Uh--

**Joe:** Really?

**Avinash:** Yeah-yeah. It's a little-little **[unintelligible 00:14:24]**

**Joe:** That's amazing. I didn't know that. [chuckles] Yeah. Well, Sam's dad is very involved with-- I think it's a foundation? **[00:14:30]**

**Avinash:** Yep.

**Joe:** There's a pretty big philanthropic effort that's going on.

**Avinash:** A 100% We recently had just had a FTX foundation hackathon at the FTX Arena where we-we gave away-- well we awarded a million dollars in pricing for high school students that were building businesses in sort of like the-the tech space. So



we're really excited about that and Joe Bankman leads a lot of that for us, uh, as well as we have a lot of other initiatives around climate and that the foundation is super focused on-on just the whole idea of effective altruism and, **[00:15:00]** you know, making the world a better place.

**Joe:** What's going on with F1 Mercedes? You guys I know sponsored the team.

**Avinash:** Oh, man, uh, I-I love F1, right? Like, you know, drive to survive has gotten so many of-of us Americans like pulled into the sport and-and it really is a team sport all the way from like engineering these cars to executing on-on race day. So we are a Mercedes Formula One partner, they've been awesome. This year has been pretty interesting so far. Last year was, you know, I'm biased, but you know, I didn't agree with the results. **[00:15:30]**

**Joe:** Lewis Hamilton didn't either.

[laughter]

**Avinash:** But the guy's a true professional man.

**Joe:** Yeah.

**Avinash:** Like the fact that he's back in-in that seat and ready to go again is super impressive but we're planning to have a pretty big event here in Miami for the Miami Grand Prix, that's May 6th through 8th. We'll be announcing that pretty shortly, but expecting a lot of people to come through, doing a lot of activations around just other Mercedes partners, our partners involved like just try to bring together a whole community of people **[00:16:00]** building cool things together to celebrate that all and it's gonna be big. I-I wish I could share more details.

**Joe:** How much money have you guys spent on marketing?

**Avinash:** Oh, that's a good question.

**Joe:** Um, like just ballpark. Are we talking 500 million, a billion?

**Avinash:** Well-well, some of these deal-- like--

**Joe:** Let's do committed, right? Yeah, they-they're multi-year deals, right?

**Avinash:** Right-right.

**Joe:** Committed.

**Avinash:** I'd say, I'd say over 500.

**Joe:** Yeah. Over 500 million, you-you-- have you crossed over a billion you think?

**Avinash:** I-I don't know. I-I-I don't think so.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

8



**Joe:** Yeah, because what the-the arena deal **[00:16:30]** is how much?

**Avinash:** In total, like if you consider the Heat and the arena portion of it, like close to 200.

**Joe:** Yeah.

**Avinash:** So that's 200 of-- at least 500.

**Joe:** And-and that's a 19-year deal, you know, so we're committed.

**Avinash:** Yeah-yeah, part-part of this is when you do the committed, you could look at this, it could be over 20 years, literally.

**Joe:** Right. But, so $500 million is a huge commitment. What was the major league baseball? Is the umms a one-off or is it part of a bigger deal?

**Avinash:** It's part of a bigger deal. So we have a lot of other components that, you know, the-the patch **[00:17:00]** is so visible, right which we love, but there's so many other components to it. Last season we had this campaign called Moon Blasts, so every time someone hit a home run over certain, I think it was 400 or 425 feet, then it was considered a moon blast and so that was branded on social media, FTX Moon Blast like so there's that entire element of it, we have some additional--

**Joe:** That's a very FTX-type thing to do.

[laughter]

And you had the guy at the playoff?

**Avinash:** Yeah, we had the-the moon, uh, the Moonman.

**Joe:** They literally had someone show up with like a costume at the games **[00:17:30]** and he was the Moonman.

**Avinash:** And we planted him behind the umpire in the stands with this giant head, it was **[inaudible 00:17:35]**

**Joe:** You can see 'em right in the screen every game, it was amazing. There's moon Boys on Twitter and then there's moon blasts on-in baseball.

[laughter]

So how did the individual deals work, right? Because you've done a bunch of those also with Tom Br-- someone in the chat asked if you personally know Tom Brady? [laughter]

**Avinash:** I-I personally do not. I've met him, great guy, like excellent smile, um-

**Joe:** Like great hair, great face.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

9



**Avinash:** Yeah, some of these **[00:18:00]** people we meet and they just have this like-like gravitas to them, right? Just--

**Joe:** Yeah.

**Avinash:** And-and he is that, he's a su-- bonafide superstar, you know, that really came through. So, you know, Cena's a-- he works on a lot of our-our-our partnerships with-with the athletes. He's done a great job with-with really, not just, you know, working with Tom, but Giselle too is also a partner of ours. And so we're looking to do more things with her.

**Joe:** If you're gonna work with the family, you better work with the richer of the two.

[laughter]

**Avinash:** Totally. And like, you know, you keep them both involved together, right? And I think that makes the partnership **[00:18:30]** stronger. And, you know, again, credit to them, they're open about learning. Like-like they-they will say, "Hey, I'm comfortable with this. I'm not comfortable with this. Help me learn about this." And-and our team who-who handles those relationships have done a great job with--

**Joe:** Is Brady a Bitcoiner?

**Avinash:** He is. Yeah. I mean, you've seen like those videos he's throwing, like there's-there's one video that he made on his own, I mean, his teammate, but he throws a football like into the sky, and he's got like laser eyes on it, and the Bitcoin like comes down. So he's--he's--

**Joe:** But it's amazing **[00:19:00]** you guys had nothing to do with that video. [laughs]

**Avinash:** Because I-I think that that's what-- those are the partnerships we love, where like, you get them excited about crypto, and then they kind of authentically take it in the direction that they want to take it has been the most successful stuff that we've done.

**Joe:** How do you guys think about, like, you added, I believe, equity part of Tom Brady's deal. Like how important is that to align incentives with these individual athletes for these marketing deals?

**Avinash:** Great question. Like-like, these guys have money, right? Like-like-like you kind of kind of figure out like what gets **[00:19:30]** them excited about partnering with you, and he doesn't need another X millions of dollars more, but if he's got an investment in-in something, and they're competitors, right? So like-like in a way, business is competition, right? And he's kind of aligning himself with FTX, which we love, right? And he-he thinks, and-and backs us that-that we're strong competitor. So I think that validates FTX, but also gives him some access to be competitive in the-- in this world that he wants to learn more about and compete in.



**Joe: [00:20:00]** What-what about the Stephen Curry? I-I saw that there's a brand new, I guess, commercial or-

**Avinash:** Yeah.

**Joe:** -video that you guys put out, and he's like chiseling the ice and-

**Avinash:** Yeah.

**Joe:** -uh, I think Shaq does the voiceover-

**Avinash:** Yeah.

**Joe:** -and he's like, "Tell Shaq stop playing." Right? Uh, but like when you guys do that type of stuff, how much of that is like they have ideas for the creative versus you guys are like, "Okay, we're gonna do, you know, A, B, C, here's the scenes, you know, you just-

**Avinash:** Yeah.

**Joe:** -gotta do your kind of acting role.

**Avinash:** Yeah, I mean, they're generally so busy, so when it's hard to get their time. So when you have it, like you wanna have a plan as to what you wanna do. **[00:20:30]** So-so we-we have a plan, right? We have a script. We're like, "Hey, here's the theme." You know, we keep them, Steph and his team involved throughout the entire process, because they gotta be comfortable doing it. If it's not authentic to your brand, like they're not gonna do it. I think this last spot, the not a expert spot is-is really authentic to him, 'cause like he's interested in crypto, but doesn't know a ton about it-

**Joe:** Mm-hmm.

**Avinash:** -but wants to, right? And that makes it approachable. And I think that aligns with what FTX's sort of ethos. Is it like, "Hey, **[00:21:00] [00:21:00]** like, we're here when you're ready, or like, come to us to like learn and, you know, you're not alone in this process." Right? Like, you know, Steph, like arguably, you know, the best basketball player on the planet is successful at so many things, but here's something that he is not the best at. But he's willing to admit that and say he wants to learn.

**Joe:** Try to learn.

**Avinash:** And come with us on that journey is really important.

**Joe:** David Schwab did that deal?

**Participant:** I'm not sure he works at Octagon. So maybe, yeah.

**Joe:** Yeah, he did.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Participant:** All right. Yeah. Look, he-he'll be happy we gave him a little shout-out.

**Joe:** Here we go.

**Participant:** David Schwab [laughs]. What else?

**Joe:** [00:21:30] I was just gonna ask about the real estate stuff. What do you do on the real estate side?

**Avinash:** Oh, yeah. This-this is my- this is my new sort of like excitement and passion right now.

**Joe:** We're in.

[laughter]

If you- if you need partners, we're in.

**Avinash:** Let's-let's talk about this. So we're helping a lot of, um, condo developments specifically here in Miami except cryptocurrency payments for purchases. The first couple that we did is with 11 eleven Residences, which is a PMG property. [crosstalk] Uh, and then also, uh, with the Waldorf Astoria. I'm actually going to a real estate [00:22:00] event tonight with the Diesel Wynwood Condominiums in Wynwood. So they're now a partner and we've done a partnership with Paramount as well. And I got off the call before here with another big, uh, real estate firm. Does, like, people just want, like, the interesting thing about right now, it's like, "Hey, let's accept payments for real estate."

And what that really does is, one, you guys know. If you transact in crypto, you're in control. You could do it anytime. You don't have to wait for a wire transfer cutoff, you're in control. And it's just infinitely [00:22:30] more seamless. And then plus a lot of people in crypto have made money. So if you give them a way to sort of diversify their assets into a asset class, like real estate, there's value there. And then sort of the third point is like a lot of international buyers really prefer it. It's just easier to move the money.

**Joe:** Do-do you wear a, uh, a suit and tie when you go to these events? Or you show up in the FTX t-shirt?

**Avinash:** Uh, I'm a t-shirt guy. I did bring a blazer. I'm not sure if I'm gonna wear, uh, to be honest, like I brought a blazer to work. I'm not sure if I'm gonna wear it or not, but, uh, I just brought it just in case. Like--

**Joe:** I feel like that's an insurance [00:23:00] policy.

**Avinash:** Yeah.

**Joe:** Like that may be one of the industries that, and like lawyers.



**Avinash:** Yeah.

**Joe:** Those two together.

**Avinash:** So I'm-I'm feeling it out like, uh, I'm definitely wearing sneakers [laughs], like forget the dress shoes.

**Joe:** What's the process like when a company, a traditional like mortgage company or whatever for loans is like, "Hey, we want to start accepting payments in crypto." Like, do you guys just go in and help them set it all up? Like what's the process like?

**Avinash:** Yeah, totally. It's actually fairly easy. Like we have an agreement, you know, we've sort of templatized at this point. We're just essentially accepting funds crypto **[00:23:30]** and then converting it in real-time to dollars and putting those dollars wherever it needs to go. Whether that's to the seller or to the title company, right?

**Joe:** Mm-hmm.

**Avinash:** Like they don't really wanna hold crypto. So it's really the benefit is more so for the buyer, ease of transaction for the buyer.

**Joe:** How many people actually wanna buy using crypto versus the buildings or the building Managers want to say they accept it, but they don't actually have any anticipation of people actually buying? Like, it's like a-- I've seen them, cool 'cause I accept it, but no one's gonna do it 'cause of the tax ramifications, et cetera.

**Avinash:** Well, the tax, you have to pay taxes **[00:24:00]** regardless. Right. So I-I don't think that's really a deterrent.

**Joe:** Well, right now if I buy the building, if I-- let's say I buy a condo and I buy it in cash, I just pay the sales tax or-or whatever.

**Avinash:** Yeah.

**Joe:** But if I buy it in crypto, I have to pay the capital gains on top of the sales tax, except like--

**Avinash:** Correct.

**Joe:** That's why I always wonder, I've seen a couple of announcements in Miami, which I'm assuming you guys were involved in, where people bought, you know, some are $5 million, some are $20 million type condo purchases in crypto.

**Avinash:** Yep.

**Joe:** I'm like, man, are they really paying capital gains tax on doing **[00:24:30]** it? But I guess like if you have a 100% of your assets in crypto, like you have no other choice.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Avinash:** Th-th-that's what I'm saying, like a lot of, like most of them, some are international buyers, so it's just easier to transfer. Some are I, some people would just be YOLO buying condos, right?

**Joe:** Mm-hmm.

**Avinash:** Because they-they can, you know, I think today it just starts with-with cryptocurrency payments, but to your point, right? Like, you know, would love to get to a point where, okay, you know, if I have a-a million dollars in-in Bitcoin, like can I take out a mortgage against that, right? So then I don't have to sell my Bitcoin or can I borrow against it in some particular **[00:25:00]** way and, you know, tie that closer to real estate.

I-I think we're gonna get there, it's just a matter of when. Like technically, I think we can get there like tomorrow, but like- but like-like regulatory-wise and just like, you know, smoothing all that stuff over. I think that's-that's really sort of where the hurdle is. And that's a big thing that we're-we're doing at FTX, right? Like Sam and Brett spend a ton of time in DC working with the regulators, like educating them. Like we make sure we have all of our licenses.

So it's just super important for **[00:25:30]** us to-to be up to speed and-and do things the right way. So when we wanna offer these cool, fun products that people are kind of used to already, but now put a crypto spin on it, I think is gonna be really interesting.

**Joe:** How have those conversations with DC and everything changed over the last year?

**Avinash:** You know, I'm not personally involved in them, but like, just from like the outside, I-I think they've gone really, really well. And so much of that is just cause like you guys know, right? Like one, okay, you hear about Bitcoin or you hear about any cryptocurrency, but then you like, put a **[00:26:00]** little skin in the game, whether it's like a $100, $1,000 or whatever, then you start like paying attention to it more and you learn more and you see the use cases. And I think it's just, uh, the time and the effort that's been spent has really moved things forward. And I only see like, it's just gonna trend upward.

**Joe:** Well, it sounds too like when you guys first started doing these partnerships, take the Miami Heat for example, they were questioning maybe is not the right word, but interested to see if this industry was gonna be here in a decade, right?

**Avinash:** Yeah.

**Joe:** And asking the right questions and now it's, people are coming to you guys to do partnerships, I'm sure, right? **[00:26:30]**

**Avinash:** Yeah, 100%. Like, you know, our inboxes are flooded, like, you know, people know we've spent a-a little bit of money on-on some sponsorships, so, you know, we see a lot of interesting things.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

14



**Joe:** What's the- what's the craziest thing someone's asked you guys to do?

**Avinash:** I saw like-like a Canadian, like, curling team was like super, just like wacky and just like out there, one of my favorite ones that we've done is, uh, we wrote the Fortunes for Fortune Cookies. So a few-- and-and I-I forget how many we, but they're all over the US. So if you, **[00:27:00]** like, you know, you get a fortune cookie from one of these restaurants, it'll say FTX on the back, and Alec, the guy who runs-

**Joe:** Who runs our Fortune cookie business?

[laughter]

How much is a fortune cookie?

**Avinash:** He-he's our-he's our-he runs our Twitter handles, he wrote most of the fortunes.

**Joe:** No way.

**Avinash:** Um, so like you-

**Joe:** Shout on Alec.

[laughter]

That's amazing.

**Avinash:** And they're really-they're really witty, he did-he did a great job.

**Joe:** Like what- so like, take that for example, right?

**Avinash:** Yeah.

**Joe:** Because I think a lot of people like, what do you mean, whatever, is it just a branding exercise or like, is there like a QR code that people can scan and then--

**Avinash:** Yeah, it's just a branding, **[00:27:30]** you know, you, you know, you-you ordered like an Asian meal and, you know, you're done with a meal, you-you crack open the fortune cookie and, you know, you see an FTX logo and it's like some witty, just like fortune around, it's-it's all crypto related fortunes.

**Joe:** Got it. Got it.

**Avinash:** Like blockchain and crypto-related fortunes.

**Joe:** And so when you do that, I'm assuming that there's some kind of analysis on like, "Hey, we're arbing the potential eyeballs that are gonna look at this versus like what it costs", and I always wonder if you were to unleash, you know, like intelligent **[00:28:00]** quantitative people on marketing, which I'll put FTXs as, you know, a leader here, it seems like that's really what you guys are doing, right? You're trying to

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

15



GoTranscript

figure out like what are all the mispriced marketing opportunities in the market and then you go and you just attack those and you're not scared to kind of do it with conviction.

**Avinash:** For sure, that's like, at a high level, that is what it is like what's sort of like mispriced, I mean maybe things, I think sports partnerships now are less mispriced for crypto. Like, 'cause like everything's been bid up, but when we got into it, I think it was mispriced-- not mispriced, that's like a-- **[00:28:30]** it was just like, there was an opportunity, like there was value there.

**Joe:** Yeah. I just got a text from someone. They said, "Hey, man, I'm watching this show and I can say that I've had a few of those FTX fortune

Cookies from our favorite Chinese place in Chicago.

[laughter]

The branding Chicago.

**Avinash:** Exactly right. And-and people-people tweet them out. So there's like this just natural like good vibe feeling that comes with that, right?

**Joe:** Yeah.

**Avinash:** And-and you, some of that's not quantifiable, right? But someone cracks that open, sees FTX, feels good about it like maybe they think differently **[00:29:00]** about the--

**Joe:** If I got that, you know what I would think? I'm like, these guys are everywhere. They're literally infiltrating the fortune cookie industry. I saw Sam at one point was like, I think he was joking, but he was like, ah, maybe at some point we should like start doing things 'cause like the rest of the industry will do it as well and like throw 'em off our scent. Yeah, he's like, "I'm gonna lose money on purpose", I think is what he said.

[crosstalk]

**Participant:** They're one of the fortune cookies up right now, it says, in retrospect it was inevitable.

[laughter]

**Joe:** When-when you guys think about-- like have you guys ever actually considered like trying to fake out everyone else and like do something that would, **[00:29:30]** you guys put a little bit of money lose on purpose and then let everyone else go spend all their money?

**Avinash:** I mean, there's definitely some-some games-gamesmanship.



[crosstalk]

There's some gamesmanship that goes along with-with, you know, anytime there's a counterparty involved.

**Joe:** Yeah.

**Avinash:** Right. So--

**Joe:** So the fortune cookies or the money-losing one?

**Avinash:** No, I mean, it's-it's-it's hard to, like I wouldn't, honestly, I think that's-that one's been like, you know-

**Participant:** I actually think that was really smart. I actually, that was really smart.

**Joe:** So like what-what would be, I wanna like just sit here and brainstorm for a second, what would be **[00:30:00]** something that you guys could do, that would throw everyone else off. Like, I feel like the sports stuff--

**Avinash:** We can't reveal it on air. [laughs]

**Joe:** Trust me. You could definitely say a lot of stuff-

**Avinash:** People will steal it.

**Joe: [unintelligible 00:30:08]** [crosstalk] Follow. No, they're-they're trying to trick us into thinking that it wouldn't work, but it really would work. [laughter] But it feels like, like I saw in Miami, right? There was just ultra, there was a whole bunch of stuff.

**Avinash:** Yeah.

**Joe:** And one day I, I was walking and I just saw like 17 planes all pulling like the banners behind them.

**Avinash:** Yeah.

**Joe:** And I was like, what are the odds that I can-- won't even see any of those? **[00:30:30]** But also too, like I understand what it means, I remember it and I go and it converts and it's like, it's probably not that much. There's also like those screen that floats-

**Avinash:** Yep.

**Joe:** -in-in the water.

**Avinash:** I see those all the time from my farm.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

17



**Joe:** Yeah. And it's like, I've seen it over and over and over again. I probably could remember maybe two of the ads I've seen. But then I went and I looked, how much does this cost? It's like nothing.

**Avinash:** Yeah.

**Joe:** Right? It-- it's-it's so inexpensive that I feel like some teams are just like, we might as well do it. And it's just a pure branding exercise that has nothing to do with conversion.

**Avinash:** Yeah.

**Joe:** But the cost to the impression number is so **[00:31:00]** skewed that you're just like, screw it, whatever. And for those people, they're making money and so they keep the cost low without, you know, really worrying about trying to price it at the-the high price point.

**Avinash:** Totally, and it's that-- that's an awareness play, right? Like you're just trying to get people aware of FTX. So then okay, they see, you know, that boat go by and it's an FTX logo or some quick hit about it. They see the plane go by. Oh, FTX. But then when they get to FTX Arena and there's an opportunity to, I don't know, check out with FTX pay or something of that nature, I think, oh cool. Like I've seen that **[00:31:30]** brand twice already. Here's for the third time and this is kind of what they do. Let me now convert, right? So--

**Joe:** You wanna know what I think you guys should do?

**Avinash:** Yeah.

**Joe:** I think you guys should open a bar. If you open a bar in Miami. Cause there's a ton of young people who have started to move here.

**Avinash:** Yep.

**Joe:** Right? There's a lot of crypto folks who have moved here, et cetera. But if you make it a fun bar, it then infiltrates into the conversations and what ends up happening is, it's kinda like a club or-or some of this other stuff. Right? It becomes the center of people's social life.

**Avinash:** Right.

**Joe:** **[00:32:00]** And once you do that, like you win.

**Participant:** Well, you could probably make money doing it too.

[laughter]

[crosstalk]

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Participant:** It's like I **[unintelligible 00:32:08]** $500 million **[unintelligible 00:32:09]**.

**Joe:** Even if you did things like, you know, hey, if, uh, certain times there's like FTX, you know, specific events, but if it literally was just like the FTX bar and it was just fun. It was like genuinely fun to go to and people would go there regardless of what the name was.

**Avinash:** Right.

**Joe:** You just infiltrate into the social life and like a bunch of 25-year-old kids, like, where are we gonna go tonight? Like, oh, every Friday we go to FTX bar.

**Avinash:** Yeah.

**Joe:** You just immediately **[00:32:30]** become part of the conversation. And it feels like those are the types of things where like the arena when people, they're not thinking, "Hey, I'm marketing FTX, but like, hey, I'm going to FTX Arena."

**Avinash:** Correct.

**Joe:** "I'm going to the game." There's other things that you could do that are like that. And I don't know what the legal risks are of, uh--

**Avinash:** Yeah. Well, you guys wanna open that bar up with us?

**Joe:** Sure.

**Avinash:** Like let's-let's do it.

**Joe:** Sure. [laughs] I-I'm being dead serious.

**Avinash:** [laughs] No, I'm not saying--

**Participant:** I've been com-- [crosstalk]

**Joe:** I'm not gonna run it?

**Avinash:** I have been complaining too. [laughs]

**Joe:** Yeah. Well, we'll find someone to operate it. But-- I've been complaining about the bars in Miami too. [laughs]

**Avinash:** Perfect.

[crosstalk]

**Joe:** We are not-- We have, uh,-- **[unintelligible 00:32:58]**

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



GoTranscript

**Avinash:** If we got to **[unintelligible 00:32:59]** street research? **[00:33:00]** [crosstalk]

**Avinash:** No, my brother cannot **[unintelligible 00:33:03]** I am out.

**Participant:** We're not-we're not-we're not interviewing if you're running.

[laughter]

**Avinash:** If John's the general manager, [crosstalk] I'm out.

**Participant:** You guys aren't making money.

**Avinash:** Well, that's the problem.

[laughter]

**Joe:** Yeah, yeah. I think we may not make money.

**Avinash:** I know you. You and all your friends will be there all the time.

**Joe:** Nah.

**Avinash:** We won't make any money.

**Joe:** Yeah. My friends will be paying covers to get it.

[laughter] And-and they'll be downloading the FTX. [laughter]

**Participant:** I love it. I love it.

**Joe:** Have you guys sponsored college athletes?

**Avinash:** We have, yes. We've done a couple of teams and a couple of players. Uh, I think we've done the **[00:33:30]** UCLA women's basketball team, a softball team in Florida, Kentucky men's basketball team.

**Joe:** Yeah.

**Avinash:** So we experimented in the NIL space. Like, I think it's interesting and there's definitely value in there, especially because so many of these athletes want to build their brand and like they also learn about it, and they're also really good at it, right? They're-they're natively just good at social media. But there are some challenges. And those challenges are just like, you know, they're still- they're still college students, right? Their-their main focus is, **[00:34:00]** you know, going to **[unintelligible 00:34:01]** playing bask-- like playing sports.

[laughter]

Going to class.



[laughter]

**Joe:** Let's just call a speed, a spade.

[laughter]

**Participant:** Play sports and they wanna party. That's what they're trying to do.

**Avinash:** Yeah. It's like still hard. Like I remember when I was like, you know, 19, 20 when it's, this hard-hard to get people to do things, but some of them are great and-and totally get it. It-- I think there needs to be a little bit more structure in that space and it's gonna come. Uh, and these-- there's some platforms out there that have been really helpful in-in helping sort of put the plan out there. But I think there's a lot of value there once that gets sorted out and figured out.

**Joe:** Yeah. I-- if you **[00:34:30]** really think about it, if you're like an enterprising, you know, 18 to 22 year old and you're good at your sport, you could make an absolute bag right now. Because there's so much capital that everyone-- it feels like everyone's like, that market's going to be big and I need to get there early.

**Participant:** Yep.

**Joe:** And they don't know really kinda what the cost should be. They don't know how effective it is. Like there's a lot of kind of fragmentation. And so if you actually have a big following and you understand business, like you-you probably **[unintelligible 00:34:55]**

**Participant:** Most people don't have agents either, right? Which is one piece of it. So they're-- [crosstalk]

**Joe:** Yeah. But they have **[00:35:00]** like somebody looking after their life.

**Avinash:** Yeah, they got their brother or their mom [laughs] or their--

**Participant:** But the deal is my point. Is there much less structured, right? They're not-- they're not nearly as.

**Joe:** Is it worse to call up a college athlete and him be like, okay, I've got an agent that works at, you know, CAA or whatever, or to be like, yeah, my mom handles my deals. Which one- which-which one are you like, Dave? [laughs]

**Participant:** I-I-I feel like I'd rather deal with the agent.

[laughter]

Right? Yeah. Like, even if I gotta pay extra, its like, [laughs] let's just deal with the agent.

**Joe:** Like, imagine if our mom was like our agent **[00:35:30]** and she'd be like, "My boys are worth so much more." [laughter]

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

21



**Participant:** Right?

**Joe:** Like every mom would be that 100%--

**Participant:** Jonny need to post this yesterday. Why didn't he post? He'll post it when he wants.

[laughter]

That's literally what would happen.

**Avinash:** That's great.

**Joe:** Yeah. It's like, I-I-I don't know, it just feels like when there is fragmentation, sometimes actually the fragmentation's bad. We talk all time about the Miami apartment scene.

**Avinash:** Yep.

**Joe:** Is completely different than New York. Like in New York, the landlords are on it. They know exactly what the deal is. There's laws, there's regulations. You can't raise rent too much, like all this stuff. In Miami, multiple friends, we know **[00:36:00]** where they're like, "We're raising rent 30%." And you're like, you can't do this. Like, we can do whatever we want. And you're like, "I wanna go back to the structure."

**Avinash:** It's free. It's a free for all.

**Joe:** Yeah. They show you comps. You're like, that's from two towns over.

[laughter]

**Avinash:** Like, that has nothing to do with my apartment.

**Joe:** The, uh, the-the one that, uh, I keep seeing on Instagram, there's an apartment in one of the buildings on I-I guess what it is, Brooklyn Avenue.

**Avinash:** Mm-hmm.

**Joe:** And it's like a $50 million apartment.

**Avinash:** Jeez.

**Joe:** And all these like real estate Instagram accounts, went and took a tour. There's a video that they all **[00:36:30]** keep using and it's got indoor pool, it's got all this stuff and everything. And I always just think of like, the landlords sitting there be like, well, if they're selling $50 million apartment down the street, then my thing is worth, you know, at least a million. [laughs] You're like, that's not how this works. They have an indoor pool. You have a pool on the roof that sometimes is open.



**Participant:** 100%. Uh, it's-it's-it's a little wacky out there for sure in the real estate market here. And you know, I think doing stuff with crypto and maybe bringing a little bit more transparency through that can be really beneficial. How long have you lived in Miami? Eight months?

**Avinash:** Eight months.

**Participant: [00:37:00]** Yeah. Okay, cool.

**Avinash:** Yeah.

**Participant:** Where did you come from?

**Avinash:** So, I'm kind of all around from upstate New York, school in Boston, then San Francisco, Los Angeles, and then now here.

**Participant:** Oh, smart move.

**Avinash:** Yeah.

**Participant:** Yeah

**Participant:** Yeah. You like it? Are you staying?

**Avinash:** Yeah-yeah. We love- we love it in Miami. We just bought a house, so.

**Participant:** Yeah. Smart.

**Avinash:** It's-it's the, uh, it's a good place. [laughs]

**Participant:** Things are- things are- things are happening.

**Avinash:** We went to, uh, we went to LA for the Super Bowl and we were trying to figure out where the 52% of your income was going.

[laughter]

**Joe:** We thought they'd be flying cars. We thought, you know, the weather's great, **[00:37:30]** don't get me wrong.

**Avinash:** Yeah.

**Joe:** But--

**Avinash:** For sure.

**Joe:** It's a nice place to visit now.

**Avinash:** Yeah.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Joe:** The part that cracks me up-up when people come to, uh, Miami is like, it's one thing when people from Miami go somewhere else, like, oh, this is like a little off for whatever reason. But when people come here now, I feel like they're just like, damn this is what freedom looks like.

**Avinash:** Yeah.

**Joe:** Right. And like, they're talking about everything from, you know, pandemic-related stuff to the economy, to the, just the way that the local government feels to be encouraging local business, like all this stuff. And it makes you actually thankful, like grateful. Like, you know, most people didn't **[00:38:00]** move here with their eyes wide open. Like that's why they were moving. But once you get here and you get into it and you're like, oh, okay. Like this is where I want to be.

**Avinash:** Totally. I-I feel like in-in Miami, there's not really rules. They're like guidelines.

[laughter]

**Joe:** Yeah.

**Participant:** You know- you know, you can follow them.

**Avinash:** The Mayor's like, shit.

[laughter]

**Participant:** You like, follow them or-or-or not. But like, I feel like most people, you know, if you treat them like adults, they'll behave like adults.

**Joe:** Yeah-yeah-yeah.

**Participant:** You know, like, and-and that's, there's like this general mutual respect. So yeah, I think that's been really referring.

**Joe:** I completely agree with that. Before we let you go, where can **[00:38:30]** people go? Like what-what would be helpful to FTX or like, how do you guys wanna help people that are watching this?

**Avinash:** Thanks for that. I-I-I would say, you know, follow us on Twitter, on Instagram, ftx.us if you wanna open an account. If you're in Miami, you know, come to our event, which we'll-we'll be announcing for the Miami Grand Prix. I think we'll be announcing next week. But, you know, excited to, and opening that up to-to anyone and everyone.

**Joe:** Somebody suggested also you should do FTX barf bags on the- on the airplanes. I don't know if that's good or bad. **[00:39:00]** It's probably cheap relative impressions.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



[laughter]

[crosstalk]

**Avinash:** I don't think I've ever thrown up on a plane. Like, yeah. I don't think those **[unintelligible 00:39:10]** that much.

**Joe:** Uh, to-to be honest, actually, uh, now that I'm thinking about it is, I bet you no one's ever done an advertising deal inside of the plane but like, you're just sitting there staring.

**Avinash:** Right. Right.

**Participant:** Well, you can do the airbag comes down and you're like, "Oh, let me check out the **[unintelligible 00:39:24]** first. Well, if I go sell or did say Bitcoin was oxygen, so like--

**Avinash:** Y-you know what, I always see the Marriott Bonvoy **[00:39:30]** commercial play before, like every movie that I try and watch [crosstalk] and credit card ads. I mean, they literally go down the aisle trying to sell you--

[laughter]

[crosstalk]

And it's only rewards they talking about. It's not like what the APR or any of that stuff.

**Participant:** We've been 27% APR but don't listen to that. You get 500 airline points.

**Joe:** You can go to **[unintelligible 00:39:50]** for one night.

[laughter]

**Avinash:** Yeah. That's crazy.

**Joe:** Thank you so much for coming on.

**Avinash:** Hey, thank you guys so much for having me. This is- this is fun. This is really fun.

**Joe:** We're gonna bring back after you guys do something **[00:40:00]** else crazy.

**Avinash:** Sure when we open that bar, like let's-let's, uh, what we could do is **[unintelligible 00:40:03]**

**Joe:** We're gonna message you afterwards. [crosstalk] John is gonna find the GM and we'll mean business.

**Avinash:** Sounds great, guys. Thank you. Thanks so much.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Joe:** Alright. Thank you, buddy. All right, everyone. That's it for today. I hope you enjoyed this episode. And as always, I appreciate you listening to the Joe Pomp Show. Make sure you subscribe to the podcast on Apple or Spotify so that you don't miss any episodes going forward. And if you are looking for additional content, check out my daily newsletter at readhuddleup.com **[00:40:30]** or follow me on Twitter @JoePompliano. I hope you have a great day and I'll see you next time.

**[00:40:38] [END OF AUDIO]**

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



# Certificate of Accuracy

Transcription of **40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **10 May 2023**

Signed *MindCaplin*

Name Mindaugas Caplinskas

Position CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

# Exhibit C

**FIRST INTERIM REPORT OF JOHN J. RAY III TO THE INDEPENDENT
DIRECTORS ON CONTROL FAILURES AT THE FTX EXCHANGES**

April 9, 2023

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ................................................................................................... 3

         A.     Alameda ...................................................................................... 3

         B.     FTX.com .................................................................................... 4

         C.     FTX.US ...................................................................................... 4

III.   SCOPE OF REVIEW ......................................................................................... 4

         A.     Retention of Advisers ............................................................... 4

         B.     Data Collection ......................................................................... 5

         C.     Witnesses .................................................................................. 6

IV.   REVIEW OF CONTROL FAILURES ................................................................. 7

         A.     Lack of Management and Governance Controls ...................... 7

                 1.     FTX Group Management and Governance ...................... 7

                 2.     Debtors' Management and Governance ........................... 9

         B.     Lack of Financial and Accounting Controls ......................... 10

                 1.     Lack of Key Personnel, Departments, and Policies ........ 11

                 2.     Lack of Appropriate Accounting Systems ..................... 12

                 3.     Inadequate Reporting and Documentation ..................... 14

                 4.     Trading Records from Other Exchanges ......................... 16

                 5.     Intercompany Transactions ............................................. 17

                 6.     Extraordinary Privileges Granted to Alameda ............... 18

         C.     Lack of Digital Asset Management, Information Security & Cybersecurity Controls ........................................................... 22

                 1.     Lack of Key Personnel, Departments, and Policies ........ 22

2.   Crypto Asset Management and Security ........................ 23

3.   Identity and Access Management ................................. 30

4.   Cloud and Infrastructure Security ................................ 32

5.   Application and Code Security ..................................... 35

6.   Debtors' Work to Identify and Secure Crypto Assets in
     the Computing Environment .............................. 37

V.   CONCLUSION ........................................................................ 39

## I.       Introduction

FTX Trading Ltd. ("FTX.com" and, together with its U.S. counterpart, FTX.US, the "FTX exchanges") was among the world's largest cryptocurrency exchanges, where millions of customers bought, sold and traded crypto assets.  The FTX exchanges gained international prominence for their popularity among users, their high-profile acquisitions and celebrity endorsements, and the public image of Sam Bankman-Fried, their co-founder and CEO, as a philanthropist who worked to enhance standards, disclosure, oversight, and customer protection in the crypto industry.[1]  On November 11, 2022, however, capping a stunning collapse that began just nine days earlier with the revelation of financial weakness at their affiliated trading firm, Alameda Research LLC ("Alameda"), the FTX exchanges and certain entities under common ownership (the "FTX Group")[2] filed for bankruptcy (the "Chapter 11 Cases").  Within weeks, Bankman-Fried was charged with perpetrating a multibillion-dollar fraud through the FTX Group with at least three senior insiders, who have pleaded guilty in connection with the scheme.

When the Chapter 11 Cases were first filed, the Debtors[3] identified five core objectives:  (1) implementation of controls, (2) asset protection and recovery, (3) transparency and investigation, (4) efficiency and coordination with any non-U.S. proceedings and

---

[1]       *See* David Yaffe-Bellany, *A Crypto Emperor's Vision: No Pants, His Rules*, N.Y. TIMES, May 14, 2022, https://www.nytimes.com/2022/05/14/business/sam-bankman-fried-ftx-crypto.html?.

[2]       The "FTX Group" refers to FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries.

[3]       The Debtors comprise the approximately one hundred entities associated with the FTX Group listed at https://restructuring.ra.kroll.com/FTX.

(5) maximization of value.[4]  It is in furtherance of these core objectives, particularly

transparency, that this first interim report is issued.  The Debtors plan to issue supplemental

reports which describe the cause and effect of the pre-petition events which lead up to the

Chapter 11 Cases.

              In working to achieve their objectives, the Debtors have had to overcome unusual

obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical

areas, including, among others, management and governance, finance and accounting, as well as

digital asset management, information security and cybersecurity.  Normally, in a bankruptcy

involving a business of the size and complexity of the FTX Group, particularly a business that

handles customer and investor funds, there are readily identifiable records, data sources, and

processes that can be used to identify and safeguard assets of the estate.  Not so with the FTX

Group.

              Upon assuming control, the Debtors found a pervasive lack of records and other

evidence at the FTX Group of where or how fiat currency and digital assets could be found or

accessed, and extensive commingling of assets.  This required the Debtors to start from scratch,

in many cases, simply to identify the assets and liabilities of the estate, much less to protect and

recover the assets to maximize the estate's value.  This challenge was magnified by the fact that

the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of

controls, that drained approximately $432 million worth of assets on the date of the bankruptcy

---

[4]      First Day Declaration of John Ray III, Dkt 24 ("First Day Declaration") ¶ 6.  *See also* Presentation to the
Official Committee of Unsecured Creditors, Dkt 507 at 7; Presentation to the Official Committee of Unsecured
Creditors, Dkt 792 (describing efforts to assess exchange shortfalls); Presentation to the Official Committee of
Unsecured Creditors, Dkt 1101 (describing statement of financial affairs).

petition (the "November 2022 Breach"),[5] and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

This first interim report provides a high-level overview of certain of the FTX Group's control failures in the areas of (i) management and governance, (ii) finance and accounting, and (iii) digital asset management, information security and cybersecurity. The report does not address all control failures in these or other areas. The Debtors continue to learn new information daily as their work progresses and expect to report additional findings in due course.

## II.     Background

The following is a brief description of the FTX Group entities most relevant to this interim report.

### A.     Alameda

Founded in 2017 by Bankman-Fried and Gary Wang, Alameda operated as a "crypto hedge fund" that traded and speculated in crypto assets and related loans and securities

---

[5]        All crypto asset values set forth in this report are as of the petition date, November 11, 2022.

for the account of its owners, Bankman-Fried (90%) and Wang (10%).[6]  Alameda also offered

over-the-counter trading services and made and managed other debt and equity investments.

Beginning in October 2021, Caroline Ellison acted variously as CEO and co-CEO of Alameda,

which was organized in the State of Delaware.

### B.    FTX.com

Founded in 2019 by Bankman-Fried and Wang, FTX.com was a digital asset

trading platform and exchange that was organized in Antigua and represented as being off-limits

to U.S. users.[7]  FTX.com was operated, at the most senior level, by Bankman-Fried, Wang, and

Nishad Singh, who had worked at Alameda and joined FTX.com soon after it was launched.  By

November 2022, FTX.com had more than seven million registered users around the world.

### C.    FTX.US

Founded in January 2020 by Bankman-Fried, Wang, and Singh, FTX.US was an

exchange for spot trading in digital assets and tokens in the United States.  The FTX.US platform

was organized in the State of Delaware.  By November 2022, FTX.US had over one million U.S.

users.[8]

## III.    Scope of Review

### A.    Retention of Advisers

In connection with the Chapter 11 Cases and related matters, the Debtors have

retained a number of advisers, including:[9]

---

[6]      First Day Declaration ¶ 22.

[7]      *See id.* ¶ 33.

[8]      *Id.* ¶ 21.

[9]      This summary is limited to the advisers, and the work these advisers are performing, on the control failures that are relevant to this interim report.  As noted in the Debtors' Chapter 11 filings, some of these advisers have additional responsibilities, and the Debtors have retained additional advisers beyond those listed here to assist with other important matters of the estate.

- **Legal:**  The Debtors retained Sullivan & Cromwell LLP as lead counsel to assist in the filing and prosecution of the Chapter 11 Cases, investigating potential causes of action and avenues of recovery for the Debtors' estate, and responding to requests from government authorities, among other matters.  The Debtors also retained Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to assist the Debtors and the Board in litigating bankruptcy-related matters against third parties, and investigating and prosecuting certain claims, including asset recovery actions.

- **Restructuring, asset identification and forensic accounting:**  The Debtors retained Alvarez & Marsal North America, LLC ("A&M") as their restructuring adviser to assist in identifying, quantifying, and securing liquid and crypto assets, investments, and other property of the Debtors' estate, as well as development of ongoing business plans and supporting the overall restructuring process.  The Debtors also retained AlixPartners LLP ("AlixPartners") to assist in tracing and analyzing financial and accounting data, including trading activity and FTX Group internal transfers, and re-constructing historical financial statements for each Debtor entity.

- **Cybersecurity, computer engineering, and cryptography:**  The Debtors retained Sygnia, Inc. ("Sygnia") to secure their computing environment following the November 2022 Breach; to identify and secure the Debtors' remaining digital assets; to investigate the November 2022 Breach; and to perform technical and forensic analysis in support of the Debtors' other ongoing work to recover assets.

- **Blockchain analytics:**  The Debtors retained TRM Labs, Inc. ("TRM") and Chainalysis Inc. ("Chainalysis") to engage in blockchain analysis to assist A&M and Sygnia in identifying crypto assets of the Debtors, and to monitor crypto assets stolen in the November 2022 Breach, including in order to work with law enforcement and other third parties to attempt to freeze and recover the stolen assets.

Identifying and recovering assets of the Debtors' estate, and identifying potential claims of the estate, requires extensive coordination among these advisers, particularly given the FTX Group's lack of adequate record keeping and extensive commingling of assets.

     **B.**     **Data Collection**

     To date, the Debtors have reviewed over one million documents collected from Debtor entities around the world, including communications (*e.g.*, Slack, Signal, email) and other documents (*e.g.*, Excel spreadsheets, Google Drive documents).  The Debtors have also been engaged in substantial analysis of FTX Group customer transaction data, which is housed in databases that are over one petabyte (*i.e.*, 1000 terabytes) in size.  The Debtors' review of relevant documents and customer transaction data remains ongoing.

The Debtors have also reviewed and analyzed the FTX Group's available financial records. These include QuickBooks, which certain entities in the FTX Group used as their general ledgers; certain bank statements; financial statements; tax returns; promissory notes evidencing intercompany loans; spreadsheets recording real estate transactions, political and charitable contributions, and venture investments; and Slack channels devoted to expense reimbursements and related matters.

Finally, the Debtors have analyzed a small set of laptops and other electronic devices of certain employees of the FTX Group, and continue to collect such devices. The set of electronic devices in the Debtors' possession does not include those known to have belonged to Bankman-Fried and other key insiders that are currently in the possession of the Bahamian Joint Provisional Liquidators ("JPLs") and are the subject of ongoing discussion between the Debtors and the JPLs.

C.    **Witnesses**

To date, the Debtors have conducted interviews of 19 employees of the FTX Group, and received substantial information through counsel for five others. These include interviews of employees who worked in Policy and Regulatory Strategy, Information Technology, Controllers, Administration, Legal, Compliance, and Data Science and Engineering, among others. The Debtors continue to identify, interview, and collect information from potentially relevant witnesses.

While Singh, Wang, and Ellison have pleaded guilty pursuant to cooperation agreements with the Justice Department, it is generally not feasible for the Debtors to interview them on key subjects until after the ongoing criminal prosecution of Bankman-Fried has concluded. Wang has provided discrete assistance to the Debtors' financial and technical advisors.

## IV.    Review of Control Failures

The FTX Group's control failures created an environment in which a handful of employees had, among them, virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight or controls to act as checks on how they exercised those powers. These employees, particularly Bankman-Fried, deprioritized or rejected advice to improve the FTX Group's control framework, exposing the exchanges to grave harm from both external bad actors and their own misconduct.

### A.    Lack of Management and Governance Controls

The FTX Group lacked appropriate management, governance, and organizational structure. As a result, a primary objective of the Debtors has been to institute an appropriate governance framework from the outset of the bankruptcy.

#### 1.    FTX Group Management and Governance

The management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions, and Singh and Wang largely deferred to him.[10] These three individuals, not long out of college and with no experience in risk management or running a business, controlled nearly every significant aspect of the FTX Group. With isolated exceptions, including for FTX.US Derivatives ("LedgerX"), a non-Debtor entity it acquired in late 2021, FTX Japan, a Debtor acquired in 2022, and Embed Clearing LLC, a non-Debtor acquired in 2022, the FTX Group lacked independent or experienced finance, accounting, human resources, information security, or cybersecurity personnel or leadership, and lacked any internal audit function whatsoever. Board oversight, moreover, was also effectively non-existent.

---

[10]    *See, e.g.*, *SEC* v. *Caroline Ellison et al.*, 22-cv-10794 (S.D.N.Y. Dec. 21, 2022), Compl. ¶¶ 21, 25, 45(b), 45(c), 46, 67, 96, Dkt 1; *SEC* v. *Nishad Singh*, 23-cv-01691 (S.D.N.Y. Feb. 28, 2023), Compl. ¶¶ 8, 9, 32, 34, 40, 50-51, 67, 90, 100, Dkt 1.

Most major decision-making and authority sat with Bankman-Fried, Singh, and Wang, and numerous significant responsibilities were not delegated to other executives or managers even where such individuals had been hired. Commenting on Wang's and Singh's control over the FTX Group's technology development and architecture, an FTX Group executive stated that "if Nishad [Singh] got hit by a bus, the whole company would be done. Same issue with Gary [Wang]."

Efforts to clarify corporate responsibilities and enhance compliance were not welcome and resulted in backlash. For example, the President of FTX.US resigned following a protracted disagreement with Bankman-Fried and Singh over the lack of appropriate delegation of authority, formal management structure, and key hires at FTX.US; after raising these issues directly with them, his bonus was drastically reduced and senior internal counsel instructed him to apologize to Bankman-Fried for raising the concerns, which he refused to do. Similarly, less than three months after being hired, and shortly after learning about Alameda's use of a North Dimension bank account to send money to customers of the FTX exchanges, a lawyer within the FTX Group was summarily terminated after expressing concerns about Alameda's lack of corporate controls, capable leadership, and risk management.

Echoing its lack of appropriate management and governance structure, the FTX Group lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interests, all under the ultimate control of Bankman-Fried.

The FTX Group's lack of management and governance controls also manifested in the absence of any comprehensive organizational chart of the FTX Group entities prior to the end of 2021, and the lack of any tracking of intercompany relationships and ownership of

-8-

particular entities.  At the time of the bankruptcy filing, the FTX Group did not even have

current and complete lists of who its employees were.

        **2.**      **Debtors' Management and Governance**

        A primary objective of the Debtors was to institute an appropriate management,

governance, and structural framework at the outset of the bankruptcy.  To do so, the Debtors

arranged the conduct of the Chapter 11 Cases into four groups of businesses, or "Silos," for

organizational purposes:  (a) Debtor West Realm Shires Inc. and its Debtor and non-Debtor

subsidiaries (the "WRS Silo"), which includes the businesses known as FTX.US, LedgerX,

FTX.US Derivatives, FTX.US Capital Markets, and Embed Clearing, among other businesses;

(b) Debtor Alameda Research LLC and its Debtor subsidiaries (the "Alameda Silo"); (c) Debtor

Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures

Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) Debtor FTX Trading Ltd. and

its Debtor and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing

business as "FTX.com" and similar exchanges in non-U.S. jurisdictions.  The Debtors then

moved expeditiously to build a Board of Directors that, for the first time, would provide

independent oversight of the disparate corporate chains that constituted the FTX Group.

        As previously set forth in filings in the Chapter 11 Cases, the Debtors appointed a

board of directors (the "Board") consisting of five directors with respective silo

responsibilities.[11]  These directors were wholly independent from the FTX Group, and have a

wealth of experience in complicated restructuring matters well suited to the Debtors' present

---

[11]     First Day Declaration ¶¶ 46-47.

circumstances.[12]  The Board meets effectively on a weekly or more frequent basis on matters of common interest of the Silo directors, including the objectives set forth above.[13]

The Debtors appointed John J. Ray III as their Chief Executive Officer, Mary Cilia as their Chief Financial Officer, Kathryn Schultea as their Chief Administrative Officer, and Raj Perubhatla as their Chief Information Officer.  These officers each have extensive experience in providing crisis management services, including work relating to complex financial and operational restructurings, to distressed and under-performing companies.  Collectively, these executives have over 125 years of experience, including at senior management levels of public companies.

**B.      Lack of Financial and Accounting Controls**

At its peak, the FTX Group operated in 250 jurisdictions, controlled tens of billions of dollars of assets across its various companies, engaged in as many as 26 million transactions per day, and had millions of users.  Despite these asset levels and transaction volumes, the FTX Group lacked fundamental financial and accounting controls.  Reconstruction of the Debtors' balance sheets is an ongoing, bottom-up exercise that continues to require significant effort by professionals.

---

[12]      *Id.*  The Director of the WRS Silo is Mitchell I. Sonkin, a Senior Advisor to MBIA Insurance Corporation. The Director of the Alameda Silo is Matthew R. Rosenberg, a Partner at Lincoln Park Advisors.  The Director of the Ventures Silo is Rishi Jain, a Managing Director and Co-Head of the Western Region of Accordion.  The Director of the Dotcom Silo, and the Lead Independent Director, is the Honorable Joseph J. Farnan, who served for almost three decades as a United States District Judge for the District of Delaware.

[13]      At this phase in the Chapter 11 Cases, the Debtors are focused on asset recovery and maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and property around the world.  The Debtors believe that all Silos benefit from this central administration process and full visibility of the assets being obtained, and the various sales processes being run, with all Silo Directors participating in the relevant decision-making processes in order to flag any inter-Silo issues early. At a later stage in the Chapter 11 Cases, when the Debtors' assets have been appropriately marshaled and secured, the Board and Debtors will turn their focus to distributional matters. The Board has also implemented appropriate procedures for the resolution of any conflicts of interest among the Silos and if necessary as the case progresses, any Silo may engage independent counsel in connection with the resolution of intercompany claims which, as the Debtors have previously noted, are likely to be complex but are still in the process of being assessed.

1.      **Lack of Key Personnel, Departments and Policies**

The FTX Group did not have personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports.  Key executive functions, including those of Chief Financial Officer, Chief Risk Officer, Global Controller and Chief Internal Auditor, were missing at some or all critical entities.  Nor did the FTX Group have any dedicated financial risk, audit, or treasury departments.  Although certain of the FTX Group entities nominally employed individuals responsible for accounting at those entities, in many instances, those individuals lacked the requisite expertise and had little or no internal staff.  As a general matter, policies and procedures relating to accounting, financial reporting, treasury management, and risk management did not exist, were incomplete, or were highly generic and not appropriate for a firm handling substantial financial assets.

Indeed, in late December 2020, when the FTX Group learned, in connection with exploring a potential direct listing on NASDAQ, that FTX.US would have to be audited, and that this audit would include a review of policies and procedures, senior FTX Group personnel scrambled to cobble together purported policies that could be shown to auditors.  In requesting the assistance of certain employees in quickly writing policies, FTX Group management informed them that because the "auditors [would] spend time in understanding and reviewing [FTX] internal processes," internal controls would have to be documented.  FTX Group management asked employees "well-versed with" "parts of the [work]flow" to provide first drafts of policies and procedures in a mere 24 hours.  It is unclear to what extent the resulting policies—which were prepared by editing off-the-shelf precedents provided by the FTX Group's outside accountants—reflected the reality of the FTX Group's business, but they were never formally promulgated, and no employees were ever trained on them.

-11-

The FTX Group principally relied on a small outside accounting firm to perform almost all of its basic accounting functions. Although the outside accountants' public profile is limited, it appears to have a small number of employees and no specialized knowledge relating to cryptocurrencies or international financial markets. There is no evidence that the FTX Group ever performed an evaluation of whether its outside accountants were appropriate for their role given the scale and complexity of the FTX Group's business, or whether they possessed sufficient expertise to account for the wide array of products in which the FTX Group transacted.

### 2. Lack of Appropriate Accounting Systems

Companies with operations as large and complex as those of the FTX Group normally employ either an advanced off-the-shelf Enterprise Resource Planning ("ERP")[14] system (*e.g.*, Oracle Fusion Cloud ERP, SAP S/4HANA Cloud) or a sophisticated proprietary system tailored to the accounting needs of the business such as, for a crypto exchange or trading business, a system tailored to the crypto assets in which the business transacted. Any appropriate accounting system should be capable of handling large volumes of data to accurately record, process, and report financial statement information (balance sheet/income statement) as well as operational information (actual versus budgeted spending), and to store key supporting materials. To minimize the risk of data integrity errors and the need for manual processing of transactions, data should flow automatically into the accounting system from core systems of the business, with transactions recorded based on appropriate accounting criteria and logic. None of the FTX Group companies employed such an accounting system.

Fifty-six entities within the FTX Group did not produce financial statements of any kind. Thirty-five FTX Group entities used QuickBooks as their accounting system and

---

[14]     An ERP system is a type of software system that helps an organization automate and manage core business processes for optimal performance. ERP software coordinates the flow of data among a company's business processes, streamlining operations across the enterprise.

relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities. QuickBooks is an accounting software package designed for small and mid-sized businesses, new businesses, and freelancers.[15]  QuickBooks was not designed to address the needs of a large and complex business like that of the FTX Group, which handled billions of dollars of securities, fiat currency, and cryptocurrency transactions across multiple continents and platforms.

As a result of the FTX Group's poor controls, and the inherent limitations of QuickBooks software for use in a large and complex business, the FTX Group did not employ QuickBooks in a manner that would allow it to maintain accurate financial records.  For example, QuickBooks did not interface directly with the FTX Group's core systems.  Data had to be transported from the FTX Group systems into QuickBooks manually, generally by outside accountants who did not have access to the source data to validate that they had completely and accurately transferred the data into QuickBooks.  Furthermore, because they processed large volumes of data only manually, a great deal of transaction detail (*e.g.*, the purpose of a transaction) was either populated *en masse*, or omitted entirely.  Substantial accounts and positions went untracked in QuickBooks.  Digital asset transactions were tracked in QuickBooks using the generic entry "investments in cryptocurrency," but detailed recordkeeping reflecting what those cryptocurrency investments actually consisted of did not exist in QuickBooks, making reconciliation with other data sources extremely challenging or impossible. Approximately 80,000 transactions were simply left as unprocessed accounting entries in catch-all QuickBooks accounts titled "Ask My Accountant."  Further complicating matters,

---

[15]    *See* INTUIT QUICKBOOKS, https://quickbooks.intuit.com/ (last visited Apr. 4, 2023).

QuickBooks entries were often made months after transactions occurred, rendering impossible real-time financial reporting and risk management.

Alameda often had difficulty understanding what its positions were, let alone hedging or accounting for them. For the vast majority of assets, Alameda's recordkeeping was so poor that it is difficult to determine how positions were marked. A June 2022 "Portfolio summary" purporting to model cryptocurrency positions held by Alameda stated, with respect to valuation inputs for certain tokens, that Alameda personnel should "come up with some numbers? idk." In an internal communication, Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

Bankman-Fried's statements evidence the challenges a competent audit firm would have had to overcome to audit Alameda's business.

### 3.    Inadequate Reporting and Documentation

A large number of FTX Group entities did not close financial reporting periods on a timely basis, and back-end checks to identify and correct material errors (*e.g.*, secondary review of transactions over a certain size, reconciliations of bank accounts, cryptocurrency wallets transactions, and other off-exchange positions) did not occur. These and other deficiencies resulted in numerous, often substantial, positions either not being recorded or being recorded in vague or inaccurate ways.

Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party

-14-

transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly. Important treasury reports, such as reports on daily liquidity, daily settlement, funding mismatches, concentration risk, and liability profiles, did not exist or were not prepared regularly. Copies of key documentation—including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types—were incomplete, inaccurate, contradictory, or missing entirely. Thousands of deposit checks were collected from the FTX Group's offices, some stale-dated for months, due to the failure of personnel to deposit checks in the ordinary course; instead, deposit checks collected like junk mail. As discussed in greater detail below, the FTX Group did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories. The Debtors have had to construct this historical data from scratch and make sense of the numerous resulting discrepancies, anomalies, and undocumented positions.

Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging. To make matters worse, Slack, Signal, and other informal methods of communication were frequently used to document approvals. Signal and Telegram were at times utilized in communications with both internal and external parties with "disappearing messages" enabled, rendering any historical review impossible. Expenses and invoices of the FTX Group were submitted on Slack and were approved by "emoji." These informal, ephemeral messaging systems were used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all.

Numerous loans were executed between former insiders and Alameda without contemporaneous documentation, and funds were disbursed pursuant to those purported loans with no clear record of their purpose. In one instance, an insider entered into an agreement to

-15-

purchase a piece of real estate. The funds used to purchase that property, however, were wired directly from Alameda and FTX Digital Markets Ltd. ("FTX DM"), a Bahamas-based entity which was owned by, and had obtained the funds from, FTX Trading Ltd. Only four months after the real estate purchase had closed did the employee enter into a promissory note with Alameda in which he undertook to repay the funds used to purchase the property. Other insiders received purported loans from Alameda for which no promissory notes exist.

### 4. Trading Records from Other Exchanges

While the FTX Group maintained over a thousand accounts on external digital asset trading platforms in jurisdictions around the world, many of which held significant assets at various points in time, it had no comprehensive, centralized source of information reflecting the purpose of these accounts, or the credentials to access them. Many of these accounts were opened using names and email addresses that were not obviously linked to any of the FTX Group entities. Other accounts were opened using pseudonymous email addresses, in the names of shell companies created for these purposes, or in the names of individuals (including individuals with no direct connection to the FTX Group).

The Debtors have been working to identify and access these external accounts in order to secure the Debtors' assets and extract historical trading data. Obtaining such access has required significant document review, interviews with current and former employees, and engagement with the external platforms. In many instances, accounts belonging to the Debtors have been seized, locked, or frozen, requiring further coordination with the platforms and foreign government agencies to provide adequate proof of ownership and authorization to access the accounts.

### 5.     Intercompany Transactions

The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions.  Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation.  Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors.  Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally "papered" as personal loans with below-market interest rates and a balloon payment due years in the future.

Intercompany and insider transfers were often recorded on the QuickBooks general ledgers in a manner that was inconsistent with the apparent purpose of the transfers.  For example, an Alameda bank account transferred tens of millions of dollars to a personal bank account of Bankman-Fried in 2021 and 2022.  Although the transfers were documented in promissory notes as loans from Alameda to Bankman-Fried, they were recorded on the general ledger as "Investment in Subsidiaries:  Investments-Cryptocurrency."  The Debtors have identified examples of intercompany transactions that do not balance to each other (*i.e.*, where the amounts "due to" and "due from" do not balance across the relevant entities).  North Dimension, a shell company owned by Alameda, frequently recorded cash transfers to Alameda accounts in the general ledger with the description "interco transfer reflecting bank wire," without otherwise stating the purpose or substance of the transaction.

In addition to these inconsistencies, many intercompany transactions recorded in the QuickBooks general ledgers involved digital assets, but critical records regarding which digital assets were transferred, and at what values they were transferred, were not maintained in

QuickBooks. Multiple intercompany transactions were recorded in QuickBooks by grouping many transactions together in summary batch entries without sufficient information to identify or properly account for the underlying transactions. Compounding the issue, these batch entries were then recorded under generalized account names in QuickBooks such as "investments in cryptocurrency," as described above. The cumulative impact is that these intercompany transactions as recorded in QuickBooks are difficult to reconcile with underlying documentation, and have required substantial additional investigation to understand and properly account for.

### 6. Extraordinary Privileges Granted to Alameda

Alameda was a customer of FTX.com, trading for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group.[16] As detailed below, the FTX Group configured the codebase of FTX.com and associated customer databases to grant Alameda an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers. Any number of different controls routinely implemented by financial institutions and exchanges in established financial markets would be expected to have prevented, detected, and escalated these secret privileges to personnel in control functions with sufficient independence and authority to address the issue.[17]

---

[16]     FTX Group granted the same privileges to Alameda on FTX.US. Because the Debtors' investigation is ongoing as to whether or to what extent Alameda made use of these privileges on FTX.US, this discussion focuses on FTX.com.

[17]     For instance, at a financial institution, these privileges would be expected to be identified by the finance department, as part of balance activity reports and margin balance monitoring; the market risk department, via VAR calculations and funding risk metrics; and the accounting department, through reconciliations of account-level balances against independently calculated aggregate exchange balances; and by having compliance, information technology, risk management, and finance departments that are segregated and independent from traders and other front-line business personnel.

The FTX Group not only failed to disclose these privileges to its customers or the public, but affirmatively misrepresented Alameda's privileged status relative to that of other customers. On July 31, 2019—the same day Singh altered the codebase to allow Alameda to withdraw apparently unlimited amounts of crypto assets from FTX.com, and a week after he altered it to effectively exempt Alameda from auto-liquidation—Bankman-Fried claimed on Twitter that Alameda's account was "just like everyone else's and "Alameda's incentive is just for FTX to do as well as possible."[18] As recently as September 2022, in interviews with reporters, Bankman-Fried claimed that Alameda was a "wholly separate entity" and Ellison claimed that Alameda was "arm's-length and [did not] get any different treatment from other market makers."[19]

### a. FTX customers and auto-liquidation processes

In general, there were two types of customers on FTX.com: retail customers and market makers (*i.e.*, liquidity providers that stand ready to buy or sell to satisfy market demand). As to both types of customers, the exchange implemented automatic liquidation processes such that if the customer's account balance fell below a certain threshold, then the customer's existing positions on the exchange would be liquidated (*i.e.*, sold off) until the account balance became net-positive again.

For retail customers, the auto-liquidation process was triggered if the customer's account balance approached zero. Market-makers and certain other preferred customers were

---

[18]    Sam Bankman-Fried, Twitter (July 31, 2019), *at*
https://twitter.com/bitshine_/status/1156665108174651392?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7
Ctwterm%5E1156696100729806849%7Ctwgr%5E4bccfdc775938ec4496be7f2a64f95301cbc3e7b%7Ctwcon%5Es
2_&ref_url=https%3A%2F%2Fwww.forbes.com%2Fadvisor%2Finvesting%2Fcryptocurrency%2Fwhat-happened-
to-ftx%2F (responding to a Twitter user's question about how Bankman-Fried would "resolve the conflict of interest
of running [his] own derivative exchange, AND actively trading against the market at the same time").

[19]    Annie Massa, Anna Irrera, and Hannah Miller, *Quant Shop with Ties to FTX Powers Bankman-Fried's
Crypto Empire*, BLOOMBERG NEWS (Sept. 14, 2022).

provided lines of credit in amounts that varied by customer up to a maximum of $150 million; for those customers, the auto-liquidation process would be triggered if the account became negative and approached the pre-set borrowing limit.

Apart from auto-liquidation processes that prevented customers from trading on the exchange if their balance went below a given threshold, through the operation of its code, FTX.com did not allow customers—except, as set forth below, Alameda—to withdraw assets from the exchange in excess of the amount of their net-positive account balance.

### b. Alameda's privileges

Contrary to the public claims of FTX Group management, the FTX Group exempted Alameda from the automatic processes set forth above in multiple ways. Specifically, one of the privileges secretly granted to Alameda, executed through a setting known as "*borrow*," permitted Alameda alone to trade on FTX.com effectively without regard to the size of its overall negative position. *Borrow* was a field in the customer account settings within the FTX.com exchange's customer databases that contained a value for each customer representing how much the customer could "borrow"—*i.e.*, whether and to what extent the customer's account balance could become net-negative without triggering trade restrictions or the FTX.com exchange's auto-liquidation processes. As of the petition date, on FTX.com:

- Most retail customers had a *borrow* value of zero;

- Certain preferred customers and market makers had a *borrow* value greater than zero and in amounts up to $150 million;

- Alameda alone had a *borrow* value set to $65 billion.[20]

The second and third privileges secretly granted to Alameda, known as "*can_withdraw_below_borrow*," and "*allow_negative*," provided Alameda the unique ability to withdraw an unlimited amount of crypto assets from FTX.com even when its account balance was net-negative. Singh added these features to the codebase of the FTX.com exchange on July 23, 2019 and July 31, 2019, respectively. It appears that Alameda's *can_withdraw_below_borrow* privilege was quickly supplanted by the addition to the codebase of *allow_negative*, which operated in essentially the same manner and controlled in the event of conflict with the settings for *can_withdraw_below_borrow*.[21]

*Allow_negative* referred to a field in the FTX.com exchange's customer databases that, if set to "true" for a particular customer, (i) allowed the customer to *withdraw* an unlimited amount of crypto assets from the FTX.com exchange while having a net-negative account balance (as opposed to merely "borrow") and (ii) exempted the customer from the FTX.com exchange's automatic liquidation processes. As of the petition date, Alameda was the only customer on FTX.com for which *allow_negative* was set to "true." When taken together, Alameda's $65 billion *borrow* and *allow_negative* settings gave it the unique ability to trade and

---

[20]     Due to the FTX Group's failure to maintain appropriate database logs, it is not possible to determine precisely when these particular *borrow* values for Alameda were configured, or by whom. In interviews, one FTX Group employee recalled that, in approximately the summer of 2022, he discovered a configuration that gave Alameda a line of credit in a very large amount, and raised the issue with Singh, who responded that he would reduce the amount to $1 billion (an amount that would still be approximately seven times larger than that of any customer or market maker on the exchange). Due to the lack of database logs, it is unclear what Alameda's *borrow* value was set to at the time, or to what extent Singh made any change to reduce it. Nonetheless, database records reflect that as of the petition date, Alameda's *borrow* limit was set to $65 billion.

[21]     While it appears that *can_withdraw_below_borrow* was thus rendered obsolete by Singh's addition of *allow_negative*, the Debtors currently understand that the *borrow* privilege granted to Alameda continued to remain relevant because Alameda would still need a net-positive account balance (after accounting for the specified *borrow* value) in order to actually trade on the exchange.

withdraw virtually unlimited assets, regardless of the size of its account balance and without risk of its positions being liquidated.

The Debtors' investigation of extraordinary privileges granted to Alameda remains ongoing.

### C. Lack of Digital Asset Management, Information Security & Cybersecurity Controls

The Debtors identified extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity. These deficiencies were particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets. As a result of these control failures, the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach.

#### 1. Lack of Key Personnel, Departments, and Policies

While the FTX Group employed software developers and a single dedicated IT professional, it had no dedicated personnel in cybersecurity, a specialized discipline that generally acts as a "check" to mitigate risks posed by business pressure for technology to operate as fast and easily as possible. The FTX Group had no independent Chief Information Security Officer, no employee with appropriate training or experience tasked with fulfilling the responsibilities of such a role, and no established processes for assessing cyber risk, implementing security controls, or responding to cyber incidents in real time. Instead, its security was largely managed by Singh and Wang, neither of whom had the training or experience to handle the FTX Group's cybersecurity needs, and both of whom had responsibilities for the speed, efficiency, and continuing development of the FTX Group's technology, which are business needs that generally run counter to those of security and thus are

not appropriately managed by the same personnel. In short, as with critical controls in other areas, the FTX Group grossly deprioritized and ignored cybersecurity controls, a remarkable fact given that, in essence, the FTX Group's entire business—its assets, infrastructure, and intellectual property—consisted of computer code and technology.

### 2. Crypto Asset Management and Security

A critical responsibility of a crypto exchange, as with any business that holds funds provided by others, is to safeguard crypto assets from loss, misuse, misappropriation, or theft by insiders or unauthorized third parties. Crypto exchanges face unique security challenges in this regard, which only heightens their need to focus adequate time, resources, and expertise on fulfilling this core responsibility.

### a. Crypto wallets and storage

Crypto assets are held in a crypto wallet, which consists of (i) a public key that serves as the asset owner's identifier on the blockchain ledger, and (ii) a private key that is required to access the user's crypto holdings, authorize transactions, and exercise ownership over a blockchain asset. A crypto wallet can either be a "cold" wallet (*i.e.*, an offline storage unit[22]) or a "hot" wallet (*i.e.*, a storage unit that is connected to the internet). Crypto assets held in hot wallets are at a higher risk of compromise because hot wallets are internet-connected, rendering their private keys vulnerable to hacking, malware, and other cybersecurity threats. Compounding the risk, blockchain transactions are generally irreversible and anonymous, making unauthorized transfers particularly challenging, if not impossible, to recover. For these reasons, it is axiomatic in the crypto industry that a private key should be kept confidential,

---

[22] Assets maintained in cold wallets are typically kept in a physically secured location and accessed only by authorized personnel on a need-to-access basis, a method known as "cold storage."

including by being generated and stored in a secure and encrypted manner,[23] and used exclusively by the owner.  Relatedly, businesses that control private keys need detailed access control policies such that the keys may only be accessed by authorized parties or systems.

The FTX Group stored the private keys to its crypto assets in its cloud computing environment, which included over one thousand servers and related system architecture, services, and databases that it leased from Amazon Web Services (the "AWS account").  AWS's cloud computing platform offers businesses a range of infrastructure-as-a-service (IaaS), platform-as-a-service (PaaS), and software-as-a-service (SaaS) capabilities, and through it, like other businesses, the FTX Group customized, configured, and controlled its own cloud environment.

### b.     Lack of security controls to protect crypto assets

The FTX Group failed to implement basic, widely accepted security controls to protect crypto assets.  Each failure was egregious in the context of a business entrusted with customer transactions, and any one of the controls may have prevented the loss in the November 2022 Breach.  Taken together, the failures were further magnified, since each control failure exacerbated the risk posed by the others.

*First*, the FTX Group kept virtually all crypto assets in hot wallets, which are far more susceptible to hacking, theft, misappropriation, and inadvertent loss than cold wallets because hot wallets are internet-connected.  Prudently-operated crypto exchanges keep the vast majority of crypto assets in cold wallets, which are not connected to the internet, and maintain in hot wallets only the limited amount necessary for daily operation, trading, and anticipated

---

[23]      Encryption is the process by which readable data is converted to an unreadable form to prevent unauthorized parties from viewing or using it.  Plaintext, by contrast, refers to data that is unencrypted and, therefore, can be viewed or used without requiring a key or other decryption device.

customer withdrawals.[24]  Relatedly, prudently-operated crypto exchanges implement strict

processes and controls to minimize the security risks (for example, the risk of hacking, theft or

loss) inherent in the transfer of crypto assets between hot and cold wallets.

        The FTX Group undoubtedly recognized how a prudent crypto exchange should

operate, because when asked by third parties to describe the extent to which it used cold storage,

it lied.  For example, in 2019, Bankman-Fried falsely responded to a customer question on

Twitter by providing assurance that "[we use the] standard hot wallet/cold wallet setup."[25]  In

2022, the FTX Group responded to questions posed by certain advisers and counterparties about

its use of cold storage as follows:

> FTX uses a best practice hot wallet and cold wallet standard solution for the
> custody of virtual assets. The firm aims to maintain sufficient virtual assets in
> the hot wallet to cover two days of trading activities, which means only a
> small proportion of assets held are exposed to the internet, the remaining
> assets are stored offline in air gapped encrypted laptops, which are
> geographically distributed. The 2-day trading figure is continuously
> monitored and if the hot wallet exceeds this amount, it will overflow into the
> cold wallet. If the figure drops below the 2-day trading figure, the hot wallet
> will be topped up from the cold wallet.

These representations were false.  None of FTX.com, FTX.US, or Alameda had a system in

place to monitor or move to cold wallets crypto assets in excess of the amount needed to cover

two days of trading activity, and they did not use offline, air-gapped, encrypted, and

geographically distributed laptops to secure crypto assets.

---

[24]     Although there is currently no regulation in the United States that requires exchanges to use cold wallets to store customer assets, other regulatory authorities have imposed such requirements.  For instance, regulation in Japan mandates that "Crypto Asset Exchange Service Providers" keep at least 95% of users' crypto assets in a device that is always disconnected from the internet.  *See* Article 63-11(2) Payment Services Act in connection with Article 27(2) Cabinet Order on Crypto Asset Exchanges.  Offline storage of information is also a standard security practice and control for organizations outlined in the U.S. National Institute of Standards and Technology ("NIST")'s Special Publication 800-53 under System and Communications Protection SC-28(2).

[25]     Sam Bankman-Fried, (@SBF_FTX), Twitter (Aug. 16, 2019, 5:00 AM), https://twitter.com/SBF_FTX/status/1162288084634836993.

FTX Group employees openly acknowledged uncertainty about FTX Group's use of cold storage, and that regulators and users appeared to receive different information on the subject. In Slack communications in October 2022, an FTX Group employee relayed an internal communication that "it's ab[ou]t 70% cold and 30% hot," and that he had been instructed that this information was not to be shared with regulators unless it was specifically requested. Another FTX Group employee responded that if the question was being posed by "non-regulators," then "we say 10% in hot wallet, and 90% in cold wallet."

In fact, neither of these assertions about cold storage use was true. Outside of Japan, where required by regulation to use cold storage, the FTX Group made little use of cold storage. The Debtors have identified evidence that an individual associated with LedgerX, a non-Debtor entity, recommended to FTX Group management that FTX.US secure crypto assets in cold storage using a system similar to that employed by LedgerX, but no such system was put in place prior to the bankruptcy.

*Second*, the FTX Group failed to employ multi-signature capabilities or Multi-Party Computation ("MPC") controls (together, "multi-signature/MPC controls") that are widely used throughout the crypto industry to protect crypto assets. These controls require the cooperation of multiple individuals using unique keys or key fragments to effectuate a transaction.[26] As a result, the controls significantly reduce the risk of fraud, theft, misuse, or errors either by any single individual or in the event any single individual's key or key fragment is compromised. These controls are widely understood to be crucial for crypto exchanges to ensure that unauthorized transactions do not occur, for many reasons: exchanges are regularly

---

[26] "Multi-signature" refers to the requirement that two or more authorized individuals provide unique keys or credentials to perform sensitive or critical operations, such as engaging in a high-value transfer of crypto assets. MPC controls generate multiple private keys required to digitally sign transactions, thus providing multi-signature capabilities to crypto assets that do not natively support multi-signature. Because MPCs utilize cryptographic methods, multiple parties can act to effect a single transaction without revealing their private keys to each other.

targeted by hackers; exchanges custody assets provided by others, heightening the need for security; exchanges engage in a high volume of transactions, increasing the likelihood that errors will occur; and, as noted above, compounding all of these issues, crypto assets may be difficult or impossible to recover once they have been transferred.

While a single-key mechanism may not be inappropriate for wallets holding a relatively small amount of assets, such as those held by many retail customers, there is no question that a crypto exchange should employ multi-signature/MPC controls and cold storage solutions for—at a minimum—the central wallets that hold the majority of the crypto assets of the exchange. Nonetheless, neither the FTX exchanges nor Alameda utilized them to protect crypto assets. In the few instances in which the FTX Group even attempted to employ these controls, it misapplied them: for each wallet, the FTX Group stored together, in one place, all three private keys required to authorize a transfer such that any individual who had access to one had access to all the keys required to transfer the contents of the wallet, thus defeating the purpose of the controls.

*Third*, the FTX Group failed to manage or implement any appropriate system to attempt to manage private keys. As noted above, because crypto assets in a hot wallet may be misappropriated by anyone with access to the private key for that wallet, private keys must be maintained in a highly-secure manner. For crypto exchanges, controls to protect and manage keys are of paramount importance because customers who transfer crypto assets from their own wallets to the exchange's wallet must relinquish control over the security of their assets to the exchange. Exchanges and other crypto businesses rely on a variety of methods of secure key storage and management that are generally not difficult to implement, and they rely on detailed access control and management policies such that the keys may only be accessed by authorized

parties or systems critical to the operation of the associated wallets.[27]  Businesses also regularly

retain the services of third-party crypto custodians to secure their crypto assets and minimize the

risk of maintaining their own private keys.

Despite the well-understood risks, private keys and seed phrases[28] used by

FTX.com, FTX.US, and Alameda were stored in various locations throughout the FTX Group's

computing environment in a disorganized fashion, using a variety of insecure methods and

without any uniform or documented procedure.  Among other examples:

- The Debtors identified private keys to over $100 million in Ethereum assets stored in plain text and without encryption on an FTX Group server.

- The Debtors identified private keys, as well as credentials to third-party exchanges, that enabled access to tens of millions of dollars in crypto assets that were stored in plain text and without encryption across multiple servers from which they could be accessed by many other servers and users in many locations.

- Single-signature-based private keys to billions of dollars in crypto assets were stored in AWS Secrets Manager (a cloud-based tool used to manage sensitive information), and/or a password vault (a tool for secure storage of passwords), neither of which is designed to meet the needs of secure-key storage; any of the many FTX Group employees who had access to AWS Secrets Manager or the password vault could access certain of the keys and unilaterally transfer the corresponding assets.[29]

- Alameda also lacked appropriate documentation as to the description or usage of private keys.  For example, a key for $600 million dollars' worth of crypto assets was titled with four non-descriptive words, and stored with no information about what the key was for, or who might have relevant information about it.  The Debtors identified other keys to millions of dollars in crypto assets that were simply titled "use this" or "do not use," with no further context.

---

[27]     Examples of these methods include encryption, as well as the use of commercially available products such as hardware wallets, hardware security modules ("HSMs"), and MPC protocols.  A hardware wallet stores a user's private keys in a secure hardware device that resembles a USB drive.  Crypto transactions can be made by plugging the hardware wallet into a computer or other device. An HSM is a physical computing device that protects, manages, and stores secrets, such as cryptographic keys.

[28]     A seed phrase (also known as a recovery phrase or mnemonic seed) is a series of words generated by a crypto wallet that allows a user to recover all the crypto assets associated with that wallet.

[29]     In the infrequent instances in which the FTX Group stored private keys in encrypted form, it stored the decryption key in AWS Secrets Manager and not in a protected form, such as HSM.  As a result, the decryption keys could easily be retrieved by an unauthorized actor, thereby dramatically reducing the value of encryption.

- Many FTX Group private keys were stored without appropriate backup procedures such that if the key was lost, the associated crypto assets would likely be permanently lost.

- Because the FTX Group lacked adequate records of private keys, there was a significant risk that crypto assets would be lost simply because no one knew how to locate or access them. As described below, through painstaking analysis by experts, the Debtors have recovered to date over a billion dollars' worth of crypto assets as to which few or no records existed.

- Because the FTX Group failed to maintain appropriate records of access to private keys, employees or others could potentially copy those keys to their own electronic devices and transfer the associated crypto assets without detection.

*Fourth*, the FTX Group failed to appropriately implement controls to manage "wallet nodes," which are software programs that operate on servers running the software of the blockchain network and help to implement and propagate transactions and maintain the security and integrity of the blockchain. A wallet node that holds private keys for a specific wallet is responsible for managing that wallet's assets and communicating with the blockchain network to process transactions. As a result, the security of the associated wallet's assets depends in large part on the security of the server on which the node is running.

Crypto exchanges typically use trusted wallet nodes to broadcast transactions and query the blockchain to reconcile exchange ledger data with blockchain data. The FTX exchanges and Alameda maintained servers that ran wallet nodes for blockchains, including Bitcoin, Litecoin, and Dogecoin, among others; these nodes acted as hot wallets that held hundreds of millions of dollars' worth of assets. Virtually all FTX.com Bitcoin assets, for example, were held in a single Bitcoin Core wallet node.

Despite the obvious importance of securing its wallet nodes, the FTX Group's security controls for its wallet nodes were grossly deficient. For example, the passwords for encrypting the private keys of wallet nodes were stored in plain text, committed to the code repository (where they could be viewed by many and were vulnerable to compromise), and

reused across different wallet nodes such that if one were compromised, every other node with the same password could be compromised as well. Furthermore, wallet node servers were not securely segregated from connected servers such that anyone who compromised the FTX Group's computing environment could potentially compromise its wallet nodes.

### 3. Identity and Access Management

The FTX Group failed to implement in an appropriate fashion even the most widely accepted controls relating to Identity and Access Management ("IAM")—often the first line of defense in preventing an unauthorized system compromise. IAM refers to the policies, technologies, and procedures used to manage digital identities and control access to computer systems. Typically, IAM controls involve user authentication, authorization, and permissions management to ensure that only authorized individuals or systems are granted access to resources, while preventing unauthorized access and enforcing security policies. In the context of a cryptocurrency exchange, IAM controls are essential for protecting the confidentiality, integrity, and availability of crypto assets.

The FTX Group's IAM controls were insufficient in at least three respects:

*First*, the FTX Group failed to adhere to the basic security principle of "least privilege," by which users and systems are given access to the minimum needed to perform their duties or functions and nothing more.[30] By limiting access in this way, the impact of a security breach or an unintentional action involving any particular user or system is also necessarily limited. Among notable examples of the FTX Group's failures in this respect, over a dozen people had direct or indirect access to the FTX.com and FTX.US central omnibus wallets, which

---

[30] The Committee on National Security Systems defines "least privilege" as "[t]he principle that a security architecture should be designed so that each entity is granted the minimum system resources and authorizations that the entity needs to perform its function." Committee on National Security Systems (CNSS) Glossary, CNSSI No. 4009-2015, (Apr. 6, 2015).

held billions of dollars in crypto assets, and dozens of other users were granted access to other types of FTX exchange and Alameda wallets. Only a small number of these individuals needed access to these wallets to perform their duties.

*Second*, the FTX Group failed to effectively enforce the use of multi-factor authentication ("MFA") among its own personnel and corporate infrastructure, increasing the risk that key account credentials would be compromised and critical assets would thereby be vulnerable to unauthorized access. MFA is a basic security mechanism that requires users to provide two or more methods of authentication (for example, a password and one-time passcode sent to a cell phone or email previously associated with the user) to verify their identity and gain access to a system or account. MFA is a widely used and simple technique to mitigate the risks created by password weaknesses and theft, and businesses commonly require MFA to access any corporate systems, and particularly systems holding sensitive data.

The FTX Group did not enforce the use of MFA in connection with two of its most critical corporate services—Google Workspace, its primary tool for email and document storage and collaboration, and 1Password, its password-management program. The deficiency is ironic given that the FTX Group recommended that customers use MFA on their own accounts,[31] and Bankman-Fried, via Twitter, publicly stressed the importance of "2FA [Two-factor authentication]," a form of MFA, for crypto security:

---

[31]    *See* FTX.US Security Features, (Sept. 25, 2021) [http://web.archive.org/web/20210925211745/https://help.ftx.us/hc/en-us/articles/4408447825815-FTX-US-Security-Features]; FTX.US Security Features, (Aug. 14, 2022) [http://web.archive.org/web/20220814000906/https://help.ftx.us/hc/en-us/articles/4408447825815-FTX-US-Security-Features]; FTX Security Features, (Sept. 21, 2021) [http://web.archive.org/web/20210921181611/https://help.ftx.com/hc/en-us/articles/360044838051-FTX-Security-Features-]; FTX Security Features, (July 1, 2022) [http://web.archive.org/web/20220701085013/https://help.ftx.com/hc/en-us/articles/360044838051-FTX-Security-Features-].

> Daily reminder:  use 2FA!  90% of crypto security is making sure
> you've done the basics.[32]

While he correctly characterized MFA as one of "the basics" in securing crypto assets, the FTX

Group did not enforce it in the essential areas described above.  And in an important instance in

which FTX Group did use MFA—for a corporate email account that handled significant

administrative matters—FTX Group management arranged to bypass the MFA requirement.

      *Third*, the FTX Group generally did not use Single Sign-On ("<u>SSO</u>"),[33] an

authentication scheme used by companies worldwide to manage user access centrally, enabling

users to adopt a single strong password to use across multiple applications, thus reducing the risk

of unauthorized access and other harms.  Without SSO, among other problems, the FTX Group

could not effectively manage or revoke user access, enforce MFA, revoke user access, or prevent

users from having many user accounts for different services with separate passwords, which

increased the likelihood of compromise.

### 4.    Cloud and Infrastructure Security

      The FTX Group also failed to implement appropriate controls with respect to

cloud and infrastructure security—that is, controls to protect its cloud services, networks,

servers, and "user endpoints" such as desktops and laptops.  These controls were crucial for the

FTX Group, which essentially "lived" in the cloud, where the exchanges operated and the FTX

---

[32]      Sam Bankman-Fried, (@SBF_FTX), TWITTER (Sept. 12, 2019, 4:11 AM),
https://twitter.com/SBF_FTX/status/1172060173604515840.

[33]      SSO enables users to authenticate their identity once in order to continually gain access to multiple
applications and services without having to re-enter login credentials.

Group stored the majority of its assets.  The FTX Group's management of its cloud and infrastructure security deviated from standard corporate practices in several respects.

> *First*, the FTX Group generally shared computer infrastructure and IT services among FTX.com, FTX.US, and Alameda, and in doing so, departed from the fundamental security principle of segmentation, whereby business entities and computing environments are separated to minimize the impact of a breach, and exercise greater control over who can access particular systems.  Among many examples, the FTX exchanges and Alameda used a single, shared AWS account, meaning that a compromise of that AWS account would expose all three entities' assets to misuse or theft.[34]

> *Second*, while crypto exchanges are notoriously targeted by hackers, the FTX Group had poor or, in some cases, no "visibility" controls to detect and respond to cybersecurity threats.  As widely understood across industries, and emphasized by the U.S. government in public advisories, appropriate visibility controls generally include the creation and collection of logs that record and reflect activity within the computing environment, and systems to alert

---

[34]     Other significant examples of the FTX Group's segmentation failures that increased the risk of harm from an information security problem or compromise include hosting FTX.com and Alameda in the same collaboration platform, Google Workspace, and employing the same password vault tenant, 1Password, for both FTX.com and FTX.US.  The FTX Group appears to have recognized the deficiency, because as of the petition date, FTX.US had begun a process of migrating to its own dedicated AWS account; because it did not complete that work, its assets remained within the shared account such that FTX.US lost approximately $139 million of its crypto assets during the November 2022 Breach.  In these ways, the FTX Group departed from best practices, which call for segregation and separation of an organization's infrastructure and networks in order to effectively mitigate the risk of, and impact from, unauthorized access to the organization's environment.  *See, e.g.*, U.S. CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, *Securing Network Infrastructure Devices*, at https://www.cisa.gov/news-events/news/securing-network-infrastructure-devices (noting that "[s]ecurity architects must consider the overall infrastructure layout, including segmentation and segregation" because "[a] securely segregated network can contain malicious occurrences, reducing the impact from intruders in the event that they have gained a foothold somewhere inside the network").

designated personnel to suspicious activity. [35]  The FTX Group failed by any measure to

maintain such appropriate controls.

    Among many examples of its control deficiencies in this area, the FTX Group did

not have any mechanism to identify promptly if someone accessed the private keys of central

exchange wallets holding hundreds of millions or billions of dollars in crypto assets, and it did

not fully enable even the basic features offered by AWS to assist with cyber threat detection and

response.[36]  In fact, due to the lack of such controls, the FTX Group did not learn of the

November 2022 Breach until the Debtors' restructuring advisor alerted employees after

observing, via Twitter and other public sources, that suspicious transfers appeared to have

occurred from FTX Group crypto wallets.  The FTX Group similarly failed to institute any basic

mechanism to be alerted to any "root" login to its AWS account, the cloud computing

environment where it operated the FTX exchanges and stored keys to billions of dollars in crypto

assets, even though such access would provide virtually complete access to the environment.

    *Third*, the FTX Group did not implement controls sufficient to protect its network

endpoints, such as laptops and desktops, from potential security threats.  The FTX Group had no

commonly used technical controls to ensure that employees used their corporate laptops, leaving

employees free to use personal devices devoid of corporate security controls.  The FTX Group

also lacked any endpoint protection tool to monitor cloud-hosted servers for threats, and several

---

[35]     *See, e.g.*, U.S. CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, *Weak Security Controls and Practices Routinely Exploited for Initial Access* (last revised Dec. 8, 2022), at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-137a (noting that "[l]og files play a key role in detecting attacks and dealing with incidents[,]" that "implementing robust log collection and retention" provides organizations with "sufficient information to investigate incidents and detect threat actor behavior," and that effective log management calls for setting up "notifications of suspicious login attempts based on an analysis of log files").

[36]     For example, Amazon GuardDuty, an AWS feature that supports threat detection, was not enabled at all on FTX.com, and across the entities, VPC flow logs that can capture IP traffic information were only enabled to log the rejected traffic (and only in some networks)—they were not enabled to log the permitted traffic at all.  The lack of these and other logs complicated the Debtors' investigation of the November 2022 Breach.

of its critical services did not have the latest security updates installed. For example, to manage inbound internet traffic on a key server, the FTX Group used a version of software that was nearly four years out of date, leaving the server exposed to known vulnerabilities that had been addressed in updated versions of the software. This practice flouted industry standards by which software flaws and vulnerabilities should be remediated in a timely manner.[37]

       *Fourth*, the FTX Group had no comprehensive record from which it could even identify critical assets and services, including employee workstations, software application servers, business data, and third-party cloud and other services it relied upon, leaving it with little to no visibility into what it needed to secure, let alone how to best secure it.[38] Indeed, to understand and gain necessary access to the full scope of services that the FTX Group used, the Debtors had to analyze financial records such as bills paid to vendors, and search through employees' email and chat messages. Although the FTX Group's designated IT professional began creating an inventory of electronic devices issued to employees, and stressed to Singh (who was supposedly in charge of the FTX's Group's cybersecurity) the importance for security purposes of having Singh and other FTX Group senior management identify in the inventory the electronic devices they were using, neither Singh nor other senior management provided the requested information.

### 5. Application and Code Security

       The FTX Group did not implement controls sufficient to protect sensitive data relating to its applications, including its application code, from vulnerabilities and attacks. While essential in any context, securing such data was particularly critical for the FTX Group, which

---

[37]      *See* NIST Special Publication 800-53 Revision 5: SI-2: Flaw Remediation.

[38]      The NIST identifies the development and maintenance of an inventory of information systems (including hardware, software, and firmware) that are owned, leased, or operated by an organization as a standard security practice and control. *See* NIST Special Publication 800-53 Revision 5: PM-5: Information System Inventory.

used multiple applications with access to sensitive data and assets, including customer data, financial data, and crypto wallets. In managing its application and code security, the FTX Group departed from standard practices in several ways.

*First*, while it is widely recognized that sensitive data should be protected through encryption and appropriate access controls,[39] the FTX Group failed to adopt these basic controls to secure its "application secrets," that is, the highly sensitive data such as passwords, API keys,[40] and private keys used by its applications. Protecting these secrets is paramount because they are frequently the target of malicious actors who may use them to gain access to additional data and assets. With respect to the FTX Group, access to such secrets could enable someone to make transfers of billions of dollars' worth of crypto assets from hot wallets or third-party crypto exchanges. Nonetheless, among many examples of its deficient controls in this area, the FTX Group simply stored certain secrets—including the private keys and seeds to Alameda's crypto wallets—in unencrypted files to which numerous employees had access, and kept hundreds of other secrets—including passwords for crypto wallet nodes, API keys for crypto exchanges, and credentials for sensitive email accounts—in source code repositories from which they were widely accessible.[41]

---

[39]      *See* NIST Special Publication 800-53 Revision 5: SC-28: Protection of Information at Rest.

[40]      Application Programming Interface, or "API," keys are credentials used to authenticate to third-party services, including, for example, other crypto exchanges.

[41]      While a senior developer subsequently deleted a file containing these secrets from the repository, the developer did not remove the file from the code history in the repository, contrary to the recommended practice of GitHub, where the repository was maintained. As a result, the file continued to remain exposed to anyone who accessed the code repository.

*Second*, the FTX Group failed to adopt certain standard controls in order to ensure the integrity of its code.[42]  For example, there was no effective process for securely introducing, updating, or patching software, and no procedures, such as scanning, to continually ensure the integrity of the code running on FTX Group servers.  Thus, among many other harms, the FTX Group was highly vulnerable to software "supply chain" attacks in which malicious actors insert vulnerabilities into third-party software in order to compromise any organization that uses the software.[43]  Furthermore, with only minimal code review and testing procedures in place, and no focus on continuous security testing, the FTX Group did not review, test, or otherwise deploy its code in a manner that sufficiently ensured that it was functioning as expected and free of vulnerabilities that might be leveraged by malicious actors.

### 6.  Debtors' Work to Identify and Secure Crypto Assets in the Computing Environment

As a result of FTX Group's lack of appropriate documentation and recordkeeping, the Debtors had to undertake significant efforts to identify, access, and secure crypto assets from the FTX Group's computing environment.  The lack of records was particularly challenging because cryptocurrency keys are simply strings of alphanumeric characters that may otherwise be indiscernible in a computing environment.  The Debtors' challenge was compounded by the

---

[42]     *See, e.g.,* NIST Special Publication 800-53 Revision 5: SA-12: Supply Chain Protection ("Verify the integrity of code obtained from external sources before it is deployed on the system"); NIST Special Publication 800-53 Revision 5: SA-11:  Developer Security Testing and Evaluation ("Require developers to test their code for security vulnerabilities before it is deployed into production"); NIST Special Publication 800-53 Revision 5: SA-3: System Development Life Cycle ("Incorporate security requirements into the system development life cycle and ensure that security is addressed in all stages of the life cycle").

[43]     The most prominent example of a software supply chain attack is the 2020 SolarWinds attack, in which Russian state-sponsored actors compromised SolarWinds software, used widely throughout the U.S. public and private sectors, in order to gain access to the networks of government agencies and companies that downloaded the software.

enormous time pressure that they faced due to a confluence of circumstances that resulted from

other FTX Group control failures described above:

- The Debtors took over responsibility for a computing environment that had been compromised. A malicious actor had just drained approximately $432 million worth of crypto assets in hours; the FTX Group did not have the controls to detect the compromise, much less to stop it; and due to the FTX Group's deficient controls to secure crypto assets, the Debtors faced the threat that billions of dollars of additional assets could be lost at any moment.

- Compounding the challenge, and reflecting additional FTX Group control deficiencies, the Debtors' cybersecurity experts found that the FTX Group had no written plans, processes, or procedures that explained the architecture or operation of its computing environment or storage of crypto assets.

- Even as they raced to secure the environment in these challenging circumstances, the Debtors separately faced the risk that individuals in possession of private keys to crypto assets could unilaterally transfer those assets. In other words, securing the environment would not be enough: until the crypto assets were transferred to cold storage, they could be taken by anyone who had the private keys. Indeed, the day after the November 2022 Breach, without the Debtors' authorization, and at the direction of Bahamian authorities, Bankman-Fried and/or Wang used private keys they had in their possession to transfer hundreds of millions of dollars' worth of FTT, SRM, MAPS and other tokens out of Debtor wallets and into cold wallets in Bahamian custody.[44]

- Compounding all of these challenges, and as the Debtors worked to identify and access crypto assets with no "map" to guide them, the Debtors had to engineer technological pathways to transfer many types of assets they identified to cold storage because the FTX Group had never engaged in the computer engineering necessary to make those transfers possible.

The Debtors' work to identify and secure these crypto assets required the

combined efforts of experts in computer engineering, cryptography, blockchain technology,

cybersecurity, IT architecture, and cloud computing. Examples of the work that was undertaken

to identify crypto assets in the environment—ultimately, to date, over a billion dollars' worth of

crypto assets as to which few or no records existed—include the following:

---

[44]      Due to price declines, illiquidity, and other issues, these tokens are currently worth a small fraction of the amount of their estimated worth at the time of transfer.

- Experts developed novel code to identify crypto assets and keys that were stored in over a thousand servers and IT resources that constituted the FTX Group computing environment. Millions of these keys had no labelling or description that reflected their nature or use, requiring further analysis and blockchain analytics. Through this work, the Debtors recovered hundreds of millions of dollars' worth of crypto assets not reflected in any recordkeeping system of the FTX Group.

- Experts identified and recovered crypto wallets used for the FTX Group's extensive trading operations, and developed scanning tools and dedicated software to identify Alameda's DeFi portfolio[45] as to which few centralized records have been identified. Using these tools, the Debtors have identified tens of millions of dollars' worth of crypto assets that are in the process of being recovered.

- Experts learned that the FTX exchanges had experienced difficulty with the accuracy of code that the FTX Group had engineered to identify and transfer assets from over 10 million wallets of exchange customers into omnibus accounts. Surmising that crypto assets could still remain scattered among the wallets due to the inaccuracy of that code, experts developed code that would automatically both identify any crypto assets across blockchains that remained among the more than 10 million wallets, and then automatically transfer those assets to cold storage. Through the operation of this code alone, the Debtors have identified and secured over $140 million in crypto assets of the estate.

## V. Conclusion

The FTX Group's profound control failures placed its crypto assets and funds at risk from the outset. They also complicated the Debtors' recovery efforts, although the Debtors have made and continue to make substantial progress in that regard. To date, through the work described above, the Debtors have recovered and secured in cold storage over $1.4 billion in digital assets, and have identified an additional $1.7 billion in digital assets that they are in the process of recovering. The Debtors will continue to provide updates on their ongoing recovery efforts and investigation.

---

[45] A Decentralized Finance (DeFi) portfolio encompasses a range of investments, holdings, and trading positions in blockchain-based financial applications that operate in a decentralized, peer-to-peer manner, rather than relying on centralized exchanges, brokerage firms, or banks.

JS 44 (Rev. 04/21) FLSD Revised 12/02/2022

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
EDWIN GARRISON, et al., on behalf of themselves and all others similarly situated,

**DEFENDANTS**
MAJOR LEAGUE BASEBALL, MAJOR LEAGUE BASEBALL ENTERPRISES, INC. MAJOR LEAGUE BASEBALL PROPERTIES, INC. MAJOR LEAGUE BASEBALL PROMOTION CORPORATION and MLB PLAYERS, INC.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Adam Moskowitz, and Joseph M. Kaye
THE MOSKOWITZ LAW FIRM, PLLC,
3250 Mary Street, Suite 202, Coconut Grove, FL

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 367 Health Care/ | **PERSONAL INJURY** | | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 320 Assault, Libel & Slander | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 330 Federal Employers' Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| (Excl. Veterans) | | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine | | ☐ 840 Trademark | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards Acts | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury - Med. Malpractice | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 370 Other Fraud | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 371 Truth in Lending | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 380 Other Personal Property Damage | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 385 Property Damage Product Liability | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | |
| | ☐ 441 Voting | ☐ 463 Alien Detainee | | |
| | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | |
| | ☐ 443 Housing/ Accommodations | ☐ 530 General | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | |
| | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed *(See VI below)*
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)**
*(See instructions)*: a) Re-filed Case ☐ YES ☐ NO b) Related Cases ☐ YES ☐ NO
JUDGE: 1:23-md-03076
DOCKET NUMBER: 1:22-cv-23753

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/27/2023 | |

| FOR OFFICE USE ONLY : RECEIPT # | AMOUNT | IFP | JUDGE | MAG JUDGE |
|---|---|---|---|---|

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys**. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit**. Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.** **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.** **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VIII.** **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

)
)
)
)
_____ )
*Plaintiff(s)* )
v. )  Civil Action No.
MAJOR LEAGUE BASEBALL, MAJOR LEAGUE BASEBALL )
ENTERPRISES, INC. MAJOR LEAGUE BASEBALL )
PROPERTIES, INC. MAJOR LEAGUE BASEBALL )
PROMOTION CORPORATION and MLB PLAYERS, INC. )
_____ )
*Defendant(s)* )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you
are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ.
P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of
the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney,
whose name and address are:     Adam M. Moskowitz
Joseph M. Kaye
THE MOSKOWITZ LAW FIRM, PLLC
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
Service@moskowitz-law.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.
You also must file your answer or motion with the court.


*CLERK OF COURT*


Date: _____     _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| MAJOR LEAGUE BASEBALL, MAJOR LEAGUE | ) | |
| BASEBALL ENTERPRISES, INC. MAJOR LEAGUE | ) | |
| BASEBALL PROPERTIES, INC. MAJOR LEAGUE | ) | |
| BASEBALL PROMOTION CORPORATION and MLB | ) | |
| PLAYERS, INC. | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Adam M. Moskowitz

Joseph M. Kaye
THE MOSKOWITZ LAW FIRM, PLLC
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
Service@moskowitz-law.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____            _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒  I returned the summons unexecuted because _____ ; or

❒  Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| MAJOR LEAGUE BASEBALL, MAJOR LEAGUE ) | |
| BASEBALL ENTERPRISES, INC. MAJOR LEAGUE ) | |
| BASEBALL PROPERTIES, INC. MAJOR LEAGUE ) | |
| BASEBALL PROMOTION CORPORATION and MLB ) | |
| PLAYERS, INC. ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:　　Adam M. Moskowitz

　　　　　　　　　　　　　　Joseph M. Kaye

　　　　　　　　　　　　　　THE MOSKOWITZ LAW FIRM, PLLC

　　　　　　　　　　　　　　3250 Mary Street, Suite 202

　　　　　　　　　　　　　　Coconut Grove, FL 33133

　　　　　　　　　　　　　　Telephone: (305) 740-1423

　　　　　　　　　　　　　　Service@moskowitz-law.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| MAJOR LEAGUE  BASE  ALL, MAJOR LEAGUE ) | |
| BASEBALL ENTERPRISES, INC. MAJOR LEAGUE ) | |
| BASEBALL PROPERTIES, INC. MAJOR LEAGUE ) | |
| BASEBALL PROMOTION CORPORATION and MLB ) | |
| PLAYERS, INC. ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Adam M. Moskowitz
Joseph M. Kaye
THE MOSKOWITZ LAW FIRM, PLLC
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
Service@moskowitz-law.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____     _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____                          _____
                                                             *Server's signature*

                                                             _____
                                                             *Printed name and title*


                                                             _____
                                                             *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><em>Plaintiff(s)</em></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td>MAJOR LEAGUE BASEBALL, MAJOR LEAGUE</td><td>)</td><td></td></tr>
<tr><td>BASEBALL ENTERPRISES, INC. MAJOR LEAGUE</td><td>)</td><td></td></tr>
<tr><td>BASEBALL PROPERTIES, INC. MAJOR LEAGUE</td><td>)</td><td></td></tr>
<tr><td>BASEBALL PROMOTION CORPORATION and MLB</td><td>)</td><td></td></tr>
<tr><td>PLAYERS, INC.</td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><em>Defendant(s)</em></td><td>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Adam M. Moskowitz

Joseph M. Kaye

THE MOSKOWITZ LAW FIRM, PLLC

3250 Mary Street, Suite 202

Coconut Grove, FL 33133

Telephone: (305) 740-1423

Service@moskowitz-law.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: