Query    Reports    Utilities    Help    Log Out

JURY,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:24-cv-00655-JMC

GARRISON et al v. LINCOLN HOLDINGS LLC
Assigned to: Judge Jia M. Cobb
Cause: 28:1332 - Diversity: Securities Fraud

Date Filed: 03/07/2024
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**
**EDWIN GARRISON**

represented by **Benjamin P. Solomon-Schwartz**
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
202-237-2727
Email: bsolomon-schwartz@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**BRANDON ORR**

represented by **Benjamin P. Solomon-Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**LEANDRO CABO**

represented by **Benjamin P. Solomon-Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**RYAN HENDERSON**

represented by **Benjamin P. Solomon-Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**MICHAEL LIVIERATOS**

represented by **Benjamin P. Solomon-Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**GREGG PODALSKY**

represented by **Benjamin P. Solomon-Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**ALEXANDER CHERNYAVSKY**

represented by **Benjamin P. Solomon-Schwartz**
(See above for address)

3/11/24, 8:32 PM

ATTORNEY TO BE NOTICED

**Plaintiff**

**VIJETH SHETTY**                    represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHUKWUDOZIE EZEOKOLI**              represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL NORRIS**                   represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHENGYUN HUANG**                   represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**VITOR VOZZA**                      represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**KYLE RUPPRECHT**                   represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SUNIL KAVURI**                     represented by **Benjamin P. Solomon-Schwartz**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**LINCOLN HOLDINGS LLC**
*doing business as*
MONUMENTAL SPORTS &
ENTERTAINMENT

| Date Filed | # | Docket Text |
|---|---|---|
| 03/07/2024 | 1 | COMPLAINT against LINCOLN HOLDINGS LLC with Jury Demand ( Filing fee $ 405 receipt number ADCDC-10739257) filed by GREGG PODALSKY, SHENGYUN HUANG, LEANDRO CABO, ALEXANDER CHERNYAVSKY, CHUKWUDOZIE EZEOKOLI, VITOR VOZZA, BRANDON ORR, SUNIL KAVURI, VIJETH SHETTY, EDWIN GARRISON, RYAN HENDERSON, KYLE RUPPRECHT, MICHAEL NORRIS, |

| | | |
|---|---|---|
| | | MICHAEL LIVIERATOS. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet, # 6 Summons)(Solomon-Schwartz, Benjamin) (Entered: 03/07/2024) |
| 03/07/2024 | 2 | NOTICE OF RELATED CASE by LEANDRO CABO, ALEXANDER CHERNYAVSKY, CHUKWUDOZIE EZEOKOLI, EDWIN GARRISON, RYAN HENDERSON, SHENGYUN HUANG, SUNIL KAVURI, MICHAEL LIVIERATOS, MICHAEL NORRIS, BRANDON ORR, GREGG PODALSKY, KYLE RUPPRECHT, VIJETH SHETTY, VITOR VOZZA. Case related to Case No. In Re: FTX Crypto. Exchange Collapse Litig. (Solomon-Schwartz, Benjamin) (Entered: 03/07/2024) |
| 03/08/2024 | | NOTICE OF ERROR re 1 Complaint; emailed to bsolomon-schwartz@bsfllp.com, cc'd 8 associated attorneys -- The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (znmw, ) (Entered: 03/08/2024) |
| 03/08/2024 | 3 | SEALED DOCUMENT filed by LEANDRO CABO, ALEXANDER CHERNYAVSKY, CHUKWUDOZIE EZEOKOLI, EDWIN GARRISON, RYAN HENDERSON, SHENGYUN HUANG, SUNIL KAVURI, MICHAEL LIVIERATOS, MICHAEL NORRIS, BRANDON ORR, GREGG PODALSKY, KYLE RUPPRECHT, VIJETH SHETTY, VITOR VOZZA(This document is SEALED and only available to authorized persons.) (Solomon-Schwartz, Benjamin) (Entered: 03/08/2024) |
| 03/08/2024 | 4 | ERRATA by LEANDRO CABO, ALEXANDER CHERNYAVSKY, CHUKWUDOZIE EZEOKOLI, EDWIN GARRISON, RYAN HENDERSON, SHENGYUN HUANG, SUNIL KAVURI, MICHAEL LIVIERATOS, MICHAEL NORRIS, BRANDON ORR, GREGG PODALSKY, KYLE RUPPRECHT, VIJETH SHETTY, VITOR VOZZA re 1 Complaint,,. (Solomon-Schwartz, Benjamin) (Entered: 03/08/2024) |
| 03/08/2024 | | Case Assigned to Judge Jia M. Cobb. (zcb) (Entered: 03/08/2024) |
| 03/08/2024 | 5 | SUMMONS (1) Issued Electronically as to LINCOLN HOLDINGS LLC. (Attachments: # 1 Notice and Consent)(zcb) (Entered: 03/08/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/11/2024 20:31:58 | | | |
| **PACER Login:** | AdamMoskoadam | **Client Code:** | FTX |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-00655-JMC |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

### CASE NO. _____

**EDWIN GARRISON, BRANDON ORR, LEANDRO CABO, RYAN HENDERSON, MICHAEL LIVIERATOS,  GREGG PODALSKY, ALEXANDER CHERNYAVSKY, VIJETH SHETTY, CHUKWUDOZIE EZEOKOLI, MICHAEL NORRIS, SHENGYUN HUANG, VITOR VOZZA, KYLE RUPPRECHT, & SUNIL KAVURI on behalf of themselves and all others similarly situated,**

*Addresses Filed Under Seal*

        *Plaintiffs,*

*v.*

**LINCOLN HOLDINGS LLC d/b/a MONUMENTAL SPORTS & ENTERTAINMENT**, 601 F Street NW, Washington, DC 20004

        *Defendant.*

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 5

PARTIES ............................................................................................................................ 16

JURISDICTION AND VENUE ......................................................................................... 20

FACTUAL ALLEGATIONS ............................................................................................. 22

   A. The Rise of FTX ....................................................................................................... 22

   B. FTX's Key Players .................................................................................................... 26

   C. The Basics of a Cryptocurrency Exchange .............................................................. 33

   D. The Mechanics of the Fraudulent Scheme .............................................................. 39

   E. The Fraud's Collapse ................................................................................................ 48

   F. FTX Files for Bankruptcy ......................................................................................... 57

   G. Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct ...................... 65

   H. The SEC's Approach to Cryptocurrency .................................................................. 70

   I. FTX's Offer and Sale of FTT Tokens, Which Are Unregistered Securities. ......... 96

   J. Using the FTX Platform Itself Necessarily Required Transacting in Unregistered Securities. ................................................................................................................... 97

   K. FTX Aggressively and Deceptively Marketed its Platform ................................. 101

   L. Monumental Sports' Role in the Fraud .................................................................. 105

   M. Material Ties to Florida ......................................................................................... 128

CLASS ACTION ALLEGATIONS ................................................................................ 131

   A. Class Definitions .................................................................................................... 131

   B. Numerosity ............................................................................................................. 133

   C. Commonality/Predominance .................................................................................. 133

   D. Typicality ................................................................................................................ 134

   E. Adequacy of Representation ................................................................................... 135

   F. Requirements of Fed. R. Civ. P. 23(b)(3) .............................................................. 135

   G. Superiority .............................................................................................................. 136

   H. Requirements of Fed. R. Civ. P. 23(b)(2) .............................................................. 137

   I. Requirements of Fed. R. Civ. P. 23(c)(4) .............................................................. 137

i

J.  Nature of Notice to the Proposed Class.................................................................................. 138

CAUSES OF ACTION ...................................................................................................................... 138

COUNT ONE.................................................................................................................................. 138

COUNT TWO................................................................................................................................. 139

COUNT THREE ............................................................................................................................. 141

COUNT FOUR ............................................................................................................................... 141

COUNT FIVE ................................................................................................................................. 143

COUNT SIX ................................................................................................................................... 144

COUNT SEVEN ............................................................................................................................. 145

COUNT EIGHT .............................................................................................................................. 146

COUNT NINE ................................................................................................................................ 147

COUNT TEN .................................................................................................................................. 148

COUNT ELEVEN ........................................................................................................................... 149

COUNT TWELVE .......................................................................................................................... 150

COUNT THIRTEEN ....................................................................................................................... 151

COUNT FOURTEEN ...................................................................................................................... 153

COUNT FIFTEEN .......................................................................................................................... 153

PRAYER FOR RELIEF ................................................................................................................... 154

Plaintiffs, on behalf of themselves and all others similarly situated, sue Lincoln Holdings LLC d/b/a Monumental Sports & Entertainment ("Monumental Sports"), for its actions, including, but not limited to 1) aiding and abetting and/or actively participating in FTX's multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), and doing so through FTX's cryptocurrency investment service that placed orders on users' behalf (the "FTX Platform"), which caused Plaintiffs substantial harm. Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

## INTRODUCTION

1.      As COVID-19 was causing unprecedented financial turmoil to the sports and entertainment industries—possibly forever— Monumental Sports had a crucial decision to make: (1) does it follow organizations like the National Football League and stay away from promoting the extremely risky and unknown world of cryptocurrency, or (2) push "all in" and put the great resources and prestige of the Monumental Sports brand behind FTX so they could leap to the front of the cryptocurrency world and sell tens of billions of dollars in unregistered and illegal securities to consumers? After considering the question and the profits at stake, Monumental Sports decided to take the risks and go all in.

2.      Unfortunately for Monumental Sports, under binding law, anyone that mass promotes products FTX's can be sued for any and all resulting damages. This law was updated for today's technology so that a promoter like Monumental Sports can be held liable under securities laws for using the Internet and social media for mass solicitations of crypto-related securities, whether for their own or the securities issuer (FTX Group)'s gain. The law now recognizes that the Internet, social media, and other new platforms have given promoters an incredible new outlet

to aid and participate in selling fraudulent investments to investors across the globe. As one expert said, "In the old days, brokers would have to call up people to convince them to invest or put on a road show. Now it's normalized with online platforms."[1] After Monumental Sports went all in for FTX and assisted it in selling unregistered securities to investors worldwide, FTX declared bankruptcy, its leaders will be in jail, and losses to the victims now total $11 billion dollars. This case seeks to hold Monumental Sports liable under the law.

3.      The FTX disaster is among the largest financial frauds in history. Sam Bankman-Fried ("SBF"), FTX Group's[1] founder and former CEO, is on house arrest awaiting his sentencing following his conviction for fraud and conspiracy after stealing billions of dollars from FTX customers. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

4.      Evidence now reveals that the FTX Group's fraud was only able to reach such heights through the offer and sale of unregistered securities, with the willing help and assistance of some of the wealthiest, most powerful, and most recognized organizations and celebrities across the globe. Every victim who invested in FTX had to open an FTX YBA, which was itself an unregistered security. The U.S. Securities and Exchange Commission ("SEC") concluded that FTX's exchange token FTT was promoted as an investment contract and is also a security.

5.      In *Wildes v. BitConnect Int'l PLC,* 25 F.4th 1341 (11th Cir. 2022), the Eleventh Circuit clearly articulated the standard applicable to mass solicitation of unregistered securities, ruling that spokespersons who promoted a crypto Ponzi scheme had engaged in "solicitation" of

---

[1] FTX Trading Ltd. and its subsidiaries are referred to herein as "FTX Trading" or "FTX Trading Ltd." West Realm Shires Inc. and its subsidiaries, including West Realm Shires Services, Inc. ("WRS"), are referred to herein as "FTX US." FTX Trading Ltd. and FTX US are collectively referred to as "FTX" or the "FTX entities." FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's promoters did not directly target particular purchasers. *Id.* at 1346. In so ruling, the Court observed that the Securities Act does not distinguish between individually targeted sales efforts and broadly disseminated pitches, and noted that in early cases applying the Securities Act of 1933, "people understood solicitation to include communications made through diffuse, publicly available means—at the time, newspaper and radio advertisements." *Id.*

6.      *In Pino v. Cardone Capital, LLC,* 55 F.4th 1253 (9th Cir. 2022), the Ninth Circuit adopted *Wildes* in its entirety, holding that a real estate management company that promoted real estate investment funds through "mass communications to potential sellers" via nontargeted internet videos posted on social media could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return. *Id.* at 1259–60. The court noted that, to state a cause of action, a plaintiff "need not have alleged that he specifically relied on any of the alleged misstatements identified in the [complaint]." *Id.*

7.      *In De Ford v. Koutoulas,* 6:22-CV-652, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), the court denied a motion to dismiss claims that a spokesperson for "Let's Go Brandon" cryptocurrency (LGBCoin) engaged in the solicitation of unregistered securities. Citing *Wildes,* the court rejected the argument that "mere social media posts cannot make him a seller of securities" and held that the plaintiff had sufficiently alleged a claim for selling unregistered securities by alleging (1) the online promotion of LGBCoin through social media channels, and (2) that the promotions were done to serve the spokesperson's own financial interests. *Id.* at *15.

8.      On September 20, 2023, Judge William H. Orrick of the Northern District of California, applying both *Pino* and *Wildes,* denied a motion to dismiss by a promoter who was sued for participating in a similar FTX scheme to sell unregistered securities in the form of

cryptocurrency, concluding that the suit alleged that the defendants actively solicited sales of the crypto assets, and were not just "mere collateral participants." *Houghton v. Leshner*, No. 3:22-cv-07781, 2023 WL 6826814, at *3–5 (N.D. Cal. Sept. 20, 2023). In reaching that conclusion, Judge Orrick reasoned that "[s]olicitation is broadly construed," and a promoter "could be a statutory seller liable for solicitation *based on YouTube videos and Instagram posts touting the investments and rates of return*." *Id.* (emphasis added) (citing *Pino*, 55 F.4th at 1256; and then citing *Wildes*, 25 F.4th 1341).

9.     In an official statement accompanying the announcement of the multi-year partnership between Monumental Sports and FTX, Monumental Sports' President, Jim Van Stone, proclaimed that "Monumental Sports & Entertainment is thrilled to be working with FTX to bring the leading cryptocurrency exchange to the most loyal and sophisticated fans in the country." Monumental Sports claimed that the "integration of blockchain technology with the sports experience has only just begun, and together [with FTX] we are going to advance to an entirely new frontier which will ignite fans beyond what they can even imagine today."[2]

10.     Interestingly, while Monumental Sports and many others were quick to jump into the crypto world with both feet when they saw the potential for fast money, the National Football League had the foresight to specifically *bar* its teams from selling sponsorships to cryptocurrency trading firms back in September 2021, because it needed the chance to evaluate the cryptocurrency industry more closely before it could develop and implement its official strategy.[3]

---

[2] Hassett, Peter, *Capital One Arena removes FTX Sign*, RMNB (December 9, 2022), https://russianmachineneverbreaks.com/2022/12/09/caps-ftx-rip/.

[3] Bibhu Pattnaik, *Why the NFL Bans Cryptocurrency, NFT Sponsorships for Teams*, yahoo!finance (Sept. 5, 2021), https://finance.yahoo.com/news/why-nfl-bans-cryptocurrency-nft-164438729.html.

## FACTUAL BACKGROUND

11.     SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

12.     On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. FTX's mobile application and/or web-based cryptocurrency investment service that placed cryptocurrency trade orders on behalf of users (the "FTX Platform") maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

13.     On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

14.     This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, fraud, and conversion.

15.     As outlined herein, Monumental Sports directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for its own financial and professional gain.

16.     Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

17.     To be sure, Monumental Sports is responsible for the damages that Class Members have sustained. As further detailed herein, Monumental Sports was a necessary player in pushing the FTX fraud to the unprecedented extent it reached, and all made exorbitant amounts of money in the process of doing so.

18.     FTX is and will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings. This class action may be the only avenue for any of the victims to recover any of their damages.

19.     What's more, FTX would not have been successful in perpetrating this fraudulent scheme on Plaintiffs and Class Members around the globe without key events that took place in and emanated from right here in Miami, Florida, which not only eventually became FTX's official headquarters but was their de facto domestic headquarters for years before FTX's eventual collapse. According to the Declaration of Dan Friedberg, attached as **Exhibit A**, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually moved its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, who was based in Miami and originally worked for Blockfolio as Director of Product and Partnership before FTX later acquired Blockfolio in late 2020.[4] *Id.* Dabir eventually

---

[4] *See* Zack Voell, *FTX Exchange's $150M Deal for Mobile-First Blockfolio Is a Retail Trading Play*, Coindesk, https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/ (Sept. 14, 2021, 5:47 AM EDT); *see also Blockfolio*, Crunchbase, https://www.crunchbase.com/organization/blockfolio/people (last visited March 6, 2024).

became FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

20.     As explained by co-founder of FTX Nishad Singh: "In September 2022, SBF announced to the company over video conference that the Miami office would become the official FTX US headquarters, and that it would close its other offices in favor of the Miami location. This selection of Miami occurred for many reasons, including a desire to consolidate operations in the United States, FTX US employees' preference for Miami for such consolidation, Miami's close proximity to the Bahamas and ease of travel between the two locales, Mr. Dexter's stature within FTX US, SBF's relationship with Miami mayor Francis Suarez, Miami's status as an informal 'crypto hub,' and the rebranding of the Miami Heat arena as FTX Arena." Declaration of Nishad Singh ("Singh Decl."), attached as **Exhibit D**, at ¶ 17.

21.     Beyond Dabir, "at least twenty-one employees not already located in Miami indicated they would move to Miami" and "[o]thers indicated they would spend the majority of their time in Miami." Singh Decl., at ¶ 17. Other FTX executives was also drawn to spend time in Miami. *See also id.* at ¶ 18  ("Even though FTX Trading was not based in the United States, at least one of SBF and Ramnik Arora, FTX Trading's head of product, traveled to the United States, on average, roughly every other week to meet with business partners, including investors. I specifically recall that these trips often took them to, at a minimum, Washington, D.C., New York, and Miami.").

22.     Mr. Dabir operated from FTX's Miami office, and he was focused on formulating and executing FTX's important celebrity partnerships. Ex. A, ¶ 21; *see also* Singh Decl. ¶ 13 ("From 2021 until FTX's collapse, Mr. Dabir executed some of FTX's various publicity campaigns

from a Miami office."). Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA. Ex. A., ¶ 21.

23. According to Friedberg, Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships. Ex. A ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

24. The naming of the "FTX Arena" served as an important centerpiece for FTX's efforts to reach other FTX partnerships with celebrities and other well-known partners. *Id.*, ¶ 23. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as the Mercedes Formula 1 team, Major League Baseball, the MLB Umpire's Association, TSM, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*

25. Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, according to Friedberg, it was the first time that he had ever agreed to serve as a spokesperson for any product. *Id.*, ¶ 24. Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*

26. Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast *The Joe Pomp Show*, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami,

Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as **Exhibit B**.

27.     Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.*

28.     After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3. Dabir explained that a contributing factor to the deal was "the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue," which "opened up the door where we could have that conversation" with Miami-Dade County and the Miami Heat. *Id.*, at 4.

29.     Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

30.     In order to close the FTX Arena deal, according to Mr. Dabir, FTX confidentially disclosed to Miami-Dade County and the Miami Heat FTX's balance sheet—which was comprised almost entirely of customer funds—and he explained to Mr. Pompliano that "there are ways to structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort." *Id.*

31.     Mr. Dabir explained that there were multiple ways that FTX measured the success of their Brand Ambassador program, with the "obvious one [being] straight up conversion," as in "[h]ow many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easy to track." *Id.*, at 6. But the other method, according to Mr. Dabir, is the "intangible element" of "trust" and "legitimacy" that comes from "building trust and value through brand association," like "I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David." *Id.*

32.     Mr. Dabir also explains how he oversaw and participated in the creation of Larry David's now infamous 2022 Super Bowl ad, and recounting, "when we saw the script, we were like, this script is awesome. And then-then we're like, 'We have to get Larry David, right?' And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?" *Id.*, 7.

33.     Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

34.     Mr. Dabir also went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.,* 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explains that Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as Curry. *Id.*

35.     The question of whether the promotion of the FTX Platform, the sale of every YBA and/or FTT is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs."[5]

> In the SEC's Report of Investigation concerning The DAO,[6] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

36.     The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this exact same type of interest-bearing account and native token, finding that exchanges such as BlockFi,[7] Voyager,[8] and Celsius[9] all offered these same products as unregistered securities.

---

[5] *SEC Statement Urging Caution Around Celebrity Backed ICOs*, SEC (Nov. 1, 2017), https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

[6] SEC, Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), https://www.sec.gov/files/litigation/investreport/34-81207.pdf.

[7] Press Release, *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product*, SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

[8] Steve Kaaru, *6 US Regulators Crackdown on Voyager Digital over Interest-Bearing Accounts*, CoinGeek (April 1, 2022), https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/.

[9] Celsius Network, LLC (N.J. Bureau of Secs. Sept. 17, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf (cease and desist order).

37.     A second narrow issue that is common to the entire Proposed Class, whose focus is also solely objective, is whether the Defendant violated state consumer laws by failing to abide by any of the FTC's long-established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

38.     We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in the FTX Platform, FTT, and/or a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held on the FTX Platform or in the YBA. In other words, the FTX Platform and YBAs were portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Monumental Sports pushed in promoting the FTX Platform. For that, Monumental Sports is liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Group.

39.     Literally overnight, Plaintiffs' assets, including FTT,[10] held on the FTX Platform and/or in their YBAs were robbed from them as FTX imploded and former-CEO, Sam Bankman-

---

[10] Although the FTX Group purported to maintain a separation between the US and International platform—in large part because it knew its products offered on the international exchange were securities required to be registered with securities regulators—the separation was merely a farce and was easily circumvented (which was something that the FTX Group encouraged) through the use of, for instance, a VPN. *See Can You Use FTX Exchange in the USA? (Revealed)*, Blockduo, https://web.archive.org/web/20231202053834/https://blockduo.com/ftx-usa/ ("FTX, like other crypto exchanges, uses something called geo-blocking to stop users from restricted countries from using the exchange. They do this by seeing where your IP address is, and if it is from one of the

Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened

because, as explained by the new CEO of the failed FTX Group:

> I have over 40 years of legal and restructuring experience. I have been the
> Chief Restructuring Officer or Chief Executive Officer in several of the largest
> corporate failures in history. I have supervised situations involving allegations of
> criminal activity and malfeasance (Enron). I have supervised situations involving
> novel financial structures (Enron and Residential Capital) and cross-border asset
> recovery and maximization (Nortel and Overseas Shipholding). Nearly every
> situation in which I have been involved has been characterized by defects of some
> sort in internal controls, regulatory compliance, human resources and systems
> integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls
> and such a **complete absence of trustworthy financial information** as occurred
> here. From compromised systems integrity and faulty regulatory oversight abroad,
> to the concentration of control in the hands of a very small group of inexperienced,
> **unsophisticated** and **potentially compromised** individuals, <u>**this situation is
> unprecedented**</u>.

*See In re: FTX Trading Ltd, et al.*, No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17,

2022) (emphasis added).

40. The Cryptocurrency National Disaster is growing by the billions almost every day.

More crypto companies are filing new federal bankruptcy petitions each day, all running for

protection from the billions of dollars of losses they directly caused to thousands of investors here

---

banned countries, they will block you from the site. . . . With the now wide availability of VPNs,
this can be bypassed . . . ."). The use of VPNs to circumvent geo-blocking for cryptocurrency
exchanges is a well-known and widely used method encouraged by the exchanges to rake in as
many new U.S.-based customers as possible to keep new funds loading onto their platform. *See*
Complaint ¶ 6, *CFTC v. Changpeng Zhao, et al.,* No. 1:23-cv-01887, (N.D. Ill. Mar. 27, 2023),
ECF No. 1 (CFTC enforcement action brought because "Binance and its officers, employees, and
agents have instructed U.S. customers to use virtual private networks ('VPNs') to obscure their
location; allowed customers that had not submitted proof of their identity and location to continue
to trade on the platform long after announcing such conduct was prohibited; and directed VIP
customers with ultimate beneficial owners, key employees who control trading decisions, trading
algorithms, and other assets all located in the United States to open Binance accounts under the
name of newly incorporated shell companies to evade Binance's compliance controls.").

in Florida and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the globe. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

41. The deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

42. Plaintiffs bring this action against Monumental Sports, who actively promoted FTX and its yield-bearing-accounts ("YBAs") to millions of people. Though FTX paid Monumental Sports handsomely to push its brand, Monumental Sports did not conduct adequate (if any) due

diligence. Given Monumental Sports' prominence and resources, it knew or should have known about FTX's financial fragility, as well as the concerns about FTX selling unregistered crypto securities.

43.     With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "Influencers" has been created. Influencers played a major role in the FTX disaster and in fact, FTX could not have risen to such great heights without the massive impact of these Influencers, who hyped the FTX Platform for undisclosed payments ranging from tens of thousands of dollars to multimillion-dollar bribes.[11] Indeed, the most searched companies on the internet today are cryptocurrency brands. According to the NBA 2021–2022 Marketing & Partnerships Annual Report by Sponsor United, the cryptocurrency industry had a higher search volume during that year than the entire Alcohol & Beverages industry.

44.     It is paramount to understand that the Florida state law claims asserted in this action **do not require "reliance" or "deceit."** The law merely requires the named Plaintiffs (and eventually the certified class) to have suffered damages as a result of: (a) purchasing an "unregistered security," and (b) that was promoted by Defendant for its financial benefit and/or the financial benefit of FTX.

45.     The reality is that anyone around the world with a computer can now be a promoter. Many of these paid FTX promoters have since asked for forgiveness because many of these Influencers rely mainly on their alleged independence and impartiality in attracting people to join

---

[11] For example, the company Coinbound touts, "We help crypto brands go viral using Web3's top influencers." Coinbound, https://coinbound.io/influencers/ (last visited March 6, 2024).

their fanbase.[12] This Action is brought to hold liable a promoter who specifically violated the law under these acts and will serve as precedent to warn and guide other promoters in the future.

46.     State and federal regulators have been required to quickly modify and adjust to all the changing sources of promoters and marketers. Starting with sponsors on radio, then television and motion pictures and today, to the wild west of the internet, the number of companies that specialize in promoting on social media have sky-rocketed. According to studies, those aged 18 to 34 are more likely to build an interest in an investment specifically from social media, instead of traditional news websites.[13]

## **PARTIES**

47.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which Monumental Sports is liable.

48.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which Monumental Sports is liable.

---

[12] Amanda Perelli, *Finance influencers are apologizing to fans after making money promoting FTX—and some say they'll make changes*, Bus. Insider (Nov. 14, 2022, 9:30 AM EST), https://www.businessinsider.com/influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11.

[13] Shane Kickey, *As 'finfluencers' spread through social media, beware the pitfalls*, The Guardian (Aug. 22, 2021, 4:00 EDT), https://www.theguardian.com/money/2021/aug/22/as-finfluencers-spread-through-social-media-beware-the-pitfalls.

49.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which Monumental Sports is liable.

50.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which Monumental Sports is liable.

51.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which Monumental Sports is liable.

52.     **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which Monumental Sports is liable.

53.      **Plaintiff Vijeth Shetty** was a citizen of and resided in the State of Florida at all times relevant to the accrual of his claims. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which Monumental Sports is liable.

54.      **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which Monumental Sports is liable.

55.      **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which Monumental Sports is liable.

56.      **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which Monumental Sports is liable.

57.     **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which Monumental Sports is liable.

58.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which Monumental Sports is liable.

59.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which Monumental Sports is liable.

60.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of Monumental Sports' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which Monumental Sports is liable.

61.     **Defendant Lincoln Holdings LLC d/b/a Monumental Sports & Entertainment**, entered into a sponsorship agreement with FTX to promote it and its products. Monumental Sports is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 601 F Street NW, Washington, DC 20004.  Monumental Sports,  a leading sport and entertainment business, owns and operates six sports teams, including the NBA's Washington Wizards, the National Hockey League's Washington Capitals and the WNBA's Washington Mystics.  Monumental Sports also owns five sports venues, including the Capital One Arena in Washington D.C.  Monumental Sports touts itself to be "one of the Top Places to Work in Washington, D.C., one of the major benefactors in [D.C], and one of the leading advocates for the community and its' citizens."[14]  Monumental Sports (1) advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (2) failed to disclose, in any of its marketing campaigns and/or advertisements, that it was paid substantial sums by FTX and profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

## JURISDICTION AND VENUE

62.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendant.

63.     This Court has general personal jurisdiction over Defendant Monumental Sports in the District of Columbia because Monumental Sports is engaged in substantial and not isolated activity within this state, rendering Defendant Monumental Sports subject to the jurisdiction of the

---

[14] https://monumentalsports.com/who-we-are/

courts of this state, whether or not the claim arises from that activity. Upon transfer of this Related Action to the Transferee Court for consolidation into the FTX MDL, the Transferee Court will have personal jurisdiction over Defendant Monumental Sports because in enacting the multidistrict litigation statute, 28 U.S.C. § 1407, Congress "authoriz[ed] the federal courts to exercise nationwide personal jurisdiction … and [t]ransfers under Section 1407 are simply encumbered by considerations of in personam jurisdiction…" *In re Agent Orange Prod. Liab. Litig. MDL No 381*, 818 F.2d 145, 163 (2d Cir. 1987). The Transferee Court further independently has personal jurisdiction over Defendant because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendant regularly conducted business in Florida and/or engaged in continuous and systematic activities within Florida, and committed tortious acts in the state of Florida, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

64. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant Monumental Sports resides in this District. Venue is also proper in the Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1407, because the Panel ordered in its Transfer Order that all Related Actions be transferred to the Transferee Court and consolidated into the FTX MDL for pretrial purposes. Venue is further proper in the Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1391 because the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within this District.

65. All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A.    The Rise of FTX**

66.    In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

67.    FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[15]

68.    All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

69.    FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX

---

[15] *See* Superseding Indictment ¶ 2, *United States of America v. Samuel Bankman-Fried*, No. S5 Cr. 673 (March 28, 2023), ECF No. 115.

US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

70. Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

71. FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

72. By structuring the rates of returns in this way, FTX targeted nascent investors— i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

73. Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms

of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

74.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

75.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self-trades in order to manipulate markets, reported statistics, or cause liquidations."

76.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders

on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.[16]

77.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).[17]

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

78.     More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, Facebook, TikTok, Instagram, and LinkedIn, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the

---

[16] https://www.cftc.gov/media/7031/CommentFTXAmendedOrder/download.

[17] https://www.govinfo.gov/content/pkg/CHRG-117hhrg48754/html/CHRG-117hhrg48754.htm.

Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

79.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . I don't want a yacht."

80.     But in truth, SBF did want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

81.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion per day and its valuation topped $32 billion within three years of its founding.

## B.     FTX's Key Players

### I.     Sam Bankman-Fried

82.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

83.     Prior to that, the Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda, in November 2017,[18] after stints in the charity world and at trading firm Jane Street.[19] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

84.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.*, Doc. 80. Bankman-Fried was convicted by a jury on November 2, 2023, of all seven charges tried in October 2023. He now faces over 100

---

[18] Lakshmi Varanasi, Sarah Jackson, Britney Nguyen & Sindhu Sundar, *The Rise and Fall of FTX's Sam Bankman-Fried, the Onetime Crypto Billionaire Prosecutors Now Want Jailed After They Say He Interfered With Witnesses in His Criminal Case*, Bus. Insider, https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (July 26, 2023, 5:12 PM EDT).

[19] Avery Hartmans, *The Collapse of Crypto Firm FTX and Its Superstar Founder Explained for Those Who Know Nothing About Crypto*, Bus. Insider (Nov. 12, 2022, 6:45 AM EST) https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations=.

years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

### II. Caroline Ellison

85.    By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

86.    In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team at Alameda included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

87.    After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda.

88.    In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and

unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[20]

89.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

90.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[21]

91.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### III.     Gary Wang

92.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

---

[20]  Nelson Wang, Co-CEO of Crypto Trading Firm Alameda Research Sam Trabucco Steps Down, CoinDesk        https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (May 11, 2023, 1:43 PM EDT).

[21] FTX Official, *FTX Podcast #36: Defi Summer Crypto Trading Strategy*, Youtube (Jan 22, 2021), https://web.archive.org/web/20221108225900/https://www.youtube.com/watch?v=zfcb9JAgWBs.

93.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[22]

94.     Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[23] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

95.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

96.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[24]

---

[22] *Raising the Bar*, FTX Blog,
https://web.archive.org/web/20221109182910/https://blog.ftx.com/blog/raising-the-bar/.

[23] *Who We Are*, FTX Future Fund,
https://web.archive.org/web/20221109222441/https://ftxfuturefund.org/about/.

[24] Keri McMahon & Vicky Ge Huang, *Here Are 10 of the Most Surprising Little-known Facts We Learned About the 29-Year-Old Crypto Billionaire Sam Bankman-Fried After Months Speaking to His Closest Friends, Family, and Colleagues*, Bus. Insider (Dec. 28, 2021, 4:00 AM CST), https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5.

97.     At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[25]

98.     In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### IV.     *Nishad Singh*

99.     Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

100.    Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

101.    He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[26]

---

[25] Sam Bankman-Fried (@SBF_FTX), Twitter (Apr. 5, 2022, 8:45 AM), https://twitter.com/SBF_FTX/status/1511324242612297738.

[26] Dave Michaels, Elaine Yu & Caitlin Ostroff, *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2:42 PM ET).

102.     Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[27]

103.     "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

104.     Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

105.     After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

106.     "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[28] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

---

[27] FTX Official, *FTX Podcast: Crypto Engineer's Responsibilities*, YouTube (Dec. 23, 2020), https://web.archive.org/web/20221123034805/https://www.youtube.com/watch?app=desktop&v=rl0Rq2cUSIQ.

[28] *Raising the Bar*, FTX Blog, https://web.archive.org/web/20221109182910/https://blog.ftx.com/blog/raising-the-bar/.

107.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[29] A similar relationship may be in place at FTX's core properties.[30]

108.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

109.     November 12, 2022, _The Wall Street Journal_ reported that Bankman-Fried, Ellison, Wang, and Singh were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.

C.     **The Basics of a Cryptocurrency Exchange**

110.     In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. There is a big difference, however, in regards to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

111.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

---

[29] Danny Nelson, _FTX Hack Sparks Revolution at Serum DEX as Solana Devs Plot Alameda's Ouster_, CoinDesk, https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (May 9, 2023, 12:02 AM EDT).

[30] Dave Michaels, Elaine Yu & Caitlin Ostroff, _Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds_, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2:42 PM ET).

112.    The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

113.    If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

a)  Trade it for another cryptocurrency

b)  Trade it for fiat currency

c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

114.    The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

115.    One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

116.    For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*[31]

117.    While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's

---

[31] *FTX Terms of Service* (May 13, 2022), https://web.archive.org/web/20221108192005/https://help.ftx.com/hc/article_attachments/97196 19779348/FTX_Terms_of_Service.pdf.

somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

118.    With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

119.    While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

120.    The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

121.    Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

122.    Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges

to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

123.    Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

124.    Due to the aforementioned reasons and risks surrounding the lack of regulation, as well as various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

125.    The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

126.    This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[32] often in spectacular fashion. The most common reasons for an exchange's failure include:

   a)   The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency;

   b)   The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency;

   c)   A hack or theft by an external actor;

   d)   Embezzlement, or theft by an internal actor, typically founder(s) of the exchange; or

   e)   Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

127.    When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

128.    Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.* FTX was not an exception

---

[32] *See Exchange Graveyard*, Crypto Wisser, https://www.cryptowisser.com/exchange-graveyard/.

to this trend. One should not assume or believe that an exchange is any of these things just because they say it.

129.     This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[33] specifically, those investors will be made whole or almost whole due to sensible regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan.

**D.     The Mechanics of the Fraudulent Scheme**

130.     The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

131.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

132.     Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

133.     Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class

---

[33] JP Koning, Opinion, *Japan Was the Safest Place to Be an FTX Customer*, Coindesk, https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/ (Sept. 28, 2023, 10:22 AM EDT).

Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

134.    Frequently, SBF routed his fraudulent scheme through Alameda LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

135.    Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

136.    Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

137.    SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's

revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

138.    Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

139.    More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:

Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

140. SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

141.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

142.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit, which Alameda used to invest $8 billion in risky startups and esoteric cryptocurrencies—highly illiquid investments purchased on credit from FTX, funded with Class Member assets. SBF also misappropriated Class Member funds to inflate the balance sheets of Alameda, which were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX and/or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using Class Member funds and to the benefit of Alameda, SBF manipulated the value of FTT by implementing a "rolling program of buying back and

burning [FTT] tokens," a process which consumed a third of FTX's revenue. By artificially increasing the value of FTT in this way, SBF increased the value of collateral available to Alameda, with which SBF was able to borrow billions of dollars from third party lenders in furtherance of his fraudulent scheme.

143.    Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

144.    The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that

FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[34]

145.    *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[35]

---

[34] Transcript of Guilty Plea at 26–29, *United States v. Ellison*, No. 22-cr-673 (S.D.N.Y. Dec. 19, 2022), https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf.

[35] Dave Michaels, Elaine Yu & Caitlin Ostroff, *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2:42 PM ET).

146.    Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[36]

147.    FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

148.    FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

---

[36] Jody Godoy & Luc Cohen, FTX's Singh Pleads Guilty As Pressure Mounts on Bankman-Fried, Reuters (Feb. 28, 2023, 4:42 PM EST), https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/.

149.     FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

150.     At no time did FTX disclose the foregoing to Class Members, including that:

I.       SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

II.      FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

III.     FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

IV.      FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

V.       SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

VI.      SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

VII.     SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

VIII.    Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

IX.      With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

X.       FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

XI.      FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

151.     Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

E.     **The Fraud's Collapse**

152.     The FTX.com exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[37]

153.     FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

154.     Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

155.     At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the defendants in the FTX MDL to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[38]

156.     Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for

---

[37] Cheyenne Ligon, *Crypto Exchange FTX Is Moving Its US Headquarters from Chicago to Miami*, CoinDesk (Sept. 27, 2022, 2:52 PM EDT), https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/.

[38] Avery Hartmans, *The Collapse of Crypto Firm FTX and Its Superstar Founder Explained for Those Who Know Nothing About Crypto*, Bus. Insider (Nov. 12, 2022, 6:45 AM EST), https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations=.

loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

157.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

158.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[39] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

159.    Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX assets

---

[39] *Id.*

– specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[40]

160.    Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.[41]

161.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a

---

[40] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Aug. 16, 2023, 5:56 PM EDT), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/.

[41] *Zahra Tayeb, FTX Was Reportedly Hit with $6 Billion in Withdrawals in Just 72 Hours*, Bus. Insider: Markets Insider (Nov. 9, 2022, 5:05 AM EST), https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11.

federal investigation.[42] In truth, there were always too many issues—issues with the
interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls,
issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even
further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[43] This triggered
panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

162.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the
FTX Group went wrong:[44]



[42] Brian Evans, *FTX Faces Federal Probes on Handling of Client Funds as Asset Shortfall Could Top $6 Billion, Report Says*, Bus. Insider: Markets Insider (Nov. 9, 2022, 1:56 PM EST), https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11.

[43] Samantha Delouya, *Thirty-Year Old Crypto Tycoon Sam Bankman-Fried Was Worth $16 Billion. 94% of That Was Wiped Out in Just One Day*, Bus. Insider: Markets Insider (Nov. 8, 2022, 8:04 PM EST), https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11.

[44] Sam Bankman-Fried (@SBF_FTX), Twitter (Nov. 10, 2022, 9:13 AM), https://twitter.com/SBF_FTX/status/1590709189370081280 (last of linked tweets).



SBF ✓ @SBF_FTX · Nov 10

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH. THERE ARE APPROXIMATIONS HERE.]

💬 259    🔁 639    ♡ 3,873    ↑



SBF ✓ @SBF_FTX · Nov 10

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals. The liquidity varies widely, from very to very little.

💬 174    🔁 636    ♡ 3,592    ↑



SBF ✓ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin. I thought it was way lower.

💬 251    🔁 749    ♡ 3,407    ↑



SBF ✔ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours. We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241      ↻ 907      ♡ 3,823      ↥



SBF ✔ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough. I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116      ↻ 278      ♡ 2,882      ↥



SBF ✔ @SBF_FTX · Nov 10

8) And so we are where we are. Which sucks, and that's on me.

I'm sorry.

💬 155      ↻ 357      ♡ 3,122      ↥



SBF ✔ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that. To take responsibility, and do what I can.

💬 162          🔁 357          ♡ 3,715          ⬆️

SBF ✔ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that. But I'm going to try. And give anything I have to if that will make it work.

💬 164          🔁 394          ♡ 3,377          ⬆️

SBF ✔ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87          🔁 234          ♡ 2,625          ⬆️

SBF ✔ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102          🔁 274          ♡ 3,007          ⬆️









**SBF** ✔ @SBF_FTX · Nov 10
Replying to @SBF_FTX

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

💬 214        🔁 320        ♡ 2,255        ⬆

**SBF** ✔ @SBF_FTX · Nov 10

17) All of the stakeholders would have a hard look at FTX governance. I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

💬 137        🔁 198        ♡ 1,878        ⬆

**SBF** ✔ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

💬 144        🔁 158        ♡ 1,970        ⬆

**SBF** ✔ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International. FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid. Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406        🔁 760        ♡ 2,776        ⬆







### F.    FTX Files for Bankruptcy

163.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[45]

---

[45] Phil Rosen, *FTX Files for Bankruptcy and Sam Bankman-Fried Steps Down as CEO After Crypto Exchange Fails to Secure Bailout*, Bus. Insider (Nov. 11, 2022), https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11.

164.     At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[46]

165.     Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[47] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[48]

166.     The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

---

[46] Matt Levine, Opinion, *FTX's Balance Sheet Was Bad*, Bloomberg (Nov. 14, 2022, 1:09 PM EST), https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg.

[47] Dave Michaels, Elaine Yu & Caitlin Ostroff, Alameda, *FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, Wall St. J., https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (Nov. 12, 2022, 2:42 PM ET).

[48] *Id.*

167.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

168.    The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

169.    The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

> *First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

> *Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

> *Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which

approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

**Fourth**, loans and other payments were made to insiders in excess of $1 billion.

**Fifth**, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

170.     On April 9, 2023, Mr. Ray filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as **Exhibit C** (the "First Interim Rpt.").

171.     Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

> the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

> Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

> Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds,

lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

172.    After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.* at 11–37.

173.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

174.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.* at 8. The FTX Group did not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.* at 8–9.

175.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a)   Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.* at 11;

b)   Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

c)   Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.* at 12–13;

d)   Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.* at 14;

e)   "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.* at 14–15;

f) "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.* at 15;

g) the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.* at 15;

h) "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

i) "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.* at 17;

j)  Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k)  On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX Platform, *Id.* at 18–22; and finally

l)  There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature

capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group
employee user access to sensitive infrastructure, such as omnibus wallets holding
billions of dollars in assets, and (v) failing to enforce multi-factor authentication
for employees and other commonsense safeguards to protect customer assets and
sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group
exposed crypto assets under its control to a grave risk of loss, misuse, and
compromise, and lacked a reasonable ability to prevent, detect, respond to, or
recover from a significant cybersecurity incident, including the November 2022
Breach." *Id.* at 22–37.

176.    Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its
crypto assets and funds at risk from the outset." *Id.* at 39.

## G.    Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct

177.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto
sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of
cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role
of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to
Digital Assets." The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring
Responsible Development of Digital Assets and is the latest report on cryptocurrency released by
DOJ[49] dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DOJ notes
that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and
other illegal online marketplaces…" and the department classified digital asset crime into three

---

[49] Press Release, *Justice Department Announces Report on Digital Assets and Launches Nationwide Network*, Dep't of Just. (Sept. 16, 2022), https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network.

categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

178.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[50] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[51] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[52] North Korea's brazenness was revealed to the public earlier this year when

---

[50] *Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022]*, U.S. Gov't Accountability Off., https://www.gao.gov/products/gao-22-105462.

[51] Emily Flitter & David Yaffe-Bellany, *Russia Could Use Cryptocurrency to Blunt the Force of U.S. Sanctions*, N.Y. Times (Feb. 24, 2022), https://www.nytimes.com/2022/02/23/business/russia-sanctions-cryptocurrency.html, Kyle Barr, *Iran Plans to Use Crypto to Pay for Imports to Help Get Around Sanctions*, Gizmodo (Aug. 9, 2022), https://gizmodo.com/iran-crypto-imports-sanctions-1849389297, Mike Orcutt, *This is How North Korea Uses Cutting-Edge Crypto Money Laundering to Steal Millions*, MIT Tech. Rev. (Mar. 5, 2020), https://www.technologyreview.com/2020/03/05/916688/north-korean-hackers-cryptocurrency-money-laundering/.

[52] Christian Davies & Scott Chipolina, Fin. Times, *It's Not Juche if You Have to Steal—How North Korea Became a Mastermind of Crypto Cybercrime*, Ars Technica (Nov. 14, 2022, 11:15 AM), https://arstechnica.com/information-technology/2022/11/how-north-korea-became-a-mastermind-of-crypto-cyber-crime/.

a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[53]

179. Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[54] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between

---

[53] *Id.*

[54] U.S. Senate Comm. on Homeland Sec. & Governmental Affs., Use of Cryptocurrency in Ransomware Attacks, Available Data, and National Security Concerns (May 25, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/HSGAC%20Majority%20Cryptocurrency%20Ransomware%20Report.pdf.

cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[55]

180.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[56] According to the September DOJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[57] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[58] The median individual loss was a staggering $2,600.

181.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the

---

[55] Lee Reiners, Opinion, *Ban Cryptocurrency to Fight Ransomware*, Wall St. J. (May 25, 2021, 1:13 PM ET) https://www.wsj.com/articles/ban-cryptocurrency-to-fight-ransomware-11621962831.

[56] Press Release, *Justice Department Announces Report on Digital Assets and Launches Nationwide Network*, Dep't of Just.: Off. of Pub. Affairs (Sept. 16, 2022) https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network.

[57] *Id.*

[58] Emma Fletcher, *Reports Show Scammers Cashing in on Crypto Craze*, FTC (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[59]

182.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[60]

183.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[61] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

---

[59] U.S. Dep't of the Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* (Sept. 2022), https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf.

[60] Becky Yerak, What to Watch in the FTX Bankruptcy as Details Remain Scarce, Wall St. J. (Nov. 14, 2022, 8:33 PM ET), https://www.wsj.com/articles/what-to-watch-in-the-ftx-bankruptcy-as-details-remain-scarce-11668475992?page=1.

[61] Michelle Faverio & Navid Massarat, *46% of Americans who have invested in cryptocurrency say it's done worse than expected*, Pew Rsch. Ctr. (Aug. 23, 2022), https://www.pewresearch.org/short-reads/2022/08/23/46-of-americans-who-have-invested-in-cryptocurrency-say-its-done-worse-than-expected/.

184. For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike Defendant, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspirators, exploited their vulnerability for tremendous financial gain. Now, Bankman-Fried is going to jail and his victims are left with nothing.

## H.    The SEC's Approach to Cryptocurrency.

### I.    Overview

185. Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

186. Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." *In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the*

70

> virtually limitless scope of human ingenuity, especially in the
> creation of "countless and variable schemes devised by those who
> seek the use of the money of others on the promise of profits," and
> determined that the best way to achieve its goal of protecting
> investors was "to define 'the term "security" in sufficiently broad
> and general terms so as to include within that definition the many
> types of instruments that in our commercial world fall within the
> ordinary concept of a security.'" Congress therefore did not attempt
> precisely to cabin the scope of the Securities Acts . . . Rather, it
> enacted a definition of "security" sufficiently broad to encompass
> virtually any instrument that might be sold as an investment."[62]

187.    Crafted to contemplate not only known securities arrangements at the time, but also

any prospective instruments created by those who seek the use of others' money on the promise

of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture

new instruments that share the common characteristics of stocks and bonds. As Supreme Court

Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined

in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> "We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in
> connection with the purchase or sale of securities, whether the artifices employed
> involve a garden type variety fraud, or present a unique form of deception. Novel
> or atypical methods should not provide immunity from the securities laws."

188.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-

related emergency asset freeze hearings where the issue is always considered and affirmed, same

as it has been by hundreds of federal courts across the country since the *Howey* Decision, which

the Supreme Court adopted over 75 years ago.[63] That decision resulted in the *Howey* Test, which

is used to determine the presence of an investment contract. The *Howey* Test stipulates that an

investment contract exists if there is an "investment of money in a common enterprise with a

---

[62] *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (emphasis added) (citations omitted).

[63] *SEC v. Howey Co.*, 328 U.S. 293 (1946).

reasonable expectation of profits to be derived from the efforts of others."[64] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

189.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[65]

190.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[66] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[67] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other

---

[64] *Id.*

[65] SEC, Pub. No. 153, *Investor Alert: Ponzi Schemes Using Virtual Currencies* (July 2013), https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.

[66] SEC, *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, Investor.gov (May 7, 2014), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39.

[67] SEC, Release No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017), https://www.sec.gov/files/litigation/investreport/34-81207.pdf.

distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[68]

191. In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[69]

192. In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[70] multiple speeches,[71] Congressional testimony,[72] and several official SEC statements[73] and proclamations.[74] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized

---

[68] *Id.* at 1–2.

[69] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Mar. 8, 2023), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[70] *Crypto Assets and Cyber Enforcement Actions*, SEC (Nov. 21, 2023), https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

[71] Gary Gensler, Chair, SEC, *Remarks Before the Aspen Security Forum*, SEC (Aug. 3, 2021), https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03.

[72] Gary Gensler, Chair, SEC, *Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee*, SEC (May 26, 2021), https://www.sec.gov/news/testimony/gensler-2021-05-26.

[73] Jay Clayton, Chairman, SEC, *Statement on Cryptocurrencies and Initial Coin Offerings*, SEC (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[74] Divisions of Enforcement and Trading and Markets, *Statement on Potentially Unlawful Online Platforms for Trading Digital Assets*, SEC (Mar. 7, 2018), https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading.

finance,[75] warning that their failure to register with the SEC may violate U.S. securities laws.[76] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[77]

193. On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[78] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[79] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[80]

---

[75] Michael McSweeney, *Gensler sets SEC sights on DeFi, crypto lending and more in expansive speech on regulation*, The Block (Aug. 3, 2021, 1:08 PM EDT), https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec.

[76] Ben Werschkul, *Crypto Platforms that Don't Register With the SEC Do Business 'Outside the Law': Gensler*, Yahoo! Finance (Mar. 4, 2022), https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html.

[77] Michael McSweeney, *Gensler sets SEC sights on DeFi, crypto lending and more in expansive speech on regulation*, The Block (Aug. 3, 2021, 1:08 PM EDT), https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec.

[78] Gary Gensler, Chair, SEC, *Kennedy and Crypto*, SEC (Sept. 8, 2022) https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

[79] *Id.*

[80] *Id.*

194.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[81]

195.     What follows are summaries of seven cases that will help inform this litigation.

## II.     SEC v. KIK

196.     In Kik[82], the SEC's complaint[83], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[84]

197.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

---

[81] *See* Simona Mola, Cornerstone Research, *SEC Cryptocurrency Enforcement: 2021 Update*, https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2021-Update.pdf.

[82] Press Release, *SEC Obtains Final Judgment Against Kik Interactive For Unregistered Offering*, SEC (Oct. 21, 2020), https://www.sec.gov/news/press-release/2020-262.

[83] Press Release, *SEC Charges Issuer With Conducting $100 Million Unregistered ICO*, SEC (June 4, 2019), https://www.sec.gov/news/press-release/2019-87.

[84] Aziz Abdel-Qader, *SEC Seeks to Block Kik Subpoenas, Refutes "Void for Vagueness" Claim*, Fin. Magnates (Oct. 29, 2019, 22:35 GMT), https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/.

### III.   SEC v. Telegram

198.   In Telegram,[85] the SEC filed a complaint[86] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

199.   Telegram argued[87] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

200.   On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[88] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

---

[85] Press Release, *Telegram to Return $1.2 Billion to Investors and Pay $18.5 Million Penalty to Settle SEC Charges*, SEC (June 26, 2020), https://www.sec.gov/news/press-release/2020-146.

[86] Press Release, *SEC Halts Alleged $1.7 Billion Unregistered Digital Token Offering*, SEC (Oct. 11, 2019), https://www.sec.gov/news/press-release/2019-212.

[87] Rachel McIntosh, *SEC vs. Telegram: Will Gram Tokens Ever Be Distributed?*, Fin. Magnates (Oct. 10, 2019, 7:11 GMT), https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/.

[88] *SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement?*, Greenberg Traurig (Apr. 1, 2020), https://www.gtlaw.com/en/insights/2020/4/sec-v-telegram--a-groundbreaking-decision-in-cryptocurrency-enforcement.

201.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### IV.    SEC v. BlockFi

202.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 14, 2022, the SEC charged BlockFi [89] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

203.    BlockFi argued for "increased regulatory clarity" but lost. [90]

204.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and

---

[89] Press Release, BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product, SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

[90] *A Letter from Our Founders: Pioneering a Path Forward to Regulatory Clarity*, BlockFi (Feb. 14, 2022), https://web.archive.org/web/20221111035031/https://blockfi.com/pioneering-regulatory-clarity.

sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### SEC Wells Notice to Coinbase

205.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[91] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a Wells Notice, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

206.    According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[92]

207.    The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

208.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend

---

[91] Paul Grewal, *The SEC Has Told Us It Wants to Sue Us Over Lend. We Don't Know Why.*, Coinbase (Sept. 7, 2021), https://www.coinbase.com/blog/the-sec-has-told-us-it-wants-to-sue-us-over-lend-we-have-no-idea-why.

[92] *Id.*

investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

209.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

210.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and 7) a note evidencing loans by commercial banks for current operations.

211.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

212.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

213.    Given the clear facts of the case, Coinbase decided to cancel the Lend program.[93]

### SEC v. Binance

214.    In Binance, the SEC filed a complaint[94] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Changpeng Zhao. The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The

---

[93] *See* Mitchell Clark, *Coinbase Cancels Lend Program Launch After SEC Fight / The Company Says It's Still Looking for "Regulatory Clarity"*, Verge (Sept. 20, 2021, 2:38 PM EDT), https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats.

[94] Complaint, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. June 5, 2023), ECF No. 1, https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.

SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

### SEC v. Coinbase

215.     In Coinbase, the SEC filed a complaint[95] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[96]

### SEC v. Terraform Labs Pte. Ltd.

216.     In one of the most recent developments in the crypto space, on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346, 2023 WL 4858299 (S.D.N.Y. July 31, 2023).

217.     This is a significant ruling for several reasons.

---

[95] Complaint, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. June 6, 2023), ECF No. 1, https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.

[96] Press Release, *SEC Charges Coinbase for Operating as an Unregistered Securities Exchange, Broker, and Clearing Agency*, SEC (June 6, 2023), https://www.sec.gov/news/press-release/2023-102.

218.     First, it supports the fact that YBAs and FTT are unregistered securities.

219.     Second, Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc.*, No. 20 CIV. 10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023), *motion to certify appeal denied*, No. 20 CIV. 10832, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.

220.     Third, Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge Rakoff, in a *Financial Times* article, the "[T]he most respected securities authority in the federal judiciary."[97]

221.     The relevant points of comparison in Judge Rakoff's decision to the FTX MDL are his analysis around the Luna token and UST stablecoin, which bear similarities to the FTT token and YBAs, respectively.

222.     With respect to the Luna token, Judge Rakoff found that a common enterprise and expectation of profit existed because Terraform labs used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that that these improvements would increase the value of the Luna tokens. This is similar to the FTT token, which was an exchange token. Given FTT's features, it was clearly designed to go up in value as the FTX platform grew and became more popular with crypto traders. In fact, in their complaint alleging, amongst other things, that FTT is an unregistered security, the SEC states:

---

[97]     Todd Baker, *Crypto Got Rakoff'd, Fin. Times* (Aug. 3, 2023), https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880.

FTX used the pooled proceeds from FTT sales to fund the development, marketing, business operations, and growth of FTX, depending on the success of FTX and its management team in developing, operating, and marketing the trading platform. If demand for trading on the FTX platform increased, demand for the FTT token could increase, such that any price increase in FTT would benefit holders of FTT equally and in direct proportion to their FTT holdings. The large allocation of tokens to FTX incentivized the FTX management team to take steps to attract more users onto the trading platform and, therefore, increase demand for, and increase the trading price of, the FTT token.[98]

223.    The SEC makes a similar allegation with respect to Luna in the Terraform Labs action and Judge Rakoff sides with the SEC. From his decision:

> The SEC's theory for horizontal commonality as to these other coins, however, rests on a different but equally plausible theory. As to the LUNA tokens, for instance, the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves. See Amended Complaint ¶¶ 46-47, 49-51. In other words, by alleging that the defendants "pooled" the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise.[99]

224.    Also, of relevance to the FTX MDL and to this case is Judge Rakoff's conclusion that the algorithmic stablecoin, UST, also met the *Howey* standard for investment contracts. Note that this is the first time the SEC has alleged that a stablecoin is an investment contract, and the SEC's reasons for making this allegation also support the assertion that YBAs are securities.

225.    While UST, like most stablecoins, was supposed to be tied one-for-one to the US dollar, Terraform and Kwon marketed "UST coins as profitable investment opportunities—as

---

[98] Complaint ¶ 79, *SEC v. Ellison*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022), ECF No. 1, https://www.sec.gov/files/litigation/complaints/2022/comp-pr2022-234.pdf.

[99] *SEC v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346, 2023 WL 4858299, at *13 (S.D.N.Y. July 31, 2023).

opposed to just stable stores of value—in meetings with U.S. investors, investment conferences in major U.S. cities, and on social media platforms."[100]

226.    Then, in 2021, Terraform launched the "Anchor Protocol" which was an "investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated."

227.    Judge Rakoff found that "the fact that most of the UST coins were deposited in the Anchor Protocol independently rendered these tokens investment contracts, indeed investments that were touted as being capable of being able to generate future profits of as much as 20%."[101] Judge Rakoff goes on to say:

> In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol—in other words, on a pro-rata basis."[102]

228.    This closely resembles the facts surrounding YBAs and Judge Rakoff's finding that UST met the requirements for an investment contract supports the conclusion that YBAs are also unregistered securities.

229.    Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the *Ripple* decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach

---

[100] *Id.* at *2.

[101] *Id.* at *12.

[102] *Id.* at *13.

recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[103]

230.     Judge Rakoff goes on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[104]

231.     While noting that "in theory, the tokens, if taken by themselves, might not qualify as investment contracts," Judge Rakoff evaluated—"as the Supreme Court did in *Howey*—whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."[105]

232.     Judge Rakoff's rejection of the *Ripple* decision's secondary market distinction and fulsome *Howey* analysis support Plaintiffs' assertion that FTT and YBAs are unregistered securities. FTT purchasers, on the FTX Platform or elsewhere, did not necessarily know who the seller was. But, as Judge Rakoff explains, knowledge of the seller's identity is not necessary to prove that purchasers expected profits based on the efforts of FTX, who is the ***issuer*** of these assets, and not simply a platform where the assets traded.

### V.     SEC v. Payward (Kraken)

233.     The SEC filed a complaint against Payward, Inc. and Payward Ventures, Inc., which do business as Kraken, on November 20, 2023, in the United States District Court for the Northern District of California.

---

[103] *Id.* at *15.

[104] *Id.*

[105] *Id.* at *12.

234.     The SEC alleges that Kraken entities have violated multiple securities laws, including hundreds of millions of dollars from operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines and from unlawfully facilitating the buying and sale of crypto asset securities. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil penalties. "We allege that Kraken made a business decision to reap hundreds of millions of dollars from investors rather than coming into compliance with the securities laws. That decision resulted in a business model rife with conflicts of interest that placed investors' funds at risk," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[106]FTX's offer and sale of YBAs, which are unregistered securities.

235.     Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

236.     The details of the Earn program were presented on the FTX website,[107] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[108]

---

[106] https://www.sec.gov/news/press-release/2023-237

[107]     FTX     Crypto     Derivatives     Exchange,     FTX     App     Earn,     FTX, https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/1057345824532-FTX-App-Earn.

[108] Supplemental Declaration to the Texas State Securities Board's and the Texas Department of Banking's Limited Objection to the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief, *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (Bankr. S.D.N.Y. Oct. 14, 2022), ECF No. 536, https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf.

237.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[109]

238.    On the same webpage, the company also states:

The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[110]

239.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

240.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[111] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time

---

[109]    FTX Crypto Derivatives Exchange, *FTX App Earn*, FTX, https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn.

[110] *Id.*

[111] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[112]

241.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[113] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[114]

242.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof

---

[112] *See, e.g.*, *What is Staking?*, Coinbase, https://www.coinbase.com/learn/crypto-basics/what-is-staking; Mensholong Lepcha, *Slashing*, Techopedia (Nov. 2, 2023), https://www.techopedia.com/definition/slashing; Blocknative, *A Staker's Guide to Ethereum Slashing & Other Penalties*, Blocknative (Oct. 1, 2022), https://www.blocknative.com/blog/an-ethereum-stakers-guide-to-slashing-other-penalties.

[113] Paul Kiernan & Vicky Ge Huang, Ether's New 'Staking' Model Could Draw SEC Attention, Wall St. J. (Sept. 15, 2022, 6:07 PM ET), https://www.wsj.com/articles/ethers-new-staking-model-could-draw-sec-attention-11663266224.

[114] *Id.*

of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

243.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

> From a securities perspective, the *Howey* Test defines an investment contract as:
> a. An investment of money
>     i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.
> b. In a common enterprise
>     i. FTX customer assets are almost always consolidated in wallets operated and controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to

other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c. With the expectation of profit

    i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[115]

d. To be derived from the efforts of others

    i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

    ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

244.    The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that

---

[115]    FTX    Crypto    Derivatives    Exchange,    *FTX    App    Earn*,    FTX, https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/1057345824532-FTX-App-Earn.

Earn users will receive "yield earnings" on their "investment portfolio."[116] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[117]

245.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

246.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

247.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14,

---

[116] *Id.*

[117] Press Release, *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product*, SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.
> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

> FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

> FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer

in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[118] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information

---

[118] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still showed the application as developed by Blockfolio.

about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled How do you calculate APY? Does my balance compound daily? that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled Location Restrictions published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> FTX does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic,**

**Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda.** There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.

(emphasis in original).

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam

Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## I.     FTX's Offer and Sale of FTT Tokens, Which Are Unregistered Securities.

248.     The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform . . . ."[119] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the

---

[119] Robert Stevens, *What Is an Exchange Token?*, Coindesk (Nov. 9, 2022, 12:19 PM EST) https://www.coindesk.com/learn/what-is-an-exchange-token/.

exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[120]

249.    FTT passes the *Howey* Test because the token was controlled by FTX (the company could create or destroy it at will) and because its value was based upon the success of FTX, which was dependent on the "efforts" of others besides the investors. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[121]

## J.    Using the FTX Platform Itself Necessarily Required Transacting in Unregistered Securities.

250.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the FTX Platform.

251.    Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

252.    When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes

---

[120] *See FTX Token FTT*, CoinMarketCap,  https://coinmarketcap.com/currencies/ftx-token/ (last accessed Nov. 21, 2023) (showing FTT price history).

[121] Harrison Miller, *Binance Passes on FTX Takeover, Bitcoin Rebounds on CPI Data*, Investor's Business  Daily  (Nov.  10,  2022),  https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/.

the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

253.    Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not), with best practice being for exchanges to hold the majority of cryptocurrency they are holding on behalf of customers in multiple cold wallets. Best practices would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

254.    According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

> The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date,

during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[122]

255.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[123] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[124] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[125]

256.    To further complicate matters, statements given by Sam Bankman-Fried to the Wall Street Journal ("WSJ") last year suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[123] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that "[o]ver time, FTX customers deposited more than $5 billion in those Alameda accounts . . . ."[126]

---

[122] Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ¶¶ 65–66, *In re FTX Trading LTD*, No. 22-11068, (Bankr. D. Del. Nov. 17, 2022), ECF No. 24, https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf.

[123] *Id.* ¶ 18.

[124] *Id.* ¶ 19.

[125] *Id.* ¶ 38.

[126] *Id.*

The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions"—and that "[s]uch double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[127]

257.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[128] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned crypto asset—although some have suggested that the loans were made for free.[129] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[130]

258.    It appears that Alameda did post collateral to secure the loans of customer crypto assets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional

---

[127] *Id.*

[128] Molly White, *The FTX Collapse: The Latest Revelations (Part Three)*,: The FTX Files (Nov. 18, 2022), https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations.

[129] Paige Tortorelli & Kate Rooney, *Sam Bankman-Fried's Alameda Quietly Used FTX Customer Funds for Trading, Say Sources*, CNBC, https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (Nov. 14, 2022, 8:08 AM EST).

[130] For a more general discussion of the conflicts of interest inherent in these relationships, *see* Frances Coppola, *The FTX-Alameda Nexus*, Coppola Comment (Nov. 10, 2022), https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html.

and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

259.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens. (It is possible that it received these in a kind of bailout from FTX.) Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[131] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

## K.    FTX Aggressively and Deceptively Marketed its Platform

260.    These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency. These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

---

[131] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk, https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (Aug. 16, 2023, 5:56 PM EDT).

261.     FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

262.     FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' For example:

In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatantly stated when he claims,

*"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

Kevin O'Leary, another FTX brand ambassador, stated,

*"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

Given that FTX continually misappropriated customer assets and didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Sharks make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[:] Sam Bankman-Fried is an American. His parents are*

American compliance lawyers. There were no other [large] American exchanges to invest in if you wanted to invest in crypto as an infrastructure play."[132]

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

263.     Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

"Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[133]

264.     Mr. Ray's pleading contains a number of troubling findings, among them, (1) FTX did not have centralized control of its cash; (2) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group; (3) there was a lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis; (4) corporate funds were used to purchase homes and personal items for

---

[132] *Kevin O'Leary Says FTX Collapse Makes Him and Other Investors in the Crypto Exchange 'Look Like Idiots'*, Daily Hodl (Dec. 9, 2022), https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/.

[133] Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ¶¶ 5, *In re FTX Trading LTD*, No. 22-11068, (Bankr. D. Del. Nov. 17, 2022), ECF No. 24, https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf.

employees, and; (5) there was a lack of books and records and an absence of lasting records of decision-making.

265. It is hard to imagine that anyone who did business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

266. Furthermore, many customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

267. Thus, celebrated sports and entertainment franchises like Monumental Sports have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

268. In addition to the conduct of Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

269. In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

270. FTX's explanation for using stars like Tom Brady and Gisele Bunchden and sports and entertainment franchises like Monumental Sports was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in

the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken . . . . We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that . . . ."

271.    In other words, the FTX Group needed celebrities and well known sports and entertainment franchises like Monumental Sports to continue funneling investors into the FTX Ponzi scheme and to promote and substantially assist in the sale of unregistered securities, including the YBAs. Below are representative statements and advertisements Monumental Sports made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

272.    The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, including by all of the defendants in the FTX MDL, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

## L.    Monumental Sports' Role in the Fraud

273.    Like each group of defendants in the FTX MDL, Monumental Sports contributed both to the perpetration of the fraud and to the sale of unregistered securities in a vital way.

274.    Monumental Sports claims to be "America's leading sports & entertainment family," owning eight sports teams, six venues, a media platform, one philanthropy, and one brand.[134]

---

[134] https://monumentalsports.com/



BRANDS

275. In addition to its sports teams, Monumental Sports also owns the Capital One Arena (where its sports franchises play their home games). The Capital One Arena is the epicenter of sports and entertainment in the nation's capital, hosting hundreds of events each year in Washington, D.C.

276. Monumental Sports also owns the TV Network, NBC Sports Washington, which gives Monumental Sports full power over the distribution of their teams' content. Each year, millions of people worldwide tune into broadcasts of the Monumental Sports' teams games, and millions of people follow Monumental Sports and its teams' social media accounts.

277.     Monumental Sports is valued at an estimated $4.51 billion.[135] To maintain its success, Monumental Sports claims that it "stay[s] transparent, nimble, and always ready to take a calculated risk."[136]

### a) Monumental Sports Partnered with FTX to Promote Its Platform.

278.     In December 2021, FTX and Monumental Sports announced a multi-year partnership.

279.     As part of the deal, Monumental Sports announced that FTX would be "featured on the premium, concourse, and arena television networks, maximizing [Capital One] arena patrons' exposure to the FTX US Brand."[137]   In addition, FTX would be featured as the presenting partner for the "Big Block-Chain," an in-game and social media feature highlighting blocked shots by Monumental Sports' basketball teams or saves during Capitals hockey games. This allowed FTX's brand and logo to be promoted through in-game announcements, LWD takeovers, and social media.[138]

280.     FTX also became the first official cryptocurrency exchange and NFT (Non-Fungible Token) partner for Monumental Sports, meaning FTX's platform had exclusive rights to NFT drops by Monumental Sports' Washington Wizards and Capitals.

---

[135] https://www.forbes.com/sites/mikeozanian/2023/01/24/the-worlds-most-valuable-sports-empires-2023/?sh=132646c448e5&utm_source=ForbesMainTwitter&utm_campaign=socialflowForbesMainTwitter&utm_medium=social

[136] https://monumentalsports.com/who-we-are/

[137] https://news.bitcoin.com/ftx-us-partners-with-monumental-sports-entertainment-gets-exposure-to-4-new-sports-teams/

[138] Jones, Rory, *FTX Gets Wizards and Capitals NFT Rights in MSE Partnership*, Sports Media (December 21, 2021), https://www.sportspromedia.com/news/ftx-mse-washington-capitals-wizards-mystics-crypto-nft-platform-nhl-nba/



The Official Cryptocurrency Exchange and Non-Fungible Token
Partner of **Monumental Sports & Entertainment**

[139]

281.    In commenting on the collaboration, FTX US Vice President Avi Dabir explained that one of FTX's key goals was "to continue growing the awareness of digital assets, while also providing users of the FTX US platform with a unique experience . . . through this partnership, we are able to work alongside one of the leading organisations in professional sports to do just that."[140] Mr. Dabir went on to state that FTX was "excited to bring the world of crypto to Washington DC sports fans and provide dedicated fans with a one-of-a-king experience."[141]

282.    In exchange for those services, Monumental Sports received substantial compensation. According to an exhibit authenticated in SBF's criminal trial, FTX paid Monumental Sports $1,900,000 in connection with the partnership as of March 2022. After March 2022, Monumental Sports was due to receive an additional $969,000 in October 2022. Monumental Sports did not disclose the form or number of payments received under their agreement to the public when promoting FTX.

---

[139] *FTX gets Wizards and Capitals NFT rights in MSE partnership,* SPORTSPRO (Dec. 21, 2021), https://www.sportspromedia.com/news/ftx-mse-washington-capitals-wizards-mystics-crypto-nft-platform-nhl-nba/
[140] *Id.*
[141] *Id.*

283.    FTX's partnership with Monumental Sports was a critical step in legitimizing the exchange's claims of being a safe, secure, well-regulated, and compliant cryptocurrency exchange. Indeed, Mr. Dabir was quoted as saying that "FTX is very much focused on being, you know, the adult in the room, in terms of working with regulators and helping wherever we can to push the industry forward in the right way . . . **To be able to have a presence in D.C. in this manner goes hand-in-hand with our desire to work with everyone involved to make sure crypto is done properly**."[142] (emphasis added).

284.    Throughout the course of its partnership with FTX, Monumental Sports provided services in accordance with their agreements and their own financial interests. For example, Monumental Sports and its franchises promoted FTX through social media posts, sweepstakes, flyers on the seats at the Capital One arena, branding on their merchandise, placards and LED signs at the Capital One arena, and advertising on the arena television network, as well as during broadcasts and special event programming. Representative examples of Monumental Sports' teams' FTX promotions are below:

---

[142] https://www.coindesk.com/business/2021/12/20/ftx-us-scores-deal-with-owner-of-washington-wizards-capitals-in-bid-to-expand-dc-presence/



143



144

---

143 https://twitter.com/corndogchuck/status/1593744452161503233

144 https://twitter.com/HodlDogCrypto/status/1500149642033512453



145



146

[145]https://twitter.com/WashWizards/status/1491977204405878792; *see also* https://www.nba.com/wizards/washington-acquites-kristaps-porzingis-021022
[146] https://twitter.com/Capitals/status/1589265986993401856



147



148

---

147 https://twitter.com/Capitals/status/1588180630738591745

148 https://russianmachineneverbreaks.com/2022/12/09/caps-ftx-rip/

285.    FTX used its social media platform to promote its partnership with Monumental Sports.



286.    Throughout the course of their partnership, FTX's logo was showcased on Monumental Sports teams' merchandise, marketing announcements, and official social media pages, often while tagging FTX.

287.    Monumental Sports' promotions using FTX logo placements were visible to millions of people watching its professional sports teams' games, as well as those who attended sports and entertainment events at the Capital One Arena, those who viewed Monumental Sports' and its teams' online and social media content, or even those who saw fans wearing the FTX-branded merchandise in public.

288.    These promotions via logo placement and tagging implicitly promoted FTX (and by extension FTT and YBAs) as a mainstream, trustworthy brand and product.

---

[149] https://twitter.com/FTX_Official/status/1472943354392588299

289.    For example, on July 14, 2022, Monumental Sports' Washington Capitals tweeted the news that it had signed Dylan Strome to a one-year, $3.5million contract.  It its post, the Capitals tagged FTX's official account "FTX_Official" and included the FTX logo:



290.    The Washington Wizards' used its official Twitter page to tweet several images of its players along with the FTX logo, while also tagging FTX's official account "FTX_Official."

---

150 https://twitter.com/Capitals/status/1547713900539363328



151

151 https://twitter.com/WashWizards/status/1545051287057620995

291. Numerous examples of the persistent use of the FTX logo and tagging of FTX's official account can be seen on the teams' social media feeds, in addition to outside sources.

292. In turn, FTX, in addition to promoting joint products, regularly cheered on Monumental Sports-owned teams, creating a rapport and veneer of trustworthiness with Monumental Sports teams' fans by making it seem as if FTX shared Monumental Sports teams' fans' values. This ploy would not have been as effective were it not for Monumental Sports' parallel promotions of FTX. These return promotions by FTX also directly benefited Monumental Sports by leading FTX's own followers to Monumental Sports teams' content.

293. FTX further bolstered its reputation with Monumental Sports' fans by partnering with Monumental Sports teams to conduct giveaways to win Bitcoin and NFTs.

294. For example, in early 2022, Monumental Sports and FTX announced the FTX Impact Sweepstakes, which offered Washington Capitals and Wizards fans a chance to win more than $40,000 in Bitcoin while also raising for charity:



152

---

[152] https://www.nba.com/wizards/monumental-sports-entertainment-debuts-fan-sweepstakes-powered-blockchain-presented-ftx

295.    To enter the sweepstakes, fans were required to download the FTX application, register and enter the promotional codes "CAPS22" or "WIZ22."  Fans then received their sweepstakes entry via and NFT sent directly to their digital NFT wallet.[153] The amount of the prize funds would be determined based on the number of in-game saves and blocks by Capitals and Wizards players at home and away games. The total prize pool would then be split evenly–half to the sweepstakes winner and half donated to the team-selected community organization.  The sweepstakes winners would be paid entirely in Bitcoin.

296.    The promotion was intended to induce Monumental Sports' fans, followers, and supporters to use FTX's platform.  Indeed, Monumental Sports' President of Business Operations and Chief Commercial Officer stated that "[t]his kind of kind of fan engagement opportunity is what is so special about a partner like FTX US – being able to innovate around fan excitement, blockchain technology and doing good in the community is a unique offering which we know Caps and Wizards fans are going to truly appreciate . . . We're excited to merge for our fans the action on the ice and court with the action happening on the FTX app."[154]

297.    FTX's Avi Dabir also emphasized FTX's excitement in partnering with Monumental Sports "on a first of its kind fan experience" that would "bring together NFTs, exciting moments in the game, a chance to win crypto and raise money for local charities."[155]

298.    During the course of their partnership, Monumental Sports and FTX also launched exclusive NFT collections.

---

[153] *Id.*

[154] *Id.*

[155] *Id.*

299.    One such collection was the "W" Series by the Washington Capitals.  Fans could visit FTX's website and platform to obtain special NFTs that could be redeemed for a team signed jersey.



[156]

300.    As another example, FTX partnered with the Washington Wizards to unveil the Bloom City NFT Collection, which featured five unique works of art inspired by Washington D.C.'s iconic cherry blossoms.  The NFT collection also included the opportunity to win experiences, such as a trip to the NBA Global Games in Japan in 2022.[157]

---

[156] https://twitter.com/FTX_NFTs/status/1513548065860427781

[157] https://www.nba.com/wizards/wizards-celebrate-cherry-blossom-night-march-29



<sup>158</sup>

301.    FTX and Monumental Sports' Washington Capitals also released two NFT Collections, the Blue W Series and Crypto Canines.  Those who purchased an NFT from the Blue W Series Collection would receive a Capitals team signed jersey.  The Crypto Canines collection included 2,022 NFTs featuring dogs and a cat in the Capitals jersey.[159]

302.    The NFT collaborations and fan giveaways sponsored by FTX continued until FTX declared bankruptcy, and were repeatedly promoted on social media, sometimes multiple times a day. Even after FTX announced that it would file for bankruptcy protection, Monumental Sports continued to allow FTX's logo to appear on giveaway items that it distributed to its fans.[160]

303.    At least one goal of the NFT collaborations and sweepstakes was to increase traffic to and deposits in FTX and associated apps. In order to bid on or otherwise "mint" NFTs, users were required to sign up for FTX and deposit money into their accounts sufficient to cover any

---

[158] *Id.*

[159] https://www.nhl.com/capitals/news/capitals-and-ftx-launch-blue-w-series-and-crypto-canines-nft-collectio-332732670

[160] https://www.washingtonpost.com/sports/2022/11/17/wizards-ftx-giveaway-capitals-mystics/

bids or transaction fees.[161]  Any money not actually used would stay in customers' FTX accounts until withdrawn.

304.    NFTs purchased or otherwise obtained through FTX themselves effectively remained in customers' FTX wallets. Once users had signed up for FTX to buy or access the NFTs and associated benefits, they were more likely to invest in FTX, FTT, and/or YBAs for other purposes. Thus, Monumental Sports' promotion of the collaborative NFTs inherently promoted FTX, FTT, and/or YBAs.

305.    On November 11, 2022, FTX declared bankruptcy.  Hours after FTX announced its bankruptcy, Monumental Sports' Washington Capitals posted its final tweet mentioning FTX, in which the team promoted the "Rock the Retro" concert presented by FTX.[162]  That tweet has now been deleted.  That night, FTX's logo appeared on the digital board advertisements at the Capital One Arena.[163]

306.    Shortly thereafter, Monumental Sports began to distance itself from the disgraced cryptocurrency exchange.  Among other things, Monumental Sports removed the placard featuring FTX's logo from the Capital One Arena.  The placard was replaced by a blank spot.

---

[161] *See, e.g.,* Filyo, Jackson, *Monumental Sports & Entertainment Debuts a Fan Sweepstakes Powered by the Blockchain, Presented by FTX* (February 3, 2022), https://www.nba.com/wizards/monumental-sports-entertainment-debuts-fan-sweepstakes-powered-blockchain-presented-ftx

[162] Hasset, Peter, *Capital One Arena Removes FTX Sign*, RMNB, (December 9, 2022), https://russianmachineneverbreaks.com/2022/12/09/caps-ftx-rip/

[163] *Id.*; *see also* Oland, Ian, *Capital Announce Act for 'Rock the Retro Concert' at 930 Club, Reveal Design for T-shirt Giveaway*, RMNB (November 2, 2022), https://russianmachineneverbreaks.com/2022/11/02/capital-announce-act-for-rock-the-retro-concert-at-930-club-reveal-design-of-t-shirt-giveaway/



164

307.     Monumental Sports halted its promotions of FTX and removed FTX's logo from its digital board advertisements at the Capital One Arena, marking the end of its partnership with the cryptocurrency exchange.  Shortly after November 11, 2022, Monumental Sports announced that it had "taken the appropriate steps to remove FTX as much as possible from our promotional platforms . . . while [FTX's] logo will still appear on certain pre-produced giveaway items that we will continue to distribute out of fairness to our fans, they will not have a presence with our teams in light of the recent news surrounding the company."[165]

308.     Notably, Monumental Sports stated it would continue with four fan giveaways that were sponsored by FTX and had already been produced, which were distributed to fans.[166] These giveaways featured FTX-sponsored and/or branded merchandise offered to fans November 18, December 10, December 27, 2022 and March 24, 2023.[167]

---

[164] https://russianmachineneverbreaks.com/2022/12/09/caps-ftx-rip/

[165] *Id.*

[166] https://www.washingtonpost.com/sports/2022/11/17/wizards-ftx-giveaway-capitals-mystics/

[167] https://www.nba.com/wizards/news/washington-unveils-themes-and-promotional-schedule-for-wizards-25th-anniversary-season

309.    The first of these post-bankruptcy promotional giveaways were distributed to fans at the Washington Wizards' game against the Miami Heat on November 18, 2022.  The "first 10,000 fans [who attended the game at the Capital One Arena] received a hat designed by Wizards alumnus Antawn Jamison presented by FTX," which featured FTX's logo.[168]



[169]

[168] *Id.*

[169] *Id.*



170

---

[170] *See*
https://www.ebay.com/itm/325865304923?_trkparms=amclksrc%3DITM%26aid%3D1110006%
26algo%3DHOMESPLICE.SIM%26ao%3D1%26asc%3D20231107084023%26meid%3D1c9ea
d5c07aa4adbadc61b5300187a0c%26pid%3D101875%26rk%3D2%26rkt%3D4%26sd%3D1560
00934427%26itm%3D325865304923%26pmt%3D1%26noa%3D0%26pg%3D4429486%26algv
%3DSimplAMLv11WebTrimmedV3MskuWithLambda85KnnRecallV1V2V4ItemNrtInQueryA
ndCassiniVisualRankerAndBertRecallWithVMEV3CPCAutoWithCassiniEmbRecall&_trksid=p
4429486.c101875.m1851&itmprp=cksum%3A3258653049231c9ead5c07aa4adbadc61b5300187
a0c%7Cenc%3AAQAIAAABcHD%252FO%252BVoFoPPIoZ2g0kOZxWd85mWuIHekSp3qag
7zFfwObZeQoitzE%252FDCfcejfO%252BzOLmzZmy11RrgWpA56KM9DpasK%252BGtGY
wCFvgaK6ijP5AqShEUhT8f2oX6hvndJ3G0oWH8DD1DlBWseQltpxcSDW2Uu52NrseaxeINp
srDP6vx7ny%252BkPKauMa3yeSanWiigD63f%252Fc9s504sfoEaj6TSiLIT6s8t6rgtNOydCMn
wZruKJvb91vpC6skkKTsWeItUh%252ByXdOvNgKEbrKdReShP0eK95kNYfb4TOTYOeJTw
Kzb5Wio705n3dJ6E7o4W%252BpL8kWG9MyF6we9JK3A1mOdHqKXCln1H7vNXZ5ydpi2b
QhPdJnl60XAdM9QLuKYF0LCCKOpSR7hov7TFwX%252FFromrmH9ODzEO3hbjfBQ1HnL
OPDoYwFGSlLSDwB6jKyxiJZcjSNsnBT9J%252BemaJ5qFf2lW4Z45i3XAt2kPOAHfYN1AU
p%7Campid%3APL_CLK%7Cclp%3A4429486&itmmeta=01HQ6D8FS1SGM3FNC2A0AKW
GDB

310.    On or shortly after November 11, 2022, Monumental Sports and its franchises deleted FTX-related content from its website.[171] While several official social media feeds for Monumental Sports and its teams still contain FTX promotions, Plaintiffs are uncertain whether individuals related to Monumental Sports or FTX may have deleted relevant information, as other celebrity promoters of FTX have done. As a result, discovery is likely to uncover many additional, actionable statements.

311.    Furthermore, certain FTX resources, like its podcast database, are no longer publicly accessible. These may reveal further actionable statements once obtained.

312.    The overarching objective of the partnership was for Monumental Sports, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

313.    As Monumental Sports expected and understood when entering their partnerships with FTX, their promotions would be widely viewed across the world, including in the U.S. and in Florida, where FTX had its domestic home office.

314.    Monumental Sports also knew and intended that their promotions would be disseminated to consumers in Florida and elsewhere, not just on their own and FTX's social media outlets, but that said promotions would also be linked, published, and reposted across innumerable media outlets on the internet and elsewhere.

---

[171] By way of example, the Washington Wizards appear to have deleted a social media post from March 4, 2022 telling fans that "For every block we record our partner @FTX_Official is giving away bitcoin to @UrbanAlliance and a lucky fan." *See Id.*

b) **Monumental Sports Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

315.   Monumental Sports and FTX had a symbiotic relationship. The partnership provided Monumental Sports with an opportunity to embrace "next-generation engagement to increase brand awareness" for its sports teams.[172]

316.   Monumental Sports' President of Business Operations & Chief Commercial Officer, Jim Van Stone, explained that Monumental Sports "had so much synergy with FTX because the purpose of this partnership is really about education and engaging our community."[173] When discussing plans to integrate NFTs into fan engagement initiatives (like loyalty programs and digital commemorative tickets) through its partnership with FTX, Mr. Van Stone stated "whether you describe it as NFTs or blockchain programs, I think ticketing is going in that direction . . . Certainly, collectible tickets are, I think, a no brainer."[174]

317.   Similarly, Washington Wizards' Senior Vice President of Marketing, Rebecca Winn, commented that the collaboration with FTX on the NFT collection "has been great. The imagination and the technology on this project are just the first step as we continue to create unique collections this season and beyond."[175]

318.   Monumental Sports had every incentive to be an effective promoter of FTX to continue the sponsorship relationship and continue receiving payment for its services. Given the

---

[172] https://news.bitcoin.com/ftx-us-partners-with-monumental-sports-entertainment-gets-exposure-to-4-new-sports-teams/

[173] https://www.sportsbusinessjournal.com/Daily/Morning-Buzz/2021/12/20/Monumental.aspx

[174] https://www.sportsbusinessjournal.com/Daily/Issues/2021/12/20/Technology/crypto-firm-ftx-is-new-exclusive-nft-partner-for-the-washington-wizards-capitals-and-mystics.aspx

[175] https://www.nba.com/wizards/wizards-ftx-us-partner-unveil-cherry-blossom-inspired-nfts

huge expenses associated with running multiple sports franchises, particularly in light of the devastating effects that the COVID-19 pandemic on the sports and entertainment industries.

319.    FTX's sponsorship was especially valuable for Monumental Sports because the promotions went both ways, with each promoting the other. Monumental Sports was "thrilled" to partner with FTX and "further engage its fanbase with the world of NFTs."[176]

320.    The partnership was also invaluable for FTX.  FTX's platform gained massive exposure and credibility with Monumental Sports teams' fans in Washington D.C. and around the nation.  FTX targeted Monumental Sports because the organization "regularly gathers the world's top leaders, advocates, and influencers at its games and events in the heart of a global city and in the nation's capital."[177]  The partnership also gave FTX and opportunity to "become more visible among regulators."[178]

321.    The more people Monumental Sports drove to use FTX generally, the more lucrative their NFT projects were likely to be, as people already invested in FTX and NFTs would be more likely to buy Monumental Sports-FTX NFTs.

c) **The Promotions Were Deceptive and Unlawful.**

322.    Monumental Sports' promotions solicited or assisted FTX in soliciting investments in unregistered securities by encouraging viewers to invest in FTX, FTT, and/or YBAs.

323.    Monumental Sports did not disclose the form or amount of their compensation by FTX for promoting the sale of FTX securities.

---

[176] https://www.nhl.com/capitals/news/capitals-and-ftx-launch-blue-w-series-and-crypto-canines-nft-collectio-332732670

[177] https://news.bitcoin.com/ftx-us-partners-with-monumental-sports-entertainment-gets-exposure-to-4-new-sports-teams/

[178] https://www.coindesk.com/business/2021/12/20/ftx-us-scores-deal-with-owner-of-washington-wizards-capitals-in-bid-to-expand-dc-presence/

324.    Monumental Sports and its agents made deceptive statements and/or allowed their name and likeness to be used in connection with FTX's deceptive statements in promotions of FTX and its products, as detailed above. These deceptive statements and other promotions conveyed the messages that everyone—regardless of socioeconomic status—would benefit from using FTX and that FTX was a safe place to invest and store assets.

### d) Monumental Sports Knew or Should Have Known It Was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that They Were Aiding and Abetting FTX Group's Fraud and/or Conversion.

325.    Given Monumental Sports' substantial investment experience and vast resources to obtain outside advisors, they knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that they were aiding and abetting FTX Group's fraud and/or conversion, especially to millions of their followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off.

326.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[179] In addition, CME Group CEO Terry Duffy allegedly told SBF that he was "an absolute fraud" upon having an initial conversation with him.[180]

---

[179] Laura Davison & Sophie Alexander, *Sam Bankman-Fried's Red Flags Were Seen in All Corners of His Empire*, Moneyweb (Dec. 1, 2022, 6:39 AM), https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/.

[180] Stephanie Landsman, *CME Group CEO Calls Bankman-Fried 'an Absolute Fraud,' Says He Saw Trouble Months Before FTX collapse*, CNBC (Nov. 22, 2022, 8:57 PM EST) https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html.

e) **The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

327. Monumental Sports' promotions were published on public social media accounts and their website, appeared at sporting and entertainment events, and aired on local and national television broadcasts, among other places. They were accessible to plaintiffs nationwide, including in Florida.

## M. Material Ties to Florida

328. The connections to Florida in this consolidated case are numerous.

329. During the course of Monumental Sports' partnership with FTX, Florida's professional sports teams and fans visited the Capital One Arena on multiple occasions and were exposed to FTX's branding, signage, TV broadcasts, and other promotions described above. For example, the Washington Wizards played the Orlando Magic in the Capital One Arena on January 12, 2022 and March 30, 2022. The Wizards also played the Miami Heat in the Capital One Arena on February 7, 2022. The Washington Capitals hosted games against the Florida Panthers in the Capital One Arena on May 7th, 9th, and 13th, 2022. Monumental Sports' Washington Wizards and Capitals also played multiple games in Florida during the 2022 season, including games in Orlando, Florida (on January 9, 2022) and Sunrise, Florida (on May 5 and 11, 2022).

330. Upon information and belief, Monumental Sports worked closely with Avi Dabir, Vice President of Business Development at FTX US who was located in Miami, Florida, in connection with the partnership. Monumental Sports'

331. In addition, according to the Declaration of Dan Friedberg, attached as Exhibit A, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced the move of its Domestic headquarters to Brickell in late 2022. *Id.* ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business

Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

332. Mr. Dabir, from the Miami office, focused on formulating and executing FTX's important partnerships. *Id.* ¶ 21. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.* ¶ 23.

333. It was Mr. Dabir's idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.* ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and acquire the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, which included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

334. Mr. Dabir deserves much of the credit for the collaboration with Mr. David that resulted in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.* ¶ 24. Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

335. Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast The Joe Pomp Show, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as Exhibit B.

336.    Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.* at 2–3.

337.    Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.* at 4.

338.    Mr. Dabir went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.* at 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explained that MDL Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as MDL Defendant Curry. *Id.*

339.    In addition to coordinating the promoter campaigns from Miami, Florida, FTX announced it was moving its official U.S. headquarters from Chicago to Miami in 2022.[181] This move happened before FTX declared bankruptcy.

340.    The promotional campaigns came from the brain trust of FTX in Miami, but many of the promotions also took place in Florida as a cryptocurrency hub.

## CLASS ACTION ALLEGATIONS

341.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

342.    Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, and Huang seek to represent the following Classes:

(1) **International Class:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

(2) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or held

---

[181] Cheyenne Ligon, *Crypto Exchange FTX Is Moving Its US Headquarters From Chicago to Miami*, Coindesk (May 11, 2023, 2:51 PM EDT), https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/.

131

legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

**In the Alternative:**

**(3) Florida Subclass:** All persons or entities in the State of Florida who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

**(4) California Subclass:** All persons or entities in the State of California who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

**(5) Oklahoma Subclass:** All persons or entities in the State of Oklahoma who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

Excluded from the Classes are Monumental Sports and its officers, directors, affiliates, legal representatives, and employees; the MDL Defendants and their officers, directors, affiliates, legal representatives, and employees; the FTX Group and their officers, directors, affiliates, legal representatives, and employees; any governmental entities, any judge, justice, or judicial officers presiding over this matter and members of their immediate family and judicial staff.

343. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether

such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which Monumental Sports materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

## B. Numerosity

344. The Classes are comprised of thousands, if not millions, of consumers globally to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

## C. Commonality/Predominance

345. This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b) whether Monumental Sports agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c) whether Monumental Sports had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d) whether the FTX Platform, YBAs and/or FTT were unregistered securities under federal, Florida, California, or other law;

(e) whether Monumental Sports' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs and/or FTT violated the provisions of applicable securities law;

(f) the type and measure of damages suffered by Plaintiffs and the Class;

(g) whether Monumental Sports' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes;

(h) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(i) whether Plaintiffs and Class members are entitled to injunctive relief;

(j) whether Plaintiffs and Class members are entitled to declaratory relief; and

(k) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other appropriate legal or equitable remedies as a result of Monumental Sports' conduct.

## D. Typicality

346. Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's FTX Platform, YBAs and/or FTT because of Monumental Sports' actions and/or participation in the offering and sale of these unregistered securities, that Monumental Sports aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that Monumental Sports agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims

and legal theories on behalf of themselves and all such members. Further, there are no defenses available to Monumental Sports that are unique to Plaintiffs.

**E.     Adequacy of Representation**

347.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.     Requirements of Fed. R. Civ. P. 23(b)(3)**

348.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Monumental Sports (1) in marketing, offering, and/or selling the FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

349.    The common course of conduct by Monumental Sports includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or their

aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

350. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

351. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G. Superiority

352. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H.      Requirements of Fed. R. Civ. P. 23(b)(2)

353.     Monumental Sports has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

354.     Monumental Sports has acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and/or omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I.      Requirements of Fed. R. Civ. P. 23(c)(4)

355.     As it is clear that one of the predominant issues regarding Monumental Sports' liability is whether the FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

356.     As it is clear that another predominant issue regarding Monumental Sports' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.     Nature of Notice to the Proposed Class.**

357.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**CAUSES OF ACTION**

**COUNT ONE**

**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Individually and on behalf of the Classes)**

358.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

359.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

360.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale," making them "jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

361.    The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs are each a security pursuant to Fla. Stat. § 517.021(22)(a).

362.    The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs were not:

a.      exempt from registration under Fla. Stat. § 517.051;

b.      a federal covered security;

c.      registered with the Office of Financial Regulations (OFR); or

d.      sold in a transaction exempt under Fla. Stat. § 517.061.

363.    The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs.

364.    Defendant is an agent of the FTX Entities pursuant to Fla. Stat. § 517.211.

365.    The FTX Entities, with the Defendant's material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, the Defendant violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

### For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq.* (Plaintiffs Individually and on behalf of the Classes)

366.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

367.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

368.    Plaintiffs and Class members are consumers as defined by Florida Statutes Section 501.203. Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

369.    Florida Statutes Section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

370.    The Defendant's unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead—and have materially misled—consumers acting reasonably in the circumstances.

371.    The Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

372.    Plaintiffs and consumers in the Classes have been aggrieved by the Defendant's unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the FTX Platform and in the amount of their lost investments.

373.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of the Defendant, as more fully described herein.

374.    Pursuant to Florida Statutes Sections 501.211(2) and 501.2105, Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees, and costs.

375.    The Defendant still utilizes many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Defendant continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory and/or injunctive relief to put an end to the Defendant's unfair and deceptive scheme.

## COUNT THREE

### Civil Conspiracy
### (Plaintiffs Individually and on behalf of the Classes)

376.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

377.    The FTX Entities and the Defendant made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to promote false confidence in and to drive consumers to invest in what was ultimately a Ponzi scheme. This misled customers with the false impression that any cryptocurrency assets held on the FTX Platform were safe and were not being invested in unregistered securities.

378.    The FTX Entities entered into one or more agreements with the Defendant with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in the YBAs and/or use the FTX Platform.

379.    The Defendant engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

380.    The Defendant's conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, the Defendant had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

381.    The Defendant's conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## COUNT FOUR

### Aiding and Abetting Fraud

**(Plaintiffs Individually and on behalf of the Classes, or in the alternative, Plaintiffs Orr, Cabo, Hendersen, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, and Huang Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Shetty, and Chernyavsky on behalf of the Florida Subclasses)**

382.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 as if fully set forth herein.

383.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendant actively joined these efforts by misleading customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

384.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

385.    Defendant participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendant still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

386.    Defendant substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

387.   Plaintiffs and the Class members suffered damages as a direct and proximate result of Defendant aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT FIVE

### Aiding and Abetting Conversion

**(Plaintiffs Individually and on behalf of the Classes, or in the alternative, Plaintiffs Orr, Cabo, Hendersen, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, and Huang Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Shetty, and Chernyavsky on behalf of the Florida Subclasses)**

388.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 as if fully set forth herein.

389.   The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money, the amount that each plaintiff had in their FTX account that they could not withdraw.

390.   Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

391.   Defendant, based on its knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

392.   Notwithstanding this knowledge, and by reason of the conduct described herein, Defendant substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

393.   Defendant's actions, in combination with the actions of FTX and MDL Defendants, are a proximate cause of actual damages to Plaintiffs and class members. Together with the MDL

Defendants, Defendant is jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT SIX

### Declaratory Judgment
### (Federal Declaratory Judgment Act)
### (Plaintiffs Individually and on behalf of the Classes)

394.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 as if fully set forth herein.

395.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse, and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

396.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

397.     Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendant's misrepresentations and omissions regarding the FTX Platform as further described hereinabove.

398.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the FTX Platform does not work as represented, and Defendant was paid exorbitant sums of money to peddle FTX to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

399.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendant illegally solicited their purchases from Plaintiff and the Class.

400.    Plaintiff and the Class seek an order declaring that the YBAs were securities, that the FTX Platform did not work as represented, and that Defendant was paid exorbitant sums of money to peddle FTX to the nation.

## COUNT SEVEN

### Unjust Enrichment
### (Plaintiffs Individually and on behalf of the Classes)

401.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs above as if fully set forth herein.

402.    Plaintiffs directly conferred a monetary benefit on the Defendant in the form of investment funds provided to the Defendants from FTX customer funds.

403.    Plaintiffs also conferred a monetary benefit on the Defendant because it accepted funds that it knew, or should have known, were FTX consumer deposits.

404.    With Plaintiffs' money, the Defendant enriched itself.

405.    The Defendant has knowledge of the benefits that Plaintiffs conferred on it.

406.    Under principles of equity and good conscience, the Defendant should not be permitted to retain the funds and assets it received as a result of its misappropriation of Plaintiffs' assets, because it knowingly concealed material information from Plaintiffs regarding FTX's conversion of the funds, which directly resulted in the loss of Plaintiffs' funds and assets that were supposed to have been stored on the exchange.

407.    As a result of the Defendant's conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

408.     To the extent that Plaintiffs have no other adequate remedy at law, Plaintiffs seek restitution of all funds and assets that the Defendant has unjustly received as a result of its conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

---

**THE CALIFORNIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

**COUNT EIGHT**

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, *et seq.***
**(In the alternative, Plaintiffs Cabo and Henderson Individually and on behalf of the California Subclasses)**

409.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

410.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code § 17500.

411.     Defendant has committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct, and unlawful conduct. Defendant's conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

412.     The conduct of Defendant as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

413. Defendant's conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendant should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT NINE

### Violations of the California Securities Law
### Cal. Corp. Code §§ 25110 *et seq.*
### (In the alternative, Plaintiffs Cabo and Henderson individually and on behalf of the California Subclasses)

414. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

415. Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL Section 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Additionally, Section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

416. Defendant materially assisted and/or personally participated with the FTX Group in the offering and selling of the FTX Platform, the YBAs and/or FTT Tokens Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of Section 25503.[52]

---

[52] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to Section 255030 does not require proof that Defendant intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendant's knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the FTX Platform, the YBAs and/or FTT Tokens.

417.     Moreover, CSL Section 25210(b) provides: "No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents."

418.     Defendant breached Section 25210(b) by encouraging the FTX Group to offer and sell the FTX Platform, YBAs and/or FTT Tokens securities despite the fact that such securities were not qualified under the CSL.

419.     Additionally, CSL Section 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

420.     Together with the MDL Defendants, Defendant is accordingly jointly and severally liable to Plaintiffs for recessionary damages under Section § 25504.1.

421.     Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with Section § 25503.

## COUNT TEN

### Aiding and Abetting Fraud
### (In the alternative, Plaintiffs Cabo and Henderson Individually and on behalf of the California Subclasses)

422.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 as if fully set forth herein.

423.     The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendant misled customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe

and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

424.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

425.    Defendant participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendant still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

426.    Defendant substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme.

427.    Plaintiffs and the Class members suffered damages as a direct and proximate result of Defendant's aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT ELEVEN

### Aiding and Abetting Conversion
### (In the alternative, Plaintiffs Cabo and Henderson Individually and on behalf of the California Subclasses)

428.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 as if fully set forth herein.

429.    The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully

interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money, the amount that each plaintiff had in their FTX account that they could not withdraw.

430.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

431.    Defendant, based on its knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

432.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendant substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

433.    Defendant's actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Together with the MDL Defendants, Defendant is jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT TWELVE

### Civil Conspiracy
### (In the alternative, Plaintiffs Cabo and Henderson Individually and on behalf of the California Subclasses)

434.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

435.    The FTX Group and Defendant made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the FTX Platform were

safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendant knew these statements to be false.

436. The FTX Group entered into one or more agreements with Defendant with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs, FTT and/or use the FTX Platform. Defendant stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

437. Defendant engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

438. Defendant's conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, Defendant had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above, and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, Defendant knew that the material misrepresentations and omissions relating to the safety of the FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

439. Defendant's conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

| IN THE ALTERNATIVE, THE OKLAHOMA CLAIMS |
| --- |

## COUNT THIRTEEN

**Violations of the Oklahoma Consumer Protection Act**
**Okla. Stat. Ann. tit. 15, § 751 *et seq*.**
**(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)**

440. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

441. This cause of action is brought pursuant to the Oklahoma Consumer Protection Act ("OCPA"), section 751 *et seq*.

442. The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in section 752." § 753(20).

443. Plaintiffs and Class members are persons as defined by section 752(1). Defendant is engaged in a "consumer transaction" as defined by section 752(2), and as described more fully herein.

444. Defendant has violated the OCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

445. Plaintiffs and consumers in the Class have been aggrieved by Defendant's unfair and deceptive practices in the amount of their lost investments.

446. The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendant's, as more fully described herein.

447. Pursuant to section 761.1 of the OCPA, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT FOURTEEN

### Violations of the Oklahoma Uniform Securities Act of 1980
### Okla. Stat. Tit. 71, §§ 1-101 *et seq*.
### (In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)

448.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 above, as if fully set forth herein.

449.    71 Section 1-301 of the Oklahoma Securities Act ("OSA") makes it unlawful to sell a security in Oklahoma unless the security is registered, exempted, or the security is a covered security as defined in the act.

450.    The FTX Platform, YBAs and/or FTT Tokens are each a security pursuant to 71 Okla. Stat. § 1-102(32), as described more fully herein.

451.    As a result of these actions, Defendant violated section 1-102(32) and are liable to Plaintiffs pursuant to section 1-509 for both primary and secondary violations of Oklahoma securities law, as described more fully hereinabove.

## COUNT FIFTEEN

### Aiding and Abetting Fraud

### (In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)

452.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–357 as if fully set forth herein.

453.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendant misled customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe

and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

454.     Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

455.     Defendant participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendant still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

456.     Defendant substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

457.     Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendant aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a)  Certifying the Class as requested herein;

b)  Awarding actual, direct and compensatory damages;

c)  Awarding restitution and disgorgement of revenues;

d)  Awarding declaratory relief as permitted by law or equity, including declaring the Defendant's practices as set forth herein to be unlawful;

e) Awarding injunctive relief as permitted by law or equity, including enjoining the Defendant from continuing those unlawful practices as set forth herein, and directing the Defendant to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f) Awarding statutory, punitive, and multiple damages, as appropriate;

g) Awarding attorneys' fees and costs; and

h) Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: March 8, 2024                    Respectfully submitted,

|  | **By: _/s/ Benjamin P. Solomon-Schwartz_** |
|---|---|
|  | Benjamin P. Solomon-Schwartz |
|  | USDC Bar No. D00463 |
|  | **BOIES SCHILLER FLEXNER LLP** |
|  | 1401 New York Avenue, N.W. |
|  | Washington, DC 20005 |
|  | Office: 202-237-2727 |
|  | Bsolomon-schwartz@bsfllp.com |
|  |  |
|  | *Co-Counsel for Plaintiffs and the Class* |
|  | Adam M. Moskowitz (*pro hac vice* forthcoming) |
|  | Florida Bar No. 984280 |
|  | Joseph M. Kaye (*pro hac vice* forthcoming) |
|  | Florida Bar No. 117520 |
|  | **THE MOSKOWITZ LAW FIRM, PLLC** |
|  | 2 Alhambra Plaza, Suite 601 |
|  | Coral Gables, FL 33134 |
|  | Telephone: (305) 740-1423 |
|  | adam@moskowitz-law.com |
|  | joseph@moskowitz-law.com |
|  | service@moskowitz-law.com |
|  |  |
|  | *Co-Counsel for Plaintiffs and the Class* |

|  | José M. Ferrer (*pro hac vice* forthcoming)<br>Florida Bar No. 173746<br>**MARK MIGDAL & HAYDEN**<br>Brickell City Tower<br>80 SE 8th Street, Suite 1999<br>Miami, FL 33130<br>jose@markmigdal.com<br><br>*Co-Counsel for Plaintiffs and the Class* |
|---|---|